No. 26-2638

# In the United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

KIMBERLEY WOODRUFF; et al.,
*Plaintiffs-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:21-cv-02155-YGR (The Hon. Yvonne Gonzalez Rogers)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD VOLUME II OF VII

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94602
(415) 692-0772

MATTHEW W.H. WESSLER
ALISA C. PHILO
GUPTA WESSLER LLP
1400 16th Street NW, Suite 225
Washington, DC 20036
(202) 888-1741
*matthew@guptawessler.com*

October 28, 2026

*Counsel for Plaintiffs-Appellants*

*(Additional counsel listed on inside cover)*

FRANCIS A. BOTTINI, JR.
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
(858) 914-2001

THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

DAVID A. STRAITE
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 993-1000

LESLEY WEAVER
ANNE K. DAVIS
STRANCH, JENNINGS & GARVEY, PLLC
1111 Broadway, Suite 03-130
Oakland, CA 94607
(341) 217-0550

BRIAN DANITZ
NANCI NISHIMURA
COTCHETT PITRE & MCCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

# Attachment B

**ATTACHMENT B**

**PRITZKER LEVINE ENTRIES FOR TIME AND EXPENSE AUDITING TASKS INCLUDED IN EXHIBIT 7 TO SOMVICHIAN DECLARATION (ECF 787-9)**

| Line # | Date | Timekeeper | Category | Detail | Rate | Time | Total Amount |
|---|---|---|---|---|---|---|---|
| 116 | 08/11/2021 | Elizabeth Pritzker | (1) Case Management | Further revise time and expense protocol/reporting form re same; circulate same to PEC | $1,200.00 | 1.20 | $1,440.00 |
| 215 | 09/15/2021 | Heather Haggarty | (1) Case Management | Review time and expense reports provided by co-counsel. Confer via telephone and email with E. Pritzker re: timekeeping process. Review sample tracking reports. Confer via email with co-counsel re: time submissions. | $300.00 | 0.50 | $150.00 |
| 242 | 09/24/2021 | Heather Haggarty | (1) Case Management | Continue drafting time and expense master tracking. Input firm submissions for Inception through July and August 2021. Confer via email with co-counsel firms re: revising submission for clarity and submitting supporting documentation. Prepare Pritzker Levine time and expense reports. | $300.00 | 3.50 | $1,050.00 |
| 431 | 12/16/2021 | Heather Haggarty | (1) Case Management | Review and document reports submitted by Cotchett Pitre; confirm receipt with Cotchett Pitre via email with N. Nishimura and P. Luc at Cotchett. Prepare PL November 2021 time and expense reports. | $300.00 | 1.00 | $300.00 |
| 1363 | 05/18/2022 | Heather Haggarty | (1) Case Management | Review submission fromco-counsel. Audit time and expense reporting and confer via email with co-counsel re. same. | $300.00 | 0.30 | $90.00 |
| 1909 | 09/01/2022 | Elizabeth Pritzker | (1) Case Management | Draft correspondence to co-counsel re. time and expense reporting requirements and audits of same. | $1,200.00 | 1.00 | $1,200.00 |
| 1924 | 09/06/2022 | Elizabeth Pritzker | (1) Case Management | Draft letter to co-counsel (L. Weaver of Bleichmar Fonti & Auld) re time and expenses. | $1,200.00 | 0.50 | $600.00 |
| 1925 | 09/06/2022 | Elizabeth Pritzker | (1) Case Management | Draft letter to co-counsel (F. Bottini, Bottini & Bottini) re time and expenses. | $1,200.00 | 0.50 | $600.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2589 | 12/19/2022 | Heather Haggarty | (1) Case Management | Update all P&L time and expense submissions from March 2022 to present. | $300.00 | 0.80 | $240.00 |
| 2840 | 01/30/2023 | Joanna Dowaliby | (1) Case Management | Monthly Time and Expense Report January 2023 | $295.00 | 1.00 | $295.00 |
| 3038 | 02/28/2023 | Joanna Dowaliby | (1) Case Management | Monthly Time and Expense Report February 2023 | $295.00 | 1.00 | $295.00 |
| 3087 | 03/06/2023 | Elizabeth Pritzker | (1) Case Management | Analyze PEC time and expense reports; correspondence with PEC members re same. | $1,200.00 | 1.00 | $1,200.00 |
| 3328 | 03/31/2023 | Joanna Dowaliby | (1) Case Management | Monthly Time and Expense Report March 2023 | $295.00 | 1.00 | $295.00 |
| 3337 | 04/03/2023 | Heather Haggarty | (1) Case Management | Review co-counsel time and expense submission emails. Confer with J. Dowaliby re: submissions. Email S. Banks (DiCello) re: submissions. | $300.00 | 0.50 | $150.00 |
| 4982 | 06/11/2024 | Elizabeth Pritzker | (1) Case Management | Analyze May monthly time and expense records for PEC firms; confer J Dowaliby re audit of same. | $1,200.00 | 0.80 | $960.00 |
| 4983 | 06/11/2024 | Joanna Dowaliby | (1) Case Management | At request of lead counsel, revise tracking sheet with co-counsel time and expenses for past 8 months as cross-check/audit. Emails from/to E. Pritzker regarding same. | $295.00 | 2.00 | $590.00 |
| 5027 | 06/28/2024 | Elizabeth Pritzker | (1) Case Management | Analyze/audit PEC time and expense records; confer J Dowaliby re audit analysis. | $1,200.00 | 2.00 | $2,400.00 |
| 5149 | 08/09/2024 | Elizabeth Pritzker | (1) Case Management | Audit time & expense reports per ECF No. 77; confer J Dowaliby re same. | $1,200.00 | 1.30 | $1,560.00 |
| 5153 | 08/12/2024 | Elizabeth Pritzker | (1) Case Management | Continue audit time & expense reports per ECF No. 77; draft correspondence to PEC counsel re same. | $1,200.00 | 2.60 | $3,120.00 |
| 5288 | 09/17/2024 | Joanna Dowaliby | (1) Case Management | As office of lead counsel continue audit of other co-counsel firms' time and expense reports. | $295.00 | 4.00 | $1,180.00 |
| 5293 | 09/18/2024 | Joanna Dowaliby | (1) Case Management | As office of lead counsel, continue audit of co-counsel time and expense reports. | $295.00 | 3.00 | $885.00 |
| 5436 | 10/29/2024 | Elizabeth Pritzker | (1) Case Management | Continue to undertake PEC time and expense reporting audit; confer J Dowaliby re same. | $1,200.00 | 2.00 | $2,400.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5490 | 11/15/2024 | Elizabeth Pritzker | (1) Case Management | Audit monthly time/expense reports for duplication, efficiencies; confer J. Dowaliby re audit. | $1,200.00 | 2.00 | $2,400.00 |
| 5927 | 05/09/2025 | Heather Haggarty | (1) Case Management | Confer with team re: preparing final time and expense submissions process. Calendar meeting. | $300.00 | 0.10 | $30.00 |
| 5940 | 05/14/2025 | Bethany Caracuzzo | (1) Case Management | To prepare for auditing of all counsel's fees, confer with H. Haggarty and then with Pritzker Levine team via Zoom re. development of protocol for auditing of all counsel's billings. | $1,100.00 | 1.00 | $1,100.00 |
| 5941 | 05/14/2025 | Heather Haggarty | (1) Case Management | Confer with B. Caracuzzo re: preparing final time and expense submissions process. Prepare for and meet with team re: same. Draft and circulate outline of process. Create folders and review firm submissions. | $300.00 | 1.90 | $570.00 |
| 6025 | 06/20/2025 | Elizabeth Pritzker | (1) Case Management | In accordance with lead counsel appointment order, analyze/audit of PEC firm time and expense reporting and confer B Caracuzzo and co-counsel (A Truong) re same. | $1,200.00 | 0.80 | $960.00 |
| 6026 | 06/23/2025 | Elizabeth Pritzker | (1) Case Management | In accordance with lead counsel appointment order, analyze/audit PEC firm time and confer B Caracuzzo and co-counsel (A Truong) re same. | $1,200.00 | 0.50 | $600.00 |
| **TOTAL** | | | | | | 37.80 | $26,660.00 |

# Attachment A

| Discovery Motion ECF | Issue | Orders/Resolution ECF | Outcome |
|---|---|---|---|
| 95 | JLB re ESI | 116, 125 | Partially Granted |
| 157 | JLB re Google's Search Terms, Custodians, and Non-Custodial Sources | 165, 187 (sealed) | Partially Granted |
| 141 | JLB re Plaintiffs' 1st RFPs | 184 | Partially Granted |
| 143 | JLB re Plaintiffs' RFPs re Docs Produced to Regulators | 184 | Partially Granted |
| 171 | JLB re Plaintiffs' 3rd RFPs | 189, 202, 217 | Partially Granted |
| 177 | JLB re 502(d) | 192 | Denied |
| 206 | Calhoun Discovery, filed before Judge Yvonne Gonzalez Rogers | 242 (YGR), 287 (VKD), 313 (VKD) | Partially Granted |
| 209 | JLB re Plaintiffs' 30(b)(6) Depo Notice | 231 | Partially Granted |
| N/A (not briefed initially as a JLB, but raised during hearing on 30(b)(6) and ordered subsequent submissions at ECF 241, 248, 251, 252) | Creation, Source, and Storage of Account Holder Information | 231, 246, 287, 314 | Partially Granted |
| 269 | JLB re Plaintiffs' RFPs 12-13 and 41-42 re Named Plaintiffs' Data | 314, 321 | Partially Granted |
| 291 | JLB re Economic Damages Discovery | 326 | Partially Granted |
| 336 | JLB re Plaintiffs' 5th RFPs | 352 | Partially Granted |
| 353 | Pltfs' Motion to Compel re Google's Non-Compliance with Court Order at ECF 326 | 357 | Granted |
| 355 | JLB re Access to Calhoun Discovery | 358 | Denied |
| 339 | JLB re Google's Privilege Assertions | 360, 421, 439, 461, 731 | Partially Granted |
| 365 | JLB re the Named Plaintiffs' Log Data | 383 (sealed) | Partially Granted |
| 393 | Pltfs' Motion to Compel re Google's Improperly Withheld Docs | 424 (sealed) | Partially Granted |
| 404 | JLB re Google's Clawback of Documents | 442 (public), 451 | Denied |
| 429 | JLB re Bid Response Fields | 482 (sealed) | Partially Granted |
| 430 | JLB re Time Sampling | 484 (sealed) | Partially Granted |
| 434 | JLB re Bid Request Fields | 486 (sealed) | Partially Granted |
| 464 | JLB re Production of Hyperlinked Docs | 490 | Partially Granted |
| 463 | JLB re Further Production of Berntson and Belov Documents and Further Deposition of Belov | 491 | Denied |
| 473 | JLB re Production of Dashboards and Source Code Changes | 494 (redacted) | Denied |
| 503 | JLB re Account Identifiers | 524 (redacted) | Granted |
| 506 | Further JLB re Dashboards and Source Code Changes | 532 | Partially Granted |
| 537 | JLB re Vertical Fields | 543 | Denied |
| 554 | JLB re Exceeding Rule 30(a) Deposition Limit | 566, 576 | Partially Granted |
| 562 | JLB re Plaintiffs' Amended 30(b)(6) Notice | 576 | Partially Granted |
| 652 | JLB re Plaintiffs' Request to Strike Portion of Google's Errata to Bernston Deposition Transcript | 691, 724 (final) | Granted |
| 660 | JLB re Plaintiffs' RFPs 125, 126, 127, 130, 131, 132, 133 | 691, 723 | Denied |
| 661 | JLB re Plaintiffs' ROG 22 & RFPs 128-129 | 691, 723 | Denied |
| 662 | JLB re Plaintiffs' ROG 23 | 691, 729 (sealed) | Partially Granted |
| 663 | JLB re Plaintiffs' RFP 141 | 691, 698, 699 | Granted |
| 664 | JLB re Plaintiffs' RFAs of Business Records | 691, 725 | Denied |
| 733 | JLB re Plaintiffs' Challenges to Google's Privilege Logs and Proposals for Resolution of Pending Disputes | 734 | Granted |
| 740 | JLB re Selection of Special Master to Address Privilege Disputes | 744, 746 | Denied in so far as the Magistrate Judge selected Google’s special master candidate over Plaintiffs’ candidate, and retained the authority to review objections to the special master's rulings |

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**PLAINTIFFS' RESPONSE TO ORDER GRANTING IN PART MOTION FOR ATTORNEYS' FEES (ECF 813)**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Courtroom: 1, 4th Floor |

**INTRODUCTION**

This settlement favors all consumers in America who use the internet because they can now control their private, personal information from Google's collection and sale of that information from which Google reaps billions of dollars. Plaintiffs' counsel ("Counsel") worked hard to make this happen. On March 26, 2026, the Court approved the settlement, which successfully resolves this litigation through a stipulated injunction limiting Google's ability to send out tracking information regarding users in its Real Time Bidding advertising auctions, by means of a new RTB Control. The RTB Control will be available for all Google account holders throughout the United States – estimated to be more than *200 million* individuals – each of whom will receive *direct notice* of the RTB Control by email from Google. This is a historic result that will *for the first time* allow Google account holders to control how their personal information is used in the RTB auctions, which have been characterized by regulators as the largest data breach ever recorded, occurring billions of times daily.

In connection with the settlement, Counsel requested an award of $128.3 million in attorneys' fees, which represented a 3.5 multiplier on Counsel's $36.7 million in lodestar that was incurred by six law firms litigating this case on a purely contingent basis for almost five years. In its March 26, 2026 Order, the Court awarded Counsel $21.8 million in attorneys' fees, which represents just 59% of Counsel's reported lodestar (a significant negative multiplier). *See* March 26, 2026 Order (ECF 813) (the "Order"). The Court reached this number by first reducing Counsel's reported lodestar from 46,521 hours to 36,242.15 hours and from $36.7 million to $28.6 million (both a 22% reduction), based on purported inefficiencies in four specific categories of time billed (appeal, discovery motions, tier 1 document review, and lead counsel/PEC meetings). *Id.* at 9-10. The Court then reduced Counsel's lodestar further, from $28.6 million to $25.7 million (an additional 10% reduction) based on the "inefficiencies . . . already established" and the purported lack of detailed billing records that prevented a more detailed analysis. *Id.* at 10. Finally, the Court applied a negative 0.85 multiplier to Counsel's reduced $25.7 million lodestar to reach the $21.8 million attorneys' fee award. *Id.* at 11.

The Order provides Counsel an opportunity only to challenge the Court's lodestar reduction calculations. *See* Order at 10. Accordingly, while reserving all rights with respect to the Order,

Counsel respectfully submit this response to the Order to request that the Court revisit certain of its lodestar calculations in the manner and for the reasons set forth below.

**ARGUMENT**

Respectfully, the manner in which the Court calculated its reductions based on the discovery motions, tier1 document review, and lead counsel/PEC meeting time reporting categories is wrong, and incorrectly reduces Counsel's reported lodestar by 7,799.35 hours and $6,654,143.70. Similarly, the manner in which the Court calculated the further 10% across the board lodestar reduction of $2,857,024.73 based on purported inefficiencies and the purported lack of detailed billing records is wrong, because it includes improper double counting, and inaccurately states that the Court did not have Counsel's detailed billing records (which were lodged for *in camera* inspection in December 2025). The 10% further reduction should, therefore, be eliminated entirely. Counsel address each of these lodestar reductions in detail below.

**A. Discovery motions**

On the basis that "plaintiffs brought (and lost) excessive discovery motions," the Court reduced time Counsel billed to discovery motions from 4,059.50 hours to 1,000 hours, a 75.4% reduction. Order at 9. Counsel disagree that they brought excessive discovery motions, and disagree that the win/loss rate – for which Google offered no particularized evidence[1] – is a suitable proxy for excessiveness. *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (stating that a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit"). But, for purposes of the Court's lodestar reduction calculation here, and in light of the record, Counsel respectfully submit that the Court got it backwards: Counsel won full or partial relief in 73% of the discovery motions they brought. Thus, even under the Court's own metric, the reduction should have been 27%, not 75.4%.

Plaintiffs brought 37 discovery and two sanctions motions during the litigation. Plaintiffs

[1] Google had the burden of refuting, with evidence, any hours it claims were not reasonably incurred, which it repeatedly failed to do. *See Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) ("[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits.").

prevailed, either in whole or in part, on 27 of the 37 discovery motions, or 73% of the time. *See* Attachment A hereto. With respect to the two sanctions motions, while it is true that the Magistrate Judge did not award sanctions (*see* ECFs 487 and 755), with respect to one of those motions, plaintiffs did, as a result, obtain critical information about certain data fields that Google was ordered to produce (*see* ECF 487), so that motion achieved important relief for plaintiffs. If the Court is going to reduce the discovery motions lodestar category based on success, then the calculated reduction should be limited to 27%, which is the percentage of the time that plaintiffs lost entirely on their discovery motions, not the 75.4% currently reflected in the Order.

Moreover, as the record reflects, and as the Court acknowledged during the fee hearing, plaintiffs were forced to file so many discovery motions because Google refused to produce any discovery without it being brought to a motion. As the Court told Google's counsel during the hearing: "You fight about everything, which inflates the amount of attorneys' fees that they have to expend to fight against you. So why should they be damaged because Google is a bottomless pit and is willing to pay its lawyers to just fight?" Feb. 17, 2026 Hearing Tr. at 23. And later in the hearing: "Google is to blame, as much as the plaintiffs, as making this – acting and litigating in a way that resulted in fees being as high as they were. And you don't get a pass on that either." *Id.* at 32. The Court's calculation that reduces discovery motion time by 75.4% ignores these facts, damages Counsel, gives Google a pass on its own conduct, and encourages such conduct in the future.

Even absent these considerations, the Court should, at a minimum, recalculate its lodestar reductions based on the discovery motions category, and reduce it by 27%, based on the actual discovery record, not the 75.4% currently set forth in the Order. A 27% reduction would allow 2,963 hours instead of the 1,000 hours currently allowed, and would add back $1,547,472.16 to Counsel's lodestar using the $788.32 blended hourly rate assumed in the Order.[2]

---

[2] While the Order does not specifically state how the reduction in lodestar hours was translated into a reduction in lodestar dollar amounts, it appears that the Court simply took the percentage of lodestar hours it reduced from the reported lodestar (22%) and applied the same 22% reduction to the reported lodestar total. In both instances (reported and reduced lodestar), this results in a blended hourly rate of $788.32 for Counsel's lodestar, so each hour that lodestar was reduced in the Order also reduced Counsel's lodestar by $788.32. Plaintiffs do not take issue with this approach, except as it applies to the tier 1 document review category, as discussed below.

**B. Tier 1 document review**

Respectfully, the manner in which the Court calculated reductions to Counsel's lodestar for tier 1 document review was incorrect for two reasons. First, the Court used the wrong document review rate with respect to Counsel's review of documents produced by Google, imposing an impossible standard on Counsel. Second, the Court used the wrong hourly rate ($788.32 instead of $325.00) when it reduced Counsel's lodestar, resulting in a $2.53 million penalty to Counsel.

For tier 1 document review, the Court used a minimum document review rate of 50 ten-page documents per hour (or 500 pages an hour), calling it a "generally accepted standard." Order at 9-10. But, to the extent this rate is drawn from any published literature, this is the rate for a ***first-pass*** review for relevance and privilege, not for the substantive review and coding of documents by the receiving party. The Court erred in applying this rate to Counsel's substantive review of Google's highly technical document production. Even Google's cited authorities support the distinction. For example, in *Brown v. Barnes and Noble, Inc*., 474 F. Supp. 3d 637 (S.D.N.Y. 2019), cited by Google at ECF 786, the court assumed a review rate of "50 documents per hour," but this was expressly in the context of time for "an attorney to review these documents for production." *Id.* at 645.

The two most cited industry authorities for the 50-document review pace also clearly limit the discussion to first-pass relevance review. For example, the Sedona Conference assumed a 50-document pace in a report on ESI production, but only in the context of relevance review for production. *See The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 SEDONA CONF. J. 189, 198 & n.13 (2007). Similarly, RAND notes a 50-document review rate consensus, but again, only for responsiveness and privilege review. Nicholas M. Pace and Laura Zakaras, "Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery," RAND Institute for Civil Justice (2009), at 56 (discussing review for "relevance and responsiveness") ("RAND Report"). The RAND Report uses the word "responsive" or "responsiveness" more than 120 times, and even the comparison of predictive coding versus human review was limited to reviewing for relevance. This stands in stark contrast with the pace needed for a full comprehension review, including the review documents produced by another party (documents already deemed relevant). *Id.* at 55 (noting that stories of

document reviewers held to a 50-document-per-hour relevance review pace "offer a stark contrast to the image of a senior counsel thoughtfully and deliberately reading each of his or her client's documents").

The math underscores the error in applying the 50-document review rate to Counsel's substantive review of Google's documents here. Assuming 10 pages per document (Order at 10), a pace of 50 documents per hour implies that tier 1 document reviewers in this case had to review 8.3 pages per minute – ***or one page every 7.2 seconds***. This 7.2 seconds would also necessarily include coding, making any attorney notes, escalating questions to senior attorneys, keeping track of potential gaps in the ESI custodian list, and privilege review. Such a pace is simply not possible, particularly here, when most of the documents Google produced were highly technical, laden with internal jargon, heavily hyperlinked to other documents, and frequently redacted. *See* Pritzker Reply Fee Declaration (ECF 793-1) at ¶ 16 (describing Google's production). Even the RAND Report noted that trained "speed readers" at approximately this pace would only achieve "about 50-percent comprehension." RAND Report at 50 (also noting "trade-off between reading speed and comprehension, especially in light of the complexity of documents subject to discovery in large-scale litigation."); *accord, Brown*, 474 F. Supp. 3d at 645 ("the rate of review can vary considerably based on the complexity of the documents").

Counsel have attested that the time they spent on document review tasks was reasonable and appropriate under the circumstances, taking into account the undisputed complexity of the tens of thousands of documents Google produced, and the fact that Counsel's review of these documents was substantive, not for responsiveness. Generally speaking, Counsel's attestations on these matters are entitled to deference. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112, 1115 (9th Cir. 2008) (stating that courts should not seek "to determine if different staffing decisions might have led to different fee requests."). On this record, and to the extent any reduction is made, the Court should use a more realistic and plausible document review rate of, at most, 10 documents (or 100 pages) an hour. If the Court applies this rate, the number of hours excluded from the tier 1 document review category should be reduced from 5,458 to 1,091.6.

The other calculation error with respect to the tier 1 document review category is that the

Court used the wrong hourly rate in calculating the amount of the lodestar reduction. The Court reduced Counsel's tier 1 document review lodestar by 5,458 hours, from 8,110 hours to 2,652 hours. Using the $788.32 blended hourly rate that corresponds with all of the Court's lodestar reductions results in a reduction to Counsel's lodestar of $4,302,650.56 (5,458 hours x $788.32). This was wrong because all tier 1 document review time was capped at $325 per hour, so a 5,458 reduction in lodestar hours should have resulted in a lodestar reduction of only $1,773,850, not $4,302,650.56, a $2,528,800.56 over-reduction in Counsel's lodestar.[3]

If the Court maintains the 5,458 reduction in lodestar hours for tier 1 document review, $2,528,800.56 needs to be added back to Counsel's lodestar to reflect the $325 per hour billing rate for that billing category. Additionally, to further correct calculation errors, if the Court makes a more modest reduction in lodestar hours for tier 1 document review, as proposed above, then any such reduction must be calculated using the $325 per hour rate, not the blended $788.32 hourly rate.[4]

### C. Lead counsel and PEC meetings

The Court reduces time spent on lead counsel and PEC meetings by 50%, or 1,507.75 hours, because Counsel purportedly "violated a Court Order which required (1) all billing to be recorded by task, not block billing, and (2) no billing related to fee issues or time spent preparing or reviewing time and expenses. (Dkt. No. 77)." Order at 10. There are several problems with this lodestar reduction. First, there was no block billing in the case, and Google never identified any in its opposition filing.[5] *See* Pritzker Reply Fee Declaration (ECF 793-1) at ¶ 43. Second, the only time included in Counsel's lodestar relating to time and expense reporting was the 37.8 hours incurred by lead counsel to audit time records of all PEC firms in its lead counsel role, and this time was not billed to the lead counsel and PEC meeting category, but to the separate case management category, so the time auditing issue should not operate to reduce the lead counsel and PEC meeting category at

---

[3] Counsel only billed $2,635,750 in total for all tier 1 document review tasks (8,110 hours x $325 per hour). Thus, the Court's $4,302,650.56 lodestar reduction for this category significantly exceeds all time billed in the category.

[4] For example, if the Court only excludes 1,091.6 hours, as Counsel propose, the lodestar reduction would be $354,770 (1,091.6 hours excluded x $325 per hour).

[5] The Order similarly does not identify any examples of purported block billing by Counsel.

all. *Id.* at ¶ 42; *see* Attachment B hereto.[6] Third, even if time auditing should be excluded from Counsel's lodestar, the amount of time billed for time auditing, over five years of litigation, totals only 37.8 hours, representing only 3.1% of the 1,207.30 hours billed to case management. Respectfully, such a modest percentage of time provides no basis for the 50% reduction set forth in the Order, whether applied to the lead counsel meeting category or the case management category.

For all of these reasons, no reductions to time spent on lead counsel and PEC meetings should have been made and, at most, a 3.1% reduction to the case management category (or 37.8 hours) should have been made instead. So calculated, this would add 1,469.95 hours back to Counsel's lodestar (1,507.75 - 37.8) and increase Counsel's lodestar by $1,158,790.98 using the $788.32 blended hourly rate.

**D. The further 10% reduction**

In addition to the specific lodestar reductions discussed above, the Order includes a further 10% across the board reduction in Counsel's reported lodestar. The only articulated bases for this further reduction are the Court's reasoning that "[s]uch a reduction is appropriate where inefficiencies were already established and the lack of detailed billings does not allow for a more detailed analysis." Order at 10. Respectfully, the Court erred in determining and calculating this "across the board" reduction for several reasons, as explained below. This additional reduction should, therefore, be removed.

The Ninth Circuit provides clear guidance that a district court need not "set forth an hour-by-hour analysis" in its fee determination, but it ***must***, if exercising its discretion to reduce counsel's lodestar on a percentage basis, set forth a "concise but clear explanation of its reasons for choosing a given percentage reduction." *Gates v. Deukmejian*, 987 F.2d 1392, 1402 (9th Cir. 1992); *see also Indep. Living Ctr. of S. California, Inc. v. Figueroa*, 856 F. App'x 97, 100 (9th Cir. 2021) (*accord*: "[P]ercentage-based cuts are 'subject to heightened scrutiny,' and the district court still must 'set forth a concise but clear explanation of its reasons for choosing a given percentage reduction,' and

---

[6] Attachment B is an Excel spreadsheet generated from an analysis of the time entries included in Ex. 7 to Google's fee opposition brief (ECF 787-9) that reference time expended by lead counsel on time and expense auditing pursuant to its court-assigned role, as specifically provided for in ECF 77 at p.2.

"independently review the applicant's fee request."); *Moreno*, 534 F.3d at 1116 **(***accord*: "if the district court is going to make substantial cuts to a winning lawyer's fee request, it needs to explain why with sufficient specificity that the lawyer can meaningfully object and we can meaningfully review the objection."); *Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001) (*accord*: "This order is less informative than the order reversed in *Gates*. In *Gates*, the order specified the size of the reduction – 10 percent – but neither set out the degree of the overbilling nor explained the relationship between the number of hours improperly billed and the size of the reduction."). In addition, the Ninth Circuit instructs, the district court ***must not*** use an across-the-board percentage reduction that would result in duplicative cuts to counsel's lodestar – especially those that result in reductions that exceed 10 percent. *See Moreno*, 534 F.3d at 1116 ("[T]he district court must exercise extreme care in making such reductions to avoid double counting."); *Welch v. Metr. Life Ins. Co.,* 480 F.3d 942, 948 (9th Cir. 2007) (fee order vacated for compounded across the board percentage reductions to lodestar reductions already taken to specified entries, effectively serving as impermissible and imprecise "40 percent penalty" on specified entries.). The Order violates these settled precepts, for several reasons.

First, the two purported bases for the Court's application of an across the board 10 % lodestar reduction – "inefficiencies . . . already established" in the Order and "lack of detailed billing records" – do not contain the required "concise but clear" explanation for cutting ***all*** of Counsel's lodestar by 10%, and are wrong in any event. The only "inefficiencies" identified in the Order refer to appeals, discovery motions, tier 1 document review, purported "block billing" and "time and expense" reporting entries associated with lead counsel and PEC meetings. *See* Order at 9-10. ***None*** of these have any specified application to the many ***other*** reported categories of Counsel's work – including, for example, categories listing work performed for pleadings, non-discovery motions, fact and expert deposition work, and settlement-related work, among others. The Order thus lacks the "clear and concise" explanation for its across-the-board 10% reduction to ***all*** work categories.

Second, Counsel had ***in fact*** provided their detailed billing record to Google and to the Court with the parties' fee briefing. *See* ECF 793-22 (evidencing Counsel's notice of lodging their completed detailed billing records with the Court, *in camera*, on December 22, 2025). Respectfully,

therefore, the Order is factually incorrect to the extent it suggests otherwise and relies on the lack of detailed billing records as a basis for any cuts to Counsel's lodestar.

Finally, the 10% across the board reduction results in impermissible double-counting with respect to at least the three categories of lodestar time specifically identified by the Court and discussed above, resulting, at a minimum, in compound reductions to Counsel's lodestar for discovery motions, tier 1 document review, and lead counsel and PEC meetings and would, if applied, amount to 78%, 71%, and 55% penalty reductions, respectively, to these three lodestar categories, alone. This is impermissible under Ninth Circuit precedent. *See Welch*, 480 F.3d at 948.

**E. Adjustments to the Court's lodestar calculations and reductions**

If the Court makes the adjustments discussed above, the changes would be as follows:

- Discovery motions: 2,963 hours allowed instead of 1,000. $1,547,472.16 added to lodestar at the blended rate of $788.32 per hour.
- Tier 1 document review: 7,018.4 hours allowed instead of 2,652. $4,302,650.56 added back to lodestar to fix hourly rate error (using $788.32 instead of $325.00), then $354,770 deducted from lodestar (1,091.6 hours disallowed x $325 per hour).
- Lead counsel/PEC meetings: 1,507.75 hours added back to lead counsel/PEC meetings category and 37.8 hours deducted from case management category for a net increase to Counsel's lodestar of 1,469.95 hours. This would increase Counsel's lodestar by $1,158,790.98 at the blended rate of $788.32 per hour.
- Further 10% reduction: Elimination of this reduction would add back $2,857,024.73 to Counsel's lodestar.
- ADJUSTED TOTAL: **44,041.50 lodestar hours and $35,224,391.04 in lodestar.**

## CONCLUSION

Reserving all rights, plaintiffs submit this brief at the Court's request to address the manner in which the Court calculated Counsels' lodestar in the Order. For all of the foregoing reasons, Counsel respectfully request that the Court recalculate Counsel's lodestar in the manner and amounts set forth above, resulting in a final lodestar of 44,041.50 hours and $35,224,391.04, rather than the 36,242 hours and $25,713,222.61 million set forth in the Order.

DATED: April 2, 2026

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: /s/ *Elizabeth C. Pritzker*

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Class Counsel*

**STRANCH, JENNINGS & GARVEY, PLLC**
Lesley Weaver (Cal. Bar No. 191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1111 Broadway, Suite 300
Oakland, CA 94607
Tel.: (341) 217-0550
*lweaver@stranchlaw.com*
*adavis@stranchlaw.com*
*jsamra@stranchlaw.com*

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (212) 784-6400
*dstraite@dicellolevitt.com*

James Ulwick (admitted pro hac vice)
Ten North Dearborn Street, Sixth Floor

Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Aaron P. Arnzen (Cal. Bar. No. 218272)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
*fbottini@bottinilaw.com*
*aarnzen@bottinilaw.com*

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I caused to be electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

Dated: April 2, 2026

*/s/ Lesley E. Weaver*
Lesley E. Weaver

## FILER'S ATTESTATION

Pursuant to Civil L.R. 5-1(i)(3), I, Lesley E. Weaver, hereby attest that concurrence in the filing of this document has been obtained from each of the above signatories.

Dated: April 2, 2026

*/s/ Lesley E. Weaver*
Lesley E. Weaver

Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: GOOGLE RTB CONSUMER )
PRIVACY LITIGATION ) **Case No. 4:21-cv-02155 YGR**
_______________________________)

Oakland, California
Tuesday, February 17, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94608
BY: **ELIZABETH C. PRITZKER, ATTORNEY AT LAW**
**JONATHAN K. LEVINE, ATTORNEY AT LAW**

STRANCH, JENNINGS & GARVEY
1111 Broadway, Suite 300
Oakland, CA 94607
BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**

SIMMONS HANLY CONROY
231 S Bemiston Avenue, Suite 525
St. Louis, MO 63105
BY: **JAY BARNES, ATTORNEY AT LAW**

SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
BY: **ERIC JOHNSON, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Court Reporter

APPEARANCES (Continued):

For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
BY: **BRIAN DANITZ, ATTORNEY AT LAW**
**NANCI E. NISHIMURA, ATTORNEY AT LAW**

For Defendant:

COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
BY: **WHITTY SOMVICHIAN, ATTORNEY AT LAW**
**REECE TREVOR, ATTORNEY AT LAW**

COOLEY LLP
55 Hudson Yards
New York, NY 10001
BY: **JOYCE V. RODRIGUEZ-LUNA, ATTORNEY AT LAW**

Tuesday - February 17, 2026 2:09 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** Calling the Civil Matter 21-cv-2155-YGR, In re Google RTB Consumer Privacy Litigation.

Parties, please step forward and state your appearances for the record, starting with the plaintiff. Lecturns, please.

**MS. PRITZKER:** Good afternoon, Your Honor. Elizabeth Pritzker, Pritzker Levine, for the plaintiffs.

**THE COURT:** Good afternoon.

**MR. LEVINE:** Good afternoon, Your Honor. Jonathan Levine, Pritzker Levine, for the plaintiffs.

**THE COURT:** Good afternoon.

All right. To the mics, please. Let's go. To the mics. Both sides. Who's arguing on behalf of the plaintiff?

**MS. PRITZKER:** Oh, sorry.

**THE COURT:** So you've announced your appearance.

**MR. SOMVICHIAN:** Good afternoon, Your Honor. Whitty Somvichian with Cooley. I'll be arguing today. With me at counsel table is Reece Trevor and Joyce Rodriguez-Luna.

**THE COURT:** All right. Good afternoon. Stay at the mic.

So nothing in this case has ever been simple.

**MS. PRITZKER:** No, Your Honor.

**THE COURT:** It's hard for me to understand how the

plaintiffs in this action can argue that this is a complete win. It was not. You sought a significant amount of damages. You lost on those fronts. The amount of discovery disputes that you've lost were significant. The complaints that I have from the magistrate judges regarding the manner in which you litigated were significant.

It's not to say that there was no positive achievement. There absolutely was. And Google's arguments that there wasn't, just wrong. The fact that you may have disclosed things to developers has -- says nothing about what you disclosed to consumers.

So I'm not particularly pleased -- no surprise -- with either side. I've said that so many times in this case, it's -- I'm a broken record. So you're not going to get all the money you're asking for. And they're going to pay more than you're asking.

Do you wish to be heard?

**MS. PRITZKER:** I do, Your Honor. I -- Mr. Levine was going to address the settlement approval motion. I was going to address the fee motion. So I can certainly speak to the issue of whether this was or was not a damages case. I mean, it clearly was not. You know, we did bring a (b)(3) certification motion. That motion also sought certification under (b)(2).

**THE COURT:** I didn't say that it was the only thing.

**MS. PRITZKER:** Okay. I just -- I wanted to make clear on the record that this was not primarily a damages case.

**THE COURT:** What was your damages expert asking for -- recommending?

**MS. PRITZKER:** Again, this was backward for relief, going back seven years based on the models that --

**THE COURT:** What was the number?

**MS. PRITZKER:** I believe it was about $20 billion.

**THE COURT:** Yeah.

**MS. PRITZKER:** Right.

**THE COURT:** You can't tell me, when you have an expert that says your damages for the class are $20 billion --

**MS. PRITZKER:** Going backwards. That's correct. Because it was a --

**THE COURT:** -- that this case does not involve a damages case.

**MS. PRITZKER:** I -- I think what I meant to say: It was not primarily a damages case. We sought discovery and we gave a very fulsome presentation on class certification on all of our claims and all of the relief available under those claims.

And Your Honor, in your class certification order there, really spent a lot of time on the injunctive relief part of the case, which we presented a substantial amount of evidence on as a result of a lot of those discovery disputes that you're

referencing.

**THE COURT:** Why is it, then, that you would present an application that didn't even attempt -- other than I think maybe two sentences -- didn't even attempt to excise the damages component?

**MS. PRITZKER:** Well, we didn't, I think, for the reasons that we explain, is that because a lot of that work on class certification was really directed to getting our claims certified under both prongs of (b)(2) and (b)(3).

Now, on reply, we do -- we -- we took the criticisms to heart, and we did offer the Court an opportunity to consider areas that it could excise that were pure damages-related work, which was not the substantial -- it was not the primary work that was going into that motion. There was literally one motion on damages. We've got one document related to damages. We had two experts on damages.

Everything else that we did in the case was on liability and was on the technical aspects of RTB and trying to prove our liability case that -- you know -- this was a -- this was a -- you know -- an omnipresent system that was, you know, interfering with the privacy rights of hundreds of millions of consumers every single day. That was the factual presentation that we gave you at class certification.

**THE COURT:** Explain to me the statement from the Connecticut Attorney General that says: Google RTB -- Google's

RTB auction's existing technologies appear inadequate to prevent the dissemination of customer personally identifiable information to unknown bidders in the RTB auction.

Doesn't that say that, after all of this --

**MS. PRITZKER:** I'm sorry. I'm -- where are you reading from? I'm looking.

**THE COURT:** On page 2, Roman II --

**MS. PRITZKER:** Oh.

**THE COURT:** -- beginning at the fourth line. He seems to suggest that, after all of this, they can't even do what folks are asking him to do.

**MS. PRITZKER:** No. He's talking about presettlement. He's talking about the current system that is in place. The AG is saying Google's RTB auction's existing technologies, which are the technologies that this settlement changes, are ineffective for that purpose. This is exactly what the settlement relief is designed to change.

So, you know, the new RTB control and the disclosures that we got are actually supposed to cure this problem that the AG is identifying here -- and will.

**THE COURT:** What --

**MS. PRITZKER:** I mean, this is something -- the AG has certainly set forth his experience in these areas, and he has come out strongly in support of the settlement because of all of the advantages and benefits that it brings to --

**THE COURT:** If he is, he doesn't express an opinion on what the fees should be.

**MS. PRITZKER:** Well, no. But that's --

**THE COURT:** And I'm supportive of the settlement. That's a different question. So, yes, the settlement's going to be approved. It's fair. It was hard fought. It creates finality. It was arm's length.

**MS. PRITZKER:** And it proposes sweeping business practice changes in this area that are, for the first time, going to protect people's personal information from being shared in the auction.

**THE COURT:** And it's --

**MS. PRITZKER:** This is new --

**THE COURT:** -- the toggle; is that it?

**MS. PRITZKER:** It's the toggle --

**THE COURT:** It's the toggle on and off.

**MS. PRITZKER:** It's the toggle on and off.

**THE COURT REPORTER:** I'm sorry. I missed what the Judge said.

**THE COURT:** Right. You cannot interrupt me, as much as you want.

**MS. PRITZKER:** I don't want to.

It's the toggle but combined with the accountability -- transparency and accountability measures. This case was always about Google's sharing and selling of personal information in

the RTB auction. What this settlement does is limit the data flow in the RTB so that consumers' -- individuals' personal targeting identifying information is no longer being shared with third parties. That's huge. That's enormous. This has never been done before.

**THE COURT:** What is it supposed to look like? That is -- and I'll -- I can ask Mr. --

**MR. SOMVICHIAN:** Somvichian.

**THE COURT:** -- Somvichian. I didn't want to use your first name.

So all these people are going to get one email. I don't know how we avoid it looking like it's junk mail -- about anybody even reading it. I think it's important, but it's an email. Do you know how many emails I even get a day?

Second, what's the webpage going to look like? How do we even know people are going to be able to -- you know, you fought for this for years -- to go and make this toggle? So response? Do you have it? What is it going to look like?

**MR. SOMVICHIAN:** What we -- Your Honor, we do have a copy of what the disclosure page will look like. The email is not finalized and it won't be finalized until before it's actually implemented. But it will refer directly to the disclosure page and provide a direct link to it. But the disclosure page, itself, we do have a copy of. It was attached as part of submissions.

**THE COURT:** Mr. Levine.

**MR. LEVINE:** Yes, thank you, Your Honor.

A couple of things: On the email, I'm not sure account holders get that many official emails from Google to their account about the account. So it doesn't go into spam. It can't go into spam, because it's going from Google to a Google email address.

The -- as Mr. Somvichian said, the email hasn't been drafted yet, but we do have a right to review it. And the -- what must be included in that email has been negotiated by the parties. In terms of its content, I think Mr. Somvichian alluded to that. The RTB control -- which was submitted at docket 785 -- there are pictures of it where it sits both in the signed-in and signed-out capacity on the ads settings pages. That's Exhibit A at 785. And then 785-2, Exhibit B, is the new disclosure itself. It will probably look different. It didn't print very well in this photo. But this is the new disclosure. And both of those -- the control and the disclosure, I think, will be referenced and linked in the email.

**THE COURT:** So I see the pages for the settings pages --

**MR. LEVINE:** Yes.

**THE COURT:** -- and the three -- the three screens. What I -- what I didn't see was how we're letting people know,

if I go to -- if I go to Google right now, to click on that to begin with.

**MR. LEVINE:** Well, it's not there yet. Because until the Court -- until the settlement is approved, none of this is going to appear publicly.

**THE COURT:** I'm talking hypothetically.

**MR. LEVINE:** Okay.

**THE COURT:** So you go to the landing page. And then what is your anticipation?

**MR. LEVINE:** It is in privacy -- I think Mr. Somvichian can answer this better than we can. But there -- it is going to sit in the privacy controls section of the website. There's two links down. But there will be a direct hyperlink to that -- the RTB control -- both in the new disclosures and in the email, I believe.

**MR. SOMVICHIAN:** Correct, Your Honor. If you're asking about the control itself, you can go to your account settings and from -- directly from your account settings -- it will show one option for personalized ads on Google-owned-and-operated sites and then personalization on third-party sites and apps.

And it will -- the new control will be linked directly from there. And there will be a clear signal that indicates that these are the controls if you want to exercise control over your browsing activity and what information gets shared on

partner sites and apps. So that will be made clear, in terms of how it's presented.

**THE COURT:** All right. What else do you want me to think about?

**MR. LEVINE:** Your Honor, I am -- from your comments, you indicated you were going to approve the settlement. I don't know if you want to hear anything about the settlement itself.

**THE COURT:** Look, you both -- you both agree. It's -- it addresses a number of things that we were -- that the litigation was seeking to address. That's not the issue. The main issue is the fighting over the fees.

**MR. LEVINE:** And if I can talk a little bit about the value of the settlement, Your Honor.

**THE COURT:** You may.

**MR. LEVINE:** Okay. Thank you.

The -- I think Ms. Pritzker alluded to this earlier. This is -- I think it's been described by some of the press we've submitted -- a sea change in how Google operates in the auction space.

There are sort of three principal pieces to the settlement. There's the control itself, which, when implemented, will essentially make any information conveyed by Google to auction participants non-personalized or non-personally identifying by stripping out various identifiers

or generalizing them in a way that collectively has never been done before. There is no -- as Your Honor pointed out, there is no control, currently, that prevents people's personally identifying information from being transmitted in the auctions. That ends with this settlement.

Number two, is there are new disclosures. The new disclosures are the first time in one place, in one unified document, that Google will be describing, holistically, as they say, the ad auction business and its ad practices in one unified disclosure from start to finish. That's new, as well.

And then there are pieces of this that have never been disclosed before. Obviously the RTB control, since it's new, hasn't been disclosed. What information is conveyed in bids has never been disclosed before. The fact that data is auctioned has never been disclosed before. The auction participants haven't been disclosed before.

So there is a package of new disclosures. There's a new web page that, in one place, takes all this information that previously was in the developer pages and in five or six other different documents and spread out, puts it in one place, and is going to be on a web page at Google.

And then they're going to get -- the third piece is they're going to get an email saying, hey, there's a new control. And here's this new web page. And here are the links. Go look at them. And none of that's ever really been

done before. And we think that, you know, from a privacy -- just from a privacy perspective -- not putting a price on it -- that is an enormous victory.

I think we described the extent of RTB and how pervasive it is. And, you know, this is something that not only Google account holders can benefit from, but the general public can in the signed-out capacity. So this control is the first control that works both signed in and signed out. So if you're a Google account holder, and you're signed in, the benefit is it will work across all your devices. If you have five different devices, and you're signed into any of them, and you've implemented this control, it will automatically work on those devices.

For signed out, it could be -- anyone could do this on their browser or device, whether you're an account holder or not. The other thing about this control is it's going to work on apps. Most of the controls don't work on apps. Because there's no setting for which you can do that. This control is going to work both on websites and apps.

So there's a lot to this settlement --

**THE COURT:** It's your -- it's your perspective that less than 10 percent -- I mean, it's an opt-in.

**MR. LEVINE:** It is.

**THE COURT:** It's not an opt-out. So they're going to be doing it, unless someone opts out.

**MR. LEVINE:** Correct.

**THE COURT:** And your view is that, you know, only -- less than 10 percent are going to opt out.

**MR. LEVINE:** That's --

**THE COURT:** Again, that's 90 percent for whom it's still business as usual.

**MR. LEVINE:** That's -- that's not our view. That was our expert's conservative estimate of a lower end of range of how to value the settlement. And what that was based on was the CCPA opt-out rate, which is focused just on Chrome users. I think -- we think it's going to be a higher number here, for a couple of reasons.

One, is people are going to get notice -- specific notice -- about the new control. So unlike some other sort of, you know, privacy mechanisms, which are just sort of sitting there, but no one -- you know -- you have to go find them -- this one is going to be sort of pushed out to people. So even though it is an opt-out regime, they're getting notice of it and a direct link to it.

**THE COURT:** Well, what's your estimate?

**MR. LEVINE:** I don't know. I just think people -- holistically, I think people, today, are paying more attention to privacy. I think people are paying more attention to tech. There was just an article in *Law360* this morning about how many people -- there's a new opt-out mechanism in California that

was just implemented -- how many people -- even though that's gotten no publicity -- there was an article commenting on how many -- they're surprised by how many people are going to that and filling it out.

**THE COURT:** Do you think your compensation should be tied to how successful this program is?

**MR. LEVINE:** Well, I think our compensation is tied to it, because --

**THE COURT:** No. I'm suggesting something a little bit different --

**MR. LEVINE:** Okay. What are you suggesting?

**THE COURT:** -- which is perhaps I make an award. We see how well it does. And if it does as well as you think it is, then you get an additional amount.

**MR. LEVINE:** Um...

**THE COURT:** I know that's -- you probably don't like that idea. But it seems to me that -- you know -- you're saying that this is this great thing, and, yet, your expert's saying, eh, you know, less than 10 percent is probably -- so we don't know how effective or how great it will be -- how much -- how much the public is actually going to benefit from this.

**MR. LEVINE:** I mean, the problem with tying it is we don't have control -- you know -- the problem is we don't really have control over that process, obviously. It's --

**THE COURT:** Well, if it was opt-out -- I mean, if it

was opt-out, then it would apply to everybody. If it was opt-out, I would say, great, this is 100 percent successful, Mr. Levine. Everyone's going to benefit. But I have -- I don't know that.

**MR. LEVINE:** The -- I think looking at the opt-out rate is not the relevant metric. That was used to provide a conservative value -- economic value -- to the settlement. That's what it was there for. I'm -- those numbers could be different. I think what you have to look at, really, is it's -- is -- what the settlement provides is choice. And that choice is provided in disclosures -- transparency and choice.

**THE COURT:** It's only choice if people see it. That is, it's only choice if it is obvious enough that someone makes the choice. If people -- and that's why I started this by asking, where is this going to be? How is this going to be disclosed? Because, at this point, you know, you guys want to get paid. I totally understand that. You've put a lot into this. But if it's hidden, then you get your -- you get paid. They're business as usual, other than the disclosure form. And, yeah, maybe some people actually get to take advantage of it.

**MR. LEVINE:** I -- well, I don't think that's -- I don't -- I don't agree with that. I think that the choice -- that the ability to choose -- people are going to get notice. Everyone's going to get an email. There are going to be more

than 200 million emails sent out as a result of this settlement. I mean, the numbers are enormous. And if 10 percent of those people opt in, that's 20 million people.

And, you know, the other -- tying it to the opt-out rate -- the problem is, of course, there's a three-year injunction period during -- so, for three years, people could be opting -- you know -- people could be hitting the button at any time during the injunction period. So that rate could start small, but --

**THE COURT:** What happens after the injunction period?

**MR. LEVINE:** After the injunction period, Google is free to keep going or change. I mean, the thought was that the three years in the technology -- in this industry -- was an appropriate period, given the rate of technological change.

I mean, there may be, at some point, legislation or regulations that overtake this. They could enhance it. I mean, the business could change. But the three years was thought to be the appropriate time period for this. That was what was recommended by the mediator.

But for three years, people have the right to opt in or out. They can change. And, you know, we do think -- you know -- going back to the Court's class certification order, what Your Honor focused on and ended that order was with choice, transparency, and accountability. And that's what this settlement provides.

It provides choice in the -- it provides a choice to every account holder as to whether or not they want to implement this control or not. It provides transparency in the form of the new disclosures. And it provides accountability for -- you know -- in terms of requiring Google to make an email to disclose this information and the need to control to hundreds of millions of people.

And separately from that, then, our economics expert has said -- you know -- looked at that and placed values on that, from an economic perspective, as to what he thinks the value of that is. And in doing so, you know, he was looking to be conservative. He was -- yes, not everyone -- we understand not everyone is going to implement the control. But what he was looking for is what that number is. What is a fair number of a fair estimate of how many people would implement the control?

And what he uses is the CCPA opt-out, which is 8.8 percent. You could alternatively look at what the gap opt-out rate is, which is 4 percent. But that still would value the settlement at about $750 million, according to our expert, even if you cut it in half.

So I don't think it's so simple as to say we -- you know -- we got a little bit. This is a very meaningful injunctive relief settlement. The press that -- to the extent press have looked at this, they have, you know, been favorable to the settlement. There's not a single objection. Not a

single CAFA regulator has said anything negative about it. The only regulator -- obviously Connecticut put something in supporting the settlement and saying it's a very good first step.

The Electronic Frontier Foundation has supported the settlement. There are other, you know, press that have said, look, this is the sea change in the business -- in the ad auction business. And it's -- yes, it's injunctive relief. But it's very meaningful, valuable injunctive relief. It has a value of at least -- I mean, our expert says 1.4 billion. But even if you cut that in half, and you accept some of the criticisms by Mr. Deal on either the unjust enrichment method or the market price method, it's still a settlement that has an economic value in terms of the value of the data that's no longer being conveyed or the unjust enrichment that will not occur going forward for Google of at least $750 million.

**THE COURT:** Response?

**MR. SOMVICHIAN:** Your Honor --

**THE COURT:** Or any -- or any statement.

**MR. SOMVICHIAN:** Your Honor, we obviously agree. The settlement should be approved. It's fair, adequate, and reasonable. It delivers relief to the settlement class that is directly responsive to the claims at issue.

With respect to fees, I think we really need to put this in the right context. We talked about the injunctive relief

versus damages. But to underscore that point, you just heard the quantification of what the injunctive relief is worth, between $1 billion and $2 billion. We dispute that valuation. But that's their valuation of the injunctive relief that they're delivering to the class.

Compare that to the damages that they sought that was the centerpiece of the claim from day one, Your Honor. And it wasn't just $20 billion. That was a breach of contract and unjust enrichment. Front and center in the case from day one were statutory penalties, $5,000 per violation.

If you take just one violation per class member -- you heard the email may go out to 200 million settlement class members -- that's a trillion dollars in damages that they would seek, at a minimum. You measure -- you compare that to the value phrased -- framed by their own expert of the value of the injunctive relief, the injunctive relief here is less than a percentage point of what they were trying to achieve in terms of damages for the class.

They didn't get that. They're delivering no damages, no monetary recovery to the class. And it's not just, like, they went after two things and got one. When you talk about the quantification, it really puts it into perspective.

With respect to the injunctive relief, it was a hard fought negotiation, Your Honor. And we -- where we landed was a reasonable package that we believe should be approved. But

they didn't get everything that they wanted. And you can see that by comparing to their class certification motion to the second class certification motion, where they were focused on injunctive relief -- an injunctive class -- and defined exactly what they wanted. They didn't get, for example, a control that would end --

**THE COURT:** What do your experts say the impact is going to be from these opt-outs, where you're no longer in a -- you know -- behind the closed curtain, profiting off of people's data?

**MR. SOMVICHIAN:** We don't have a quantification, Your Honor, of -- tied to the opt-out rates. We know that the valuation -- based on the assumptions of the plaintiffs -- we view to be inflated and overstated.

**THE COURT:** Do you not have a contrary expert?

**MR. SOMVICHIAN:** We do.

**THE COURT:** And what did the expert say the value of RTB was to Google, which was not transparent, which was solely benefiting off of individuals' data? What was that value to you? If we took 100 percent of that away -- if it was an opt-in to RTB as opposed to not -- what would be the financial impact?

**MR. SOMVICHIAN:** We -- our -- our expert was a rebuttal expert that pointed out flaws in the plaintiffs' model, Your Honor. We don't then translate that to our own

valuation of the injunctive relief --

**THE COURT:** Well, because that's not helpful to you; right? It could be billions of dollars.

**MR. SOMVICHIAN:** It could be billions compared to the trillions that they were seeking in terms of monetary damages and statutory penalties. That's our point, Your Honor. So in terms of the partial success that was achieved here, it has to be weighed in relation to the immense magnitude of the damages that they sought --

**THE COURT:** Yeah. But you're not suggesting that they should get their lodestar. You are not an easy defendant to fight against. You fight about everything, which inflates the amount of attorneys' fees that they have to expend to fight against you. So why should they be damaged because Google is a bottomless pit and is willing to pay its lawyers to just fight?

**MR. SOMVICHIAN:** Your Honor, we don't just fight to fight. We fight to defend practices that we think are justified --

**THE COURT:** Well, these I don't think were justified. They were not transparent.

**MR. SOMVICHIAN:** And we've addressed that through a new set of disclosures and a new control that, with respect to the settlement, we believe achieves the purposes that you had --

**THE COURT:** Okay. But we wouldn't have gotten there

but for their suing you and but for the attorneys' fees.

**MR. SOMVICHIAN:** Your Honor, a full lodestar is appropriate when they achieve the objectives of the case. They only achieved part of the objective of the case.

**THE COURT:** Even taking that argument, if I gave them -- if they achieved 100 percent, they get their lodestar plus. It's not just their lodestar. Plaintiffs' lawyers -- that's the way it works in the Ninth Circuit.

**MR. SOMVICHIAN:** That's not unusual, Your Honor, for a plaintiffs' group to get a multiplier. It's also not unusual, in this particular circumstance, where the focus of the case was damages, class-wide damages, and you don't deliver that, that there is a reduction to the lodestar.

Your Honor's *Stathakos* case reduced the lodestar by 35 percent in a similar situation. That relied on a *Henderson* case. Same posture, class action, didn't get the damages class certified, got some injunctive relief. Much bigger reduction in that case -- 90 percent reduction.

The *Navarro* case that we cited --

**THE COURT:** I have the page of your cites.

**MR. SOMVICHIAN:** That was a 40 percent reduction. And the prevailing standard that we've seen that plaintiffs' counsel enter into voluntarily in this posture is about a 50 percent reduction. That's what we're asking for as a starting point.

**THE COURT:** So a lot of case law that says that when you do not achieve all of your results, the Court should discount.

**MR. LEVINE:** I think that's -- we're moving between both things, so I'll defer to Ms. Pritzker on that. But I just want to address the statutory damages thing.

I don't think that's the appropriate benchmark here. I don't think our experts on class cert put in numbers on statutory damages for a reason, which is we weren't -- you know -- we understand that, in this case, the statutory mechanisms don't really work, because they result in numbers that are, frankly, unrealistic.

So if you -- I think if you go back and you look at our papers, we were not benchmarking and seeking -- you know -- in terms of if you look at our damage experts, they were not opining on what statutory damages were. They were opining on hard numbers based upon the market rate model, which is Screenwise, or unjust enrichment. And those numbers were a lot lower. They weren't in the trillions. They were -- yes, they were in the billions -- but they were in the billions.

But the injunctive relief here potentially has a value of -- according to our expert -- of anywhere from 1.4 to 2.9 billion. So it's not -- you know -- it's much more of an apples-to-apples comparison looking at the realistic methods here than what was going on. If we had tried this case, we

would not have asked for trillions of dollars in statutory damages. It's just -- it's ridiculous. It just is.

I'll let Ms. Pritzker respond to the case law.

**MS. PRITZKER:** Thank you, Your Honor. Sorry for the up and down.

So the partial success precedent that Google is relying upon doesn't -- doesn't say that if you don't achieve damages, but you achieve otherwise monetarily valuable significant injunctive relief, that you don't --

**THE COURT:** Where's your case law?

**MS. PRITZKER:** We cited it in our brief. The standard is, if you lose on claims that are not related in the sense that they stem from a different core set of facts, or are based on distinct legal theories -- different legal theories -- then it's in those instances where there's a partial success deduction. And that's the *Hensley v. Eckerhart* case from the U.S. Supreme Court. It's the Ninth Circuit opinion in *Odima v. Westin Tucson Hotel*, Ninth Circuit, 1995.

The partial success theory is really in a case where you were pursuing, you know, distinct unrelated claims and you lost on one or two. It doesn't parse between relief that was available under those claims. It parses between whether the claims were related or not -- or stem from different facts -- a different core set of facts.

Here, you know, I have to -- I have to disagree that our

case was entirely focused on damages. We were focused on getting relief for our class members. And, I think, if you look at the briefing and all of the work that we did through the case and through both class certification proceedings, we were focused on making real effective change that was going to benefit consumers.

Going backwards, if there was availability for damages for the sale and sharing of their information in RTB, sure. But even our own plaintiffs testified at deposition that what -- you know -- the key reason for joining the case is they wanted to stop the selling and sharing of their personal information in RTB. We put that deposition excerpt testimony in front of the Court, and that's what we were doing.

And all of the work that we did in discovery -- well, not all -- but the vast majority of the work that we did in discovery with our technical experts was focused on, you know, what is happening in RTB? How is the data flow occurring? How is it impacting class members and our clients? You know, what is -- how do we translate all of that discovery into a liability case to present to Your Honor on class certifications, summary judgment, and trial?

You know, damages are a remedy; they're not the claim; right? Injunctive relief is a remedy; it's not a claim. So we didn't -- you know -- we didn't parse our claims. We pursued all available remedies from the word "go."

If you look in our complaint, we plead both injunctive relief and damages. We pursued injunctive relief and damages at class certification the first time around. And when we didn't succeed on certifying a damages class because of the implied consent issue, you know, we came back to the Court on the injunctive relief -- in the injunction relief.

But, at the core, the allegations in the case and the work that we've done were all centered on changing this practice and getting real meaningful protection for users, as they surf the Internet, to ensure that they can control whether or not their data is sold or shared by Google in the ad auction -- something that they didn't have before and that they didn't know about, because it was never disclosed.

We achieved those litigation objectives. And we did it, as Your Honor said, through a lot of hard work and a lot of hard battle at every stage of the litigation, from motion to dismiss through class certification. We had -- you know -- Your Honor noted, we had numerous discovery motions. I will agree --

**THE COURT:** I have to tell you that I certainly don't want to reward you for some of the practices that happened during discovery, where you all -- specifically the plaintiffs -- were not on the right side of those battles.

**MS. PRITZKER:** I --

**THE COURT:** And it caused an incredible amount of work

for a bench that is -- that is already overwhelmed. So I don't want to support that.

**MS. PRITZKER:** Look, I understand, Your Honor. But we -- we -- you know -- I've been doing this a long time. I don't just bring discovery motions to bring discovery motions. We -- you know -- in a lot of cases, you know, things go smoothly in discovery. Everybody knows what the core set of discovery is. We're able to work with the other side about how to proceed.

Your Honor said it best: Google fought us on everything. They fought us on custodians. They fought us on search terms. They fought us on an ESI protocol. They forced every single discovery request to a motion.

**THE COURT:** You lost many, many, many times.

**MS. PRITZKER:** We won 75 percent of those motions in whole or in part. We won the majority of those motions. And more importantly, we got the discovery that we needed to present to Your Honor at class certification and that we were going to use at summary judgment and at trial that established that we had a good liability case.

A lot of those motions -- we spent a whole year fighting on just the transactional data, because Google wouldn't produce it in the form in which it's maintained. We spent a whole year on that.

**THE COURT:** Ms. Pritzker --

**MS. PRITZKER:** And, ultimately, we succeeded.

**THE COURT:** Ms. Pritzker, you all have been in front of me many times. And I'm just telling you that, in this case, you did not show well on those issues. And you may have a different perspective. But I'm the one who has to award the fees. And I'm trying to be transparent.

**MS. PRITZKER:** I'm also trying to be transparent, Your Honor. And I'm not up here suggesting that, you know, everything we do is successful. But I do believe it was honorable and it was well -- it was well done for purpose of enforcing our clients' rights and for purposes of getting discovery that we needed for the case.

You know, I don't think we were vexatious. I don't think we were improper. This was a case where there's a lot of data. There's a lot of data.

**THE COURT:** I understand that. But you need to do a debrief, because you -- you -- whatever you thought you all were doing, you were not as successful as you seem to think you were.

**MS. PRITZKER:** Well, that analysis comes from us going back and looking over those motions. And we discussed that in my reply declaration.

And I also want to be candid with the Court. Judge DeMarchi learned alongside us. She -- she -- there was an iterative process with her as to what the discovery was -- you

know -- what discovery was needed and why we needed it. And she evolved over the case as we did.

Look, we lost a lot of times on proportionality, as you would expect. This is a big data case. But we got the essential data that we needed to prove up not only our named plaintiffs' claims, but the claims for the class. And we only did that because we pushed for it. Had we not pushed for it, we would have gotten nothing. Everything was pushed to a motion, Your Honor. Everything.

And I'm sorry -- you know, as a person who feels that she litigates responsibly -- I'm sorry to hear that you have those reports from the Magistrate. That's just -- that's not how I run my practice. That's not how I litigate. And so I'm sorry if those are the stories that you're hearing. But I feel that we were pushing in a way that was respectful and responsible to get what we needed for the needs of the case.

**THE COURT:** Anything else either sides want me to think about?

**MR. SOMVICHIAN:** Your Honor, with respect to the legal standard in evaluating partial success and what portions of a fee request should be considered and potentially reduced, what I heard from Counsel seems to be this idea that the only appropriate reductions are things that relate to -- exclusively to damages. And if it had anything to do more generally with liability or other issues, it should be compensated as part of

the lodestar. That's not the analysis, Your Honor.

Ms. Pritzker mentioned the *Odima* case. I think that actually is a nice summary of the standard, part of which is analyzing whether there were unsuccessful claims that were unrelated. That is part of the analysis. That's what they want the Court to focus on and to only apply deductions for things that were completely unrelated to the injunctive aspect of the case.

But then the Ninth Circuit goes on and explains, quote, "Then the Court must apply the second part of the analysis in which the Court evaluates the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended."

So that standard makes sense, Your Honor. Because if -- if this case were just a single claim just about damages -- you try to get a million bucks, and you get nominal damages -- everything relates to the liability effort, but the Court certainly can and should still consider the overall result achieved.

**THE COURT:** And you -- and I have to tell you, again, Google is to blame, as much as the plaintiffs, as making this -- acting and litigating in a way that resulted in fees being as high as they were. And you don't get a pass on that either.

So I'll take it under submission. I'll let you know the

settlement will be approved. I just need to decide on fees.

**MS. PRITZKER:** Okay, Your Honor. Thank you very much. I appreciate your time.

**THE COURTROOM DEPUTY:** Court is adjourned.

(Proceedings adjourned at 2:55 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, February 21, 2026

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court

COOLEY LLP
WHITTY SOMVICHIAN (SBN 194463)
(wsomvichian@cooley.com)
REECE TREVOR (SBN 316685)
(rtrevor@cooley.com)
ANUPAM DHILLON (SBN 324746)
(adhillon@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

COOLEY LLP
JOYCE V. RODRIGUEZ-LUNA (*pro hac vice*)
(jrodriguez-luna@cooley.com)
55 Hudson Yards
New York, New York 10001-2157
Telephone: +1 212 479 6000
Facsimile: +1 212 479 6275

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re Google RTB Consumer Privacy Litigation,

This Document Relates to: *all actions*

Master File No. 4:21-cv-02155-YGR-VKD

**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

Hearing Date: February 3, 2026
Hearing Time: 2:00 pm

**(UNREDACTED) VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

## TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1
II. FACTUAL BACKGROUND .......... 2
A. Plaintiffs' Counsel Sue Google, Leveraging the Prior Work of Others. .......... 2
B. Plaintiffs' Counsel Engage in Years of Overreaching Discovery. .......... 3
C. Plaintiffs' Counsel Lose Their Bid to Certify a Damages Class With Prejudice. .......... 4
D. Plaintiffs' Counsel Settle the Case for No Money and Limited Injunctive Relief. .......... 4
III. ARGUMENT .......... 5
A. The Court Should Disregard Plaintiffs' Counsel's Inflated Valuation of the Settlement and Reject Their Request for a Percentage-of-the-Fund Award. .......... 5
B. The Lodestar Method Also Does Not Support a $128 Million Fee Award. .......... 9
1. Plaintiffs' Counsel's Lodestar Is Dramatically Inflated. .......... 10
a. Plaintiffs' Counsel Improperly Seek Compensation for Their Damages Claims. .......... 10
b. Plaintiffs' Counsel's Billing Records Reflect Pervasive Inefficiency and Unnecessary Work. .......... 14
(1) Plaintiffs' Counsel Should Not Be Rewarded for Their Intransigent Approach to Discovery. .......... 15
(2) Plaintiffs' Counsel Pervasively Overstaffed Their Teams and Billed for Duplicative and Excessive Work. .......... 16
2. Plaintiffs' Counsel Have Not Earned a Multiplier. .......... 21
a. Plaintiffs' Counsel Ignore That They Failed to Prove That the Information Affected by the RTB Control Otherwise Renders Bid Requests Personally Identifying. .......... 21
b. Plaintiffs' Counsel Ignore That Google Already Offered Account Holders Most of the Features of the RTB Control and Already Disclosed RTB's Functions. .......... 22
c. The Settlement Is Reasonable, Not Exceptional. .......... 22
d. The Remaining Considerations Do Not Warrant Plaintiffs' Counsel's Request for an Extraordinary 3.5x Multiplier. .......... 24
C. Plaintiffs' Counsel Fail to Substantiate Their Request for Expenses. .......... 24
IV. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ang v. Bimbo Bakeries USA, Inc.*,
2020 WL 5798152 (N.D. Cal. Sept. 29, 2020) ........ 11

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011)........ 6, 23

*Brown v. Barnes & Noble, Inc.*,
474 F. Supp. 3d 637 (S.D.N.Y. 2019)........ 17

*Campbell v. Facebook Inc.*,
2017 WL 3581179 (N.D. Cal. Aug. 18, 2017)........ 10, 11

*City of Plantation Police Officers' Employees' Retirement Systems v. Jeffries*,
2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) ........ 23

*Corker v. Costco Wholesale Corp.*,
2023 WL 6215108 (W.D. Wash. Sept. 25, 2023) ........ 9

*Dang v Cross*,
422 F. 3d 800 (9th Cir. 2005)........ 14

*Farrell v. Bank of America, N.A.*,
327 F.R.D. 422 (S.D. Cal. 2018)........ 8, 9

*Gaston v. LexisNexis Risk Solutions Inc.*,
2021 WL 2077812 (W.D.N.C. May 24, 2021) ........ 23

*Grissom v. Sterling Infosystems, Inc.*,
2024 WL 4627567 (S.D.N.Y. Oct. 30, 2024) ........ 23

*Grissom v. Sterling Infosystems, Inc.*,
2025 WL 1348480 (S.D.N.Y. May 8, 2025)........ 23

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)........ 9, 24

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994)........ 25

*Hawthorne v. Umpqua Bank*,
2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) ........ 24

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ........ 10, 13, 14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ........ 21

*Iswed v. Caruso*,
2013 WL 12093132 (W.D. Mich. Feb. 14, 2013) ........ 13

*Jankey v. Poop Deck*,
537 F.3d 1122 (9th Cir. 2008) ........ 16

*Kim v. Allison*,
8 F.4th 1170 (9th Cir. 2021) ........ 6

*Lilly v. Jamba Juice Co.*,
2015 WL 2062858 (N.D. Cal. May 4, 2015) ........ 11

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
No. 4:20-cv-09077 (N.D. Cal. Dec. 9, 2024), ECF No. 150 ........ 11

*Moreno v. San Francisco Bay Area Rapid Transit District*,
2019 WL 343472 (N.D. Cal. Jan. 28, 2019) ........ 11

*Navarro v. Gen. Nutrition Corp.*,
2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) ........ 16

*Oliva v. Infinite Energy, Inc.*,
2013 WL 6815989 (N.D. Fla. Dec. 24, 2013) ........ 17

*In re Online DVD-Rental Antitrust Litigation*,
779 F.3d 934 (9th Cir. 2015) ........ 9

*In re Ring LLC*,
2023 WL 9687346 (C.D. Cal. Dec. 20, 2023) ........ 11

*In Re Ring LLC Privacy Litigation*,
2024 WL 2845978 (C.D. Cal. May 28, 2024) ........ 10, 11

*Robinson v. Open Top Sightseeing San Francisco, LLC*,
2018 WL 2088392 (N.D. Cal. May 4, 2018) ........ 17

*Rodriguez v. County of Los Angeles*,
96 F. Supp. 3d 1012 (C.D. Cal. 2014) ........ 19

*Simon v. Maple Beach Ventures LLC*,
2021 WL 1907821 (N.D. Cal. May 12, 2021) ........ 20

*St. Louis Police Ret. Sys. v. Severson*,
2014 WL 3945655 (N.D. Cal. Aug. 11, 2014) ........ 21, 23

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Stathakos v. Columbia Sportswear Co.*,
2018 WL 1710075 (N.D. Cal. Apr. 9, 2018) ..... 10, 12

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ..... 6, 7

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2023 WL 4109573 (N.D. Cal. June 20, 2023) ..... 18

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
445 F. Supp. 3d 508 (N.D. Cal. 2020) ..... 6, 17

**Federal Rules of Civil Procedure**

Rule 23(b)(2) ..... 4

Rule 23(b)(3) ..... *passim*

Rule 23(f) ..... 4, 12, 14

Rule 30(b)(6) ..... 3

**Other Authorities**

Bennett Cyphers, "Google Says It Doesn't 'Sell' Your Data. Here's How the Company Shares, Monetizes, and Exploits It," Elec. Frontier Found. (Mar. 19, 2020), https://www.eff.org/deeplinks/2020/03/google-says-it-doesnt-sell-your-data-heres-how-company-shares-monetizes-and ..... 2

Johnny Ryan, "A summary of the ICO report on RTB – and what happens next," Brave (Jun. 26, 2019), https://brave.com/blog/ico-adtech-update-rtb; ..... 2

Nicholas M. Pace & Laura Zakaras, *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery* ..... 17

# I. INTRODUCTION

Measured against their own ambitions, the six law firms that prosecuted this lawsuit against Google ("Plaintiffs' Counsel") achieved little to justify the massive $130+ million award they now seek for this mostly unsuccessful litigation. They never proved on the merits that Google violated any law or breached any contract. They failed to certify any class, their damages class was dismissed with prejudice, and the resulting settlement delivers not one cent to the settlement class. Indeed, despite excessive spending, Plaintiffs' Counsel achieved de minimis success: settling, after years of litigation, for additional disclosures and an optional user control that largely duplicates existing controls. And while these measures provide fair, adequate, and reasonable consideration to the settlement class, the result is a far cry from the "trailblazing" and "exceptional" result that Plaintiffs' Counsel claim. *See* ECF No. 781 ("Motion" or "Mot.") at 1.

With no payment flowing to the settlement class, Plaintiffs' Counsel are left to argue that their nine-figure demand is, in their view, justifiably modest because it is less than ten percent of the purported $1.4 billion value of the injunctive relief, according to their expert. The Ninth Circuit consistently cautions that such valuations are prone to manipulation. Therefore, courts should rarely use them to determine percentage-of-the-fund fee awards, reserving their use only for cases where the valuation is indisputable. . This is not such a case, and the Court should instead apply the lodestar method. That method dictates that Plaintiffs' Counsel should recover far less than their claimed $36.6 million lodestar given the limited success they achieved. Ignoring prevailing practice in this District, Plaintiffs' Counsel make no effort to remove from their lodestar ***any*** of the substantial work they devoted throughout the litigation to their unsuccessful effort to recover classwide damages. Nor do they try to account for the rampant instances of inefficient and unnecessary work that comprise a substantial portion of their lodestar. These include practices like regularly staffing depositions with a half-dozen or more lawyers, and billing millions of dollars to internal meetings and "strategy" discussions.

The Court should not grant this inflated and overreaching request. Instead, the Court should (1) reduce Plaintiffs' Counsel's lodestar by half to account for the limited success they achieved, consistent with reductions routinely applied in this District in similar circumstances where counsel

failed to recover classwide damages, and (2) apply additional reductions to address the inefficient and unnecessary work further discussed below. These adjustments result in a still-substantial fee award of no more than $14,279,402. The Court should also require Plaintiffs' Counsel to exclude from their cost request certain extraneous expenses, particularly fees paid to damages experts.

## II. Factual Background

### A. Plaintiffs' Counsel Sue Google, Leveraging the Prior Work of Others.

Plaintiffs' Counsel sued Google in a series of complaints in 2021, each alleging that Google shares "personal information" through its real time bidding ("RTB") system and seeking statutory penalties, damages, and other monetary relief.[1] To support their fee request, Plaintiffs' Counsel now claim the complaints were "based entirely on their own investigation and not on any government proceeding or investigation." Mot. at 3. But when they filed their Consolidated Amended Class Action Complaint (ECF No. 92, the "CACC"), Plaintiffs' Counsel said the opposite, claiming there was a "growing list of governmental entities and civil liberties groups, at home and abroad, that have opened investigations into the ad exchange process." CCAC ¶ 278. Indeed, the CCAC drew heavily on prior reports, including complaints to regulators in Ireland and the United Kingdom and a March 2020 Electronic Frontier Foundation ("EFF") article about Google RTB.[2] Plaintiffs' Counsel cited these reports extensively and their allegations in the CCAC about the types and quantity of information included in the RTB process closely tracked the substance of these reports. *See, e.g.*, CCAC ¶¶ 1 (quoting headline of EFF article), 133 & n.17 (citing EFF article), 199 (citing a "September 2020 study submitted to the Irish Data Protection Commission"), 271-278 (listing various allegations regarding RTB by others).

Three firms in the underlying cases sought appointment as lead counsel. After Cotchett, Pitre & McCarthy, LLP ("Cotchett") and Bottini & Bottini, Inc. ("Bottini") withdrew their request, Judge Koh appointed Elizabeth Pritzker of Pritzker Levine LLP ("Pritzker Levine") as Interim

[1] *Hewitt v. Google*, No. 5:21-CV-02155, was filed in March 2021; *Delahunty v. Google*, No. 21-CV-03360, and *Toronto v. Google*, No. 21-CV-03725, were both filed in N.D. Cal. in May 2021.

[2] *See* Johnny Ryan, "A summary of the ICO report on RTB – and what happens next," Brave (Jun. 26, 2019), https://brave.com/blog/ico-adtech-update-rtb; Bennett Cyphers, "Google Says It Doesn't 'Sell' Your Data. Here's How the Company Shares, Monetizes, and Exploits It," Elec. Frontier Found. (Mar. 19, 2020), https://www.eff.org/deeplinks/2020/03/google-says-it-doesnt-sell-your-data-heres-how-company-shares-monetizes-and.

Class Counsel. ECF No. 77.[3] In the same order, the Court established an Executive Committee to direct the litigation, appointing certain specific individuals to participate in the Executive Committee and imposing clear guidelines on their work and billing: Lesley E. Weaver of Bleichmar Fonti & Auld LLP ("BFA"); Jay Barnes of Simmons Hanly Conroy LLC ("Simmons Hanly Conroy"); David A. Straite of DiCello Levitt Gutzler LLC ("DiCello Levitt"); Nanci Nishimura of Cotchett; and Francis Bottini of Bottini. *Id.*

**B. Plaintiffs' Counsel Engage in Years of Overreaching Discovery.**

Plaintiffs' Counsel spent most of the next three years trying and largely failing to compel the overbroad discovery they demanded from Google. A pattern quickly emerged: Plaintiffs' Counsel would ask for everything, compromise on nothing, seek Judge DeMarchi's intervention, and mostly lose. *See, e.g.*, ECF Nos. 231 at 13 (largely rejecting Plaintiffs' 30(b)(6) topics and noting that "Plaintiffs' portion of the submission was particularly unhelpful in showing why they should be permitted to obtain the disputed testimony"), 287 at 5 (rejecting Plaintiffs' demand "for comprehensive discovery of all aspects of Google's 'front-end' process"), 314 at 3-7 (rejecting demand for information about Google's internal linking of accounts and several other topics). Judge DeMarchi's orders often reflected frustration with Plaintiff's Counsel's approach. In describing an early dispute over a Rule 30(b)(6) notice, the Court called several of the requests overbroad, "poorly crafted," and "not well-considered," remarking that "Plaintiffs can do better." ECF No. 231 at 3, 4, 8; *see also* ECF No. 314 at 1-2 ("Plaintiffs' portion of the joint [discovery dispute] submission is not tethered in any meaningful way to these document requests"); *id.* at 3 ("plaintiffs rely on conclusory arguments or purported admissions without ever explaining why the discovery they seek is relevant to a claim or defense."). Plaintiffs often relitigated the same disputes by serving lightly-revised versions of the same demands Judge DeMarchi had already rejected. In one instance, Judge DeMarchi offered Plaintiffs the chance to submit supplemental briefing on an issue, only to observe that "Plaintiffs have largely squandered this opportunity" because they primarily "rel[ied] on the same conclusory assertions and generalities that have been unpersuasive." ECF No. 287 at 2-3.

[3] The order appointing counsel referred to this case as "antitrust litigation." ECF No. 77 at 1.

As part of their largely unsuccessful discovery motion practice, in last-ditch efforts to improperly expand discovery, Plaintiffs' Counsel twice tried to sanction Google for purported noncompliance with Judge DeMarchi's discovery orders. After full briefing and hearings, Judge DeMarchi denied both motions, finding that Google had violated no court order and Plaintiffs had suffered no prejudice. ECF Nos. 488, 755.

**C. Plaintiffs' Counsel Lose Their Bid to Certify a Damages Class With Prejudice.**

Throughout discovery, Plaintiffs' Counsel focused intensely on classwide damages and certification of a damages class under Rule 23(b)(3). From the outset of the case, Plaintiffs sought to recover "compensatory damages, including statutory damages where available," "the measure of unjust enrichment enjoyed by [Google]," and "punitive damages," CCAC Prayer for Relief, and Plaintiffs' Counsel's litigation efforts consistently focused on trying to establish entitlement to these categories of damages on a classwide basis, with injunctive relief largely relegated to a sideshow. Notably, when Plaintiffs' Counsel filed their first class certification motion, they devoted just two paragraphs to Rule 23(b)(2). ECF No. 546 at 25. In contrast, they spent nearly fifteen pages arguing predominance and damages issues, including that Google's purported unjust enrichment alone exceeded $1.35 billion per year of the class period. *Id.* at 10-24. The Court denied certification of any class. In denying the damages class with prejudice, the Court found that individual questions about putative class members' understanding of and consent to the practices at issue predominate over common issues. *See generally* ECF No. 690. Plaintiffs' Counsel asked the Ninth Circuit to intervene and grant interlocutory review under Rule 23(f), but the Court of Appeals denied their petition. ECF Nos. 700, 716.

**D. Plaintiffs' Counsel Settle the Case for No Money and Limited Injunctive Relief.**

Plaintiffs filed a renewed Rule 23(b)(2) class certification motion, which Google opposed. Before Plaintiffs' Reply deadline, the parties negotiated and Plaintiffs' Counsel agreed to a non-monetary classwide settlement. *See* Settlement Agreement, ECF No. 778-4 ("S.A."). Under the settlement, settlement class members will receive none of the statutory penalties, compensatory damages, restitution, or punitive damages that Plaintiffs' Counsel sought throughout the case. S.A. at 4. Google admits no liability or wrongdoing and will continue to operate its RTB platform. *Id.*

at 5. Google will, instead, launch two changes that will remain in effect for at least three years. *Id.* at 5-6. First, Google will introduce a new setting (the "RTB Control"), that will be disabled by default and will appear alongside existing Google privacy controls. *Id.* If users enable the RTB Control, their online activity can still generate RTB bid requests, but certain information may be omitted or generalized from those requests because "Google will apply a privacy treatment equivalent to its restricted data processing ('RDP') privacy treatment." *Id.* The RTB Control may continue to evolve as the RDP standard evolves, but in its current form, IP addresses (which were previously truncated) will be omitted, user agent strings associated with a device will be generalized, pseudonymous identifiers like cookies or other unique identifiers will be omitted, and no cookie matching will occur. *Id.* As previously detailed in Google's class certification briefing, users can already omit much of this information from RTB bid requests through various existing controls offered by Google and third-parties, including Google's current Ads Personalization setting. ECF No. 592-1 ¶ 49. Second, Google will notify users of the RTB Control's existence with a dedicated webpage and an email to account holders. S.A. at 6. The settlement does not otherwise require Google to change how it operates or publicly describes RTB.

## III. ARGUMENT

### A. The Court Should Disregard Plaintiffs' Counsel's Inflated Valuation of the Settlement and Reject Their Request for a Percentage-of-the-Fund Award.

Plaintiffs' Counsel and their expert, Professor Fitzpatrick[4], urge the Court to treat this settlement as if it were a common-fund settlement and award them a percentage of the injunctive relief's claimed value. The reason is clear: by claiming that the changes to Google's controls and disclosures are worth over $1.4 ***billion***, they can present their massive $130+ million request as seeking only a "modest" 8.4 percent of the settlement's purported value and further claim this is "far below the 25 percent 'benchmark'" often applied in this Circuit. Mot. at 6 (quoting *In re*

[4] Professor Fitzpatrick's report should be given no weight. His Declaration rehashes Plaintiffs' Counsel's arguments that "the fee requested would be reasonable" under either the "percentage method or lodestar method." ECF No. 781-7 ¶ 6. But he ignores that there is no reliable valuation on which to draw here for the percentage method, and he does not account for prevailing practice in this District of excluding time spent on failed Rule 23(b)(3) damages claims from counsel's lodestar when they secure only injunctive relief, including failing to account for this Court's prior guidance on this issue. *See infra* 1-14.

*Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 942 (9th Cir. 2011). This self-serving position is exactly why the Ninth Circuit has cautioned courts to avoid a percentage-of-the-fund approach in settlements like this that involve only injunctive relief: "Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003). In *Staton*, the Ninth Circuit explained that courts generally should ***not*** consider the asserted value of injunctive relief when calculating fees, except in rare instances where the monetary value of that relief can be clearly measured. *Id.* The Ninth Circuit reaffirmed this guidance in *Kim v. Allison*, underscoring that "a district court must exercise caution when using the value of injunctive relief to determine proportional attorneys' fees and should generally avoid valuing hard-to-measure injunctive relief altogether" lest counsel "overestimate the value of injunctive relief in order to inflate fees." 8 F.4th 1170, 1181 (9th Cir. 2021). Thus, "district courts applying *Staton* regularly find that the value of various injunctive or other non-monetary relief measures cannot be accurately ascertained" and should not be considered in a fees request. *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 521 (N.D. Cal. 2020) (collecting cases).

Plaintiffs' Counsel cannot dispute that Ninth Circuit law disfavors their effort to tie their fees request to the purported value of the injunctive relief here, but they claim they meet the Ninth Circuit's high bar based on Dr. Zeithammer's declaration. ECF No. 778-7 ("Zeithammer Decl."). Dr. Zeithammer claims the settlement is worth at least $1.4 billion based on the "market price" of the data he believes the RTB Control affects. *Id.* ¶ 59. The Motion focuses on this valuation method. Mot. at 6-7. Dr. Zeithammer also puts forth an even higher valuation of $2.9 billion based on a purported estimate of the "unjust enrichment" to Google that he thinks the settlement will prevent.[5] Zeithammer Decl. ¶ 58. The Court should reject both of these valuations, which are built on layers of improper assumptions and speculation, as summarized below and further detailed in the accompanying Declaration of Bruce Deal ("Deal Decl.").

[5] Dr. Zeithammer's valuations are all based on the effect of the RTB Control; he does not make any attempt to assign independent value to the disclosure pages that Google will publish so there is no basis to assign value to those aspects of the settlement. Zeithammer Decl. ¶ 11.

***First***, Dr. Zeithammer's conclusions all rely on the premise that the RTB Control "will for the first time provide U.S. Google account holders with the ability to limit the sharing of their User Data in Google RTB bid requests, so that the information transmitted will no longer constitute PI [personalized information]." Zeithammer Decl. ¶ 6. But this assumes Plaintiffs are right about the central disputed issue in this case: that RTB bid requests otherwise ***do*** contain "personal information." *See* Deal Decl. ¶¶ 16-18. Plaintiffs and Google, and their respective experts, have spilled much ink on this highly technical issue, which was never resolved on the merits and which the Settlement Agreement expressly acknowledges remains disputed. *See, e.g.*, ECF Nos. 750-4 to 750-13 (Plaintiffs' expert reports); 761-3 & 761-5 (Google's expert reports); *see also* S.A. at 3 (settlement term providing that "Google denies that it sells or shares personal information with third parties through RTB"). Plaintiffs' Counsel cannot ask the Court to award fees based on a valuation that requires the Court to adopt their view of what constitutes "personal information," when they agreed in the Settlement Agreement that the issue remains disputed.

***Second***, and relatedly, Dr. Zeithammer's valuation entirely ignores that users already have access to various controls that allow them to limit the information in RTB bid requests, including the Google Ads Personalization ("GAP") control that affects much of the same data as the new RTB Control. *See infra* 21-22. Dr. Zeithammer does not even acknowledge these other controls exist, much less try to put a value on the incremental differences between these current controls and the new RTB Control, which would be the only appropriate way to place a value on the injunctive relief here. Deal Decl. ¶¶ 7-12. Instead, Dr. Zeithammer creates a fictional value for the RTB Control by comparing it to a nonexistent world where users have no ability at all to restrict the inclusion of any information in a bid request. *Id.* ¶ 12. This glaring error alone is grounds for the Court to reject Plaintiffs' valuation under *Staton* and *Kim*.

***Third***, Dr. Zeithammer assumes that the information allegedly shared through RTB has a market value of $36 per year based on the typical amount that a market research program called Screenwise pays its participants. Zeithammer Decl. ¶ 27. But Screenwise collects far more information than is allegedly shared via RTB, as do the other research programs that Dr. Zeithammer uses "to corroborate the market price with other sources of evidence." *Id.* ¶ 28. These

programs collect users' complete browsing history and all information that users enter on websites. Deal Decl. ¶ 21. They also require participants to complete additional tasks, like completing questionnaires and linking their social media accounts. *Id.* ¶ 20. Plaintiffs have never alleged, nor could they, that RTB bid requests include the same extent of information as these voluntary research programs, and that fundamental disconnect makes Screenwise and similar programs an invalid way to measure the value of the injunctive relief here.

***Fourth,*** Dr. Zeithammer's valuation assumes that 8.8 percent of users will enable the RTB Control, but that number is based on guesswork. Dr. Zeithammer extrapolates from the estimated number of individuals who have enabled controls that websites make available to users under the California Consumer Privacy Act, but those controls are a poor comparator for the RTB Control for numerous reasons and Dr. Zeithammer likely overestimates the number of people who enable them. Deal Decl. ¶¶ 25-27.

***Fifth***, regarding Dr. Zeithammer's even more inflated valuation based on "unjust enrichment," he first makes various unsupported assumptions about the amount of Google's RTB-related revenue, then assumes that ***all*** incremental revenue associated with the data affected by the RTB Control is "unjust." This ignores the fact that many users impliedly consented to the practices at issue, as the Court recognized in denying certification of a damages class. *See* ECF No. 690 at 23-24 (finding that "Google's, RTB participants', and third parties' disclosures" could support a finding of implied consent depending on a user's "individual, and subjective, understanding" of those disclosures). Dr. Zeithammer makes no attempt to remove any revenue derived from such consenting users from his calculation, even though there is no theory under which such revenues could constitute "unjust enrichment." Deal Decl. ¶¶ 13-15.

Given the many flaws, uncertainties, and assumptions in Dr. Zeithammer's calculations, the Court should reject Plaintiffs' Counsels' effort to tie their fees to his speculative and massively inflated valuations. Plaintiffs' Counsel cannot point to a single case where a court applied a percentage-of-the-fund approach to a valuation remotely similar to Dr. Zeithammer's. Instead, their case citations underscore why it would be inappropriate to do so here. *See* Mot. at 5-6. For example, in *Farrell v. Bank of America, N.A.*, the defendant bank ***itself*** estimated that by agreeing not to

charge certain fees as part of the settlement, it would forego $1.2 billion in revenue over the settlement period. 327 F.R.D. 422, 426 (S.D. Cal. 2018). In *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), the defendant and the plaintiffs ***jointly*** valued the settlement's injunctive relief. Even then, "the court ***rejected*** the idea of a straight percentage recovery because of its uncertainty as to the valuation of the settlement" and instead used a lodestar calculation that the Ninth Circuit affirmed. *Id.* (emphasis added).[6] Here, Google has not proposed or agreed to any valuation, and *Farrell* and *Hanlon* reinforce why the Court should reject Plaintiffs' unilateral and self-serving valuation here. Further, in *Corker v. Costco Wholesale Corp.,* 2023 WL 6215108 at *2 (W.D. Wash. Sept. 25, 2023), the plaintiffs obtained "both the cash recovery for past wrongs and the present day value of the injunctive relief designed to prevent the exact same type of harm going forward."[7] In other words, the injunctive relief in that case was closely related to and could be readily quantified based on the concrete amount of past damages recovered in the settlement. Here, there is no damages recovery against which to benchmark the injunctive relief.

For all these reasons, the Court should reject Plaintiffs' Counsel's reliance on the percentage-of-the-fund method and find that it cannot support their requested award.

### B. The Lodestar Method Also Does Not Support a $128 Million Fee Award.

Plaintiffs' Counsel also claim their nearly $130 million request can be justified by awarding them not only their full lodestar but a 3.5 multiplier to account for what they hyperbolically characterize as an "exceptional" settlement result. Mot. at 7. But Plaintiffs' Counsel's irrational claim entirely ignores that they failed in their primary objective of recovering classwide damages. Indeed, the limited success Plaintiffs' Counsel achieved in this case prevents them from recovering anything approaching their full $36.6 million lodestar, let alone the 3.5x multiplier they seek.[8] Instead, the Court should cut the lodestar amount by half to account for Plaintiffs' failure to recover

---

[6] Plaintiffs' Counsel also cite *In re Online DVD-Rental Antitrust Litigation,* 779 F.3d 934 (9th Cir. 2015), which has no relevance here since the settlement in that case provided cash and gift cards to all class members and the fee award was not premised, as here, on an alleged valuation of injunctive relief.

[7] *Corker* also involved only a modest fee request. In contrast, here, the valuation of the injunctive relief is not only highly speculative but coupled with a massive fee request, placing a far greater need for this Court to apply rigorous scrutiny.

[8] Google does not dispute the reasonableness of Plaintiffs' Counsel's hourly rates except as specifically noted herein relating to the first-tier document review process.

classwide damages and apply further discounts to address the many instances of unnecessary and excessive work included in Plaintiffs' Counsels' claimed lodestar.[9]

**1. Plaintiffs' Counsel's Lodestar Is Dramatically Inflated.**

**a. Plaintiffs' Counsel Improperly Seek Compensation for Their Damages Claims.**

Where "a plaintiff has achieved only partial or limited success," awarding attorneys' fees based on the "hours reasonably expended on the litigation as a whole" can lead to "an excessive amount." *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983). "This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id*. In cases involving only partial success, a district court has broad discretion to award an amount less than the full lodestar, which it can calculate by either "identify[ing] specific hours that should be eliminated" or "simply reduc[ing] the award to account for the limited success." *Id*. at 436-37. Applying these standards, this Court has noted it is an "appropriate starting point" for counsel in privacy and other class actions to remove "time entries related to monetary relief" from their lodestar where a settlement provides only injunctive relief. *Stathakos v. Columbia Sportswear Co.*, 2018 WL 1710075, at *3 (N.D. Cal. Apr. 9, 2018) (Gonzalez Rogers, J.). Plaintiffs' Counsel pay passing lip service to the *Hensley* standard for evaluating fees requests in cases involving "partial or limited success." *Hensley*, 461 U.S. at 435 n.11. But they claim their entire lodestar, including all time spent advancing their damages claims failed Rule 23(b)(3) class. Mot. at 3, 10.

Other counsel representing plaintiffs in many other matters have applied this commonsense approach and ***voluntarily*** reduced their lodestar when seeking attorneys' fees in similar circumstances. For example, in *Campbell v. Facebook Inc.*, "[t]he fees sought by plaintiffs [we]re ***less than half*** of their actual lodestar"—reflecting that the court had "rejected plaintiffs' motion for class certification under Rule 23(b)(3)" and the settlement included only injunctive relief. 2017 WL 3581179, at *2, 7 (N.D. Cal. Aug. 18, 2017). *Campbell*, like *RTB*, was "a very hard-fought case, with heavy motions practice and intensive discovery in a highly technical context" involving alleged privacy violations. *Id.* at *7. In another privacy case, *In Re Ring LLC Privacy Litigation*,

---

[9] Google does not dispute the reasonableness of Plaintiffs' Counsel's hourly rates.

the plaintiffs' counsel sought just over ***a third*** of their lodestar. 2024 WL 2845978, at *6 (C.D. Cal. May 28, 2024). The *In re Ring* settlement, like *RTB* and *Campbell*, provided only a new data control and new disclosures, with no monetary relief to the settlement class. *In re Ring LLC*, 2023 WL 9687346, at *2 (C.D. Cal. Dec. 20, 2023). The plaintiffs in *Moreno v. San Francisco Bay Area Rapid Transit District* did the same: "[t]he fees sought represent[ed] approximately ***one third*** of [c]lass [c]ounsel's actual lodestar" in an injunctive-relief privacy settlement. 2019 WL 343472, at *6 (N.D. Cal. Jan. 28, 2019) (emphasis added)); *see also* Order at 4-5, *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, No. 4:20-cv-09077, (N.D. Cal. Dec. 9, 2024), ECF No. 150 (granting attorney's fees subject to "a ***62.1% voluntary reduction*** in [c]lass [c]ounsel's lodestar" in injunctive-relief settlement following denial of Rule 23(b)(3) class (emphasis added)); *Lilly v. Jamba Juice Co.*, 2015 WL 2062858, at *6 (N.D. Cal. May 4, 2015) (after counsel failed to certify a damages class and settled for injunctive relief only, they proposed "voluntary acceptance of a ***substantial 35% reduction*** from the full lodestar amount" (emphasis added)). Counsel who lost Rule 23(b)(3) certification have taken this approach even where—unlike here—they settled after successfully certifying an injunctive class, such as in *Ang v. Bimbo Bakeries USA, Inc.*, where plaintiffs' counsel sought just ***one third*** of their lodestar. 2020 WL 5798152, at *9 (N.D. Cal. Sept. 29, 2020). These cases are summarized below:

| **Case** | **(b)(2) Class Certified?** | **(b)(3) Class Certified?** | **Lodestar % Sought** |
|---|---|---|---|
| *In re Google RTB* | No | No | **350%** |
| *Campbell v. Facebook Inc.* | Yes | No | 49.7% |
| *In Re Ring LLC Privacy Litigation* | No | No | 36% |
| *Moreno v. San Francisco Bay Area Rapid Transit District* | No | No | 33% |
| *Moore v. GlaxoSmithKline Consumer Healthcare Holdings* | No | No | 37.9% |
| *Lilly v. Jamba Juice Co.* | No | No | 65% |
| *Ang v. Bimbo Bakeries USA, Inc.* | Yes | No | 33% |

This prevailing practice of substantial and voluntary lodestar reductions makes Plaintiffs' Counsel's demand here all the more jarring. This over-reaching request includes substantial categories of fees that should be excluded from any award, consistent with this Court's approach of removing "time entries related to monetary relief." *Stathakos*, 2018 WL 1710075, at *3.

As an overarching matter, all work related to Plaintiffs' Counsel's failed effort to certify a Rule 23(b)(3) class, including time spent briefing and arguing these issues and the discovery underlying them, should be excluded. As the Court made clear in the *Brown* case when discussing plaintiffs' request for fees tied to their 23(b)(3) certification efforts and other time spent on monetary damages in the case: "it's inappropriate to compensate for those motions, and [this Court] won't do it." *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, ECF No. 1131 at 27 (Aug. 12, 2024).

Likewise, the substantial expert process focused on damages—including Plaintiffs' Counsel's work with Dr. Zeithammer and Dr. Greg Regan on damages issues and their deposition of and *Daubert* challenge to Google's damages expert Bruce Deal—should be excluded from their lodestar since this work related exclusively to their failed Rule 23(b)(3) certification effort. This would include Plaintiffs' Counsels' work in deposing Google's survey expert Dr. Dominique Hanssens (and related work) since that survey addressed the predominance requirement of Rule 23(b)(3). *See* ECF No. 690 (discussing Dr. Hanssens' survey as a basis for denying a damages class on predominance grounds).

So too for Plaintiffs' failed Rule 23(f) petition seeking Ninth Circuit review of this Court's order denying certification of a Rule 23(b)(3) class. *Woodruff v. Google LLC*, Case No. 24-2479 (9th Cir. Apr. 18, 2024), ECF No. 1.1. This quarter-million dollar expenditure, focused exclusively on the Rule 23(b)(3) predominance inquiry, was entirely unrelated to Plaintiffs' injunctive relief claims. Even if the Court did not exclude this time as improperly seeking compensation for damages claims, Plaintiffs' Counsel could not seek the $163,300 charged by Gupta Wessler LLP, which violated the Court's instruction that "no other law firms shall work on the instant case without prior approval of the Court." ECF No. 77 at 2.

Plaintiffs' Counsel's justifications for recovering their entire lodestar, including the categories above, are unpersuasive. For the most part, Plaintiffs' Counsel argue the Court should

simply ignore these issues because they delivered an "excellent result" and these steps were "necessary" in the litigation. Mot. at 18. But awarding a full lodestar for partial success—and Plaintiffs' Counsel cannot seriously claim their success is anything more than partial—is generally inappropriate even where "conscientious counsel tried the case with devotion and skill." *See Hensley*, 461 U.S. at 436. Plaintiffs also contend that all of their damages work was inextricably intertwined with their injunctive relief claims, mainly asserting that "Professor Zeithammer's work [at the first class certification motion] remained highly relevant to valuing any injunctive relief ultimately obtained by plaintiffs through settlement or trial, and in quantifying the unjust enrichment to Google." Mot. at 19. But the primary value of Dr. Zeithammer's assertions about injunctive relief is in supporting their arguments in the instant Motion, not in achieving any benefit for the settlement class. Tellingly, Plaintiffs did not cite Dr. Zeithammer or their other damages expert, Dr. Regan, even once in their renewed class certification motion seeking injunctive relief. *See generally* ECF No. 749. And any argument that this damages-specific work helped force Google to the negotiating table to produce this settlement would not be credible. Concern over a potential damages award could not have motivated Google to settle, since by the time the parties began negotiations, this Court had already denied a damages class with prejudice and the Ninth Circuit had already refused interlocutory review of that denial. ECF Nos. 690 (denial of class certification), 716 (Court of Appeals' denial of review).

Plaintiffs' Counsel's case authorities are similarly unpersuasive. *See* Mot. at 19. First, they rely chiefly on *Iswed v. Caruso*, 2013 WL 12093132 (W.D. Mich. Feb. 14, 2013), a single-plaintiff prisoner's rights case where the jury found the defendants had qualified immunity against damages stemming from violations of plaintiffs' constitutional rights but enjoined defendants from future violations. Under these circumstances, the court found an amount close to the full lodestar was appropriate because the "requests for monetary damages and injunctive relief largely overlap and are not easily separated." *Id.* at *4. *Iswed* bears little resemblance to the circumstances here. Indeed, the *Iswed* court noted that the circumstances in that case were distinct from other matters where "counsel's work related to one claim can be accurately separated from work on other claims." *Id.* That is precisely the case here. Second, Plaintiffs' Counsel refer to dicta from a footnote in *Hensley*.

Mot. at 19. But they ignore that the Court's holding actually vacated the attorneys' fees award at issue that "refused to eliminate from the award hours spent on unsuccessful claims," while cautioning that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 428, 440. Third, Plaintiffs' Counsel cite *Dang v Cross*, 422 F. 3d 800 (9th Cir. 2005), in which the district court reduced a lodestar amount where the plaintiff recovered damages from one defendant but not certain others. The Ninth Circuit remanded to the district court, not because it found a full lodestar award was warranted, but simply because the district court had not considered the relatedness of the claims against the various defendants. None of these authorities support Plaintiffs' Counsel's effort to recover not only their full lodestar.

In summary, Plaintiffs' Counsel's refusal to deduct even a dollar from their lodestar due to their failure to obtain classwide damages is overreaching that dramatically departs from prevailing practice. To account for the limited success in this case and consistent with the options outlined in *Hensley*, the Court should either (1) exclude all time spent on Plaintiffs' Rule 23(f) petition and reduce the remaining lodestar by half, which reflects roughly the midpoint of the range of discounts applied in the *Campbell* and other cases discussed above, or (2) require Plaintiffs to identify and deduct from their lodestar the time entries associated with the specific categories of work identified above, subject to review and response by Google. If the Court adopts the first option, the adjusted lodestar would be $18,205,740, subject to additional deductions for the issues identified below.

**b. Plaintiffs' Counsel's Billing Records Reflect Pervasive Inefficiency and Unnecessary Work.**

For what remains after the adjustments above, the Court should apply further discounts to the lodestar to account for pervasive inefficient and unnecessary work. Far from "ensur[ing] efficiency in representing the putative classes in the instant case" as the Court ordered, Plaintiffs' Counsel over-litigated, overstaffed, and overbilled this case at every turn. ECF No. 77 at 2. Their lodestar reflects a scorched-earth, uncompromising discovery strategy that needlessly burdened the Court and Google, relitigating the same issues across multiple motions and mounting two failed campaigns to sanction Google. Worse, Plaintiffs' Counsel seek compensation for duplicative work

by timekeepers at every level—from staff attorneys who spent thousands of hours re-reviewing documents to senior partners who billed to simply observe depositions and hearings.

**(1) Plaintiffs' Counsel Should Not Be Rewarded for Their Intransigent Approach to Discovery.**

Plaintiffs' Counsel's "extensive discovery," "37 discovery motions," "two discovery-related contempt and sanctions motions," and "seven appeals to the District Court of discovery rulings by the Magistrate Judge" resulted in unnecessary and dilatory discovery bills. Mot. at 14. Judge DeMarchi put it best when she observed that Plaintiffs' Counsel "repeatedly undermined their cause by serving and insisting upon overbroad discovery requests," which Google was entitled to and did resist. ECF No. 326 at 4. When these disputes required court intervention, Plaintiffs' Counsel regularly "fail[ed] to explain how the discovery they seek is relevant to a claim or defense and proportional to the needs of the case." *Id.* Instead, Plaintiffs' Counsel devoted time to improper and unauthorized briefs that did not assist the Court at all, such as "an 11-page letter and more than 800 pages of exhibits from the *Calhoun* action" that "should not have been filed, given the Court's very clear direction regarding supplemental briefing on the scope of relevant discovery." ECF No. 287 at 5-6. Google overwhelmingly prevailed on these motions, and when Plaintiffs serially appealed Judge DeMarchi's rulings, this Court affirmed them. *See, e.g.,* ECF Nos. 344, 345, 732.

Even after these admonitions, Plaintiffs' Counsel never changed their approach to discovery. One of the Court's very last discovery orders rejected Plaintiffs' Counsel's demand that Google answer ***560*** requests for admission, each with six subparts. Denying that demand in full, the Court observed that "the sheer number of plaintiffs' requests, and the fact that each has multiple subparts . . . makes plaintiffs' RFAs unduly burdensome and disproportionate," with no "sufficient justification for these RFAs as to any document, let alone 560 documents." ECF No. 725 at 4. And on two separate occasions when Plaintiffs were dissatisfied with Google's responses to discovery or simply suspected Google had not produced responsive information, they brought full-blown sanctions motions—both of which were denied outright. ECF Nos. 486, 754.

Plaintiffs' Counsel's extreme and unwarranted discovery practices have already greatly burdened Google; it would only incentivize wasteful behavior were Google ordered to pay for the

Plaintiffs' Counsel's unnecessary tactics. The Court should reduce Plaintiffs' Counsel's time spent on discovery motions by 45 percent to account for their prevalent overlitigation, yielding an award of $1,067,382 for this category. Pritzker Fee Decl. ¶ 28. *See Navarro v. Gen. Nutrition Corp.*, 2005 WL 2333803, at *17 (N.D. Cal. Sept. 22, 2005) ("[T]he Court must not hesitate to reduce the lodestar computed when the result obtained is the product of an unnecessarily extended proceeding.").

**(2) Plaintiffs' Counsel Pervasively Overstaffed Their Teams and Billed for Duplicative and Excessive Work.**

Consistent with their strategy of overlitigation, Plaintiffs' Counsel disregarded the Court's mandate to "impose and enforce limits on the number of lawyers assigned to each task." ECF No. 77 at 2. Plaintiffs' Counsel repeatedly refused to provide their billing records to Google in a manipulable and unredacted Excel format. Declaration of Whitty Somvichian ("Somvichian Decl.") ¶¶ 3-4. This alone is telling, as Google was unable to conduct a full and detailed assessment of Plaintiffs' Counsel's time based on the seven PDFs they produced.[10] *Id.* Nevertheless, several trends make clear that much of the time for which Plaintiffs' Counsel seek compensation was "excessive, redundant, or otherwise unnecessary." *Jankey v. Poop Deck*, 537 F.3d 1122, 1132 (9th Cir. 2008). Plaintiffs' Counsel's refusal to provide their billing records in readily analyzed formats made proposing line-item reductions impossible, so Google proposes the following reductions yielding a total fee award of $14,365,768. For the Court's reference, Google outlines these reductions in chart form in the Somvichian Declaration. *See* Somvichian Decl. ¶ 11 & Ex. 10.[11]

**(a) Inefficient document review & excessive document reviewer rates.**

Plaintiffs' Counsel's work on first-level and pre-deposition document review is excessive on its face. Multiple issues warrant reducing the fees awarded for this work.

***First***, it appears that Plaintiffs' Counsel used contract attorney document reviewers for a substantial amount of document review but billed them at full associate rates of $325 to $435. Two

---

[10] Google is separately lodging the portions of these records cited in this brief with the Court for in camera review in the format in which Plaintiffs' Counsel produced them. *See* Exs. 2-8.
[11] All exhibit citations are to the Somvichian Declaration except as noted.

of Plaintiffs' Counsel's most prolific document reviewers, Mojisola Onabanjo (who billed $996,424 for DiCello Levitt) and Lloyd Donders (who billed $572,386 for BFA) do not appear anywhere in those firms' resumes or descriptions of their personnel. Ex. 1; *see also* ECF Nos. 781-8 Ex. A (BFA resume with no mention of Donders), 781-11 Ex. A (DiCello Levitt resume with no mention of Onabanjo). On the contrary, these two attorneys appear to maintain their own private practices, supporting the inference that they were contractors. Somvichian Decl. ¶¶ 7-8 & Exs. 9-10. Plaintiffs' Counsel are seeking far above market rates for contract reviewers, and they "have not met their burden of producing satisfactory evidence that the requested rates for contract attorneys are in line with those prevailing in the community." *In re Wells Fargo*, 445 F. Supp. 3d. at 531 (citation modified) (awarding "the $42.50 per hour average [contract reviewers] were actually paid," not the $295 to $415 that plaintiffs' counsel claimed). The Court should reduce these two attorneys' rates to $70 per hour for all billing categories—still a generous increase over the $42.50 awarded in *Wells Fargo*.

***Second***, Plaintiffs' Counsel billed 8,110 hours—over $2.6 million's worth—to first-level document review of Google's productions. Ex. 1. Google produced just 57,608 documents[12] (totaling 498,013 pages, an average of 8.6 pages per document) that required review, a fraction of the number at issue in similar cases.[13] Somvichian Decl. ¶ 10. Courts recognize that a standard first-level reviewer should typically process at least 40 documents per hour. *See, e.g.*, *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 645 (S.D.N.Y. 2019) ("The average rate of review is about 40-60 documents per hour."); *Oliva v. Infinite Energy, Inc.*, 2013 WL 6815989, at *8 (N.D. Fla. Dec. 24, 2013) ("The generally accepted rule is that associate-level document review can be effectively conducted at a rate of fifty 10–page documents per hour."); Nicholas M. Pace & Laura Zakaras, *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery*,

---

[12] Plaintiffs' Counsel make much of "voluminous bid data" that Google produced in addition to documents, but they concede that at "[a]ll of this data was analyzed and reviewed by plaintiffs' experts" and reviewed only "in summary form" by counsel. ECF No. 778-2 ¶¶ 13, 19; *see also Robinson v. Open Top Sightseeing San Francisco, LLC*, 2018 WL 2088392, at *7 (N.D. Cal. May 4, 2018) (excluding from lodestar review of "documents that plaintiffs' expert, and not plaintiffs' counsel, would have analyzed").

[13] *See, e.g.*, Motion for An Award of Attorneys' Fees at 10, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR (April 23, 2024), ECF No. 1106 (case in which "935,644 documents [were] produced by Google, totaling almost six million pages, including from 43 Google custodians").

RAND at 49 (2012). Even generously assuming that 1,500 of Plaintiffs' Counsel's Tier I review hours were spent in meetings or reviewing the small number of documents that Plaintiffs and third parties produced, this still equates to a rate of just ***8.7 documents per hour.*** To account for this issue, the Court should award fees for first-level review limited to the amount of hours reasonably needed to review the volume of documents at issue based on normal expectations of 50 documents per hour, which amounts to 1,152 hours in addition to the 1,500 hours referenced above.

***Third***, Plaintiffs' Counsel's document reviewers also spent over a million dollars on time billed to "Depositions." Ex. 1. Most of this work appears to pertain to the analysis and preparation of documents for use at depositions. But it is unclear what further analysis occurred and why it was necessary, especially at this scale, after Plaintiffs' Counsel had already spent over ten thousand hours on first- and second-level document review as discussed above. Further, multiple senior associates and partners also participated extensively in second-level document review—which totaled $2.54 million—or in billing time to depositions they did not take or defend. For instance, An Truong billed $217,980 to "Depositions," despite taking just one half-day deposition. Ex. 1. To be sure, deposition preparation and associated document reviews can take substantial work, but Plaintiffs' Counsel spent unnecessary and duplicative time that no paying client would pay for. The Court should further reduce the hours billed to "Depositions" by document review attorneys Donders, Onabanjo, Jennifer Jurmark, Jooyoung Koo, and Glen Tsurudome by half on this basis.

**(b) Excessive interfirm meetings.**

Plaintiffs' Counsel spent over 3,000 hours and ***$2.94 million*** in fees for inter-firm meetings, nominally of the members of the Plaintiffs' Executive Committee. Ex. 1. The Court appointed six attorneys—one from each firm—to participate on the Executive Committee. But eight ***additional*** lawyers billed over $100,000 each—a total of more than $1.25 million—on committee and "lead counsel" meetings. *Id.* This includes $111,340 in time spent by Joseph Cotchett, who never even appeared in the case. *Id.* Courts regularly question whether counsel's time spent on "internal communications and communicating with each other" is compensable ***at all***, often excluding some or all of such time from a lodestar calculation. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2023 WL 4109573, at *9 (N.D. Cal. June 20, 2023) (collecting cases).

Even if the Court finds that some of the time billed to executive committee meetings is recoverable, Plaintiffs' Counsel overreach by seeking so much compensation for so many lawyers from so many firms at so many meetings. Moreover, Plaintiffs' Counsel spent another $1 million on "Case Management" and $1.25 million on "Analysis/Strategy," two categories that appear to overlap with the kind of strategic and administrative matters to be handled by the Executive Committee. Ex. 1. Other overstaffed meetings appear in additional categories, like [redacted] Exs. 2 at 379-380; 4 at 190-; 5 at 82; 7 at 366; 8 at 173. To address these issues, the Court should apply a 30% reduction to Plaintiffs' Counsel's fees for the "Lead Counsel/PEC Meetings" category.

**(c) Excessive deposition and hearing staffing.**

Plaintiffs' Counsel regularly staffed depositions and hearings with two, three, or even more lawyers—almost always at the partner level—in addition to the attorneys directly handling the deposition or argument. For instance, four non-speaking timekeepers attended Haskell Garon's deposition, six attended Bruce Deal's, and ***seven*** attended Glenn Berntson's. Somvichian Decl. ¶ 9. As this Court put it during oral argument on the fee motion in *Brown*, "you certainly don't need three or four people at a deposition. You may want them there. That's fine. But ***you can't charge for them***." *Brown v. Google LLC*, 4:20-cv-03664-YGR, ECF No. 1131 at 36:6-8 (emphasis added). All told, Plaintiffs' Counsel billed for at least two non-participating lawyers at twelve separate depositions.[14] Somvichian Decl. ¶ 9. Plaintiffs' Counsel followed the same practice at hearings. Thirteen lawyers appeared for Plaintiffs at the hearing on their first class certification motion and its related *Daubert* motions, even though only five of them were slated to argue any portion of the hearing. ECF No. 680 at 1-2 (appearances), 5:6-6:11 (outlining how Plaintiffs' Counsel intended to divide the argument among five attorneys). Another listened in via Zoom and billed for doing so. Ex. 7 at 366. Just three attorneys represented Google at that hearing. ECF No. 680 at 2. The

[14] Plaintiffs' Counsel may protest that "[a] second attorney may serve as a sounding board or be necessary to assure that valuable testimony . . . is obtained during the limited time allotted in deposition." Perhaps, but the depositions Google highlights all featured at least three (and usually more) lawyers for Plaintiffs. *Rodriguez v. County of Los Angeles*, 96 F. Supp. 3d 1012, 1024 (C.D. Cal. 2014).

Court should correct these issues by reducing fees for time spent on "Depositions" by a further ten percent and fees for time spent on "Court Appearances" by a further twenty percent.

**(d) Unauthorized "fees on fees" billing.**

Plaintiffs' Counsel ignored the Court's order that they "shall not bill time related to fee issues or time spent preparing or reviewing time and expenses." ECF No. 77 at 2. Pritzker Levine, in particular, billed extensively for time on reviewing, auditing, and communicating with other firms about fees and expense reports. *See, e.g.*, Ex. 7 at 8, 15, 17, 32, 106, 140, 145, 146, 196, 215, 232, 236, 255, 380, 383, 394, 394, 405, 416, 420, 454, 461. The Court should reduce the "Case Management" category where these fees were billed by a further fifteen percent.

**(e) Excessive billing to oppose the motion to dismiss.**

Remarkably, Plaintiffs' Counsel billed $839,756 on "Dispositive Motions." The only dispositive motion filed in the case was Google's motion to dismiss.[15] That motion was decided on the papers, with no hearing. ECF No. 123. In other words, Plaintiffs' Counsel billed the better part of a million dollars on ***a single 25-page brief*** and its exhibits. *See* ECF No. 103. This strongly indicates inefficient and duplicative work that the Court should discount by ten percent.

**(f) Block billing.**

Plaintiffs' Counsel's billing records contain rampant block billing, with timekeepers at each firm regularly recording multiple tasks in single entries, many of which span multiple hours.[16] This flies in the face of the Court's clear order that "all billing shall be recorded by task, rather than by block billing." ECF No. 77 at 2. As a result, it is next to impossible for Google or the Court to determine for many entries how Plaintiffs' Counsel allocated their time or whether they did so efficiently. Indeed, it is hard to imagine how Plaintiffs' Counsel themselves could have audited block-billed entries to "strike duplicative or inefficient billing," and they evidently did not do so. *Id.* The Court should apply an across-the-board 5 percent reduction to the lodestar, after the additional reductions above are applied, on this basis. *See, e.g.*, *Simon v. Maple Beach Ventures*

---

[15] Plaintiffs' Counsel account for class certification proceedings in a separate category. *See* Ex. 1.

[16] *See, e.g.*, Exs. 2 (BFA Records) at 52, 225, 308, 377; 3 (Bottini Records) at 1, 2, 7, 21, 33, 37, 62, 69; 4 (Cotchett Records) at 30, 38, 43, 53, 54, 86, 88, 91, 104, 131, 138, 149, 183; 5 (DiCello Levitt Records) at 62, 77, 80, 83, 132, 181, 186; 6 (Gupta Wessler Records) at 2; 7 (Pritzker Levine Records) at 97, 102, 204, 271; 8 (Simmons Hanly Conroy Records) at 91, 104, 115, 118, 135.

*LLC*, 2021 WL 1907821, at *4 (N.D. Cal. May 12, 2021) (imposing "a 10 percent 'haircut' to plaintiff's total based on their block billing, although further reduction would be justifiable given the opacity of counsel's records").

**2. Plaintiffs' Counsel Have Not Earned a Multiplier.**

"[T]he lodestar figure is a presumptively reasonable amount of attorneys' fees," and only "special circumstances" warrant a positive multiplier. *St. Louis Police Ret. Sys. v. Severson*, 2014 WL 3945655, at *5 (N.D. Cal. Aug. 11, 2014) (Gonzalez Rogers, J.). The results here do not support awarding even the full lodestar for all the reasons discussed above, much less the 3.5 multiplier that Plaintiffs seek. Seeking to justify this excessive and highly unusual multiplier, Plaintiffs' Counsel extol the settlement as "trailblazing," "expansive," "novel," and "exceptional," Mot. at 2, 7, but this hyperbole rests on two faulty premises, discussed below, and entirely ignores that Plaintiffs failed to recover any classwide damages.

**a. Plaintiffs' Counsel Ignore That They Failed to Prove That the Information Affected by the RTB Control Otherwise Renders Bid Requests Personally Identifying.**

As set forth above, Plaintiffs' Counsel assume away the central dispute in this case in arguing that the settlement allows users to remove from bid requests information that would otherwise be personally identifying. *See supra* at 7 (discussing Dr. Zeithammer's identical assumptions). In the Settlement Agreement, Plaintiffs' Counsel acknowledged that this remains a disputed issue. *See id*. And elsewhere in their papers, Plaintiffs' Counsel themselves acknowledge the possibility "that Google might prevail on all or some of its anticipated summary judgment motion, or that plaintiffs would not meet their burden of proof at trial." ECF No. 778-2 ¶ 49. Just as in any settlement, "it is imprudent" for Plaintiffs here "to presume ultimate success at trial and thereafter" and the Court should not do so. *In re Heritage Bond Litig.*, 2005 WL 1594403, at *7 (C.D. Cal. June 10, 2005) (citation omitted). Plaintiffs' Counsel are free to argue that they have secured some additional choices for the settlement class, but they cannot claim that they have freed settlement class members from having their "personal information" shared or sold without their consent. That issue remains contested.

**b. Plaintiffs' Counsel Ignore That Google Already Offered Account Holders Most of the Features of the RTB Control and Already Disclosed RTB's Functions.**

Plaintiffs' Counsel falsely claim that the settlement allows Google account holders "***for the very first time*** to limit the information Google shares about them in the Google RTB auctions" and "remov[e] from Google RTB bid requests the key information" at issue in the case. Mot. at 7 (emphasis added). But users already have access to multiple ways to limit the information contained in bid requests directly through Google as well as third-party controls. ECF No. 592-1 ¶ 49. These existing options include the Google Ads Personalization ("GAP") setting, which allows users control over most of the same bid request fields affected by the new RTB Control. When a Google account holder disables GAP, "all pseudonymous identifiers" are omitted from bid requests, along with "hosted match data," and "cookie matching is also disabled." *Id*. These overlap with two of the four features of the RTB Control that Plaintiffs' Counsel and their expert tout: "[a]ll pseudonymous identifiers are removed" and "[c]ookie matching does not occur." S.A. at 6; *see also* ECF No. 778-5 ¶ 17 (listing these changes).[17]

Likewise, Google's agreement to publish "[a] new dedicated webpage" that "disclose[s] the new RTB Control, with appropriate links to other relevant Google webpages and the new RTB Control," S.A. at 6, is not an innovation in "transparency" or "accountability," Mot. at 24. As this Court recognized in its Class Cert. Order, Google already provides disclosures that provide a "layperson's explanation of RTB," including explaining that it transmits "various categories of information from its account holders to serve personalized ads." ECF No. 690 at 23. Plaintiffs' Counsel do not appear to argue otherwise, but the point bears emphasis.

**c. The Settlement Is Reasonable, Not Exceptional.**

Google agrees that the RTB Control and other injunctive relief at issue provide meaningful benefits to the settlement class and that the settlement as a whole is fair, adequate, and reasonable. But it is not remotely the historic victory Plaintiffs' Counsel now suggest. The measures agreed to

[17] Dr. Shafiq misleadingly suggests that the RTB Control offers a fifth innovation: "[n]o user lists will be shared or used." But as the Settlement Agreement explains, this is not a freestanding change, but simply the consequence of omitting pseudonymous identifiers. S.A. at 6. Without pseudonymous identifiers, user lists are useless.

in the Settlement bear no resemblance to the sweeping relief, including classwide damages, that Plaintiffs sought in the CCAC, and "the benefit obtained for the class" is of "foremost" importance in determining whether to apply a lodestar multiplier. *In re Bluetooth*, 654 F.3d at 942. Most saliently, the settlement includes ***not a single dollar*** in compensation to class members, failing to achieve Plaintiffs' primary goals of extensive compensatory damages, statutory damages, punitive damages, and equitable restitution.. This monetary compensation, which Plaintiffs claimed far exceeded $1 billion, was the cornerstone of their case. ECF Nos. 546 at 23, 546-6 ¶ 53. Indeed, by one of Plaintiffs' damages estimates, they should have recovered over three quarters of a billion dollars in compensatory damages alone ***for each year*** of the class period.[18] In casting their settlement as a win for class members because it "preserv[es] their rights to individually pursue any potential damage claims," Plaintiffs' Counsel elide that class members retain this right only because Plaintiffs' Counsel lost their bid to certify a damages class. Mot. at 2.

The various injunctive-relief cases Plaintiffs' Counsel cite in which courts awarded high multipliers involved far more impressive results. *See* Mot. at 21-22. For instance, in *Grissom v. Sterling Infosystems, Inc*., 2025 WL 1348480 (S.D.N.Y. May 8, 2025), plaintiffs' counsel obtained injunctive relief through a settlement even though the statute under which they had sued did not provide for injunctive remedies at all. *See Grissom v. Sterling Infosystems, Inc.*, 2024 WL 4627567, at *5 (S.D.N.Y. Oct. 30, 2024). In *St. Louis Police Retirement System*, 2014 WL 3945655, at *6, the plaintiffs secured a judicial finding on a preliminary injunction that the defendants had likely broken the law, and their settlement largely confirmed and made permanent changes that the court had ordered in granting them a preliminary injunction. And in both *Gaston v. LexisNexis Risk Solutions Inc.*, 2021 WL 2077812, at *7 (W.D.N.C. May 24, 2021), and *City of Plantation Police Officers' Employees' Retirement Systems v. Jeffries*, 2014 WL 7404000, at *11 (S.D. Ohio Dec. 30, 2014), the defendants agreed to pay the requested fees.

---

[18] *See* ECF No. 546 at 9 (asserting that "[t]here are at a minimum tens of millions"—*i.e.*, 20 million—"class members here"), 23 (asserting that the yearly market value of information at issue is $38 per class member). Plaintiffs now estimate that there are "***hundreds*** of millions" of Google account holders, which would further increase this figure that they tried and failed to secure. Mot. at 7 (emphasis added).

**d. The Remaining Considerations Do Not Warrant Plaintiffs' Counsel's Request for an Extraordinary 3.5x Multiplier.**

No other factor courts consider in evaluating whether to increase counsel's lodestar— "the quality of representation," "the complexity and novelty of the issues presented," and "the risk of nonpayment"—justifies a positive multiplier. *In re Bluetooth*, 654 F.3d at 941–42 (quoting *Hanlon*, 150 F.3d at 1029). Plaintiffs' Counsel's experience and credentials are already reflected in their substantial hourly rates, which Google does not (with the limited exception for contract reviewers) dispute. Although their case involved some complex technical issues, their legal claims were familiar breach of contract, common law tort, and statutory privacy causes of action. And contrary to Plaintiff's Counsel's claim that they researched and drafted their complaints from scratch, without drawing on "a government proceeding or some other public exposure," they actually drew heavily on prior filings with the Irish data protection authorities and the EFF's publication regarding RTB. One need not look beyond the Consolidated Class Action Complaint for proof: it includes a diagram taken ***directly*** from the EFF report. CCAC ¶ 133. Moreover, as Plaintiffs themselves put it, many issues "about Google's universal privacy and consent policies, how Google collects and stores named plaintiff data, and how Google uses that information in the real-time bidding ("RTB") auctions, [were] common across" *RTB* and the earlier-filed related *Calhoun* case. ECF No. 206 at 2. As a result, those of Plaintiffs' Counsel in *RTB* who were also counsel in *Calhoun* could draw on their background knowledge and experience litigating against Google in that case, further reducing any novelty here. And the risk of non-payment is inherent in all class action litigation. As Plaintiffs' Counsel know, this kind of "contingency-fee litigation is not a special consideration—it's the nature of the beast." *Hawthorne v. Umpqua Bank*, 2015 WL 1927342, at *5 (N.D. Cal. Apr. 28, 2015) (citation modified). Likewise, "it is not unusual to take years to litigate class actions." *Id.* Especially in light of the unexceptional results Plaintiffs' Counsel secured, all of these considerations further militate against a multiplier.

**C. Plaintiffs' Counsel Fail to Substantiate Their Request for Expenses.**

Plaintiffs' Counsel concede, as they must, that they may recover only "***reasonable*** expenses ***that would typically be billed to paying clients*** in non-contingency matters." Mot. at 25 (emphasis

added) (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). But Plaintiffs' Counsel make only a cursory effort to justify the nearly $3.5 million in costs that they seek, refusing to itemize them by vendor or payee. Somvichian Decl. ¶ 6. For the same reasons set forth above, Plaintiffs' Counsel is not entitled to this full amount. Their single biggest expense was $1.67 million paid to experts and consultants. ECF No. 781-10 Ex. D ($140,800 paid to Zeithammer), ECF No. 781-1 ¶ 35 ($1.53 million paid in other "Expert/Consultant Fees"). But as explained above, Plaintiffs' Counsel should reduce this amount for payments to experts who contributed only to their damages arguments, such as Dr. Zeithammer and Dr. Regan. *See supra* at 10-14. Plaintiffs' Counsel should also exclude from their cost request travel expenses associated with non-participating attorneys' attendance at depositions, hearings, and in-person meetings. *See supra* at 18-20. The Court should order Plaintiffs' Counsel to propose appropriate reductions and substantiate them in detail.

## IV. CONCLUSION

The Court should reject Plaintiffs' Counsel's request. Instead, any fee award should (1) first reduce the claimed lodestar by half to account for the limited success Plaintiffs' Counsel achieved in their injunctive-only settlement, consistent with the prevailing practice in this District, and (2) apply further discounts to address prevalent unnecessary and inefficient work as detailed above. In sum, this amounts to a recovery of no more than $14,279,402. The Court should also order Plaintiffs' Counsel to identify and remove from their cost request expenses related exclusively to damages claims and resulting from their overstaffing of the case.

Respectfully submitted,

Dated: November 26, 2025

COOLEY LLP

By: */s/ Whitty Somvichian*
Whitty Somvichian

Attorney for Defendant
GOOGLE LLC

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal Bar No. 220289)
Bethany Caracuzzo (Cal Bar No. 190687)
Caroline Corbitt (Cal Bar. No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document relates to: *all actions*. | Master File No. 4:21-cv-02155-YGR-VKD<br><br>**NOTICE OF LODGING OF EXHIBITS SUBMITTED IN SUPPORT OF PLAINTIFFS' REPLY RE. MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>**[Civil L.R. 7-11, 79-5(f); Standing Order Rule 12]**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Hearing Date: February 3, 2026<br>Hearing Time: 2:00p.m.<br>Hearing Location: Courtroom 1 |

Pursuant to Civil Local Rules, plaintiffs hereby provide notice of the following documents which were lodged with the Court in support of Plaintiffs' Reply filed in support of plaintiffs' Motion for an Award of Attorneys' Fees and Expenses as exhibits to the Reply Declaration of Elizabeth C. Pritzker:

**Exhibit G** – Pritzker Levine LLP time records

**Exhibit H** – Bleichmar Fonti & Auld LLP time records

**Exhibit I** – Bottini & Bottini Inc. time records

**Exhibit J** – Cotchett Pitre & McCarthy LLP time records

**Exhibit K** – DiCello Levitt time records

**Exhibit L** – Gupta Wessler time records

**Exhibit M** – Simmons Hanly Conroy LLP time records/

These records were designated "Confidential" or "Highly Confidential – Attorneys' Eyes Only" by plaintiffs pursuant to the protective order in this case (ECF No. 59), and the parties had agreed that these records and any excerpts therefrom, would be lodged and not filed.

Plaintiffs will provide the Court with these lodged records on a flash drive. Plaintiffs have already provided Google's counsel with these time records, but will also re-serve copies of lodged Exhibits G – M on Google's counsel in accordance with Civil L.R. 5-1(e).

DATED: December 22, 2025

**PRITZKER LEVINE LLP**

By: *<u>/s/ Bethany Caracuzzo</u>*
Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar. No. 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*

*Interim Class Counsel*

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

*IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*

*This document applies to all actions.*

**CASE NO. 4:21-CV-02155-YGR-VKD**

**REPLY DECLARATION OF ELIZABETH C. PRITZKER IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

Judge: Hon. Yvonne Gonzalez Rogers
Date: February 3, 2026
Time: 2:00 pm
Courtroom: 1, 4th Floor

I, Elizabeth C. Pritzker, hereby declare as follows:

1. I am a co-founding partner of Pritzker Levine LLP, and an attorney licensed in the State of California and duly admitted to practice before this Court.

2. On September 2, 2025, plaintiffs and defendant Google LLC ("Google") entered in a formal agreement to resolve this action by settlement, and that same day, plaintiffs filed their Motion for Certification of a Settlement Class and Final Approval of Settlement (the "Approval Motion"). ECF 777. I submitted a declaration in support of the Approval Motion (the "Pritzker Decl."). ECF 778-2.

3. In advance of moving for final approval, plaintiffs provided Google with Mediator Shirish Gupta's proposed Statement supporting the settlement, as well as with a draft of the Approval Motion. Google did not propose any edits and or express any disagreement with the Mediator's Statement (filed at ECF 778-16), and plaintiffs adopted Google's comments to the Approval Motion prior to filing.

4. On October 1, 2025, plaintiffs filed their Motion for an Award of Attorneys' Fees and Expenses (the "Fee Motion"). *See* ECF 781. I submitted a declaration in support of the Fee Motion. ECF 781-1 (the "Pritzker Fee Decl.").

5. This reply declaration (the "Pritzker Reply Decl.") is made in further support of plaintiffs' Fee Motion and in response to Google's Opposition to the Fee Motion ("Opp."). I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

## REACTION TO THE APPROVAL AND FEE MOTIONS

6. The deadline for settlement class members to object to or comment on the Approval Motion and the Fee Motion was December 12, 2025. No settlement class member has objected to or commented on either of the pending motions.

7. CAFA notice was issued on September 12, 2025 (*see* ECF 790), and the deadline for any recipients of the CAFA notice to object to or comment on the Approval Motion and the Fee Motion was also December 12, 2025. No CAFA notice recipient has objected to or commented on either of the pending motions.

PLAINTIFFS' COUNSEL'S TIME AND EXPENSE RECORDS

8. In its opposition, Google makes statements about how and when plaintiffs' counsel provided Google with their time records and asserts that plaintiffs' counsel refused to provide Google with a line-itemized accounting of their expenses. *See* Somvichian Decl. (ECF 787-2), ¶¶2-6. I discuss the course of events about these issues as I recall them, below.

9. The Fee Motion was filed on October 1, 2025. Google sent counsel an email requesting plaintiffs' counsel's time records three weeks later, on October 21, 2025. The parties met and conferred the following day, October 22, 2025. On October 23, 2025, plaintiffs' counsel prepared and sent Google a draft letter agreement to countersign, providing that plaintiffs' counsel would agree to provide Google their detailed time records, in chronological form as requested, subject to review and redaction and other protections to protect their confidentiality. Google's counsel sent a reply on October 27, 2025, saying it was reviewing the letter agreement and would circle back. In this email, Google for the first time asked that counsel's detailed time records be produced in Excel. Plaintiffs' counsel sent a response email the same day, advising that they were quickly undertaking the process of review and redaction, and that counsel could not provide the time records in Excel as Excel does not permit line-item redaction for confidentiality and privilege, but that detailed records would be produced, as agreed, chronologically in PDF format, promptly after Google returned the signed letter agreement. Nearly two weeks later, on November 10, 2025, Google requested modifications to the parties' letter agreement. Plaintiffs' agreed to those modifications and sent a revised letter without delay later that day. On November 11, 2025, the Veterans' Day holiday, Google finally returned an executed form of the letter agreement to plaintiffs' counsel. Despite counsel's offices being closed that day, plaintiffs' counsel provided Google with a link to access to their redacted billing records that same afternoon.

10. As to plaintiffs' line-item expense records, Google first requested these records on November 3, 2025, more than a month after the Fee Motion was filed on October 1st. That same day, counsel sent a reply email asking Google to explain what specific additional information it was seeking, since the detailed declarations filed with Fee Motion attest to the nature of the expenses that have been incurred in this case, all of which were clearly categorized for Google and the Court in

plaintiffs' Fee Motion and supporting materials, and inviting a meet and confer for the next day, November 4, 2025. Google never responded and never took counsel up on their meet and confer offer.

11. The detailed time records Plaintiffs' counsel produced to Google span some 1,605 pages. Google lodged with the Court only 80 pages (*see* Somvichian Decl., Exs. 2-8), which is less than 5 % of all of counsels' records. In the interest of completeness, and if the Court wishes to review the time records in full, the complete time records for each firm seeking reimbursement are being contemporaneously lodged with the Court as follows:

a. **Exhibit G** - Pritzker Levine time records

b. **Exhibit H** - Bleichmar Fonti & Auld time records

c. **Exhibit I** - Bottini & Bottini time records

d. **Exhibit J** – Cotchett Pitre & McCarthy time records

e. **Exhibit K** – DiCello Levitt time records

f. **Exhibit L** – Gupta Wessler time records

g. **Exhibit M** – Simmons Hanly Conroy time records

These records are in the same format as were provided to Google, except that Exhibit cover sheets have been appended and page numbers added. Page numbers are not necessary to locate and identify entries, because every time entry has a unique line number by firm.

RESPONSE TO GOOGLE'S PROPOSED LODESTAR ADJUSTMENTS

12. Google proposes a series of cuts to plaintiffs' counsel's reported lodestar resulting in reductions upon reductions, and leading to ***a massive 61 % proposed overall reduction*** in plaintiffs' counsel's overall lodestar. For the convenience of the Court, this declaration responds to Google lodestar reduction arguments in the same order as they appear in paragraph 11 of and Exhibit 11 to the Somvichian Declaration. The series of cuts proposed by Google can be summarized as follows:

(a) **First**, specific cuts to certain categories of time for (i) plaintiffs' 23(f) petition to the Ninth Circuit, (ii) alleged overbilling of contract attorneys, and (iii) alleged inefficiencies in tier one document review and deposition preparation.

(b) **Second**, an across-the-board 50 % reduction in all time billed because plaintiffs allegedly were only partially successful in the litigation.

(c) **Third**, further cuts to certain categories of time for alleged inefficiencies in (i) deposition and hearing staffing, (ii) interfirm meetings, (iii) time auditing, and (iv) motion practice.

(d) **Fourth**, another across-the-board 5 % reduction in all time billed because of alleged block billing.

Each series of cuts is discussed in detail below. In my role as Interim Lead Counsel, I have carefully reviewed plaintiffs' counsel's time records throughout this litigation. *See* my Fee Decl., ECF 781-1, ¶¶18-19, 30-33. I, on behalf of plaintiffs' counsel, twice offered to confer with Google and in advance of the filing of Google's opposition brief, both to answer questions and to see if Google was interested in a compromise to resolve any dispute. I never received a response to those offers. Upon reading Google's opposition, I again carefully analyzed and considered the challenged series of billing entries in order evaluate and respond to Google's arguments. I apply my experience and expertise over three decades of litigation, including my experience in leadership roles in other nationwide class action litigation, and conclude for the reasons stated herein, that plaintiffs' counsel work associated with challenged series of entries was appropriately recorded and necessary to the litigation, and the resulting requesting fees are reasonable in light of the work performed.

14, **<u>Plaintiffs' Rule 23(f) Petition</u>** - Google takes issue with plaintiffs' counsel billing for the Rule 23(f) petition plaintiffs filed with the Ninth Circuit after this Court denied Rule 23(b)(3) certification. As I explained in my initial declaration, that appellate work was necessary to preserve plaintiffs' appellate rights. *See* ECF 781-1, fn. 5. I further believe that Google stretches the Court's initial appointment order (ECF 77) too far when it contends that appellate counsel, Gupta Wessler LLP, cannot be compensated because it wasn't formally appointed by this Court. First, given the short time frame in which plaintiffs had to file a Rule 23(f) petition, it was not practical to seek appointment before Gupta Wessler began work on a brief due to be filed a mere 14 days later. Second, the Court's appointment order specifically applies to work in the case pending before the District Court (the "instant case"); it does not extend to appellate work before the Ninth Circuit. Third, seeking out appellate counsel with particular skill in briefing appellate matters before the Ninth Circuit on a short timeline appeared, to me, in my role as interim lead counsel to be the most efficient use of attorney

resources and in the best interests of plaintiffs and class members.

13. **Contract attorneys** – Google contends that billing rates for two of plaintiffs' associate- level attorneys, Mojisola Onabanjo of DiCello Levitt LLP and Lloyd Donders of Bleichmar Fonti & Auld LLP, should be reduced from their recorded $425/hour rate for deposition support work and their capped $350/hour rate for Tier 1 document review, down to $70/hour for all work performed. Opp. at 16; Somvichian Decl., ¶11 and Ex. 11. I have confirmed that Google's speculation that these lawyers appear to be "contract reviewers," is incorrect. *Id.* Throughout the period reflected in their time entries, both Ms. Onabanjo and Mr. Donders were full-time, benefitted attorneys of their respective firms. *See* Reply Declaration of David A. Straite, ¶¶4-6; Reply Declaration of Lesley E. Weaver, ¶¶4-6, both filed contemporaneously herewith

14. **Tier 1 document review and deposition preparation** – Google contends that plaintiffs' counsel spent too much time reviewing documents and preparing for depositions because there were not that many documents produced by Google in the litigation. Opp. at 16-18. As an attorney with 35 years of experience handling litigation matters and leading class actions, I believe this view misconstrues the propriety and need for this work.

15. The almost half a million pages of documents Google produced were highly complex and technical. As a comparative data point, Google's document production, spanning some 57,608 unique documents and 498,613 pages, was so detailed and so complex that Google and its counsel took over two years to gather it, review it for relevancy and privilege, and produce it in over 65 separate document productions.

16. The documents that Google eventually produced are dense, heavily technical, and usually involved numerous different authors and recipients. The materials are laden with internal jargon about cookies, internal Google systems, projects, teams, testing, analyses, and technological specifics known only to Google employees (all of which Google has sealed in public filings). They also contain details about the complexities and mechanics of the extraordinarily complex RTB system, and the types and extent of user data shared in RTB. Many of the documents were heavily hyperlinked to other documents (some of which were produced and some of which were not and none of which were linked in the production), and annotated with comments by multiple Google executives

and employees that plaintiffs' counsel had to first uncover (through motion practice) and then understand and contextualize. Nor was this simply a rote exercise of review and coding of documents for relevance. Here, almost every document Google produced was both substantive and directly relevant to the issues in the case. Plaintiffs' counsel are experienced trial litigators; here, as in other cases, at my direction, they efficiently deployed attorneys in their respective firms to review and analyze Google's document production, evaluate the propriety of Google's 10,065 separate privilege designations, and establish the evidentiary record necessary for a fair prosecution of the case.

17. As is typical in complex class cases, plaintiffs' attorneys were organized in tiered review groups. In addition to the Tier 1 linear review, plaintiffs' counsel relied on more experienced document reviewers to review documents specifically for deposition preparation, which was considered Tier 2 document review for "deposition preparation" and billed accordingly. For this review, certain selected reviewers were assigned documents identified as "hot" or "significant" during the Tier 1 review, or that were identified as a result of specific searches conducted within Google's production, and those Tier 2 reviewers analyzed and substantively summarized the documents for use as a potential deposition exhibit.

18. For each deponent, one reviewer was assigned as lead to take the summaries and documents prepared by the other reviewers, de-duplicate, further select and narrow, and put into an outline for the deposition-taker who would then use that to prepare their deposition outline and exhibits. This type of staffing saves the deposition-takers from having to personally review thousands of documents to prepare for the 13 depositions taken of Google witnesses.

19. For the same reasons that the Tier 1 review was time-consuming and difficult due to the lengthy and complex nature of Google's documents, so was the Tier 2 review for deposition preparation. For example, for the Glenn Berntson deposition, the first deposition in the case, over 3,800 documents were tied to him as the custodian. From that, the Tier 1 review and search requests identified over 1,300 documents that needed to be further analyzed for his deposition, and this work resulted in a lengthy (32-page) "depo prep" analysis of documents for the deposition taker to review to prepare their questions and select exhibits from. As a second example, Stan Belov was the custodian of over 12,000 documents Google produced, and was also included on thousands of

additional emails. Ultimately, approximately 9,400 documents were reviewed for deposition prep, and the "depo prep" reviewers whittled those down into a depo prep outline of 70 pages. Mr. Belov's deposition preparation was particularly labor intensive as almost all the key documents had numerous hyperlinks to other documents, but Google refused to provide those hyperlinked documents in a way that plaintiffs could identify them (this refusal was the subject of a discovery letter brief); as a result, reviewers had to run searches to try to locate those documents, which was very time-consuming.

20. **Partial success** --Google contends that because plaintiffs did not prevail in certifying a Rule 23(b)(3) damages class, all of plaintiffs' counsel's time in the case, regardless of what it was billed for and when, should be reduced by 50 % because plaintiffs were, in Google's view, only partially successful in the litigation. Opp. at 10-14. My careful review of counsel's time records reveals, however, that the vast majority of the time plaintiffs' counsel billed had little to nothing to do with the "damages" remedy sought in the case.

21. For example, Google fails to explain why plaintiffs' counsel's initial investigation of the case, drafting of the complaints, and work on the motion to dismiss should be cut at all, since that work related to the claims asserted, not the particular relief being sought for any particular claim, and with one immaterial exception, plaintiffs prevailed entirely on the motion to dismiss. All of those claims also survived and were settled, notwithstanding the Court's decision on the initial class certification motion.

22. Google asks the Court to reduce by 50 % all the time plaintiffs' counsel spent on written and document discovery, depositions, and discovery motions. This is a sweeping and unjustified reduction. There was only one damages-related discovery motion. The only damages-specific discovery Google produced was a single one-page spreadsheet. And the only depositions relating to damages in any way were of three experts (Regan, Zeithammer, and Deal). To the extent the Court believes that this damages-specific time should be cut in some manner, then it can easily be quantified, as discussed below. The vast bulk of the discovery-related time in the case was spent on liability and technology issues having nothing to do with damages, and there is no factual basis to cut any of that time, since all of that work was necessary for the injunctive relief case.

23. Even with respect to the initial class certification motion, Google's proposed 50 %

reduction of all time associated with that motion is far too sweeping, and it is unsupported by the record of work performed by plaintiffs' counsel in the case. Aside from the discreet work done by the three damages experts, the time records show that most of the attorney work on class certification matters related to proving the other elements necessary for class certification under Rule 23(a) and (b), proving that Google's contracts and disclosures were uniform, and establishing and that the RTB auctions operated in a uniform and common manner for all class members. On all of these issues, plaintiffs' counsel substantially prevailed.

24. Finally, Google fails to explain why any of the significant time plaintiffs' counsel spent on the case **after** the Court denied the Rule 23(b)(3) class should be cut, since none of that work had anything to do with damages at that point in time. This would include all of the work on the second class certification motion, work done on merits expert reports, work done on initial trial preparation, and the significant work done relating to mediation and settlement.

25. If the Court is inclined to reduce plaintiffs' counsel's lodestar and expenses to remove work specific to the damage claims, then, at most, plaintiffs propose the following damages-specific cuts instead of Google's 50 % proposal:

(i) All work and expenses related to plaintiffs' class certification expert Greg Regan be cut by 100 %, since his work was exclusively damages-related. This would reduce plaintiffs' counsel's lodestar by $148,973.00 and expenses by $331,439.68, for a total reduction of $480,412.68.

(ii) All class certification work and expenses related to plaintiffs' expert Robert Zeithammer be cut by 50 %, since most of his work was ultimately necessary to value the injunctive relief settlement for settlement approval purposes and had it not been done earlier, would have had to have been done later in the case. This would reduce plaintiffs' counsel's lodestar by $131,332.75 and expenses by $64,737.48, for a total reduction of $196,070.23.

(iii) All work and expenses related to Google's expert Bruce Deal be cut by 50 %, since some of his work related to issues other than damages and was responded to by plaintiffs' technical experts (Profs. Shafiq and Wilson) and, as with Mr.

Zeithammer, some of Mr. Deal's work was ultimately reused later in the case to respond to settlement valuation issues on settlement approval. This would reduce plaintiffs' counsel's lodestar by $170,730.25 and expenses by $1,796.47, for a total reduction of $172,526.72.

(iv) All work on the one damages-specific discovery motion be cut by 100%. This would reduce plaintiffs' counsel's lodestar by $36,680.00.

26. In total, these damages-specific cuts would reduce plaintiffs' counsel's lodestar by 585.17 hours, totaling $487,716.00 in attorneys' fees, and reduce expenses by $397,973.63, for a total reduction of $885,689.63.

27. I have also further reviewed the time records to address Google's request for further cuts to certain categories of time for alleged inefficiencies by plaintiffs' counsel in (i) deposition and hearing staffing, (ii) interfirm meetings, (iii) time auditing, and (iv) motion practice. In response:

28. **Deposition and hearing staffing** – Google proposes a 10 % cut in time billed for depositions and an additional 20 % cut for time counsel billed for court hearings. The Court should reject these across-the-board proposals.

29. The case history and billing records show that during the pendency of the litigation, plaintiffs' counsel took or defended 32 depositions, which included 12 expert depositions, seven named plaintiff depositions, and 13 substantive fact depositions of Google and certain of its employees. Google contends that plaintiffs' counsel overstaffed 12 of these depositions, including seven expert depositions, one named plaintiff deposition, and four depositions of Google and certain of its employees. Opp. at 16; Somvichian Decl. ¶9. Google apparently concedes that the other 20 depositions taken in the case were appropriately staffed by plaintiffs' counsel.

30. As a general matter, when comparing to what actually transpired, Google's factual presentation about the 12 challenged depositions is misleading. Many of the plaintiffs' counsel it lists as being "present" actually appeared by Zoom (thus saving significant travel time and expenses); many of these were only on Zoom for a small portion of each deposition; and certain plaintiffs'

counsel listed as being "present" did not bill for their time.[1] In other instances, plaintiffs' counsel listed as being "present" were conducting related depositions within days of the deposition Google complains about; there presence at the challenged deposition was intended to aid in their preparation of the related deposition.

31. These deposition staffing decisions were made by me, and were often dictated by what was transpiring around the time of the challenged depositions, such as parallel motion practice, expert witness report preparation, the anticipation of other related witness depositions, etc., as well as the efficient prosecution of the litigation.

32. As an example, nine of the 12 depositions that Google challenges were of experts and class certification declarants taken over a short two to three-month period in the middle of class certification briefing. This is typical in class action cases. But, it is also typical, and it is certainly the case here, that counsel not themselves taking or defending a deposition need to glean information from the deposition, in real time or as close to real time as possible, in order to complete other assigned work tasks, such as preparing for other witness or expert depositions, assist with class certification briefing and preparation of expert reports, and prepare or respond to *Daubert* challenges. Google and its counsel similarly staffed all challenged depositions with multiple counsel—in person or by Zoom—further underscoring the point that complex deposition matters typically require the presence of multiple attorneys from both sides of the case.

33. Plaintiffs address each of the 12 challenged depositions below in more detail. To provide better context, the deponents and deposition locations are identified and the depositions are dated and listed in chronological order. All information is gleaned from deposition transcripts and plaintiffs' counsels' billing records:

(a) Dec. 8, 2022 in New York - **Glenn Berntson** (Google fact witness on technology issues): This was the first deposition in the case, it was highly technical and

---

[1] The amount of time attorneys billed for a deposition and whether they appeared in person or via Zoom was known to Google prior to its filing of its opposition: Google's counsel was present at the depositions, had access to the deposition transcripts (which note when attendees appear via Zoom), and were in possession of the chronological line-item time entries plaintiffs produced to Google which show the time each attorney billed for a deposition.

substantive, and it was followed a few business days later by the Dec. 13, 2022 related deposition of Stan Belov, also in New York. Four of the plaintiffs' counsel listened in on zoom, one (Ms. Davis) for less than three hours. One lawyer (Ms. Swope) did not bill her time at all. Mr. Levine and Ms. Truong were present because they were responsible for conducting the related Belov deposition a few days later, also in New York, and many of the same documents and technology issues were being discussed at both depositions since Mr. Berntson worked directly with Mr. Belov. One of the goals of the Berntson deposition was for him to explain how RTB worked and also to explain what many of the Google-jargon terms meant, that would be used for the Belov and other upcoming depositions. I participated in my role as interim lead counsel. Google had three attorneys at the deposition.

(b) Dec. 9, 2022 in San Francisco – **John Kevranian** (named plaintiff): This was the first named plaintiff deposition in the case and was followed a few business days later by the Dec. 14, 2022 deposition of named plaintiff Christopher Valencia, also in California. Two of the plaintiffs' counsel listened in on Zoom, one (Ms. Swope) for only an hour. I participated in my role as interim lead counsel, Ms. Nishimura and Mr. Danitz participated because it was their client being deposed, and David Straite was present because he was defending Mr. Valencia's deposition, also in California, just days later. Google had two attorneys at the deposition.

(c) Jan. 26, 2023 in Washington, D.C. - **Haskell Garon** (Google fact witness on technology issues): Mr. Garon worked with Mr. Berntson and Mr. Belov and his deposition was, like theirs, highly technical and substantive. Two of the plaintiffs' counsel listened in on Zoom and one of those (Mr. Barnes) did not bill his time at all. Mr. Levine, Ms. Truong and Ms. Paulson attended as part of the technology team preparing for and conducting the technology-related depositions in the case. I participated in my role as interim lead counsel. Google had three attorneys at the deposition.

(d) Sept. 5, 2023 in San Francisco – **Greg Regan** (Plaintiff damage expert): This was one of nine expert depositions conducted over a two-month period during class

certification and *Daubert* briefing, and was followed two days later by the related deposition of plaintiffs' other damage expert, Robert Zeithammer. Two of the plaintiffs' counsel listened in on Zoom and one attorney present (Ms. Weaver) did not bill her time at all. *See also* Weaver Reply Decl. at ¶7. Mr. Danitz listened in because he was preparing for and defending the Zeithammer deposition two days later, and I participated in my role as interim lead counsel. Google had three attorneys at the deposition.

(e) Sept. 7, 2023 in Santa Monica – **Robert Zeithammer** (Plaintiff damage expert): This was another of the nine expert depositions conducted over a two-month period during class certification and *Daubert* briefing. Mr. Mudd attended because he was working on damage-related issues relating to the ongoing class certification and *Daubert* briefing. Mr. Mudd was based in Los Angeles and did not incur travel costs. I attended in my role as interim lead counsel. Google had three attorneys at the deposition.

(f) Oct. 16, 2023 in Santa Monica– **Konstantinos Psounis** (Google technology expert): This was another of the nine expert depositions conducted over a two-month period during class certification and *Daubert* briefing. Two of the plaintiffs' counsel listed in on Zoom and one of those attorneys (Ms. Caracuzzo) billed only two hours for doing so. Ms. Truong and Ms. Davis participated because they were part of the team assigned to technology issues and the technology experts in the case and were helping prepare for the related Striegel expert deposition a few days later in Chicago. Google had three attorneys at the deposition.

(g) Oct. 20, 2023 in Chicago – **Aaron Striegel** (Google technology expert): This was another of the nine expert depositions conducted over a two-month period during class certification and *Daubert* briefing. Two of the plaintiffs' counsel listened in on Zoom. Ms. Truong and Ms. Davis participated because they were part of the team assigned to technology issues. Google had two attorneys at the deposition.

(h) Oct. 24, 2023 in San Francisco – **Bruce Deal** (Google damage expert): This was another of the nine expert depositions conducted over a two-month period during class certification and *Daubert* briefing. Five of the plaintiffs' counsel listened in

on Zoom, and four plaintiffs' counsel (Ms. Weaver, Ms. Davis, Mr. Samra, Ms. Swope) each billed two hours or less. *See* Weaver Reply Decl. at ¶7. Mr. Danitz was present because he was working on damages issues and with the damage experts. Mr. Samra, Ms. Davis and Mr. Swope were present because they were working on damages and *Daubert*-related issues, and I was present in my role as interim lead counsel. Google had four attorneys at the deposition.

(i) Oct. 30, 2023 in New York – **Glenn Berntson** (as Google 30(b)(6) witness on technology issues and class certification declarant): This was a combined deposition of Google on technology issues as well as a deposition of Mr. Berntson in his capacity as a declarant in support of Google's opposition to the class certification motion. It was one of fourteen fact and expert depositions conducted over a several month period during class certification and *Daubert* briefing. Two of the plaintiffs' counsel (Ms. Caracuzzo and Ms. Davis) listened in on Zoom for only 1 hour and 2.5 hours respectively. Mr. Levine, Ms. Truong and Ms. Davis participated because they were part of the team responsible for technology issues, discovery and experts in the case. Google had three attorneys at the deposition.

(j) Oct. 31, 2023 in Santa Monica– **Dominique Hanssens** (Google survey expert): This was another of the nine expert depositions conducted over a two-month period during class certification and *Daubert* briefing. Two of the plaintiffs' counsel (Ms. Caracuzzo and Ms. Truong) listened in on Zoom and neither billed more than a few hours. I was present in my role as interim lead counsel. Google had three attorneys at the deposition.

(k) Nov. 15, 2023 in Burlingame- **Suneeti Vakharia** (as Google 30(b)(6) witness on disclosure issues and class certification declarant): This was a combined deposition of Google on disclosure issues as well as a deposition of Ms. Vakharia in her capacity as a declarant in support of Google's opposition to the class certification motion. It was one of fourteen fact and expert depositions conducted over a several month period during class certification and *Daubert* briefing. One of the plaintiffs' counsel present

(Ms. Weaver) did not bill any time. *See* Weaver Reply Decl., ¶7. Ms. Caracuzzo and Ms. Swope were present because they were working on disclosure issues in the case and Ms. Caracuzzo worked on the deposition outline and with exhibit selection. Google had three attorneys at the deposition.

(l) Feb. 14, 2025 in Chicago - **Aaron Striegel** (Google technology expert): This was one of three expert depositions conducted over a two-month period during the second round of class certification briefing. One of the plaintiffs' counsel (Ms. Weaver) listened in on Zoom and billed less than two hours of time. Ms. Davis and Ms. Weaver participated because they were also helping to prepare for the Psounis expert deposition in Santa Monica four days after the Striegel deposition in Chicago. Google had three attorneys at the deposition.

34. Google also challenges how plaintiffs' counsel staffed the February 21, 2024 class certification and related *Daubert* hearing. This was the first major hearing in the case, involving a potentially case-dispositive motion. There were numerous motions on calendar, including the class certification motion, and three *Daubert* motions and related sealing motions. As part of the class certification motion, moreover, each of the six firms representing plaintiffs was seeking formal appointment by the Court to represent the class in some capacity. In light of these facts, each firm had counsel present and attending the hearing.[2]

35. **Motion practice** – Google contends that plaintiffs' counsel spent too much time on the motion to dismiss, and argues that all time billed under the "Dispositive Motion" category should therefore be reduced by an additional 10 %. Opp. at 20. The Court should reject this across-the-board proposal.

36. With respect to "Dispositive Motion" work, Google ignores that this category specifically included all other motion work except for discovery motions, as I have previously attested

[2] There were dozens of hearings in this case -- before this Court, before the discovery magistrate, and before the special master. In its opposition to the Fee Motion, Google only challenges one class certification hearing, and thus concedes that it has no issue with how all the other hearings were staffed by plaintiffs' counsel.

in my Fee Decl., ECF 781-1, ¶28. There were numerous and extensive sealing motions that took significant time, case extension motions, and consolidation and lead counsel motions, all of which are part of the time billed in this category. Plaintiffs' counsels' billing records reflect the efficiency with which these motions were staffed.

37. Google also claims that plaintiffs' counsel engaged in excessive discovery motion practice, and argues that all time billed under the "Discovery Motions" category should therefore be reduced by an additional 45 % (this is on top of the 50 % reduction discussed above). Opp. at 15-16. Google provides no basis for the Court to make this further proposed reduction nor does Google tether the 45 % amount to any actual rulings. Based upon a review of the discovery orders and hearing transcripts in in the case, in fact, plaintiffs prevailed in whole or in part on the vast majority (74 %) of their discovery motions, so no reduction in lodestar associated with these matters is warranted.

38. Nor did plaintiffs' counsel refuse compromise or repeatedly re-litigate settled issues. Rather, the Court frequently recognized plaintiffs' efforts at compromise, ordering production of documents pursuant to plaintiffs' narrowed requests. *See*, *e.g.*, ECF 184 ("Plaintiffs have narrowed the scope of their demand … As narrowed the request asks for relevant documents and is not unduly burdensome." (re: RFP 1)); ECF 314 at 1-3; (describing the dispute presented to the Court as narrower than the document requests); ECF 352 ("As a compromise, plaintiffs propose that Google provide the information in the form of a written answer, rather than documents. … the dispute is easily resolved by adopting the solution plaintiffs propose); ECF 490 ("Having considered the parties' joint submission, the Court finds that plaintiffs have made a reasonable request for production of a specific set of hyperlinked documents, rather than an indiscriminate request for all hyperlinked materials, and have provided an adequate justification for these documents.").

39. Plaintiffs sought relief from the Court so frequently because Google resisted nearly all of plaintiffs' efforts to obtain relevant information. *See*, *e.g.*, ECF 189 ("This dispute is easily resolved. … [Google] shall produce those documents); ECF 314 at 2 ("Plaintiffs persuasively argue that what a user sees in the course of account sign-up, including a representation that "Google does not sell your personal information" in proximity to a button asking the user to "agree," is relevant to at least their breach of contract claim."); ECF 326 (ordering production of revenue data requested by

Plaintiffs where Google had not identified a different or more accurate alternative and discussing that Google "generally resisted discovery"); ECF 382 ("Google has failed to comply with the Court's August 26 order in one important respect… Plaintiffs say that Google's production must include documents sufficient to show both the explicit sharing of verticals associated with the named plaintiffs and any implicit sharing that facilitates ad targeting. The Court agrees.")

40. Google cherry picks the Court's critiques (*e.g.*, as to ECFs 287, 314, 326), while ignoring that fact that counsel obtained necessary discovery through its motion practice, and Judge DeMarchi's recognition that plaintiffs present "some new arguments that are more specific and helpful," that the Judge DeMarchi "encourage[d] Google to revisit its relevance objections to any such requests," and that Judge DeMarchi also recognized that the scope of discovery was not as narrow as Google claimed. ECF 287 at 3:11-12, 5:12-13 (recognizing that the scope of relevant discovery is broader than Google's narrowed view); ECF 314 (largely granting Plaintiffs' motion to compel); 326 (acknowledging that "… Google has objected to most of plaintiffs' document requests and generally resisted discovery.").

41. Google similarly makes much of the Court's denial of plaintiffs' two motions for sanctions, while ignoring that Judge DeMarchi granted plaintiffs' request for access to information, where such data had not been deleted by Google. *E.g.*, ECF 488 at 7 (ordering Google "to [remedy] its prior productions" so that Plaintiffs could correlate across sources.); ECF 788 at 9 (discussing the lack of a "clear and definite court order to preserve and produce.").

42. **Time auditing** – Google contends that all time billed under the "Case Management" category should be reduced by an additional 15 % because plaintiffs' counsel billed for "fees on fees." Opp. at 20. The Court should reject this across-the-board proposal. When I looked at the pages of Pritzker Levine time entries lodged as Google's Ex. 6 that Google claims contain inappropriate time auditing, adding them up, these entries represent only 3 % percent of the time billed in the "Case Management" category, not 15 percent. Further, what Google complains about is not "fees on fees" billing, but rather interim class counsel performing a court-ordered responsibility to review and audit time billed in the case on a regular basis. *See also* my Fee Decl, ECF 781-1 at ¶¶18-19, 30-33. Moreover, this time was not excessive under the circumstances. Over the nearly five years of

litigation, Google complains about only 37.8 hours in total, which represents about seven hours a year on average. There is no basis to either cut this specific time, which was incurred pursuant to a court order, or to cut **all** case management time by 15 percent.

43. **Block billing** – Finally, the Court should reject Google's request for another across-the-board 5 % reduction in all time billed because of alleged block billing. Again, Google has not identified anywhere in its opposition filing any specific entries that it contends qualify as block billing. Instead, Google has provided the Court with 42 pages of 676 entries excerpted from plaintiffs' counsel's 1,605 pages of time records containing 27,186 individual time entries, and left it for the Court and plaintiffs' counsel to speculate as to which of the 676 entries on those pages Google contends are block billing. I reviewed the entries Google has submitted: none fall within the definition of block billing as I understand that term, and all appear to be sufficiently detailed to inform the Court of the nature of work being performed and its compensability.

**LODESTAR AND EXPENSES**

44. Plaintiffs' incurred litigation expenses are explained in detail in my Fee Declaration, and total $3,488,796.92. ECF 781-1, ⁋⁋34-36. Plaintiffs' total requested lodestar, calculated at 2024 rates, is $36,673,815.00. *Id.*, ⁋⁋24-28, Ex. E thereto and attorney declarations filed in support (ECFs 781-8 – 781-13); *see also* lodged time records, Exs. G-M lodged herewith.

45. If the Court is in any way inclined to reduce plaintiffs' counsel's lodestar and expenses to remove work specific to the damage claims, then, at most, plaintiffs propose the following damages-specific reductions: (a) a reduction of 585.17 attorney hours, resulting in a lodestar reduction of $487,716.00 in requested attorneys' fees; and (b) litigation expense reductions totaling $397,973.63.

46. The above reductions would reduce plaintiffs' requested fees from 36,673,815.00 to $36,186,099.00 (before applying any multiplier), and reduce plaintiffs' requested reimbursable expenses from $3,488,796.92 to $3,090,819.33.

**NAMED PLAINTIFF EXCERPTED TESTIMONY**

47. Attached hereto as **Exhibit P** is a true and correct copy of non-confidential excerpts of the deposition of named plaintiff Terry Diggs;

48. Attached hereto as **Exhibit Q** is a true and correct copy of excerpts of the deposition of named plaintiff Rethena Green;

49. Attached hereto as **Exhibit R** is a true and correct copy of non-confidential excerpts of the deposition of named plaintiff John Kevranian;

50. Attached hereto as **Exhibit S** is a true and correct copy of non-confidential excerpts of the deposition of named plaintiff Christopher Valencia;

51. Attached hereto as **Exhibit T** is a true and correct copy of non-confidential excerpts of the deposition of named plaintiff Salvatore Toronto.

52. Attached hereto as **Exhibit U** is a true and correct copy of non-confidential excerpts of the deposition of named plaintiff Tara Williams;

**PRESS ARTICLES REGARDING THE SETTLEMENT**

53. Attached hereto as **Exhibit V** are true and correct copies of five press articles about the settlement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 22nd day of December 2025 in Emeryville, California.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br>______________________<br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: February 3, 2026<br>Time: 2:00 pm<br>Courtroom: 1, 4th Floor |

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. LEGAL ARGUMENT ........ 1

A. The Settlement Provides Exceptional and Valuable Injunctive Relief ........ 1

1. The “new” RTB Control is unique and provides *broader* privacy protection. ........ 1

2. The “new” disclosures Google will make are unique and meaningful. ........ 3

B. The Court May Award Fees Using the Percentage Method ........ 3

1. The correct legal standard is satisfied here. ........ 3

2. The reasonably ascertainable value of the settlement is exceptional. ........ 4

3. Google’s expert has no reasonable basis to undermine the settlement’s value. ........ 5

C. Counsel’s Fee Request Is Supported by the Lodestar Cross-Check ........ 6

1. Counsel are entitled to be compensated for the Rule 23(f) Petition. ........ 7

2. Google’s proposed lodestar reduction for “contract” attorneys is baseless. ........ 7

3. Counsel efficiently tackled the complexities of discovery and deposition work. ........ 7

4. Google’s proposed 50% across-the-board lodestar reduction is without basis. ........ 8

5. The Court should reject Google’s proposed additional cuts for alleged inefficiencies. ........ 11

6. There was no “block billing” by counsel. ........ 14

7. Google does not address the many other efficiencies reflected in the Fee Motion. ........ 14

D. The Requested 3.5 Multiplier on Counsels’ Lodestar Is Appropriate ........ 14

E. Counsel’s Expenses Are Properly Documented ........ 15

III. CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ang v. Bimbo Bakeries USA, Inc.*,
2020 WL 5798152 (N.D. Cal. Sep. 29, 2020) ... 9

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ... 6

*Cabrera v. Ford Motor Co.*,
2025 WL 2462442 (S.D. Cal. Aug. 26, 2025) ... 14

*Campbell v. Facebook*,
2017 WL 3581179 (N.D. Cal. Aug. 18, 2017) ... 9

*Charlebois v. Angels Baseball LP*,
993 F. Supp. 2d 1109 (C.D. Cal. May 30, 2012) ... 12

*Chaudhry v. City of Los Angeles*,
751 F.3d 1096 (9th Cir. 2014) ... 12

*Corker v. Costco Whole. Corp.*,
2023 WL 6215108 (W.D. Wash. Sept. 23, 2023) ... 4

*Donastrong v. City of Ontario*,
2021 WL 6103545 (C.D. Cal. Sep. 23, 2021) ... 14

*Farrell v. Bank of Am. Corp., N.A.*,
827 F. App'x 628 (9th Cir. 2020) ... 4

*Fischel v. Equitable Life Assur. of US*,
307 F.3d 997 (9th Cir. 2002) ... 14

*Gates v. Deukmejian*,
987 F.2d 1392 (9th Cir. 1992) ... 6, 8

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ... 6, 9, 14

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ... 3

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ... 4

*In re Optical Disk Drive Prods. Antitrust Litig.*,
959 F.3d 922 (9th Cir. 2019) ... 6

*In re Ring LLC Priv. Litig.*,
2024 WL 2845978 (C.D. Cal. May 28, 2024) ....................9

*In Re Volkswagen "Clean Diesel" Mktg. Sales Pracs. & Prods. Liab. Litig.*,
2023 WL 4109573 (N.D. Cal. June 20, 2023) ....................12

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994)....................4

*Indep. Living Ctr. of S. Cal., Inc. v. Figueroa*,
856 F. App'x 97 (9th Cir. 2021) ....................8

*Kranson v. Fed. Express Corp.*,
2013 WL 6503308 (N.D. Cal. Dec. 11, 2013) ....................14

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998)....................15

*Lilly v. Jamba Juice Co.*,
2015 WL 2062858 (N.D. Cal. May 4, 2015) ....................9

*MacDonald v. Ford Motor Co.*,
2016 WL 3055643 (N.D. Cal. May 31, 2016) ....................12

*Mendoza v. Brewster Sch. Dist. No. 111*,
469 F. Supp. 2d 905 (E.D. Wash. 2006) ....................11

*Moore v. GlaxoSmithKline Consumer Healthcare Hldgs. (US) LLC*,
2024 WL 4868182 (N.D. Cal. Oct. 3, 2024)....................9

*Moreno v. San Fran. Bay Area Rapid Trans. Dist.*,
2019 WL 343472 (N.D. Cal. Jan. 28, 2019) ....................9

*Nutraceutical Corp. v. Lambert*,
586 U.S. 188 (2019)....................7

*Odima v. Westin Tucson Hotel*,
53 F.3d 1484 (9th Cir. 1995)....................9

*Open Source Security, Inc. v. Perens*,
2018 WL 2762637 (N.D. Cal. June 9, 2018) ....................6, 7

*Probe v. State Teachers' Ret. Sys.*,
780 F.2d 776 (9th Cir.1986)....................11

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ....................6

*Simon v. Maple Beach Ventures, LLC*,
2021 WL 1907821 (N.D. Cal. May 12, 2021) ....................14

*Sorenson v. Mink*,
239 F.3d 1140 (9th Cir. 2001)....................9

*Staton v. Boeing*,
327 F.3d 938 (9th Cir. 2003)....................4

*Welch v. Metr. Life Ins. Co.*,
480 F.3d 942 (9th Cir. 2007)....................8

*White v. FCA U.S. LLC*,
2024 WL 4257640 (N.D. Cal. Sep. 20, 2024)....................6

*Xu v. Yamanaka*,
2014 WL 3840105 (N.D. Cal. Aug. 1, 2014)....................14

*Younger v. Michael & Assoc., P.C.*,
2014 WL 1760827 (N.D. Cal. April 30, 2014)....................13

**RULES**

Fed. R. Civ. P. 23(a)....................10

Fed. R. Civ. P. 23(b)(2)....................10

Fed. R. Civ. P. 23(b)(3)....................7, 8, 10

Fed. R. Civ. P. 23(f)....................7

**OTHER AUTHORITIES**

*Brown v. Google LLC*,
No. 20-cv-03664-YGR (N.D. Cal. Aug. 14, 2024), ECF 1108
(Hearing Transcript)....................8

*Lilly v. Jamba Juice Co.*,
No. 3:13-cv-02998-JST(N.D. Cal. May 4, 2015), ECF 69
(Motion for Final Approval of Class Action Settlement)....................9

Manual for Complex Litigation (4th ed. 2004)
§10.222....................12

*Moore v. GlaxoSmithKline Consumer Healthcare Hldgs. (US) LLC*,
No. 4:20-cv-09077-JSW (N.D. Cal. Dec. 9, 2024), ECF 150
(Order Granting Plaintiff's Motion for Final Approval
of Rule 23(b)(2) Class Action Settlement, Service Award, and
Attorneys' Fees and Costs, and Final Judgment)....................9

# I. INTRODUCTION

For almost a decade, Google has engaged in the routine practice of sharing and selling its U.S. account holders' personal information in its Real-Time-Bidding ("RTB") auctions without disclosing this practice to its account holders or providing them any meaningful way to control the use of their personal information by Google in those auctions. That ends with this settlement. Plaintiffs have achieved for hundreds of millions of Americans a unique remedy that gives them informed choice, accountability, and transparency. Google must now tell account holders about its RTB auctions, what personal information about them Google uses in the auctions, and how they can choose to limit that sharing by enacting a new RTB Control that will prevent them from being tracked and targeted by hundreds of auction participants from around the world. None of this would have occurred but for plaintiffs' counsels' work identifying this wrong, and pressing this case forward for class members against one of the most well-defended, wealthiest, and sophisticated tech companies in the world.

Google wants the Court to approve the settlement—it filed a statement saying so. Google's only goal, now, is to deprive counsel of a reasonable fee for their efforts. Google raises no issues with counsels' rates, generally. But it takes the extreme position that counsels' fees should be cut by **61%**, and no multiplier should be awarded to account for counsels' risk, five years of nonpayment, or the success they have achieved. The Court should reject Google's blunderbuss approach. It is contrary to fact and law—both of which require the Court exercise its discretion **in favor** of awarding fees in the amounts requested, plus a significant enhancement. If there are discrete items of concern, there is a reasoned way for the Court to make a "clear and concise" decision to reduce only fees or expenses associated with those items. Counsel do not concede this approach is warranted, but show how it can be done below. As set forth in plaintiffs' Fee Motion (ECF 781), and as detailed below and in the Reply Declaration of Elizabeth Pritzker ("Pritzker Reply Decl."), the Court should award counsel their full lodestar, apply a 3.5 multiplier to that time, and reimburse counsel for all expenses incurred.

# II. LEGAL ARGUMENT

## A. The Settlement Provides Exceptional and Valuable Injunctive Relief

### 1. <u>The "new" RTB Control is unique and provides ***broader*** privacy protection.</u>

The Settlement Agreement ("SA") (ECF 778-4) underscores that the RTB Control is, in fact,

a "new user control" that allows users to "elect a privacy treatment that limits the information Google provides to third parties about them in the Google RTB system." SA, ¶A.1. This new control will remove or generalize user information shared in the RTB auctions (so as to render the information no longer "personal information") in a way and to an extent that no other technology can. *Id.*; *see also* Decl. of Zubair Shafiq in Support of Plaintiffs' Motion for Settlement Approval ("Shafiq Decl.") ECF 778-6, ¶¶16-20, 22-23. Mediator Shirish Gupta, in his statement supporting the settlement, reiterated the unique, sweeping benefit of the new RTB Control: "**[T]the settlement terms provide a new and unique user control (the "RTB Control") that I understand, for the first time, provides Google account holders with the ability to limit the information Google shares about them with third parties in the Google RTB auctions."** ECF 778-16, ¶7 (emphasis added) Google approved this and posed no objection to it then, and cannot take issue with it now. Pritzker Reply Decl., ¶3.

Despite agreeing to the novel privacy-protective value of the new RTB Control, Google now downplays that result. It asserts that the existing Google Ads Personalization ("GAP") Control "affects much of the same fields as the new RTB Control" and that GAP "allows users control over most of the same bid request fields affected by the new RTB Control." Opp. at 7, 22. Not so. The new RTB Control covers data fields in RTB bid requests that **no existing Google control—GAP included—addresses**. Reply Decl. of Zubair Shafiq ("Shafiq Reply Decl."), ¶9. "[O]nly the new RTB Control suppresses IP address and User Agent, which are the two primary fields that allow RTB participants to perform fingerprinting (also known as probabilistic matching)." *Id.* These two fields are the most critical points of bid stream data used to identify and track users, as Google's records show. *Id.* ¶¶10, 12. These fields also are important for fingerprinting or tracking by RTB participants as the use of cookies and other deterministic identifiers decline. *Id.* ¶¶11, 13-14. The RTB Control, and only this control, will successfully limit fingerprinting and tracking in the RTB auctions, thereby providing the broadest privacy protection yet for Google U.S. account holders. *Id.* ¶¶10, 24.

Finally, because the RTB Control will suppress fingerprinting and tracking information, it will be the only user control that meaningfully limits ad personalization by RTB participants. Shafiq Reply Decl., ¶¶15, 19-20. The GAP control, all experts agree, **does not** prevent RTB participants from delivering personalized ads to account holders. *Id.* ¶¶15-17 (citing testing and analysis of plaintiffs'

expert Prof. Christopher Wilson), ¶18 (citing Google's expert, Aaron Striegel).[1]

2. The "new" disclosures Google will make are unique and meaningful.

The settlement also requires Google to create and maintain a "new dedicated webpage" that will, for the first time, contain consumer-facing disclosures about the types of user data Google shares in the RTB auctions and with whom, and tell consumers about the new RTB Control. SA, ¶A.2.A. Mediator Gupta also confirms this is a "new" disclosure. ECF 778-16, ¶7 ("[A]s part of the settlement, Google agreed to… set up new web-page disclosures that describe the RTB auctions and how the new RTB Control works to limit data sharing in those auctions.") (emphasis added).

Google has filed the "webpage specified" in the Settlement Agreement, all 11 pages of it. ECF 785-2, Ex. B. In opposing the Fee Motion, Google downplays its significance, suggesting (without any evidence) that it largely duplicates existing disclosures. The new disclosures are precisely what the settlement provides—unique and meaningful—and are the first consumer-facing disclosures Google has ever made about its ad auctions. The new webpage will, for the first time: (1) describe how Google's ad auctions work; (2) identify the user information Google shares with auction participants; (3) list the types of auction participants; (4) describe "cooking matching" techniques used in the auctions; and (5) provide information about the new RTB Control and how it can be used to omit specific user information from being shared with auction participants. ECF 785-2. Google will notify all U.S. account holders about the new RTB Control and webpage by email. SA, ¶A.2.B.

Independent press articles describe the settlement as "transform[ing] digital advertising" and "Google's most significant privacy concession to date." Pritzker Reply Decl., Ex. V. It represents an historic victory for hundreds of millions of Americans—the most relevant factor in awarding attorneys' fees. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).

**B. The Court May Award Fees Using the Percentage Method**

1. The correct legal standard is satisfied here.

The Court can apply **either** the percentage or lodestar method. Under governing Ninth Circuit

---

[1] Google's declarant, economist Bruce Deal, is not a computer scientist, lacks any technical expertise to opine on the RTB system, and relies mostly on an unidentified declaration by Google's Glenn Bernston. His discussion about Google's controls is wrong, unsubstantiated by usage statistics, and contrary to the evidence Google produced (ECF 787-14, ¶¶22-26), and should be disregarded.

precedent, this discretion is unencumbered by "any presumption in favor of either the percentage or the lodestar method." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994)). The Court may make its award using either analysis. Google misstates this precedent, claiming that the law "disfavors" use of the percentage method in injunctive relief settlements. Opp. at 6. Google cites no law for this assertion: there is none. To the contrary, the Ninth Circuit has held that courts are free to apply the percentage method, which is generally favored because it is easier for courts to calculate[2], where the "value to individual class members of benefits deriving from injunctive relief can be reasonably ascertained." *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003); *and see Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020); *Corker v. Costco Whole. Corp.*, 2023 WL 6215108, *2, n.4 (W.D. Wash. Sept. 23, 2023) (applying percentage method, finding the "…injunctive relief will benefit each individual class member going forward…, and plaintiffs have provided a reasonable valuation of the relief obtained."). Plaintiffs meet this legal standard here.

2. <u>The reasonably ascertainable value of the settlement is exceptional.</u>

Building on his prior work, plaintiffs' expert economist, Robert Zeithammer, provides two methods to assign a reasonable value to the settlement. First, he calculates the value to class members of the new RTB Control's ability to remove personally-identifying information from RTB bid requests, preventing RTB participants from tracking or fingerprinting them, and limiting the delivery of personalized ads to them by auction participants. Shafiq Reply Decl., ¶¶10-12. He assesses the market for personal tracking information to ascertain a "market price" for the user data that will no longer be transmitted when the RTB Control is activated. Zeithammer Decl., ECF 778-7, ¶¶22-33. He applies this market price across the class, and conservatively estimates that 8.8% of all class members will use the new RTB Control. *Id.* ¶¶34-36. Applying these inputs, Prof. Zeithammer calculates the minimum value of the injunctive relief at $1.4 billion. *Id.* ¶36. The $128.3 million in fees sought by counsel is 9.2% of the effective $1.4 billion common fund under this valuation. Mot. at 6, n.6; Fitzpatrick Decl., ¶18.

Under the second method, Prof. Zeithammer measures the settlement value as a function of

[2] Declaration of Brian Fitzpatrick ("Fitzpatrick Decl.") ECF 781-7, ¶¶11-12.

the unjust enrichment that will be prevented by the settlement. An unjust enrichment occurs because Google currently lacks the transparency and choice that the settlement provides, and it makes more revenue than it would if it did not share user data that allows tracking in the RTB auctions. Zeithammer Decl., ¶37. He estimates the value of the unjust enrichment by applying the percent of Google revenue he attributes to Google's sharing of user data in the RTB auctions (52%) to all of Google's U.S. RTB revenue ($1.81 billion), resulting in a value of $2.9 billion over the injunction period. *Id.* ¶¶38-58. The $128.3 million fee request represents 4.4% of the $2.9 billion common fund under this valuation.

3. Google's expert has no reasonable basis to undermine the settlement's value.

Google, through Mr. Deal, raises several criticisms of Prof. Zeithammer's methodologies. None provide a basis to undermine the settlement's assigned value. Mr. Deal criticizes Prof. Zeithammer for assuming that when the RTB Contral is enabled, the user data sent in RTB no longer contains "personal information," because this issue was "never resolved on the merits." Opp. at 7. That's true, because the case settled. But this ignores the Court's prior comment that the data transmitted in Google's RTB bid requests **"is uniformly personally identifying**." ECF 690 at 15-16 (emphasis added). This was premised, in part, on Prof. Shafiq's testimony, who now offers further analysis in support of plaintiffs' Approval Motion (ECF 778-5, ¶¶17,19,23), and in rebuttal to Mr. Deal (Shafiq Reply Decl., ¶¶22-26), on which Prof. Zeithammer has a reasonable basis to rely.

Mr. Deal also criticizes Prof. Zeithammer for not considering what impact the existing GAP Control has on restricting user information in the RTB auctions. Opp. at 7; Deal Decl., ¶¶7-12. The Court can ignore this criticism: as Google itself conceded, the GAP Control does not stem the sharing of account holder information in RTB auctions. ECF 690 at 25-26. Prof. Shafiq's expert analysis confirms this. ECF 778-5, ¶13; Reply Shafiq Decl., ¶¶16-20. Mr. Deal's next criticism concerns Screenwise: he contends it cannot be a suitable analog because it collects more user information than is shared in RTB. Opp. at 7-8; Deal Decl., ¶¶20-21. But, Prof. Zeithammer acknowledges the ways in which the user data fields shared in Screenwise and in RTB do and do not overlap. Zeithammer Decl., ¶¶24, 28. Marginal similarities and differences do not eliminate the power of Screenwise as a market metric, as courts have found, and market price models akin to Prof. Zeithammer's have been used by economists and have survived *Daubert* challenges in similar cases against Google. *See, e.g.*,

*Rodriguez v. Google LLC*, 2024 WL 38302, *10-13 (N.D. Cal. Jan. 3, 2024); *Brown v. Google, LLC*, 2022 WL 17961497, *3, 5 (N.D. Cal. Dec. 12, 2022).

Mr. Deal next contends that Prof. Zeithammer "likely overestimates" that 8.8% of class members will enable the new RTB Control. Opp. at 8. Mr. Deal's self-selected and biased surveys provide little support for this critique. Zeithammer Reply Decl. ¶¶15-18. But, even assuming the lower rate at which Google's discovery shows that users enact the GAP Control (the only Google-specific corollary available) the resulting minimum settlement value is still $740 million. *Id.* Plaintiffs' fee request of $128.3 million is only 17.3% of this valuation—still well below the 25% benchmark.

Finally, addressing the unjust enrichment valuation, Mr. Deal criticizes Prof. Zeithammer for not considering whether certain users "impliedly consented to the practices at issue." Opp. at 8; Deal Decl., ¶¶13-15. This criticism again ignores the Court's prior rulings. As this Court has held, implied consent is irrelevant where the relief is only injunctive. ECF 690 at 25. Prof. Zeithammer's unjust enrichment valuation is focused on the injunctive relief provided by the settlement, not damages.

**C. Counsel's Fee Request Is Supported by the Lodestar Cross-Check**

The Court may evaluate plaintiffs' settlement valuations and "perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery method is reasonable." *In re Optical Disk Drive Prods. Antitrust Litig*., 959 F.3d 922, 930 (9th Cir. 2019). In doing so, the Court must be mindful of the parties' respective burdens. "The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The "party opposing a fee request has the burden of rebuttal" through "the submission of evidence challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992). The opposing party must list "specific objections to specific billing entries" and "must point to the specific items challenged, with a sufficient argument and citations to the evidence." *Open Source Security, Inc. v. Perens*, 2018 WL 2762637,*4 (N.D. Cal. June 9, 2018); *White v. FCA U.S. LLC*, 2024 WL 4257640, *2 (N.D. Cal. Sep. 20, 2024)."General arguments" or "conclusory and unsubstantiated objections are not sufficient. *Gates*, 987 F.2d at 1397-98. Plaintiffs have met their burden: they presented a detailed record of the work performed, their hourly rates, and billing write-downs that were taken to ensure efficiencies. Mot. at 13-17; Pritzker

Decl., ¶¶19, 28-33. Google has not met its burden in opposing plaintiffs' motion.[3]

1. Counsel are entitled to be compensated for the Rule 23(f) Petition.

Time spent on the Rule 23(f) petition to appeal the denial of a Rule 23(b)(3) class is fully compensable as it was necessary to preserve plaintiffs' right to seek a permissive appeal. *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019) (14-day period for filing a timely a Rule 23(f) petition is not subject to equitable tolling); Pritzker Decl., n.5. It was also necessary to preserve plaintiffs' right to claim individual damages and to ultimately settle that claim for consideration. The settlement preserves rights for absent class members to seek damages. SA, Definitions, ¶14.

2. Google's proposed lodestar reduction for "contract" attorneys is baseless.

Google argues that the hourly rates for attorneys Ms. Onabanjo and Mr. Donders should be reduced substantially because they must be contract attorneys. Opp. at 16-17. That is incorrect: both were full-time, benefitted attorneys. Straite Reply Decl., ¶¶4-5; Weaver Reply Decl., ¶¶4-5.

3. Counsel efficiently tackled the complexities of discovery and deposition work.

Google contends that counsel spent too much time reviewing its document productions and preparing for depositions. Opp. at 16-18; Somvichian Decl., ¶11. Google cannot meet its burden by simply lodging generalized criticisms of counsels' time.[4] "[C]onclusory and unsubstantiated objections do not warrant a fee reduction." *Open Source*, 2018 WL 2762637, *4. And general references to document productions made by litigants in other cases (Opp. at 11) do not suffice either.

The facts refute Google's complaints. Google's document production was significant and complex and took over two years to complete. The production was technical and dense, laden with jargon about systems, testing, analyses, and technological specifics known only to Google employees. It details the complexities and mechanics of the RTB system and the types and extent of user data shared in RTB; and frequently was annotated with comments by Google employees that counsel had to first uncover (through motion practice) and then understand and contextualize. This was not a

[3] For the Court's convenience, counsel responds to Google's lodestar reduction arguments in the same order in which they appear in ¶11 of and Ex. 11 to the Somvichian Declaration.

[4] Google attempts to excuse these generalities with inaccurate claims about counsels' "refusal" to produce their billing records in "readily analyzed formats." Opp at 16. There was no such refusal. Counsel turned over their detailed billing records in precisely the form and on precisely the timeline that Google allowed. Pritzker Reply Decl., ¶9.

simple rote review and coding of documents for relevance, and it was made even more complicated by Google's assertion of privilege for more than 10,000 documents. Pritzker Reply Decl., ¶¶16-17.

Deposition preparation was time-consuming and difficult for the same reasons. Attorneys were efficiently organized in tiered review groups, as is common in complex cases. For Tier 2, select attorneys were assigned documents tagged as "hot" or "significant", and tasked with analyzing and summarizing the documents into outlines for use in depositions, saving deposition-takers from having to review thousands of documents to prepare for depositions. As one example, Google's Stan Belov was the custodian of over 12,000 documents and also included on thousands of emails. Approximately 9,400 documents made the Tier 1 cut and were reviewed for his deposition. Mr. Belov's deposition preparation was particularly labor intensive: nearly all of his key documents had hyperlinks to other documents, which Google refused to provide (this was the subject of a discovery motion), so reviewers had to run time-consuming searches to try to locate those documents. This was typical of other Google witnesses offering technical testimony. Pritzker Reply Decl., ¶¶17-19.

4. <u>Google's proposed 50% across-the-board lodestar reduction is without basis.</u>

On top of the cuts described above, Google asks the Court to slash **all** recorded hours in half. Google's purported reason for this sweeping reduction is that plaintiffs failed to certify a damages class under Rule 23(b)(3). Opp. at 10-14; Somvichian Decl., ¶11, Ex. 11. Google's position is as extreme as it is baseless.[5] The Court should reject it for several reasons.

***First,*** Google suggests there is a "commonsense" practice in which counsel "voluntarily" reduce their lodestar when seeking fees for injunction only class settlements or that follow denial of Rule 23(b)(3) certification. Google identifies six cases it contends support this position. Opp. at 10. But, what Google fails to tell the Court is that in **each** of those cases the parties' settlement agreement

[5] Google ignores Ninth Circuit authority stating that wholesale, across-the-board cuts of this nature, without concise but clear justification, are improper. *See, e.g.*, *Indep. Living Ctr. of S. Cal., Inc. v. Figueroa*, 856 F. App'x 97, 100 (9th Cir. 2021) (finding that district court inadequately justified awarding counsel 50% of his requested hours); *Welch v. Metr. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (district court erred by imposing unsupported 20% across-the-board cut for block billing); *Gates*, 987 F.2d at 1402 (district court abused its discretion by applying a 10% across-the-board cut to plaintiffs' lodestar without providing a "concise but clear" explanation for its cuts); *see also* Hrg. Tr. (8/14/24), *Brown v. Google LLC*, 20-cv-03664-YGR, ECF 1108 at 14-15 ("The Court: **Ninth Circuit law says that I cannot do across-the-board cuts above 10 percent. And defendants have given me no authority for the proposition that I should or I that I can**.") (emphasis added).

contained a "clear sailing" agreement in which defendants agree not to contest class counsel's request for attorneys' fees up to a set amount.[6] These cases thus provide no support for Google's position.

***Second***, this was never "primarily" a damages case. Each claim litigated by counsel provides for damages **as well as** injunctive relief. Every plaintiff who was asked testified that, irrespective of any monetary relief, a key purpose for bringing the case was to obtain business practices changes that would allow them to limit the sharing or sale of their personal information in the RTB auctions. Pritzker Reply Decl., Exs. P-U. This settlement accomplishes that key purpose.

***Third***, Google misstates the law. The Supreme Court sets out an analysis for analyzing potential lodestar reductions for "limited success" in *Hensley*, 461 U.S. at 431. The Court considers whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded." *Id.* at 434. Claims are "unrelated" if they are "entirely distinct and separate" from the claims on which the plaintiff prevailed. *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1499 (9th Cir. 1995). Hours expended on unrelated, unsuccessful claims should not be included in an award of fees. *Sorenson v. Mink*, 239 F.3d 1140 (9th Cir. 2001). Plaintiffs' claims here were all related: all focused on Google's RTB auctions, all "involve[d] a common core of facts" and all were "based on related legal theories." *Hensley*, 461 U.S. at 435. In such cases, "[m]uch of counsel's time will be devoted generally to the litigation as a whole" and "cannot be viewed as [split between] a series of discrete claims" for purposes of any across-the-board lodestar reduction. *Id.*

---

[6] *See Campbell v. Facebook*, 2017 WL 3581179, *2 (N.D. Cal. Aug. 18, 2017) (Facebook agreed to take "no position" on plaintiffs' application for fees and costs up to $3.89 million; plaintiffs moved for an award in the full amount); *In re Ring LLC Priv. Litig.*, 2024 WL 2845978, *2 (C.D. Cal. May 28, 2024) ("Ring "agrees to pay up to $500,000" under the parties' settlement agreement; counsel moved for a total of $500,000); *Moreno v. San Fran. Bay Area Rapid Trans. Dist.*, 2019 WL 343472, *2, 5 (N.D. Cal. Jan. 28, 2019) ("The parties agreed that BART would not oppose a request for attorneys' fees of up to $57,500" which plaintiffs moved for); *Moore v. GlaxoSmithKline Consumer Healthcare Hldgs. (US) LLC*, 2024 WL 4868182, *2 (N.D. Cal. Oct. 3, 2024) ("The Settlement allows for Class Counsel to request up to $495,000 for attorneys' fees and costs") and 4:20-cv-09077-JSW, ECF 150 (Dec. 9, 2024) (awarding plaintiffs' requested fees and costs totaling $495,000); *Lilly v. Jamba Juice Co.*, 3:13-cv-02998-JST (N.D. Cal. May 4, 2015), ECF 69 at 5 (Referencing settlement agreement: "Defendants will pay the total sum of $425,000…for any and all Plaintiffs' attorneys fees and costs…") and 2015 WL 2062858, *2 (N.D. Cal. May 4, 2015) ("Plaintiffs seek an award of $410,673.13 in attorney's fees" and "$14,326.87 in litigation costs" (totaling $425,000)); *Ang v. Bimbo Bakeries USA, Inc.*, 2020 WL 5798152,*4, 8 (N.D. Cal. Sep. 29, 2020) ("Defendant agrees that as part of the settlement, … Counsel [may seek] attorneys' fees not to exceed $325,000").

***Fourth***, the Court's order denying plaintiffs' motion under Rule 23(b)(3) reinforces that their **overall** litigation effort—from initial pleading through motion practice, discovery, and beyond—was a necessary predicate to plaintiffs' achieving class-wide injunctive relief. The Court's order relies heavily on plaintiffs' factual evidence and expert testimony regarding the RTB auctions to find that "Plaintiffs have demonstrated sufficiently for class certification that this data, along with user lists and cookie matching, allows RTB participants to create detailed profiles of individual account holders" and that the "named plaintiffs RTB data is personally-identifying." ECF 690 at 16. It held that plaintiffs' evidence met "many of the elements of Rule 23(b)(2)" and further satisfied the core elements of Rule 23(a)—numerosity, typicality, and adequacy. *Id.* at 2, 10, 18-19. It also found that "an injunctive class under Rule 23(b)(2) is appropriate," and that the injunctive relief advocated for—website disclosures and a tool to allow account holders to opt out of having their information shared in RTB—"would be an important step toward choice, accountability, and transparency." *Id.* at 24-26.

***Fifth***, Google's blunderbuss approach should be rejected because it would be highly unfair to counsel to reduce all their time in the litigation when, as here, the vast majority of that time had little to nothing to do with the damages aspect of the case. Google fails to explain why counsel's initial investigation, drafting of the complaints, and work on the motion to dismiss should be cut since that work related to the claims asserted, not the relief being sought, and plaintiffs mostly prevailed on the motion to dismiss. The same is true for discovery and discovery motions. The only damages-specific discovery Google produced was a one-page spreadsheet. There was only one damages-related discovery motion, and the only damages-related depositions were of three experts. Most discovery-related time was spent on liability and technology issues, all of which was necessary for the injunctive relief case. Even as to the first class certification motion, Google's proposed 50% cut makes no sense. Aside from the discreet work done by certain damages experts, most of the work on class certification related to proving the other elements necessary for certification under Rule 23(a) and (b) and proving that Google's contracts and disclosures were uniform and that the RTB auctions operated in a common manner for all class members. Google also fails to explain why any work performed **after** the Court denied the 23(b)(3) class should be cut when none related to damages. Pritzker Reply Decl., ¶¶22-24.

***Finally***, if the Court is inclined to reduce counsel's lodestar and expenses to remove work

specific to the damage claims (and plaintiffs do not concede that it should), the Court should strictly cabin its reductions to damages-specific cuts for certain expert and motion work, the basis of which is set forth in detail in the Pritzker Reply Declaration. Such focused, damages-specific cuts would lower the lodestar by 585.17 hours ($487,716.00), and expenses by $397,973.63, for a total reduction of $885,689.63 (before the application of any potential multiplier). Pritzker Reply Decl., ¶¶25-26.

5. The Court should reject Google's proposed additional cuts for alleged inefficiencies.

On top of the cuts described above, Google proposes cuts to certain categories of time for alleged inefficiencies by counsel. None of these assertions by Google have merit.

a. Depositions and hearings were appropriately staffed

During the litigation, counsel took or defended 31 depositions, including 12 experts, seven plaintiffs, and 13 Google employees. Google apparently concedes that counsel appropriately staffed 20 depositions, but complains about how the other 12 were staffed. Opp. at 19; Somvichian Decl., ¶9. Google's complaints lack merit. It is often necessary for multiple attorneys to participate at depositions in complex class cases such as this. Courts recognize this reality. *See Probe v. State Teachers' Ret. Sys*., 780 F.2d 776, 785 (9th Cir.1986) ("In an important class action litigation [ ], the participation of more than one attorney does not constitute an unnecessary duplication of effort."); *Mendoza v. Brewster Sch. Dist. No. 111*, 469 F. Supp. 2d 905, 915 (E.D. Wash. 2006) ("The work of more than on attorney on the same litigation task does not automatically mean overstaffing has occurred"). Google knows this, as it also staffed depositions with nonparticipating attorneys. Pritzker Reply Decl. ¶32.

Google misrepresents the nature of counsels' participation at the 12 challenged depositions. It fails to mention that many attorneys it lists as being "present" actually appeared by Zoom (saving both travel time and expense) and only for a small portion of time, or that certain attorneys listed as "present" were conducting related depositions within days of the deposition Google complains about, or that some attorneys listed as "present" did not even bill for their time. Staffing in this way actually **created** litigation efficiencies; as an example, nonparticipating counsel monitoring portions of depositions were able to quickly apply testimony gleaned, in real time, to their other work assignments, saving time and resources that otherwise would have been spent expediting and reviewing deposition transcripts. Pritzker Reply Decl. ¶¶30-33. The Court is within its discretion to

defer to counsels' judgment on these matters. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1111 (9th Cir. 2014) ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case.").

b. Inter-firm meetings were necessary and increased, not decreased, efficiency

Google objects to time spent by counsel in inter-firm meetings, time it views as "excessive" without explanation and for which it proposes the Court make an **additional** 35% lodestar reduction. Opp. at 18-19. In addition to getting the law wrong,[7] Google fails to identify specifically what it finds objectionable, failing once again to meet its burden in opposing this motion. Meetings among firms appointed to lead litigation are a necessary component of complex class actions. The *Manual for Complex Litigation* advises that interim lead counsel should meet as needed "to seek consensus …when making decisions that may have a critical impact on the litigation" and "to keep the other attorneys in the group advised of the progress of the litigation and consult with them about decisions significantly affecting their clients." MCL 4th §10.222 (2004). Here, the inter-office meetings **promoted** efficiencies. The PEC firms did meet frequently, but for substantive purposes: to discuss work assignments, obtain input on litigation strategy and decisions affecting the clients and the class, review work product, share liability analyses, prepare for oral arguments, and apprise one another of legal or regulatory changes, settlement status, and the progress of the litigation generally. Pritzker Decl., ¶18. Meeting all together is more efficient than having attorneys meet one-on-one or seriatim. Courts recognize these efficiencies in assessing fees. *See, e.g.*, *MacDonald v. Ford Motor Co.*, 2016 WL 3055643, *4 (N.D. Cal. May 31, 2016) ("This was a large, putative class action. In such cases, some number of intra-office conferences are not only to be expected, but will often result in savings of attorney time by ensuring that all attorneys on a team are kept apprised of important information about the case as it becomes available."); *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1125 (C.D. Cal. May 30, 2012) ("the Court declines to reduce the hours simply because Class Counsel kept each other informed about the case and double-checked each other's work").

c. Plaintiffs did not engage in excessive motion practice

[7] Google cites *In Re Volkswagen "Clean Diesel" Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 4109573, *9 (N.D. Cal. June 20, 2023), an irrelevant non-class decision that discusses internal, "unnecessary…inter-firm" meetings within a single firm, not inter-firm meetings of class counsel.

Google claims that counsel spent too much time on the motion to dismiss, and that all time billed under "Dispositive Motions" should therefore be reduced by an **additional** 10%. Opp. at 20. But Google ignores counsel's attestation that this category includes all other motion work, except for discovery motions. Pritzker Fee Decl., ¶28. There also were extensive sealing motions, case extension motions, and consolidation and lead counsel motions, all of which reflect time billed in this category. Google's similar claim that discovery practice was excessive, and that all time billed by counsel for "Discovery Motions" should be reduced by an **additional** 45%, (Opp. at 15-16) is also baseless. Plaintiffs in fact prevailed in whole or in part on most discovery motions. And counsel did not refuse compromise nor re-litigate settled issues. In fact, the Court repeatedly ordered production of documents pursuant to plaintiffs' narrowed requests. Pritzker Reply Decl., ¶¶35-38.

Plaintiffs often sought relief from the Court because Google objected to virtually all discovery. Google cherry picks the Court's critiques, ignoring that: (i) counsel obtained necessary discovery; (ii) the Court's recognition that plaintiffs presented "new arguments that are more specific and helpful;" (iii) the Court "encourage[d] Google to revisit its relevance objections"; and (iv) recognized that the scope of discovery was not as narrow as Google claimed. Pritzker Reply Decl., ¶40. Google also makes much of the Court's denial of plaintiffs' sanctions motions, while ignoring that the Court granted plaintiffs' request for access to data, where it had not been deleted by Google. *Id.*, ¶¶39-41.

d. <u>Plaintiffs did not bill for "fees on fees" even though that is allowed</u>

The Court should reject Google's argument that all time billed under "Case Management" should be reduced by an **additional** 15% because counsel allegedly billed for "fees on fees." Opp. at 20. What Google complains about is not "fees on fees" billing, but rather interim class counsel performing her court-ordered responsibilities to review and audit time billed in the litigation. Pritzker Reply Decl., ¶42. This time was, in any event, minimal (37.8 hours in total), and hardly justifies the across-the-board cut Google proposes. *Id.* Notably, these hours, undertaken at the Court's direction, actually **saved** Google money, resulting in an overall reduction of more than 2300 attorney hours and more than more than $1,000,000 in lodestar. Pritzker Decl. ¶33. Finally, even if these hours are "fees on fees" billing, as Google contends, they are permitted. *See, e.g.*, *Younger v. Michael & Assoc., P.C.*, 2014 WL 1760827, *3 (N.D. Cal. April 30, 2014)("Federal courts 'have uniformly held that time spent

in establishing the entitlement to and amount of the fee is compensable.'"(internal citation omitted)).

6. There was no "block billing" by counsel.

Google's contention that all lodestar should be reduced by an **additional** 5% because the time record contains "rampant block billing" is unspecified and unsupported by the record and the law. Block billing is where "discrete and unrelated tasks are lumped together in one entry" so that it is "impossible to determine the reasonableness of the hours spent on each task." *Donastrong v. City of Ontario*, 2021 WL 6103545 (C.D. Cal. Sep. 23, 2021); *Xu v. Yamanaka*, 2014 WL 3840105, *3 (N.D. Cal. Aug. 1, 2014). "Block billing only becomes an issue where there is a need to separate work that qualifies for compensation from work that does not." *Cabrera v. Ford Motor Co*., 2025 WL 2462442, *9 (S.D. Cal. Aug. 26, 2025); *and see Kranson v. Fed. Express Corp*., 2013 WL 6503308, *4 (N.D. Cal. Dec. 11, 2013). Google does not point to any specific entry in the 42 pages of entries it claims contain block billing, failing again to carry its burden. "An applicant is not required to record in detail how she spends each minute and need only record the general subject matter." *Hensley*, 461 U.S. at 437, n. 12. Counsel have reviewed the entries Google identifies. None reveal unrelated tasks that include both "covered and uncovered work." Pritzker Reply Decl., ¶43.[8]

7. Google does not address the many other efficiencies reflected in the Fee Motion.

Google proposes to cut wide swaths of counsels' lodestar, yet fails to address the significant cost-saving measures that are reflected in the Fee Motion. Counsel used 2024 rates, resulting in a lodestar that was likely millions of dollars lower than it would be had the request been based on current 2025 rates, as Ninth Circuit law allows. *Fischel v. Equitable Life Assur. of US*, 307 F.3d 997, 1100 (9th Cir. 2002). And they have not sought fees for any work performed since July 31, 2025 to get the settlement across the finish line and present it for Court approval. The Court should consider these measures—likely worth millions—in weighing counsels' fee request and Google's opposition to it.

**D. The Requested 3.5 Multiplier on Counsels' Lodestar Is Appropriate**

Google does not contest the Court's authority to award a multiplier or that, under California

[8] The 42 pages contain 676 individual entries (less than 2.5% of plaintiffs' 27,186 entries). The only case Google cites, *Simon v. Maple Beach Ventures, LLC*, is distinguishable: there, plaintiffs shared summary charts showing "six general categories of time with the total number of hours spent." 2021 WL 1907821, *4 (N.D. Cal. May 12, 2021).

law, the "range of acceptability" for multipliers is "2 to 4 or even higher." Mot. at 20. Nor does Google contest that, in cases where exceptional results are achieved, courts in the Ninth Circuit award large multipliers approaching or significantly above 4.0. *Id*. Google argues that plaintiffs got no money for the class, and suggests the injunctive relief obtained is "not exceptional." Opp. at 22-23. The record shows otherwise. The injunctive relief secured in the settlement is of a scale and importance that outweighs any conceivable monetary damages award. Plaintiffs achieved their litigation goals of choice, transparency, and accountability through a settlement that will fundamentally alter Google's business practices, and the workings of the entire online advertising industry. Hundreds of millions of Americans (not just Google account holders) will benefit from new disclosures about Google's RTB auctions and a never-before-available RTB Control that will prevent them from being identified and tracked by RTB auction participants. Plaintiffs 'expert values the settlement conservatively at $1.4 billion but, by any measure, plaintiffs have obtained an injunctive relief settlement that is of "systemic effect of importance," and that serves a "substantial public interest." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 760 (2d Cir. 1998). Counsel advocated for this relief for over four years of high-risk litigation, working for the benefit of the class on an entirely contingency basis, all the while skillfully negotiating "a unique technology, an evolving legal landscape, the potential interplay of state, federal and international privacy regulations, and the corporate complexities of Google -- one of the largest tech companies in the world." Mediator's Statement, ¶2. All of these considerations favor application of a 3.5 multiplier here.

### E. Counsel's Expenses Are Properly Documented

There is no basis for Google's challenge to certain of counsels' expenses, which are documented in a manner and form consistent with N.D. Cal. practice and entirely proper. If the Court concludes that damages-related expenses should be reduced, plaintiffs provide above what those reductions should be. Google's other complaints, about deposition and travel expenses, are unsupported by any evidence and meritless for the reasons set forth above.

## III. CONCLUSION

For all the foregoing reasons, the Court should award plaintiffs' counsel their full lodestar, apply a 3.5 multiplier to that time, and reimburse counsel for all litigation expenses incurred.

DATED: December 22, 2025

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: /s/ Elizabeth C. Pritzker

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (212) 784-6400
Tel: (646) 993-1000
*dstraite@dicellolevitt.com*

James Ulwick (admitted *pro hac vice*)

Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Aaron P. Arnzen (Cal. Bar. No. 218272)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
*fbottini@bottinilaw.com*
*aarnzen@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

*IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*

*This document applies to all actions.*

**CASE NO. 4:21-CV-02155-YGR-VKD**

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION TO CERTIFY A SETTLEMENT CLASS AND GRANT FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Judge: Hon. Yvonne Gonzalez Rogers
Date: February 3, 2026
Time: 2:00 pm
Courtroom: 1, 4th Floor

Plaintiffs respectfully submit this reply in further support of their motion for certification of a settlement class and for final approval of their proposed class action settlement with defendant Google LLC ("the Motion").

## ARGUMENT

CAFA Notice

Plaintiffs' Motion was filed on September 2, 2025. *See* ECF 777. Under the terms of the settlement, Google was required to provide notice of the settlement to the Department of Justice and each state attorney general within 10 days of the filing of the Motion, pursuant to CAFA's notice requirements, 29 U.S.C. § 1715(b). On September 12, 2025, Epiq Class Action & Claims Solutions, Inc., on behalf of Google, sent CAFA notice packages to 57 federal and state officials (the Attorney General of the United States and the Attorneys General of each of the 50 states, the District of Columbia, and the United States Territories). *See* ECF 790 (Google Notice of CAFA Compliance). Pursuant to CAFA, the deadline for any federal or state official receiving the CAFA notice to comment on or oppose the settlement was December 12, 2025. No federal or state official receiving the CAFA notice has commented on or opposed the settlement and the December 12, 2025 deadline has now passed.

Objections

Pursuant to the terms of the settlement, the deadline for any settlement class member to object to the fairness, reasonableness, or adequacy of the settlement or to plaintiffs' counsel's attorneys' fee and expense motion was also December 12, 2025. No settlement class member has objected to either the Motion or the fee motion, and the December 12, 2025 deadline has now passed.

Google's Response

On November 12, 2025, Google filed its response to the Motion. In its response, Google stated that it "agrees that the proposed settlement is 'fair, reasonable, and adequate,' and that the Court should grant final approval." ECF 784 at 2.

## CONCLUSION

For all of the reasons set forth in the Motion, and in light of the facts set forth above, plaintiffs respectfully request that the Court certify the settlement class, appoint plaintiffs as settlement class

representatives, appoint plaintiffs' counsel as settlement class counsel, and finally approve the settlement.

DATED: December 22, 2025

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: */s/ Elizabeth C. Pritzker*

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017

Tel.: (212) 784-6400
Tel: (646) 993-1000
dstraite@dicellolevitt.com

James Ulwick (admitted pro hac vice)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
julwick@dicellolevitt.com

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
nnishimura@cpmlegal.com
bdanitz@cpmlegal.com
kswope@cpmlegal.com

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Aaron P. Arnzen (Cal. Bar. No. 218272)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
fbottini@bottinilaw.com
aarnzen@bottinilaw.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

# EXHIBIT 11
# Proposed Google Fee Reductions

| Billing Category | Plaintiffs' Counsel's Claimed Hours | Plaintiffs' Counsel's Claimed Fees | Google's Proposed Reduced Hours | Google's Proposed Fees for Reduced Hours & Corrected Contractor Rates | Further 50% Reduction for Damages / 23(b)(3) Work | Further Reductions for Inefficiency (%) | Google's Proposed Fees (Reduced for Inefficiency) | Google's Proposed Fees (Further 5% Reduction for Block Billing) |
|---|---|---|---|---|---|---|---|---|
| Case Mgmt (1) | 1207.3 | $1,026,259 | 1207.3 | $1,026,259 | $513,130 | 15% | $436,160 | $414,352 |
| Fact Investigation (2) | 238.4 | $220,640 | 238.4 | $220,640 | $110,320 | 0% | $110,320 | $104,804 |
| Pleadings (3) | 926.9 | $839,756 | 926.9 | $839,756 | $419,878 | 0% | $419,878 | $398,884 |
| Client/Class Member Comms. (4) | 359.6 | $320,017 | 359.6 | $320,017 | $160,008 | 0% | $160,008 | $152,008 |
| Lead Counsel/PEC Meetings (5) | 3015.5 | $2,936,549 | 3015.5 | $2,936,549 | $1,468,275 | 30% | $1,027,792 | $976,403 |
| Experts/Consultant/Daubert Motions (6) | 2029.7 | $1,836,647 | 2029.7 | $1,836,647 | $918,323 | 0% | $918,323 | $872,407 |
| Settlement/Mediation (7) | 1236.1 | $1,301,034 | 1236.1 | $1,301,034 | $650,517 | 0% | $650,517 | $617,991 |
| Court Appearances (8) | 371.9 | $387,261 | 371.9 | $387,261 | $193,630 | 20% | $154,904 | $147,159 |
| Dispositive Motions (9) | 1927.7 | $1,818,239 | 1927.7 | $1,818,239 | $909,119 | 10% | $818,207 | $777,297 |
| Class Action Certification and Notice (10) | 4684.2 | $4,621,005 | 4684.2 | $4,621,005 | $2,310,503 | 0% | $2,310,503 | $2,194,977 |
| Research (11) | 605.4 | $517,500 | 605.4 | $517,500 | $258,750 | 0% | $258,750 | $245,812 |
| Discovery - Written (12) | 4049.7 | $3,725,281 | 4049.7 | $3,725,281 | $1,862,641 | 0% | $1,862,641 | $1,769,508 |
| Discovery - Tier I Review (13) | 8110 | $2,639,596 | 2652 | $710,169 | $355,085 | 0% | $355,085 | $337,330 |
| Discovery - Tier II Analysis (14) | 3636.1 | $2,538,352 | 3636.1 | $2,538,352 | $1,269,176 | 0% | $1,269,176 | $1,205,717 |
| Discovery - Third Party (15) | 1156.9 | $786,759 | 1156.9 | $786,759 | $393,380 | 0% | $393,380 | $373,711 |
| Discovery - Depositions (16) | 5734.9 | $4,274,608 | 4366.7 | $3,216,954 | $1,608,477 | 10% | $1,447,629 | $1,375,248 |
| Discovery - Experts (17) | 1297 | $1,123,572 | 1297 | $1,123,572 | $561,786 | 0% | $561,786 | $533,697 |
| Discovery - Motions (18) | 4059.5 | $3,881,392 | 4059.5 | $3,881,392 | $1,940,696 | 45% | $1,067,383 | $1,014,014 |
| Analysis/Strategy (19) | 1207.9 | $1,248,411 | 1207.9 | $1,248,411 | $624,205 | 0% | $624,205 | $592,995 |
| Trial Prep. (20) | 457.9 | $368,608 | 457.9 | $368,608 | $184,304 | 0% | $184,304 | $175,089 |
| Trial (21) | 0 | $0 | 0 | $0 | $0 | 0% | $0 | $0 |
| Appeal (22) | 209.15 | $245,353 | 0 | $0 | $0 | 0% | $0 | $0 |
| Total | 46521.75 | $36,656,834 | 39486.4 | $33,424,400 | $16,712,200 | | $15,030,949 | **$14,279,402** |

*Yellow highlighting indicates proposed reductions.*

# EXHIBIT B

# How Google uses your information for Display Advertising on partner sites, apps, and other services in the United States

When you visit sites and apps (or similar online services like Connected TV), you may see image or video ads appear on the page you are visiting. This is called Display Advertising. These Display ads keep many of these sites, apps and services free of charge.

Companies that own sites and apps (or similar services) can use Google Display Advertising tools to show you ads in empty windows on their pages, sometimes known as “ad slots.” The companies then use these tools provided by Google to connect with Advertisers (or Advertising Partners working on the Advertiser’s behalf) to:

- provide Advertising Partners with information about the ad slot and the page or content you are looking at,
- provide these companies with information about your previous visits to this or other sites, apps and similar services in order to understand what ads would interest you, and
- show you ads.

When you visit a website that uses Google Display Advertising tools, your web browser automatically sends certain information to Google. This includes the URL of the page you’re visiting and your IP address. We may also set cookies on your browser or read cookies that are already there. Apps and connected TV devices that use Google advertising services may also share information with Google, such as the name of the app or channel and a unique identifier for advertising. Advertising Partners receive information about the ad slot, and they can then choose whether to bid for the opportunity to show an ad in that slot.

## How do you control what information Google collects and discloses in Display Advertising?

When you visit a site, app or service that uses a Google Display Advertising tool on the page you are visiting, that site, app or service may show you a message that:

- describes how it may use  cookies, mobile IDs or other information stored on your device, including to show you personalized ads;

- tells you about the “vendors” (companies) that can receive information about you and your device in order to help these companies decide if they want to buy the ad slot, and/or
- gives you controls (e.g., links or settings that allow you to opt-out) over the information these vendors can receive about you and your device when serving personalized ads on the page you are visiting.

You can also control whether to allow personalized advertising and whether to allow advertising partners to use additional information from your browser or device to inform the selection of ads on sites and apps that partner with Google. If you turn off this control, Bid Request Data (defined below) sent to Advertising Partners will omit more specific details about your browser or device.

Learn more about who can receive information about you and your device.

## How do I contact Google if I have questions?

If you have additional questions or requests related to your rights, you can contact Google.

# More information on how Google Display Advertising tools process your personal data

## Key terms

**Advertisers**
Advertisers are companies that own sites and apps (or similar services) that use Google Display Advertising tools to understand more about the people visiting their sites, apps or services, and to improve the way they can show you ads on other sites, apps and services.

**Advertising Partners**
These are companies working on the Advertiser's and Publisher's behalf. For example, they help Advertisers buy ad slots on Publisher sites and apps (or similar services). They also help Publishers sell ad slots. Learn more about Advertising partners.

**Publishers**
Publishers are companies that own sites and apps (or similar services) that use Google Display Advertising tools to show you ads on the site, app or similar service you are viewing.

## Categories of data processed by Display Advertising tools

The exact information Google collects about you and your device depends on choices you have made in your ad settings, and the browser or device you are using. It may also depend on the permissions you give in consent messages (sometimes known as "cookie banners") that appear on some sites, apps, or other services, or in the privacy controls offered by those services.

Consent messages may be presented to you when you visit a site, app or other service. The consent messages may let you choose whether companies (including Google) collect information about you and your device to learn more about your interests and, therefore, understand what type of ads would interest you. This information can be stored in a personalized advertising profile.

The exact information Google collects about you may also depend on instructions we receive from Publishers. For example, Publishers may choose to send Google identifiers that are used for things like frequency capping, audience segmentation and audience targeting, sequential ad rotation, and other audience-based ad delivery controls across devices.

The below tables provide more information on data processed when Google provides Display Advertising services to Publishers and Advertising Partners.

### Data received when a Publisher requests ads ("Ad Request Data")

| Data type | Examples of information |
|---|---|
| Information about an ad space (slot) | Ad slot identifier assigned by the Publisher; allowed ad width and height; supported formats or types of ad media or technology; location of the ad slot on the page; Publisher targeting parameters |
| Content surrounding an ad space | Web page or content URL; mobile app ID; video content description |
| Publisher information | Identifier that enables Google to know who the Publisher is ("Publisher identifier") |
| Publisher-provided information | Publisher-provided identifier; Secure Signals; Publisher first-party IDs |

| | |
|---|---|
| Information about your device or browser | Browser and operating system type and version, information about your device, including model, brand, battery and storage information; preferred languages; referrer information; app installation source<br><br>For personalized ads and non-personalized ads requests from a web browser, cookies in doubleclick.net domain or the Publisher domain that may contain a user-resettable identifier for advertising<br><br>For personalized ads and non-personalized ads requests from a mobile or a connected TV device, a device advertising identifier and (if available) user authentication identifier |
| Information about a browsing or in-app session | Identifier of the current web page view or in-app session; width and height of the browser window |
| Network information | IP address; HTTP and other network headers; Carrier information (mcc/mnc), network state |
| Privacy settings | Whether a Publisher requests non-personalized or limited ads or requests ads directed at children |
| Publisher ad tag or advertising software development kit (SDK) information | Ad tag or SDK type and version |
| Supported advertising technologies | Application programming interfaces (APIs) supported by your device; the Publisher ad tag or the software development kit (SDK); Apple's SKAdNetwork for measuring ad-driven application installations; Open Measurement SDK |
| Third-party demand information | Bid responses and bids received from a Publisher's Advertising Partners, such as header bidding partners through header bidding trafficking |
| Signals for detecting and preventing ad fraud and abuse | Proprietary signals collected from a device or a web browser that help detect invalid activity |
| Google Analytics information | Session ID; App Analytics ID |
| Experimental and debugging information | Set of active experiments; date and time of the ad request; other ad load timing parameters<br><br>For app, system health metrics; crash analytics and reports; app launch time; hang rate; energy usage |

## Data disclosed to Advertising Partners in the bid request ("Bid Request Data")

| **Data type** | **Examples of information** |
|---|---|
| Information about an ad space (slot) | Ad slot identifier; allowed ad width and height; supported formats or types of media; whether the slot is above or below the fold; historical viewability and click-through-rate |
| Content surrounding the ad space | Web page URL; mobile app ID; video content description |
| Publisher information | Publisher identifier; billing country; Advertising Partners involved in selling ad space |

| | |
|---|---|
| Publisher-provided information | Secure Signals; Publisher-provided signals |
| Publisher configuration settings | Categories of ads disallowed by a Publisher; direct deals between a Publisher and a buying Advertising Partner; minimal price a Publisher wishes to be paid for showing an ad |
| Information about your device or browser | Approximate detected device geolocation; IP address; user-resettable advertising identifiers for a browser, based on cookies, or a device; device model and brand; browser brand and version; operating system brand and version |
| Privacy settings | Whether fields in the bid request were redacted or generalized |
| Supported advertising technologies | Application programming interfaces (APIs) supported by your device; the Publisher ad tag or the software development kit (SDK); Apple's SKAdNetwork for measuring ad-driven application installations; Open Measurement SDK |

### Data received when an ad is shown

| **Data type** | **Examples of information** |
|---|---|
| Information about the related ad request | Reference to the ad request that resulted in selecting the ad, data about the selected ad |
| Information about your device or browser | Browser and operating system type and version, device model and brand (as part of user-agent information); preferred browser languages<br><br>For personalized ads and non-personalized ads requests from a web browser, cookies in doubleclick.net domain or the Publisher domain that may contain a user-resettable identifier for advertising<br><br>For personalized ads and non-personalized ads requests from a mobile or a connected TV device, a device advertising identifier |
| Network information | IP address; HTTP and other network headers |
| Signals for detecting and preventing ad fraud and abuse | Proprietary signals collected from a device or a web browser that help detect invalid activity |
| Interaction data | Information on how you interact with an ad, such as whether you click on it; interactions with a video in an ad (such as whether it is muted, paused, skipped, expanded or collapsed) |
| Information related to the rendering of the ad | Information related to the rendering of the ad, such as error messages; client-side ad selection and whether and for how long the ad shows up on screen |

### Data received from our Advertising Partners when they submit a bid for the ad slot

| **Data type** | **Examples of information** |
|---|---|
| Information about the ad | The ad's dimensions; the page you will be directed to if you click on the ad; the HTML code your browser will render to request the ad from the Advertising Partner's server |
| Information about the bid for the ad slot | The amount the Advertising Partner bids for the ad slot |

## Data disclosed to Publishers about ad transactions

Data disclosed to Publishers for reporting, analysis, optimization, personalization, and auditing purposes is done both at the event-level and in aggregate. Except for anonymized benchmark data, this information is only ever disclosed to the Publisher originating the ad request.

| **Data type** | **Examples of information** |
|---|---|
| Information provided by the Publisher about the request in relation to you and the ad slot | The ad slot parameters; rules and targeting configured by the Publisher; freeform text provided by the Publisher, browser, geography<br><br>Per-Publisher third and/or first party identifiers about you or your device provided in ad request (provided ads personalization is permitted) |
| Information about the ad that was returned | The buying Advertising Partner; the transacting deal; the detected Advertiser; the Publisher payment for the ad; the ad creative |
| Information about the ad's visibility and your interactions with it | If the ad was shown on screen (Active View); if you clicked on an ad; if you muted an ad |

## Data we use to display the ads

| **Data type** | **Examples of information** |
|---|---|
| Network information | IP address; HTTP and other network headers |
| Information about an ad space (slot) | Ad slot identifier; allowed ad width and height; supported formats or types of media; whether the slot is above or below the fold |

## Data used for "cookie matching"

| **Data type** | **Examples of information** |
|---|---|
| Information about your device or browser | Browser and operating system type and version; device model and brand (as part of user-agent information); preferred browser languages |
| Pseudonymous cookie-based user identifiers | For requests from a web browser: cookies in doubleclick.net domain or other ad techs' domains. The cookies may contain a user-resettable identifier for advertising (for personalized and non-personalized ads) |
| System debug information | Account ID of the cookie matching partner; hostname of the Google machine that starts the request; timestamp of when the request started; details of whether the request was over SSL |

## How your data is used

Google uses your information to provide the Display Advertising tools for the purposes described below:

| How your data is used | What data is used |
|---|---|
| **To display ads.** We process your information so we know where to send ads that are served using the Display Advertising tools. For example, we process your IP address in order to send ads to the page you're reading on your device. We also use information about the ad slot to make sure the ad we serve is appropriate (such as to make sure it is the right size to fit into the ad slot on the page). | • Data we use to display ads |
| **To select ads that you will see (whether or not the ad is personalized to you).** We process data to determine the types of ads you see and which Advertising Partners are eligible to receive certain data. The data collected and disclosed will depend on the permissions you give in your ad settings, including in the banner that may be presented to you when you visit the Publisher's site, app or service, or in the privacy controls offered by those services.<br><br>Ads are shown to you according to factors like the time of day, the topic of the site you are visiting or your general location (using part of your IP address). For example, you might see a restaurant ad for lunch specials because you're reading a blog about lunch recipes. Or you might see an ad for a roofing business because you are on a site about home repair.<br><br>We process data to limit the amount of times you see the same ad.<br><br>Depending on the permissions you give, we will disclose Bid Request Data to our Advertising Partners, who use it to decide whether they want to make a bid for an ad slot on the Publisher's site, app or service. If one or more of our Advertising Partners decide to submit a bid for the relevant ad slot, Google processes the data we receive from them to determine the winning bid and show the relevant ad on the Publisher's site, app or service. | • Data received when a Publisher requests ads ("Ad Request Data")<br>• Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br>• Data received from our Advertising Partners when they submit a bid for ad space |
| **To show personalized ads.** We use data to show personalized ads on Publisher sites, apps and services. Ads can be personalized based on your inferred interests. These inferences are derived from cookies and other identifiers that give information about your previous interactions with sites, apps and other services (including Advertisers' sites, apps and services).<br><br>We process data to determine the types of ads you see and determine the Advertising Partners which are eligible to receive data for ads personalization. The data collected and disclosed will depend on the permissions you give your ad settings and in a consent message that may be presented to you when you visit the site, app or service, or in the privacy controls offered by those services.<br><br>When showing personalized ads, we will disclose Bid Request Data to our Advertising Partners, who use it to decide whether they want to make a bid for the ad slot on the Publisher's site, app or service. If one or more of our Advertising Partners decide to submit | • Data received when a Publisher requests ads ("Ad Request Data")<br>• Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br>• Data received from our Advertising Partners when they submit a bid for ad space<br>• Data used for cookie matching |

| | |
|---|---|
| a bid for the relevant ad slot, Google processes this information to determine the winning bid and show the relevant ad on the Publisher's web, app or service.<br><br>Information from cookies and identifiers is collected, stored and combined with other information about you (for example, information from your previous visits to this site, app or service, or your previous visits to other sites, apps and services) in order to generate a personalized ads profile and to show you ads that would interest you. Your profile will include information on products and services you are likely to be interested in, and Advertisers use this information to serve you personalized ads. For example, if you visited a site and looked at red shoes, your profile will record that you are interested in red sneakers. An Advertiser that sells red sneakers could then choose to serve you a personalized ad for red sneakers when you visit another site, app or service.<br><br>Some of our Advertising Partners also use a feature called "cookie matching" to personalize ads. This feature allows our Advertising Partners to match cookies or identifiers that they have collected when a user browsed certain sites, services and apps with cookies that they receive when they use the Display Advertising tools. These cookies are stored in "match tables" and may be used by our Advertising Partners for a number of reasons, including to personalize ads. For example, an Advertiser can use the cookie matching service to match cookies that they collected when you visited their site with a cookie that they receive in the Display Advertising tools. If you use the controls to disallow personalized advertising or to disallow advertising partners to use additional information from your browser or device to inform the selection of ads on sites and apps that partner with Google, cookie matching will also be disabled on that impression.<br><br>Advertising Partners may also use information accessed from application programming interfaces (APIs) supported by your device to show you personalized ads. | |
| **To measure how you view or click on ads.** We use data for analytics and measurement to understand how the Display Advertising tools are used. For example, we measure the performance of ads placed via the Display Advertising tools, including by analysing the performance of different types of ad formats. This includes analysing metrics such as viewability (whether an ad displayed on a page is visible to you) or click through rates (how often people click on an ad). These metrics can help Publishers and Advertising Partners understand how ads are performing, including whether you bought their goods or services after viewing or clicking on the ad. They are also used for billing and payment purposes.<br><br>We collect, store, aggregate, analyze and combine data, and may disclose data with our Advertising Partners, for this purpose. | • Data received when an ad is shown<br><br>• Data disclosed to Advertising Partners in the bid request ("Bid Request Data") |
| **Provide, maintain and improve the Display Advertising tools for Publishers and Advertisers, and understand how the Display Advertising tools are being used.** We use data to make sure our Display Advertising tools are working properly and to provide services that meet the needs of Publishers and Advertising Partners that use these tools. | • Data received when a Publisher requests ads ("Ad Request Data") |

| | |
|---|---|
| For example:<br>• we use the data we receive when an ad is shown to provide reporting and forecasting tools that help Publishers and Advertising Partners understand how ads are performing, and to troubleshoot potential issues.<br>• we provide Advertising Partners with reporting and forecasting tools that use aggregated data to allow them to estimate the volume of ad slots that may become available in future.<br>• depending on Publisher settings in the Display Advertising tools, we disclose "event-level" data to Publishers. "Event-level" data is non-aggregated Ad Request Data and data received when an ad is shown on a Publisher's own site, app or other service. Publishers only receive event-level data that relates to the ads that are shown on their sites, apps and other services. Event-level data allows Publishers to more effectively analyze and optimize the performance of their ad slots.<br>• we utilize data obtained when an ad is displayed to invoice our Advertising Partners and remit payments to our Publishers.<br>• we collect a sample of the data we disclose to Advertising Partners, and enable Advertising Partners to to debug and troubleshoot issues that may arise in the Display Advertising tools.<br><br>To do this:<br>• we collect, store, aggregate, combine and analyze data (including by using automated and manual techniques).<br>• we disclose information to Publishers and our Advertising Partners for this purpose (including event-level data to publishers). We apply appropriate safeguards that protect your privacy, such as by redacting identifiers or using encryption techniques. | • Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br>• Data received from our Advertising Partners when they submit a bid for ad space<br>• Data received when an ad is shown |
| **Develop new services and features.** We process data to develop new features that are useful for Publishers and our Advertising Partners.<br><br>For example:<br>• we analyze and conduct experiments using the data we receive when an ad is shown, such as by testing new ad formats or controls, based on how our Advertising Partners use the Display Advertising tools or based on technical issues that our Advertising Partners experience with the Display Advertising tools. Using this data, we can analyze which ad formats are in higher demand or are causing technical issues and develop new features for Publishers and Advertising Partners (such as new ad formats or new controls available to Publishers or Advertising Partners) as a result.<br><br>To do this, we<br>• collect, store, combine, aggregate and analyze data (including by using automated and manual techniques) for this purpose. | • Data received when a Publisher requests ads ("Ad Request Data")<br>• Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br>• Data received from our Advertising Partners when they submit a bid for ad space<br>• Data received when an ad is shown |
| **Customise the Display Advertising tools, including by providing recommendations.** We process data to customise | • Data received when a Publisher requests |

| | |
|---|---|
| certain features in the Display Advertising tools that Publishers and our Advertisers Partners use.<br><br>For example:<br>● to optimize the kinds of ad slot bid requests sent to Advertising Partners, we analyze data received when ads are shown and use it to build customized features.<br>● we provide Publishers with customised insights and recommendations on how to optimise ad performance based on our analysis of data received when ads are shown.<br><br>To do this, we:<br>● collect, store, aggregate, combine and analyze data (including using manual and automated techniques) for this purpose.<br>● use this data to customise features in the Display Advertising tools for Publishers and our Advertising Partners. | ads ("Ad Request Data")<br><br>● Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br><br>● Data received from our Advertising Partners when they submit a bid for ad space<br><br>● Data received when an ad is shown |
| **Communicate with Publishers, Advertisers and the public.** We use the data we process in providing the Display Advertising tools to inform marketing campaigns aimed at Publishers and Advertising Partners and to inform communication strategies about upcoming product changes.<br><br>For example:<br>● we use the data we receive when an ad is shown to inform our Advertising Partners about the volumes of available ad slots on Publishers' sites, apps and other services.<br>● we use this data to inform Publishers about how they can optimise revenue from using the Display Advertising tools.<br><br>To do this, we:<br>● collect, store, aggregate, combine and analyze data (including by automated and manual techniques) for this purpose. | ● Data received when a Publisher requests ads ("Ad Request Data")<br><br>● Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br><br>● Data received from our Advertising Partners when they submit a bid for ad space<br><br>● Data received when an ad is shown |
| **Protect Google, our users and the public.** We use data to improve the safety and reliability of the Display Advertising tools. This includes detecting, preventing and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.<br><br>For example:<br>● we collect and analyze IP addresses and cookies to protect against abuse that may occur on the Display Advertising tools. This abuse takes many forms, such as bots stealing money from Advertisers by fraudulently clicking on ads.<br>● we use data to detect, prevent or otherwise address non-compliance with Google's policies and/or applicable law. This includes helping us detect and address issues such as spam, malware, and illegal content.<br><br>To do this, we:<br>● collect, store and analyze (including using manual and automated techniques), such as malware scanning.<br>● disclose data to Advertising Partners who protect against fraud and abuse, with government authorities and with our external advisers (such as external legal counsel). | ● Data received when a publisher requests ads ("Ad Request Data")<br><br>● Data disclosed to Advertising Partners in the bid request ("Bid Request Data")<br><br>● Data received from our Advertising Partners when they submit a bid for ad space<br><br>● Data received when an ad is shown |

## Disclosing your information

When we provide the Display Advertising tools, we may disclose information with the below categories of recipients. The individual recipients of information may also be subject to the permissions you give in the consent message that Publishers and Advertisers may present to you when you visit the Publisher or Advertiser site, app or other service:

- **With Publishers**. We disclose data to Publishers as part of features in the Display Advertising tools that are designed to help Publishers understand how ads are performing on their sites, apps or services.
- **With Advertising Partners.** Publishers using Google's Display Advertising tools partner with **Advertisers** (or other types of Advertising Partners listed below that work for Advertisers):
    - **Advertisers**: We disclose data to Advertisers as part of features in the Display Advertising tools that are designed to help Advertisers to understand how their ads are performing on sites, apps or services, and to help them improve their ad campaigns (including enabling Advertisers to personalize ads that you see).
    - **Advertising Partners who facilitate the purchase of ad slots**: These are companies working on the Advertiser's or Publisher's behalf that facilitate the purchase of the ad slots on Publisher sites and apps (or similar services), including:
        - Ad networks: companies that bring together a pool of publisher ad inventory to be matched with advertisers looking for places to show their ads, acting as an intermediary between the two.
        - Ad Exchanges: virtual marketplaces where Publishers and Advertisers trade digital ad inventory.
        - Demand-side platforms: companies that help Advertisers automate the process of buying ad slots on Publisher sites, apps and other services in real time.
        - Supply-side platforms: companies that help Publishers sell ad slots, fill them with ads, and receive revenue.
        - Data Partners: companies that help other Advertisers (and Advertising Partners working on their behalf) deliver greater insights about the purchase of ad slots in a way that meets Advertisers' campaign goals, and streamlines the way ad slots can be purchased.
    - **Advertising Partners who provide ad measurement services.** These companies provide services to Advertisers that measure how users click on and view ads.
    - **Advertising Partners who protect against fraud and abuse.** For example, these companies protect against bots clicking on ads.
    - **Advertising Partners who deliver the ad to the ad slot**. These companies deliver ads onto the page you are visiting.

You can also control whether to allow personalized advertising and whether to allow advertising partners to use additional information from your browser or device to inform the selection of ads on sites and apps that partner with Google. If you turn off this control, Bid Request Data sent to Advertising Partners will omit more specific details about your browser or device.

We also disclose data to our Advertising Partners to help them understand how ads are performing and to debug issues that our partners may experience when using the Display Advertising tools.

*Using personal data from our Advertising Partners*

Advertising Partners can also use some of our Display Advertising tools to help them learn more about the people visiting their sites, apps and services, and to improve the way they show ads to you in their advertising campaigns when you visit other sites, apps and similar services. Learn more about how Google uses data from our Advertising Partners.

- **With Government Authorities, Courts or with our External Advisors.** For legal reasons, we will share data outside of Google if we have a good-faith belief that disclosure of the information is reasonably necessary to respond to:
    - Respond to any applicable law, regulation, legal process, or enforceable governmental request. We share information about the number and type of requests we receive from governments in our Transparency Report.
    - Enforce applicable Terms of Service, including investigation of potential violations.
    - Protect against harm to the rights, property or safety of Google, our users, or the public.

## Retaining your information

All information that we collect in our server logs is retained in accordance with the *Retention periods for Google storing information not in the user's Google Account* section of our Google Ads User Data Retention Policy, unless we need to retain it for the following specific business and legal purposes:

- Samples of the data disclosed to our Advertising Partners as part of our Authorized Buyers service, and which we and our Advertising Partners use to identify and debug issues that may occur with the product: are retained for a period of up to **8 days**.
- Information that identifies you or your device that is necessary for spam and abuse prevention when showing ads (for all Display Advertising tools): is retained for up to **3 years** from the time of collection;
- Data necessary for financial record keeping purposes: is retained for up to **11 years** from the time of collection; and
- If you have directly communicated with Google, through a customer support channel, feedback form or bug report, records of these communications: is retained for up to **7 years.**
- We delete data that is associated with user-resettable identifiers if our systems do not see any requests for that identifier for **180 days**. Event-level data that is provided to Publishers is deleted after a period of up to **60 days**.

# EXHIBIT A

# Signed in RTB Control

Partner Ad Settings page | Confirmation modal | Success message



# Signed in RTB Control



# Signed out RTB Control



**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Jenny Paulson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*jpaulson@simmonsfirm.com*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, | **CASE NO. 4:21-cv-02155-YGR** |
| This Document relates to: *all actions*. | **DECLARATION OF JAY BARNES IN SUPPORT PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES** |

I, Jay Barnes, declare:

1. I am a partner at Simmons Hanly Conroy, LLP (SHC), and chair of the firms Class Action Litigation department. I have been licensed to practice law in the state of Missouri since September 21, 2005. I am admitted to practice in the U.S. District Court(s) for Missouri Western District Court and was admitted to this Court *pro hac vice* on May 22, 2023 and have been admitted to practice in California since July 2025. The following facts are within my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I submit this declaration in support of Plaintiffs' Motion for and Award of Attorneys' Fees, Costs and Expenses.

3. On March 26, 2021, I filed a proposed class action lawsuit on behalf of my client Kimberley Woodruff against Google LLC in the United States District Court for the Northern District of California, assigned Case No. 21-cv-02155. My client's action was related to and consolidated into the instant action, *In Re Google RTB Consumer Privacy Litig*., Case No. 4:21-cv-02155-YGR-VKD (this "Action"), on June 24, 2021. *See* ECF No. 69.

4. I am the principal attorney at SHC for this litigation. I have practiced civil litigation on behalf of consumers and individuals since 2011. The firm generally employs more than 100 attorneys practicing in, among other areas, consumer class action, unfair competition law, and privacy class actions. I head the Class Action Litigation department, which includes class actions related to consumer protection, privacy, and products liability. Attached hereto as **Exhibit A** is SHC's Firm resume.

5. SHC's attorneys have a long history of successfully handling class actions across a range of industries, including privacy class actions. I bring substantial experience in complex litigation and class action matters with a history of litigating in an efficient and practical manner. *See* **Exhibit A** at 10.

6. I have an extensive background in privacy and consumer protection class action litigation. I have litigated dozens of complex litigation or class action cases across the country involving privacy, unfair competition, consumer protection, or other claims, including the following matters in which I have served in a leadership position:

- *Doe v. Partners Healthcare System, Inc.,* Case No. 1984CV01651 (Suffolk Co., MA), Lead Counsel.
- *In re Google Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015), Plaintiffs' Steering Committee.
- *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016), Lead Counsel.
- *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020), Class Counsel.
- *Smith v. Facebook*, 745 Fed. App'x 8 (9th Cir. 2018) (unreported), Lead Counsel.
- *In re Meta Pixel Healthcare Litig.,* Case No. 22-cv-03580 (N.D. Cal.), Co-Lead counsel.
- *In re The Trade Desk, Inc., Data Privacy Litig.,* No. 3:25-cv-02889 (N.D. Cal.), Member of the Plaintiffs' Executive Committee.

7. On August 3, 2021, the Court appointed me and the SHC Firm to serve on the Interim Plaintiffs Executive Committee in this Action. S*ee* ECF No. 77.

8. I and my firm have been actively involved in the litigation of this Action under the direction of Interim Class Counsel, including, among other tasks, assisting with development and coordination of a comprehensive legal strategy tailored to the intricacies of this case; conducting in-depth investigation, review, and analysis of the technologies at issue; developing and implementing discovery plans with respect to Google's data infrastructure, data flow, and collection and use of named Plaintiff data; assisting and drafting assigned portions of discovery briefs, oppositions to dispositive motions, and Plaintiffs' motions for class certification; and, establishing clear and ongoing communication with clients regarding case status and discovery obligations.

9. The Court's order appointing Interim Lead Counsel and an Interim Plaintiffs Executive Committee (ECF No. 77) included directives for periodic reporting of professional time, costs and expenses incurred in this Action by plaintiffs' counsel and their law firms. Interim Lead Counsel followed that order with a comprehensive time and expense protocol for submitting time and expense reports to Lead Counsel for her review and audit. I was primarily responsible for compliance with all time and expense reporting requirements in this Action, for reviewing the SHC Firm's time and expense reports with such requirements in mind, and for communicating with Interim Lead

Counsel regarding any time and expense audits performed by Interim Lead Counsel pursuant to the Court's appointment order and its time and expense reporting directives, ECF. No. 77.

10. Attached as **Exhibit B** is a chart listing SHC attorneys and staff that have worked on the Action, the hours each has spent working on specific categories of work as of July 31, 2025, and the 2024 hourly rate (or applicable rate cap) for each listed professional. The chart set forth in **Exhibit B** reflects audits undertaken by Interim Lead Counsel and the SHC Firm, both for the exercise of billing judgment and to ensure efficiencies.

11. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours SHC attorneys and staff spent working on the Action, subtotaled by year, for each year from January 2021 through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

12. **Exhibit B** and **Exhibit C** were prepared from contemporaneous, daily time records regularly prepared and maintained by SHC in its usual course and manner. SHC maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations are based on SHC's 2024 billing rates. These records are available for review at the request of the Court.

13. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my firm's representation of Plaintiffs and the Class, in coordination with Interim Lead Class Counsel, who approved the tasks and the hours spent on each task.

14. I have general familiarity with the range of hourly rates typically charged by plaintiffs' class action counsel specifically in the field of unfair competition and privacy law in the geographical area where my firm practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by my firm are commensurate with those prevailing in the market in 2024 for legal services furnished in complex class action litigation such as this. My firm's comparable hourly rates have been approved courts, including most recently in:

- *Doe v. Rush*, 1:22-CV-05380, Northern District of Illinois, on Dec. 17, 2024.
- *Doe v. University Hospitals*, CV 20 933357, Court of Common Pleas Cuyahoga County, Ohio, on April 25, 2025.

15. My firm has incurred expenses of $34,989.95 (not including contributions made to the overall Litigation Fund) so far in litigating the Action. Attached as **Exhibit D** is a chart detailing these, by category of expense. All listed expenses are at cost, i.e., without any upcharge or associated overhead.

16. As with all of our cases, SHC carefully invested its time and resources in the prosecution of this case, and did so with the expectation that the firm would be reasonably compensated for the risks it undertook, the professional time and resources it put in to the case, and for the successful results that have been achieved for the Settlement Class. SHC's hourly rate, while reasonable, does not reflect the contingent risks of this case, and the firm took the case with the expectation of an enhanced fee award reflecting this risk in the event that plaintiffs prevailed.

17. Throughout the litigation, my firm and I worked under the direction of Interim Lead Class Counsel, and I made every effort to operate as efficiently as possible and to avoid unnecessary duplication. I coordinated with Class Counsel for all work performed and costs incurred in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 22, 2025, at Jefferson City, Missouri.

Dated: September 22, 2025

*/s/ Jay Barnes*
Jay Barnes
SIMMONS HANLY CONROY LLP

# EXHIBIT A

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

# FIRM RESUME




*We stand for our clients.*

HEADQUARTERS
One Court Street
Alton, IL 62002
TEL: (618) 259-2222
FAX: (618) 259-2251

NEW YORK
112 Madison Avenue
New York, NY 10016
TEL: (212) 784-6400
FAX: (212) 213-5949

CHICAGO
230 W. Monroe
Suite 2221
Chicago, IL 60606
TEL: (312) 759-7500
FAX: (312) 759-7516

SAN FRANCISCO
455 Market
Suite 1150
San Francisco, CA 94105
TEL: (415) 536-3986
FAX: (415) 537-4120

LOS ANGELES
100 N. Sepulveda Blvd.
Suite 1350
El Segundo, CA 90245
TEL: (310) 322-3555
FAX: (310) 322-3655

ST. LOUIS
231 S. Bemiston
Suite 525
St. Louis, MO 63105
TEL: (800) 479-9533

# GENERAL INFORMATION AND FIRM HISTORY




A LEADING NATIONAL LAW FIRM. Simmons Hanly Conroy is a leading national law firm representing individuals, businesses and government entities seeking justice. Our clients have been harmed in every conceivable way: by terrorism, child abuse, defective drugs and devices, toxic exposures and economic conspiracies. We are at home in the justice system, whether in state or federal court, and we seek the best procedural course for our clients, including the filing of individual cases, class actions, or multidistrict mass tort litigation, as circumstances require.

A STRONG FOUNDATION AND COMMITMENT TO JUSTICE. Led by John Simmons, Jayne Conroy, and Larry Nassif, along with over 100 attorneys and 150 support staff in offices coast to coast, the firm brings decades of experience to bear against companies who have harmed American workers and families. We have spent years researching, talking to countless experts, and creating a network of knowledge that gives clients the comprehensive resources they deserve. We use these resources to level the playing field against larger opponents in and out of the courtroom, and we have prevailed. Rest assured that SHC has the resources and capital to handle almost any case, and the staying power to remain committed throughout the litigation process. We are resolute and unwavering in our stance against corporate wrongdoers.

A PROVEN RECORD OF SUCCESS. We stand on a strong foundation of values and a track record of success. We never lose sight of the fact that our success is measured one satisfied client at a time. Keeping this paramount is what helps drive our success. To date, Simmons Hanly Conroy has secured billions in settlements and verdicts on behalf of thousands of clients across the country.

A DIVERSE LITIGATION PRACTICE. OUR PRACTICE AREAS INCLUDE:

- ASBESTOS & MESOTHELIOMA LITIGATION
- DANGEROUS DRUGS & MEDICAL DEVICES LITIGATION
- SEXUAL ABUSE LITIGATION
- BUSINESS AND COMMERCIAL LITIGATION
- CATASTROPHIC PERSONAL INJURY LITIGATION
- CLASS ACTIONS & MASS TORT LITIGATION

# FIRM AFFILIATIONS & AWARDS

SIMMONS HANLY CONROY and its attorneys are listed in several peer-reviewed legal listings for its mass tort and private liability litigation practices, and have been recognized by a number of legal and business listings, including:

### BBB Accredited

The firm has been a Better Business Bureau (BBB) accredited business since 2003 and has maintained an A+ rating during that time. The BBB has processed 0 total complaints about this company in the last 36 months, the BBB's standard reporting period.

### U.S. News & World Report/Best Law Firm

Since 2014, the firm has been ranked one of the "Best Law Firms" in the country by U.S. News & World Report and Best Lawyers. The annual ranking is based on a rigorous research process, including client and lawyer evaluations, peer reviews from leading attorneys, and a survey completed by the firm.

### Martindale-Hubbell AV rating

Attorneys at Simmons Hanly Conroy have earned AV Preeminent ratings from Martindale-Hubbell. An AV rating, which identifies a lawyer with a very high to preeminent legal ability, is a prestigious peer-reviewed analysis of the attorney's expertise, experience, integrity and overall professional excellence.

### Super Lawyers & Rising Stars

Firm attorneys have been represented on the Super Lawyers and Rising Stars lists since 2006. The annual selections are made using a rigorous, multi-phased process of statewide lawyer surveys, an independent research evaluation of candidates and peer reviews by practice area.

### Named Among America's Elite Trial Lawyers: Product Liability

The National Law Journal, the nation's top legal publication, and Law.com teamed up to select law firms doing the most creative and substantial work on the plaintiff's side. This is the fifth year Simmons Hanly Conroy has been included among the nation's top 50 firms that secured the largest awards for their clients in that calendar year.

### Top 100 Verdicts & Settlement Lists

Verdicts and settlements secured by Simmons Hanly Conroy's trial teams have been consecutively ranked in national and state Top 100 Verdicts & Settlements lists since 2016. In the past four years, the Asbestos Department has won eight asbestos verdicts, totaling more than $180 million. These results were featured on the National Law Journal's Top 100 Verdicts list, The New York Law Journal's Top Verdicts & Settlements List, The (California) Daily Journal's Top Verdicts List, and Texas Lawyer's Top Verdicts & Settlements of the Southwest List.

# FIRM QUALIFICATIONS

## FIRM QUALIFICATIONS | *Notable Cases*

SIMMONS HANLY CONROY attorneys have a history of persevering for their clients amid the most challenging circumstances and fierce opposition during the course of class action and mass tort lawsuits. The following representative cases illustrate the firm's experience, commitment, and success in handling complex litigations.

### *Opioid Litigation*

Since 1999, the amount of opioids sold in the U.S. has nearly quadrupled. Over that same time period, the number of deaths from prescription opioids have also more than quadrupled. From 1999 to 2019, nearly 500,000 people have died in the United States from overdoses involving opioids.

As hundreds of thousands of people suffered from the metastasizing opioid epidemic, attorneys at Simmons Hanly Conroy took notice and effectively invented large-scale, multi-defendant opioid litigation against drug manufacturers. In 2003, the firm commenced groundbreaking opioid litigation and went toe-to-toe against pharmaceutical giants, becoming the only major plaintiffs' firm in the country at the time to prosecute and hold drug manufacturers accountable for the havoc they wreaked on individuals, families and governmental entities throughout the country.

Simmons Hanly Conroy continues to lead the way in opioid litigation against drug manufacturers, distributors, retail pharmacies, and pharmacy benefits managers. SHC partner Jayne Conroy serves as one of three members of the Plaintiffs' Executive Committee in the *In Re National Prescription Opiate Litigation, MDL No. 2804 (N.D. Ohio*) and a member of the Plaintiffs' Steering Committee in *In re McKinsey & Co. Inc. National Prescription Opiate Consultant Litigation*, MDL No. 2996 (N.D. Cal.). In addition, the firm was lead trial counsel for Suffolk County, New York in one of the first opioid cases to go to trial. SHC played a major role as co-lead trial counsel in *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 3:18-cv-07591-CRB (N.D. Cal.) (Breyer, J.).

To date, the firm has recovered over $60 billion in global settlements with multiple opioid manufacturers, distributors, and retail pharmacies as part of the National Prescription Opiate MDL.

## FIRM QUALIFICATIONS | *Notable Cases (Cont.)*

### *In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*

In December 2016, SHC Partner Jayne Conroy served on the lead trial team that secured a $1 billion jury verdict against the defendants on behalf of six patients who were injured by DePuy's Pinnacle metal-on-metal hip implant. The jury awarded more than $1 billion punitive damages and nearly $40 million compensatory damages. The legal team convinced the jury in the U.S. District Court for the Northern District of Texas, Dallas Division that J&J sidestepped standard regulatory review and mislead doctors to believe that the design of the market-leading device was safe. The evidence presented during testimony against J&J told the deeper story of how the science was manipulated in order to sell the product, Jayne Conroy said. The trial was the third bellwether trial as part of the federal multidistrict litigation.

In March 2016, SHC Partner Jayne Conroy served on the lead trial team that secured a $502 million jury verdict against the defendants on behalf of five patients injured by DePuy's Pinnacle metal-on-metal hip implant. The jury verdict for $142 million compensatory and $360 million punitive damages followed 37 days of testimony in the U.S. District Court for the Northern District of Texas Dallas Division. The trial was the second bellwether trial as part of the federal multidistrict litigation.

### *In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*

SHC filed the first lawsuits on behalf of vehicle owners harmed by unintended acceleration in 2010. Three years of hard-fought litigation followed in which firm partner Jayne Conroy played a leading role, having been appointed by U.S. District Judge James Selna as a member of the plaintiffs' leadership team. In connection with the settlement, Ms. Conroy was separately appointed by Judge Selna as one of three settlement allocation counsel charged with overseeing the allocation of settlement funds to millions of Toyota owners throughout the United States. SHC helped to secure more than $1.1 billion, plus $200 million in attorneys' fees and Toyota's reimbursement of plaintiffs' counsel's expenses in the amount of approximately $27 million

### *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*

A total of $15.9 billion in a class action lawsuit was awarded to the owners of Volkswagen diesel vehicles that had secret software installed to falsely pass emission tests. More than $10 billion of the settlement was for buybacks of 2.0-liter diesel vehicles and owner compensation. Another $1.2 billion was for buybacks of 3.0-liter diesel vehicles and the remaining $4.7 billion went to offsetting excess emissions. Partner Jayne Conroy serves on the Plaintiffs' Executive Committee of the Volkswagen MDL.

## FIRM QUALIFICATIONS | *Notable Cases (Cont.)*

### *In re Chantix (Varenicline) Products Liability Litigation*

Chantix, known by the generic name varenicline, works by blocking the effect of nicotine on the brain. In early 2008, U.S. Food and Drug Administration officials acknowledged receiving troubling reports from Chantix patients throughout the U.S. These reports included 34 cases of suicide and nearly 420 reports of suicidal thoughts and behaviors. Firm attorneys Jayne Conroy, Clint Fisher and David Miceli served on the Plaintiffs' Steering Committee against Pfizer. The case consolidated more than 2,500 lawsuits filed between 2009 and 2012 and was settled for approximately $299 million.

### *In re: Actos (Pioglitazone) Products Liability Litigation*

The Actos lawsuits alleged Takeda Pharmaceutical Company executives ignored or downplayed risks about the drug's cancer-causing potential before Actos went on sale in the U.S. in 1999, and also misled regulators about the medication's risks. As reported by Bloomberg, Takeda executives failed to provide clear warnings about the associated cancer risk for at least seven years. Although research showed a link between Actos and bladder cancer, the company chose not to issue warnings to consumers. SHC Partner Jayne Conroy served as a court-appointed member of the Plaintiff's Steering Committee and helped secure millions of dollars for clients, with a global total of $2.37 billion.

### *In re: Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*

Bayer aggressively marketed its birth control medications Yaz and Yasmin, claiming the medications also treated PMS symptoms, caused weight loss and treated acne. Not only were the claims misleading, according to the FDA, but the newer pill was also found to be three times more likely to cause serious, fatal complications. SHC, led by attorney Jayne Conroy, and joined by attorneys Trent Miracle and Paul Hanly, Jr., filed litigation on behalf of over 100 clients injured by the drug. Ms. Conroy and Mr. Miracle were appointed to leadership positions on the federal Yaz MDL and helped negotiate the final global settlement of $1.69 billion dollars for all women harmed by the drug.

### *Joseph Jean-Charles v. Douglas Perlitz et al.*

The firm represented over 180 Haitian boys who were the victims of a pedophile sponsored by Fairfield University and the Society of Jesus. Members of the firm traveled to Haiti on numerous occasions to investigate the case and provide counsel to the victims. Because of their extraordinary efforts in both Haiti and the federal court proceedings in the United States, the firm was able to hold the defendants responsible and provide justice to the victims and their families, garnering settlements in two actions totaling over $72 million and providing financial security to these victims.

## FIRM QUALIFICATIONS | *Notable Cases (Cont.)*

### *Chambers et al v. Merrill Lynch & Co., Inc., et al.*

In this nationwide class action suit, the firm represented 1,100 former Merrill Lynch financial advisors who were denied deferred compensation benefits upon the acquisition of the company in 2009 by Bank of America. The complex case involved difficult issues of contract interpretation in the context of class certification. The settlement was in the amount of approximately $20 million for the plaintiffs. Partner Paul Hanly, Jr. served as lead counsel.

### *Families Impacted by 9/11 Terrorist Attack*

SHC proudly represented thousands of family members of September 11 victims in their suits against financial sponsors of terrorism and against airlines and airport security companies. Working directly with Ronald L. Motley in this litigation, Simmons Hanly Conroy co-founder Jayne Conroy was appointed to a leadership role on the Plaintiffs' Executive Committee for Personal Injury and Death Claims. She, and other firm mass tort attorneys, represented the consolidated cases against the airlines and security companies in the multidistrict litigation against the financial sponsors of terrorism. In 2007, the litigation was settled for hundreds of millions of dollars in payments to clients of the firm. The firm also represented property owners who suffered financial injury as a result of the September 11 attacks.

### *Synergetics USA, Inc. v. Alcon Laboratories Inc., et al.,*

SHC represented Synergetics, a small medical device manufacturer, in an antitrust lawsuit against a larger competitor. The suit alleged that Alcon engaged in certain anti-competitive conduct in the market for vitreoretinal surgical equipment and supplies. Partner Paul Hanly, Jr. served as lead counsel and the firm secured a $32 million settlement.

### *In re Syngenta MIR162 Corn Litigation*

The subject of the case was Syngenta's Agrisure Viptera corn, a strain that had been genetically modified to be resistant to insects. While Viptera had been approved in 2010 for sale in the United States, it did not have such acceptance in corn markets worldwide, which class members allege was responsible for economic chaos within the U.S. corn market. Partner Jayne Conroy served on the Plaintiffs' Steering Committee for the Syngenta MIR 162 MDL and the case ultimately resulted in Syngenta agreeing to pay $1.51 billion to the members of a class of U.S. farmers who either grew corn or rent land for growing corn. The result was considered by some to be the largest monetary award to-date in a court case involving agriculture.

## FIRM QUALIFICATIONS | *Leadership Appointments (Partial List)*

SHC attorneys have held court-appointed leadership roles in high-stakes, high-profile litigation of national scope. To be appointed, the firm and its attorneys must have a track record of experience and have the resources necessary to litigate the cases. A sampling of cases in which SHC attorneys have held leadership positions is as follows:

### CONSUMER PROTECTION & DATA PRIVACY CLASS ACTIONS

- *In re Facebook Internet Tracking Litig.*, No. 12-md-02314 (N.D. Cal.)
- *Doe v. Partners Healthcare System, Inc., et al.*, No. 1984CV01651-BLS1 (Massachusetts Superior Court, Suffolk County)
- *Doe v. Virginia Medical Center, et al.*, No. 19-2-26674-1 SEA (Washington Superior Court, King County)
- *In re Google RTB Consumer Privacy Litig.*, No. 21-cv-02155 (N.D. Cal.)
- *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580 (N.D. Cal.)
- *In re The Trade Desk, Inc., Data Privacy Litig.*, No. 25-cv-02889 (N.D. Cal.)

### OTHER MULTI-DISTRICT LITIGATIONS

- *In Re National Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio)
- *In re McKinsey & Co. Inc. National Prescription Opiate Consultant Litig.*, MDL No. 2996 (N.D. Cal.)
- *In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, MDL No. 2921 (D.N.J)
- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, And Prods. Liab. Litig.*, MDL No. 2672 (N.D. Cal.)
- *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Prod. Liab. Litig.*, MDL No. 2151 (C.D. Cal.)
- *In re Terrorist Attacks on September 11, 2001*, MDL No. 1570 (S.D.N.Y.)
- *In re DePuy Pinnacle Hip Implant Prods. Liab. Litig.*, MDL No. 2244 (N.D. Tex.)
- *In re DePuy ASR Hip Implant Prods. Liab. Litig.*, MDL No. 2197 (N.D. Ohio)
- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.)
- *In re Syngenta AG MIR162 Corn Litig.*, MDL No. 2591 (D. Kan.)
- *In re Lipitor Prods. Liab. Litig.*, MDL No. 2502 (D.S.C.)
- *In re Zoloft Products Liability Litig.*, MDL No. 2342 (E.D. Pa.)
- *In Re Propecia (Finasteride) Product Liab. Litig.*, MDL No. 2331 (E.D.N.Y.)
- *In re Pelvic Repair System Prods. Liab. Litig.*, MDL Nos. 2325, 2326, 2327 (S.D. W. Va.)
- *In re Actos Products Liability Litigation*, MDL No. 2299 (W.D. La.)
- *In re Yazmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, MDL No. 2100 (S.D. Ill.)
- *In re Chantix (Varenicline) Prods. Liab. Litig.*, MDL No. 2092 (N.D. Ala.)
- *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, MDL NO. 1909 (N.D. Ohio)
- *In re Zyprexa Litig.*, MDL No. 1596 (E.D.N.Y.)

## FIRM QUALIFICATIONS | *Resources and Commitment*




**Cases over the years:** This map shows the amount of cases the we have filed in each state since 1999.

As noted above, SHC has more than 100 lawyers and 150 support staff, has extensive financial resources, has extensive experience in mass torts and complex litigation, has a significant reputation nationwide, and has successfully prosecuted thousands of claims against some of the largest companies in the world.

Simmons Hanly Conroy has the track record, the staying power and the resources to handle all phases of litigation of this matter and the firm is committed to aggressively prosecuting this case through final resolution. Our firm has and will continue to litigate cases in multiple courts across the country, and we have the resources and the capital to support ongoing litigation. A sample list of the resources we bring to bear are as follows.

### OUR RESOURCES

- ✓ 100 plus attorneys and 150 paralegals, assistants and support staff spread through six offices in the United States
- ✓ Full-time case investigators, including former police officers
- ✓ State-of-the-art technical support for document management and trial preparation
- ✓ Research and Discovery Department comprised of veteran attorneys and Ph.D. researchers
- ✓ Robust national network of consulting and trial experts

# ATTORNEY QUALIFICATIONS

## ATTORNEY QUALIFICATIONS | *Jason "Jay" Barnes, Partner*



Attorney Jason "Jay" Barnes is a partner at Simmons Hanly Conroy in the Complex Litigation Department. He leads the Class Action Litigation Team and focuses his practice on consumer protection and data privacy lawsuits. Prior to joining the firm, Jay served eight years as a state representative in the Missouri General Assembly. In this role, he fought against fraud, abuse and waste as chairman of the House Committee on Government Oversight and Accountability. He also served as chairman of the Special Investigative Committee on Oversight formed in 2018 to investigate the wrongdoings of former Missouri governor Eric Greitens.

As a partner at the firm, Jay represents hardworking people who have been wronged through corporate fraud and utilizes a mixture of experience, dedication, professionalism and tenacity to secure justice on behalf of his clients. As one of the nation's leading consumer-privacy attorneys, Jay has held leadership positions and key roles in several notable privacy cases. For example:

- *Doe v. Partners Healthcare System, Inc.*, Case No. 1984CV01651 (Suffolk Co., MA)
- *In re Google Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015)
- *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016)
- *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020)
- *Smith v. Facebook*, 745 Fed. App'x 8 (9th Cir. 2018) (unreported)

Currently, Jay serves on Plaintiffs' leadership for the following data privacy cases (among others):

- *In re Meta Pixel Healthcare Litig.*, Case No. 22-cv-03580 (N.D. Cal.)
- *In re Google RTB Consumer Privacy Litig.*, Case No. 20-cv-02155 (N.D. Cal.)
- *In re The Trade Desk, Inc., Data Privacy Litig.*, No. 3:25-cv-02889 (N.D. Cal.)

An Award-winning Attorney, Jay's accomplishments are well-documented not only through verdicts, settlements and press clippings, but also through the awards and accolades he's received from his peers and community. A small sampling of notable honors include:

- Influential Lawyer Award, Missouri Lawyers Weekly, 2019
- Champion of Justice Award, Missouri Association of Trial Attorneys, 2018
- State Advocate of the Year Award, St. Louis Children's Hospital, 2015
- Rory Ellinger Legislative Award, The Legal Services of Eastern Missouri, 2015
- Legislator of the Year Award, Missouri Bar Association, 2014

For additional information please visit https://www.simmonsfirm.com/about-us/our-attorneys/jason-barnes/

## ATTORNEY QUALIFICATIONS | *Eric S. Johnson, Partner*



Attorney Eric Johnson is a partner at Simmons Hanly Conroy, focusing his practice on complex litigation, mass torts and consumer class actions. Eric graduated with his master's degree in public health from the University of Illinois at Chicago and earned his J.D. from St. Louis University's School of Law where he was a member of the school's National Moot Court Competition Team. During law school, he also worked as a law clerk for Judge Paula Bryant in the 22nd Judicial Circuit Court in St. Louis. Eric is a member of the Missouri Bar and admitted to practice in the Eastern and Western Districts of Missouri, and the Southern and Central Districts of Illinois.

As a partner of the firm, Eric has extensive experience in data privacy litigation, including:

- *Doe v. Partners Healthcare System, Inc.*, Case No. 1984CV01651 (Ma. Super. Ct.)
- *In re Facebook, Inc. Internet Tracking Litig.*, Case No. 12-md-2314 (N.D. Cal.)
- *Kurowski v. Rush*, Case No. 22-cv-05380 (N.D. Ill.)
- *Doe v. Bon Secours Mercy Health*, Case No. A 2002633 (Oh. Ct. Com. Pl.)
- *Doe v. University Hospitals Health System, Inc.*, Case No. CV 20 933357 (Oh. Ct. Com. Pl.)
- *Doe v. Virginia Mason*, Case No. 19-2-26674-1 SEA (Wash. Super. Ct.)
- *In re Meta Pixel Healthcare Litig.*, Case No. 22-cv-03580 (N.D. Cal.)
- *Doe v. BJC*, Case No. 2222-CC09151-01 (Mo. Cir. Ct.)
- *Doe v. MedStar*, Case No. 24-C-20-000591 OG (Md. Cir. Ct.)
- *Calhoun v. Google LLC*, Case No. 20-cv-05146 (N.D. Cal.)
- *Riganian, et al. v. LiveRamp Holdings, Inc.*, Case No. 25-cv-00824 (N.D. Cal.)
- *Doe v. Sutter Health*, Case No. 34-2019-00258072-CU-BT-GDS (Ca. Super. Ct.)
- *Doe v. MedStar*, Case No. 24-C-20-000591 (Md. Cir. Ct.)

In 2012, Eric was selected to serve on the national multidistrict litigation discovery sub-committee involving the DePuy Pinnacle System metal-on-metal hip implant. He was also awarded the Judge Robert G. Dowd, Sr. Appellate Advocacy Award in 2008.

For additional information see https://www.simmonsfirm.com/about-us/our-attorneys/eric-johnson/

## ATTORNEY QUALIFICATIONS | *An V. Truong, Partner*



An Truong is a partner in the firm's Complex Litigation Department. Based in the New York City office, An's practice is focused on class actions and mass torts involving data prviacy, product liability, and consumer fraud. Prior to joining SHC, An was a Senior Court Attorney with the New York State Supreme Court, Appellate Division, Second Department. Her state appellate experience, and commitment to justice, provides a strong base from which to successfully litigate cases on behalf of plaintiffs nationwide. Currently, An serves on Plaintiffs' leadership committees in several nationwide and multi-district litigations.

### *Representative Cases*

- *In re Google RTB Privacy Litig.*, Case No. 20-cv-02155 (N.D. Cal.) (data privacy class action)
- *Riganian, et al. v. LiveRamp Holdings, Inc.*, Case No. 25-cv-00824 (N.D. Cal.) (data privacy class action)
- *In re The Trade Desk, Inc., Data Privacy Litig.*, Case No. 25-cv-02889 (N.D. Cal.) (data privacy class action)
- *Doe, et al. v. Google, LLC*, Case No. 23-cv-02431 (N.D. Cal.) (data privacy class action)
- *In re Allergan Biocell Textured Breast Implant Products Liability Litig.*, MDL No. 2921 (D.N.J.) (appointed by Plaintiffs' leadership to Law & Briefing Committee)
- *In re Uber Technologies, Passenger Sexual Assault Litig.*, MDL No. 3084 (N.D. Cal.) (appointed by Plaintiffs' leadership to Law & Briefing Committee)
- *In re: Social Media Adolescent Addiction/Personal Injury Prod. Liab. Litig.*, MDL No. 3047 (N.D. Cal.) (litigation team focused on liability case against defendant Google/YouTube)
- *In re East Palestine Train Derailment*, Case No. 24-cv-00242 (N.D. Ohio) (expert committee team)
- *Bailey v. Rite Aid Corp.*, Case No. 18-cv-06936 (N.D. Cal.) (consumer protection; certified class)
- *Johnson, et al. v. Nissan North Am., Inc.*, Case No. 17-cv-00517 (N.D. Cal.) (consumer protection and products lilability; certified class)

***Awards:*** *Best Lawyers: ones to Watch in America, 2023 & 2024 (Products Liability-Plaintiffs)*

An is a committed and active member of her community bar associations. She currently servces as Vice President of the Board of Directors for the Southern District of New York's Chapter of the Federal Bar Association. In addition, she is on the Board of Directors for Public Justice, a nonprofit legal advocacy organization that tackles impact litigation to increase access to justice.

For additional information see https://www.simmonsfirm.com/about-us/our-attorneys/an-truong/

## ATTORNEY QUALIFICATIONS | *Sona R. Shah, Partner*



Sona R. Shah is a partner at Simmons Hanly Conroy in the Complex Litigation Department. Located in the New York City office, Sona's practice is focused on consumer actions involving complex legal matters including privacy, antitrust, and mass torts.

Sona's experience includes being a leading member of a litigation team that achieved a $399 million settlement with pharmaceutical companies, in a class action alleging that the companies violated antitrust laws by participating in a $400 million reverse payment scheme to delay market entry of a generic antibiotic. The American Antitrust Institute recognized her work on that case as an Outstanding Antitrust Litigation Achievement by a Young Lawyer.

Sona is a member of the Committee to Support Antitrust Laws, the New York State Bar Association Antitrust Section's Diversity and Inclusion Committee, and has spoken at the American Antirust Institute's annual Private Antitrust Enforcement Conference.

Sona received a B.A. in Politics from New York University and her J.D. from Fordham University Law School. She is admitted to the New York and New Jersey bars, and is admitted to practice in the Southern and Eastern Districts of New York and the District of New Jersey.

For additional information see https://www.simmonsfirm.com/about-us/our-attorneys/sona-r-shah/

## ATTORNEY QUALIFICATIONS | *Erin Gee, Associate*



Erin Gee is an attorney at Simmons Hanly Conroy in the Complex Litigation Department. Her practice is focused on complex legal matters involving privacy and mass torts.

Erin was a member of the trial team for the bellwether trials in MDL 2244, *In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litig.*, in the U.S. District Court for the Northern District of Texas. Together, the three trials resulted in more than $1.5 billion in jury verdicts and led to settlement of one of the largest MDLs in the country. Erin was also involved with individual cases pending in MDL 2391, *In re: Biomet M2A Magnum Hip Implant Products Liability Litigation*, in the U.S. District Court for the Northern District of Indiana. In addition to briefing key issues, she assisted with one of the largest and most diverse post-global settlement/opt out group of Biomet plaintiffs.

For additional information see https://www.simmonsfirm.com/about-us/our-attorneys/erin-gee/

## ATTORNEY QUALIFICATIONS | *Jenny Paulson, Associate*



Jenny Paulson is an associate at Simmons Hanly Conroy. She joined the firm's Complex Litigation Department in 2022, and focuses her practice on consumer class action lawsuits. Located at the firm's Alton, Illinois office, Jenny works closely with the trial attorneys on all aspects of litigation from initial investigation, to pleadings and discovery, and on to trial preparation.

Prior to joining the firm, Jenny served as a judicial law clerk to Chief Judge Nancy J. Rosenstengel, the Honorable Mark A. Beatty and the Honorable Clifford J. Proud in the U.S. District Court for the Southern District of Illinois.

Jenny received a B.A. in English from The Ohio State University in 2014. She received her J.D. and MBA from Southern Illinois University School of Law, graduating summa cum laude and first in her class.

For additional information see https://www.simmonsfirm.com/about-us/our-attorneys/jenny-paulson/

# EXHIBIT B

# Exhibit B

**Firm Name: Simmons Hanly Conroy LLP**
Time through July 31, 2025

| Professional Name (Status) | Hourly Rate | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Barnes, Jay (P) | $1,300 | 8.50 | 69.20 | 85.90 | 24.60 | 48.40 | 10.60 | 4.90 | 2.20 | 4.70 | 119.20 | 77.40 | 237.10 | | 34.70 | | 196.60 | 41.00 | 284.00 | 35.20 | 5.90 | | 1.10 | 1291.20 | $1,678,560.00 |
| Truong, An (P) | $900 | 24.00 | 20.00 | 89.40 | 11.50 | 149.30 | 99.30 | 32.50 | 8.20 | 16.50 | 143.20 | 10.30 | 262.90 | | 39.80 | 54.20 | 242.20 | 215.60 | 324.90 | 26.50 | 55.40 | | 0.80 | 1826.50 | $1,643,850.00 |
| Gee, Erin (A) | $650 | 2.80 | | 9.50 | | 0.40 | 6.20 | | | | | 29.70 | 35.70 | 5.20 | 19.70 | 7.20 | 6.00 | | 4.70 | 64.80 | | | | 191.90 | $124,735.00 |
| Paulson, Jenny (A) | $600 | 2.40 | | 19.40 | | 36.70 | 12.20 | | | | 9.60 | 0.60 | 133.00 | | 43.80 | | 138.40 | 11.50 | 213.60 | 5.80 | | | | 627.00 | $376,200.00 |
| Gurnani, Payal (A) | $325 | | | | | | | | | | | 2.00 | | 105.10 | | | | | | 1.00 | | | | 108.10 | $35,132.50 |
| Knox, Crystal (A) | $325 | | 2.00 | | | | | | | | | | | 88.30 | | | | | | 0.70 | | | | 91.00 | $29,575.00 |
| Tate, Kyle (A) | $325 | | | | | | | | | | | | | 110.80 | | | | | | | | | | 110.80 | $36,010.00 |
| Biggs, Brad (A) | $325 | | | | | | | | | | | | | 1119.00 | | | | | | | | | | 1119.00 | $363,675.00 |
| **Total:** | | **37.70** | **91.20** | **204.20** | **36.10** | **234.80** | **128.30** | **37.40** | **10.40** | **21.20** | **272.00** | **120.00** | **668.70** | **1428.40** | **138.00** | **61.40** | **583.20** | **268.10** | **827.20** | **134.00** | **61.30** | **0.00** | **1.90** | **5365.50** | **$4,287,737.50** |

Columns 1–22 are under the heading "Categories".

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

# EXHIBIT C

# Exhibit C

Simmons Hanly Conroy LLP – Annual Hours and Lodestar

| Year | Sum of Hours | Sum of Lodestar |
|---:|---:|---:|
| 2021 | 640.40 | $ 651,385.00 |
| 2022 | 2492.40 | $ 1,783,075.00 |
| 2023 | 1964.30 | $ 1,592,317.50 |
| 2024 | 214.00 | $ 210,040.00 |
| 2025 | 54.40 | $ 50,920.00 |
| Grand Total | 5365.50 | $ 4,287,737.50 |

# EXHIBIT D

# Exhibit D

## Simmons Hanly Conroy LLP – Expenses

| Description | Cumulative Total |
|---|---|
| Court Fees (filing, etc.) | $951.00 |
| Court Reporters/Transcripts | $0.00 |
| Computer Research | $0.00 |
| Reproduction/Duplication/Copies | $363.90 |
| Notice Costs | $0.00 |
| Express Delivery/Messenger | $0.00 |
| Pre-approved Professional Fees/Services (expert, investigator, accountant, etc.) | $0.00 |
| Service of Process | $0.00 |
| Telephone/Fax/Postage | $0.00 |
| Travel: | $0.00 |
| ** Airline (Professional/Destination/Purpose) | $9,632.57 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $3,511.46 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | $0.00 |
| ** Meals (Professional/Purpose) | $3,975.24 |
| ** Lodging (Professional/Destination/Purpose) | $15,539.50 |
| ** Other (Describe/Professional/Destination/Purpose) | $1,016.28 |
| Litigation Assessments | |
| Miscellaneous: (Describe): Expert invoices | |
| | ($320,000.00)[1] |
| **TOTAL EXPENSES** | **$34,989.95** |

[1] Contributions paid by Simmons Hanly Conroy LLP to the plaintiffs' common litigation fund are accounted for separately, so are excluded from this individual law firm cost summary.

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (646) 933-1000
Fax: (646) 494-9648
*dstraite@dicellolevitt.com*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, | **CASE NO. 4:21-cv-02155-YGR-VKD** |
| This Document relates to: *all actions*. | **DECLARATION OF DAVID A. STRAITE IN SUPPORT PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES** |

I, David A. Straite, declare:

1. I am a partner at DiCello Levitt LLP ("DiCello Levitt"). I have been licensed to practice law in the state of Pennsylvania since 1996; New Jersey since 1996; New York since 2000; the District of Columbia since 2009, and Delaware since 2010. I am admitted to practice in the United States Supreme Court; the United States Courts of Appeals for the Second, Third and Ninth Circuits; and the United States District Courts for the following Districts: EDNY, SDNY, D.N.J., E.D. Pa., D. Del., and D.D.C. I was admitted to this Court *pro hac vice* on May 11, 2021. Dkt. No. 37. The following facts are within my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I submit this declaration in support of Plaintiffs' Motion for and Award of Attorneys' Fees, Costs and Expenses.

3. On May 11, 2021, I entered my appearance on behalf of all plaintiffs in *Woodruff, et al. v. Google LLC*, originally assigned case no. 5:21-cv-2155-LHK-SVK, the first-filed case in this now consolidated action. The *Woodruff* action was related to and consolidated into the instant action, *In Re Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR-VKD (this "Action"), on June 24, 2021, *see* Dkt. No. 69, and my clients Christopher Valencia, Terry Diggs, Rethena Green and Tara Williams joined with the filing of the consolidated amended complaint filed August 21, 2021. Dkt. No. 80.

4. I am the principal attorney at DiCello Levitt for this litigation. I practiced civil litigation in the defense bar starting in 1996, and later on behalf of consumers and individuals starting in 2008. DiCello Levitt employs approximately 90 attorneys protecting individuals in the areas of consumer class action, antitrust law, privacy class actions, environmental, sex abuse and trafficking, personal injury and mass torts. We also represent institutional investors in securities and corporate governance cases, and represent State Attorneys General and other public clients in consumer protection and environmental cases.

5. I am a lead partner in our Firm, specifically related to cybersecurity, data privacy, biometrics, artificial intelligence, appellate, securities and corporate governance matters. I have been recognized publicly as follows:

a. Law360: Cybersecurity and Data Privacy MVP (2022)

b. LawDragon: 500 Leading Plaintiff Financial Lawyers (2019-2025)

c. LawDragon: 500 Leading Global Cyber Lawyers (2025)

d. National Law Journal: Plaintiff's Lawyer Trailblazer (2022)

I also taught business law and ethics for five consecutive years at Yeshiva University (Sy Sims School of Business) and have presented on more than two dozen CLE panels and other events. My artificial intelligence panel at the New York Inn of Court was awarded "Best Program" in 2022. I also serve on the New York City Bar Association's LGBTQ-Rights Committee, and I co-chair our Firm's A.I. Working Group. Attached hereto as **Exhibit A** is the DiCello Levitt Firm resume.

6. DiCello Levitt's attorneys have a long history of successfully handling class actions across a range of industries, including privacy class actions. I bring substantial experience in complex litigation and class action matters with a history of litigating in an efficient and practical manner. *See* **Exhibit A** at 24.

7. I have an extensive background in privacy and consumer protection class action litigation. I have litigated more than 30 complex litigation or class action cases across the country involving privacy, antitrust, artificial intelligence, securities and corporate governance claims, including the following matters in which I have served in a leadership position:

- *In re: Citigroup CSO Hedge Fund Litig.*, 1:12-cv-7717-JPO (SDNY) (co-lead)
- *In re: Facebook, Inc. Internet Tracking Litig.*, 5:12-cv-2314-EJD (N.D. Cal.) (co-lead)
- *Kurowski v. Rush System for Health*, 1:22-cv-5380-MFK (N.D. Ill.) (co-lead)
- *Rodriguez v. Universal Prop. & Cas. Ins.*, 16-60442-CIV-COHN (S.D. Fla.) (lead)

8. On August 3, 2021, the Court appointed me and the DiCello Levitt firm to serve on the Interim Plaintiffs Executive Committee in this Action. S*ee* ECF No. 77.

9. I and my firm have been actively involved in the litigation of this Action under the direction of Interim Class Counsel, including, among other tasks: researching and drafting the consolidated amended complaint; assisting with expert discovery; motion practice; taking 30(b)(1) depositions of Google executives; defending and helping to prepare for depositions of all named plaintiffs; coordinating written discovery responses and device imaging with the named plaintiffs;

attending numerous meet and confer video conferences and assisting with related discovery motions; preparation for and attendance at all hearings; and assisting with all aspects of settlement and mediation including attendance at both sessions of the in-person mediation and assistance with the mediation briefs. I also assisted in preparing this filing and the concurrently filed motion papers in support of final approval of the Settlement.

10. The Court's order appointing Interim Lead Counsel and an Interim Plaintiffs Executive Committee (ECF No. 77) included directives for periodic reporting of professional time, costs and expenses incurred in this Action by plaintiffs' counsel and their law firms. Interim Lead Counsel followed that order with a comprehensive time and expense protocol for submitting time and expense reports to Lead Counsel for her review and audit. I was primarily responsible for compliance with all time and expense reporting requirements in this Action, for reviewing DiCello Levitt's time and expense reports with such requirements in mind, and for communicating with Interim Lead Counsel regarding any time and expense audits performed by Interim Lead Counsel pursuant to the Court's appointment order and its time and expense reporting directives, ECF. No. 77.

11. Attached as **Exhibit B** is a chart listing DiCello Levitt attorneys and staff that have worked on the Action, the hours each has spent working on specific categories of work as of July 31, 2025, and the 2024 hourly rate (or applicable rate cap) for each listed professional. The chart set forth in **Exhibit B** reflects audits undertaken by Interim Lead Counsel and the DiCello Levitt firm, both for the exercise of billing judgment and to ensure efficiencies.

12. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours DiCello Levitt attorneys and staff spent working on the Action, subtotaled by year, for each year from May 10, 2021 through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

13. **Exhibit B** and **Exhibit C** were prepared from contemporaneous, daily time records regularly prepared and maintained by DiCello Levitt in its usual course and manner. DiCello Levitt maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations are based on the Firm's 2024 billing rates. These records are available for review at the request of the Court.

14. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my firm's representation of Plaintiffs and the Class, in coordination with Interim Lead Class Counsel, who approved the tasks and the hours spent on each task.

15. During 2024, my firm performed work for clients in the private sector at negotiated hourly rates. The attorneys who performed that work (one of whom is a timekeeper in this case) have experience levels and charge hourly rates commensurate to the timekeepers in this case. These negotiated hourly rates provide an additional sound basis for confirming the reasonableness of my firm's hourly rates in this case. I am able to provide further substantiation and information regarding these rates *in camera*, if the Court so requires.

16. When DiCello Levitt agreed to take this case, it was with the expectation that we would receive a risk-enhancement if we prevailed. We invested time and resources on a contingent basis, and would not have done so if there had been no chance of an enhanced fee award. The hourly rates for professionals at DiCello Levitt do not reflect the risk that the Firm undertook, which is the case with all of our contingent litigation.

17. In addition, I have general familiarity with the range of hourly rates typically charged by plaintiffs' class action counsel specifically in the field of unfair competition and privacy law in the geographical area where my firm practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by my firm are commensurate with those prevailing in the market in 2024 for legal services furnished in complex class action litigation such as this. My firm's hourly rates were most recently approved by the following Courts:

- *Kurowski v. Rush System for Health*, 1:22-cv-5380-MFK (N.D. Ill.) (Dec. 17, 2024)
- *In re: Facebook Internet Tracking Litig.*, 5:12-md-02314-EJD (N.D. Cal.) (Nov. 10, 2022)
- *In re Fairlife Milk Products Marketing and Sales Practices Litigation*, No. 191-cv-3929 (N.D. IL.) (Sept. 28, 2022)

- *Borozny, et al. v. RTX Corporation, Pratt & Whitney Division, et al.*, No. 21-cv-01657 (D. Conn.) (May 14, 2025)
- *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.,* No. 2:20-cv-02600 (W.D. Tenn.) (Oct. 4, 2023)
- *In re Platinum and Palladium Antitrust Litig.*, No. 1:14-cv-9391 (S.D.N.Y.) (Jan. 17, 2025)
- *In re Opana ER Antitrust Litigation*, No 14-cv-10150 (N.D. Ill.) (Dec. 15, 2022)

18. My firm has incurred held expenses of $44,236.56 so far in litigating the Action, in addition to my Firm's $320,000.00 of contributions to the litigation fund. Attached as **Exhibit D** is a chart detailing these held expenses, by category of expense. All held expenses listed therein are at cost, i.e., without any upcharge or associated overhead.

19. Throughout the litigation, my firm and I worked under the direction of Interim Lead Class Counsel, and I made every effort to operate as efficiently as possible and to avoid unnecessary duplication. I coordinated with Class Counsel for all work performed and costs incurred in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 22 2025, at New York, NY.

Dated: September 22, 2025

By: *<u>/s/ David Straite</u>*

David A. Striate

# EXHIBIT A

DICELLO LEVITT





## Overview

DiCello Levitt is focused on achieving justice for its clients. The firm's attorneys are respected for their ability to win cases and working tirelessly for human beings who deserve the firm's best, whether they be victims in major injury cases, decision-makers for public clients tasked with finding the best lawyers for their communities, or leaders of national and global corporations harmed by misconduct in significant commercial matters. Every day, DiCello Levitt puts its reputation—and its capital—on the line for its clients.

DiCello Levitt has achieved top recognition as *ALM* and *The National Law Journal's* 2023 **Plaintiffs Firm of the Year** and 2023 **Trial Innovation Firm of the Year**, in addition to its high-ranking *Chambers USA* and *Benchmark Litigation* ratings. The firm's individual practice areas have also received distinguished accolades, including being named *Law360*'s **Cybersecurity Practice Group of the Year** for three years in a row and *The National Law Journal's* 2023 **Environmental Protection Law Firm of the Year**.

## Practice Areas

- Agriculture and Biotechnology
- Antitrust and Competition Litigation
- Civil and Human Rights Litigation
- Class Action Litigation
- Commercial Litigation
- Environmental Litigation
- Labor and Employment Litigation
- Mass Tort Litigation
- Personal Injury
- Privacy, Technology, and Cybersecurity
- Product Liability
- Public Client
- Securities and Financial Products Litigation
- Whistleblower Representation

## Landmark Moments

**The Largest Consumer Data Breach Settlement in History**
DiCello Levitt Partner Amy Keller became the youngest woman ever appointed to lead a nationwide multidistrict litigation in the massive Equifax data breach, which exposed the sensitive personal information of nearly 150 million consumers. Notably, the settlement included a cash fund of up to $505 million, a commitment from Equifax to invest $1 billion in security changes, and a guarantee that Equifax would cover credit monitoring for every single class member.
*In re Equifax Inc. Customer Data Security Breach Litigation*, MDL No. 2800 (N.D. Ga.)



**One of the Most Significant Civil Rights Verdicts in History**

DiCello Levitt Partners Robert F. "Bobby" DiCello, Mark DiCello, and Justin Hawal achieved one of the most significant civil rights verdicts in history when a jury awarded Arnold Black $50 million in a case against the City of East Cleveland—a verdict that has been affirmed by all state and federal courts. Arnold was the victim of brazen police misconduct where, after a routine traffic stop, officers detained, beat, and falsely imprisoned him in a storage locker for four days with no food or bathroom facilities.

*Black v. Hicks*, No. CV-14-826010 (Ohio C.P., Cuyahoga County.)

**Pioneering Multidistrict Litigation Leadership**

DiCello Levitt Partner Diandra "Fu" Debrosse made U.S. legal history by being the first Black woman ever appointed co-lead of a multidistrict litigation. More impressively, she shattered that glass ceiling twice in less than a year. On May 27, 2022, Fu was appointed Plaintiffs' Co-Lead Counsel in a products liability case against two of the world's largest manufacturers of infant formula, Abbott Laboratories and Mead Johnson. The case stems from allegations by parents of premature infants who developed the deadly neonatal condition, necrotizing enterocolitis (NEC), after being fed the defendants' infant formula. Then, on March 2, 2023, Fu was appointed Plaintiffs' Co-Lead Counsel in the multidistrict litigation against L'Oréal, Revlon, and other manufacturers of hair-straightening products marketed primarily to Black and Brown consumers after thousands of women nationwide contracted uterine, ovarian, and endometrial cancer from using these products. This litigation prompted the U.S. Food and Drug Administration to plan regulatory rulemaking for early 2024 to ban chemical hair straighteners and relaxers.

*In re Abbott Laboratories, et al., Preterm Infant Nutrition Products Product Liability Litigation* MDL No. 3026 (N.D. Ill.); *In re Hair Relaxer Marketing Sales Practices and Products Liability Litigation*, MDL No. 3060 (N.D. Ill.)

**Class Action Jury Trial $102 Million Verdict**

DiCello Levitt achieved this jury verdict for a class of consumers who suffered an excessive oil consumption defect in their General Motors SUVs and light trucks. After weeks of trial but less than one full day of jury deliberation, the jury awarded 100% of the damages the class suffered. Trial preparation included conducting months of in-house focus grouping in Northern California.

*Siqueiros, et al. v. General Motors LLC*, No. 16-cv-07244 (N.D. Cal)

**The Most Significant Environmental Litigation of Our Time**

DiCello Levitt's environmental litigation team is counsel for several states investigating and litigating claims of widespread pollution from a group of contaminants known as PFAS (per- and poly-fluoroalkyl substances). This group of ubiquitous and harmful contaminants has been used in countless applications, including well-known consumer goods such as Teflon and Scotchgard, thousands of industrial products, and certain firefighting foams (AFFF). DiCello Levitt's litigation is aimed at compelling some of the largest chemical companies in the world to provide the financial resources necessary for the firm's state clients to end the contamination caused by PFAS and AFFF and meaningfully protect public health, natural resources, and the environment.



**Addressing One of the Largest Maritime Disasters in U.S. History**

DiCello Levitt has been retained by the City of Baltimore to launch legal action to address the catastrophic impact of the Francis Scott Key Bridge collapse, one of the largest maritime disasters in U.S. history, with damages estimated at more than $1 billion. Through this engagement, the City will take decisive action to hold accountable all entities responsible for the Key Bridge tragedy—including the owner, charterer, manager/operator, and manufacturer of the MV Dali, as well as any other potentially liable third parties—and to mitigate the immediate and long-term harm caused to Baltimore residents by the disaster.

## The DiCello Levitt Trial Center

At the DiCello Levitt Trial Center, the firm's elite trial lawyers combine extensive litigation experience with a science-based, multidisciplinary approach to understand, engage, and connect with jurors. By applying its proprietary system to understand jurors' decision-making processes, the Trial Center crafts the winning story.

The Trial Center leads high-stakes trials for DiCello Levitt's clients, wielding advanced strategies to gain an edge over adversaries who cling to traditional trial methods. The center also trains DiCello Levitt's lawyers to continuously improve their litigation strategies, trial preparation, and courtroom presentations.

**Shaping the Future of Trial Science**

The DiCello Levitt Trial Center serves as a training solution for the firm's attorneys to sharpen their skills as they engage in significant and consequential litigation; as a research base for focus groups, mock trials, mediation, and arbitration; and as a platform for litigators to test their case with a science-informed method of trial preparation.

The Trial Center capitalizes on the latest research findings in linguistics, literacy, information processing, and cognitive neuroscience to interpret focus group feedback and craft compelling stories for trial. DiCello Levitt's trial lawyers have led thousands of focus groups in the past decade, including comprehensive studies exploring myriad issues that influence jurors.

**Trial First**

The insights and strategy that DiCello Levitt has developed through the Trial Center have materially enhanced the firm's productivity and effectiveness. The firm's attorneys credit multiple landmark trial outcomes in recent years—including a $102.6 million jury verdict in a class action trial against General Motors—to the Trial Center's research and testing of hundreds of mock jurors in those cases.

**Powered by Nationally Recognized Trial Lawyers**

The Trial Center is helmed by Trial Team Leader Bobby DiCello and Trial Center Coordinator Ken Abbarno, who collaborate with other talented trial lawyers at DiCello Levitt. The Trial



Center's attorneys are among the nation's most sought-after trial lawyers because of their knowledge and experience with the decision-making behavior of contemporary jurors and the art of trial messaging.

DiCello Levitt has received repeated accolades for the Trial Center's innovative accomplishments and contributions to the advancement of trial science, including from *The National Law Journal* and the *New York Law Journal*.

DiCello Levitt has won more than **$20 billion** for clients.

## Leading in Diversity

DiCello Levitt believes in embedding diversity, equity, and inclusion into the firm's culture. The firm empowers attorneys from diverse backgrounds to reach their full potential while promoting a sense of belonging. Authenticity in the workplace gives DiCello Levitt a real competitive advantage.

The firm proudly includes a diverse group of women attorneys, minority associates and partners, and LGBTQIA+ attorneys and staff. Senior attorneys train and mentor younger talent from minority backgrounds in a conscious effort to build the next generation of diverse leaders.

DiCello Levitt's Diversity, Equity & Inclusion (DEI) Committee is dedicated to creating a workplace that prioritizes hiring, retention, and promotion of diverse talent. Driving societal change by fostering an inclusive workplace engenders leadership opportunities internally at the firm and externally in litigation management.

Diandra "Fu" Debrosse, managing partner of DiCello Levitt's Birmingham office, made legal history with her appointment as the first Black woman on the plaintiffs' side to co-lead two multidistrict litigations. Fu is also a co-founder and president of the advocacy group Shades of Mass, which promotes the appointment of Black and Brown attorneys to leadership roles in mass tort and class action lawsuits. DiCello Levitt proudly supports the group.

Greg Asciolla, managing partner of the firm's New York office, is a leader for the LGBTQIA+ community in the legal profession, serving as vice chair of the American Bar Association Antitrust Law Section's Diversity Advanced Committee. In addition to co-chairing the firm's DEI Committee, Greg was selected to *Crain's New York Business*' 2023 list of Notable

LGBTQIA+ Leaders and appointed to *Law360*'s 2023 Diversity & Inclusion Editorial Advisory Board.

Other notable attorneys in the firm exemplify DiCello Levitt's commitment through their active involvement in various advocacy groups and committees. Partner David Straite serves on the LGBTQ Rights Committee of the New York City Bar Association. In 2023, David Straite, Amy Keller, Greg Asciolla, Eli Hare, and Grant Patterson represented five LGBTQ+ students as pro bono amicus curiae to the U.S. Court of Appeals for the Ninth Circuit in a case addressing whether private religious universities may discriminate against LGBTQ+ student organizations. Their dedication, both within and outside the firm, underscores DiCello Levitt's belief that authentic DEI efforts strengthen the professional community and propel us toward a future where diversity is not just celebrated but integral to the pursuit of justice.

## DL Cares

In 2021, DiCello Levitt launched DL Cares, a charitable foundation dedicated to providing increased access to justice in the United States and around the world. DL Cares partners with nonprofits focused on increasing the availability of legal services to underserved communities through meaningful financial contributions and educational efforts.

DL Cares' first partner is Justice Defenders, a nonprofit organization that provides legal education programs to prisoners in Kenya and Uganda to create greater access to justice in their communities. DL Cares pledged a substantial, multiyear commitment to facilitate and enhance Justice Defenders' vital efforts.

## Practice Areas

### Agriculture and Biotechnology Litigation

Leveraging its deep knowledge of agricultural biotechnology and complex litigation, DiCello Levitt has built an impressive track record of successfully representing plaintiffs in nationwide commercial and class action lawsuits against large corporate conglomerates. The firm has led several of the largest biotechnology class actions in U.S. history, recovering billions of dollars in compensation for damage inflicted and to cover the effects of future damage. While securing landmark settlements on behalf of its clients, DiCello Levitt has pioneered legal strategies in the agriculture and biotechnology space, including a game-changing model to measure crop contamination damages, that has since become the modern industry standard.

**Representative Matters**

***In re Genetically Modified Rice Litigation***
DiCello Levitt attorneys achieved aggregate settlements exceeding $1.1 billion for all U.S. long-grain rice farmers as Co-Lead Counsel in the biotechnology multidistrict litigation against Bayer Crop Science for its contamination of the U.S. rice supply with unapproved, genetically modified rice seed traits.

***In re StarLink Corn Products Liability Litigation***
DiCello Levitt attorneys obtained a record $110 million nationwide settlement for all U.S. corn farmers as Co-Lead Counsel in the biotechnology multidistrict litigation against Aventis CropScience and Garst Seed Company for their contamination of the U.S. corn supply with genetically modified seed traits. The plaintiffs' leadership team devised an innovative damages model that is now used in every crop contamination case.

***In re Imprelis Herbicide Marketing, Sales Practices, and Products Liability Litigation***
DiCello Levitt attorneys reached a nearly $600 million settlement for homeowners, golf course operators, and other property owners as Co-Lead Counsel in this nationwide class action lawsuit against DuPont, alleging its turf herbicide, Imprelis, killed millions of trees and other nontargeted vegetation and that DuPont knew or should have known its dangers.

## Antitrust and Competition Litigation

DiCello Levitt's Antitrust and Competition Litigation Practice Group continuously leads the most significant private antitrust litigations in the country and has done so over the last several decades. DiCello Levitt's antitrust attorneys are nationally recognized for successes in challenging global anticompetitive conduct with their singular focus on getting businesses and consumers economic justice by righting the anticompetitive wrongs in the marketplace. The practice's sophisticated client base includes small businesses, large corporations, public pension funds, health and welfare funds, municipalities and related quasi-government agencies, and individual consumers. DiCello Levitt's antitrust lawyers pursue class, competitor, and individual (opt-out) claims involving all types of anticompetitive conduct, including price-fixing and market allocation conspiracies among competitors and monopolization of markets by industry giants.

DiCello Levitt's Antitrust and Competition Litigation Practice Group has repeatedly garnered national and international recognition, including Band 1 top honors from *Chambers USA*.

**Representative Matters**

***Fusion Elite All Stars v. Varsity Brands LLC***
DiCello Levitt served as Co-Lead Counsel and obtained a $43.5 settlement with Varsity Brands, other Varsity entities, and the U.S. All Star Federation (USASF) to resolve an antitrust class action over Varsity's monopolization of the All Star Cheer events market. In addition to

the cash payments, Varsity consented to significant relief aimed at curbing and unwinding its anticompetitive behavior.

***In re European Government Bonds Antitrust Litigation***
DiCello Levitt serves as Co-Lead Counsel, alleging several global financial institutions manipulated the price of European government bonds issued by sovereign European governments. To date, DiCello Levitt has achieved settlements with multiple defendants—including JP Morgan, Natixis, UniCredit, and State Street—securing $40 million and significant cooperation with the class while DiCello Levitt continues to litigate against the remaining defendants.

***In re Novartis and Par Antitrust Litigation***
DiCello Levitt served as Lead Counsel for end-payors and secured a $30 million settlement alleging that a brand and generic drug manufacturer entered into an anticompetitive pay-for-delay agreement for the antihypertensive drug Exforge.

***In re Opana ER Antitrust Litigation***
DiCello Levitt served as Co-Lead Counsel for end-payors and secured a $15 million settlement midtrial, alleging that certain brand and generic drug manufacturers entered into an anticompetitive pay-for-delay agreement for the pain reliever Opana ER.

## Civil and Human Rights Litigation

DiCello Levitt is recognized nationally as a leader in the field of civil and human rights litigation. The Civil and Human Rights Litigation Practice Group represents people who have suffered racial, gender, and religious discrimination, police misconduct and brutality, sexual harassment and assault, human trafficking, and other violations of individuals' civil rights. DiCello Levitt's visionary advocates have litigated—and won—some of the most significant civil rights cases in modern history, including the landmark trial in *Black v. Hicks*, a case of shocking police brutality and corruption that resulted in one of the largest civil rights verdicts for a single person in American history. The firm's civil rights attorneys are dedicated to achieving justice for those whose rights have been violated, and they have the experience and expertise to take on the powerful individuals, corporations, and governmental institutions who violate those rights.

In recognition of the firm's outstanding work in high-stakes civil rights litigation, DiCello Levitt was named a finalist in *The National Law Journal*'s 2023 Elite Trial Lawyers Awards in the civil rights category, and several of the firm's attorneys were awarded Public Justice's prestigious Trial Lawyer of the Year award in 2021 for their successful prosecution and trial in the *Black v. Hicks* case.



**Representative Matters**

***Jane Does 1-57 v. Peter Nygard***
DiCello Levitt represents victims of the largest individual international sex trafficking lawsuit in U.S. history, which alleges that Peter Nygard, the Nygard Companies, and his employees committed a decades-long conspiracy to rape, sexually assault, and traffic hundreds of women and girls. Due in large part to the efforts of DiCello Levitt, Peter Nygard has since been convicted in a criminal court of multiple sex crimes.

***Marquetta Williams v. City of Canton, et al.***
DiCello Levitt represents James Williams in a civil suit against the City of Canton, Ohio, after one of its police officers shot and killed Williams, a 46-year-old Black man, through a wooden fence without warning. The lawsuit claims the city failed to properly train its officers and has an unwritten policy of "shoot first and ask questions later."

***Rolle, et al. v. City of Orlando, et al.***
DiCello Levitt represents the family of Kaia Rolle, who, at just six years old, was arrested and restrained by police after administrators at her elementary school reported her to authorities. In addition to seeking damages for this traumatizing event, the family is seeking to change Florida's laws so that children of Kaia's age and older will no longer have to suffer similar trauma.

***Jada Walker, et al. v. City of Akron***
DiCello Levitt successfully represented the family of Jayland Walker in a lawsuit alleging excessive force and unconstitutional police practices against the City of Akron, Ohio, and the eight police officers who brutally shot and killed the unarmed 25-year-old in a hail of more than 90 bullets.

## Class Action Litigation

DiCello Levitt's Class Action Litigation Practice Group leads some of the largest class actions in the U.S. and consistently delivers innovative and meaningful results for class members. The practice group has recovered billions of dollars in damages for injured class members and clients harmed by corporate entities and executives from many of the world's most powerful corporations in a wide range of industries, including automotive manufacturers, technology companies, financial institutions, and pharmaceutical corporations.

DiCello Levitt's attorneys have decades of experience in class actions involving product liability, antitrust, securities and financial services, environmental law, biotechnology, privacy and cybersecurity, and public clients. They have achieved landmark recoveries for classes harmed by defective products, unfair competition, faulty pharmaceuticals and medical devices, data and security breaches, and other instances of corporate misconduct. The firm's attorneys are frequently named lead or co-lead counsel in large, consequential



multidistrict litigations, and they have repeatedly triumphed at the appellate level, including in high-profile appeals that have created new laws and are often cited as precedent.

DiCello Levitt has been honored by the leading industry rankings organizations for its success in class action litigation. In 2021, *Benchmark Litigation* named DiCello Levitt a top plaintiffs' firm nationwide—one of only 12 firms to be recognized—and the firm has received the top honor every year since. *Chambers USA* has repeatedly ranked the firm among the leading plaintiffs' litigation firms nationwide and for its outstanding work in antitrust litigation, and *The Legal 500* has ranked DiCello Levitt for its achievements in product liability, mass tort, and class action litigation.

**Representative Matters**

***In re Fairlife Milk Products Marketing and Sales Practices Litigation***
DiCello Levitt secured a $21 million settlement in a consumer case against Coca-Cola, Fairlife, and other defendants associated with the Fairlife milk brand for deceptive labeling and marketing of certain dairy products produced using milk from cows that were allegedly treated inhumanely. The settlement—one the highest animal welfare labeling practices settlements ever—also creates an accountability program to ensure that the defendants treat their dairy cows humanely moving forward.

***Alaska Electrical Pension Fund v. Bank of America Corp.***
DiCello Levitt attorneys served as Class Counsel and secured $504.5 million in settlements from major dealer banks to resolve claims alleging a conspiracy to manipulate ISDAFIX, a key benchmark for valuing various interest rate derivatives.

**NCUA Residential Mortgage-Backed Securities Actions**
DiCello Levitt attorneys served as Lead Counsel in more than a dozen high-profile securities actions that the National Credit Union Administration (NCUA) brought against international investment banks for alleged misrepresentations made to investors in connection with subprime-backed residential mortgage securities. Those actions were resolved through settlements totaling more than $4.5 billion.

***In re Navistar MaxxForce Litigation***
DiCello Levitt secured a $135 million settlement—a landmark result in the trucking industry—as Co-Lead Counsel for a class of truck owners and lessees in this multidistrict class action lawsuit alleging that Navistar's model year 2011–2014 vehicles were equipped with defective MaxxForce diesel engines.



## Commercial Litigation

DiCello Levitt's Commercial Litigation Practice Group has won billions of dollars in verdicts and settlements for clients in commercial disputes. With a focus on bet-the-company and high-stakes litigation, DiCello Levitt's commercial litigators represent clients affected by commodities traders' market manipulation and price fixing by corporate executives, corporate ownership disputes, breaches of contract, and tortious interference claims, as well as a myriad of litigation stemming from a range of conduct leading to economic damages. The firm's driving objective is winning, measured not only by monetary compensation but also in the broad context of clients' overarching business goals. The firm works with clients to map out a successful strategy based on damages, market positioning, public relations considerations, and long-term profit and loss outlook. Leveraging the same innovative approach applied in court, the Commercial Litigation Practice Group collaborates with clients to obtain the best possible results for their businesses.

**Representative Matters**

**Ownership Dispute Among the Principals of Ivani LLC**
DiCello Levitt represented three of the four owners of a technology company who were denied their contractual ownership and management rights. The key owners are now able to advance the progress of their burgeoning technology company.

***Green Plains Trade Group v. Archer Daniels Midland Company***
DiCello Levitt represents one of the largest ethanol producers in the world against Archer Daniels Midland Company (ADM) for illegally scheming to manipulate the U.S. ethanol market as both a seller and a trader of the same commodity. The scheme made it appear as though there was an oversupply of ethanol in the markets, and ADM's commodities traders allegedly acquired large financial derivative contracts that increased in value as the price of ethanol plummeted. DiCello Levitt's client retained the firm to vindicate their rights and recover their losses stemming from ADM's conduct.

***SitNet LLC v. Meta Platforms Inc*.**
DiCello Levitt represents a patent holder who brought an action against Facebook's parent company, Meta Platforms Inc., alleging that Facebook knowingly infringed the plaintiff's patents for technology relating to situational networking, a critical component of targeted advertising.

***Norwegian Air Shuttle ASA v. The Boeing Company***
DiCello Levitt represented Norwegian Airlines in prosecuting economic loss and equitable claims exceeding $1 billion against The Boeing Company and Boeing Commercial Services Europe Limited in an action arising from Boeing's gross negligence, fraud, and breach of contract relating to Boeing's 737 MAX and 787 Dreamliner aircraft. The firm's attorneys secured a confidential settlement in this matter.

## Environmental Litigation

DiCello Levitt's Environmental Litigation Practice Group is recognized among the best in the United States for successfully representing people, businesses, and communities, as well as state and local governments, in lawsuits against some of the largest companies in the world for polluting the environment and endangering human health. DiCello Levitt is frequently chosen by state and local governments to lead groundbreaking environmental contamination cases and is committed to helping people who have suffered exposure to harmful pollution, whether from an acute, catastrophic event or through years of continuous air, water, and soil contamination in their towns and neighborhoods. Known for their efficiency and effectiveness in navigating the complexities of environmental, health, and safety regulations, DiCello Levitt's attorneys help environmentally conscious corporate clients protect the environment through compliance with federal laws. The firm also guides businesses in the development of safety and health programs and assists companies with air, water, and waste permitting applications.

DiCello Levitt was named *The National Law Journal*'s 2023 **Environmental Protection Law Firm of the Year**.

**Representative Matters**

**PFAS Litigation as Special Assistant Attorneys General**
DiCello Levitt has been retained by State Attorneys General to assist their states in multibillion-dollar fights against the manufacturers of per- and poly-fluoroalkyl substances (PFAS) and aqueous film-forming foam (AFFF) for contaminating the states' air, water, and soil. The amount of contamination at issue makes these matters among the largest environmental pollution cases in U.S. history. DiCello Levitt was selected after a highly competitive process involving, at least in one state, 15 competing proposals submitted by law firms across the country.

**Chemtool Fire Class Action Litigation**
DiCello Levitt serves as Co-Lead Counsel in the Rockton, Illinois, community's class action against Chemtool Incorporated following a massive fire that burned for days at Chemtool's chemical plant in Rockton. The catastrophic event required the evacuation of the surrounding community and contaminated properties for miles around the plant.

**Union, Illinois, Toxic Exposure Cases**
DiCello Levitt represents more than a dozen residents and former residents of Union, Illinois, who have been diagnosed with devastating illnesses after being exposed to carcinogenic chlorinated solvents dumped into the village's environment by nearby factories for decades.

**Climate Change and Deception Litigation**
DiCello Levitt represents multiple cities and counties in lawsuits against major oil companies and their industry trade association, the American Petroleum Institute, alleging that these

industry giants promoted and profited from deceptive campaigns to discredit climate science and mislead the public about the role their products play in driving climate change. DiCello Levitt seeks to hold these companies financially accountable for the damage caused by climate change.

## Labor and Employment Litigation

DiCello Levitt's Labor and Employment Litigation Practice Group represents people harmed by the discriminatory and illegal actions of their employers. The firm investigates, litigates, and exposes systemic workplace abuses, holds companies responsible, and ensures fair practices in recruitment, hiring, promotion, and pay. DiCello Levitt's labor and employment litigators fight for employees who experience discrimination in the workplace based on race, gender, ethnicity, sexual orientation, or religion. They assist women who are denied pay equal to their male peers; pregnant women who are terminated or passed over for promotions; and workers subjected to hostile workplaces, sexual harassment, and disparate treatment. The practice group's extensive experience enables DiCello Levitt to successfully challenge arbitration agreements, noncompete agreements, and other employment contracts and to enforce workers' rights under collective bargaining agreements.

DiCello Levitt understands the risks workers face when they speak out against their employers and knows how to safeguard against retaliation. Not only do the attorneys at DiCello Levitt protect employees' positions and recover compensation for their losses, but they also fight to change the policies and practices that allow labor abuses to take place while ensuring that similar behavior does not occur in the future.

**Representative Matters**

***Angela Betancourt v. Rivian Automotive LLC***
DiCello Levitt serves as Co-Lead Counsel in a gender discrimination class action case against Rivian, a major automotive manufacturer, for allegedly permitting and fostering a hostile work environment in its Illinois facility, where women employees are subjected to pervasive sexual harassment and complaints of such harassment are routinely ignored.

***Waggoner, et al. v. VSE Corp., et al.***
DiCello Levitt negotiated a seven-figure settlement on behalf of a certified collective of unionized workers based on federal contractors' failure to properly pay the firm's clients during rest breaks while working at the Red River Army Depot in Texarkana, Texas.

**Correctional Officers Wage and Hour Litigation**
DiCello Levitt represents state employees in Wisconsin and North Carolina, part of a certified class and collective, for the states' failure to pay wages for work performed before and after the start of their scheduled shifts.

**Confidential Individual Settlement**
DiCello Levitt negotiated a favorable settlement for a woman who was terminated in the hospitality industry after disclosing to the company that she was pregnant.

**Confidential Group Settlements**
DiCello Levitt has achieved numerous multimillion-dollar settlements on behalf of groups of employees and former employees of large companies, international corporations, educational institutions, and other entities who courageously stood up to racial, gender, and other forms of discrimination in all aspects of the employment relationship, from hiring to compensation, promotion, layoff, and termination.

## Mass Tort Litigation

DiCello Levitt's nationally recognized and award-winning attorneys leverage their extensive experience to represent plaintiffs in mass torts involving faulty medical devices, pharmaceuticals, cosmetics, and other illegal practices by defendants in the automotive and biotechnology sectors, among others. DiCello Levitt's Mass Tort Litigation Practice Group also leads cases seeking remediation and financial reparation from global companies responsible for environmental pollution, contamination, and endangering human health. Representing individuals, businesses and investors, municipalities, and State Attorneys General, DiCello Levitt's attorneys have recovered billions of dollars for clients across the United States and effected corporate and legislative changes that protect the safety of all consumers.

DiCello Levitt has received national acclaim for its successful leadership and resolution of mass injury cases and has consistently led the charge on some of the largest such cases in U.S. history, repeatedly getting appointed to leadership positions—including groundbreaking appointments to some of the most diverse plaintiffs' teams ever—by federal judges across the country.

**Representative Matters**

***In re Hair Relaxer Marketing Sales Practices and Products Liability Litigation***
DiCello Levitt serves as Co-Lead Counsel representing thousands of women who have developed uterine, ovarian, and endometrial cancer from using chemical hair relaxers manufactured by L'Oréal, Revlon, and other hair relaxer manufacturers. DiCello Levitt's attorneys filed the first hair relaxer lawsuit and continue to be a leading force in this significant litigation.

***Camp Lejeune Water Litigation v. United States of America***
DiCello Levitt represents thousands of military members and their families who suffered catastrophic injuries and death from the toxic water supply at Camp Lejeune.



***In re Paraquat Products Liability Litigation***
DiCello Levitt serves on the Plaintiffs' Executive Committee of the multidistrict litigation on behalf of thousands of farmers and other licensed applicators—who developed Parkinson's disease from using the herbicide paraquat—against defendant manufacturers Chevron and Syngenta.

***Glucagon-like Peptide-1 Receptor Agonists (Glp-1 Ras) Products Liability Litigation***
DiCello Levitt serves on the Plaintiffs' Leadership Committee of the multidistrict litigation against drugmakers Novo Nordisk and Eli Lilly, pursuing damages arising from the severe health risks allegedly caused by Ozempic and similar drugs, including intestinal obstruction, gastroparesis, and other acute gastrointestinal injuries.

***In re Tepezza Marketing, Sales Practices, and Products Liability Litigation***
DiCello Levitt serves on the Plaintiffs' Executive Committee in the multidistrict litigation against Horizon Therapeutics and represents thousands of plaintiffs who suffered hearing impairment, including complete hearing loss, after taking the prescription drug Tepezza.

***In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation***
DiCello Levitt represents thousands of young plaintiffs who have suffered acute injuries because of the defendants' wrongful actions in purposely creating and marketing addictive and defective social media applications. The plaintiffs seek damages against Meta, Snap, ByteDance, and Google.

***In re Baby Food Products Liability Litigation***
DiCello Levitt represents thousands of children harmed by the defendants' baby food products that were found in a U.S. government investigation to be highly contaminated with heavy metal toxins, including arsenic, lead, cadmium, and mercury. The plaintiffs seek damages against baby food manufacturers and distributors Walmart Inc., Gerber Products Co., and four other defendants, alleging that their products are contaminated with toxic metals, causing infants to develop autism spectrum disorder and other severe health conditions.

## Privacy, Technology, and Cybersecurity

DiCello Levitt's Privacy, Technology, and Cybersecurity Practice Group includes award-winning attorneys and skilled technologists who routinely represent consumers and public clients against some of the largest corporations in the world. DiCello Levitt represents people and businesses affected by major data breaches and wrongful use of their private information. The firm's attorneys have played leading roles in some of the largest data breach, privacy, and technology settlements in the United States, winning significant motions and creating new legal theories and damages models that have been cited in numerous cases across the country.

A first-of-its-kind group with both a dedicated data breach section and privacy section, DiCello Levitt's Privacy, Technology, and Cybersecurity Practice Group has been named *The National Law Journal*'s Practice Group of the Year and is the only law firm to be recognized by *Law360* for three consecutive years as Cybersecurity and Data Privacy Practice Group of the Year.

**Representative Matters**

***In re Facebook Internet Tracking Litigation***
DiCello Levitt achieved a substantial settlement on behalf of a class of consumers against Facebook, alleging Facebook inappropriately collected user data even after logging out of their accounts. The landmark case established the new precedent that personal information has financial value, and the first-of-its-kind nationwide injunction requiring deletion of the at-issue data was hailed by the press as a "watershed moment" in data privacy.

***In re Google RTB Consumer Privacy Litigation***
DiCello Levitt took a central role in negotiating a significant settlement on behalf of a class of consumers as an Executive Committee and Mediation Team member after aggressively litigating against Google for breaching its contractual promise not to sell users' personal information by rebroadcasting data during real-time bidding auctions, securing substantial injunctive relief that ensures users control whether or not Google will share their personal information in their Real-Time Bidding ad auctions.

***Calhoun v. Google***
DiCello Levitt is co-leading a data privacy action brought by Google Chrome users whose PII was collected while not "synched" with a Google account, in violation of contractual privacy promises. In August 2024, in a landmark opinion, a unanimous panel of the Ninth Circuit rejected Google's "consent" defenses and remanded to the district court for trial, pending class certification. The team was named Law360 "Legal Lions of the Week" for the victory.

***In re Marriott International Inc. Customer Data Security Breach Litigation***
DiCello Levitt represents a class of hundreds of millions of consumers as Co-Lead Counsel against Marriott for a data breach that exposed sensitive personal information and for failing to notify the victims in a timely manner, and resulted in the first class ever certified in a data breach case. The district court's rulings in favor of the classes are routinely cited in cybersecurity cases.

## Product Liability

When corporations choose their profits over the safety of their customers and the public, DiCello Levitt will act. The firm's product liability attorneys rely on a scientific approach and decades of trial experience to achieve justice for its clients. DiCello Levitt represents individuals, businesses, State Attorneys General, municipalities, and other public clients in



individual lawsuits, mass torts, and class actions. Taking on industry goliaths like Abbott, Syngenta, Volkswagen, General Motors, Apple, and Intel, DiCello Levitt has secured more than $20 billion in verdicts and settlements for clients in some of the most significant and well-known product liability cases in the country. The firm's attorneys have successfully wielded their skills on behalf of injured parties in cases involving faulty medical devices, automotive and airplane defects, and other dangerous and defective products. By aggressively pursuing and rooting out corporate malfeasance, DiCello Levitt creates positive and lasting social change—in addition to winning compensation for those already injured.

**Representative Matters**

***In re General Motors LLC Ignition Switch Litigation***
DiCello Levitt attorneys achieved a $121.1 million settlement as a member of the Plaintiffs' Executive Committee and as Settlement Allocation Counsel for the nationwide class of vehicle owners against General Motors for damages from the defective ignition switches installed in its vehicles.

***Simerlein, et al. v. Toyota Motor Corporation, et al.***
DiCello Levitt obtained a $40 million nationwide settlement for owners and lessees of 2011-2018 Toyota Sienna minivans with malfunctioning power sliding doors. The firm's attorneys worked with Toyota to create a program to provide needed service and reimburse out-of-pocket repairs for the power sliding doors.

***In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation***
DiCello Levitt attorneys served as counsel on a case that ended in a $17 billion recovery against Volkswagen, Audi, and Porsche for defrauding consumers who believed they were buying vehicles with "clean diesel" engines. Leadership in the case was referred to as the "class action dream team."

***Palmieri v. Intervet Inc. d/b/a Merck Animal Health***
DiCello Levitt represents a class of plaintiffs against Merck Animal Health for failing to adequately warn pet owners that its flea and tick medication can cause neurological side effects such as seizures.

## Public Client

When corporations harm the public interest through deceptive, dishonest, or dangerous business practices, DiCello Levitt assists state and local governments in recovering the public's damages, penalizing corporate wrongdoing, and enjoining future harm. DiCello Levitt's Public Client Practice Group has worked alongside government attorneys and investigators in numerous high-profile cases and has a deep understanding of the public client perspective. When DiCello Levitt works with public clients, the firm maintains an unwavering focus on what is best for them today, tomorrow, and years into the future.

DiCello Levitt's attorneys approach their work as a joint venture, where they provide support through active, ongoing collaboration while drawing on their own significant legal, scientific, and technological resources to aggressively pursue justice and bring about meaningful social change.

**Representative Matters**

***State of New Mexico, ex rel. Hector H. Balderas v. Volkswagen Group of America***
DiCello Levitt represented the State of New Mexico against Volkswagen, Audi, and Porsche in litigation arising from the automakers' sale of vehicles with "defeat devices" that the manufacturers installed to evade emissions standards. DiCello Levitt achieved a settlement per vehicle that far exceeded the damages any other state received in related litigation.

***State of New Mexico v. Takata Corporation, et al.***
DiCello Levitt obtained more than $25 million on behalf of the State of New Mexico against Honda, Ford, and other automobile companies for the marketing and sale of vehicles with Takata airbag inflators susceptible to rupture and capable of causing death and severe injury.

***State of New Mexico, ex rel. Hector H. Balderas v. Solvay Pharmaceuticals, et al.***
DiCello Levitt secured a $24 million settlement on behalf of the State of New Mexico in an action relating to the deceptive marketing of a testosterone therapy supplement as a "cure" for aging men.

**PFAS Litigation on Behalf of the States of Michigan and Illinois**
The States of Michigan and Illinois retained DiCello Levitt in their multibillion-dollar fights against the manufacturers of the "forever chemicals" known as PFAS for contaminating the states' air, water, and soil. The amount of contamination at issue makes these matters among the largest environmental pollution cases in U.S. history.

## Securities and Financial Products Litigation

DiCello Levitt's Securities and Financial Products Litigation Practice Group has worked on—and won—some of the highest-profile securities actions ever filed, including cases against Enron, AOL/Time Warner, BP, Pfizer, Petrobras, and Volkswagen, as well as the $1 billion securities class action against Merck & Co. Inc. over alleged misrepresentations about the safety of its drug Vioxx. Many of DiCello Levitt's attorneys have worked for the U.S. Department of Justice, prosecuting financial crimes such as those arising from the residential mortgage-backed securities crisis. Collaborating with a team of e-discovery specialists, investigators, and forensic accountants with federal and state law enforcement experience, the Securities and Financial Products Litigation Practice Group is quick to grasp complex structured finance issues, from mortgage-backed and asset-backed collateralized debt obligations to credit-default swaps and credit-linked notes. When DiCello Levitt suspects financial misconduct, the firm secures serious recoveries for its clients.

DiCello Levitt was named one of the 2023 **Top Boutiques** by the *Daily Journal* in recognition of its leadership in "huge and international" securities litigation matters and legal excellence in the state of California.

**Representative Matters**

***United Association of Plumbers and Pipefitters, et al. v. Syneos Health Inc., et al.***
DiCello Levitt serves as Lead Counsel in a national securities class action against Syneos Health Inc. and its former executives. The lawsuit alleges that Syneos made misleading statements about the collapse of its new business and nearly $3 billion in uncollectable receivables and, as a result, defrauded purchasers of Syneos common stock.

**Milestone Cases**

***In re Enron Corporation Securities Litigation***
DiCello Levitt attorneys were among the more than 70 attorneys who led this historic action that obtained a $7.2 billion recovery—the largest securities class action recovery in history—for investors, primarily from Wall Street's largest banks and the company's auditor, Arthur Andersen.

**AOL Time Warner Individual Actions**
DiCello Levitt attorneys devised a creative and unique strategy to pursue an institutional investor group action to recover losses resulting from the disastrous merger of AOL and Time Warner. The group action for dozens of institutional investors, including state and local pension funds and multi-employer funds, was ultimately successful in recovering $629 million for investors.

***Merck & Co. Inc. Securities, Derivative & "ERISA" Litigation***
DiCello Levitt attorneys were integral members of the Co-Lead Counsel team that secured a unanimous decision from the U.S. Supreme Court in favor of shareholders with respect to the statute of limitations for securities fraud claims and that ultimately secured a settlement for more than $1 billion on behalf of the lead plaintiffs, including the Public Employees' Retirement System of Mississippi, and the class.

***In re Initial Public Offering Securities Litigation***
DiCello Levitt Founding Partner Adam Levitt served on the Plaintiffs' Executive Committee, recovering more than $500 million for shareholders.

## Whistleblower Representation

DiCello Levitt's Whistleblower Representation Practice Group represents whistleblowers across the United States and around the globe in pursuing whistleblower actions and securing awards for their role in recovering monies wrongly obtained. DiCello Levitt's

attorneys bring a wealth of knowledge from their deep experience as prosecutors at the U.S. Department of Justice and other government agencies, as well as their prior work in private practice. Through its vigorous advocacy, which includes the use of analytics, comprehensive investigations, and extensive legal analysis, DiCello Levitt has successfully collaborated with the government to litigate significant whistleblower actions. With a notable track record of success on behalf of its clients, DiCello Levitt has pursued private litigation across a wide range of industries, including residential mortgage-backed securities, life sciences and medical devices, industrial manufacturing, and government procurement.

DiCello Levitt's whistleblower advocates have extensive experience representing whistleblowers in bringing claims under the federal False Claims Act and its state and local analogues, as well as various agency whistleblower programs. DiCello Levitt also represents consumers, fraud victims, whistleblowers, and government agencies against pharmaceutical companies for fraud, waste, abuse, and deceptive practices in the manufacture, marketing, and sale of drugs and devices.

**Representative Matters**

***United States of America ex rel. Gill et al. v. CVS Health Corp., et al.***
DiCello Levitt serves as Co-Counsel in representing whistleblower Michael Gill in his partially intervened lawsuit against CVS Health Corporation and its subsidiaries. Mr. Gill alleges that CVS violated the federal and state False Claims Act by fraudulently billing for and improperly retaining payments on various drug products and healthcare services.

**Municipal Bond Rate Rigging Cases**
DiCello Levitt represents whistleblower Edelweiss Fund LLC in a set of related lawsuits brought under state false claims acts against some of the largest banks in the nation for allegedly colluding to set inflated interest rates on municipal bonds. The first of these lawsuits, *Illinois ex rel. Edelweiss v. JP Morgan Chase, et al.*, was settled in 2023 for $70 million.

***State of Illinois ex rel. Kenny Gilman v. Fieldturf USA Inc.***
DiCello Levitt obtained a substantial settlement during the second week of a jury trial on behalf of whistleblowers in a *qui tam* action over defective athletic fields sold and installed in Illinois.

# Awards and Recognition

**"An extraordinary plaintiffs' firm ..."**

**"... top of the line in litigation strategy and representing clients zealously."**

— Chambers and Partners

**Chambers USA**

Band 1:
Litigation: Mainly Plaintiffs, Illinois; (2021-2025)

Ranked:
Litigation: Mainly Plaintiffs, Alabama; Antitrust: Plaintiff, Nationwide; Antitrust: Mainly Plaintiff, New York, Product Liability: Plaintiffs, Nationwide (2022-2025)

Attorneys recognized: Adam Levitt, Greg Asciolla, Diandra "Fu" Debrosse, and Amy Keller

**Benchmark Litigation**

Plaintiff Firm of the Year Finalist (2024)

Highly Recommended Firm: Top Plaintiffs (2021-2025)

Ranked: Competition/Antitrust (2023)

Attorneys recognized: Mark DiCello, Adam Levitt, Greg Asciolla, Diandra "Fu" Debrosse, Greg Gutzler, Amy Keller, Corban Rhodes, and Justin Hawal

**Law360**

Cybersecurity and Privacy Practice Group of the Year (2020-2022)

Class Action Practice Group of the Year (2020)

Competition/Antitrust MVP: Greg Asciolla (2023)

Cybersecurity & Data Privacy MVP: David Straite (2022)

**Lawdragon**

500 Global Plaintiff Lawyers: Plaintiff Class Action Litigation: Mark DiCello, Adam Levitt, Diandra "Fu" Debrosse, and Bobby DiCello (2025)

500 Leading Global Cyber Lawyers: Class Action, Data Breach: Amy Keller, David Straite, Nada Djordjevic, and Corban S. Rhodes (2025)

**The Legal 500**

Ranked: Product Liability, Mass Tort and Class Action – Plaintiff; Antitrust: Civil Litigation/Class Actions – Plaintiff (2022 and 2024); Securities Litigation: Plaintiff (2024)

Attorneys recognized: Greg Asciolla, Amy Keller, and Jonathan Crevier

**The National Law Journal**

Elite Trial Lawyers Civil Rights Winner (2024)

Elite Trial Lawyers Plaintiffs Firm of the Year (2023)

Practice areas of the year: Trial Strategy Innovation, Privacy/Data Breach, and Environmental Protection (2023)

Elite Women of the Plaintiffs Bar: Diandra "Fu" Debrosse (2023)

Elite Trial Lawyers: Justin Hawal and Amy Keller (2021)

Trailblazers: Mark DiCello (2020), Adam Levitt (2020), Ken Abbarno (2021), Diandra "Fu" Debrosse (2022), Greg Gutzler (2021), and David Straite (2022)

**The New York Law Journal**

New York Legal Awards Innovation Winner (2023)

Distinguished Leader Award: Greg Asciolla (2023)



# Meet the Team

To provide robust representation to plaintiffs affected by large data breaches and wrongful use of their private information, DiCello Levitt developed a first-of-its-kind practice group with both a dedicated data breach section and a privacy section.



**David A. Straite, CIPP/US**
Partner

**EMAIL**
dstraite@dicellolevitt.com

**EDUCATION**
Villanova University School of Law, J.D., *magna cum laude*, Managing Editor, *Villanova Law Review,* and Order of the Coif

Tulane University, Murphy Institute of Political Economy, B.A.

David Straite is one of the nation's leading voices for the recognition of property rights in personal data, a 10-year effort culminating in the Ninth Circuit's landmark April 2020 decision in *In re: Facebook Internet Tracking Litigation* and the Northern District of California's March 2021 decision in *Calhoun v. Google*, both of which he argued. David also successfully argued for the extraterritorial application of the Computer Fraud and Abuse Act in 2019 in *In re: Apple Device Performance Litigation*, and filed the first-ever data privacy class action under seal to address a dangerous website vulnerability under Court supervision in *Rodriguez v. Universal Property & Casualty Insurance Company*. As *M.I.T. Technology Review* magazine put it, David is "something of a pioneer" in the field. In September 2022, *Law360* named him a Cybersecurity/Privacy "MVP." He also protects investors in securities, corporate governance, and hedge fund litigation in federal court and in the Delaware Court of Chancery, admitted to practice in both New York and Delaware.

David is a former adjunct professor at Yeshiva University's Sy Syms School of Business, teaching Business Law and Ethics every fall semester from 2015 to 2021. He has co-authored "Dobbs Ruling Means It's Time to Rethink Data Collection" in *Law360* (2022), "Google and the Digital Privacy Perfect Storm" in *E-Commerce Law Reports* (UK) (2013), authored "Netherlands: Amsterdam Court of Appeal Approves Groundbreaking Global Settlements Under the Dutch Act on the Collective Settlement of Mass Claims" in *The International Lawyer's* annual International Legal Developments in Review (2009), and was a contributing author for Maher M. Dabbah and K.P.E. Lasok, QC's "Merger Control Worldwide" (2005). He speaks frequently on topics related to both privacy and investor protection.

David co-chairs the firm's Diversity, Equity, and Inclusion Committee, which seeks to promote diversity within the firm and the legal profession, generally. In 2022, David was also appointed to the LGBTQ Rights Committee of the New York City Bar Association, whose mission is to address "legal and policy issues in legal institutions and in the court system that affect lesbian, gay, bisexual, transgender and queer individuals."

Prior to joining the firm, David was a partner with Kaplan Fox & Kilsheimer LLP, and helped launch the U.S. offices of London-based Stewarts Law LLP before that, where he was the global head of investor protection litigation. Prior to joining the plaintiffs' bar, David was an associate with the New York office of Skadden Arps Slate Meagher & Flom LLP.



**James Ulwick**
Senior Counsel

**EMAIL**
julwick@dicellolevitt.com

**EDUCATION**
Loyola University Chicago, J.D., *cum laude*

Kenyon College, B.A.

James Ulwick is a senior counsel in DiCello Levitt's Chicago office with experience litigating complex data breach cases, data privacy violations, complex commercial suits, and actions involving serious injuries. He represents classes of individuals, businesses, and public entities in a wide range of disputes, protecting their interests in an ever-growing, national practice. As a core member of the firm's award-winning Privacy, Technology, and Cybersecurity Practice Group, James' practice is on the cutting edge of emerging technologies.

James has represented classes of consumers against some of the largest, most powerful companies in the world, including Meta, Google, AT&T, General Motors, Samsung, and Capital One, where he litigates aggressively to protect consumers against privacy encroachment and corporate malfeasance. Advocating on the cutting edge of internet-based technologies, James has also played a central role in litigating the limits of novel, artificial intelligence systems, to protect artists' copyrights, and to punish unfair corporate enrichment at the cost of authors. Listed as an Illinois Rising Star by *Super Lawyers* in 2024 and 2025 and highlighted by BestLawyers.com as "One to Watch" since 2023, James has helped secure injunctive relief and monetary compensation worth hundreds of millions of dollars for consumer classes in just the last three years.

Since joining DiCello Levitt, he has worked with consumers to secure hundreds of millions of dollars in compensation for data privacy violations, defective products, and data breaches. Prior to joining the firm, James was an insurance defense attorney, representing individuals, corporations, and local municipalities through all stages of litigation. James routinely uses his experience on the defense side to help negotiate meaningful, forward-looking injunctive relief, to ensure that corporations are held both financially accountable for past wrongs, and made responsible for preventing future wrongdoing.



**Amy Keller**
Partner

**EMAIL**
akeller@dicellolevitt.com

**EDUCATION**
John Marshall Law School, J.D. (*n/k/a The University of Illinois at Chicago School of Law*)

University of Michigan, B.A.

Amy Keller has held leadership positions in a variety of complex litigations across the nation, where she successfully litigated high-profile and costly data security and consumer privacy cases. As the Managing Partner of the firm's Chicago office and the Privacy, Technology, and Cybersecurity practice chair, she is the youngest woman ever appointed to serve as co-lead class counsel in a nationwide class action. In the multidistrict litigation against Equifax related to its 2017 data breach, Amy represented nearly 150 million class members and helped to secure a $1.5 billion settlement, working alongside federal and state regulators to impose important security practice changes to protect consumer data.

Amy has represented consumers against industry titans like Apple, Marriott, Electrolux, and BMW, securing victories against each. She has been appointed to leadership positions in more multidistrict litigations than any other woman in the past eight years, each case requiring sophistication in not only understanding complex legal theories, but also in presenting multifaceted strategies and damages modeling to ensure favorable results. For example, in leading a nationwide class action related to a data breach that exposed the confidential information of over 300 million individuals, Amy worked with her team to develop an argument recognized by the trial court that the loss of someone's personal information, alone, could trigger financial liability, and later secured a rare victory, certifying that case to proceed as a class action to trial. In another matter, Amy defended her team's victory all the way to the U.S. Supreme Court, ensuring that consumers would be able to band together as a class when a company defrauds them for small amounts individually that are worth millions of dollars in the aggregate.

Amy is rated by *Chambers & Partners* for her work in cybersecurity litigation and is an elected member of the American Law Institute. She serves on the Steering Committee of the Sedona Conference's Working Group 11, which focuses on advancing the law on issues surrounding technology, privacy, artificial intelligence, and data security, and she is also on drafting teams for both Model Data Breach Notification Principles and Statutory Remedies and the California Consumer Privacy Act. Her work in cybersecurity and privacy has been recognized many times over—in both 2021 and 2022, she was honored as one of Benchmark Litigation's Top 250 Women in Litigation; in 2020 and 2021, she was named by *The National Law Journal* as one of the Elite Women in the Plaintiffs' Bar; and the practice group which she chairs has won Practice Group of the Year in 2020, 2021, and 2022 by *Law360* and in 2020 by *The National Law Journal*. Amy is also recognized by Illinois Super Lawyers as a "Rising Star," and was named a "trailblazer" by *The National Law Journal.* In 2022, Amy was named to the "40 Under 40" list for *Crain's Chicago* for her leadership in litigation roles and promoting diversity and inclusivity in the bar.

Amy proudly holds leadership positions in both the American Association for Justice and the Public Justice Foundation, organizations which both focus on access to the courts for civil litigants.



## J. Gordon Bergstresser
Senior Counsel

**EMAIL**
gbergstresser@dicellolevitt.com

**EDUCATION**
New England School of Law, J.D.

Lycoming College, B.A.

Gordon Bergstresser's passion for ESI flows from his recognition that every case litigated by the firm, from the largest data breach class action to an individual tort victim, is brought because someone was harmed by another's wrongful conduct. Gordon's experience includes in-depth collection and review of ESI in a number of industries, including data privacy, internet tracking, mobile devices, cryptocurrency, securities exchange platforms, automotive, pharmaceutical, security contractors, and food labeling. This wide range of hands-on experience gives him a wealth of knowledge to draw upon when new cases with pressing ESI issues come through the door.

Gordon's approach builds advantages into the ESI workflow at the outset of a case. When the time comes for the litigation team to marshal the ESI needed to achieve the best outcome for a client, Gordon has already created the infrastructure so that important evidence can be quickly located and presented.

Gordon's background includes working in review rooms to produce ESI for civil defendants, giving him unique insight in his current work receiving document productions on behalf of plaintiffs. Crafting search terms and leveraging predictive coding is central to Gordon's strategy for finding the smallest of needles in the largest of haystacks. He has experience in all of the major review platforms, including Relativity and Everlaw, ensuring that every case, whether ESI is managed directly by DiCello Levitt or with partner firms, can be brought to successful resolution for our clients.



## Adam Levitt

Partner

**EMAIL**
alevitt@dicellolevitt.com

**EDUCATION**

Northwestern University School of Law, J.D.

Columbia College, Columbia University, A.B., *magna cum laude*

Adam Levitt is one of the nation's leading advocates for plaintiffs in complex, multidistrict, class action, public client, mass tort, and commercial litigation. Drawing on his extensive experience pursuing and obtaining justice for those who have been wronged by powerful defendants, he co-founded DiCello Levitt to create a top-tier complex issues and trial firm founded on excellence, trust, and respect.

In his decades-long career, Adam has scored numerous significant and precedent-setting victories, delivering more than $20 billion in recoveries to clients in biotechnology, financial services, securities, insurance coverage, consumer protection, automotive defects, agricultural products, and antitrust disputes. He has been appointed to leadership positions in many historic and headline-grabbing litigations, including three of the largest biotechnology class actions in U.S. history, where he served as co-lead counsel, helped recover more than $1.7 billion on behalf of plaintiffs, and created a crop contamination damages model that set the modern industry standard. He was also retained by multiple State Attorneys General to hold some of the world's largest chemical companies accountable for widespread environmental contamination from their "forever chemicals" known as PFAS (per- and polyfluoroalkyl substances) and was retained by the City of Baltimore to address the catastrophic impact of the Francis Scott Key Bridge collapse, one of the largest maritime disasters in U.S. history. Additionally, as part of a leadership group characterized as a "class action dream team," Adam helped secure a $16 billion settlement in litigation arising from Volkswagen's emissions scandal, and, in a rare class action trial, he and his fellow co-lead counsel secured a milestone $102.6 million jury verdict against General Motors for hiding engine defects from consumers.

Adam is also a leader in the legal profession and a frequent speaker on multidistrict litigation, consumer protection, automotive litigation, biotechnology, corporate governance, securities litigation, and internet privacy. Nationally recognized as an authority on class action litigation, Adam writes a monthly class action column in *The National Law Journal*, has testified before the Illinois Supreme Court Rules Committee on class action practice, and chairs an annual class action litigation conference in Chicago.

As a founding partner of DiCello Levitt, Adam has cultivated a diverse roster of skilled litigators to advance the cause of justice for individuals, businesses, and public clients through class action, business-to-business, whistleblower, personal injury, civil rights, and mass tort litigation. With a long history of working with public clients, Adam and his partners understand the wants and needs of government officials and their teams, and, as experts in trial practice and jury persuasion, they consistently achieve best-in-class results for their clients.

Adam's own groundbreaking work on behalf of plaintiffs has been recognized locally and nationally in prestigious ranking directories and publications, including *Chambers USA*, *Benchmark Litigation*, *The National Law Journal*, *Crain's Chicago Business,* and *Lawdragon*.

**Birmingham**
T: 205.855.5700

**Chicago**
T: 312.214.7900

**Cleveland**
T: 440.953.8888

**New York**
T: 646.933.1000

**San Diego**
T: 619.923.3939

**Santa Fe**
T: 505.810.0770

**Washington, DC**
T: 202.975.2288

**DiCelloLevitt.com**

DICELLO LEVITT

# EXHIBIT B

# Exhibit B

**DiCello Levitt LLP**
Time through 7/31/2025

| | | Categories | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Professional Name (Status)** | **Hourly Rate** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | **16** | **17** | **18** | **19** | **20** | **21** | **22** | **Total Hours** | **Total Lodestar** |
| Abramowitz, Mark (Partner) | $1,125.00 | 1.40 | | 1.20 | 7.70 | 11.10 | | | | | | | 7.30 | | | 2.10 | | | | 0.80 | | | | 31.60 | $35,550.00 |
| Frawley, John (Associate) | $715.00 | 13.80 | | | | 20.30 | | | | | | 4.70 | | | | | 19.80 | | 5.60 | 3.20 | | | | 67.40 | $48,191.00 |
| Kerrane, Erin (Paralegal) | $300.00 | 18.80 | | | | | | | | | 8.40 | | 0.40 | | | | 4.10 | | 3.90 | | | | | 35.60 | $10,680.00 |
| Levitt, Adam (Partner) | $1,500.00 | 1.20 | | | | | | 0.80 | 2.70 | 2.40 | 1.00 | | 1.00 | | | | | | | 21.30 | | | | 30.40 | $45,600.00 |
| Onabanjo, Mojisola (Associate - Tier I R | $325.00 | | | | | | | | | | | | | 1747.00 | | | | | | | | | | 1747.00 | $567,775.00 |
| Onabanjo, Mojisola (Associate) | $435.00 | | | | | | | | | | | | | | | | 985.40 | | | | | | | 985.40 | $428,649.00 |
| Rhodes, Corban (Partner) | $1,150.00 | 1.20 | | | | 24.90 | | | | | | | 3.10 | 2.30 | | | | | 0.70 | 1.00 | | | | 33.20 | $38,180.00 |
| Straite, David (Partner) | $1,250.00 | 117.70 | 8.60 | 4.00 | 21.10 | 160.60 | 24.50 | 146.90 | 50.40 | 20.80 | 137.40 | 18.00 | 115.90 | 0.20 | 6.50 | 2.30 | 273.20 | 8.00 | 56.70 | 86.00 | 10.20 | | | 1269.00 | $1,586,250.00 |
| Ulwick, James (Associate) | $785.00 | 53.80 | | 5.80 | 137.00 | 181.10 | 3.10 | 16.60 | 31.80 | 22.60 | 92.90 | 5.50 | 310.80 | 0.30 | 17.70 | 4.10 | 409.80 | 30.30 | 71.20 | 94.60 | | | | 1489.00 | $1,169,841.50 |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total:** | | **207.90** | **8.60** | **11.00** | **165.80** | **398.00** | **27.60** | **164.30** | **84.90** | **45.80** | **239.70** | **28.20** | **438.50** | **1749.80** | **24.20** | **8.50** | **1692.30** | **38.30** | **138.10** | **206.90** | **0.00** | **0.00** | **0.00** | **5688.60** | **$3,930,716.50** |

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

# EXHIBIT C

# Exhibit C

DiCello Levitt LLP – Annual Hours and Lodestar

| Year | Sum of Time | Sum of Lodestar |
|---|---|---|
| 2021 | 272.00 | $293,817.50 |
| 2022 | 2847.00 | $1,518,479.50 |
| 2023 | 2006.40 | $1,497,249.00 |
| 2024 | 366.50 | $391,556.50 |
| 2025 | 196.70 | $229,614.00 |
| Grand Total | 5688.60 | $3,930,716.50 |

# EXHIBIT D

# Exhibit D

## DiCello Levitt LLP – Expenses

| Description | Cumulative Total |
|---|---|
| Court Fees (filing, etc.) | $1,617.00 |
| Court Reporters/Transcripts | $39.60 |
| Computer Research (Westlaw & Pacer) | $2,059.09 |
| Reproduction/Duplication/Copies | |
| Notice Costs | |
| Express Delivery/Messenger | $713.10 |
| Pre-approved Professional Fees/Services (expert, investigator, accountant, etc.) | |
| Service of Process | |
| Telephone/Fax/Postage | |
| Travel: | |
| ** Airline (Professional/Destination/Purpose) | $15,402.00 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $6,484.34 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | |
| ** Meals (Professional/Purpose) | $3,502.60 |
| ** Lodging (Professional/Destination/Purpose) | $11,074.67 |
| ** Other (Describe/Professional/Destination/Purpose) | |
| Miscellaneous: (Describe): Replacement device for client who turned over device per cour order ($800); meeting rooms for client deposition prep sessions | $3,344.16 |
| | ($320,000.00) [1] |
| **TOTAL EXPENSES** | **$44,236.56** |

[1] Contributions paid by DiCello Levitt LLP to the plaintiffs' common litigation fund are accounted for separately, so are excluded from this individual law firm cost summary.

NANCI E. NISHIMURA (SBN 152621)
nnishimura@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN SWOPE (PRO HAC VICE)
kswope@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, | **CASE NO. 4:21-cv-02155-YGR** |
| This Document relates to: *all actions*. | **DECLARATION OF NANCI E. NISHIMURA**<br><br>**IN SUPPORT PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES** |

I, NANCI E. NISHIMURA, declare:

1. I am a partner at Cotchett, Pitre & McCarthy, LLP ("CPM"). I have been licensed to practice law in the state of California since 1991. I am admitted to practice in the U.S. District Courts for the Northern, Eastern, Southern and Central Districts of California, the Southern District of New York, and the United States Supreme Court. The following facts are within my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I submit this declaration in support of Plaintiffs' Motion for and Award of Attorneys' Fees, Costs and Expenses.

3. On May 5, 2021, I caused to be filed a proposed class action lawsuit on behalf of clients Meagan Delahunty, Meghan Cornelius, and John Kevranian against Google LLC in the United States District Court for the Northern District of California, originally assigned to Hon. Lucy Koh, Case No. 21-cv-03360-LHK. By order dated June 24, 2021, this case was related to and consolidated with other class action complaints against Google, titled *Hewitt, et al. v. Google LLC*, Case No. 21-CV-02155-LHK. By order dated January 24, 2022, this action was transferred to Hon. Yvonne Gonzales Rogers in the Oakland Courthouse, and related with additional class action complaints filed by other individuals and consolidated into the instant action, *In Re Google RTB Consumer Privacy Litig*., Case No. 4:21-cv-02155-YGR-VKD (this "Action"). *See* ECF No. 69.

4. On August 3, 2021, the Court appointed me and the CPM firm to serve on the Interim Plaintiffs Executive Committee in this Action. *See* ECF No. 77. I am a partner at CPM and a principal attorney in this litigation. I have practiced civil litigation on behalf of individuals and public entities, in individual actions and class actions since 1991. I have an extensive background in privacy and consumer protection class action litigation. I have litigated numerous complex litigation or class action cases across the country involving privacy, unfair competition, consumer protection, antitrust, and securities, including the following matters in which I have served in a leadership position:

- *PayPal Honey Browser Extension Litigation*, Case No. 5:24-cv-09470-BLF (USDC NDCA) (Co-Lead Counsel);

- *In re Google Play Store Antitrust Litigation,* Case No. 3:21-md-02981-JD (USDC NDCA) (Plaintiffs' Executive Committee);
- *In re Google Privacy RTB Consumer Privacy Litigation,* Case No. 21-cv-02155-YGR (USDC NDCA) (Plaintiffs' Executive Committee);
- *In re: LIBOR-based Financial Instruments Antitrust Litigation*, 11-md-2262-NRB (MDL 2262) (S.D.N.Y.) (Lead Counsel for 14 individual actions by public entities transferred to NY and consolidated with nationwide class actions);

5. CPM's attorneys have a long history of successfully handling class actions across a range of industries, including privacy, data breach, antitrust, securities, and unfair competition. I bring substantial experience in complex litigation and class action matters with a history of litigating in an efficient and practical manner. The firm employs nearly fifty (50) attorneys practicing in the areas of privacy, consumer rights, data breach, unfair competition law, antitrust, and securities. The firm handles both individual and class action litigation through offices in Burlingame and Santa Monica, California; Seattle, Washington; and New York, New York. The firm resume of Cotchett, Pitre & McCarthy, LLC is attached hereto as **Exhibit A.**

6. Members of my firm and I have been actively involved in the litigation of this Action under the direction of Interim Class Counsel, including, among other tasks, communicating with the clients, preparing the clients for depositions, taking depositions, the investigation, retention and conferring with experts, preparing discovery, working on the motion for class certification, auditing time and expense reports, assisting in the settlement mediation, assisting in the preparation of this filing and the concurrently filed motion papers in support of final approval of the Settlement.

7. The Court's order appointing Interim Lead Counsel and an Interim Plaintiffs Executive Committee (ECF No. 77) included directives for periodic reporting of professional time, costs and expenses incurred in this Action by plaintiffs' counsel and their law firms. Interim Lead Counsel followed that order with a comprehensive time and expense protocol for submitting time and expense reports to Lead Counsel for her review and audit. I was primarily responsible for compliance with all time and expense reporting requirements in this Action, for reviewing CPM Firm's time and expense reports with such requirements in mind, and for communicating with Interim Lead Counsel

regarding any time and expense audits performed by Interim Lead Counsel pursuant to the Court's appointment order and its time and expense reporting directives, ECF. No. 77.

8. Attached as **Exhibit B** is a chart listing CPM's attorneys and staff that have worked on the Action, the hours each has spent working on specific categories of work as of July 31, 2025, and the 2024 hourly rate (or applicable rate cap) for each listed professional. The chart set forth in **Exhibit B** reflects audits undertaken by Interim Lead Counsel and the CPM Firm, both for the exercise of billing judgment and to ensure efficiencies.

9. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours CPM attorneys and staff spent working on this Action, subtotaled by year, for each year from April 2021 through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

10. **Exhibit B** and **Exhibit C** were prepared from contemporaneous, daily time records regularly prepared and maintained by CPM in the ordinary course and manner of business. CPM maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations are based on CPM's 2024 billing rates. These records are available for review at the request of the Court.

11. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my firm's representation of Plaintiffs and the Class, in coordination with Interim Lead Class Counsel, who approved the tasks and the hours spent on each task.

12. I have general familiarity with the range of hourly rates typically charged by plaintiffs' class action counsel specifically in the field of unfair competition and privacy law in the geographical area where my firm practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by my firm are commensurate with those prevailing in the market in 2024 for legal services furnished in complex class action litigation such as this. While the most recently granted motions for fees did not specifically address my firm's hourly rates, a blended hourly rate with a lodestar cross-check, and "percentage-of-the-benefit" with a lodestar cross-check, were applied by the following Courts:

- *In re Telescopes Antitrust Litigation,* Case No. 5:20-cv-03639-EJD (USDC NDCA) (April 11, 2025) (Dkt. No. 419) ("The Court also finds that the blended rate of $709 is within the acceptable range of attorneys' fees in this district.");
- *In re: Cattle and Beef Antitrust Litigation,* Case No. MDL No. 22-3031 (JRT/JFD) (USDC DMN) (June 11, 2024) (Dkt. No. 705) ("In the Eight Circuit use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established'" and "Using the lodestar cross-check methodology and reviewing the total fees awarded with the lodestar generated on these cases from the inception of the litigation … is well within the accepted ranges awarded in similar contingent fee cases."); and,
- *In re: Apple Inc. Device Performance Litigation*, Case No. 5:18-md-2827-EJD (USDC N.D. Cal.) (March 17, 2021) (Dkt. No. 609) ("As a final check on the reasonableness of requested attorneys' fees, courts often compare the amount counsel would receive under the percentage-of-recovery method with the amount counsel would have received under the lodestar method." … "The Court has reviewed the underlying records and is satisfied that the revised lodestar is supported. Class Counsel applied their customary professional rates. Joint Decl. of Joseph W. Cotchett and Laurence D. King In Support of Motion ¶ 66, Dkt. No. 471. Those rates are consistent with rates that have been awarded in this District. *See, e.g., Dickey v. Advanced Micro Devices, Inc.*, 2020 WL 870928m at *8 (N.D. Cal. Feb. 21, 2020) (finding rates between $275 and $1,000 for attorneys reasonable); *In re Lidoderm Antitrust Litig.*, 2018 WL 4620695, at *2 (N.D. Cal. Sept. 20, 2018) (finding rates between $300 and $1,050 for attorneys reasonable). Further, the Court finds that the 68,731 hours expended by Class Counsel (Joint Decl. ¶ 65) was reasonable and necessary, taking into consideration the amount of substantive litigation activity."

13. CPM has incurred expenses of $489,855.85 so far in litigating the Action. Attached as **Exhibit D** is a chart detailing the expenses incurred by my firm, by category of expenses. All expenses listed are at cost, i.e., without any upcharge or associated overhead.

14. CPM carefully invested its time and resources in leading the prosecution of this case, as it does with all of our contingent cases. CPM did so with the expectation that the firm would be

reasonably compensated for the risks it undertook, and professional time and resources that CPM put into the case, for the successful results that have been achieved for the Settlement Class. CPM's hourly rate does not reflect the contingent risks of this case, and the firm took the case with the expectation of an enhanced fee award reflecting this risk in the event that plaintiffs prevailed.

15. Throughout the litigation, my firm and I worked under the direction of Interim Lead Class Counsel, and I made every effort to operate as efficiently as possible and to avoid unnecessary duplication. I coordinated with Class Counsel for all work performed and costs incurred in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 22, 2025, at Burlingame, California.

Dated: September 23, 2025 By: *__/s/ Nanci E. Nishimura__*

NANCI E. NISHIMURA

# EXHIBIT A

C P M

COTCHETT PITRE & McCARTHY LLP

SAN FRANCISCO BAY AREA | LOS ANGELES AREA | NEW YORK | SEATTLE

WWW.CPMLEGAL.COM

## OUR FIRM

Cotchett, Pitre & McCarthy, LLP ("CPM") based on the San Francisco Peninsula for over 50 years, engages exclusively in litigation and trials. The firm's dedication to prosecuting or defending socially just actions has earned it a national reputation. With offices in the San Francisco Bay Area, Los Angeles, Seattle, and New York, the core of the firm is its people and their dedication to principles of law, their work ethic, and their commitment to justice. We are trial lawyers dedicated to achieving justice.





**Blowing the whistle on BP helps California recoup funds** *State of California ex rel. et al. v BP America*

JUSTIN T. BERGER Cotchett, Pitre & McCarthy LLP PAULA L. BLIZZARD AND KENNETH J. SUGARMAN California Department of Justice NIALL P. MCCARTHY Cotchett, Pitre & McCarthy LLP

From 2003 to 2012, BP allegedly overcharged the California Department of General Services for natural gas — violating the terms of three successive contracts in the process. This cost was then passed on to universities, cities, agencies and others that

Government agencies often lack the manpower and expertise of the corporations they have to deal with, he said, leaving them vulnerable to manipulation.

Schroen was a BP trader in Texas whose job it was to put together under an overall contract

guy," said Justin T. Berger, also a principal with the firm.

In 2012, Schroen sued BP under the California False Claims Act. The act allows a private citizen, even one outside the state, to sue for fraud committed against the government. The California Department of Justice got involved in 2014, with Kenneth J. Sugarman and Paula L. Blizzard representing the state.

McCarthy and Berger compared the fraud to some of the manipulation that happened during the financial, in which unsuspecting investors were sold mortgage-backed securities too complex to understand. In this case, the industry jargon involved MMBtus, units of natural gas. While the profit on each unit seemed small, the actual profit on each deal often ended up being multiple times what BP was permitted to keep under the contract.

The company abruptly settled for $102 million right before a month-long trial was about to begin. Schroen was instrumental in undermining BP's case, the attorneys said.

"I think the turning point in the case came when we were able to show even using BP's own data, the state was massively overcharged," Berger said.

Schroen himself got a significant payout as part of the settlement, a provision that is written into the Act in order to encourage people to take the risk to come forward. But Berger noted he lost his chosen career and endured years of litigation.







**"The Cotchett firm has few peers that equal their ability in litigation. Their commitment to the cause of justice and their ethical standards stands apart. They are people who give back to the community and give lawyers a good name."**

***—Judge of the Superior Court (Retired)***

## OUR PRACTICE AREAS

CPM represents both plaintiffs and defendants in a wide range of practice areas, including:

- Antitrust & Global Competition
- Aviation / Helicopter Accidents
- Commercial Litigation
- Consumer Protection Class Actions
- Defective Products / Mass Torts
- Elder Abuse
- Employment Law
- Environmental Law
- False Claims / Whistleblower Law
- Municipal & Public Entity Litigation
- Privacy & Intellectual Property
- Personal Injury & Wrongful Death
- Pharmaceutical Litigation
- Securities / Financial Fraud
- Shareholder Rights / Corporate Governance

**"This court has had the distinct pleasure of having the parties in this case represented by some of the finest attorneys not only in this state but in the country." Cotchett, Pitre & McCarthy has "well reputed experience in [consumer fraud] litigation."**

***—Judge of the U.S. District Court***

**OUR OFFICES**




**San Francisco Bay Area**
840 Malcolm Road
Suite 200
Burlingame, CA 94010
T: 650.697.6000
F: 650.697.0577



**Los Angeles Area**
2716 Ocean Park Blvd.
Suite 3088
Santa Monica, CA 90405
T: 310.392.2008
F: 310.392.0111



**40 Worth Street**
Suite 602
New York, NY 10013
T: 212.201.6820
F: 917.398.7753



**Seattle**
1809 7th Avenue
Suite 1610
Seattle, WA 98101
T: 206.802.1272
F: 206.299.4184

## CPM'S EXPERIENCE IN ANTITRUST, PRIVACY & BUSINESS CASES

### Noteworthy Results for Consumers and Businesses

CPM represents plaintiffs in the following class actions in which it serves or served as **Lead or Co-lead counsel** securing noteworthy results for American consumers and businesses:

***In re In re Google Play Consumer Antitrust Litigation***
**United States District Court, Northern District of California**
CPM and Nanci E. Nishimura serves on the Steering Committee and represents consumers of Android apps and in-app purchases against Google for allegedly and unlawfully maintaining a monopoly in the Android application distribution market and in-app aftermarket. In September 2023 Consumer Plaintiffs and Google reached an agreement in principle to settle the case, after many months of mediation. The agreement in principle specifies that ***Google will pay approximately $700 million to reimburse consumers for their allegedly inflated app purchases***.

***Bank of America California Unemployment Benefits Litigation***
**United States District Court, Southern District of California**
CPM and Brian Danitz serves as Co-Lead Counsel in this multidistrict litigation asserting claims on behalf of over 100,000 California EDD debit cardholders deprived of access to their unemployment benefits by the bank's use of an automated "Claim Faud Filter." CPM successfully obtained a preliminary injunction with the court finding that "continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads." ***The MDL court recently granted class certification.***

***In re Apple Inc. Device Performance Litigation***
**United States District Court, Northern District of California**
CPM and Brian Danitz served as Co-Lead Counsel representing a nationwide class of Apple customers who alleged that Apple issued software updates that slowed down the performance of certain phones. After years of litigation, ***CPM negotiated a settlement fund of $310 to $500 million to class members, the largest all-cash recovery in a computer intrusion case in history.***

***In re Automotive Parts Antitrust Litigation***
**United States District Court, Eastern District of Michigan**
CPM serves as co-lead counsel for end-payor plaintiffs against a number of automotive parts suppliers for allegedly engaging in massive conspiracies to fix the prices, rig the bids, and allocate the markets of various automotive parts sold to automobile manufacturers, next sold to automobile dealerships, and then sold to consumers and businesses. ***To date, CPM and its co-lead counsel have recovered over $1.2 billion for the end-payor plaintiff classes.***

***In re Broiler Chicken Antitrust Litigation***
**United States District Court, Northern District of Illinois**
CPM serves as co-lead counsel for commercial and institutional indirect purchasers against broiler

chicken suppliers for allegedly engaging in a conspiracy to fix, raise, maintain, and stabilize the prices of broiler chickens by coordinating output and limiting production with the intended and expected result of increasing the prices of broiler chickens. ***To date, CPM and its co-lead counsel have recovered over $104 million for commercial and institutional purchaser plaintiff classes.***

***In re Capacitors Antitrust Litigation***
**United States District Court, Northern District of California**
CPM serves as lead counsel for indirect purchasers of electrolytic and film capacitors against capacitor suppliers for allegedly engaging in two massive and separate conspiracies to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of electrolytic and film capacitors, respectively. ***CPM recovered $80.4 million for the indirect purchaser plaintiff classes.***

***In re Cattle and Beef Antitrust Litigation***
**United States District Court, District of Minnesota**
CPM serves as co-lead counsel for direct purchaser plaintiffs against beef processing and packing defendants for allegedly engaging in a conspiracy to constrain beef supplies in the United States, thereby artificially inflating domestic beef prices. ***To date, CPM and its co-lead counsel have recovered $52.5 million for the direct purchaser class.***

***In re Domestic Airline Travel Antitrust Litigation***
**United States District Court, District of Columbia**
CPM serve as co-lead counsel for purchasers of air transportation against American Airlines, Inc., Delta Airlines, Inc., Southwest Airlines Co., and United Airlines, Inc. for allegedly engaging in a conspiracy to restrict capacity and thereby raise prices for air passenger transportation services. ***To date, CPM and its co-lead counsel have recovered $60 million for the class.***

***In re Farm-Raised Salmon and Salmon Products Litigation***
**United States District Court, Southern District of Florida**
CPM serves as a member of an informal Executive Committee and represents a class of indirect salmon buyers against Norwegian salmon-farming companies for allegedly coordinating price hikes of salmon and salmon products. ***Counsel for indirect purchaser plaintiffs recovered $33 million for the classes***.

***In re Freight Forwarders Antitrust Litigation***
**United States District Court, Eastern District of New York**
CPM served as co-lead counsel for purchasers of freight forwarding services from freight forwarders who allegedly engaged in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of freight forwarding services. ***CPM and its co-lead counsel recovered approximately $450 million for the class.***

***In re Geisinger Health and Evangelical Comm. Hosp. Healthcare Workers Antitrust Litig.***
**United States District Court, Middle District of Pennsylvania**
CPM serves as co-lead counsel for a class of healthcare workers against their employers, two health

systems, for allegedly entering a no-poach agreement to reduce competition for healthcare workers and for suppressing job mobility and wages below levels that would have prevailed but for the agreement. Defendants' motion to dismiss was denied in November 2021. After extensive class certification briefing and expert work, in ***March 2025, both Geisinger and Evangelical settled.***

***In re Lithium Batteries Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as co-lead counsel for indirect purchasers of lithium-ion batteries against lithium-ion battery suppliers for allegedly engaging in a conspiracy to fix the prices of these products. ***CPM and its co-lead counsel recovered $113 million for the classes.***

***In re Resistors Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as lead counsel for indirect purchasers of linear resistors against resistor suppliers for allegedly engaging in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of linear resistors. ***CPM recovered $33.4 million for the classes.***

***In re Telescopes Antitrust Litigation***
**United States District Court, Northern District of California**
CPM serves as co-lead counsel for classes of consumers and businesses against telescope manufacturers for allegedly engaging in massive conspiracies to fix the prices and allocate the markets of telescopes and telescope products. ***CPM and co-lead recovered $32 million for the class.***

***In re Transpacific Passenger Air Transportation Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as co-lead counsel for purchasers of air transportation against 13 Asian and Oceanic airlines for allegedly engaging in a conspiracy to fix the prices of discount fares and fuel surcharges on long-haul passenger flights for transpacific routes. ***CPM and its co-lead counsel recovered over $148 million for the classes***.

## Noteworthy Cases Not Yet Tried or Completely Settled

CPM also represents plaintiffs in the following class actions in which it serves as **Lead or Co-lead** counsel but where CPM has not yet tried or settled the actions:

***In re PayPal Honey Browser Extension Litigation***
**United States District Court, Northern District of California**
CPM and Nanci E. Nishimura serve as Co-Lead Counsel on behalf of a class of content creators against PayPal Holdings Inc. which owns a popular web browser extension called PayPal Honey, in a complaint alleging that defendants, through the Honey extension, unlawfully appropriates the commission that plaintiffs are supposed to generate when their audience members purchase specific products through a covert scheme of cookie-stuffing.

***Bank of America California Unemployment Benefits Litigation***
**United States District Court, Southern District of California**
CPM and Brian Danitz serves as Co-Lead Counsel in this multidistrict litigation asserting claims on behalf of over 100,000 California EDD debit cardholders deprived of access to their unemployment benefits by the bank's use of an automated "Claim Faud Filter." CPM successfully obtained a preliminary injunction with the court finding that "continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads." ***The MDL court recently granted class certification.***

***In re Blue Shield of California Privacy Litigation***
**United States District Court, Northern District of California**
CPM recently filed a class action complaint on behalf of insureds against California Physicians' Service d/b/a Blue Shield of California one of the largest health care providers and insurance companies, alleging that Blue Shield unlawfully disclosed Personally Identifiable Information (PII) and Protected Health Information (PHI) to third parties, including Google Analytics, enabling the unauthorized third parties to monetize that private information by delivering targeted ads.

***In re Deere & Company Repair Services Antitrust Litigation***
**United States District Court, Northern District of Illinois**
CPM serves as co-lead counsel for a class of persons and entities who purchased repair services for Deere agricultural equipment with onboard computers known as electronic control units for monopolizing and restraining the market for repair and maintenance services of such equipment.

***Mach, et al. v. Yardi Systems, Inc., et al.***
**Superior Court of the State of California, County of Alameda**
CPM serves as co-lead counsel on behalf of a class of plaintiffs in California against multifamily residential property owners, operators and managers that allegedly colluded and conspired to artificially inflate the rental prices of their units above competitive levels, and to reduce the occupancy of such units below competitive levels through their usage of a centralized pricing software algorithm called "RENTmaximizer," created by Yardi Systems, Inc.

***In re Passenger Vehicle Replacement Tires Antitrust Litigation***
**United States District Court, Northern District of Ohio**
CPM was named co-lead counsel for a class of end-payor plaintiffs who purchased replacement tires in which defendants allegedly engaged in a conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market in the United States for replacement tires.

## Lead Counsel, Executive Committee or Steering Committee Experience

CPM represents plaintiffs in the following class actions in which it serves as Lead Counsel or as a member of the Executive Committee or Steering Committee:

***In re Google Play Consumer Antitrust Litigation***
**United States District Court, Northern District of California**
CPM and Nanci E. Nishimura serves on the Steering Committee and represents consumers of Android apps and in-app purchases against Google for allegedly and unlawfully maintaining a monopoly in the Android application distribution market and in-app aftermarket. In September 2023 Consumer Plaintiffs and Google reached an agreement in principle to settle the case, after many months of mediation. The agreement in principle specifies that ***Google will pay approximately $700 million to reimburse consumers for their allegedly inflated app purchases***.

***In re PayPal Honey Browser Extension Litigation***
**United States District Court, Northern District of California**
CPM and Nanci E. Nishimura serve as Co-Lead Counsel on behalf of a class of content creators against PayPal Holdings Inc. which owns a popular web browser extension called PayPal Honey, in a complaint alleging that defendants, through the Honey extension, unlawfully appropriates the commission that plaintiffs are supposed to generate when their audience members purchase specific products through a covert scheme of cookie-stuffing.

***In re Apple Inc. Device Performance Litigation***
**United States District Court, Northern District of California**
CPM and Brian Danitz serve as Co-Lead Counsel representing a nationwide class of Apple customers who alleged that Apple issued software updates that slowed down the performance of certain phones. After years of litigation, ***CPM negotiated a settlement that provided a settlement fund of $310 to $500 million to class members, the largest all-cash recovery in a computer intrusion case in history.***

***In re Cathode Ray Tube (CRT) Antitrust Litigation***
**United States District Court, Northern District of California**
CPM serves on the Executive Committee representing direct purchasers against CRT manufacturers for allegedly conspiring to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize prices of CRTs. ***To date, counsel has recovered over $212 million for the class.***

***In re Crop Inputs Antitrust Litigation***
**United States District Court, Eastern District of Missouri**
CPM serves as a member of the Executive Committee and represents a class of consumers and businesses that purchased crop inputs against crop input suppliers that allegedly established a secretive distribution process that keeps crop inputs prices inflated at supra-competitive levels and, in furtherance of their conspiracy, denies farmers access to relevant market information.

***In re Copaxone Antitrust Litigation***
**United States District Court, District of New Jersey**
CPM serves on an informal Executive Committee for a class of third-party payors against Teva for willfully maintaining a monopoly for the prescription drug Copaxone using restrictive or exclusionary conduct.

***In re Generic Pharmaceuticals Pricing Antitrust Litigation***
**United States District Court, Eastern District of Pennsylvania**
CPM and Adam J. Zapala serve as a member of the Steering Committee and represent end-payor plaintiffs of generic drugs against dozens of generic drug manufacturers for alleged engaging in conspiracies to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of dozens of generic drugs.

***In re Granulated Sugar Antitrust Litigation***
**United States District Court, District of Minnesota**
CPM serves on the Plaintiffs' Steering Committee and represents direct purchaser plaintiffs against Defendants who allegedly conspired to artificially inflate the price of Refined Sugar in the United States and its territories.

***In re Oral Phenylephrine Marketing and Sales Practice Litigation***
**United States District Court, Eastern District of New York**
CPM serves on the Plaintiffs' Steering Committee and represents purchasers of over-the-counter, orally ingested phenylephrine-containing products to relieve nasal and sinus congestion sold by Defendants that allegedly do not relieve nasal and sinus congestion yet were continued to be marketed as effective decongestants.

***In re Parking Heaters Antitrust Litigation***
**United States District Court, Eastern District of New York**
CPM served as liaison counsel for indirect purchaser plaintiffs of air and coolant parking heaters in the aftermarket for commercial vehicles against parking heater manufacturers for allegedly engaging in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of parking heaters. ***Counsel for IPPs recovered $7.7 million for the class.***

***In re Visa Debt Card Antitrust Litigation***
**United States District Court, Southern District of New York**
CPM serves on the Plaintiffs' Executive Committee for the fee payor class. Visa has allegedly entrenched its monopoly by using a multi-faceted exclusionary strategy to stifle competition and innovation in the United States debit market, resulting in enormous financial harms to merchants.

## Representative Examples of Prior Leadership Experience

***In re Citric Acid Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as co-lead counsel in an antitrust class action against the five largest sellers of citric acid in the United States, Archer Daniels Midland Co., Hoffmann-La Roche Inc., Jungbunzlauer, Inc., Haarmann & Reimer Corp., and Cerestar Bioproducts B.V., for alleged conspiring to fix the prices of citric acid at artificially high levels. The court certified the class in October 1996. ***CPM and its co-lead counsel recovered approximately $86.5 million for the class.***

***In re Dynamic Random Access Memory (DRAM) Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as chair of the Discovery Committee and represented direct purchasers against DRAM manufacturers for allegedly engaging in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of ODDs. ***Counsel for direct purchaser plaintiffs recovered over $325 million for the class.***

***In re International Air Transportation Surcharge Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as co-lead counsel for purchasers of purchasers of air transportation against Virgin Atlantic Airways Ltd. and British Airways for allegedly engaging in a conspiracy to impose fuel surcharges on long-haul passenger flights for transatlantic routes. ***CPM and its co-lead counsel recovered over $204 million for the class.***

***In re Methionine Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as co-lead counsel in this antitrust class action against several methionine manufacturers for allegedly engaging in a conspiracy to fix the prices and allocate the markets of methionine. ***CPM recovered $107 million for the class***.

***In re Optical Disk Drive (ODD) Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as a member of the Executive Committee and represented direct purchasers against ODD manufacturers for allegedly engaging in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of ODDs. ***Counsel for direct purchaser plaintiffs recovered $74.75 million for the class.***

***In re Static Random Access Memory (SRAM) Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as lead counsel for direct purchasers of SRAM against SRAM manufacturers for allegedly engaging in a conspiracy to unlawfully inflate, fix, raise, maintain, and/or artificially stabilize the prices of SRAM chips. ***CPM recovered $77 million for the class.***

***In re Sodium Gluconate Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as lead counsel against manufacturers of sodium gluconate, an industrial cleaning agent for alleged price-fixing. The court certified the class. ***CPM recovered $4,801,600.***

***In re Webkinz Antitrust Litigation***
**United States District Court, Northern District of California**
CPM served as lead counsel for small business retailers who purchased Webkinz plush line toy from Ganz Inc. on the condition that they also order a minimum $1,000 of products from Ganz's "core line" of products. ***CPM recovered $2.5 million for the class.***

***Kopies, Inc., et al. v. Eastman Kodak Co.***
**United States District Court, Northern District of California**
CPM served as co-lead counsel for copier service firms against manufacturers of parts for alleged illegal tying of products and services. ***CPM and its co-lead counsel recovered $45 million for the plaintiffs.***

***Natural Gas Antitrust Cases I, II, III, & IV***
**Superior Court of California, San Diego Superior Court**
CPM represented 11 public entities and others for the alleged reporting of false information by non-core natural gas retailers to publish price indices to manipulate the natural gas market during the California energy crisis. ***CPM successfully prosecuted and recovered $124 million in settlements***.

## CPM ATTORNEYS IN LEADERSHIP

### NANCI E. NISHIMURA



**Education**

- Columbus School of Law at The Catholic University in Washington, D.C.
- University of Southern California, B.A., School of International Relations, M.A.
- Waseda University, Tokyo, Japan

**Admissions**

- California

**Nanci E. Nishimura** is a partner at CPM and leads the firm's complex individual actions focusing on antitrust and business litigation. Nishimura attended the University of Southern California, where she earned both undergraduate and graduate degrees, Waseda University in Japan, and the Columbus School of Law at The Catholic University in Washington, D.C. Nishimura worked at the U.S. Overseas Private Investment Corporation and clerked at the U.S. International Trade Commission in D.C. She joined CPM from Los Angeles, after working as co-counsel in antitrust and securities class actions. Nishimura has represented plaintiffs in some of the largest and most complex individual actions coordinated in State and Federal Courts across the country.

Ms. Nishimura has served a co-lead counsel, or other court-appointed leadership positions, including as Co-Lead Counsel in *In Re PayPal Honey Browser Extension Litigation*, on the Plaintiffs' Executive Committee in *In Re Google RTB Consumer Privacy Litigation*, and the Plaintiffs' Executive Committee in *In re Google Play Antitrust Litigation*. Nishimura has led complex cases alleging antitrust and other claims on behalf of dozens of cities, counties, and other public entities and non-profit organizations in California, New York and Texas, including the City of Los Angeles, Los Angeles World Airports, The Regents of the University of California, California State University Board of Trustees, East Bay Municipal Utilities District, Sacramento Suburban Water District, City and County of San Francisco, County of San Diego, County of San Mateo, and Houston, Texas. As detailed on CPM's website at www.cpmlegal.com, and as summarized below, Nishimura and CPM have demonstrated a knowledge of the law, the skill and ability to work with others, and the resources and commitment to pursue justice for her clients. Below are representative cases:

***In re PayPal Honey Browser Extension Litigation,*** Case No. 5:24-cv-9470-BLF (N.D. Cal). Ms. Nishimura served as Co-Lead Counsel on behalf of a class of content creators against PayPal Holdings Inc. which owns a popular web browser extension called PayPal Honey, in a complaint alleging that defendants, through the Honey extension, unlawfully appropriates the commission that plaintiffs are supposed to generate when their audience members purchase specific products through a covert scheme of cookie-stuffing.

***Google RTB Consumer Privacy Litigation,*** Case No. 4:21-cv-02155-YGR (N.D. Cal). Ms. Nishimura serves as an Executive Committee member and represents consumers against Google who allegedly sold and shared consumers' personal information through the Google Real-Time Bidding ("RTB") system. Plaintiffs reached a groundbreaking settlement with Google that provides sweeping, never-before-available relief for the hundreds of millions of active individual U.S. Google account holders who make up the settlement class

***In re Google Play Consumer Antitrust Litigation,*** Case No. 3:20-cv-05761-JD (N.D. Cal). Ms. Nishimura served on the Steering Committee and represented consumers of Android apps and in-app purchases against Google for allegedly and unlawfully maintaining a monopoly in the Android application distribution market and in-app aftermarket. In September 2023 Consumer Plaintiffs and Google reached an agreement in principle to settle the case, after many months of mediation. The agreement in principle specifies that Google will pay approximately $700 million to reimburse consumers for their allegedly inflated app purchases.

***In re: LIBOR-based Financial Instruments Antitrust Litigation***, Case No. 11-md-2262-NRB (MDL 2262) (S.D.N.Y.). Ms. Nishimura was the lead attorney in actions filed on behalf of 15 public entities and consolidated for pretrial purposes in multidistrict litigation. Plaintiffs include The Regents of the University of California, East Bay Municipal Utility District, County of Sacramento, County of San Mateo, and Houston, Texas. The complaints alleged that more than a dozen of the world's major financial institutions reported manipulated daily interbank borrowing rates to the British Bankers Association (BBA) known as the London Interbank Offered Rate (LIBOR), to benefit their profits and credit ratings to the detriment of transactions worldwide with interest rates set to LIBOR from consumer loans to complex municipal investment instruments.

***Ambac Bond Insurance Litigation***, San Francisco County Superior Court Case No. CJC-08-004555 (JCCP 4555) (CEK). Ms. Nishimura was the lead attorney in individual actions filed on behalf of 26 California public entities, including The Regents of the University of California, City of Los Angeles, Los Angeles World Airports, City and County of San Francisco, East Bay Municipal Utility District, and non-profits, including the Jewish Community Center of San Francisco. The complaints alleged antitrust violations by seven defendant bond insurance companies for maintaining an unfair dual credit rating system with three defendant credit rating agencies requiring municipalities to pay exorbitant premiums to insure bonds issued to raise money for public projects. The case settled for more than $18 million.

***In re: Municipal Derivatives Antitrust Litigation***, Case No. 1:08-cv-02516-VM-GWG (MDL 1950) (S.D.N.Y). Ms. Nishimura was the lead attorney in individual actions filed on behalf of 20 California public

entities and consolidated for pretrial purposes in multidistrict litigation. Plaintiffs include City of Los Angeles, East Bay Municipal Utility District, Sacramento Municipal Utility District, County of San Diego, County of San Mateo, and Contra Costa County. The complaints allege antitrust violations by more than three dozen financial institutions, insurance companies, and brokers to rig the bidding process for municipal derivative transactions used by public entities to invest unused bond proceeds. Plaintiffs recovered more than $10 million.

***People of the State of California v. Atlantic Richfield, et al.***, No. 1-00-CV-788657 (Santa Clara County Superior Court), CPM represented the state of California along with 10 cities and counties in a public nuisance action. After more than a decade of litigation, the case went to trial and resulted in a judgment of $1.15 billion in 2013.

## JOSEPH W. COTCHETT



**Education**

- UC Law San Francisco (Formerly UC Hastings), J.D.
- California State Polytechnic University, B.S. in Engineering
- Named an Outstanding Graduate

**Admissions**

- California
- District of Columbia
- New York

As stated by the National Law Journal, **Joseph W. Cotchett** is considered by plaintiffs and defense attorneys alike to be one of the foremost trial lawyers in the country. He has been named one of the 100 most influential lawyers in the nation for the past 20 years. In recent years, he has been in the Top 3 for best attorneys in Northern California. Since 2017, he has been named by Super Lawyers to be the #1 lawyer in Northern California, as ranked by his peers. The *Daily Journal* has named him to be one of the Top 100 in California since its inception. In 2019 he was named Consumer Attorney of the Year for his 20-year fight against lead paint manufacturers for poisoning California's most vulnerable children and communities. The California Labor Federation honored Cotchett with its "Top Slugger for Workers" award in 2019, recognizing his decades of fighting for the underdog. In 2020, Cotchett was named one of the Top 100 in California and Top 25 Plaintiff Lawyers.

As reported in the San Francisco / Los Angeles Daily Journal, he is "considered one of the best trial strategists in the state" who built a career out of representing the underdog against powerful interests. The San Francisco Chronicle rated him as one of the best in California, saying, "The Burlingame attorney has had a star career that is not only talked about in legal circles but has made headlines around the country. Known mostly as a plaintiffs' lawyer, many of his cases are filed on behalf of fraud victims, and have a widows-and-orphan flavor to them."

During his 50-plus year legal career, he has tried more than 100 cases to verdict, and settled hundreds more, winning numerous jury verdicts, ranging from multi-million dollar fraud, antitrust and securities jury verdicts to several defense verdicts in complex civil cases. He successfully negotiated multi-million-dollar settlements in qui tam lawsuits and in antitrust, securities, major fraud cases, and mass torts.

In the 1980s, Cotchett won mammoth judgments and settlements for investors in white-collar fraud cases, with jury verdicts of more than $200 million arising out of the collapse of the Technical Equities Corp. in San Jose. He is known nationally as the lead trial lawyer for 23,000 plaintiffs in the Lincoln Savings & Loan Association/American Continental Corp. case in 1990 involving Charles Keating, his lawyers, accountants and bankers in Tucson, Arizona. He won one of the then largest jury verdicts in US history, $3.3 billion. He obtained nearly $400 million in settlements from lawyers, accountants and other professionals caught up in the scandal.

He has represented both the National Football League and its teams since the early 1980s in various legal actions. As counsel for E. & J. Gallo Winery, he won a celebrated defense jury verdict in a trade dress infringement case involving wine labels and bottles produced by Gallo.

In recent years, Cotchett has taken on major corporate entities and Wall Street for financial fraud. He and the firm are involved in litigation resulting from nearly every major corporate scandal including Enron, WorldCom, Global Crossing, Homestore.com, Qwest, Montana Power Company, Lehman, Bank of America, Goldman Sachs and numerous others on behalf of private investors and public pensions. The firm has represented the California Public Employees' Retirement System, California State Teachers' Retirement System, and the University of California Board of Regents, along with numerous political subdivisions of the state, such as counties, cities and districts.

In 2000, he served as trial counsel for Consumers Union, successfully defending the watchdog consumer group in a product disparagement and defamation suit in Federal Court in Los Angeles. Isuzu Motors of Japan had sued Consumers Union for disparagement to the 1995-96 Trooper, claiming millions in damages. Following an eight-week trial, a jury ruled in favor of Consumers Union. Trial Lawyers for Public Justice honored Cotchett as "Trial Lawyer of the Year" in 2000 in honor of his "outstanding contribution to the public interest" through his work for Consumers Union. Also, in 2000, Consumer Attorneys of California gave Cotchett its "Presidential Award of Merit." In 2004, he was the lead trial counsel in a product defamation case against Consumers Union. The jury ruled for Consumer Union in what was considered a major victory for a free press and the First Amendment.

Cotchett is involved in extensive pro bono work. In one such case, he brought a lawsuit against the United States Navy on behalf of 8,600 Amerasian children in the Philippines who were left in villages after the closing of the Subic Bay Naval Base. The case ended in a settlement giving direct U.S. aid to the children fathered by U.S. servicemen and a television documentary on the subject. He regularly takes on pro bono causes including environmental and public policy matters and the firm represents and advises several Native American groups.

Cotchett received his B.S. in Engineering from California State Polytechnic University, San Luis Obispo in June 1960, being named an Outstanding Graduate, and his J.D. from Hastings College of Law at the University of California in June 1964. In June 2002, Cotchett received an **Honorary Doctor of Laws** from Cal Poly and The California State University Board of Trustees. In May 2006, Cotchett received an **Honorary Doctor of Letters** from Notre Dame de Namur University. In May 2011, Cotchett received an **Honorary Doctor of Letters** from the University of San Francisco. In each case, he was the graduation speaker honored by the Universities.

Following college, he served as an officer in the U.S. Army Intelligence Corps, followed by years as a Special Forces paratrooper and JAG Corps officer, in the active reserves. Before transferring to the JAG, he made 12 airborne operations. He retired in 1991 with the rank of Colonel with various citations including the distinguished **Legion of Merit**. He is a member of many veteran and airborne associations having served on active duty 1960-1961. From 2001 to 2005, he served on the board of the Army War College Foundation in Carlisle, Pennsylvania which supports the prestigious Army War College at Carlisle Barracks, the graduate school for the senior commanders of all branches of the service, including officers from foreign allies.

In 2003, Cotchett was honored by **Disability Rights Advocates** for his nearly 40 years of civil rights work. At a San Francisco dinner attended by lawyers, judges and community leaders, Cotchett was described as follows:

***Joe Cotchett has been a champion for justice since his college days. As an engineering student in North Carolina, Joe challenged segregation by drinking from segregated water fountains and riding in the back of buses. Later, as a student at Cal Poly, in 1958 Joe successfully established the first integrated fraternity, which prompted the other fraternities on campus to follow suit.***

***Joe's legal career has involved representing the underdog and doing extensive pro bono work. His civil rights commitment has been leveraged over and over by his financial support of legal fellowships. He has given a 'kick-start' to the public interest careers of the new law graduates at Trial Lawyers for Public Justice, Public Citizen, Southern Poverty Law Center and Disability Rights Advocates. Through these fellowships, Joe has helped to ensure social change through law. Joe guided DRA as a board and litigation committee member from its infancy years into the defender of disability rights it has become today.***

**BRIAN DANITZ**



**Brian Danitz** is a partner at CPM with two decades of experience representing clients in state and federal complex litigation and consumer class actions. Mr. Danitz currently serves as co-lead counsel in *Landsheft v. Apple Inc*., 5:25-cv-02668-NW (N.D. Cal.), a putative class action based on Apple's representations concerning the AI capabilities of "Apple Intelligence" on the iPhone 16, and in *In re Bank of America California Unemployment Benefits Litigation*, No. 3:21-md-02992-GPC (S.D. Cal.), a multidistrict litigation asserting claims on behalf of over 100,000 California EDD debit cardholders deprived of access to their UI benefits, in which plaintiffs successfully obtained a preliminary injunction against the bank and the MDL court recently granted class certification

Mr. Danitz and CPM are adept at handling complex consumer class actions involving advanced technologies. For example, Mr. Danitz currently represents a nationwide putative class of Google account holders alleging that, every second of every day, Google shares and sells users' personal information, without informed consent, to participants in its real-time bidding auctions for targeted advertising. *In re Google RTB Consumer Privacy Litigation*, No. 5:21-cv-02155-YGR (N.D. Cal.). The parties recently filed a Notice of Proposed Settlement in that case. CPM's Nanci Nishimura is a member of the five-firm executive committee, which will impact the privacy interests of over one hundred million consumers across the nation. Mr. Danitz was also part of the leadership team, together with co-lead counsel, who represented a national class of consumers in *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.), securing a settlement that provided for a non-reversionary minimum class settlement amount of $310 million, with a maximum class settlement amount of $500 million. The claims at issue in that nationwide class action against Apple Inc. included violation of California and federal computer intrusion statutes, and involved extensive technical issues raised in the pleading, discovery, and damages phases of the case.

Mr. Danitz's other cases include shareholder derivative suits (*e.g.*, *Tribble v. Gerrans*, No. CIV1803695 (Marin Sup. Ct.)) and suits brought on behalf of the victims of Ponzi schemes (*Koo v. Happe*, No. 19CIV00270925 (Sacramento Sup. Ct.); *JD Brothers LLC, et al. v. Kirk, et al*., 3:15-cv-01373-VC (N.D. Cal.)). His pro-bono activities range from prosecuting cases on behalf elder abuse victims (*Hatch v. Kantz*, No. 18CIV537546 (San Mateo Sup. Ct.)) to representing municipalities in cases challenging the constitutionality of government actions (*City of San Jose v. Trump*, No. 17-cv-05329-WHA (N.D. Cal.); *City of Richmond v. Trump*, No. 17-cv-01535-WHO (N.D. Cal.)). Prior to joining CPM, Mr. Danitz litigated numerous class action and derivative cases as an attorney at Wilson Sonsini Goodrich & Rosati in Palo Alto. Mr. Danitz is active in the legal community and has served on the California State Bar Judicial Nominees Evaluation Commission, the Audit Committee of the San Mateo County Bar Association, and volunteered in local bar activities such as mock trial competition for high school students.

Prior to becoming a lawyer, Mr. Danitz was a documentary filmmaker and producer of new media. He was the cinematographer for the Oscar-winning documentary *Bowling for Columbine*, Oscar-nominated film *Sound and Fury*, and Emmy Award winner TV Nation, and directed *Ecological Design: Inventing the*

*Future, Objects and Memory*, and *N is for Nuclear*, among other films. Mr. Danitz received his J.D. from Fordham University School of Law, cum laude, where he was the Symposium Editor of the Fordham Intellectual Property, Media and Entertainment Law Journal. Mr. Danitz received B.F.A. and M.P.S. degrees from New York University.

## KARIN B. SWOPE



**Education**

- Columbia Law School, J.D., Harlan Fiske Stone Scholar
- Amherst College, B.A., *magna cum laude*, Phi Beta Kappa

**Admissions**

- Washington

**Karin Swope** is a Partner with Cotchett, Pitre & McCarthy, LLP's where she represents clients in antitrust and consumer protection litigation, securities litigation, privacy litigation and intellectual property counseling. Karin has represented clients for over 30 years in proceedings in state and federal courts across the country, as well as before the USPTO. She helped consumers fight against unfair and deceptive practices, and has helped to change consumer protection law in the process. She has been appointed as co-lead counsel and to steering committees in antitrust and consumer cases.

Ms. Swope has extensive experience litigating highly complex antitrust, consumer fraud and other class actions before federal district courts across the country. She has litigated against big tech companies, including serving as lead counsel or on the executive committees in the *Apple Device Performance Litigation* No. 18-MD-2827 (N.D. Cal.), *Google RTB Consumer Privacy Litigation* No. 21-CV-02155 (N.D. Cal.) and *In re Zoom Video Communications, Inc. Privacy Litigation* No. 20-cv-02155 (N.D. Cal). She has prosecuted highly complex actions in *Google Play Consumer Antitrust Litigation*, No. 20-cv-05761, (N.D. Cal.); *In re Bank of America Unemployment Benefits Litigation* No. 21-md-2992 (S.D. Cal.), and *Yardi Rental Antitrust Litigation,* No. 24-CV-063117 (CA Sup. Ct. Alameda Cnty).

She has represented companies and sovereign nations in protecting their intellectual property rights. She has protected the retirement funds of employees whose employers had breached their fiduciary duties in violation of ERISA, in cases against Washington Mutual, State Street Bank and Regions Financial Corporation, among others. She has also represented unemployment insurance benefit recipients in the MDL Bank of America Unemployment Benefits Litigation. She has represented shareholders in complex securities litigation, including disputes involving breach of fiduciary duty. Representative cases include *In re Slack Securities Litigation* and *John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust v. Williams et al.*

Since 2008, Karin has served as an Adjunct Professor at Seattle University School of law, where she taught the Intellectual Property Art Law Clinic. She has previously served as President of Executive Committee of the Intellectual Property Section of the Washington State Bar Association and is a member of the Western Washington Federal Bar Association Local Rules Committee. She has presented and/or co-chaired numerous CLE's on topics ranging from E-Discovery practices to Intellectual Property. Following her graduation from Columbia Law School, Karin served as a law clerk to the Honorable John C. Coughenour in the U.S. District Court for the Western District of Washington, and as a law clerk to the Honorable Robert E. Cowen of the U.S. Court of Appeals, Third Circuit.

# EXHIBIT B

# Exhibit B

## Firm Name: Cotchett, Pitre & McCarthy, LLP

Time through 7/31/2025

| Professional Name (Status) | Hourly Rate | Categories 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joseph Cotchett (P) | $950 | 19.60 | 4.20 | 50.60 | | 117.20 | 63.10 | | | 55.40 | 31.40 | 27.70 | 8.80 | | | | | 22.40 | 14.80 | 61.00 | | | | 476.20 | $452,390.00 |
| Brian Danitz (P) | $850 | 6.70 | 24.40 | 91.30 | 3.80 | 199.80 | 110.40 | 67.10 | 7.20 | 140.70 | 280.20 | | 255.10 | | 1.00 | 41.10 | 198.80 | 347.20 | 134.90 | 8.50 | | | 5.70 | 1923.90 | $1,635,315.00 |
| Karin B. Swope (P) | $775 | 17.50 | 6.50 | 81.70 | 5.90 | 146.40 | 27.90 | 29.20 | 9.30 | 30.90 | 208.90 | 11.50 | 234.90 | | 16.10 | 30.20 | 6.00 | 126.80 | 53.30 | 6.40 | 14.20 | | 2.70 | 1066.30 | $826,382.50 |
| Nanci Nishimura (P) | $850 | 25.80 | 4.30 | 44.90 | 49.90 | 316.50 | 98.70 | 36.50 | 13.30 | 45.10 | 48.50 | 2.50 | 7.30 | | | 1.50 | 26.00 | 13.50 | 19.10 | 7.20 | | | | 760.60 | $646,510.00 |
| Andrew Kirtley (P) | $675 | 2.40 | | | 0.10 | 59.20 | 0.30 | | 5.80 | 44.90 | 35.90 | 0.90 | 0.50 | | 96.90 | 66.30 | 5.20 | 3.00 | 29.60 | 2.00 | | | | 353.00 | $238,275.00 |
| Andrew Kirtley (P) - Tier I Doc Rev. | $325 | | | | | | | | | | | | | 6.60 | | | | | | | | | | 6.60 | $2,145.00 |
| Ellen J. Wen (A) | $425 | | | | | 0.50 | | 29.60 | | | 73.50 | 21.90 | | | | | | | | 14.00 | 61.30 | | | 200.80 | $85,340.00 |
| Jeffrey G. Mudd (A) | $600 | | | | | 73.80 | 47.60 | | 9.00 | 115.90 | 129.00 | | | | 30.20 | 6.20 | | 38.40 | 0.20 | 19.70 | | | | 470.00 | $282,000.00 |
| Jeffrey G. Mudd (A) - Tier I Doc Rev. | $325 | | | | | | | | | | | | | 1.30 | | | | | | | | | | 1.30 | $422.50 |
| Michael A. Costa (A) | $325 | | | | | | | | | | | | | | | | 0.90 | | | | | | | 0.90 | $292.50 |
| Michael A. Costa (A) - Tier I Doc Rev. | $325 | | | | | | | | | | | | | 1809.20 | | | | | | | | | | 1809.20 | $587,990.00 |
| Noorjahan Rahman (A) | $600 | | | 3.10 | | 3.20 | | | | 51.90 | | | 4.00 | | | 12.20 | | | | 11.90 | | | | 86.30 | $51,780.00 |
| Kaiyi A. Xie (A) | $600 | | | 4.90 | | 8.10 | | | | 62.00 | | | 10.40 | | | | | | 0.40 | | | | | 85.80 | $51,480.00 |
| Taylor L. Tang (A) | $425 | 7.40 | | | | | | | | | | | | | | | | | | | | | | 7.40 | $3,145.00 |
| Taylor L. Tang (A) - Tier I Doc Review | $325 | | | | | | | | | | | | | 484.70 | | | | | | | | | | 484.70 | $157,527.50 |
| Galen K. Cheney (A) | $425 | | | | | | | | | | 13.00 | 6.20 | | | | | 0.50 | 1.80 | 23.10 | | | | | 44.60 | $18,955.00 |
| Peter Luc (PL) | $300 | 11.50 | | 21.00 | 3.50 | 1.50 | 5.30 | | 1.00 | 38.50 | 43.50 | 2.00 | 41.00 | | | 31.50 | 33.00 | 19.00 | 25.00 | | | | | 277.30 | $83,190.00 |
| Zyres Agudelo (PL) | $300 | | | 45.10 | | | | | | | | | | | | | | | | | | | | 45.10 | $13,530.00 |
| Makenalani K. Cash (LC) | $200 | | | | | | | | | | 7.70 | 28.80 | | | | | | | | | 10.20 | | | 46.70 | $9,340.00 |
| **Total:** | | **90.90** | **39.40** | **342.60** | **63.20** | **926.20** | **353.30** | **162.40** | **45.60** | **585.30** | **871.60** | **101.50** | **562.00** | **2301.80** | **144.20** | **189.00** | **270.40** | **572.10** | **300.40** | **130.70** | **85.70** | **0.00** | **8.40** | **8146.70** | **$5,146,010.00** |

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

5.9
1.5

# EXHIBIT C

# Exhibit C

Cotchett Pitre & McCarthy – Annual Hours and Lodestar

| Year | Sum of Time | Sum of Lodestar |
|---:|---:|---:|
| 2021 | 1,391.80 | $1,049,587.50 |
| 2022 | 3,297.10 | $1,914,452.50 |
| 2023 | 2,481.40 | $1,505,760.00 |
| 2024 | 678.00 | $453,935.00 |
| 2025 | 298.40 | $222,275.00 |
| Grand Total | 8,146.70 | $5,146,010.00 |

# EXHIBIT D

# Exhibit D

## Cotchett Pitre & McCarthy LLP – Expenses

| **Description** | **Cumulative Total** |
|---|---|
| Court Fees (filing, etc.) | $317.00 |
| Court Reporters/Transcripts | $0.00 |
| Computer Research | $2,767.50 |
| Reproduction/Duplication/Copies | $5,974.65 |
| Notice Costs | $0.00 |
| Express Delivery/Messenger | $199.50 |
| Pre-approved Professional Fees/Services (expert, investigator, accountant, etc.) (**fees paid to expert R. Zeithammer**) | $140,800.00 |
| Service of Process | $437.75 |
| Telephone/Fax/Postage | $180.66 |
| Travel: | |
| ** Airline (Professional/Destination/Purpose) | $4,236.39 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $4,615.41 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | $33.70 |
| ** Meals (Professional/Purpose) | $8,575.79 |
| ** Lodging (Professional/Destination/Purpose) | $2,783.46 |
| ** Other (Describe/Professional/Destination/Purpose) | |
| Miscellaneous: (Describe): Working Meals | $471.16 |
| | ($320,000.00) [1] |
| **TOTAL EXPENSES** | **$171,392.97** |

[1] Contributions paid by Cotchett Pitre & McCarthy LLP to the plaintiffs' common litigation fund are accounted for separately, so are excluded from this individual law firm cost summary.

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*,<br><br>This Document relates to: *all actions*. | **CASE NO. 4:21-cv-02155-YGR**<br><br>**DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES** |

I, Francis A. Bottini, Jr., declare:

1. I am a partner at Bottini & Bottini, Inc. ("B&B"). I have been licensed to practice law in the state of California since January 19, 1995. I am admitted to practice in this District. The following facts are within my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I submit this declaration in support of Plaintiffs' Motion for an Award of Attorneys' Fees, Costs and Expenses.

3. On May 18, 2021, my firm filed a proposed class action lawsuit on behalf of our client Salvatore Toronto against Google LLC in the United States District Court for the Northern District of California, assigned Case No. 5:21-cv-3725-LHK. Our client's action was related to and consolidated into the instant action, *In Re Google RTB Consumer Privacy Litig*., Case No. 4:21-cv-02155-YGR-VKD (this "Action"), on June 24, 2021. *See* ECF No. 69.

4. I am the principal attorney at B&B for this litigation. I have practiced civil litigation on behalf of consumers and individuals since 1995. The firm generally employs five attorneys practicing in the areas of consumer class actions, unfair competition law, shareholder litigation, and privacy class actions. I oversee the complex litigation team, specifically related to consumer protection, privacy class actions, shareholder derivative matters, and securities class actions. Attached hereto as **Exhibit A** is a copy of Bottini & Bottini, Inc.'s firm resume.

5. B&B's attorneys have a long history of successfully handling class actions across a range of specialized practice areas, including privacy class actions. The firm's attorneys bring substantial experience in complex civil litigation and class action matters, with a history of litigating in an efficient and professional manner. *See* **Exhibit A** at pp. 17-20.

6. I have an extensive background in privacy and consumer protection class action litigation. I have litigated dozens of complex litigation or class action cases across the country involving privacy, unfair competition, consumer protection, and other claims, including the following matters in which my firm has served in a leadership position:

- *In re PowerSchool Holdings, Inc. and PowerSchool Group, LLC Data Security Breach Litigation*, Case No. 25-md-3149 BEN (MSB) (S.D. Cal.) (Plaintiffs' Steering Committee);
- *In re Zoom Video Communications, Inc. Privacy Litigation*, Case No. 20-cv-2155 LHK (N.D. Cal.) (Plaintiffs' Steering Committee); and
- *In re TikTok, Inc. Consumer Privacy Litigation*, MDL No. 2948, Master Docket No. 20 C 4699 (N.D. Ill.) (Plaintiffs' Steering Committee).

7. On August 3, 2021, the Court appointed myself and Bottini & Bottini to serve on the Interim Plaintiffs Executive Committee in this Action. *See* ECF No. 77.

8. I and my firm have been actively involved in the litigation of this Action under the direction of Interim Class Counsel. We have been assigned and worked on many tasks, including factual investigation and legal research, preparation of pleadings, court appearances, document review in preparation for depositions, appearances at depositions, participation in mediation/settlement negotiations, involvement in case strategy/management, and assisting with the preparation and filing of the motion for final approval of the Settlement.

9. The Court's order appointing Interim Lead Counsel and an Interim Plaintiffs Executive Committee (ECF No. 77) included directives for periodic reporting of professional time, costs and expenses incurred in this Action by plaintiffs' counsel and their law firms. Interim Lead Counsel implemented that order by establishing a comprehensive time and expense protocol for submitting time and expense reports to Lead Counsel for her review and audit. At Bottini & Bottini, I was primarily responsible for compliance with all time and expense reporting requirements in this Action, for reviewing B&B Firm's time and expense reports with such requirements in mind, and for communicating with Interim Lead Counsel regarding any time and expense audits performed by Interim Lead Counsel pursuant to the Court's appointment order and its time and expense reporting directives. *See* ECF No. 77.

10. Attached as **Exhibit B** is a chart listing B&B attorneys and paralegals that have worked on the Action, the hours each has spent working on specific categories of work from inception through July 31, 2025, and the 2024 hourly rate (or applicable rate cap) for each listed professional.

The chart set forth in **Exhibit B** reflects audits undertaken by Interim Lead Counsel and the B&B Firm, both for the exercise of billing judgment and to ensure efficiencies.

11. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours B&B attorneys and staff spent working on the Action, subtotaled by year, for each year from May 2021 through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

12. **Exhibit B** and **Exhibit C** were prepared from contemporaneous, daily time records regularly prepared and maintained by B&B in the ordinary course of business. B&B maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations are based on B&B's 2024 billing rates. These records are available for review at the request of the Court.

13. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my firm's representation of Plaintiffs and the Class, in coordination with Interim Lead Class Counsel, who approved the tasks and the hours spent on each task.

14. I am familiar with the range of hourly rates typically charged by plaintiffs' class action counsel, and specifically in the field of unfair competition and privacy law, in the geographical area where my firm practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by my firm are commensurate with those prevailing in the market in 2024 for legal services furnished in complex class action litigation such as this. My firm's hourly rates were most recently approved by the following Courts:

- *Wilhoite v. Hou*, Case No. 23cv2333 BEN (MSB) (S.D. Cal.) (July 23, 2025); and
- *Boston Retirement System v. Uber Technologies, Inc.,* Case No. 3:19-cv-06361-RS (N.D. Cal.) (Dec. 4, 2024).

15. As with all of our contingent cases, Bottini & Bottini carefully invested its time and resources in leading the prosecution of this case, and did so with the expectation that the firm would be reasonably compensated for the risks it undertook and professional time and resources it put in to the case. Bottini & Bottini's hourly rates do not already reflect the contingent risks of this case since

the firm's current rates are the same rates we charge to clients paying on an hourly basis. The firm took the case with the expectation of an enhanced fee award reflecting the significant risks of the case in the event that plaintiffs prevailed.

16. My firm has incurred expenses of $32,065.36 so far in litigating the Action. This amount does not include contributions made to the common litigation fund. Attached as **Exhibit D** is a chart detailing these, by category of expense. All listed expenses are at cost, *i.e.*, without any upcharge or associated overhead.

17. Throughout the litigation, my firm and I worked under the direction of Interim Lead Class Counsel, and I made every effort to operate as efficiently as possible and to avoid unnecessary duplication. I coordinated with Class Counsel for all work performed and costs incurred in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 23, 2025, at La Jolla, California.

Dated: September 23, 2025 By: *[/s/ Francis A. Bottini, Jr.]*

FRANCIS A. BOTTINI, JR.

# EXHIBIT A

BOTTINI & BOTTINI, INC.

**FIRM RESUME**

Bottini & Bottini, Inc. specializes in representing shareholders, consumers, businesses, and whistleblowers in high-stakes cases across the United States. The firm concentrates its practice in complex civil litigation, including the areas of securities class actions, shareholder derivative litigation, consumer privacy class action lawsuits, antitrust class action litigation, shareholder mergers and acquisitions litigation, *qui tam* litigation on behalf of whistleblowers under the False Claims Act, and class actions under the Employee Retirement Income Security Act of 1974 ("ERISA").

The attorneys at Bottini & Bottini, Inc. have been appointed lead counsel, co-lead counsel, or played a significant role in hundreds of high-profile cases in state and federal courts across the country. The firm's representative matters and the biographies of the firm's professionals are set forth below.

**Representative Matters**

- ***Pampena v. Elon Musk***, Case No. 22-cv-05937-CRB (United States District Court for the Northern District of California). By order dated April 24, 2023, the Hon. Charles Breyer appointed Bottini & Bottini, Inc. and Cotchett Pitre & McCarthy LLP to serve as Co-Lead Counsel for the Class. *See Pampena v. Musk*, 2023 U.S. Dist. LEXIS 71169 (N.D. Cal. Apr. 24, 2023). The case, which is a "seller class action," asserts securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 against Defendant Elon Musk on behalf of all persons who sold Twitter stock between May 13, 2022 and October 4, 2022, inclusive. Plaintiffs allege that Musk made false statements to the public designed to drive Twitter's stock down so that Musk could attempt to renegotiate the merger price for his buyout of Twitter. Plaintiffs filed an amended complaint on June 8, 2023. By order dated December 11, 2023, Judge Breyer upheld all Plaintiffs' claims and denied Musk's motion to dismiss. *See Pampena v. Musk*, 2023 U.S. Dist. LEXIS 220240 (N.D. Cal. Dec. 11, 2023). The Court later denied Defendant Elon Musk's motion for judgment on the pleadings by order dated August 5, 2024. *See Pampena v. Musk*, 2024 U.S. Dist. LEXIS 138528 (N.D. Cal. Aug. 5, 2024). The case is currently in the discovery phase. By order dated September 27, 2024, the Court granted Plaintiffs' Motion for Class Certification. *See Pampena v. Musk*, 2024 U.S. Dist. LEXIS 175950 (N.D. Cal. Sept. 27, 2024).

- ***In re Tik Tok, Inc. Consumer Privacy Litigation***, MDL No. 2948 (N.D. Ill.) – In 2020, Bottini & Bottini was appointed to Plaintiffs' Steering Committee by the Hon. John Z. Lee in this consumer privacy class action. Plaintiffs filed a Consolidated Amended Complaint on December 18, 2020. The complaint alleges that Defendants, through the TikTok app, collected, captured, obtained, stored and disclosed Illinois resident TikTok users' biometric information in violation of the Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS §14/1, et seq. In 2022, a settlement of **$92 million** was approved by the Court.

- ***In re Zoom Video Commc'ns, Inc. Privacy Litig.***, Master File No. 20-CV-02155 (N.D. Cal.) (Koh, J.) -- Bottini & Bottini was appointed as a member of Plaintiffs' Steering Committee by Order dated June 30, 2020. By Order dated March 11, 2021, Judge Koh denied in substantial part Defendants' motion to dismiss. By Order dated April 5, 2021, Judge Koh denied Zoom's motion to stay discovery. The case was settled in 2021 for **$85 million**. By Order dated April 21, 2022, Judge Koh granted final approval to the settlement.

- ***Dinko Mihaylov v. Tattooed Chef, Inc., et al.*** (In re Tattoeed Chef Inc. Sec. Litig.), Case No. CV 22-9311-GW-Ex (C.D. Cal.). By order dated March 24, 2023, the Hon. George Lu appointed Bottini & Bottini sole Lead Counsel over the competing applications of two other law firms in this securities class action brought under the Private Securities Litigation Reform Act of 1995 and asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against the Company's officers and directors and accounting firm. *See Mihaylov v. Tattooed Chef, Inc*., 2023 U.S. Dist. LEXIS 62620 (Mar. 23, 2023). Plaintiffs filed a First Amended Complaint on June 1, 2023.

- ***Sterling v. Iris Energy Ltd***., Case No. 2:22-cv-7273-JMV-MAH (D.N.J.). Bottini & Bottini was appointed sole Lead Counsel by the Court over competing lead plaintiff motions in an order dated March 27, 2023. The case is a securities class action asserting claims under the Securities Act of 1933 and Securities Exchange Act of 1934 against the Company's officers and directors and underwriters. The lawsuit seeks damages on behalf of investors who bought Iris Energy's stock in the Company's IPO and also on the open market after the IPO. Iris Energy is a bitcoin miner. On June 6, 2023, Plaintiffs filed a First Amended Complaint. The action is currently pending and being litigated.

- ***In re Alphabet Inc. Shareholder Derivative Litig.***, Lead Case No. 19CV341522 (Santa Clara Superior Court). Bottini & Bottini was appointed Co-Lead Counsel by the Hon. Brian C. Walsh after a heavily-contested lead counsel process. A groundbreaking settlement was reached in 2020 which resulted in Google's commitment to eliminate the use of mandatory arbitration in cases alleging sexual harassment and discrimination, the establishment of a Diversity, Equity, & Inclusion Council including two members selected by Plaintiffs' counsel, and an agreement by Google to spend **$310 million** over ten years on workplace initiatives designed to eliminate sexual harassment and discrimination and initiatives that support diversity, equity, and inclusion. See "Alphabet Settles Shareholder Suits Over Sexual Harassment Claims," THE NEW YORK TIMES, Sept. 25, 2020. The membership of the DEI Council will consist of both external experts and internal members, including, in its first year, Alphabet's CEO (Sundar Pichai). The workplace initiatives and programs will focus on (1) expanding the pool of historically underrepresented technologists; (2) hiring, progression, and retention of historically underrepresented talent at Alphabet and, in particular, Google; (3) fostering respectful, equitable, and inclusive workplace cultures; and (4) helping historically underrepresented groups and individuals succeed with their businesses and in the digital economy and tech industry.

- ***Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust* v. Williams et al.**, Lead Case No. CGC-17-562591 (Superior Court for the State of California, County of San Francisco). Bottini & Bottini was one of the firms retained by Justice John Trotter on behalf of the PG&E Fire Victim Trust to assert claims against various former officers and directors of PG&E Corporation. The suit asserted damages for breaches of fiduciary duty committed by such officers and directors in connection with wildfires caused by PG&E Corp. in Northern California -- the 2017 North Bay Wildfires and the 2018 Camp Fire. Bottini & Bottini had previously filed a shareholder derivative action against PG&E's officers and directors on December 24, 2018. After PG&E filed for bankruptcy due to massive liabilities related to the wildfires, Justice Trotter was appointed as Trustee of the PG&E Fire Victim Trust in order to pursue claims seeking compensation for the fire victims. The shareholder derivative claims originally asserted by Bottini & Bottini were among the claims assigned to the Fire Victim Trust. An amended complaint was filed on March 24, 2021 in San Francisco Superior Court asserting direct claims for breach of fiduciary duty against PG&E's officers and directors.

  On November 8, 2021, Judge Andrew Y.S. Cheng denied in substantial part Defendants' demurrer to the Amended Complaint. Defendants moved for reconsideration of the Court's order overruling their demurrer, and the Court denied that motion by Order dated December 16, 2021. Meanwhile, Plaintiffs had filed a Second Amended Complaint on November 18, 2021 to add additional factual details about Defendants' wrongdoing.

  Defendants filed a demurrer/motion to dismiss the Second Amended Complaint, which was heard by the Court on February 24, 2022. On April 1, 2022, the Court issued an Order overruling Defendants' demurrers in their entirety.

  Trial was set for August 1, 2022. Plaintiff diligently prepared the case for trial, reviewing millions of pages of documents and taking dozens of depositions.

  A settlement of **$117 million** was reached just a few months before trial was set to commence.

  Cathy Yanni, a spokesperson for the Fire Victim Trust, stated in announcing the settlement that "It is our hope that in holding PG&E's past officers and directors accountable in connection with the damage inflicted on thousands of fire victims in California, the current board and new leadership of PG&E charts a different course where safety and the protection of customers is the central operating principle of the company. We are pleased to see early signs of a new focus on safety with PG&E's recent announcements about plans to harden infrastructure and lay power lines underground, both measures that would significantly reduce fire hazards."

- ***Pettry v. Gilead Sciences., Inc.***, C.A. No. 2020-0132-KSJM, C.A. No. 2020-0138-KSJM, C.A. No. 2020-0155-KSJM, C.A. No. 2020-0173-KSJM *(Del. Ch.)*. In this action in which stockholders sought to inspect books and records of Gilead Sciences under Del. Code Ann. tit. 8, § 220 regarding allegations that Gilead wrongfully delayed the introduction of a safer HIV drug to increase its profits, judgment was entered for the stockholders. *Pettry v. Gilead Sciences., Inc.,* 2020 Del. Ch. LEXIS 347 (Nov. 24, 2020). The Court also permitted Plaintiffs to pursue fee shifting due to Gilead's

misconduct, ultimately granting Plaintiffs attorneys' fees and expenses. *See Pettry v. Gilead Sciences., Inc.*, 2021 Del. Ch. LEXIS 156 (Jul. 22, 2021).

- ***In re Yahoo! Inc. Shareholder Litig.***, Lead Case No. 17-CV-307054 (Superior Court for the State of California, County of Santa Clara). Bottini & Bottini was Co-Lead Counsel in this shareholder derivative litigation, which involved the largest corporate data breach in U.S. history. After engaging in expedited discovery, the Court granted in part Plaintiff's motion for a preliminary injunction and ordered Yahoo! to provide additional information to the Company's shareholders in a proxy statement filed with the SEC. Thereafter, after further substantial litigation, the derivative claims settled for a cash payment by Defendants of $29 million, representing the largest recovery ever in a shareholder derivative action involving a data breach.

  By order dated January 4, 2019, Judge Brian C. Walsh of the Complex Litigation Department granted final approval to the settlement stating: "But I have to say that on both sides, the intelligence, the persistence, the professionalism was a joy to behold. You're a credit to your clients and I hope they appreciate the fine work you did for them, and a credit to your profession. It was a pleasure to work with you."

  The Yahoo shareholder derivative litigation has been described as a "milestone" by commentators for the significant cash recovery obtained for Yahoo, especially since past shareholder derivative cases involving data breaches had all been dismissed or not resulted in any cash recovery for the company. In describing the significant **$29 million cash recovery** in Yahoo, one commentator stated that "the track record in prior data breach related derivative litigation makes the significant recovery in the Yahoo data breach-related derivative settlement all the more noteworthy." *See* Kevin LaCroix, The D&O Diary, Jan. 21, 2019.

- ***Wilhoite v. Xiaodi Hou*** (In re TuSimple Shareholder Deriv. Litig.), Case No. 3:23-cv-02333-BEN-MSB (United States District Court for the Southern District of California). Bottini & Bottini and Bernstein Litowitz Berger & Grossmann LLP are Co-Lead Counsel for the plaintiffs, who are shareholders of TuSimple, Inc. Plaintiffs filed suit on December 22, 2023, seeking a preliminary injunction and damages under the federal Defend Trade Secrets Act of 2016 and the California Uniform Trade Secrets Act. Plaintiffs then promptly moved for a TRO and also filed an *ex parte* motion to expedite the hearing on the motion for TRO, which the court granted. On January 23, 2024, the court granted Plaintiffs' Motion for TRO and expedited discovery and enjoined the company's co-founder and others from:

  1. Violating the National Security Agreement between TuSimple, Holdings, Inc. and the Committee on Foreign Investment in the United States ("CFIUS").
  2. Selling, transferring, or disclosing TuSimple trade secrets to people or entities outside the United States, including TuSimple's China-based businesses.
  3. Selling, transferring, or disclosing TuSimple trade secrets to Hydron, Inc.
  4. Transferring outside of the United States any proceeds obtained from the sale, transfer, or disclosure of TuSimple's trade secrets.
  5. Transferring outside of the United States any proceeds obtained from the sale, transfer, or disclosure of TuSimple's assets other than trade secrets.

*See Wilhoite v. Xiaodi Hou*, 2024 U.S. Dist. LEXIS 12040 (S.D. Cal. Jan. 23, 2024) (order granting Plaintiffs' Motion for TRO to prevent company executives from transferring intellectual property to China). Plaintiffs subsequently settled the action for **$42.5 million in cash** and corporate governance changes designed to protect against related-party transactions at TuSimple. The Hon. Roger T. Benitez granted preliminary approval of the settlement on January 27, 2025.

- ***In re Google RTB Consumer Privacy Litig.***, Case No. 4:21-cv-02155-YGR (N.D. Cal.). Bottini & Bottini is serving as a member of the Executive Committee in this consumer privacy class action alleging that Google misappropriated consumers' personally identifiable information without consent and used the information for its own profit in connection with the operation of its "real time bidding" network with advertisers. Most of plaintiffs' claims have been upheld by the court. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935 (2022). The case is currently in the discovery phase and *Daubert* and dispositive motions are set for July 18, 2025.

- ***In re Franklin Wireless Shareholder Derivative Litigation,*** Case No. 21-cv-1837-AJB-MSB (S.D. Cal.). The firm serves as Co-Lead Counsel in this shareholder derivative action, which asserts claims for violation of Section 14(a) of the Securities Exchange Act of 1934, breach of fiduciary duty, and unjust enrichment. The lawsuit involves alleged wrongdoing by the CEO and board members relating to the loss of the Company's largest customer (Verizon) due to the board's failure to adequately address and remediate the Company's defective products. After the claims were upheld, Plaintiffs engaged in full merits and expert discovery and prevailed on all claims against Defendants' motion for summary judgment. *See In re Franklin Wireless Corp. Derivative Litig*., 2024 U.S. Dist. LEXIS 47516 (S.D. Cal., Mar. 18, 2024). The case was tried to a jury beginning on December 9, 2024. On December 19, 2024, the jury returned a verdict in plaintiffs' favor, finding that plaintiffs had proven demand futility and finding half the members of the company's board of directors liable for breach of fiduciary duty. The case represents the first successful trial of a "Caremark" claim in U.S. history. Courts have repeatedly stated that a "Caremark" claim is the most difficult claim to plead and prove among all types of shareholder claims.

- ***Gehrich v. Frederick Howe et al. (In re MedImpact Shareholder Litig.)***, Case No. 37-2018-00041295-CU-SL-CTL (San Diego Superior Court). Bottini & Bottini served as sole court-appointed Lead Counsel in this shareholder class action against the officers and directors of MedImpact Holdings, Inc., the largest privately-owned pharmacy benefit manager in the United States. After prevailing on a demurrer in which the Court upheld all the claims alleged by the Plaintiffs, and after extensive litigation and motion practice in the case, including discovery and the filing of three motions seeking declaratory and injunctive relief, the case was settled. As a result of Plaintiffs' efforts, the price offered to the Company's minority shareholders for their stock was increased by 75.12% (from $21.70 to $38.00), representing a recovery of **over $41 million**. During the case, the Company also agreed to hold annual meetings of shareholders and disseminate annual reports to shareholders. By order dated December 20, 2019, the Hon. Kenneth J. Medel granted final approval to the settlement.

- ***Wolther v. Maheshwari et al. (In re Veeco Instruments Shareholder Litig.)***, Lead Case No. 18CV329690 (Superior Court for the State of California, County of Santa Clara). Bottini & Bottini, Inc. served as Lead Counsel in this shareholder class action brought under the Securities Act of 1933. By Order dated May 3, 2019, the Hon. Brian Walsh denied defendants' demurrers in their entirety. The case subsequently settled for **$15 million** -- approximately 17% of the estimated damages.

- ***In re Eventbrite, Inc. Securities Litigation***, Lead Case No. 19CIV02798 (Superior Court for the State of California, County of San Mateo). By Order dated June 25, 2019, Judge Weiner appointed Bottini & Bottini and Cotchett Pitre & McCarthy Lead Counsel in this securities class action brought under the Securities Act of 1933, which seeks damages relating to Eventbrite's IPO. Bottini & Bottini successfully opposed Defendants' motion to stay the case, which the Court denied by Order dated August 20, 2019. The case recently settled for **$19.25 million** -- approximately 27% of the estimated damages. On June 10, 2022, the Court granted final approval to the settlement.

- ***Boston Retirement System v. Uber Technologies, Inc.***, Case No. 3:19-cv-06361-RS (U.S. District Court for the N.D. Cal.). In this securities class action alleging claims related to Uber's IPO, Bottini & Bottini served as one of the counsel for the plaintiffs, and as counsel for one of the three lead plaintiffs (Sal Toronto). After five years of litigation in which Defendants' motions to dismiss were defeated, the class was certified, and extensive discovery was conducted, the case **settled for two hundred million dollars ($200,000,000) in 2024.** The Court granted final approval to the settlement by order dated December 4, 2024.

- ***Chicago Laborers Pension Fund v. Alibaba Group Holding Ltd.***, Case No. CIV535692 (Superior Court for the State of California, County of San Mateo). Bottini & Bottini was one of three firms (together with Robbins Geller Rudman & Dowd LLP and Cotchett, Pitre, & McCarthy LLP) that prosecuted a class action under the Securities Act of 1933 against Alibaba Group Holding Limited ("Alibaba") in the Superior Court of California, County of San Mateo, arising from Alibaba's September 2014 initial public offering ("IPO"). After three and a half years of hard-fought litigation that involved substantial discovery in both the United States and China, a cash settlement was reached in December 2018 of **$75,000,000** — approximately 23.4% of the estimated maximum damages. The settlement was granted final approval by the Hon. Richard H. DuBois on May 17, 2019.

- ***In re Snap, Inc. Securities Cases***, JCCP No. 4960 (Superior Court for the State of California, County of Los Angeles). Bottini & Bottini served as co-lead counsel in this shareholder class action relating to Snap's IPO. In January 2020, the case and a related action in federal court settled for a combined **$187.5 million, with $32,812,500 representing the state court settlement**. The Hon. Elihu M. Berle granted final approval of the settlement by Order dated March 9, 2021. The settlement represented the 97th largest securities class action settlement ever. See Sarah Jarvis, "Two Investor Settlements From 2021 Crack Top 100 List," Law360, Jan. 25, 2022 ("Robbins Geller, Kessler Topaz, Bottini & Bottini and Block & Leviton led the two investor class action settlements from 2021 that broke into the top 100 largest such

settlements of all time, according to a report released Tuesday . . . the $187.5 million settlement involving social media giant Snap Inc. — led by Kessler Topaz Meltzer & Check LLP in the federal case and co-lead by Robbins Geller, Bottini & Bottini and Block & Leviton in a related state action — ranks 97th.”).

- ***Overbrook Capital LLC v. Aerogrow International, Inc***., Lead Case No. A-21-827665-B (Clark County, Nevada District Court). By order dated Feb. 18, 2021, the Court consolidated multiple pending class actions and appointed Bottini & Bottini, Inc. sole Lead Counsel for the Class. The Consolidated Complaint alleges that Defendants breached their fiduciary duties by fraudulently divesting the Company’s minority shareholders of fair value for their stock in a self-interested transaction orchestrated by Defendant Scotts Miracle-Gro, the 80% majority owner of the Company. By order dated October 21, 2021, the Court upheld all Plaintiffs’ claims against all Defendants. The Defendants petitioned the Nevada Supreme Court for review, which review was granted. By Order dated June 30, 2022, the Nevada Supreme Court ruled in Plaintiff’s favor, and in the process confirmed the applicable standard for bringing “invalid merger” claims under Nevada law. *See* Aerogrow International, Inc. v. Eighth Judicial District of Nev., 511 P.3d 1035 (Nev. 2022). The case was certified as a class action by Order dated June 10, 2022 and notice was provided to the Class. The case is currently in the discovery phase and trial is scheduled for 2024.

- ***Dollens v. Goosehead Insurance, Inc***., C.A. No. 2022-1018-JTL (Delaware Chancery Court). In this shareholder class action filed in 2022, Plaintiffs, represented by Bottini & Bottini and Saxena White, alleged that in violation of DGCL Section 141(a), Goosehead’s insiders adopted various shareholder agreements and terms in the company’s governing documents that provided certain favored minority stockholders with contractual veto power over the most important decisions and functions properly entrusted to the Board under Delaware’s corporate system, such as the hiring, firing, and compensation of the Company’s CEO, CFO, and other most senior executive officers. The complaint also alleged that, in violation of Delaware common law principles recognizing “[t]he shareholders’ right to vote includes the right to nominate a contesting slate,” *Hubbard v. Hollywood*, 1991 WL 3151, at *8 (Del. Ch. Jan. 14, 1991), Goosehead provided the same favored minority stockholders with a contractual right to always designate the nominees for a majority of the seats on the Company’s Board, including the Chair of the Board, so long as they continue to hold a mere 10% of the Company’s total outstanding shares. As a result of Plaintiffs’ efforts, the case was settled on August 8, 2023, with Goosehead agreeing to make significant changes to these agreements, including: (i) narrowing the consent rights provision of the Stockholders Agreement, (ii) clarifying the board nomination rights provision of the Stockholders Agreement, and (iii) adding a “fiduciary out” clause to both (collectively, the “Proposed Settlement”). The final approval hearing is set for Feb. 16, 2024 before the Hon. V.C. Laster.

- ***In re DRAM Antitrust Litigation***, MDL No. 1486 (N.D. Cal.). Mr. Bottini’s prior firm, Wolf Haldenstein Adler Freeman & Herz LLP, served as Co-Lead Counsel for the Class, and Mr. Bottini was one of two lead partners for his firm on the case. After five years of litigation, **$325,997,000** in settlements was obtained for the Class from nine

defendants in one of the largest and most complex civil antitrust class actions in the country. Mr. Bottini was involved in all aspects of the case from the filing of the first complaint in 2002 to the final approval of the settlements which occurred in August 2007. Mr. Bottini was part of the trial team that was set to try the case against the two remaining defendants – Mosel Vitelic, Inc. and Nanya – when separate settlements with these last two defendants were reached on March 21, 2007, the day before oral argument was to be conducted on the motions in limine for trial. On August 15, 2007, the Honorable Phyllis J. Hamilton granted final approval to the settlements, stating:

> I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that the results are exceptional. The percentages, as you have outlined them, do put this [case] in one of the upper categories of results of this kind of [antitrust] class action. I am aware of the complexity . . . I thought that you all did an exceptionally good job of bringing to me only those matters that really required the Court's attention. You did an exceptionally good job at organizing and managing the case, assisting me in management of the case. There was excellent coordination between all the various different plaintiffs' counsel with your group and the other groups that are part of this litigation. . . . So my conclusion is the case was well litigated by both sides, well managed as well by both sides.

- ***In re Brocade Communications Systems, Inc. Derivative Litigation***, No. 1:05cv41683 (Cal. Super. Ct., County of Santa Clara). Mr. Bottini was Co-Lead Counsel in one of the highest-profile cases in the country challenging the award of backdated stock options by executive officers of Brocade. The case was filed in May 2005 and, on August 8, 2008, Mr. Bottini was retained as co-counsel to Brocade by the Special Litigation Committee of the Board of Directors to help litigate the company's claims against ten former officers and directors of the company. An amended complaint was filed in federal court in San Francisco, and the case, *In re Brocade Communications Systems, Inc.*, No. 05-cv-2233 (N.D. Cal.), proceeded before the Honorable Charles R. Breyer in the United States District Court for the Northern District of California. After litigation of the case for over five years, **over $24 million** was recovered for Brocade through the litigation.

- ***Hack v. Wright et al.***, Civil Action No. 4:14-CV-3442 (KPE) (United States District Court for the Southern District of Texas) ("In re Conns Inc. Shareholder Derivative Litig."). Bottini & Bottini served as Lead Counsel in this shareholder derivative litigation that was filed in 2014. By order dated July 22, 2020, Judge Palermo denied defendants' motion to dismiss with respect to Plaintiffs' breach of fiduciary duty claims. *See Hack v. Wright*, 2020 U.S. Dist. LEXIS 179979 (July 22, 2020). The case was fully litigated through discovery, and trial was set for Nov. 29, 2022. Plaintiffs settled the case prior to trial for **$11 million**. By Order dated March 15, 2022, Judge Ellison granted final approval of the settlement.

- ***In re Tintri, Inc. Securities Litigation***, Lead Case No. 17-CIV-04321 (Superior Court

for the State of California, County of San Mateo). Bottini & Bottini is Lead Counsel, along with Robbins Geller Rudman & Dowd, in this shareholder class action seeking damages relating to Tintri's IPO.

- ***Searles v. DeMartini et al. ("Capital Bank")****,* C.A. No. 2020-0136-KSJM (Del. Ch. Court). Bottini & Bottini served as Plaintiffs' counsel, along with Bernstein Litowitz Berger & Grossmann LLP, in this stockholder class action alleging aiding and abetting breach of fiduciary duties related to the acquisition of Capital Bank Financial Corp. by First Horizon. Plaintiff alleged that Capital Bank's largest outside investor, Crestview Advisors, LLC, and its Board designee, Defendant Richard M. DeMartini ("DeMartini"), had not only initiated the sales process without Board approval, but had conflicts of interests in quickly closing a deal. By Order dated Jan. 20, 2021, Vice Chancellor McCormick denied in part the defendants' motion to dismiss. After engaging in discovery, the case settled in 2021 for **$23 million**.

- ***Houser v. CenturyLink, Inc.***, Case No. 2018CV30556 (District Court, Boulder County, Colorado). Bottini & Bottini is Lead Counsel in this shareholder class action brought under the Securities Act of 1933 regarding securities issued to stockholders in connection with the 2017 merger of Centurylink and Level 3 Communications. The trial court dismissed the complaint on a motion to dismiss and plaintiff appealed. On March 31, 2022, the Colorado Court of Appeal reversed the trial court's decision, holding that Plaintiff had adequately alleged facts to support a claim based on allegations about the company's practice of "cramming." *See Houser v. Centurylink*, 513 P.3d 395 (2022). The case was remanded to the trial court. After another round of motions to dismiss, the trial court again dismissed the complaint. Plaintiff appealed, and on August 22, 2024 the Colorado Court of Appeal reversed the second dismissal. *See Houser v. CenturyLink, Inc.,* 2024 COA 96, 2024 Colo. App. LEXIS 1058 (Colorado Court of Appeals, August 22, 2024) (reversing dismissal and holding, as a matter of first impression, that shareholders can rely on confidential witness allegations in other lawsuits).

- ***In re King Digital Entertainment plc Shareholder Litig.***, Case No. CGC15544770 (Superior Court for the State of California, County of San Francisco, Judge Curtis E.A. Karnow). Bottini & Bottini was a member of the Plaintiffs' Executive Committee in the case, which was litigated in the Superior Court for the State of California, County of San Francisco. The case was brought under Sections 11 and 12 of the Securities Act of 1933 and alleged that the Registration Statement and Prospectus for the Company's IPO were false and misleading. In 2016, the case settled for $18.5 million. The court granted final approval of the settlement by order dated June 9, 2017.

- ***In re Castlight Health Inc. Shareholder Litig.***, Case No. CIV533203 (Superior Court for the State of California, County of Santa Clara). Bottini & Bottini was a member of the Executive Committee in this shareholder class action asserting claims under Sections 11 and 12 of the Securities Act of 1933. The complaint alleged that the Registration Statement and Prospectus for the Company's March 14, 2014 IPO were false and misleading. The case settled for $9.50 million. Judge Marie Seth Weiner, Chair of the Complex Litigation Department, approved the Settlement and

entered Final Judgment on October 28, 2016.

- ***In re McKesson Corp. Stockholder Derivative Litig.***, C.A. No. 2017- 0736-SG (Del. Ch.). Bottini & Bottini served as one of the plaintiffs' counsel in this shareholder derivative litigation for a cash payment of $175 million, as well as significant corporate governance reforms designed to address the complaint's allegation that the Company had been damaged by regulatory fines and actions as a result of failure to properly comply with federal rules and regulations governing the sale of the company's prescription opioid products. Specifically, Plaintiff's complaint alleged that McKesson's directors failed properly to implement a Controlled Substance Monitoring Program (CSMP), as required by a settlement with the United States Department of Justice (DOJ) and Drug Enforcement Administration (DEA) in 2008. Plaintiffs' Delaware action was coordinated with a related action pending in the Northern District of California. The settlement was approved and final judgment was entered on January 20, 2020.

- ***Plymouth County Retirement System v. Model N, Inc.***, Case No. CIV530291 (Superior Court for the State of California, County of Santa Clara). Bottini & Bottini was one of three counsel for Plaintiffs in the case, which was brought in Santa Clara, California and alleged claims under Sections 11 and 12 of the Securities Act of 1933. The complaint alleged that the Registration Statement and Prospectus for the Company's March 23, 2013 IPO were false and misleading. Recently, the case settled for $8.55 million. Judge Marie Seth Weiner, Chair of the Complex Litigation Department, approved the Settlement and entered Final Judgment on April 4, 2016.

- ***In re BOFI Holding, Inc. Shareholder Derivative Litig.***, Case No. 15CV2722-GPC-KSC (United States District Court for the Southern District of California). By Order dated June 9, 2016, the Hon. Gonzalo P. Curiel of the United States District Court for the Southern District of California appointed Bottini & Bottini as Lead Counsel over four related shareholder derivative actions brought on behalf of BofI Holding, Inc. Plaintiffs filed a Consolidated Amended Complaint on August 26, 2016. The Amended Complaint alleges that due to the misconduct of BofI's fiduciaries, BofI suffered from a myriad of internal-control and risk-management problems during the Relevant Period. According to the internal audits conducted by a former employee turned whistleblower named Erhart, BofI was making substantial loans to foreign nationals, including politically-exposed persons such as foreign officials in war zones, in potential violation of anti-money-laundering laws and other banking regulations. Contrary to BofI's representations to the Office of the Comptroller of Currency ("OCC"), hundreds of BofI accounts lacked required tax-identification numbers ("TIN"). By order dated August 8, 2017, the Court denied Defendants' motion to dismiss, and held that Plaintiff had adequately alleged "demand futility" with great particularity. Later, the court granted a subsequent motion to dismiss. Plaintiffs appealed and prevailed in part in the Ninth Circuit -- *In re BofI Holding, Inc. S'holder Litig.*, 848 Fed. Appx. 234 (9th Cir. Feb. 25, 2021). The case was remanded to the district court, where defendants filed another motion to dismiss. By order dated March 5, 2024, the Hon. Gonzalo Curiel denied the motion to dismiss without prejudice, stating that Plaintiffs had alleged new particularized facts demonstrating demand futility. *See In re Bofi Holdings, Inc.*, 2024 U.S. Dist. LEXIS 38599 (S.D. Cal. Mar.

5, 2024) (finding that "Plaintiff has supplemented his initial claims with information discovered in the course of the whistleblower action, including allegations regarding BofI's attempts following Erhart's termination to defame and harass Erhart with lawsuits. ECF No. 178 at 9 (sealed)" and rejecting Defendants' "attempt to brush aside Plaintiff's new allegations.").

- ***In re PG&E Corp. Shareholder Derivative Litig.***, Case No. 3:16-cv- 00973-SI (United States District Court for the Northern District of California). Bottini & Bottini was counsel for the Plaintiff in a shareholder derivative action involving Pacific Gas & Electric Corp in federal court in San Francisco. The case sought damages on PG&E's behalf and against current and former officers and directors of the Company due to the defendants' breaches of fiduciary duty related to pipeline safety at PG&E, including a deadly 2010 explosion in San Bruno, California. PG&E was ultimately indicted for obstruction of justice and violation of federal and state safety standards by the Department of Justice, and was later convicted on several counts. In addition to filing the shareholder derivative case, Bottini & Bottini filed a case in California state court to enforce a shareholder inspection demand which sought company documents such as board of director minutes, and which documents were related to the alleged wrongdoing by the Company's officers and directors. In late 2016 and early 2017, the case and several related lawsuits in California state court were settled on highly favorable terms, including the payment of $90 million in cash by the defendants (and/or their insurance carriers) to PG&E, plus the enactment of very significant corporate governance reforms designed to avoid future harm to PG&E and its shareholders. On July 18, 2017, the California state court granted final approval to the settlement agreement.

- ***Cook v. McCullough (In re Career Education Shareholder Derivative Litig.)***, No. 11 C 9119 (N.D. Ill.). Bottini & Bottini, Inc. was lead counsel for the plaintiff in this shareholder derivative action on behalf of Career Education Corporation against its officers and directors. By order dated August 13, 2012, the Hon. John W. Darrah denied Defendants' motion to dismiss on demand futility grounds. See 2012 U.S. Dist. LEXIS 114621 (N.D. Ill. Aug. 13, 2012). Bottini & Bottini, Inc. settled the case on October 25, 2013 for a cash payment of $20 million and significant corporate governance reforms at Career Education. By Order dated Jan. 28, 2014, Judge Darrah granted final approval to the settlement.

- ***In re FireEye Inc. Sec. Litig***., Case No. 1-14-cv-266866 (Superior Court for the State of California, County of Santa Clara, the Hon. Peter H. Kirwan). Bottini & Bottini served as co-counsel in this securities class action which asserted claims under the Securities Act of 1933 against FireEye Inc., its board of directors, and the underwriters who conducted a Secondary Offering of company stock on March 6, 2014. After surviving multiple motions to dismiss, defeating defendants' appeals seeking appellate review, and engaging in three years of litigation and discovery, the case settled in 2017 for $10.25 million. Judge Kirwan issued an order granting final approval to the settlement on August 10, 2017.

- ***In re Facebook, Inc. Shareholder Derivative Privacy Litigation***, No. 4:18-CV-01792-HSG (N.D. Cal.). Bottini & Bottini served as a member of Plaintiffs'

Executive Committee in this shareholder derivative litigation on behalf of Facebook, Inc. relating to allegations that personal information of at least 50 million Facebook users was improperly shared with Cambridge Analytica in a major data breach.

- ***In re Southern California Gas Leak Cases***, JCCP No. 4861 (Superior Court for the State of California, County of Los Angeles). Bottini & Bottini was one of the counsel for plaintiffs in this shareholder derivative action on behalf of Sempra Energy relating to losses suffered by the Company in connection with a massive natural gas leak at the Company's Aliso Canyon, California underground storage well, which has been described as one of the most devastating environmental disasters in U.S. history.

- ***In re Sanchez Energy Derivative Litig.***, C.A. No. 9132-VCG (Delaware Chancery Court). Bottini & Bottini represented shareholders of Sanchez Energy Corp. in this shareholder derivative action, which alleged that the officers and directors of Sanchez Energy engaged in self-dealing and breached their fiduciary duties by engaging in transactions that benefitted themselves at the expense of the Company and its shareholders. The complaint alleged that the Company's insiders own and controlled a privately held company named Sanchez Resources. Eduardo Sanchez, the son of Sanchez Jr. and brother of Sanchez III, established and ran Sanchez Resources, while both Sanchez Jr. and Sanchez III maintained equity interests in it. In August 2013, Sanchez Energy, with the Board's approval, agreed to purchase working interests in the Tuscaloosa Marine Shale ("TMS") from Sanchez Resources (the "Transaction"). Sanchez Energy purchased these working interests at a price seventeen times higher than other oil and gas companies have paid for similar interests in the TMS. The beneficiaries of this over-priced purchase were the Sanchez family. On August 15, 2017, the parties announced that they reached a settlement which is worth approximately $27.75 million. Under the terms of the Stipulation of Settlement, the directors of Sanchez Energy along with the directors of the company that sold it the mining interests will pay $11.75 million to Sanchez Energy, and the equity of the seller in Sanchez Resources, valued at more than $16 million, will be transferred to Sanchez Energy.

- ***In re Tibco Software, Inc. Stockholders Litig.***, C.A. No. 10319-CB (Delaware Chancery Court). Bottini & Bottini was one of the counsels for plaintiffs in this shareholder class action lawsuit asserting claims for breach of fiduciary duty against Tibco's former offices and directors, and claims for aiding and abetting breach of fiduciary duty against Goldman Sachs, arising from the $4.2 billion sale of Tibco to Vista Equity Partners in 2014. After hard-fought litigation, the case was settled in 2016 for $30.4 million. On September 7, 2016, Chancellor Bouchard of Delaware Chancery Court approved the settlement, declaring it an "excellent outcome for the shareholders."

- ***In re American Apparel Shareholder Derivative Litig.***, Case No. BC443763 (Superior Court for the State of California, County of Los Angeles). Bottini & Bottini served as Plaintiffs' Lead Counsel in this shareholder derivative litigation on behalf of American Apparel and against its former officers and directors, including founder and CEO Dov Charney. After the company filed for bankruptcy, the Litigation Trustee appointed by the bankruptcy court hired Bottini & Bottini to continue to

pursue the claims, including the claims against Dov Charney, the former CEO of the Company who is alleged to have committed egregious sexual harassment of female employees at the company. The case settled for a large payment to the Trustee.

- ***In re Sogou, Inc. Securities Litigation***, Lead Case No. 18CIV06699 (Superior Court for the State of California, County of San Mateo). Bottini & Bottini served as Lead Counsel in this shareholder class action relating to Sogou's IPO.

- ***In re Pinduoduo Securities Litigation***, Case No. 18CIV04256 (Superior Court for the State of California, County of San Mateo). Bottini & Bottini served as Co-Lead Counsel in this shareholder class action seeking damages under the Securities Act of 1933 relating to Pinduoduo's IPO.

- ***In re PFF Bancorp, Inc. ERISA Litigation***, Master File No. 08-cv-1093 (C.D. Cal.). Mr. Bottini was one of the attorneys for plaintiffs in this ERISA class action, which alleged that defendants breached their fiduciary duties by continuing to allow plan participants to invest in the company's stock. The case settled for $3 million, plus the allowance of a $400,000 bankruptcy claim, after the company declared bankruptcy.

- ***In re General Growth Properties, Inc. ERISA Litig.***, Master File No. 08-6680 (N.D. Ill.). Mr. Bottini and Mr. Chang were members of Plaintiffs' Executive Committee in this ERISA class action litigation, which alleged that defendants breached their fiduciary duties by continuing to allow plan participants to invest in the company's stock. The case settled for $5.75 million in 2010. By Order dated December 9, 2010, the Hon. James B. Zagel of the United States District Court for the Northern District of Illinois granted final approval of the settlement.

- ***In re Terex Corp. ERISA Litig.***, Master File No. 3:10-cv-00006-RNC (D. Conn.). Bottini & Bottini was one of Plaintiffs' counsel in this class action lawsuit under ERISA, which alleged that defendants breached their fiduciary duties by continuing to allow plan participants to invest in the company's stock. The case settled for $2.5 million. Final approval of the settlement was entered by the Hon. Robert M. Chatigny of the United States District Court for the District of Connecticut on November 4, 2015.

- ***Robinson v. Audience***, No. 12-cv-232227 (Santa Clara, California Superior Court). Bottini & Bottini was one of the counsels for plaintiffs in this securities class action alleging claims for strict liability under the Securities Act of 1933, arising out of an allegedly false and misleading Registration Statement and Prospectus for Audience's IPO. By order dated September 3, 2013, Judge Kleinberg denied defendants' demurrer, denied defendants' motion to stay, and granted plaintiffs' motion to compel. Plaintiffs moved for class certification, which motion was granted by Order dated Jan. 16, 2015. The case was settled for $6,050,000. By Order dated June 10, 2016, the Court granted final approval to the settlement.

- ***Wiley v. Envivio, et al.***, No. CIV517185 (San Mateo, California Superior Court). Bottini & Bottini was one of the counsels for plaintiffs in this securities class action which asserted claims under the 1933 Act relating to Envivio's IPO. In March 2014, Judge Marie Seth Weiner overruled defendants' demurrer. Bottini & Bottini, Inc.

assisted in procuring a settlement involving an $8.5 million cash payment which was approved by Judge Weiner on June 22, 2015.

- ***Snellink v. Gulf Resources, Inc.***, No. 11-cv-03722-ODW (C.D. Cal.). Bottini & Bottini, Inc. served as co-lead counsel for the plaintiffs in this securities fraud class action brought under the federal securities laws. By order dated May 15, 2012, the court denied Defendants' motion to dismiss. See 2012 U.S. Dist. LEXIS 67839 (C.D. Cal. May 15, 2012). Bottini & Bottini, Inc. procured a settlement involving a $2.125 million cash payment which was approved by the Honorable Otis D. Wright II on January 18, 2014.

- ***Diaz v. First American Home Buyers Protection Corp***., Case No. 13cv1585 BAS (JLB) (S.D. Cal.). Bottini & Bottini was Co-Lead Counsel for the plaintiffs in this consumer class action case challenging the marketing and sale of home warranty plans by Defendant First American. After the case was dismissed by the district court, Plaintiffs appealed and obtained reversal by the Ninth Circuit Court of Appeals. *See Diaz v. First American Home Buyers Protection Corp*., 732 F.3d 948 (9th Cir. 2013) (holding that an unaccepted offer of judgment pursuant to F.R.C.P. 68 for full amount of plaintiff's damages does not moot a plaintiff's case; 9th Circuit refused to follow other circuits which had held to the contrary).

- ***In re General Growth Properties, Inc. ERISA Litigation***, No. 08 C 6791 (N.D. Ill.). Mr. Bottini and Mr. Chang were members of Plaintiffs' Executive Committee in this class action under ERISA seeking recovery of losses to General Growth Properties, Inc.'s employee retirement savings plans. Notwithstanding General Growth's filing for bankruptcy court protection, the Honorable James B. Zagel approved a settlement of $5.75 million on December 9, 2010.

- ***Schuh v. HCA Holdings, Inc.***, No. 3:11-cv-01033 (M.D. Tenn.). Bottini & Bottini was one of the counsel for the plaintiffs in this securities class action lawsuit seeking damages under the Securities Act of 1933 relating to HCA's IPO. By order dated May 28, 2013, the Court denied defendants' motion to dismiss. *See Schuh v. HCA Holdings, Inc*., 947 F. Supp. 2d 882 (M.D. Tenn. 2013). By order dated September 22, 2014, the Court granted Plaintiffs' motion for class certification. *See* Fed. Sec. L. Rep. (CCH) ¶98,187; 2014 WL 4716231 (M.D. Tenn.). In November 2015, the case settled for $215 million.

- ***Karlin v. Alcatel***, No. SA CV 00-0214-DOC (C.D. Cal.). Mr. Bottini represented investors who received a tender offer for their shares from Alcatel S.A., a French telecommunications company. Mr. Bottini was the lead partner at his firm, Wolf Haldenstein Adler Freeman & Herz LLP, which served as Co-Lead Counsel for the Class. After conducting broad-ranging discovery, including depositions in Paris and London, and defeating defendants' motion for summary judgment, the case settled for $10.5 million on the eve of trial. *See* 2001 WL 1301216 (C.D. Cal. Aug. 13, 2001) (denying defendants' motion for summary judgment).

- ***In re Novastar Home Mortgage, Inc. Mortgage Lending Practices Litigation***, No. CV05-1677, MDL Docket No. 1677 (S.D. Ga.). Mr. Bottini was one of the lead attorneys in this class action litigation under the Real Estate Settlement Procedures

Act of 1974 ("RESPA"). After three years of litigation, Chief Judge William T. Moore entered a Final Judgment on September 18, 2007 approving a nationwide class action settlement of Plaintiffs' RESPA claims in which approximately $20 million in cash payments were made available to class members.

- ***Reyes v. Zynga, Inc.***, Case No. CGC-12-522876 (San Francisco Superior Court). Bottini & Bottini was co-lead counsel in this class action alleging violations of the Securities Act of 1933 on behalf of a class of investors who bought Zynga stock in the company's Secondary Offering, which closed on April 3, 2012. Bottini & Bottini successfully had the case remanded to state court after being removed to federal court by defendants (see 2013 WL 5529754). In addition, by Order dated August 26, 2013, the Court denied defendants' demurrer on subject matter grounds and held that plaintiffs could bring their '33 Act federal claims in state court and that SLUSA did not eliminate concurrent jurisdiction in state and federal court for '33 Act claims. By order dated September 29, 2014, the Court denied defendants' demurrer as to the sufficiency of the complaint's allegations and denied defendants' motion to stay the action.

- ***In re SunPower Corp. Shareholder Derivative Litigation***, Master File No. C-09-05731 (N.D. Cal.). Bottini & Bottini served as Co-Lead Counsel in this shareholder derivative litigation in San Francisco, which involved accounting fraud and the restatement of the financial statements of SunPower Corporation. In October 2013, the case was settled in exchange for Sunpower's agreement to enact significant corporate governance reforms. By order dated August 22, 2014, the Court granted final approval to the settlement.

- ***In re Pacific Capital Bancorp Derivative Litigation***, No. CIVRS1340306 (Cal. Super. Ct., County of Santa Barbara). Mr. Bottini and his prior firm, Chapin Fitzgerald Sullivan & Bottini LLP, were Lead Counsel in this shareholder derivative action which alleged breaches of fiduciary duties by certain officers and directors of Pacific Capital Bancorp. By Order dated October 8, 2010, the Court denied defendants' demurrer and held that Lead Plaintiff had adequately alleged demand futility under California law. After two years of litigation, in which over a million pages of documents were produced and reviewed and certain legal issues were litigated in the court of appeal, a substantial settlement was reached in which significant corporate governance changes were made to the Company, including changes to provide greater Board independence and accountability, strict internal financial controls, significant and substantial revisions to PCBC's credit policies (including the establishment of a new Credit Administration Group, the restriction of lending authority to specified senior loan officers, and enhanced new appraisal guidelines), new requirements obligating any individual desiring to serve on PCBC's board to own a minimum amount of stock in the Company, annual review of the Company's Code of Ethics, a new corporate governance training program for PCBC directors, new procedures to handle internal and external complaints from whistleblowers, annual review of all committee charters, and a vigorous insider trading policy. By Order dated January 19, 2012, the Court granted final approval of the settlement and entered a final judgment.

- ***In re Herald, Primeo, and Thema Funds Securities Litigation***, No. 09 Civ. 0289 (RMB) (S.D.N.Y.). Bottini & Bottini, Inc. was Lead Counsel for the Thema Fund plaintiffs in this securities-fraud class action case under the PSLRA. The action was brought on behalf of all persons who invested in three Madoff "feeder funds" controlled by Bank Medici – the Herald, Primeo, and Thema funds. After a partial $62.5 million settlement was obtained from one of numerous defendants, the Court dismissed the case on forum non conveniens grounds and denied preliminarily approval of the settlement.

- ***In re Level 3 Communications, Inc. Securities Litigation***, No. 09-cv- 00200-PAB-CBS (D. Colo.). Mr. Bottini and his prior firm, Johnson Bottini LLP, were Co-Lead Counsel in this securities-fraud class action asserting claims under Section 10(b) of the Securities Exchange Act of 1934.

- ***In re UCBH Holdings, Inc. Derivative Litig.***, No. CGC-09-492237 (San Francisco Superior Court). Mr. Bottini and his prior firm, Johnson Bottini LLP, were Lead Counsel in this shareholder derivative action filed in 2009. After the company declared bankruptcy, the Trustee asserted the claims contained in the lawsuit and eventually recovered $4 million from the defendants.

- ***In re Arena Resources, Inc. Shareholder Litigation***, No. CV10-01069 (Nev. Dist. Ct., County of Washoe). Mr. Bottini and his firm (Johnson Bottini LLP) served as one of the counsels for Plaintiffs in this shareholder class action, which was filed in 2010 and challenged the acquisition of Arena Resources by SandRidge Energy, Inc. As a result of the prosecution of the action, SandRidge raised the cash portion of the merger consideration by $2.00 per share, reduced the duration of the matching rights period, amended the terms of the non-solicitation clause in favor of Arena, reduced the amount of termination fees payable by a party from $50 million to $39 million, made additional material financial disclosures to Arena's shareholders and extended the date of the shareholder meeting to vote on the merger.

- ***Bamboo Partners LLC v. The Robert Mondavi Corp.***, No. 26-27170 (Cal. Super. Ct., County of Napa). Mr. Bottini represented the plaintiff common shareholders of the Mondavi Corporation in connection with the 2004 acquisition of the company by Constellation Brands, Inc. Mondavi had a dual-class stock structure pursuant to which the common shareholders owned Class A shares and the Mondavi family members owned Class B shares. Plaintiffs alleged that the insider Class B Mondavi family members improperly received more consideration for their shares than the common Class A public shareholders. The case was settled when defendants agreed to pay an additional $10.8 million to the Class A shareholder plaintiffs.

- ***In re Dole Shareholder Litigation***, No. B281969 (Cal. Super. Ct., County of Los Angeles). In this mergers & acquisitions, going-private class action case, Mr. Bottini was one of two lead partners from his firm at the time (Wolf Haldenstein Adler Freeman & Herz LLP), which served as Co-Lead Counsel for the plaintiffs and was involved in all aspects of the litigation. A $172 million settlement was obtained for the Class when the tender offer price was increased by $4 per share.

- ***In re Heritage Bond Litigation***, No. 02-MDL-1475-DT (C.D. Cal.). In this class

action bondholder litigation, which was ordered consolidated in Los Angeles by the Panel on Multidistrict Litigation in 2002, Mr. Bottini represented the outside director defendants. After obtaining dismissal of most of the claims against the outside directors, Mr. Bottini obtained dismissal of the remaining claims against the outside directors for a combined payment of $102,500. The other defendants not represented by Mr. Bottini paid $27 million to settle the case. See 2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005).

- ***Deane v. Tombros (In re NPS Pharmaceuticals Securities Litigation)***, No. 60913838 (Utah Dist. Ct., Salt Lake City). Mr. Bottini and his firm, Johnson Bottini LLP, were Lead Counsel in this shareholder derivative action filed against current and former officers and directors of NPS Pharmaceuticals, Inc. This matter was settled on terms that required the implementation of significant corporate therapeutic changes at NPS.

- ***In re American Express ERISA Litigation***, No. 08 Civ. 10834 (JGK) (S.D.N.Y.). Mr. Bottini served as one of the lawyers representing the plaintiffs, who asserted class action claims under ERISA on behalf of plan participants due to breaches of fiduciary duties by the defendants.

## Biographies of Attorneys

### Francis A. Bottini, Jr.

Mr. Bottini practices in the areas of securities class actions, consumer and privacy/data breach class actions, mergers & acquisitions, antitrust class actions, shareholder derivative litigation, and ERISA class action litigation. Prior to forming Bottini & Bottini, Inc., Mr. Bottini was a partner at several firms, including Chapin Fitzgerald & Bottini LLP, Johnson Bottini, LLP, and Wolf Haldenstein Adler Freeman & Herz LLP. Mr. Bottini has successfully achieved numerous multi-million-dollar recoveries in securities, consumer, shareholder derivative, and antitrust class action cases throughout the country. Mr. Bottini served as an Adjunct Professor of Business Law at the University of San Diego from 1995 to 1997. Mr. Bottini is a 1991 graduate of St. Louis University (B.A. *magna cum laude*), and the University of San Diego School of Law (J.D. *cum laude* 1994), where he was the Lead Articles Editor of the San Diego Law Review and received the American Jurisprudence Award in Property. Mr. Bottini is admitted to practice before the United States Supreme Court, all California state and federal courts, the United States Court of Appeals for the Second, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits, the United States District Court for Colorado, and the United States District Court for the Northern District of Illinois. He is AV-rated by Martindale-Hubbell.

The following are some examples of Mr. Bottini's reported cases:

- *Houser v. CenturyLink, Inc.,* 2024 COA 96, 2024 Colo. App. LEXIS 1058 (Colorado Court of Appeals, August 22, 2024) (reversing dismissal of securities class action brought under Section 11 of the Securities Act of 1933 pertaining to the merger of Centurylink and Level 3 Communications and holding, as a matter of first impression, that shareholders can rely on confidential witness allegations in other lawsuits).

- *Pampena v. Musk*, 2024 U.S. Dist. LEXIS 175950 (N.D. Cal. Sept. 27, 2024) (granting

Plaintiffs' Motion for Class Certification).

- *Pampena v. Musk*, 2024 U.S. Dist. LEXIS 138528 (N.D. Cal. Aug. 5, 2024) (denying defendant Elon Musk's motion for judgment on the pleadings in a securities fraud class action under Section 10(b) of the Securities Exchange Act of 1934).

- *In re Franklin Wireless Corp. Derivative Litig.*, 2024 U.S. Dist. LEXIS 47516 (S.D. Cal., Mar. 18, 2024) (denying defendants' motion for summary judgment in shareholder derivative action).

- *Aerogrow International, Inc. v. Eighth Judicial District of Nev.*, 511 P.3d 1035 (Nevada Supreme Court 2022). By Order dated June 30, 2022, the Nevada Supreme Court ruled in Plaintiff's favor, affirming a district court order upholding all Plaintiffs' claims in a shareholder class action, and in the process confirming the applicable standard for bringing "invalid merger" claims under Nevada law. Bottini & Bottini is sole Lead Counsel in the case.

- *Wilhoite v. Xiaodi Hou,* 2024 U.S. Dist. LEXIS 12040 (S.D. Cal. Jan. 23, 2024) (order granting Plaintiffs' Motion for TRO to prevent company executives from transferring intellectual property to China).

- *Pettry v. Gilead Sciences., Inc.*, 2020 Del. Ch. LEXIS 347 (Nov. 24, 2020) (entering judgment in Plaintiff's favor after inspection demand trial) and *Pettry v. Gilead Sciences., Inc.*, 2021 Del. Ch. LEXIS 156 (Jul. 22, 2021) (granting Plaintiffs' fee-shifting motion under Delaware law after trial).

- *Diaz v. First American Home Buyers Protection Corp.*, 732 F.3d 948 (9th Cir. 2013) (holding that an unaccepted offer of judgment pursuant to F.R.C.P. 68 for full amount of plaintiff's damages does not moot a plaintiff's case; 9th Circuit refused to follow other circuits which had held to the contrary).

- *Reyes v. Zynga, Inc.*, No. 12–05065 JSW, 2013 WL 5529754 (N.D. Cal. Jan. 23, 2013) (granting plaintiff's motion to remand claims brought under the Securities Act of 1933 to state court).

- *Cook v. McCullough*, No. 11 C 9119, 2012, U.S. Dist. LEXIS 114621, 2012 WL 3488442 (N.D. Ill. August 13, 2012) (denying motion to dismiss in shareholder derivative action brought on behalf of Career Education Corporation against its officers and directors for breach of fiduciary duty).

- *Snellink v. Gulf Resources, Inc.*, No. 11-cv-03722-ODW, 2012 U.S. Dist. LEXIS 67839 (C.D. Cal. May 15, 2012) (denying motion to dismiss in securities-fraud class action complaint).

- *Smith v. Apollo Group, Inc.*, No. CV-11-0722-PHX-PGR, 2012 U.S. Dist. LEXIS 3672 (D. Ariz. Jan. 11, 2012) (denying defendants' motion to stay shareholder derivative case pending completion of an internal investigation by a Special Committee of the Board of Directors and also denying a stay of the case until

resolution of a related securities-fraud class action case).

- *Ferguson v. Corinthian Colleges, Inc.*, No. SACV 11-0127 DOC (AJWx), 2012 U.S. Dist. LEXIS 1358 (C.D. Cal. Jan. 5, 2012) (denying defendants' motion to stay case pending interlocutory appeal of order denying motion to compel arbitration as to plaintiffs' claims for injunctive relief under California Business & Professions Code §17200 et seq.); 2011 U.S. Dist. LEXIS 119261 (C.D. Cal. Oct. 6, 2011) (denying in part a motion to compel arbitration).

- *Rosendahl v. Bridgepoint Education, Inc.*, No. 11cv0061 WQH (WVG), 2011 U.S. Dist. LEXIS 119735 (S.D. Cal. Oct. 17, 2011) (denying in part motion to dismiss consumer class action complaint alleging fraud and misrepresentation by for-profit college);

- *Bottini v. City of San Diego*, 27 Cal. App. 5th 281 (2018) (affirming trial court's grant of mandamus in action to set aside City Council resolution due to the improper use of baseline in California Environmental Quality Act ("CEQA") appeal; successfully arguing that prior California Supreme Court opinion was abrogated in light of subsequent U.S. Supreme Court precedent).

- *Juen v. Alain Pinel Realtors, Inc.*, 32 Cal. App. 5th 972 (2019) (6th Dist.) (affirming denial of petition to compel arbitration; rejecting defendants' reliance on custom-and-habit evidence and post-contract-formation assent to arbitration).

- *Spracher v. Paul M. Zagaris, Inc.*, 39 Cal. App. 5th 1135 (2019) (1st Dist.) (affirming denial of petition to compel arbitration; concluding that plaintiff carried the heavy burden of proving that defendants waived the right to compel arbitration).

- *In re Fidelity Nat'l Home Warranty Co. Cases*, 46 Cal. App. 5th 812 (2020) (4th Dist.) (concluding, as a matter of first impression, that an order dismissing a class action without resolving class notice does not constitute an appealable judgment; reversing in part after concluding that the time between assignment to a coordination motion judge and decision on petition for coordination must be excluded from the time to bring the case to trial).

- *In re Extreme Networks, Inc. Shareholder Derivative Litigation*, No. C-07- 02268-RMW, 2009 U.S. Dist. LEXIS 111445 (N.D. Cal. Nov. 17, 2009), reconsideration denied by, 2010 U.S. Dist. LEXIS 32685 (N.D. Cal. Apr. 2, 2010) (denying motion to dismiss and upholding shareholder derivative complaint, finding that plaintiff had adequately alleged demand futility under Federal Rule of Civil Procedure 23.1).

- *In re Brocade Communications Systems, Inc. Derivative Litigation*, 615 F. Supp. 2d 1018 (N.D. Cal. 2009) (denying in part and granting in part motion to dismiss in shareholder derivative action, after Mr. Bottini was retained by the Company's Special Litigation Committee and an amended complaint was filed on behalf of the Company).

- *In re Dynamic Random Access Memory Antitrust Litigation*, No. M 02-1486, 2006

U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006) (granting motion for class certification in direct purchaser antitrust class action involving DRAM computer memory).

- *Karlin v. Alcatel*, No. SA CV 00-0214-DOC, 2001 WL 1301216 (C.D. Cal. Aug. 13, 2001) (denying defendants' motion for summary judgment).

On April 18-20, 2005, Mr. Bottini gave a presentation on Securities Class Action Litigation at the 2nd Annual CFO Forum in Seoul, South Korea.

**Albert Y. Chang**

Mr. Chang specializes in representing shareholders and consumer in class actions. He also has extensive experience litigating privacy, data breach, and *qui tam* cases, and has substantial experience handling appeals.

Before joining Bottini & Bottini, Inc. in 2009, Mr. Chang had over ten years of experience in federal litigation. He served as a judicial law clerk to United States District Judge Suzanne B. Conlon for the Northern District of Illinois and to United States District Judge Roger T. Benitez for the Southern District of California.

In addition to his judicial clerkships, Mr. Chang litigated complex cases on behalf of both plaintiffs and defendants. He prosecuted securities and ERISA class actions on behalf of shareholders. He also defended executives, energy companies, insurers, and trade associations for six years at the New York office of Dewey & LeBoeuf LLP, where he focused on litigating high-stakes cases and conducting corporate internal investigations.

A member of the New York and California bars, Mr. Chang is admitted to practice in numerous federal trial and appellate courts. He is a graduate of Beloit College (B.A. 1997) and Indiana University School of Law-Bloomington (J.D. 2001). He is fluent in Cantonese and Mandarin.

**Aaron P. Arnzen**

Aaron P. Arnzen is an experienced litigator and trial attorney who specializes in representing shareholders in class action and derivative litigation.

Prior to joining Bottini & Bottini, Mr. Arnzen was an Assistant United States Attorney in the Southern District of California. At the U.S. Attorney's Office, Mr. Arnzen primarily focused on the investigation and prosecution of complex securities fraud schemes, including insider trading, accounting fraud, market manipulation, offering frauds, and Ponzi schemes. He was the lead prosecutor in the criminal case against Gina Champion-Cain, who carried out the largest Ponzi scheme in the history of the District. Mr. Arnzen has well-honed trial skills, having conducted jury trials on behalf of the United States in cases involving insider trading, pump-and-dump schemes, government procurement fraud, mortgage fraud, perjury, and drug smuggling. Mr. Arnzen was also named Chief of the Major Frauds and Public Corruption Section of the U.S. Attorney's Office, where he oversaw hundreds of white-collar investigations. In addition, Mr. Arnzen served as the Office's designated Financial Fraud Coordinator, responsible for providing input on all aspects of financial- and securities fraud-related investigations in the Office, and coordinating matters that intersected with other federal and state authorities.

Before he was a federal prosecutor, Mr. Arnzen served as a Staff Attorney and Senior Trial Counsel with the United States Securities and Exchange Commission's Division of Enforcement, having been posted in the SEC's New York and San Francisco Regional Offices. While at the SEC, Mr. Arnzen acted as the primary SEC enforcement attorney dedicated to the investigation of Bernard Madoff and his co-conspirators. He also litigated and investigated cases focused on high frequency trading, asset management, broker-dealer practices, accounting fraud, Ponzi schemes, and manipulative trading.

Mr. Arnzen began his legal career with Cooley LLP, where he represented corporate and individual clients in criminal and regulatory inquiries, internal investigations, and class action securities litigation. He second-chaired the successful defense of a "Big 5" audit engagement partner in successive federal criminal trials that cumulatively lasted more than five months. He also co-chaired the firm-wide Associates Committee, and received the San Diego Volunteer Lawyer Program's award for Pro Bono Lawyer of the Year.

In addition, Mr. Arnzen has in-house business experience, having worked for a multi-national company as a Certified Public Accountant in financial reporting, internal auditing, and financial analysis roles.

Mr. Arnzen is a 2001 graduate, with honors, of the University of North Carolina, Chapel Hill, School of Law, and a 1994 graduate of the University of Cincinnati, where he graduated summa cum laude with a degree in Business Administration. While at UNC, Mr. Arnzen served as an Articles Editor for the Law Review. His articles include *U.S. v. Dickerson: A Case Study in Executive Constitutional Interpretation*, 78 N.C. L. REV. 1153 (2000). Mr. Arnzen was certified as a public accountant by the Ohio Board of Accountancy (license currently inactive). He is admitted to California State Bar; District of Columbia Bar; Ninth Circuit Court of Appeals; and the United States District Courts for the Southern, Central, and Northern Districts of California.

**Anne Bottini Beste**

Ms. Beste is of counsel to Bottini & Bottini, Inc. She practices complex civil litigation, with an emphasis in consumer, shareholder, and privacy class actions. She is a 1992 graduate of Northwestern University School of Law. She received her undergraduate degree in 1989 from Boston College, where she was Phi Beta Kappa and graduated *magna cum laude* with a B.A. in Economics. From 1996 to 2001, Ms. Beste practiced complex civil litigation at Swidler Berlin Shereff Freidman, LLP in Washington, D.C. Her practice at Swidler Berlin included employment litigation, environmental litigation, and trade secret litigation. Ms. Beste is admitted to practice in Washington, D.C., Missouri, Illinois, and California. Her reported cases include *Pettry v. Gilead Sciences., Inc.*, 2020 Del. Ch. LEXIS 347 (Nov. 24, 2020) (entering judgment in Plaintiff's favor after inspection demand trial) and *Pettry v. Gilead Sciences., Inc.*, 2021 Del. Ch. LEXIS 156 (Jul. 22, 2021) (Court granted Plaintiffs attorneys' fees and expenses in inspection demand under Delaware law).

**Nina M. Bottini**

Nina M. Bottini is a 2001 graduate of Heinrich-Heine-University School of Law, Dusseldorf, Germany, and received an LL.M. degree (Masters in Comparative Law) from California Western

School of Law in 2006. Ms. Bottini specializes in securities class action litigation, ERISA class action litigation, antitrust, securities, and shareholder derivative actions.

Her representative cases include In re DRAM Antitrust Litigation, MDL No. 1486 (N.D. Cal.), and *In re Brocade Communications Systems, Inc. Deriv. Litig.*, No. 1:05cv41683 (Cal. Super. Ct., County of Santa Clara).

**Michelle Ciccarelli Lerach**

Ms. Lerach is a 1993 graduate of the University of Kentucky School of Law and is admitted to the Kentucky and California bars. Ms. Lerach has dedicated her life to fighting for those without enough voice, from fighting for immigrants' rights as a young law student to serving as partner/Of Counsel to the nation's largest plaintiff's firms, representing shareholders, workers, and consumers in a broad range of complex and class-action litigation for fraudulent business practices, human rights abuses, and labor and employment violations.

After graduating from the University of Kentucky College of Law, Ms. Lerach served as law clerk to the Honorable Sara Walter Combs, Kentucky Court of Appeals, and practiced

law in Lexington (Newberry, Hargrove & Rambicure, PSC) and Louisville (Greenbaum, Doll & McDonald, LLP) before relocating to California in 1999.

In California, she joined Milberg Weiss and was a lead litigator in many cases, including *Does I v. The Gap, Inc.*, Case No. 01-0031 (D.N. Mariana Islands), a case on behalf of approximately 25,000 sweatshop workers against leading clothing manufacturers, which successfully concluded with a $20 million settlement and a precedent-setting Monitoring Program to oversee labor and human rights practices in Saipan's garment factories. During her time at the firm and successor firms, she also worked on cases on behalf of the Sierra Club & the International Brotherhood of Teamsters (cross-border trucking), as well as a number of high-profile securities class actions such as Enron ($7.3 billion recovered) and coordinated private actions like WorldCom. In 2008, she received the Consumer Attorneys of California, Women's Law Caucus Award as Outstanding Consumer Advocate.

Ms. Lerach's passion for law intersects with activism both in her pro bono work and in her teaching: she worked as a consultant to the Liberian Ministry of Gender & Development with respect to that country's proposed constitutional revisions, specifically as relates to gender neutrality; an outspoken critic of current GMO labeling policy, she was involved in the 2012 California ballot initiative to label GMOs (Prop 37), organizing university forums and debating opponents of the measure in San Diego, and served on the steering committee of Californians for GE Labeling, which spearheaded the renewed effort to achieve GMO labeling in California in 2016; and she is an advocate for sustainable farm internship programs, and was chosen as one of San Diego Magazine's 50 People to Watch 2011 for this work.

Ms. Lerach speaks regularly at a number of institutions, including previous presentations at the Buchmann Faculty of Law at Tel Aviv University (regarding the recently adopted Israeli class-action statute), Cornell University Law School (Joint JD/MBA Program), the University of Kentucky College of Law (Randall-Park Colloquium), and most recently the University of San Diego, moderating panels on Ethical Eating and Water Matters (in conjunction with the

Changemaker Challenge) and the Future Thought Leaders series on behalf of the Berry Good Food Foundation on UCTV, for which she has received four San Diego Press Club Excellence in Journalism Awards. She was the author of "Improving Corporate Governance Through Litigation Settlements," Corporate Governance Review.

Ms. Lerach serves as the Vice Chair of the Board of the University of California Press Foundation, focused on progressive scholarship; a member of the Advisory Board of the Women Peacemakers Program at the Kroc Institute for Peace & Justice at the University of San Diego; an Advisor to Kiss the Ground, devoted to promoting regenerative agriculture, connecting sustainable agricultural practices to the larger issue of climate change, and Executive Producer to a documentary film of the same name slated for release 1/18; and Founder/President of the Berry Good Food Foundation.

Ms. Lerach is currently serving as one of the lead counsel in *Mayberry et al., Derivatively as members and Beneficiaries of Trust Funds on behalf of the Kentucky Retirement Systems v. Aldridge et al*, CASE No. 2019-CA-000043-OA (Circuit Court, Franklin, Kentucky), a derivative action seeking to recover billions of dollars in losses sustained by the Kentucky Retirement System due to wrongdoing committed by KKR, Blackstone, and various individual defendants.

**Stephanie M. Ammirati**

Ms. Ammirati is a paralegal specializing in complex civil litigation, consumer class actions, and shareholder derivative litigation. Before joining the firm in 2010, Ms. Ammirati developed a legal career as an attorney in both private practice and government service. She is a member of the Washington State Bar Association as well as the Idaho State Bar, and has an extensive range of experience in civil litigation.

Between 2006 and 2010 Ms. Ammirati served as a Deputy Attorney General at the Office of the Attorney General for the State of Idaho. Before her appointment as a Deputy Attorney General, Ms. Ammirati had nine years of experience in civil litigation while in private practice in Seattle. Additionally, she devoted time to volunteer work in the community by serving as a Court-Appointed Special Advocate (CASA) for many years. She also assisted domestic violence victims by providing pro bono legal services at the New Beginnings Family Law Clinic, and was a Board of Trustees Member of the FRIENDS of CASA.

Ms. Ammirati received her Juris Doctor from Loyola Law School where she graduated on the Dean's List and was the recipient of the Wiley W. Manuel Award for Pro Bono Legal Services. While in law school, she developed her legal skills through Loyola's externship programs, performing clinical work at the Civil Appellate Division of the Los Angeles City Attorney's Office, the Maynard Toll Pro Se Counseling Center, and the Alliance for Children's Rights. Ms. Ammirati received her Bachelor of Arts degree from Pepperdine University where she graduated *summa cum laude* and was awarded Valedictorian of her class.

**Shelby Ramsey**

Ms. Ramsey has ten years of experience as a complex litigation paralegal, primarily in plaintiffs' securities class actions, mergers and acquisitions, ERISA matters, shareholder derivative actions, and consumer and employee class action litigation.

Ms. Ramsey earned a Bachelor of Arts degree in Legal Studies, with a Minor in Speech Communications, in 2006 from Chapman University. She received her American Bar Association-approved Paralegal certificate from the University of San Diego in 2007.

# EXHIBIT B

# Exhibit B

**Firm Name: Bottini & Bottini**
Time through 7/31/2025

| Professional Name (Status) | Hourly Rate | Categories 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Francis A. Bottini, Jr. (P) | $1,090.00 | 9.90 | 1.90 | 43.50 | 25.30 | 49.40 | 16.00 | 19.30 | | 29.50 | 7.70 | 17.50 | 35.90 | | | 8.60 | | | | 12.10 | | | 0.90 | 277.50 | $302,475.00 |
| Yury Kolesnikov (A) | $795.00 | 1.70 | | 20.70 | 34.60 | 70.00 | 1.60 | | 8.60 | 58.00 | 50.40 | 75.60 | 190.50 | | 9.80 | 41.20 | 92.30 | 1.20 | 151.10 | 28.60 | | | | 835.90 | $664,540.50 |
| Nicholas Woltering (A) Tier I Doc Review | $325.00 | | | | | | | | | | | | | 796.00 | | | | | | | | | | 796.00 | $258,700.00 |
| Nicholas Woltering (A) | $685.00 | | | | 12.70 | 1.60 | | | | | | | 67.40 | | 231.10 | 5.30 | 6.80 | | | 2.20 | | | | 327.10 | $224,063.50 |
| Stephanie Ammirati (PL) | $300.00 | 114.20 | 0.70 | | | | | | | | 0.90 | 10.20 | 2.40 | | | | | | 4.20 | | | | | 132.60 | $39,780.00 |
| Amelia Ardito (PL) | $300.00 | 92.70 | | | | | | | | 10.20 | | 21.30 | 28.90 | 2.60 | | 9.80 | | | 6.60 | | | | | 172.10 | $51,630.00 |
| Aaron Arnzen (A) | $880.00 | 3.50 | | | 1.80 | 21.60 | | 28.90 | | | 7.20 | 20.90 | 0.80 | | | | | | | 1.60 | 62.00 | | | 148.30 | $130,504.00 |
| **Total:** | | **222.00** | **2.60** | **64.20** | **74.40** | **142.60** | **17.60** | **48.20** | **8.60** | **97.70** | **66.20** | **145.50** | **325.90** | **798.60** | **240.90** | **64.90** | **99.10** | **1.20** | **161.90** | **44.50** | **62.00** | **0.00** | **0.90** | **2689.50** | **$1,671,693.00** |

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

# EXHIBIT C

# Exhibit C

Bottini & Bottini, Inc. – Annual Hours and Lodestar

| Year | Sum of Time | Sum of Lodestar |
|---:|---:|---:|
| 2020 | 21.00 | $22,831.00 |
| 2021 | 329.00 | $270,069.00 |
| 2022 | 1712.80 | $895,103.00 |
| 2023 | 411.30 | $292,687.00 |
| 2024 | 158.70 | $138,232.00 |
| 2025 | 56.70 | $52,771.00 |
| **Grand Total** | **2689.50** | **$1,671,693.00** |

# EXHIBIT D

# Exhibit D

Bottini & Bottini, Inc. – Expenses

| Description | Cumulative Total |
|---|---|
| Court Fees (filing, etc.) | $402.00 |
| Court Reporters/Transcripts | $3,826.10 |
| Computer Research | $13,506.30 |
| Reproduction/Duplication/Copies | $6,828.17 |
| Notice Costs | $0.00 |
| Express Delivery/Messenger | $238.09 |
| Pre-approved Professional Fees/Services (expert, investigator, accountant, etc.) | $0.00 |
| Service of Process | $0.00 |
| Telephone/Fax/Postage | $455.01 |
| Travel: | |
| ** Airline (Professional/Destination/Purpose) | $3,450.37 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $832.28 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | $30.63 |
| ** Meals (Professional/Purpose) | $342.53 |
| ** Lodging (Professional/Destination/Purpose) | $2,042.08 |
| ** Other (Describe/Professional/Destination/Purpose) | $0.00 |
| Litigation Assessments | $0.00 |
| Miscellaneous: (Describe): | $111.80 |
| | (-$245,000.00).[1] |
| **TOTAL EXPENSES** | **$32,065.36** |

[1] Contributions paid by Bottini & Bottini, Inc. to the plaintiffs' common litigation fund are accounted for separately, so are excluded from this individual law firm cost summary.