No. 26-2638

# In the United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

KIMBERLEY WOODRUFF; et al.,
*Plaintiffs-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:21-cv-02155-YGR (The Hon. Yvonne Gonzalez Rogers)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
## VOLUME III OF VII

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94602
(415) 692-0772

MATTHEW W.H. WESSLER
ALISA C. PHILO
GUPTA WESSLER LLP
1400 16th Street NW, Suite 225
Washington, DC 20036
(202) 888-1741
*matthew@guptawessler.com*

October 28, 2026

*Counsel for Plaintiffs-Appellants*

*(Additional counsel listed on inside cover)*

FRANCIS A. BOTTINI, JR.
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
(858) 914-2001

THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

DAVID A. STRAITE
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 993-1000

LESLEY WEAVER
ANNE K. DAVIS
STRANCH, JENNINGS & GARVEY, PLLC
1111 Broadway, Suite 03-130
Oakland, CA 94607
(341) 217-0550

BRIAN DANITZ
NANCI NISHIMURA
COTCHETT PITRE & MCCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation*, <br><br> This Document relates to: *all actions*. | **CASE NO. 4:21-cv-02155-YGR** <br><br> **DECLARATION OF LESLEY E. WEAVER IN SUPPORT PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES** |

I, Lesley E. Weaver, declare:

1. I am a partner at Bleichmar Fonti & Auld LLP ("BFA"). I have been licensed to practice law in the state of California since 1997. I am admitted to practice before this Court. The following facts are within my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I submit this declaration in support of Plaintiffs' Motion for and Award of Attorneys' Fees, Costs and Expenses.

3. On March 26, 2021, I and my team at BFA drafted and filed a proposed class action lawsuit on behalf of Benjamin Hewitt and Kimberley Woodruff against Google LLC in the United States District Court for the Northern District of California, assigned Case No. 21-cv-02155. My clients' action was related to and consolidated into the instant action, *In Re Google RTB Consumer Privacy Litig*., Case No. 4:21-cv-02155-YGR-VKD (this "Action"), on June 24, 2021. *See* ECF No. 69. This complaint was the first of its kind in the United States to challenge what Google shared with third parties through its real time bidding auction. The work I performed on the initial draft was based on my personal review of Google's public Chromium code, analysis of Google's policies and disclosures, and work with consulting experts, both technical and privacy-focused, as well as the hard work of our team. Learning what we did about the data flow and its use, I thought it was important to challenge Google's false promises about how data is used in its RTB auction.

4. I have been the head of my firm's consumer and antitrust practice since 2016, when I joined the firm. I have practiced civil litigation in the Northern District of California on behalf of consumers and individuals since 1999, focusing primarily on class actions. Our predominantly consumer-facing department is supported by the work of nine attorneys practicing in the areas of consumer class actions, which can include unfair competition law, privacy class actions, as well as derivative matters on behalf of institutional investors. I am the Partner-in-Charge of the California office of the firm. Attached hereto as **Exhibit A** is the firm resume.

5. Our team has a long history of successfully handling class actions across a range of industries, including privacy class actions. I bring substantial experience in complex litigation and

class action matters with a history of litigating in an efficient and practical manner. *See* **Exhibit A** at 23–25.

6. I have an extensive background in privacy and consumer protection class action litigation. I have litigated more than fifty complex litigation or class action cases across the country over the past thirty years involving privacy, unfair competition, consumer protection, or other claims. Below is a list of some recent matters in which I have served in a leadership positions, either as Co-Lead Counsel or on an Executive Committee:

- *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 3:18-md-02843 (N.D. Cal.) (Co-Lead Counsel);
- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-02672 (N.D. Cal.) (PSC);
- *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation*, No. 3:17-md-02777 (N.D. Cal.) (PSC);
- *In re: Allstate & Arity Consumer Privacy Litigation*, No. 1:25-cv-00407 (N.D. Ill.) (PEC);
- *In re Bank of America Unauthorized Account Opening Litigation*, No. 3:23-cv-00422 (W.D.N.C.) (Co-Lead Counsel); and
- *In re: ZF-TRW Airbag Control Units Products Liability Litigation*, No. 2:19-MD-02905 (C.D. Cal.) (PEC).

7. On August 3, 2021, the Court appointed me to serve on the Interim Plaintiffs' Executive Committee in this Action. S*ee* ECF No. 77.

8. Our team has been actively involved in the litigation of this Action under the direction of Interim Class Counsel. Our work has included among other tasks, conducting factual and technical investigation and analysis in connection with drafting the initial complaint, as well as the legal analysis of Google's policies and disclosures. I and members of my team researched and analyzed underlying issues of law and fact in drafting the initial complaint, including extensive analysis of terms and conditions. My office, and I personally, corresponded with potential plaintiffs and class members and I played a key role in coordinating with other plaintiffs' counsel regarding consolidation and leadership issues. Throughout this action, I, and key litigators in my office, including Anne Davis and Joshua Samra, have participated in and contributed to conferences with Interim Class Counsel to develop litigation strategy and assign tasks, share developing evidence, and craft strategies for further discovery and expert analysis; drafted discovery requests and negotiated the method and scope of

discovery with Defendants; my team also reviewed and analyzed documents produced by Defendants and/or third-parties and publicly available documents; responded to Defendants' discovery requests; participated in drafting of and contributed legal research and analysis in support of Plaintiffs' opposition to Defendants' motion to dismiss, Plaintiffs' motions for class certification, and extensive briefing arising from offensive and defensive discovery, as well as assisting in the preparation of those filings; prepared for and deposed Defendants' and/or third-parties' employees and senior executives; deposed Defendants' experts and defended Plaintiffs' experts in deposition; worked with Plaintiffs' experts in their preparation of opening expert reports and rebuttal reports; worked with experts and consultants for purposes of determining classwide damages and liability for purposes of mediation class certification, and trial; prepared for and attended court hearings; and developed litigation strategy for summary judgment and potential trial. I also played a significant role in settlement discussions and my team also worked with Interim Class Counsel and Plaintiffs' experts on settlement. Our team also participated in preparing motion papers in support of approval of the settlement, and assisted in the preparation of that filing.

9. The Court's order appointing Interim Lead Counsel and an Interim Plaintiffs Executive Committee (ECF No. 77) included directives for periodic reporting of professional time, costs and expenses incurred in this Action by plaintiffs' counsel and their law firms. Interim Lead Counsel followed that order with a comprehensive time and expense protocol for submitting time and expense reports to Lead Counsel for her review and audit. I was primarily responsible for compliance with all time and expense reporting requirements in this Action, for reviewing my firm's time and expense reports with such requirements in mind, and for communicating with Interim Lead Counsel regarding any time and expense audits performed by Interim Lead Counsel pursuant to the Court's appointment order and its time and expense reporting directives, ECF No. 77.

10. Attached as **Exhibit B** is a chart listing thirteen (13) attorneys and staff that have worked on the Action, the hours each has spent working on specific categories of work as of July 31, 2025, and the 2024 hourly rate (or applicable rate cap) for each listed professional. The chart set forth in **Exhibit B** reflects audits undertaken by Interim Lead Counsel and BFA, both for the exercise of billing judgment and to ensure efficiencies.

11. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours those thirteen (13) attorneys and staff spent working on the Action, subtotaled by year, for each year from January 20, 2021 through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

12. **Exhibit B** and **Exhibit C** were prepared from contemporaneous, daily time records regularly prepared and maintained by BFA in its usual course and manner. BFA maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations are based on BFA's 2024 billing rates. These records are available for review at the request of the Court.

13. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my firm's representation of Plaintiffs and the Class, in coordination with Interim Lead Class Counsel, who approved the tasks and the hours spent on each task.

14. Contingent matters like this case always carry risk. In this particular action, against a well-funded defendant challenging a key business model, my firm managed our investment of resources and time reasonably and carefully. The hourly rates we charge are consistent with rates paid to counsel of the same caliber in the Northern District of California. It does not account for the risk of losing the case, in which event we would not have been compensated at all. We litigated this matter with the expectation that we would be compensated for this risk through a multiplier contingent upon our success.

15. I have general familiarity with the range of hourly rates typically charged by plaintiffs' class action counsel specifically in the field of unfair competition and privacy law in the geographical area where my firm practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by my firm are commensurate with those prevailing in the market in 2024 for legal services furnished in complex class action litigation such as this. My firm's hourly rates were most recently approved by the following Courts:

- *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 3:18-md-02843 (N.D. Cal.);
- *In re Talis Biomedical Securities Litigation*, No. 22-cv-00105 (N.D. Cal.);
- *Ciarciello v. Bioventus*, No. 1:23-cv-00035 (M.D.N.C.).

16. My firm has incurred expenses of $29,994.91 so far in litigating the Action. Attached as **Exhibit D** is a chart detailing these, by category of expense. All listed expenses are at cost, i.e., without any upcharge or associated overhead.

17. Throughout the litigation, my firm and I worked under the direction of Interim Lead Class Counsel, and I made every effort to operate as efficiently as possible and to avoid unnecessary duplication. I coordinated with Class Counsel for all work performed and costs incurred in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 23, 2025, at Oakland, California.

Dated: September 23, 2025

By: *__/s/ Lesley E. Weaver__*
Lesley E. Weaver

# EXHIBIT A

BFA
BLEICHMAR
FONTI & AULD LLP

# FIRM RESUME

BFA BLEICHMAR FONTI & AULD LLP

## OVERVIEW

Bleichmar Fonti & Auld LLP ("BFA" or the "Firm") has acted as co-lead or executive committee counsel in some of the country's most significant consumer and antitrust class actions in recent years. Settlements of these actions have totaled more than $18 billion. BFA's cases are cutting-edge and high impact, involving developing AI technology, consumer privacy, and significant actions against high tech companies and automotive manufacturers. BFA brings a specialized mix of experience and expert analysis in privacy and automotive fields that match the needs of this case.

BFA's lawyers are nationally recognized as leading litigators in the field of privacy, consumer, and securities litigation. They are Chambers certified and have collectively garnered numerous awards, including California Lawyer of the Year, 500 Leading Plaintiff Consumer Lawyers, Top 500 Financial Lawyers, Titan of the Plaintiffs Bar, Elite Women of the Plaintiff's Bar, and Top 100 Civil Plaintiff Trial Lawyers. Our achievements have been profiled in a variety of national and international media, including *The Wall Street Journal*, *The New York Times*, *Law360*, *Chambers*, the *National Law Journal's Plaintiffs' Hot List*, and *The Legal 500*. We are also frequently asked to comment on breaking developments in antitrust, consumer, financial fraud, and other consumer-privacy related issues.

Lesley E. Weaver, head of the consumer and antitrust group, acted as Co-Lead Counsel in the largest private action settlement in *In re Facebook, Inc. Consumer Privacy User Profile Litig*., which arises out of the Cambridge Analytica scandal. After years of intense litigation by just two plaintiff firms, the BFA team secured a historic settlement of $725 million on behalf of more than 240 million people, establishing an important benchmark for the value of privacy to consumers.

Ms. Weaver is also currently acting as Co-Lead Counsel in *In re Google Generative AI Copyright Litigation*, a class action brought on behalf of authors and artists whose protected, original work was used as an input to train Google's AI products in violation of copyright laws. Ms. Weaver also serves as Co-Lead Counsel in *In re Wells Fargo & Co. Consolidated Derivative Shareholder Litig.*, an action against the Wells Fargo Board for breach of their fiduciary duties for their failure to prevent discrimination in lending and hiring by the bank against non-white employees and applicant lenders. On September 20, 2024, in a decision noted by legal scholars including Allison Frankel, Judge Thompson upheld plaintiffs' notoriously difficult *Caremark* claims. That is, Judge Thompson found that Wells Fargo's board must respond to plaintiffs' claims that the board should be liable for failing to execute their fiduciary duties to prevent the Company from discriminating in lending and hiring.

Ms. Weaver also served on the plaintiffs' steering committee of *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, which resulted in settlements totaling more than $17 billion, the largest automotive settlement in

history. The BFA team participated in settlement negotiations overseen by Special Master Mueller and the prosecution of Bosch, the maker of the so-called "defeat device," involving investigations in the United States and Germany. Ms. Weaver has served or is serving on executive committees of other signification automotive litigation, including *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litig.*, which resulted in a settlement of $307.5 million; and *In re ZF-TRW Airbag Control Units Products Liability Litig.*, which has resulted in settlements of $147.8 million to date. BFA has also participated in antitrust matters resulting in recoveries totaling many hundreds of millions of dollars for consumers.

Ms. Weaver also serves on the executive committee of *In re Google RTB Consumer Privacy Litig.*, a nationwide class action challenging Google's practice of sharing and selling users' personal information through Google's digital ad auction system, Google Real-Time Bidding (RTB), and *Ji, et al. v. Naver Corp.*, representing users of the mobile messenger app, LINE Messenger, and photo altering app, B612, who had their personal information surreptitiously collected by the defendants responsible for marketing and operating the apps.

BFA
BLEICHMAR
FONTI & AULD LLP

## CONSUMER LITIGATION HIGHLIGHTS

The Consumer Protection Group plays an important role in significant actions, including those described below.

| | |
|---|---|
| ***In re Facebook, Inc. Consumer Privacy User Profile Litigation***<br>• MDL No. 2843<br>• Northern District of California, No. 3:18-md-02843<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Sara Pildis Simnowitz, Joshua D. Samra | Total Settlement:<br>$725 Million |

Background: This high-profile case arising out of the Cambridge Analytica scandal, was brought on behalf of millions of Facebook users in the U.S. whose private content was unlawfully shared by Facebook with numerous third parties. The hard-fought and contentious litigation was overseen by United States District Judge Vince Chhabria and then-Magistrate and now District Judge Jacqueline Scott Corley of the Northern District of California, as well as by discovery mediators Daniel Garrie and Judge Gail Andler. Mr. Garrie also served as the Special Master for discovery disputes, and former U.S. Magistrate Judge Jay C. Gandhi mediated the settlement. The litigation set a new benchmark for resolving privacy class actions not only in the U.S. but also internationally and created new strategies and standards, including focusing on the breach of contract claim.

BFA's Role: Ms. Weaver was appointed Co-Lead Counsel by Judge Chhabria after an extensive vetting process.

Status: On October 10, 2023, Judge Vince Chhabria issued an Order Granting Final Approval of the $725 million class action settlement. This is the largest privacy settlement resolved through private litigation and the most Meta has ever paid to resolve such a case. On February 13, 2025, the U.S. Court of Appeals for the Ninth Circuit affirmed Judge Chhabria's decision. The litigation is notable not only for the settlement amount, but for the many significant orders issued and the public evidence generated in the matter, which has been used by privacy advocates around the world. *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899 (N.D. Cal. 2023); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019).

BFA BLEICHMAR FONTI & AULD LLP

| *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*<br>• MDL No. 2672<br>• Northern District of California, No. 3:15-md-02672<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Total Settlements:<br>$17 Billion |
|---|---|

Background: This landmark case resolved claims against Volkswagen, Audi, and Porsche in connection with the widely-reported news that the companies had installed emission systems created to avoid regulator detection and defraud customers who believed they were buying Volkswagen and Audi vehicles with "clean diesel" engines. VW admitted that it installed these "defeat devices," which eliminated the emissions reduction during normal driving, and only allowed for reduced fuel emissions when the automobiles were being tested.

BFA's Role: Judge Charles R. Breyer appointed Ms. Weaver to the Plaintiffs' Steering Committee. Ms. Weaver's leadership position in the case included spearheading the investigation that ultimately uncovered German auto supplier Robert Bosch GmbH's significant role in multiple schemes to place software purposefully designed to evade emissions laws in vehicles. She also led the investigation into additional claims relating to defeat devices in certain gas vehicles, resulting in an additional $96.5 million settlement for the Class.

Status: Lead Counsel and the Plaintiffs' Steering Committee have achieved settlements for Plaintiffs worth more than $17 billion, the largest automotive class action recovery in history.

| *In re Google RTB Consumer Privacy Litigation*<br>• Northern District of California, No. 4:21-cv-02155<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Gregory S. Mullens, Joshua D. Samra | Case Status:<br>Pending |
|---|---|

Background: The case is the first in the country to demand transparency about what information Google reveals about its users when it auctions ad placements to Google users through Google's "Real-Time Bidding" system.

BFA's Role: Ms. Weaver is a member of the Plaintiffs' Executive Committee.

Status: On May 7, 2025, the parties notified the Court that they reached a settlement in principle to resolve the litigation on a classwide basis.

BFA
BLEICHMAR
FONTI & AULD LLP

| *In re Google Generative AI Copyright Litig.*<br>• Northern District of California, No. 5:23-cv-03440<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Gregory S. Mullens, Joshua D. Samra | Case Status:<br>Pending |
|---|---|

Background: The is a cutting-edge challenging the practice of using copyright materials to train AI language models. Author and Artist Plaintiffs allege that Google has infringed their copyrights by scraping and using their copyrighted works to train its AI products, including Gemini. This case addresses issues in the intersection of AI technology and copyright law.

BFA's Role: On December 18, 2024, Judge Lee approved Ms. Weaver's position as Co-Lead Counsel.

Status: On December 22, 2024, Plaintiffs filed a consolidated complaint. The parties have briefed Defendants' motion to dismiss.

| *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation*<br>• MDL No. 2777<br>• Northern District of California, No. 3:17-md-02777<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Total Settlements:<br>$307.5 Million |
|---|---|

Background: This case resolved claims against Fiat Chrysler and Bosch over allegations that they deliberately cheated on emission testing of 2014–2016 model Dodge and Jeep trucks marketed and sold as environmentally friendly "eco-diesel" vehicles.

BFA's Role: Judge Edward M. Chen of the U.S. District Court for the Northern District of California appointed Ms. Weaver as one of nine members of the Plaintiffs' Steering Committee. Ms. Weaver played a key role in litigating the action, including taking depositions and coordinating with experts.

Result: The case has settled for $307 million in cash in addition to extended warranties worth more than $120 million.

| *In re: Allstate & Arity Consumer Privacy Litig.*<br>• Northern District of Illinois, No. 1:25-cv-00407<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Joshua D. Samra, Gregory S. Mullens | Case Status:<br>Pending |
|---|---|

Background: *In re: Allstate & Arity Consumer Privacy Litigation* seeks redress from Allstate and its data analytics subsidiary, Arity, for their unlawful harvesting of consumer data through mobile apps, use of such consumer data to increase policyholders' insurance rates, as well as the sale of such consumer data to other auto insurers and third parties.

BFA BLEICHMAR FONTI & AULD LLP

BFA's Role: Lesley Weaver was appointed to the Plaintiffs' Executive Committee on April 10, 2025.

Status: On April 10, 2025, the Honorable Jeremy C. Daniel consolidated cases and appointed leadership. On May 27, 2025, Plaintiffs filed a consolidated complaint.

| | |
|---|---|
| *Ji, et al. v. Naver Corp., et al.*<br>• Northern District of California, No. 4:21-cv-05143<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Joshua D. Samra, Gregory S. Mullens | Case Status: Pending |

Background: The class action complaint alleges Defendants surreptitiously collected personal information of users of the mobile messenger app, LINE Messenger, and photo altering app, B612.

BFA's Role: BFA is acting as Co-Lead Counsel representing the class of users of the LINE Messenger and B612 apps.

Status: Plaintiffs filed their First Amended Class Action Complaint on October 28, 2022. On October 3, 2023, Judge Haywood S. Gilliam, Jr. largely denied Defendants' motion to dismiss. Discovery in this matter is ongoing.

| | |
|---|---|
| *In re Bank of America Unauthorized Account Opening Litig.*<br>• Western District of North Carolina, No. 3:23-cv-00422<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Joshua D. Samra, Gregory S. Mullens | Case Status: Pending |

Background: The Bank of America Unauthorized Account Opening action consolidates a series of cases brought on behalf of consumers alleging that Bank of America engaged in the practice of unauthorized opening of accounts for its customers without their consent or knowledge, resulting in damages that included, among others, improper fee charges, negative credit consequences, and loss of control over protected personal information.

BFA's Role: On August 5, 2024, Judge Max O. Cogburn of the U.S. District Court for the Western District of North Carolina appointed Ms. Weaver as one of five members serving as Co-Lead Interim Class Counsel.

Status: On October 4, 2024, Plaintiffs filed the consolidated class action complaint and have briefed Defendant's motion to dismiss.

BFA BLEICHMAR FONTI & AULD LLP

| *In re: ZF-TRW Airbag Control Units Products Liability Litigation*<br>• MDL No. 2905<br>• Central District of California, No. 2:19-MD-02905<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Case Status:<br>$147,800,000 Million in Settlements; Remaining litigation pending |
|---|---|

Background: The class action complaint alleges the ZF-TRW airbag and seat belt control units in over 15 million cars sold are defective and may prevent airbags from inflating in the event of crash. This defect has been linked to at least eight deaths and several serious injuries.

BFA's Role: Judge John A. Kronstadt of the Central District of California appointed Lesley Weaver to the Plaintiffs' Steering Committee for this multidistrict litigation.

Status: On November 28, 2023, Judge Kronstadt granted final approval of the settlement for Toyota Class Members, with settlement benefits worth more than $147.8 million. On October 10, 2023, Plaintiffs announced a settlement with Mitsubishi Defendants and on September 27, 2024, Plaintiffs announced a settlement with the Hyundai-Kia Defendants. The remaining parties have briefed motions to dismiss, to stay discovery, and to compel arbitration.

BFA BLEICHMAR FONTI & AULD LLP

## U.S. ANTITRUST LITIGATION HIGHLIGHTS

Lesley Weaver has been appointed to leadership positions and the BFA team plays key roles in many significant antitrust actions, including in those described below.

| *In re Local TV Advertising Antitrust Litigation*<br>• MDL No. 2867<br>• Northern District of Illinois, No. 1:18-cv-0678<br>• Attorneys: Lesley E. Weaver, Anne K. Davis, Joshua D. Samra | Case Status:<br>$48 Million in Settlements;<br>Remaining litigation pending |
|---|---|

Background: Plaintiffs allege a price fixing cartel facilitated by an anticompetitive information exchange between and among certain major television station owners and operators to artificially inflate the prices of broadcast television spot advertisements.

BFA's Role: BFA acts as counsel for Plaintiff One Source Heating & Cooling, LLC and is an integral member of the litigation team.

Status: On November 6, 2020, Judge Virginia Kendall of the Eastern District of Illinois denied Defendants' motion to dismiss. On December 7, 2023, Judge Kendall granted final approval of a $48,000,000 settlement with defendants CBS, Fox, The Cox Entities, and ShareBuilders. The action against the remaining defendants is ongoing.

| *In re Packaged Seafood Products Antitrust Litigation*<br>• MDL No. 2670<br>• Southern District of California, No. 3:15-md-02670<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Case Status:<br>Settlements Totaling $39 Million Approved;<br>Remaining litigation and settlements pending |
|---|---|

Background: Plaintiffs allege Defendants entered into a conspiracy involving packaged seafood products in violation of the Sherman Act and state antitrust law.

BFA's Role: BFA is part of a critical discovery effort against a key Defendant.

Status: On July 30, 2019, Judge Janis L. Sammartino of the Southern District of California granted class certification to a class of direct purchasers. In January 2021, Direct Purchaser Plaintiffs and Defendant Tri-Union Seafoods d/b/a Chicken of the Sea International and Thai Union Group PCL (collectively, "COSI"), announced a settlement agreement in principle, and final approval was granted in the amount of $13,001,961.86 on March 7, 2023. On July 18, 2023, the Court granted final approval of a $20 million settlement between End Payer Plaintiffs and Defendants COSI. On August 22, 2023, the Court granted final approval of a $6,500,000 settlement between Commercial Food Preparer Plaintiffs and Defendants COSI. Commercial Food Preparer Plaintiffs and Defendants StarKist Co. and Dongwon Industries Co.,

BFA BLEICHMAR FONTI & AULD LLP

Ltd. reached a settlement on January 5, 2024. The remaining parties have briefed motions for summary judgment and are awaiting a decision.

| | |
|---|---|
| *In re Domestic Airlines Travel Antitrust Litigation*<br>• District of Columbia, No. 1:15-mc-01404<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Case Status:<br>$60 Million in Settlements;<br>Remaining litigation pending |

Background: Plaintiffs allege a conspiracy by the four largest commercial air passenger carriers in the United States—American Airlines, Inc., Delta Airlines, Inc., Southwest Airlines Co., and United Airlines, Inc.—to fix prices for domestic air passenger transportation services in violation of the Sherman Act by colluding to limit capacity on their respective airlines.

BFA's Role: BFA is a key part of plaintiffs' nonparty discovery committee and has led meet and confer negotiations with dozens of nonparties, resulting in the production of some of plaintiffs' best evidence.

Status: Plaintiffs settled for $15 million with Defendant Southwest Airlines and $45 million with Defendant American Airlines. On September 5, 2023, the District Court denied in full Delta's and United's Motions for Summary Judgment, which sought dismissal of Class Plaintiffs' claims.

| | |
|---|---|
| *In re Mexican Government Bonds Antitrust*<br>• Southern District of New York., No. 1:18-cv-02830<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Case Status:<br>$21 million in settlements; Remaining litigation pending |

Background: Plaintiffs allege that Defendant broker-dealers have fixed auctions for securities issued by the Mexican government and manipulated the bid-ask spread in transactions to U.S.-based investors, causing U.S.-based investors to pay artificially inflated prices for their Mexican government bonds.

BFA's Role: BFA represents Southeastern Pennsylvania Transit Authority and is assisting the team litigating the case in the Southern District of New York.

Status: Plaintiffs negotiated ice-breaker settlements with JPMorgan for $15 million and Barclays PLC for $5.7 million, and are cooperating in litigating against the remaining defendants, based on a highly detailed complaint based in part on incriminating documents received from the cooperating defendants. On February 9, 2024, the Second Circuit vacated the District Court's dismissal on jurisdictional grounds, finding that the alleged price-fixing had enough connection to New York to maintain the case in the United States.

BFA BLEICHMAR FONTI & AULD LLP

| *In re Disposable Contact Lens Antitrust Litigation*<br>• MDL No. 2626<br>• Middle District of Florida, No. 3:15-md-02626<br>• Attorneys: Lesley E. Weaver | Total Settlements:<br>$118 million |
|---|---|

Background: This case resolved claims against four leading contact lens manufacturers and the largest nationwide distributor of contact lenses. Plaintiffs alleged that defendants unilaterally imposed minimum retail prices for contact lenses, in violation of state and federal antitrust laws.

BFA's Role: BFA led discovery efforts against the largest manufacturer-Defendant, Johnson & Johnson.

Status: Plaintiffs settled with Defendant CooperVision, Inc. for $3 million, with Defendant Bausch & Lomb for $10 million, with Defendant ABB Optical Group LLC for $30.2 million, with Defendant Alcon Vision, LLC for $20 million, and with Defendant Johnson & Johnson Vision Care, Inc. for $55 million.

| *In re Farm-Raised Salmon and Salmon Products Litigation*<br>• Southern District of Florida, No. 19-CV-21551<br>• Attorneys: Lesley E. Weaver, Anne K. Davis | Total Settlements:<br>$85 Million |
|---|---|

Background: Plaintiffs alleged that defendants fixed prices of farm-raised Atlantic salmon sold in the United States.

Role: BFA worked with the executive team facilitating jurisdictional discovery.

Status: Plaintiffs achieved a $85 million settlement.

BFA
BLEICHMAR
FONTI & AULD LLP

## U.S. SECURITIES AND CORPORATE GOVERNANCE LITIGATION HIGHLIGHTS

BFA partners have represented lead plaintiffs in dozens of securities class actions, as well as investors in direct actions, including the cases featured below.

| | |
|---|---|
| ***Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Oklahoma Firefighters Pension and Retirement System v. Calhoun et al. and The Boeing Company***<br>• Eastern District of Virginia, No. 1:24-cv-01200 / Delaware Chancery Court, No. 2024-1210<br>• Clients: Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio<br>• Attorneys: Joseph A. Fonti, Javier Bleichmar, Lesley E. Weaver, Derrick B. Farrell, Matthew L. Miller, Evan A. Kubota, Thayne Stoddard, William Freeland, Brandon Slotkin, Robert B. Lackey | Case Status:<br>Pending |

Background: Plaintiffs allege that certain of Boeing's current and former board members and senior management, including former CEO David Calhoun, made (or participated in making) public misstatements about Boeing's safety measures and legal compliance.

BFA's Role: BFA is Counsel for Plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio.

Status: BFA represents Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio in two derivative actions involving Boeing. The first action is pending in the Eastern District of Virginia. That action alleges that the Company's board and senior management made public misstatements regarding systemic safety and quality issues that impacted Boeing aircraft, leading to the January 2024 incident when a Boeing 737 MAX's door plug blew out at 16,000 feet, causing significant financial, regulatory, reputational, and legal harm to Boeing. On December 20, 2024, U.S. District Judge Leonie Brinkema denied Defendants' motion to dismiss as to claims under the Securities Exchange Act of 1934, finding that "plaintiffs have pled with particularity violations of Section 10(b) and 14(a)." On February 3, 2025, Judge Brinkema advanced the claims to discovery.

The second action is pending in the Delaware Court of Chancery. That action alleges that the Company's board and senior management breached their fiduciary duties by failing to implement and oversee safety and compliance functions that led to systemic quality issues with Boeing aircraft. On March 20, 2025, Vice Chancellor Morgan T. Zurn appointed Ohio Public Employees Retirement System, State

BFA BLEICHMAR FONTI & AULD LLP

Teachers Retirement System of Ohio, and Oklahoma Firefighters Pension and Retirement System as Lead Plaintiffs and BFA as Co-Lead Counsel.

| | |
|---|---|
| *In re Wells Fargo & Co. Consolidated Derivative Shareholder Litigation*<br>• Northern District of California, No. 3:22-cv-05173<br>• Client: City of Plantation Police Officers' Retirement Fund, the City of Pontiac Reestablished General Employees' Retirement System, and Amy J. Cook<br>• Attorneys: Lesley E. Weaver, Derrick B. Farrell, Nancy A. Kulesa, Matthew L. Miller, Anne K. Davis, Joshua D. Samra, Robert B. Lackey | Case Status:<br>Pending |

Background: The Wells Fargo Derivative Action consolidates a series of cases brought on behalf of the shareholders of Wells Fargo & Company, alleging (among other things) that its Board of Directors breached their fiduciary duties with regards to Wells Fargo's discriminatory hiring and lending practices.

BFA's Role: On February 12, 2024, Judge Trina L. Thompson of the United States District Court for the Northern District of California appointed BFA as Co-Lead Counsel, representing the City of Plantation Police Officers' Retirement Fund, the City of Pontiac Reestablished General Employees' Retirement System, and Amy J. Cook as co-lead plaintiffs of In re Wells Fargo & Co. Consolidated Derivative Shareholder Litigation (the "Wells Fargo Derivative Action").

In making the appointment, Judge Thompson recognized BFA's "decorated counsel" with a "demonstrated . . . capacity to settle very large derivative shareholder actions and securities class actions."

Status: On September 19, 2024, the Court denied in part defendants' motion to dismiss, finding that the complaint adequately alleged that the Wells Fargo Board "Failed to Implement Reporting Systems and Controls as to the Mission Critical Issue of Fair Lending Compliance." Judge Thompson further wrote that "[t]he Board had no committee charged with direct responsibility to monitor fair lending compliance," it "did not monitor, discuss, or address fair lending compliance on a regular schedule," and "had no regular process or protocols that required management to keep the Board apprised for fair lending compliance practices, risks, or reports." What's more, the Court stated that "[d]uring a key period, management received reports that contained what could be considered red, or at least yellow, flags [with respect to fair lending compliance], and the Board minutes of the relevant period revealed no evidence that these were disclosed to the Board." The case is currently in discovery.

BFA BLEICHMAR FONTI & AULD LLP

| *The Police and Fire Retirement System of the City of Detroit v. Elon Musk, et al.*<br>• Court of Chancery of the State of Delaware, No. 2020-0477<br>• Client: Police and Fire Retirement System of the City of Detroit<br>• Lead Attorneys: Javier Bleichmar, Joseph A. Fonti, George Bauer, Nancy A. Kulesa, Thayne Stoddard | Case Status:<br>Pending Approval of $919 million Settlement |
|---|---|

Background: Plaintiffs allege that from 2017 to 2020, certain current and former members of Tesla's Board of Directors (the "Director Defendants") awarded themselves unfair and excessive compensation. This compensation was significantly above the compensation awarded to directors at Tesla's peer companies. Through these awards, plaintiff alleges that the Director Defendants breached their fiduciary duties and unjustly enriched themselves at Tesla's expense.

BFA's Role: BFA is co-Counsel representing Plaintiff Police and Fire Retirement System of the City of Detroit.

Status: BFA filed a complaint on June 17, 2020. On September 17, 2020, the Director Defendants filed an answer to the complaint. Thereafter, the parties engaged in extensive discovery: Plaintiff served numerous written discovery requests on Defendants, served 23 third-party subpoenas, completed 22 fact witness depositions, and the parties exchanged opening and rebuttal expert reports. On July 14, 2023, the parties agreed to settle the action on terms that amount to one of the largest derivative settlements in the history of the Delaware Court of Chancery.

The settlement contemplates the following considerations:

- The Director Defendants will return to Tesla the value of over 3.1 million options, which, by using an agreed-upon valuation methodology, are valued at over $919 million.
- Certain Director Defendants will permanently forego compensation for 2021, 2022, and 2023.
- Tesla and its Board of Directors will implement certain governance reforms regarding director compensation effective for the next five years. These reforms include: (i) conducting an annual review and assessment of director compensation with the assistance of an independent compensation consultant; (ii) providing disclosures to Tesla stockholders regarding the results of the annual review and assessment of director compensation, including any peer group or other comparative data; (iii) submitting proposed director compensation to an approval vote of the majority of Tesla stockholders who are unaffiliated with the Director Defendants and the other

members of the current Tesla Board; and (iv) reviewing Tesla's internal controls specific to director compensation and implementing any changes necessary to ensure appropriate administration of director compensation.

The hearing for approval occurred on October 13, 2023. The proposed settlement is subject to Court approval.

| *In re Teva Securities Litigation* | Total Settlement: $420 Million |
| --- | --- |
| • District of Connecticut, No. 17-cv-00558<br>• Clients: Ontario Teachers' Pension Plan Board and Anchorage Police and Fire Retirement System<br>• Attorneys: Joseph A. Fonti, Javier Bleichmar, Evan A. Kubota, Benjamin F. Burry, Sara Pildis Simnowitz, Thayne Stoddard | |

Background: Plaintiffs alleged that the company and its senior management made materially false and misleading statements that concealed that Teva had engaged in a multi-year scheme to exponentially increase generic drug prices across its portfolio, in some instances by more than 1000%. Often, these increases were in lock-step with so-called competitors.

BFA's Role: BFA was sole Lead Counsel for the Class and Court-appointed Class Representative Ontario Teachers' and named plaintiff Anchorage Police and Fire Retirement System.

Status: On June 2, 2022, BFA secured final approval of the $420 million settlement after five years of hard-fought litigation, including the Court's certification of the class and the Second Circuit's denial of defendants' attempt to appeal class certification, completing intensive fact and expert discovery, and preparing a summary judgment motion. This represents the second largest class settlement in the history of the District of Connecticut (where the case was pending), the fourth-largest within the Second Circuit (excluding cases arising from restatements or the 2008-09 financial crisis), and among the five largest securities settlements against a pharmaceutical manufacturer. No objections were filed. BFA's effort required over 77,000 hours of work, investing nearly $10 million in litigation and expert expenses, and navigating both Teva's financial distress and competing civil and criminal actions arising from the same alleged pricing conduct (including Teva USA's 2020 indictment by the U.S. Department of Justice). The resulting $420 million settlement was the first meaningful recovery related to this conduct.

In approving the settlement, Judge Underhill described Teva as "the most complex securities case I've ever had" and a "remarkably complex" case that "required analysis of a very broad portfolio of drugs." Judge Underhill praised BFA's work, stating: "The quality of the representation was excellent in the face of very quality

BFA BLEICHMAR FONTI & AULD LLP

defense . . . This was not a case that every law firm could handle, and I think it was done exceptionally well."

| | |
|---|---|
| *The Police Retirement System of St. Louis v. Granite Construction Incorporated, et al.*<br>• Northern District of California, No. 19-cv-04744<br>• Client: The Police Retirement System of St. Louis<br>• Attorneys: Peter Borkon, Javier Bleichmar, George N. Bauer, Benjamin F. Burry, Evan A. Kubota, Ross Shikowitz, Sara Pildis Simnowitz, Thayne Stoddard | Total Settlement:<br>$129 Million |

Background: Plaintiffs alleged that Granite and its senior management fraudulently misrepresented the impact of several of the company's largest joint venture construction projects on Granite's business. Specifically, plaintiffs asserted that Granite and its senior management understated the significant cost overruns and schedule delays the Company was experiencing as well as their impact on Granite's financial statements.

BFA's Role: BFA was sole Lead Counsel for Court-appointed Lead Plaintiff the Police Retirement System of St. Louis.

Status: BFA filed an amended complaint on February 20, 2020. In May 2020, Judge Alsup denied defendants' motion to dismiss. In January 2021, Judge Alsup certified the class, naming the Police Retirement System of St. Louis as class representative and BFA as class counsel. After beginning discovery and taking a number of depositions, the parties reached a $129 million settlement.

On March 17, 2022, Judge William Alsup granted final approval of a $129 million settlement BFA secured for Granite investors. In approving the settlement, Judge Alsup noted that the "$129 million settlement flowed from the hard work of class counsel, the discovery they took, the investigations they did, and their victories in court." He further observed that "the $129 million settlement is almost entirely the result of the hard work of class counsel," that "[c]lass counsel investigated this case in great depth," and that class counsel's efforts "plausibly led to a restatement" whereby Granite admitted that its financial statements could no longer be relied upon.

At the time, the settlement was the third largest approved in the Northern District of California in the last decade. The settlement promises to compensate investors for 20-30% of their estimated damages, which exceeds by nearly 400% the average rate of recovery in cases alleging claims under Section 10(b) of the Securities Exchange Act of 1934.

| | |
|---|---|
| *MTA v. Allianz Global Investors U.S., L.L.C.* | Case Status:<br>Confidential Settlement |

BFA BLEICHMAR FONTI & AULD LLP

- Southern District of New York, No. 20-CV-7842
- Client: Metropolitan Transportation Authority
- Attorneys: Javier Bleichmar, George Bauer

Background: Since 2008, the Metropolitan Transportation Authority ("MTA") invested nearly $200 million in Allianz Global Investor's ("AllianzGI") Structured Alpha funds. Due to AllianzGI's negligent and imprudent trading strategies and its failure to implement adequate risk management procedures, despite its commitment to do so, the MTA lost over 90% of its investment. AllianzGI's failure cost the MTA and similar institutional investors hundreds of millions of dollars.

BFA's Role: BFA represented the MTA in their suit against AllianzGI.

Status: BFA filed a complaint against AllianzGI on behalf of the MTA in September 2020. On September 30, 2021, the Court denied defendants' motion to dismiss, and after engaging in fact discovery and extensive mediation, the parties reached a confidential settlement that was announced on May 17, 2022.

*In re Talis Biomedical Securities Litigation,*

- Northern District of California, No. 3:22-cv-00105
- Client: Individual Investors
- Attorneys: Joseph A. Fonti, Evan Kubota

Case Status: $32.5 Million Settlement Pending

Background: Plaintiffs allege that the company, its senior officers and directors, as well as the underwriters for Talis's initial public offering ("IPO") violated Sections 11 and 15 of the Securities Act of 1933 by misrepresenting the effectiveness, regulatory status, and ability to manufacture the company's "Talis One" COVID-19 test in the offering documents for the IPO.

BFA's Role: BFA was appointed co-Lead Counsel for the putative class on June 3, 2022.

Status: BFA filed a second amended class action complaint on January 13, 2023. On April 28, 2023, the Court denied defendants' motion to dismiss. Plaintiffs' motion for class certification was granted on February 9, 2024. On November 22, 2024, BFA was granted preliminary approval of a $32.5 million class settlement.

BFA BLEICHMAR FONTI & AULD LLP

| | |
|---|---|
| *In re Citigroup Securities Litigation*<br>• Southern District of New York, No. 20-CV-9132<br>• Client: Public Sector Pension Investment Board ("PSP") and Anchorage Police & Fire Retirement System ("Anchorage")<br>• Attorneys: Javier Bleichmar, Joseph A. Fonti, Erin H. Woods, Benjamin F. Burry, Thayne Stoddard | Case Status: Pending |

Background: Plaintiffs allege that Citigroup and its senior management misrepresented and concealed that the company's internal controls and risk management systems suffered from serious and longstanding deficiencies that exposed the Company to massive regulatory penalties that will cost significantly more than $1 billion to remediate.

BFA's Role: BFA is sole Lead Counsel for Court-appointed Lead Plaintiff PSP and Named Plaintiff Anchorage.

Status: The Court appointed PSP as Lead Plaintiff and approved its choice of BFA as Lead Counsel on February 4, 2021. BFA filed an Amended Complaint on April 20, 2021. The Court granted defendants' motion to dismiss on March 24, 2023. BFA filed a motion to amend the complaint and a proposed Amended Class Action Complaint on May 24, 2023.

| | |
|---|---|
| *Peters v. Twist Bioscience Corp.*<br>• Northern District of California, No. 22-cv-08168<br>• Client: Policemen's Annuity and Benefit Fund of Chicago<br>• Attorneys: Joseph A. Fonti, Nancy A. Kulesa, George Bauer, Benjamin Burry, Joseph Baier, Alessandra Slayton | Case Status: Pending |

Background: Plaintiffs allege that from December 13, 2019 through November 14, 2022, Twist and its senior management misrepresented that the company possessed innovative proprietary technology to produce synthetic DNA at a higher quality and lower cost than competitors, positioning Twist for significant future growth. Plaintiffs further allege that defendants engaged in accounting improprieties to conceal the scheme.

BFA's Role: The Court appointed BFA as Lead Counsel to represent Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago on July 28, 2023.

Status: BFA filed an amended complaint on October 11, 2023. Defendants filed a motion to dismiss on December 6, 2023 and plaintiffs filed their opposition on January 26, 2024. The motion is presently pending.

BFA
BLEICHMAR FONTI & AULD LLP

| *Albert Chow v. Enochian Biosciences Inc. et al*<br>• Central District of California, No. 22-cv-01374<br>• Client: Individual Investors<br>• Lead Attorneys: Joseph A. Fonti, George Bauer, Joseph Baier, Alessandra (Sasha) Slayton | Case Status:<br>Settlement Pending |
|---|---|

Background: Plaintiffs allege that from January 17, 2018 through June 27, 2022, Enochian and its senior management misrepresented the qualifications of Serhat Gumrukcu, the Company's founder and "Inventor." Defendants repeatedly represented Gumrukcu as a medical doctor and world-class disease researcher to the public and based the Company's entire business model on his purported HIV cure. In truth, Gumrukcu was not a doctor, not a medical researcher, and had a long history of fraudulent business dealings and criminal activity. Gumrukcu is currently imprisoned and awaiting trial on murder charges stemming from allegations that he paid a hitman to kill a former business associate to prevent the associate from derailing Gumrukcu's work with Enochian.

BFA's Role: The Court appointed BFA as Lead Counsel for the putative class on October 22, 2023.

Status: On June 28, 2024, the Court denied Enochian's Motion to Dismiss in its entirety from the bench after oral argument from both parties. At the hearing, Judge Holcomb commended counsel for "excellent briefing [and] argument" and said he "wish[ed] all lawyers were as skilled and prepared as you are." Following a full-day mediation session, and continued further negotiations, the parties accepted a mediator's recommendation to settle the case. On December 9, 2024, BFA filed an unopposed motion for preliminary approval of the proposed class action settlement.

| *In re MF Global Holdings Ltd. Securities Litigation*<br>• Southern District of New York, No. 11-cv-07866<br>• Client: Alberta Investment Management Corp. (AIMCo)<br>• Lead Attorneys: Javier Bleichmar, Dominic Auld | Total Settlements:<br>$234.3 Million |
|---|---|

Background: This litigation arose from MF Global's dramatic bankruptcy in October 2011. Plaintiffs alleged that defendants misrepresented the company's risk controls, liquidity position, and exposure to European sovereign debt, and failed to properly account for its deferred tax assets.

BFA's Role: BFA represented Court-appointed Co-Lead Plaintiff AIMCo. Partners Javier Bleichmar and Dominic Auld represented AIMCo in this case since its inception in November 2011, and served as Court-appointed Co-Lead Counsel for the putative class since January 2012. When BFA launched in August 2014, the Court approved

BFA BLEICHMAR FONTI & AULD LLP

AIMCo's selection of BFA to serve as Co-Lead Counsel for the putative class, continuing the core litigation team's representation.

Status: Lead Counsel achieved five partial settlements worth a total of just over $234 million on behalf of investors: (1) a $74 million settlement with Goldman Sachs and certain other underwriters of the company's securities; (2) a $64.5 million settlement with former officers and directors, including MF Global's former CEO Jon Corzine; (3) a $65 million settlement with auditor PricewaterhouseCoopers; (4) a $29.825 million settlement with Jefferies and other underwriters of the final bond offering issued during the Class Period; and (5) a separate $932,828 settlement with another underwriter defendant associated with that last offering. These settlements represent a recovery of as much as 35% of the estimated recoverable damages available at trial – an excellent result, particularly in light of the issuer's bankruptcy.

These settlements were achieved after years of hard-fought litigation. Following the Court's decision sustaining the Complaint and denying defendants' six motions to dismiss in their entirety, Co-Lead Counsel reviewed millions of documents produced by defendants and third-parties, and conducted more than 50 depositions of former employees of MF Global and other key witnesses, including four days of testimony from former CEO Jon Corzine. The Court granted Plaintiffs' motion for class certification on October 14, 2015, which assisted in achieving the settlements.

### *In re Genworth Financial Inc. Securities Litigation*

- Eastern District of Virginia, No. 14-cv-00682
- Client: Alberta Investment Management Corp. (AIMCo)
- Lead Attorney: Joseph A. Fonti

**Total Settlement: $219 Million**

Background: Plaintiffs alleged that defendants misrepresented the profitability of the company's core business and reported false financial results by grossly understating long-term care insurance reserves. When Genworth announced a $531 million charge to its reserves, the company's stock price fell more than 55% – wiping out billions in market capitalization – and credit rating agencies downgraded the company and its corresponding debt to "junk" status.

BFA's Role: BFA represented Court-appointed Co-Lead Plaintiff AIMCo. In November 2014, the Court approved AIMCo's selection of BFA to serve as Co-Lead Counsel for the putative class.

Notably, BFA secured one of the most thoroughly reasoned, investor-oriented decisions after the then-recent decision in *Omnicare v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). The District Court ruled that Lead Plaintiffs had sufficiently pled that defendants' statements were intended to mislead investors and to provide false assurances regarding the company's

reserves. The District Court also largely sustained allegations that defendants falsely certified that the company's internal controls were adequate.

Status: On March 10, 2016, Genworth announced a proposed settlement of $219 million, the largest securities class action recovery achieved in the Eastern District of Virginia, and as much as 44% of estimated recoverable damages available at trial. BFA and AIMCo sought and achieved a significant contribution from the company beyond available insurance; despite significant liquidity issues, the company paid $69 million, and the remaining $150 million was funded by insurance.

The settlement was reached after 15 months of intense and complex litigation. The Eastern District of Virginia is known as the "rocket docket" for its rapid disposition of cases and strict adherence to schedule deadlines. In December 2014, Lead Plaintiffs filed a consolidated complaint and, in February 2015, defendants filed a motion to dismiss. Partner Joseph A. Fonti successfully argued against the motion on April 28, 2015, and the securities fraud claims were sustained on May 1, 2015. Lead Plaintiffs filed their motion for class certification on December 3, 2015; fact discovery closed on January 15, 2016; and expert discovery closed on February 11, 2016. In effect, BFA conducted two to four years of litigation in just 15 months. This effort included more than 20 depositions, extensive trial preparation, and full briefing on motions for class certification and summary judgment. At the time of settlement, BFA attorneys were preparing for trial, which was scheduled to begin on May 9, 2016.

*In re Weatherford International Securities Litigation*

- Southern District of New York, No. 12-cv-02121
- Client: Anchorage Police and Fire Retirement System
- Lead Attorney: Javier Bleichmar

Total Settlement: $120 Million

Background: Plaintiffs alleged that Weatherford, one of the world's largest oil and gas servicing companies, issued false financial statements that misled investors about its tax structure and internal controls. The company allegedly overstated its earnings by more than $900 million and was forced to issue three restatements due to its failure to comply with Generally Accepted Accounting Principles.

BFA's Role: BFA represented Court-appointed Co-Lead Plaintiff Anchorage Police and Fire Retirement System, and BFA partner Javier Bleichmar represented Anchorage continuously since the case was filed in March 2012.

Status: In June 2015, the company agreed to settle all claims for $120 million of out-of-pocket cash, with no available insurance, or as much as 30% of recoverable damages available at trial. Achieving this settlement required more than three years of intense litigation, including defeating defendants' motion to dismiss in its entirety; obtaining class certification; completing fact discovery, after more than 20

depositions and the review of more than eight million pages of documents; filing four expert reports; and preparing for expert discovery and summary judgment.

| *Arkansas Teacher Retirement System v. New Relic, Inc.*<br>• Court of Chancery of the State of Delaware, No. 2023-1089<br>• Client: Arkansas Teacher Retirement System<br>• Lead Attorneys: Derrick Farrell, Matthew L. Miller, Erin Woods, Robert B. Lackey | Case Status: Pending |
|---|---|

Background: On April 5, 2024, Bleichmar Fonti & Auld LLP filed suit in the Delaware Court of Chancery on behalf of the Arkansas Teacher Retirement System, to enforce its demand to examine books and records of New Relic, Inc. under Title 8, Section 220 of the Delaware Code. The Arkansas Teacher Retirement System issued its demand in 2023 to investigate the independence of, and potential wrongdoing by, the New Relic, Inc. board of directors in connection with the company's acquisition by Francisco Partners and TPG, Inc. The merger closed on November 8, 2023.

BFA's Role: BFA Represents the Arkansas Teacher Retirement System.

Status: Since issuing the demand, Bleichmar Fonti & Auld LLP has worked to enforce the inspection rights of the Arkansas Teacher Retirement System. This ultimately required filing suit in the Delaware Court of Chancery. The case was initially assigned to Magistrate in Chancery Selena E. Molina and is currently on appeal before Chancellor Kathaleen St. J. McCormick.

BFA BLEICHMAR FONTI & AULD LLP

## TEAM PROFILES

| LESLEY E. WEAVER *Partner* | Oakland | • Email: lweaver@bfalaw.com<br>• Tel: +1 415 455 4004<br>• www.bfalaw.com /professionals/lesley-weaver |
|---|---|---|

Lesley Weaver is the Partner in Charge of BFA's California office, and the head of BFA's Antitrust and Consumer Litigation Teams, and has received multiple honors throughout her career. For over thirty years, Lesley has litigated high profile cases that protect the public interest, consumers, and public entities, and recovering billions of dollars for her clients.

Ms. Weaver is an experienced, soup-to-nuts litigator who has deep experience with the legal and technical issues central to this action. As one of two Co-Lead Counsel appointed by Judge Vince Chhabria in the Northern District of California to lead the high-profile MDL against Facebook arising out of the Cambridge Analytica scandal, Ms. Weaver and her team steered the case to a $725 million settlement after five years of tenacious litigation, yielding at least two landmark decisions of national import. *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899 (N.D. Cal. 2023); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019).

Also in 2024, Lesley argued the motion to dismiss in a derivative lawsuit against the board of Wells Fargo. *In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*, No. 22-cv-05173, ECF No. 176 (N.D. Cal. Sept. 20, 2024). While this is primarily a financial action, the case is premised on discrimination in lending and hiring by the bank against non-white employees and applicant lenders. Judge Thompson upheld plaintiffs' notoriously difficult Caremark claims.

Since 2024, Lesley is acting as Co-Lead Counsel in *In re Google Generative AI Copyright Litigation*, a cutting-edge case challenging the practice of using copyright materials to train AI language models. Plaintiffs allege that Google has infringed copyrights by scraping and using copyrighted works to train its AI products, including Gemini. This case addresses issues in the intersection of AI technology and copyright law, further highlighting Lesley's leadership in emerging legal fields.

In addition to these matters, Lesley's important role in other significant matters is ongoing:

- Lesley was one of two significant drafters of the original complaint in *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-02155 (N.D. Cal.), a nationwide class action brought on behalf of Google account holders and she leads the executive committee. Following the filing of this complaint, regulators around the country and the world re-focused their scrutiny of real time bidding auctions. Plaintiffs have shown in that case that Google

unlawfully shares and sells users' personal data with thousands of companies participating in Google's Real-Time Bidding (RTB) digital ad auction system, violating its promise not to sell personal information. Class certification is pending. This case is poised to be another landmark in the fight for consumer privacy rights in the digital age.

- For nearly eight years, Lesley has served as Co-Lead Counsel in *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 18-md-02843 (N.D. Cal.), which resulted in a historic $725 million recovery for plaintiffs. On February 13, 2025, the Ninth Circuit approved this settlement order, which is the largest privacy settlement resolved through private litigation. The case, arising from the Cambridge Analytica scandal, set a new benchmark for resolving privacy class actions not only in the U.S. but also internationally. The litigation is notable not only for the result, but for the many significant orders issued and the public evidence generated in the matter, which has been used by privacy advocates around the world. The settlement reflects Lesley's ability to navigate complex, cutting-edge issues in privacy law and her commitment to holding major corporations accountable for violating consumers' rights. *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899 (N.D. Cal. 2023).
- In 2015, Lesley was appointed by Judge Breyer to the Plaintiffs' Steering Committee "legal dream team" in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 15-md-02672 (N.D. Cal.). The PSC recovered roughly $17 billion for U.S. consumers and public entities, including $5 billion allocated to environmental causes, the largest automotive class action recovery ever. Lesley was actively involved in settlement negotiations overseen by Special Master Robert Mueller and led discovery in German of defendant Bosch.
- Lesley serves on the Plaintiffs' Steering Committee in *In re ZF-TRW Airbag Control Units Products Liability Litigation*, No. 19-ml-02905 (C.D. Cal.), and the team has already secured settlements totaling $147.8 million for Toyota class members, with further litigation pending against additional defendants.

Lesley is also one of the few lawyers to try a privacy case to a jury in the U.S. In 2015, Lesley won a complete jury verdict in one of the few privacy cases to go to trial in the country, which awarded 100% of economic damages and $15 million in punitive damages.

Lesley has received numerous awards throughout her career. She was named by The National Law Journal as one of just ten Elite Women in the Plaintiffs' Bar nationally in 2023; one of the Top 500 Leading Plaintiff Consumer Lawyers as well as Financial Lawyers by Lawdragon; one of the Top 100 Plaintiffs Lawyers by the National Trial Lawyers; and the prestigious recognition as California Attorney of the Year in 2018 by the Daily Journal. She has been deemed a SuperLawyer since 2016; holds a Tier 1

Chambers ranking; and was inducted into the Fellows of the American Bar Association in 2017. More important that this external recognition is Ms. Weaver's sincere commitment to her cases and the profession. She has served as a Lawyer Representative for the Northern District of California, and co-chaired many board of non-profit organizations, including Bay Area Lawyers for Individual Freedom; the national advisory board for the National Center for Lesbian Rights; the SF LGBT Community Center; and many others.

Lesley studied at the University of Bonn (Germany) and Harvard College (A.B.), and received a J.D. from the University of Virginia Law School (1997). She speaks German, Danish and some French.

Lesley is admitted to practice in California (1997), Delaware (2008), the U.S. Court of Appeals for the Ninth Circuit (1998), and the U.S. District Courts for the Northern District (1997) and the Eastern, Central, and Southern Districts of California (1998), and the Eastern District of Michigan (2019).

| | | |
|---|---|---|
| ANNE K. DAVIS<br>*Partner* | Oakland | • Email: adavis@bfalaw.com<br>• Tel: +1 415 445 4016<br>• www.bfalaw.com/professionals/anne-davis |

Anne has nearly 15 years of experience litigating complex matters in both federal and state courts, including in California, Delaware, and Kansas. She focuses her practice on complex investigations and litigation of antitrust, consumer, and securities matters.

She was a key member of the team that litigated *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, which resulted in a historic $725 million settlement—the largest privacy class action settlement in history. She is currently a key member of the teams litigating *In re Google RTB Consumer Privacy Litigation*, *In re Google Generative AI Copyright Litigation*, *In re: Allstate & Arity Consumer Privacy Litigation*, *In re Local TV Advertising Antitrust Litigation*, *In re Domestic Airlines Travel Antitrust Litigation*, *In re: ZF-TRW Airbag Control Units Products Liability Litigation*, and *In re Mexican Government Bonds Antitrust Litigation*.

She was named a 2025 Lawdragon 500 Leading Plaintiff Consumer Lawyers, and a National Trial Lawyers Top 100 Litigator in 2023 and 2024. She serves on the Executive Committee of the California Lawyer's Association's Antitrust and Unfair Competition Law Section, am a Senior Editor of the California Antitrust and Unfair Competition Law Treatise, am an active member of and contributor to WG11 (Data Security and Privacy Liability) and WG13 (AI and the Law) for the Sedona Conference, and serve on the drafting team for the Sedona Conference Data Privacy Primer, Second Edition. She is also a member of the faculty for PLI's annual Accounting for Lawyers seminar.

Prior to joining BFA, she served as a Principal Counsel for Sales Practice Enforcement at the Financial Industry Regulatory Authority (FINRA), where she investigated and litigated matters pertaining to violations of FINRA, U.S. Securities and Exchange Commission (SEC), Municipal Securities Rulemaking Board (MSRB) rules, and federal securities laws by registered individuals and FINRA member firms.

Before FINRA, she was a senior associate at a global law firm, where she specialized in securities litigation and enforcement, complex civil litigation, and internal investigations.

Anne earned a B.A. with honors from DePaul University (2002), a M.A. (Political Science) from the University of Michigan (2006), and a J.D. from the University of Michigan Law School (2008). She is admitted to practice in California (2009), the U.S. Court of Appeals for the Ninth Circuit (2023), and the U.S. District Courts for the Northern (2010), Central (2011), Eastern (2014), and Southern (2025) Districts of California and the Eastern District of Michigan (2019).

| | | |
|---|---|---|
| JAVIER BLEICHMAR<br>*Partner* | New York | • Email: jbleichmar@bfalaw.com<br>• Tel: +1 212 789 1341<br>• www.bfalaw.com/ professionals/javier-bleichmar |

Javier Bleichmar co-founded BFA and leads the firm's U.S. Case Evaluation and U.S. Securities Litigation teams. He brings a decades-long career of litigation success to his prosecution of large-scale securities class and shareholder actions on behalf of institutional investors. Over the course of his career, Javier has secured significant recoveries for clients and the classes they represent, while achieving landmark and sweeping corporate governance improvements.

Javier has consistently been recognized as one of the nation's leading plaintiffs'-side financial lawyers. He has been named a Titan of the Plaintiffs' Bar by Law360, a SuperLawyer by Thomson Reuters, and a Leading Plaintiff Financial Lawyer by *Lawdragon*, and has been "recommended" in the field of securities litigation by the *Legal 500*. Most recently, Javier was profiled by *The New York Law Journal*, *Forbes*, *Fortune*, and *CT Insider* for his work achieving landmark outcomes.

Javier played a leading role in prosecuting the firm's derivative stockholder action against Tesla's Board of Directors in Delaware Chancery Court, resulting in a historic resolution valued at $919 million–the largest derivative settlement in Delaware history. He also spearheaded the securities class action against Teva Pharmaceutical Industries, Ltd., recovering $420 million for investors.

Other significant resolutions include the $234 million recovery in *In re MF Global Holdings Limited Securities Litigation* on behalf of BFA client Her Majesty the Queen in Right of Alberta in connection with MF Global's collapse and bankruptcy, the $129 million for investors in the securities class action against Granite Construction Inc. that involved the company's restatement of financial results in 2020, and successfully

BFA
BLEICHMAR
FONTI & AULD LLP

representing the Metropolitan Transportation Authority in an action against Allianz Global Investors U.S., L.L.C. that centered on Allianz's now-defunct Structured Alpha funds, which toppled one of Allianz's U.S. subsidiaries.

Javier has co-authored several articles concerning developments in the securities class action, group action and investor protection landscapes in the U.S. and globally, and has been published by *The New York Law Journal*, as well as in newsletters for the National Association of Public Pension Attorneys, the National Council on Teacher Retirement, and the National Conference on Public Employee Retirement Systems, among others.

Javier is a native Spanish speaker and fluent in French.

| | | |
|---|---|---|
| JOSEPH A. FONTI<br>*Partner* | New York | • Email: jfonti@bfalaw.com<br>• Tel: +1 212 789 1342<br>• www.bfalaw.com /professionals/joseph-fonti |

Joseph A. Fonti co-founded BFA and leads the firm's U.S. Securities Litigation practice. With over two decades of experience representing institutional investors in complex litigation, Joseph's commitment to clients, dedication to his cases, and advocacy skills have led to exceptional results in several of the most prominent securities and derivatives cases in recent decades. Joseph has achieved significant recoveries for investors while also securing landmark and sweeping corporate governance improvements.

Joseph has consistently been recognized as one of the nation's leading plaintiffs'-side financial lawyers. He has been named a Titan of the Plaintiffs' Bar by *Law360*, a SuperLawyer by Thomson Reuters, and a Leading Plaintiff Financial Lawyer by *Lawdragon* and has been "recommended" in the field of securities litigation by *Legal 500*. He has also been recognized by Chambers USA for his securities litigation prowess, with clients quoted in Chambers praising him as "a vigorous, strong litigator who does everything he can to represent his clients." Joseph has been profiled by *The New York Law Journal*, *Forbes*, *Fortune*, and *CT Insider*, among others, for the landmark results he achieved for investors.

Joseph led the team that prosecuted the firm's derivative stockholder action against Tesla's Board of Directors in Delaware Chancery Court, resulting in a historic resolution valued at $919 million–the largest derivative settlement in Delaware history. He also led BFA's prosecution of the securities class action against Teva Pharmaceutical Industries, Ltd. arising from misrepresentations concerning price fixing and other unlawful conduct. After five years of hard-fought litigation, including securing class certification, extensive fact and expert discovery, and preparing a summary judgment motion, BFA secured a $420 million recovery for shareholders.

Throughout his career, Joseph has led historic litigations representing U.S. institutional investors and a number of Canada's most significant pension systems

and asset managers. He served as co-lead counsel in the $219 million recovery on behalf of shareholders of long-term care insurer Genworth Financial, the largest securities class action settlement in the history of the Eastern District of Virginia. Joseph also served as sole Lead Counsel in the securities class action involving Computer Science Corporation, recovering $97.5 million for the class at the brink of trial. In addition, he helped lead the prosecution and ultimate resolution of the *Weatherford* securities litigation, achieving a $120 million recovery for Weatherford shareholders; and contributed to securing a $173.5 million settlement in *In re Broadcom Corp. Securities Litigation*, which, at the time, was the second-largest cash settlement involving a company accused of options backdating.

Joseph has also achieved significant successes for clients in the area of auditor liability. He represented shareholders in the $671 million recovery in *In re HealthSouth Securities Litigation*, recovering $109 million from HealthSouth's outside auditor Ernst & Young LLP, one of the largest recoveries to date against an auditing firm.

Currently, Joseph is leading BFA's actions against TD Bank, Boeing, CVS, Citigroup, UiPath, TaskUs, and Talis Biomedical ($32.5 million settlement, pending final approval). Joseph also led the teams prosecuting actions against Bioventus ($15.25 million settlement) and Gatos Mining ($21 million settlement).

In addition to his success in trial and settlement, Joseph has distinguished himself as an appellate advocate. For example, he successfully argued before the Second Circuit Court of Appeals in *In re Celestica Inc. Securities Litigation* and was instrumental in advocacy before the Ninth Circuit Court of Appeals in *In re Broadcom Corp. Securities Litigation*.

Dedicated to community service, Joseph served for four years as Chair of the Leadership Committee for the Cardinal's Annual Stewardship Appeal for the Archdiocese of New York, which supports local communities across ten New York counties. He currently serves as a member of the board of Saint Joseph's Seminary of the Archdiocese of New York and as a trustee of Saint Augustine Parish in Larchmont.

Joseph earned a B.A., *cum laude*, from New York University and a J.D. from New York University School of Law (1999), where he was a member of the Marden Moot Court. He is admitted to practice in New York (2000), the U.S. Supreme Court (2007), and the U.S. Courts of Appeals for the Second Circuit (2010), Ninth Circuit (2007), and Tenth Circuit (2013). He also is admitted in the U.S. District Courts for the Southern and Eastern Districts of New York (2001).

BFA
BLEICHMAR
FONTI & AULD LLP

| DOMINIC J. AULD<br>*Partner* | Toronto | • Email: dauld@bfalaw.com<br>• Tel: +1 212 789 1344<br>• www.bfalaw.com /professionals/dominic-auld |
|---|---|---|

Dominic J. Auld co-founded BFA in 2014 and has nearly two decades of experience in representing and advising institutional clients in large-scale securities and investment-related lawsuits.

Dominic is responsible for BFA's outreach to pension systems, asset managers, and sovereign wealth funds outside the United States, regularly advising clients in Europe, Australia, Asia, and across his home country of Canada.

Dominic and his team have served as liaison counsel to global investors in dozens of shareholder and investor litigations outside the United States. With extensive experience working directly with institutional clients impacted by securities fraud, Dominic played a key role in representing the Ontario Teachers' Pension Plan Board in major securities actions, including *In re Nortel Networks Corp. Securities Litigation*, *In re Williams Securities Litigation*, and *In re Biovail Corp. Securities Litigation*–cases that collectively recovered over $1.7 billion for investors.

Dominic is sought after as a high-profile commentator on topics such as corporate governance, shareholder activism, fiduciary duty, corporate misconduct, and international class and collective litigation. He has been a regular speaker and panelist at law and investment conferences, including past events such as the Canadian Foundation for Advancement of Investor Rights (FAIR Canada) and Osgoode Hall Law School conference on public and private securities enforcement and investor recovery in Toronto, the IMF Bentham shareholder class action conference in Sydney, and the Annual International Bar Association meeting in Dubai.

Dominic is the author of various articles of interest to the firm's client base, including an analysis of shareholder remedies in Japan in *Law360*, and a piece regarding custodian bank fees and their impact on pension funds globally in Investment & Pensions Europe Magazine's Nordic Regions Pensions and Investment News section. He is quoted in publications including *The Economist*, *The Financial Times*, *The New York Times*, *USA Today*, and *The Times of London*, among others, and numerous trade publications such as *Global Pensions*, *OP Risk and Regulation*, *The Lawyer*, *Professional Pensions*, and *Benefits Canada*. He also was interviewed by *Corporate Counsel* for a feature article on rogue trading.

Prior to founding BFA, Dominic was a partner at another securities litigation firm, and was previously a member of the team responsible for prosecuting the landmark action *In re WorldCom Inc. Securities Litigation*, which resulted in a settlement of more than $6 billion.

BFA
BLEICHMAR
FONTI & AULD LLP

Dominic has been named a "Super Lawyer" by Thomson Reuters in the field of securities litigation and has been "recommended" in the field of securities litigation by *Legal 500*.

Dominic earned a B.A. from Queen's University in Canada and a J.D. from Lewis and Clark Law School (1998). He is admitted to practice in New York (1998), and in the U.S. District Courts for the Southern and Eastern Districts of New York (2011).

| ERIN H. WOODS<br>*Partner* | New York | • Email: ewoods@bfalaw.com<br>• Tel: +1 212 789 1353<br>• www.bfalaw.com/professionals/erin-woods |
|---|---|---|

Erin Woods is Director of Institutional Investor Relations at BFA and the head of the firm's Claims Filing Team. Erin's practice combines her vast experience advising institutional investors on current and potential securities litigation, as well as in recovering investment losses through filing settlement claims.

With nearly 20 years in the class action industry, Erin brings to BFA's clients a unique blend of years of litigation experience, over a decade of representation of institutional investors, and expertise in the claims administration process. Sheis currently a member of the teams prosecuting the securities class action against CVS, Inc. and Citigroup, Inc., as well as the teams pursuing Section 220 Demands on behalf of a number of BFA's clients. Erin also leads institutional investor outreach and advises pension funds and other entities on lawsuits concerning violations of U.S. and non-U.S. securities and investment laws, antitrust and consumer laws, and relevant securities class action settlements.

Erin is regularly asked to speak about securities monitoring and litigation by numerous organizations, including on the inaugural panels at the annual conference of National Council on Teacher Retirement (NCTR), the annual conference for National Institute on Retirement Security, as well as annual conferences for the Louisiana Trustee Education Council (LATEC), among others.

Erin recently published "The Importance of Private Enforcement of Federal Securities Laws: Institutional Investors Continue to Outpace SEC" in *NCPERS PERSist*, "Examining Potential Conflicts of Interest in the Private Equity Industry During an Uncertain Market" and "The Australian Securities Class Action Landscape and Potential Changes Ahead" in the National Association of Public Pension Attorneys' *NAPPA Report*, "Why an Active Approach to Corporate Governance is Important in Today's Market" in *NCPERS Spring 2024 PERsist* and in the *Second Quarter Newsletter* by Georgia Association of Public Pension Trustees, and both "Claims Filing in Australia: Missed Recovery Opportunities for American Investors" and "*Maximizing Returns Through Asset Protection and Recovery*" in *NCPERS PERSist*.

While working with BFA's founding partners as an associate at their prior firm, Erin litigated a number of securities class actions, including a matter that resulted in a

BFA BLEICHMAR FONTI & AULD LLP

cross-border settlement that was at the time the largest settlement under Canada's securities class action laws, as well as two related cases that resulted in a $100 million settlement.

Prior to joining BFA, Erin was a Director at an industry-leading claims administration firm, where she provided plaintiffs' and defense counsel with comprehensive, accurate, and practical approaches to class action and mass tort settlement administration.

Erin earned a B.A. from Villanova University in 2004 and a J.D. from Brooklyn Law School in 2008. She is admitted to practice in New York (2009), the U.S. Courts of Appeals for the Ninth Circuit (2010) and Second Circuit (2011), and the U.S. District Court for the Southern District of New York (2009).

| | | |
|---|---|---|
| NANCY A. KULESA<br>*Partner* | New York | • Email: nkulesa@bfalaw.com<br>• Tel: +1 860 869 5525<br>• www.bfalaw.com /professionals/nancy-kulesa |

Nancy Kulesa is a Partner at BFA, and has secured significant recoveries for institutional investors in securities class actions and shareholder actions while achieving historic corporate governance reforms. She has extensive experience in complex litigation in federal and state courts, including securities litigation, corporate governance, Employee Retirement Income Security Act of 1974 (ERISA) litigation, consumer fraud litigation, mergers and acquisitions cases, and antitrust litigation.

Nancy represents public pension funds, Taft-Hartley funds, and other institutional investors in securities class actions and derivative litigation, and consults with institutional investors to help them monitor litigation and to evaluate opportunities for recovery. She has over two decades of experience assisting clients in identifying material losses in their securities portfolios caused by corporate wrongdoing, and has repeatedly been recognized by Lawdragon as a Leading Plaintiff Financial Lawyer.

Nancy was a member of the team that prosecuted the firm's derivative stockholder action against Tesla's Board of Directors on behalf of the Police & Fire Retirement System of City of Detroit in Delaware Court of Chancery, resulting in a historic resolution valued at $919 million–the largest derivative settlement in Delaware history. Nancy is currently on the teams litigating BFA's securities cases against Bioventus, Inc., Twist Bioscience, and TaskUs, Inc. She was a member of the team that prosecuted the securities action against Allianz Global Investors U.S., L.L.C. She is also pursuing confidential derivative actions on behalf of additional institutional clients.

Prior to joining BFA, Nancy was a partner at a well-established national securities litigation firm, where she created and directed the firm's Portfolio Monitoring Services practice. Nancy has also been counsel in numerous high-profile securities fraud litigations which have recovered hundreds of millions of dollars for

shareholders, including: *In re CIT Group Securities Litigation*, ($75 million settlement) and *Carlson v. Xerox Corporation*, ($750 million settlement). Nancy also represented a Taft-Hartley Fund in the historic settlement with Twenty-First Century Fox, Inc. regarding allegations of workplace harassment incidents at Fox News, which resulted in a $90 million derivative settlement and wide-ranging corporate governance reforms at the company.

Nancy recently co-authored "Maximizing Returns Through Asset Protection and Recovery" and "The Importance of Private Enforcement of Federal Securities Laws: Institutional Investors Continue to Outpace SEC" in NCPERS' *PERSist* journal. She frequently speaks on topics related to securities litigation and investor rights at educational forums for public pension funds and Taft-Hartley funds.

Nancy earned a B.A. from Fordham University and a J.D. from the University of Connecticut School of Law (2001). She is a member of the National Conference on Public Employee Retirement Systems (NCPERS), International Foundation of Employee Benefit Plans (IFEBP), and many other organizations. She also serves as Treasurer of the National Association of Shareholder & Consumer Attorneys (NASCAT). Nancy is admitted to practice in Connecticut (2001), New York (2021), the U.S. Court of Appeals for the Ninth Circuit (2016), and the U.S. District Courts for the District of Connecticut (2003) and the Southern District of New York (2015).

| | | |
|---|---|---|
| ROSS SHIKOWITZ<br>*Partner* | New York | • Email: rshikowitz@bfalaw.com<br>• Tel: +1 212 789 1349<br>• www.bfalaw.com/professionals/ross-shikowitz |

Ross Shikowitz focuses his practice on investigating, analyzing and prosecuting complex securities matters on behalf of institutional investors.

For over a decade, Ross has been advising many of the world's largest and most sophisticated institutional investors concerning their rights and potential legal claims arising out of securities-related matters. He is a leader of the Firm's Client Monitoring and Case Evaluation Group in which he, together with a team of attorneys and financial analysts, develops, and recommends legal strategies to the Firm's clients.

Ross was one of the lead attorneys that litigated the securities class action against Granite Construction Inc. and achieved a $129 million resolution on behalf of the class. Ross is also one of the attorneys representing investors in the securities class actions concerning Talis Biomedical Corp. ($32.5 million settlement, pending court approval), Gatos Silver, Inc. ($21 million settlement), Enochian Biosciences Inc. ($2.5 million settlement, pending court approval), Exicure, Inc. ($5.625 million settlement), The Toronto-Dominion Bank, CVS Health Corporation, TaskUs, Inc., and UiPath, Inc.

For his success representing investors, Ross has consistently been named as a "Rising Star" and a member of "Super Lawyers" in the area of securities litigation by

BFA
BLEICHMAR
FONTI & AULD LLP

Thompson Reuters *Super Lawyers*. He was also recognized by The Legal 500 for his work representing investors.

Currently, Ross serves as a Vice President of the Institute for Law and Economic Policy, a public policy research and educational foundation whose mission is to preserve, study, and enhance investor and consumer access to the civil justice system. In addition, Ross served as a member of *Law 360*'s 2023 Securities Editorial Advisory Board, which provides the organization with expert insight into relevant trends in securities litigation. Ross has also authored several articles focused on investor protection that have been published by the National Association of Public Pension Attorneys and the National Conference on Public Employee Retirement Systems, among others.

Prior to joining the Firm, Ross successfully represented numerous institutions that were misled when investing in residential mortgage-backed securities, and participated in the resolution of securities class actions concerning a European car manufacturer as well as a U.S. technology company.

Ross earned a B.A., *cum laude*, from Skidmore College, and an M.A. from Indiana University-Bloomington. He earned a J.D., *magna cum laude*, from Brooklyn law School (2010) where he worked as a research assistant to Brooklyn Law School Professor of Law Emeritus Norman Poser, a widely respected expert in international and domestic securities regulation. He also served as a judicial intern to the Honorable Brian M. Cogan of the Eastern District of New York, a legal intern for the Major Narcotics Investigations Bureau of the Kings Country District Attorney's Office, and a summer associate at a prominent defense firm.

Ross is admitted in New York (2011), and the U.S. District Court for the Southern District of New York (2012), the Eastern District of New York (2012), and the District of Colorado (2022).

| EVAN KUBOTA<br>*Partner* | New York | • Email: ekubota@bfalaw.com<br>• Tel: +1 212 789 1347<br>• www.bfalaw.com/professionals/evan-kubota |
|---|---|---|

Evan Kubota brings substantial experience in all stages of litigation, from pre-suit investigation and strategic advice through motion practice, discovery, trial, and appeal. His experience includes complex securities and derivative actions, bankruptcy confirmation and adversary proceedings, and regulatory investigations. He has taken and defended numerous depositions, worked closely with damages and industry experts, and participated in several trials.

Evan was a member of the teams prosecuting the successfully resolved cases against Teva Pharmaceutical Industries, Ltd. ($420 million settlement), Granite Construction Incorporated ($129 million settlement), Gatos Silver, Inc. ($21 million settlement), and Bioventus Inc. ($15.25 million settlement), and is currently litigating class actions

against Talis Biomedical Corp. ($32.5 million settlement, pending final approval) and TaskUs, Inc., as well as sovereign debt litigation against Sri Lanka and the Republic of Argentina.

Prior to joining BFA in 2019, Evan was an associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP for nine years, where he litigated high-profile matters on behalf of financial institutions and issuers in a variety of industries. Representative matters include plaintiff's counsel in breach of contract, fraud and civil RICO litigations against a distressed insurance company; debtor's counsel in a leading media company's Chapter 11 bankruptcy, which eliminated over $1 billion in debt; and the defense of numerous RMBS-related litigations, arbitrations, and investigations in the wake of the financial crisis.

Evan earned a B.A. from the University of Florida, *cum laude*, in 2007 and a J.D. from Harvard Law School, *cum laude*, in 2010. He is admitted to practice in New York (2011), as well as the U.S. District Courts for the Southern and Eastern Districts of New York (2011).

| GEORGE BAUER<br>*Partner* | New York | • Email: gbauer@bfalaw.com<br>• www.bfalaw.com/professionals/george-bauer |
|---|---|---|

George Bauer is a partner in the Westchester office where he represents institutional investors in complex securities and investment-related disputes.

George was a lead member of the team that litigated and resolved the firm's derivative stockholder action against Tesla and its Board of Directors in Delaware Chancery Court, which resulted in the largest derivative settlement in Delaware Chancery Court history. George was also a member of the teams that prosecuted BFA's cases against Granite Construction Inc., Allianz Global Investors U.S., L.L.C., Bioventus, Inc., and Elastos. George is currently on the teams litigating BFA's securities cases against Enochian Biosciences, Inc., Twist Bioscience Corp., Toronto-Dominion Bank, CVS Health Corporation, UiPath, Inc., and Citigroup.

George has taken a lead role in all stages of complex civil litigation, from pre-suit investigation through motion practice, discovery, summary judgment, and trial. While an associate and later junior partner at Kirkland & Ellis LLP, George gained experience taking and defending depositions, working with expert consultants and witnesses, and appearing in court. In addition, George has handled numerous internal investigations and investigations by both the U.S. Department of Justice and the U.S. Securities and Exchange Commission. George has represented clients in connection with complex regulatory enforcement matters dealing with, among other things, securities fraud, commodities fraud, and foreign bribery issues. He has also advised transactional teams on litigation and compliance related risks.

BFA BLEICHMAR FONTI & AULD LLP

Prior to Kirkland, George attended Brooklyn Law School where he served as a student prosecutor in the Kings County District Attorney's office and led the prosecution of misdemeanor domestic violence cases. He also interned at the New York City Police Department, the U.S. Attorney's Office for the Eastern District of New York, the Federal Trade Commission, and the New York Attorney General's Office.

George earned a B.A. from the University of Massachusetts at Amherst, *cum laude*, in 2008 and a J.D. from Brooklyn Law School, *magna cum laude*, in 2011. He is admitted to practice in New York (2012), the Eastern District of New York (2013), and the Southern District of New York (2014).

| | | |
|---|---|---|
| BENJAMIN F. BURRY<br>*Partner* | New York | • Email: bburry@bfalaw.com<br>• Tel: +1 212 789 1345<br>• www.bfalaw.com /professionals/benjamin-burry |

Benjamin has substantial experience representing clients in a broad range of complex commercial and statutory litigation matters, including in contract and investment disputes, intellectual property disputes, actions involving a wide array of business torts, fraud, breach of fiduciary duty, securities class actions, shareholder derivative litigation, and bankruptcy litigation, as well as cases involving the Federal Arbitration Act. He has represented clients in federal and state courts throughout the United States, including bankruptcy court, as well as arbitration forums, private mediation, and in enforcement proceedings.

Benjamin was a member of the teams that prosecuted BFA's action against Teva Pharmaceutical Industries, Ltd. ($420 million settlement), Granite Construction Inc. ($129 million settlement), Gatos Silver, Inc. ($21 million settlement), and Bioventus Inc. ($15.25 million settlement), and currently serves as a member of the teams prosecuting BFA's cases against Citigroup, Inc., Twist Bioscience Corp., and TD Bank.

Benjamin also maintains an active pro bono practice, including representing New York City parks and community gardens in civil litigation as well as in corporate governance issues, land rights, local law and regulations, licensing and leases.

Prior to joining BFA, Benjamin was a senior associate at Sidley Austin LLP, where he was a member of the firm's securities and shareholder litigation, commercial litigation and disputes, and Supreme Court and appellate practices.

Benjamin earned a B.A., *magna cum laude*, from Illinois Wesleyan University in 2007 and a J.D. from the University of Chicago Law School in 2010. Benjamin is admitted to practice in the U.S. Court of Appeals for the Second Circuit (2014), the U.S District Courts for the Southern and Eastern Districts of New York (2013), New York (2011), and Tennessee (2013). After earning his law degree, Benjamin served as law clerk to the Honorable Susan P. Read of the New York Court of Appeals.

BFA
BLEICHMAR FONTI & AULD LLP

| DERRICK FARRELL<br>*Partner* | Delaware | • Email: dfarrell@bfalaw.com<br>• Tel: +1 302 499 2158<br>• www.bfalaw.com/ professionals/ derrick-farrell |
|---|---|---|

Derrick Farrell is a Partner in the Delaware office and focuses his practice on representing stockholders in direct and derivative breach of fiduciary duty class action litigation. Derrick has substantial trial experience arguing before the Delaware Court of Chancery and conducting stockholder investigations under 8 *Del. C.* § 220.

In addition to a number of confidential investigations, Derrick is currently litigating derivative actions against the Boards of Directors of The Boeing Company, Wells Fargo, Inc., Focus Financial, Inc., and BioVentrix, Inc., as well as a Section 220 matter investigating New Relic, Inc. Derrick previously litigated a Section 220 matter investigating The Boeing Company.

Derrick served as one of the attorneys representing the lead plaintiff in *In re: Dell Technologies Inc. Class V Stockholders Litigation*, which challenged the acquisition of Dell's Class V tracking stock by Dell's controllers. The parties settled the case for $1 billion, which is the largest settlement in U.S. state court history.

Derrick has also obtained successful results in *In re Pattern Energy Group Inc. Stockholder Litigation* (a direct action successfully challenging a $6.1 billion merger transaction which settled for $100 million) and *Nantahala Capital Partners L.P. v. QAD Inc., et al.* (a direct action which succeeded in enjoining a merger on the basis of inadequate disclosures which settled for $65 million).

Derrick has tried a number of other cases in the Delaware Court of Chancery including: *In re Appraisal of Ancestry.com, Inc.*; *IQ Holdings, Inc. v. Am. Commercial Lines Inc.*; and *In re Cogent, Inc. Shareholder Litigation*. He has also argued before the Delaware Supreme Court on multiple occasions.

Derrick began his career as a Clerk for the Honorable Donald F. Parsons, Jr., then a Vice Chancellor in the Delaware Court of Chancery. Thereafter, Derrick gained substantial M&A experience as a defense lawyer at a prominent global law firm. Derrick has guest lectured at Harvard University and co-authored numerous articles for various publications, including the *Harvard Law School Forum on Corporate Governance and Financial Regulation* and the *Practicing Law Institute* (*PLI*).

Derrick received his B.S from Texas A&M University and his J.D. from Georgetown University Law Center, *cum laude*. He is admitted to practice in Delaware (2012); Massachusetts (2006); and the District of Delaware (2012).

BFA
BLEICHMAR FONTI & AULD LLP

| MATTHEW MILLER<br>*Partner* | Delaware | • Email: mmiller@bfalaw.com<br>• Tel: +1 302 499 2360<br>• www.bfalaw.com/professionals/matthew-miller |
|---|---|---|

Matthew Miller is a Partner in the Delaware office. He focuses his practice on representing investors in class action and derivative breach of fiduciary duty litigation. Matt has practiced before Delaware state and federal courts for more than a decade, with his primary focus on litigation in the Court of Chancery. He has stand-up trial experience and has argued dispositive and other motions. Matt also has extensive experience taking and defending depositions.

Matt represented large appraisal petitioners in the consolidated fiduciary duty and appraisal action styled *In re Dole Food Co., Inc. Stockholder Litigation/In re Appraisal of Dole Food Company, Inc*. There, the Delaware Court of Chancery found fraud and breaches of the duty of loyalty that led to post-trial damages of nearly $150 million. In *Cygnus Opportunity Fund, LLC v. Washington Prime Group, LLC*, Matt presented written and oral arguments that led to a published opinion denying two motions to dismiss. That lawsuit is pending. Matt represented a special litigation committee in *In re Baker Hughes, a GE Company, Derivative Litigation*, which led to new law in that area. Matt has also represented several litigation demand review committees.

Among other matters, Matt is currently a member of the teams litigating derivative claims against Wells Fargo and Boeing and litigating class action claims against Focus Financial and BioVentrix.

Before coming to BFA, Matt spent more than a decade at a Delaware corporate and business law boutique focusing on high stakes commercial litigation. There, he represented plaintiffs and defendants, along with appraisal petitioners and respondents.

Matt has extensive experience with valuation and industry experts. He co-wrote an article addressing the relationship between appraisal fair value and fiduciary duty fair price. The article—"Fair Price for Delaware Fiduciary Actions Can Exceed Appraisal Fair Value"—was published in the Business Valuation Review and appeared on the Harvard Law School Forum on Corporate Governance.

Matt earned a J.D. from the University of Virginia School of Law, where he graduated *Order of the Coif*. Matt is admitted to practice in Delaware (2013) and the U.S. District Court for the District of Delaware (2013).

BFA
BLEICHMAR
FONTI & AULD LLP

| KENDRA SCHRAMM<br>*Of Counsel* | New York | • Email: kschramm@bfalaw.com<br>• Tel: +1 212 789 1358<br>• www.bfalaw.com/professionals/kendra-schramm |
|---|---|---|

Kendra Schramm is a highly valued litigator, with years of experience working on large and complex securities matters, and is also the lead member of the Firm's International Litigation Practice.

The Firm's International Litigation Practice advises, and acts in a liaison capacity on behalf of, leading institutional investors in connection with securities and investment-related claims pursued outside the United States – the majority of which require a client's formal decision to participate.

Kendra provides pragmatic and unbiased advice regarding meaningful recovery opportunities, including the risks and burdens that can arise from pursuing an international claim. Kendra has experience overseeing matters in Australia, Japan, England, the Netherlands, Germany, Denmark, Brazil, France, and elsewhere, on behalf of public pension systems, asset managers, and sovereign wealth funds located around the global. Kendra also recently co-authored "A Look at Shareholder Remedies in Japan," in *Law360*, discussing the evolving Japanese litigation regime.

Kendra is instrumental to the Firm's outreach to prospective clients and ongoing client relations, and also works with the Firm's Client Monitoring and Case Evaluation Group, assisting in the assessment and prosecution of domestic securities class actions.

Prior to joining BFA, Kendra was an associate at another plaintiffs' securities firm, where she was a member of the team that recovered more than $1 billion in total settlements on behalf of investors in the landmark securities litigation against American International Group and numerous related defendants. Kendra was also instrumental in prosecuting the complex securities litigation against the Federal National Mortgage Association (Fannie Mae), which persuasively alleged that investors' losses were caused by Fannie Mae's statements and actions rather than the financial crisis and resulted in a $170 million settlement.

Kendra earned a B.A. from New York University and a J.D. from Brooklyn Law School (2011), where she was an Associate Managing Editor of the *Journal of Law & Policy*. During law school, she served as a law clerk to the Honorable Elizabeth S. Stong, U.S. Bankruptcy Court Judge for the Eastern District of New York. She is admitted to practice in New York (2012), New Jersey (2012), the U.S. Supreme Court (2014), and the U.S. District Courts for the Southern District of New York (2012) and the District of New Jersey (2012).

BFA BLEICHMAR FONTI & AULD LLP

| DAVID MACISAAC<br>*Of Counsel* | New York | • Email: dmacisaac@bfalaw.com<br>• Tel: +1 212 789 3606<br>• www.bfalaw.com/professionals/david-macIsaac |
|---|---|---|

David MacIsaac is Of Counsel in the White Plains Office. His practice focuses on investigating, analyzing and prosecuting direct and derivative breach of fiduciary duty actions on behalf of stockholders. He is currently actively pursuing confidential books and records requests on behalf of institutional and individual clients.

For nearly a decade, David has built a track record of success in the Delaware Chancery Court. He successfully developed and prosecuted numerous high-profile actions against board of directors and officers for breaches of fiduciary duty, including but not limited to:

- *Nantahala Capital Partners L.P. v. QAD Inc., et al.* (direct action; enjoining merger on basis of inadequate disclosures; settled for $65 million)
- *Macomb County Employees' Retirement System v. Kenneth McBride, et al.* (Stamps.com) (derivative action; settled for $30 million plus corporate governance reforms)
- *In re Versum Materials, Inc. Stockholder Litigation* (direct action; resulted in revocation of poison pill)
- *In re Pattern Energy Group Inc. Stockholder Litigation* (direct action; successful challenge to $6.1 billion merger transaction)
- *Ontario Provincial Council of Carpenters' Pension Trust Fund, et al. v. Walton, et al.* (Walmart Inc.) (derivative action arising from the opioid crisis)
- *In re McKesson Corporation Derivative Litigation* (derivative action arising from the opioid crisis; settled for $175 million plus corporate governance reforms)
- *City of Monroe Employees' Retirement System v. Rupert Murdoch et al.* (derivative action arising from sexual harassment at Fox News; settled for $90 million plus corporate governance reforms)
- *In re Yahoo, Inc. Derivative Litigation* (derivative action arising from the largest data breach in U.S. history; settled for $29 million)

Prior to joining the plaintiffs' bar, David served as an Associate at Kirkland & Ellis LLP, where he litigated a wide array of complex matters. He earned his Juris Doctor *cum laude* from Georgetown University Law Center and received his bachelor's degree from Franklin & Marshall College. David is admitted to practice in New York (2014).

BFA BLEICHMAR FONTI & AULD LLP

| | | |
|---|---|---|
| Gregory S. Mullens<br>*Of Counsel* | Oakland | • Email: gmullens@bfalaw.com<br>• Tel: +1 415 445 4006<br>• www.bfalaw.com/professionals/gregory-mullens |

Greg Mullens has over a decade of experience litigating complex matters in the public and private sectors, in both state and federal court. He is an accomplished trial attorney with over forty trials under his belt, including acting as first-chair on ten jury trials to verdict. Greg currently focuses his practice on complex investigations and litigation of antitrust and consumer matters.

Greg is involved in all aspects of the Firm's Antitrust and Consumer investigations and litigations, including *In re Google Generative AI Copyright Litigation*, *In re Google RTB Consumer Privacy Litigation*, *Ji, et al. v. Naver Corp.*, and *In re Bank of America Unauthorized Account Opening Litigation*.

Before BFA, Greg was Counsel at a litigation boutique in New Jersey where he was regularly called upon to lead internal investigations and run the defense of individual and corporate clients in a wide range of federal and state matters, including those involving the U.S. Department of Justice, U.S. Attorneys' Offices, Offices of Inspectors General, and State Attorneys General.

Greg began his legal career as a prosecutor for the Hudson County Prosecutor's Office (New Jersey). After serving in the trial division, Greg was promoted to the Office's Gangs and Narcotics Task Force, where he led the specialized unit's investigation and prosecution of high-priority criminal targets, including RICO enterprises, money laundering networks, firearms and narcotics traffickers, and street gangs.

Before becoming an attorney, Greg was a pitcher for the New York Mets in their minor league system. He is proud to be the first Tibetan professional baseball player.

Greg earned his B.A. from Columbia University (2006), and his J.D. from Benjamin N. Cardozo School of Law (2012), where he was the Articles Editor of the Journal of International and Comparative Law. He is admitted to New York (2013), New Jersey (2012), U.S. Court of Appeals for the Third Circuit (2022), the Southern District of New York (2018), Eastern District of New York (2018), and District of New Jersey (2018).

| | | |
|---|---|---|
| THAYNE STODDARD<br>*Of Counsel* | New York | • Email: tstoddard@bfalaw.com<br>• Tel: +1 212 789 1355<br>• www.bfalaw.com /professionals/thayne-stoddard |

Thayne Stoddard has experience in all aspects of litigation, including investigating and drafting claims, briefing dispositive and other motions, coordinating discovery efforts, taking depositions, and preparing for and attending trial. At BFA, Thayne was a member of the teams that prosecuted the Firm's derivative stockholder action

against Tesla's Board of Directors in Delaware Chancery Court, resulting in a $919 million settlement, as well as cases against Teva Pharmaceutical Industries, Ltd., resulting in a $420 million settlement, and Granite Construction Inc., resulting in a $129 million settlement. Thayne is currently a member of the teams litigating securities-related claims against TaskUs, Inc. and Citigroup, Inc.

Prior to joining BFA, Thayne was an associate at Kirkland & Ellis LLP for over three years and represented clients in numerous securities class actions, complex commercial, shareholder, and bankruptcy cases.

Thayne earned a B.A. from Yale University in 2007, a J.D. from Duke University School of Law in 2014, and a M.A. from Duke University in 2014. Thayne is admitted to practice in New York (2015) and the U.S. District Court for the Southern District of New York (2016).

| | | |
|---|---|---|
| SARA PILDIS SIMNOWITZ<br>*Special Counsel* | New York | • Email: ssimnowitz@bfalaw.com<br>• Tel: +1 212 789 2309<br>• www.bfalaw.com/professionals/sara-simnowitz |

Sara Pildis Simnowitz is Special Counsel at BFA. Sara represents institutional investors, consumers, corporations and public entities pursuing complex securities, antitrust and consumer claims. Sara has nearly twenty years of experience in all aspects of litigating complex matters, from pre-suit investigation through motion practice, discovery, summary judgment, trial and appeals. Sara also has considerable courtroom experience ranging from arguing critical dispositive motions to examining witnesses at trial and arguing appeals.

Sara was a member of the teams prosecuting the successfully resolved cases against Teva Pharmaceutical Industries, Ltd., Granite Construction Incorporated, and *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*.

Sara has considerable courtroom experience ranging from arguing critical dispositive motions to examining witnesses at trial and arguing appeals. She also has extensive experience taking and defending depositions and working with expert consultants and witnesses.

Prior to joining BFA, Sara was an attorney at prominent law firms where she focused on complex commercial and securities matters. In addition, Sara has handled internal investigations and investigations by both the U.S. Department of Justice and the U.S. Securities and Exchange Commission.

Sara earned a B.A., *summa cum laude*, from Brandeis University, a J.D. from the University of Chicago Law School (2001), and an M.A. from the London School of Economics and Political Science (2002). She is admitted to practice in Massachusetts (2002), New York (2006), the U.S. Supreme Court (2008), the U.S. Court of Appeals for the First Circuit (2003), and the U.S. District Courts for the District of

Massachusetts (2002), the Southern and Eastern Districts of New York (2006), and the Western District of New York (2008).

| | | |
|---|---|---|
| NICHOLAS DENNANY<br>*Associate* | New York | • Email: ndennany@bfalaw.com<br>• Tel: +1 212 789 1354<br>• www.bfalaw.com /professionals/nicholas-dennany |

Nicholas J. Dennany focuses his practice on investigating and analyzing pending and potential complex securities matters and derivative breach of fiduciary duty claims on behalf of the firm's institutional investor clients.

For more than five years, Nick has been a key member of the firm's Client Monitoring and Case Evaluation Group in which he, together with a team of attorneys and financial analysts, develops and recommends legal strategies to the firm's clients to protect and preserve their investments and protect their rights as shareholders.

Nick has also played a key role as a member of the firm's litigation team and has more than a decade of litigation experience. He contributed to the Firm's discovery efforts in *In re Genworth Financial Inc. Securities Litigation* which resulted in a settlement of $219 million, a record for securities litigations in the Eastern District of Virginia.

Previously, Nick litigated *In re MF Global Holdings Limited Securities Litigation* in connection with the company's dramatic collapse on October 31, 2011. Nick managed the firm's staff attorney discovery team through a complex discovery process involving the production of over 46 million pages of documents and dozens of depositions coordinated across multiple MF Global litigations. Plaintiffs secured settlements totaling over $234 million, resolving claims against MF Global's former officers and directors, underwriter defendants, and MF Global's outside auditor.

Prior to joining the firm, Nick was a Staff Attorney at a prominent plaintiffs' law firm, where he was a member of the teams that successfully litigated and ultimately secured significant settlements in *In re Broadcom Corp. Securities Litigation* ($173.5 million) and *In re NovaGold Resources Inc. Securities Litigation* ($28 million CDN).

Nick is admitted to practice in New York (2006), the Southern District of New York (2021), and the Eastern District of New York (2021).

| | | |
|---|---|---|
| STEPHANIE BARTONE<br>*Associate* | New York | • Email: sbartone@bfalaw.com<br>• Tel: +1 212 789 3606<br>• www.bfalaw.com /professionals/stephanie-bartone |

Stephanie Bartone is a member of BFA's Global Recovery Services Group where she provides comprehensive consulting and liaison services to leading institutional investors in connection with pursuing securities and investment-related claims across the globe.

BFA BLEICHMAR FONTI & AULD LLP

Stephanie has nearly a decade of experience representing clients in large-scale securities and consumer related class action lawsuits in both federal and state court and brings her substantial securities litigation experience to help monitor and evaluate opportunities for institutional clients to obtain recoveries outside the United States.

Prior to joining BFA, Stephanie was an associate at a nationally recognized securities litigation firm where she represented individuals and institutional clients in a wide-range of complex class actions, including securities fraud, consumer fraud, and mergers and acquisitions. Most recently, Stephanie was an attorney at the Connecticut Department of Consumer Protection where she oversaw the regulation and implementation of newly enacted legislation authorizing online casino gaming, online sports betting, and online fantasy contests in the State of Connecticut.

Stephanie earned a B.A., *summa cum laude*, from the University of New Hampshire (2008) and a J.D. from the University of Connecticut School of Law (2012), where she served as Symposium Editor for the Connecticut Law Review. Stephanie is admitted to practice in Connecticut (2012), the Commonwealth of Massachusetts (2012), New York (2023), the District of Connecticut (2015), the Second Circuit Court of Appeals (2018) and the Third Circuit Court of Appeals (2020).

| | | |
|---|---|---|
| JOSHUA D. SAMRA<br>*Associate* | Oakland | • Email: jsamra@bfalaw.com<br>• Tel: +1 415 445 4017<br>• www.bfalaw.com/joshua-samra |

Josh Samra is an associate in the Firm's Antitrust and Consumer practice group, and is involved in all aspects of the Firm's antitrust and consumer investigations and litigations. Josh was a significant member of the team litigating *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, which resulted in the largest privacy class action settlement in history at $725 million. Josh currently plays an important role in the teams litigating *Ji, et al. v. Naver Corp., et al.*, *In re Local TV Advertising Antitrust Litigation*, *In re Bank of America Unauthorized Account Opening Litigation*, *In re Wells Fargo & Co. Consolidated Derivative Shareholder Litigation*, *In re Google Generative AI Copyright Litigation*, and *In re Google RTB Consumer Privacy Litigation.*

Josh has been named to the "Northern California Rising Stars" list by Thompson Reuters *Super Lawyers* for years 2023-2025.

Prior to joining BFA, Josh was a Deputy District Attorney in Contra Costa County. As a Deputy D.A., Josh oversaw all parts of criminal prosecutions, including arguing pre-trial motions, trying cases before a jury, and litigating post-trial appeals. Josh has prosecuted ten jury trials to verdict.

Josh earned his B.A. from the University of California Berkeley (2013) and his J.D. from the University of California Los Angeles (2016), where he served as an Associate

Editor for the UCLA Law Review. Josh is admitted to practice in California (2016), and the U.S. District Courts for the Northern and Central Districts of California (2019), and the Eastern District of Michigan (2019).

Josh is an active member and contributor to The Sedona Conference, Working Group 1 on Electronic Document Retention and Production, and Working Group 6 on International Electronic Information Management, Discovery, and Disclosure.

| | | |
|---|---|---|
| FREDERICK WILLIAM GREEN<br>*Associate* | New York | • Email: wgreen@bfalaw.com<br>• Tel: +1 212 789 1348<br>• www.bfalaw.com/professionals/frederick-green |

Frederick William Green joined the firm in 2014 and is currently an Associate who assists on complex securities fraud litigation. Will also has experience managing litigation discovery efforts.

Will was a member of the litigation teams that prosecuted the Firm's cases against Teva Pharmaceutical Industries, Ltd., resulting in a $420 million settlement, and Granite Construction Inc., resulting in a $129 million settlement. Will was also a member of the teams prosecuting actions against Bioventus, Inc. ($15.25 million settlement) and Exicure, Inc. ($5.625 million settlement). Prior to that, Will contributed to the Firm's discovery efforts in *In re Genworth Financial Inc. Securities Litigation*, managing the staff attorney discovery team from inception to settlement. That case resulted in a $219 million settlement.

Will is currently a member of the teams litigating securities-related claims against Citigroup, Inc.; TaskUs, Inc.; and Talis Biomedical Corporation ($32.5 million settlement, pending final approval).

Will received a B.A. from Union College (2009) and a J.D. from Washington University in St. Louis (2013). Will is admitted to practice in New York (2015) and Massachusetts (2013).

| | | |
|---|---|---|
| JOSEPH W. BAIER<br>*Associate* | Delaware | • Email: jbaier@bfalaw.com<br>• Tel: +1 212-789-2304<br>• www.bfalaw.com/professionals/joseph-baier |

Joe Baier is an associate at BFA and represents plaintiffs in federal class actions and related appellate litigation. Joe has substantial experience in a variety of aspects of litigation, including investigating and drafting claims, briefing dispositive and other motions, managing discovery efforts, taking depositions, working closely with experts, preparing for summary judgment and trial, and briefing appeals.

Joe was a member of the teams that prosecuted actions against Talis Biomedical Corporation ($32.5 million settlement, pending final approval) and Bioventus Inc. ($15.24 million settlement). He was also a member of the appellate team that

BFA BLEICHMAR FONTI & AULD LLP

successfully defended the settlement on appeal in *In re Facebook, Inc., Consumer Privacy Litigation* (9th Cir. 2025)—the largest recovery ever in a data privacy class action. Joe is currently litigating actions against Twist Bioscience and TD Bank.

Prior to joining the Firm, Joe served as a law clerk to the Honorable Andrew L. Brasher of the United States Court of Appeals for the Eleventh Circuit and the Honorable Rodolfo A. Ruiz II of the United States District Court for the Southern District of Florida. Before clerking, Joe was an associate at the Washington, D.C. office of Sidley Austin where his practice focused on representing clients in investigations before the Securities and Exchange Commission as well as in appellate litigation before the United States Courts of Appeals and the Supreme Court of the United States.

Joe graduated *cum laude* from Duke University School of Law where he served on the Editorial Board of the school's law review and was a member of the Duke Moot Court and Mock Trial boards. He placed first overall in the Duke Law Jessup Cup Moot Court Tournament open to all Duke Law students and was a finalist in the Twiggs Beskind Trial Competition. Joe is admitted to practice in the District of Columbia (2021), the U.S. Court of Appeals for the Ninth (2024) and Eleventh Circuit (2023).

| | | |
|---|---|---|
| ALESSANDRA (SASHA) SLAYTON<br>*Associate* | New York | • Email: sslayton@bfalaw.com<br>• Tel: +1 212-789-1359<br>• www.bfalaw.com /professionals/Alessandra-slayton |

Alessandra (Sasha) Slayton is an associate in the New York City offices of BFA. Her practice focuses on prosecuting complex securities and shareholder derivative suits.

Sasha has experience representing clients in a broad range of complex commercial and statutory litigation matters, including contract, investment, and intellectual property disputes. She has also litigated actions involving business torts, fraud, breach of fiduciary duty, and bankruptcy.

Sasha was a member of the team prosecuting Bioventus, Inc. ($15.25 million settlement), and is currently a member of the teams prosecuting securities class action cases against Citigroup, Talis Biomedical Corp. ($32.5 million settlement, pending final approval), TaskUs, and Enochian.

Prior to joining BFA, Sasha was an associate at McKool Smith, where she worked on securities litigation, intellectual property litigation, and commercial litigation and disputes. Sasha earned her J.D. and M.B.A from Harvard. Prior to graduate school, she served as an officer in the U.S. Army.

BFA
BLEICHMAR FONTI & AULD LLP

| | | |
|---|---|---|
| ROBERT LACKEY<br>*Associate* | Delaware | • Email: rlackey@bfalaw.com<br>• Tel: +1 302-499-2317<br>• www.bfalaw.com /professionals/robert-lackey |

Robert Lackey is an associate in the Delaware office of BFA. His practice focuses on representing stockholders in direct and derivative actions in the Delaware Court of Chancery and in other courts. Robert has experience in pursuing claims arising under Section 220 of the Delaware General Corporation Law, breaches of fiduciary duty, breaches of contract, and other commercial torts.

Prior to joining BFA, Robert was an associate at another well-regarded plaintiffs' firm where he developed expertise in litigating in the Delaware Court of Chancery. Robert received a B.S. from the University of Delaware (2017) and a J.D. from American University, Washington College of Law (2020). Robert is admitted to practice in Delaware (2022).

| | | |
|---|---|---|
| WILLIAM MASSA<br>*Associate* | New York | • Email: wmassa@bfalaw.com<br>• Tel: +1 212 789 3603<br>• www.bfalaw.com /professionals/William-massa |

William Massa joined BFA in 2024 and is an associate in the Firm's New York City office where he focuses his practice on investigating and analyzing complex securities matters on behalf of the Firm's clients. Billy leverages his experience prosecuting complex securities fraud matters to monitor and evaluate opportunities for the Firm's institutional investor clients.

Prior to joining BFA, Billy was an associate at a prominent securities litigation firm, where he represented individuals and institutional clients in securities fraud class actions. Billy graduated *cum laude* from Fordham University School of Law in 2020, obtained an MBA from Stony Brook University in 2016, and graduated *summa cum laude* with a major in economics from Stony Brook University in 2014, where he was the recipient of the H. Lee Dennison Valedictorian Award. Billy is admitted to practice in New York (2021) and the U.S. District Courts for the Eastern and Southern Districts of New York (2021).

| | | |
|---|---|---|
| ADAM C. MCCALL<br>*Associate* | New York | • Email: amccall@bfalaw.com<br>• Tel: +1 212 789 2302<br>• www.bfalaw.com /professionals/adam-mccall |

Adam McCall is an associate at the firm and focuses his practice on advising investors concerning their rights and potential legal claims arising out of securities-related matters. Adam has securities litigation trial experience and leverages his experience prosecuting complex securities fraud matters and knowledge of the federal securities laws to develop and recommend legal strategies to the firm's clients.

BFA
BLEICHMAR
FONTI & AULD LLP

Prior to joining BFA, Adam successfully represented numerous investors in securities fraud class actions as a senior associate at a prominent securities litigation firm. Adam also gained experience serving as an extern at the U.S. Securities and Exchange Commission and worked at two large investment banks.

Adam graduated *cum laude* from the California Western School of Law and received his L.L.M. from Georgetown University Law Center. Adam is admitted to practice in California (2014), the District of Columbia (2018), the U.S. District Courts for the Central, Eastern, Northern, and Southern Districts of California (2015), and the Ninth Circuit Court of Appeals (2016).

| | | |
|---|---|---|
| WILLIAM E. FREELAND<br>*Associate* | New York | • Email: wfreeland@bfalaw.com<br>• Tel: +1 212 789 2305<br>• www.bfalaw.com /professionals/William-freeland |

Billy Freeland is an associate in the New York City offices of BFA and prosecutes complex securities class actions and shareholder derivative suits across the country on behalf of investors. Billy has substantial experience in all aspects of litigation, including investigating and drafting claims, briefing dispositive and other motions, managing discovery efforts, working closely with experts, and preparing for trial. Billy is currently a member of the team litigating securities-related claims against UiPath, Inc.

Billy is an active member of the Federal Bar Council, LGBT Bar Association of New York, and the New York City Bar Association, where he recently served as co-secretary of the Securities Litigation Committee. Billy is a Lieutenant Junior Grade in the United States Navy Reserve, where he is an Intelligence Officer.

Prior to joining BFA, Billy was an associate at a prominent securities litigation firm, where he represented individuals and institutional clients in securities fraud class actions. Billy graduated from New York University School of Law, where he was a member of the *Annual Survey of American Law* as an article editor, finalist in the *Orison S. Marden Moot Court Competition* (2014 and 2015), and research assistant to Professors Rachel Barkow and Catherine Sharkey. While attending law school, Billy was a law clerk for Senator Charles E. Schumer on the United States Senate Committee on the Judiciary. He received both his M.A. in International Affairs and his B.A. in Political Science at Columbia University.

Billy is admitted to practice in New York (2016).

| | | |
|---|---|---|
| BRANDON A. SLOTKIN<br>*Associate* | New York | • Email: bslotkin@bfalaw.com<br>• Tel: +1 212 789 3617<br>• www.bfalaw.com /professionals/brandon-slotkin |

Brandon Slotkin is an associate at BFA and represents investors in securities class actions and related litigation. Prior to BFA, Brandon was an associate at a prominent

BFA BLEICHMAR FONTI & AULD LLP

plaintiffs' securities litigation firm, where he represented investors in securities class actions. Brandon was also an associate at a notable defense firm, where his practice areas included securities, Delaware and derivative actions, and white-collar investigations.

Brandon is currently a member of the team litigating securities claims against TaskUs, Inc.

Brandon earned a JD/MBA from Cornell Law School and Cornell Johnson Graduate School of Management. Brandon served as an Articles Editor on the *Cornell Journal of Law and Public Policy* and as an Associate for the Legal Information Institute's *Supreme Court Bulletin*. He also served as an Honors Fellow for the Cornell Lawyering Program and was a full-time semester-long extern at the Securities and Exchange Commission.

Brandon is admitted to practice in New York (2022) and the Fifth Circuit Court of Appeals (2023).

| | | |
|---|---|---|
| FRANKLYN WILLIAMS<br>*Senior Projects Attorney* | New York | • Email: fwilliams@bfalaw.com<br>• Tel: +1 212 789 1357<br>• www.bfalaw.com /professionals/franklyn-williams |

Franklyn Williams brings nearly a decade of legal experience to his role as a Senior Projects Attorney. As a Senior Projects Attorney, Franklyn was an integral part of the team that litigated *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al*, which alleged that Teva fraudulently misled investors about its U.S. generics business, its financial performance, and its participation in a widespread generic drugs antitrust conspiracy.

Franklyn received his J.D. in 2006 from Boston University School of Law where he served as the Editor in Chief of the Boston University International Law Journal and participated in the Civil Litigation Clinic. Franklyn earned his BA in 2003 from Cornell University with a minor in Law & Society and majors in both government and philosophy. While attending Cornell, Franklyn externed with Judge Patricia Anne Williams of the Bronx County Supreme Court and summer interned with both NYC HRA Bureau of Fraud Investigation and NYC ACS Legal Division.

Franklyn is admitted to practice in New York (2008) and New Jersey (2007).

| | | |
|---|---|---|
| JOOYOUNG KOO<br>*Projects Associate* | Oakland | • Email: jkoo@bfalaw.com<br>• Tel: +1 415 445 4003<br>• www.bfalaw.com /professionals/ jooyoung-koo |

Jooyoung Koo is a Project Associate in BFA's Oakland office.

BFA
BLEICHMAR FONTI & AULD LLP

Jooyoung is an experienced attorney who has worked on complex IP, antitrust, consumer protection and pharmaceutical product liability cases, and has conducted in-depth document review and research analysis on a wide variety of subject matters.

She is also fluent in Korean.

| | | |
|---|---|---|
| KATHERINE SULLIVAN<br>*Projects Associate* | Oakland | • Email: ksullivan@bfalaw.com<br>• Tel: +1 415 445 4014<br>• www.bfalaw.com/katherine-sullivan |

Katherine ('Kasey") Sullivan joined the Firm in 2016 and is currently a Projects Associate in BFA's Oakland office. Kasey brings nearly two decades of experience to BFA. She currently plays a significant role in managing third party discovery in the *In re Domestic Airlines Travel Antitrust Litigation* and *In re Facebook, Inc. Consumer Privacy User Profile Litigation*.

Kasey earned her J.D. from Northwestern University School of Law (1999), and is admitted to practice in California (2000).

| | | |
|---|---|---|
| MARGARET STRAKOSCH<br>*Projects Associate* | Oakland | • Email: mstrakosch@bfalaw.com<br>• Tel: +1 415 445 40003<br>• www.bfalaw.com/margaret-strakosch |

Margaret ("Margo") Strakosch joined the firm in 2020 and is currently a Projects Associate in BFA's Oakland office, where she works with the consumer and antitrust litigation team.

Margo plays a significant role in BFA's discovery efforts against defendants in major consumer privacy class actions including *In re: Facebook, Inc. Consumer Privacy User Profile Litigation* and *In re Google RTB Consumer Privacy Litigation*.

Prior to joining BFA, she clerked for Alaska Supreme Court Justice Susan M. Carney and the U.S. Department of Labor's Office of Administrative Law Judges.

Margo earned her J.D. from the University of Michigan Law School (2015) and a B.A. from the Thomas More College of the Liberal Arts (2008). While at the University of Michigan Law School, Margo served as an Executive Editor of the Michigan Journal of International Law. Margo is admitted to practice in California (2018).

| | | |
|---|---|---|
| SYLVIA SUM<br>*Staff Associate* | Oakland | • Email: ssum@bfalaw.com<br>• Tel: +1 415 445 4003 |

Sylvia joined the firm in 2016, and is a staff associate at BFA's Oakland office where she focuses on prosecuting consumer and antitrust class actions. Sylvia brings over twenty years of experience to BFA. She has played a meaningful role in litigating

BFA BLEICHMAR FONTI & AULD LLP

several matters including *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation* and *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*. In each of these litigations, Sylvia's German language skills have been critical in analyzing the evidence underlying plaintiffs' claims.

Sylvia earned her J.D. from the UC Los Angeles School of Law (1997), and is admitted to practice in California (2000) and Oregon (1997).

| | | |
|---|---|---|
| GLEN TSURUDOME<br>*Staff Associate* | Oakland | • Email: gtsurudome@bfalaw.com<br>• Tel: +1 415 789 1348 |

Glen joined BFA's Oakland office in 2019. Glen brings over a decade of experience to his role as staff associate, where he focuses on prosecuting consumer and antitrust class actions. Glen is a key member of the team litigating the *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, *Ji, et al. v. Naver Corp.*, and the *In re Google Generative AI Copyright Litigation* matters.

Glen received a B.A. (2005) from the UC San Diego and a J.D. from the University of San Francisco School of Law (2005). Glen has also completed the Yamasa Institute Academic Intensive Japanese Program (2012). Glen is admitted to practice in California (2005).

| | | |
|---|---|---|
| JENNIFER JURMARK<br>*Senior Discovery Operations Manager* | New York | • Email: jjurmark@bfalaw.com<br>• Tel: +1 212 789 1340<br>• www.bfalaw.com /professionals/Jennifer-jurmark |

As BFA's Senior Discovery Operations Manager, Jennifer Jurmark oversees daily discovery operations firmwide and manages large scale document reviews. She works closely with Partners, Associates, Staff Attorneys and other external stakeholders on the strategy and implementation of eDiscovery protocols for complex high-stakes litigation. Jennifer leverages AI and Data Analytics to optimize evidence gathering and case analysis.

Jennifer helped lead the eDiscovery efforts and designed and implemented workflows for document reviews as a member of the teams that prosecuted the securities actions concerning Teva Pharmaceuticals Industries Ltd, Granite Construction Inc, and Allianz Global Investors U.S. LLC, and the firm's derivative action against certain current and former members of Tesla's Board of Directors. Currently, Jennifer manages the eDiscovery efforts as a member of the teams litigating BFA's securities cases against Talis and Bioventus ($15.25 million resolution, pending court approval).

BFA BLEICHMAR FONTI & AULD LLP

Jennifer has nearly fifteen years of experience working at the intersection of law, business and technology. Prior to joining BFA, Jennifer worked at large financial institutions and law firms. In her prior roles, she gained extensive experience managing and leading eDiscovery efforts for multiple complex investigations and litigations using cutting edge technology, advising senior stakeholders daily, and running large document review teams.

Jennifer received a J.D. from Benjamin N. Cardozo School of Law (1999) and a B.A. from Barnard College of Columbia University (1995).

| | | |
|---|---|---|
| CHRISTOPHER CAPUOZZO<br>*Director, Client Data and Claims* | New York | • Email: ccapuozzo@bfalaw.com<br>• Tel: +1 212 789 2307<br>• www.bfalaw.com /professionals/christopher-capuozzo |

Christopher Capuozzo is BFA's Director of Client Data and Claims. He manages a team of analysts dedicated to the evaluation of client exposure to alleged securities fraud and is at the vanguard of the firm's efforts of recovering funds by preparing and submitting class action claims on behalf of institutional investor clients.

With nearly twenty years of experience in the securities class action field, Chris monitors client portfolios to identify and evaluate investment losses and potential opportunities for BFA clients to serve as lead plaintiff, to participate in direct or derivative actions, to join class action litigation in non-U.S. jurisdictions, and to recover from class action settlements.

Prior to joining BFA, Chris was a Data Analytics Manager at a securities litigation firm, where he managed a team of analysts providing portfolio monitoring services to the firm's client base. Chris was also a Research Analyst at a global leader in class action recovery services. Chris began his career at a prominent claims administrator, where he processed electronically filed claims from financial institutions across the globe.

Chris received a Bachelor of Arts in Economics, East Asian Studies from New York University.

| | | |
|---|---|---|
| VICTORIA TSE<br>*Senior Data Analyst* | New York | • Email: vtse@bfalaw.com<br>• Tel: +1 212 789 3601<br>• www.bfalaw.com /professionals/victoria-tse |

Victoria Tse joined BFA in 2020 as a Senior Data Analyst. Victoria monitors client portfolios to identify and evaluate investment losses, exposure to financial fraud, and potential opportunities for BFA clients to serve as lead plaintiff, participate in direct actions, join class action litigations in non-U.S. jurisdictions, and recover from class action settlements. In assessing client exposure, she evaluates recovery opportunities for clients based on court-approved loss methodologies for a wide variety of securities fraud allegations. Victoria also helps oversee the acquisition of

BFA BLEICHMAR FONTI & AULD LLP

client investment data from custodians on a monthly basis, as well as maintains clients' accounts by performing annual reviews.

Prior to joining the Firm, Victoria was a senior data analyst at a securities litigation firm.

| | | |
|---|---|---|
| ELAINE RIVERA<br>*Senior Data Analyst* | New York | • Email: erivera@bfalaw.com<br>• Tel: +1 212 789 3604<br>• www.bfalaw.com /professionals/elaine-rivera |

Elaine Rivera monitors and analyzes client exposure to financial fraud and evaluates investment losses and potential opportunities for clients to serve as lead plaintiff. In assessing client exposure, she evaluates recovery opportunities for clients based on court-approved loss methodologies for a wide variety of securities fraud allegations. Elaine also assists with determining client eligibility to participate in class action settlements and submitting the necessary claim documents on behalf of eligible clients.

Prior to joining BFA, Elaine was a Data Analyst at a securities litigation firm.

Elaine received a Bachelor of Arts from Baruch College.

| | | |
|---|---|---|
| JEFFREY ESPERANCE<br>*Data Analyst* | New York | • Email: jesperance@bfalaw.com<br>• Tel: +1 212 789 2306<br>• www.bfalaw.com /professionals/ jeffrey-esperance |

Jeffrey Esperance monitors and analyzes client exposure to financial fraud and evaluates investment losses and potential opportunities for clients to serve as lead plaintiff. In assessing client exposure, he evaluates recovery opportunities for clients based on court-approved loss methodologies for a wide variety of securities fraud allegations.

Jeffrey also assists with determining client eligibility to participate in international securities cases and in class action settlements.

Prior to joining BFA, Jeffrey was a Data Analyst at a securities litigation firm.

Jeffrey received a Bachelor of Arts from Baruch College.

| | | |
|---|---|---|
| UMANG NARAYAN SUHALKA<br>*Data Analyst* | New York | • Email: usuhalka@bfalaw.com<br>• Tel: +1 212 789 3605<br>• www.bfalaw.com /professionals/umang-suhalka |

Umang Narayan Suhalka is a Data Analyst at BFA, where he maintains BFA's proprietary database, monitors and analyzes client exposure to financial fraud, and evaluates investment losses and potential opportunities for clients to serve as lead

BFA BLEICHMAR FONTI & AULD LLP

plaintiff. In assessing client exposure, he evaluates recovery opportunities for clients based on court-approved loss methodologies for a wide variety of securities fraud allegations.

Umang also assists with determining client eligibility to participate in international securities cases and in class action settlements.

Prior to joining BFA, Umang interned at a financial services firm.

Umang received a Bachelor of Engineering in Computer Science from the University of Pune and a Masters of Science in Information Technology from New York University.

| | | |
|---|---|---|
| ALHASSAN BAH<br>*Data Analyst* | New York | • Email: abah@bfalaw.com<br>• Tel: +1 212 789 1351<br>• www.bfalaw.com /professionals/alhassan-bah |

Alhassan Bah is a Data Analyst at BFA, where he monitors and analyzes client exposure to financial fraud, and evaluates investment losses and potential opportunities for clients to serve as lead plaintiff. In assessing client exposure, he evaluates recovery opportunities for clients based on court-approved loss methodologies for a wide variety of securities fraud allegations.

Alhassan also assists with determining client eligibility to participate in international securities cases and in class action settlements.

Prior to joining BFA, Alhassan was an analyst at a financial services firm.

Alhassan received a B.A. from Bloomsburg University of Pennsylvania.

| | | |
|---|---|---|
| TRACEY SHEAK<br>*Marketing Director* | New York | • Email: tsheak@bfalaw.com<br>• Tel: +1 860 810 9177<br>• www.bfalaw.com /professionals/tracey-sheak |

Tracey Sheak leads BFA's marketing efforts, with responsibility for client outreach and initiatives with institutional investors throughout the United States.

Tracey is actively involved in the firm's plans and presentations at industry events, conferences, and organizations including the National Conference on Public Employee Retirement Systems (NCPERS), International Foundation of Employee Benefit Plans (IFEBP), as well as many state pension associations, including Pennsylvania, Texas, Massachusetts, Michigan, Florida, Georgia and Illinois.

A seasoned marketing professional, Tracey has nearly two decades of experience working closely with attorneys and assisting them to expand and enhance the firm's outreach. She also works with firm leadership on a variety of strategic initiatives to further the firm's leading brand and market position.

Outside the firm, Tracey is a successful entrepreneur and founder and president of a high-quality cosmetic and medicinal herbal product line. She has been involved in her communities for many years, volunteering time with organizations including Massachusetts Special Olympics, Hole in the Wall Gang Camp SCUBA Experience, and St. Vincent De Paul warming shelters along with many local and global environmental and humanitarian initiatives. Tracey resides in Connecticut where she raised her family and still enjoys many outdoor sports and activities along the shore.

For more information, please visit:
www.bfalaw.com

# EXHIBIT B

# Exhibit B

**Firm name: Bleichmar Fonti & Auld**
Time through July 31, 2025

| Professional Name (Status) | Hourly Rate* | Categories 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Cumulative Hours | Current Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lesley Weaver (P) | $1,250 | 0.00 | 0.00 | 93.40 | 2.60 | 90.10 | 93.10 | 79.00 | 20.60 | 68.90 | 122.90 | 20.00 | 86.80 | 0.00 | 0.00 | 9.70 | 77.10 | 11.00 | 70.90 | 16.20 | 0.00 | 0.00 | 13.40 | 875.70 | $1,094,625.00 |
| Matthew Melamed (P) | $800 | 1.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.50 | 0.00 | 1.10 | 0.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37.30 | $29,840.00 |
| Anne Davis (P) | $950 | 2.30 | 5.00 | 52.50 | 2.00 | 132.40 | 186.00 | 34.40 | 61.90 | 198.10 | 349.70 | 2.90 | 598.00 | 0.00 | 83.60 | 50.50 | 56.00 | 115.10 | 568.00 | 1.10 | 11.00 | 0.00 | 2.10 | 2,512.60 | $2,386,970.00 |
| Melissa Mather (P) | $995 | 0.00 | 0.00 | 0.00 | 0.00 | 13.50 | 108.10 | 0.00 | 0.00 | 1.00 | 11.60 | 0.00 | 0.90 | 0.00 | 0.00 | 0.00 | 31.80 | 20.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 187.40 | $186,463.00 |
| Joshua Samra (A) | $755 | 0.00 | 7.20 | 79.30 | 8.30 | 10.00 | 1.50 | 27.80 | 3.60 | 93.00 | 185.60 | 4.10 | 290.60 | 0.00 | 53.50 | 110.40 | 9.70 | 16.00 | 288.20 | 0.00 | 4.00 | 0.00 | 0.90 | 1,193.70 | $901,243.50 |
| Kasey Sullivan (O) Projects Associate | $550 | 0.00 | 70.60 | 0.00 | 2.50 | 0.00 | 0.00 | 19.40 | 0.00 | 0.00 | 1.20 | 0.00 | 0.20 | 0.00 | 26.30 | 585.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 705.90 | $388,245.00 |
| Kasey Sullivan (O) Projects Associate | $325 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,137.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,137.10 | $369,557.50 |
| Jennifer Jurmark (O) E-Discovery Mai | $550 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 906.00 | 0.00 | 196.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,108.30 | $609,565.00 |
| Margaret Strakosch (O) Projects Asso | $550 | 0.00 | 0.00 | 23.60 | 0.00 | 0.00 | 53.50 | 36.50 | 0.00 | 2.80 | 20.90 | 6.20 | 12.20 | 0.00 | 0.00 | 0.00 | 13.80 | 54.50 | 13.60 | 0.00 | 0.00 | 0.00 | 0.00 | 237.60 | $130,680.00 |
| Jooyoung Koo (O) Projects Associate* | $325 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 585.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 585.80 | $190,385.00 |
| Jooyoung Koo (O) Projects Associate | $550 | 0.00 | 0.00 | 0.00 | 0.00 | 32.40 | 279.00 | 6.30 | 0.00 | 0.00 | 141.20 | 0.00 | 90.40 | 0.00 | 1,250.80 | 0.00 | 185.20 | 23.60 | 22.30 | 0.00 | 0.00 | 0.00 | 0.00 | 2,031.20 | $1,117,160.00 |
| Julie Law (PL) | $300 | 9.60 | 0.00 | 1.60 | 0.00 | 0.00 | 43.40 | 1.50 | 0.00 | 0.40 | 107.90 | 0.00 | 64.90 | 0.00 | 0.00 | 0.50 | 91.00 | 26.40 | 160.20 | 0.00 | 0.00 | 0.00 | 0.00 | 507.40 | $152,220.00 |
| Glen Tsurudome (O) Staff Associate | $520 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 69.20 | 13.50 | 0.00 | 0.00 | 0.00 | 0.00 | 3.50 | 0.00 | 0.00 | 0.00 | 212.20 | 0.00 | 14.00 | 0.00 | 0.00 | 0.00 | 0.00 | 312.40 | $162,448.00 |
| Lloyd Donders (O) Staff Associate | $470 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,157.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,157.20 | $543,884.00 |
| Lloyd Donders (O) Staff Associate** | $325 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87.70 | $28,502.50 |
| Sandy Gonzalez (A) Associate | $605 | 0.00 | 0.00 | 0.00 | 0.00 | 16.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 72.90 | 2.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 91.70 | $55,478.50 |
| **Total:** | | **13.80** | **82.80** | **250.40** | **15.40** | **295.10** | **839.70** | **218.40** | **86.10** | **397.70** | **941.00** | **107.20** | **1,150.40** | **1,810.60** | **2,320.20** | **756.80** | **2,030.40** | **267.10** | **1,137.20** | **17.30** | **15.00** | **0.00** | **16.40** | **12,769.00** | **$8,347,267.00** |

* 2024 Rates
** Tier 1 Document Review (Capped at $325.00/hr)
***Note - 152 Hours Cut (see tab Time (Original)***
***Note - an additional 286 hours cut (see Time (Audited - Deprecated)***

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

# EXHIBIT C

# Exhibit C

Bleichmar Fonti & Auld LLP – Annual Hours and Lodestar

| Year | Sum of Time | Sum of Lodestar |
|---:|---:|---:|
| 2021 | 1330.50 | $1,230,364.00 |
| 2022 | 5126.80 | $2,813,047.00 |
| 2023 | 5196.70 | $3,287,518.00 |
| 2024 | 814.60 | $732,256.00 |
| 2025 | 300.40 | $284,082.00 |
| Grand Total | 12769.00 | $8,347,267.00 |

# EXHIBIT D

# Exhibit D

Bleichmar Fonti & Auld LLP – Expenses

| Description | Total |
|---|---|
| Court Fees (filing, etc.) | $1,449.00 |
| Court Reporters/Transcripts | $32.00 |
| Computer Research | $3,349.64 |
| Reproduction/Duplication/Copies | $6,719.83 |
| Notice Costs | $0.00 |
| Express Delivery/Messenger | $592.68 |
| Pre-approved Professional Fees/Services (expert, investigator, accountant, etc.): 10/1/2021 - Electronic Discovery Vendor, Trustpoint.One | $0.00 |
| Service of Process | $6,437.39 |
| Telephone/Fax/Postage | $99.50 |
| Travel: | |
| ** Airline (Professional/Destination/Purpose) | $3,342.52 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $1,305.01 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | $349.08 |
| ** Meals (Professional/Purpose) | $1,276.88 |
| ** Lodging (Professional/Destination/Purpose) | $4,541.38 |
| ** Other (Describe/Professional/Destination/Purpose): Conf. Room for Team Mtg | $500.00 |
| Litigation Assessments | $0.00 |
| Miscellaneous: (Describe): | $0.00 |
| | ($320,000.00)[1] |
| **TOTAL EXPENSES** | **$29,994.91** |

[1] Contributions paid by Bleichmar, Fonti & Auld LLP to the plaintiffs' common litigation fund are accounted for separately, so are excluded from this individual law firm cost summary.

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

*In re: Google RTB Consumer Privacy Litigation*
No. 4:21-cv-01255

# DECLARATION OF BRIAN T. FITZPATRICK

## BACKGROUND AND QUALIFICATIONS

1. I am the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University in Nashville, Tennessee. I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006. I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court. I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1. I speak only for myself and not for Vanderbilt.

2. My teaching and research at Vanderbilt have focused on class action litigation. I teach the Civil Procedure, Federal Courts, and Complex Litigation courses. In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the Fordham Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review. My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal. I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, 2019, 2023, and 2024; and the ABA Annual Meeting in

2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies. In 2015, I was elected to the membership of the American Law Institute. In 2021, I became the co-editor of THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (with Randall Thomas).

3. In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study"). This article is still what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007). *See id.* at 812-13. As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 169 from the Ninth Circuit alone. *See id.* at 817. I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, at the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. Since then, this study has been relied upon regularly by a number of courts, scholars, and testifying experts.[1] I will draw upon this study and I attach it as Exhibit 2.

[1] *See, e.g.*, *In re Stericycle Sec. Litig.*, 35 F.4th 555, 561 (7th Cir. 2022) (relying on article to assess fees); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (same); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 2022 WL 4329646, at *5 (D. Mass., Sep.

19, 2022) (same); *de la Cruz v. Manhattan Parking Group*, 2022 WL 3155399, at *4 (S.D.N.Y., Aug. 8, 2022) (same); *Kukorinis v. Walmart*, 2021 WL 8892812, at *4 (S.D.Fla., Sep. 21, 2021) (same); *Kuhn v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020) (same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), *appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp.*, No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15–3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09–cv–00938–JLK–KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod. Liab. Litig.*, No. 11–1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07–CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov.

4. In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation. *See*, *e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021) (hereinafter "Fiduciary Judge"); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "Class Action Lawyers"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009). Much of this work was discussed in a book I published with the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019). The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively, and that courts should provide proper incentives to encourage such private attorney general behavior. This work, too, has been relied upon by courts and scholars.[2] I will also draw upon this work.

5. Finally, in 2020, I was asked by the Department of Justice to gather data on the hourly rates charged by lawyers in Washington, D.C., to replace the outdated Laffey Matrix. My matrix has now been adopted by the Department and the United States District Court for the District of Columbia. *See J.T. v. D.C.*, 652 F. Supp. 3d 11 (D.D.C. 2023). Although my task was to gather rates charged in "complex litigation," that term has been given a broad definition by the D.C. Circuit and my data included typical lawyers as well as elite lawyers, individual cases as well

---

1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

[2] *See, e.g.*, *Briseno v. Henderson*, 998 F.3d 1014, 1025, 1029 (9th Cir. 2021); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 960 (11th Cir. 2020) (Jordan, J., dissenting); *Neese et al. v. Becerra*, 2022 WL 9497214, at *2 n.1 (N.D.Tex., Oct. 14, 2022); *Tershakovec v. Ford Motor Co.*, 2021 WL 2700347, at *18 (S.D. Fla. July 1, 2021); *Vita Nuova, Inc. v. Azar*, 2020 WL 8271942, at *3 n.5 (N.D. Tex. Dec. 2, 2020).

as class actions. The matrix aggregates all of these lawyers and cases and identifies the average hourly rate among them. *See* The Fitzpatrick Matrix, *available at* https://www.justice.gov/usao-dc/media/1395096/dl?inline.

**SUMMARY OF OPINIONS**

6. I have been asked by class counsel to opine on whether the attorneys' fees they have requested here are reasonable in light of the empirical studies and research on economic incentives in class action litigation. In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents in Exhibit 3. As I explain, based on my study of settlements across the country and in the Ninth Circuit in light of the empirical and economic research on class actions, my opinions are as follows:

- The court could use either the percentage method or the lodestar method in this case.
- The fee requested would be reasonable under the percentage method in light of the estimated value of the relief secured for the class.
- The fee requested would reasonable under the lodestar method in light of the reasonable and risk-justified multiplier that would result.

**CASE BACKGROUND**

7. The plaintiffs here allege that Google breached their account holder agreements and invaded their privacy in violation of California law by selling and sharing their personal information to hundreds of advertisers and other participants in Google's "real time bidding" advertising auctions. Class counsel largely defeated Google's motion to dismiss and spent years in unusually complicated and contentious discovery—including third-party discovery, dozens of depositions, reams of data disclosure and analysis, expert discovery, and *Daubert* motion practice. The court denied certification of a damages class under Rule 23(b)(3). While a renewed motion

for class certification under Rule 23(b)(2) was pending, the parties reached a class-wide settlement. The parties have now moved the court to certify their agreed-upon class definition and to approve the settlement; class counsel have also requested that the court approve a payment from Google for their attorneys' fees, their expenses, and for service awards for the class representatives. The proposed class includes, with minor exceptions, "all individual Google account holders subject to a Google U.S. Terms of Service who have an active Google account on the Effective Date." Settlement Agreement, Definitions ¶ 16. The settlement requires Google to create a new, easily toggled switch that will allow class members to limit the information Google shows third parties during the advertising auctions. *See id.* at ¶ A.1. The settlement requires Google to show class members how to toggle this switch by a variety of mechanisms, including by direct email to every class member, and to maintain the switch for at least three years. *See id.* at B.1. Google is also required to create new disclosures that will allow the public to find information about Google's auction practices, the new switch, and how to limit the sharing of their data. *See id.* at A.2.a

8. The settlement further obligates Google to pay whatever fees and expenses the court awards to class counsel as well as any service payments to the class representatives. *See* Settlement Agreement ¶¶ B.1, C.1. In exchange, the class will release Google from claims that are "based on, or arise from, one or more of the same factual predicates or theories of liability asserted in the Complaint . . . for injunctive, declaratory, or any other equitable non-monetary relief, arising from Google's alleged sharing or selling of personal information through Google's Real-Time Bidding System . . . ." *Id.* at Definitions ¶ 13. Claims for monetary relief remain unaffected. *See id.* ("The Released Class Claims do not include any claim for monetary relief of any kind . . . .").

9. Class counsel have requested that this court approve a fee payment from Google

for $128,358,352 for attorneys' fees. As I explain, it is my opinion that this request is within the reasonable range in light of the empirical and economic research on class actions.

**ASSESSMENT OF THE REQUEST FOR ATTORNEYS' FEES**

10. Although Google will pay class counsel's fees, courts scrutinize such arrangements as though the class was paying them directly. *See Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award. [T]he assumption in scrutinizing a class action settlement agreement must be, and has always been, that the members of the class retain an interest in assuring that the fees to be paid class counsel are not unreasonably high."). When courts ask class members to pay class counsel directly, they do so under the common law of unjust enrichment. This is sometimes called the "common fund" or "common benefit" doctrine.

**Percentage versus Lodestar Method**

11. At one time, courts that awarded fees under this doctrine did so predominantly using the familiar lodestar approach. *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2051. Under this approach, courts awarded counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor, largely for two reasons. First, courts came to dislike the lodestar method because it was difficult to calculate; courts had to review and analyze voluminous time records and related materials. Second—and more importantly, in my view—courts came to dislike the lodestar method because it did not align the interests of counsel with the interests of their clients—to wit, counsel's recovery did not depend on how much

was recovered, but rather on how many hours were spent on the case. *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class actions, usually those where fees are paid pursuant to a fee-shifting statute or those where the relief is injunctive in nature and the value of the injunction cannot be reliably quantified. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements). The other large-scale academic studies of fees agree. *See, e.g.,* Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (hereinafter "Eisenberg-Miller 2017") (finding the lodestar method used only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008).

12. The more widely utilized method of calculating attorneys' fees today is known as the "percentage" method. Under this approach, courts select a percentage that they believe is fair to counsel, multiply the settlement amount by that percentage, and then award counsel the resulting amount. The percentage approach became popular precisely because it corrected the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly in my view, it aligns the interests of counsel with the interests of their clients because the greater the recovery, the more counsel receives. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

13. In the Ninth Circuit, district courts have the discretion to use either the lodestar method or the percentage method. *See, e.g., In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (en banc) ("No presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other."). This is true in settlements that consist entirely of injunctive relief so long as the injunction can be reliably quantified. *See Staton*, 327 F.3d at 974 ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief

as part of the value of a common fund for purposes of applying the percentage method of determining fees.”).

14. In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should generally use the percentage method when enough of the value of the settlement can be reliably quantified. It is my opinion that courts should use the lodestar method only where the value of the settlement cannot be reliably quantified (and the percentage method is therefore not feasible) or a fee-shifting statute requiring the lodestar method is applicable. This is not just my opinion. It is the consensus opinion of class action scholars. *See* American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) (“[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases.”).

15. In this case, it is my opinion that either the percentage or lodestar method could be used. Although the settlement consists almost entirely of injunctive relief (it also includes the fees, expenses, and service awards that Google has agreed to pay), class counsel have retained an expert who has estimated the value of the injunction. I discuss this valuation below. If the court concludes that this or another valuation is reliable, then the court could use the percentage method. Or, as an alternative, the court could use the lodestar method. As I explain, it does not matter which method the court selects because the result here is the same: the fee request is reasonable.

**The Percentage Method**

16. If the court concludes that the relief in the settlement here can be quantified, then it can use the percentage method. Under the percentage method, the court must 1) calculate the value of the benefits conferred by the litigation, and then 2) select a percentage of that value to award to counsel.

17. When calculating the value of the benefits, most courts include any benefits conferred by the litigation, whether cash relief, non-cash relief, service awards, attorneys' fees and expenses, or administrative expenses. Although some of these things do not go directly to the class, they facilitate compensation to the class (e.g., notice and administration expenses), provide future savings to the class, or deter defendants from future misconduct by making defendants pay more when they cause harm. Thus, in my opinion, it is appropriate to include them all in the denominator of the percentage method. *See also* Principles of the Law of Aggregate Litigation, *supra*, § 3.13(b) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").

18. In this case, class counsel's expert most conservative estimates of the value of the injunctive relief put it between $1.4 and $2.9 billion, depending on the methodology. *See* Zeithammer Declaration ¶¶ 36, 58. To this number, we must add the requested fees, expenses, and service payments, which come to roughly $132 million. If the court grants these payments as requested, it would bring the total settlement valuation to between $1.532 and $3.032 billion. In my opinion, it is not important to pick a particular number in this range because, as I explain below, any number in this range would result in a fee percentage that is reasonable under the percentage method.

19. When selecting the percentage, the Ninth Circuit instructs district courts to start with 25% as a presumptively reasonable "benchmark" percentage, *see, e.g., Staton*, 327 F.3d at 968, and then to adjust it upward or downward using at least eight different factors:

1) the percentages awarded in other cases, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002);

2) the results achieved by counsel, *see Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Vizcaino,* 290 F.3d at 1048;
3) the complexity of the case, *see Six Mexican Workers*, 904 F.2d at 1311; *In re Pacific Enters. Securities Litig.*, 47 F.3d 373, 379 (9th Cir. 1995);
4) the risks the case involved, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1048-49;
5) the length the case has transpired, *see Six Mexican Workers*, 904 F.2d at 1311; *Vizcaino*, 290 F.3d at 1050;
6) the percentages in standard contingency-fee agreements in similar individual cases, *see Vizcaino*, 290 F.3d at 1049;
7) any non-monetary benefits obtained by counsel, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1049; *Staton*, 327 F.3d at 946; and
8) counsel's lodestar, *see id*. at 1050-51.

20. Class counsel have requested that the court approve a fee payment from Google of $128.3 million. If the court values the injunctive relief on the low end of class counsel's expert's most conservative range—$1.4 billion—this would result in a fee percentage of 8.4% of the total settlement valuation of $1.532 billion.

21. If the court values the injunctive relief on the high end of the class counsel's expert's most conservative range—$2.9 billion—this would result in a fee percentage of 4.2% of the total settlement valuation of $3.032 billion. Both of these numbers are well below the Ninth Circuit's 25% benchmark and, as I explain, either of them would be reasonable under the Ninth Circuit's factors in light of the empirical research and research on economic incentives in class action litigation. Thus, any number between them would be reasonable as well.

22. Consider first the Ninth Circuit's factor (1): the awards in other cases. According to my empirical study, the most common percentages awarded by all federal courts using the percentage method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%. *See* Fitzpatrick, *Empirical Study, supra,* at 833-34, 838. The numbers for the 111 settlements in the Ninth Circuit in my study where the percentage method was used were quite similar: the mean was 23.9% and the median 25%. My numbers agree with the other large-scale academic studies of class action fee awards. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (hereinafter "Eisenberg-Miller 2010") (finding mean and median of 24% and 25% nationwide, and 25% in Ninth Circuit); *Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of 27% and 29% nationwide, and 26% and 25% in the Ninth Circuit). Both sides of the fee range described above—4.2% to 8.4%—are well below the typical percentages awarded nationwide and in the Ninth Circuit. As such, it is my opinion that the "other cases" factor supports the fee request.

23. In order to visualize how low the fee request here is, I graphed the distribution of the Ninth Circuit's percentage awards from my study in Figure 1, below. The figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis). I have marked which columns 4.2% and 8.4% would fall into with red arrows. As the arrows show, the vast majority of fee awards in this Circuit have been much higher than either percentage. Indeed, the lower side of the possible fee range here is so low that it is literally "off the chart": lower than any percentage awarded in the years covered by my study (out of 111 fee awards).

**Figure 1: Percentage-method fee awards in the Ninth Circuit, Fitzpatrick (2010)**




24. Of course, this is not a normal class action settlement. At any of class counsel's expert's valuations, it would be unusually large. This is notable because some courts analyze this "other cases" factor in reference to settlements of a similar size and my empirical study and the other large-scale academic studies show that settlement size has a statistically significant but inverse relationship with fee percentages—*i.e.*, that some courts award lower percentages in cases where settlements were larger. *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44; *Eisenberg-Miller 2010*, *supra*, at 263-65; *Eisenberg-Miller 2017, supra*, at 947-48. This is sometimes called the "increase-decrease" or "sliding scale" rule. In particular, my study found that, in settlements above $1 billion, the average and median fee percentages were only 13.7% and 9.5%, respectively. *See* Fitzpatrick, *Empirical Study, supra*, at 839. The Eisenberg-Miller studies did not separately report numbers for very large settlements. Thus, in order to give the court as much data as possible, I supplemented my study with Table 1, below, which sets forth all of the billion-dollar settlements

in federal court of which I am aware from any year between 1998 (the earliest billion-dollar settlement of which I am aware) and 2024. It includes 38 settlements in all. Most of the settlements consisted of cash, but two of them included cash and quantified injunctive relief. Most of the courts used the percentage method (35 cases, including those where both the percentage and lodestar methods were used), and, when they did, the average and median in Table 1 is only slightly below what I found in the two years of my study: 11.2% and 9.2%, respectively (if the total rather than cash-only valuations of the two hybrid settlements are used). Thus, no matter which data you look at, a fee percentage in the range of 4.2% to 8.4% would be well below average even in billion-dollar cases. As such, even if the "other cases" factor is analyzed in reference to similarly-sized settlements, it is my opinion that the factor supports the fee request.

**Table 1: All Federal Class Action Settlements Greater Than or Equal to $1 Billion, 1998-2024**

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage |
|---|---|---|---|---|
| BP Gulf Oil Spill (2012)[3] | $13 billion | Percent | 2.3 | 4.3% |
| 3M PFAS (2024)[4] | $10.5-$12.5 billion | Percent | 3.0 | 8% |
| Volkswagen Diesel Engine (Consumer) (2017)[5] | $10 billion | Percent | 2.6 | 1.7% |
| Enron Securities Fraud (2008)[6] | $7.2 billion | Percent | 5.2 | 9.52% |
| Diet Drugs Products Liability (2008)[7] | $6.4 billion | Percent | 2.6+ | 6.75% |
| WorldCom Securities (2005)[8] | $6.1 billion | Percent | 4.0 | 5.5% |

[3] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2016 WL 6215974 (E.D.La. Oct. 25, 2016). This settlement was uncapped and I estimated the settlement benefits to total $13 billion at the time fees were awarded.

[4] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2024 WL 4868615 (D.S.C. Nov. 22, 2024).

[5] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017). This settlement was uncapped and I estimated the settlement benefits to total $10 billion at the time fees were awarded.

[6] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008).

[7] *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008).

[8] *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005).

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage |
|---|---|---|---|---|
| Payment Card Interchange Fees Antitrust (2019)[9] | $5.62 billion | Percent | 2.4 | 9.31% |
| Visa Antitrust (2003)[10] | $3.4 billion | Percent | 3.5 | 6.5% |
| Indian Trust (2011)[11] | $3.4 billion | Not specified | Not calculated | 2.9% |
| Tyco Securities (2007)[12] | $3.3 billion | Percent | 2.7 | 14.5% |
| Cendant Securities (2003)[13] | $3.2 billion | Percent | Not calculated | 1.73% |
| Petrobras Securities (2018)[14] | $3 billion | Lodestar | 1.8 | 6.2% |
| Blue Cross Blue Shield Antitrust (2022)[15] | $2.67 billion | Percent | 3.23 | 23.47% |
| AOL Securities (2006)[16] | $2.65 billion | Percent | 3.7 | 5.9% |
| Bank of America Securities (2013)[17] | $2.4 billion | Not specified | Not calculated | 6.5% |
| Foreign Exchange Antitrust (2018)[18] | $2.31 billion | Percent | 1.72 | 13% |
| Toshiba Diskette (2000)[19] | $2.1 billion (total)<br>$1 billion (cash) | Both | Not calculated | 7.1% (total)<br>15% (cash) |
| Toyota Unintended Acceleration (2013)[20] | $1.6 billion (est. total)<br>$757 million (cash) | Percent | 2.9 | 12.3% (total)<br>26.4% (cash) |

---

[9] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6888488 (E.D.N.Y. Dec. 16, 2019).

[10] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

[11] *Cobell v. Salazar*, No. 96-cv-01285 (D.D.C. Jul. 27, 2011).

[12] *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007).

[13] *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003).

[14] *In re Petrobras Sec. Litig.*, No. 14-9662 (S.D.N.Y. Jun. 22, 2018).

[15] *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587617 (N.D. Ala. Aug. 9, 2022).

[16] *In re AOL Time Warner, Inc. Sec.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006).

[17] *In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, No. 09-md-2058 (S.D.N.Y. Apr. 8, 2013).

[18] *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-7789 (S.D.N.Y. Nov. 8, 2018).

[19] *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000).

[20] *In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, No. 10-ml-2151 (C.D. Cal., June 17, 2013).

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage |
|---|---|---|---|---|
| Credit Default Swaps Antitrust (2016)[21] | $1.87 billion | Percent | 6.2 | 13.6% |
| Prudential Insurance (2000)[22] | $1.8 billion | Percent | 2.1 | 4.8% |
| Household Securities (2016)[23] | $1.58 billion | Percent | Not calculated | 24.7% |
| Syngenta Corn (2018)[24] | $1.51 billion | Percent | 1.4 | 33.33% |
| Valeant Securities (2021)[25] | $1.21 billion | Percent | 3.6 | 13% |
| Volkswagen Diesel Engine (Dealer) (2017)[26] | $1.2 billion | Lodestar | 2.0 | 0.25% |
| Black Farmers Discrimination (2013)[27] | $1.2 billion | Percent | <2.0 | 7.4% |
| Tobacco Antitrust (2003)[28] | $1.2 billion | Lodestar | 4.5 | 5.9% |
| DuPont PFAS (2023)[29] | $1.19 billion | Percent | <1.0 | 8% |
| Chinese Drywall (2018)[30] | $1.12 billion | Both | 1.0 | 9.18% |
| TFT-LCD Antitrust (2013)[31] | $1.1 billion | Percent | ≈2.5 | 28.6% |
| Nortel Securities I (2006)[32] | $1.1 billion | Percent | 2.1 | 3% |
| Nortel Securities II (2006)[33] | $1.1 billion | Percent | Not calculated | 8% |
| Royal Ahold Securities (2006)[34] | $1.1 billion | Percent | 2.6 | 12% |

[21] *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016).

[22] *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F. Supp. 2d 721, 736 (D.N.J. 2000).

[23] *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 2-cv-05893 (N.D.Ill. Nov. 10, 2016).

[24] *In re: Syngenta AG MIR 162 Corn Litigation*, 357 F.Supp.3d 1094 (D. Kan. 2018).

[25] *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 358611 (D.N.J. Feb. 1, 2021).

[26] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672, 2017 WL 1352859 (N.D. Cal. Apr. 12, 2017).

[27] *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013) (incurred rather than awarded expenses).

[28] *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003).

[29] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2024 WL 1739709 (D.S.C. Apr. 23, 2024).

[30] *In re: Chinese Manufactured-Drywall Products Liab. Litig.*, No. 2047 (E.D.La. Jan. 31, 2018).

[31] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013).

[32] *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y., Jan. 29, 2007).

[33] *In re Nortel Networks Corp. Sec. Litig.*, No. 04-cv-2115 (S.D.N.Y., Dec. 26, 2006).

[34] *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006).

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage |
|---|---|---|---|---|
| Allapattah Contract (2006)[35] | $1.1 billion | Percent | Not calculated | 31.33% |
| ARCP Securities (2020)[36] | $1.03 billion | Both | 1.5 | 9.76% |
| Sulzer Hip (2003)[37] | >$1 billion | Both | 2.4 | 4.8% |
| Wells Fargo Securities (2023)[38] | $1 billion | Percent | Not calculated | 18% |
| Nasdaq Antitrust (1998)[39] | $1 billion | Percent | 4.0 | 14% |
| NFL Concussion (2018)[40] | ≈ $1 billion | Both | 3.0 | 10.8% |

25. Consider next factors (2), (3), and (4): the results achieved by counsel compared to the risks and complexities counsel faced. These factors reward or punish class counsel based on what they accomplished for the class: did they over or underperform with the hand they were dealt? To a large extent, the percentage method is supposed to address this by automatically rewarding class counsel if they recover more for the class, but the percentage method does not perfectly incentivize class counsel, *see* Fitzpatrick, *Fiduciary Judge*, *supra*, at 1154-55; FITZPATRICK, THE CONSERVATIVE CASE FOR CLASS ACTIONS 93-95, so it is good to double check class counsel's performance with these factors. In my opinion, these factors strongly support the fee request.

26. The relief here gives the class comprehensive injunctive relief: it is now completely up to class members whether Google will be permitted to share their personal information with advertisers or not. As such, it is hard to see how the injunctive relief result here could have been much better. But this relief must be measured against the risks class counsel faced.

---

[35] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-cv-986 (S.D.Fla. Apr. 16, 2007).

[36] *In re American Realty Capital Properties Litig.*, No. 15-mc-00040 (D.N.J. Jan. 23, 2020).

[37] *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 939 (N.D. Ohio 2003).

[38] *In re Wells Fargo & Co. Securities Litig.*, No. 20-cv-04494 (S.D.N.Y. Sep. 8, 2023).

[39] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998).

[40] *In re Nat'l Football League Players' Concussion Injury Litig.*, 2018 WL 1635648 (E.D. Pa. Apr. 5, 2018). This settlement was uncapped and the settlement benefits were estimated to total $1 billion at the time fees were awarded.

27. This was not a slam-dunk case. At all times, plaintiffs faced a formidable and well-heeled defendant. Google is one of the largest and most sophisticated technology companies in the world. Class counsel faced significant risks. Consider the following hurdles that class counsel had to surmount to prevail in this case had it not settled:

- First, the court denied certification of a damages class with prejudice and it is not clear that the court would have certified an injunctive relief class given Google's opposition to the renewed class certification motion and the opinions and testimony of Google's experts. Had certification been granted, it could have been overturned on appeal if litigation continued.
- Second, this case sits at the cutting edge of both online and mobile auction technology—an extremely complex, ever-changing, and opaque technology not known to the public—and an evolving body of privacy law and regulation, all of which implicate complex issues of rights to privacy and user consent. This ever-changing landscape raised the possibility that the relief being sought at trial would be mooted as a result of industry, legal, or regulatory changes.
- Third, Google certainly would have attempted to exclude some or all of plaintiffs' experts before any trial. In this regard, the court has already limited the scope of one of plaintiffs' experts (Prof. Neil Richards) with respect to his class certification opinions. Even if the court accepted all of plaintiffs' experts at summary judgment and trial, the court's decision in this regard could have been overturned on appeal if the litigation continued.
- Fourth, Google would have moved for summary judgment on all of plaintiffs' claims to obviate any trial. In privacy cases such as this one, disclosure and consent have both

been significantly contested issues and Google had arguments as to why its existing disclosures were adequate and why class members should be deemed to have consented to the data tracking practices at issue here.

- Fifth, plaintiffs would have been proceeding to trial only on forward-looking injunctive relief claims, and Google could have mooted these claims in advance of any trial by voluntarily implementing corporate changes. For example, Google could have implemented the same or similar RTB Control and disclosures that it has agreed to make as part of the settlement, leaving nothing for plaintiffs to try before the court, or which the court may have accepted as sufficient to moot plaintiffs' claims.
- Sixth, if the case proceeded to trial, plaintiffs may not have met their burden of proof before the court (the trier of fact here). If plaintiffs did prevail, it is unclear what injunctive remedies the court would require Google to make as a result, or whether they would be as robust or consequential as the injunctive relief plaintiffs have obtained by way of this settlement. Any trial victory for plaintiffs could also have been overturned on appeal had the litigation continued.

28. In my opinion, it is clear that the result here is excellent in light of all these risks. Thus, in my opinion, these factors weigh in favor of the fee request.

29. Consider next factor (5): the length the litigation has transpired. This factor is important because the longer class counsel who work on contingency must wait to get paid for their work, the lower their "effective" fee becomes. This is the "time value of money": a dollar today is worth more than a dollar several years from now. This case has already transpired for more than four and one-half years. This is much longer than the typical class action transpires before reaching final approval. *See* Fitzpatrick, *Empirical Study, supra*, at 820 (finding mean and

median times to final approval of around three years). Thus, it is my opinion that this factor, too, supports the fee request.

30. Consider next factor (6): the percentages in standard contingency-fee agreements in similar individual cases. It is well known that standard contingency-fee percentages in individual litigation are one-third or greater. *See, e.g.*, Fitzpatrick, *Fiduciary Judge*, *supra*, at 1159-63 (canvassing the empirical studies). This is true even among sophisticated clients, and, as far as I can tell, it is true even in big cases like this one. *See, e.g.,* Schwartz, *supra,* at 360 (finding that corporations in patent cases either agree to flat rates of, on average, 38.6% or graduated rates that start, on average, at 28% and accelerate, on average, to 40.2%); Fitzpatrick, *Fiduciary Judge*, *supra*, at 1159-63. The fee request here is well below such numbers. Thus, this factor, too, supports the fee request.

31. Consider next factor (7): the non-monetary benefits conferred by the litigation. Courts use this factor to reward class counsel for injunctive relief they secure for the class when the value of such relief will not be known and class counsel cannot thereby be paid a percentage of that value. For example, if a settlement has both cash and injunctive components and the injunctive components cannot be valued, courts use this factor to increase the percentage they would otherwise award class counsel from the cash components. Courts do this because it is important to find some way to compensate class counsel for securing injunctive relief; otherwise, class counsel would be disincentivized to go after it, even when it would be of greater benefit to the class than cash. Here, while the injunctive relief has been valued by class counsel's expert, there are three additional non-monetary benefits that have not: (1) class members have received all the benefits of comprehensive injunctive relief while maintaining their right to seek damages if they so choose; (2) because the new toggle switch is available in "signed out" mode, members of

general public who are not Google account holders (and are thus not class members) but who are browsing on Google websites or applications can also avail themselves of the switch to limit the information that Google shows advertisers; and (3) where the switch has been enabled, advertisers and other participants in Google's advertising auction will no longer be able to link information derived from Google to information that those participants may already have about specific individuals, thus limiting the ability of third parties to use Google's advertising auction to build their own profiles of the browsing activity of members of the general public across the web. Thus, it is my opinion that this factor supports the fee request.

32. Finally, consider factor (8): counsel's lodestar. If the court grants the fee request, class counsel would earn a multiplier of 3.5 on their lodestar. Although this would be higher than average in a run-of-the-mill class action settlement, *see* Fitzpatrick, *Empirical Study*, *supra*, at, 834 (reporting a mean multiplier of 1.65 and a median of 1.48), it is more typical in bigger settlements, *see Eisenberg-Miller 2010*, *supra*, at 274 (reporting a mean multiplier of 3.18 and a median of 2.6 in settlements above $175.5 million). For example, in the billion-dollar settlements in Table 1, among the courts that used the percentage method and calculated the lodestar, the mean lodestar multiplier was 2.85 and the median was 2.6. Thus, while a 3.5 multiplier is somewhat above average, it is well within the range of previous cases, and, in my opinion, this factor, too, supports the fee request, particularly in light of the excellent result achieved.

33. For all these reasons, I believe the fee request is reasonable under the percentage method in light of the empirical and research on economic incentives in class action litigation.

**The Lodestar Method**

34. As an alternative, the court can use the lodestar method. The lodestar method "begins with the multiplication of the number of hours reasonably expended by a reasonable hourly

rate" but "[t]he resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). Some courts also consider "the length of the proceedings." *Staton*, 327 F.3d at 967. It is important to note that, unlike the lodestar method called for by statute in fee-shifting cases, where the adjustments upward are reserved for exceptional cases, the lodestar method under unjust enrichment doctrine in class action cases allows for routine multipliers. *See id.* ("The procedures used to determine the amount of reasonable attorneys' fees differ concomitantly in cases involving a common fund from those in which attorneys' fees are sought under a fee-shifting statute. As in a statutory fee-shifting case, a district court in a common fund case can apply the lodestar method . . . . In common fund cases, however, the court can apply a risk multiplier when using the lodestar approach."); William Rubenstein, 5 Newberg and Rubenstein on Class Actions § 15:90 (6th ed.) ("[C]ourts have more leeway in approving a positive multiplier when using the lodestar approach in a common fund case than they do when using the lodestar approach to make an award in a fee-shifting case."). Moreover, the court must apply a risk multiplier "when the fee applicant establishes that the prevailing party would have faced 'substantial difficulties' in finding counsel without an adjustment for risk and that it is difficult to find counsel for this class of contingency fee cases," *Fischel Equitable Life Assur. Soc. of US*, 307 F.3d 997, 1008 (9th Cir. 2002), or where "(1) attorneys take a case with the expectation they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky." *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016). Finally, sometimes courts also "crosscheck" the lodestar method against the percentage method

like they do the percentage method against the lodestar. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011).

35. Class counsel have reported a lodestar here of $36,673,815, based on 46,521.75 total hours spent on the case. I have examined their hourly rates and I found them to be within the range accepted in previous cases in this district for elite class action representation. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2024 WL 4246282, at *5-*6 (N.D. Cal. Sept. 18, 2024) (finding rates up to $1400 "reasonable and commensurate with those charged by attorneys with similar experience in the market" when awarding fees with a 3.88 multiplier). They are also consistent with the hourly rates I found when I gathered data for the Fitzpatrick Matrix: those rates ranged up to $1250 even back in 2020. *See* Declaration of Brian T. Fitzpatrick ¶ 11, *available at* https://www.justice.gov/usao-dc/page/file/1504381/dl?inline. Additionally, it appears that class counsel's rates are well below the rates charged by the defendant's firm Cooley LLP. *See, e.g., Yuga Labs, Inc. v. Ripps*, No. 2:22-cv-04355-JFW-JEMx, 2024 WL489248, at *4 n. 8 (citing a survey indicating that in 2017, Cooley had an $1,100 average rate for partners and $595- $835 for associates and recognizing counsel's argument that rates have increased significantly since then); BTI Consulting Group 2018 Report (Cooley's rates are among the "highest of the high").[41] As I noted above, the fees class counsel have requested would result in a multiplier of 3.5. In my opinion, that multiplier would be more than reasonable under the Ninth Circuit's lodestar-method factors in light of the empirical and research on economic incentives in class action litigation.

36. Many of the lodestar-method factors are the same as the factors under the percentage method. As such, I will not repeat here all I said there. Rather, suffice it to say that:

[41] Available at https://bticonsulting.com/themadclientist/the-highest-rate-firms-2018).

- The representation of the class and the benefits obtained were and are excellent: the class is receiving comprehensive injunctive relief.
- The complexity, novelty, and risk of nonpayment were substantial: the class is receiving full relief despite facing *numerous* litigation risks against a well-heeled defendant.
- The length of proceedings has been long: this case has already transpired nearly twice as long as the typical class action does before it reaches settlement.
- The percentage crosscheck is uneventful: the fee would consume a small, below-average percentage of the value of the relief, even by the standards of billion-dollar settlements.

37. Moreover, as I noted above, the multiplier requested here would be in line with the empirical research on other big class action settlements, *see Eisenberg-Miller 2010*, *supra*, at 274 (reporting a mean multiplier of 3.18 and a median of 2.6 in settlements above $175.5 million), including the billion-dollar settlements in Table 1. It is true that most of this data is based on lodestar crosschecks from percentage-method fee awards and it is true that multipliers tend to be lower under the lodestar-method. *See* Fitzpatrick, *Empirical Study, supra*, at 835 (finding overall mean and median just under 1.0). But it is also true that the lodestar-method data is dominated by small cases such as debt collection cases. *See* Fitzpatrick, *Empirical Study, supra*, at 836 (finding overall mean and median influenced by mean of 0.66 in debt collection cases). By contrast, if we look at lodestar-method awards in big cases—such as the billion-dollar cases in Table 1—we find numbers much closer to the multiplier requested here: the average multiplier is 2.8 among the three lodestar-method awards in Table 1. Thus, no matter how you slice the data, it is my opinion that the multiplier requested here would be in line with the empirical data.

38. Finally, the multiplier requested here would also be in line with the economic research on class counsel's incentives. As I noted above, scholars and courts generally prefer the percentage method over the lodestar method because the former gives class counsel better incentives. But, if the lodestar method must be used, it is still important to use it in the way that creates the best incentives for class counsel. In particular, it is important to ensure that class counsel is awarded a multiplier on their time when successful that compensates them adequately for the risk they took of not prevailing and thereby not getting paid at all. If courts do not compensate class counsel for such risk, then lawyers will underinvest in class action litigation to the detriment of all of the people who rely on them to hold wrongdoers accountable. The economics literature has calculated what the optimal multiplier is to accomplish this task: the inverse of the probability that class counsel would prevail. *See* William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class-Action Litigation*, 23 J. Legal Stud. 185, 209 & n.18 (1994) ("[T]he multiplier must be [divided by] p*, the probability of winning an efficiently prosecuted case . . . ."). For example, if class counsel had only a 50-50 chance to get paid, then they would have to be paid twice their normally hourly rate when they do in order to induce them to invest their time in the litigation. This analysis suggests that the multiplier that would result here is not too high at all. In particular, so long as the probability of prevailing at the outset of this litigation was less than 29 percent, then class counsel's requested 3.5 multiplier is justified. In light of the many significant risks I catalogued above, it is my opinion that the probability of prevailing here was no better than 29% and may have been lower than that.

39. For all these reasons, I believe the fee requested here would be reasonable under the lodestar method in light of the empirical and research on economic incentives in class action litigation.

Nashville, TN

September 30, 2025

Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present

- *FedEx Research Professor*, 2014-2015
- *Professor of Law*, 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts, Litigation Finance, Textualism & Originalism
- Hall-Hartman Outstanding Professor Award, 2008-2009 & 2023-2024
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018

- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010

- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000

- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997

- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (Cambridge University Press 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019) (winner of the Pound Institute's 2022 Civil Justice Scholarship Award)

## BOOK CHAPTERS

*Climate Change and Class Actions* in CLIMATE LIBERALISM: PERSPECTIVES ON LIBERTY, PROPERTY, AND POLLUTION (Jonathan Adler, ed., Palgrave Macmillan 2023)

*How Many Class Actions are Meritless?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC ARTICLES

*A New Source of Data on Class Action Settlements: The Department of Justice's Class Action Fairness Act Log*, J. EMPIRICAL LEGAL STUD. (forthcoming 2026)

*Do Representative Payments Matter? An Empirical Study*, 22 J. EMPIRICAL LEGAL STUD. (forthcoming 2025) (with Colton Cronin)

*Agency Costs in Third Party Litigation Finance Reconsidered*, 25 THEORETICAL INQUIRIES IN LAW 1 (2024) (with Will Marra)

*Distributing Attorney Fees in Multidistrict Litigation*, 13 J. LEG. ANAL. 558 (2021) (with Ed Cheng & Paul Edelman)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORD. L. REV. 1151 (2021)

*Many Minds, Many MDL Judges*, 84 L. & CONTEMP. PROBLEMS 107 (2021)

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORD. L. REV. 437 (2020)

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017) (reprinted in THE ROMANIAN JUDGES' FORUM REVIEW, no. 2 (2023))

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*Originalism and Natural Law*, 79 FORD. L. REV. 1541 (2011)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

*Strict Scrutiny of Facially Race-Neutral State Action and the Texas Ten Percent Plan*, 53 Baylor L. Rev. 289 (2001)

**ACADEMIC PRESENTATIONS**

*Non-Securities Class Actions in the United States*, Asia-Pacific Law Institute, Seoul National University, Seoul, South Korea (June 16, 2025)

*Seminar on Collective Actions: Bringing Efficiency into the Administration of Justice*, University of Valladolid, Valladolid, Spain (May 22, 2025)

*Collective Actions in Spain: The View from Abroad*, FIDE, Madrid, Spain (May 21, 2025)

*Global Trends in Class Action Litigation*, Perfect Law, London, United Kingdom (April 24, 2025)

*Originalism: A Debate*, Clark Symposium on Constitutional Interpretation, University of California Law School, Berkeley, CA (March 17, 2025)

*Is Originalism Really Worse Than Nothing? A Debate*, Vanderbilt Law School, Nashville, TN (February 6, 2025)

*Theories of Mass Litigation*, McGovern Symposium on Civil Litigation, Duke Law School, Durham, NC (December 12, 2024) (panelist)

*The Conservative Case for Private Antitrust Enforcement*, American Antitrust Institute Annual Private Enforcement Conference, National Press Club, Washington, DC (October 30, 2024) (panelist)

*Hot Topics in Class Action Settlement Approval,* National Institute on Class Actions, American Bar Association, Nashville, TN (October 24, 2024) (panelist)

*Non-Securities Class Action Settlements Since CAFA,* University of Missouri Law School, Columbia, MO (September 20, 2024)

*Do Representative Payments Matter? An Empirical Study*, University of Missouri Law School, Columbia, MO (September 20, 2024)

*Non-Securities Class Action Settlements Since CAFA,* University of California at Berkeley Law School, Berkeley, CA (September 18, 2024)

*Do Representative Payments Matter? An Empirical Study*, University of California at Berkeley Law School, Berkeley, CA (September 18, 2024)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, Conference of the European Society for Empirical Legal Studies, Universidad Miguel Hernandez, Elche, Spain (June 21, 2024)

*Litigation Financing*, Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Mar. 7, 2024) (panelist)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, George Mason Law School, Arlington, VA (Feb. 6, 2024)

*Agency Costs in Third Party Litigation Finance Reconsidered*, Third Party Litigation Funding: The Past, The Present, and The Future Conference, Tel Aviv University Buchmann Faculty of Law, Tel Aviv, Israel (June 14, 2023)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, University of Florida Law School, Gainesville, FL (Feb. 6, 2023)

*Entrapment of the Little Guy: Resisting the Erosion of Investor, Employee and Consumer Protections,* Institute for Law and Economic Policy, San Diego, CA (Jan. 27, 2023) (panelist)

*A New Source of Data for Non-Securities Class Actions,* William & Mary Law School, Williamsburg, VA (Nov. 10, 2022)

*Can Courts Avoid Politicization in a Polarized America?*, American Bar Association Annual Meeting, Chicago, IL (Aug. 5, 2022) (panelist)

*A New Source of Data for Non-Securities Class Actions,* Seventh Annual Civil Procedure Workshop, Cardozo Law School, New York, NY (May 20, 2022)

*Resolution Issues in Class Actions and Mass Torts,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Mar. 11, 2022) (panelist)

*Developments in Discovery Reform*, George Mason Law & Economics Center Fifteenth Annual Judicial Symposium on Civil Justice Issues, Charleston, SC (Nov. 16, 2021) (panelist)

*Locality Litigation and Public Entity Incentives to File Lawsuits: Public Interest, Politics, Public Finance or Financial Gain?*, George Mason Law & Economics Center Symposium on Novel Liability Theories and the Incentives Driving Them, Nashville, TN (Oct. 25, 2021) (panelist)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, University of California Hastings College of the Law, San Francisco, CA (Nov. 3, 2020)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, The Judicial Role in Professional Regulation, Stein Colloquium, Fordham Law School, New York, NY (Oct. 9, 2020)

*Objector Blackmail Update: What Have the 2018 Amendments Done?,* Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions,* National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement*, Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, National Institute on Class Actions, American Bar Association, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability, Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional? Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*The Perils of Using Class Actions as a Replacement for Universal Injunctions*, SCOTUSBLOG (Aug. 12, 2025)

*Senate's Tax Bill Picks Winners and Losers in Litigation Finance*, BLOOMBERG LAW (June 20, 2025)

*Trump is Right About One Thing: Nationwide Injunctions Need Fixing*, THE BERKSHIRE EAGLE (Apr. 9, 2025)

*We Don't Need the Consumer Financial Protection Bureau—We Have Courts*, THE HILL (Mar. 15, 2025)

*Is the Fifth Circuit Really Too Conservative for the Supreme Court?* THE NATIONAL LAW JOURNAL (Aug. 15, 2024)

*Judicial Profile: Hon. Charles Breyer*, THE FEDERAL LAWYER (Summer 2024)

*Racial Preferences Won't Go Easily*, WALL ST. J. (June 1, 2023)

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?,* NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

**OTHER PRESENTATIONS**

*Ethics & Professionalism,* Class Action & Pharmaceutical and Medical Device Sections, American Association for Justice Annual Convention, Nashville, TN (July 21, 2024) (panelist)

*Abstention*, Tennessee Attorney General's Office Continuing Legal Education, Nashville, TN (Apr. 13, 2022)

*The Need for New Lower Court Judgeships, 30 Years in the Making*, Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Feb. 24, 2021)

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, LA (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Referee, Israel Science Foundation
Referee, Journal of Legal Studies
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Referee, Supreme Court Economic Review
Reviewer, Aspen Publishing
Reviewer, Cambridge University Press
Reviewer, University Press of Kansas
Reviewer, Palgrave Macmillan
Reviewer, Oxford University Press
Reviewer, Routledge
Member, American Law Institute
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association, 2012-2022
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia & California (inactive)

**COMMUNITY ACTIVITIES**

Board of Directors, Beacon Center of Tennessee, 2018-present; Board of Directors, Nashville Ballet, 2011-2017 & 2019-2022; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

Case: 26-2638, 10/28/2026, DktEntry: 24.4, (113 of 283)

Case 4:21-cv-02155-YGR Document 781-7 Filed 10/01/25 Page 44 of 82

JOURNAL OF EMPIRICAL LEGAL STUDIES

*Journal of Empirical Legal Studies*
Volume 7, Issue 4, 811–846, December 2010

# An Empirical Study of Class Action Settlements and Their Fee Awards

*Brian T. Fitzpatrick**

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15 percent of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I. Introduction

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2] Commentators and scholars have

---

*Vanderbilt Law School, 131 21st Ave. S., Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu.

Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1]See, e.g., Robert W. Wood, Defining Employees and Independent Contractors, Bus. L. Today 45, 48 (May–June 2008).

[2]See Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711–1715 (2006).

suggested countless ways to reform them.[3] Despite all the attention showered on class actions, and despite the excellent empirical work on class actions to date, the data that currently exist on how the class action system operates in the United States are limited. We do not know, for example, how much money changes hands in class action litigation every year. We do not know how much of this money goes to class action lawyers rather than class members. Indeed, we do not even know how many class action cases are resolved on an annual basis. To intelligently assess our class action system as well as whether and how it should be reformed, answers to all these questions are important. Answers to these questions are equally important to policymakers in other countries who are currently thinking about adopting U.S.-style class action devices.[4]

This article tries to answer these and other questions by reporting the results of an empirical study that attempted to gather all class action settlements approved by federal judges over a recent two-year period, 2006 and 2007. I use class action settlements as the basis of the study because, even more so than individual litigation, virtually all cases certified as class actions and not dismissed before trial end in settlement.[5] I use federal settlements as the basis of the study for practical reasons: it was easier to identify and collect settlements approved by federal judges than those approved by state judges. Systematic study of class action settlements in state courts must await further study;[6] these future studies are important because there may be more class action settlements in state courts than there are in federal court.[7]

This article attempts to make three contributions to the existing empirical literature on class action settlements. First, virtually all the prior empirical studies of federal class action settlements have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). In this article, by contrast, I attempt to collect every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first to attempt to collect a complete set of federal class action settlements for

---

[3]See, e.g., Robert G. Bone, Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness, 83 B.U.L. Rev. 485, 490–94 (2003); Allan Erbsen, From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions, 58 Vand. L. Rev. 995, 1080–81 (2005).

[4]See, e.g., Samuel Issacharoff & Geoffrey Miller, Will Aggregate Litigation Come to Europe?, 62 Vand. L. Rev. 179 (2009).

[5]See, e.g., Emery Lee & Thomas E. Willing, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions 11 (Federal Judicial Center 2008); Tom Baker & Sean J. Griffith, How the Merits Matter: D&O Insurance and Securities Settlements, 157 U. Pa. L. Rev. 755 (2009).

[6]Empirical scholars have begun to study state court class actions in certain subject areas and in certain states. See, e.g., Robert B. Thompson & Randall S. Thomas, The Public and Private Faces of Derivative Suits, 57 Vand. L. Rev. 1747 (2004); Robert B. Thompson & Randall S. Thomas, The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions, 57 Vand. L. Rev. 133 (2004); Findings of the Study of California Class Action Litigation (Administrative Office of the Courts) (First Interim Report, 2009).

[7]See Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 56 (2000).

any given year.[8] As such, this article allows us to see for the first time a complete picture of the cases that are settled in federal court. This includes aggregate annual statistics, such as how many class actions are settled every year, how much money is approved every year in these settlements, and how much of that money class action lawyers reap every year. It also includes how these settlements are distributed geographically as well as by litigation area, what sort of relief was provided in the settlements, how long the class actions took to reach settlement, and an analysis of what factors were associated with the fees awarded to class counsel by district court judges.

Second, because this article analyzes settlements that were approved in both published and unpublished opinions, it allows us to assess how well the few prior studies that looked beyond securities cases but relied only on published opinions capture the complete picture of class action settlements. To the extent these prior studies adequately capture the complete picture, it may be less imperative for courts, policymakers, and empirical scholars to spend the considerable resources needed to collect unpublished opinions in order to make sound decisions about how to design our class action system.

Third, this article studies factors that may influence district court judges when they award fees to class counsel that have not been studied before. For example, in light of the discretion district court judges have been delegated over fees under Rule 23, as well as the salience the issue of class action litigation has assumed in national politics, realist theories of judicial behavior would predict that Republican judges would award smaller fee percentages than Democratic judges. I study whether the political beliefs of district court judges are associated with the fees they award and, in doing so, contribute to the literature that attempts to assess the extent to which these beliefs influence the decisions of not just appellate judges, but trial judges as well. Moreover, the article contributes to the small but growing literature examining whether the ideological influences found in published judicial decisions persist when unpublished decisions are examined as well.

In Section II of this article, I briefly survey the existing empirical studies of class action settlements. In Section III, I describe the methodology I used to collect the 2006–2007 federal class action settlements and I report my findings regarding these settlements. District court judges approved 688 class action settlements over this two-year period, involving over $33 billion. I report a number of descriptive statistics for these settlements, including the number of plaintiff versus defendant classes, the distribution of settlements by subject matter, the age of the case at settlement, the geographic distribution of settlements, the number of settlement classes, the distribution of relief across settlements, and various statistics on the amount of money involved in the settlements. It should be noted that despite the fact that the few prior studies that looked beyond securities settlements appeared to oversample larger settlements, much of the analysis set forth in this article is consistent with these prior studies. This suggests that scholars may not need to sample unpublished as well as published opinions in order to paint an adequate picture of class action settlements.

---

[8]Of course, I cannot be certain that I found every one of the class actions that settled in federal court over this period. Nonetheless, I am confident that if I did not find some, the number I did not find is small and would not contribute meaningfully to the data reported in this article.

In Section IV, I perform an analysis of the fees judges awarded to class action lawyers in the 2006–2007 settlements. All told, judges awarded nearly $5 billion over this two-year period in fees and expenses to class action lawyers, or about 15 percent of the total amount of the settlements. Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method and, unsurprisingly, the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Using regression analysis, I confirm prior studies and find that fee percentages are strongly and inversely associated with the size of the settlement. Further, I find that the age of the case is positively associated with fee percentages but that the percentages were not associated with whether the class action was certified as a settlement class. There also appeared to be some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all other areas, and district courts in some circuits—the Ninth and the Second (in securities cases)—awarded lower fee percentages than courts in many other circuits. Finally, the regression analysis did not confirm the realist hypothesis: there was no association between fee percentage and the political beliefs of the judge in any regression.

## II. Prior Empirical Studies of Class Action Settlements

There are many existing empirical studies of federal securities class action settlements.[9] Studies of securities settlements have been plentiful because for-profit organizations maintain lists of all federal securities class action settlements for the benefit of institutional investors that are entitled to file claims in these settlements.[10] Using these data, studies have shown that since 2005, for example, there have been roughly 100 securities class action settlements in federal court each year, and these settlements have involved between $7 billion and $17 billion per year.[11] Scholars have used these data to analyze many different aspects of these settlements, including the factors that are associated with the percentage of

[9]See, e.g., James D. Cox & Randall S. Thomas, Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions, 106 Colum. L. Rev. 1587 (2006); James D. Cox, Randall S. Thomas & Lynn Bai, There are Plaintiffs and . . . there are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements, 61 Vand. L. Rev. 355 (2008); Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after *Goldberger v. Integrated Resources, Inc.*, 29 Wash. U.J.L. & Pol'y 5 (2009); Michael A. Perino, Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions (St. John's Legal Studies, Research Paper No. 06-0034, 2006), available at <http://ssrn.com/abstract=870577> [hereinafter Perino, Markets and Monitors]; Michael A. Perino, The Milberg Weiss Prosecution: No Harm, No Foul? (St. John's Legal Studies, Research Paper No. 08-0135, 2008), available at <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133995> [hereinafter Perino, Milberg Weiss].

[10]See, e.g., RiskMetrics Group, available at <http://www.riskmetrics.com/scas>.

[11]See Cornerstone Research, Securities Class Action Settlements: 2007 Review and Analysis 1 (2008), available at <http://securities.stanford.edu/Settlements/REVIEW_1995-2007/Settlements_Through_12_2007.pdf>.

the settlements that courts have awarded to class action lawyers.[12] These studies have found that the mean and median fees awarded by district court judges are between 20 percent and 30 percent of the settlement amount.[13] These studies have also found that a number of factors are associated with the percentage of the settlement awarded as fees, including (inversely) the size of the settlement, the age of the case, whether a public pension fund was the lead plaintiff, and whether certain law firms were class counsel.[14] None of these studies has examined whether the political affiliation of the federal district court judge awarding the fees was associated with the size of awards.

There are no comparable organizations that maintain lists of nonsecurities class action settlements. As such, studies of class action settlements beyond the securities area are much rarer and, when they have been done, rely on samples of settlements that were not intended to be representative of the whole. The two largest studies of class action settlements not limited to securities class actions are a 2004 study by Ted Eisenberg and Geoff Miller,[15] which was recently updated to include data through 2008,[16] and a 2003 study by Class Action Reports.[17] The Eisenberg-Miller studies collected data from class action settlements in both state and federal courts found from court opinions published in the Westlaw and Lexis databases and checked against lists maintained by the CCH Federal Securities and Trade Regulation Reporters. Through 2008, their studies have now identified 689 settlements over a 16-year period, or less than 45 settlements per year.[18] Over this 16-year period, their studies found that the mean and median settlement amounts were, respectively, $116 million and $12.5 million (in 2008 dollars), and that the mean and median fees awarded by district courts were 23 percent and 24 percent of the settlement, respectively.[19] Their studies also performed an analysis of fee percentages and fee awards. For the data through 2002, they found that the percentage of the settlement awarded as fees was associated with the size of the settlement (inversely), the age of the case, and whether the

---

[12]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–24, 28–36; Perino, Markets and Monitors, supra note 9, at 12–28, 39–44; Perino, Milberg Weiss, supra note 9, at 32–33, 39–60.

[13]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–18, 22, 28, 33; Perino, Markets and Monitors, supra note 9, at 20–21, 40; Perino, Milberg Weiss, supra note 9, at 32–33, 51–53.

[14]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 14–24, 29–30, 33–34; Perino, Markets and Monitors, supra note 9, at 20–28, 41; Perino, Milberg Weiss, supra note 9, at 39–58.

[15]See Theodore Eisenberg & Geoffrey Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004).

[16]See Theodore Eisenberg & Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248 (2010) [hereinafter Eisenberg & Miller II].

[17]See Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (Mar.–Apr. 2003).

[18]See Eisenberg & Miller II, supra note 16, at 251.

[19]Id. at 258–59.

district court went out of its way to comment on the level of risk that class counsel had assumed in pursuing the case.[20] For the data through 2008, they regressed only fee awards and found that the awards were inversely associated with the size of the settlement, that state courts gave lower awards than federal courts, and that the level of risk was still associated with larger awards.[21] Their studies have not examined whether the political affiliations of the federal district court judges awarding fees were associated with the size of the awards.

The Class Action Reports study collected data on 1,120 state and federal settlements over a 30-year period, or less than 40 settlements per year.[22] Over the same 10-year period analyzed by the Eisenberg-Miller study, the Class Action Reports data found mean and median settlements of $35.4 and $7.6 million (in 2002 dollars), as well as mean and median fee percentages between 25 percent and 30 percent.[23] Professors Eisenberg and Miller performed an analysis of the fee awards in the Class Action Reports study and found the percentage of the settlement awarded as fees was likewise associated with the size of the settlement (inversely) and the age of the case.[24]

## III. Federal Class Action Settlements, 2006 and 2007

As far as I am aware, there has never been an empirical study of all federal class action settlements in a particular year. In this article, I attempt to make such a study for two recent years: 2006 and 2007. To compile a list of all federal class settlements in 2006 and 2007, I started with one of the aforementioned lists of securities settlements, the one maintained by RiskMetrics, and I supplemented this list with settlements that could be found through three other sources: (1) broad searches of district court opinions in the Westlaw and Lexis databases,[25] (2) four reporters of class action settlements—*BNA Class Action Litigation Report*, *Mealey's Jury Verdicts and Settlements*, *Mealey's Litigation Report*, and the *Class Action World* website[26]—and (3) a list from the Administrative Office of Courts of all district court cases

---

[20]See Eisenberg & Miller, supra note 15, at 61–62.

[21]See Eisenberg & Miller II, supra note 16, at 278.

[22]See Eisenberg & Miller, supra note 15, at 34.

[23]Id. at 47, 51.

[24]Id. at 61–62.

[25]The searches consisted of the following terms: ("class action" & (settle! /s approv! /s (2006 2007))); (((counsel attorney) /s fee /s award!) & (settle! /s (2006 2007)) & "class action"); ("class action" /s settle! & da(aft 12/31/2005 & bef 1/1/2008)); ("class action" /s (fair reasonable adequate) & da(aft 12/31/2005 & bef 1/1/2008)).

[26]See <http://classactionworld.com/>.

coded as class actions that terminated by settlement between 2005 and 2008.[27] I then removed any duplicate cases and examined the docket sheets and court orders of each of the remaining cases to determine whether the cases were in fact certified as class actions under either Rule 23, Rule 23.1, or Rule 23.2.[28] For each of the cases verified as such, I gathered the district court's order approving the settlement, the district court's order awarding attorney fees, and, in many cases, the settlement agreements and class counsel's motions for fees, from electronic databases (such as Westlaw or PACER) and, when necessary, from the clerk's offices of the various federal district courts. In this section, I report the characteristics of the settlements themselves; in the next section, I report the characteristics of the attorney fees awarded to class counsel by the district courts that approved the settlements.

### *A. Number of Settlements*

I found 688 settlements approved by federal district courts during 2006 and 2007 using the methodology described above. This is almost the exact same number the Eisenberg-Miller study found over a *16*-year period in both federal *and* state court. Indeed, the number of annual settlements identified in this study is *several times* the number of annual settlements that have been identified in any prior empirical study of class action settlements. Of the 688 settlements I found, 304 were approved in 2006 and 384 were approved in 2007.[29]

### *B. Defendant Versus Plaintiff Classes*

Although Rule 23 permits federal judges to certify either a class of plaintiffs or a class of defendants, it is widely assumed that it is extremely rare for courts to certify defendant classes.[30] My findings confirm this widely held assumption. Of the 688 class action settlements approved in 2006 and 2007, 685 involved plaintiff classes and only three involved

[27]I examined the AO lists in the year before and after the two-year period under investigation because the termination date recorded by the AO was not necessarily the same date the district court approved the settlement.

[28]See Fed. R. Civ. P. 23, 23.1, 23.2. I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act (see 29 U.S.C. § 216(b)), if such actions did not also include claims certified under the opt-out mechanism in Rule 23.

[29]A settlement was assigned to a particular year if the district court judge's order approving the settlement was dated between January 1 and December 31 of that year. Cases involving multiple defendants sometimes settled over time because defendants would settle separately with the plaintiff class. All such partial settlements approved by the district court on the same date were treated as one settlement. Partial settlements approved by the district court on different dates were treated as different settlements.

[30]See, e.g., Robert H. Klonoff, Edward K.M. Bilich & Suzette M. Malveaux, Class Actions and Other Multi-Party Litigation: Cases and Materials 1061 (2d ed. 2006).

defendant classes. All three of the defendant-class settlements were in employment benefits cases, where companies sued classes of current or former employees.[31]

### C. *Settlement Subject Areas*

Although courts are free to certify Rule 23 classes in almost any subject area, it is widely assumed that securities settlements dominate the federal class action docket.[32] At least in terms of the number of settlements, my findings reject this conventional wisdom. As Table 1 shows, although securities settlements comprised a large percentage of the 2006 and 2007 settlements, they did not comprise a majority of those settlements. As one would have

Table 1: The Number of Class Action Settlements Approved by Federal Judges in 2006 and 2007 in Each Subject Area

| | *Number of Settlements* | |
|---|---|---|
| *Subject Matter* | *2006* | *2007* |
| Securities | 122 (40%) | 135 (35%) |
| Labor and employment | 41 (14%) | 53 (14%) |
| Consumer | 40 (13%) | 47 (12%) |
| Employee benefits | 23 (8%) | 38 (10%) |
| Civil rights | 24 (8%) | 37 (10%) |
| Debt collection | 19 (6%) | 23 (6%) |
| Antitrust | 13 (4%) | 17 (4%) |
| Commercial | 4 (1%) | 9 (2%) |
| Other | 18 (6%) | 25 (6%) |
| Total | 304 | 384 |

NOTE: Securities: cases brought under federal and state securities laws. Labor and employment: workplace claims brought under either federal or state law, with the exception of ERISA cases. Consumer: cases brought under the Fair Credit Reporting Act as well as cases for consumer fraud and the like. Employee benefits: ERISA cases. Civil rights: cases brought under 42 U.S.C. § 1983 or cases brought under the Americans with Disabilities Act seeking nonworkplace accommodations. Debt collection: cases brought under the Fair Debt Collection Practices Act. Antitrust: cases brought under federal or state antitrust laws. Commercial: cases between businesses, excluding antitrust cases. Other: includes, among other things, derivative actions against corporate managers and directors, environmental suits, insurance suits, Medicare and Medicaid suits, product liability suits, and mass tort suits.

SOURCES: Westlaw, PACER, district court clerks' offices.

---

[31]See Halliburton Co. v. Graves, No. 04-00280 (S.D. Tex., Sept. 28, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Aug. 29, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Sept. 17, 2007).

[32]See, e.g., John C. Coffee, Jr., Reforming the Security Class Action: An Essay on Deterrence and its Implementation, 106 Colum. L. Rev. 1534, 1539–40 (2006) (describing securities class actions as "the 800-pound gorilla that dominates and overshadows other forms of class actions").

expected in light of Supreme Court precedent over the last two decades,[33] there were almost no mass tort class actions (included in the "Other" category) settled over the two-year period.

Although the Eisenberg-Miller study through 2008 is not directly comparable on the distribution of settlements across litigation subject areas—because its state and federal court data cannot be separated (more than 10 percent of the settlements were from state court[34]) and because it excludes settlements in fee-shifting cases—their study through 2008 is the best existing point of comparison. Interestingly, despite the fact that state courts were included in their data, their study through 2008 found about the same percentage of securities cases (39 percent) as my 2006–2007 data set shows.[35] However, their study found many more consumer (18 percent) and antitrust (10 percent) cases, while finding many fewer labor and employment (8 percent), employee benefits (6 percent), and civil rights (3 percent) cases.[36] This is not unexpected given their reliance on published opinions and their exclusion of fee-shifting cases.

### *D. Settlement Classes*

The Federal Rules of Civil Procedure permit parties to seek certification of a suit as a class action for settlement purposes only.[37] When the district court certifies a class in such circumstances, the court need not consider whether it would be manageable to try the litigation as a class.[38] So-called settlement classes have always been more controversial than classes certified for litigation because they raise the prospect that, at least where there are competing class actions filed against the same defendant, the defendant could play class counsel off one another to find the one willing to settle the case for the least amount of money.[39] Prior to the Supreme Court's 1997 opinion in *Amchem Products, Inc. v. Windsor*,[40] it was uncertain whether the Federal Rules even permitted settlement classes. It may therefore be a bit surprising to learn that 68 percent of the federal settlements in 2006 and 2007 were settlement classes. This percentage is higher than the percentage found in the Eisenberg-Miller studies, which found that only 57 percent of class action settlements in

---

[33]See, e.g., Samuel Issacharoff, Private Claims, Aggregate Rights, 2008 Sup. Ct. Rev. 183, 208.

[34]See Eisenberg & Miller II, supra note 16, at 257.

[35]Id. at 262.

[36]Id.

[37]See Martin H. Redish, Settlement Class Actions, The Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process, 73 U. Chi. L. Rev. 545, 553 (2006).

[38]See Amchem Prods., Inc v Windsor, 521 U.S. 591, 620 (1997).

[39]See Redish, supra note 368, at 557–59.

[40]521 U.S. 591 (1997).

state and federal court between 2003 and 2008 were settlement classes.[41] It should be noted that the distribution of litigation subject areas among the settlement classes in my 2006–2007 federal data set did not differ much from the distribution among nonsettlement classes, with two exceptions. One exception was consumer cases, which were nearly three times as prevalent among settlement classes (15.9 percent) as among nonsettlement classes (5.9 percent); the other was civil rights cases, which were four times as prevalent among nonsettlement classes (18.0 percent) as among settlements classes (4.5 percent). In light of the skepticism with which the courts had long treated settlement classes, one might have suspected that courts would award lower fee percentages in such settlements. Nonetheless, as I report in Section III, whether a case was certified as a settlement class was not associated with the fee percentages awarded by federal district court judges.

### *E. The Age at Settlement*

One interesting question is how long class actions were litigated before they reached settlement. Unsurprisingly, cases reached settlement over a wide range of ages.[42] As shown in Table 2, the average time to settlement was a bit more than three years (1,196 days) and the median time was a bit under three years (1,068 days). The average and median ages here are similar to those found in the Eisenberg-Miller study through 2002, which found averages of 3.35 years in fee-shifting cases and 2.86 years in non-fee-shifting cases, and

Table 2: The Number of Days, 2006–2007, Federal Class Action Cases Took to Reach Settlement in Each Subject Area

| *Subject Matter* | *Average* | *Median* | *Minimum* | *Maximum* |
|---|---|---|---|---|
| Securities | 1,438 | 1,327 | 392 | 3,802 |
| Labor and employment | 928 | 786 | 105 | 2,497 |
| Consumer | 963 | 720 | 127 | 4,961 |
| Employee benefits | 1,162 | 1,161 | 164 | 3,157 |
| Civil rights | 1,373 | 1,360 | 181 | 3,354 |
| Debt collection | 738 | 673 | 223 | 1,973 |
| Antitrust | 1,140 | 1,167 | 237 | 2,480 |
| Commercial | 1,267 | 760 | 163 | 5,443 |
| Other | 1,065 | 962 | 185 | 3,620 |
| All | 1,196 | 1,068 | 105 | 5,443 |

Source: PACER.

[41]See Eisenberg & Miller II, supra note 16, at 266.

[42]The age of the case was calculated by subtracting the date the relevant complaint was filed from the date the settlement was approved by the district court judge. The dates were taken from PACER. For consolidated cases, I used the date of the earliest complaint. If the case had been transferred, consolidated, or removed, the date the complaint was filed was not always available from PACER. In such cases, I used the date the case was transferred, consolidated, or removed as the start date.

medians of 4.01 years in fee-shifting cases and 3.0 years in non-fee-shifting cases.[43] Their study through 2008 did not report case ages.

The shortest time to settlement was 105 days in a labor and employment case.[44] The longest time to settlement was nearly 15 years (5,443 days) in a commercial case.[45] The average and median time to settlement varied significantly by litigation subject matter, with securities cases generally taking the longest time and debt collection cases taking the shortest time. Labor and employment cases and consumer cases also settled relatively early.

*F. The Location of Settlements*

The 2006–2007 federal class action settlements were not distributed across the country in the same way federal civil litigation is in general. As Figure 1 shows, some of the geographic circuits attracted much more class action attention than we would expect based on their docket size, and others attracted much less. In particular, district courts in the First, Second, Seventh, and Ninth Circuits approved a much larger share of class action settlements than the share of all civil litigation they resolved, with the First, Second, and Seventh Circuits approving nearly double the share and the Ninth Circuit approving one-and-one-half times the share. By contrast, the shares of class action settlements approved by district courts in the Fifth and Eighth Circuits were less than one-half of their share of all civil litigation, with the Third, Fourth, and Eleventh Circuits also exhibiting significant underrepresentation.

With respect to a comparison with the Eisenberg-Miller studies, their federal court data through 2008 can be separated from their state court data on the question of the geographic distribution of settlements, and there are some significant differences between their federal data and the numbers reflected in Figure 1. Their study reported considerably higher proportions of settlements than I found from the Second (23.8 percent), Third (19.7 percent), Eighth (4.8 percent), and D.C. (3.3 percent) Circuits, and considerably lower proportions from the Fourth (1.3 percent), Seventh (6.8 percent), and Ninth (16.6 percent) Circuits.[46]

Figure 2 separates the class action settlement data in Figure 1 into securities and nonsecurities cases. Figure 2 suggests that the overrepresentation of settlements in the First and Second Circuits is largely attributable to securities cases, whereas the overrepresentation in the Seventh Circuit is attributable to nonsecurities cases, and the overrepresentation in the Ninth is attributable to both securities and nonsecurities cases.

It is interesting to ask why some circuits received more class action attention than others. One hypothesis is that class actions are filed in circuits where class action lawyers

---

[43]See Eisenberg & Miller, supra note 15, at 59–60.

[44]See Clemmons v. Rent-a-Center W., Inc., No. 05-6307 (D. Or. Jan. 20, 2006).

[45]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006).

[46]See Eisenberg & Miller II, supra note 16, at 260.

*Figure 1:* The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.




SOURCES: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).

believe they can find favorable law or favorable judges. Federal class actions often involve class members spread across multiple states and, as such, class action lawyers may have a great deal of discretion over the district in which file suit.[47] One way law or judges may be favorable to class action attorneys is with regard to attorney fees. In Section III, I attempt to test whether district court judges in the circuits with the most over- and undersubscribed class action dockets award attorney fees that would attract or discourage filings there; I find no evidence that they do.

Another hypothesis is that class action suits are settled in jurisdictions where defendants are located. This might be the case because although class action lawyers may have discretion over where to file, venue restrictions might ultimately restrict cases to jurisdic-

[47]See Samuel Issacharoff & Richard Nagareda, Class Settlements Under Attack, 156 U. Pa. L. Rev. 1649, 1662 (2008).

*Figure 2:* The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.




SOURCES: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).

tions in which defendants have their corporate headquarters or other operations.[48] This might explain why the Second Circuit, with the financial industry in New York, sees so many securities suits, and why other circuits with cities with a large corporate presence, such as the First (Boston), Seventh (Chicago), and Ninth (Los Angeles and San Francisco), see more settlements than one would expect based on the size of their civil dockets.

Another hypothesis might be that class action lawyers file cases wherever it is most convenient for them to litigate the cases—that is, in the cities in which their offices are located. This, too, might explain the Second Circuit's overrepresentation in securities settlements, with prominent securities firms located in New York, as well as the

[48]See 28 U.S.C. §§ 1391, 1404, 1406, 1407. See also Foster v. Nationwide Mut. Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240 at *2–17 (N.D. Cal. Dec. 14, 2007) (transferring venue to jurisdiction where defendant's corporate headquarters were located). One prior empirical study of securities class action settlements found that 85 percent of such cases are filed in the home circuit of the defendant corporation. See James D. Cox, Randall S. Thomas & Lynn Bai, Do Differences in Pleading Standards Cause Forum Shopping in Securities Class Actions?: Doctrinal and Empirical Analyses, 2009 Wis. L. Rev. 421, 429, 440, 450–51 (2009).

overrepresentation of other settlements in some of the circuits in which major metropolitan areas with prominent plaintiffs' firms are found.

### G. *Type of Relief*

Under Rule 23, district court judges can certify class actions for injunctive or declaratory relief, for money damages, or for a combination of the two.[49] In addition, settlements can provide money damages both in the form of cash as well as in the form of in-kind relief, such as coupons to purchase the defendant's products.[50]

As shown in Table 3, the vast majority of class actions settled in 2006 and 2007 provided cash relief to the class (89 percent), but a substantial number also provided in-kind relief (6 percent) or injunctive or declaratory relief (23 percent). As would be

Table 3: The Percentage of 2006 and 2007 Class Action Settlements Providing Each Type of Relief in Each Subject Area

| *Subject Matter* | *Cash* | *In-Kind Relief* | *Injunctive or Declaratory Relief* |
|---|---|---|---|
| Securities ($n = 257$) | 100% | 0% | 2% |
| Labor and employment ($n = 94$) | 95% | 6% | 29% |
| Consumer ($n = 87$) | 74% | 30% | 37% |
| Employee benefits ($n = 61$) | 90% | 0% | 34% |
| Civil rights ($n = 61$) | 49% | 2% | 75% |
| Debt collection ($n = 42$) | 98% | 0% | 12% |
| Antitrust ($n = 30$) | 97% | 13% | 7% |
| Commercial ($n = 13$) | 92% | 0% | 62% |
| Other ($n = 43$) | 77% | 7% | 33% |
| All ($n = 688$) | 89% | 6% | 23% |

NOTE: Cash: cash, securities, refunds, charitable contributions, contributions to employee benefit plans, forgiven debt, relinquishment of liens or claims, and liquidated repairs to property. In-kind relief: vouchers, coupons, gift cards, warranty extensions, merchandise, services, and extended insurance policies. Injunctive or declaratory relief: modification of terms of employee benefit plans, modification of compensation practices, changes in business practices, capital improvements, research, and unliquidated repairs to property.

SOURCES: Westlaw, PACER, district court clerks' offices.

[49] See Fed. R. Civ. P. 23(b).

[50] These coupon settlements have become very controversial in recent years, and Congress discouraged them in the Class Action Fairness Act of 2005 by tying attorney fees to the value of coupons that were ultimately redeemed by class members as opposed to the value of coupons offered class members. See 28 U.S.C. § 1712.

expected in light of the focus on consumer cases in the debate over the anti-coupon provision in the Class Action Fairness Act of 2005,[51] consumer cases had the greatest percentage of settlements providing for in-kind relief (30 percent). Civil rights cases had the greatest percentage of settlements providing for injunctive or declaratory relief (75 percent), though almost half the civil rights cases also provided some cash relief (49 percent). The securities settlements were quite distinctive from the settlements in other areas in their singular focus on cash relief: every single securities settlement provided cash to the class and almost none provided in-kind, injunctive, or declaratory relief. This is but one example of how the focus on securities settlements in the prior empirical scholarship can lead to a distorted picture of class action litigation.

### *H. Settlement Money*

Although securities settlements did not comprise the majority of federal class action settlements in 2006 and 2007, they did comprise the majority of the money—indeed, the *vast majority* of the money—involved in class action settlements. In Table 4, I report the total amount of ascertainable value involved in the 2006 and 2007 settlements. This amount

Table 4: The Total Amount of Money Involved in Federal Class Action Settlements in 2006 and 2007

| | *Total Ascertainable Monetary Value in Settlements (and Percentage of Overall Annual Total)* | | | |
|---|---|---|---|---|
| *Subject Matter* | *2006* (n = *304*) | | *2007* (n = *384*) | |
| Securities | $16,728 | 76% | $8,038 | 73% |
| Labor and employment | $266.5 | 1% | $547.7 | 5% |
| Consumer | $517.3 | 2% | $732.8 | 7% |
| Employee benefits | $443.8 | 2% | $280.8 | 3% |
| Civil rights | $265.4 | 1% | $81.7 | 1% |
| Debt collection | $8.9 | <1% | $5.7 | <1% |
| Antitrust | $1,079 | 5% | $660.5 | 6% |
| Commercial | $1,217 | 6% | $124.0 | 1% |
| Other | $1,568 | 7% | $592.5 | 5% |
| Total | $22,093 | 100% | $11,063 | 100% |

NOTE: Dollar amounts are in millions. Includes all determinate payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.

SOURCES: Westlaw, PACER, district court clerks' offices.

[51]See, e.g., 151 Cong. Rec. H723 (2005) (statement of Rep. Sensenbrenner) (arguing that consumers are "seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong").

includes all determinate[52] payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.[53] I did not attempt to assign a value to any relief that was not valued by the district court (even if it may have been valued by class counsel). It should be noted that district courts did not often value in-kind or injunctive relief—they did so only 18 percent of the time—and very little of Table 4—only $1.3 billion, or 4 percent—is based on these valuations. It should also be noted that the amounts in Table 4 reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* after the claims administration process concluded. Prior empirical research has found that, depending on how settlements are structured (e.g., whether they awarded a fixed amount of money to each class member who eventually files a valid claim or a pro rata amount of a fixed settlement to each class member), defendants can end up paying much less than they agreed.[54]

Table 4 shows that in both years, around three-quarters of all the money involved in federal class action settlements came from securities cases. Thus, in this sense, the conventional wisdom about the dominance of securities cases in class action litigation is correct. Figure 3 is a graphical representation of the contribution each litigation area made to the total number and total amount of money involved in the 2006–2007 settlements.

Table 4 also shows that, in total, over $33 billion was approved in the 2006–2007 settlements. Over $22 billion was approved in 2006 and over $11 billion in 2007. It should be emphasized again that the totals in Table 4 understate the amount of money defendants agreed to pay in class action settlements in 2006 and 2007 because they exclude the unascertainable value of those settlements. This understatement disproportionately affects litigation areas, such as civil rights, where much of the relief is injunctive because, as I noted, very little of such relief was valued by district courts. Nonetheless, these numbers are, as far as I am aware, the first attempt to calculate how much money is involved in federal class action settlements in a given year.

The significant discrepancy between the two years is largely attributable to the 2006 securities settlement related to the collapse of Enron, which totaled $6.6 billion, as well as to the fact that seven of the eight 2006–2007 settlements for more than $1 billion were approved in 2006.[55] Indeed, it is worth noting that the eight settlements for more than $1

---

[52]For example, I excluded awards of a fixed amount of money to each class member who eventually filed a valid claim (as opposed to settlements that awarded a pro rata amount of a fixed settlement to each class member) if the total amount of money set aside to pay the claims was not set forth in the settlement documents.

[53]In some cases, the district court valued the relief in the settlement over a range. In these cases, I used the middle point in the range.

[54]See Hensler et al., supra note 7, at 427–30.

[55]See In re Enron Corp. Secs. Litig., MDL 1446 (S.D. Tex. May 24, 2006) ($6,600,000,000); In re Tyco Int'l Ltd. Multidistrict Litig., MDL 02-1335 (D.N.H. Dec. 19, 2007) ($3,200,000,000); In re AOL Time Warner, Inc. Secs. & "ERISA" Litig., MDL 1500 (S.D.N.Y. Apr. 6, 2006) ($2,500,000,000); In re: Diet Drugs Prods. Liab. Litig., MDL 1203 (E.D. Pa. May 24, 2006) ($1,275,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel I), No. 01-1855 (S.D.N.Y. Dec. 26, 2006) ($1,142,780,000); In re Royal Ahold N.V. Secs. & ERISA Litig., 03-1539 (D. Md. Jun. 16, 2006)

*Figure 3:* The percentage of 2006–2007 federal class action settlements and settlement money from each subject area.




SOURCES: Westlaw, PACER, district court clerks' offices.

billion accounted for almost $18 billion of the $33 billion that changed hands over the two-year period. That is, a mere 1 percent of the settlements comprised over 50 percent of the value involved in federal class action settlements in 2006 and 2007. To give some sense of the distribution of settlement size in the 2006–2007 data set, Table 5 sets forth the number of settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards (605 out of the 688 settlements). Nearly two-thirds of all settlements fell below $10 million.

Given the disproportionate influence exerted by securities settlements on the total amount of money involved in class actions, it is unsurprising that the average securities settlement involved more money than the average settlement in most of the other subject areas. These numbers are provided in Table 6, which includes, again, only the settlements

($1,100,000,000); Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) ($1,075,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel II), No. 05-1659 (S.D.N.Y. Dec. 26, 2006) ($1,074,270,000).

Table 5: The Distribution by Size of 2006–2007 Federal Class Action Settlements with Ascertainable Value

| *Settlement Size (in Millions)* | *Number of Settlements* |
|---|---|
| [$0 to $1] | 131 (21.7%) |
| ($1 to $10] | 261 (43.1%) |
| ($10 to $50] | 139 (23.0%) |
| ($50 to $100] | 33 (5.45%) |
| ($100 to $500] | 31 (5.12%) |
| ($500 to $6,600] | 10 (1.65%) |
| Total | 605 |

NOTE: Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.

SOURCES: Westlaw, PACER, district court clerks' offices.

Table 6: The Average and Median Settlement Amounts in the 2006–2007 Federal Class Action Settlements with Ascertainable Value to the Class

| *Subject Matter* | *Average* | *Median* |
|---|---|---|
| Securities ($n = 257$) | $96.4 | $8.0 |
| Labor and employment ($n = 88$) | $9.2 | $1.8 |
| Consumer ($n = 65$) | $18.8 | $2.9 |
| Employee benefits ($n = 52$) | $13.9 | $5.3 |
| Civil rights ($n = 34$) | $9.7 | $2.5 |
| Debt collection ($n = 40$) | $0.37 | $0.088 |
| Antitrust ($n = 29$) | $60.0 | $22.0 |
| Commercial ($n = 12$) | $111.7 | $7.1 |
| Other ($n = 28$) | $76.6 | $6.2 |
| All ($N = 605$) | $54.7 | $5.1 |

NOTE: Dollar amounts are in millions. Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.

SOURCES: Westlaw, PACER, district court clerks' offices.

with an ascertainable value beyond fee, expense, and class-representative incentive awards. The average settlement over the entire two-year period for all types of cases was almost $55 million, but the median was only $5.1 million. (With the $6.6 billion Enron settlement excluded, the average settlement for all ascertainable cases dropped to $43.8 million and, for securities cases, dropped to $71.0 million.) The average settlements varied widely by litigation area, with securities and commercial settlements at the high end of around $100

million, but the median settlements for nearly every area were bunched around a few million dollars. It should be noted that the high average for commercial cases is largely due to one settlement above $1 billion;[56] when that settlement is removed, the average for commercial cases was only $24.2 million.

Table 6 permits comparison with the two prior empirical studies of class action settlements that sought to include nonsecurities as well as securities cases in their purview. The Eisenberg-Miller study through 2002, which included both common-fund and fee-shifting cases, found that the mean class action settlement was $112 million and the median was $12.9 million, both in 2006 dollars,[57] more than double the average and median I found for all settlements in 2006 and 2007. The Eisenberg-Miller update through 2008 included only common-fund cases and found mean and median settlements in federal court of $115 million and $11.7 million (both again in 2006 dollars),[58] respectively; this is still more than double the average and median I found. This suggests that the methodology used by the Eisenberg-Miller studies—looking at district court opinions that were published in Westlaw or Lexis—oversampled larger class actions (because opinions approving larger class actions are, presumably, more likely to be published than opinions approving smaller ones). It is also possible that the exclusion of fee-shifting cases from their data through 2008 contributed to this skew, although, given that their data through 2002 included fee-shifting cases and found an almost identical mean and median as their data through 2008, the primary explanation for the much larger mean and median in their study through 2008 is probably their reliance on published opinions. Over the same years examined by Professors Eisenberg and Miller, the Class Action Reports study found a smaller average settlement than I did ($39.5 million in 2006 dollars), but a larger median ($8.48 million in 2006 dollars). It is possible that the Class Action Reports methodology also oversampled larger class actions, explaining its larger median, but that there are more "mega" class actions today than there were before 2003, explaining its smaller mean.[59]

It is interesting to ask how significant the $16 billion that was involved annually in these 350 or so federal class action settlements is in the grand scheme of U.S. litigation. Unfortunately, we do not know how much money is transferred every year in U.S. litigation. The only studies of which I am aware that attempt even a partial answer to this question are the estimates of how much money is transferred in the U.S. "tort" system every year by a financial services consulting firm, Tillinghast-Towers Perrin.[60] These studies are not directly

---

[56]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) (approving $1,075,000,000 settlement).

[57]See Eisenberg & Miller, supra note 15, at 47.

[58]See Eisenberg & Miller II, supra note 16, at 262.

[59]There were eight class action settlements during 2006 and 2007 of more than $1 billion. See note 55 supra.

[60]Some commentators have been critical of Tillinghast's reports, typically on the ground that the reports overestimate the cost of the tort system. See M. Martin Boyer, Three Insights from the Canadian D&O Insurance Market: Inertia, Information and Insiders, 14 Conn. Ins. L.J. 75, 84 (2007); John Fabian Witt, Form and Substance in the Law of

comparable to the class action settlement numbers because, again, the number of tort class action settlements in 2006 and 2007 was very small. Nonetheless, as the tort system no doubt constitutes a large percentage of the money transferred in all litigation, these studies provide something of a point of reference to assess the significance of class action settlements. In 2006 and 2007, Tillinghast-Towers Perrin estimated that the U.S. tort system transferred $160 billion and $164 billion, respectively, to claimants and their lawyers.[61] The total amount of money involved in the 2006 and 2007 federal class action settlements reported in Table 4 was, therefore, roughly 10 percent of the Tillinghast-Towers Perrin estimate. This suggests that in merely 350 cases every year, federal class action settlements involve the same amount of wealth as 10 percent of the entire U.S. tort system. It would seem that this is a significant amount of money for so few cases.

## IV. Attorney Fees in Federal Class Action Settlements, 2006 and 2007

### *A. Total Amount of Fees and Expenses*

As I demonstrated in Section III, federal class action settlements involved a great deal of money in 2006 and 2007, some $16 billion a year. A perennial concern with class action litigation is whether class action lawyers are reaping an outsized portion of this money.[62] The 2006–2007 federal class action data suggest that these concerns may be exaggerated. Although class counsel were awarded some $5 billion in fees and expenses over this period, as shown in Table 7, only 13 percent of the settlement amount in 2006 and 20 percent of the amount in 2007 went to fee and expense awards.[63] The 2006 percentage is lower than the 2007 percentage in large part because the class action lawyers in the Enron securities settlement received less than 10 percent of the $6.6 billion corpus. In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent.[64] Lawyers received less than 33 percent of settlements in fees and expenses in virtually every subject area in both years.

---

Counterinsurgency Damages, 41 Loy. L.A.L. Rev. 1455, 1475 n.135 (2008). If these criticisms are valid, then class action settlements would appear even more significant as compared to the tort system.

[61]See Tillinghast-Towers Perrin, U.S. Tort Costs: 2008 Update 5 (2008). The report calculates $252 billion in total tort "costs" in 2007 and $246.9 billion in 2006, id., but only 65 percent of those costs represent payments made to claimants and their lawyers (the remainder represents insurance administration costs and legal costs to defendants). See Tillinghast-Towers Perrin, U.S. Tort Costs: 2003 Update 17 (2003).

[62]See, e.g., Brian T. Fitzpatrick, Do Class Action Lawyers Make Too Little? 158 U. Pa. L. Rev. 2043, 2043–44 (2010).

[63]In some of the partial settlements, see note 29 supra, the district court awarded expenses for all the settlements at once and it was unclear what portion of the expenses was attributable to which settlement. In these instances, I assigned each settlement a pro rata portion of expenses. To the extent possible, all the fee and expense numbers in this article exclude any interest known to be awarded by the courts.

[64]See, e.g., Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 284–86 (1998) (reporting results of a survey of Wisconsin lawyers).

Table 7: The Total Amount of Fees and Expenses Awarded to Class Action Lawyers in Federal Class Action Settlements in 2006 and 2007

| | *Total Fees and Expenses Awarded in Settlements (and as Percentage of Total Settlement Amounts) in Each Subject Area* | |
|---|---|---|
| *Subject Matter* | *2006* (n = *292*) | *2007* (n = *363*) |
| Securities | $1,899 (11%) | $1,467 (20%) |
| Labor and employment | $75.1 (28%) | $144.5 (26%) |
| Consumer | $126.4 (24%) | $65.3 (9%) |
| Employee benefits | $57.1 (13%) | $71.9 (26%) |
| Civil rights | $31.0 (12%) | $32.2 (39%) |
| Debt collection | $2.5 (28%) | $1.1 (19%) |
| Antitrust | $274.6 (26%) | $157.3 (24%) |
| Commercial | $347.3 (29%) | $18.2 (15%) |
| Other | $119.3 (8%) | $103.3 (17%) |
| Total | $2,932 (13%) | $2,063 (20%) |

NOTE: Dollar amounts are in millions. Excludes settlements in which fees were not (or at least not yet) sought (22 settlements), settlements in which fees have not yet been awarded (two settlements), and settlements in which fees could not be ascertained due to indefinite award amounts, missing documents, or nonpublic side agreements (nine settlements).

SOURCES: Westlaw, PACER, district court clerks' offices.

It should be noted that, in some respects, the percentages in Table 7 overstate the portion of settlements that were awarded to class action attorneys because, again, many of these settlements involved indefinite cash relief or noncash relief that could not be valued.[65] If the value of all this relief could have been included, then the percentages in Table 7 would have been even lower. On the other hand, as noted above, not all the money defendants agree to pay in class action settlements is ultimately collected by the class.[66] To the extent leftover money is returned to the defendant, the percentages in Table 7 understate the portion class action lawyers received relative to their clients.

### *B. Method of Awarding Fees*

District court judges have a great deal of discretion in how they set fee awards in class action cases. Under Rule 23, federal judges are told only that the fees they award to class counsel

[65] Indeed, the large year-to-year variation in the percentages in labor, consumer, and employee benefits cases arose because district courts made particularly large valuations of the equitable relief in a few settlements and used the lodestar method to calculate the fees in these settlements (and thereby did not consider their large valuations in calculating the fees).

[66] See Hensler et al., supra note 7, at 427–30.

must be "reasonable."[67] Courts often exercise this discretion by choosing between two approaches: the lodestar approach or the percentage-of-the-settlement approach.[68] The lodestar approach works much the way it does in individual litigation: the court calculates the fee based on the number of hours class counsel actually worked on the case multiplied by a reasonable hourly rate and a discretionary multiplier.[69] The percentage-of-the-settlement approach bases the fee on the size of the settlement rather than on the hours class counsel actually worked: the district court picks a percentage of the settlement it thinks is reasonable based on a number of factors, one of which is often the fee lodestar (sometimes referred to as a "lodestar cross-check").[70] My 2006–2007 data set shows that the percentage-of-the-settlement approach has become much more common than the lodestar approach. In 69 percent of the settlements reported in Table 7, district court judges employed the percentage-of-the-settlement method with or without the lodestar cross-check. They employed the lodestar method in only 12 percent of settlements. In the other 20 percent of settlements, the court did not state the method it used or it used another method altogether.[71] The pure lodestar method was used most often in consumer (29 percent) and debt collection (45 percent) cases. These numbers are fairly consistent with the Eisenberg-Miller data from 2003 to 2008. They found that the lodestar method was used in only 9.6 percent of settlements.[72] Their number is no doubt lower than the 12 percent number found in my 2006–2007 data set because they excluded fee-shifting cases from their study.

### *C. Variation in Fees Awarded*

Not only do district courts often have discretion to choose between the lodestar method and the percentage-of-the-settlement method, but each of these methods leaves district courts with a great deal of discretion in how the method is ultimately applied. The courts

---

[67]Fed. R. Civ. P. 23(h).

[68]The discretion to pick between these methods is most pronounced in settlements where the underlying claim was not found in a statute that would shift attorney fees to the defendant. See, e.g., In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995) (permitting either percentage or lodestar method in common-fund cases); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (same); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (same). By contrast, courts typically used the lodestar approach in settlements arising from fee-shifting cases.

[69]See Eisenberg & Miller, supra note 15, at 31.

[70]Id. at 31–32.

[71]These numbers are based on the fee method described in the district court's order awarding fees, unless the order was silent, in which case the method, if any, described in class counsel's motion for fees (if it could be obtained) was used. If the court explicitly justified the fee award by reference to its percentage of the settlement, I counted it as the percentage method. If the court explicitly justified the award by reference to a lodestar calculation, I counted it as the lodestar method. If the court explicitly justified the award by reference to both, I counted it as the percentage method with a lodestar cross-check. If the court calculated neither a percentage nor the fee lodestar in its order, then I counted it as an "other" method.

[72]See Eisenberg & Miller II, supra note 16, at 267.

that use the percentage-of-the-settlement method usually rely on a multifactor test[73] and, like most multifactor tests, it can plausibly yield many results. It is true that in many of these cases, judges examine the fee percentages that other courts have awarded to guide their discretion.[74] In addition, the Ninth Circuit has adopted a presumption that 25 percent is the proper fee award percentage in class action cases.[75] Moreover, in securities cases, some courts presume that the proper fee award percentage is the one class counsel agreed to when it was hired by the large shareholder that is now usually selected as the lead plaintiff in such cases.[76] Nonetheless, presumptions, of course, can be overcome and, as one court has put it, "[t]here is no hard and fast rule mandating a certain percentage . . . which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case."[77] The court added: "[i]ndividualization in the exercise of a discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility."[78] It is therefore not surprising that district courts awarded fees over a broad range when they used the percentage-of-the-settlement method. Figure 4 is a graph of the distribution of fee awards as a percentage of the settlement in the 444 cases where district courts used the percentage method with or without a lodestar cross-check and the fee percentages were ascertainable. These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time). The awards ranged from 3 percent of the settlement to 47 percent of the settlement. The average award was 25.4 percent and the median was 25 percent. Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent. The Eisenberg-Miller study through 2008 found a slightly lower mean (24 percent) but the same median (25 percent) among its federal court settlements.[79]

It should be noted that in 218 of these 444 settlements (49 percent), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded. In 204 of these settlements, the lodestar multiplier resulting

---

[73]The Eleventh Circuit, for example, has identified a nonexclusive list of 15 factors that district courts might consider. See Camden I Condo. Ass'n, Inc. v. Dunkle, 946 F.2d 768, 772 n.3, 775 (11th Cir. 1991). See also In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 265 (D.N.H. 2007) (five factors); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (six factors); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) (seven factors); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 385 (D. Md. 2006) (13 factors); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988) (12 factors); In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (seven factors).

[74]See Eisenberg & Miller, supra note 15, at 32.

[75]See Staton v. Boeing Co., 327 F.3d 938, 968 (9th Cir. 2003).

[76]See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 282 (3d Cir. 2001).

[77]*Camden I Condo. Ass'n*, 946 F.2d at 774.

[78]*Camden I Condo. Ass'n*, 946 F.2d at 774 (alterations in original and internal quotation marks omitted).

[79]See Eisenberg & Miller II, supra note 16, at 259.

*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.




SOURCES: Westlaw, PACER, district court clerks' offices.

from the fee award could be ascertained. The lodestar multiplier in these cases ranged from 0.07 to 10.3, with a mean of 1.65 and a median of 1.34. Although there is always the possibility that class counsel are optimistic with their timesheets when they submit them for lodestar consideration, these lodestar numbers—only one multiplier above 6.0, with the bulk of the range not much above 1.0—strike me as fairly parsimonious for the risk that goes into any piece of litigation and cast doubt on the notion that the percentage-of-the-settlement method results in windfalls to class counsel.[80]

Table 8 shows the mean and median fee percentages awarded in each litigation subject area. The fee percentages did not appear to vary greatly across litigation subject areas, with most mean and median awards between 25 percent and 30 percent. As I report later in this section, however, after controlling for other variables, there were statistically significant differences in the fee percentages awarded in some subject areas compared to others. The mean and median percentages for securities cases were 24.7 percent and 25.0 percent, respectively; for all nonsecurities cases, the mean and median were 26.1 percent and 26.0 percent, respectively. The Eisenberg-Miller study through 2008 found mean awards ranging from 21–27 percent and medians from 19–25 percent,[81] a bit lower than the ranges in my

---

[80]It should be emphasized, of course, that these 204 settlements may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar cross-check.

[81]See Eisenberg & Miller II, supra note 16, at 262.

Table 8: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | *Percentage of Settlement Awarded as Fees* | |
|---|---|---|
| *Subject Matter* | *Mean* | *Median* |
| Securities ($n = 233$) | 24.7 | 25.0 |
| Labor and employment ($n = 61$) | 28.0 | 29.0 |
| Consumer ($n = 39$) | 23.5 | 24.6 |
| Employee benefits ($n = 37$) | 26.0 | 28.0 |
| Civil rights ($n = 20$) | 29.0 | 30.3 |
| Debt collection ($n = 5$) | 24.2 | 25.0 |
| Antitrust ($n = 23$) | 25.4 | 25.0 |
| Commercial ($n = 7$) | 23.3 | 25.0 |
| Other ($n = 19$) | 24.9 | 26.0 |
| All ($N = 444$) | 25.7 | 25.0 |

SOURCES: Westlaw, PACER, district court clerks' offices.

2006–2007 data set, which again, may be because they oversampled larger settlements (as I show below, district courts awarded smaller fee percentages in larger cases).

In light of the fact that, as I noted above, the distribution of class action settlements among the geographic circuits does not track their civil litigation dockets generally, it is interesting to ask whether one reason for the pattern in class action cases is that circuits oversubscribed with class actions award higher fee percentages. Although this question will be taken up with more sophistication in the regression analysis below, it is worth describing here the mean and median fee percentages in each of the circuits. Those data are presented in Table 9. Contrary to the hypothesis set forth in Section III, two of the circuits most oversubscribed with class actions, the Second and the Ninth, were the only circuits in which the mean fee awards were *under* 25 percent. As I explain below, these differences are statistically significant and remain so after controlling for other variables.

The lodestar method likewise permits district courts to exercise a great deal of leeway through the application of the discretionary multiplier. Figure 5 shows the distribution of lodestar multipliers in the 71 settlements in which district courts used the lodestar method and the multiplier could be ascertained. The average multiplier was 0.98 and the median was 0.92, which suggest that courts were not terribly prone to exercise their discretion to deviate from the amount of money encompassed in the lodestar calculation. These 71

Table 9: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | *Percentage of Settlement Awarded as Fees* | |
|---|---|---|
| *Circuit* | *Mean* | *Median* |
| First ($n = 27$) | 27.0 | 25.0 |
| Second ($n = 72$) | 23.8 | 24.5 |
| Third ($n = 50$) | 25.4 | 29.3 |
| Fourth ($n = 19$) | 25.2 | 28.0 |
| Fifth ($n = 27$) | 26.4 | 29.0 |
| Sixth ($n = 25$) | 26.1 | 28.0 |
| Seventh ($n = 39$) | 27.4 | 29.0 |
| Eighth ($n = 15$) | 26.1 | 30.0 |
| Ninth ($n = 111$) | 23.9 | 25.0 |
| Tenth ($n = 18$) | 25.3 | 25.5 |
| Eleventh ($n = 35$) | 28.1 | 30.0 |
| DC ($n = 6$) | 26.9 | 26.0 |

SOURCES: Westlaw, PACER, district court clerks' offices.

settlements were heavily concentrated within the consumer (median multiplier 1.13) and debt collection (0.66) subject areas. If cases in which district courts used the percentage-of-the-settlement method with a lodestar cross-check are combined with the lodestar cases, the average and median multipliers (in the 263 cases where the multipliers were ascertainable) were 1.45 and 1.19, respectively. Again—putting to one side the possibility that class counsel are optimistic with their timesheets—these multipliers appear fairly modest in light of the risk involved in any piece of litigation.

### *D. Factors Influencing Percentage Awards*

Whether district courts are exercising their discretion over fee awards wisely is an important public policy question given the amount of money at stake in class action settlements. As shown above, district court judges awarded class action lawyers nearly $5 billion in fees and expenses in 2006–2007. Based on the comparison to the tort system set forth in Section III, it is not difficult to surmise that in the 350 or so settlements every year, district court judges

*Figure 5:* The distribution of lodestar multipliers in 2006–2007 federal class action fee awards using the lodestar method.




SOURCES: Westlaw, PACER, district court clerks' offices.

are awarding a significant portion of all the annual compensation received by contingency-fee lawyers in the United States. Moreover, contingency fees are arguably the engine that drives much of the noncriminal regulation in the United States; unlike many other nations, we regulate largely through the ex post, decentralized device of litigation.[82] To the extent district courts could have exercised their discretion to award billions more or billions less to class action lawyers, district courts have been delegated a great deal of leeway over a big chunk of our regulatory horsepower. It is therefore worth examining how district courts exercise their discretion over fees. This examination is particularly important in cases where district courts use the percentage-of-the-settlement method to award fees: not only do such cases comprise the vast majority of settlements, but they comprise the vast majority of the money awarded as fees. As such, the analysis that follows will be confined to the 444 settlements where the district courts used the percentage-of-the-settlement method.

As I noted, prior empirical studies have shown that fee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases. As shown in Figure 6, the 2006–2007 data are consistent with prior studies. Regression analysis, set forth in more detail below, confirms that after controlling for other variables, fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all nonsecurities cases.

---

[82]See, e.g., Samuel Issacharoff, Regulating after the Fact, 56 DePaul L. Rev. 375, 377 (2007).

*Figure 6:* Fee awards as a function of settlement size in 2006–2007 class action cases using the percentage-of-the-settlement method with or without lodestar cross-check.




SOURCES: Westlaw, PACER, district court clerks' offices.

As noted above, courts often look to fee percentages in other cases as one factor they consider in deciding what percentage to award in a settlement at hand. In light of this practice, and in light of the fact that the size of the settlement has such a strong relationship to fee percentages, scholars have tried to help guide the practice by reporting the distribution of fee percentages across different settlement sizes.[83] In Table 10, I follow the Eisenberg-Miller studies and attempt to contribute to this guidance by setting forth the mean and median fee percentages, as well as the standard deviation, for each decile of the 2006–2007 settlements in which courts used the percentage-of-the-settlement method to award fees. The mean percentages ranged from over 28 percent in the first decile to less than 19 percent in the last decile.

It should be noted that the last decile in Table 10 covers an especially wide range of settlements, those from $72.5 million to the Enron settlement of $6.6 billion. To give more meaningful data to courts that must award fees in the largest settlements, Table 11 shows the last decile broken into additional cut points. When both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent, and by the time $500 million was reached, they plunged well below 15 percent, with most awards at that level under even 10 percent.

[83]See Eisenberg & Miller II, supra note 16, at 265.

Table 10: Mean, Median, and Standard Deviation of Fee Awards by Settlement Size in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| *Settlement Size (in Millions)* | *Mean* | *Median* | SD |
|---|---|---|---|
| [$0 to $0.75] (*n* = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (*n* = 44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (*n* = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (*n* = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (*n* = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (*n* = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (*n* = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (*n* = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (*n* = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6,600] (*n* = 45) | 18.4% | 19.0% | 7.9% |

Sources: Westlaw, PACER, district court clerks' offices.

Table 11: Mean, Median, and Standard Deviation of Fee Awards of the Largest 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| *Settlement Size (in Millions)* | *Mean* | *Median* | SD |
|---|---|---|---|
| ($72.5 to $100] (*n* = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (*n* = 14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (*n* = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1,000] (*n* = 2) | 12.9% | 12.9% | 7.2% |
| ($1,000 to $6,600] (*n* = 9) | 13.7% | 9.5% | 11% |

Sources: Westlaw, PACER, district court clerks' offices.

Prior empirical studies have not examined whether fee awards are associated with the political affiliation of the district court judges making the awards. This is surprising because realist theories of judicial behavior would predict that political affiliation would influence fee decisions.[84] It is true that as a general matter, political affiliation may influence district court judges to a lesser degree than it does appellate judges (who have been the focus of most of the prior empirical studies of realist theories): district court judges decide more routine cases and are subject to greater oversight on appeal than appellate judges. On the other hand, class action settlements are a bit different in these regards than many other decisions made by district court judges. To begin with, class action settlements are almost never appealed, and when they are, the appeals are usually settled before the appellate court hears the case.[85] Thus, district courts have much less reason to worry about the constraint of appellate review in fashioning fee awards. Moreover, one would think the potential for political affiliation to influence judicial decision making is greatest when legal sources lead to indeterminate outcomes and when judicial decisions touch on matters that are salient in national politics. (The more salient a matter is, the more likely presidents will select judges with views on the matter and the more likely those views will diverge between Republicans and Democrats.) Fee award decisions would seem to satisfy both these criteria. The law of fee awards, as explained above, is highly discretionary, and fee award decisions are wrapped up in highly salient political issues such as tort reform and the relative power of plaintiffs' lawyers and corporations. I would expect to find that judges appointed by Democratic presidents awarded higher fees in the 2006–2007 settlements than did judges appointed by Republican presidents.

The data, however, do not appear to bear this out. Of the 444 fee awards using the percentage-of-the-settlement approach, 52 percent were approved by Republican appointees, 45 percent were approved by Democratic appointees, and 4 percent were approved by non-Article III judges (usually magistrate judges). The mean fee percentage approved by Republican appointees (25.6 percent) was slightly *greater* than the mean approved by Democratic appointees (24.9 percent). The medians (25 percent) were the same.

To examine whether the realist hypothesis fared better after controlling for other variables, I performed regression analysis of the fee percentage data for the 427 settlements approved by Article III judges. I used ordinary least squares regression with the dependent variable the percentage of the settlement that was awarded in fees.[86] The independent

---

[84]See generally C.K. Rowland & Robert A. Carp, Politics and Judgment in Federal District Courts (1996). See also Max M. Schanzenbach & Emerson H. Tiller, Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence, and Reform, 75 U. Chi. L. Rev. 715, 724–25 (2008).

[85]See Brian T. Fitzpatrick, The End of Objector Blackmail? 62 Vand. L. Rev. 1623, 1640, 1634–38 (2009) (finding that less than 10 percent of class action settlements approved by federal courts in 2006 were appealed by class members).

[86]Professors Eisenberg and Miller used a square root transformation of the fee percentages in some of their regressions. I ran all the regressions using this transformation as well and it did not appreciably change the results. I also ran the regressions using a natural log transformation of fee percentage and with the dependent variable natural log of the fee amount (as opposed to the fee percentage). None of these models changed the results

variables were the natural log of the amount of the settlement, the natural log of the age of the case (in days), indicator variables for whether the class was certified as a settlement class, for litigation subject areas, and for circuits, as well as indicator variables for whether the judge was appointed by a Republican or Democratic president and for the judge's race and gender.[87]

The results for five regressions are in Table 12. In the first regression (Column 1), only the settlement amount, case age, and judge's political affiliation, gender, and race were included as independent variables. In the second regression (Column 2), all the independent variables were included. In the third regression (Column 3), only securities cases were analyzed, and in the fourth regression (Column 4), only nonsecurities cases were analyzed.

In none of these regressions was the political affiliation of the district court judge associated with fee percentage in a statistically significant manner.[88] One possible explanation for the lack of evidence for the realist hypothesis is that district court judges elevate other preferences above their political and ideological ones. For example, district courts of both political stripes may succumb to docket-clearing pressures and largely rubber stamp whatever fee is requested by class counsel; after all, these requests are rarely challenged by defendants. Moreover, if judges award class counsel whatever they request, class counsel will not appeal and, given that, as noted above, class members rarely appeal settlements (and when they do, often settle them before the appeal is heard),[89] judges can thereby virtually guarantee there will be no appellate review of their settlement decisions. Indeed, scholars have found that in the vast majority of cases, the fees ultimately awarded by federal judges are little different than those sought by class counsel.[90]

Another explanation for the lack of evidence for the realist hypothesis is that my data set includes both unpublished as well as published decisions. It is thought that realist theories of judicial behavior lose force in unpublished judicial decisions. This is the case because the kinds of questions for which realist theories would predict that judges have the most room to let their ideologies run are questions for which the law is ambiguous; it is

---

appreciably. The regressions were also run with and without the 2006 Enron settlement because it was such an outlier ($6.6 billion); the case did not change the regression results appreciably. For every regression, the data and residuals were inspected to confirm the standard assumptions of linearity, homoscedasticity, and the normal distribution of errors.

[87]Prior studies of judicial behavior have found that the race and sex of the judge can be associated with his or her decisions. See, e.g., Adam B. Cox & Thomas J. Miles, Judging the Voting Rights Act, 108 Colum. L. Rev. 1 (2008); Donald R. Songer et al., A Reappraisal of Diversification in the Federal Courts: Gender Effects in the Courts of Appeals, 56 J. Pol. 425 (1994).

[88]Although these coefficients are not reported in Table 8, the gender of the district court judge was never statistically significant. The race of the judge was only occasionally significant.

[89]See Fitzpatrick, supra note 85, at 1640.

[90]See Eisenberg & Miller II, supra note 16, at 270 (finding that state and federal judges awarded the fees requested by class counsel in 72.5 percent of settlements); Eisenberg, Miller & Perino, supra note 9, at 22 ("judges take a light touch when it comes to reviewing fee requests").

Table 12: Regression of Fee Percentages in 2006–2007 Settlements Using Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | *Regression Coefficients (and Robust* t *Statistics)* | | | | |
|---|---|---|---|---|---|
| *Independent Variable* | *1* | *2* | *3* | *4* | *5* |
| Settlement amount (natural log) | −1.77 | −1.76 | −1.76 | −1.41 | −1.78 |
| | (−5.43)** | (−8.52)** | (−7.16)** | (−4.00)** | (−8.67)** |
| Age of case (natural log days) | 1.66 | 1.99 | 1.13 | 1.72 | 2.00 |
| | (2.31)** | (2.71)** | (1.21) | (1.47) | (2.69)** |
| Judge's political affiliation (1 = Democrat) | −0.630 | −0.345 | 0.657 | −1.43 | −0.232 |
| | (−0.83) | (−0.49) | (0.76) | (−1.20) | (−0.34) |
| Settlement class | | 0.150 | 0.873 | −1.62 | 0.124 |
| | | (0.19) | (0.84) | (−1.00) | (0.15) |
| 1st Circuit | | 3.30 | 4.41 | 0.031 | 0.579 |
| | | (2.74)** | (3.32)** | (0.01) | (0.51) |
| 2d Circuit | | 0.513 | −0.813 | 2.93 | −2.23 |
| | | (0.44) | (−0.61) | (1.14) | (−1.98)** |
| 3d Circuit | | 2.25 | 4.00 | −1.11 | — |
| | | (1.99)** | (3.85)** | (−0.50) | |
| 4th Circuit | | 2.34 | 0.544 | 3.81 | — |
| | | (1.22) | (0.19) | (1.35) | |
| 5th Circuit | | 2.98 | 1.09 | 6.11 | 0.230 |
| | | (1.90)* | (0.65) | (1.97)** | (0.15) |
| 6th Circuit | | 2.91 | 0.838 | 4.41 | — |
| | | (2.28)** | (0.57) | (2.15)** | |
| 7th Circuit | | 2.55 | 3.22 | 2.90 | −0.227 |
| | | (2.23)** | (2.36)** | (1.46) | (−0.20) |
| 8th Circuit | | 2.12 | −0.759 | 3.73 | −0.586 |
| | | (0.97) | (−0.24) | (1.19) | (−0.28) |
| 9th Circuit | | — | — | — | −2.73 |
| | | | | | (−3.44)** |
| 10th Circuit | | 1.45 | −0.254 | 3.16 | — |
| | | (0.94) | (−0.13) | (1.29) | |
| 11th Circuit | | 4.05 | 3.85 | 4.14 | — |
| | | (3.44)** | (3.07)** | (1.88)* | |
| DC Circuit | | 2.76 | 2.60 | 2.41 | — |
| | | (1.10) | (0.80) | (0.64) | |
| Securities case | | — | | | — |
| Labor and employment case | | 2.93 | | — | 2.85 |
| | | (3.00)** | | | (2.94)** |
| Consumer case | | −1.65 | | −4.39 | −1.62 |
| | | (−0.88) | | (−2.20)** | (−0.88) |
| Employee benefits case | | −0.306 | | −4.23 | −0.325 |
| | | (−0.23) | | (−2.55)** | (−0.26) |
| Civil rights case | | 1.85 | | −2.05 | 1.76 |
| | | (0.99) | | (−0.97) | (0.95) |
| Debt collection case | | −4.93 | | −7.93 | −5.04 |
| | | (−1.71)* | | (−2.49)** | (−1.75)* |
| Antitrust case | | 3.06 | | 0.937 | 2.78 |
| | | (2.11)** | | (0.47) | (1.98)** |

Table 12 *Continued*

| | *Regression Coefficients (and Robust* t *Statistics)* | | | | |
|---|---|---|---|---|---|
| *Independent Variable* | *1* | *2* | *3* | *4* | *5* |
| Commercial case | | −0.028 | | −2.65 | 0.178 |
| | | (−0.01) | | (−0.73) | (0.05) |
| Other case | | −0.340 | | −3.73 | −0.221 |
| | | (−0.17) | | (−1.65) | (−0.11) |
| Constant | 42.1 | 37.2 | 43.0 | 38.2 | 40.1 |
| | (7.29)** | (6.08)** | (6.72)** | (4.14)** | (7.62)** |
| *N* | 427 | 427 | 232 | 195 | 427 |
| $R^2$ | .20 | .26 | .37 | .26 | .26 |
| Root MSE | 6.59 | 6.50 | 5.63 | 7.24 | 6.48 |

NOTE: **significant at the 5 percent level; *significant at the 10 percent level. Standard errors in Column 1 were clustered by circuit. Indicator variables for race and gender were included in each regression but not reported.
SOURCES: Westlaw, PACER, district court clerks' offices, Federal Judicial Center.

thought that these kinds of questions are more often answered in published opinions.[91] Indeed, most of the studies finding an association between ideological beliefs and case outcomes were based on data sets that included only published opinions.[92] On the other hand, there is a small but growing number of studies that examine unpublished opinions as well, and some of these studies have shown that ideological effects persisted.[93] Nonetheless, in light of the discretion that judges exercise with respect to fee award decisions, it hard to characterize *any* decision in this area as "unambiguous." Thus, even when unpublished, I would have expected the fee award decisions to exhibit an association with ideological beliefs. Thus, I am more persuaded by the explanation suggesting that judges are more concerned with clearing their dockets or insulating their decisions from appeal in these cases than with furthering their ideological beliefs.

In all the regressions, the size of the settlement was strongly and inversely associated with fee percentages. Whether the case was certified as a settlement class was not associated

---

[91]See, e.g., Ahmed E. Taha, Data and Selection Bias: A Case Study, 75 UMKC L. Rev. 171, 179 (2006).

[92]Id. at 178–79.

[93]See, e.g., David S. Law, Strategic Judicial Lawmaking: Ideology, Publication, and Asylum Law in the Ninth Circuit, 73 U. Cin. L. Rev. 817, 843 (2005); Deborah Jones Merritt & James J. Brudney, Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals, 54 Vand. L. Rev. 71, 109 (2001); Donald R. Songer, Criteria for Publication of Opinions in the U.S. Courts of Appeals: Formal Rules Versus Empirical Reality, 73 Judicature 307, 312 (1990). At the trial court level, however, the studies of civil cases have found no ideological effects. See Laura Beth Nielsen, Robert L. Nelson & Ryon Lancaster, Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in the Post Civil Rights United States, 7 J. Empirical Legal Stud. 175, 192–93 (2010); Denise M. Keele et al., An Analysis of Ideological Effects in Published Versus Unpublished Judicial Opinions, 6 J. Empirical Legal Stud. 213, 230 (2009); Orley Ashenfelter, Theodore Eisenberg & Stewart J. Schwab, Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes, 24 J. Legal Stud. 257, 276–77 (1995). With respect to criminal cases, there is at least one study at the trial court level that has found ideological effects. See Schanzenbach & Tiller, supra note 81, at 734.

with fee percentages in any of the regressions. The age of the case at settlement was associated with fee percentages in the first two regressions, and when the settlement class variable was removed in regressions 3 and 4, the age variable became positively associated with fee percentages in nonsecurities cases but remained insignificant in securities cases. Professors Eisenberg and Miller likewise found that the age of the case at settlement was positively associated with fee percentages in their 1993–2002 data set,[94] and that settlement classes were not associated with fee percentages in their 2003–2008 data set.[95]

Although the structure of these regressions did not permit extensive comparisons of fee awards across different litigation subject areas, fee percentages appeared to vary somewhat depending on the type of case that settled. Securities cases were used as the baseline litigation subject area in the second and fifth regressions, permitting a comparison of fee awards in each nonsecurities area with the awards in securities cases. These regressions show that awards in a few areas, including labor/employment and antitrust, were more lucrative than those in securities cases. In the fourth regression, which included only nonsecurities cases, labor and employment cases were used as the baseline litigation subject area, permitting comparison between fee percentages in that area and the other nonsecurities areas. This regression shows that fee percentages in several areas, including consumer and employee benefits cases, were lower than the percentages in labor and employment cases.

In the fifth regression (Column 5 of Table 12), I attempted to discern whether the circuits identified in Section III as those with the most overrepresented (the First, Second, Seventh, and Ninth) and underrepresented (the Fifth and Eighth) class action dockets awarded attorney fees differently than the other circuits. That is, perhaps district court judges in the First, Second, Seventh, and Ninth Circuits award greater percentages of class action settlements as fees than do the other circuits, whereas district court judges in the Fifth and Eighth Circuits award smaller percentages. To test this hypothesis, in the fifth regression, I included indicator variables only for the six circuits with unusual dockets to measure their fee awards against the other six circuits combined. The regression showed statistically significant association with fee percentages for only two of the six unusual circuits: the Second and Ninth Circuits. In both cases, however, the direction of the association (i.e., the Second and Ninth Circuits awarded *smaller* fees than the baseline circuits) was opposite the hypothesized direction.[96]

---

[94]See Eisenberg & Miller, supra note 15, at 61.

[95]See Eisenberg & Miller II, supra note 16, at 266.

[96]This relationship persisted when the regressions were rerun among the securities and nonsecurities cases separately. I do not report these results, but, even though the First, Second, and Ninth Circuits were oversubscribed with securities class action settlements and the Fifth, Sixth, and Eighth were undersubscribed, there was no association between fee percentages and any of these unusual circuits except, again, the inverse association with the Second and Ninth Circuits. In nonsecurities cases, even though the Seventh and Ninth Circuits were oversubscribed and the Fifth and the Eighth undersubscribed, there was no association between fee percentages and any of these unusual circuits except again for the inverse association with the Ninth Circuit.

The lack of the expected association with the unusual circuits might be explained by the fact that class action lawyers forum shop along dimensions other than their potential fee awards; they might, for example, put more emphasis on favorable class-certification law because there can be no fee award if the class is not certified. As noted above, it might also be the case that class action lawyers are unable to engage in forum shopping at all because defendants are able to transfer venue to the district in which they are headquartered or another district with a significant connection to the litigation.

It is unclear why the Second and Ninth Circuits were associated with lower fee awards despite their heavy class action dockets. Indeed, it should be noted that the Ninth Circuit was the baseline circuit in the second, third, and fourth regressions and, in all these regressions, district courts in the Ninth Circuit awarded smaller fees than courts in many of the other circuits. The lower fees in the Ninth Circuit may be attributable to the fact that it has adopted a presumption that the proper fee to be awarded in a class action settlement is 25 percent of the settlement.[97] This presumption may make it more difficult for district court judges to award larger fee percentages. The lower awards in the Second Circuit are more difficult to explain, but it should be noted that the difference between the Second Circuit and the baseline circuits went away when the fifth regression was rerun with only nonsecurities cases.[98] This suggests that the awards in the Second Circuit may be lower *only* in securities cases. In any event, it should be noted that the lower fee awards from the Second and Ninth Circuits contrast with the findings in the Eisenberg-Miller studies, which found no intercircuit differences in fee awards in common-fund cases in their data through 2008.[99]

## V. Conclusion

This article has attempted to fill some of the gaps in our knowledge about class action litigation by reporting the results of an empirical study that attempted to collect all class action settlements approved by federal judges in 2006 and 2007. District court judges approved 688 class action settlements over this two-year period, involving more than $33 billion. Of this $33 billion, nearly $5 billion was awarded to class action lawyers, or about 15 percent of the total. District courts typically awarded fees using the highly discretionary percentage-of-the-settlement method, and fee awards varied over a wide range under this method, with a mean and median around 25 percent. Fee awards using this method were strongly and inversely associated with the size of the settlement. Fee percentages were positively associated with the age of the case at settlement. Fee percentages were not associated with whether the class action was certified as a settlement class or with the

---

[97]See note 75 supra. It should be noted that none of the results from the previous regressions were affected when the Ninth Circuit settlements were excluded from the data.

[98]The Ninth Circuit's differences persisted.

[99]See Eisenberg & Miller II, supra note 16, at 260.

Case: 26-2638, 10/28/2026, DktEntry: 24.4, (148 of 283)



political affiliation of the judge who made the award. Finally, there appeared to be some variation in fee percentages depending on subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all of the other litigation areas, and district courts in the Ninth Circuit and in the Second Circuit (in securities cases) awarded lower fee percentages than district courts in several other circuits. The lower awards in the Ninth Circuit may be attributable to the fact that it is the only circuit that has adopted a presumptive fee percentage of 25 percent.

# EXHIBIT 3

Documents reviewed:

- Order Granting in Part and Denying in Part Motion to Dismiss (document 233, filed 6/13/22)
- Order Denying Without Prejudice the Motion for Class Certification; Granting in Part and Denying in Part Google's *Daubert* Motion to Exclude the Expert Opinions of Professor Neil Richards; Denying without Prejudice Plaintiffs' *Daubert* Motion to Exclude the Expert Opinions of Bruce Deal (document 690, filed 4/4/24)
- Declaration of Professor Zeithammer in Support of Plaintiffs' Motion for Certification of Settlement Class and Final Approval of Class Action Settlement (filed under seal, 7/24/25)
- Plaintiffs' Notice of Motion and Motion to Certify a Settlement Class and Grant Final Approval of Class Action Settlement (document 777, filed 9/2/25)
- Declaration of Elizabeth C. Pritzker in Support of Plaintiffs' Motion for Certification of a Settlement Class and Final Approval of Settlement (document 778-3, filed 9/2/25)
- Settlement Agreement (document 778-4, filed 9/2/25)
- Draft of Exhibit B to Declaration of Lesley E. Weaver in Support of Plaintiffs' Motion for An Award of Attorneys' Fees and Expenses (filed herewith)
- Draft of Exhibit B to Declaration of Francis A. Bottini in Support of Plaintiffs' Motion for An Award of Attorneys' Fees, Costs and Expenses (filed herewith)
- Draft of Exhibit B to Declaration of Nanci E. Nishimura in Support of Plaintiffs' Motion for An Award of Attorneys' Fees and Expenses (filed herewith)

- Draft of Exhibit B to Declaration of David A. Straite in Support of Plaintiffs' Motion for An Award of Attorneys' Fees, Costs and Expenses (filed herewith)
- Draft of Exhibit B to Declaration of Elizabeth C. Pritzker in Support of Plaintiffs' Motion for An Award of Attorneys' Fees and Expenses (filed herewith)
- Draft of Exhibit B to Declaration of Jay Barnes in Support of Plaintiffs' Motion for An Award of Attorneys' Fees, Costs and Expenses (filed herewith)
- Draft of Exhibit B to Declaration of Matthew W.H. Wessler in Support of Plaintiffs' Motion for An Award of Attorneys' Fees, Costs and Expenses (filed herewith)

# EXHIBIT E

# Exhibit E

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | **All Firms' Cumulative Time by Category** | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | Through July 31, 2025 | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | **Firm Name** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | **16** | **17** | **18** | **19** | **20** | **21** | **22** | **Total Hours** | **Total Lodestar** |
| 7 | Bleichmar Fonti & Auld LLP | 13.80 | 82.80 | 250.40 | 15.40 | 295.10 | 839.70 | 218.40 | 86.10 | 397.70 | 941.00 | 107.20 | 1150.40 | 1810.60 | 2320.20 | 756.80 | 2030.40 | 267.10 | 1137.20 | 17.30 | 15.00 | 0.00 | 16.40 | 12769.00 | $8,347,267.00 |
| 8 | Bottini & Bottini Inc. | 222.00 | 2.60 | 64.20 | 74.40 | 142.60 | 17.60 | 48.20 | 8.60 | 97.70 | 66.20 | 145.50 | 325.90 | 798.60 | 240.90 | 64.90 | 99.10 | 1.20 | 161.90 | 44.50 | 62.00 | 0.00 | 0.90 | 2689.50 | $1,671,693.00 |
| 9 | Cotchett Pitre & McCarthy LLP | 90.90 | 39.40 | 342.60 | 63.20 | 926.20 | 353.30 | 162.40 | 45.60 | 585.30 | 871.60 | 101.50 | 562.00 | 2301.80 | 144.20 | 189.00 | 270.40 | 572.10 | 300.40 | 130.70 | 85.70 | 0.00 | 8.40 | 8146.70 | $5,146,010.00 |
| 10 | DiCello Levitt LLP | 207.90 | 8.60 | 11.00 | 165.80 | 398.00 | 27.60 | 164.30 | 84.90 | 45.80 | 239.70 | 28.20 | 438.50 | 1749.80 | 24.20 | 8.50 | 1692.30 | 38.30 | 138.10 | 206.90 | 0.00 | 0.00 | 0.00 | 5688.60 | $3,930,716.50 |
| 11 | Pritzker Levine LLP | 635.00 | 13.80 | 54.50 | 4.70 | 1018.80 | 663.20 | 605.40 | 136.30 | 780.00 | 2293.70 | 103.00 | 904.20 | 20.80 | 768.60 | 76.30 | 1059.50 | 150.20 | 1494.70 | 674.50 | 233.70 | 0.00 | 48.30 | 11729.20 | $13,127,091.00 |
| 12 | Simmons Hanly Conroy LLP | 37.70 | 91.20 | 204.20 | 36.10 | 234.80 | 128.30 | 37.40 | 10.40 | 21.20 | 272.00 | 120.00 | 668.70 | 1428.40 | 138.00 | 61.40 | 538.20 | 268.10 | 827.20 | 134.00 | 61.30 | 0.00 | 1.90 | 5365.50 | $4,287,737.50 |
| 13 | Gupta Wessler | | | | | | | | | | | | | | | | | | | | | | 133.25 | 133.25 | $163,300.00 |
| 14 | **Total:** | **1207.30** | **238.40** | **926.90** | **359.60** | **3015.50** | **2029.70** | **1236.10** | **371.90** | **1927.70** | **4684.20** | **605.40** | **4049.70** | **8110.00** | **3636.10** | **1156.90** | **5689.90** | **1297.00** | **4059.50** | **1207.90** | **457.70** | **0.00** | **209.15** | **46521.75** | **$36,673,815.00** |
| 15 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | **Categories:** | | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | (1) Case Management | | | | | | | | | | | | | | | | | | | | | | | | |
| 18 | (2) Fact Investigation | | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | (3) Pleadings | | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | (4) Client/Class Member Communications | | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | (5) Lead Counsel/PEC Meetings | | | | | | | | | | | | | | | | | | | | | | | | |
| 22 | (6) Experts/Consultants/Daubert Motions | | | | | | | | | | | | | | | | | | | | | | | | |
| 23 | (7) Settlement/Mediation | | | | | | | | | | | | | | | | | | | | | | | | |
| 24 | (8) Court Appearances | | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | (9) Dispositive Motions | | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | (10) Class Action Certification and Notice | | | | | | | | | | | | | | | | | | | | | | | | |
| 27 | (11) Research | | | | | | | | | | | | | | | | | | | | | | | | |
| 28 | (12) Discovery - Written | | | | | | | | | | | | | | | | | | | | | | | | |
| 29 | (13) Discovery - Tier I Review (**Rate Limit $325/hour**) | | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | (14) Discovery - Tier II Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 31 | (15) Discovery - Third Party | | | | | | | | | | | | | | | | | | | | | | | | |
| 32 | (16) Discovery - Depositions (Nonexpert) | | | | | | | | | | | | | | | | | | | | | | | | |
| 33 | (17) Discovery - Experts | | | | | | | | | | | | | | | | | | | | | | | | |
| 34 | (18) Discovery - Motions | | | | | | | | | | | | | | | | | | | | | | | | |
| 35 | (19) Analysis/Strategy | | | | | | | | | | | | | | | | | | | | | | | | |
| 36 | (20) Trial Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 37 | (21) Trial | | | | | | | | | | | | | | | | | | | | | | | | |
| 38 | (22) Appeal | | | | | | | | | | | | | | | | | | | | | | | | |

# EXHIBIT C

# Exhibit C

Pritzker Levine LLP – Annual Hours and Lodestar

| Year | Sum of Time | Sum of Lodestar |
|---:|---:|---:|
| **2021** | 672.20 | $776,710.00 |
| **2022** | 3378.10 | $3,803,830.00 |
| **2023** | 4424.90 | $4,948,202.00 |
| **2024** | 2054.20 | $2,238,879.00 |
| **2025** | 1199.80 | $1,359,470.00 |
| **Grand Total** | **11,729.20** | **$13,127,091.00** |

# EXHIBIT B

# Exhibit B

**Firm Name: Pritzker Levine LLP**
Time through 7/31/2025

| Professional Name (Status) | Hourly Rate | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Current Hours | B4T Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jonathan K. Levine (P) | $1,200 | 184.90 | 5.60 | 10.50 | 0.70 | 191.80 | 108.40 | 228.00 | 61.20 | 265.60 | 737.80 | | 71.10 | | | 25.80 | 638.60 | | 471.20 | 193.10 | | | 13.20 | 3207.50 | $3,849,000.00 |
| Elizabeth C. Pritzker (P) | $1,200 | 282.30 | 8.20 | 39.50 | 3.70 | 457.20 | 401.60 | 260.80 | 40.50 | 331.90 | 956.30 | 12.90 | 262.30 | | | 28.80 | 211.90 | 52.50 | 495.30 | 163.00 | | | 21.60 | 4030.30 | $4,836,360.00 |
| Bethany Caracuzzo (P) | $1,100 | 19.20 | | 3.50 | 0.30 | 241.40 | 30.90 | 79.60 | 23.10 | 105.50 | 437.80 | 90.10 | 534.20 | | 659.90 | 8.90 | 146.20 | 97.70 | 350.90 | 233.70 | 40.80 | | | 3103.70 | $3,414,070.00 |
| Heather P. Haggarty (A) | $300 | 80.80 | | | | | | | | | | | | | | | | | | | | | | 80.80 | $24,240.00 |
| Caroline Corbitt (A) | $800 | 5.60 | | | | 128.40 | 122.30 | 37.00 | 11.50 | 77.00 | 161.60 | | 36.60 | | 108.70 | 12.80 | 62.80 | | 177.30 | 84.30 | 182.90 | | 13.50 | 1222.30 | $977,840.00 |
| Caroline Corbitt (A) - - Type 1 Doc Review | $325 | | | | | | | | | | | | | 20.80 | | | | | | | | | | 20.80 | $6,760.00 |
| Joanna Dowaliby (Paralegal) | $295 | 62.20 | | 1.00 | | | | | | | 0.20 | | | | | | | | | 0.40 | | | | 63.80 | $18,821.00 |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total:** | | **635.00** | **13.80** | **54.50** | **4.70** | **1018.80** | **663.20** | **605.40** | **136.30** | **780.00** | **2293.70** | **103.00** | **904.20** | **20.80** | **768.60** | **76.30** | **1059.50** | **150.20** | **1494.70** | **674.50** | **223.70** | **0.00** | **48.30** | **11,729.20** | **$13,127,091.00** |

(Columns 1–22 are Categories.)

**Categories:**
(1) Case Management
(2) Fact Investigation
(3) Pleadings
(4) Client/Class Member Communications
(5) Lead Counsel/PEC Meetings
(6) Experts/Consultants/Daubert Motions
(7) Settlement/Mediation
(8) Court Appearances
(9) Dispositive Motions
(10) Class Action Certification and Notice
(11) Research
(12) Discovery - Written
(13) Discovery - Tier I Review (**Rate Limit $325/hour**)
(14) Discovery - Tier II Analysis
(15) Discovery - Third Party
(16) Discovery - Depositions (Nonexpert)
(17) Discovery - Experts
(18) Discovery - Motions
(19) Analysis/Strategy
(20) Trial Preparation
(21) Trial
(22) Appeal

**Professional Status:**
(P) Partner
(OC) Of Counsel
(A) Associate
(LC) Law Clerk
(PL) Paralegal
(O) Other - specify

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**DECLARATION OF ELIZABETH C. PRITZKER IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD [on or after January 13, 2026]<br>Time: TBD<br>Courtroom: 1, 4th Floor |

I, Elizabeth C. Pritzker, hereby declare as follows:

1. I am a co-founding partner of Pritzker Levine LLP, and an attorney licensed in the State of California and duly admitted to practice before this Court.

2. On September 2, 2025, plaintiffs and defendant Google LLC ("Google") entered in a formal agreement to resolve this action by settlement, and that same day, plaintiffs filed their Motion for Certification of a Settlement Class and Final Approval of Settlement. *See* ECF 777. I submitted a declaration in support of that motion (the "Pritzker Decl.") (ECF 778-2) and attached as an exhibit to my declaration was the Settlement Agreement ("SA") (ECF 778-4).

3. This declaration is made in support of Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses to compensate plaintiffs' counsel for their work on behalf of the class in achieving that settlement. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

4. In my earlier declaration, I detailed the history of the litigation, from pre-filing investigation and filing through motion work, discovery, class certification and settlement. ECF 778-2. In making this declaration, I hope to avoid unnecessary repetition by incorporating that case history (*see id.*, ¶¶ 2-39) by reference, and summarizing pertinent events below.

5. In early Spring 2021, I and the Pritzker Levine law firm worked with co-counsel to prepare plaintiffs' initial class action complaint, *Hewitt et al. v. Google LLC*, Case No. 21-cv-02155, on behalf of our firm's respective clients, Benjamin Hewitt and Kimberly Woodruff. That complaint was filed on March 26, 2021. ECF 1. Thereafter, I worked with counsel for plaintiffs in two additional RTB-related class actions, *Delahunty v. Google LLC*, Case No. 21-cv-03360, and *Toronto v. Google LLC*, Case No. 21-cv-03725, to relate and consolidate the cases. The cases were consolidated by the Court on June 24, 2021, and renamed *In re Google RTB Consumer Privacy Litigation*. ECF 69.

6. On August 3, 2021, I was appointed to serve as Interim Class Counsel on behalf of plaintiffs. ECF 77. That order also appointed a Plaintiffs' Executive Committee (PEC), consisting of myself, Lesley E. Weaver of Bleichmar Fonti & Auld LLP, Jay Barnes of Simmons Hanly Conroy, David A. Straite of DiCello Levitt LLP, Nanci E. Nishimura of Cotchett Pitre & McCarthy LLP, and Francis Bottini, Jr. of Bottini & Bottini, Inc. *See id.*

7. This case involved over four years of active, hard-fought litigation and almost a year of settlement negotiations and discussions. Google is one of the largest, most profitable and most sophisticated public companies in the world.[1] Its counsel, Cooley LLP, is among the largest and most highly compensated defense firms in the nation.[2] The issues involved in this case sit at the cutting edge of both online auction technology and an evolving body of privacy law. Plaintiffs' counsel independently developed a complaint concerning Google's unique, highly complex, and generally undisclosed RTB auction practices. Uncovering and understanding Google's RTB technologies consumed considerable firm resources. Google and its attorneys fought every step of the way, particularly with respect to plaintiffs' discovery requests, pushing off for years Google's ultimate production of evidence of the billions of actual RTB transactions involving plaintiffs and the class showing the pervasive nature and uniform impact of Google's RTB auctions on class members' personal data. *See* ECF 778-2 at ¶¶ 12-19. Google and its counsel were equally aggressive when they conducted discovery, demanding forensic imaging of plaintiffs' devices, deposing each plaintiff, and countering each of plaintiffs' experts with Google's own experts and high-level management and technical personnel. *See id.*, ¶¶ 20-21. The motion to dismiss and class certification briefing was lengthy and complex, centering around common and statutory laws that implicate complex issues of the rights of privacy in the technical space – issues that courts around the country continue to determine. *See id.*, ¶¶ 9, 21-28.

8. A successful litigation outcome here was by no means assured. Yet, the settlement plaintiffs have achieved through their efforts is a successful and meaningful one by any measure. The settlement provides sweeping, never-before-available relief for hundreds of millions of individual U.S. Google account holders and the public generally.[3] With the new user RTB Control, internet users

---

[1] *See* https://www.macrotrends.net/stocks/charts/GOOGL/alphabet/net-worth, last accessed Sept. 18, 2025.

[2] *See* https://abovethelaw.com/2024/11/the-biglaw-firms-with-the-highest-hourly-rates-2024/, last accessed Sept. 18, 2025.

[3] *See Sovereign Magazine*, "Privacy Concession: How Google's RTB Settlement Could Transform Digital Advertising Forever" (Sept. 8, 2025), available at https://www.sovereignmagazine.com/legal/privacy-revolution-googles-rtb-settlement-could-transform-digital, last accessed Sept. 18, 2025.

can take control of their privacy by activating a new technology that will limit the information Google shares about them in Google's RTB auctions. The forthcoming email dispatch from Google to all currently active individual Google U.S. account holders advising them of the new RTB control and all of the various new disclosures provided for in the settlement satisfies the additional litigation objectives of transparency and accountability. *See* SA at A.2.1, A.2.a. and A.2.b. Further, the settlement provides three additional benefits: (1) class members have received all the benefits of comprehensive injunctive relief while maintaining their right to seek damages if they so choose, *see* SA at ¶ 14, D.8; (2) because the new RTB Control is available in "signed out" mode, members of general public who are not Google account holders but who are browsing on Google websites or applications can also avail themselves of the Control to limit the information that Google shows advertisers; and relatedly (3) the Google RTB Control, when enabled, will limit the ability of third parties to use Google's RTB auction to identify and track individuals and from building their own profiles of the browsing activity of settlement class members and members of the general public across the web. This groundbreaking achievement thus satisfies plaintiffs' key litigation objectives, and provides real value to plaintiffs and the class plaintiffs' counsel serve.

PRITZKER LEVINE'S INTERIM CLASS COUNSEL ROLE IN THE LITIGATION

9. Pritzker Levine is a nine-attorney California-based firm with a strong, nationwide complex litigation practice. The firm's key attorneys on this matter are Jonathan K. Levine, Bethany Caracuzzo, Caroline C. Corbitt, and myself. Each attorney is skilled at successfully handling class actions across a range of industries, including privacy, data breach, antitrust, securities, and unfair competition law, and each of us has tried cases to juries, courts or arbitrators. Mr. Levine is a co-founding partner of the firm, with more than 35 years of experience in complex litigation and class actions, often serving in a leadership role. Ms. Caracuzzo is a Pritzker Levine partner with over 26 years of class action and complex litigation experience. Ms. Corbitt is a senior associate and has practiced complex litigation for 10 years. Attached hereto as **Exhibit A** is a firm resume

10. Consistent with my Interim Class Counsel appointment, I am the principal attorney at Pritzker Levine on this matter. With a background in economics as well as law, I have represented plaintiffs in antitrust, unfair competition law, and privacy class actions, and clients in other high-

stakes complex litigation, for 35 years, including through trial. I have litigated over three dozen class action cases across the country. Since the firm's founding in 2013, I have had the honor of serving in a leadership position in several class actions. Some examples include:

- *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, MDL No. 2785-DDC (D. Kan.) (Co-Lead Class Counsel)
- *In re: Google Play Store Antitrust Litig.,* MDL No. 2981-JD (N.D. Cal) (Liaison Counsel for Consumer Plaintiffs)
- *In Re National Collegiate Athletic Association Grant-In-Aid Cap Antitrust Litig,*, No. 14-md-02541-CW (N.D. Cal.) (Additional Class Counsel)
- *In Re Adobe Systems, Inc. Privacy Litig*, Case No.: 13–CV–05226–LHK (N.D. Cal.) (Plaintiffs' Executive Committee)
- *Il Fornaio (America) Corporation v. Lazzari Fuel Company, LLC et al.*, Case No. 3:13-cv-05197-WHA (N.D. Cal.) (Class Counsel)
- *In Re Aqueous Film-Forming Foams Products Liability Litig.*, MDL No. 2873-RMG (D. S.C.) (Plaintiffs' Executive Committee)
- *In re: GoodRx and Pharmacy Benefit Manager Antitrust Litig, (No. II)*, 1:25-md-03148-MSM-AEM (D. R.I.) (Plaintiffs' Executive Committee)
- *Al's Discount Plumbing, LLC et al., v. Viega*, LLC, Case No. No. 1:19-cv-00159 (M.D. Penn.) (Co-Lead Class Counsel)
- *In re Packaged Seafood Products Antitrust Litig.*, MDL No. 2670-DMS (S.D. Cal.) (Plaintiffs' Executive Committee and Trial Counsel)
- *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No 1827-SI (N.D. Cal.) (Liaison Counsel)
- *In re Lithium Ion Rechargeable Batteries Antitrust Litig.*, MDL No. 2420-YGR (N.D. Cal.) (Direct Purchaser Plaintiffs Executive Committee)
- *In re GIB, LLC Cases / In re Brazilian Blowout Class Action Litig.*, JCCP No. 4657 (L.A. Sup. Ct.) (Co-Lead Class Counsel).

11. As Interim Class Counsel, it has been my personal responsibility to oversee every aspect of this litigation for the plaintiff class. Working collaboratively with PEC counsel, I and members of the Pritzker Levine team prepared a comprehensive amended and consolidated class

action complaint, filed on August 27, 2021.

12. We were actively involved in discovery planning and discovery proceedings, prepared and negotiated third party subpoenas and productions made by third party publishers and participants in the RTB auctions, and actively participated in meet and confers with Google's counsel and the parties' extensive discovery motion practice.[4]

13. Pritzker Levine partner, Bethany Caracuzzo, oversaw the document review process that was undertaken by all PEC firms: this involved weekly meetings with attorneys assigned to Tier I document review, working with document review teams to identify key documents and areas requiring follow up discovery, and supervising the process of incorporating discovery into a detailed order of proof to guide plaintiffs at depositions and in the motion to dismiss, class certification, and merits phases of the litigation.

14. Pritzker Levine was actively involved with all research, briefing and argument on Google's motion to dismiss and plaintiffs' motions for class certification.

15. The firm was also actively involved in the identification and selection of plaintiffs' experts and consultants, and worked directly with each of them to assist them in preparing their analyses and expert reports. Pritzker Levine attorneys prepared for and took a number of depositions of Google witnesses and class certification experts, and defended the plaintiffs' class certification experts at their depositions. I assigned the responsibility for preparing the plaintiffs for deposition, and for defending them at their depositions, to other PEC firms. At my direction, other PEC firms also took or defended specified Google witness depositions or specified expert depositions.

16. Pritzker Levine oversaw all litigation, pretrial, and trial strategies. The case was twice set for trial, with merits expert reports closely tracking class certification briefing and argument. Working with other PEC firms, Pritzker Levine identified merits experts, began the process of working with those experts to prepare merits reports, and undertook steps to assess address thousands of Google's privilege claims and identify witnesses and authenticate documents to be used a trial.

17. Pritzker Levine also had primary responsibility for all settlement discussions, and

---

[4] The extensive and hard-fought nature of the parties' discovery practices are described in my September 2, 2025 declaration (ECF 788-2), at ¶¶ 11-19.

Jonathan Levine and I prepared for, participated in, and attended all settlement meetings and mediations. As noted in the Pritzker Declaration, and as confirmed by the Statement of the Mediator, Shirish Gupta, these settlement discussions occurred over the course of a full year – and in parallel with the parties' active litigation. *See, e.g.,* Pritzker Decl., ¶¶ 30-38; Mediator's Statement (ECF 778-16), ¶¶ 3-10.

18. Throughout the litigation, I have employed, to the best of my ability, my skill and experience handling the case management, oversight, and diplomatic roles that are essential in leading complex cases and class actions, and to ensuring that work assigned to PEC counsel was being conducted in a timely, responsible and efficient matter. As the Federal Judicial Center's *Manual for Complex Litigation* advises, attorneys appointed as Interim Class Counsel should endeavor "to seek consensus…when making decisions that may have a critical impact on the litigation" and "to keep the other attorneys in the group advised of the progress of the litigation and consult with them about decisions significantly affecting their clients." MCL 4TH §10.222 (2004). To that end, it was my practice to meet frequently with the other attorneys and law firms appointed to the PEC to discuss and review work assignments, consult and obtain input on litigation strategy and decisions affecting the clients and putative class, and apprise counsel of changes in the legal or regulatory landscape, settlement status, and the progress of the litigation generally.

19. Additionally, pursuant to the Court's appointment order, I have taken affirmative steps throughout the litigation to ensure efficiency in representing the putative class. *See* ECF 77 at 2. To that end, I established a monthly time and expense protocol that required monthly submissions of time and expense records from each PEC firm, with all billing to be recorded by task and in tenth-of-an hour increments, and specifying that only work assigned by Interim Class Counsel would be eligible for compensation. *Id.* In that protocol, I directed that hourly rates for all Tier 1 document reviewers be capped at $325/hour, that hourly rates for all paralegals be capped at $300/hour, and that hourly rates for all law clerks be capped at $425/hour. That protocol also specified that all litigation expenses for which reimbursement would be sought would be logged at cost, i.e., without markup, and only coach airfare and reasonable hotel expenses would be reimbursed. Pursuant to the Court's appointment order, I also reviewed all billing records on a monthly basis, and removed

duplicative or inefficient billing entries. *See* ECF 77 at 2. I describe the results of this auditing process more fully in paragraph 33, below.

PRITZKER LEVINE'S TIME AND EXPENSES

20. The hours spent by attorneys and professional staff at Pritzker Levine working on the case as of July 31, 2025, as well as the 2024 hourly rate (or applicable rate cap) for each listed professional, and their corresponding lodestar amounts, are listed in **Exhibit B.** Consistent with the Court's *Procedural Guidance for Class Acton Settlements*, all professional time listed in **Exhibit B** is organized by the category of work performed. **Exhibit B** also reflects the audit responsibilities (described in paragraph 19, above, and in paragraph 33, below) that I performed in the exercise of billing judgment and to ensure efficiencies.

21. As a convenience to the Court, attached as **Exhibit C** is a chart that lists the total hours associated with those Pritzker Levine attorneys and professional staff, subtotaled by year, for each year through July 31, 2025. **Exhibit C** contains the same audit work and the same billing judgment performed for **Exhibit B**.

22. **Exhibits B** and **C** were prepared from contemporaneous, daily time records regularly prepared and maintained at Pritzker Levine in its usual course and manner. Pritzker Levine maintains detailed billing records regarding the amount of time spent by its professionals, and the lodestar calculations presented in these two exhibits are based on Pritzker Levine's 2024 billing rates (or applicable billing caps). These records are available for review at the request of the Court.

23. In my judgment and based on my experience in complex class action litigation and other litigation, the number of hours expended, and the services performed by Pritzker Levine, as reflected in **Exhibit B** and **Exhibit C**, were reasonable and necessary to my firm's representation of plaintiffs and the class, and commensurate with the firm's lead role as Interim Class Counsel.

24. I have general familiarity with the range of hourly rates charged by plaintiffs' class action counsel specifically in the field of unfair competition and privacy law in the geographical area where Pritzker Levine practices and throughout the United States, both on a current basis and historically. From that basis, I am able to conclude that the rates charged by Pritzker Levine are commensurate with those prevailing in the market in 2024 for legal services furnished in complex

class action litigation such as this. Pritzker Levine's hourly rates were recently approved by the following courts:

- *In Re Aqueous Film-Forming Foams Products Liability Litig.*, MDL No. 2873-RMG (D. S.C.);
- *In re Packaged Seafood Products Antitrust Litig.*, MDL No. 2670-DMS (S.D. Cal.);
- *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, MDL No. 2785-DDC (D. Kan.);
- *In Re National Collegiate Athletic Association Grant-In-Aid Cap Antitrust Litigation*, No. 14-md-02541-CW (N.D. Cal.).

25. Pritzker Levine has personally incurred expenses of $46,814.44 (excluding firm contributions to the common benefit litigation fund described in paragraph 35, below). Attached as **Exhibit D** is a chart totaling the firm's incurred expenses, by category of expense. Consistent with the governing time and expense protocol, all listed expenses in **Exhibit D** are at cost, *i.e.*, without upcharge or associated overhead.

26. Pritzker Levine typically represents plaintiffs in antitrust, consumer protection, and privacy class actions on a wholly contingent basis. As with all of our contingent cases, Pritzker Levine carefully invested its time and resources in leading the prosecution of this case, and did so with the expectation that the firm would be reasonably compensated for the risks it undertook, and professional time and resources it put in to the case, for the successful results that have been achieved for the Settlement Class. Pritzker Levine's hourly rate does not already reflect the contingent risks of this case, and the firm took the case with the expectation of an enhanced fee award reflecting this risk in the event that plaintiffs prevailed.

PLAINTIFFS' FIRMS' COLLECTIVE TIME AND EXPENSES

27. Each plaintiffs' firm that performed work in this matter has submitted a declaration similar to this one, attesting to the hours spent by attorneys and professional staff at the firm, organized by category of work, from case inspection through July 31, 2025, and listing the expenses directly incurred by that firm in litigating that action. For the Court's reference, the following additional plaintiff firm declarations are filed contemporaneously with this motion:

a. Declaration of Lesley E. Weaver on behalf of Bleichmar Fonti & Auld LLP;

b. Declaration of Francis Bottini, Jr., on behalf of Bottini & Bottini, Inc.;

c. Declaration of Nanci E. Nishimura on behalf of Cotchett Pitre & McCarthy LLP;

d. Declaration of David A. Straite on behalf of DiCello Levitt LLP;

e. Declaration of Jay Barnes on behalf of Simmons Hanly Conroy LLP; and

f. Declaration of Matthew Wessler on behalf of Gupta Wessler LLP.[5]

28. The table below incorporates my and each of the above-described plaintiff firm declarations, and shows all hours expended by each contributing firm on the action and their corresponding lodestar, as follows:

| ALL FIRMS' TOTAL LODESTAR | | |
|---|---|---|
| **Firm Name** | **Total Hours** | **Lodestar (2024 Rates)** |
| Pritzker Levine LLP | 11,729.20 | $13,127,091.00 |
| Bleichmar Fonti & Auld LLP | 12,769.00 | $ 8,347,267.00 |
| Bottini & Bottini, Inc. | 2,689.50 | $ 1,671,693.00 |
| Cotchett Pitre & McCarthy LLP | 8,146.70 | $ 5,146,010.00 |
| DiCello Levitt LLP | 5,688.60 | $ 3,930,716.50 |
| Simmons Hanly Conroy LLP | 5,365.50 | $ 4,287,737.50 |
| Gupta Wessler LLP | 133.25 | $ 163,300.00 |
| **TOTALS:** | **46,521.75** | **$36,673,815.00** |

Attached as **Exhibit E** is a chart listing the hours spent by each firm on specific categories of work as of July 31, 2025, its corresponding lodestar, and the resulting total hours and lodestar for all

[5] Gupta Wessler LLP is a highly honored appellate law firm that prepared and filed plaintiffs' petition to appeal the Court's denial of plaintiffs' motion for certification of a Rule 23(b)(3) class, pursuant to Fed. R. Civ. P. 23(f). That work was necessary to preserve plaintiffs' right to seek a permissive appeal. *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019) (holding that 14-day period for filing a timely a Rule 23(f) petition is not subject to equitable tolling).

plaintiffs' counsel. Pursuant to the Court's *Procedural Guidance for Class Action Settlements*, the reported hours by category detailed in **Exhibit E** are summarized, together with a percentage of work by category calculation, below:

| **ALL FIRM HOURS BY CATEGORY AND PERCENTAGE OF WORK** | | |
|---|---|---|
| **Category Of Work** | **Total Hours** | **Percentage By Category** |
| Case Management | 1207.30 | 2.6 % |
| Fact Investigation | 238.40 | 0.5 % |
| Pleadings | 926.90 | 2.0 % |
| Client/Class Member Communication | 359.60 | 1.0 % |
| Lead Counsel/PEC Meetings | 3015.50 | 6.5 % |
| Experts/Consultants/Daubert Motions | 2029.70 | 4.3 % |
| Settlement/Mediation | 1236.10 | 2.7 % |
| Court Appearances | 371.90 | 0.8 % |
| Dispositive Motions [all motion work except for discovery] | 1927.70 | 4.2 % |
| Class Action Certification | 4684.20 | 10.1 % |
| Research | 605.40 | 1.3 % |
| Discovery – Written [includes meet and confer time] | 4049.70 | 8.7 % |
| Discovery – Tier 1 Review ($325/hour cap) | 8110.00 | 17.4 % |
| Discovery – Tier II Analysis | 3636.10 | 7.8 % |
| Discovery – Third Party (Non-party discovery) | 1156.90 | 2.5 % |
| Discovery - Depositions (Nonexpert) [includes deposition preparation] | 5689.90 | 12.2 % |
| Discovery - Experts | 1279.00 | 2.8 % |
| Discovery - Motions | 4059.50 | 8.7 % |
| Analysis/Strategy | 1207.90 | 2.5 % |
| Trial Preparation Related Work | 457.70 | 1.0 % |
| Trial | 0.00 | |
| Appeal [Rule 23(f) Petition] | 209.15 | 0.4 % |
| **TOTALS:** | **46,521.75** | **100.0 %** |

29. All of the reported time listed above and set forth in **Exhibit E** is contingent in nature, meaning that each firm assumed the risk of nonpayment in the event the case concluded

unsuccessfully for plaintiffs and the Settlement Class.

30. With respect to the reported lodestar, it is important to note that plaintiffs' counsel have elected to use 2024 rates in calculating their lodestar – despite Ninth Circuit law that would support using current 2025 rates – in recognition of the fact that much of the time incurred by counsel in 2025 was spent on settlement related matters, rather than substantively advancing the litigation.

31. With respect to the hours reported by each plaintiff firm, it is also important to note that plaintiffs' counsel decided to exclude all professional time incurred after July 31, 2025. This is the date plaintiffs had planned to file their motion for settlement approval; however, that date was postponed to September 2, 2025 to allow Google to complete its internal vetting process for the disclosures required by the settlement. As a result of this delay, plaintiffs' counsel had to expend additional professional time in August and September 2025 on settlement-related matters, and will continue to expend additional professional time on motion work in the months leading up to the hearing on final settlement approval. Plaintiffs' counsel have elected not to seek compensation for these additional professional services, and instead have limited their request for compensation for work performed as of July 31, 2025.

32. In my judgment and based on my experience in complex class action litigation, the number of hours expended by plaintiffs' counsel through July 31, 2025, and the services provided by each of these plaintiffs' firms over the course of the litigation, were reasonable and necessary to the representation of plaintiffs and the putative class in this action. As just one data point, as compared to the related *Brown v. Google LLC* matter, plaintiffs' counsel in this action recorded ***41 percent less*** hours of professional time than plaintiffs' counsel did in *Brown* over a slightly longer time period (46 months in *Brown*, as compared to 52 months in *Google RTB*), and at roughly comparable blended hourly rates ($792/hour in *Brown*, as compared to $788/hour in *Google RTB*). *Cf: Brown v. Google LLC*, Case No. 4:20-cv-03664-YGR, ECF 1106, at pp. 3, 8-9.

33. As further evidence of reasonableness, the total time and lodestar reflected in **Exhibit E** is the result of careful review and audit. Throughout the case, as Interim Class Counsel, I and others at Pritzker Levine reviewed all billing records from all firms on a monthly basis, and removed duplicative or inefficient billing entries. *See* ECF 77 at 2. Once the case settled, with the benefit of

hindsight, we then re-reviewed the entirety of each firm's billing entries – including those of Pritzker Levine – and removed or reduced any entries which in the exercise of my billing judgment and discretion I determined were not productive for the Settlement Class. This re-review was undertaken to ensure that "read/review" entries, or entries that appeared to reflect primarily clerical or duplicative work, were removed, as well as any time incurred by attorneys or staff who billed fewer than 30 hours on the case. All totaled, this additional audit round resulted in an overall reduction of over 2300 hours and more than $1,000,000 in plaintiff lodestar (calculated at 2024 rates).

34. The table below shows all costs and expenses that were directly incurred by each contributing plaintiffs' law firm:

| **ALL FIRMS' RECORDED LITIGATION EXPENSES** | |
|---|---|
| **Firm Name** | **Recorded Expenses** |
| Pritzker Levine LLP | $46,814.44 |
| Bleichmar Fonti & Auld LLP | $29,994.91 |
| Bottini & Bottini, Inc. | $32,065.36 |
| Cotchett Pitre & McCarthy LLP | $171,392.97 |
| DiCello Levitt LLP | $44,236.56 |
| Simmons Hanly Conroy LLP | $34,989.95 |
| Gupta Wessler LLP | $ 0.00 |
| **TOTAL:** | **$359,494.19** |

35. In addition to expenses that were directly incurred by each firm, plaintiffs incurred additional common benefit litigation expenses that were accounted for in a separate litigation fund that was established for this litigation and funded by the PEC.[6] The table below shows these additional expenses:

| COMMON BENEFIT FUND LITIGATION EXPENSES | |
|---|---|
| **Description** | **Cumulative Total** |
| Service of Process | $11,158.60 |
| Court Reporters/Hearing transcripts | $5,583.75 |
| E-Discovery vendor (for hosting plaintiffs', third parties', and defendant's document productions) | $1,197,612.92 |
| Plaintiff device-imaging | $61,976.32 |
| Deposition stenography, videography and copies of transcripts | $161,527.88 |
| Expert/Consultant Fees | $1,525,644.66 |
| Litigation Support Services / Case Art Legal Graphics | $1,608.75 |
| Special Master / Mediation Services / Mediator Fees (JAMS)[7] | $181,090.63 |
| Travel: (Jay Barnes, Simmons Hanly Conroy)[8] | |
| ** Airline (Professional/Destination/Purpose) | $814.39 |
| ** Ground Travel - E.g., Taxi/Lyft/Uber (Professional/Destination/Purpose) | $86.50 |
| ** Mileage (Professional/Origination-Destination/Purpose) @ Max IRS Rate | |
| ** Meals (Professional/Purpose) | $107.93 |
| ** Lodging (Professional/Destination/Purpose) | $437.54 |
| ** Other (Describe/Professional/Destination/Purpose) | |
| **TOTAL** | **$3,129,298.77** |

36. All totaled, the litigation expenses directly incurred by each PEC firm for purposes of the action ($359,494.19**),** and the additional litigation expenses commonly accounted for in the

---

[6] The PEC firms did not solicit or use separate, third-party litigation funders.

[7] This amount includes an estimated $25,000 in anticipated expenses for mediation services for the period September – December 2025.

[8] These are legacy travel expenses incurred for a meeting with other PEC counsel in the San Francisco Bay Area prior to the appointment of interim lead counsel. These expenses were accounted for in the common litigation fund account at the time the account was created.

separate litigation fund ($3,129,298.77), equals **$3,488,792.96.** I believe these expenses were fair, reasonable, and necessarily incurred to prosecute the action diligently and to a successful conclusion.

37. Throughout the litigation, Pritzker Levine and I made every effort to operate as efficiently as possible to oversee and coordinate the work performed by other plaintiffs' counsel to avoid unnecessary duplication of effort and to minimize the costs expended to prosecute the action to its successful conclusion.

38. Attached hereto as **Exhibit F** is the Declaration of Professor Brian T. Fitzpatrick, setting forth his expert opinion as to the reasonableness of plaintiffs' counsel's attorneys' fees request in this matter based on his analytical research.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 1st day of October 2025 in Emeryville, California.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD [on or after January 13, 2026]<br>Time: TBD<br>Courtroom: 1, 4th Floor |

## TABLE OF CONTENTS

Page

NOTICE OF MOTION ... 1

ISSUE TO BE DECIDED ... 1

RELIEF REQUESTED ... 1

I. INTRODUCTION ... 2

II. ARGUMENT ... 4

A. Plaintiffs' Counsel are Entitled to Attorneys' Fees Pursuant to the Settlement Agreement and Under California Law ... 4

B. A $128.3 Million Fee is Warranted Under the Percent-of-the-Fund Methodology ... 5

1. Plaintiffs' Counsel Achieved Exceptional Results for the Class Through Securing Important Injunctive Relief ... 7

2. Counsel Worked on Contingency and the Case Presented a Heightened Risk of Loss ... 9

3. Comparable Awards Support the Requested Fees ... 11

C. Plaintiffs' Counsel's Lodestar Supports the Fee Request ... 13

1. Counsel's Hours Are Reasonable ... 14

2. Counsel's Hourly Rates Are Reasonable ... 16

3. No Reduction Based on "Unsuccessful" Motions or Claims Is Warranted ... 18

D. The Court Should Apply a Positive Multiplier to Counsel's Lodestar ... 19

E. The Requested 3.5 Multiplier Is Consistent with Case Law ... 20

1. Counsel Upheld Important Privacy Rights in the Face of Significant Risk ... 22

2. The Contingent Nature of the Case ... 23

3. The Value of the Injunctive Relief Obtained ... 24

III. PLAINTIFFS' EXPENSES ARE REASONABLE AND REIMBURSABLE ... 24

IV. CONCLUSION ... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aguilar Auto Repair, Inc. v. Wells Fargo Bank, N.A.*, No. 3:23-cv-06265-LJC, 2025 WL 1753509 (N.D. Cal. May 23, 2025) .... 20

*Akins v. Facebook, Inc.*, No. 23-3550, 2025 WL 484621 (9th Cir. Feb. 13, 2025) .... 12

*In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2023 WL 2090981 (N.D. Cal. Feb. 17, 2023) .... 23

*In re Apple Sec. Litig.*, No. 4:19-cv-02033-YGR, 2024 WL 4246282 (N.D. Cal. Sept. 18, 2024) .... 20

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .... passim

*Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) .... 10

*Bui v. Nguyen*, 230 Cal. App. 4th 1357 (2014) .... 4

*Calhoun v. Google LLC*, 349 F.R.D. 588 (N.D. Cal. 2025) .... 10, 22

*In re Cap. One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915-AJT, 2022 WL 17176495 (E.D. Va. Nov. 17, 2022) .... 23

*City of Plantation Police Officers' Employees' Retirement System v. Jeffries*, No. 2:14-cv-1380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) .... 21

*Coalition for Los Angeles County Planning in the Public Interest v. Board of Supervisors of Los Angeles County*, 76 Cal. App. 3d 241 (Dec. 28, 1977) .... 22

*Corker v. Costco Wholesale Corp.*, No. 2:19-CV-00290-RSL, 2023 WL 6215108 (W.D. Wash. Sept. 25, 2023) .... 6

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) .... 19

*Davis v. City of San Francisco*, 976 F.2d 1536 (9th Cir. 1992) .... 16

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021), *aff'd*,
No. 21-15553, 2022 WL 822923 (9th Cir. Mar. 17, 2022) ..... 20

*In re Facebook Consumer Priv. User Profile Litig.*,
No. 3:18-md-02843-VC, 2023 WL 8445812,
*aff'd sub nom. Akins v. Facebook, Inc.*,
No. 23-3550, 2025 WL 484621 (9th Cir. Feb. 13, 2025) ..... 23

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ..... 19

*Farrell v. Bank of Am. Corp., N.A.*,
827 F. App'x 628 (9th Cir. 2020) ..... 5

*Fields v. Kijakazi*,
24 F.4th 845 (2d Cir. 2022) ..... 12

*Fischel Equitable Life Assur. Soc. of US*,
307 F.3d 997 (9th Cir. 2002) ..... 17, 22, 23

*Gaston v. LexisNexis Risk Sols. Inc.*,
No. 5:16-cv-00009-KDB, 2021 WL 2077812 (W.D.N.C. May 24, 2021) ..... 21

*Gates v. Deukmejian*,
987 F.2d 1392 (9th Cir. 1992) ..... 17

*Greenfield Fresh, Inc. v. Berti Product-Oakland, Inc.*,
No. 14-cv-1096, 2015 WL 1160584 (N.D. Cal. March 13, 2015) ..... 18

*Grisson v. Sterling Infosystems, Inc.*,
No. 1:20-cv-07948-VSB, 2025 WL 1348480 (S.D.N.Y. May 8, 2025) ..... 21

*In re Google LLC St. View Elec. Commc'ns Litig.*,
611 F. Supp. 3d 872 (N.D. Cal. 2020),
*aff'd sub nom. In re Google Inc. St. View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ..... 11

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..... 5, 6, 20

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994) ..... 24

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ..... 16, 18, 19

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ..... 5

*Iswed v. Caruso*,
No. 1:08-cv-1118, 2013 WL 12093132 (W.D. Mich. Feb. 14, 2013) ....................................19

*Ketchum v. Moses*,
17 P.3d 735 (Cal. 2001) ....................................................................................................23

*Krumme v. Mercury Ins. Co.*,
123 Cal. App. 4th 924 (2004) ...........................................................................................20

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998)..............................................................................................24

*Leiserson v. City of San Diego*,
202 Cal. App. 3d 725 (1988)...............................................................................................4

*Littlejohn v. Copland*,
819 F. App'x 491 (9th Cir. 2020) .......................................................................................21

*Mangold v. Calif. Pub. Utils. Comm'n*,
67 F.3d 1470 (9th Cir. 1995)...............................................................................................4

*Matera v. Google LLC*,
No. 5:15-CV-04062 LHK, 2018 WL 11414641 (N.D. Cal. Feb. 9, 2018) ................................4

*McCown v. City of Fontana*,
565 F.3d 1097 (9th Cir. 2009)...........................................................................................24

*Moreno v. City of Sacramento*,
534 F.3d 1106 (9th Cir. 2008)...........................................................................................15

*Moreyra v. Fresenius Med. Care Holdings, Inc.*,
No. SACV 10-517-JVS, 2013 WL 12248139 (C.D. Cal. Aug. 7, 2013)...............................7, 9

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
768 F. App'x 651 (9th Cir. 2019) .......................................................................................21

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015)......................................................................................6, 7, 13

*In re Optical Disk Drive Prods. Antitrust Litig.*,
959. F.3d 922 (9th Cir. 2020)........................................................................................12, 13

*In re PFA Ins. Mktg. Litig.*,
No. 4:18-CV-03771, 2024 WL 1145209 (N.D. Cal. Feb. 5, 2024) ........................................25

*Planned Parenthood v. Aakhus*,
14 Cal. App. 4th 162 (1993) ...............................................................................................4

*Pokorny v. Quixtar, Inc.*,
No. C 07-0201 SC, 2013 WL 3790896 (N.D. Cal. July 18, 2013) ..........................................20

*In re Prudential Ins. Co. Sales Practices Litig.*,
148 F.3d 283 (3rd Cir. 1998) ....................20

*Robinson v. City of Chowchilla*,
202 Cal. App. 4th 382 (2011) ....................4

*Rodman v. Safeway Inc.*,
No. 11-CV-03003-JST, 2018 WL 4030558 (N.D. Cal. Aug. 23, 2018) ....................22

*Serrano v. Unruh*,
32 Cal.3d 621 (1982) ....................4

*St. Louis Police Ret. Sys. v. Severson*,
No. 12-cv-5086, 2014 WL 3945655 (N.D. Cal. Aug. 11, 2014) .................... passim

*Staton v. Boeing*,
327 F.3d 938 (9th Cir. 2003)....................5

*Steiner v. American Broadcasting Co.*,
248 Fed. Appx. 780 (9th Cir. 2007) ....................21

*Stetson v. Grissom*,
821 F.3d 1157 (9th Cir. 2016)....................23

*Thurman v. Yellow Freight Sys., Inc.*,
90 F.3d 1160 (6th Cir. 1996), *amended in part*, 97 F.3d 833 (6th Cir. 1996) ....................19

*Uphold our Heritage v. Town of Woodside*,
No. A120749, 2008 WL 4868816 (Cal. Ct. App. Nov. 12, 2008) ....................21, 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
No. 2672 CRB, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ....................16

*Vizcaino v. Microsoft Corp.*,
142 F. Supp. 2d 1299 (W.D. Wash. 2001),
*aff'd*, 290 F.3d 1043 (9th Cir. 2002) ....................9

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002).................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................5

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994)....................5

*Wershba v. Apple Computer, Inc.*,
91 Cal. App. 4th 224 (2001 ....................20

*Willner v. Manpower Inc.*,
No. 11-CV-02846-JST, 2015 WL 3863625 (N.D. Cal. June 22, 2015)....................22

*Yong Soon Oh v. AT & T Corp.*,
225 F.R.D. 142 (D.N.J. 2004) ..... 22

**STATUTES**

Cal. Civ. Proc. Code § 1021.5 ..... 4

**RULES**

Fed. R. Civ. P. 23(h) ..... 4

**OTHER AUTHORITIES**

5 *Newberg and Rubenstein on Class Actions* § 15:81 ..... 13

Theodore Eisenberg & Geoffrey P. Miller,
*Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*,
7 J. Empirical L. Stud. 248 (2010) ..... 11

Theodore Eisenberg et al.,
*Attorneys' Fees in Class Actions 2009-2013*,
92 N.Y.U. Law Review 937 (2017) ..... 11

## NOTICE OF MOTION

Please take notice that, **on a date and at a time to be set by the Court <u>on or after January 13, 2026,</u>**[1] the undersigned plaintiffs will appear before the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California to move the Court for an order granting an award of attorneys' fees and expenses to plaintiffs' counsel. As set forth in the parties' Settlement Agreement ("SA"), plaintiffs and defendant Google did not discuss attorneys' fees and expenses during settlement negotiations and, while Google does not dispute that plaintiffs' counsel are entitled to an award of attorneys' fees and expenses, Google has reserved the right to contest the reasonableness of the amounts requested in this motion. *See* SA at C.1.[2]

The Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Elizabeth C. Pritzker ("Pritzker Fee Decl."), Jay Barnes, Francis A. Bottini, Jr., Nanci E. Nishimura, David A. Straite, and Lesley E. Weaver, with supporting exhibits, Plaintiffs' Motion for Settlement Approval and supporting documents (ECF 778), all matters on which the Court may take judicial notice, other pleadings and papers on file in this action, and any other argument plaintiffs may present to the Court. A proposed order is filed herewith.

## ISSUE TO BE DECIDED

Whether the Court should award the requested attorneys' fees and expenses to plaintiffs' counsel.

## RELIEF REQUESTED

Plaintiffs respectfully ask the Court to award their counsel $128,358,352 in attorneys' fees and $3,488,792.96 in expenses.[3]

---

[1] Plaintiffs request a hearing date on or after January 13, 2026 so that this fee motion can be heard on the same schedule as the pending motion for final approval of the settlement. The Settlement Agreement provides that objectors will have until December 12, 2025 to object to the fee motion.

[2] A copy of the Settlement Agreement is attached as Exhibit 1 to the Declaration of Elizabeth C. Pritzker in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Final Approval of Class Action Settlement ("Pritzker Decl.") (ECF 778-4).

[3] As part of the settlement, and subject to Court approval, Google has agreed to pay each plaintiff a service award of $15,000. *See* SA at B.1. Because the service awards are not contested, the request that they be approved is covered in the pending final approval motion, not this fee motion.

## I. INTRODUCTION

Plaintiffs' counsel achieved a trailblazing settlement with Google that puts the hundreds of millions of active U.S. Google account holders in the settlement class in control of their privacy. Independent press describes the settlement as fundamentally "transform[ing] digital advertising" and "Google's most significant privacy concession to date."[4] This expansive, novel relief is: (i) directly tied to the claims asserted in the litigation on behalf of the settlement class arising from Google's real-time bidding ("RTB") auctions, (ii) provides substantial and immediate benefits focused on choice, transparency, and accountability for all absent settlement class members, while still preserving their rights to individually pursue any potential damage claims, and (iii) has a minimum economic value of $1.4 billion according to plaintiffs' expert. While reserving the right to contest the reasonableness of the amounts requested, Google does not dispute that the settlement plaintiffs' counsel have achieved entitles plaintiffs' counsel to an award of attorneys' fees and expenses, and Google has agreed to pay any such fees and expenses awarded by the Court. *See* SA at C.1.

The settlement now before the Court was never certain and not easy to reach. It comes after more than four years of contentious and hard-fought litigation in which plaintiffs' counsel were opposed every step of the way by a formidable opponent with sizeable resources to defend Google and continue protracted and expensive litigation. Google is one of the largest and most sophisticated and profitable technology companies in the world, and it is represented in this litigation by Cooley LLP, one of the largest and most tech-savvy law firms in the United States. *See* Pritzker Fee Decl. ¶ 7, fns. 1 and 2. Google and Cooley ***never*** stopped fighting for nearly four and a half years. Indeed, even though a settlement in principle was reached in early May of this year, it still took more than three months (and substantial involvement of the mediator) to then negotiate the parties' formal Settlement Agreement, which was not signed until the evening that the settlement was due to be filed with the Court. *See* Pritzker Decl. ¶¶ 36-39.

In order to even get Google to the settlement table, plaintiffs' counsel first had to research and

[4] *Sovereign Magazine*, "Privacy Concession: How Google's RTB Settlement Could Transform Digital Advertising Forever" (Sept. 8, 2025), available at https://www.sovereignmagazine.com/legal/privacy-revolution-googles-rtb-settlement-could-transform-digital/.

draft two complaints (based entirely on their own investigation and not on any government proceeding or investigation); retain numerous consultants and experts to assist in this highly technical and complex case; overcome Google's motion to dismiss; litigate 37 discovery motions, two sanctions motions, seven appeals to this Court, one petition to the Ninth Circuit, and several proceedings before a Special Master; review and analyze tens of thousands of technical internal Google documents pertaining to how RTB operates; review and analyze 120 terabytes of RTB bid data; conduct and defend dozens of fact and expert depositions; engage in significant non-party discovery; litigate two class certification motions; and begin preparing for Google's summary judgment and *Daubert* motions and then trial. Once settlement discussions began, it still took months of negotiations before a settlement in principle was reached, and several months more before the settlement was finalized.

Having litigated this case on a purely contingent basis for over four years, and having spent more than 46,500 hours and incurred out-of-pocket expenses of more than $3.5 million (*see* Pritzker Fee Decl. ¶¶ 27-29), plaintiffs' counsel now seek to be fairly compensated for the significant results they have achieved for the settlement class, for the risks they undertook in litigating this case for the settlement class, and for the fact that plaintiffs' counsel have not been paid for their work over that period. Plaintiffs' counsel seek an attorneys' fee award of $128,358,352 and reimbursement of $3,488,792.96 in litigation expenses. The $128.3 million fee award, if approved, represents just 8.4 percent of the minimum value of the settlement and a 3.5 multiplier on plaintiffs' counsel's $36,673,815 in audited lodestar. As detailed below, and in the accompanying Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl."),[5] whether calculated as a percentage of the minimum value of the settlement (8.4%) or using a lodestar multiplier (3.5), the attorneys' fees requested are warranted on this record. Plaintiffs' counsel satisfy every factor considered by courts in the Ninth Circuit in determining whether and in what amount to award attorneys' fees.

For the reasons set forth below, plaintiffs' motion for an award of $128,358,352 in attorneys' fees and reimbursement of $ 3,488,792.96 in expenses should be granted.

[5] The Fitzpatrick Decl. is attached as **Exhibit F** to the Pritzker Fee Decl.

## II. ARGUMENT

### A. Plaintiffs' Counsel are Entitled to Attorneys' Fees Pursuant to the Settlement Agreement and Under California Law

Plaintiffs sought class certification (for settlement purposes) of claims that all arise under California law. The parties' Settlement Agreement also has a California choice-of-law provision. Accordingly, plaintiffs' counsel's fee request is governed by California law. *See Mangold v. Calif. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).

"In a class action settlement, a court may award reasonable attorneys' fees and costs as authorized by law or by the parties' agreement." *Matera v. Google LLC*, No. 5:15-CV-04062 LHK, 2018 WL 11414641, at *2 (N.D. Cal. Feb. 9, 2018) (citing Fed. R. Civ. P. 23(h)). Here, as part of the parties' settlement, Google has agreed that plaintiffs' counsel are entitled to an award of attorneys' fees and expenses and that it will pay any fees and expenses awarded by the Court. *See* SA at C.1.

Even without this agreement, California law supports the award of fees to plaintiffs' counsel pursuant to the "private attorney general" statute, which provides for an award of attorneys' fees "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if ... a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons...." *Matera*, 2018 WL 11414641, at *2 (citing Cal. Civ. Proc. Code § 1021.5). "Such an award advances 'the policy of encouraging private actions to vindicate important rights affecting the public interest.'" *Id.* (quoting *Serrano v. Unruh*, 32 Cal.3d 621 (1982)). Here, plaintiffs have achieved significant injunctive relief that establishes them as the "successful" parties. *See Leiserson v. City of San Diego*, 202 Cal. App. 3d 725, 734-35 (1988). Plaintiffs have also conferred a significant benefit on millions of U.S. Google account holders, triggering an entitlement to fees. *See, e.g.*, *Robinson v. City of Chowchilla*, 202 Cal. App. 4th 382, 392-403 (2011) (attorneys' fee award under § 1021.5 permissible for successful breach of contract claim); *Planned Parenthood v. Aakhus*, 14 Cal. App. 4th 162, 174-76 (1993) (§ 1021.5 fee award to respondent upheld where respondent vindicated important privacy rights); *Bui v. Nguyen*, 230 Cal. App. 4th 1357, 1366 (2014) (plaintiff may seek attorney fees under §1021.5 for a successful unfair competition law claim).

**B. A $128.3 Million Fee is Warranted Under the Percent-of-the-Fund Methodology**

In awarding fees sought following a class action settlement, the court has discretion to apply either the percentage-of-the-fund or lodestar method. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). While "no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other," *In re Hyundai*, 926 F.3d at 570 (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994)), courts generally favor the percentage method because it is easier to calculate and better aligns the interests of counsel with their clients. *See* Fitzpatrick Decl. ¶¶ 11-12.

Courts may employ the lodestar methodology in injunctive relief-only settlements "where the relief sought – and obtained – is … primarily injunctive in nature and thus ***not easily monetized***, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citing cases) (emphasis added). This is because "[w]hen valuing the settlement is difficult or impossible, the lodestar method may prove more convenient." *In re Hyundai*, 926 F.3d at 570 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 338 (2011)).

In this case, the percentage method, rather than the lodestar method, is particularly appropriate because this settlement presents the "the unusual instance where the value to individual class members of benefits deriving from injunctive relief *can* be accurately ascertained" and "courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003). Similar to *Staton*, in *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020), the Ninth Circuit affirmed a district court's use of the percentage method in making a fee award on a common fund that consisted partially of cash and partially of injunctive relief, recognizing that "[w]hile it can be difficult to value nonmonetary relief, we have no trouble finding that the value here exceeds the $29.1 million assigned to it by the parties…. We do not struggle to conclude, as the district court did, that counsel generated benefits far beyond the cash settlement fund." (internal quotation and citation

omitted).

Here, the value of the injunctive relief obtained, in addition to the $15,000 service awards for each of the seven plaintiffs that Google has agreed to pay, as well as any attorneys' fees and expenses awarded by the Court, can constitute a "common fund." *See* SA at B.1, C.1; Fitzpatrick Decl. ¶¶ 17-18. *Accord In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015) (affirming calculation of attorneys' fees award as a percentage of the total settlement fund, including notice and administrative costs, and litigation expenses); *Hanlon*, 150 F.3d at 1029 (discussing an attorneys' fee award as a percentage of a "common fund" that was otherwise injunctive in nature). Most critically, here, the Court has the ability to accurately ascertain the value of the injunctive relief to the class. *See Corker v. Costco Wholesale Corp.*, No. 2:19-CV-00290-RSL, 2023 WL 6215108, at *2 n. 4 (W.D. Wash. Sept. 25, 2023) ("Although the Ninth Circuit is careful about including the value of injunctive relief in the denominator when calculating the percentage of a common fund that is represented by a given fee award, the circumstances presented here justify the inclusion. The injunctive relief will benefit each individual class member going forward, the benefits they will receive from the injunctive relief are concrete and directly tied to the settlements, and plaintiffs have provided a reasonable valuation of the relief obtained.").

Plaintiffs' expert Professor Robert Zeithammer values the injunctive relief obtained at a minimum of $1.4 billion, a figure derived from multiplying his calculated $36 annual benefit per account holder by the number of account holders who may choose to activate the new RTB control – and assuming a very conservative opt-in percentage of only 8.8 percent. *See* Zeithammer Decl., ECF 788-8, ¶¶ 34-36. The $1.4 billion valuation of the injunctive relief plus the service awards (totaling $105,000) and attorneys' fees and expenses sought (totaling $131.8 million) would, if approved, effectively result in a common fund of just over $1.53 billion. *See* Fitzpatrick Decl. ¶ 18. The $128.3 million in fees sought by plaintiffs' counsel represent only 8.4 percent of the $1.53 billion common fund, falling far below the 25 percent "benchmark" award.[6] *See Bluetooth*, 654 F.3d at 942.

[6] If the Court excludes the service awards and requested attorneys' fees and expenses from the analysis, the attorneys' fees sought still represent only 9.2 percent of the effective $1.4 billion common fund.

The Court may assess the merits of plaintiffs' counsel's request for attorneys' fees under the percentage method through considering factors such as "the extent to which class counsel 'achieved exceptional results for the class,' whether the case was risky for class counsel, whether counsel's performance 'generated benefits beyond the cash settlement fund,' the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (*e.g.,* cost, duration, foregoing other work), and whether the case was handled on a contingency basis." *Online DVD-Rental*, 779 F.3d at 954–55 (quoting *Vizcaino*, 290 F.3d at 1047-50).

Each factor supports the requested fee here.

**1. Plaintiffs' Counsel Achieved Exceptional Results for the Class Through Securing Important Injunctive Relief**

The "benefit obtained for the class" is the "foremost" consideration in evaluating a fee request. *Bluetooth*, 654 F.3d at 942; *see also Moreyra v. Fresenius Med. Care Holdings, Inc.*, No. SACV 10-517-JVS, 2013 WL 12248139, at *3 (C.D. Cal. Aug. 7, 2013) (noting that the result is "[t]he single clearest factor reflecting the quality of class counsels' services"). Both exceptional results and injunctive relief beyond a cash settlement fund are relevant circumstances for the Court to consider in making an award under the percentage method. *Vizcaino*, 290 F.3d at 1048.

This case will generate exceptional benefits for the settlement class through the injunctive relief obtained. As the Court noted in its April 2024 class certification order, what plaintiffs sought in the litigation was choice, transparency, and accountability with respect to Google's RTB auction practices. *See* Order, ECF 690 at 25-26. The settlement terms achieve these aims for all active individual U.S. Google account holders – a number estimated in the hundreds of millions.

**Choice.** Google will create a new user control (the "RTB Control") that empowers settlement class members for the very first time to limit the information Google shares about them in the Google RTB auctions. Settlement class members will be able to activate the new RTB Control regardless of whether they are signed in or signed out of their Google accounts. Settlement class members who choose to limit data sharing by enabling the RTB Control will succeed in removing from Google RTB bid requests the key information that can be linked to them in the RTB auctions. *See* SA at A.1. The RTB Control puts settlement class members in control of their privacy by making it very difficult for

thousands of Google RTB participants to identify and/or track any settlement class member who enables the RTB Control, and results in those settlement class members no longer being secretly tracked or targeted through RTB for personalized ads or for other purposes.

**Transparency and Accountability**. Google has agreed as part of the settlement to send an email to all currently active individual U.S. Google account holders at the email addresses maintained in their Google accounts advising them of the new RTB Control, of the options available to control the personal information provided to third parties through RTB, and of Google's new dedicated webpage (with a link to that webpage) describing the RTB Control. *See* SA at A.2.b. A new dedicated webpage maintained by Google will also disclose and describe the new RTB Control, and provide appropriate links to other relevant Google webpages and to the new RTB Control itself. *Id.* at A.2.a. Google also has agreed as part of the settlement to change its current ads personalization settings webpages to disclose the new RTB Control, and will similarly link to other relevant Google webpages containing additional disclosures and information. *Id.* at A.2.1.

As described in one press account, these settlement benefits represent "Google's most significant privacy concession to date."[7] This outstanding injunctive relief obtained for the settlement class supports plaintiffs' counsel's fee request. Additionally, three non-monetary benefits obtained from the settlement also support the fee request: (1) class members have received all the benefits of comprehensive injunctive relief while maintaining their right to seek damages if they so choose, *see* SA at ¶ 14, D.8; (2) because the new toggle switch is available in "signed out" mode, members of the general public who are not Google account holders (and are thus not class members) but who are browsing on Google websites or applications can also avail themselves of the switch to limit the information that Google shows advertisers; and (3) where the switch has been enabled, advertisers and other participants in Google's RTB auctions will no longer be able to link information derived from Google to information that those participants may already have about specific individuals, thus limiting the ability of third parties to use Google's RTB auctions to build their own profiles of the browsing activity of settlement class members and members of the general public across the web.

[7] *See* fn. 4, above.

### 2. Counsel Worked on Contingency and the Case Presented a Heightened Risk of Loss

Because plaintiffs' counsel have worked on a contingent basis, "[r]isk is a relevant circumstance." *Vizcaino*, 290 F.3d at 1048. With no guarantee of recovering anything for their efforts, plaintiffs' counsel advanced 46,521.75 attorney hours and $3,488,792.96 in expenses, while facing unusually heightened risks of no recovery, for four and a half years. Those risks were material throughout the action, from the commencement of the litigation through the parties' extended settlement negotiations. It was not until the very day of the September 2, 2025 filing of plaintiffs' motion for final settlement approval that the parties finalized and signed the Settlement Agreement.

As discussed above, "[t]he settlement was not reached lightly." *Moreyra*, 2013 WL 12248139, at *3. Plaintiffs faced a formidable defendant with unparalleled resources to defend itself and continue protracted litigation. Google and its counsel's aggressive approach slowed plaintiffs' progress for sizeable stretches of this case, heightening the risk of loss and requiring plaintiffs' counsel to invest much more time and resources than would have otherwise been required. *See Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1303 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th Cir. 2002) ("Class Counsel's risk was even greater, and their work made more difficult, because Microsoft is one of the nation's largest and most formidable companies and it, and several law firms, defended the case vigorously for several years.").

Moreover, this case sits at the cutting edge of both online auction technology and an evolving body of privacy law. Plaintiffs independently developed a complaint concerning the unique and highly complex RTB auction practices of one of the largest and most sophisticated technology companies in the world. *See* Pritzker Decl., ECF 778-2, ¶ 3. They brought this complaint on the grounds of common and statutory laws that implicate complex issues of rights to privacy and user consent that courts around the country continue to determine. Success here was by no means assured.

There were substantial risks that no class would ultimately be certified in this action, which would have been a death knell to the case. Efforts to obtain the discovery from Google necessary to support class certification (and ultimately prove up plaintiffs' case) went on for three years and were hard-fought, with nearly 40 discovery disputes filed before the Magistrate Judge due to Google's

objections to producing almost all requested discovery. Pritzker Decl., ECF 778-2, ¶ 11. Ultimately, the Court denied plaintiffs' initial class certification motion due in part to plaintiffs' failure to demonstrate that the RTB data produced by Google for the plaintiffs was representative of all putative class members. Order, ECF 690 at 16-17. It was only through plaintiffs' further persistent discovery efforts – bolstered by the Court's admonishment to Google that "Google cannot refuse to produce RTB data about other putative class members and then argue that, without this data, plaintiffs cannot meet their commonality burden," *id.* at 17 – that plaintiffs were subsequently able to obtain the classwide data from Google necessary to support a renewed class certification motion.

Overcoming Google's arguments that issues of individualized consent made class certification inappropriate was another significant hurdle here. Google argued that its affirmative defense of consent should defeat both Rule 23(b)(2) and (b)(3) certification. *See* Order, ECF 690 at 24-25. As in the related cases *Calhoun v. Google LLC*, 349 F.R.D. 588, 598 (N.D. Cal. 2025), and *Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *19 (N.D. Cal. Dec. 12, 2022), Google prevailed on this argument as to a damages class: the Court denied with prejudice plaintiffs' efforts to certify a Rule 23(b)(3) damages class on the grounds that "all six damages claims implicate the affirmative defense of consent for which individualized inquiries will predominate." Order, ECF 690 at 24. The Court's ruling foreclosed the possibility of obtaining damages for the putative class, further heightening the risks of continued litigation for plaintiffs and their counsel.

Even if plaintiffs had completed briefing on their renewed motion for class certification and ultimately been successful in certifying a (b)(2) class (which plaintiffs in *Calhoun* tried and failed to do), plaintiffs also faced substantial risks that Google might prevail on all or some of its anticipated summary judgment and *Daubert* motions, or that plaintiffs would not meet their burden of proof at trial, especially in light of Google's recalcitrance in producing discovery and Google witnesses who resisted providing the testimony needed to authenticate the documents that Google had produced during depositions. Another merits risk that plaintiffs faced, in light of Google's failure to preserve certain log data, was "technical challenges involved in demonstrating that any one individual class member's privacy was violated." *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 888 (N.D. Cal. 2020), *aff'd sub nom. In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th

1102 (9th Cir. 2021). Plaintiffs' counsel also faced the risk that Google could effectively moot plaintiffs' forward-looking injunctive relief claims before trial by implementing corporate changes (either voluntarily or as a result of regulatory changes or a deal with regulators). Had plaintiffs lost summary judgment or trial, both plaintiffs and plaintiffs' counsel would have recovered nothing. These and other risks support the requested fee award here. *See* Fitzpatrick Decl. ¶¶ 26-33.

In addition to their uncompensated years of dedicated work in this litigation, plaintiffs' counsel also funded millions of dollars of material case expenses. They hosted voluminous electronic discovery, paid deposition expenses, and retained experts to assist in highly technical aspects of discovery. These already sizeable expenses grew after the Special Master and the settlement mediator were engaged.

**3. Comparable Awards Support the Requested Fees**

In *Vizcaino*, the Ninth Circuit indicated that it is appropriate to consider "the range of fee awards out of common funds of comparable size," although no "particular percentage" is reasonable or unreasonable "in the abstract, without reference to all the circumstances of the case." 290 F.3d at 1048, 1050 (quotation and citation omitted). Here, whether calculated at either 8.4 or 9.2 percent of the settlement's minimum value, the requested attorneys' fee is at the lowest end of the range awarded in comparably sized cases – including settlements over $1 billion.

The supporting declaration of Professor Fitzpatrick describes his empirical research finding that the most common percentages awarded by all federal courts using the percentage method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%. Fitzpatrick Decl. ¶¶ 11-13, 17, 22. Within the Ninth Circuit, Professor Fitzpatrick considers 111 settlements and concludes that the mean fee award was 23.9% and the median award was 25%. *Id.*, ¶¶ 22-24. Professor Fitzpatrick's conclusions are consistent with other large-scale academic studies of class action fee awards. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding mean and median of 24% and 25% nationwide, and 25% in Ninth Circuit); Theodore Eisenberg et al., *Attorneys' Fees in Class Actions 2009-2013*, 92 N.Y.U. Law Review 937, 951 (2017) (finding mean and median of 27% and 29% nationwide, and 26% and 25% in the Ninth

Circuit). *Id.*

Professor Fitzpatrick's empirical study and the other large-scale academic studies show that settlement size has a statistically significant but inverse relationship with fee percentages, meaning that some courts award lower percentages in cases when settlements are larger. Fitzpatrick Decl. ¶ 24. Cognizant of the large valuation of this settlement, Professor Fitzpatrick undertook a separate analysis of all located billion-dollar settlements in federal courts from any year through 2024. As Professor Fitzpatrick notes, most of the settlements consisted of cash, but two of them included cash and injunctive relief. Professor Fitzpatrick found that the average and median attorneys' fee award for billion-dollar settlements is 11.2% and 9.2% of the common fund, respectively (if the total rather than cash-only valuations of the two hybrid settlements are used). *Id.*

There is no "bright-line rule" requiring fee awards to decrease as settlement funds increase. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959. F.3d 922, 933 (9th Cir. 2020); *Akins v. Facebook, Inc.*, No. 23-3550, 2025 WL 484621, at *2 (9th Cir. Feb. 13, 2025) ("We have not required fee percentages to fall in relation to the size of a class settlement."). Plaintiffs' counsel are nonetheless mindful of the concern of "windfall profits for class counsel in light of the hours spent on the case." *Bluetooth*, 654 F.3d at 942. Accordingly, they request only 8.4% of the minimum value of the common fund – below the average and median even of billion-dollar settlements. The requested $128.3 million fee will not create a windfall for plaintiffs' counsel.

*First*, a potential windfall may arise where minimal effort quickly yields a large recovery. *See Fields v. Kijakazi*, 24 F.4th 845, 856 (2d Cir. 2022) (explaining that "windfall" suggests some "unearned advantage," such as a "contingency-fee representation that succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery"). The opposite occurred here: the hard-earned result is the product of skilled and sustained effort over four and a half years of litigation.

*Second*, this is not a case where class size drove the result. While the class is very large, if litigation had continued, there was no certainty about whether it could be certified, or the relief (if any) that might be available at trial.

*Third*, unlike a case with "very little risk of nonrecovery," *Fields*, 24 F.4th at 856, for four and a half years, plaintiffs' have borne the significant risk of a total loss while performing (and

funding) 46,522 hours of work and millions in expenses advanced for the benefit of the class with no guarantee of recovering anything.

*Fourth*, counsel should be rewarded for sustained, successful work that increases the total recovery for class members. To do otherwise would disincentivize counsel to seek the best possible relief for the class. *See* Fitzpatrick Decl. ¶¶ 31, 38.

*Fifth*, the reasonable 3.5 multiplier confirms that the requested percentage of 8.4% is not an unearned windfall. Because the multiplier measures the relationship between counsel's work and the requested fee, a reasonable multiplier ensures that the percentage is appropriate, regardless of the size of the common fund. "Given that a high multiplier is the best measuring stick of a windfall, courts ought to use the high multiplier to police windfalls, regardless of the size of the fund, rather than use the size of the fund as a policing mechanism." 5 *Newberg and Rubenstein on Class Actions* § 15:81. As detailed below, plaintiffs' counsel's multiplier of 3.5 is within the range upheld by courts in the Ninth Circuit and nationwide.

**C. Plaintiffs' Counsel's Lodestar Supports the Fee Request**

The Ninth Circuit has "encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable." *Optical Disk*, 959 F.3d at 930 (citing *Online DVD-Rental*, 779 F.3d at 949); *see Vizcaino*, 290 F.3d at 1050 (lodestar "measures the lawyers' investment of time in the litigation" and "may provide a useful perspective on the reasonableness of a given percentage award").

A lodestar is "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Bluetooth*, 654 F.3d at 941 (citation omitted). The court may then apply an upward or downward "multiplier" to the lodestar. *Id.*

As discussed above, courts may apply the lodestar methodology where the relief obtained is injunctive in nature and cannot be valued. *See St. Louis Police Ret. Sys. v. Severson*, No. 12-cv-5086, 2014 WL 3945655, at *1 (N.D. Cal. Aug. 11, 2014) (Gonzalez Rogers, J.). In such instances, the lodestar methodology "presumptively provides an accurate measure of reasonable attorney's fees"

because "it approximates the market value of the legal services." *Matera*, 2018 WL 11414641, at *4 (internal quotation omitted).

Plaintiffs' counsel's lodestar, calculated by multiplying the hours that plaintiffs' counsel reasonably worked by a reasonable hourly rate, is $36,673,815.00. They seek a 3.5 multiplier on that time for a total fee award of $128,358,352. Here, whether the Court elects to employ the percentage methodology with a lodestar cross-check or a lodestar-plus-multiplier methodology, plaintiffs' counsel's fee request is reasonable.

**1. Counsel's Hours Are Reasonable**

Plaintiffs' counsel extensively audited their time records before filing this motion. In addition to removing clerical, duplicative, and "review" time entries, and any time incurred by attorneys or staff who billed fewer than 30 hours on the case, plaintiffs' counsel scrutinized each entry in an effort to ensure that all hours for which they now seek compensation were incurred for the benefit of the class. Ultimately, plaintiffs' counsel elected not to seek reimbursement for and cut from their lodestar more than 2,300 hours spent on the case. Pritzker Fee Decl. ¶ 33. Plaintiffs' counsel now seek compensation for 46,521.75 total hours that were reasonably incurred over the course of this hard-fought, four and a half year litigation.

As detailed in the Pritzker Declaration, plaintiffs' counsel's work included:

- Investigating and filing the initial complaint, which detailed Google's highly complex, cutting-edge technology RTB auction practices that are virtually unknown to most consumers, not disclosed anywhere to Google's U.S. account holders, and had not been publicly disclosed through a government proceeding or some other public exposure.
- Drafting an amended complaint ("the Complaint").
- Substantially prevailing on Google's motion to dismiss the Complaint.
- Negotiating an ESI protocol, electronic discovery sources, search terms, and the Google custodians whose files would be searched for responsive information.
- Serving Google with extensive discovery and meeting and conferring with Google concerning its objections to virtually all of this discovery.
- Filing 37 discovery motions before the Magistrate Judge, two discovery-related contempt and sanctions motions, and seven appeals to the District Court of discovery rulings by the Magistrate Judge.
- Reviewing tens of thousands of internal Google documents, many of which were highly technical in nature and required the assistance of experts to understand.

- Reviewing, at a high level, millions of RTB bid requests associated with the seven plaintiffs, and tens of billions of RTB bid requests associated with the class as a whole.
- Evaluating and contesting Google's thousands of privilege claims before the Magistrate Judge and then before an appointed Special Master.
- Negotiating and obtaining discovery from subpoenas served on 51 third-party entities.
- Responding and litigating the extensive discovery that Google served on the plaintiffs.
- Deposing eleven Google employees and taking two Rule 30(b)(6) depositions of Google.
- Defending the depositions of all seven plaintiffs.
- Taking or defending twelve expert depositions.
- Preparing and filing two class certification motions, with supporting expert reports.
- Opposing Google's *Daubert* motion to exclude one of plaintiffs' experts.
- Filing a *Daubert* motion to exclude portions of one of Google's expert's report.
- Working with merits experts on their analyses and draft merits expert reports.
- Evaluating the authentication and admission of potential exhibits to be used by the parties for Google's anticipated summary judgment motion and trial.
- Conducting months of settlement discussions with Google and the mediator.

In the accompanying Pritzker Fee Declaration, consistent with the Court's *Procedural Guidance for Class Action Settlements*, plaintiffs provide a list of the legal work they performed by category of work. Pritzker Fee Decl. ¶¶ 27-29, and **Exhibit E** thereto. While Google may challenge certain of plaintiffs' staffing decisions, some duplication "is inherent in the process of litigating," and courts should not seek "to determine if different staffing decisions might have led to different fee requests." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112, 1115 (9th Cir. 2008). Google at all times provided an aggressive defense. In light of the complexity and duration of the litigation, including the considerable time that was necessary for plaintiffs to expend on developing the case, bringing and resolving discovery disputes both before the Magistrate Judge and the Special Master, preparing motions, reviewing documents and data, taking depositions, and pressing settlement negotiations forward while simultaneously preparing for renewed class certification, merits deadlines, and trial, plaintiffs' counsel expended a reasonable number of hours on the case.

Plaintiffs' counsel's hours also are reasonable given the novel legal and technological issues that are the hallmark of litigation focused on data privacy involving complex technologies and high-

tech defendants. While every case presents its unique challenges, as just one data point for the Court to consider, as compared to the related *Brown v. Google LLC* matter, plaintiffs' counsel here recorded ***41 percent less*** hours of professional time (46,521) than plaintiffs' counsel did in *Brown* (78,880), over a slightly longer time period (46 months in *Brown*, as compared to 52 months in *Google RTB*), and at roughly comparable blended hourly rates ($792/hour in *Brown*, as compared to $788/hour in *Google RTB*). *See* Pritzker Fee Decl. ¶ 32.

Finally, plaintiffs' counsel's hours are reasonable in light of their decision to exclude all time incurred after July 31, 2025. They made this decision over the summer in light of what was then a July 31 deadline for plaintiffs to file a motion for settlement approval. However, on July 29, 2025, because Google had not yet completed its internal vetting process for certain aspects of the settlement and the new disclosures, the parties stipulated to extend the filing deadline to September 2, 2025. ECF 772. As a result of this delay, plaintiffs' counsel had to expend additional professional time in August and September 2025 on settlement-related matters, and will continue to expend additional professional time on motion work in the months leading up to the hearing on final settlement approval. Plaintiffs' counsel have elected not to seek compensation for these additional professional services, and instead have limited their request for compensation for work performed as of July 31, 2025, even though courts in this District have concluded that a lodestar cross-check properly includes time reasonably anticipated for settlement approval, claims administration, and payment. Pritzker Fee Decl. ¶ 31; *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017).

Plaintiffs' counsel have complied with the Supreme Court's directive that counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary;" therefore, the Court should find that their submitted hours were reasonably incurred. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

### 2. Counsel's Hourly Rates Are Reasonable

Reasonable hourly rates are calculated by reference to "prevailing market rates in the relevant community," with a special emphasis on fees charged by lawyers of "comparable skill, experience, and reputation." *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992). The forum

district generally represents the relevant legal community. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). Here, the forum district is the Northern District of California.

The Court has previously acknowledged that plaintiffs' counsel have "experience in complex and class action litigation, including privacy class actions." Order, ECF 690 at 19. Plaintiffs' counsel detail that experience in their accompanying declarations. *See, e.g.*, Pritzker Fee Decl. ¶¶ 9-10, Ex. A; Declaration of Jay Barnes ¶¶ 5-6, Ex. A; Declaration of Francis A. Bottini, Jr. ¶¶ 5-6, Ex. A; Declaration of Nanci E. Nishimura ¶¶ 4-5, Ex. A; Declaration of David Straite ¶¶ 4-6, Ex. A; Declaration of Lesley E. Weaver ¶¶ 5-6, Ex. A.

Plaintiffs' counsel's requested rates reflect their breadth of experience, and are in line with those billed by attorneys in this District who practice complex litigation. *See, e.g.*, *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW (partner rates $800-$1695, associate rates $350-$980); *In re: Apple Securities Litigation*, No. 4:19-CV-02033-YGR (partner rates $755-$1400; associate rates $425-$575); *Hunt v. Bloom Energy Corp*, No. 19-cv-02935-HSG (partner rates $900-$1000, associate rates $500-$675); *Brown v. Google LLC*, No. 4:20-cv-03664-YGR-SVK (partner rates $850-$2330, associate rates $250-$1000); *In re: Facebook Consumer Privacy User Profile Litig.*, 3:18-md-02843-VC (partner rates $695-$1320, associate rates $400-$760).

Plaintiffs' counsel's rates have been upheld by courts, further demonstrating their reasonableness. *See* Pritzker Fee Decl. ¶ 24; Barnes Decl. ¶ 14; Bottini Decl. ¶ 14; Nishimura Decl. ¶ 12; Straite Decl. ¶ 17; Weaver Decl. ¶ 15.[8]

Plaintiffs' counsel have used 2024 rates in calculating their lodestar, although Ninth Circuit law would support the use of current 2025 rates. *See Fischel Equitable Life Assur. Soc. of US*, 307 F.3d 997, 1010 (9th Cir. 2002) ("Attorneys in common fund cases must be compensated for any delay in payment" by one of two methods: (1) the court may apply "the attorneys' current rates to all hours billed during the course of the litigation"; or (2) the court may use the attorneys' historical rates and add a prime rate enhancement." (internal quotation omitted)). Plaintiffs' counsel have elected to use 2024 rates in recognition of the fact that much of the time they incurred in 2025 was spent in

---

[8] Each counsel's declaration provides the detailed lodestar information required by the Northern District of California's *Procedural Guidance for Class Action Settlements*.

settlement negotiations and in preparing approval papers rather than substantively advancing the litigation. This further weighs in favor of the reasonableness of their rates.

**3. No Reduction Based on "Unsuccessful" Motions or Claims Is Warranted**

Google may argue that the requested fee award should be reduced to exclude time spent on "unsuccessful" work, such as plaintiffs' failure to prevail on every discovery motion brought before the Magistrate Judge or because the Court foreclosed the possibility of a Rule 23(b)(3) damages class. This, however, would be contrary to settled law.

The first and foremost factor in a court's evaluation of a fee request is the question of whether counsel achieved an excellent result. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley*, 461 U.S. at 435.

Here, plaintiffs' counsel achieved an excellent result, and thus no reduction of hours based on "unsuccessful" motions or claims is warranted. The discovery motions brought by plaintiffs were necessary to press Google to produce relevant discovery, and to preserve for appeal plaintiffs' arguments that they had sought key information that Google had refused to produce. For the same reasons, the time expended by plaintiffs on appeals to the Court of certain orders of the Magistrate Judge as well as the time expended on the Fed. R. Civ. P. 23(f) petition filed with the Ninth Circuit to challenge the Court's denial of (b)(3) certification was necessary. *See Hensley*, 461 U.S. at 435 ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.").

Courts may deduct from a lodestar time spent on "unsuccessful claims," *Greenfield Fresh, Inc. v. Berti Product-Oakland, Inc.*, No. 14-cv-1096, 2015 WL 1160584, at *2-3 (N.D. Cal. March 13, 2015) (Gonzalez Rogers, J.), but there are no unsuccessful claims here (with the possible exception of the breach of implied covenant of good faith and fair dealing claim that the Court dismissed from the Complaint partially on the grounds that it was duplicative of plaintiffs' breach of

contract claim).[9] *See* Order, ECF 233 at 9-11. As to the import of plaintiffs' obtaining only injunctive relief, courts "emphatically" reject arguments that counsel who recovered injunctive relief but not monetary damages should only be compensated for half of the hours spent. *Iswed v. Caruso*, No. 1:08-cv-1118, 2013 WL 12093132, at *4 (W.D. Mich. Feb. 14, 2013). *See also Hensley*, 461 U.S. at 435 n. 11 ("[A] plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time."); *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005) ("[A] plaintiff does not need to receive all the relief requested in order to show excellent results warranting the fully compensatory fee.").

Moreover, the Court's denial with prejudice of plaintiffs' bid to certify a damages class did not affect the value of the prior technical and damages-related work that plaintiffs and their experts had undertaken on behalf of the putative class. For example, Professor Shafiq's work continued to be relevant and was used again in the renewed 23(b)(2) class certification motion, and Professor Zeithammer's work remained highly relevant to valuing any injunctive relief ultimately obtained by plaintiffs through settlement or trial, and in quantifying the unjust enrichment to Google. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599, 606 (9th Cir. 2020) (a defendant's unjust enrichment relevant to "the degree [of] intrusion," the defendant's "motives and objectives," and the discrepancy between the defendant's conduct and "social norms."). Moreover, had the case not resolved when it did, substantially all of plaintiffs' experts would have put in merits reports, provided testimony on specified issues raised on summary judgment, and appeared at trial.

**D. The Court Should Apply a Positive Multiplier to Counsel's Lodestar**

"Courts applying California law often award multipliers of the lodestar to take into account such factors as the contingent nature of the employment, the quality of the work, difficulty of pretrial and trial preparation, importance of the suit, and the public nature of plaintiffs' position." *St. Louis*,

[9] No reduction of fees on this basis is warranted because breach of the implied covenant was not a "distinct claim." *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996), *amended in part*, 97 F.3d 833 (6th Cir. 1996) ("When claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced.").

2014 WL 3945655, at *5 (citing cases). In California, "[t]here is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation." *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924, 947 (2004) (internal quotation omitted).

Courts also apply federal law in awarding lodestar fees. *See St. Louis*, 2014 WL 3945655, at *1 (citing cases). In the Ninth Circuit, in applying a multiplier to counsel's lodestar, courts consider factors such as "'the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *Bluetooth*, 654 F.3d at 941–42 (quoting *Hanlon*, 150 F.3d at 1029).

All of these factors support plaintiffs' counsel's fee request here. In particular, a 3.5 multiplier is warranted in light of the (i) the difficulty of the litigation and accompanying quality of the work; (ii) the contingent nature of the case; and (iii) the important injunctive benefit obtained.

**E. The Requested 3.5 Multiplier Is Consistent with Case Law**

Most awarded multipliers fall within the range of 1.0 to 4.0. *Vizcaino*, 290 F.3d at 1051 (surveying cases and approving a 28% fee that resulted in a 3.65 multiplier); *In re Prudential Ins. Co. Sales Practices Litig.*, 148 F.3d 283, 341 (3rd Cir. 1998) ("multiples ranging from one to four are frequently awarded"); *see also Pokorny v. Quixtar, Inc.*, No. C 07-0201 SC, 2013 WL 3790896, at *1–2 (N.D. Cal. July 18, 2013) (citing a study "reporting average multiplier of 3.89 in survey of 1,120 class action cases" and finding that a multiplier of 2.43% would be "per se reasonable" (internal citation and quotations omitted); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255 (2001) *disapproved of on other grounds by Hernandez v. Restoration Hardware, Inc.*, 4 Cal. 5th 260, 409 P.3d 281 (2018) ("[m]ultipliers can range from 2 to 4 or even higher") (citing cases); Fitzpatrick Decl. ¶¶ 24, 32.

In cases where exceptional results are achieved, courts within the Ninth Circuit award large multipliers, approaching or significantly above 4.0. *E.g.*, *Aguilar Auto Repair, Inc. v. Wells Fargo Bank, N.A.*, No. 3:23-cv-06265-LJC, 2025 WL 1753509, at *10 (N.D. Cal. May 23, 2025) (awarding 6.99 multiplier); *In re Apple Sec. Litig.*, No. 4:19-cv-02033-YGR, 2024 WL 4246282, at *6 (N.D. Cal. Sept. 18, 2024) (awarding 3.88 multiplier); *In re Facebook Biometric Info. Priv. Litig.*, 522 F.

Supp. 3d 617, 633 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022 WL 822923, at *1 (9th Cir. Mar. 17, 2022) (awarding 4.71 multiplier); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653 (9th Cir. 2019) (affirming multiplier of 3.66); *Steiner v. American Broadcasting Co*., 248 Fed. Appx. 780 (9th Cir. 2007) (affirming multiplier of 6.85).

Google may attempt to distinguish these cases on the grounds that they concern lodestar cross-checks on percentage-of-the-fund awards, and argue that plaintiffs' requested multiplier is too high in light of the injunctive relief nature of the settlement achieved. However, there is no prohibition against awarding plaintiffs' counsel their requested 3.5 multiplier on a primarily injunctive relief settlement. In making a fee award, the Court need only "reasonably conclude[] that the Settlement's injunctive relief provided value to the class, and, applying Rule 23(e)(2) and our case law, determine[] that the Settlement, including the attorney's fees award, [is] fair, reasonable, and adequate." *Littlejohn v. Copland*, 819 F. App'x 491, 494 (9th Cir. 2020) (internal quotation omitted). Both federal courts and California courts award positive multipliers on fee requests made in injunctive relief-only settlements when the results achieved so merit. *E.g.*, *Grisson v. Sterling Infosystems, Inc*., No. 1:20-cv-07948-VSB, 2025 WL 1348480, at *1 (S.D.N.Y. May 8, 2025) (awarding 3.21 multiplier for lodestar apportioned to injunctive-relief-only subclass, *see Grisson* ECF 48-1 at 22); *Gaston v. LexisNexis Risk Sols. Inc.*, No. 5:16-cv-00009-KDB, 2021 WL 2077812, at *7 (W.D.N.C. May 24, 2021) (Following unsuccessful attempt to obtain classwide damages, court awarded a 1.85 multiplier for (b)(2) settlement, including because "(1) Plaintiffs' counsel expended large amounts of time and labor, demonstrated skill commensurate with their reputations, and achieved an excellent result in this large and complex action; (2) Plaintiffs negotiated a Settlement Agreement that provides substantial benefits for over 200 million consumers; (3) the Settlement Agreement forces Defendants to comply with the DPPA and increases consumer privacy protection measures."); *City of Plantation Police Officers' Employees' Retirement System v. Jeffries*, No. 2:14-cv-1380, 2014 WL 7404000, at *4, *19 (S.D. Ohio Dec. 30, 2014) (Court awarded a 3.0 multiplier based on a settlement that led to "changes to executive compensation," citing the importance of "rewarding attorneys for the benefits secured."); *St. Louis*, 2014 WL 3945655, at *5-6 (This Court awarded a 1.5 multiplier for a non-monetary settlement that resulted in "important" changes to company policies.); *Uphold our Heritage*

*v. Town of Woodside*, No. A120749, 2008 WL 4868816, at *7 (Cal. Ct. App. Nov. 12, 2008) (California Court of Appeal affirmed the award of a 2.0 multiplier for a non-monetary settlement); *Coalition for Los Angeles County Planning in the Public Interest v. Board of Supervisors of Los Angeles County*, 76 Cal. App. 3d 241, 251 (Dec. 28, 1977) (California Court of Appeal affirmed a fee award equivalent to a 2.04 multiplier on lodestar in injunctive relief settlement).

In considering an injunctive relief-only settlement, one court made a percentage-based award of between 13% and 27.4% of the total estimated injunctive relief settlement value (as calculated by plaintiffs' expert), supported by a lodestar cross-check yielding a 2.15 multiplier. *Yong Soon Oh v. AT & T Corp*., 225 F.R.D. 142, 150, 154 (D.N.J. 2004). In so doing, the court praised plaintiffs for "attempt[ing] to correct a wrong being perpetrated" through settlement of a case where the "logistics of establishing damages … would have been a nightmare." *Id.*

**1. Counsel Upheld Important Privacy Rights in the Face of Significant Risk**

This is a case where "the exceptionally strong result obtained, the risk undertaken by counsel litigating on contingency, the complexity of the legal issues, and the duration of the litigation all weigh in favor of an upward adjustment." *Rodman v. Safeway Inc*., No. 11-CV-03003-JST, 2018 WL 4030558, at *6 (N.D. Cal. Aug. 23, 2018). As detailed in Section II.B.(2), "counsel faced significant risks by engaging in substantial motion practice, extensive discovery, and hard-fought litigation surrounding essentially every conceivable issue." *See id.* at 3; *see also* Fitzpatrick Decl. ¶¶ 26-27. As is the case here, where a case is "fiercely litigated" and class counsel represented the class for more than four years on a contingency fee basis, an upward adjustment is warranted. *Rodman*, 2018 WL 4030558 at *3 (citing *Willner v. Manpower Inc*., No. 11-CV-02846-JST, 2015 WL 3863625, at *6 (N.D. Cal. June 22, 2015)). *See also St. Louis*, 2014 WL 3945655, at *5 ("particularly protracted litigation" supports a higher multiplier).

A court must apply a risk multiplier "when the fee applicant establishes that the prevailing party would have faced 'substantial difficulties' in finding counsel without an adjustment for risk and that it is difficult to find counsel for this class of contingency fee cases." *Fischel*, 307 F.3d at 1008 n. 8 (citing cases). Because of the substantial risk in undertaking privacy and consumer protection actions on a contingent basis, *see, e.g.*, *Calhoun*, 349 F.R.D. at 598 (class certification denied with

prejudice), counsel who achieve success on behalf of class members are well compensated by courts. *E.g.*, *In re Facebook Consumer Priv. User Profile Litig.*, No. 3:18-md-02843-VC, 2023 WL 8445812, *aff'd sub nom. Akins v. Facebook, Inc.*, No. 23-3550, 2025 WL 484621 (9th Cir. Feb. 13, 2025) (awarding counsel $181,250,000 in fees); *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2023 WL 2090981 (N.D. Cal. Feb. 17, 2023) (awarding counsel $80.6 million in fees).

This case was hard fought at great risk to plaintiffs' counsel for a reason. This case is extremely important to the contractual and privacy rights of hundreds of millions of Google account holders, and to the general public (*see* Pritzker Fee Decl. ¶¶ 7-8), further meriting the application of a positive multiplier to plaintiffs' counsel's lodestar. Courts may award multipliers based not just on "the difficulty of pretrial and trial preparation," but also the "importance of the suit." *St. Louis*, 2014 WL 3945655, at *5.

**2. The Contingent Nature of the Case**

A district court generally has discretion to apply a multiplier to the attorney's fees calculation to compensate for the risk of nonpayment. *Fischel*, 307 F.3d at 1008. And the Ninth Circuit has directed that a district court "must apply a risk multiplier to the lodestar when (1) attorneys take a case with the expectation they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky." *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016).

All three factors are present here. First, plaintiffs' counsel took this case with the expectation of receiving a risk enhancement if they were successful. *See* Pritzker Fee Decl. ¶¶ 26, 29. Second, plaintiffs' counsel's rates do not reflect the risk of nonpayment. *See id.*; Barnes Decl. ¶ 16; Bottini Decl. ¶ 15; Nishimura Decl. ¶ 14; Straite Decl. ¶ 16; Weaver Decl. ¶ 14. Accordingly, "public policy favors a significant award of attorneys' fees above what Class Counsel would have charged on an hourly fee basis." *In re Cap. One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915-AJT, 2022 WL 17176495, at *5 (E.D. Va. Nov. 17, 2022). *See also Ketchum v. Moses*, 17 P.3d 735, 745-46 (Cal. 2001) (Multipliers "approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment."); *Uphold our Heritage*, 2008 WL 4868816, at *7 ("A lawyer who both bears the risk of not being paid and provides legal services

is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.") (internal citation and quotation omitted). Third, for all the reasons already described, this case was extremely risky for plaintiffs' counsel.

### 3. The Value of the Injunctive Relief Obtained

The foremost consideration in determining whether to apply a positive multiplier to counsel's lodestar figure is the benefit obtained for the class. *Bluetooth*, 654 F.3d at 942 (citing cases). *See also McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (the ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff.").

The value of the relief obtained by the settlement is conservatively $1.4 billion, as detailed by Professor Zeithammer. Zeithammer Decl. ¶¶ 34-36. Moreover, while all settlement class members retain the right to pursue individual damage claims against Google in the future, the injunctive relief secured by plaintiffs is of a scale and importance that outweighs any conceivable monetary damages award. Plaintiffs achieved their litigation goals of choice, transparency, and accountability through a settlement that will fundamentally alter both Google's business practices as well as the workings of the entire online and mobile advertising industry. No longer can Google and its advertising partners identify and target for personalized ads hundreds of millions of Americans without their informed consent. Plaintiffs have obtained injunctive relief with a "systemic effect of importance" and serving a "substantial public interest," *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 760 (2d Cir. 1998), and for that result, plaintiffs' counsel respectfully submits that a substantial fee award is warranted.

## III. Plaintiffs' Expenses Are Reasonable and Reimbursable

Plaintiffs' counsel also moves for recovery of $3,488,792.96 in total out-of-pocket expenses incurred during this litigation, which are itemized in the Pritzker Fee Declaration. *See* Pritzker Fee Decl. ¶¶ 34-36. As with fees, Google agrees that plaintiffs' counsel are entitled to be compensated for litigation expenses incurred and will pay any expenses awarded by the Court, but reserves the right to contest the reasonableness of the amount requested. *See* SA at C.1.

Plaintiffs' counsel have submitted reasonable expenses that were necessary to prosecute this case and are of the type that are typically approved for reimbursement by courts or billed to paying

clients. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (holding that attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters); *In re PFA Ins. Mktg. Litig.*, No. 4:18-CV-03771, 2024 WL 1145209, at *25 (N.D. Cal. Feb. 5, 2024) (Gonzalez Rogers, J.) (awarding costs for travel expenses, research, court filing fees, transcripts and court reporters, mediation expenses, experts, and document review expenses). Here, submitted expenses include travel costs, filing fees, service of process, hearing transcripts, photocopies, database licensing and hosting, deposition and court reporter fees, internet-based research costs, court fees, and research and expert consulting costs. *See* Pritzker Fee Decl. ¶¶ 25, 34 and Ex. D thereto; *see also* Exhibits D to the Weaver Decl., Bottini Decl., Nishimura Decl., Straite Decl., and Barnes Decl. They also include expenses for the Special Master and Mediator, which were reasonably incurred to resolve privilege disputes and to achieve the extraordinary settlement of this action. *Id.*

## IV. CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court award plaintiffs' counsel $128,358,352 million in attorneys' fees and $3,488,792.96 in expenses.

DATED: October 1, 2025

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: <u>/s/ Elizabeth C. Pritzker</u>

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (212) 784-6400
Tel: (646) 993-1000
*dstraite@dicellolevitt.com*

James Ulwick (admitted pro hac vice)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Aaron P. Arnzen (Cal. Bar. No. 218272)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
*fbottini@bottinilaw.com*
*aarnzen@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**MEDIATOR'S STATEMENT IN SUPPORT OF CLASS ACTION SETTLEMENT** |

In support of the Class Action Settlement Agreement between Plaintiffs Terry Diggs, Rethena Green, John Kevranian, Salvatore Toronto, Christopher Valencia, Tara Williams, and Kimberley Woodruff ("Plaintiffs" or "Class Representatives"), individually and as representatives of the Settlement Class on the one hand, and Defendant Google LLC ("Google") on the other hand, I, SHIRISH GUPTA, state as follows:

1. I am a private mediator with JAMS ADR Services ("JAMS") in San Francisco and San Jose, California. I have worked as a private mediator, neutral and arbitrator since 2010, first, at Flashpoint Mediation, from 2010 to 2015, and then at JAMS, which I joined in 2015. My practice focuses on resolving complex disputes involving intricate financial, technical, and legal matters, including privacy class actions, mass arbitrations, patents and trade secrets, securities fraud, start-up founder break-ups, private equity carry interest claims, and crypto/blockchain-related matters. Prior to becoming a neutral, I litigated cases for nearly two decades at Mayer Brown, Howard Rice Nemerovski Canady Falk & Rabkin, and Flashpoint Law.

2. In February 2025, I was retained by the parties as a mediator in this matter. This particular mediation was especially complex, involving a unique technology (the Google Real-Time Bidding Auction, or "Google RTB"); an evolving legal landscape; the potential interplay of state, federal, and international consumer privacy regulations; and the corporate complexities of Google – one of the largest tech companies in the world. The quality of the attorneys, and their advocacy, was excellent.

3. Plaintiffs and Google participated in an initial all-day mediation session before me on February 20, 2025. No settlement was reached at that time, but I was able to assess the parties' positions on key terms of an injunctive relief settlement. Both sides appeared to leave the mediation with the feeling that progress was being made, and a further mediation was scheduled before me for March 7, 2025 – which I believe was the first available date on my calendar.

4. Plaintiffs and Google participated actively in the all-day mediation session on March 7, 2025. While no settlement was reached at that time, it was apparent that further significant progress was being made, and the parties left at the end of the day poised to continue to work out

specific key terms of injunctive settlement relief.

5. Following March 7, 2025 mediation, the parties worked diligently on a number of settlement issues and were continuing to make progress. This was a highly-detailed and time-consuming process for counsel, their clients and me, as the parties continued to confer with each other, and with me, during the months of March and April 2025, on various key terms of an injunctive relief settlement. Additionally, certain aspects of the parties' settlement discussions required review and participation by multiple stakeholders at Google, which required additional time, effort, and analysis on everyone's part to fully explore potential settlement options.

6. Plaintiffs and Google participated in a third mediation session before me on April 29, 2025, having again made significant progress on key terms of an injunctive relief settlement. Following that session, the parties had several calls and Zoom sessions with me, both individually and together, as they continued to work diligently to hash out class settlement terms.

7. The parties scheduled a further Zoom session with me on May 6, 2025. It was at this session that Plaintiffs and Google ultimately reached agreement on all key material class settlement terms. These agreed-upon terms provide for injunctive relief that is tied to the factual allegations and legal claims asserted by Plaintiffs in the litigation, and that is focused, in particular, on issues of transparency and control. With respect to the issue of control, the settlement terms provide a new and unique user control (the "RTB Control") that I understand, for the first time, provides Google account holders with the ability to limit the information Google shares about them with third parties in the Google RTB auctions. With respect to transparency, as part of the settlement, Google agreed to notify settlement class members of the RTB Control via email to their Google accounts, and set up new webpage disclosures that describe the Google RTB auctions and how the new RTB Control works to limit data sharing with third parties in those auctions. Google agreed to maintain these technical and disclosure changes for at least three (3) years – a time frame that is generally consistent with other injunctive relief settlements in the fast-changing technology and privacy spheres of which I am aware.

8. Other than the precise look and feel of the disclosures and control, all material terms of the class-wide injunctive relief were agreed to before the parties discussed, and ultimately resolved,

the individual Plaintiffs' claims for monetary relief in the form of requested service awards of no more than $15,000 each.

9. On May 8, 2025, the parties exchanged and signed off on a summary settlement document outlining the key terms of settlement, which they shared with me.

10. Since that time, the parties have been engaged in documenting the settlement with a formal settlement agreement, and I participated in an August 22, 2025 Zoom session with the parties in which Google presented via screen share to Plaintiffs' counsel its then-current draft forms of the disclosures provided for by the settlement. I have been actively involved in discussions between the parties even after the May 8th agreement in principle. In May, June, July, and August, 2025, I participated in many calls and communications with the parties as they worked to finalize the settlement and its documentation.

11. Based on all of the above, and as well as my oversight role as mediator in this matter, I can attest that all aspects of the settlement being presented to the Court for its approval were zealously negotiated by the parties at arms' length, and by experienced, informed, knowledgeable, and skilled counsel.

DATED: September 2, 2025

Respectfully submitted,

Mediator

# EXHIBIT 3

## [REDACTED VERSION]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR |
| This document applies to: *all actions* | **DECLARATION OF PROFESSOR ROBERT ZEITHAMMER IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF SETTLEMENT CLASS AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

I, Robert Zeithammer, hereby declare as follows:

1. I am a Professor of Marketing in the Anderson School of Management at the University of California, Los Angeles (UCLA). Prior to UCLA, I was Assistant Professor of Marketing in the University of Chicago Graduate School of Business. I have been retained by the counsel for plaintiffs as an expert in this matter and I submit this declaration in support of plaintiffs' Motion for Final Approval of Class Action Settlement. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

## BACKGROUND

2. I previously submitted two expert reports in support of plaintiffs' July 14, 2023 Motion for Class Certification which provided analyses pertaining to the value of the User Data transmitted in Google RTB for damages purposes.[1] In this declaration I rely on the same analyses to estimate the value of the overall benefits provided to class members in this injunctive relief settlement.

3. My expert qualifications generally are set forth in paragraphs 1-4 of the July 14, 2023 Zeithammer Report, and my curriculum vitae was as Appendix 1 thereto. My hourly rate is $900. My fee is neither contingent on the results of this case nor contingent on the content of this declaration.

## ASSIGNMENT

4. In light of my expertise and background and my prior expert work in this matter, counsel for plaintiffs have asked me to opine on the value of the benefits that the proposed settlement will provide if the settlement is approved by the Court and the technical changes contemplated in the settlement are implemented by Google. Specifically, my assignment is to calculate (1) the value to U.S. Google account holders of the proposed "RTB Control" option for limiting the sharing of their user data in RTB bid requests; and (2) the value of the unjust enrichment the proposed settlement will prevent.

[1] Expert Class Certification Report of Professor Robert Zeithammer, July 14, 2023 ("Zeithammer Report") (ECF 545-7); Expert Class Certification Rebuttal Report of Professor Robert Zeithammer, Nov. 29, 2023 ("Zeithammer Rebuttal Report") (ECF 616-7).

## CASE BACKGROUND

5. My understanding of the relevant facts in this matter is as follows: Google sells advertising inventory of publishers through automated real-time bidding auctions ("RTB"). For every potential display advertising impression auctioned by RTB, Google provides all auction participants with a bid request that includes information about the user, hereafter called "User Data," which, plaintiffs' allege, constitutes personal information ("PI"). The User Data includes information about the user, the user's location, the user's browser, the user's device (for example the user's computer or smart phone), the website or app the user is viewing, and unique identifiers that can be used for tracking the user by any recipient of the bid request. In addition, it is my understanding that Google offers RTB participants a "cookie matching" service that enables Google RTB participants to link together their information with Google's information regarding particular users and that this is used to create user lists based on each user's individual browsing history.

## THE PROPOSED SETTLEMENT

6. I understand that under the Settlement Agreement in this case, Google will implement a new RTB Control at both the device and the account level that will for the first time provide U.S. Google account holders with the ability to limit the sharing of their User Data in Google RTB bid requests, so that the information transmitted will no longer constitute PI. Specifically, I understand that if a Google U.S. account holder chooses to limit data sharing by Google through the RTB Control, no personalized ads will be shown and the following categories of information will be modified or deleted from RTB bid requests:

a. All pseudonymous identifiers will be removed from the RTB bid request, including the Google User ID and the device ID.

b. The IP address will be removed from the RTB bid request.

c. No user lists will be shared or used in connection with the RTB bid request.

d. No cookie matching will occur in connection with the RTB bid request.

e. Bid request fields that contain user agent data will be generalized to the highest version level in the RTB bid request.

7. I understand that when a U.S. Google Account Holder chooses to activate the RTB Control, the User Data transmitted in the RTB bid stream will be sufficient to allow contextual ads, but insufficient to allow targeted ads based on identification and tracking of the individual through the bid stream data.

8. I am not a computer science expert and for purposes of this declaration I am assuming that the above facts are correct. I also understand, and for purposes of this Report assume, that Google will also provide all active U.S. Google Account Holders with adequate disclosures advising them about and providing links to the new RTB Control.

## THE SETTLEMENT'S BENEFIT TO THE CLASS

9. As described above, the proposed Settlement will provide all U.S. Google account holders with transparency and choice concerning Google's transmission of their User Data in RTB auctions. It is my opinion that this represents a significant change to the status quo that will benefit each U.S. Google account holder whether or not they ultimately choose to activate the RTB Control.

10. Providing U.S. Google account holders with information about how their User Data is utilized in RTB auctions and with the ability to control whether that data is shared with third parties is valuable to all Class members. Evidence produced in this case demonstrates that Google account holders value the ability to control what is shared and what is not.[2] Publicly available research confirms that both the desire for more information and the need for control are almost universally shared among Americans: A recent large representative poll finds that 91 percent of Americans "want to have control over what marketers can learn about them online", and 87 percent "would like to

[2] *See, e.g.*, GOOG-HEWT-00012303 at -324 (2015) (describing privacy as "[redacted]"); GOOG-HEWT-00040123 at -128 (Spring 2016) (expressing concern "[redacted]"); GOOG-HEWT-00480493 at -499 (Oct. 23, 2018) ("[redacted]"); GOOG-HEWT-00098506 at -511 ("[redacted]."); GOOG-HEWT-00057910 at -938 (Dec. 4, 2019) ("[redacted].").

understand how digital marketers use the information they collect about my online activities".[3] Google's Privacy Policy also recognizes the value of control over User Data in the following bolded headline: "**When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.**"

11. By requiring disclosures regarding the sharing of User Data in RTB auctions and by putting U.S. Google account holders in control of the extent to which their User Data will be shared, this Settlement provides both the information and the control that U.S. Google account holders want and intrinsically value. I do not quantify this intrinsic value of information and control in this report, but focus on the additional extrinsic (market) value to the U.S. Google account holders who actually activate the RTB control. Whatever extrinsic value my analysis calculates to the U.S. Google account holders who actually activate the RTB control is over and above the intrinsic value that accrues to all U.S. Google account holders as outlined in the previous paragraph.

12. To estimate the extrinsic benefit of this Settlement to U.S. Google account holders, I apply the Market Price Model methodology that I previously described in the July 14, 2023 Zeithammer Report (ECF 545-7). The market price model estimates the benefit of this Settlement to US. Google account holders by establishing a market price for the User Data that will no longer be transmitted in the RTB bid stream when the RTB Control is activated. The activation rate is not known at this time, so I provide a range of possible total values.

13. By providing U.S. Google account holders with a truly informed choice over their User Data, the proposed settlement also prevents unjust enrichment by Google, which I documented in the July 14, 2023 Zeithammer Report. The report documented that Google makes more RTB revenue when it shares User Data in bid requests. For the U.S. Google account holders who activate the proposed RTB Control, the accrual of this additional revenue will be prevented directly. For the U.S. Google account holders who do not activate the proposed RTB Control, the revenue will still accrue, but will no longer be earned unjustly. Therefore, whether or not U.S. Google account holders

[3] Turow, Lelkes, Draper and Waldman (2023) Americans Can't Consent to Companies' Use of Their Data. Available at: https://www.asc.upenn.edu/sites/default/files/2023-02/Americans_Can%27t_Consent.pdf. (Last accessed June 3, 2025)

choose to activate the RTB Control, the unjust enrichment documented in my July 14, 2023 Zeithammer Report will be prevented as a result of the relief obtained in this settlement.

14. The two methodologies introduced above (prevented unjust enrichment and extrinsic value to the U.S. Google account holders) provide alternative approaches for calculating the value of the benefits that the proposed settlement will provide if the settlement is approved by the Court and the technical changes contemplated in the settlement are implemented by Google. In the rest of this report, I present each methodology in turn, starting with the market price model.

<u>SETTLEMENT VALUE: MARKET PRICE MODEL</u>

15. The market price model provides an estimate of the benefit of this Settlement to U.S. Google account holders by establishing a market price of the User Data that will no longer be transmitted in the RTB bid stream when the RTB Control is activated. This measures the value of the Settlement as a function of the damages it will prevent.

16. A key input to the settlement value under the market price valuation is the number of U.S. Google account holders which I understand has not been produced. To estimate the number of U.S. Google account holders, I use three different approaches, resulting in a range from 169 million to over 200 million. In the next few paragraphs, I outline each approach in more detail.

17. The first approach starts with public information about the monthly unique U.S. visitors to Google Search, and adjusts this number down to only count logged-in users who, by construction, are U.S. Google account holders. Google Search has around 277 million monthly unique visitors to its official site in the U.S.[4], and 61% of Google searchers are logged into a Google service when using the search engine. This means they are actively using their Google account while searching, and are therefore Google account holders. Therefore, the number of unique U.S. Google account holders is at least 277*0.61=169 million. This estimate is conservative because it does not count infrequent searchers, as well as Google account holders who prefer an alternative search engine. Google provides many other products including Gmail, Google Docs, Google Drive, Google Play

[4] https://magecomp.com/blog/google-search-statistics-and-facts/. (Last accessed June 26, 2025)

Store, ChromeOS, and YouTube, all of which may be associated with a U.S. Google account even when the account holder is not a Google search user.

18. The second approach for estimating the number of U.S. Google account holders starts with the number of Americans in different age cohorts, and adjusts this number down to only count email users who use Gmail, and who, by construction, are therefore U.S. Google account holders. Statista reported that, as of 2024, 75% of U.S. email users (between 18 and 64 years old) currently use Gmail.[5] Since about 93% of Americans between 15 and 64 years of age use email,[6] we can estimate the number of U.S. Google Account holders between 13 and 64 as (*number of Americans in the cohort)* × (*percent of email users*) × (*percent of Gmail users among email users*). Since there are 228 million Americans between 13 and 64 years old, this calculation yields an estimate of 228*0.93*0.75=159 million U.S. Google Account holders between 13 and 64.[7]

19. It is well known that a smaller share of U.S. email users over 65 years of age use Gmail, and one publicly available source conservatively estimates this share to be only 31 percent.[8] Americans over 65 also use email less than younger cohorts, and one source conservatively estimates this usage share to be 84 percent. Since there are 59 million Americans over 65 years old, the same calculation as outlined in the previous paragraph implies that there are about 59*0.84*0.31=15 million U.S. Google Account holders over the age of 65. Adding the two cohorts together finally yields an estimate of 159+15=174 million U.S. Google account holders. This estimate is conservative because it does not count Google account holders who prefer an alternative email provider to Gmail. Google provides many other products including Search, Google Docs, Google Drive, Google Play

---

[5] https://www.statista.com/chart/34197/share-of-us-respondents-use-email-providers/. (Last accessed June 26, 2025)

[6] https://porchgroupmedia.com/blog/100-compelling-email-statistics-to-inform-your-strategy-in-2023/. (Last accessed June 26, 2025)

[7] Lacking information about some of the youngest people, this calculation assumes that the percentage of email usage among 13-14 year olds is similar to the percentage among older Americans, and the percentage of Gmail users among email users 13 to 17 years old is likewise similar to the Gmail share among older email users. Both of these assumptions are plausible and do not impact the final estimate much, but the estimates can easily be adjusted should new information about U.S. Google Account holders under 18 become available.

[8] https://emailanalytics.com/gmail-statistics/. (Last accessed June 26, 2025)

Store, ChromeOS, and YouTube, all of which may be associated with a U.S. Google account even when the account holder is not a Gmail user.

20. The third approach relies on representations from Google regarding the number of active Google accounts in the U.S. today as determined using a confidential and proprietary internal Google metric. This representation cannot be disclosed in this report. It has to be adjusted for the fact that some people may have more than one Google account. In fact, the latest publicly available report found that worldwide, there were 1.9 email accounts per email user.[9] By dividing the number of active Google accounts in the U.S. today by 1.9, we can therefore arrive at an estimate of the number of unique U.S. Google account holders. This calculation results in an estimate over 200 million.

21. Combining the three approaches outlined above, there are between 169 and over 200 million U.S. Google account holders. To the extent the actual number of U.S. Google account holders materially deviates from this range, it is a matter of basic math to substitute the actual number for the estimate of the benefit of this Settlement to U.S. Google account holders to which I now turn.

22. To establish a fair market price for the User Data of a single U.S. Google account holder transmitted in Google RTB, I consider the annual compensation Google itself has offered customers as compensation for sharing personalized tracking data as part of its Screenwise program, which I describe next.

23. Since 2012, Google has worked with Ipsos (a market research company) to recruit consumers into the Ipsos Screenwise Panel (hereafter "Screenwise Panel"). Members of the Screenwise Panel agree to install various "meters" that track their online behavior. The different types of meters include software that collects information from internet browsers or mobile phones and hardware such as a special router that allows personal tracking across devices

24. The "Summary" of the panel's privacy policy states:

- *"Google collects data through its meters, including, for example:*
  - *The content and advertising shown on your devices, and your interactions with that content and advertising, including videos you watched, your emails and SMS, and web pages you've visited.*

[9] https://www.radicati.com/wp/wp-content/uploads/2015/02/Email-Statistics-Report-2015-2019-Executive-Summary.pdf (Last accessed June 26, 2025)

- *Information you input (e.g., text you type) into your devices.*
- *Cookies and device information.*

- *Your participation in the Panel is voluntary. You may end your participation in the Panel at any time by following the instructions provided to you during the sign-up process. You can also temporarily pause or turn off metering at any time.*
- *Google may combine the data collected with other data collected by Google when you're using Google products and services as a Google user. For example, we may combine your panel data with information in your Google Account(s) (e.g., which ads you viewed), or with anonymous or pseudonymous identifiers (such as cookies or unique device identifiers) used by Google products and services.*
- *Google will use the data above in connection with existing Google products and services, to provide, maintain, and improve them, and to develop new ones. For example, we may use this data to conduct analytics and measurement to understand how our services are used, as well as conduct ads-related market research. As another example, we may use this data to improve Google products such as Search, Android, YouTube and Google Assistant."*[10]

25. Since Screenwise compensates its members for being tracked, and members enter this transaction voluntarily and with full knowledge of the data they are "selling" to Screenwise and how it is to be used, the compensation constitutes a market price for the User Data at the heart of the present matter. The potential usages indicated in the summary prominently include similar types of personalized tracking of usages involved in Google RTB advertising and, to that extent, the Screenwise compensation suggests a market price for the type of data used in RTB.

26. The exact compensation structure of Screenwise Panel participants depends on the number and type of meters the panelist installs. The meters relevant for measuring online behavior are the following three types of software meters: The payment available is $3 per month for installing a piece of tracking software in the Chrome browser. Additional $3 per month is available for installing a tracking app on a mobile phone, and yet additional $3 per month is available for installing a tracking app on a tablet. Based on online reviews of the Screenwise panel, it is also my understanding that the $3 per month per browser can turn into $6 per month if the account holder installs the browser "meter" on browsers on two different devices.[11]

[10] https://screenwisepanel.com/google-panel-privacy-policy

[11] https://lushdollar.com/the-screenwise-meter-panel/ includes a reward tier table "taken directly from the app itself", which shows weekly "incentives" of $1.00 for "computer only", and

27. One key benefit of User Data to third party users is cross-device and cross-website tracking. The average person in the US uses about 3 devices connected to IP networks[12], so cross-device tracking is important for tracking the totality of a single user's behavior. It is therefore conservative to assume that members of the class each use just one device to browse the internet, so the compensation they would earn in the Screenwise panel is $3 per month, i.e. $36 per year. My single device assumption is also conservative because both the online reviews and the Screenwise website mention even higher possible rewards available from connecting more than two devices, possibly from multiple household members.[13]

28. Screenwise also tracks types of data that are not included in Google RTB (e.g. content of messages) and unlike Google RTB which is largely focused on third-party participants that gain access to the User data, Screenwise is a program with primary utility to Google owned and operated products. Therefore, both the value account holders place on the data they share with Screenwise and the recipient of the data places on that data may be different than the corresponding values in the context of User Data shared in RTB bid requests. The resulting market price of data sharing on Screenwise is thus only an approximation of the true market price of User Data shared in RTB bid requests, and it is important to corroborate the market price with other sources of evidence, e.g. other markets for sharing personal User Data.

29. Several vendors other than Screenwise pay consumers for sharing data analogous to the User Data at issue in this case, i.e. data which specifically enables tracking of people by third parties. I consider the compensation these other vendors offer as a corroboration of my conclusion that the $3/month compensation Screenwise offers is a plausible estimate of the prevailing market price, i.e. not an obvious over-estimate.

---

$1.50 for "Computer and EITHER Smartphone or Tablet". With four weeks in a month, connecting two devices to Screenwise thus provides a monthly incentive of $6.00

[12] Cisco Annual Internet Report, 2020-2023

[13] The incentive table documented on https://lushdollar.com/the-screenwise-meter-panel/ shows $2.00 per week for connecting "Computer and Smartphone and Tablet", and Screenwise.com says "Earn up to $16/month Each household member age 13+ earns by joining with their own devices." (last accessed May 19 2023).

30. One firm that pays its registered users for their personal data is Reklaim Rewards, formerly known as "Killi" (and covered in more detail in the July 2023 Zeithammer Report), which claimed to have 100 million U.S. accounts in 2020.[14] The compensation available on Reklaim Rewards is in terms of points, which can be converted to gift cards or money. The Reklaim Rewards does not specifically advertise a fixed monetary monthly compensation, so I have to rely on online reviews to estimate the available compensation in dollar terms. One source claims that 1000 points are worth $10, with 200 points available per month for passive sharing of data, so the implied earnings are $24 per year.[15]

31. Another company that pays its registered users for their personal data is Datacy (launched in 2021, and covered in more detail in the July 2023 Zeithammer Report). Their own website represents that "Many of our consumers earn $30+ per month."[16] On an annual basis, this corresponds to over $360. But it is not clear how many "consumers" participate in this program. A recent review represents Datacy as the "most popular" vendor, and provides an estimate of average annual earnings of $120.[17]

32. Yet another company that pays its registered users for their personal data is Caden (launched in 2023, and hence not covered by the July 2023 Zeithammer Report). A recent review describes it as "a widely accepted app for Apple and Android users that allows you to get paid for using your data.", and "overall the most consistent for earning around $160 in passive income over a span of a year."[18]

[14] https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing

[15] https://paidfromsurveys.com/reklaim-review (Last accessed June 3, 2025)

[16] https://datacy.com/consumer/knowledge-base/how-much-will-i-earn-using-datacy (Last accessed June 3, 2025)

[17] "Datacy is the most popular extension earning users over $120 a year in passive income." https://freecash.com/academy/en/earn/how-to-get-paid-for-your-data (Last accessed June 3, 2025)

[18] https://freecash.com/academy/en/earn/how-to-get-paid-for-your-data. (Last accessed June 3, 2025)

33. The market for personal data is currently very active, with new vendors appearing regularly, and others going out of business.[19] But the above three examples of vendors show that the $36 annual compensation Screenwise offers is not a high outlier. It is slightly more than the $24 offered by Reklaim Rewards, and quite a bit less than the $120 available on Datacy and $160 available on Caden. I conclude that $36 is a conservative estimate of the fair market price for the User Data of a single U.S. Google account holder transmitted in Google RTB, and hence a reliable estimate of the annual benefit per U.S. Google account holder who decides to enable the new RTB Control (which, for purposes of this declaration, I refer to in short-hand as an "opt in").

34. The overall measure of the Settlement value may be obtained by multiplying the $36 annual benefit per account holder by the number of account holders who will choose to activate the RTB control, as follows: *Total Annual Benefit of Settlement* = (*benefit per account holder*) × (*opt in percentage*) × (*number of account holders*).

35. Since the opt-in percentage is not knowable without details of the implementation, I provide a range of possible value. At the high end, suppose that all U.S. Google account holders opt in. Then, the estimated range from 169 million to over 200 million U.S. Google account holders implies that the total Settlement value will be between $6.1 billion and over $7.2 billion per year or **between $18.3 billion and over $21.6 billion** over the course of the three years that the injunction will remain in force.

36. At the low end of the plausible opt-in percentages, I rely on the very conservative rate of 8.8 percent, which is the percentage of Chrome users opting out of the sale of their personal information under the CCPA as reported by Alcobendas et al (2023). This rate is conservative because businesses implementing the CCPA may "make it difficult for consumers to opt out through various means, including the use of dark patterns."[20] Applying this conservative 8.8 percent opt-in rate, I

---

[19] For example, the July 2023 Zeithammer Report also included one more company that pays users for their personal data called Datacoup. However, it is not clear if that company is continuing to operate today. Accordingly, I omitted Datacoup from this analysis and declaration.

[20] Van Hong Tran, Aarushi Mehrotra, Ranya Sharma, Marshini Chetty, Nick Feamster, Jens Frankenreiter, and Lior Strahilevitz. 2025. Dark Patterns in the Opt-Out Process and Compliance with the California Consumer Privacy Act (CCPA). In Proceedings of the 2025 CHI Conference on

obtain a low-end estimate of **between $1.4 billion and over $1.9 billion** over the course of the three years that the injunction will remain in force. This low-end estimate can be used as a lower bound on the total benefit of the settlement for at least two reasons: the opt-in rate will likely be higher, and this number does not include the intrinsic benefit accruing to the entire class noted in paragraph 10.

## SETTLEMENT VALUE: UNJUST ENRICHMENT MODEL

37. The unjust enrichment model measures the value of the Settlement as a function of the degree of unjust enrichment prevented by the change in RTB. An unjust enrichment occurs because Google currently lacks the transparency and choice that will be provided by this Settlement and it makes more revenue than it would if it did not share User Data that allows personal identification and persistent tracking as part of the RTB bid request. This section of my declaration calculates the percentage of RTB revenue attributable to such sharing of User Data.

38. A key input to the calculation of unjust revenue is the total revenue Google makes in the U.S. from RTB advertising. Earlier in this case, Google produced a document indicating that their annual revenue from RTB was approximately $[redacted] billion in 2021 and $[redacted] billion in 2022.[21] Because this revenue data has not been updated, I use the most recent (2022) number of $[redacted] billion. The calculations in this declaration are based on this estimate. To the extent the actual Google RTB revenue deviates from this estimate, it is a matter of basic math to substitute the actual number for the estimate, and I reserve the right to update this number when a more precise estimate is produced or otherwise comes to light. My unjust enrichment analysis simply multiplies this dollar amount by the percentage that can be attributed to sharing User Data that allows personal identification and persistent tracking as part of the RTB bid request. The rest of this section lays out my computation of this key percentage.[22]

---

Human Factors in Computing Systems (CHI '25). Association for Computing Machinery, New York, NY, USA, Article 223, 1–25. Available at: https://doi.org/10.1145/3706598.3714138 (Last accessed July 29, 2025).

[21] GOOG-HEWT-00455648 gives a January-June total for 2022, and I scaled it up by a factor of [redacted] to arrive at the estimated 2022 annual total.

[22] A more refined calculation of unjust enrichment damages would account for and deduct Google's marginal costs. Google did not, however, produce marginal cost data tied specifically to

39. To estimate the percentage of Google revenue that can be attributed to sharing User Data that allows personal identification and persistent tracking as part of the RTB bid request I draw on various sources: experiments at Google, as well as non-experimental observational data from both academic and industry sources. To combine evidence from diverse sources, I conduct a random-effect meta-analysis of all the estimates following the standard approach outlined in Borenstein et. Al (2010) – a standard reference article.[23] As explained in a recent "how to" guide[24], the method involves eight steps. I now outline how my approach addresses each of the following eight steps:

Step 1 (defining the research question): the question I ask is "What is the percentage of Google RTB auction revenue in U.S. digital advertising markets attributable to sharing User Data in bid requests?"

Step 2 (literature search): I searched three sources of information: 1) the academic literature on RTB revenues due to User Data, starting with the only peer-reviewed article on the topic and searching through all the citing articles. 2) the industry reports on RTB revenues due to User Data, searched through internet keyword searches and citations in academic articles, and 3) the internal Google records produced in the case and provided to me by counsel. As is standard in the meta-analysis methodology, the literature search needs to be as inclusive as possible of potential sources of information about the effect magnitude, so I included both peer-reviewed papers and working papers, and I included both evidence from Google specifically and evidence from similar leading ad exchanges that also share User Data in their RTB requests. As is standard in the methodology, I then removed duplicates, as well as measurements from other markets not relevant to the research question's scope.

Step 3 (choice of effect size measure): The primary measure of the effect of User Data on RTB auction revenues I extract from each source is the proportion of RTB auction revenues

---

the RTB gross revenue numbers; absent such data, a more refined calculation deducting marginal costs is not possible here.

[23] Borenstein M, Hedges LV, Higgins JP, Rothstein HR. A basic introduction to fixed-effect and random-effects models for meta-analysis. Res Synth Methods. 2010 Apr;1(2):97-111.

[24] Hansen, C., Steinmetz, H. & Block, J. How to conduct a meta-analysis in eight steps: a practical guide. Management Review Quarterly 72, 1–19 (2022).

obtained that can be attributed to the availability of the User Data to the auction participants. In scientific terminology, this is the "average treatment effect on the treated", expressed as a proportion in order to compare across different sources. Note that some studies I examine report on the auction revenue directly while other studies report on the publisher revenue – the amount of money left over after the auctioneer and other intermediaries take their cut. Since all the intermediaries, including Google, take their compensation on a percentage basis (i.e. the publisher revenue is an affine transform of the auction revenue), the percentage change in the publisher's revenue due to a regime change such as a deprecation of User Data is the same as the percentage change in the auctioneer's revenue due to the same regime change.

Step 4 (choice of analytical method used): Given the single scalar measure of interest, the analytical method is univariate.

Step 5 (choice of software): The standard random-effect meta-analysis procedure described in the standard reference article can be implemented in Excel.

Step 6 (coding of effect sizes): The random-effect method described in the previous step requires the effect estimate and its standard error.

Step 7 (analysis type): Given the diversity of contexts and sampling strategies the three types of sources are likely to produce, the appropriate analysis to use is the random-effect meta-analysis.

Step 8 (reporting results): Given the analysis type and univariate method selected above, the reporting consists of the full list of evidence discovered by the literature search, the operative list of evidence without duplicates and irrelevant contexts, the meta-analytic mean effect, and its standard error.

40. Having outlined my meta-analysis methodology, I now review the various sources of information the meta-analysis draws on. An ideal empirical framework for measuring the effect of User Data on Google RTB auction revenue experimentally manipulates the availability of the User Data to bidders, and then observes the impact of the manipulation on Google RTB revenue. My understanding from the published literature and the internal communications at Google I reviewed is

that several such experiments "[redacted]" User Data from bidders were performed at Google. The impression-level data from these experiments was requested but was not made available by Google, so I will rely on published and/or internal documents to summarize the results of these experiments. The record contains three distinct relevant experiments, which I now discuss in turn.

41. Google Experiment 1: The only published study about internal experiments at Google I am aware of is "Effect of disabling third-party cookies on publisher revenue" by Deepak Ravichandran (Principal Engineer, Google Display Ads) and Nitish Korula (Senior Staff Research Scientist, Google Ad Manager) ("Ravichandran and Korula 2019").[25] The two authors set out to "empirically quantify the effect that disabling access to third-party cookies would have on the programmatic ad revenue of web publishers". To achieve this goal, they "ran a randomized controlled experiment on publishers who use the programmatic arm of Google Ad Manager 's serving system, in which a Google service places ads on non-Google sites across the web". The experiment "disabled access to cookies for a small fraction of randomly selected users (the treatment group)", and found that "for the top 500 global publishers, average revenue in the treatment group decreased by 52%, with a median per-publisher decline of 64%." In footnote 4, the authors report that the average effect is so precisely estimated that "the 95% confidence interval is under +/- 1%.". Since a 95% confidence interval is about four standard errors wide, I conclude that the standard error on the 52% estimate is less than 0.5%, so I will conservatively take 0.5% to be the standard error of the estimate for the purposes of my meta-analysis. The UK Competition and Markets Authority ("CMA") has re-examined the data from the Ravichandran and Korula experiment, and identified several reasons why the estimate may be conservative.[26]

---

[25] Available at https://services.google.com/fh/files/misc/disabling_third-party_cookies_ publisher_ revenue.pdf (last visited July 23, 2025))

[26] CMA has identified a number of selection issues that might bias the estimates of the effect of blocking cookies on publisher revenue: (1) The treatment blinds Google DSP selectively; (2) the treatment reduces number of impressions per query; (3) the treatment increases queries without impressions and (4) the treatment increases impressions served by non-Google SSPs. To account for these issues, the CMA "implemented econometric solutions to better estimate the effect of blocking cookies access from the perspective of publishers." The CMA report concludes that after re-examining the data, "The results of our analysis show that blocking third-party cookies decreases short-run publisher revenue by 70% of the average revenue per query in the control group, which

42. Google Experiment 2: The record includes undated Excel files showing the results of undated experiments regarding the revenue impacts of various holdback experiments related to the User Data at issue. My best estimate about the dates of these experiments is between 2019 and 2022 since the time-stamped internal communications discuss such experiments in those years, and at least some of these discussions likely refer to the experiments documented in the Excel files. After reviewing the Excel files, it is my understanding that the experiments considered three types of information: "[redacted].[27] Since no information is provided about the precision of the associated [redacted], I assume that the experiment was as precise as the one Google holdback experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

43. Google Experiment 3: A 9/12/2019 document titled "[redacted])"[28] by custodians Chris LaSala and Jason Bigler outlines the impact of privacy regulations. It says "[redacted],

approximates business as usual during the study period." This result shows that the bias in the original estimates is most likely a downward bias, making the 52% estimate conservative. On the other hand, the CMA only investigated data on U.K. users, so their result does not necessarily translate to U.S. users of main interest to this report. UK Competition and Markets Authority (2020): Online platforms and digital advertising market study, Appendix F (available at https://assets.publishing. service.gov.uk/media/5fe495438fa8f56af97b1e6c/Appendix_F_-_role_of_data_in_digital_ advertising_v.4_WEB. Pdf. (Last visited July 23, 2025.

[27] GOOG-HEWT-00456342.

[28] GOOG-HEWT-00018008

[redacted][29]. Since no information is provided about the precision of [redacted], I assume that the experiment was as precise as the one Google holdback experiment for which the precision information is available (Ravichandran and Korula 2019), and thus assume the standard error to be 0.5%.

44. In addition to the above [redacted][30]. [redacted]. My conservative reading of the record is that [redacted][31], and 3) [redacted].[32] All the other numbers are approximate and often preceded by "~" or "about" to indicate a ballpark magnitude that could plausibly refer to one of these three experiments with exact numbers. To avoid duplication of evidence, I only included the above three experiments in my meta-analysis.

45. Academic study 1: In addition to deliberate experimentation, observational data contains several types of natural experiments that withheld at least some parts of the User Data for an identifiable set of impressions: 1) one such natural experiment occurred after California passed the California Consumer Privacy Act (CCPA) in 2018, allowing people in California to block

---

[29] "ITP" stands for "Intelligent Tracking Prevention".

[30] GOOG-HEWT-00456342, GOOG-HEWT-00018008, GOOG-HEWT-00188498, GOOG-HEWT-00287442, GOOG-HEWT-00259566, GOOG-HEWT-00312065, GOOG-HEWT-00278045

[31] GOOG-HEWT-00456342

[32] GOOG-HEWT-00018008

personalized ads. 2) Another natural experiment has occurred after 2018-19 when both Safari and Firefox browsers blocked third-party cookies by default while other browsers, most prominently Chrome, did not. Alcobendas, Kobayashi, Shi and Shum (2023)[33] use the resulting variation in the availability of cookies to estimate a sophisticated model that captures the bidder behavior. They analyze over 5.5 million bids in about 740,000 auctions in 2022. In their main counterfactual analysis, they then estimate precisely the percentage of interest to this report, namely how much would the RTB auction revenue decrease if third-party cookies were universally banned. They find that publisher revenue would decline 54.7%. Based on the data in the paper, I calculate the standard error of this estimate to be about 1.2%.[34]

46. Academic study 2: Starting in 2010, the AdChoices program has enabled consumers to opt out of behaviorally targeted advertising among publishers participating in the AdChoices program. Johnson, Shriver and Du (2020) analyze the AdChoices program in the only directly relevant peer-reviewed published to date[35]. They explain that "In 2010, the ad tech industry moved to self-regulate by launching the AdChoices program, which provides both notice and choice to consumers. AdChoices provides notice by superimposing the AdChoices logo over the corner of online display ads. AdChoices enables consumer choice through a website that allows consumers to opt out of behaviorally targeted advertising. Consumers who opt out still see ads, just not ads that are targeted based on their previous browsing behavior." Johnson, Shriver and Du analyze over 62 million ad impression transactions in a single week on a single exchange in 2015.

47. Johnson, Shriver and Du sample impressions from three types of users: cookieless, cookied who opted out, and cookied who did not opt out. They conduct two analyses to account for any potential self-selection of the users into the opt-out category: first, they use fingerprinting

[33] Alcobendas, Miguel and Kobayashi, Shunto and Shi, Ke and Shum, Matthew, The Impact of Privacy Protection on Online Advertising Markets (October 6, 2023). Available at https://ssrn.com/abstract=3782889 or http://dx.doi.org/10.2139/ssrn.3782889 (Last accessed June 3, 2025).

[34] Using Table 7, I can compute the standard error of the difference of the two mean revenues, and adjust for the number of observations.

[35] Garrett A. Johnson, Scott K. Shriver, and Shaoyin Du (2020), Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry? Marketing Science 39:1, 33-51.

techniques to re-generate the purchase history for the opted-out users, and they use the imputed history to predict what prices advertisements to those users would have received in the counterfactual world with tracking by cookies. This allows the authors to estimate the percentage difference between the prices fetched by the opted-out impressions and prices of comparable impressions by tracked cookied users. The authors' "preferred marginal effect estimates implies that opt-out impressions fetch 52.0% lower prices than cookied impressions"[36] Based on the data reported in the paper, I calculate the standard error of this estimate to be about 2.7%.[37]

48. Academic study 3: Other academic papers reach very similar conclusions to Alcobendas, Kobayashi, Shi and Shum (2023) and Johnson, Shriver and Du (2020). Beales and Eisenach (2014) analyze a large "impression-level database of advertising placements during a one-week period in August 2013, provided by two anonymous companies that operate advertising exchanges with automated bidding."[38] They perform an econometric analysis that allows them to "measure the premium paid by advertisers for ads served to customers with cookies, and ultimately to assess the added economic value generated by information sharing in the online content market."[39] They find that "the availability of cookies to capture user-specific information is found to increase the observed exchange transaction price by at least 60 percent relative to the average price (for users with "new" cookies)". For the purposes of this report, I consider average-aged cookies for the two companies, and combine the data in Tables 2 and 3 to compute the difference in CPM due to a cookie to be 70.2% (standard error 0.44%) of the average CPM with a cookie for the first anonymous company and 49.4% (standard error 1.42%) for the second anonymous company.[40] I include the

---

[36] *Id.*, p.44.

[37] The model is log-linear, so I assess the error of the percentage difference using the model's formula, and then simulate from the asymptotic distribution of the critical *Opt-out* parameter (Table 3, Column 5 gives the mean and standard deviation of this parameter).

[38] Beales JH, Eisenach JA (2014), An empirical analysis of the value of information sharing in the market for online content, Technical report, Navigant Economics, Chicago.

[39] *Ibid.*

[40] My calculation uses the "Basic model" coefficients in Table 3 to compute the difference in CPM due to an average-aged cookie as 0.35 (SE 0.0022) for the first company and 0.14 (SE 0.0042) for the second company. Then, I infer the average CPM with an average-aged cookie to be 0.509

results for the two anonymous companies as separate datapoints in my meta-analysis.

49. Academic study 4: Laub, Miller and Skiera (2023) analyze a large sample of auctions from a European ad exchange collected in 2016.[41] They use a regression approach similar to Johnson, Shriver and Du (2020) to control for selection, and the model (specification 1.3 in Tables 3 and 4) implies that the estimated relative price difference due to cookies is 41.2%. To control for confounding selection of impressions into the "uncookied" state, the 1.3 model specification controls for a rich set user characteristics (device, OS, browser, time, and location), as well as for ad characteristics (position, format, and publisher). Therefore, one can interpret the 18.8 percentage points reduction from the raw difference to model 1.3 (60-41.3=18.8) as arising from somewhat less valuable kinds of users and ads systematically not having a cookie. This is the right level of controls needed for our counter-factual goal.[42] I do not include their results in my meta-analysis because their data is exclusively from Europe, while my focus is on the U.S. market.

50. Academic study 5: As outlined above, most of the evidence about the magnitude of the key effect within the academic research literature is mutually consistent and converges to a large apportionment of at least half of the revenue to personal tracking information analogous with User Data at issue. Only one academic paper I am aware of reaches a qualitatively different conclusion: Marotta, Abhishek, and Acquisti (2019) gives a small estimate of the effect of User Data on revenue.[43] The magnitude of the effect is difficult to discern from the paper because the critical part of the "Results" section says: "The estimated potential outcome mean for transactions without cookies is $0.93, while the potential outcome mean for transactions with cookies is $1.02, a statistically

---

and 0.296 for the two companies from the overall average CPM and reported percentage of cookied impressions in Table 2. All standard errors are calculated using standard methods.

[41] Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (March 20, 2023). Available at: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.425123.

[42] Laub, Miller and Skiera (2023) go further in specifications 1.4 and 1.5 , which also control for the fact that some advertisers tend to bid less or not at all for uncookied impressions. For the purposes of the present report, such advertiser behavior is material to the measurement of the effect of interest, and so should not be controlled away.

[43] Marotta, V., V. Abhishek, and A. Acquisti (2019): Online tracking and publishers' revenues: An empirical analysis," WEIS 2019 Discussion paper, Working paper.

significant difference. We run the model using a logarithmic transformation of the variable, and the results suggest that when a cookie is available, publisher's revenue increases by about 4%."[44] These two sentences are inconsistent with each other because comparing the two means yields (1.02-0.93)/0.93=9.7% for the increase due to a cookie. My best interpretation of the results is that (1.02-0.93)/1.02=8.8% is the revenue due to personalized tracking. My interpretation of the results is shared by the Laub, Miller and Skiera (2022) report.[45] The standard error of this difference can be computed as the standard error of the difference between the two imputed revenues (with and without cookie) reported in Table 4, and the standard calculation suggests it is 0.46%. The Marotta, Abhishek, and Acquisti (2019) result is broadly discounted in the literature as non-representative and unreliable.[46] Despite all these critiques, I still include Marotta, Abhishek, and Acquisti (2019) in my meta-analysis so as not to bias the study selection in any way.

51. Several published industry reports also include estimates of the key effect of interest. I found three such industry reports, released by Bidswitch, Pubmatic, and the Interactive Advertising Bureau, and I now summarize their estimates in more detail.

---

[44] ibid

[45] Laub, Rene and Miller, Klaus and Skiera, Bernd, The Economic Value of User Tracking for Publishers (March, 2023). Available at: https://ssrn.com/abstract=4251233 or http://dx.doi.org/10.2139/ssrn.4251233.

[46] Some of the critiques include the fact that Marotta *et al* only consider data from a single publisher as opposed to most of the literature that considers samples from multiple publishers on entire exchanges. Different publishers may benefit from personal tracking differently, and it is thus likely that Marotta et al happened to work with an outlier publisher. Google's own Korula and Ravichandran also discount the Marotta et al results when they say: "We believe that the difference in results may be partially attributed to the fact that their analysis was performed on a single publisher (in contrast to the larger scale of previous studies), and in part due to the inherent challenges associated with the nature of observational studies (such as the need to control for many variables, some of which may themselves be influenced by the presence of cookies)." Ravichandran and Korula 2019. The UK Competition and Markets Authority says "the paper is based on a non-randomized observational design and relies on a relatively narrow set of user characteristics to account for selection bias." UK Competition and Markets Authority (2020): Online platforms and digital advertising market study, Appendix F, paragraph 114; available at https://assets.publishing.service.gov.uk/media/5fe495438fa8f56af97b1e6c/Appendix_F_-_role_of_data_in_digital_advertising_v.4_WEB.pdf (last visited July 23, 2025).

52. Industry report 1: A large intermediary firm named Bidswitch reports that in 2019, "matched" (identifiable based on cookies) users have "2x higher eCPMs" than "unmatched" (non-identifiable users).[47] In terms of the portion of the revenue due to personal tracking, this number corresponds to 50%. Bidswitch also reports that Chrome users have "1.8x higher eCPMs" than Safari users, which in turn corresponds to at least 44.4% (=(1.8-1)/1.8) due to personal tracking by cookies since Safari users cannot be tracked by cookies while most Chrome ones can. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

53. Industry report 2: Pubmatic, a company that develops and implements online advertising software and strategies, reported in 2021 that [48] "ad prices (eCPMs) are 2.4x higher when an IDFA is present". The IDFA is "Apple's ID for Advertisers", so in terms of the portion of the revenue due to personal tracking, the "2.4x higher" number corresponds to 58.3%. Since no information is provided about the precision of this revenue reduction, I assume that the comparison was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

54. Industry report 3: The Interactive Advertising Bureau, an association of more than 700 leading media companies, brands, agencies, and the technology firms responsible for selling, delivering, and optimizing digital ad marketing campaigns, reports in 2020 that "A proprietary study by the ad exchange OpenX found that, over a week in which cookies were stripped from 3 billion impression opportunities, prices realized by cookie-less impressions were 51% lower"[49] Since no information is provided about the precision of this revenue reduction, I assume that the comparison

[47] https://www.bidswitch.com/wp-content/uploads/2020/03/BidSwitch-Programmatic-Insights-2019.pdf. Last accessed 3/13/2023.

[48] https://pubmatic.com/wp-content/uploads/2021/08/IDFA-Opt-In-Impact-Infographics.pdf?utm_source=website_reports&utm_medium=research_2021&utm_campaign=envision_2021&utm_content=idfa_infographic Last accessed 3/13/2023.

[49] https://www.iab.com/insights/the-socioeconomic-impact-of-internet-tracking/. Last accessed 3/14/2023.

was as precise as the median precision among the studies that do contain precision information, and thus assume the standard error to be 0.9%.

**Table 1: Data sources taken to meta-analysis: Numerical estimates of the reduction in revenue due to removing the bidders' ability to track users individually, sorted in ascending order, Google experiments in bold font.**

| Estimated percentage reduction | Standard error (*imputed*) | Data Year | Source | Comments |
|---|---|---|---|---|
| 8.8% | 0.5% | 2016 | Marotta, Abhishek, and Acquisti (2019) | Econometric model, revenue ~ cookie |
| 44.4% | 0.9% | 2019 | Bidswitch (2020) | Observational data, cookies available vs. not |
| 49.4% | 1.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 2 |
| 51.0% | 0.9% | 2019 | Interactive Advertising Bureau (2020) | Observational data, IDFA vs. not |
| 52.0% | 2.7% | 2015 | Johnson, Shriver and Du (2020) | Econometric model, revenue ~ opt out |
| **52.0%** | **0.5%** | **2019** | **Ravichandran and Korula (2019)** | **Experiment, absence of cookies** |
| 54.7% | 1.2% | 2021 | Alcobendas, Kobayashi and Shum (2021) | Econometric model, revenue ~ cookie |
| 58.3% | 0.9% | 2021 | Pubmatic (2021) | Observational data, cookies available vs. not |
| [redacted] | [redacted] | [redacted] | **GOOG-HEWT-00018008** | [redacted] |
| [redacted] | [redacted] | [redacted] | **GOOG-HEWT-00456342** | [redacted] |
| 70.2% | 0.4% | 2013 | Beales and Eisenach (2014) | Econometric model, revenue ~ cookie, Company 1 |

55. Table 1 collects all the estimates taken to my meta-analysis. Given the diversity of contexts and sampling strategies involved in my inclusive literature search, the appropriate analysis to use is the random-effect meta-analysis. Following Borenstein et al (2010), the random-effect meta-analysis implies a mean effect of 52% with a standard error of 6.9%. Note that this estimate corresponds closely to the average effect in Table 1 because the studies do not vary much in precision. Note also that the exact match to the first decimal point between the meta-analytic estimate and two of the studies (Johnson, Shriver and Du 2020, Ravichandran and Korula 2019) is a co-incidence.

56. As Borenstein et al explain, the meta-analytic standard error is conservative because of the way they compute the underlying variation across studies. Based on totality of the data, the best estimate of the effect of removing User Data from requests is thus 52.0%, with a standard error of at most 6.9% implying a 95% confidence interval of [38.4%,65.6%]. I conclude that User Data has a highly significant effect on auction revenues in RTB, with about 52% of the revenue directly attributable to the User Data.

57. The random-effects meta-analysis based on sources in Table 1 is conservative to narrowing the context solely to auctions run at Google because compared to an analysis that would analyze only the three experiments from Google. The effects in those three experiments have an average of 61.1% with a standard deviation of 8.2%. While directionally higher than the main estimate of 52%, the analysis narrowed to Google sources does not result in statistically significantly higher estimates because 61.1% is within the main estimate's 95% confidence interval.

58. To complete my estimate of the unjust enrichment, I multiply the meta-analytic 52% estimate by the annual U.S. Google revenue from RTB: *Total Annual Unjust Enrichment = (Annual RTB Revenue in the U.S.)* × (*percent of Google RTB revenue attributable to sharing User Data).* This calculation yields a Total Annual Unjust Enrichment of $962 million, or **$2.9 billion over the three years** during which the injunction will remain in force.

## SUMMARY AND CONCLUSIONS

59. The value of the benefits that the proposed settlement will provide to U.S. Google account holders consists of both an intrinsic value of information and control that benefits the whole class, and an extrinsic value to the account holders who adopt the new RTB controls. I do not quantify the intrinsic value account holders place on being informed and having control over their own personal data. The extrinsic value per capita can be quantified using the market price method, and the total extrinsic value to the class depends on the rate of account holder adoption of the new RTB control. Should all U.S. Google account holders adopt the new RTB control, my analysis of the market price of User Data indicates that the settlement will generate a value of **between $18.3 billion and over $21.6 billion** to the account holders over the course of the three years that the proposed

injunction will remain in force. Should only a conservatively estimated 8.8 percent of the U.S. Google account holders adopt the new RTB controls, the settlement will generate a value of **between $1.4 billion and over $1.9 billion o**ver the course of the three years that the proposed injunction will remain in force**.** The range of estimates arises from my uncertainty about the number of U.S. Google account holders being between 169 million and over 200 million. I reserve the right to update the above estimates when a more precise estimate of the number of U.S. Google account holders is produced or otherwise comes to light.

60. My meta-analysis analysis of the percentage of RTB revenue due to sharing of User Data in bid requests indicates that the settlement will prevent an unjust enrichment of **$2.9 billion** over the course of the three years that the proposed injunction will remain in force.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 24th day of July 2025 in Los Angeles, California.

Dated: July 24, 2025

Robert Zeithammer, Ph.D.

# EXHIBIT 2

## [REDACTED VERSION]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Google RTB Consumer Privacy Litigation,* | Case No. 4:21-cv-02155-YGR |
| This document applies to: *all actions* | **DECLARATION OF PROFESSOR ZUBAIR SHAFIQ IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF SETTLEMENT CLASS AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>***Redacted Version***<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

I, Zubair Shafiq, hereby declare as follows:

1. I am a Professor of Computer Science at the University of California, Davis, where my research and education efforts broadly focus on online security and privacy, including personal data collection, sharing, and usage in the online advertising ecosystem. I have been retained by the counsel for plaintiffs as an expert in this matter and I submit this declaration in support of plaintiffs' Motion for Certification of Settlement Class and Final Approval of Class Action Settlement. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

BACKGROUND

2. I previously submitted two expert reports in support of plaintiffs' July 14, 2023 Motion for Class Certification, and one expert report in support of plaintiffs' November 8, 2024 Renewed Motion for Class Certification.[1] I also consulted with counsel for plaintiffs during the settlement discussions leading up to the proposed settlement with Google.

3. My expert qualifications generally are set forth in paragraphs 1-7 of the July 14, 2023 Shafiq Report, and my updated curriculum vitae is attached as Exhibit A to the November 8, 2024 Shafiq Supplemental Report. My hourly rate is $500. My fee is neither contingent on the results of this case nor contingent on the content of this declaration.

4. In light of my expertise and background, my extensive prior expert work in this matter, and my involvement with respect to some aspects of the proposed settlement, counsel for plaintiffs have asked me to comment on the technical aspects of the proposed settlement and the benefits that the settlement will provide to Google's U.S. account holders if the settlement is approved by the Court and the technical changes contemplated in the settlement are implemented by Google.

[1] Expert Class Certification Report of Professor Zubair Shafiq, July 14, 2023 ("Shafiq Report") (ECF 545-5); Expert Class Certification Rebuttal Report of Professor Zubair Shafiq, Nov. 29, 2023 ("Shafiq Rebuttal Report") (ECF 616-5); Supplemental Expert Class Certification Report of Professor Zubair Shafiq, Nov. 8, 2024 ("Shafiq Supplemental Report") (ECF 750-8).

OVERVIEW OF GOOGLE'S RTB AUCTIONS

5. At a high level, this case focuses on Google's Real Time Bidding (or RTB) advertising auction process. Google RTB sells advertising inventory of publishers (websites or apps) through online auctions to hundreds of RTB participants (also referred to as bidders) around the world. RTB participants include advertisers, data brokers, ad exchanges running their own sub-auctions, and social media companies, like Meta. The RTB auction process for any ad opportunity is completely automated and consists entirely of computers exchanging data with one another within a matter of milliseconds; faster than the blink of an eye. The name "real time bidding" accurately reflects the speed in which the RTB auction process occurs since, to the user, the ad appears virtually instantaneous – as soon as a website or mobile app loads. *See* Shafiq Report at ¶¶ 17-25 (describing, generally, Google's RTB auction process).

6. The RTB auction process involves data sharing by Google with RTB participants regardless of whether these participants bid in the auction or win the auction. The four primary methods of data sharing in the RTB auctions include bid requests sent out by Google to RTB participants, bid responses sent back to Google from RTB participants, and cookie matching and user lists managed by Google and provided to RTB participants. *Id.* As set forth in the Shafiq Report, each RTB bid request includes hundreds of data fields containing information about the user and his or her device, information used by the RTB participants to determine whether and how much to bid to win the auction and get to show that user an ad. *See* Shafiq Report at ¶¶ 28-29.

7. In the litigation, plaintiffs contend that Google's RTB auction process raises significant privacy concerns for Google's U.S. account holders because of the nature and volume of information shared by Google with RTB participants and the lack of control Google's U.S. account holders have over their information shared in Google's RTB auctions. Plaintiffs allege that the information Google shares in the RTB auctions about its U.S. account holders constitutes personal information under Google's privacy policy and California law, and that Google should not be sharing and selling that personal information without disclosure to and the consent of its U.S. account holders.

8. In my capacity as a technical expert for plaintiffs in this matter, I analyzed more than [redacted] of RTB auction data produced by Google,[2] reviewed dozens of confidential internal Google documents concerning the RTB auctions,[3] reviewed the declarations and/or deposition testimony of certain Google employees working on the RTB auctions, and reviewed the expert reports and deposition testimony of Google's two technical experts, Dr. Aaron Striegel, a computer science professor at Notre Dame University, and Dr. Konstantinos Psounis, an electrical and computer engineering professor at University of Southern California.

9. Based on this work, and as set forth in my three expert reports, I concluded that there is a common set of about 60 data fields uniformly shared by Google in all Google RTB auctions, and that these common data fields collectively contain enough information in each bid request and are sufficiently specific to allow RTB participants to identify, associate with, or reasonably link that data to a particular person or household. In other words, these data fields, taken together in an RTB bid request, are personally identifying of the person or the person's household. *See* Shafiq Report at ¶¶ 26-89; Shafiq Supplemental Report at ¶¶ 24-44.

10. In my expert reports, I identified a number of bid request data fields that were particularly problematic from a privacy perspective, including, among others, the Google User ID (a unique Google identifier), the IP address (the internet address of the device being used), certain device information (notably, the user agent field (which includes information about the device and software being used) and device ID (a unique Google identifier)), detected language, and certain location information describing where the user is at the time. *See* Shafiq Report at ¶ 42 (discussing specific RTB data fields present in all the named plaintiffs' RTB bid requests) and ¶ 46 (discussing information transmitted by Google in exemplars of the named plaintiffs' bid requests); Shafiq Supplemental Report at ¶ 27 (discussing specific RTB data fields present in the class RTB bid

---

[2] This auction data included almost [redacted] million bid requests for the seven named plaintiffs and almost [redacted] billion bid requests for the class as a whole. *See* Shafiq Report at ¶ 35 (discussing plaintiff data); Shafiq Supplemental Report at ¶ 17 (discussing class data).

[3] These documents are listed in Exhibit B to the Shafiq Report.

requests) and ¶¶ 43-44 (discussing information transmitted by Google in exemplars from the class bid requests).

11. Some of these data fields, like the Google User ID and device ID, are what are called "pseudonymous" identifiers. Pseudonymous identifiers are particularly problematic from a privacy perspective because they are unique to a person or device and can thus easily be tracked across the internet to identify that person or device.[4] Other data fields, like the user agent and IP address, are problematic because they contain so much specific information that even the combination of just these two fields, out of the hundreds transmitted in each bid request, almost always points to a unique user and device, a fact I confirmed in my analysis of the class data and that Google itself identified as being problematic in its own internal documents, some of which I cited in the Shafiq Report. *See* Shafiq Report at ¶¶ 50-51, 54, 61, 66-68.

12. I also identified Google's use of cookie matching and user lists in connection with the RTB auctions as being problematic from a privacy perspective. *See* Shafiq Report at ¶¶ 23-25. Cookie matching enables RTB participants to match their cookies with Google's, thus allowing the RTB participants to link together information on a particular user that they have gathered with information Google has gathered. *Id.* at ¶ 23. User lists are lists of identifiers provided to RTB participants by Google for users who have visited one or more specific webpages. *Id.* at ¶¶ 24-25.

13. Another privacy concern I identified during my expert work in this matter is the sheer inescapability and ubiquity of Google RTB for Google's U.S. account holders. Google RTB is inescapable because Google has acknowledged that there is currently no way for its U.S. account holders to avoid or even limit having their information shared by Google with RTB participants in the RTB auctions.[5] *See* Shafiq Supplemental Report at ¶ 47. And Google RTB is ubiquitous because,

---

[4] My expert reports also discussed the Google Account ID, or GAIA, but because GAIA information is not transmitted in RTB bid requests, it is not addressed in the proposed settlement

[5] This is a significant issue because plaintiffs' other technical expert, Prof. Christopher Wilson, has opined that existing Google privacy and user controls are insufficient to protect Google's U.S. account holders' personal information in the RTB auctions. *See* Expert Class Certification Report of Prof. Christopher Wilson, July 14, 2023 (ECF 545-6) at ¶¶ 101-123. Based on my own work and experience and review of Prof. Wilson's work, I agree with Prof. Wilson's analysis and conclusions with respect to Google's existing privacy and user controls as they apply to the Google RTB auctions.

as my analysis of the named plaintiff data and the class data showed, any active Google U.S. account holder using the internet is almost certainly going to have their data shared and sold in Google RTB auctions.[6]

14. My analysis of the named plaintiff data showed that in just an eight-week period, the seven named plaintiffs had their data shared and sold in Google RTB auctions [redacted] million times, which works out to more than [redacted] times a day for the seven named plaintiffs. *See* Shafiq Report at ¶¶ 36-37. My analysis of the class data showed that in just a one-hour period, Google U.S. account holders had their data shared and sold in Google RTB auctions [redacted] billion times, which works out to almost 1.2 trillion times a day. *See* Shafiq Supplemental Report at ¶¶ 18-19.

15. As discussed in more detail below, the proposed settlement, if approved by the Court and implemented by Google, will address the privacy issues I identified in my expert reports and, in my opinion, provide substantial benefits to all U.S. Google account holders.

## THE PROPOSED SETTLEMENT

16. It is my understanding that under the terms of the proposed settlement, once the settlement is approved by the Court, Google will provide all U.S account holders with the ability to limit the information Google shares about them with RTB participants in its RTB auctions. Google will provide this ability through a new user control (the "RTB Control") that will be available to U.S. account holders at the account and device levels, and that will allow those account holders to choose whether to limit the information that Google shares about them with RTB participants in its RTB auctions. Google U.S. account holders will be able to implement the new RTB Control regardless of whether they are signed in or signed out of their Google account.[7]

[6] Google RTB is used on 15.6 million different websites and more than 1.6 million different apps in the United States. *See* Shafiq Supplemental Report at ¶ 48. This is borne out in the class data, which showed that in just a one-hour period, bid requests containing information for 357,380 unique website domains and 221,477 unique apps were shared for Google's U.S. account holders. *Id.*

[7] The settlement also requires Google to make new disclosures to its U.S. account holders about the Google RTB auction process and the new RTB Control.

17. If a Google U.S. account holder chooses to limit data sharing by Google through the RTB Control, no personalized ads will be shown, and the following categories of information will be modified or removed altogether from RTB bid requests:

a. All pseudonymous identifiers will be removed from RTB bid requests, including the Google User ID and the device ID.

b. The IP address will be removed from RTB bid requests.

c. No user lists will be shared or used in connection with RTB bid requests.

d. No cookie matching will occur in connection with RTB bid requests.

e. Bid request fields that contain user agent data will be generalized to the coarsest or highest version level in the RTB bid request.[8]

18. Under the terms of the proposed settlement, Google will maintain the technical changes summarized in paragraphs 16-17 above for a period of at least three years following the implementation of the settlement.

19. For the reasons discussed below, it is my opinion that the technical changes summarized in paragraphs 16-17 above directly address the privacy issues I identified in my expert reports in this matter and provide substantial benefits to all of Google's U.S. account holders.

20. As noted above, Google's U.S. account holders currently have no way to avoid having their information shared and sold in the Google RTB auctions. The settlement will provide Google's U.S. account holders, for the very first time, with an actual and meaningful choice as to whether to allow Google to continue sharing and selling their personal information in Google RTB auctions. This choice, by itself, is a meaningful and significant benefit provided to all Google U.S. account holders by the settlement, whether they exercise that choice or not.

---

[8] Google appears to have already addressed, prior to the settlement, my concerns about the detected language and location fields. According to Google, the detected language field in RTB bid requests is based only on the language of the site or app being visited, not on account or other user/device information. Similarly, location data in RTB bid requests is coarsened to ensure that the data provided identifies a geographic area that includes a sufficiently large number of users or devices so as to make identification of a unique user or device unlikely.

21. The settlement also mandates that Google disclose information about the Google RTB auctions and the new RTB Control to its U.S. account holders. These new disclosures by Google about what it is doing with U.S. account holders' personal information and how those account holders can have input into the process to limit the sharing and sale of that information is also a significant benefit of the settlement.

22. The RTB Control will be available at both the account and device levels and will work for both signed-in and signed-out Google U.S. account holders. This is a significant settlement benefit for Google's U.S. account holders and important from a privacy perspective because it does not require those account holders to be or remain signed-in to a Google account in order to obtain the benefits of the settlement.

23. For those Google U.S. account holders who implement the RTB Control to limit the information that Google shares and sells in the RTB auctions, the settlement benefits are even greater. While these Google U.S. account holders will still have some information about them shared and sold by Google in the RTB auctions, the removal or generalization of the specific data fields listed in paragraph 17 above from the bid requests, and the stopping of the use of cookie matching and user lists, will make it much harder, if not impossible, for RTB participants to identify and/or track those Google U.S. account holders, and result in those Google U.S. account holders no longer receiving personalized ads. In essence, if the RTB Control is implemented, the information transmitted by Google in RTB auctions will no longer identify, be associated with, or be reasonably linkable to a particular person or household.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 28th day of August 2025 in Davis, California.

Dated: August 28, 2025

Zubair

Zubair Shafiq, Ph.D.

# EXHIBIT 1

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and effective as of the date on which all undersigned parties have signed this Agreement (the "Settlement Date") by and between Defendant Google LLC, a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California ("Google"), and Plaintiffs Terry Diggs, Rethena Green, John Kevranian, Salvatore Toronto, Christopher Valencia, Tara Williams, and Kimberley Woodruff ("Plaintiffs" or "Class Representatives"), individually and as representatives of the Settlement Class (as defined herein). Together, Plaintiffs, the Settlement Class, and Google are referred to as the "Settling Parties." This Agreement is intended to fully, finally, and forever resolve, discharge, and settle the Released Plaintiff Claims (as defined herein) and Released Class Claims (as defined herein) as against the Released Parties (as defined herein), subject to the approval of the Court and the terms and conditions set forth in this Agreement.

## DEFINITIONS

As used in this Agreement the following terms have the meanings set forth below.

1. "Attorneys' Fees and Expense Payment" means the amount of attorneys' fees and reimbursement of costs and expenses awarded to Plaintiffs' Counsel by the Court.

2. "CAFA" means the Class Action Fairness Act.

3. "Class Representatives" or "Plaintiffs" means Terry Diggs, Rethena Green, John Kevranian, Salvatore Toronto, Christopher Valencia, Tara Williams, and Kimberley Woodruff.

4. "Complaint" means the Consolidated Amended Class Action Complaint filed by Plaintiffs on September 16, 2021 (ECF No. 92).

5. "Court" means the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California.

6. "Effective Date" means the date on which the time for filing an appeal from the Court's issuance of the Final Approval of this Agreement has either expired without an appeal being filed, or if later, after any appeal has been fully resolved upholding the Agreement (including requests for rehearing, rehearing en banc, and petitions for certiorari), at which time the obligations set forth in this Agreement and the terms of this Agreement become binding on Google, the Plaintiffs, the Class Members, Plaintiffs' Counsel, and anyone else who has undertaken an obligation under this Agreement.

7. "Final Approval Order" means the order entered by the Court providing for final approval of the Agreement.

8. "Final Judgment" means the judgment finally approving the Settlement and dismissing with prejudice the Released Class Claims and Released Plaintiff Claims, regardless of whether entered as a separate document pursuant to Fed. R. Civ. P. 58(a).

9. "Implementation Date" means 30 days after the entry of the Final Approval Order or by February 13, 2026, whichever is later.

10. "Lawsuit" means the consolidated litigation first filed on March 26, 2021, and now styled as *In re Google RTB Consumer Privacy Litigation*, Case No. 4:21-cv-02155-YGR (N.D. Cal.).

11. "Objection Deadline" means December 12, 2025.

12. "Plaintiffs' Counsel" means the law firms Pritzker Levine LLP; Bleichmar Fonti & Auld LLP; Simmons Hanly Conroy LLP; DiCello Levitt LLP; Cotchett, Pitre & McCarthy, LLP; and Bottini & Bottini, Inc.

13. "Released Class Claims" means any and all claims, known or unknown, pursuant to any theory of liability that are based on, or arise from, one or more of the same factual predicates or theories of liability asserted in the Complaint on behalf of the Settlement Class for injunctive, declaratory, or any other equitable non-monetary relief, arising from Google's alleged sharing or selling of personal information through Google's Real-Time Bidding system (including all claims asserted in the Complaint that were held in abeyance and not litigated pursuant to the Court's case management orders, *see* ECF No. 91). "Released Class Claims" expressly excludes Settlement Class Members' claims for damages that they may pursue on an individual basis. The Released Class Claims do not include any claim for monetary relief of any kind, including but not limited to any claims for statutory penalties, damages, unjust enrichment, disgorgement, restitution, punitive damages, or any other monetary claim, including the claims within the scope of the Rule 23(b)(3) class for which Plaintiffs sought and were denied certification.

14. "Released Plaintiff Claims" means any and all claims asserted in the Complaint individually by each and all of the Plaintiffs and any and all claims, known or unknown, pursuant to any theory of liability that are based on, or arise from, one or more of the same factual predicates or theories of liability asserted in the Complaint, arising from Google's alleged sharing or selling of personal information through Google's Real-Time Bidding system (including all claims asserted in the Complaint that were held in abeyance and not litigated pursuant to the Court's case management orders, *see* ECF No. 91). "Released Plaintiff Claims" expressly includes Plaintiffs' individual claims for damages and any other monetary relief.

15. "Settlement" and "Settlement Agreement" mean this Agreement and the settlement and releases described herein.

16. "Settlement Class" means all individual Google account holders subject to a Google U.S. Terms of Service who have an active Google account on the Effective Date. For the purposes of this settlement, a Google account is "active" if it has been used within the two years preceding the Effective Date.

17. "Settlement Class Member" means an individual who is a member of the Settlement Class.

**RECITALS**

WHEREAS, the Lawsuit commenced with the filing of a putative class action complaint against Google on March 26, 2021 in *Hewitt*, *et al. v. Google*, *LLC*, Case No. 21-cv-02155-LHK. Substantially similar complaints were filed on May 5, 2021 in *Delahunty v. Google*, *LLC*, Case No. 21-cv-03360-LHK, and on May 18, 2021 in *Toronto v. Google*, *LLC*, Case No. 21-cv-03725-LHK. The three cases were consolidated on June 24, 2021 (ECF No. 69) and renamed *In re Google RTB Consumer Privacy Litigation* on September 9, 2021 (ECF No. 87).

WHEREAS, on August 3, 2021, the Court entered an order (ECF No. 77) appointing Elizabeth C. Pritzker of Pritzker Levine LLP as Interim Class Counsel for Plaintiffs, and appointing the following attorneys to serve on Plaintiffs Executive Committee: Lesley Weaver of Bleichmar Fonti & Auld LLP; Jason Barnes of Simmons Hanly Conroy LLP; David A. Straite of DiCello Levitt LLP; Nanci E. Nishimura of Cotchett, Pitre & McCarthy, LLP; and Francis A. Bottini, Jr. of Bottini & Bottini, Inc.

WHEREAS, the Complaint was filed on September 16, 2021, alleging that Google sells and shares consumers' personal information through its Real-Time Bidding ("RTB") system for targeted advertising. The Complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of the California Unfair Competition Law ("UCL"), California Constitutional invasion of privacy, intrusion upon seclusion, publication of private information, breach of confidence, violation of the California Invasion of Privacy Act ("CIPA"), violations of the Electronic Communications Privacy Act ("ECPA") – unauthorized interception, use, and disclosure, violations of the ECPA Wiretap Act – unauthorized disclosure of electronic communications by an Electronic Communication Service, violations of the ECPA Stored Communications Act – unauthorized disclosure of electronic communications by an ECS, and violations of the Video Privacy Protection Act ("VPPA").

WHEREAS, Google denies that it sells or shares personal information with third parties through RTB and denies all liability to Plaintiffs and the putative class.

WHEREAS, on June 23, 2021, the parties filed a joint Rule 26(f) report (ECF No. 68), and thereafter engaged in extensive discovery including document productions, interrogatories, requests for admissions, and depositions, which fact discovery concluded on February 2, 2024.

WHEREAS, the litigation was reassigned to this Court on January 24, 2022, and now bears the case number 4:21-cv-02155-YGR-VKD (ECF No. 138).

WHEREAS, the Court granted in part and denied in part Google's motion to dismiss the Complaint on June 13, 2022 (ECF No. 233), and Google answered the Complaint on July 25, 2022 (ECF No. 258).

WHEREAS, on April 4, 2024, the Court denied with prejudice Plaintiffs' motion to certify a Rule 23(b)(3) damages class. The Court also denied Plaintiffs' motion to certify a Rule 23(b)(2) injunctive and declaratory relief class, but granted Plaintiffs leave to file a renewed motion for the latter (ECF No. 690).

WHEREAS, on November 8, 2024, Plaintiffs filed their renewed motion to certify a Rule 23(b)(2) injunctive and declaratory relief class (ECF Nos. 749-750), seeking to certify a class consisting of all individual Google account holders subject to a Google U.S. Terms of Service who have an active Google account. Google opposed the motion on January 31, 2025 (ECF No. 761), but further briefing was stayed in light of the parties' then-ongoing settlement discussions.

WHEREAS, during the pendency of the Lawsuit, the Settling Parties have investigated the facts and analyzed the relevant legal issues regarding the claims and defenses asserted, including through significant motion practice, extensive discovery, and consultations with numerous experts.

WHEREAS, the Settling Parties held a first mediation session with Shirish Gupta of JAMS (the "Mediator") on February 28, 2025, and conducted arms-length settlement negotiations and exchanges of information during that session and over the following two weeks under the supervision of the Mediator.

WHEREAS, the Settling Parties held a second mediation session with the Mediator on March 7, 2025, and continued to conduct arms-length settlement negotiations and exchanges of information during that session and over the following weeks under the supervision of the Mediator.

WHEREAS, the Settling Parties held a third mediation session with the Mediator on April 29, 2025, and continued to conduct arms-length settlement negotiations and exchanges of information during that session and over the following week under the continued supervision of the Mediator.

WHEREAS, during the settlement negotiations, the resolution of Plaintiffs' individual claims was neither discussed nor agreed upon until after all material terms of the settlement of the Settlement Class's claims were agreed to by the Settling Parties.

WHEREAS, during the settlement negotiations, in response to questions from Plaintiffs' Counsel, Google confirmed that information included in RTB bid requests regarding the language detected in connection with the associated ad opportunity is derived from the language detected on the publisher site or app, and not on a user's device or account settings.

WHEREAS, during the settlement negotiations, in response to questions from Plaintiffs' Counsel, Google confirmed that geolocation-related data in RTB bid requests is generalized to ensure the location information provided includes a sufficiently large number of users and/or devices so as to make identification of a unique user, device, or household unlikely.

WHEREAS, on May 6, 2025, with the assistance of the Mediator, the Settling Parties reached an agreement in principle on the terms and conditions of settlement regarding the claims

on behalf of the Settlement Class and Plaintiffs, which was memorialized in a summary of principal settlement terms.

WHEREAS, the Settling Parties agree that by entering into this Agreement, Google is not admitting any liability, fault, or violation of law, and that Google denies all allegations and claims asserted against it.

WHEREAS, the Settling Parties are entering into the Agreement to avoid the risk, burdens, and expense of continued litigation and trial.

WHEREAS, the Settling Parties agree that this Settlement provides no monetary payment to members of the Settlement Class.

WHEREAS, without Google admitting liability, that its practices were wrongful, or that the Lawsuit could be maintained as a class action for litigation purposes, the Settling Parties agree that this Settlement requires certain changes by Google to its business practices that will provide benefits to members of the Settlement Class.

WHEREAS, each Party has independently determined that it is desirable and beneficial for the Lawsuit to be fully and finally resolved in the manner and upon the terms and conditions set forth in this Agreement.

WHEREAS, the Settling Parties, by and through their respective undersigned counsel, have agreed to this Settlement on the terms and conditions set forth below.

NOW, THEREFORE, IT IS AGREED by and among Plaintiffs (for themselves and the Settlement Class) and Google, by and through their respective counsel, that, subject to the approval of the Court, the Lawsuit and the Released Class Claims and Released Plaintiff Claims will be fully and finally released, and the Lawsuit will be dismissed with prejudice as to all Settling Parties, upon and subject to the terms and conditions of this Agreement.

## A. SETTLEMENT CONSIDERATION TO THE SETTLEMENT CLASS

**1. Technical Changes to Limit Data Sharing.** No later than the Implementation Date, Google will provide all Settlement Class Members with the ability to limit the information Google provides to third parties about them in the Google RTB system. Google will provide this ability through a new user control (the "RTB Control") that will be available to users at the account and browser levels, and that will allow all Settlement Class Members to elect a privacy treatment that limits the information that Google provides third parties about them in the Google RTB system, as specified herein. Settlement Class Members will be able to enable the new RTB Control regardless of whether they are signed in or signed out of their Google account (provided, however, that the RTB Control will only be effective for a signed-in user on devices and browsers on which Google is able to determine that the user is signed in to their Google account, and that the RTB Control will only be effective for a signed-out user on browsers on which the user has enabled the RTB Control and where third-party cookies are enabled). When the RTB Control is enabled, Google will apply a privacy treatment equivalent to its restricted data processing ("RDP") privacy

treatment to RTB bid requests that Google currently makes available to publishers that use the Google RTB system. Subject to Google's modification rights pursuant to Paragraph A.3 below, the following current aspects of RDP treatment will be enabled by the RTB Control:

a. All pseudonymous identifiers are removed from RTB bid request, including encrypted Google User IDs and the device advertising IDs, thereby preventing the use of user lists for targeted advertising.

b. IP addresses are removed from the RTB bid request.

c. Cookie matching does not occur in connection with impression.

d. Bid request fields that contain user agent data are generalized to the highest version level in the RTB bid request.

The RTB Control will appear on Google's ads personalization settings pages for personalization of ads shown on partner sites and apps, which will include appropriate links to other relevant Google webpages. No later than 30 days before the Objection Deadline, Google will publicly file a depiction of the then-current version of the RTB Control on the public docket.

**2. Disclosure Changes.** No later than the Implementation Date, Google will make the following disclosures:

a. A new dedicated webpage maintained by Google will also disclose the new RTB Control, with appropriate links to other relevant Google webpages and the new RTB Control. No later than 30 days before the Objection Deadline, Google will publicly file a copy of the then-current version of this webpage on the public docket.

b. An email will be sent to the primary email addresses Google has on file for all individual U.S. Google account holders with a Google account active within the 28 days preceding the date on which email notice is issued (except for organizational/workplace Google accounts and accounts that Google's records indicate are associated with minors). The email notice will advise recipients of the webpage referenced above in Paragraph A.2.a (with a link to said webpage) and the options available to control the information provided to third parties through RTB.

**3. Time Period for Injunctive Relief.** Google agrees to maintain the technical changes described in A.1 and disclosure changes described in A.2 above for a period of three (3) years following the Implementation Date. Notwithstanding the foregoing, during this period, Google may, from time to time, modify the RTB Control's functionality in accordance with its Privacy Policy and U.S. Terms of Service, including to reflect changes to Google's RDP treatment, and to comply with applicable privacy regulations and court orders.

## B. SETTLEMENT CONSIDERATION TO THE PLAINTIFFS

**1.** **Service Awards.** Plaintiffs' Counsel will request that the Court approve service awards to each Plaintiff in an amount not to exceed $15,000, which Google will not oppose. Google will pay service awards in the amount ordered by the Court. Google, Plaintiffs, and Plaintiffs' Counsel agree that none of them will appeal the fact or amount of any service award awarded by the Court. A service award by the Court that is less than the amount sought will not provide a basis to withdraw from this Agreement. Google will pay service awards by ACH transfer within thirty business days of the Effective Date, provided that Plaintiffs' Counsel has, in advance of that deadline, provided Google's counsel with the account name, account number, and other necessary payment information.

**2.** **Taxes.** Plaintiffs will be responsible for any duties, taxes, or levies to which they are subject as a result of such payments and Google will not be liable at any time for any of Plaintiffs' taxes incurred in connection with or related to such payments.

**C.** **<u>ATTORNEYS' FEES AND COSTS</u>**

**1.** The Settling Parties did not discuss attorneys' fees and costs prior to reaching an agreement on the substantive terms of the Settlement. Google agrees to bear its own fees and costs. Google does not dispute that Plaintiffs' Counsel are entitled to an award of attorneys' fees and costs, but reserves the right to contest the reasonableness of the amounts requested. Plaintiffs' Counsel will apply for an award of attorneys' fees and reimbursement of expenses, either in conjunction with or separately from the motion for final approval of the Settlement. Any fee and cost award must be approved by the Court. Google will pay any fees and costs awarded to Plaintiffs' Counsel by the Court. A fee and cost award by the Court that is less than the amount Plaintiffs' Counsel seek is not a basis to withdraw from this Agreement.

**2.** Any Attorneys' Fees and Expense Payment approved by the Court shall be paid to Plaintiffs' Counsel by Google by ACH transfer as follows, provided in all cases that Plaintiffs' Counsel has provided Google with the account name, account number, and all other necessary information to allow payment to be made:

(a) 35% of the Attorneys' Fees and Expense Payment shall be paid within 60 days of the entry of the Final Approval Order and entry of any order awarding the Attorneys' Fees and Expense Payment to Plaintiffs' Counsel.

(b) If no appeal is timely filed from the Final Approval Order or the order awarding the Attorneys' Fees and Expense Payment, then the remaining 65% of the Attorneys' Fees and Expense Payment shall be paid within 60 days of the later of the entry of the Final Approval Order and entry of any order awarding the Attorneys' Fees and Expense Payment to Plaintiffs' Counsel.

(c) If an appeal is timely filed from either the Final Approval Order or the order awarding the Attorneys' Fees and Expense Payment, then the remaining 65% of the Attorneys' Fees and Expense Payment shall be paid within 60 days of the date on which all such appeals have been fully resolved (including requests for rehearing, rehearing en banc, and petitions for certiorari).

**3.** Each Plaintiffs' Counsel law firm receiving any portion of an Attorneys' Fee and Expense Award, as a condition of receiving such payment, agrees on behalf of itself and each equity partner and/or shareholder of it that the law firm and its equity partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the provisions of this paragraph. Plaintiffs' Counsel executing this Settlement Agreement stipulate, warrant, and represent that they have actual authority to enter into the obligations set forth in this paragraph on behalf of the law firms indicated below, and the shareholders, members, and/or partners of those law firms respectively. In the event of that the Effective Date does not occur, or the Final Judgment or the Attorneys' Fee and Expense Award is reversed or modified, and in the event that the Attorneys' Fee and Expense Award has been paid to any extent, then Plaintiffs' Counsel law firm receiving any portion of the Attorneys' Fee and Expense Award paid shall, within 60 days from receiving notice from Google's Counsel or from a court of appropriate jurisdiction, refund to Google such portion of the Attorneys' Fee and Expense Award as required by such reversal, modification, cancellation or termination, plus interest thereon computed using the rate and method set forth in 28 U.S.C. § 1961.

**4.** Plaintiffs' Counsel will be responsible for any duties, taxes, or levies to which they are subject as a result of such payment and Google will not be liable at any time for any of Plaintiffs' Counsel's taxes incurred in connection with or related to such payment.

## D. SCOPE AND EFFECT OF SETTLEMENT AND RELEASE

**1.** **Scope of Settlement Agreement**. This Settlement Agreement compromises and resolves only the Released Class Claims and Released Plaintiff Claims.

**2.** **Binding Effect of Settlement**. If this Settlement is approved by the Court, on the Effective Date, Google and all Settlement Class Members and Plaintiffs will be bound by the terms of the Agreement.

**3.** **Objections**. Any Settlement Class Member who wishes to object to the fairness, reasonableness, or adequacy of the Settlement must do so timely by the Objection Deadline. Any Settlement Class Member who wishes to object to the fairness, reasonableness, or adequacy of the application of Plaintiffs' Counsel for an award of attorneys' fees and expenses, and/or for service awards for Plaintiffs, must do so timely by the Objection Deadline. Plaintiffs shall file their response or reply to any such objections by no later than December 22, 2025.

**4.** **Notice of Settlement to the Settlement Class**. Based upon their review of Rule 23, prior rulings concerning class settlements involving only Rule 23(b)(2) injunctive relief, and the fact that the technical changes and disclosure changes (described above) will provide certain notice to the Settlement Class, the Settling Parties agree that no additional notice plan is required. The Settling Parties will ultimately defer to the Court on that determination. To the extent any additional notice is required, Google will provide and/or bear the costs of such notice.

**5.** **Final Approval Proceedings**. Plaintiffs will promptly file, by no later than September 2, 2025, a motion for final approval of the Settlement and certification of the Settlement Class, and request a final approval hearing. The parties will request that the Court enter a briefing schedule under which any opposition or response from Google will be filed by no later than November 12, 2025, and any reply from Plaintiffs will be filed by no later than December 22, 2025. The Settling Parties agree that no motion for preliminary approval is required under Rule 23(b)(2). Plaintiffs may include their request for attorneys' fees and costs and payment of service awards with the motion for final approval, or as a separate motion, at their election and subject to any other schedule ordered by the Court. At the final approval hearing, Plaintiffs will request that, in addition to granting final approval of the Settlement and certifying the Settlement Class, that the Court also direct that the Lawsuit be dismissed with prejudice, and release the Released Class Claims and Released Plaintiff Claims as set forth herein, and reserve jurisdiction with respect to implementing and enforcing the terms of this Agreement.

**6.** **CAFA Notice.** Google will be responsible for compliance with any Class Action Fairness Act notice requirements pursuant to 28 U.S.C. section 1715 (including the costs of compliance) and shall take steps to comply with such notice requirements in as expeditious a manner as possible (including, without limitation, by serving the notice required under 28 U.S.C. § 1715 within ten days of the filing of the motion for final approval of the Settlement).

**7.** **Effect of Non-Approval or Material Modifications**. In the event the Court does not grant final approval of the Settlement or requires any material modification to the Settlement to which any Party does not assent, the litigation will return to the status quo before submission of the Settlement for approval.

**8.** **Release of Settlement Class Claims**. Upon the Effective Date, all Settlement Class Members will be deemed to have fully, finally and forever released, relinquished and discharged all Released Class Claims against Google. Upon the Effective Date, all Settlement Class Members will be forever barred and enjoined from commencing, instituting, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, asserting any Released Class Claim against Google. As to the Released Class Claims only, all Settlement Class Members hereby expressly, knowingly, and voluntarily waive the provisions of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Settlement Class Members expressly waive and relinquish any and all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory that is similar, comparable, or equivalent to Section 1542, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Released Class Claims. In connection with such waiver and relinquishment,

Settlement Class Members hereby acknowledge that they are aware that they or their attorneys may hereinafter discovery claims or facts in addition to or different from those they now know or believe to exist with respect to the Released Class Claims, but that it is their intent to hereby fully, finally, and forever settle and release all of the Released Class Claims known or unknown, suspected or unsuspected, matured or unmatured, disclosed or undisclosed, contingent or absolute, liquidated or unliquidated, accrued or unaccrued, apparent or unapparent, that they have against Google. In furtherance of such intention, the Release herein given by Settlement Class Members to Google shall be and remain in effect as a full and complete general release as to the Released Class Claims, notwithstanding the discovery or existence of any such additional different claims or facts. Each of the Settling Parties expressly acknowledges that they have been advised by their attorneys of the contents and effect of Section 1542, and with knowledge, each of the Settling Parties hereby expressly waives whatever benefits they may have had pursuant to such section. Plaintiffs acknowledge that the foregoing waiver was separately bargained for and a material element of the Settlement for which this Release is a part.

**9.** **<u>Release of Individual Plaintiff Claims</u>.** Upon the Effective Date, all Plaintiffs will be deemed to have fully, finally, and forever released, relinquished, and discharged all Released Plaintiff Claims against Google. Upon the Effective Date, all Plaintiffs will be forever barred and enjoined from commencing, instituting, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, asserting any Released Plaintiff Claims against Google. As to the Released Plaintiff Claims only, all Plaintiffs hereby expressly, knowingly, and voluntarily waive the provisions of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY

Plaintiffs expressly waive and relinquish any and all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory that is similar, comparable, or equivalent to Section 1542, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Released Plaintiff Claims. In connection with such waiver and relinquishment, Plaintiffs hereby acknowledge that they are aware that they or their attorneys may hereinafter discover claims or facts in addition to or different from those they now know or believe to exist with respect to the Released Claims, but that it is their intent to hereby fully, finally, and forever settle and release all of the Released Claims known or unknown, suspected or unsuspected, matured or unmatured, disclosed or undisclosed, contingent or absolute, liquidated or unliquidated, accrued or unaccrued, apparent or unapparent, that they have against Google. In furtherance of such intention, the Release herein given by Plaintiffs to Google shall be and remain in effect as a full and complete general release as to the Released Claims, notwithstanding the discovery or existence of any such additional different claims or facts. Each of the Settling Parties expressly acknowledges that they have been advised by their attorneys of the contents and effect of Section 1542, and with

knowledge, each of the Settling Parties hereby expressly waives whatever benefits they may have had pursuant to such section. Plaintiffs acknowledge that the foregoing waiver was separately bargained for and a material element of the Settlement for which this Release is a part.

## E. DESTRUCTION OF NON-PUBLIC MATERIALS

**1. Stipulated Protective Order**. The Settling Parties and their counsel will comply with the terms concerning the destruction of Protected Material described in the Stipulated Protective Order Governing the Exchange of Confidential Discovery Material As Modified by the Court ("Protective Order") entered in this Action (ECF No. 59) and their continuing obligation to not disclose in any manner any information or item that is subject to the Protective Order to any person or entity except in strict compliance with its provisions. The Protective Order provides that "final disposition" of the Action triggers the duty to destroy or return all Protected Material. For purposes of the Protective Order, "final disposition" is the Effective Date.

**2. Verifications**. The Settling Parties' respective counsel will each issue verifications via email certifying that the provisions of paragraph E.1 above have been complied with within sixty days of the Effective Date.

## F. NO ADMISSION OF LIABILITY

**1. No Admission of Liability**. This Settlement is the resolution of a dispute between the Settling Parties. Nothing in or required by this Agreement, or anything that any of the Settling Parties stated or did during the negotiation of this Settlement or Agreement, will be construed or used in any manner as an admission of liability or evidence of either Party's fault, liability, or wrongdoing. The Settling Parties expressly deny any liability or wrongdoing whatsoever.

**2. Limitation on Use of Settlement Terms**. Except as otherwise provided or in connection with the settlement approval process (including Plaintiffs' Counsel's anticipated motion for an award of attorneys' fees and expenses) or to enforce the Settlement, neither the Settling Parties nor their counsel will attempt to use any aspect of this Settlement or Agreement as evidence in this or any other matter.

## G. GENERAL TERMS

**1. Entire Understanding**. This Agreement constitutes the complete, final and exclusive embodiment of the entire agreement between the Settling Parties with regard to the subject matter herein. It is entered into without reliance on any promises, warranties, or representations, written or oral, other than those expressly contained herein, and it supersedes any other promises, warranties, or representations.

**2. Modification**. This Agreement cannot be modified or amended except by a written agreement, signed by the Settling Parties to be bound by such modification or amendment, and which specifically mentions this Agreement.

**3.** **Binding on Successors**. This Agreement is binding on, and inures to the benefit of, the successors and assigns of each Plaintiff and Google.

**4.** **Severability.** Except as otherwise provided in this Agreement, the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

**5.** **No Construction Against Any Party**. This Agreement shall be construed as if the Settling Parties jointly prepared it. Any uncertainty or ambiguity shall not be interpreted against any one Party, even if that Party prepared the Agreement.

**6.** **Parties' Knowledge and Advice of Counsel**. The Settling Parties execute this Agreement freely and voluntarily and without acting under any duress or in reliance upon any threat by or on behalf of the other Party. Each Party has consulted with or has had an opportunity to consult with counsel of its own choice about the legal effect of entering into this Agreement, and executes this Agreement being fully informed as to its terms, content, and legal effect.

**7.** **No Waiver**. No Party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement. Moreover, a waiver of any breach of this Agreement by any Party shall not be deemed a waiver by any Party of any other breach of this Agreement.

**8.** **Authority to Execute**. Each counsel or other person executing the Agreement on behalf of a Party hereto warrants that such person has the full authority to do so. Plaintiffs' Counsel, on behalf of Plaintiffs and the Settlement Class, are expressly authorized to take all appropriate action required or permitted to be taken pursuant to the Agreement to effectuate its terms. All Settling Parties covenant and represent that they have consulted with competent counsel prior to entering into this Agreement.

**9.** **No Prior Agreements**. The Settling Parties represent, covenant, and warrant that they have not directly or indirectly, assigned, transferred, encumbered, or purported to assign, transfer, or encumber to any person or entity any portion of any liability, claim, demand, action, cause of action, or other rights released or discharged in this Settlement except as set forth in this Agreement.

**10.** **Non-Retaliation**. Google agrees to refrain from any retaliation against Plaintiffs (including their families, agents, counsel and businesses), including through coercion, disparagement, action or inaction. Nothing in the foregoing shall be deemed to restrict Google's right to enforce its Terms of Service, policies, and other rules governing Plaintiffs' (including their families, agents, counsel and businesses) use of Google products and services.

**11.** **Choice of Law and Continuing Jurisdiction**. This Agreement should be interpreted, enforced, construed, and controlled by the laws of the State of California, without reference to principles of conflicts of choice of law provisions. The Court will retain jurisdiction with respect to implementation and enforcement of the terms of the Agreement, and all Settling

Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in the Agreement and matters related to this Settlement.

**12.** **Counterparts**. This Agreement may be executed by the Settling Parties in counterparts and exchanged by electronic means, with the same effect as if all Settling Parties had signed the same instrument.

*[Remainder of page intentionally left blank. Signature pages follow.]*

The Parties have agreed to the terms of this Agreement and have signed below.

Dated: 8/2/25

**TERRY DIGGS**

Terry Diggs
______________________________

Dated:

**RETHENA GREEN**

______________________________

Dated:

**JOHN KEVRANIAN**

______________________________

Dated:

**SALVATORE TORONTO**

______________________________

The Parties have agreed to the terms of this Agreement and have signed below.

Dated: **TERRY DIGGS**

________________________________

Dated: 9/2/2025 **RETHENA GREEN**

________________________________

Dated: **JOHN KEVRANIAN**

________________________________

Dated: **SALVATORE TORONTO**

________________________________

The Parties have agreed to the terms of this Agreement and have signed below.

Dated: **TERRY DIGGS**

______________________________

Dated: **RETHENA GREEN**

______________________________

Dated: 9-2-2025 **JOHN KEVRANIAN**

John Kevranian

Dated: **SALVATORE TORONTO**

______________________________

The Parties have agreed to the terms of this Agreement and have signed below.

Dated: **TERRY DIGGS**

______________________________

Dated: **RETHENA GREEN**

______________________________

Dated: **JOHN KEVRANIAN**

______________________________

Dated: 2 SEPT 2025 **SALVATORE TORONTO**

______________________________

Dated: 09/02/2025

**CHRISTOPHER VALENCIA**

______________________________

Dated:

**TARA WILLIAMS**

______________________________

Dated:

**KIMBERLEY WOODRUFF**

______________________________

Dated:

**GOOGLE LLC**

______________________________

By: Cassandra Knight
Title: Vice-President, Litigation & Discovery

*Approved as to Form:*

Dated:

**PRITZKER LEVINE LLP**

______________________________

Elizabeth Pritzker
*Interim Class Counsel for Plaintiffs*

Dated: **CHRISTOPHER VALENCIA**

Dated: 9/2/2025 **TARA WILLIAMS**

Dated: **KIMBERLEY WOODRUFF**

Dated: **GOOGLE LLC**

By: Cassandra Knight
Title: Vice-President, Litigation & Discovery

*Approved as to Form:*

Dated: **PRITZKER LEVINE LLP**

Elizabeth Pritzker
*Interim Class Counsel for Plaintiffs*

Dated: **CHRISTOPHER VALENCIA**

______________________________

Dated: **TARA WILLIAMS**

______________________________

Dated: Sept 2, 2025 **KIMBERLEY WOODRUFF**

Kimberley Woodruff

Dated: **GOOGLE LLC**

______________________________

By: Cassandra Knight
Title: Vice-President, Litigation & Discovery

*Approved as to Form:*

Dated: 9/2/2025 **PRITZKER LEVINE LLP**

______________________________

Elizabeth Pritzker
*Interim Class Counsel for Plaintiffs*

Dated: **CHRISTOPHER VALENCIA**

______________________________

Dated: **TARA WILLIAMS**

______________________________

Dated: **KIMBERLEY WOODRUFF**

______________________________

Dated: September 2, 2025 **GOOGLE LLC**

Cassandra Knight
______________________________

By: Cassandra Knight
Title: Vice-President, Litigation & Discovery

*Approved as to Form:*

Dated: **PRITZKER LEVINE LLP**

______________________________

Elizabeth Pritzker
*Interim Class Counsel for Plaintiffs*

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION* | **CASE NO. 4:21-CV-02155-YGR-VKD** |
| *This document applies to all actions.* | **DECLARATION OF ELIZABETH C. PRITZKER IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF A SETTLEMENT CLASS AND FINAL APPROVAL OF SETTLEMENT**<br><br>***REDACTED VERSION***<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

I, Elizabeth C. Pritzker, hereby declare as follows:

1. I am a partner of Pritzker Levine LLP, and an attorney licensed in the State of California and duly admitted to practice before this Court. On August 3, 2021, I was appointed to serve as Interim Class Counsel on behalf of plaintiffs. *See* ECF 77. This declaration is made in support of Plaintiffs' Motion for Certification of a Settlement Class and Final Approval of Settlement. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

## CASE HISTORY

### A. Commencement and Organization of the Litigation and the Motion to Dismiss

2. The litigation commenced on March 26, 2021 with the filing of plaintiffs' initial class action complaint (*Hewitt v. Google*), which alleged that defendant Google's selling and sharing of Google U.S. account holders' data in Google's real-time bidding (or "RTB") auctions breached Google's contractual promises to its U.S. account holders and violated various federal and state laws. *See* ECF 1.

3. The filing of the complaint was preceded by months of investigation by plaintiffs' counsel, including consultation with several technical and privacy experts. This lengthy pre-filing investigation was necessary here for several reasons. First, while Google's RTB auction practices are vast in volume and scope, they are virtually unknown to most consumers and not disclosed anywhere to Google's U.S. account holders. Significant work by plaintiffs' counsel and their experts was thus necessary simply to understand what Google was actually doing with account holder data in its RTB auctions. Second, the case involves a unique and highly complex cutting-edge technology created and maintained by one of the largest and most sophisticated technology companies in the world. It took months for plaintiffs' counsel and their experts simply to understand this technology well enough to be comfortable proceeding with the litigation. Third, unlike many other privacy cases that follow the disclosure of a government proceeding or some other public exposure of the practices at issue, here there was no such government proceeding or public disclosure by Google or anyone else.

4. On April 9, 2021, the case was reassigned to then District Judge Lucy Koh, who determined that the case was related to two other class action privacy cases already pending against Google in her courtroom: *Brown v. Google*, Case No. 20-cv-05146-YGR (N.D. Cal.) ("*Brown*"), and *Calhoun v. Google*, Case No. 20-cv-03664-YGR (N.D. Cal.) ("*Calhoun*"). *See* ECF 11-12.

5. On May 5 and 18, 2021, two additional RTB-related class actions were filed against Google: *Delahunty v. Google*, Case No. 21-cv-03360-YGR (N.D. Cal.) ("*Delahunty*") and *Toronto v. Google*, Case No. 21-cv-03725-YGR (N.D. Cal.) ("*Toronto*"). On June 24, 2021, *Hewitt*, *Delahunty* and *Toronto* were related and consolidated by Judge Koh and the litigation was renamed *In re Google RTB Consumer Privacy Litigation*. *See* ECF 69.

6. On August 3, 2021, Judge Koh appointed me to serve as Interim Class Counsel for plaintiffs and a Plaintiffs' Executive Committee consisting of myself, Lesley Weaver of Bleichmar Fonti & Auld LLP, Jay Barnes of Simmons Hanley Conroy, David Straite of DiCello Levitt Gutzler LLP, Nanci Nishimura of Cotchett Pitre & McCarthy LLP, and Francis Bottini of Bottini & Bottini, Inc. *See* ECF 77.

7. On August 27, 2021, plaintiffs filed a comprehensive amended and consolidated class action complaint (the "Complaint"), which asserted the following claims against Google on behalf of a nationwide class of all Google U.S. account holders from June 29, 2016 to the present: (i) breach of contract; (ii) breach of confidence; (iii) invasion of privacy; (iv) intrusion upon seclusion; (v) publication of private facts; (vi) for violations of the California Information Privacy Act ("CIPA"), Cal. Penal Code § 631.2; (vii) for violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.; (viii) breach of the implied covenant of good faith and fair dealing; (ix) for violations of the Electronic Communications Privacy Act ("ECPA") – Unauthorized Interceptions, Use and Disclosure, 18 U.S.C. § 2511 *et seq*.; (x) for violations of the ECP Wiretap Act – Unauthorized Disclosure of Electronic Communications by an ECS, 18 U.S.C. § 2511 *et seq*.; (xi) for violations of the ECPA Stored Communications Act – Unauthorized Disclosure of Electronic Communications by an ECS, 18 U.S.C. § 2511 *et seq*.; and (xii) for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq*. *See* ECF 80 and 92. This was the operative complaint in the litigation.

8. On September 2, 2021, Judge Koh set an initial case schedule and ordered plaintiffs to identify their eight "priority claims" that they intended to proceed on. *See* ECF 83. On September 15, 2021, plaintiffs identified their eight "priority claims" that they intended to proceed on. *See* ECF 91.

9. On October 1, 2021, Google moved to dismiss all eight of plaintiffs' priority claims asserted in the Complaint. *See* ECF 93. The motion was extensively and fully briefed by November 19, 2021. *See* ECF 103-104, 122. However, before the motion could be argued or ruled on by Judge Koh, she was elevated to the Ninth Circuit, and on January 24, 2022, the case was reassigned to this Court. *See* ECF 132, 138.

10. On June 13, 2022, the Court largely denied Google's motion to dismiss the Complaint, finding that plaintiffs had sufficiently alleged that they were injured by Google's conduct with respect to the RTB auctions and that plaintiffs had alleged facts in the Complaint sufficient to support all of their claims with the exception of their breach of the implied covenant of good faith and fair dealing claim, which was dismissed without prejudice. *See* ECF 233. Google answered the Complaint on July 15, 2022, asserting eight affirmative defenses to the claims asserted. *See* ECF 258.

B. Discovery

11. The litigation involved extensive, thorough, and hard-fought discovery by both plaintiffs and Google. Discovery lasted more than three years and was contentious during that entire period. There were early disputes over the entry of a routine ESI protocol, the identity and number of key Google custodians whose files would be searched for responsive information, the sources of electronic discovery, and the search terms that Google would use to search for responsive information.

12. Plaintiffs ultimately served Google with 141 document requests, 23 interrogatories, and 560 requests for admissions. Google objected to each and every one of plaintiffs' various written discovery requests and virtually all of the discovery plaintiffs served ultimately ended up before the Magistrate Judge to be resolved after the dozens of meet and confers between plaintiffs and Google were unable to resolve Google's objections to the discovery. In total, plaintiffs ended up filing 37 discovery motions before the Magistrate Judge, two discovery-related contempt and sanctions

motions, and seven appeals to the District Court of discovery rulings by the Magistrate Judge, which were necessary to preserve issues for trial and any possible appeals.

13. In response to plaintiffs' document requests, Google ultimately produced more than 57,000 documents from 23 custodians, many of which were highly technical in nature and required the assistance of experts to understand. In addition to these documents, Google also produced more than [redacted] of computer data that included almost [redacted] million individual RTB bid requests associated with the seven plaintiffs and almost [redacted] individual RTB bid requests associated with the class as a whole. All of this data was analyzed and reviewed by plaintiffs' experts and, in summary form, reviewed by plaintiffs' counsel. This data served as one of the primary bases for plaintiffs' two class certification motions.

14. There were also extensive disputes about Google's thousands of privilege claims, which, after several motions before and rulings by the Magistrate Judge, ultimately resulted in the appointment of a Special Master (retired Judge James Warren of JAMS) in October 2024 to sort through the remaining extensive privilege issues. *See* ECF 744. This months-long process, which included briefing and hearings before the Special Master, was still ongoing at the time the parties reached their settlement in this matter.

15. Obtaining relevant discovery from Google was also made difficult because although this case was deemed related to the *Brown* and *Calhoun* cases also pending against Google, there was no cross-use of discovery allowed as between this case and *Brown/Calhoun*, even though those two cases did share discovery. As a result, even though *Brown* and *Calhoun* were more advanced in discovery and dealt with some of the same areas of discovery (and deponents), plaintiffs here had to start from scratch and fight, again, to obtain some of the same discovery and deposition testimony that had already been obtained, after months of opposition by Google, in *Brown* and *Calhoun*.

16. During the discovery period, plaintiffs also sought discovery from 51 entities that were participating, as either a publisher or bidder, in Google's RTB auctions during the relevant time period. Negotiating and obtaining discovery pursuant to these 51 subpoenas was a lengthy and arduous process that took many months.

17. Discovery was not one-way in the litigation, as Google also sought and obtained

discovery from all seven of the plaintiffs. Google served 31 documents requests and 20 interrogatories on the plaintiffs, demanded detailed Stored Communications Act-compliant efforts from the plaintiffs simply to search in Google's own data for records of the plaintiffs' RTB-related transactions, and obtained images of plaintiffs' devices, settings, applications, and other electronically-stored data. Following extensive meet and confers, and at least one motion before the Magistrate Judge, all of the plaintiffs responded to Google's written discovery.

18. The parties also conducted a total of 31 depositions during the pendency of the litigation. Plaintiffs deposed 11 Google employees involved with either the RTB auctions or the disclosures and promises that plaintiffs were challenging in the litigation. Plaintiffs also took two Rule 30(b)(6) depositions of Google (through Google employees Glenn Berntson and Suneet Vakharia) on a number of RTB-related topics. Google, for its part, conducted lengthy depositions of all seven plaintiffs. Finally, in connection with the two class certification motions, there were 12 additional expert depositions (six taken by plaintiffs and six taken by Google), with three of the experts deposed twice.

19. Taken together, the discovery that plaintiffs conducted throughout the litigation provided a critical set of evidence that plaintiffs were in a position to use for class certification and, ultimately, to prove up their case at trial. For example, the voluminous bid data that Google was ultimately forced to produce for plaintiffs ([redacted] million bid requests) and the class ([redacted] bid requests) confirmed that each Google RTB bid request that Google shared with RTB auction participants around the world uniformly contained a core set of information that could be reasonably associated with a particular consumer or household by both Google and the RTB auction participants. Similarly, the depositions of Google employees that plaintiffs conducted confirmed that Google did not disclose its RTB auction practices to Google account holders and that there was no way for Google account holders to opt-out of or avoid having their data shared with RTB auction participants in the Google RTB auctions.

C. <u>Class Certification</u>

20. On July 14, 2023, plaintiffs filed their initial motion for class certification, seeking certification of a damages class under Fed. R. Civ. P. 23(b)(3) and an injunctive and declaratory relief

class under Fed. R. Civ. P. 23(b)(2). *See* ECF 545-546. Plaintiffs' motion was supported by expert reports from two technical experts (Professors Zubair Shafiq and Christopher Wilson), two economic/damages experts (Professor Robert Zeithammer and Greg Regan), and a privacy expert (Professor Neil Richards), as well extensive citations to the discovery record (which included documents and data produced by Google as well as testimony from plaintiffs and a number of Google employees). *Id.*

21. After deposing all of the plaintiffs and all of plaintiffs' experts, Google vigorously opposed the motion, contending that no class was certifiable under either Rule 23(b)(3) or Rule 23(b)(2) for a host of reasons. Google's opposition was supported by declarations from two Google employees (Suneeti Vakharia and Glen Berntson), two technical experts (Professors Aaron Striegel and Konstantinos Psounis), an economic/damages expert (Bruce Deal), and a survey expert (Professor Dominique Hanssens). *See* ECF 583-597. Google also filed a *Daubert* motion to exclude Prof. Richard's expert report. *See* ECF 582.

22. After deposing all of Google's experts, plaintiffs filed their class certification reply papers, which included rebuttal expert reports from all five of plaintiffs' class certification experts. *See* ECF 616-617. Plaintiffs also filed a *Daubert* motion to exclude portions of Mr. Deal's expert report. *See* ECF 624.

23. On February 21, 2024, the Court held a lengthy hearing on the class certification and two *Daubert* motions and, on April 4, 2024, issued its order on those motions. *See* ECF 690. The Court denied certification of a damages class under Rule 23(b)(3), and denied without prejudice certification of an injunctive and declaratory relief class under Rule 23(b)(2), subject to further briefing on two narrow issues, which the Court granted plaintiffs leave to address in a renewed class certification motion.[1] *Id.*

24. While the Court denied certification of a Rule 23(b)(2) class at that time, the order specifically found that plaintiffs had satisfied all of the requirements for certification under Rule 23(a) and instructed the parties not to address these elements again in any renewed class certification

---

[1] To preserve their appellate rights, plaintiffs filed a petition for permission to appeal this portion of the Court's order in April 2024. The petition was denied by the Ninth Circuit in June 2024.

motion. *See* ECF 690. This included findings that the class is sufficiently numerous under Rule 23(a)(1), that there are questions of fact and law common to the class under Rule 23(a)(2), that plaintiffs' claims are typical of the class under Rule 23(a)(3), and that plaintiffs and their counsel are adequate under Rule 23(a)(4). *Id*.

25. With respect to the two *Daubert* motions, the Court granted in part and denied in part Google's motion to exclude Professor Richards' expert report and denied without prejudice plaintiffs' motion to exclude Mr. Deal's expert report. *See* ECF 690.

26. Plaintiffs filed their renewed class certification motion on November 8, 2024, which was accompanied by a new expert report from plaintiffs' technical expert Professor Zubair Shafiq that analyzed all of the new class-wide RTB bid data that Google had produced following the denial of the initial class certification motion. *See* ECF 749-750.

27. After deposing Professor Shafiq on his new report, Google again opposed plaintiffs' class certification motion. *See* ECF 760-761. Google's opposition was accompanied by new expert reports from Google's two technical experts Professors Striegel and Psounis, both of whom were deposed by plaintiffs' counsel in anticipation of plaintiffs filing a reply in further support of the renewed class certification motion.

28. Further briefing on the renewed class certification motion was suspended in light of the parties then ongoing settlement negotiations, and was never completed in light of this settlement being reached.

D. <u>Expert Discovery and Trial Preparation</u>

29. While the settlement negotiations were ongoing, plaintiffs were also working with their merits experts on their respective analyses and draft merits expert reports in light of the then pending expert report deadlines. Plaintiffs were also looking ahead to anticipated summary judgment motions and trial, and had commenced efforts to streamline the process for the authentication and admission of potential exhibits to be used by the parties. This work continued during the settlement negotiations and only was suspended when the parties neared completion of the settlement process.

//

//

## THE SETTLEMENT

A. Settlement Negotiations

30. The parties began informally discussing a potential settlement of the litigation soon after the Court's April 2024 class certification order denying certification of a damages class, but appearing to indicate that the Court would certify an injunctive relief class if plaintiffs could address two remaining outstanding issues. At Google's request, plaintiffs made an initial formal settlement demand in July 2024.

31. The parties continued to informally discuss settlement throughout the fall of 2024, as briefing on and expert discovery related to plaintiffs' renewed class certification motion was underway. Ultimately, however, the parties agreed that in order to further and formalize the settlement discussions, a mediator should be retained. The parties thereafter retained JAMS mediator Shirish Gupta in January 2025.

32. The parties participated in a full day mediation session with Mr. Gupta on February 20, 2025, and made substantial progress during the mediation. A further mediation session was held with Mr. Gupta on March 7, 2025, during which more progress was made.

33. The parties continued to confer with each other and with Mr. Gupta throughout March and April 2025 on various key terms of an injunctive relief class settlement. During this period, plaintiffs' counsel also were consulting with their retained experts concerning certain aspects of the proposed settlement that was being negotiated.

34. A third mediation session with Mr. Gupta was held on April 29, 2025. Following that session, the parties had several Zoom sessions with Mr. Gupta, and on May 6, 2025, the parties reached agreement on the material terms of an injunctive relief class settlement.

35. It was only after reaching agreement on the material terms of a class settlement that the parties then discussed and reached agreement on the resolution of the plaintiffs' individual claims, in the form of a service award of $15,000 per plaintiff, which included potential individual damage claims. Each plaintiff submits with this declaration a declaration attesting to the work performed for the benefit of the class, and plaintiffs' counsel filed supporting declarations authenticating other evidence presented with the motion, discussing the case proceedings leading up to certification, and

attesting to their qualifications and experience to serve as class counsel. True and correct copies of these individual plaintiff declarations are attached as Exs. 4 through 10, hereto.

36. After further negotiations, on May 8, 2025, the parties reached agreement on a summary term sheet outlining the key terms of the class and plaintiff settlements.

37. Since that time, and throughout the months of May, June, July, and August, and over the Labor Day holiday, the parties have been engaged in negotiating and documenting the settlement in a formal settlement agreement. A number of these settlement discussions have included the mediator as well.

38. The parties exchanged draft forms of the settlement agreement in May, June, and July 2025 with an eye to meeting then-scheduled settlement approval motion deadlines of July 11, 2025, and then, July 31, 2025. These deadlines were extended twice, at Google's request, to allow for Google's various business units to prepare for and to vet the business practice changes and disclosures contemplated by the settlement. *See* ECF Nos. 768, 770, 772, 774. The settlement agreement was not finalized and signed until September 2, 2025.

39. As with the litigation, the settlement negotiations between plaintiffs and Google that ultimately spanned more an entire year were at all times arms' length and hard fought. The record confirms that plaintiffs negotiated and completed the class settlement first, before discussing any settlement of the plaintiffs' individual damage claims. Furthermore, at no point during the settlement negotiations did the parties discuss or negotiate any amount of attorneys' fees and costs that might be awarded to plaintiffs' counsel, and there is no clear sailing provision in the settlement agreement.

B. <u>Settlement Terms</u>

40. This litigation arises from Google's practice of sharing its U.S. account holders' personal information with hundreds of RTB auction participants around the world billions of times a day without disclosing this practice in any of Google's public-facing documents and without providing its U.S. account holders with any way to prevent the sharing of their personal information in the RTB auctions. As the Court noted in its April 2024 class certification order, what plaintiffs sought in the litigation was choice, transparency, and accountability with respect to Google's RTB auction practices. *See* ECF 690 at 25-26. As set forth below, the settlement terms agreed to by the

parties address all of these issues.

41. Choice - As part of the settlement, Google will create a new user control (the "RTB Control") that empowers settlement class members for the very first time to limit the information Google shares about them in the Google RTB auctions. Settlement class members will be able to activate the new RTB Control regardless of whether they are signed in or signed out of their Google accounts. Settlement class members who choose to limit data sharing by enabling the RTB Control will succeed in removing from Google RTB bid requests much of the key information that can be linked to them in the RTB auctions. Settlement Agreement ("SA") ¶ A.1.[2] Even on its own, the RTB Control achieved through the settlement satisfies a key litigation objective: it puts settlement class members in control of their privacy by making it very difficult, if not virtually impossible, for Google RTB participants to identify and/or track any settlement class member who enables the RTB Control, and results in those settlement class members no longer being tracked or targeted through RTB for personalized ads. Google has prepared a draft version of this RTB Control, which was shared with plaintiffs' counsel on August 22, 2025. While substantive, the late timing of Google's sharing of the draft RTB Control afforded plaintiffs' counsel no opportunity to discuss or negotiate modifications to its content and appearance. To allow for a negotiated process as contemplated by the parties' terms of settlement, the parties have scheduled a further session with the mediator, and will update the settlement approval motion filing with a public-filing of the proposed RTB Control in the public court docket on or before November 12, 2025, or 30 days prior to the objection deadline. *See* SA ¶ A.1.

42. Transparency - The settlement also satisfies the key litigation goal of transparency. There will be significant public outreach about the new RTB Control and how to access and use it. In particular, Google has agreed as part of the settlement to send an email to all currently active individual Google U.S. account holders at the email addresses maintained in their Google accounts advising them of the new RTB Control, of the options available to control the information provided to third parties through RTB, and of Google's new dedicated webpage (with a link to said webpage)

---

[2] A description of the specific data fields that will be modified or deleted from the RTB bid data as a result of the settlement appears in the declaration of plaintiffs' technical expert, Professor Zubair Shafiq, Ph.D., attached as Exhibit 2, hereto.

describing the RTB Control. SA ¶ A.2.b.[3] A new dedicated webpage maintained by Google will also disclose and describe the new RTB Control, and provide appropriate links to other relevant Google webpages and to the new RTB Control itself. *Id.* ¶ A.2.a. Google also has agreed as part of the settlement to change its current ads personalization settings webpages to disclose the new RTB Control, and will similarly link to other relevant Google webpages containing additional disclosures and information. *Id.* ¶ A.2.1.

43. Accountability - The settlement secures a new level of accountability. Google has agreed to disclose and include, in a new dedicated webpage, the new RTB Control, with appropriate links to other relevant Google webpages and the new RTB Control. SA ¶ A.2.a.. Google has prepared a draft version of this webpage, which was also shared with plaintiffs' counsel on August 22, 2025. As with the draft RTB Control, to allow for a negotiated process of the pertinent aspects of these disclosures, the parties have scheduled a further session with the mediator, and will update the settlement approval motion filing with a public-filing of the disclosures in the public court docket on or before November 12, 2025, or 30 days prior to the objection deadline. *Id.*

44. The settlement also preserves all settlement class members' potential individual damage claims. Because the Court denied certification of a damages class, plaintiffs neither negotiated for nor agreed to any settlement of damage claims for absent settlement class members. While all settlement class members will obtain the benefits of the injunctive relief provided by the settlement, they also retain the right to pursue individual damage claims against Google in the future. SA, Definitions, ¶ 14; ¶ D.8.

45. Finally, the settlement does not treat plaintiffs any better than or different than the absent settlement class members. While plaintiffs are releasing their individual damage claims here as part of the settlement, in order to remain on equal footing with the absent settlement class members who they represent, plaintiffs have agreed to forgo their individual damage claims. SA ¶ D.9.

[3] Although Google regards the number of U.S. Google account holders who it identifies through this metric as confidential, non-public commercially-sensitive information, Google has advised plaintiffs and the mediator that this number [redacted] confirming that the email notification provided for in the settlement will reach the vast majority of active U.S. Google account holders.

EXPERIENCE AND VIEWS OF CLASS COUNSEL

46. Plaintiffs' counsel with primary responsibility for leading this litigation and the settlement negotiations collectively have over one hundred and fifty years of experience litigating complex commercial cases and class actions. That experience and knowledge guided our approach to the litigation and the settlement that is now before the Court, and it is our view, individually and collectively, that the settlement is exceptional and in the best interests of the hundreds of millions of active Google account holders in the United States whose personal information is currently being shared and sold by Google in its RTB auctions.

47. As discussed above, the settlement is the result of more than four years of hard-fought litigation to obtain relevant discovery from Google and others and important orders from the Court, all of which were necessary to secure the settlement now before the Court. The settlement was itself the result of many months of arms' length negotiations between the parties and before Shirish Gupta, a nationally recognized JAMS mediator. These negotiations were conducted by experienced counsel with a full understanding of the strengths and weaknesses of their respective cases.

48. Considering all the circumstances and risks both sides faced were the case to continue, this settlement is an excellent result for the settlement class and the relief they will receive as a result of plaintiffs' counsels' efforts. As set forth above and in the Motion, the settlement provides valuable injunctive relief that provides benefits for all settlement class members now.

49. While plaintiffs' counsel are confident that had the litigation continued, they would have prevailed on their renewed class certification motion, defeated any summary judgment motion by Google, and prevailed at trial, there were nonetheless substantial risks that either no class would be certified, that Google might prevail on all or some of its anticipated summary judgment motion, or that plaintiffs would not meet their burden of proof at trial. The settlement now before the Court not only accomplishes most of plaintiffs' litigation goals, but avoids these litigation risks and provides certainty and substantial benefits to the settlement class now.

50. At no point during the mediation did the parties discuss or negotiate any amount of attorneys' fees and costs, and there is no clear sailing provision in the settlement agreement. Plaintiffs' counsel prioritized the Class's interests by focusing on obtaining the most expansive injunctive relief

possible without trading any portion of that relief for any fees or costs.

DECLARATIONS IN SUPPORT OF THE SETTLEMENT

51. Plaintiffs submit the following Declarations in support of their motion and of the settlement, true and correct copies of which are filed herewith:

a. Exhibit 2 - Declaration of Professor Zubair Shafiq;

b. Exhibit 3 - Declaration of Professor Robert Zeithammer;

c. Exhibit 4 - Declaration of plaintiff Terry Diggs;

d. Exhibit 5 - Declaration of plaintiff Rethena Green;

e. Exhibit 6 - Declaration of plaintiff John Kevranian;

f. Exhibit 7 - Declaration of plaintiff Salvatore Toronto;

g. Exhibit 8 - Declaration of plaintiff Christopher Valencia;

h. Exhibit 9 - Declaration of plaintiff Tara Williams;

i. Exhibit 10 - Declaration of plaintiff Kimberley Woodruff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 2nd day of September 2025 in Emeryville, California.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker