**No. 26-2638**

# In the United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

KIMBERLEY WOODRUFF; et al.,
*Plaintiffs-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:21-cv-02155-YGR (The Hon. Yvonne Gonzalez Rogers)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD VOLUME IV OF VII

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94602
(415) 692-0772

MATTHEW W.H. WESSLER
ALISA C. PHILO
GUPTA WESSLER LLP
1400 16th Street NW, Suite 225
Washington, DC 20036
(202) 888-1741
*matthew@guptawessler.com*

October 28, 2026

*Counsel for Plaintiffs-Appellants*

*(Additional counsel listed on inside cover)*

FRANCIS A. BOTTINI, JR.
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
(858) 914-2001

THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

DAVID A. STRAITE
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 993-1000

LESLEY WEAVER
ANNE K. DAVIS
STRANCH, JENNINGS & GARVEY, PLLC
1111 Broadway, Suite 03-130
Oakland, CA 94607
(341) 217-0550

BRIAN DANITZ
NANCI NISHIMURA
COTCHETT PITRE & MCCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

COOLEY LLP
WHITTY SOMVICHIAN (SBN 194463)
(wsomvichian@cooley.com)
AARTI REDDY (SBN 274889)
(areddy@cooley.com)
KYLE C. WONG (SBN 224021)
(kwong@cooley.com)
REECE TREVOR (SBN 316685)
(rtrevor@cooley.com)
ANUPAM DHILLON (SBN 324746)
(adhillon@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation,<br><br>This Document Relates to: *all actions* | Master File No. 4:21-cv-02155-YGR-VKD<br><br>**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Date: March 28, 2025<br>Time: 9:00 am<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL** |

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION .......... 1

II. FACTUAL & PROCEDURAL BACKGROUND .......... 2

III. LEGAL STANDARD .......... 4

IV. ARGUMENT .......... 5

- A. The RTB data produced to date confirms that the Plaintiff data is not representative of the class as a whole. .......... 5
  - 1. A significant portion of the putative class data omits the pseudonymous identifiers that are the premise of Plaintiffs' claims. .......... 5
  - 2. The majority of putative class data does not involve cookie matching, in contrast to the Plaintiffs data. .......... 10
  - 3. Many putative class members enabled privacy settings that limit the information in their RTB data, making them unlike Plaintiffs who never utilized such settings. .......... 11
  - 4. The putative class data shows there is no common question whether "contents" of communications were shared through RTB for purposes of Plaintiffs' CIPA claim. .......... 13
  - 5. Plaintiff's expert cannot replicate his purported analysis of the Plaintiffs' locations for any putative class members and his opinions are misleading as a whole. .......... 14
- B. The Court should disregard Prof. Shafiq's opinions as unsupported and misleading. .......... 17
- C. Plaintiffs' class definition is not viable. .......... 18

V. CONCLUSION .......... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple iPhone Antitrust Litig.*,
2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ... 4

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ... 13, 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970, 982–83 (9th Cir. 2011) ... 4

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ... 13

*Graham v. Noom*,
533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) ... 13

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ... 9

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ... 16

*Griffith v. TikTok, Inc.*,
2024 WL 4874556 (C.D. Cal. Oct. 22, 2024) ... 2, 18

*Griffith v. TikTok, Inc.*,
2024 WL 5279224 (C.D. Cal. Dec. 24, 2024) ... 15

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ... 12

*Heeger v. Facebook, Inc.*,
2019 WL 7282477 (N.D. Cal. Dec. 27, 2019) ... 17

*In re Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ... 14

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
2015 WL 4537957 (N.D. Cal. July 27, 2015) ... 9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ... 4, 17, 18

*RJ v. Cigna Health & Life Ins. Co.*,
2024 WL 1107826 (N.D. Cal. Feb. 12, 2024) ... 4

*Robbins v. Phillips 66 Co.*,
343 F.R.D. 126 (N.D. Cal. 2022) ..... 4

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014) ..... 13

**Statutes**

Fed. R. Civ. P. 23 ..... *passim*

## I. INTRODUCTION

In its April 2024 order denying class certification (the "Denial Order," ECF No. 690), the Court made clear that to certify an injunctive relief class, Plaintiffs must demonstrate that "the RTB data[1] produced thus far is representative of the class as a whole." Denial Order at 16. Despite ample opportunity to try to meet this burden—including Google's production of a massive dataset for putative class members in accordance with the sampling method Plaintiffs specifically requested—Plaintiffs still fall far short.

Plaintiffs' renewed motion for class certification (the "Motion," ECF No. 750-1) promises that "the Class data is essentially the same as the Plaintiff data," Mot. at 11, but this blithe generalization glosses over significant disparities that undercut Plaintiffs' claim and preclude class certification. As compared to the Plaintiff data, multiple categories of data that are the foundation of Plaintiffs' case are missing from much of the broader dataset for the putative class. Unlike the Plaintiff data, much of the broader dataset lacks the "pseudonymous identifiers" that Plaintiffs claim are a principal reason why RTB data allegedly constitutes "personal information." Unlike the Plaintiff data, the broader dataset shows that "cookie matching," another key premise of Plaintiffs' claims, never took place in most instances. And unlike Plaintiffs, many putative class members took advantage of various privacy-related settings that significantly reduced the extent of information contained in their RTB bid requests. Google disputes that any aspect of the data involving the Plaintiffs supports their individual claims, but regardless, these findings confirm that the data the Court previously considered for the Plaintiffs is ***not*** "representative of the class as a whole" under their own theories.

Plaintiffs' arguments to the contrary rest almost exclusively on the purported findings of their expert Prof. Zubair Shafiq, who assures the Court that "the Plaintiff data and the Class data are essentially the same for the purposes of this case and, therefore, the Plaintiff data is in fact representative of the Class as a whole." Suppl. Rep. of Prof. Zubair Shafiq ("Shafiq Suppl. Rep.")

---

[1] "RTB" refers to Google's real-time bidding process, the functionality of which is explained in Google's Opposition to Plaintiffs' first Motion for Class Certification, ECF No. 546. ECF No. 583-4 at 2-3. "RTB data" refers to the information contained in bid requests that are generated and sent to prospective advertisers when a user visits a website that participates in Google RTB. *See id.*

¶ 34, ECF No. 750-8. The analysis that purportedly supports this assertion, however, is incomplete, haphazard, and misleading. Among other glaring issues, Prof. Shafiq treated certain critical data fields as containing information when they plainly do not, and he simply ignores other fields because they undermine his claim about the allegedly hyper-granular location information in RTB data. While these issues are troubling, they are not surprising given that another federal court recently found that Prof. Shafiq engaged in "a deeply flawed analysis" that "contained numerous serious issues." *Griffith v. TikTok, Inc.*, 2024 WL 4874556, at *1, 2 (C.D. Cal. Oct. 22, 2024).

In sum, Plaintiffs fail to meet the burden imposed by the Court's Denial Order to show that their data is "representative of the class as a whole," the Motion fails to establish commonality under Rule 23(a), and the Court should now deny class certification with prejudice.

## II. FACTUAL & PROCEDURAL BACKGROUND

The Motion marks the second time that Plaintiffs have sought class certification. When they last moved to certify a class, the seven Plaintiffs and prospective class representatives argued that information about them allegedly shared through RTB satisfied both Rule 23(a) and the requirements for injunctive and damages classes under Rules 23(b)(2) and 23(b)(3). *See* Plaintiffs' Mot. for Class Cert. and Appointment of Class Reps. and Class Counsel (the "2023 Motion"), ECF No. 546. The 2023 Motion, like this case as a whole, centered on the information included in the "bid requests" that Google sends to participants in its RTB advertising system. Plaintiffs claimed this RTB data established a common question of whether Google "sold account holders' personal or sensitive information to RTB participants." Denial Order at 2. Specifically, Plaintiffs argued that "[a]ll of the 4.9 million bid requests" Google had produced "include[d] at least 60 common data fields, including: the Google user id, the specific URL of the website or app being visited, the IP address, the publisher ID, highly specific location data of the user, highly specific information about the user's device, [and] the language being used." 2023 Mot. at 7. In so doing, they contended, Google sent information that "uniquely identifies the class member to RTB participants, including a Google User ID and other information that uniquely identifies the class member and their device." *Id.* at 14.

Plaintiffs' arguments relied in large part on expert reports from Prof. Shafiq and Prof. Christopher Wilson. Prof. Wilson opined that "Google shares a 'common core set' of information in every RTB bid which can be linked to an individual account, such as: Google's unique identifier for a user, or a cookie, truncated IP address, a user's current latitude and longitude with accuracy, the make and model of their operating system, and the webpage the person is currently viewing." Denial Order at 13-14. Prof. Wilson also opined that RTB participants are able to identify the Plaintiffs through "cookie matching," a process by which a RTB participant matches a Google-provided cookie that is unique to a particular user (but does not disclose their identity) with the participant's own cookies. Class Cert. Rep. of Prof. Christopher Wilson ("Wilson Opening Rep.") ¶ 36, ECF No. 684-4.

Prof. Shafiq, reaching similar conclusions, asserted that RTB participants can first identify all bid requests associated with a given user based on their Google User ID, then use the data combined from these multiple bid requests to "stitch together detailed user profiles" and identify a Google account holder. Denial Order at 13 (citing Class Cert. Rep. of Prof. Zubair Shafiq ("Shafiq Opening Rep.") ¶ 79, ECF No. 684-3). Prof. Shafiq contended that when RTB participants analyze information provided in the combined bid requests, they can determine a user's identity. Shafiq Opening Rep. ¶ 88. Prof. Shafiq claimed that information combined from a "significant volume of bid requests" allows RTB participants to create "very rich profiles" with which he claims they could identify to identify where the Plaintiffs live and work, "what content they were viewing, and what device and operating system they used to view that content." Denial Order at 13; *see also* Shafiq Opening. Rep. ¶¶ 42, 79.

Based on this record, the Court concluded for class certification purposes that "***named plaintiffs'*** RTB data is uniformly personally identifying" and accepted Plaintiffs' argument that "this data, along with user lists and cookie matching, allows RTB participants to create detailed profiles for individual account holders." Denial Order at 16. Nevertheless, the Court found that "[w]hat remains untested is whether the RTB data produced" for the Plaintiffs "is representative of the class as a whole." *Id.* at 16-17. Without that proof, the Court concluded it could not find that the data produced for Plaintiffs was "representative of every other putative member of the class[,]"

so Plaintiffs failed to sufficiently establish commonality under Rule 23(a). *Id.* It thus denied certification of an injunctive relief class, but gave Plaintiffs leave to try again. *Id.*

Based on the Court's statements in the Denial Order, Google opted to forego a pending discovery dispute over the production of putative class data and voluntarily produced RTB data for U.S. Google account holders in response to Plaintiffs' requests. ECF No. 698; Somvichian Decl. Ex. 1, Supplemental Expert Report of Aaron Striegel ("Striegel Suppl. Rep.") (Jan. 31, 2025), ¶ 6. Prof. Shafiq (but not Prof. Wilson) reviewed this data, and Plaintiffs contend based on his supplemental expert report that "the Class data is essentially the same as the Plaintiff data" because "***all*** of the trillions of Google's daily RTB bids ***uniformly*** contain information that is in fact personally identifying for the Class as a whole." Mot. at 11, 16 (emphases added). As detailed below, this blanket statement is highly misleading and obscures substantial variation in the data: numerous fields that Plaintiffs say are critical to their claims are missing from the broader dataset, and Plaintiffs cannot replicate a key location analysis on which the Court relied on in finding the Plaintiff-level data to be "personally identifying."

## III. LEGAL STANDARD

To determine whether Plaintiffs have met their burden under Federal Rule of Civil Procedure 23, the Court "must "judg[e] the persuasiveness of the evidence presented" for and against certification and "resolve any factual disputes necessary" to answer that question.. *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *10 (N.D. Cal. Mar. 29, 2022) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011)). Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *RJ v. Cigna Health & Life Ins. Co.*, 2024 WL 1107826, at *4 (N.D. Cal. Feb. 12, 2024) (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022)). Following the Denial Order, the principal question before the Court is whether "common questions of law or fact as to the class exist," particularly as to the representativeness of the Plaintiff data. Denial Order at 4 (citing Fed. R. Civ. P. 23(a)). On this point, "[t]he issue is not merely whether there are common questions, but common answers." *Robbins v. Phillips 66 Co.*, 343 F.R.D. 126, 131 (N.D. Cal. 2022) (finding answers as to class

claims would have required many individualized inquiries and thus denying certification of (b)(2) class for failure to establish commonality). Plaintiffs must also show that their claims or defenses "are typical of those of the class," and relatedly, that they "will fairly and adequately protect the interests of the class." Denial Order at 4 (quoting Fed. R. Civ. P. 23(a)).[2]

## IV. ARGUMENT

### A. The RTB data produced to date confirms that the Plaintiff data is not representative of the class as a whole.

Plaintiffs' Motion turns on the assertion that "because the Class data is ***essentially the same as the Plaintiff data***, the Plaintiff data is, in fact, representative of the Class as a whole." Mot. at 11 (emphasis added). The facts show otherwise, and the stark discrepancies between the datasets as a whole are fatal to Plaintiffs' Motion.

#### 1. A significant portion of the putative class data omits the pseudonymous identifiers that are the premise of Plaintiffs' claims.

First, Plaintiffs are not "representative of the class as a whole" because pseudonymous identifiers[3] are uniformly included in all of their data but are omitted for large swaths of the proposed class. Google disputes that the inclusion of pseudonymous identifiers is at all improper or supports Plaintiffs' claims, but these identifiers' alleged inclusion is nonetheless central to Plaintiffs' own claim that Google shares "personal information." *See, e.g.*, Am. Consol. Class Action Complaint ("Am. Compl.") ¶¶ 233 ("Google sells and shares Account Holders' device identifiers with RTB participants."), 513 ("[T]he identifiers Google discloses to the Google RTB participants are readily capable of being used by those companies to identify specific users even in

---

[2] The Supreme Court recently granted certiorari in *Laboratory Corporation of America Holdings v. Davis*, No. 24-304 (U.S. Jan. 24, 2025) (hereinafter "*LabCorp*"), which could affect the standards governing the circumstances when a class with uninjured members may be certified. While the Court's certiorari grant was limited to the question whether "a federal court may certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) when some members of the proposed class lack any Article III injury," *id.*, the petitioner-defendant's petition argued that Article III standing provides a ***constitutional*** basis for denying class certification, not just a basis under the Rule 23(b)(3) predominance framework. See *LabCorp*, Pet'n for Writ of Cert. at 4 (U.S. Sept. 13, 2024) ("Article III bars certification where the class includes any members lacking a concrete injury."). If petitioners raise this argument again on the merits and if the Court accepts it, such a constitutional rule would presumably apply to Rule 23(b)(2) classes as well. Google reserves the right to submit further briefing or seek other relief based on the opinion in *LabCorp*.

[3] "Pseudonymous identifiers," which Plaintiffs also call "unique identifiers" at times, are "a string of characters that can be used to uniquely identify a browser, app or device," but that do not themselves identify a natural person in the offline world. 2023 Mot. at 6.

the absence of a pre-existing database possessed by the recipient of Google's disclosures."), ECF No. 92. In the 2023 Motion, Plaintiffs told the Court that all bid requests include "unique identifiers associated with the class member . . . such as the Google User ID [and] device IDs" and claimed "these and other unique identifiers and sensitive information that Google routinely places in RTB bid requests" are sold "to hundreds of participants outside of Google in the Google RTB auction." 2023 Mot. at 7, 13 (emphasis original). Plaintiffs emphasized the alleged inclusion of pseudonymous identifiers in all RTB bid requests because their experts contended these identifiers provide the means by which RTB participants can try to personally identify individuals users. *See* Shafiq Opening Rep. ¶ 88(d) (claiming that "a 'pseudonymous' identifier can be used by RTB participant to contact and locate the corresponding natural person in the physical world."); Wilson Opening Rep. ¶ 60 (claiming that RTB participants can "translate the unique identifiers for individuals provided by Google within bid requests to their own unique identifiers for the same individuals" via cookie matching). *See also* Denial Order at 13 (noting Prof. Shafiq's claim that "all the bid requests it sends to RTB participants" include "an encrypted version of the Google User ID"), 14 (noting Dr. Wilson's claim that "every RTB bid" includes certain information including "Google's unique identifier for a user"). The evidence now shows, however, that the pseudonymous identifiers that are the foundation of Plaintiffs' claims are in fact ***omitted*** from a substantial portion of RTB data for the putative class.

Second, while all of the Plaintiff data included a Google User ID, it was omitted for ***over*** [redacted] of bid requests for putative class members. Striegel Suppl. Rep. ¶ 16. Given that fact, Plaintiffs' claim that "the Class data is essentially the same as the Plaintiff data" (Mot. at 11) is a gross overstatement that glosses over a critical divergence between the Plaintiff data and the broader data set. Worse, Prof. Shafiq's supplemental expert report appears designed to mislead the Court into concluding that the Google User ID was included in all bid requests for putative class members, when that is simply untrue. In describing the Plaintiff data analyzed in his first expert report, Prof. Shafiq summarizes: "I described many of the data fields that were commonly included in the Plaintiff data . . . These include: the unique Google User ID, which identifies the specific user and device." Shafiq Suppl. Rep. ¶ 27. That statement is accurate as far as it goes; 100% of the

Plaintiff data did include the Google User ID. But Prof. Shafiq goes on to claim in his supplemental report that "[e]xcept for the four data fields identified in paragraph 25 above[4], ***all these same data fields are present in the Class data, just like they are present in the Plaintiff data***." *Id.* If this assertion is intended, as it seems, to convey that the Google User ID is uniformly "present in the Class data," that is categorically false. Striegel Suppl. Rep. ¶ 67. On examination, Prof. Shafiq's assertion is based not on the inclusion of the Google User ID itself—but on a ***flag*** in the data that indicates ***whether or not*** the Google User ID is included in a bid request. While this flag[5] is included in all records in the broader dataset, the flag actually confirms that the Google User ID itself was omitted in over [redacted] of records.[6] In other words, all Prof. Shafiq shows is that the data consistently indicates ***whether or not*** the Google User ID was included in a bid request, which is obviously not the same as the Google User ID actually always being "present in the Class data," as Prof. Shafiq misleadingly suggests.

Third, mobile device IDs are included even less frequently in the broader data set, in only about [redacted]% of records. Confusingly, Prof. Shafiq includes a field regarding mobile device identifiers in his list of 58 fields that are supposedly "commonly included" in all RTB Data. Shafiq Suppl. Rep. Ex. C. But again, this assertion is based on a ***flag*** that does not actually contain a mobile identifier, but simply a numerical value (0 or 1) that indicates ***whether*** a mobile device identifier was included in the bid request. A proper analysis of this field shows that mobile device identifiers were omitted from more than [redacted]% of records in the broader data set involving a mobile device. Striegel Suppl. Rep. ¶ 24. Further, over [redacted]% of records in the broader data set have ***neither*** a Google User ID nor a mobile device identifier, in stark contrast to the Plaintiff data, which included one or more pseudonymous identifiers in 100% of records. *Id.* ¶ 38.

---

[4] Prof. Shafiq contends that just four fields that were present in the Plaintiff data are not uniformly present in the putative class member data: "city," "region," "model," and "brand."

[5] The flag is contained in a field named "google_user_id_present," which either contains a 1 (to indicate the ID was sent in the bid request) or a 0 (to indicate it was not). Striegel Suppl. Rep. ¶ 16.

[6] In deposition, Dr. Shafiq acknowledged that the field he relied on is a flag that indicates whether or not the Google User ID is included, not the identifier itself. Somvichian Decl. Ex. 3 ("Z. Shafiq Depo. Tr.") at 88:8-11.

These facts preclude any finding that the Plaintiff data is "representative of the class as a whole." Plaintiffs cannot credibly claim that the RTB data for the putative class is "uniformly personally identifying" in the same way they claim is true for the named Plaintiffs, when the data for a substantial portion of the putative class includes none of the pseudonymous identifiers that are a foundation of Plaintiffs' claims. Plaintiffs Motion theorizes, incorrectly, that these pseudonymous identifiers allow bid participants to reliably determine that a given bid request corresponds with a given user or device, but with these identifiers missing for a substantial portion of the broader dataset, Plaintiffs' theory falls under its own weight. Somvichian Decl. Ex. 2, Supplemental Expert Report of Konstantinos Psounis ("Psounis Suppl. Rep.") (Jan. 31, 2025), ¶ 6. Indeed, data for the putative class demonstrates that without a pseudonymous identifier, the remaining information in a given RTB bid request is often identical to information shared in [redacted] or [redacted] of other bid requests, making identification of a unique device or user effectively impossible. Prof. Shafiq's own examples make this point. *See* Shafiq Suppl. Rep. ¶¶ 43–44. For instance, in the exemplar record in Paragraph 43(a) of his Supplemental Report, Prof. Shafiq points to a particular user agent as part of the "extensive information" that he claims enables RTB participants to personally identify individuals. But that same user agent is shared across over [redacted] other records in the data. Striegel Suppl. Rep. ¶ 59. As another example, the truncated IP address associated with the bid request in Paragraph 43(c) of Prof. Shafiq's Supplemental Report is identical to the truncated IP address that appears in over [redacted] other bid request records. *Id.* ¶ 55. Plaintiffs fail to explain how this type of information could be used to identify a unique device (let alone to personally identify an individual) when it is shared commonly across so many records and devices in the data.

While Google assumes Plaintiffs will try to dispute these findings, the critical fact for class certification purposes is that whatever arguments or evidence Plaintiffs' counsel and their experts might muster on this point, they will ***not apply*** to the Plaintiffs themselves. That is, the Plaintiffs presumably will argue (as they have) that RTB participants can use the pseudonymous identifiers uniformly present in ***their*** data to determine which bid requests correspond to each Plaintiff. And as Prof. Shafiq argued and the Court accepted in the Denial Order, the Plaintiffs can then argue that

these "stitch[ed] together" bid requests can be used to personally identify and create profiles about them. Denial Order at 13. Google disputes all such arguments regarding the inclusion of pseudonymous identifiers, but for the substantial portion of data for the putative class that contains no pseudonymous identifiers, these arguments would not apply at all. Those putative class members would therefore have to find some ***other*** way to argue that RTB participants can link multiple bid requests to gather information to try to identify putative class members. *See supra* at 4. In short, Plaintiffs' theory of the case will fundamentally differ from that of many putative class members, and "proof of their own claims would not necessarily prove the other class members' claims." *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, 2015 WL 4537957, at *10 (N.D. Cal. July 27, 2015). This mandates denial of the Motion because a class cannot be certified where "[t]he representative plaintiffs simply do not have the appropriate incentive to establish . . . violations with respect to all of the absent class members." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) (finding that individual plaintiffs were not typical of the proposed class as a whole, since while all class members were allegedly injured by defendants' anticompetitive conduct, the scope and theory of their injuries were too different).[7]

Moreover, even where pseudonymous identifiers are included in bid requests, RTB bid participants cannot reliably identify particular individual users or households, as detailed in the Supplemental Psounis Report. Psounis Suppl. Rep. ¶¶ 21-26. Even where bid requests include pseudonymous identifiers, whether the information in those bid requests could ever be used to reliably identify any individual under Plaintiffs' theories is uncertain and variable. It depends, for example, on whether a device is in a city or other densely populated area, whether multiple people share a single device or account (as many Plaintiffs do), whether the device is using a virtual private

[7] Google recognizes that in the Denial Order, the Court determined that the Plaintiffs had established typicality because (a) they were "like all putative class members, subject to Google's Terms of Service, its Privacy Policy, and other standardized disclosures" and (b) "Google's RTB uniformly collects their information and shares or sells it to potential advertisers." Denial Order at 19. Based on the new information before the Court, Google respectfully subjects that this finding is no longer tenable. Plaintiffs will need to prove far more than that they entered into the same contract as other class members to win their case, and it is precisely because Google does ***not*** uniformly share identical information in RTB data that Plaintiffs cannot be typical representatives of the class.

network ("VPN") or other configuration that might affect its apparent IP address or location, and a host of other individualized factors. *See id.* § 4.B . At bottom, Plaintiffs cannot demonstrate that data for the putative class is "uniformly personally identifying" because pseudonymous identifiers are omitted in over [redacted] of the RTB data. Even where pseudonymous identifiers are included, Plaintiffs' experts fail to show how those fields, even in combination with others, can be used to identify a particular user or device.

**2. The majority of putative class data does not involve cookie matching, in contrast to the Plaintiffs data.**

Throughout this case, including the prior class certification briefing, Plaintiffs and their experts have emphasized cookie matching as a foundation of their claim that Google shares personal information through RTB. *See* Am. Compl. ¶ 250 ("Google does this through the sale and sharing of many data points, and also through 'cookie matching,' whereby participants can 'match their cookies with Google's' through a cookie-matching service that 'facilitates the creation and maintenance of the association between a bidder's cookie and the Google User ID.'"); Wilson Opening Rep. ¶¶ 43–49 (asserting that Google "facilitates the sharing and selling of individuals' information with RTB participants through cookie matching"), ¶ 61 ("Google distributes the unique identifiers that it has matched with RTB participants in the hosted_match_data field of bid requests.").[8] And concededly, the Plaintiff data shows that cookie matching occurred regularly for all Plaintiffs, with hosted match data (the output generated when there is a successful cookie match) included in roughly [redacted]% of their bid requests. Expert Report of Konstantinos Psounis ("Psounis Opening Rep.") ¶ 22, ECF No. 684-24.

But that is not the case for the putative class. Critically, as Google's expert Dr. Striegel finds, cookie matching did ***not*** occur in ***over*** [redacted]***%*** of records in the putative class data. Striegel Suppl. Rep. ¶ 17. In other words, when compared to the Plaintiff data, cookie matching is only [redacted] as prevalent in the putative class data, and many individuals likely did not experience any cookie matching because they blocked cookies in their web browser or through other means. *Id.* ¶ 39. The

[8] Cookie matching enables RTB participants to associate a first-party cookie with a Google User ID. Google's hosted match tag sends the participant-specified identifier to Google for matching. *See* ECF No. 684-23 ¶¶ 49-55.

concerns Plaintiffs and their experts have expressed about cookie matching (whose merits Google disputes) are therefore not applicable to these putative class members. Where no cookie matching occurs, RTB participants will not receive the "significant volumes of account holder information" that Plaintiffs claim are shared only through "RTB cookie matching." Wilson Opening Rep. ¶ 49. And without cookie matching, RTB participants will have no feasible way to link a bid request to whatever information they may have obtained about a user from other sources, as Dr. Psounis explains, significantly diminishing or eliminating the concerns about personal identification that is the thrust of Plaintiffs' claims. Psounis Suppl. Rep. ¶¶ 95-96.

Again, Plaintiffs may dispute these findings, but the critical point for this Motion is that any disputes over whether RTB data without cookie matching can constitute "personal information" will have little to no bearing on the Plaintiffs' own claims because all of them ***did*** experience cookie-matching. Plaintiffs gloss over this critical divergence, which underscores why Plaintiffs are not "representative of the class as a whole" and why the putative class data is not "uniformly personally identifying."

**3. Many putative class members enabled privacy settings that limit the information in their RTB data, making them unlike Plaintiffs who never utilized such settings.**

Plaintiffs also overlook the fact that many users take routine steps that cause certain information to be omitted from bid requests—unlike Plaintiffs, who never availed themselves of these options and whose RTB data therefore is correspondingly different. As explained in the declaration of Glenn Berntson, users can out of Google Personalized Ads ("GAP") in various ways, and when they do so, "certain data in RTB bid requests is omitted or generalized, including all identifiers and hosted match data, and cookie matching is also disabled." Decl. of G. Berntson ¶ 49, ECF No. 592-1. Notably, for the time period covered by the dataset Dr. Shafiq analyzed, none of the Plaintiffs opted out of GAP—even after filing this litigation and presumably learning of the option to do so. Striegel Suppl. Rep. ¶ 42. Nor did they bother to take advantage of settings in their web browsers and devices to block cookies and prevent tracking, or use other privacy-related features available outside of Google's own settings. *See* T. Diggs Depo. Tr. at 133:17 – 134:11, ECF No. 688-5; K. Woodruff Depo. Tr. at 156:6 – 157:21, ECF No. 688-7; Somvichian Decl. Exs.

4 (R. Green Depo. Tr.) at 147:6 – 154:8, 5 (S. Toronto Depo. Tr.) at 191:25 - 192:4, 6 (C. Valencia Depo. Tr.) at 228:17 – 229:4, 7 (T. Williams Depo. Tr.) at 142:11 - 143:1.

The RTB data for the putative class confirms that many users ***did*** take these straightforward steps, and that data for the putative class differs substantially from data for Plaintiffs as a result. For instance, a full [redacted]% of records in the putative class data set involved users who opted out of GAP. Striegel Suppl. Rep. ¶ 42. Again, none of the Plaintiffs did so. *Id.* Moreover, [redacted]% of records in the putative class data involve users who selected options on their mobile devices to "limit ad tracking," which causes mobile device identifiers and other information to be omitted from RTB data. *Id.* ¶ 41. None of the Plaintiffs took this step on their devices. *Id.* For users of Apple iPhones and other iOS devices in particular, over [redacted]% of records in the data involved the iOS-specific setting to limit app tracking.[9] *Id.* ¶ 40. In sum, the data shows that large groups of individuals in the putative class took various steps to limit the information shared via RTB, in stark contrast to Plaintiffs, who never bothered to avail themselves of these options.

One consequence of this discrepancy is that the Plaintiff data differs markedly from that of the putative class, as discussed above, which alone renders Plaintiffs' data not "representative of the class as a whole." Denial Order at 16. But Plaintiffs' outlier behavior also creates an additional roadblock to certification: they are subject to consent-related defenses that will not apply to large groups of putative class members. In the Denial Order, this Court found that "[i]mplied consent is an intensely factual question that requires consideration of the circumstances surrounding the alleged privacy violations." *Id.* at 20 (cleaned up). For Plaintiffs, this will include determining whether their failure to utilize any privacy controls—even after filing this lawsuit—constitutes implied consent under their particular circumstances. The specific evidence and arguments to resolve this issue for Plaintiffs will be "intensely factual," *id.*, and also entirely inapplicable to the many putative class members who ***did*** avail themselves of the many privacy controls that can limit RTB data. A class cannot be certified in these circumstances, where "it is predictable that a major focus of the litigation will be on a defense unique to" each Plaintiff that does not apply broadly to the proposed class as a whole. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

[9] Notably, none of the Plaintiffs used iOS mobile devices. Striegel Suppl. Rep. ¶ 40.

**4. The putative class data shows there is no common question whether "contents" of communications were shared through RTB for purposes of Plaintiffs' CIPA claim.**

A large portion of the putative class did not have the "contents" of their communications transmitted via RTB, and thus will not have a viable claim under CIPA. As the Ninth Circuit has held, contents of communications do not include customer record information, including "the name, address, and subscriber number or identity of a subscriber or customer," nor does it include "location data." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (quotations omitted); *Graham v. Noom*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) ("contents" of communications under the federal Wiretap Act and CIPA are the same). Moreover, basic URLs or app names do not reveal the contents of communications for purposes of CIPA. *Brown v. Google LLC*, 685 F. Supp. 3d 909, 935 (N.D. Cal. 2023). As the Ninth Circuit has explained, "full-string detailed URL[s]" that include "the exact subpage" can potentially reflect contents of communications because such "URLs, by virtue of including the particular document within a website that a person views, reveal much more information . . . divulg[ing] a user's personal interests, queries, and habits." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020) (quotations omitted). However, where a URL "includes only basic identification and address information, not a search term or similar communication made by the user," it is not considered the contents of a communication. *In re Zynga*, 750 F.3d at 1109. Accordingly, bid requests that do not include a "full-string detailed URL" and show just a top-level domain for a website or an app name would not contain contents of communications for CIPA purposes.[10]

Prof. Shafiq's supplemental report misleadingly implies that such "contents of communications" were consistently shared in the broader dataset, but this is false. Specifically, he notes that the detailed URLs in just twelve cherry-picked examples of bid requests reflect user navigation to specific web pages involving various health issues. Shafiq Suppl. Rep. ¶¶ 43-44. But looking beyond those twelve exemplars, a substantial portion of the [redacted] of bid requests Google produced do ***not*** include full, detailed URLs. As explained in the Striegel Supplemental Report, over [redacted]% of all bid requests contain nothing more than URLs for particular apps on the

[10] For example: https://policies.google.com/technologies/partner-sites?hl=en, but not google.com.

Google Play or Apple iTunes storefronts. Striegel Suppl. Rep. ¶ 80. These URLs occasionally provide the name of a particular app (and sometimes only include an app ID number), but do not reveal any additional information about a user's interaction with the app. *Id.* Moreover, of the remaining bid requests that do not include URLs to specific app pages, [redacted]% only include the base URL for the website visited, such as "https://mail.yahoo.com." *Id.* ¶ 82. This is akin to information found on the "outside of an envelope" and does not reveal the "contents" of users' communications, such as their "interests, queries, and habits." *See Brown*, 685 F. Supp. 3d at 936. Thus, there is a significant portion of the putative class whose URLs did not reveal "contents" of their communications.

Given the variation in the amount of information disclosed through URLs across the putative class member data, Plaintiffs have failed to carry their burden in demonstrating that their CIPA claim is suitable for determination on a classwide basis. *See In re Lenovo Adware Litig.*, 2016 WL 6277245, at *19 (N.D. Cal. Oct. 27, 2016) (denying certification where "[p]laintiffs' class-wide evidence . . . does not identify any particular 'violations' or instances of unauthorized interception" that applied across the entire class).

**5. Plaintiff's expert cannot replicate his purported analysis of the Plaintiffs' locations for any putative class members and his opinions are misleading as a whole.**

In its Denial Order, the Court placed weight on Prof. Shafiq's assertion that he was "able to pinpoint ***the exact coordinates*** of each Plaintiff's home and work locations based on the RTB bids within, at most, a three-kilometer error rate." Denial Order at 16 (citing Shafiq Opening Rep. ¶ 42(e)) (emphases added); *see also* 2023 Mot. at 7 (arguing that Google shared the "precise geolocation" and "highly specific location data" for the Plaintiffs); Am. Compl. ¶¶ 204, 243 (asserting that Plaintiffs were able to derive street-level addresses for 14 unidentified individuals from RTB bid request data). But Prof. Shafiq makes no similar claim that he—or any RTB participant—could similarly determine the home or work addresses of any putative class member based on information contained in the broader dataset. In fact, Prof. Shafiq confirmed in deposition that he is unable to do so. Z. Shafiq Depo. Tr. at 211:5-10. This alone provides further confirmation that the Plaintiff data is not "representative of the class as a whole." Denial Order at 16.

A closer examination of the reasons for this disconnect, however, is important to understand the misleading nature of Prof Shafiq's opinions on location data overall. Prof. Shafiq was able to reach the findings he made about the Plaintiffs only because he was ***told their actual home and work addresses*** as a starting point. From there, he was able to search Plaintiff RTB data and cherry-pick a handful of records with roughly corresponding latitude and longitude coordinates—out of many thousands that did not—to claim that he was "able to pinpoint the exact coordinates of each Plaintiff's home and work locations" Denial Order at 15 (citing Shafiq Opening Rep. ¶ 42(e)); *see also* Z. Shafiq Depo Tr. at 211:5-14 ("You need a ground truth."). This highly misleading analysis closely tracks what Prof. Shafiq was criticized for doing in *Griffith*. *See Griffith v. TikTok, Inc*., 2024 WL 5279224, at *12 (C.D. Cal. Dec. 24, 2024) ("[N]or is it even clear that Defendants obtained any personally identifiable information that Defendants would be able to associate with Plaintiffs ***without being able to work backwards*** from information on Plaintiffs' computers, as Dr. Shafiq did." (emphasis added)). Similarly here, Prof. Shafiq could not have "pinpointed" Plaintiffs' home and work locations from their RTB data without being able to work ***backwards*** from ***known*** locations. And because he could not work backwards in this way for any putative class members, his Supplemental Report does not purport to offer similar opinions about the putative class data as he claimed for Plaintiffs. Prof. Shafiq acknowledged as much in his deposition. Z. Shafiq Depo. Tr. at 211:9-10 ("… I don't know what the ground truth is [for putative class members]. But for named Plaintiffs, we know what ground truth is.").

There are multiple reasons why someone's precise location, including their home and work addresses, cannot be gleaned from the general location information in RTB data. First, as Prof. Shafiq concedes, the latitude and longitude coordinates in RTB bid requests, taken alone, correspond to an area of approximately 1.23 square kilometers. Psounis Suppl. Rep. ¶ 101. As a result, even without considering any of the other privacy-enhancing features of how location information is conveyed in RTB data, the most any RTB participant could ever determine about an individual's location is that they are in some unknown place within this 1.23 square kilometer area. And for all but the most rural of locations, population concentrations in the United States are so

dense that this information cannot be sufficient to ever identify an individual. *See* Psounis Suppl. Rep. ¶¶ 107, 129; Psounis Opening Rep. § IV.B.c.

Second, Prof. Shafiq continually and deliberately ignores that the latitude and longitude coordinates in RTB bid requests do not convey the actual coordinates of a user but are instead a reference point for determining a ***larger*** area. As Google informs RTB participants—and as Plaintiffs and Prof. Shafiq do not dispute—the latitude/longitude coordinates are "the center point of a circle" with a radius that fluctuates but is often multiple kilometers.[11] (Decl. of G. Bernston ¶ 31; *see also* Striegel Suppl. Rep. ¶ 32, Psounis Suppl. Rep. ¶ 100). In other words, the location conveyed in a bid request is a circular area extending ***beyond*** the 1.23 square kilometer area that corresponds to the latitude/longitude coordinates, and the device associated with the bid request ***can be anywhere in that larger circle.*** This area is often the size of entire metropolitan areas, as shown in the RTB data produced in this case. *See* Psounis Suppl. Rep. ¶¶ 65, 114, 119, 129. Prof. Shafiq, however, simply ignores that the location information in RTB data is determined from the ***combination*** of the latitude/longitude coordinates (the center point of the circle) ***and*** the additional area reflected in the accuracy field (the radius of the circle). As he acknowledged, "I'm taking the coordinates at their face value even though a field may say, like, this is inaccurate." Z. Shafiq Depo. Tr. at 217:16-18. This head-in-the-sand approach mirrors the flaws that led the *Griffith* court to express concern that "Dr. Shafiq's approach relies on several assumptions that Plaintiffs have not shown to be true." *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *8 (C.D. Cal. Sept. 9, 2024). Similarly here, nothing substantiates Prof. Shafiq's assumptions about location data, which run counter to the undisputed evidence of how RTB actually functions.

These features of how location information is conveyed in RTB effectively prevent the sort of identification that Plaintiffs claim, and Prof. Shafiq's own examples confirm this. Consider, for instance, the bid request Prof. Shafiq cites as showing an individual supposedly located "near the Pioneer Square in Portland, OR" based on the latitude and longitude coordinates [redacted]. Shafiq Suppl. Rep. ¶ 43(c). As Prof. Shafiq admits, he ignored the "accuracy" value in this bid

---

[11] The number of meters of the radius is contained in a field called "accuracy." The higher the number, the larger the radius, and the larger the circle that corresponds to the location of the device.

request (the radius of the circle around the latitude/longitude coordinates), which is nearly [redacted] ***kilometers***. Z. Shafiq 2024 Depo Tr. at 185:22-25; Striegel Suppl. Rep. ¶ 54; Psounis Suppl. Rep. ¶ 65. Once one accounts for this accuracy value, the location conveyed by this bid request is larger than the entire city of Portland and this individual could just as easily have been located "near" any number of other landmarks in the city, or even on the other side of the Oregon border in Washington State. Psounis Suppl. Rep. ¶ 65. Moreover, this combination of coordinates appears ***over*** [redacted] ***times*** just in the data samples Prof. Shafiq reviewed. *Id.*

Plaintiffs and Prof. Shafiq offer no method by which a RTB participant could determine—out of all the people in Portland and all the millions of users whose RTB data included the same coordinates—the identity of the individual associated with this bid request. When pressed, Prof. Shafiq conceded as much, acknowledging that "[t]his is not something that I investigate in my report." Z. Shafiq Depo. Tr. at 218:12-13. The same is true of all the other examples Prof. Shafiq cites, and of the data for the putative class as a whole. Psounis Suppl. Rep. ¶¶ 121-129. Prof. Shafiq's own examples thus disprove his claim that the location information in RTB data enables identification of individuals because "a generalized location, such as one that locates a user no more precisely than within several city blocks, may not implicate much in the way of privacy concerns." *Heeger v. Facebook, Inc.*, 2019 WL 7282477, at *3 (N.D. Cal. Dec. 27, 2019).

In sum, Prof. Shafiq's opinions regarding location data are unreliable and should be rejected in their entirety. But even taking them at face value, Prof. Shafiq's expert reports actually confirm that the Plaintiff data is not representative of the class as a whole because Prof. Shafiq, by his own admission, could not determine the home or work locations of any putative class members as he (purportedly) did for Plaintiffs.

### B. The Court should disregard Prof. Shafiq's opinions as unsupported and misleading.

As the Ninth Circuit explains, even without a formal *Daubert* challenge, "[c]ourts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23." *Olean*, 31 F.4th at 666 n.9. Here, the flaws in Prof. Shafiq's opinions described above provide ample grounds to reject his report in its entirety. But the problems

do not end there. Prof. Shafiq also counted substantively empty fields as if they were populated with information. This is no mere technical disagreement between Prof. Shafiq and Google's experts: Prof. Shafiq counted each field as being populated if it had ***anything*** in it, even a placeholder or "dummy" value that conveys no substantive information. Striegel Suppl. Rep. ¶ 56. For instance, even if a field contains just a set of brackets, Prof. Shafiq counts it towards his conclusion that values are present in the field for at least 98% of bid requests. *Id*. This tracks the same haphazard methodology that led Prof. Shafiq to conflate (1) the flags indicating ***whether*** the Google User ID and mobile device ID are present with (2) the pseudonymous IDs themselves. Prof. Shafiq used exactly the same "deeply flawed analysis" in *Griffth*, and the court there gave his opinions no weight as a result. *Griffith*, 2024 WL 4874556, at *2 (denying class certification and faulting Prof. Shafiq for including in his calculations "the word 'null,' the word 'undefined,' and an empty field"). Prof. Shafiq likewise tries to pass off location information with kilometers-wide areas of uncertainty as if they were granular, building-level coordinates, as discussed above. Like the court in *Griffith*, this Court should not credit Prof. Shafiq's misleading report—and without that report, Plaintiffs have no evidence to show that the Plaintiff data is representative of the class as a whole.

### C. Plaintiffs' class definition is not viable.

In general, if a class is "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Olean*, 31 F.4th at 669 n.14 (en banc) (citation and quotation omitted). Consistent with that rule, Plaintiffs' Motion acknowledges that a class definition should not be "overinclusive (that is, potentially inclusive of more than a de minimis number of uninjured class members." Mot. at 8. In attempting to cure the impermissible "failsafe" class proposed in the 2023 Motion, however, *see* Denial Order at 8-9, Plaintiffs have introduced a new class definition that violates this rule against overinclusive classes.

Specifically, Plaintiffs now propose to define the class as "all individual Google account holders subject to a Google U.S. Terms of Service ('ToS') who have an active Google account," as defined on a specified Google web page (the "Activity Definition Page"). *See* Mot. at 1, n.2.

Plaintiffs claim "there are no unimpacted Class members" under this definition because "Google RTB is pervasive and impacts plaintiffs and Class members in the same way." *Id.* at 9. But none of the evidence Plaintiffs cite for this proposition actually shows that Google RTB in fact affects all Google users with an active account. To the contrary, the definition of "active" includes many kinds of online activity that would never trigger an RTB bid request, such as "[r]eading or sending an email" using Gmail or "[u]sing Google drive." *See* Activity Definition Page. As Plaintiffs acknowledge, Google RTB "only implicates activity on non-Google services." Wilson Opening Rep. ¶ 96. Accordingly, someone who uses their Google account only for email or file storage would be an "active Google account" holder included in the proposed class, but may never have encountered Google RTB.

Plaintiffs try to assume this nuance away, arguing that "Google RTB is pervasive," "inescapable," and "ubiquitous" because many popular websites display ads through Google RTB. Mot. at 9; Shafiq Suppl. Rep. ¶ 49. Prof. Shafiq makes this assumption explicit, stating in conclusory terms that "all Google U.S. account holders with an active Google account" must have "necessarily [used] the internet" in a manner that would trigger RTB. Shafiq Suppl. Rep. ¶ 46. But he and Plaintiffs have done nothing to substantiate this assumption that all persons with active Google accounts would have engaged in internet usage that triggered RTB activity. Nor have Plaintiffs tried to quantify how many users within the class definition might have limited their online activity in a way that would have avoided RTB activity. Plaintiffs therefore fail to meet their burden to show that the new class definition is (in their own terms) not "inclusive of more than a de minimis number of uninjured class members." Mot. at 9. This failure of proof is particularly notable in that this Court specifically ruled, when rejecting Plaintiffs' class definition before, that they had failed to "satisfactorily demonstrate[]" that "Google shares ***all*** account holders' personal information through its RTB bids." Denial Order at 9 (emphasis added). Plaintiffs still fail to meet this requirement, which provides further grounds to deny Plaintiffs' Motion.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the Motion with prejudice.

Respectfully submitted,

Dated: January 31, 2025

COOLEY LLP

By: */s/ Whitty Somvichian*
Whitty Somvichian

Attorney for Defendant
GOOGLE LLC

312505476

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER DENYING PLAINTIFFS' MOTION FOR CONTEMPT AND SPOLIATION SANCTIONS RE NAMED PLAINTIFFS DATA**

(REDACTED)

Re: Dkt. No. 697

Plaintiffs move for an order finding defendant Google LLC ("Google") in contempt of the Court's previous discovery orders (Dkt. Nos. 487, 524) and sanctioning Google for spoliating evidence, contending that Google failed to preserve and produce certain data relating to the named plaintiffs. Dkt. No. 697. Google opposes the motion, both on the merits and on the ground that it is untimely. Dkt. No. 708. Having considered the parties' briefing and arguments at the hearing (Dkt. No. 714), the Court denies plaintiffs' motion for contempt and sanctions.

## I. BACKGROUND

On July 29, 2022, the parties filed a discovery dispute letter in which plaintiffs asked the Court to order Google to produce information regarding how Google links information it discloses through RTB with an account holder's Google account and what information is linked. Dkt. No. 269 at 2. Specifically, plaintiffs argued that "Google is purposefully withholding evidence that Google's internal systems *link* the information that Google sends through RTB *with* the Named Plaintiff's Google account. This linkage renders information disclosed through RTB *personal* information." *Id.* at 2-3 (emphasis in original). On August 26, 2022, the Court issued an order resolving this dispute. Dkt. No. 314 at 4-5. The order states in relevant part:

> Plaintiffs' premise is that if Google associates information with an account holder, the information is "personal" to the account holder because of that association. They seem to say that if such information is disclosed in an RTB auction, it is "personal information" of an account holder within the scope of discovery. The parties' arguments on this point are not well-developed. In particular, the Court is not persuaded that if an item of information *Google* associates with an account holder is shared with an RTB participant in a manner that (a) *eliminates* the association with a specific account holder and (b) does not allow the RTB participant to make the same association (*see* "cookie matching" discussion below), Google has necessarily shared "personal information" of an account holder with an RTB participant. If plaintiffs contend otherwise, they have not pointed the Court to any authority that supports their position.
>
> The Court expects Google *to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing.* If Google discloses information that allows an RTB participant to identify an account holder based on information the participant may have about that account holder, Google must produce records showing the disclosure of that information as well. Otherwise, plaintiffs have not shown they are entitled to discovery of all information Google maintains about an account holder *solely based on Google's internal linking of information with an account holder.*

*Id.* (emphasis added in second paragraph).[1]

On February 28, 2023, plaintiffs filed a motion seeking sanctions against Google. Dkt. No. 431. As relevant here, plaintiffs argued that Google "intentionally stripped out" data fields that would identify the named plaintiffs whose data they produced, making it difficult for plaintiffs to know which data is associated with a particular named plaintiff and to match later productions with earlier productions. *Id.* at 5. Specifically, plaintiffs claimed that Google deliberately omitted from its production the Google Account ID and Google User ID data fields, and the "joining keys" that link the two. *Id.* at 5-6. Google responded that it produced the named plaintiffs data using a unique "query ID" field that allowed plaintiffs to match prior productions with later productions of samples of named plaintiffs data. Dkt. No. 448 at 12. The Court held a hearing on the motion. Dkt. No. 478. On April 14, 2023, the Court denied plaintiffs' motion for sanctions. Dkt. No. 487.

---

[1] The parties' discovery dispute letter referred to four of plaintiffs' Requests for Production ("RFPs") including RFP 42. Dkt. No. 314 at 1-2.

United States District Court
Northern District of California

The order states in relevant part:

> The Court agrees with Google that [the Court's] prior orders did not specify how Google should produce data so that earlier productions can easily be matched with later productions. However, to the extent Google's productions from multiple different data sources *cannot* be easily matched up based on the query ID, as plaintiffs contend in their reply, Google's reliance solely on the query ID needlessly burdens plaintiffs.
>
> Accordingly, while Google's most recent data productions did not violate any directive in the Court's prior orders, Google must take care that all of its productions of named plaintiffs data can be easily correlated, and it must include the fields necessary to accomplish that result. During the hearing, Google acknowledged that it could include the Google Account ID, Google User ID, and "joining keys" without undue burden, and the Court expects that it will do so, including remedying its prior productions that omit this information.

*Id.* at 6-7. In a separate order issued the same day, the Court permitted plaintiffs to select six additional time periods for samples of named plaintiffs data that Google would be required to produce and ordered plaintiffs to "promptly advise Google of their selection." *See* Dkt. No. 483 at 2.

Shortly thereafter, the parties filed another discovery dispute letter regarding Google's compliance with the portion of the Court's April 14, 2023 order requiring Google to produce "the Google Account ID, Google User ID, and 'joining keys'". Dkt. No. 503. Plaintiffs complained that Google agreed to produce the Google Account ID (or [redacted]) data field but refused to produce the Google User ID or "joining keys." *Id.* at 1, 4. Google responded that because it [redacted] the "Google User ID," it could not produce this data field, and that (contrary to the Court's statements summarizing Google's position) no "joining keys" link the Google Account ID and the Google User ID. *Id.* at 5-6. The Court held a hearing on this dispute and issued an order on May 16, 2023. Dkt. No. 510 (sealed); Dkt. No. 524 (public). The order states in relevant part:

> From the parties' presentations at the May 16, 2023 hearing, the Court now understands the following: Google maintains [redacted] Google User ID which it calls the [redacted]. The [redacted]. The [redacted] is not shared with RTB participants as part of a bid request. Rather, Google

United States District Court
Northern District of California

includes an [redacted]. That [redacted] is populated in a data field called google_user_id." Google [redacted] google_user_id field that is transmitted as part of a bid request. Google does log the [redacted] and an [redacted]. However, [redacted]

With respect to "joining keys," the Court understands that plaintiffs use this term to refer to the internal mechanisms by which Google links a Google Account ID (or [redacted]) and a [redacted]. Google says [redacted].

The Court accepts Google's representation that the [redacted] google_user_id data field that is shared with RTB participants [redacted] and therefore cannot be produced to plaintiffs. However, the Court now appreciates that there is a different but related data item, the [redacted], that Google maintains internally, [redacted]. During the hearing, the Court inquired whether Google could produce [redacted], together with the Google Account ID (or [redacted]), for all sampled named plaintiffs data that the Court has previously ordered Google to produce, even though Google contends that the [redacted] is never shared with RTB participants. Google's counsel indicated he would need to investigate that possibility.

The Court also accepts Google's representation that it [redacted].

In these circumstances, the Court orders Google to investigate whether [redacted] may be produced, together with the Google Account ID (or [redacted]) where available, for all sampled named plaintiffs data. Google shall advise plaintiffs of the result of this investigation, and the parties shall jointly report to the Court whether and when Google will make a further production that includes the [redacted] information. If Google determines that the [redacted] information cannot be produced, the parties shall discuss whether any reasonable alternatives exist for the production of the same or similar information, and shall jointly report to the Court on this point.

*Id.* at 2-3.

Pursuant to the Court's direction, the parties filed a status report on May 24, 2023. Dkt. No. 529. The report stated in relevant part that "Google has represented that it performed a reasonable investigation and confirmed that it can produce the [redacted], where available, together with the Google Account ID [i.e. [redacted]], where available, for the prior and forthcoming productions of sampled named-Plaintiff data. Google has represented that it is working diligently to produce this additional information and endeavors to complete this production by June 2, 2023." *Id.* at 1. According to Google, it produced data samples in May and June 2023 that were consistent with the representations in the status report. Dkt. No. 708 at 6; Dkt. No. 708-2 ¶ 21.

On October 30, 2023, plaintiffs learned through deposition testimony of a Google representative that, in the normal course of business, [redacted]. Dkt. 697 at 9-10 (citing Rule 30(b)(6) deposition testimony of Glenn Berntson).

On November 17, 2023, plaintiffs asked Google to produce four additional samples of named plaintiffs data, beyond the six samples the Court had earlier allowed plaintiffs to select. *See* Dkt. No. 719-1; Dkt. No. 708-4. At that time, at least one of the requested samples encompassed a time period within the [redacted] retention period for [redacted] Dkt. No. 697 at 11. Google did not respond to plaintiffs' request until January 11, 2024, at which time it objected to the lateness of the request for additional data samples, but nevertheless agreed to produce the requested samples. Dkt. No. 708-4. In addition, Google's January 11, 2024 response included the following statements:

> As with prior productions, Google will not decrypt any encrypted [B]iscotti values in the data. For additional detail regarding the data that Google intends to produce from these data sources for these four additional one-week time periods, please refer to the explanations set forth in our May 8, 2023 and June 2, 2023 production cover letters.[2]

---

[2] The production cover letters are not part of the record. According to Google, its productions of

> Plaintiffs' request fails to specify what "joining keys" they are demanding or their relevance to this litigation. To the extent Plaintiffs are referring to [redacted] that can be used to decrypt certain encrypted pseudonymous identifiers in logs, Google will not produce any such [redacted]. Plaintiffs have not explained why they need this information to prosecute their claims, particularly in light of the voluminous data Google has already produced and the additional data it is committing to produce relating to the named Plaintiffs.

*Id.* at ECF 3. Google produced the four additional data samples on February 9, 2024, by which time the [redacted] retention period for all samples had expired. Dkt. No. 697 at 11.

On April 19, 2024, plaintiffs filed the present motion for an order finding Google in contempt of the Court's April and May 2023 orders for deliberately failing to maintain and produce [redacted] and [redacted] following those orders in 2023. Dkt. No. 697 at 14-15. Plaintiffs also move for evidentiary sanctions under Rule 37(e) of the Federal Rules of Civil Procedure, precluding Google from arguing that plaintiffs are unable to link RTB bid request data with account information for signed-out Google account holders, and for an adverse inference jury instruction. *Id.* at 16-17.

## II. LEGAL STANDARD

When a party "fails to obey an order to permit or provide discovery," Rule 37(b)(2)(A) permits a court to issue a further order imposing sanctions, including "prohibiting the disobedient party from supporting or opposing designated claims or defenses," "striking pleadings," "dismissing the action," or "treating as contempt of court the failure to obey [an] order . . . ." Fed. R. Civ. P. 37(b)(2)(A). To obtain a contempt order as a discovery sanction, the moving party must prove by clear and convincing evidence that a court order provided "unequivocal notice" that certain discovery must be produced. *Etienne v. Kaiser Found. Hosp.*, No. C11-02324 LB, 2012 U.S. Dist. LEXIS 91600, at *3 (N.D. Cal. July 2, 2012) (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992)); *see also F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (discussing clear and convincing evidence standard); *Koninklijke*

---

named plaintiffs' data samples in May and June 2023 included [redacted], but did not include *decrypted* [redacted] or [redacted]. *See* Dkt. No. 708 at 6; Dkt. No. 708-2 ¶¶ 20, 21, 25.

*Philips N.V. v. Elec-Tech Int'l Co.*, No. 14-cv-02737-BLF, 2015 WL 6449399, at *2 (N.D. Cal. Oct. 26, 2015) ("[C]ontempt requires the existence of a specific and definite court order."). A finding of contempt is improper where the violation was "based on a good faith and reasonable interpretation of the [order]." *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 289 F.R.D. 548, 553 (N.D. Cal. 2013).

With respect to electronically stored information ("ESI"), a court may impose sanctions under Rule 37(e) when "[ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and [the ESI] cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If a court finds that the loss of information has prejudiced the moving party, it may order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If a court finds that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the court may order an adverse evidentiary presumption, among other remedies. Fed. R. Civ. P. 37(e)(2).[3]

## III. DISCUSSION

### A. Timeliness of Plaintiffs' Motion

Fact discovery in this case closed on January 19, 2024. *See* Dkt. Nos. 530, 534. By operation of Civil Local Rule 37-3, plaintiffs' last day to file a discovery-related motion was January 26, 2024. *See* Civil L.R. 37-3 ("Where the Court has set separate deadlines for fact and expert discovery, no motions related to fact discovery may be filed more than 7 days after the fact discovery cut-off."). However, the parties filed a stipulated request asking the presiding judge to again extend the fact discovery motion deadline to February 2, 2024 so that they could "complete the meet and confer discussions [that] will allow the parties to hopefully resolve or narrow many of their outstanding discovery disputes." Dkt. No. 654 at 2. The presiding judge granted this request, with the result that the parties' deadline to file discovery-related motions was extended to February 2, 2024. *See* Dkt. No. 656. Plaintiffs filed the present motion on April 19, 2024, more

---

[3] Rule 37(e), as amended in 2015, displaces the Court's inherent authority to award sanctions with respect to ESI. *Gregory v. State of Montana*, 118 F.4th 1069, 1072 (9th Cir. 2024).

than two months after this deadline.

Plaintiffs have not shown good cause for their failure to file their motion by February 2, 2024, nor have they shown that they brought the motion "as soon as practicable" after learning the grounds for the motion. *See* Dkt. No. 711 at 2. The record reflects that with respect to samples of named plaintiffs data, plaintiffs knew as early as the May 24, 2023 status report, that Google intended to produce only encrypted [redacted], together with the Google Account IDs, or [redacted], for both prior and "forthcoming" productions of data samples, and that Google did not intend to produce decrypted [redacted] or [redacted]. Dkt. No. 529. Plaintiffs did not raise any dispute about Google's intended production with the Court, although they "reserve[d] all rights" to do so. *Id.* With respect to plaintiffs' subsequent request for additional data samples in November 2023, plaintiffs knew at least as of January 11, 2024 that Google intended its production of additional data samples to include the same information as its prior productions, and that Google would *not* produce the [redacted]; indeed, Google specifically stated it would not produce this information. Dkt. No. 708-4 at ECF 3. Plaintiffs were also aware from the deposition testimony they obtained that Google ordinarily retained [redacted] for only [redacted]. Dkt. No. 697-1 ¶ 4.

Plaintiffs offer no plausible explanation for why they could not have raised this dispute following the parties' May 24, 2023 status report, in which Google's position about what it would produce following the Court's May 16, 2023 was clearly stated. If plaintiffs were not satisfied with Google's representations about its intended production, they should have promptly raised the disagreement with the Court. Furthermore, Google's position regarding its later production of additional data samples was not ambiguous. While the Court does not condone Google's nearly two month-delay in responding to plaintiffs' request for additional samples, plaintiffs were on notice of Google's position as of January 11, 2024, and should have raised the issue no later than February 2, 2024.

Accordingly, the Court finds that plaintiffs' motion is untimely and denies the motion on that basis. Alternatively, even if timely, the Court denies the motion on its merits, as explained below.

**B. Plaintiffs' Motion for Contempt Order under Rule 37(b)(2)(A)**

Plaintiffs' principal argument is that Google had an obligation to preserve and produce decrypted [redacted] and [redacted] because the Court ordered it to do so in its April and May 2023 orders. While plaintiffs repeatedly assert that any time the Court used the term "joining keys," this necessarily included [redacted] nothing in either of these orders clearly required Google to preserve and produce [redacted] and/or decrypted [redacted].

As explained above, the focus of the Court's April 14, 2023 order was to ensure that Google's productions of named plaintiffs data "can be easily correlated" with one another. Dkt. No. 487 at 6-7. The Court did not address Google's use or production of any "[redacted]" that could be used to decrypt [redacted] that are otherwise maintained by Google as encrypted pseudonymous identifiers. While the Court's May 16, 2023 order *did* discuss this functionality—and distinguished it from the matters addressed in the April 14, 2023 order—that order required Google to "*investigate* whether the [redacted] may be produced, together with the Google Account ID ([redacted]) where available, for all sampled named plaintiffs data," and directed the parties to jointly report back to the Court. Dkt. No. 524 at 2-3 (emphasis added). After receiving the parties' joint status report on May 24, 2023, the Court issued no further orders to Google, and neither party identified any disagreements that remained to be resolved on this point. *See* Dkt. No. 529.

Accordingly, plaintiffs have not shown by clear and convincing evidence that Google violated a clear and definite court order to preserve and produce decrypted [redacted] and [redacted].

**C. Plaintiffs' Motion for Discovery Sanctions under Rule 37(e)**

While plaintiffs argue that their request for sanctions is limited to Google's conduct "*after* the Court specifically ordered Google to produce [redacted] and [redacted]," Dkt. No. 697 at 2, plaintiffs contend that their request for sanctions does not depend entirely on Google's asserted violation of a court order. Plaintiffs additionally contend that Google had an obligation to preserve and produce [redacted] based on plaintiffs' service of RFP 42

and their November 17, 2023 email request for this ESI.

In May 2021, plaintiffs served RFP 42, which asked Google to produce:

> [a]ll Information Google has collected, created associated and derived, and continues to collect, create, associate and derive, regarding Plaintiffs, including but not limited to: authenticated and unauthenticated personal identifiers and device, browser, and other identifiers (including IP address) associated with Plaintiffs and their devices; data associated with those identifiers, including browsing history, ad history, communications history, Google account sign-in history, Chrome Sync history; derived data; appended data; associated verticals and segments; embedded data; all data contained in user profiles, interest profiles, interest graphs; and, authenticated and unauthenticated data (this request will be supplemented with any currently known identifiers upon entry of a protective order governing the exchange of discovery).

Dkt. No. 697-1 ¶ 3; Dkt. 708-3 at ECF 3. In June 2021, Google objected in writing to this RFP and agreed to produce only non-privileged documents "showing what information, if any, that Google's systems directly associate with the identifiers Plaintiffs have provided or will provide to Google, and shared with third parties utilizing RTB, to the extent Google can reasonably identify such data as belonging to plaintiffs." Dkt. 708-3 at ECF 4. By the time the parties' dispute about the scope of RFP 42 was presented to the Court a year later, in July 2022, plaintiffs appeared to have limited their request. As the Court observed in its August 26, 2022 order, "[p]laintiffs' portion of the joint [discovery dispute] submission is not tethered in any meaningful way to these document requests. The Court hopes this is because, during the conferences of counsel, plaintiffs have narrowed the categories of information for which they are seeking documents to those described in the joint submission . . . . In any event, in resolving this dispute, the Court focuses on the categories described in the joint submission and not the much broader document requests." Dkt. No. 314 at 1-2. As explained above, the Court declined to order Google to produce "all information [it] maintains about an account holder solely based on Google's internal linking of information with an account holder," and instead ordered Google to produce "documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing," including "information that allows an RTB participant to identify an account holder based on information the participant may have about

that account holder." *Id.* at 4-5. Thus, to the extent plaintiffs rely on RFP 42 as a source of Google's purported obligation to preserve [redacted] beginning at least in April 2023, that reliance is misplaced in view of the Court's August 26, 2022 order resolving the parties' dispute about the scope of that RFP.

Plaintiffs argue that when their counsel sent an email on November 17, 2023 asking Google to produce four additional data samples and specifically asked for "any joining keys that exist," Google should have at least preserved the [redacted] for samples that were within the [redacted] retention period. Dkt. No. 711 at 12; Dkt. No. 720 at 14:6-15:5, 17:17-25. The Court disagrees that simply by asking Google to produce "joining keys" plaintiffs triggered Google's obligation to preserve and produce this ESI. Google has no obligation, independent of litigation, to preserve the [redacted], and their destruction in the ordinary course of business is not wrongful in any respect. To the contrary, Google offers persuasive evidence that its ordinary practice of destroying the keys after [redacted] is an important data security and privacy measure. *See* Dkt. No. 708-1. In these circumstances, plaintiffs' argument that, because they demanded "joining keys" in litigation, Google had an obligation to preserve [redacted] ignores the history of the parties' disputes and the Court's prior orders regarding this ESI, as recounted in detail above. That is, as of May 24, 2023, the parties' status report to the Court did not identify any remaining disputes about what Google would preserve or produce with respect to named plaintiffs data, and plaintiffs' counsel's email did not wipe the slate clean.

For these reasons, even if the Court accepts plaintiffs' view (which Google disputes) that decrypted [redacted] and/or [redacted] should have been preserved as relevant evidence, plaintiffs have not shown that Google acted unreasonably or with the intent to deprive plaintiffs of the use of this ESI in the litigation in not suspending its [redacted] retention period. Likewise, the Court is not persuaded that plaintiffs have suffered evidentiary prejudice by not having a sample that includes decrypted [redacted] and/or [redacted]. The question of prejudice is not even addressed in plaintiffs' opening motion, *see generally* Dkt. No. 697, and although their reply includes assertions that this information is "necessary" and "critical," it is not clear why plaintiffs require decrypted [redacted] and/or [redacted] to show

United States District Court
Northern District of California

United States District Court
Northern District of California

that "bid request information is personal information under Google's privacy policy for both signed-in and signed-out users," *see* Dkt. No. 711 at 9, given that they have obtained information in discovery regarding how Google does or does not associate account holder information with other identifying information when a user is signed-out.

## IV. CONCLUSION

For the foregoing reasons, the Court denies plaintiffs' motion for an order finding Google in contempt of the Court's April and May 2023 orders under Rule 37(b)(2)(A), and for evidentiary sanctions and an adverse inference instruction under Rule 37(e).

**IT IS SO ORDERED.**

Dated: January 3, 2025

Virginia K. DeMarchi
Virginia K. DeMarchi
United States Magistrate Judge

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar. No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION* | **Case No. 4:21-cv-02155 YGR (VKD)** |
| *This document applies to all actions.* | **PLAINTIFFS' NOTICE OF RENEWED MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

**REDACTED VERSION**

**Table of Contents**

**NOTICE OF MOTION AND MOTION** .......... V

**STATEMENT OF ISSUES TO BE DECIDED** .......... 1

I. Should the Court certify the Class and Class claims under Rule 23 (a) and (b)(2) of the Federal Rules of Civil Procedure? .......... 1

II. Should the Court appoint plaintiffs as representatives of the Class? .......... 1

III. Should the Court appoint Elizabeth Pritzker, Lesley Weaver, Jay Barnes, David Straite, Nanci Nishimura, and Francis Bottini Jr. as Class Counsel and Ms. Pritzker as Lead Class Counsel? .......... 1

**MEMORANDUM OF POINTS AND AUTHORITIES** .......... 1

**I. INTRODUCTION** .......... 1

**II. BACKGROUND** .......... 2

**III. LEGAL FRAMEWORK** .......... 7

**IV. ARGUMENT** .......... 8

**A. The Proposed Class is Objectively Defined and Appropriate in Scope** .......... 8

**B. The Plaintiff RTB Data is Representative of the RTB Data for the Class** .......... 10

1. Plaintiffs Satisfy the Standards for Rule 23(b)(2) Certification .......... 10

2. Google's RTB Shares and Sells Class Members' Personal Information .......... 11

**C. Rule 23(a) and (b)(2) Certification is Warranted** .......... 15

1. Rule 23(a)'s Requirements are Satisfied .......... 15

2. Rule 23(b)(2)'s Requirements are Satisfied .......... 16

3. Plaintiffs' Proposed Injunctive Relief Provides Class-Wide Relief .......... 18

4. The Claims to Be Certified Provide Effective Injunctive Remedies .......... 19

**V. CONCLUSION** .......... 24

# TABLE OF AUTHORITIES

CASES

*B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019) .................................... *passim*

*Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837 (N.D. Cal. Aug. 16, 2021)........................ 22

*Brooks v. Thomson Reuters Corp.*, 2023 WL 9316647 (N.D. Cal. Aug. 10, 2023)........................ 24

*Broomfield v. Craft Brew All., Inc.*, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ...................... 20

*Brown v. Google, LLC*, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022)........................................ 17

*Calhoun v. Google*, 113 F.4th 1141 (9th Cir. 2024) ..................................................................... 21

*California Coal. for Women Prisoners v. United States*, 2024 WL 1290766 (N.D. Cal. Mar. 15, 2024)........................................................................................................................ 11

*Cel–Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163 (1999)......................... 24

*Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663 (2006).......................................... 24

*Day v. GEICO Cas. Co.*, 2022 WL 16556802 (N.D. Cal. Oct. 31, 2022) ....................................... 9

*Doe v. Meta Platforms, Inc.,* 690 F. Supp. 3d 1064 (N.D. Cal. 2023)........................................... 23

*DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, (N.D. Cal. Mar. 29, 2022), *aff'd in part, vacated in part, remanded,* 96 F.4th 1223 (9th Cir. 2024)........................................ 18

*Flores-Mendez v. Zoosk, Inc.,* 2021 WL 308543 (N.D. Cal. Jan. 30, 2021).................................. 21

*Hernandez v. Hillsides, Inc*., 47 Cal. 4th 272 (2009)..................................................................... 20

*Hill v. NCAA*, 7 Cal. 4th 1 (1994) ............................................................................................ 20, 22

*In re College Athlete NIL Litig*., 2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ............................ 8

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019)........................................................................................................................................ 22

*In Re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020)................................ 19

*In re Google Inc. Gmail Litig*., 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)............................. 22

*In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016)................................................ 21

*In Re Yahoo Mail Litig*., 308 F.R.D. 577 (N.D. Cal. 2015) ......................................................... 11

*Katzberg v. Regents of Univ. of Cal*., 29 Cal. 4th 300 (2002)........................................................ 22

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552 (N.D. Cal. 2020)............................................ 9

*Messner v. Northshore Univ. Health System*, 669 F.3d 802 (7th Cir. 2012) .................................. 8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651(9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,* 143 S. Ct. 424 (2022) ........ 8

*Opperman v. Path, Inc.*, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ........ 21

*Parsons v. Ryan*, 754 F. 3d 657 (9th Cir. 2014) ........ 7

*Riley v. California*, 573 U.S. 373 (2014) ........ 21

*Rodriguez v. Google, LLC,* 2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ........ 17

*Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200 (1998) ........ 20

*Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898 (S.D. Cal. 2020) ........ 21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........ 7

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ........ 17


STATUTES


Cal. Civ. Code § 1798.140(v) ........ 17

Cal. Const. Art. 1, § 1 ........ 22

California Information Privacy Act, Cal. Penal Code § 631.2 ........ 23

California Invasion of Privacy, Cal. Penal Code § 637.2(b) ........ 23

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ........ 23

Fed. R. Civ. P. 23 (a) ........ 1, 13, 14, 15, 16

Fed. R. Civ. P. 23(b)(2) ........ *passim*


OTHER AUTHORITIES


Newberg on Class Actions, § 3.24 (5th ed.) ........ 19

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on a date and time to be determined, in Courtroom 1, 4th Floor, of this Court, located at 1301 Clay Street, Oakland, California 94612, plaintiffs Christopher Valencia, John Kevranian, Terry Diggs, Kimberley Woodruff, Rethena Green, Salvatore Toronto, and Tara Williams will and hereby do move the Court for an Order (i) certifying this action as a class action, (ii) appointing plaintiffs as representatives of the Class, and (iii) appointing Elizabeth Pritzker of Pritzker Levine LLP, Lesley Weaver of Bleichmar Fonti & Auld LLP, Jay Barnes of Simmons Hanly Conroy LLP, David Straite of DiCello Levitt LLP, Nanci Nishimura of Cotchett Pitre & McCarthy, LLP, and Francis Bottini, Jr. of Bottini & Bottini, Inc. as Class Counsel, with Ms. Pritzker to serve as Lead Class Counsel.

Plaintiffs seek to certify a class consisting of all individual Google account holders subject to a Google U.S. Terms of Service ("ToS") who have an active Google account (the proposed "Class"). Plaintiffs seek certification of the following claims, all arising under California law: (i) breach of contract, (ii) breach of confidence, (iii) invasion of privacy, (iv) intrusion upon seclusion, (v) publication of private facts, (vi) for violations of the California Information Privacy Act ("CIPA"), Cal. Penal Code § 631.2; and (vi) for violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq* (collectively, the "Class claims"). Consistent with this Court's April 4, 2024 Order (ECF 690) (the "Order") holding that "plaintiffs meet many of the requirements of class certification under" Fed. R. Civ. P. 23(b)(2) (*see* Order at 2), this Motion is made pursuant to that Rule on the grounds that plaintiffs seek with respect to all claims uniform injunctive or declaratory relief from policies or practices that are generally applicable to the Class as a whole.

Plaintiffs' Motion is based upon the Order (ECF 690); this Notice; the accompanying Memorandum of Points and Authorities; the Further Declarations of Elizabeth C. Pritzker ("Further Pritzker Decl.") and Bethany Caracuzzo ("Further Caracuzzo Decl."); and all exhibits thereto; any reply plaintiffs may file; the orders, pleadings, and files in this action; and such other matters as may be presented at or before the hearing.

## STATEMENT OF ISSUES TO BE DECIDED

I. Should the Court certify the Class and Class claims under Rule 23 (a) and (b)(2) of the Federal Rules of Civil Procedure?

II. Should the Court appoint plaintiffs as representatives of the Class?

III. Should the Court appoint Elizabeth Pritzker, Lesley Weaver, Jay Barnes, David Straite, Nanci Nishimura, and Francis Bottini Jr. as Class Counsel and Ms. Pritzker as Lead Class Counsel?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Court found that plaintiffs "meet many of the requirements of class certification under Rule 23(b)(2)" of the Federal Rules of Civil Procedure ("Rule 23(b)(2)"). Order at 2. The Court directed plaintiffs to address in "the next round of briefing," "two unresolved issues: (1) whether the class, as defined, is fail safe and, if so, whether striking 'personal information' from the definition would result in an overbroad class; and (2) whether the RTB data produced thus far [for the plaintiffs] is representative of the class as a whole." *Id*. This renewed Motion addresses these issues.[1]

In summary, with respect to the class definition questions, plaintiffs seek certification of a Rule 23(b)(2) class defined as: **All individual Google account holders subject to a Google U.S. ToS who have an active Google accoun**t (hereinafter "all active Google U.S. account holders"). This definition removes any concern that the class definition is "fail safe" because class membership does not depend upon whether a member has a valid claim. The Class here is subject to an objective inqu*i*ry that all Class members can readily discern for themselves. Invoking Google's definition, an "active" Google account is an account that has been used at any time in the past two years.[2] Google

---

[1] The Court instructed the parties that "[w]here the Court has ruled on an argument, the parties shall not reassert it at the next round of briefing." Order at 2. In this renewed Motion, Plaintiffs thus only address numerosity (*id*. at 10), commonality (*id*. at 10-18), typicality (*id*. at 18-19), and adequacy (*id*. at 20) to the limited extent necessary in light of the modified Class definition and the new Class data.

[2] A Google account "that is in use is considered active." *See* https://support.google.com/accounts/answer/12418290?hl=en&ref_topic=7189311&sjid=12474238374228731571-NC. An inactive Google account is "an account that has not been used within a 2-year period." *Id.*

can discern from its own records those accounts that are "active" versus those that are not.

Defining the Class in this way also does not present overbreadth concerns. As plaintiffs' technical experts have already shown, and as further demonstrated by Prof. Zubair Shafiq's Supplemental Class Cert. Expert Report ("Shafiq Supp.") [Ex. 3 to the Further Pritzker Decl.], Google RTB is pervasive; it is uniformly implemented across the Class; and it impacts plaintiffs and Class members in the same way. There are no unimpacted Class members. "Google's RTB protocol is identical for every one of its billions of daily [RTB] bids;" Class member and "plaintiffs' RTB data is uniformly personally identifying"; and "as Google confirmed at the [prior class certification] hearing, there currently is no way for users to stop Google from selling information about their unique IDs, location, and browsing history through the billions of RTB bids exchanged every single day with hundreds of RTB participants from all around the world." Order at 12, 16, 25-26.

As to the Court's second concern about the representative nature of the RTB data produced for the plaintiffs (the "Plaintiff data"), following the Court's Order, Google produced six ten-minute intervals of class-wide RTB bid data spread over a three-year period (2021-2023) (the "Class data"). Further Pritzker Decl., ¶ 17. Prof. Shafiq analyzed this production, encompassing over 120 terabytes of data and almost [redacted] billion RTB bid requests. His analysis directly answers the Court's inquiry, affirming that the RTB data are uniformly personal information for the plaintiffs and the Class, and that the Plaintiff data is in fact representative of the Class as a whole. *See* Shafiq Supp., ¶¶ 14-44.

Plaintiffs have met their burden. As previously illustrated and as the additional evidence shows, there is an ample evidentiary record for the Court to grant certification under Rule 23(a) and (b)(2). The injunctive relief sought – for transparency in Google's disclosures and a meaningful choice to opt-out of RTB – will apply generally to the Class, precisely as Rule 23(b)(2) requires.

## II. BACKGROUND

Plaintiffs bring this renewed Motion on a well-developed evidentiary record, supplemented by the Class data Google produced in July 2024 and Prof. Shafiq's Supplemental Expert Report.[3] As

[3] Evidence relied on in this Motion is attached to the Further Pritzker Decl. and Further Caracuzzo Decl. Because the prior reports of plaintiffs' technical experts Profs. Shafiq and Wilson are cited extensively, they are submitted again as exhibits to the Further Pritzker Decl.: Prof. Shafiq's opening

reflected in the record, this action is brought on behalf of active Google U.S. account holders – hundreds of millions of them – to whom Google consistently, and unequivocally, makes the same core promise in its ToS and Privacy Policies:

**We don't sell users' personal information.**[4]

Google restates this core promise – and the related promise that it does not sell or share personal information with anyone outside of Google – in its Google account holder agreements going back at least to June 28, 2016 and continuing to today:

> **What is still the same?**
>
> - Google does not sell your personal information to anyone.[5]
>
> ***
>
> We will share personal information with companies, organizations or individuals outside of Google ***when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information***.[6]
>
> ***
>
> **Never sell our users' personal information to anyone**... [i]t's important to clarify that **our users' personal information is simply not for sale**.[7]
>
> ***
>
> We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies: With your consent . . . With domain administrators . . . For external processing . . . For legal reasons . . . .[8]

---

report ("Shafiq Rep.") and rebuttal report ("Shafiq Reb.") are Exs. 1 and 2, and his new supplemental report is Ex. 3 thereto. Prof. Wilson's opening report ("Wilson Rep.") and rebuttal report ("Wilson Reb.") are Exs. 4 and 5. The Further Caracuzzo Decl. largely duplicates counsel's prior declaration (ECF 546-36), but adds testimony and evidence concerning Google privacy policies and ToS dated after the filing of plaintiffs' prior class certification motion.

[4] Google's *Privacy Principles*, published on Google's website and incorporated into the Google Privacy Policy since September 10, 2015. Further Caracuzzo Decl., ¶¶ 3-12, Ex. 13 (see also Order at 11); Google's *How Our Business Works*, published on Google's website and incorporated into Google's ToS from at least February 2020 to the present. *Id.*, ¶¶ 13-16, Exs. 16-19.

[5] Google's "Consent Bump" issued to U.S. account holders on June 28, 2016, and which Google testified continues to apply to all Google account holders thereafter. *Id.*, ¶¶ 21-23, Exs. 22, 23.

[6] Google's *Privacy Policy* (June 28, 2016). Further Caracuzzo Decl., ¶¶ 17-20, 24, 27-29, Exs. 14, 20, 21, 24 (bold italics added). The Privacy Policy now states Google requires "explicit consent." *Id.*

[7] Google's *Safety Center – Our Privacy & Security Principles*, published on Google's website and incorporated into Google's Privacy Policy and ToS since September 10, 2018. *Id.* ,¶¶ 8-12, Ex. 15 (emphasis added). It now adds, "We never sell your personal information." *Id.*, ¶ 12.

[8] Google's *Privacy Policy* (at least June 28, 2016 to the present). *Id.*,¶¶ 19, 24, Exs.14, 20, 21, 24.

***

> We don't show you personalized ads based on sensitive categories like race, religion, sexual orientation, or health. We don't share information that personally identifies you with advertisers unless you ask us to.[9]

***

> Google does not sell your personal information.[10]

***

> We don't sell your personal information to anyone.[11]

***

> [W]e never sell your personal information to anyone.[12]

***

> Advertisers do not pay us for personal information.[13]

***Google does not keep this uniform promise***. Instead, the record evidence shows that billions of times each day, Google sells and shares U.S. account holders' personal information to hundreds of third-party advertisers, independent ad exchanges, social media websites (such as Meta and X), and other participants around the world in Google's "real time bidding" auctions. Order at 12 (citing Shafiq Rep., ¶ 18). As the Court has already held:

> There is evidence before the Court which already shows that Google shares enough information that RTB participants can discern what an account holder is reading online, even when it is on a religious or medical topic; exactly where they are reading it, including the coordinates of an account holder's home or work; and their background, which allows for a detailed, demographic profile of the accountholder. Google cannot run away from the common question of whether it promises its account holders that it would not sell their personal information and, if so, it violates that promise billions of times a day.

Order at 25; *see also* Shafiq Supp., ¶¶ 14-44 (supplementing record with analysis of Class data).

Google RTB is a fully automated process, through which Google uses its own source code that it has embedded on websites or apps visited by a Google account holder (or "user") to instantaneously transmit back to Google an impression containing information about the user and her

---

[9] *Id.*

[10] Google's *Privacy Policy* (from March 21, 2020 to the present). *Id.*,¶ 17, Exs. 20, 21.

[11] Google's *"How Our Business Works"* page, incorporated into Google's ToS, from March 31, 2020, to the present. *Id.*,¶¶ 13-16, Exs. 16-19. *See also* Order at 21, fn. 15.

[12] *How Our Business Works,* Further Caracuzzo Decl., Ex. 16.

[13] *Id.*

computer – including unique identifiers associated with the user, the device's IP address, the URL of the website or app name being viewed, and the make/model of the user's browser or mobile device – to Google for subsequent sale and sharing through the Google RTB system. Shafiq Rep., ¶ 21. Through no action of the user, Google RTB then packages that impression into a "bid request," which is the standardized way that Google solicits bids from hundreds of potential buyers around the world seeking the opportunity to place an ad ("RTB participants"). *See* Order at 12 (citing Shafiq Rep., ¶¶ 18, 19; Wilson Rep., ¶ 24). Each bid request consistently includes: (1) information that Google associates with a user's Google account; (2) information that is reasonably capable of identifying the user to RTB participants, including a Google User ID and other information that uniquely identifies the user or their device; and (3) content and contextual information that places the user and their communication into specific ad targeting categories, oftentimes including categories that Google publicly admits are "sensitive." *See, generally,* Order at 12-14 (citing Shafiq Rep., ¶¶ 28-29, 41, 42, 46, 78, 88; Wilson Rep., ¶¶ 31, 36, 37, 43, 45-48, 49, 68, 70, 72). This is true for plaintiffs (*see id.*) and for the Class as a whole. Shafiq Supp., ¶¶ 24-27, 35-44.

As plaintiffs' experts have further shown – ***and as Google itself concedes*** – the sharing of this information in Google RTB is a uniform process for all active Google U.S. account holders. Shafiq Rep., ¶ 18; Wilson Rep., ¶ 34; *and see* 2/21/24 Hrg. Tr. (ECF 680) at 10-18 (Google conceding RTB process is identical for every one of its billions of daily bid requests). RTB participants can then bid for the opportunity to have a targeted ad delivered to the Class member based on personal information shared in the bid request. Wilson Rep., ¶ 24. RTB participants also use the RTB data to:

- "build 'profiles' of individuals by inferring their demographics, interests, hobbies, place of residence, etc." (*id.*, ¶ 31);
- link to a user's Google account using Google's unique identifier for that user, or a cookie, truncated IP address, the user's current latitude and longitude with accuracy; the model and make of their operating system; and the webpage the user is currently viewing (*id.,* ¶ 37);
- synchronize RTB data with individual users through cookie matching (*id.*, ¶¶ 43, 45-48); or

- match RTB data to individual Google account holders through "user lists"[14] (*id.*, ¶¶ 68, 70, 72).[15]

The information commonly shared and sold by Google through Google RTB is "reasonably capable of being linked to an individual or household." Wilson Rep., ¶ 36. This is not surprising. The "very purpose" of Google RTB's is "to encourage RTB participants to bid on impressions in Google RTB. And, because RTB participants seek to *target* ads to *individuals* based on context . . . the nature of the information being shared and sold needs to facilitate that *individual targeting*." Order at 14 (italics and ellipse in original) (citing Wilson Rep., ¶ 41).

U.S. Google account holders cannot avoid Google's RTB process, even if they attempt to activate Google's user "privacy" settings. Order at 14 (citing Wilson Rep., ¶¶ 101-103, 123). This basic reality is uncontroverted, as the Court recognized in the Order:

> As Google confirmed at the hearing, ***there is currently no way for users to stop Google from selling information about their unique IDs, location, and browsing history*** through the billions of RTB bids exchanged every single day with hundreds of RTB participants from around the world.

*Id.* at 25-26 (emphasis supplied) (citing 2/21/24 Hrg. Tr. at 36:7-22). And the Class data Google has produced confirms that Google RTB is essentially unavoidable for any U.S. Google account holder using the internet, given Google RTB's use on millions of websites and apps, including many of the most popular websites visited in the United States. *See* Shafiq Supp., ¶¶ 45-51.

These background facts, all fully supported by the record, demonstrate why class certification under Rule 23(a) and (b)(2) is warranted. All individual U.S. Google account holders must agree to Google's standardized U.S. ToS when creating their accounts. That ToS, together with Google's standardized Privacy Policies and related disclosures, apply generally to all U.S. account holders to form a common contract and common commitment that Google does not and will not share or sell their personal information to anyone outside of Google. *See, supra,* fn. 3-13. The essential element

---

[14] Cookie matching enables an RTB participant to match their cookies with Google's to determine whether an RTB bid request is associated with a user the participant seeks to target, facilitating the creation and maintenance between the participant's cookie and the Google User ID, and allowing for the population of user lists. *See* https://developers.google.com/authorized-buyers/rtb/cookie-guide.

[15] The cited record evidence is set forth in the Order at 14.

of Rule 23(b)(2) certification is therefore satisfied. Additionally, Google RTB is a common practice through which U.S. Google account holder information is shared and sold by Google to hundreds of companies trillions of times each day. The information Google shares and sells through RTB, as the evidence also shows, is "reasonably capable of being linked to an individual or household" across the Class, and there is no way for Class members to opt out of the auctions.

Rule 23(b)(2)'s requirements are "unquestionably satisfied when," as here, Class members "seek uniform injunctive relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F. 3d 657, 688 (9th Cir. 2014). As this Court has held, the "question of whether [Google] promises its account holders that it would not sell their personal information" will be "resolved on the basis of Google's standardized disclosures – and therefore plaintiffs' express consent – alone." Order at 25. If granted, plaintiffs' proposed injunctive relief uniformly provides Class members transparency in Google's disclosures as to the nature and extent of account holder personal information shared and sold by Google in RTB auctions, and will give each member of the Class an effective choice to opt out of these auctions. Such an injunction is appropriate as to the Class as a whole, and "would be an important step toward choice, accountability, and transparency" for Class members. *Id.* at 26. Plaintiffs' renewed motion for Rule 23(b)(2) certification should be granted.

## III. LEGAL FRAMEWORK

Rule 23(b)(2) provides that "[a] class action may be maintained if…the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate to the class as a whole." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 970-971 (9th Cir. 2019) ("*B.K.*"); *accord Rodriguez v. Google, LLC,* 2024 WL 38302 at *10 (N.D. Cal. Jan. 3, 2024). Certification under Rule 23(b)(2) is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "These requirements are 'unquestionably satisfied when members of a putative class seek uniform injunctive relief from policies or practices that are generally applicable to the class as a whole.'" *B.K.*, 922 F.3d at 971 (citing *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)).

"When a class seeks an indivisible injunction benefitting all its members at once, there is no

reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute." *Dukes*, 564 U.S. at 362-63. The Rule 23(b)(2) inquiry "does not require an examination of the viability or bases of the class members' claims for relief, does not require that issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members have suffered identical injuries." *Parsons*, 754 F.3d at 688. "Rather, as the text of the rule makes clear, this inquiry asks only whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class.'" *Id.* (quoting Rule 23(b)(2)).[16] To obtain certification under Rule 23(b)(2), plaintiffs must describe "the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K.*, 922 F.3d at 972 (quoting *Parsons,* 754 F.3d at 689 n.35).

Plaintiffs' renewed class certification motion fully satisfies Rule 23(b)(2)'s legal framework.

## IV. ARGUMENT

Plaintiffs first address the two unresolved issues identified in the Court's Order.

### A. The Proposed Class is Objectively Defined and Appropriate in Scope

Plaintiffs first respond to the Court's concern that the class to be certified will strike the right balance by being neither "fail safe" (*i.e.,* defined in such a way that qualification for membership does not depend on whether the person has a valid claim), nor overinclusive (that is, potentially inclusive of more than a *de minimis* number of uninjured class members).[17] *See* Order at 8-9.

Plaintiffs' revised class definition accomplishes that balance. Plaintiffs now seek to certify a Class consisting of all individual Google account holders subject to a Google U.S. ToS who have an active Google account.[18] The revised class definition provides objective criteria – the activation and

---

[16] *Accord In re College Athlete NIL Litig*., 2023 WL 7106483 at *6 (N.D. Cal. Sept. 22, 2023).

[17] *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 669 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,* 143 S. Ct. 424 (2022) (citing *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 825 (7th Cir. 2012)).

[18] The prior definition included all individual account holders subject to a Google U.S. ToS whose personal information was sold or shared by Google in RTB after June 28, 2016. *See* Order at 8.

use of a Google account – that allows Class members to easily determine whether they are included in the Class. *See Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 567 (N.D. Cal. 2020) ("'[P]laintiffs provide objective criteria that allow class members to determine whether they are included in the proposed class,' and that is sufficient.") (internal citation omitted)); *Day v. GEICO Cas. Co.*, 2022 WL 16556802, at *8 (N.D. Cal. Oct. 31, 2022) (class definition that relies on objective criteria satisfies ascertainability and administrative feasibility concerns). Class members know whether their Google accounts are active but, if there is any doubt, Google's website tells account holders how they can confirm their status *See, supra*, fn. 2. Google, likewise, can discern which accounts are active, *i.e.*, those that were created and have been active within the last two years. *See, supra,* pp.1-2; Shafiq Rep., ¶¶ 90-91; Wilson Rep., ¶¶ 15, 80-100, 124. Thus, there is no concern that the proposed class definition is "fail safe" or defined in such a way that membership depends on whether the person has a valid claim.

This class definition also does not sweep uninjured Class members within its scope: all Class members must agree to the same, standardized ToS when they activate their Google accounts, and all Class members are subject to the same common set of standardized Privacy Policies and disclosures. *See* Further Caracuzzo Decl., ¶¶ 31-38. Google's RTB practices similarly apply generally to the Class as a whole; Google RTB is pervasive and impacts plaintiffs and Class members in the same way. This means that Google engages in a uniform common course of conduct and there are no unimpacted Class members. The evidence shows this: (1) "Google's RTB protocol is identical for every one of its billions of daily [RTB] bids"; (2) Class member and "plaintiffs' RTB data is uniformly personally identifying" and may be associated with an individual Class member or household; and (3) "as Google confirmed at the hearing, there currently is no way for users to stop Google from selling information about their unique IDs, location, and browsing history through the billions of RTB bids exchanged every single day with hundreds of RTB participants from all around the world." Order at 12 (citing Shafiq Rep., ¶ 18; Wilson Rep, ¶ 34; 2/21/24 Hrg. Tr. at 11-18); Order at 16 (citing, prior to quoted text, Shafiq Rep., ¶¶ 42e, 46-a-g, and Shafiq Reb., ¶ 37); and Order at 25-26 (citing 2/21/24 Hrg. Tr. at 36:7-22); *see also* Shafiq Rep., ¶¶ 90-95; Shafiq Supp., ¶¶ 16-44; Wilson Rep., ¶¶ 101-123.

**B. The Plaintiff RTB Data is Representative of the RTB Data for the Class**

1. Plaintiffs Satisfy the Standards for Rule 23(b)(2) Certification

In the Order, the Court found that "[p]laintiffs have demonstrated sufficiently for class certification that [the previously-produced plaintiff RTB data], along with user lists and cookie matching, allows RTB participants to create detailed profiles of individual account holders" and that "[f]or that reason, … [the] named plaintiffs' RTB data is uniformly personally identifying." Order at 16.[19] The Court's ruling was based on the state of discovery then in effect: Google had "produced just eight weeks-worth of data about the named plaintiffs," totaling "almost five million records of RTB bid request data shared with hundreds of RTB participants around the world," amounting to "**10 thousand RTB bid requests per-user-per-day**." *Id.* at 15-16 (citing Shafiq Reb., ¶ 37 (emphasis in original)). There was, however, no class-wide RTB data production from Google with which to compare these plaintiff-specific findings. This is because Google refused to produce such data on a class-wide basis. *See* Decl. of Elizabeth C. Pritzker (ECF 546-2), ¶ 6. Acknowledging that "Google cannot refuse to produce RTB data about other putative class members and then argue that, without this data, plaintiffs cannot meet their commonality burden," the Court found the state of the record at that time to be "insufficiently developed" and directed plaintiffs "to affirmatively demonstrate through expert testimony or otherwise that the RTB data thus far is representative of all putative class members" in this renewed motion. Order at 17.

Google has since produced Class data consisting of ten-minute slices of RTB data involving U.S. Google account holders, drawn from six periods of time between 2021-2023. *See* Further Pritzker Decl., ¶¶ 12, 15, 17; Shafiq Supp., ¶¶ 14-15. With this data, as explained below, plaintiffs satisfy the Court's concerns. Before turning to that analysis, however, it should be noted that plaintiffs' evidentiary showing need not "satisfy a Rule 23(b)(3)-like predominance test" to achieve

[19] "As an example, with the limited discovery produced thus far, Professor Shafiq was able to pinpoint the exact coordinates of each named plaintiffs' home and work locations based on the RTB bid within, at most, a three-kilometer error rate. In addition to those locations, RTB participants could tell that the named plaintiffs were looking up religious verses, medical symptoms, gambling applications, and what a Supreme Court justice thought about a recent abortion decision." Order at 15 (citing Shafiq Rep., ¶¶ 42e, 46a-g).

certification under Rule 23(b)(2). *California Coal. for Women Prisoners v. United States*, 2024 WL 1290766, at *10 (N.D. Cal. Mar. 15, 2024) (*citing Parsons*, 754 F. 3d at 688); *see also In Re Yahoo Mail Litig.*, 308 F.R.D. 577, 598-99 (N.D. Cal. 2015) ("a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class."). Rather, as this Court previously held, "[r]ule 23(b)(2) permits certification of a class when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" Order at 24 (citing *B.K.*, 944 F.3d at 972).

Plaintiffs have substantial evidence to support certification of an injunctive and declaratory relief class under this standard. "Google's RTB is universal[,] . . . its disclosures are generalized" (Order at 24), and there is common, class-wide evidence that Google is selling personal, sensitive, information about its account holders to hundreds of RTB participants worldwide – literally trillions of times each day. This is in direct violation of Google's universal promise to its U.S. account holders that Google "never" has, "does not" and will not sell their personal information. Google's violations are continuing, and these violations adversely affect Class members to this very day. *See* Shafiq Supp., ¶¶ 45-51. Absent the injunctive relief plaintiffs request, Google will continue to share and sell its account holders' personal information to companies around the world through RTB, and account holders will have no mechanism to opt out of Google's RTB practices. Rule 23(b)(2) certification is appropriate and warranted to afford Class members appropriate injunctive relief.

2. <u>Google's RTB Shares and Sells Class Members' Personal Information</u>

Based on Prof. Shafiq's analysis of the Plaintiff data set forth in his two prior expert reports, the Court has already found that the "plaintiffs' RTB data is uniformly personally identifying" and that this personal information about the plaintiffs is routinely shared and sold by Google in RTB auctions. Order at 15-16. Prof. Shafiq's analysis of the Class data set forth in his new supplemental report similarly provides a basis for the Court now to find that (i) the Class data also is uniformly personal identifying; (ii) this personal information about the Class also is routinely shared and sold by Google in RTB auctions; and (iii) because the Class data is essentially the same as the Plaintiff data, the Plaintiff data is, in fact, representative of the Class as a whole.

For the plaintiffs only, Google produced limited RTB auction data for eight one-week periods that included almost five million individual RTB bid requests. *See* Shafiq Rep., ¶ 35. Prof. Shafiq first analyzed this data to determine whether there was a common set of data fields present in all of the Plaintiff data, and ultimately found that there were at least 62 data fields commonly included in all of the Plaintiff data. *See id.*, ¶ 41..[20] Prof. Shafiq then analyzed these 62 common data fields to determine what information the fields conveyed to RTB participants and whether this information collectively was personally identifying..[21] *See id.*, ¶¶ 42-88. Having analyzed the information in the fields, along with numerous internal Google documents discussing the fields and other peer-reviewed research, Prof. Shafiq concluded that the information Google conveys to RTB bid participants in RTB auctions is sufficiently specific to allow those participants to identify, associate with, or reasonably link that data to a particular user or household, a conclusion accepted by the Court in the Order. *See* Shafiq Rep., ¶¶ 43-89; Order at 16 ("the Court finds that named plaintiffs' RTB data is uniformly personally identifying.").

Prof. Shafiq also analyzed other aspects of the Plaintiff data, including the number and identities of RTB participants that were receiving the bid data from Google, the countries that the bid data was being sent to, the number of times sensitive URLs were involved, and how many times, on average, each plaintiff's personal information was being sold or shared by Google in RTB auctions. For the eight weeks of data Google produced for the plaintiffs, Prof. Shafiq found that there were at least [redacted] different companies receiving the bid data located in at least [redacted] countries, that the companies included some of the largest technology companies in the world (many with first-party relationships with the plaintiffs), that sensitive categories of information were conveyed in more than [redacted] of the bid requests, and that the plaintiffs were each subject to, on average, more than [redacted] bid requests

[20] Prof. Shafiq discussed many of the 62 common data fields in his report, and a complete list of all 62 data fields was attached as Exhibit B to his rebuttal report. Shafiq Rep., ¶ 42; Shafiq Reb., ¶ 22 and Ex. B. Prof. Shafiq considered a field to be commonly included if it was present 98% of the time or higher. Shafiq Rep., fn. 17.

[21] The information in the 62 common data fields included, among other things, a unique Google User ID, the specific URL of the website or app being visited or used, IP address, [redacted] extensive location data, extensive device information, and the language of the site or app being visited or used. *See* Shafiq Rep., ¶ 42.

a day. Shafiq Rep., ¶¶ 36-40; Shafiq Reb. ¶ 37.

For the Class as a whole, Google produced limited RTB auction data for six ten-minute periods that include almost [redacted] billion individual RTB bid requests.[22] *See* Shafiq Supp., ¶ 18. While Google only produced RTB bid data for the plaintiffs while they were signed into their Google accounts, for the Class as whole, Google produced RTB bid data for both signed-in and signed-out U.S. Google account holders. As Prof Shafiq attests, this ultimately is a distinction without a difference, since the Class data still contains the same data fields that were previously produced for the plaintiffs, and the data is still uniformly personally identifying as to both plaintiffs and Class members based on the totality of the information commonly disclosed in the bid requests. *See id.,* ¶¶ 28-34. Prof. Shafiq conducted the same analysis of the Class data that he previously did for the Plaintiff data. This allowed for a direct comparison between them to test whether the Plaintiff data is representative for the Class.

Prof. Shafiq first analyzed the Class data to determine whether the same 62 data fields common in the Plaintiff data were also common in the Class data. He concludes that with four exceptions (none of which impact his ultimate opinion that the data is uniformly personally identifying), the same data fields that are commonly included in the Plaintiff data are also commonly included in the Class data. *See id*., ¶¶ 24-26.[23] That is, 58 of the 62 fields are commonly included in both the Class data and the Plaintiff data. *Id*. He then analyzed these common data fields to determine what information the fields conveyed to RTB participants and whether this information collectively was sufficiently specific to allow those participants to identify, associate with, or reasonably link that data to a particular user or household.[24] *See id*., ¶¶ 27, 35-44. Conducting the same analysis that he did for the Plaintiff data (and relying on the same internal Google documents and peer-reviewed

---

[22] When Google produced the Class data in July 2024, it produced the same data fields that it had produced for the plaintiffs. *See* Further Pritzker Decl., ¶ 12, 15, 17.

[23] The four exceptions are for two of the nine location fields ([redacted]), which are present [redacted] of the time, respectively, and for two of the twelve device fields (model and brand), which are present [redacted] of the time, respectively. *Id*., ¶ 25.

[24] The information in the common data fields again included, *inter alia*, a unique Google User ID, the specific URL of the website or app visited or used, IP address, [redacted], extensive location data, extensive device information, and the language of the site or app. *See* Shafiq Supp, ¶ 27.

research), Prof. Shafiq again concludes that the information Google conveyed to RTB bid participants in the Class data is uniformly sufficiently specific to allow those participants to identify, associate with, or reasonably link that data to a particular user or household. *Id.*.

Just as he did with the Plaintiff data, Prof. Shafiq analyzed other aspects of the Class data, including the number and identities of RTB participants receiving bid data from Google, the countries that the bid data was being sent to, the number of times sensitive URLs were involved, and how many times, on average, each Class member's personal information was sold or shared by Google. For the six ten-minute periods of Class data Google produced, Prof. Shafiq finds that there were at least [redacted] different companies receiving the bid data located in at least [redacted] countries, and that the companies included some of the largest technology companies in the world. Shafiq Supp., ¶¶ 18, 21-22. These statistics are remarkably consistent with the statistics for the Plaintiff data. Shafiq Rep., ¶¶ 36-40. With respect to sensitive categories of information, in just the one hour of time sampled, categories of sensitive information were conveyed in more than one billion of the Class bid requests. Shafiq Supp., ¶ 23. Finally, while the manner in which Google produced the Class data makes it impossible to determine the number of individual Google account holders in that data, Prof. Shafiq was able to determine that there were at least [redacted] million signed-in Google account holders represented in the Class data and that, on average, they were each subject to at least [redacted] bid requests a day; lower than the average for the plaintiffs, but still quite substantial. Shafiq Reb. ¶ 37; Shafiq Supp., ¶ 20.

Prof. Shafiq also looked to determine whether there were any material differences in the Class data as between signed-in and signed-out Google U.S. account holders. Prof. Shafiq concludes that there are no material differences between signed-in and signed-out accounts, because all of the same data fields are populated in both sets of Class data at the same percentages. Shafiq Supp., ¶¶ 28-34. This is reflected in the spreadsheet attached as Exhibit C to Prof. Shafiq's Supplemental Report, which lists the common data fields present in the Plaintiff data and the Class data, both for signed-in and signed-out account holders. Additionally, Prof. Shafiq concludes that from Google's perspective, as opposed to the RTB participants receiving the bid requests, there is no difference between the signed-in and signed-out Class data, because Google has the ability to link, and in fact did link, signed-out data with account holders when it produced the Class data here. *Id.*, ¶¶ 32-33.

In light of all of the similarities between the Plaintiff data and the Class data summarized above and detailed in Prof. Shafiq's Supplemental Report, Prof. Shafiq opines that the Plaintiff data is in fact representative of the Class as whole, and that the Class data, like the Plaintiff data, is uniformly sufficiently specific to allow RTB bid participants to identify, associate with, or reasonably link that data to a particular user or household. Shafiq Supp., ¶ 34.

**C. Rule 23(a) and (b)(2) Certification is Warranted**

Plaintiffs have met their burden for certification of an injunctive and declaratory relief class. The requirements of Rule 23(a) (b)(2) are amply satisfied, and the form of injunctive relief plaintiffs propose – all of which focus on choice, accountability, and transparency – will provide meaningful and appropriate relief to the Class as a whole.

1. Rule 23(a)'s Requirements are Satisfied

The Court previously held that plaintiffs satisfied Rule 23(a)'s requirements of numerosity, typicality and adequacy, and the modest change in the class definition from the prior motion does not disturb any of the Court's prior holdings with respect to these three elements of Rule 23(a). The case still involves at least tens, if not hundreds of millions of active U.S. account holders, satisfying numerosity under Rule 23(a)(1). *See* Order at 10 ("Plaintiffs contend…there are potentially 1.4 billion U.S. accounts holders at issue. Google does not dispute this estimate"); Shafiq Supp. ¶ 20. If one extrapolates out the Class data (50 billion bid requests an hour), Google is sharing its U.S. account holders' personal information [redacted] million times a minute and [redacted] trillion times a day. The "proposed class representatives are, like all putative class members, subject to Google's ToS, its Privacy Policy, and other standardized disclosures" and remain in "active" account status, so typicality is still met under Rule 23(a)(3). Order at 19; Further Caracuzzo Decl., ¶¶ 31-38; Further Pritzker Decl., Exs. 6-12. Adequacy also is satisfied under Rule 23(a)(4). "Named plaintiffs and their counsel have already spent years vigorously litigating discovery. Moreover, plaintiffs' counsel has experience in complex and class action litigation, including privacy class actions." Order at 19; Further Pritzker Decl., ¶ 25.

The Court similarly held that, "at least for commonality purposes, Google's standardized disclosures are common proof capable of resolving the question" of whether Google promised its U.S. account holders that it would not share or sell their personal information." Order at 14. That

ruling addressed Rule 23(a)(2)'s commonality requirement, in part. On this renewed Motion, plaintiffs were ordered to address whether there also is evidence common to the Class that the account holder information Google shares and sells in RTB auctions is personally identifying. *See id.* at 2, 15-18. Plaintiffs have shown here that such common evidence exists. As detailed above, Google's RTB protocol, by design and in everyday practice, is identical for every one of its trillions of daily RTB bids, and it impacts all U.S. account holders in common ways. *See* Order at 12; Shafiq Supp., ¶¶ 45-51. Having now analyzed over 120 terabytes of Class data and almost [redacted] billion Class RTB bid requests, Prof. Shafiq attests that all of the trillions of Google's daily RTB bids uniformly contain information that is in fact personally identifying for the Class as a whole. *Id.*, ¶¶ 14-34. Prof. Shafiq confirms there is common class-wide evidence that the information Google commonly shares and sells in RTB auctions is personally identifying for all Google U.S. account holders and that Google and its hundreds of RTB participants around the world can readily identify, associate with, or reasonably link that data to a particular user or household. *Id.*, ¶¶ 35-44. This is how RTB works. This is true irrespective of whether account holders are signed-in or signed-out of their Google accounts when they are searching the internet or using an app. *Id.*, ¶¶ 28-33. The requirement of commonality under Rule 23(a)(2) is thus satisfied.

2. Rule 23(b)(2)'s Requirements are Satisfied

Plaintiffs also have shown that the proposed Class satisfies the requirements of Rule 23(b)(2). Rule 23(b)(2) allows for class treatment and certification of an injunctive relief class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2); *see also B.K.*, 922 F.3d at 970-971.

Here, as the Court previously held, "Google's disclosures are generalized." Order at 24. These standardized disclosures – Google's ToS, Privacy Policies, and related disclosures – apply generally across the Class to all active U.S. Google account holders to form a common contract and common commitment. *See* fn. 3-13, *supra*. Together, they provide common proof as to the question of whether Google promised its U.S. account holders that it would not share or sell their personal information, as this Court has already held. *See* Order at 11.

Additionally, as this Court has already observed, and as plaintiffs' experts have shown, "Google's RTB is universal." Order at 24. Its "RTB protocol is identical for every one of its billions of daily bids." *Id* at 12 (citing Wilson Rep., ¶34; Shafiq Rep., ¶ 18; 2/21/24 Hrg. Tr. at 10-18 (Google so conceding)). This is by design. RTB is an entirely mechanical, computerized process that operates a billion times a minute, transmitting information about a user's web browsing activity back to Google, that Google then packages into bid requests that it sends to hundreds of RTB participants from around the world, who then send bid responses back to Google as part of an auction process by which the winning RTB participant earns the opportunity to display an advertisement to the user. *See* Wilson Rep., ¶ 24. Although the entire process occurs "faster than the blink of an eye" (Shafiq Rep., ¶ 19), all Class members are subject to Google RTB in the very same way. *See* Shafiq Supp., ¶¶ 34, 45-51. There is no way for users to stop Google from sharing or selling their information through the billions of RTB bids exchanged every day in the RTB auction – Google conceded this fact when the Court considered Plaintiffs' first class certification motion. *See* 2/21/24 Hrg. Tr. at 36:7-22. Moreover, as Prof. Shafiq attests, plaintiffs now have common proof that the Class member data Google uniformly sells and shares in the RTB auction process may constitute "personal information" under California law.[25] Shafiq Supp., ¶¶ 35-44.

Plaintiffs have satisfied Rule 23(b)(2)'s requirements. Plaintiffs challenge "a pattern or practice that is generally applicable to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). And, Google RTB is ongoing – presenting continuing and present adverse effects across the Class. These are precisely the circumstances under which Rule 23(b)(2) certification and class-wide injunctive relief are appropriate. *See, e.g., Brown v. Google, LLC*, 2022 WL 17961497, at *14, *20 (N.D. Cal. Dec. 12, 2022) (certifying (b)(2) class where "plaintiffs' theory of the case was Google collects users' private browsing data after promising not to do so."); *Rodriguez v. Google,*

[25] The Court has previously held: "Under California law, personal information is 'information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household' including '[i]nternet or other electronic network activity information,' such as 'browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.'" Order at 15 (citing Cal. Civ. Code § 1798.140(v)).

*LLC,* 2024 WL 38302, at *10 (N.D. Cal. Jan. 3, 2024) (certifying (b)(2) class seeking deletion of all "SWAA-off data" collected by Google despite promise it would not collect such data from Class members who switched off their WAA and sWAA buttons); *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *10 (N.D. Cal. Mar. 29, 2022), *aff'd in part, vacated in part, remanded,* 96 F.4th 1223 (9th Cir. 2024) (certifying (b)(2) class requiring Meta to correct or cease certain alleged misleading advertising practices).

3. Plaintiffs' Proposed Injunctive Relief Provides Class-Wide Relief

Plaintiffs also satisfy Rule 23(b)(2)'s requirement that they "'describe[] the general contours' of the class-wide injunctive relief that they seek, 'that is more specific than a bare injunction to follow the law, and that can be given greater substance or specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony.'" Order at 24 (citing *B.K.*, 922 F.3d at 972 (quoting *Parsons*, 754 F.3d at 689-90, n.35)); *see also Rodriguez*, 2024 WL 38302 at *10 (granting Rule 23(b)(2) certification, also citing *Parsons*, and holding that "Plaintiffs have convincingly identified 'the general contours' of the class-wide injunctive relief they seek").

Consistent with this authority, plaintiffs describe the general contours of the injunctive relief they seek for the Class. Plaintiffs seek an order that Google:

- Cease its false representations that it "will not," does not" and will "never" share with or sell to companies the personal information of its U.S. account holders;
- Truthfully disclose precisely what information it in fact shares and sells with RTB participants and for what purposes;
- Tell U.S. account holders how long Google retains their Google RTB data and how they can request transparency into the personal information that Google shared or sold;
- Provide U.S. account holders with a mechanism they can use to decide whether they do or do not consent to Google's sharing and sale of their personal information to companies in Google RTB;
- Make available to any Class member who requests it a list of what personal information was shared or sold to third parties in Google RTB, and to whom; and
- Offer an effective means for account holders to opt out of Google RTB altogether.

*See* Further Pritzker Decl. ¶¶ 26-27. This injunctive relief, the Court has held, "would be an important

step toward choice, accountability and transparency." Order at 26. Plaintiffs' requested declaratory relief – including a judicial declaration that Google's representations in its Privacy Policies, ToS and related disclosures amount to a common contract, that Class members have a right under that contract not to have their personal information shared and sold to third parties, and that Google's RTB practices are unfair, unlawful and deceptive – is entirely complementary to such injunctive relief, and would similarly provide significant Class-wide relief. *See* Further Pritzker Decl. ¶¶ 28-29.

4. <u>The Claims to Be Certified Provide Effective Injunctive Remedies</u>

Rule 23(b)(2) "does not require an examination of the viability or bases of the class members' claims for relief," and "does not require a finding that all members have suffered identical injuries." *Parsons*, 754 F.3d at 688. Injunctive relief is appropriate under Rule 23(b)(2) when its issuance is "respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also B.K.*, 922 F.3d at 970-971. Here, plaintiffs' requested injunctive relief is logically tied to the claims to be certified, is appropriate to address the continuing violations and class-wide harms plaintiffs allege, and provides important, prospective relief for Class member in ways that satisfy Rule 23(b)(2)'s requirements.

**The Breach of Contract Claim**. Google does not challenge that there is common proof in its ToS, Privacy Policies and related disclosures of its contractual promise that it will not sell or share Class members' personal information outside of Google. This is the precise type and form of evidence that courts look to in assessing whether there is common contract to which Google and all Class members are bound. *See In Re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020) ("*Facebook Tracking*"). Indeed, at the prior class certification hearing, "Google conceded that whether it made a contractual promise not to sell its account holders' personal information is capable of classwide resolution." Order at 11 (citing 2/21/24 Hrg. Tr. at 0:13-24).

Claims that arise from common form contracts, as here, "are particularly appropriate for class treatment." <u>Newberg on Class Actions</u>, § 3.24 (5th ed.). Injunctive relief in the form plaintiffs request is an appropriate prospective way to afford class-wide relief on this common contractual claim. That claim, like plaintiffs' other claims, is governed entirely by California law. *See* ECF 92, CCAC, Count I, ¶¶ 339-350, Prayer, ¶¶ E, F; Further Caracuzzo Decl. ¶¶ 32-37. Pecuniary compensation would not afford adequate relief for Google's continuing RTB practices and its ongoing breaches of its

contractual promises to its U.S. account holders. Conversely, an order that would require Google to (1) amend and clarify its standardized contractual disclosures; (2) stop Google from misrepresenting that it never shares or sells account holder personal information in RTB despite its promise to the contrary; (3) stop Google's sharing or selling account holders' personal information in violation of this core contractual promise, and (4) require Google to provide Class members a meaningful opportunity to opt out of RTB would provide effective class-wide relief to remedy these continuing breaches and ongoing class-wide impacts. *See Broomfield v. Craft Brew All., Inc.*, 2018 WL 4952519, at *8 (N.D. Cal. Sept. 25, 2018) (certifying Rule 23(b)(2) class where proposed injunctive relief would enjoin defendant's "uniform policy and practice of misrepresenting on its packaging the brewing location of the Kona Beers")*; Brown*, 2022 WL 17961497 at *1, 20 (granting Rule 23(b)(2) certification of breach of contract and related claims).

**The Privacy Tort Claims.** Plaintiffs also seek Rule 23(b)(2) certification of four privacy tort claims under California law. *See* ECF 92 (Count IV-Invasion of Privacy, ¶¶ 383-397; Count V-Intrusion Upon Seclusion, ¶¶ 399-408; Count IV-Publication of Private Information, ¶¶ 410-425; Count VIII-Breach of Confidence, ¶¶ 417-426, Prayer, ¶¶ E, F). Each claim involves common questions, including whether Class members possess a legally protected privacy interest, whether they maintain a reasonable expectation of privacy, and whether the intrusion is highly offensive to a reasonable person. *See Hernandez v. Hillsides, Inc*., 47 Cal. 4th 272, 287 (2009) (claim for invasion of privacy under the California Constitution); *Facebook Tracking*, 956 F. 3d at 605 (intrusion upon seclusion); *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 214 (1998) (publication of private information). Plaintiffs' breach of confidence claim requires proof that Class members' private information is "widely published and not confined to a few persons or limited circumstances." *Hill v. NCAA*, 7 Cal. 4th 1, 37 (1994).

Each claim also is subject to common proof. As shown above (at § C.1), there is common proof that Google collects and shares with RTB participants Class members' legally protected "personal information," as that term is defined in California law. This includes the contents of Class members' internet communications, such as the URLs they are visiting, information about their activities and interests, and information that can identify or be associated with the Class member or

her household. Shafiq Supp. ¶¶ 35-44. Such information is obviously "confidential." MTD Order (ECF 233) at 15:2-6.[26] Whether Class members have a reasonable expectation of privacy in their personal information, and whether Google's common practice of sharing and selling that information billions of time each day to hundreds of RTB participants from around the world is highly offensive to a reasonable person, are objective inquiries that also can be answered through common proof. *See* Order at 7-8 ("It is black letter law that whether someone has a reasonable expectation of privacy is an objective, and therefore common, inquiry.") (citing *Shulman*, 18 Cal.4th at 214)); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016) (certifying class for intrusion upon seclusion claim where common proof of class members' "reasonably expectations" of privacy shown through broadly based and widely accepted community norms).

Here, in light of Google's uniform promises that it would not share and sell Class members' personal information, Class members uniformly had a reasonable expectation that Google would keep their information private in accordance with its promises. *See, e.g., Calhoun v. Google*, 113 F.4th 1141, 1150 (9th Cir. 2024) (Google's Chrome Privacy Notice includes an "affirmative statement[ ] that it would not receive [user] information"…"unless you choose to ... turn[ ] on sync," setting an expectation that data would not be collected and stored if sync is not turned on); *Facebook Tracking*, 956 F.3d at 602 ("Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway"); *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262, 294 (3d Cir. 2016) (a reasonable expectation of privacy existed when Nickelodeon promised users that it would not collect information from users, but then did). Proof of these issues is common to the Class (*see* Order at 7-8), using common evidence – Google's standardized ToS, Privacy Policies and related disclosures.

Additionally, insofar as the reasonable expectation of privacy inquiry at this juncture rises or falls on consent, Google's express promises, and its breaches of those promises, are uniform for all Class members and go directly to the issues of consent and reasonable expectations of privacy for

---

[26] *Cf. Riley v. California*, 573 U.S. 373, 395-96 (2014) ("Internet search and browsing history" and "location information"); *Flores-Mendez v. Zoosk, Inc.,* 2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021) ("sexual preference[]"); *Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020) (medical information).

injunctive relief purposes – **as this Court has already held**. *See* Order at 25 ("[W]hether Google promised not to share account holders' personal information is a … question … [t]hat will be resolved on the basis of Google's standardized disclosures – and therefore plaintiffs' express consent – alone.") (citing *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *19 (N.D. Cal. Mar. 18, 2014)); *accord Calhoun*, 113 F.4th at 1150. Prof. Shafiq's analysis of the Class data also provides common proof that Class members' personal information is both "widely published and not confined to a few persons or limited circumstances" (*Hill*, 7 Cal. 4th at 27),[27] and of such an immense scope and scale as to be highly offensive to a reasonable person. Prof. Shafiq's analysis reveals that for just six, ten-minute periods, Google disclosed its U.S. account holders' personal information to at least [redacted] different companies located in [redacted] countries almost [redacted] billion times, equating to roughly [redacted] million disclosures each minute of each day. Shafiq Supp. ¶¶ 18-22. His analysis also reveals the scope and breadth of Google RTB and how unlikely it would be for any Class member using the internet to avoid having their personal information shared or sold by Google in RTB. *See id.*, ¶ 45-51.

Injunctive and corresponding declaratory relief are entirely appropriate remedies to address a common, ongoing practice that violates Class members' personal privacy where, as here, there is no adequate remedy at law for damages. *See, e.g., Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 307 (2002) (Cal. Const. Art. 1, § 1 is self-executing and, like many other constitutional provisions, it "supports an action…for declaratory relief or for an injunction."); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022) (injunctive relief appropriate to remedy invasion of privacy triggered by Meta's ongoing disclosure of plaintiffs' medical information – "precisely the kind of intangible injury that cannot be remedied by damages"); *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *11 (N.D. Cal. Aug. 16, 2021) (injunctive relief available where there is an invasion of privacy that "can never be fully remedied through damages" and loss of privacy is "irreparable").

An order requiring Google to (1) amend and clarify its standardized contractual disclosures, (2) stop it from misrepresenting what types of user information it shares and sells to outside

[27] *See also In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 796 (N.D. Cal. 2019) ("[D]issemination of your private information to tens of thousands of individuals and companies is generally going to be equivalent to making that information 'public.'").

companies in the RTB auctions, and (3) requiring Google to provide Class members a mechanism to opt out of RTB, would provide effective class-wide relief to remedy these ongoing intrusions of Class members' privacy, and the continuing dissemination by Google of their personal information to hundreds of companies billions of times every day. *See, e.g., Rodriguez*, 2024 WL 38302 at *10 (granting Rule 23(b)(2) certification for injunctive relief of invasion of privacy, intrusion upon seclusion, and related claims); *Brown*, 2022 WL 17961497 at *14, *20 (same).

**The CIPA Claim.** The Court has already held that "an injunctive relief class would be appropriate for purposes of plaintiffs' claims under…[the California Invasion of Privacy Act,] CIPA. Order at 26. And, with good reason. Plaintiffs' CIPA claim is supported by common proof that Google allows RTB participants to "read" or "attempt to read" or "learn the contents or meaning of "class member communications as part of the Google RTB process. Shafiq Rep. ¶ 42; Shafiq Reb. ¶¶ 44-47. And, the undisputed proof that Google's actions occurred while the communications were "in transit" is common to all class members. *See* Order at 18.

The CIPA statute, Penal Code § 637.2(b), specifically provides that "any person…may bring an action to enjoin and restrain any violation of this chapter…." *Id.* An order for injunctive relief is an appropriate class-wide remedy, here. Google's conduct has not stopped. Absent an injunction in the form requested, Google will continue to violate Class member's rights under CIPA in the very manner it does so today. These are precisely the circumstances under which this courts grant Rule 23(b)(2) certification for injunctive relief under CIPA. *See Brown*, 2022 WL 17961497 at *1, 20 (granting Rule 23(b)(2) certification for injunctive relief under CIPA); *In re Yahoo Mail Litig.*, 308 F.R.D. at 599 (certifying Rule 23(b)(2) class, under CIPA, for a requested injunction to stop Yahoo from scanning class members' emails and using contents without consent); *see also Doe v. Meta Platforms, Inc.,* 690 F. Supp. 3d 1064, 1079 (N.D. Cal. 2023) (noting, without ruling, that Meta's ToS, specifying that California laws applies to disputes between Meta and its users, supports allowing out-of-state plaintiffs to seek all available relief under CIPA).

**The UCL Claim.** Plaintiffs' complaint also asserts a claim for relief under the California Unfair Competition Law (UCL). *See* ECF 92, ¶¶ 372-382. This claim has been held in abeyance, consistent with Judge Koh's directive, at the outset of the litigation, to specify only eight of plaintiffs'

claims to be litigated through trial. *See* ECF 83 at 1; ECF 91 at 2. The Order specifically found "plaintiffs' motion for an injunctive relief class under Rule 23(b)(2) would be appropriate for purposes of plaintiffs' claims under the UCL." Order at 26. The Court was well within its discretion to bring this claim out of abeyance, and the Court can, and should, afford Class members appropriate injunctive relief under the UCL now. The UCL covers a wide range of conduct. It "borrows" violations from other laws making them independently actionable as unfair competitive practices, embracing "anything that can properly be called a business practice and that at the same time is forbidden by law" (*Cel–Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999)), and it lists injunctive relief as one of the UCL's core equitable remedies. *See* Cal. Bus. & Prof. § 17203; *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 702 (2006), as modified on denial of reh'g ("A trial court has broad authority to enjoin conduct that violates section 17200.")

Here, an order providing for plaintiffs' requested injunctive relief (*see* § C.3 above) would go a long way toward remedying Google's misleading and unfair RTB practices, providing effective relief to the Class as a whole. *See Brooks v. Thomson Reuters Corp.*, 2023 WL 9316647, at *16 (N.D. Cal. Aug. 10, 2023) (certifying Rule 23(b)(2) class under the UCL, finding: "In whatever form injunctive relief takes – whether creating a public campaign to inform Californians that CLEAR exists, enhancing its…Privacy Policy for individuals to easily request opt-out and remove their information from CLEAR, reaching out to individuals for consent, or shutting down the CLEAR platform altogether – 'a proposed injunction addressing those policies and practices would…prescribe a standard of conduct applicable to all class members.'"); *Brown*, 2022 WL 17961497 at *1, *20 (certifying Rule 23(b)(2) class for UCL and related claims, finding that injunctive relief that would "…preclude Google from collecting further private browsing information; …require Google to delete the private browsing information that it previously collected…; [and]… require Google to remove any services that were developed or improved with the private browsing information…" would provide "important changes to reflect transparency in the system.").

## V. CONCLUSION

For all the foregoing reasons, the Court should certify the Class and Class claims under Rule 23(a) and (b)(2), appoint plaintiffs as representatives of the Class, and appoint Class Counsel.

DATED: November 8, 2024

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: _/s/ Elizabeth C. Pritzker_

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
_ecp@pritzkerlevine.com_
_jkl@pritzkerlevine.com_
_bc@pritzkerlevine.com_
_ccc@pritzkerlevine.com_

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
_lweaver@bfalaw.com_
_adavis@bfalaw.com_
_jsamra@bfalaw.com_

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
_jaybarnes@simmonsfirm.com_
_atruong@simmonsfirm.com_

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (212) 784-6400
Tel: (646) 993-1000
_dstraite@dicellolevitt.com_

James Ulwick (admitted pro hac vice)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Aaron P. Arnzen (Cal. Bar. No. 218272)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
*fbottini@bottinilaw.com*
*aarnzen@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, I caused to be electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE SELECTION AND APPOINTMENT OF SPECIAL MASTER TO ADDRESS PRIVILEGE DISPUTES**

Having the considered the parties' respective proposals for resolution of the remaining disputes regarding Google's privilege claims, the Court concludes that these disputes cannot be effectively and timely addressed by the undersigned or any other district judge or magistrate judge in this district. Accordingly, the Court will appoint a special master pursuant to Rule 53(a)(1)(C) of the Federal Rules of Civil Procedure to resolve these remaining disputes.

To facilitate this appointment, the parties must confer and attempt to reach agreement on the following matters:

1. Identification of a special master with the capability and availability to address the parties' remaining disputes regarding Google's privilege claims. Any special master candidate will be required to execute an affidavit pursuant to 28 U.S.C. § 455. If the parties cannot agree on a special master, each side may identify two candidates for the Court's consideration.
2. Whether the parties will stipulate to Rule 53(f)(3)(A) or (B) as the standard of review for the special master's findings of fact.

The parties shall file a joint stipulation or report advising the Court of their agreed or respective views on these matters by **September 12, 2024**. In addition, the parties shall provide a

United States District Court
Northern District of California

list identifying the names of all parties and all attorneys participating in this action in a form that can be easily shared with a special master candidate, so that he or she can determine whether any grounds for disqualification exist, pursuant to Rule 53(a)(2).

**IT IS SO ORDERED.**

Dated: August 29, 2024

Virginia K. DeMarchi
United States Magistrate Judge

***Via CM/ECF***

August 16, 2024

Magistrate Virginia K. DeMarchi
Courtroom 2 – 5th Floor
San Jose Courthouse
280 South 1st Street
San Jose, CA 95113

**Re: *In re Google RTB Consumer Privacy Litig.*, No. 4:21-cv-02155-YGR (N.D. Cal.) Status Update Regarding Plaintiffs' Challenges to Google's Privilege Logs in Response to ECF No. 731**

Dear Judge DeMarchi,

In accordance with the Court's order at ECF No. 731, Plaintiffs and Google respectfully submit this joint report outlining their respective proposals for resolution of the pending disputes regarding Google's privilege log and assertions of privilege over documents withheld in this action. The parties met and conferred by videoconference on August 14, 2024, but have been unable to reach agreement on the appropriate next steps.

## I. PLAINTIFFS' POSITION & PROPOSAL

Consistent with the Court's guidance in the August 1, 2024 Order, ECF No. 761, Plaintiffs propose the Parties engage a special master to help resolve the remaining 3,217 privilege disputes. Plaintiffs have repeatedly conferred with Google in an effort to resolve these disputes—including, most recently, a meet and confer regarding the retention of a special master for this purpose. Regrettably, Google has declined Plaintiffs' and the Court's invitation to supplement its log to substantiate its privilege claims or to engage with Plaintiffs on substance.

Google now opposes appointment of a special master on the basis that it is unnecessary and unduly burdensome, without proposing a viable alternative path. Google's position fails to grapple with the scope of the pending disputes, and will result in further delay of the necessary resolution of disputes to its privilege claims. Engaging a special master at this juncture is the most expeditious way to resolve Google's privilege claims, which are substantial in number especially in light of its overall production. *See* ECF No. 360 at 7 ("The very large number of otherwise responsive documents that Google has withheld as privileged, particularly when compared to the number of nonprivileged documents Google has produced, raises questions about whether Google's privilege assertions—i.e., its decisions to withhold documents in whole or in part from production—are more expansive than Ninth Circuit law permits.").

A court may appoint a special master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. Proc. 53(a)(1)(C). Appointment of a special master here is appropriate given the scope of disputes remaining and the Court's attention already given to this matter. *See Dolby Lab'ys Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 862 (N.D. Cal. 2019) (M.J. Ryu)

(appointing a special master "to determine any issues of privilege" over the 4,690 disputed privilege log entries); *United States v. Burga*, No. 18-CV-01633-BLF-SVK, 2019 WL 3859157, at *7 (N.D. Cal. Aug. 16, 2019) (M.J. Van Keulen) (indicating that the Court "will appoint a special master" to handle remaining privilege disputes and ordering the parties to confer on the "identification of a special master," the process for the special master to review the disputes, and the standard of review for the special master's findings of fact under Rule 53(f)(3)); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. Ohio 2010) (noting the prior appointment of a special master to conduct the review *in camera* of pending privilege disputes). Plaintiffs' challenges to Google's privilege entries have been pending for over a year (indeed, the vast majority have been pending since 2022, *see* ECF No. 339). These challenges have been the subject of extensive briefing (ECF Nos. 339, 393, 396, 401, 437, 454, 519), one Court hearing (ECF No. 417), and six Court orders (ECF Nos. 360, 421, 423, 439, 461, 731). Most recently, the Court issued the August 1st Order, providing guidance on the pending disputes and finding that "unless there are disputes that can be resolved at a categorical level, or that require assessment of only a limited number of individual entries or documents, the Court is inclined to recommend referral to a special master, with each side to bear the expense of the master's services in proportion to that side's success or lack thereof on the merits." ECF No. 731 at 9.[1]

In response to the August 1st Order, Plaintiffs withdrew several challenges, narrowed their challenges to 2,183 identified entries and, at Google's request, provided additional detail to support their privilege challenges to several dozen additional entries. Google, in contrast, did nothing and has not withdrawn or revised any of its entries. Thus, challenges to 3,217 entries on Google's privilege logs remain in dispute and Plaintiffs raise multiple bases for challenging each entry, which Plaintiffs have described in previous submissions to the Court. *E.g.* ECF No. 519.

As the Court's August 1st Order makes clear, many of the remaining disputes cannot be resolved without a "case-by-case determination." ECF No. 731 at 5. Further, resolving certain disputes may require *in camera* review of potentially thousands of withheld documents. Given the level of fact finding needed and the attention the Court has already given to this matter, the Court should appoint a special master to assist in efficiently resolving these privilege disputes, as no other viable alternative exists at this point and the disputes need to be resolved.

During the Parties' meet and confer on August 14, 2024, Google argued that appointing a special master is unnecessary and that this Court can continue to handle the pending disputes. But this Court has already provided extensive attention to these disputes and indicated that it cannot do more. *See* ECF Nos. 360, 421, 423, 439, 461, 731. Further, even if the Parties were to submit a sample of the disputes to the Court (a process which Plaintiffs had previously proposed and Google opposed, *see* ECF Nos. 454 at 4; 519 at 5), Google has not agreed that it would apply a ruling as to a sample of documents more broadly. A special master can more easily manage a sampling process to ensure the order applies broadly to all similar pending disputes: indeed, Plaintiffs suggested this as one potential pathway for a special master process in the Parties' meet and confer discussion. In contrast, Google has offered no specific pathway for resolving these disputes other

[1] Plaintiffs believe the guidance provided by the Court in its August 1st Order provides appropriate direction for the Parties in briefing these disputes, and helpful assistance to a special master in adjudicating them.

than to say "no" to a special master appointment for this purpose.

Google has argued that appointing a special master now would be unduly burdensome where fact discovery has closed. It is unclear how that can be. Plaintiffs raised their challenges well before the close of fact discovery and the withheld documents continue to be relevant to upcoming proceedings. The burden to the Parties of litigating these issues and on the judicial officer in deciding these disputes remains the same irrespective of whether the process is undertaken by the Court or a special master. If anything, Google's argument shows that appointment of a special master at this juncture will help to expedite resolution of these disputes.

Because resolving the thousands of the at-issue privilege disputes will require careful attention, the Court should appoint a special master to handle these remaining disputes. Plaintiffs request that the Court order the Parties to meet and confer to see if they can agree on the selection of a special master and the standard of review to be applied by the person so appointed. If the Parties cannot agree, the Parties should be required to submit four names of proposed special masters (two from each side) within one week of the Court's order and the standard of review will be that set forth in Fed. R. Civ. P. 53(f)(3). The Court's order should specify that any list the Parties submit should not identify which names were proposed by which side. The Court can then select one name from the list for appointment.

## II. <u>GOOGLE'S POSITION & PROPOSAL</u>

While Plaintiffs continue to present this dispute as complex and time-consuming to force its referral to a special master, their failure to comply with the painstaking guidance this Court has provided, *see* ECF No. 731, reveals that there is no colorable basis to do so. Plaintiffs merely regurgitate thousands of the exact same vague challenges to Google's privilege log they made before the Court issued its last order, underscoring that these challenges are speculative and lack any good faith factual basis. Indeed, Plaintiffs have fully withdrawn their challenges to only ***three*** privilege log entries, leaving a total of ***3,217*** entries at issue—even more entries than existed when the Parties first briefed this dispute prior to the close of fact discovery. Plaintiffs have provided substantive further information about their challenges for just ***34*** of these entries—those pertaining to documents sent via email distribution lists (the "Distribution List Challenges"). As to the remainder, Plaintiffs continue to stand on the same generic and speculative objections that the Court has already confirmed cannot justify in camera review.

Distilled to its essence, this dispute is actually quite manageable, and involves a few dozen documents at most. Given its familiarity with the prior privilege disputes, the Court is also best positioned to resolve the discrete outstanding questions regarding the Distribution List Challenges. Google proposes that the Court address this single remaining dispute and decline to refer this matter to a special master because Plaintiffs have once again failed to articulate a coherent challenge that would justify the sweeping review they demand. Indeed, referral to a special master would be wasteful and inefficient—and it would reward Plaintiffs for their refusal to apply the guidance this Court offered in its prior orders.

The August 1, 2024 order could not be more clear or more straightforward: once Google makes a *prima facie* showing of privilege, "[P]laintiffs must provide a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal that the logged

document is not privileged." ECF No. 731 at 7. ***Plaintiffs have done nothing to justify a special master's intervention as to either step.***

***First***, Plaintiffs do not explain why they believe Google has failed to make a *prima facie* showing of privilege. Rather, they rely on the same argument that this Court already rejected: that Google's existing privilege entries were all per se deficient. The Court was clear, as it confirmed in its most recent order: it "did not order Google to revise every remaining entry on its privilege log, but only to ensure that the remaining entries included this information[,]" a request with which Google has diligently complied.[2] ECF No. 731 at 5. Plaintiffs appear to argue that Google must describe these documents' subject matter in additional detail, but this Court already rejected this argument over a ***year*** ago. Specifically, in resolving a prior privilege dispute in which Plaintiffs raised the same argument, the Court held that "plaintiffs' demand for information about the document title or subject line, the organizational positions of the authors and recipients, and detail about the issue, regulation, or policy that is the subject of the document are unlikely to make it easier for plaintiffs or the Court to assess whether a document actually seeks or contains legal advice." ECF No. 360 at 7. Google has provided all required information for each of its privilege log entries, and Plaintiffs have not explained why ***any*** of the challenged entries are insufficient—much less all of them.

***Second***, Plaintiffs have not made any attempt to articulate a good-faith factual basis for all but 34 of their challenges—even after the Court directed them to do so and the parties met and conferred in response. Aside from the Distribution List Challenges, Plaintiffs' remaining 3,183 challenges remain entirely speculative and virtually unchanged. In the most recent annotated version of Google's privilege log that Plaintiffs sent to Google on August 9, 2024, the vast majority of Plaintiffs' stated reasons for challenging Google's entries were vague, deficient, and completely ***identical to those Plaintiffs presented when the parties last briefed this issue in the spring of 2023***. *See* ECF No. 519. These include assertions like "Attorney ID'd, but No Legal-Advice Provided/Solicited" and "Improperly Withheld." This too runs afoul of the Court's prior orders. Specifically, the Court previously found that "Plaintiffs may not rely solely on speculation that the primary purpose of the communication is something other than seeking or obtaining legal advice, or that the document does not contain legal advice merely because no attorney participated in the communication," much less that a document does not contain legal advice ***even where*** an attorney participated in the communication. ECF No. 731 at 8 (referring to Court's order on a "prior, similar dispute"). These kinds of challenges underscore that Plaintiffs have no good-faith basis for their positions and instead continue to ignore the Court's repeated guidance.

* * * *

---

[2] The required information, as the parties agree, is "(1) date, (2) author/sender/custodian name, (3) all known recipients, (4) the attorney(s) involved, (5) the nature of the document, (6) the subject matter of the document, (7) the privilege or protection claimed, and (8) an explanation of the basis for the claim of privilege or protection if not evident from the other information disclosed for that entry sufficient to enable the Court to evaluate the claim without reviewing the document *in camera*." ECF No. 461 at 2.

Plaintiffs' mere say-so as to both Google's *prima facie* showing of privilege and the basis for their challenges cannot be enough to trigger a special master's review. Were it otherwise, any party could always force its opponent to go through the lengthy and costly special master process simply by taking maximalist discovery positions and refusing to moderate them. While Google appreciates the Court's proposal that the losing party in any dispute before a special master assume a proportionate share of the special master's fees, this proposal is unlikely to discourage Plaintiffs from pursuing meritless positions. For one thing, were the parties to reach a settlement or were Plaintiffs to prevail on a judgment, Plaintiffs have admitted they intend to seek recovery of the special master's costs and their associated attorneys' fees. In other words, Plaintiffs have no incentive to moderate their position because they believe that they can force Google to either pay now or pay later. *See Vargas v. Howell*, 949.F.3d 1188 (9th Cir. 2020). For another, even if Google were to avoid paying any of Plaintiffs' costs or fees, it would still be forced to incur significant attorney time and fees of its own to resolve this baseless dispute before a special master.

To the extent Plaintiffs continue to challenge the 34 Distribution List Challenges they claim were distributed to an overly broad set of Google employees, the dispute is sufficiently limited that the Court can resolve this challenge itself. Indeed, the Court need only conduct this review if it concludes that the fact of distribution to more than a certain number of individuals alone may constitute a satisfactory good faith showing to justify in camera review. The Court should order a final set of briefing on these documents—at most. It should decline to refer any other aspects of the parties' privilege disputes to a special master based only on Plaintiffs' speculation and attorney argument.

Respectfully submitted,

Dated: August 16, 2024

**PRITZKER LEVINE LLP**

By: *_/s/ Elizabeth C. Pritzker_*

Elizabeth C. Pritzker (SBN 146267)
Jonathan K. Levine (SBN 220289)
Bethany Caracuzzo (SBN 190687)
Caroline Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

*Interim Class Counsel*
***Counsel for Plaintiffs and the Proposed Class***

Dated: August 16, 2024

**COOLEY LLP**

By: */s/ Aarti Reddy*

Michael G. Rhodes
Whitty Somvichian
Aarti Reddy
Kelsey R. Spector
Reece Trevor
Anupam S. Dhillon
3 Embarcadero Center, 20th floor
San Francisco, CA 94111-4004
Tel.: 415-693-2000
Fax: 415-693-2222
rhodesmg@cooley.com
wsomvichian@cooley.com
areddy@cooley.com
kspector@cooley.com
rtrevor@cooley.com
adhillon@cooley.com

Khary J. Anderson
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004-2400
Tel.: 202-776-2109
Fax: 202-842-7899
rsaldana@cooley.com
kjanderson@cooley.com

***Attorneys for Defendant GOOGLE LLC***

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

I, Aarti Reddy, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of August, 2024, at San Francisco, California.

*/s/ Aarti Reddy*
Aarti Reddy

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JUN 20 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In re: Google RTB Consumer Privacy Litigation.

---

KIMBERLEY WOODRUFF; et al.,

Plaintiffs - Petitioners,

v.

GOOGLE LLC,

Defendant - Respondent.

No. 24-2479

D.C. No.
4:21-cv-2155-YGR
Northern District of California, Oakland

ORDER

Before: SILVERMAN and BUMATAY, Circuit Judges.

The motion (Docket Entry No. 5) for leave to file a reply in support of the petition for permission to appeal is granted.

The petition for permission to appeal is denied. *See* Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959-60 (9th Cir. 2005) (describing factors this court considers in analyzing a Rule 23(f) petition).

Office of the Clerk
**United States Court of Appeals for the Ninth Circui**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

FILED

APR 19 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

## DOCKETING NOTICE

---

Docket Number: 24-2479
Originating Case Number: 4:21-cv-2155-YGR
Short Title: Woodruff, et al. v. Google LLC

---

Dear Petitioner/Counsel

This is to acknowledge receipt of your Petition for Permission to Appeal.

All subsequent letters and requests for information regarding this matter will be added to your file to be considered at the same time the cause is brought before the court.

The file number and the title of your case should be shown in the upper right corner of your letter to the clerk's office. All correspondence should be directed to the above address pursuant to Circuit Rule 25-1.

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CONTEMPT AND SPOLIATION SANCTIONS RE NAMED PLAINTIFF DATA**<br><br>Judge: Hon. Virginia K. DeMarchi<br>Date: May 28, 2024<br>Time: 10:00 a.m.<br>Courtroom: 2, Fifth Floor |

**REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on May 28, 2024, at 10 a.m., in Courtroom 2, 5th Floor, of this Court, located at 280 South 1st Street, San Jose, California, before the Hon. Virginia K. DeMarchi, United States Magistrate Judge for the Northern District of California, plaintiffs will and do hereby move the Court, pursuant to Fed. R. Civ. P. 16(f), 37(b) and 37(e), and Civil L.R. 37-4, and for the reasons set forth below and in the Declaration of Jonathan K. Levine ("Levine Decl."), for an order imposing contempt and evidentiary sanctions against Google for its willful violations of this Court's April 14, 2023 Order re Plaintiffs' Motion for Contempt and Sanctions ("April 14 Order") (ECFs 487, 488) and May 16, 2023 Order re Account Identifiers and Further Production of Named Plaintiffs' Data ("May 16 Order") (ECFs 510, 524), and for its willful failure to maintain and produce [redacted], even after this Court held that [redacted]

As reflected in the April 14 and May 16 Orders, there are three key pieces of data associated with each RTB bid request sent out by Google: the Google account id ("GAIA ID"), the Biscotti ID (which is a form of the Google User ID generated for each bid request), and the [redacted], which allows Google to [redacted]. *See* ECF 487 at 6-7, ECF 510 at 2-3. Google was ordered to produce [redacted] for all productions of named plaintiff data and was on notice at least as early as April 2023 that the [redacted] should be maintained and produced. But Google did not do so. When plaintiffs requested named plaintiff data from 2023 ***after*** the Court's Orders, Google did not produce any [redacted]. Google eventually admitted that the 2023 [redacted], and because of that, [redacted]

Plaintiffs seek sanctions against Google for its willful violation of the Court's orders and failure to [redacted] on the grounds set forth below and in the Levine Decl., and upon any further grounds the Court may determine or that plaintiffs may assert on reply or at hearing in this matter.

**TABLE OF CONTENTS**

**MEMORANDUM OF POINTS AND AUTHORITIES** ............ 1

**I. INTRODUCTION** ............ 1

**II. RELEVANT FACTS** ............ 3

**III. ARGUMENT** ............ 13

**IV. CONCLUSION** ............ 17

# TABLE OF AUTHORITIES

CASES

*Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406 (9th Cir. 1990) .......... 14

*Brown v. Google LLC*, 2022 WL 2789897 (N.D. Cal. July 15, 2022) .......... 13

*Brown v. Google LLC*, Case No. 20-cv-03664-YGR (SVK), ECF 918 (N.D. Cal. April 4, 2023) .......... 12

*Calhoun v. Google LLC*, 2022 WL 1987864 (N.D. Cal. June 6, 2022) .......... 13

*Cato v. Fresno City*, 234 F.3d 1276 (9th Cir. 2000) .......... 14

*Clear-View Tech., Inc., v. Rasnick*, 2015 WL 2251005 .......... 17

*Dong Ah Tire & Rubber Co., Ltd. v Glasforms, Inc.*, 2009 WL 1949124 .......... 17

*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .......... 14

*Fausto v. Credigy Servs. Corp.*, 251 F.R.D. 436 (N.D. Cal. 2008) .......... 13

*Guifu Li v. A Perfect Day Franchise, Inc*, 281 F.R.D. 373 (N.D. Cal. 2012) .......... 14

*Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 3895118 (N.D. Cal. Aug. 29, 2011) .......... 16

*Harmon v. City of Santa Clara*, 323 F.R.D. 617 (N.D. Cal. 2018) .......... 14

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693 (9th Cir. 1993) .......... 16

*In re Google Litig.*, 2011 WL 5190831 (N.D. Cal. Oct. 31, 2011) .......... 13

*In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981 (N.D. Cal. 2023) .......... 12

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992) .......... 14

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) .......... 13, 14

*Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) .......... 14

*Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Cal. 1987) .......... 17

*Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802 (9th Cir. 1982) .......... 17

*Unigard Sec. Ins. Co. v. Lakewood Eng. Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992) .......... 14

*United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958) .......... 13

*United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365 (9th Cir. 1980) .......... 14

*Woods v. Google*, 2014 WL 3909527 (N.D. Cal. Aug. 8, 2014) .......... 13

STATUTES

Cal. Civ. Code § 1798.140 .......... 4

OTHER AUTHORITIES

8B *Federal Practice and Procedure* § 2284 (3d ed. 2022) .......... 13

Fed. R. Civ. P. 16(f)(1) .......... 14

Fed. R. Civ. P. 37 .......... 14

Fed. R. Civ. P. 37(b) .......... 13

Fed. R. Civ. P. 37(e) .......... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

This case is brought on behalf of millions of U.S. Google account holders whose personal information Google shared and sold to hundreds of real time bidding ("RTB") auction participants around the world in trillions of RTB auctions during the Class Period. One of the ways plaintiffs can prove that the information shared and sold by Google in the RTB auctions was "personal information" is by showing that Google links or is reasonably capable of linking that information with account holders' Google accounts. Google does this through three key pieces of event-level log data: the GAIA ID (account id), the Biscotti ID (the [redacted] Google User ID associated with a bid request) and the [redacted] Levine Decl., ¶ 2.

Google has been aware of plaintiffs' theory of the case since it commenced in March 2021 (it is, after all, based on Google's own Privacy Policy and its express promises not to sell or share personal information with third parties). Yet Google has fought tooth and nail since then to withhold evidence plaintiffs need to show that Google does, as a matter of course, routinely link RTB bid request information with corresponding Google accounts - all while repeatedly assuring the Court and plaintiffs that Google had "taken reasonable and proportionate steps to preserve evidence relevant to this litigation" and that with respect to "event-level log data beyond Google's standard retention periods . . . such data and other documents and data relevant to this litigation have been preserved." ECF 296 (Joint CMCS) at 6.[1] *See also* Levine Decl., ¶¶ 6-7.

These representations were false, at least with respect to the [redacted]. Google did not preserve [redacted] although it had the capacity to do so, has done so for other cases, and should have done so in this action. Google willfully and knowingly destroyed [redacted] and then attempted to hide this destruction from plaintiffs and the Court by engaging in

[1] *See also* Joint Case Management Conference Statements filed at ECF 69 at 7; ECF 82 at 7; ECF 112 at 3; ECF 146 at 5-6.

endless meet and confers with plaintiffs and lengthy and costly motion practice before this Court. For a time, Google incorrectly claimed that there was no Court order requiring Google to produce either the [redacted]. But in 2023, the Court specifically ordered Google to produce [redacted]. It was only then, after years of meet and confers and countless motions, that Google admitted that for its prior productions of 2021 and 2022 named plaintiff data, Google had not in fact [redacted] Nor could Google produce the [redacted] for those productions, since the only way to produce [redacted] This conduct, by itself, warrants contempt and spoliation sanctions, but it is not the subject of this motion, only the background.

This motion seeks to hold Google accountable for its conduct in 2023, ***after*** the Court specifically ordered Google to produce [redacted] In the April 14 Order, the Court ordered Google to ensure that "all of its productions of named plaintiff data can be easily correlated, and that it must include the fields necessary to accomplish that result." The Court specifically identified the GAIA ID, the Google User ID (internally known at Google as the Biscotti ID), and the related joining keys. ECF 487 at 7. That same day, the Court also ordered Google to produce more named plaintiff data for six weeks of plaintiffs' choosing. ECF 484 (Order re Time Sampling) at 2. Google was thus on notice, at least as early as April 14, 2023, that [redacted] should be maintained and that plaintiffs were entitled to additional weeks of named plaintiff data from Google. In the subsequent May 16 Order, the Court went further, and ordered Google to produce [redacted] for all named plaintiff productions - and if it could not, Google was to work with plaintiffs to come up with a reasonable alternative to produce the same or similar information. ECF 510 at 3.

In response to the April 14 and May 16 Orders, plaintiffs now understand that Google took no steps to stop the routine destruction of the [redacted][2] When plaintiffs requested

---

[2] Google's retention period is only 90 days [redacted] *See* Levine Decl., Ex. A at 238:7-15.

additional named plaintiff data for four different one-week samples in 2023 (two of which post-dated the April 14 Order and one of which was well within Google's 90-day retention period at the time of the Order), Google produced some named plaintiff data for the four weeks requested, but did ***not*** produce any [redacted], falsely claiming at the time of its eventual production in February 2024 that [redacted] This feigned ignorance was just to hide the fact that Google allowed the [redacted] to be deleted, after the Court's order to produce them - [redacted] And because the [redacted] were destroyed, Google also claimed it could not produce the [redacted] Google has not claimed that this was an inadvertent failure, nor has Google offered to mitigate or find some other way to get plaintiffs the data they are entitled to under the Court's Orders. Nor did Google bring this issue to the Court's attention and ask for forgiveness. This is notable given the number of times Google has been sanctioned in for discovery abuses in this District.

Google's willful violation of the Court's April 14 and May 16 Orders and willful and knowing spoliation of [redacted] in 2023, and resulting [redacted] for 2023, is highly prejudicial to plaintiffs and constitutes contempt of this Court, for which contempt and evidentiary sanctions should be imposed.

## II. RELEVANT FACTS

There is no serious dispute that certain information about Google account holders was routinely sold and shared in RTB auctions trillions of times during the Class Period.[3] *See, generally*, ECF 545-5 (Shafiq Report); ECF 545-6 (Wilson Report). One key issue for trial is

[3] By way of example, Google's records confirm that for just an eight-week period for just the seven named plaintiffs, their personal information was shared with more than 300 RTB participants in 24 different countries 4.9 million times. *See* ECF 545-5 (Shafiq Report) at ¶¶ 35, 39. Extrapolated out over the entire seven-year Class Period, Google shared the seven named plaintiffs' personal information with hundreds of RTB auction participants around the world about 223 million times.

proving that the Google account holder information sold and shared was "personal information" under Google's Privacy Policy and California law.

Under Google's Privacy Policy, personal information includes information that an account holder provides to Google that personally identifies that person, such as name, email address, or billing information, ***or other data that can be reasonably linked to such information by Google, such as information Google associates with that person's Google account.*** The Privacy Policy goes on to describe information Google "associate[s] with…Google Account[s]" to include, among other things, unique identifiers, browser type and settings, device type and settings, and operating systems. Google defines unique identifiers as including cookies, advertising IDs, and other unique device identifiers. ECF 546-36 (Caracuzzo Declaration) at ¶¶ 19, 29, 36 (emphasis added).

Under California law, personal information includes information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household, including unique personal identifiers, online identifiers, IP addresses, browsing history, search history, geolocation data, and any inferences drawn from any of this information that can be used to create a profile about a consumer reflecting the consumer's preferences, characteristics, predispositions, or behavior. *See* Cal. Civ. Code § 1798.140; *accord*, ECF 233 (order on motion to dismiss) (for purposes of Rule 12(b)(6), "the Court finds that the information at issue in this case falls within the broad definition of personal information, as defined under both California law and in Google's privacy policy")[4].

There are thus two different ways plaintiffs can prove at trial that what Google was sending out in the RTB bid requests was personal information. First, plaintiffs can prove that RTB bid request data was personal information under Google's Privacy Policy because Google was

---

[4] *See also*, ECF 690 at 25 (class certification order) ("There is evidence before the Court which already shows that Google shares enough information that RTB participants can discern what an account holder is reading online, even when it is on a religious or medical topic; exactly where they are reading it, including the coordinates of an account holder's home or work; and their background, which allows for a detailed, demographic profile of the account holder.").

reasonably capable of linking the bid request data with information Google associated with Google accounts. Second, plaintiffs can prove RTB bid request data was personal information under California law because the bid request data Google was sending out identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. The first looks at what Google was doing internally with the bid request data it was sending out. The second looks at what the RTB participants were receiving from Google. Plaintiffs can prove either or both at trial to prevail on their claims.

Focusing on the first method, all Google U.S. account holders have their personal information sold and shared in RTB auctions regardless of whether they are signed-in or signed-out of their Google accounts while using the internet.[5] *See, generally*, ECF 545-5 (Shafiq Report); ECF 545-6 (Wilson Report); ECF 545-9 (Richards Report). For signed-in account holders, plaintiffs will show at trial that Google has multiple ways to [redacted] (*see, e.g.*, ECF 545-5 (Shafiq Report) at ¶ 98), thus demonstrating that the bid request information is personal information under Google's Privacy Policy. For signed-out account holders, Google [redacted].[6] *See* Levine Decl., Ex. A at 225:13-226:20; ECF 545-5 (Shafiq Report) at ¶¶ 96-98; ECF 616-5 (Shafiq Rebuttal Report) at ¶¶ 98-107; ECF 616-12 (Ex. 51 to Pritzker Declaration) at 215-216, 219, 225-226.

[5] Google does not disclose its RTB auction practices to its U.S. account holders and provides no mechanism for any account holders to opt out of having their personal information shared and sold in RTB auctions. *See* ECF 545-9 (Richards Report) at ¶ 91.

[6] The GAIA ID is a unique identifier for a Google account holder and his/her Google account. Internal Google documents confirm that Google [redacted] *See* ECF 545-5 (Shafiq Report) at ¶ 97.

Thus, for plaintiffs to be able to prove at trial that RTB bid request data sold and shared by Google for signed-out account holders also constitutes personal information under Google's Privacy Policy, [redacted] are the best way to present the jury with the actual data demonstrating that Google is reasonably capable of linking that bid request data with information associated with particular Google accounts. The Court's May 16 Order reflects the connection between [redacted] as an evidentiary matter for trial.

Plaintiffs served a document request ("RFP 42") on Google in May 2021, shortly after the litigation commenced, seeking production of information about the named plaintiffs. Levine Decl., ¶ 3. RFP 42 called for production of, among other things, bid request data associated with the named plaintiffs, their Google account data, and any identifiers and data associated with the named plaintiffs, their devices and their accounts (which would include the [redacted] and any other joining keys associated with the named plaintiffs). *Id*. RFP 42 put Google on notice that it was required to maintain [redacted] for the named plaintiffs as of May 2021, at the latest. Since Google has a 90-day retention period [redacted], had Google stopped the deletion of the data at that time, [redacted] would have existed for the entire three-year period post-dating the filing of the litigation. But Google did not do that.[7] Levine Decl., Ex. A at 226:21-227:4.

Instead, Google categorically refused to produce [redacted], even after they were specifically requested by plaintiffs, and even when that production would have been limited to the then eight weeks of sampled named plaintiff data that Google was producing. Levine Decl., ¶ 7. When plaintiffs moved to compel the production of [redacted] in July 2022, Google told the Court that this data was irrelevant, too burdensome

[7] This is contrary to repeated representations to plaintiffs and the Court that Google was not only maintaining relevant discovery (as it was required to do), but specifically as to event-level log data, that Google was preserving such data beyond Google's standard retention periods. *See* the parties' Joint Case Management Conference Statements, ECF 69 at 7; ECF 82 at 7; ECF 112 at 3; ECF 146 at 5-6; ECF 295 at 6.

to produce, and that there were more efficient ways to conduct this discovery. *See* ECF 269 (joint letter brief) at 5. None of these contentions by Google were true, but they were sufficient to persuade the Court at that time to deny plaintiffs' motion as to the [redacted]. *See* ECF 314 (Aug. 26, 2022 Order) at 4-5. At no time during the meet and confers between counsel or in the briefing before the Court did Google inform plaintiffs or the Court that it had not suspended its 90-day retention period [redacted] and was routinely destroying that data after 90 days. Levine Decl., ¶ 9.

On February 28, 2023, plaintiffs moved for sanctions against Google for its failure to produce "verticals" data pertaining to the named plaintiffs in violation of two prior Court orders. ECF 431. As part of that motion, plaintiffs argued that Google had intentionally stripped joining key data from its productions of named plaintiff data, and specifically identified the [redacted] as an example of what was missing. *See* ECF 431 (sanctions motion) at 5; ECF 457 (reply brief) at 8-9. In its opposition to the motion, Google argued that it had not manipulated the named plaintiff data it produced, but again did not disclose to plaintiffs or the Court that the [redacted] for the eight weeks for which named plaintiff data was produced no longer existed.[8] *See* ECF 447-2 (Google's opposition) at 12.

On April 14, 2023, the Court denied plaintiffs' sanctions motion, but ordered Google to produce additional data fields, including the GAIA ID, Google User ID (known internally at Google as the Biscotti ID), and joining key data (which would include the [redacted]), for all prior and future productions of named plaintiff data. ECF 487 at 7. The Court also ordered Google to make sure that "all of its productions of named plaintiff data can be easily correlated, and it must include the fields necessary to accomplish that result." *Id*. That same day, the Court also issued another order allowing plaintiffs to select six additional weeks for which Google would be required to produce named plaintiff data. ECF 484 at 2. Thus, as of April 14, 2023, Google knew that (i) it was required to produce GAIA IDs, [redacted]

---

[8] Google's counsel also failed to disclose this during the sanctions hearing. *See* ECF 489 (April 11, 2023 hearing transcript).

(including [redacted]) for all prior and future productions of named plaintiff data in a manner that allowed them to be easily correlated, and (ii) plaintiffs were entitled to six more weeks of named plaintiff data.

As of the date of the two April 14, 2023 Orders, Google should have had [redacted] going back at least 90 days, or to about January 14, 2023, based on Google's representations regarding retention. Google again took no steps to stop the deletion of this data after the 90-day retention period had elapsed.

In meet and confers following the Court's April 14, 2023 Orders, Google again refused to produce [redacted] and joining keys (including [redacted]), for either past or future productions of named plaintiff data. *See* ECF 502-3 (joint letter brief). On May 8, 2023, plaintiffs again moved to compel Google to produce the [redacted] and joining key data, including specifically the [redacted] *Id.* at 3. Even though plaintiffs specifically identified the [redacted] by name and cited internal Google documents discussing those keys, in its opposition, Google claimed again not to know what joining keys plaintiffs were seeking. *Id.* at 5. Again, at no time during the meet and confer discussions or in the briefing to the Court did Google disclose to plaintiffs or the Court that it was not maintaining, and in fact ***already*** had destroyed, the [redacted] plaintiffs were, and had been, seeking for prior productions of named plaintiff data from 2021 and 2022. Nor did Google disclose that as a result of its failure to maintain the [redacted] Google was also [redacted]

On May 16, 2023, the Court held a hearing on the motion to compel. During the hearing, and for the very first time, Google's counsel admitted that [redacted] 90-day retention period for that data). ECF 512 (hearing transcript) at 34-35, 67. Later that day, the Court issued an order on the motion, memorializing that Google [redacted] for the named plaintiff data from 2021 and 2022. ECF 510 (May 16, 2023 Order) at 2-3. But the Court's May 16 Order did not excuse Google from maintaining [redacted] on a going forward basis, which was governed by the Court's earlier April 14, 2023 Order (ECF 487). And

the May 16 Order emphasized the importance of the [redacted] and instructed Google to investigate [redacted] for all named plaintiff data, and if not, to work with plaintiffs to determine whether "any reasonable alternatives exist for the production of the same or similar information." ECF 510 at 2-3. Google did not produce [redacted] (because the [redacted] for any of the dates requested by plaintiffs) and never worked with plaintiffs to determine whether other alternatives existed to get plaintiffs the information they need for trial, as instructed by the Court.[9]

On May 24, 2023, the parties submitted a status report to the Court regarding production of named plaintiff data. *See* ECF 528-2. Google stated that it would produce [redacted]. It also told the Court that it was [redacted] and intended [redacted] by June 2, 2023. This was not true, as Google's additional productions from the [redacted] did not include numerous fields that correspond to data fields publicly known to be included in RTB bid requests, including URLs, device properties, and app IDs.

On October 30, 2023, Google confirmed in corporate deposition testimony that, [redacted] which "represent[s] a logical super set of the information that would be shared in an RTB bid request," i.e. "all of the items and there may be additional information." Levine Decl., Ex. A at 89:19-90:3.[10] For [redacted]

[9] For example, an obvious alternative would be for Google to produce more recent weeks of named plaintiff data within the 90-day retention period, but this is not something Google ever proposed to plaintiffs.

[10] Google's belated admission that the [redacted] is a separate act of misconduct that is not the subject of this motion, but easily warrants imposition of sanctions. Had Google simply produced the RTB-

[redacted] *Id.* at 12:22-13:16. [redacted] *Id.* at 225:13-226:8.

Also during the deposition, Google's representative was asked whether with [redacted] Levine Decl., Ex. A at 15:3-11. [redacted] Google answered that it did not "because it wasn't required." *Id.* at 15:12-19. Google later admitted that it could distinguish between Google Account holders and non-Google Account holders in Biscotti logs, but only "if the data has not been purged and if the decryption key has not been purged." *Id.* at 237:16-22. Google then admitted that, unless otherwise preserved, the "functional look-back window [redacted] to figure out who that GAIA user is only 90 days." *Id.* at 238:7-15. But, if "you want to preserve something, all bets are off, with the limitation you still have the look-back window on the current data that's available." *Id.* at 238:16-23.

---

relevant [redacted] information at the outset of this case, it would have saved the Court from several motions and made the named plaintiff data much easier to understand. For example, rather than [redacted]

[11] Google also admitted that when it is "processing" a "signed-out [RTB bid] request, the GAIA ID will be encrypted and available in the Biscotti logs in an encrypted form." Levine Decl., Ex. A at 223:24-224:3. However, because Google did not preserve or produce [redacted] or any [redacted] plaintiffs do not have any such data to show to a jury.

On November 17, 2023, plaintiffs requested that Google produce four additional weeks of named plaintiff data from 2023 pursuant to the Court's other April 14, 2023 Order (ECF 484), including three weeks that should have fallen within the rolling 90-day look-back window. The four weeks requested were January 7-14, March 18-25, June 2-9, and September 30-October 7, 2023. Levine Decl., ¶ 12. Had Google stopped destroying [redacted] when the April 14, 2023 Orders were issued, as it should have, Google would have had this data (and the related [redacted]) for the March 18-25, June 2-9, and Sept. 30-October 7 dates. *Id.*, ¶ 13. And for the last set of dates (Sept. 30-Oct. 7), Google should have had [redacted] for this week no matter what, since at the time it was requested in November 2023, this was well within the 90-day retention period for that data. *Id.*

Google did not respond to plaintiffs' November 17 request in November or December 2023. Levine Decl., ¶ 14. On January 4, 2024, plaintiffs again asked for a response from Google and Google again failed to respond. *Id.*, ¶ 15. On January 10, 2024, plaintiffs told Google that if it did not respond by the next day, plaintiffs would seek relief from the Court. *Id.*, ¶ 16. On January 11, 2024, almost two months after plaintiffs' request and just as the 90-day look-back window had run on the [redacted] Google finally responded. *Id.*, ¶ 17. In its response, [redacted] *Id.*

On January 12, 2024, plaintiffs asked Google to confirm [redacted] Levine Decl., ¶ 18. Google did not respond to this either. *Id.*, ¶ 19. It took Google another six weeks, until February 28, 2024, to finally admit that [redacted]

*Id*. Google purposefully ran out the 90-day clock so that the four time slices (the last one ending on October 7, 2023) could no longer contain [redacted]

Google did not stop deleting [redacted] after the Court's April 14, 2023 Order or even after plaintiffs requested that data for four weeks in 2023. Google appears to have intentionally dragged out the meet and confer process on [redacted] for more than 90 days to ensure that when the named plaintiff data was finally produced in February 2024 (months late) and Google finally responded to plaintiffs about the [redacted] the response would necessarily be that [redacted] But this is so only because Google intentionally failed to stop spoliating data the Court already had ordered to be produced and that plaintiffs already had specifically requested, particularly with respect to the Sept. 30-Oct. 7, 2023 week of data, which was well within the 90-day retention period at the time plaintiffs requested the data.

Google's conduct is a violation of the Court's April 14 and May 16, 2023 Orders, of Google's discovery obligations under the Federal Rules, and of Google's and its counsel's ethical obligations and responsibilities as representatives of a party and as officers of this Court. Google and its counsel's conduct should not be viewed in a vacuum. Google is an extremely sophisticated and well-versed corporate litigant represented by one of the largest and most sophisticated law firms in the country. They know how to maintain and produce relevant discovery. That Google has not done so here, willfully and contemptuously, and then hid that fact from plaintiffs and the Court for as long as possible, speaks volumes about not only Google, but also the importance of the data Google has now willfully and knowingly spoliated. It is also entirely consistent with Google's pattern and practice in this District of engaging in sanctionable and contemptuous discovery misconduct. Google has been sanctioned for discovery abuse in this District at least six times in no fewer than five other cases, and this pattern and practice should also be taken into consideration by the Court here.[12]

---

[12] *See In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 992-94 (N.D. Cal. 2023); *Brown v. Google LLC*, Case No. 20-cv-03664-YGR (SVK), ECF 918 (N.D. Cal. April 4, 2023);

## III. ARGUMENT

"Modern instruments of discovery" are designed to make litigation "a fair contest with the basic issues and facts disclosed to the fullest possible extent." *Fausto v. Credigy Servs. Corp.*, 251 F.R.D. 436, 439 (N.D. Cal. 2008) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)). When parties do not live up to their discovery obligations, the district court "may, within reason, use as many and as varied sanctions as are necessary to hold the scales of justice even." 8B *Federal Practice and Procedure* § 2284 (3d ed. 2022 update). Federal courts have the power to sanction litigants for discovery misconduct under both the Federal Rules of Civil Procedure and the court's inherent power to prevent abusive litigation practices. *See Leon v. IDX Sys. Corp.,* 464 F.3d 951,958 (9th Cir. 2006).

When a party violates a discovery order, Rule 37(b)(2)(A) authorizes a variety of sanctions. For the most serious cases of disobedience, courts may dismiss claims or an action, render a default judgment, or hold the party in contempt of court for failing to obey a court order. Fed. R. Civ. P. 37(b)(2)(A)(v)–(vii). In other cases, they may strike pleadings, direct that certain matters or facts be deemed "established for purposes of the action," preclude a disobedient party from making certain arguments or introducing certain evidence. Fed. R. Civ. P. 37(b)(2)(A)(i)–(ii).

Evidentiary sanctions are available under Rule 37(e) when electronically stored information that should have been preserved is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, and the court finds that the party acted with the intent to deprive another party of the information's use in the litigation. Fed. R. Civ. P. 37(e). Sanctions may include a presumption that the lost information was unfavorable to the party, or an instruction to the jury that it may or must preserve the information was unfavorable to the party. *Id.*

---

*Brown v. Google LLC*, 2022 WL 2789897, at *1-2 (N.D. Cal. July 15, 2022); *Calhoun v. Google LLC*, 2022 WL 1987864, at *1–2 (N.D. Cal. June 6, 2022); *Woods v. Google*, 2014 WL 3909527, at *3 (N.D. Cal. Aug. 8, 2014); *In re Google Litig.*, 2011 WL 5190831, at *4-6 (N.D. Cal. Oct. 31, 2011).

Sanctions are also available under Rule 16(f)(l), which provides that a "court may issue any just orders ... if a party or its counsel . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(l)(C). Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial management." *Cato v. Fresno City*, 234 F.3d 1276, 1276 (9th Cir. 2000) (citation omitted). A court may order sanctions under Rule 16 for violation of an order where "[d]isregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir. 1992).

Additionally, "discovery misconduct may be punished under the court's 'inherent powers' to manage its affairs." *Guifu Li v. A Perfect Day Franchise, Inc*, 281 F.R.D. 373, 396 (N.D. Cal. 2012) (quoting *Unigard Sec. Ins. Co. v. Lakewood Eng. Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992)). That inherent power embraces all the sanctions available under Rule 37. As the case law notes, sanctions under the inherent power are analyzed using the same test as those under Rule 37. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 n.4 (9th Cir. 1990) (making use of cases involving Rule 37 and the inherent power "interchangeably").

The Court may also take general deterrence into account in imposing sanctions. That is because one of the objectives of discovery sanctions is "generally deterring flagrant disobedience and callous disregard of court discovery orders." *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370 (9th Cir. 1980) (citing *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam)).

To hold a party in contempt, a court must find by clear and convincing evidence that the party violated a specific and definite order and that it had sufficient notice of its terms and the fact that it would be sanctioned if it did not comply. *See Harmon v. City of Santa Clara*, 323 F.R.D. 617, 626 (N.D. Cal. 2018) (citing *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)). Plaintiffs move the Court for an order of contempt against Google in light of its knowing and willful failure to maintain and produce [redacted] for 2023 after

this Court ordered [redacted] in April and May 2023 and after plaintiffs requested that it be produced in November 2023.

Granting contempt sanctions against Google is warranted here because Google has violated specific and definite orders. In its April 14 Order, the Court directed Google to produce GAIA IDs, Google User IDs (Biscotti IDs) and joining key data (which necessarily includes the [redacted] for all past and future productions of named plaintiff data. *See* ECF 487 at 7 ("Google must take care that all of its productions of named plaintiff data can be easily correlated, and it must include the fields necessary to accomplish this result. During the hearing, Google acknowledged that it could include the Google Account ID, Google User ID, and "joining keys" without undue burden, and the Court expects that it will do so, including remedying its prior productions that omit this information"). In its May 16 Order, the Court again emphasized the importance of the [redacted] and instructed Google to investigate whether [redacted] for all named plaintiff data, and if not, to work with plaintiffs to determine whether "any reasonable alternatives exist for the production of the same or similar information." ECF 510 at 2-3. Google did not produce [redacted] and never worked with plaintiffs to determine whether other alternatives existed to get plaintiffs the information they need for trial, as instructed by the Court.

Google did not comply with the April 14 and May 16 Orders with respect to either the [redacted] It produced no such data for its 2021 and 2022 productions of named plaintiff data and failed to retain and thus destroyed [redacted] during 2023 to ensure that it would not have to produce [redacted] for its 2023 production of named plaintiff data either. Google's contempt is made even worse by the fact that Google and its counsel tried to hide these facts from plaintiffs and Court, resulting in costly, time-consuming, and completely unnecessary motion practice directed to the [redacted] Rather than come clean, Google and its counsel forced plaintiffs into months of pointless meet and confer

negotiations over discovery that Google and its counsel knew no longer existed. Google then burdened the Court with multiple rounds of briefing and multiple hearings about discovery that either no longer existed or that Google had no intention of retaining in the future. Google and its counsel took a cavalier attitude to their ethical disclosure obligations to opposing counsel, which the Court should also take into consideration in determining whether to hold Google in contempt.

Google's conduct is plainly willful and knowing and should be sanctioned. Google should have stopped destroying [redacted] back in May 2021, after plaintiffs served RFP 42, but did not do so, even when it was representing to the Court that it was. It had a second, even clearer opportunity to stop doing so after the Court's April 14 Order that specifically directed Google to produce such data. Google again did nothing. This was a willful and knowing decision by Google not to comply at that point in time. But, even if Google's actions were *not* willful, contempt sanctions would still be appropriate here in light of Google' violation of the Court's orders. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) ("Civil contempt in . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order") (internal quotation omitted).

In addition to holding Google in contempt, evidentiary sanctions under Fed. R. Civ. P. 37(e) also should be imposed on Google in the form of an order preventing Google from making any arguments about plaintiffs' inability to link RTB bid request data with Google account information for signed-out Google account holders in any summary judgment motion or at trial in this matter. Courts impose evidentiary sanctions when monetary sanctions remain inadequate. *See Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 3895118, at *3 (N.D. Cal. Aug. 29, 2011) (imposing evidentiary sanctions to remedy prejudice of "information withheld from Plaintiffs [that] could very well bear on whether or not Plaintiffs are able to establish commonality of issues across the putative class"). Here, monetary sanctions are plainly inadequate because relevant evidence necessary for plaintiffs' case has been spoliated. *See also Clear-View Tech., Inc., v.*

*Rasnick*, 2015 WL 2251005 at *7-8 (evidentiary and monetary sanctions warranted given defendants' protracted and needless delays that frustrated discovery process); *Dong Ah Tire & Rubber Co., Ltd. v Glasforms, Inc.*, 2009 WL 1949124, *10 *adopted in part and modified in part* 2009 WL 2485556, *4 (N.D. Cal. Jul. 2, 2009) (evidentiary sanctions for failure to preserve evidence).

Finally, Google's spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it. *See, e.g. Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.,* 682 F.2d 802, 806 (9th Cir. 1982); *Nat'l Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party"). As a further sanction, the jury should be instructed that Google destroyed relevant [redacted] and failed to produce [redacted] in violation of Court orders and failed to disclose this in a timely manner, and that the jury may infer from Google's conduct that the evidence that Google failed to maintain and produce was not helpful to Google and would have been favorable to plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, the Court should hold Google in contempt for knowing and willful violation of the Court's April 14 and May 16 Orders and impose evidentiary sanctions against Google for knowing and willful failure to [redacted] in 2023 after they were ordered to be produced by the Court and requested by plaintiffs. Google should be prevented from making any arguments based on the lack of [redacted] in favor of summary judgment or at trial in this matter. At trial, the also jury should be instructed that Google spoliated evidence and that the jury should infer from that spoliation that the evidence would have been favorable to plaintiffs and harmful to Google.

DATED: April 19, 2024

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: /s/ Jonathan K. Levine

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Oakland, CA 94602
Tel.: (415) 692-0772
Fax: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
adavis@bfalaw.com
jsamra@bfalaw.com

**SIMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
James Ulwick (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
Tel.: (212) 784-6400
Fax: (212) 213-5949
New York, NY 10017
Tel: (646) 993-1000
dstraite@dicellolevitt.com
julwick@dicellolevitt.com

**COTCHETT PITRE & MCCARTHY, LLP**
Nancy E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
7817 Ivanhoe Ave., Ste. 102
LA Jolla, CA 92037
Tel.: (848) 914-2001
*fbottini@bottinilaw.com*

*Plaintiffs' Executive Committee*

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION**

**Case No.:** 4:21-cv-2155-YGR

**ORDER DENYING WITHOUT PREJUDICE THE MOTION FOR CLASS CERTIFICATION;**

**GRANTING IN PART AND DENYING IN PART GOOGLE'S *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINIONS OF PROFESSOR NEIL RICHARDS;**

**DENYING WITHOUT PREJUDICE PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINIONS OF BRUCE DEAL**

Re: Dkt. No. 546, 582, 624

Pending before the Court are plaintiffs' Motion for Class Certification, the parties' corresponding *Daubert*[1] motions, and an Omnibus Sealing Motion that the Court will address by separate order. At issue is Google's Real Time Bidding ("RTB"), the process through which it sells advertisements that make up the vast majority of its business. Plaintiffs assert: Although Google repeatedly promises its account holders that it has not, does not, and will not sell their personal information, they have garnered common evidence that Google sells this this type of data billions of times each day to hundreds of participating advertisers. This common evidence, plaintiffs conclude, justifies class certification. Google objects. It urges that individualized issues will predominate on the critical issue of whether individual account holders have consented to its RTB data collection.

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

Having carefully considered the papers submitted, the oral argument heard on February 21, 2024, and for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Google's *Daubert* motion to exclude the expert opinions of Neil Richards, **DENIES** as moot plaintiffs' *Daubert* motion to exclude the expert opinions of Bruce Deal, and **DENIES WITHOUT PREJUDICE** the motion for class certification,.[2] Though plaintiffs meet many of the requirements of class certification under Rule 23(b)(2), the motion must be denied so that plaintiffs can address two unresolved issues: (1) whether the class, as defined, is fail safe and, if so, whether striking "personal information" from the decision would result in an overbroad class; and (2) whether the RTB data produced thus far is representative of the class as a whole. *See, e.g., In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022). That said, many of Google's arguments are not well-taken. Where the Court has ruled on an argument, the parties shall not reassert it at the next round of briefing.

## I. BACKGROUND

The Court incorporates the background provided in its Order largely denying Google's motion to dismiss. *In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935 (N.D. Cal. 2022). As relevant, plaintiffs allege that Google shares and sells its account holders' information through its RTB auction system to advertisers, or RTB participants. *Id.* at 939. Because Google provides highly detailed information about its account holders, RTB participants can create profiles of individual account holders. *Id.* Plaintiffs allege that this amounts to the sale of account holders' personal information. *Id.* at 940. Google does this, plaintiffs argue, in direct violation of its promise made through its standardized Terms of Service, Privacy Policy, and various other disclosures hyperlinked in both that it does not sell personal information. *Id.* at 940–41.

After the Court ruled on Google's motion to dismiss, the parties engaged in a hotly disputed discovery process. A year later, on July 14, 2023, plaintiffs moved to certify a class under Federal Rules of Civil Procedure 23(b)(2) and (b)(3). Both parties also filed corresponding *Daubert*

[2] The Court also denies as moot Google's evidentiary objections to certain evidence presented by plaintiffs in support of their reply brief. (Dkt. No. 628.)

motions. Because of the parties' extended briefing schedule, the Court did not hold a hearing on this motion until February 21, 2024.

## II. LEGAL FRAMEWORK

### A. *DAUBERT* MOTION

Federal Rule of Evidence 702[3] provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis supplied). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

### B. CLASS CERTIFICATION

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against

---

[3] The Supreme Court updated the rule effective December 1, 2023. The changes are underlined. *See* Order of the Court, Rules of Evidence (April 24, 2023), https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf. The new language does not change the intent of the rule, rather it provides further clarity.

certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted). The party moving for certification first must show that the four requirements of Rule 23(a) are met. Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

## III. *DAUBERT* MOTIONS

In its *Daubert* motion, Google moves to exclude the opinions of plaintiffs' expert Professor Neil Richards in their entirety. (Dkt. No. 582.)[4] It does so for five reasons: (1) Professor Richards impermissibly opines on ultimate questions of law; (2) he lacks the requisite expertise on consumer privacy expectations; (3) he lacks reliable methodology; (4) his opinions do not fit the facts of the case; and (5) he improperly opines on Google's state of mind. (*Id.*) The Court examines each.

Professor Richards is the Koch Distinguished Professor of Law at Washington University School of Law in St. Louis, Missouri. (Dkt. No. 545-9, Expert Class Certification Report on Neil

[4] Plaintiffs, in turn, move to exclude the opinions of Google's damages rebuttal expert, Bruce Deal. (Dkt. No. 624.) Because, as set forth below, the Court finds that the proposed class cannot be certified as a Rule 23(b)(3) damages class, it **DENIES** plaintiffs' *Daubert* motion **WITHOUT PREJUDICE**.

Richards, "Richards Rep." ¶ 11.) He also co-directs the Cordell Institute for Policy in Medicine and Law, where he focuses on problems involving the collection and use of personal information. Professor Richards is an affiliate scholar with the Stanford Center for Internet and Society, the Yale Information Society Project, and the Berkman-Klein Center at Harvard Law School, a Fellow with the Center for Democracy and Technology, and a member of the American Law Institute. (*Id.*) His expertise is in the field of information privacy. (*Id.* ¶ 13.) His body of work has focused on the historical importance of privacy, the continued importance of societal privacy norms, privacy rights, and privacy protections in our digital world. (*Id.*)

Professor Richards sets forth six opinions in his report. First: "[P]rivacy—including freedom from unwanted surveillance—is a fundamental right and important societal norm with deep roots in the social, cultural, and legal history of the United States." (*Id.* ¶ 2.) Second: Google's Terms of Service and Privacy Policies "reflect a societal understanding that privacy is a fundamental right and an important societal norm in the U.S." (*Id.* ¶ 3.) Third: Google's RTB process, and the scope and quantity of information it collects and sells about Google account holders, are at "extreme odds with fundamental privacy rights and societal privacy norms in the U.S." (*Id.* ¶ 4.) Fourth: Societal privacy norms require Google to provide informative disclosures about what information it collects from its account holders. (*Id.* ¶ 5.) Fifth: There is "common evidence" that Google's Terms of Service, Privacy Policies, and disclosures "give rise to a common (false) expectation that Google does not offer for sale or sell information about or associated with U.S. account holders to Google RTB participants." (*Id.* ¶ 6.) Sixth: There is "common evidence" that Google fails to disclose its Google RTB auction to U.S. account holders or to offer any mechanism for them to affirmatively consent to the at-issue data collection. (*Id.* ¶ 7.)

To start, the Court agrees with Google that opinions five and six are impermissible legal conclusions that are based on the cumulation of the prior opinions in the Report. Experts may not opine on "matters of law for the court." *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 971 (N.D. Cal. 2019) (internal citations omitted). (Richards Rep. Sections VIII, IX.) In this regard, the Report is merely a "thinly disguised attempt to submit what is essentially an amicus brief as an expert report." *LD v. United Behavioral Health*, No. 20-cv-2254-YGR, 2023 WL

2806323 at *3 (N.D. Cal. Mar. 31, 2023). Whether RTB data or Google's disclosures are "common evidence" and whether Google violates the privacy rights of its account holders by failing to inform them of the at-issue data collection are two of the central legal questions raised by plaintiffs' class certification motion. Plaintiffs cannot meet their burden by submitting an expert report that invades on the province of the Court. For that reason, the Court **GRANTS** Google's motion as to the Professor Richards's fifth and sixth opinions.

Professor Richards's third opinion—that there is "common evidence" that Google's RTB violates societal privacy norms—impermissibly reaches both an ultimate question of fact and law. (*See* Richards Rep. Section VI.) In addition to opining on a legal issue raised by plaintiffs' motion for class certification, Professor Richards's opinion that RTB in fact violates privacy norms invades the province of a fact finder. (*See, e.g.*, Richards Rep. ¶ 113 "Google's practice of sharing . . . account holders' bidstream data through Google RTB runs contrary to longstanding and important privacy norms.") That said, the rest of the section in which Professor Richards lays out this opinion is admissible. The Court therefore **GRANTS** Google's motion to strike to the extent Professor Richards seeks to opine on factual and legal conclusions (*see id.* ¶¶ 93, 100, 113, 118), but **DENIES** it as to the rest of his third opinion.

Moreover, Professor Richards's opinion that Google "understands" its disclosures do not comport with societal norms and it knowingly gives account holders a "false" expectation of control over their information is an improper attempt to impute Google's intent or state of mind. *See Brown v. Google*, No. 20-cv-3664-YGR, 2022 WL 17961497, at *12 (N.D. Cal. Dec. 12, 2022). (*See, e.g.*, Richards Rep. ¶¶ 126, 136.) Google's motion in that respect is **GRANTED.**

The Court, however, disagrees with Google that Professor Richards's Report should be struck in its entirety. Professor Richards is an expert on consumer privacy expectations and the history of evolving privacy norms in the United States. (Richards Rep. ¶¶ 11–13.) He is certainly qualified by relevant "knowledge, skill, experience, training, or education" to comment on the reasonable privacy expectations of Google's account holders. *See* Fed. R. Evid. 702. That he does not have a "marketing" degree or chose not to run a consumer expectations survey, per Google, is of no consequence. As this Court said in *Brown v. Google*, an Order on which Google relies in its

*Daubert* motion, "[a]n expert who offers testimony on the question o[f] what a reasonable consumer is likely to do and/or think is not required to conduct a consumer survey if his or her testimony is otherwise reliable." 2022 WL 17961497 at *11 n.8.

To that point, Professor Richards's methodology is reliable. Google argues that his opinions are not based on a "scientific method," *see Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998), but on his own subjective belief, and thus, should be excluded. In evaluating expert testimony based on historical research, not all of the *Daubert* factors, such as whether the opinions are a product of a scientific, testable process, will be applicable. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (recognizing that "not all of the specific *Daubert* factors can apply to every type of expert testimony"). As here, where Professor Richards bases his opinions on the way privacy norms have evolved over time, the Court instead must determine whether the expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022); *see also, e.g.*, *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 950 (N.D. Ill. Dec. 21, 2010) (noting that in academic historian with relevant experience in the field can meet *Daubert* qualifications). In other words, the expert in this type of case must explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how the experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The rest of Professor Richards's opinions are an application of his expertise in the history of privacy norms he has developed over the past twenty years. He has published books and peer-reviewed articles on the topic. *See Daubert*, 509 U.S. at 593 ("Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication."). For that reason, the Court finds that the rest of Professor Richards's opinions have a reliable basis in his knowledge and experience in a discipline relevant to them.

Moreover, Professor Richards's opinions are obviously relevant. Google proposes that, because implied consent here is an individualized inquiry, *see infra*, Professor Richards's opinion that there is a universal reasonable expectation of privacy is unfounded. This is specious. It is black letter law that whether someone has a reasonable expectation of privacy is an objective, and

therefore common, inquiry. *Shulman v. Group W Prods., Inc.*, 955 P.2d 469, 490 (Cal. 1998). For that objective inquiry, Professor Richards's experience in the history of evolving privacy norms and how those norms apply in this context is apt.

For the reasons stated above, Google's *Daubert* motion as to Professor Richards's third, fifth, and sixth opinions (stated in Sections VI, VIII, and IX of his Report) is **GRANTED IN PART AND DENIED IN PART** but **DENIED** as to the rest.

## IV. CLASS CERTIFICATION

Plaintiffs seek to certify a class consisting of all individual Google account holders subject to a Google United States Terms of Service whose personal information was sold or shared by Google in its RTB auctions after June 28, 2016. They moved to do so under either Federal Rule of Civil Procedure 23(b)(2) or (b)(3)[5] for the following California law claims: (1) breach of contract; (2) breach of confidence; (3) invasion of privacy; (4) intrusion upon seclusion; (5) publication of private facts; and (6) violations of the California Information Privacy Act ("CIPA"), Cal. Pen. Code § 631.

### A. RULE 23(A)

#### 1. Class Definition

Because the class definition is limited to Google account holders whose "personal information" was sold or shared, Google argues in a footnote that it is a fail-safe class. (*See* Dkt. No. 583-4, Google's Opposition at 11 n.10.) Plaintiffs did not reply, perhaps considering this argument was only raised in a footnote. At the hearing, however, the Court gave both parties an opportunity to address the issue. Google argued plaintiffs' class definition "embeds the concept of personal information" and therefore "subsumes the merits issue"—whether Google shared account holders' personal information. (Dkt. No. 616-12, Tr. 76:7–16.) It continued that plaintiffs could not simply resolve the issue by striking "personal information" from the definition. (Tr. 79:1–5.) This would result in an "overbroad" class that contains uninjured members. (Tr. 79: 2.) Plaintiffs disagreed.

[5] In a footnote, plaintiffs also request issue certification under Rule 23(c)(4). Because the Court denies with leave to amend plaintiffs' motion for class certification, it does not address whether issue classes would be appropriate.

In *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, an *en banc* panel of the Ninth Circuit rejected the argument that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem with a class definition that includes uninjured class members is "the obverse of a different problem with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Id.* Both, however, "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825).

The Court agrees with Google that, as written, the class definition is fail safe. The question on which this suit hinges is whether Google impermissibly shared its account holders' personal information through RTB. That said, the Court at this stage does not have enough information to analyze whether and to what extent omitting "personal information" from the class definition would result in an overbroad class. Even if it would, under *Olean*, the Court should refine rather than "flatly deny[]" a class that includes some number of uninjured members. *See id.* at 669 n.14. Plaintiffs suggested at the hearing that the Court could simply strike "personal information" from their proposed definition because the RTB data released thus far suggests that Google shares all account holders' personal information through its RTB bids. As the Court explains below, *see infra*, plaintiffs have not yet satisfactorily demonstrated that this is the case.

Given that the Court here denies plaintiffs' motion for class certification with leave to amend, and to allow for more thorough exposition of the issue on both sides, the Court will rule on class definition at the next round of briefing. In that briefing, the parties should address the caselaw and concerns identified.

**2. Numerosity**

The class proposed must be so numerous that joinder of all members individually would be impracticable. Fed. R. Civ. P. 23(a)(1). As the Supreme Court has explained, the "numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *A.B. v. Hawaii State Dep't of Education*, 30 F.4th 828, 835 (9th Cir. 2022) (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). Plaintiffs contend that this requirement is met because there are potentially 1.4 billion U.S. accounts holders at issue. Google does not dispute this estimate. Accordingly, the Court concludes that plaintiffs have satisfied the numerosity requirement.

**3. Commonality**

Commonality requires "questions of law or fact common to the class." Fed. R. of Civ. P. 23(a)(2). To satisfy this requirement, the common question must be of "such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[F]or purposes of Rule 23(a)(2)[,] even a single [common] question will do." *Id.* at 359 (quotation marks and citation omitted) (third alteration in original). Commonality has been "construed permissively, and all questions of fact and law need not be common to satisfy the rule." *Ellis v. Costco Wholesale Corp*, 657 F.3d 970, 981 (9th Cir. 2011) (cleaned up).

Plaintiffs propose three common questions: whether (1) Google promised not to share or sell account holders' personal or sensitive information to third parties; (2) Google offered for sale and/or sold account holders' personal or sensitive information to RTB participants in Google RTB auctions; and (3) Google's conduct contravenes societal norms and is highly offensive to a reasonable person. These questions are capable of classwide resolution, plaintiffs argue, because they can be answered in one stroke by Google's standardized disclosures and its RTB data. Google disputes this. The Court analyzes whether plaintiffs have demonstrated that both types of evidence—Google's disclosures and its RTB data—are capable of providing common answers. In

addition, the Court addresses Google's contention that the Court cannot certify the reasonable expectation of privacy element or CIPA claim because plaintiffs have no common proof for either.

**a. Google's Disclosures**

Plaintiffs argue that Google's Terms of Service, Privacy Policy, and the various documents incorporated will provide common proof to the question of whether Google promised its account holders it would not share or sell their personal information. In one disclosure, for example, Google tells its account holders: "We don't sell users' personal information." (Dkt. No. 546-37, Google's Privacy & Terms.) At the hearing, Google conceded that whether it made a contractual promise not to sell its account holders' personal information is capable of classwide resolution. (Tr. 10:13–24.) It is for that reason that claims that arise from "form contracts" are "particularly appropriate for class action treatment." 1 Newberg on Class Actions § 3.24 (6th ed.) The Court agrees that, at least for commonality purposes, Google's standardized disclosures are common proof capable of resolving that question.

**b. RTB Data Collection**

The parties dispute whether Google's alleged sale of plaintiffs' personal information is capable of classwide resolution. Google argues that because the data shared in each RTB bid varies, the answer to this common question will vary as well. Plaintiffs respond that Google always shares or sells sufficient information for an RTB participant to identify the Google account holder. In support, plaintiffs present reports from two experts, Professors Shafiq and Wilson, opining that virtually every Google RTB bid request produced thus far in discovery includes sufficient information to commonly identify the Google account holder.[6]

To determine whether the RTB data will furnish a common answer, the Court analyzes two interrelated issues: whether (i) the RTB data produced thus far is personally identifying, and if so, (ii) it is representative of the class as a whole. First though, the Court lays out how the RTB auction process works, what plaintiffs' experts conclude about that process, and Google's experts' rebuttal.

---

[6] Dkt. No. 545-5, Expert Class Certification Report of Professor Zubair Shafiq, "Shafiq Rep." Dkt. No. 545-6, Expert Class Certification Report of Professor Christopher Wilson, "Wilson Rep." The Court notes that Google did not bring a *Daubert* motion to challenge these plaintiffs' experts' qualifications or methodology.

***The RTB Auction Process.*** Google's RTB is so enormous it "may be difficult for the ordinary consumer to comprehend." Every second Google auctions tens of millions of RTB "bids" to participating advertisers. (Shafiq Rep. ¶ 18.) The RTB process starts when a person visiting a website containing Google code, such as Google Analytics. Google's code on the website transmits user information back to Google, including the user's IP address and the URL of the website visited. Google then packages the information into a "bid request" and sends it to RTB auction participants. Participants send "bid responses" back to Google, which then uses these responses to determine the auction winner. Google then instructs its users' browsers or app to display the winning bid's advertisement. (Wilson Rep. ¶ 24.) This auction process is known as "real time bidding" because this all happens "faster than the blink of an eye." (Shafiq Rep. ¶ 19.)

The RTB protocol is identical for every one of its billions of daily bids. (Wilson Rep. ¶ 34; Shafiq Rep. ¶ 18; Tr. 10 at 11–18 (Google so conceding).) An RTB bid request contains hundreds of fields about Google's users. (Shafiq Rep. ¶ 28.) Google groups these fields into categories, including those that: represent a user's location, such as a postal code; identify a particular account, such as an IP address; and denote browsing history, such as the URL of the webpage visited. (*Id.* ¶¶ 28–29.) That said, the actual user information shared through that protocol can differ from bid to bid.

Relevant here, plaintiffs requested RTB data associated with the seven named plaintiffs during discovery. (*Id.* ¶ 35.) Google produced RTB bids for eight one-week periods which was required to be "representative" of the named plaintiffs' data during the entire class period. (*Id.*; *see also* Dkt. No. 382.)

***Professor Shafiq's expert opinion.*** Based on this sample, Professor Shafiq states that Google commonly populates at least sixty fields in all the bid requests it sends to RTB participants. (Shafiq Rep. ¶ 41.) Among those are: an encrypted version of the Google User ID; the URL of the website or app visited by the user; the IP address; the publisher of the website or application visited; various location fields; device information; and detected language. (*Id.* ¶ 42a–g.)

Professor Shafiq concludes that, through RTB, advertisers could tell exactly where each named plaintiff lives and works, what content they were viewing, and what device and operating

United States District Court
Northern District of California

system they used to view that content. (*Id.* ¶ 42.) Even with only a single bid request, an RTB participant could know, for example, that a plaintiff looked up a Bible verse near the Capital Mall in Jefferson City, Missouri or searched the symptoms and causes of insomnia on Mayo Clinic's website near Lynwood, California on their Samsung Galaxy phone. (Shafiq Rep. ¶¶ 46a–46b.) Professor Shafiq notes, however, that RTB participants would not actually limit themselves to analyzing RTB data in isolation. Instead, RTB participants can stitch together detailed user profiles based on the many billions of RTB bids Google shares daily "to identify users with even more certainty." (*Id.* ¶ 78.) In fact, Professor Shafiq notes, Google acknowledges that RTB participants are capable of "build[ing] very rich profiles if they receive a significant volume of bid requests." (*Id.* ¶ 79.)

From this, Professor Shafiq opines that RTB participants can use RTB data to identify a Google account holder in two ways. First, RTB participants who have their own relationship with users can link the RTB data to their internal profiles. For example, many users have both Google and Amazon accounts; when Google shares RTB data about a user with Amazon, Amazon can then use its own internal profile to identify whose information was shared. The same would be true for those who also have Meta, LinkedIn, and Baidu accounts. (*Id.* ¶ 88.) Second, RTB participants "fingerprint" or analyze multiple pieces of information, often using machine learning, to probabilistically determine a user's identity. Google is aware of these practices, Professor Shafiq concludes. (*Id.* ¶¶ 88, 88c.)

***Professor Wilson's expert opinion.*** Next, Professor Wilson analyzed data by two RTB participants, the New York Times and the Trade Desk, who sold ad space through Google's RTB. Professor Wilson concludes that RTB participants can use RTB data to identify individual account holders in three relevant ways.

First, Professor Wilson opines that RTB participants use the RTB data transmitted by Google to "build 'profiles' of individuals by inferring their demographics, interests, hobbies, place of residence, etc." (Wilson Rep. ¶ 31.) This data, like the Google User ID, URL fields, and IP address, is "reasonably capable of being linked to an individual or household." (*Id.* ¶ 36.) Moreover, Professor Wilson opines, Google shares a "common core set" of information in every

RTB bid which can be linked to an individual account, such as: Google's unique identifier for a user, or a cookie, truncated IP addresses, a user's current latitude and longitude with accuracy, the model and make of their operating system, and the webpage the person is currently viewing. (*Id.* ¶ 37.)

Second, Google allows an RTB participant to synchronize RTB data with an account holder through cookie matching. (*Id.* ¶¶ 43, 45–48.) Professor Wilson explains that Google might send its unique identifier, or cookie, to an RTB participant who can then match its own unique identifier for that account holder through the bid process. This allows an RTB participant to synchronize RTB data with an account holder. (*Id.* ¶¶ 45–48.) Professor Wilson references academic studies suggesting the process is widespread. (*Id.* ¶ 49.)

Third, RTB participants can match RTB data to individual account holders through "user lists." For example, an RTB participant might be interested in sending an advertisement to all the people who visit a specific website, such as webmd.com. If Google auctions an impression for an account holder, it will note to RTB participants that the account holder is in the user list. (*Id.* ¶¶ 68, 70, 72.)

Finally, Professor Wilson concludes that account holders cannot avoid Google's RTB process even if they attempt to use its privacy settings. (*Id.* ¶ 101.) For example, Google does tell users of its Account Ad Personalization Opt-Out ("GAP") feature. Google has calculated, however, that only 4% of account holders have ever used the GAP feature. Further, even with GAP enabled, account holders still receive targeted ads based on their browsing history. (*Id.* ¶¶ 102, 103, 123.) In sum, Professor Wilson notes that "[t]he fact that the information shared and sold through Google RTB can be used to identify an individual or household is not surprising. The very purpose of Google RTB is to encourage RTB participants to bid on impressions in Google RTB. And, because RTB participants seek to *target* ads *to individuals* based on context . . . the nature of the information being shared and sold needs to facilitate that *individual targeting*." (Wilson Rep. ¶ 41.)

***Google's rebuttal experts***. Google challenges Professors Shafiq and Wilson's opinion that 99.8% of the bid requests produced so far include sufficient information for an RTB participant to identify a particular Google account holder or household. Dr. Striegel and Dr. Psounis criticize

plaintiffs' conclusions that RTB data was uniformly personally identifying on the ground that each RTB bid includes highly variable information that cannot be used to identify individuals in a statistically-significant way.[7] (*See generally* Striegel Rep.; Psounis Rep.)

***Whether the RTB data produced thus far constitutes common proof.*** With that background, the Court considers whether plaintiffs have put forth evidence that RTB data could constitute personal information. Under California law, personal information is "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household" including "[i]nternet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140(v).

Based upon named plaintiffs' RTB data, Professor Shafiq was able to identify, for example, a named plaintiff's location, the website they had searched, and their unique device ID. Of course, RTB participants are not so limited; as Professors Shafiq and Wilson opine, advertisers can analyze the millions of bids sent by Google each day about named plaintiffs to create much more detailed profiles of plaintiffs' locations, demographics, and preferences. As an example, with the limited discovery produced thus far, Professor Shafiq was able to pinpoint the exact coordinates of each named plaintiff's home and work locations based on the RTB bids within, at most, a three-kilometer error rate. (Shafiq Rep. ¶ 42e.) In addition to those locations, RTB participants could tell that named plaintiffs were looking up religious verses, medical symptoms, gambling applications, and what a Supreme Court justice thought about a recent abortion decision. (Shafiq Rep. ¶ 46 a–g.)

Plaintiffs do not contend that every RTB bid is identical, as Google argues. Instead, they propose that through its uniform RTB process, Google shares so much information about named plaintiffs that its RTB data constitutes "personal information." Based on just eight weeks-worth of data about named plaintiffs, Google produced almost five million records of RTB bid request data

---

[7] Dkt. No. 584-2, Expert Report of Aaron Striegel, "Striegel Rep." Dkt. No. 584-4, Expert Report of Konstantinos Psounis, "Psounis Rep."

shared with hundreds of RTB participants around the world.[8] (Shafiq Reb. ¶ 37.) This amounts to "**10 thousand RTB bid requests per-user per-day**." (*Id.* (emphasis in original).) Plaintiffs have demonstrated sufficiently for class certification that this data, along with user lists and cookie matching, allows RTB participants to create detailed profiles of individual account holders. For that reason, the Court finds that named plaintiffs' RTB data is uniformly personally identifying.

What remains untested is whether the RTB data produced thus far is representative of the class as a whole. On this point, plaintiffs' justifications do not suffice. Plaintiffs primarily argue that they have demonstrated that RTB data will provide common evidence for the rest of the class because the court required "Google's production of sampled plaintiff data be representative of the entire class period ***and*** for the class as a whole." (Dkt. No. 545-3, Class Certification Motion at 7 (emphasis supplied).) In doing so, plaintiffs rely on two orders, one of which quotes the other. (Dkt. Nos. 382 and 483.)[9] A close read of both reveals that plaintiffs overreach. In the first, Magistrate Judge DeMarchi acknowledged Google's point that "production of ***named plaintiff data*** for the ***entire class period*** would impose an undue burden," so "some sampling" was appropriate as long as Google guaranteed that the specific time sample chosen was "representative." (Dkt. No. 382 (emphasis supplied).) Later, because the parties could not agree on what was a sufficiently representative time sample, she ordered the parties to confer on the potential production of additional periods of "***named plaintiffs' data***." (Dkt. No. 484 (emphasis supplied).) In other words, the court ordered Google to produce a sample of RTB data that was representative of the type of information that Google shared about named plaintiffs during the class period, not specifically one that was representative of every other putative member of the class. It did so because by this time plaintiffs only requested RTB data from named plaintiffs.[10] (*See, e.g.*, Dkt. No. 428-3.)

---

[8] Dkt. No. 616-5, Rebuttal Report of Professor Shafiq, "Shafiq Reb."

[9] These orders were written by Magistrate Judge DeMarchi, to whom discovery in this case was referred.

[10] The Court notes that plaintiffs originally requested RTB data about all putative class members. Google refused this discovery request as overbroad. (Dkt. No. 269.) After Google refused to produce RTB data for any account holder other than named plaintiffs, plaintiffs narrowed their request. (Dkt. No. 365.)

After Google's experts challenged him on this point, Professor Shafiq responded that Google has produced millions of RTB bids about named plaintiffs thus far that are uniformly personally identifying and Google experts do not "identify any bid requests that differ in terms of content or form." (Shafiq Reb. ¶¶ 37, 39.)[11] Professor Shafiq also cites to academic literature indicating that Google collects information about the great majority of its users. (*Id.* ¶ 41.)

Ultimately, the burden of demonstrating that evidence is common to the class rests with plaintiffs. So far, they have not. A jury cannot be instructed based upon plaintiffs' inaccurate reading of the court's orders. And Professor Shafiq's rebuttal that Google has many millions of RTB bids about named plaintiffs that are uniform and none about putative class members that vary materially is well-taken but insufficiently developed. Plaintiffs need to affirmatively demonstrate, through expert testimony or otherwise, that the RTB data thus far is representative of all putative class members without resorting to orders that do not stand for that point. On the other hand, Google cannot refuse to produce RTB data about other putative class members and then argue that, without this data, plaintiffs cannot meet their commonality burden. Because all six of plaintiffs' claims hinge on whether RTB data is personally identifying, plaintiffs' failure to more definitively demonstrate that the RTB data thus far is representative of the class as a whole is fatal, even for commonality.[12]

The Court reminds plaintiffs that simply accusing Google of producing discovery in bad faith, without more, will not do.[13] Plaintiffs must meet this burden on the merits of their arguments. Because the Court expects that plaintiffs can address this deficiency, the Court **DENIES** plaintiffs'

---

[11] Dkt. No. 616-5, Expert Class Certification Rebuttal Report of Professor Zubair Shafiq, "Shafiq Reb."

[12] Though the Court acknowledges that the commonality requirement is less rigorous than the predominance one, and Google raises this argument with respect to both, it finds for the reasons stated above that even under Rule 23(a)(2)'s less demanding standard, plaintiffs have not met their burden.

[13] This is especially true because Magistrate Judge DeMarchi has already denied plaintiffs' motion for sanctions. *See* Dkt. No. 487.

motion **WITHOUT PREJUDICE** on this point. *See In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714, 2022 WL 1284104, at *1 (N.D. Cal. Mar. 29, 2022).

**c. Reasonable Expectation of Privacy and CIPA**

Next, Google argues that the common evidence plaintiffs' proffer for the reasonable expectation of privacy, Professor Richards's Report, should be stricken. This argument is largely a repeat of Google's *Daubert* motion against Professor Richards and is denied on the same grounds. In sum, though the Court does strike certain opinions offered by Professor Richards that are legal conclusions, the rest of Professor Richards's Report will provide common proof on the objective inquiry of whether plaintiffs had a reasonable expectation of privacy.

Finally, Google contends that plaintiffs' CIPA claim cannot be certified because there is no evidence that all RTB data is intercepted within California. Cal. Pen. Code § 631(a). Google is headquartered in California and manages RTB from there. It offers no citation for the novel proposition that plaintiffs must demonstrate the precise processor from where Google allegedly intercepted the contents of plaintiffs' communications to meet its class certification burden. More importantly, the Court already told Google two years ago that if it did have evidence that it processes RTB bids from other locations, "Google shall produce it to the plaintiffs immediately." *In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022). Google never produced this information and in fact objected to plaintiffs asking for it. (*See* Tr. 123:17–20.) It cannot use the tactic both as a shield and a sword.

**4. Typicality**

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2020) (citation omitted). "The typicality requirement looks to whether 'the claims of the class representatives [are] typical of those of the class, and [is] "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted) (alterations in original), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The requirement is "permissive," and

the representative's claims need only be "reasonably co-extensive with those of absent class members." *Id.* (quotation marks and citation omitted).

The proposed class representatives here are, like all putative class members, subject to Google's Terms of Service, its Privacy Policy, and other standardized disclosures. Google's RTB uniformly collects their information and shares or sells it to potential advertisers. Because Google does not dispute this, the Court finds that the typicality requirement is met.

#### 5. Adequacy

For adequacy, Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether named plaintiffs and their counsel have any conflicts of interest with other class members, and whether plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Named plaintiffs and their counsel have already spent years vigorously litigating discovery. Moreover, plaintiffs' counsel has experience in complex and class action litigation, including privacy class actions. Google does not dispute this. For that reason, the Court finds that the adequacy requirement is met.

### B. Rule 23(b)

Because the Court expects plaintiffs will file a renewed motion for class certification, the Court addresses here whether plaintiffs' class can be certified under Rule 23(b). Consistent with plaintiffs' order of briefing, the Court first addresses whether plaintiffs have met the predominance requirement under Rule 23(b)(3). It then analyzes whether the class here can be certified under Rule 23(b)(2).

#### 1. Rule 23(b)(3)

Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized,

class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted) (alteration in original). The "predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 Newberg and Rubenstein on Class Actions § 4:49 (5th ed.)). Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013).

The parties dispute whether consent defeats predominance. Google argues that its implied consent defense raises individualized issues.[14] Plaintiffs disagree, urging that this defense is speculative because Google does not disclose to account holders that it in fact sells their personal information to hundreds of advertisers all over the world.

Someone "who consents to an act is not wronged by it." Cal. Civ. Code § 3515. Consent is generally an element of contract formation or an affirmative defense to tort liability. Under California law, however, "[c]onsent may also be a defense to an action for breach of contract when, for example, the defendant can show that the plaintiff previously accepted and consented to the performance now asserted as a breach." 2 Cal. Affirmative Def. § 32:1 (2d ed.). There are "two different forms of consent." *In re Google Inc. Gmail Litig.*, No. 13-md-2430, 2014 WL 1102660, at *14 (N.D. Cal. Mar. 18, 2014). In privacy litigation, consent can be "express," but it can also be "implied in fact based on whether the surrounding circumstances demonstrate" that the party whose personal information was collected knew it. *See id.* (so holding for alleged privacy violations under the Federal Wiretap Act and CIPA). "Implied consent," in particular, "is an intensely factual question that requires consideration of the circumstances" surrounding the alleged privacy violation. *See id.* at *16. For that reason, Judge Koh in *In re Gmail* concluded "that while consent

[14] Google also argues that the Court should not certify plaintiffs' Rule 23(b)(3) class because individualized issues will predominate over its CIPA claims, its reasonable expectation of privacy contention, and its RTB data. In addition, Google challenges plaintiffs' damages model. Because the Court finds that it cannot certify a Rule 23(b)(3) damages class, it does not address these arguments.

United States District Court
Northern District of California

may only be implied in a narrow set of circumstances, a broad set of materials are relevant to determining whether such consent should be implied." *Id.* at *17.

"Defenses that must be litigated on an individual basis can defeat class certification." *Brown*, 2022 WL 17961497, at *17 (citing *Truth Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018)). Because Google here raises consent as an affirmative defense, the Court must start by "analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence." *Id.* (quoting *Truth Health*, 896 F.3d at 931) (alteration in original). In that regard, Google presents its own disclosures, RTB participants' privacy policies, third-party materials, and consumer surveys. The Court reviews each.

***Google disclosures.*** Google cites to various Google disclosures and settings where it tells account holders that Google shares their information with third parties to serve advertisements. In its "How our business works" page, Google tells account holders that "[a]dvertising is what makes it possible to offer our products to everyone. While we sell things like Pixel phones, apps on the Play Store, YouTube subscriptions, and tools for businesses, we make the vast majority our money from advertising."[15]

Google's Privacy Policy tells its account holders that it "processes information to provide advertising, including online identifiers, browsing and search activity, and information about your location and interactions with advertisements." That information, Google states, may be used to show "personalized ads." Specifically, Google advises that it "may share non-personally identifiable information" with, among others, "advertisers." For example, information about an account holders' location, like their IP address, can be used to serve "ads based on your location." Altogether, Google reveals that there are "over 2 million non-Google websites and apps that partner with Google to show ads."

---

[15] Google, *Terms of Service*, https://policies.google.com/terms?hl=en-US. The Terms of Service has hyperlinked to the "How our business works" page since 2020.

The Privacy Policy also directs users to the "Advertising" page.[16] There, Google tells account holders that "[a]dvertising keeps Google and many of the websites and services you use free of charge." Google explains how it uses "cookies" to "show ads that are likely to be more relevant (such as ads based on websites you have visited)," in partnership with other websites. Google notes that "[s]ometimes the ad you see on a page is served by Google but selected by another company." In addition to using "location information," including IP addresses, Google "infer[s] demographic information, to improve the relevance of the ads you see, to measure ad performance and to report aggregate statistics to advertisers." It notes, however, that Google "prohibit[s] advertisers from selecting an audience based on sensitive information, such as health information or religious beliefs." Google informs users that they may "opt out of Ads Personalization" by turning off certain cookies.

Next, the Privacy Policy directs users to the "How Google uses information from sites or apps that use our services" page.[17] There, Google tells account holders that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google." Google notes it may collect information through cookies. Again, it reiterates that the type of information collected includes the URL of the page visited or an IP address which it uses to "personalize content and ads you see on Google and on our partners' sites and apps." This disclosure also tells account holders they may turn off ad personalization.

***Publisher disclosures.*** Google contends that RTB participants themselves have privacy policies that disclose they may share information with Google for advertisements. As one example, Google points to Accuweather.com's privacy policy. (Dkt. No. 593-4.) In it, Accuweather.com has specific disclosures about Google. It tells its users its websites use Google Analytics and that their

---

[16] Google, *Advertising*, https://policies.google.com/technologies/ads?hl=en-US. At the bottom of the Privacy Policy, Google directs users to "Other useful resources," under which it hyperlinks to "Technologies used for Advertising (hyperlink)."

[17] Google, *How Google uses information from sites or apps that use our services.* https://policies.google.com/technologies/partner-sites?hl=en-US. Also at the bottom of the Privacy Policy, Google hyperlinks to "How Google uses information from sites or apps that use our services."

information may be collected through Google's cookies to, among other things, "inform, optimize and serve ads based on a user's past visits to Accuweather sites."

***Third-party materials.*** Next, Google argues that its account holders could learn about its RTB data collection from third-party materials like news articles and nonprofit reports. The Electronic Frontier Foundation ("EFF"), for example, published a report in 2020 about Google's RTB process. (Dkt. No. 591-17.) In it, the EFF reported that, through RTB, Google sells its users' personal information, including their geolocation, gender, age, and interests.

***Consumer surveys.*** Finally, Google points to its expert, Dr. Hanssens, who conducted four surveys to understand Google account holders' expectations of its RTB data collection. (Dkt. No. 584-6.) As relevant, in the Business Disclosures survey, Dr. Hanssens asked respondents whether they expected Google to share their information when exposed to the "How Our Business Works" disclosure. Based on this disclosure, Dr. Hanssens asked respondents to state how likely they thought it was that Google shared their truncated IP address, the URL of where an ad should be placed, browser cookies, the category of the website, and characteristics of the web browser used. Between 45–74% of respondents stated that Google was very likely or somewhat likely to share that information after being shown Google's disclosure. (Hanssens Rep. ¶ 60.) In the second survey, the Privacy Disclosures survey, Dr. Hanssens showed respondents portions of Google's Privacy Policy. After reading the Privacy Policy, between 52–74% of respondents thought Google shared this information. (*Id.* ¶ 61.)

The Court finds that individualized issues will predominate over plaintiffs' damages claims. In litigating plaintiffs' past consent to Google sharing certain types of information, like their IP address or URL viewed, Google has demonstrated that a factfinder will need to assess each account holder's individual, and subjective, understanding of Google's, RTB participants', and third parties' disclosures. Because consent is a central issue to all six of plaintiffs' claims, this individualized inquiry will drive the litigation for plaintiffs' damages remedy.

Plaintiffs' arguments otherwise do not persuade. Though Google does not name RTB explicitly in its disclosures, Google tells users that it collects and sells various categories of information from its account holders to serve personalized ads. This is the layperson's explanation

of RTB. That Google chose not to detail the very technical process by which it converts its users' information into advertisements in its generalized disclosures does not vitiate its consent defense.

That said, as the Court explains further below, plaintiffs' injunctive claims for future relief are distinguishable. Google represents that it can provide "personalized ads" by sharing only "non-personally identifiable information" while plaintiffs contend that Google is, in fact, sharing or selling personal information. Whether Google has done so and will continue to do so—in direct violation of its promise to account holders that it "never" has, "does not," and "will not" sell their personal information—is an objective inquiry that can be answered on a common basis, making classwide injunctive relief possible.

Accordingly, and as it did in *Brown v. Google*, the Court finds that all six damages claims implicate the affirmative defense of consent for which individualized inquiries will predominate. No. 20-cv-3664-YGR, 2022 WL 17961497, at *17–*18 (N.D. Cal. Dec. 12, 2022). For that reason, plaintiffs' motion to certify a Rule 23(b)(3) damages class is **DENIED WITH PREJUDICE.** In future briefing, plaintiffs will not relitigate this issue.

**2. Rule 23(b)(2)**

Finally, the parties dispute whether the Court should certify a Rule 23(b)(2) injunctive class.

Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." To obtain certification under Rule 23(b)(2), plaintiffs must describe "the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K. v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).

Because Google's RTB is universal and its disclosures are generalized, the Court finds that an injunctive class under Rule 23(b)(2) is appropriate. Moreover, plaintiffs describe the general contours of the relief sought. Plaintiffs seek an order that would stop Google from sharing or selling their personal information without their knowing consent or a meaningful opportunity to opt-out.

Google arguments otherwise do not persuade. Google argues that plaintiffs effectively seek to halt RTB. Not so. Instead, plaintiffs request an injunction ultimately seeking transparency: if the evidence reveals that Google is selling personal, and sensitive, information about its account holders to hundreds of RTB participants worldwide, then Google must either tell its account holders or change its practice. There is evidence before the Court which already shows that Google shares enough information that RTB participants can discern what an account holder is reading online, even when it is on a religious or medical topic; exactly where they are reading it, including the coordinates of an account holder's home or work; and their background, which allows for a detailed, demographic profile of the account holder. Google cannot run away from the common question of whether it promises its account holders that it would not sell their personal information and, if so, it violates that promise billions of times a day.

To the extent plaintiffs seek transparency and opt-out procedures, Google argues that at least some account holders already know it transmits certain information to advertisers or have availed themselves of its settings to avoid personalized ads. In so arguing, Google misses the point of the injunctive relief sought. Though the Court agrees with Google that individualized inquiries will be required for implied consent, whether Google promised not to share account holders' personal information is a different question. That question will be resolved on the basis of Google's standardized disclosures—and therefore plaintiffs' express consent—alone. *See In re Gmail*, 2014 WL 1102660 at *19 (positing that for privacy claims sounding in breach of contract, only contractual disclosures, not extrinsic evidence, are relevant).[18]

Finally, plaintiffs are not simply seeking to opt out of certain personalized ads; they are requesting a mechanism to opt out of Google RTB entirely. As Google confirmed at the hearing, there is currently no way for users to stop Google from selling information about their unique IDs, location, and browsing history through the billions of RTB bids exchanged every single day with

[18] At the hearing, Google cited to *In re Gmail* for the opposite proposition. The Court notes that Judge Koh actually differentiated a breach of consent claim from, for example, a claim brought under the Wiretap Act on the question of whether "implied consent should be limited exclusively to Google's disclosures." 2014 WL 1102660 at *19. In that situation then, express consent would control. Google cites to no precedent holding otherwise.

hundreds of RTB participants from all around the world. (Tr. 36:7–22.) The injunctive relief sought would be an important step toward choice, accountability, and transparency.

The Court therefore finds plaintiffs' motion for an injunctive relief class under Rule 23(b)(2) would be appropriate for purposes of plaintiffs' claims under the UCL and CIPA.

## V. CONCLUSION

For the foregoing reasons, and notwithstanding the Court's rulings in favor of certain portions of plaintiffs' motion, the Court:

- **GRANTS IN PART AND DENIES IN PART** Google's *Daubert* motion against Professor Richards;
- **DENIES** as moot plaintiffs' *Daubert* motion against Google's expert Bruce Deal;
- **DENIES WITH PREJUDICE** plaintiffs' motion for class certification under Rule 23(b)(3); and
- **DENIES WITHOUT PREJUDICE** plaintiffs' motion for class certification under Rule 23(b)(2).

This terminates Docket Nos. 546, 582, and 624.

**IT IS SO ORDERED.**

Date: **April 4, 2024**

[signature]
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

Pages 1 - 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: GOOGLE RTB CONSUMER )
PRIVACY LITIGATION ) **Case No. 4:21-cv-02155 YGR**
)

Oakland, California
Wednesday, February 21, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94608
BY: **ELIZABETH C. PRITZKER, ATTORNEY AT LAW**
**JONATHAN K. LEVINE, ATTORNEY AT LAW**

BLEICHMAR FONTI & AULD LLP
1330 Broadway, Suite 630
Oakland, CA 94612
BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
**ANNE K. DAVIS, ATTORNEY AT LAW**
**JOSHUA D. SAMRA, ATTORNEY AT LAW**

SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
BY: **AN V. TRUONG, ATTORNEY AT LAW**

SIMMONS HANLY CONROY
231 S Bemiston Avenue, Suite 525
St. Louis, MO 63105
BY: **JAY BARNES, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official Court Reporter

APPEARANCES (Continued):

For Plaintiffs:

DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
BY: **DAVID A. STRAITE, ATTORNEY AT LAW**

DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
BY: **JAMES A. ULWICK, ATTORNEY AT LAW**

COTCHETT, PITRE & MCCARTHY LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
BY: **BRIAN DANITZ, ATTORNEY AT LAW**
**NANCI E. NISHIMURA, ATTORNEY AT LAW**

COTCHETT, PITRE & MCCARTHY LLP
999 N Northlake Way, Suite 215
Seattle, WA 98103
BY: **KARIN B. SWOPE, ATTORNEY AT LAW**

COTCHETT, PITRE & MCCARTHY LLP
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405-5267
BY: **JEFFREY G. MUDD, ATTORNEY AT LAW**

For Defendant:

COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
BY: **WHITTY SOMVICHIAN, ATTORNEY AT LAW**
**AARTI G. REDDY, ATTORNEY AT LAW**
**REECE TREVOR, ATTORNEY AT LAW**

Wednesday - February 21, 2024 9:26 a.m.

P R O C E E D I N G S

---o0o---

**THE CLERK:** Morning, again, everyone. Just a reminder, our court reporter is appearing remote. Please identify yourselves when speaking. And if there will be several attorneys on the lecturn, we have to share microphones.

I will start recording now.

**THE CLERK:** All rise. The Court is now in session, the Honorable Yvonne Gonzalez Rogers presiding.

**THE COURT:** All right. Good morning, everyone.

**THE CLERK:** Morning, everyone. Calling the Civil Matter 21-cv-02155-YGR, In re: Google RTB Consumer Privacy Litigation.

Parties, please step forward and state your appearances for the record, starting with the plaintiffs.

Lecturns, please.

**MS. PRITZKER:** Morning, Your Honor. Elizabeth Pritzker of Pritzker Levine on behalf of the plaintiffs.

**THE COURT:** Good morning, Ms. Pritzker.

Mr. Levine, good morning.

**MR. LEVINE:** Good morning, Your Honor.

Jonathan Levine, Pritzker Levine, for the plaintiffs.

**THE COURT:** Ms. Weaver, good morning.

**MS. WEAVER:** Good morning, Your Honor. Lesley Weaver,

Bleichmar Fonti, on behalf of the plaintiffs.

**MR. DANITZ:** Good morning, Your Honor. Brian Danitz of Cotchett Pitre McCarthy for the plaintiffs.

**THE COURT:** Okay.

**MR. DANITZ:** I'm here today with Nanci Nishimura, who is on the executive committee, Karin Swope, and Jeffrey Mudd.

**THE COURT:** Okay.

Anybody else that's going to come to the mic, come now. I mean, I don't know why you're waiting back there.

**MR. STRAITE:** Morning, Your Honor. David Straite for the plaintiffs from the DiCello Levitt firm. Also joining me is my associate James Ulwick.

**THE COURT:** Okay. Good morning.

**MR.BARNES:** Good morning, Your Honor. Jay Barnes from Simmons Hanly Conroy. Also with me is An Trong.

**THE COURT:** Okay. Morning.

**MS. WEAVER:** And, forgive me, Your Honor. I'll identify my partner -- Anne Davis. Josh Samer, also from my firm, Bleichmar Fonti.

**THE COURT:** All right.

Mr. Somvichian, good morning.

**MR. SOMVICHIAN:** Good morning, Your Honor. Whitty Somvichian with Cooley, representing Google today.

**MS. REDDY:** Good morning, Your Honor. Aarti Reddy with the Cooley Law Firm, representing Google.

**THE COURT:** Okay. Mr. Trevor, it lies on both sides.

**MR. TREVOR:** Good morning, Your Honor. Reece Trevor from Cooley for Google.

**THE COURT:** Okay. Good morning.

All right. Who's arguing what issues?

**MS. PRITZKER:** Good morning, Your Honor. Obviously, subject to how you want to arrange the proceedings today, plaintiffs' counsel are prepared to present argument on all of the Rule 23 factors.

**THE COURT:** Who?

**MS. PRITZKER:** I'm going to tell you. So focusing on the issues of the challenges to predominance, plaintiffs have divvied up the arguments with the twofold concept of Comcast (check) in mind.

Mr. Levine and I will be addressing the first part of the inquiry, which is whether there's common evidence capable of proving issues for the class.

Mr. Levine will address the evidence showing that Google's conduct towards the class is capable of proof, comment to the class a whole. He will also focus on the issues regarding the class definition and ascertain ability and injunctive relief.

I will be addressing how plaintiffs can prove their specific claims and overcome Google's specific defenses on a common basis. I think that goes specifically to the implied consent defenses and the -- whether there's a basis for -- a

reasonable expectation of privacy on a class-wide basis. I'm prepared to discuss the Rule 23(a) factors if that's an issue that the Court wants to hear argument on.

Brian Danitz, from the Cotchett firm, will be addressing the second part of the inquiry, which is damages. And then with respect to the pending Daubert motions, Lesley Weaver will address plaintiffs' challenge to Google's damages expert -- Bruce Deal. And Jeffrey Mudd, who is an attorney with under seven years of practice, will address Google's challenge to plaintiffs' privacy expert -- Professor Neil Richards.

I hope that's helpful.

**THE COURT:** It is. Thank you.

Danitz is doing what?

**MS. PRITZKER:** This is the opposition -- the challenge to the predominance of -- on the damages inquiry, Your Honor.

**THE COURT:** Okay.

**MS. PRITZKER:** So this is class-wide damages.

**THE COURT:** Great.

All right.

**MR. SOMVICHIAN:** Your Honor, my partner -- Aarti Reddy -- will handle the damages issues, including the Daubert motion as it relates to our expert Bruce Deal. My associate -- Reece Trevor -- is prepared to address the evidentiary objections that we lodged to plaintiffs' reply evidence. And I will do my best to cover everything else.

**THE COURT:** All right. Well, stay at the mic. We'll start with you.

**MR. SOMVICHIAN:** Okay.

**THE COURT:** I want to start with -- as a -- and I'll let Mr. Levine and Ms. Pritzker decide who wants to get up here. This action, in many ways -- not identical -- but, in many ways, seems to me to be similar to Brown. So from a starting point, why wouldn't I just certify an injunctive class? That's where I'm starting.

**MR. SOMVICHIAN:** Would you like me to address that first, Your Honor?

**THE COURT:** Go ahead. They're still deciding who's getting up here.

**MR. SOMVICHIAN:** Okay.

The distinction here between -- as it relates to 23(b)(2), Your Honor -- let me back up. First of all, we agree that the 23(b)(3) elements cannot be established here, just as they were not established in Brown. And class certification of a damages class should certainly be denied, as it was in Brown.

With respect to the injunctive relief class, the difference here is that -- whereas the individualized issues in Brown that defeated 23(b)(3) certification went to defenses of implied consent -- and those were the only grounds the Court found to be individualized that defeated predominance -- in that situation, there are -- that leaves room for a 23(b)(2)

class, because you can still have commonality as to the predicate findings of liability.

You layer on top individualized issues with respect to implied consent defenses, that defeats 23(b)(3). But a 23(b)(2) class, as your court -- as Your Honor found -- could proceed in that case. Here, we have additional issues -- additional individualized issues -- that go not just to the defenses of consent, but also with respect to the predicate findings of liability, Your Honor.

So, in this case, there are -- there is no commonality under 23(a) that could support either an injunctive relief class or a damages class, because there are issues that would need to be adjudicated on an individual basis to determine, for example, whether there's any breach, whether the specific data fields that were shared for any given individual could --

**THE COURT:** Well, do you -- do you -- do you deny that -- do you all agree? Is there a stipulation as to the contract?

**MS. PRITZKER:** There's not a stipulation, Your Honor. But we do have testimony from Google's 30(b) witness --

**THE COURT:** I -- I'm --

**MS. PRITZKER:** -- deponent -- basically confirming that it's a standard contract that's applicable to the class throughout the class period.

**THE COURT:** Do you agree on what the terms of the

contract are?

**MR. SOMVICHIAN:** No, Your Honor.

**THE COURT:** Isn't that a common issue that can be decided for the class?

**MR. SOMVICHIAN:** What -- what documents comprised the contract --

**THE COURT:** Yes.

**MR. SOMVICHIAN:** -- would be a common issue. Yes.

**THE COURT:** So --

**MR. SOMVICHIAN:** But the issue of breach --

**THE COURT:** I -- that's not my question.

**MS. PRITZKER:** Correct.

**THE COURT:** Right? We have millions of people, and you all dispute the basics of what a contract is; correct?

**MR. SOMVICHIAN:** We do as to certain elements of what's incorporated or not, yes.

**THE COURT:** It's a "yes" or "no." You either agree that -- I either have a contract that everybody agrees on or not. I have lots of cases where everybody agrees on the contract. Do you agree on the contract?

**MR. SOMVICHIAN:** That is a disputed issue, yes.

**THE COURT:** Okay. And that can be resolved on a classified basis; right?

**MR. SOMVICHIAN:** Yes.

**THE COURT:** Okay. So make a note -- or mark the

record -- we have one, at lease, issue. And we're going to go through each element of each claim.

You disagree on breach; right?

**MR. SOMVICHIAN:** Yes.

**THE COURT:** And why can't that be -- why can't the breach -- once they decide what the contract is -- why can't that be resolved on a class-wide basis?

**MR. SOMVICHIAN:** Because that depends on the actual data that was shared for a given individual, Your Honor, and whether --

**THE COURT:** And if I disagree with you, then that's really your only argument; right? That is, you have a system in place that may populate different fields differently. But your algorithm -- your system -- that is something that is common to the class.

**MR. SOMVICHIAN:** There's a single system, but it outputs different data for different people. And that does matter for breach, Your Honor, because --

**THE COURT:** Well, only if you -- only if -- I mean, how do I know that? That is, you don't agree on what the terms are. So I don't know that you can show that it's -- it can't be resolved on a system-wide basis.

What is the plaintiffs' view on that?

**MS. PRITZKER:** I think that's you, Mr. Levine.

**MR. LEVINE:** Thank you. Jonathan Levine for the

plaintiffs.

Plaintiffs' view is that that is capable of resolution on a class-wide basis, because all of the evidence that's before the Court is that the information that's conveyed out -- the information that would be looked at as to whether there's a breach or not -- is uniform -- not in that it's identical -- but it's uniform in that every single example that's before the Court -- and there are tens of billions of them -- uniformly contains enough information to meet the standard for a breach of Google's contract.

**THE COURT:** Is there a -- is there a baseline that is -- is there -- while the data that gets populated into these fields -- while it may differ from one individual to another, are there certain data fields that always must, as a matter of course, be populated?

**MR. LEVINE:** The answer to that is -- is there any one data field that's -- as to whether there's any one, the answer is "no." As to whether there's a combination of core data fields, that is what our experts focused on. Professor Shafiq focused on -- out of the 200 -- focused on the core 60. And, at least for the named plaintiff data Google produced, those core 60 fields are present in every single bid request.

With respect to the bid data that we received from The Trade Desk and The New York Times, Professor Wilson looked at that. That data does have different -- does have -- the data

fields are the same, but whether they're populated or not may differ. But he looked at those and concluded, based upon his expert opinion with doing his analyses, which are set forth in his first and second report, that 99.7 percent of those bid requests were identifiable and contained sufficient information to be identifiable looking at the combination of the fields.

So it's never one field; it's a combination. But every bid request includes a sufficient number of fields to make that combination work. And that's --

**THE COURT:** Okay.

**MR. LEVINE:** -- the evidence that's before the Court on class cert. There is no other evidence.

**THE COURT:** Okay.

Let's start, first, with his representation about the scope of evidence in front of me; is that correct?

**MR. SOMVICHIAN:** No, Your Honor. So with respect to whether there is a common set of data that compromises the alleged personal information, there is not. We submitted demonstratives to Your Honor yesterday, in the morning. I have a copy that summarizes some of the distinctions in the data --

**THE COURT:** And did you -- did share that with the --

**MR. LEVINE:** We have it.

**MR. SOMVICHIAN:** We did.

**THE COURT:** Okay. I don't have a copy up here. Do you have them?

All right. Go ahead.

**MR. SOMVICHIAN:** On the first page there, Your Honor -- what we did was, in our opposition brief, we had summarized this also in a table to show the data fields that the plaintiffs contend are personal information -- the identifiers, location information, other data -- and showed what the actual data reflects. And there is no uniformity. There's substantial variation in when these data fields are included or omitted, which reflects the fact that there are a multitude of user settings and controls and publisher settings and controls that can impact what the data looks like for any given individual.

What we did in the slide before you is to take our version. The plaintiffs had the last word. They complained about certain data -- certain of our experts' findings and said they weren't reliable. And so what we did in this chart was to just populate it with their own expert numbers. So you see citations to Wilson and Shafiq, those are the plaintiffs' experts.

So the numbers here are from the plaintiffs' own experts' rebuttal reports. So when you see, for example, this Google user ID reference, and you look at The Trade Desk data Dr. Wilson found, it's only populated 40 percent of the time with the mobile device idea, another one of the allegedly identifying aspects of data. Mr. Wilson -- Dr. Wilson -- found

that's there 15 percent of the time.

This cookie matching data -- this is the centerpiece of their complaint. They're alleging that this cookie matching process is what makes the combination of data identifying, in many instances. We found that that was populated only 40 percent of the time. That's not contested.

The location information -- also a centerpiece of what the plaintiffs claim to be personally identified -- that varies across what was in the named plaintiffs' data versus The Trade Desk date and The New York Times data, Your Honor.

So the -- they had the last word on reply. And they made a representation that I really want to address, directly. They said that 99-plus percent of the -- of the data meets their definition of personal information, and, therefore, there is this uniformity, and it's all common, and you can certify a class. It's really important to see where that comes from, Your Honor. It's in the Wilson rebuttal report.

And, as an initial matter, we have made an evidentiary objection to those opinions. This was a data analysis submitted for the first time on reply, based on data that the plaintiffs have had for months, had at the time of their opening motion. It's not a response to our expert. It's not a criticism of what our expert did. It's simply a new opinion that should have been presented in their opening. And, instead, they held it back, submitted it on reply. It should

not be considered.

But even if Your Honor considers it, it actually proves our point. Because the way that Dr. Wilson gets to this 99 percent calculation is a mishmash of different calculations. He has one method that looks at the Google user ID and the mobile device ID. But, as this chart shows you, that's not populated in a significant portion, a majority of the time.

So the way he gets to 99 percent, he says, for some data, I'll look at that. For other data sources, I'm going to look at different combinations of either user agent or other information for The Trade Desk data. That didn't work for The New York Times data. So there's a different methodology there. He looks at a different ID. That's only 57 percent. So he says, okay, I'm either going to look at that or look at these other combinations of device information with some location information.

The point is, Your Honor, that across the various expert reports, we have multiple methods -- different methods -- that are based on different sources for different data recipients. And there's no common method that's been presented to show that there is a way from common proof to show that the data shared is, in fact, personal information within the definition that the plaintiffs have offered. And that's because the data differs. So they've had to do this combination and present it to you as if it was uniform.

**THE COURT:** All right.

Your response?

**MR. LEVINE:** Thank you, Your Honor.

The data may differ. The question, though, for the jury is -- it's not about whether every bid request is identical. It's whether every bid request contains enough information, uniformly, to be deemed personal information under Google's privacy policy or California law. On that question, the data is uniform.

So what the defendants -- what Google is doing is focusing on minor differences in some bid requests and ignoring the big picture, which is the liability question that gets presented to the jury. And, on that, this chart is not relevant, because this chart is, once again, focusing on individual variations in one individual field in isolation, and saying, aha, there, plaintiffs lose. But that's not the inquiry.

The inquiry is whether the bid, as a whole, contains enough data fields and enough information to make it personal information and personally identifiable. And Google doesn't address that anywhere, and its experts don't address that anywhere.

**THE COURT:** And your evidence of that is the expert report. Is there other evidence?

**MR. LEVINE:** Well, it's the bid requests themselves. I mean, the Court has -- I don't want to say it -- this is

confidential -- but has lots and lots and lots of bid requests that are in the record that have been carefully analyzed by plaintiffs' experts. So it's plaintiffs' experts, but it is the underlying data itself. Google produced bid request data for all of the named plaintiffs -- lots of it. It is completely uniform -- completely.

Neither Google nor its experts ever look at all of the data in any bid request to make a judgment as to whether it's uniformly identifiable or not. They studiously stay away from ever doing that kind of holistic bid-by-bid request. And the reason they don't do that is because the answer that must flow from that, which is the answer our experts reached, is that they are all uniformly identifiable.

Specifics to this chart, the Google user ID column -- that's actually not a field that plaintiffs focused on. The actual column is Google user ID present, which indicates whether simply the Google user ID was or was not sent.

The mobile device ID would only be present if a mobile device is being used, which may explain the lower numbers in The Trade Desk.

Hosted match data is not even a field that plaintiffs raised as one of their core 62 fields. So plaintiffs have never alleged that the hosted match data field is a common field on which they are relying for the purposes of class certification.

And the location information -- it's different, but all of them contain location information. Plaintiffs' experts looked at that and concluded that was sufficient, along with all of the other data in every single bid request, to make those bid requests uniformly identifiable.

**THE COURT:** Okay. We're not going to talk, at the moment, about damages.

**MR. SOMVICHIAN:** Your Honor, can I just give you citations to the Wilson expert reports that I think are the key paragraphs?

**THE COURT:** They're not on -- they're not here on the chart?

**MR. SOMVICHIAN:** No.

**THE COURT:** Okay.

**MR. SOMVICHIAN:** When I refer to the different methodologies that Wilson -- Dr. Wilson -- utilizes to get to this 99 percent calculation, that is at paragraphs 154 through 156 of his rebuttal report. I would contrast that to paragraph 79 of his opening report. And if you track those, you can see how the theories have been morphing in response to the differences in the data.

**THE COURT:** Any comments on that, Mr. Levine?

**MR. LEVINE:** Yeah. I think the answer is that Professor Wilson's initial report didn't do the analysis that he was criticized for not doing by Dr. Striegel and

Dr. Psounis. So his report -- his original report -- Professor Wilson's report -- was talking about the unavoidability of Google and the structure of Google -- the uniform structure -- the process, as I think Your Honor referred to it earlier.

So he didn't do the -- the analysis -- the -- sort of the -- of the individual bid requests at that level. So when he was criticized for that, and when Dr. Striegel criticized him for that, he went back and then looked at that analysis. And these are the results. So, yes, it is a different analysis between the two reports. Because, in the first report, he was looking at something different than in his rebuttal report, which is directly in response to the criticisms from Google's experts.

**THE COURT:** All right.

Count 2 relates to the breach of the implied covenant. And here --

**MR. SOMVICHIAN:** I believe that's been dismissed, Your Honor.

**MS. PRITZKER:** It's held in abeyance, Your Honor. Elizabeth Pritzker. That's one of the --

**THE COURT REPORTER:** I'm sorry. I can't hear you.

**THE COURT:** She can't hear. You need to be at a mic.

**MS. PRITZKER:** This is Elizabeth Pritzker.

That's one of the claims that's being held in abeyance. This is one of the claims that Judge Koh asked us to not

proceed on at the moment. So that's why we can't --

**THE COURT:** All right. So --

**MS. PRITZKER:** -- brief it in our class cert briefing.

**THE COURT:** All right. So we have then -- what? -- Count 4, invasion of privacy, and Count 5, intrusion upon seclusion; is that right?

**MS. PRITZKER:** That is correct.

**MR. SOMVICHIAN:** Your Honor, I just want to correct the record. If you were referring to the breach of implied covenant claim -- Count 2 -- that was addressed in the motion to dismiss.

**MS. PRITZKER:** Oh.

**MR. SOMVICHIAN:** And it was --

**THE COURT:** I granted that.

**MS. PRITZKER:** Maybe that's the case.

**MR. SOMVICHIAN:** The motion was granted.

**MS. PRITZKER:** Yes.

**MR. SOMVICHIAN:** That is not in abeyance. It's been dismissed.

**THE COURT:** I agree. I agree. Sorry.

All right. Counts 4 and 5 -- so to state a claim for invasion of privacy under the California constitution, plaintiff must plead, one, that they have a legally protected privacy interest. Isn't that a common issue that can be addressed on a class-wide basis? Isn't it?

**MS. PRITZKER:** I believe it is here, Your Honor. I mean, that's certainly how we briefed it. And that's -- that really stems from the fact that the disclosures that we're relying upon in this case are all the same. They apply, across the board, to every class member who is a Google account holder in the United States.

And those disclosures, we allege -- and I think we've put all of them in front of your Court -- affirmatively represent to all of those consumers that Google will not share or sell their personal information in the Google RTB auction.

**THE COURT:** So I take it you -- do you agree -- do you concede or do you disagree on a privacy -- the existence of a privacy interest?

**MR. SOMVICHIAN:** Well, I think the question is a legally protected interest in privacy in what data, Your Honor.

**THE COURT:** Right.

**MR. SOMVICHIAN:** And that can differ. So as -- so --

**THE COURT:** So you can't reshape the plaintiffs' claim. All you can do is defend against their articulation. Do you understand?

**MR. SOMVICHIAN:** I understand, Your Honor.

**THE COURT:** Okay.

**MR. SOMVICHIAN:** And with respect to the question of whether there's a legally protected interest --

**THE COURT:** Isn't it -- it's the -- they've identified

a legally protected interest, whether or not -- I'm not sure that they'll win on it, but they've identified it. And it's the same for everybody. So why can't that be resolved on a class-wide base?

**MR. SOMVICHIAN:** They've articulated a legally protected interest in the data in its totality, Your Honor, but not all of that data is shared for every individual. That's the issue.

**THE COURT:** That's a separate question. Whether there's a violation is separate from the existence of the right.

**MR. SOMVICHIAN:** So if you define it as the totality of the information, and setting aside the question of whether that actually applies to a given individual, the initial issue of a legally protected interest, I agree, is common.

**THE COURT:** Okay. So that can be resolved on a class-wide basis.

**MR. SOMVICHIAN:** That element, yes.

**THE COURT:** Okay.

Second, whether, for that articulation, there's a reasonable expectation of privacy. A reasonable expectation of privacy is just that: It's objective. It is not subjective. So individuals may have opinions, but that doesn't mean that it controls the objective issue. That seems to me also to be resolvable on a class-wide basis. It's an objective issue.

**MR. SOMVICHIAN:** I disagree, Your Honor. The -- an expectation of privacy has to be objectively reasonable, yes, but the --

**THE COURT:** And who decides that? Who decides? A jury decides.

**MR. SOMVICHIAN:** Yes.

**THE COURT:** So they're going to put together -- they're going to articulate what they believe is the legally protected privacy interest. You will probably disagree. The jury will decide whether or not that's legally protected. And then they'll decide, with respect to that particular articulation, is there a reasonable expectation of privacy? And there's only one answer, and that answer is the jury's.

**MR. SOMVICHIAN:** There's also another element of it, Your Honor. And that's reflected in the California Supreme Court's decisions that they cite and that have been recognized by the Ninth Circuit -- the Hill v. NCAA case.

It says (as read):

> "The plaintiff, in an invasion of privacy case, must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e. he or she must not have manifested, by his or her conduct, a voluntary consent to the invasive actions of a defendant."

That's also reflected in the Opperman v. Path case that

the plaintiffs also rely on.

So, yes, there is a common initial question of whether the alleged expectation of privacy is objectively reasonable. But for an individual to make out a claim, they have to have an actual expectation of privacy, and their conduct has to be consistent with that expectation of privacy and not --

**THE COURT:** Well, that's two parts. So part A, you agree, is resolvable on a class-wide basis. Your concern is part B.

**MR. SOMVICHIAN:** Yes.

**THE COURT:** Okay.

A response on part B?

**MS. PRITZKER:** Well, on part B, Your Honor -- and this is one area in which we think this case differs from the Brown case.

On part B, unlike in Brown, the representations that we're relying upon contain an express representation that this personal information belonging to the U.S. account holders will not be sold or shared in RTB. So when the Google account holder signs up for his or her account, that is the promise that they encounter.

It's hard to imagine how they could have manifested an actual -- by their conduct of signing up for a Google account -- consenting to having their information sold and shared in the auction, when Google expressly says that it won't

do it. And it says it repeatedly, again and again and again.

And the case -- this is, I think, where the In re: Facebook Internet Tracking case is relevant. It says that, you know, where you have an expressed representation by the defendant that it will not do something, that creates a reasonable expectation of privacy in that data. I can get you that cite, and I can probably say it more eloquently, but that's essentially what Facebook Internet Tracking says.

And so there is a -- of course, there is -- the item of actual consent -- or the lack of actual consent -- is actually implied by the fact -- of the terms of the agreement themselves.

Nowhere in the disclosures -- nowhere in the consumer-facing disclosures -- does Google tell class members that notwithstanding this promise, that it shares and sells their data in the auction.

**THE COURT:** So I'd like you to address, specifically, the Hill case and the issue -- well, yeah -- address Hill, specifically. Are you saying that, as a matter of law, they could not voluntarily consent?

**MS. PRITZKER:** The way that -- well, they can't under the circumstance. I mean, there was really an absence of consent. Because the benefit of the bargain is that you're signing up for a Google account according to its terms. And the obligation is that the information that you're providing

Google associated with your account will not be transmitted or shared elsewhere. There is --

**THE COURT:** Are you saying that as a matter of law then, if the contract is what you say it is, that an individual could not consent?

**MS. PRITZKER:** There is no way to manifest sort of any -- yeah -- there's sort of a lack of actual consent in that scenario because you're --

**THE COURT:** Do you agree with the proposition that Hill says that one needs -- one may -- in evaluating a reasonable expectation of privacy, that one may voluntarily consent and must act consistent with the objective expectation? Do you agree that that's what it says?

**MS. PRITZKER:** I do agree, Your Honor. But all of -- all the class members are doing are surfing the Internet. So, I mean, their conduct is that they're surfing -- they're using their -- they're surfing the Internet. It's not even a factor of using Google services. They're surfing the Internet. That's their conduct.

But undisclosed to them is this -- you know -- is this background auction where, every time they engage in an Internet browsing activity, the data that they share with Google, that Google is scooping up that data, and selling it and transacting it in the auction. So this is not -- this is not a scenario where there's a way to act --

**THE COURT:** Okay. So what is the evidence that they acted -- that they could have knowingly acted in a manner inconsistent with that objective expectation of privacy, and where is it in the record?

**MR. SOMVICHIAN:** I think the most direct evidence, Your Honor, is the survey that -- survey evidence -- that we put into the record. That's the report of Dr. Hanssens. We can debate about what the disclosures -- how the disclosures would be interpreted by different people. Ms. Pritzker will say they're confusing and they wouldn't tell anybody about the data practices at issue. I can give you a different interpretation, Your Honor. But the proof really is in how people responded when they were asked these questions, directly, in this survey. We --

**THE COURT:** Well, is that proof or is that just evidence on the other side?

**MR. SOMVICHIAN:** It is proof, Your Honor. We showed -- we showed these survey respondents the statements that the plaintiffs say are misleading -- the promises about personal information. And --

**THE COURT:** And was it 100 percent?

**MR. SOMVICHIAN:** It wasn't 100 percent.

**THE COURT:** What was it then?

**MR. SOMVICHIAN:** There were substantial majority --

**THE COURT:** What was it?

MR. SOMVICHIAN: I can give the specific numbers for each category, Your Honor. We asked them about different categories of information.

THE COURT: So what was the range?

MR. SOMVICHIAN: The range is from 45 to 75 percent, approximate.

THE COURT: Okay. So, on the other side then, it's 55 percent -- a majority -- which is proof of a preponderance -- would degree for the issues that are on the lower end of your survey. It proves the opposite.

MR. SOMVICHIAN: I don't think so, Your Honor. It --

THE COURT: Well, that's what a jury gets to decide; right?

MR. SOMVICHIAN: Their are substantial -- it doesn't even need to be a majority, Your Honor. What the survey evidence shows is that there are material numbers of people who understand exactly that things like the URL of the website they're on -- that's going to be shared.

THE COURT: Why don't you let the jury decide? And then all the class members -- millions and millions of people -- whether or not they agree, are bound; right?

MR. SOMVICHIAN: That's not the inquiry for implied consent, Your Honor. What the survey --

THE COURT: Implied consent is a defense. And as I said in Brown, that's not a basis to not certify --

**MR. SOMVICHIAN:** It's not a basis --

**THE COURT:** -- per the Ninth Circuit.

**MR. SOMVICHIAN:** It's not a basis to -- well, it was --

**THE COURT:** Per the Ninth Circuit; right?

**MR. SOMVICHIAN:** Yes. And it was an adequate basis to deny the 23(b)(3) class. We agree that that finding should apply here, Your Honor. Is your question with respect to the injunctive relief class --

**THE COURT:** I'm -- I haven't gotten to -- I haven't gotten to damages; right? And I said we weren't getting there yet. I'm talking about the fundamental elements of the claim -- objective expectation, which is not subjective. So these people's opinions may inform, but they certainly do not bind a jury to decide what's objective.

**MR. SOMVICHIAN:** What it shows, Your Honor, is that there are people who do not have a claim, and that there's no way to identify them --

**THE COURT:** Well, that's ascertainability. That's not the elements of the claim. So don't conflate.

**MR. SOMVICHIAN:** I'm --

**THE COURT:** Let's move on.

A jury can also decide whether the alleged intrusion is highly offensive. Perhaps your evidence -- what it shows -- is that it's not offensive. People don't care. But a jury gets

to decide that. That's -- that is common evidence to have a jury decide an element of a claim.

**MR. SOMVICHIAN:** Again, Your Honor, it's based on an assumption that the data is shared in the uniform way when it is not. They can -- they can --

**THE COURT:** That's common evidence.

**MR. SOMVICHIAN:** If -- if the assumption were accurate, and if they had shown that -- in the evidence -- that there's a common --

**THE COURT:** You're debating evidence. I'm not here to debate evidence. I'm here to see is there common evidence that I can have a jury decide that question, and it seems like there is.

**MR. SOMVICHIAN:** Your Honor --

**THE COURT:** Like I said -- look, these folks -- these plaintiffs -- they've been in my courtroom before and lost.

**MS. PRITZKER:** Yes, we have.

**THE COURT:** They've lost.

**MS. PRITZKER:** I'll admit it here, right on the record.

**THE COURT:** So --

**MR. SOMVICHIAN:** Your Honor --

**THE COURT:** And so just because there's common evidence doesn't mean that they're going to win. But it seems like there's common evidence for the jury to decide whether

what Google is doing is highly offensive.

**MR. SOMVICHIAN:** But in the context of a particular individual, Your Honor, the highly offensive element can look very different if, for example, there were identifiers --

**THE COURT:** They can evaluate the practice.

**MR. SOMVICHIAN:** -- and the location information was --

**THE COURT:** We aren't talking about damages. We're talking about the practice of what you are doing.

**MR. SOMVICHIAN:** But claims are resolved for individual people, Your Honor. And for an individual person, their proof --

**THE COURT:** No, only in a damages case.

**MR. SOMVICHIAN:** I don't think so, Your Honor. There can be an element of the adjudication that relates to the general practice. But a practice gets applied to individual people. And, here, it gets applied in different ways. And it -- as it relates to the "highly offensiveness" element, the data could look very different from person to person.

**THE COURT:** Well, maybe, then, that's a -- maybe that's just a question of how the class gets defined.

**MR. SOMVICHIAN:** There's not a --

**THE COURT:** I don't know.

**MR. SOMVICHIAN:** Well, the plaintiff --

**THE COURT:** But it seems to me that there's evidence

that a jury could decide whether or not Google is doing something that is highly offensive to people.

**MR. SOMVICHIAN:** There can be a judgment made as to the practice, but not as to how the practice is applied to an individual person.

**THE COURT:** Well, that's open.

Let's move on. Claim for intrusion upon seclusion.

**MR. SOMVICHIAN:** I think this implicates the same issues, Your Honor, with respect to the Hill element of conduct, an actual expectation. So, again, I think the survey evidence shows that there are different expectations, different understandings, all of which would impact the intrusion upon seclusion claim, as well as the other privacy claims that we've talked about.

**THE COURT:** Response?

**MS. PRITZKER:** I guess I would like to respond in a couple of ways. I mean, we took a 30(b)(6) deposition of a Google employee who was put up on the issue of the consent flow -- what does it mean to consent to Google's practices. And I want to say two things about her deposition testimony. This is -- this is Suneeti Vakharia. And her deposition transcript appears in the record at Exhibit 52 to my declaration, which I think is ECF 617-12.

In looking at all of the disclosure language about -- in looking at all of the terms of service and privacy policies and

everything that we're alleging contains the affirmative promise, she was asked this question (as read):

**"QUESTION:** In looking at the exhibits to your declaration, filed in opposition to class certification, where do they refer to the real-time bidding auction?"

**"ANSWER:** They do not specifically refer to the real-time bidding auction."

At page 274 of her deposition transcript (as read):

**"QUESTION:** So the promise that every class member saw: 'Google does not sell your personal information to anyone.' Does Google say anywhere that Google might sell their information to anyone?"

**"ANSWER:** No. It does not state that it might sell anyone's information."

**"QUESTION:** Do any of these disclosures say that Google does sell or has sold class members' information to third parties?"

**"ANSWER:** No. These disclosures do not communicate the sale of any user's information."

And there are several other excerpts in her transcript which say the same things.

At 295 (as read):

**"QUESTION:** In terms of the terms of service" --

**THE COURT:** So just give me the cite and make your point. I don't -- I'm not going to be here for five hours.

**MS. PRITZKER:** This is my last one on this issue (as read):

"**QUESTION:** In terms of the terms of service and all of the disclosures that we've discussed today, you're not aware of any disclosures to Google account holders about how the real-time bidding auction functions; right?"

"**ANSWER:** I am not familiar with any."

She was also asked about the issue of consent -- a Google account holder consent to these practices. And this is her deposition transcript at page 62 (as read):

"**QUESTION:** In your work at Google, can someone consent to a data collection practice is that not disclosed to them?"

"**ANSWER:** I don't think we would ask someone to consent to something that is not disclosed to them. We would disclose what they need to consent to."

"**QUESTION:** So disclosure is critical to consent; correct?"

"**ANSWER:** Right. We're sharing information with them. And I don't know if 'disclosure' has a legal definition, but sharing information. We would share the appropriate information for them to consent to."

None of that exists here, Your Honor. None of it. You know, consent is a class-wide question without a -- it's subject to class-wide proof without a --

**THE COURT:** Well, I found that it couldn't be -- that

implied consent, in any event -- could not be shown through common evidence in Brown. Why should I find opposite here?

**MS. PRITZKER:** The disclosures are different. Here, we have affirmative representations of what Google will not do with consumers' personal information.

**THE COURT:** Well, this goes back to your claim that, effectively, I'd have to be saying, "Well, as a matter of law, despite an expressed disclosure, they couldn't -- a person -- couldn't agree to this."

**MS. PRITZKER:** I think, to answer the questions that you've posed to opposing counsel, it's a common question, Your Honor. It's not a question of law, but it's a common question. There's nothing that they can do to get out of, you know, the Google RTB auction. There's no conduct that they can engage into evidence -- consent to a practice -- that is not disclosed to them. That's at least what True Health requires -- that there be some actual disclosure of the practice.

**THE COURT:** Is there -- was there -- is there a way to extract yourself from --

**MS. PRITZKER:** There is not, Your Honor.

**THE COURT:** So even if someone wanted to -- if someone wanted to extract themself, could they?

**MR. SOMVICHIAN:** They can opt out of personalized ads. That changes what information is shared. That prevents any cookie matching. That prevents any IDs from being included.

You can undertake other -- or utilize -- other third-party services, which have the impact of changing what data can be included in the bid requests.

So there are ways to control and limit the data that is shared. Bid requests can still be sent. I want to be clear about that. But users can control what data is included.

**THE COURT:** So there's no way to opt out?

**MR. SOMVICHIAN:** There's no way to opt out of bid requests being sent entirely, although there are ways to control the data.

**THE COURT:** So there's -- then how could one consent if you could never opt out entirely?

**MR. SOMVICHIAN:** That would be expressed consent, Your Honor. So I think it's important to keep the distinction between expressed consent and implied consent --

**THE COURT:** But how can you consent to something when it isn't an option, implied or expressed? If I say to you -- or your client -- who's probably a client sitting back there -- "I want to make sure you never do this for my data," it doesn't sound like I could do that.

**MR. SOMVICHIAN:** You cannot prevent bid requests from being sent entirely. You can control what data is included. But that's not the inquiry -- that's not the entirety of the inquiry for implied consent, Your Honor. It's not whether a given practice can be prevented entirely. Implied content is

based on understanding of a practice and acceptance of it. So there is --

**THE COURT:** But the opposite has to be true. In order to consent, you either -- you either have to -- it's like -- it's like proving a negative. How can you say I can consent if I can't consent not to have you do it? You can't have one without the other.

**MR. SOMVICHIAN:** I don't think so, Your Honor. Because implied -- the Gmail case is one -- is an example. So, in that case, class certification was denied because of implied consent issues, based on a similar record as here. There was no way to opt out of the practice at issue --

**THE COURT:** And that went up to the Ninth?

**MR. SOMVICHIAN:** It did not.

**THE COURT:** Okay.

**MR. SOMVICHIAN:** So that issue involved the automated scanning of Gmail to deliver targeted advertising.

**THE COURT:** So it's just one judge's opinion.

**MR. SOMVICHIAN:** It was Judge Koh's opinion. It's been followed in many cases. And what it shows is that the implied consent analysis looks at whether there is potential awareness of the practice -- and there was there -- there is here -- and whether people could accept that practice and manifest that through their conduct, including the continued use of the service. We have --

**THE COURT:** But -- but the opposite's not true. I don't understand how -- how it can only work in your favor.

**MR. SOMVICHIAN:** I don't -- I don't think we're saying that it can only work in our favor.

**THE COURT:** Of course you are.

**MR. SOMVICHIAN:** We have --

**THE COURT:** You're -- of course you are. You're saying that you can consent to control only. You can't consent to not have your data entirely.

**MR. SOMVICHIAN:** As a matter of the element of consent that's based on user actions. But, again, awareness and inaction, acceptance of the practice, continued use, failure to even opt out of personalized ads -- we're entitled to assert that defense to an individual claim.

For example, the named plaintiffs, Your Honor, after filing this case, after learning from their attorneys about the full extent of the practices, what data is shared, and the ways that it can be limited, none of them bothered to turn off personalized ads, none of them bothered to block cookies, all of which would prevent much of the activity --

**THE COURT:** To what effect?

**MR. SOMVICHIAN:** -- that they're complaining about.

**THE COURT:** To what affect? Only, again, back to the damages.

**MR. SOMVICHIAN:** To --

**THE COURT:** I mean --

**MR. SOMVICHIAN:** To the effect that these are individualized issues and individualized defenses that Google is entitled to assert. And there's no way to --

**THE COURT:** For what -- for what purpose?

**MR. SOMVICHIAN:** To defeat liability, Your Honor, to an individual claim. That's what we're entitled to do.

**THE COURT:** Response?

**MR. LEVINE:** With respect to the named plaintiffs, Your Honor, the named plaintiffs, during meet and confers, were told by Google that if they changed any of their settings, that would be viewed as -- after the filing of the lawsuit -- that would be viewed as spoliation. So that is one reason why they never changed any of their settings.

The settings also don't stop anyone from being subject to RTB, a fact that Google now admits. So the settings -- all the settings do is change one field out of 200. There is no setting that stops RTB. So unlike the Gmail case, where one could simply stop using Gmail and go use another email service, what Google is saying is you have to stop using the Internet. That's what they're saying. You have to stop using the Internet if you don't want to be deemed to consent.

**THE COURT:** Well, you have to stop using Google.

**MR. LEVINE:** No, because -- no. Everyone in America who's using the Internet is being subject to RTB auctions. Our

case is only on behalf of account holders, because that's the only group for which Google makes an express promise that they won't do what they're doing.

So everyone is being subject to RTB. It's pervasive. It exists all over -- all over the world. It's on half the websites. You cannot escape RTB. And it doesn't matter whether you're an account holder or not. Our case, though, which is based upon the promise, only applies to Google account holders. So, in fact, what they're saying is you have to stop using the Internet, otherwise you're deemed to consent to their behavior, which they don't disclose anywhere.

**THE COURT:** All right.

Any response?

**MR. SOMVICHIAN:** Your Honor, I'd point to the survey evidence. I referred earlier to the aspect of the survey that tested people's awareness that certain data -- categories of data -- are, in fact, shared and used in online advertising. Substantial majorities of people said that they were aware.

We tested another question also. We asked people, would they accept terms and gave them a hypothetical set of terms that adopted the plaintiffs' version in this case. So that version said we will share your personal information. And your personal information includes all of these categories that the plaintiffs contend, including IP address and user agent and cookies and so forth. And, again, substantial majorities --

over 70 percent -- had no problem accepting those terms. So, again, awareness and acceptance is implied consent.

**THE COURT:** But you just said -- doesn't that -- I mean, in some ways, doesn't it prove the point that you gave a set of people a question, which that set of people answered, and now you're relying on that? It's like a class-action. Common evidence presented to a small group, which you'd like to have the Court adopt. Sounds like a class-action.

**MR. SOMVICHIAN:** Your Honor, this isn't UCL claim, for example, where we're trying to show, in the abstract, that there's some risk that consumers could be misled. The point of the survey is different here. The point of the survey here is that there are, in fact, individuals who knew of and --

**THE COURT:** Well, that's the -- that's the point of the survey that you'd like me to -- evidence can have multiple -- can be used for multiple purposes. I understand that's what you'd like me to use it for. And that's the reason that you obtained it. But it does imply some other things.

Let me ask you, where do you disclose to users that Google is sharing or selling your information to third parties to provide ads? Where do you disclose that?

**MR. SOMVICHIAN:** Your Honor, in a multitude of places -- in a collection of places --

**THE COURT:** Where is it in the briefing in front of me? Do you provide me with an easy list for me to identify

your disclosures?

**MR. SOMVICHIAN:** Yes, Your Honor. Those are all identified in the Vakharia declaration and the exhibits to the Vakharia declaration. The pertinent portions of those disclosures are quoted in the body of the declaration, and all of the materials are attached.

I would also point out that, in addition to Google's disclosures, there's an entire body of additional evidence that's relevant here that actually wasn't at issue in Brown. It's an added layer here to the consent issue. And that's the cookie notices and privacy policies of publishers -- the websites and apps that integrate Google RTB.

So recall that, as Mr. Levine just mentioned, the process -- the Google RTB process -- is triggered when somebody accesses a website or app that displays ads through the Google RTB process. For that reason, they have specific disclosures and explanations of the data sharing that's triggered by using their website or app. Those disclosures cover the practices at issue. And some of them actually specifically refer to Google.

And I can get you those examples, Your Honor. There's one involving an AccuWeather website. There's another one relating to JetBlue. But common websites with privacy policies that expressly address the sharing of information and directly address Google. So I would say --

**THE COURT:** All right.

Let's get a response on that.

**MR. SOMVICHIAN:** Real quick, Your Honor, just so you have the record cites, those are in the Hanzarik declaration.

**MS. PRITZKER:** I guess I want to point -- let me respond to two pieces of that argument, Your Honor.

It is not accurate for Google to say that the disclosures that are attached to the Vakharia declarations filed in this case in any way disclose to class members that Google shares themselves their user data in the auction. This was a question that she was asked specifically at her deposition, where she was appearing at the 30(b)(6) witness for Google.

And at 158 of her deposition transcript, the question was (as read):

"**QUESTION:** In looking at the exhibits to your declaration filed in opposition to class certification, where do they refer to the real-time bidding auction?"

"**ANSWER:** They do not specifically refer to the real-time bidding auction."

And then there were other references where she says that (as read):

"Our disclosures do not communicate that we would share personal information or information that could be linked to Google account personal information for purposes of RTB."

So it's not accurate to say that the disclosures that are

as part -- attached -- to the declaration of Ms. Vakharia in any way disclose --

**THE COURT:** All right. I'll take a look at it.

What's the second point you wanted to make?

**MS. PRITZKER:** I've forgotten what the second point was.

**THE COURT:** All right. Well, while you think about it, let's move to the claim of publication of private information.

**MS. PRITZKER:** Oh, the third-party websites.

That, too, is a bit of a -- I think if Your Honor wants to look at those excerpts, they're attached to Mr. Hanzarik's declaration. And none of those disclose the Google RTB auction either.

A lot of those websites deal -- all of those websites -- deal with cookie policies and advertising policies related to those specific websites. And sometimes they refer to Google, sometimes they refer to Google analytics, but none of them refer to the fact that information is being shared by Google to any publisher in the real-time bidding auction. The real-time bidding auction, again, is not disclosed anywhere in those third-party disclosures.

So, you know, I don't know how you can imply consent by going to third-party sites, which don't disclose Google's activity as opposed to the activity of that third-party website

publisher, as evidencing any implied consent here.

**THE COURT:** All right. Publication -- a claim for publication of private information. Seems like the arguments are similar.

**MS. PRITZKER:** Pretty much the same, mm-hm.

**THE COURT:** So first element -- that the RTB process is a public disclosure. That element, itself, seems like it could be commonly answered, whether or not it's a disclosure. It goes from Google to other people. Is that a disclosure?

Agreed?

**MR. SOMVICHIAN:** I agree, that's a common issue, Your Honor.

**THE COURT:** Okay. It's the next one that I assume that you disagree. And that is whether the disclosure -- there is a disclosure of a private fact; right?

**MR. SOMVICHIAN:** Correct.

**THE COURT:** For the same reasons.

**MR. SOMVICHIAN:** Yes.

**THE COURT:** Same reasons?

**MS. PRITZKER:** That's correct, Your Honor.

**THE COURT:** Next, which would be offensive and objectionable to the reasonable person.

Same issues?

**MS. PRITZKER:** Same issues.

**MR. SOMVICHIAN:** I agree.

**THE COURT:** Which is not a legitimate concern. That's -- that's a slightly separate issue.

Any comment on that?

**MS. PRITZKER:** I think the issue of not legitimate concern is sort of an add-on to the private nature of the information; right? I mean, so it's not -- it's not as if --

**THE COURT:** Well, it doesn't have to be, as with the other ones, highly offensive. The other ones discuss whether something is highly offensive.

**MS. PRITZKER:** Correct.

**THE COURT:** This is whether it's a legitimate concern.

**MS. PRITZKER:** Correct, which, I guess, is one's reasonable expectation of privacy in their personal data that they share with Google.

**THE COURT:** Is that objective or subjective?

**MS. PRITZKER:** It's objective, Your Honor.

**THE COURT:** You agree? Objective?

**MR. SOMVICHIAN:** I think the public concern element would be objective, Your Honor, but, again, it --

**THE COURT:** "Legitimate concern" is the term.

**MR. SOMVICHIAN:** I agree that legitimate public concern is a common element based on objective -- an objective standard. But whether it applies to a given individual is where it becomes individualized. Because the data may -- again, it goes back to the variation in the data and applying

the general concepts to a given individual.

**THE COURT:** All right.

The next one you have breach of confidence, Count 7. The elements for a breach of confidence claim are that the plaintiff conveyed confidential and novel information to the defendant, one. Two, the defendant had knowledge that the information was being disclosed in confidence. Three, there was an understanding between the defendant and the plaintiff that the confidence would be maintained. And, four, there was disclosure or use in violation of that understanding.

How is it that there is evidence that the plaintiff conveyed confidential and novel information to the defendant when your other argument is that they didn't know they were conveying anything?

**MS. PRITZKER:** No. That's actually not our argument. So to become a Google account holder, you obviously have to agree to the terms of service and the privacy policies. And those terms of service do -- you do acknowledge that you are sharing information with Google -- a lot of information with Google -- your name, your address, your IP address, a lot of your -- you know -- a lot of information you're sharing with Google. And you do so with the understanding that Google may use that information for its own purposes and its own services.

That's a very different question with respect to whether you are agreeing that Google can then share and tell that

information with third parties in the real-time bidding auction when it promises it will not do so. So the information --

**THE COURT:** Are you not proceeding on this claim?

**MS. PRITZKER:** No, we are proceeding on this claim.

**THE COURT:** Okay. For class certification?

**MS. PRITZKER:** Oh, there may be a technical question that Mr. Levine can --

**MR. LEVINE:** I think Your Honor was -- and this may be wrong -- but I think you were asking the technical question of how is the plaintiff -- if they don't know about RTB, how are they conveying this information to Google. And I think the answer is --

**THE COURT:** So --

**MR. LEVINE:** Yes.

**THE COURT:** So, Mr. Levine, you don't get to double-dip. So I'm not going to listen to -- she's -- if she's going to argue the issue -- I want to make sure that I haven't dismissed the breach of confidence claim. Are you seeking certification on breach of confidence?

**MS. PRITZKER:** Yes, we are, Your Honor. That's one of the claims that we're proceeding on.

**THE COURT:** Okay.

You can write her a note. You just can't double-dip.

So all of this you're saying -- your common evidence on all of these issues relates, in part, to the agreement. How is

it -- if that's the case, how is this any different from a breach of contract claim?

**MS. PRITZKER:** They -- they -- you know -- they -- they provide different remedies of --

**THE COURT:** What are the remedies?

**MS. PRITZKER:** I mean, in this case, I guess, we have damages and -- under -- under both. Some of the tort claims have punitive damages associated with them.

**THE COURT:** How is this different -- how is Count 7 --

**MS. PRITZKER:** It's not different.

**THE COURT:** -- different --

**MS. PRITZKER:** It's not different with respect to how we're calculating damages on behalf of class members.

**THE COURT:** How is Count 7 different from Count 1? And if it's duplicative, why are you moving on both?

**MS. PRITZKER:** Well, this is class certification, Your Honor. I think that if we're entitled to have the class -- have the claims -- subject to class treatment so that they can proceed to summary judgment and even to trial, I think we -- you know -- we're entitled to do that.

There may be merits challenges to the particular claims that will come up at summary judgment. But if they're entitled to class treatment, we'd like to proceed on them. And then if -- if those claims survive summary judgment, and it comes down to an issue of trial, we can probably trim it -- you

know -- there may be an opportunity to trim at that time. But we want to make sure that we have certified claims that we can proceed on, at least through the summary judgment phase and ultimately to trial, and give us the option to pick and choose, depending on how the chips fall later in the case.

**THE COURT:** All right.

Is there anything different with respect to this claim that you all want me to consider?

**MR. SOMVICHIAN:** One --

**THE COURT:** Or is it all the same?

**MR. SOMVICHIAN:** One detail, Your Honor.

The same issues with respect to awareness and acceptance on the one hand and breach on the other apply here, as well. And for all the reasons we've talked about, we believe those are individualized.

I would point out that here -- where the claim requires that the plaintiffs have conveyed information that they believe to be confidential -- now that makes the element of knowledge and awareness part of the prima facie elements of the claim.

**THE COURT:** Well, where does it say that --

**MR. SOMVICHIAN:** It's not just a defense.

**THE COURT:** Where does it say that -- someone can convey information -- well, I guess, that's a question about Element 1. Did plaintiff have to know that they were conveying confidential and novel information?

**MS. PRITZKER:** I don't know that the elements require a notice -- I mean, a knowledge element -- for the plaintiff to have conveyed the information.

**THE COURT:** Does anybody have any law --

**MS. PRITZKER:** It does --

**THE COURT:** Does anybody have any law on that issue?

**MS. PRITZKER:** I was just going to say there is a knowledge element on behalf of the defendant that the information is confidential and novel.

**MR. SOMVICHIAN:** I don't have a --

**MS. PRITZKER:** Disclosed in confidence. So...

**THE COURT:** Is there evidence that the defendant had knowledge that the disclosure was in confidence? Where -- did you go through that issue with the defendant? Where is the issue -- where is the evidence of confidence?

**MS. PRITZKER:** The evidence of confidence is the fact that, again, in order to become a Google account holder, you have to provide all kinds of information to Google. And you do. And you do so --

**THE COURT:** What is the evidence, then, that you were saying was both confidential and known? What is the proffer of evidence?

**MS. PRITZKER:** It's the same aggregate information that Google ends up transmitting in the Google bid requests. It's -- it's your identifying information --

**THE COURT:** The 60 fields? 200 fields? What is it?

**MS. PRITZKER:** 60 fields. Well, it's probably the 200, but we only have evidence of the 60, because that's all that we were given. So it's the 60 fields for purposes of trial at this point.

It's all of the information that has sort of, you know, an informational aspect to it; right? It's your IP address. It's the content of your communications as you're, you know, traveling the web and information is taken in the Google RTB auction. It's all the information that Google associates with your account -- your device ID -- all of these things from which, again, somebody can obtain private data or private information about you.

**THE COURT:** In the complaint, you argued that that data included health data, race, sexual orientation, religious beliefs. Is all of that part of the proffer at this juncture? Because that's what you alleged for purposes of this particular claim.

**MS. PRITZKER:** I don't know exactly. I don't know the technology on that.

Is that still in play?

**MR. LEVINE:** That is, Your Honor.

**MS. PRITZKER:** Okay.

**MR. LEVINE:** The -- those would be the sensitive categories. That is addressed in Professor Shafiq's report.

He did analyze the number of times that the named plaintiffs -- that it -- that comes from their search histories -- from the URLs that are provided as part of the bids. And he analyzed those using Google's own sensitive category categorizations and determined that, of all of the bid requests for the named plaintiffs, there were X number -- hundred thousands -- it's a very large number -- that involved sensitive information, which is what's -- that's coming -- that's where that complaint was going on that -- sensitive fields.

So if somebody went to the Mayo Clinic website, for example, and looked up a particular disease, that would be deemed sensitive by Google, and that would show up. And that shows up in Professor Shafiq's report -- his opening report.

**THE COURT:** All right.

Anything else on this one?

**MR. SOMVICHIAN:** Your Honor, just on that last point, I think that highlights another element of variation. Dr. Shafiq certainly didn't say that all of the websites visited by the plaintiffs that are reflected in the data are sensitive, nor could he.

And the percentages and ranges that he applied for the named plaintiffs differ across the board. That's another element that's going to cut across all of these privacy claims that have some component that the plaintiffs are trying to tie to the URL information and the ability to track it to

categories and so forth. So, again, it's another element of variation in the data.

**THE COURT:** So we don't see this in the notice of the motion that you were seeking to have class cert on the breach of confidence claim. Where did you notice that issue? If somebody could check while I continue with the argument.

All right. The next one --

**MS. PRITZKER:** I think it may be in the footnote of our notice, but let me see.

In our notice of motion in paragraph 2 --

**THE COURT:** All right. Thank you.

**MS. PRITZKER:** -- where we lay forth all of the claims for which we're seeking certification -- breach of contract, breach of confidence, invasion of privacy, intrusion upon seclusion, publication of private facts, and CIPA -- violations of CIPA.

**THE COURT:** Let's move to CIPA.

**MR. SOMVICHIAN:** Your Honor, for what it's worth, we understood their breach of confidence claim was one that they were moving on.

**THE COURT:** All right. The last is CIPA; right?

**MR. SOMVICHIAN:** Your Honor, I think --

**THE COURT:** This is only for California.

**MS. PRITZKER:** We haven't pled it that way, Your Honor.

**THE COURT:** Isn't it a California statute?

**MS. PRITZKER:** It is a California statute. But in the recent Doe v. Meta case, there was a nationwide application of CIPA. The Court found that it was appropriate to apply it, in that case, where there was evidence of a California choice of law clause, the defendant was in California, and that the conduct emanated from California. That the statutory history allowed -- promoted the idea of folks outside of California asserting that claim.

**THE COURT:** Doe v. Meta -- is that me?

**MS. PRITZKER:** I'm sorry?

**THE COURT:** Doe v. Meta -- we have lots of Meta cases. We have lots of --

**MS. PRITZKER:** Yeah, I know. It's Doe v. Meta Platforms. It's 2023 Westlaw --

**THE COURT:** Who's the judge?

**MS. PRITZKER:** This is Judge Orrick. It's a --

**THE COURT:** Well, then Judge Orrick can do it nationwide.

**MS. PRITZKER:** -- September 2023 --

**THE COURT:** I don't tend to do that. I don't do it in my antitrust cases. I barely -- I don't think I've done it in my MDL cases.

**MS. PRITZKER:** To be fair, Your Honor, it was at the motion to dismiss stage. It wasn't -- it wasn't class

certification or beyond. So I don't want to misrepresent the context of the decision. The Court can create a California subclass for CIPA. I mean...

**THE COURT:** All right. CIPA requires -- they use -- first, that there's a machine, instrument, or contrivance. That's common. Google's not using different mechanisms to do what it's doing; right?

**MR. SOMVICHIAN:** I will agree that's common, Your Honor.

**THE COURT:** The next one is intentionality -- that it acted with intentionality. Again, that seems to be common.

And then it -- to intercept the content of any communication over any telegraph or telephone wire, line, cable, or instrument. Or, B, read, attempt to read, or learn the contents or meaning of any message, report, or communication -- while the message, report, or communication is in transit, or passing over any wire, line, or cable, without the consent of all parties to the communication.

That's the statute, at least under 631.

Are you proceeding under 631 or 632?

**MR. SOMVICHIAN:** 631, Your Honor.

**MS. PRITZKER:** Yes, 631, Your Honor.

**MR. SOMVICHIAN:** And the problems with the CIPA claim -- where the individualized issues come in, Your Honor -- are twofold.

One has to do with the requirement that the alleged interception involved the contents of communications. CIPA claim, just like the federal analogue, doesn't apply to any and all data. It applies to data that can meet the requirements of being, quote, "the contents of communications."

The plaintiffs haven't clearly articulated what, in a bid request, they believe to be the contents of a communication. But they've referred, generally, to their expert report. And Dr. Shafiq, in particular. And he identifies a number of data elements. We would dispute that many of those could even arguably be contents of communications.

But setting aside that merits dispute, what's relevant here is that several of the data fields that Dr. Shafiq identifies are not commonly sent. Again, this goes back to the slide I handed up to Your Honor. And one of them that does vary, as reflected by the plaintiffs' own experts, is the Google user ID, for example. That's one that Dr. Shafiq seems to say, and the plaintiffs seem to say, is the contents of the communication.

It's not uniformly sent. In fact, it's often not sent over 60 percent of the time. And so the question of whether any given alleged interception involves the contents of communications will differ across different individuals, and that's an individualized issue.

The second individualized issue, Your Honor, has to do

with the California nexus. You read the statutory section that refers to that. The alleged interception has to occur while the communication is either in transit or is being sent from or received in this state -- in California. And so there has to be some showing that that California nexus can also be shown through common proof.

We've submitted evidence, Your Honor, that it cannot. That's in the Glenn Berntson declaration, paragraph 22. With respect to the sending of a bid request, which we understood the plaintiffs to be focusing on as the alleged moment of interception from their discovery requests, we've shown that that, in fact, often does not occur in California.

We acknowledge that there are some circumstances, based on network usage and so forth, where the communication and the initial transmission of a bid request can route through California. So we acknowledge that. But the point for class certification is that it differs. And there's no method to determine which ones, in particular, get routed through California or not, and which ones have the necessary California nexus.

**THE COURT:** All right.

Response?

**MS. PRITZKER:** Do you want a response on the Shafiq --

**THE COURT:** Just a response.

**MS. PRITZKER:** Okay. Two points.

So Professor Shafiq does discuss the content of communications element in his expert report at paragraph 42. Again, he lays out the data fields commonly included in all RTB bid requests. And he provides the relevant content analysis in paragraph 42B, which concludes that the RTB requests transmit the referrer field, which contains the full URLs.

Professor Shafiq also discusses in his report, at paragraph 51, in internal Google document in which Google ad tech employees acknowledge the content-rich nature of URLs. It discusses the ability to establish linking between the user's identity and some notion of the user profile, page verticals, sensitive categories, frequently visits sites, sociodemographic group. So it does -- it does talk about the contextual nature of the signals in the URL and the categories.

In paragraph 60 and paragraph 80, Professor Shafiq also discusses other internal documents in which Google discusses that RTBs -- continued disclosure of URLs for web requests and app name -- app IDs -- for app requests -- means that the recipient can discern the content of the communication and create their own user categorizations based off of that information.

At paragraph 80, he discusses other content-rich -- other content factors -- about the URLs that are, in fact, shared in the bid requests. There are other references in his report to other content-rich nature. But, you know, the factual evidence

of content is there.

**THE COURT:** What about the router issues?

**MS. PRITZKER:** So as to the router -- and this is, frankly, an issue that we've been trying to get to the bottom of for quite some time. And I think we're there. But opposing counsel cited to the declaration of Dr. Berntson, who is a Google employee, at paragraph 12, in which he purports to discuss certain -- that there are egress points from Google's internal network that Google uses to transmit many of these Google RTB requests, and that those egress points, you know, often are not in California.

But Google has what Dr. Berntson referred to as two trading locations in the entire United States that receive -- that Google RTB participants use to organize where they can receive RTB bid requests. One is in California. One is identified on Google's website as being in the San Francisco Bay Area. The other is in Virginia.

Now, Dr. Berntson described this as not a server, but some sort of electronic means through which RTB bid requests are received, organized, and transmitted so that each bidder can manage RTB traffic. Again, it's not a physical location in California, but I think it's -- survives the California nexus under CIPA.

**THE COURT:** All right.

Any response? And then we'll move on.

No?

**MR. SOMVICHIAN:** Yeah. I'm sorry, Your Honor.

I want to point out, counsel just said they were trying to get to the bottom of this. They had a chance to depose Mr. Berntson after he submitted his declaration explaining the issues relating to the California nexus and explain that there is not a consistent California nexus.

The testimony about a trading location -- I'd invite you to actually review those citations in the reply brief. They don't -- they don't refer to California as a physical location for the sending of bid requests. These trading locations are proxies for RTB participants to determine latency and other technical issues. The bottom line is, that's not where the bid request actually gets sent from. And so there is no common evidence that the plaintiffs have put in front of you with respect to a California connection.

I also want to very briefly address something that was mentioned earlier. This has to do with the named plaintiffs in the case and the fact that none of them has ever changed their personalized ad setting or taken any other action to prevent any data sharing.

Counsel said that we threatened them with spoliation. That's not true, Your Honor. We had a discovery fight with Judge DeMarchi for the purpose of getting information about how they might -- or what their settings are and how they've

changed them. We wanted a record of how they've changed their settings over time. But we've never objected to them ever doing anything with respect to their settings -- turning them on or off.

**THE COURT:** All right.

Let's move to damages.

**MS. PRITZKER:** Thank you, Your Honor.

**THE COURT:** So back to where I started. I did not certify a damages class in Brown.

Mr. Danitz?

**MR. DANITZ:** Thank you, Your Honor.

In the Rodriguez case, Chief Judge Seeborg recently certified a class -- 12(b)(3) class -- looking at substantially the same damages models that are presented here. In that opinion, the Court referenced Your Honor's Brown decision quite often.

In looking at Lasinski's models in those cases, the Court recognized that the market price model based on Screenwise, which is also at issue here, is based on objective factors and a standard payment of $3 a month for the right to be surveilled -- right? -- giving up the right to be surveilled. That is similar to the issue here. And it's the basis of the functional view taken by Professor Zeithammer in the market price. It's an objective measure.

For the unjust enrichment/disgorgement portion, we have

shown that aggregate damages can be measured, and that they're consistent with the theory of liability in this case. And although it's a -- at the current time -- it's an approximation, that is all plaintiffs have to bring forth at this time.

**THE COURT:** Okay.

Response?

**MS. REDDY:** Thank you, Your Honor. Aarti Reddy for defendant Google.

Plaintiffs in this case have put forward two damages models, an unjust enrichment damages model and a compensatory damages model. We understand that plaintiffs don't need to prove damages with an exact certainty at the class certification stage; however, their damages models must be consistent with their theory of liability. That is a requirement under Comcast. And both of their damages models fail that threshold requirement, Your Honor.

I'd like to talk about unjust enrichment first. There are two independent reasons on which the Court should reject plaintiffs' unjust enrichment damages model. First -- now, unjust enrichment -- their damages model is essentially to take the pool of revenue that Google earns from third parties through the RTB auction and deduct 51 percent -- which they say is the percentage attributable to personal and sensitive information -- deduct costs, and that is their damages;

however, that damages theory is not consistent with their theory of liability in this case.

Your Honor, you should have the demonstrative in front of you that my colleague Mr. Somvichian handed to you. If I could direct you to page 3 of that demonstrative. This represents plaintiffs' class definition in this case. It states, in relevant parts, "All individual Google account holders subject to a Google United States Terms of Service." That is the class that they are seeking to certify; however, their revenue that they use as a basis for their unjust enrichment damages model includes revenue not just from Google account holders subject to a U.S. TOSs, but all revenue that Google generates from third parties through RTB.

And as Mr. Levine [sic] just stated a few minutes ago, you don't have to be a Google account holder to receive ads through RTB. Google RTB is available to people who are not Google account holders. The revenue model that they put forward includes revenue from nonpunitive class numbers. Non-Google account holders are served ads through RTB. Google does not have revenue limited to their class definition of Google account holders subject to a United States TOSs.

We have made this clear in discovery, Your Honor. And plaintiffs did not seek their revenue data they need to match their class definition until after filing their class certification reply. Google has now confirmed, in discovery,

it does not have this revenue information. There is no way for plaintiffs to remedy this defect, and fact discovery has now closed.

This is a classic Comcast problem, Your Honor, because their unjust enrichment damages model does not match their class definition. It is overbroad.

**THE COURT:** Response?

**MR. DANITZ:** If I may respond, Your Honor.

First --

**THE COURT:** Well, do you agree that the pool that your expert is seeking 51 percent less cost is from all users, not just the class? Do you concede that?

**MR. DANITZ:** No, Your Honor, not exactly. Let me explain.

In response to plaintiffs' discovery requests seeking documents sufficient to establish Google's RTB revenues, Google produced a spreadsheet -- an attorney-created spreadsheet -- with two lines, U.S. users, non-U.S. users. And that spreadsheet substantially reproduced as Schedule 1 in the (indiscernible) --

**THE COURT REPORTER:** Sorry, "as Schedule 1 in" what?

**MR. DANITZ:** In the Regan Report, R-E-G-A-N.

**THE COURT REPORTER:** Thank you.

**MR. DANITZ:** As discussed in our brief, the record evidence, including internal Google documents and testimony

from multiple 30(b)(6) corporate representatives, establishes that Google can and does parse revenue from U.S. versus non-U.S. account holders, and it is estimable.

Our expert used the best available evidence in calculating -- in approximating -- these damages that was available at the time. The record evidence shows that Google has determined the user's IP address provides the most reliable method to identify whether the U.S. TOSs applied to that user, and that Google bases its billing and accounting systems on that same information -- IP address -- or also called -- well, I won't use the exact phrase, Your Honor, because we're in open court.

Google's response to Interrogatory 11 stated that "U.S. user" in the produced spreadsheet means a U.S. -- a user accessing the Internet using a device with an IP address within the U.S. The record evidence establishes that Google uses IP address to determine the relevant country for multiple reasons, including Google's calculation of revenues.

**THE COURT:** So this really isn't an issue between the U.S. and other countries. This is a question of those who have accounts versus those who do not.

**MR. DANITZ:** All right, Your Honor. Yes.

So Google also maintains the data that can distinguish between Google account holders and non-Google account holders, Your Honor. This came through --

**THE COURT:** The question is what is it that the expert used?

**MR. DANITZ:** Well, Your Honor, this -- the expert used the only spreadsheet that was produced by Google, which said user -- U.S. user and non-U.S. user. That is -- that is the spreadsheet that the expert used, Your Honor; however, in the 30(b)(6) depositions that were taken, it is clear that, in fact, Google was able to distinguish between Google account holders and non-Google account holders that it logs RTB auction information, including Google account ID, and that Google has a dashboard --

**THE COURT:** So that -- so that it can, but you don't actually have that evidence --

**MR. DANITZ:** That --

**THE COURT:** -- and you didn't get that evidence?

**MR. DANITZ:** Well, Your Honor --

**THE COURT:** Are they accurately representing the state of the record?

**MR. DANITZ:** Your Honor, they're accurately representing that they provided a spreadsheet that we understood --

**THE COURT:** The request that was made --

**MR. DANITZ:** -- that we understood -- that we understood to apply to the Google account holders, but actually we found out in this --

**THE COURT:** Okay. I understand you're blaming --

**MR. DANITZ:** -- in this motion --

**THE COURT REPORTER:** Sorry, I can't understand --

**THE COURT:** I understand you're blaming them now. Do I have, in the record, what your request was?

**MR. DANITZ:** Yes, Your Honor. That's at paragraph 12 of the Regan reply -- expert report.

**THE COURT:** I have -- you copied and pasted the document request?

**MR. DANITZ:** Yes, Your Honor. There are excerpts of two RFPs.

**THE COURT:** In the response by Google, did you indicate, and do I have it in the record, that this related -- that the production -- related to all U.S. users and not the U.S. users who had accounts -- did that make -- did you make that clear?

**MS. REDDY:** Yes, Your Honor. We made that clear in our supplemental interrogatory responses where plaintiffs propounded requests for information about the specific revenue spreadsheet.

So Mr. Danitz was just referring to Google's references to U.S. versus non-U.S. users. In -- he's referring to discovery responses in which we made clear that the U.S. versus non-U.S. line item meant an Internet user, not necessarily a Google account holder.

This was also made clear in subsequent discovery where we have provided, in interrogatory responses, that Google does not parse revenue based on Google account holder versus non-Google account holder.

I will -- I do want to emphasize, Your Honor, that plaintiffs only first sought this specific revenue they need -- that is, Google RTB revenue limited to Google account holders subject to a United States TOSs -- they only fist sought that information after filing their class certification reply. At that point, we indicated that we do not have that information, and now fact discovery is closed.

**THE COURT:** Well, does -- so what you're saying is it doesn't matter. If you don't have the information, are you saying that you -- that had they timely requested, you would have -- you couldn't have produced it?

**MS. REDDY:** We couldn't have produced it, because we don't have it, Your Honor.

And I would like to note that their experts had the opportunity and had the last word to propose some methodology or some workaround to fix their model in accounting for this, but they did not.

And I would like to respond just on the point about the 30(b)(6) witness testimony that Mr. Danitz was referring to. There was no testimony in the record demonstrating that Google actually possesses that information. I think he's referring to

Mr. -- Dr. Berntson's testimony that is at the 30(b)(6) deposition transcript 237-4-7. This is not in the record, Your Honor, but we're happy to provide this to the Court should the Court request it (as read):

**"QUESTION:** Can Google distinguish between Google account holders and non-Google account holders?" That's the question.

**"ANSWER:** In the finance data set, no."

That is the testimony that they claim supports their view that this data exists. It doesn't, Your Honor. And the testimony of these other witnesses who aren't responsible for finance issues is not relevant. Google has already confirmed in discovery that it doesn't have this information.

**MR. DANITZ:** If I may respond, Your Honor.

In the Berntson depo at -- it appears in our briefing and in the Regan reply report. In the Berntson's depo, at 225 through 226 and 237 through 242, he testifies and also -- he testifies -- and also internal documents show, such as the excerpt at page 10 of the Regan report, that Google, in fact, has the ability to determine the proportion of RTB revenue attributable to Google account holders and non-Google account holders.

This information can be used for finding Mr. Regan's estimate. The artful response to that one deposition testimony about how -- where it is stored in a financial particular

log -- that does not answer the question whether that can be distinguished. And the references I just gave Your Honor show that it can --

**THE COURT:** With respect to the --

**MS. PRITZKER:** -- including the excerpt at page 10.

**THE COURT:** I'm going to stop you. With respect to the $3 per individual class member, don't you then, at that juncture, get into issues of individual implied consent?

**MR. DANITZ:** Well, Your Honor, this Court, in Brown, pointed out that this is an objective standard and that --

**THE COURT:** This Court, in Brown, didn't certify a damages class.

**MR. DANITZ:** That's -- that is true.

Judge Seeborg also recognized that the market price model is objective and does not --

**THE COURT:** The question -- I understand it's objective. There was an objective amount in Brown, as well. That wasn't my question. My question was implied consent.

**MR. DANITZ:** Your Honor, we don't -- we don't believe the damages issue raises the issue of implied consent, especially here where there's an express statement that they will not sell your personal information in these RTB auctions, and then they secretly do, unbeknownst to --

**THE COURT:** So back to what Ms. Pritzker was arguing. You want me to find, as a matter of law, that people can't do

it, even though I've got survey evidence that suggests that they all know that they were doing it, and they were fine with it.

**MR. DANITZ:** Your Honor, Professor Zeithammer --

**THE COURT:** "Yes," right?

**MR. DANITZ:** -- addressed --

**THE COURT:** The answer to my question is "yes" -- that's what you want me to find?

**MR. DANITZ:** Your Honor, what -- I believe that could be both a common issue -- I believe it can be a common issue. The Court can also find as a matter of law. I mean, the evidence presented in the Hanssens' survey -- he admitted that it has nothing to do with privacy. Nothing. That's in the record. That's in our papers. It's in Dr. Zeithammer's rebuttal response, which is in his -- yeah -- his rebuttal, which is in his reply expert report.

There are also multiple methodological issues with that report, including extreme selection bias, which are outlined in the -- in that response by Professor Zeithammer. It is an unreliable survey that does not ask the correct questions, does not identify anything about RTB, and it's basically a reading comprehension test that's set up for the results they attained. That's all in the Zeithammer rebuttal report.

**THE COURT:** On the other side, if I find that the Rule 23(a) requirements are met, why can't I -- why would an

injunctive relief be an appropriate measure here?

**MS. REDDY:** Your Honor, I believe my colleague -- Mr. Somvichian -- is prepared to address the injunctive relief issues.

**MR. SOMVICHIAN:** Your Honor, I think it goes back to the element of commonality, which we don't think is satisfied, because there are no common answers to the questions that drive liability in this case. So it's not an issue of --

**THE COURT:** I'm not asking about liability. Assume you lose on liability.

**MR. SOMVICHIAN:** Okay.

**THE COURT:** Then why wouldn't I be able to -- why isn't it appropriate to have injunctive relief as a possibility?

**MR. SOMVICHIAN:** Injunctive relief would be appropriate relief in -- if you find, Your Honor, which we don't think you should -- that liability is a common issue --

**THE COURT:** We've spent almost two hours. I understand that that's your perspective. I'm asking you to have a response if you lose on that. Or I could just have you sit down and have no response.

**MR. SOMVICHIAN:** Understood.

So there's the element of commonality that we've talked about. With respect to a circumstance where you've found that those issues are all common, and now we're having a trial on

the business practice and injunctive relief, there's a question, Your Honor, as to whether the proposed remedy that they've proffered --

**THE COURT:** Well, I'm not asking about --

**MR. SOMVICHIAN:** -- is appropriate for a class. The injunctive relief has to provide a remedy to the class as a whole. What they're asking --

**THE COURT:** But that's -- now you're asking about the -- debating the merits. That's not my question.

**MR. SOMVICHIAN:** No. I'm trying to address Your Honor's questions, which I take to be, "Would injunctive relief be appropriate here as a remedy to the class as a whole?" And what I'm suggesting is that what they had proposed would not offer any meaningful relief to large categories of the class --

**THE COURT:** I'm asking whether it is appropriate for me to consider on a class-wide basis, not whether what they're asking for is what they will get. The question is, if I find that all of the elements are met, isn't it appropriate for the Court to consider whether injunctive relief is appropriate on a class-wide basis?

**MR. SOMVICHIAN:** That is certainly an issue that would be appropriate to consider, Your Honor. But with respect to the --

**THE COURT:** And that's all I was questioning -- that's all I was asking, not whether they -- their proposal is any

good -- whether any proposal is any good. That's -- that's not in front of me.

**MR. SOMVICHIAN:** Understood, Your Honor. But the question remains, is there a proposal that could be applied? If the Court were to evaluate those options, is there something before the Court that would provide meaningful relief to the class as a whole that would be appropriate injunctive relief? And we don't think --

**THE COURT:** Well, perhaps -- perhaps people could have the choice, which they obviously don't have now. There's no transparency and there's no choice. So maybe that is appropriate. And it certainly is what you claim they should be able to do at this point. But it's actually not what you do -- and I obviously don't mean you, personally -- your client. But transparency and choice. It's kind of my mantra. Transparency and choice, neither of which exist.

**MR. SOMVICHIAN:** Those are appropriate considerations, Your Honor, for sure, with respect to how to fashion injunctive relief. My only point is --

**THE COURT:** We're not there yet.

**MR. SOMVICHIAN:** -- they have not proposed something that meets those requirements.

**THE COURT:** We're not there yet. But, certainly, it seems to me injunctive relief that focuses on transparency and choice might be an appropriate thing for me to consider.

Do you want to add anything?

**MR. LEVINE:** I think you got it, Your Honor.

**THE COURT:** Under Ninth Circuit law, ascertainability isn't something that we are supposed to deny class cert on. You did argue this. And you did argue issues related to a fail-safe class. Do you want to address that topic?

**MR. SOMVICHIAN:** Yes, Your Honor.

On the fail-safe class issue, that has to do with the fact that their class definition embeds the concept of personal information. So you're only in the class if data has been shared that meets the definition -- their version of personal information. So that subsumes the merits issue that's in dispute. So if they win, then people are class members. If they lose on their definition of personal information, then people aren't class members. That's the definition of a fail-safe class.

**THE COURT:** Response?

**MR. LEVINE:** Well, "personal information" is both -- a term that Google uses with all of its account holders. So we thought it was appropriate. I mean, that's the language they use in all of the agreements with the account holders. "We will not sell or share your personal information."

Now, it may also be a term of art. But tracking the language of the disclosures themselves, we think it's an appropriate way to describe -- if you're sending out a class

notice, for example -- since this is the very language Google uses with its account holders. Every single one of them, in a uniform fashion, the words "personal information" show up.

So it's the language Google uses to communicate with its account holders, so we do think it's an appropriate term here. We understand that it is also separately a question for the jury, but it doesn't make it a fail-safe class. It's a well-defined, ascertainable class. Everyone's identifiable --

**THE COURT:** Yeah. But isn't your argument, given the evidence that you've presented and the manner in which you were suggesting to present it, that this applies to all account holders? Because, by definition, your evidence and your common evidence you define as including personal information. So why do you need it?

**MR. LEVINE:** We had a long internal debate about whether we needed to include that or not. I mean, ultimately --

**THE COURT:** But I just -- Mr. Levine, I want to make sure I understand the evidence that you are presenting to me. Am I right? And then you can tell me about your strategy.

**MR. LEVINE:** Okay.

**THE COURT:** But it seems to me that your presentation is just that: That it does, in fact, apply to all account holders. That there is no -- you know -- perhaps there's a California subclass related to the CIPA claim. But, otherwise,

you're suggesting that this is a class of all account holders.

**MR. LEVINE:** That is correct, Your Honor.

We intend to put before the jury -- the evidence we will put before the jury is Google's internal bid data. We're probably not going to use The Trade Desk or The New York Times data, because the best evidence of what Google is doing internally and is sending out is the information Google sends out. So what we're going to put before the jury is all the bid data that we have that Google produced.

The evidence, both from Professor Wilson and Professor Shafiq, is that if you are a U.S. Google account holder, and you used the Internet at any point over the last seven years, which you have to do to have a Google account in the first place, you would have been subject to RTB.

So it does, in some sense, collapse in on itself, because every U.S. Google account holder over the last seven years, since you can't opt out of it -- and no controls work -- if you used the Internet, they were subject to RTB, and their personal information was also shared, because every bid request that is before the Court uniformly shows that that information is personal information.

**THE COURT:** All right.

Do you want to say anything else on this topic?

**MR. SOMVICHIAN:** Your Honor, the reason they didn't define the class as "all Google account holders" is because

that would have walked into a different problem. Then it would have been overbroad. Now you're including people in the definition who never had bid requests, didn't have combinations of data that they even allege are personal information. So this is a really important point.

They couldn't articulate a workable class definition, because that would depend on objective factors that they don't have here that apply commonly. So they had to use the proxy of personal information, which is the disputed legal issue in the case. And so if -- had they went a different tack of proposing what I think you had in mind, Your Honor -- do you even need to refer to personal information? Isn't it just all Google account holders? Their own expert found that -- in fact -- and Mr. Levine mentioned, I think, in his argument -- RTB is triggered only on about half of websites and apps that their expert examined.

So you can't make a uniform assumption that everybody was affected. So you can't have a definition of "all Google account holders." And the way they defined it as "personal information" walks into the fail-safe issue, because now you're incorporating a legal concept right into the definition.

What they should have done is identify certain objective metrics around the data that was shared that could form a basis for identifying who's in and out. But then that walks into another problem, which is the data isn't uniform. So they

couldn't identify a specific set of objective criteria from which they could define the class. And the class definition actually illustrates many of the problems that we've been talking about today.

**MR. LEVINE:** Your Honor, the data that Google has produced is entirely uniform. There are millions and millions of bid requests. And every single one of them contains all 60 fields, uniformly, 100 percent. Google's experts don't dispute that. That's what Google produced in this case.

And if they produce more data -- they produced -- it's not -- it's not before the Court now, but it will be before the Court at trial or before the jury. Google just produced additional named plaintiff data -- another several million bid requests -- and all of those are uniform, as well. Every single one of them.

So we're into -- we're into multiple, multiple millions of bid requests. That's the record of what Google sent out. And every single one of them -- that's the record we're going to put before the jury. That's the only record here. Google hasn't come forward with a single bid request that doesn't include all of this data that it produced; not one.

The other issue as to whether you can avoid Google -- Google is misunderstanding that statistic by Professor Wilson about the 55 percent. Google RTB is present on at least 1.2 million websites. That's probably a low estimate. It's --

it's everywhere. The idea that -- so let's just say that's half. But the idea that somebody can be on the Internet in any meaningful way, and avoid Google RTB -- here -- let me give you just a brief example of what websites you're not going to have to -- if you want to avoid RTB, here are the websites you can't go to: CNN, ABC, CBS, NBC, FOX, ESPN, CNBC, The New York Times, The Wall Street Journal, The Washington Post, USA Today, U.S. News, The Guardian, Reuters, Newsweek --

**THE COURT:** Slow down.

**MR. LEVINE:** -- Weather.com, AccuWeather, MarketWatch, Zillow, Realtor.com, Orbitz, Mayo Clinic, Women's Health, Men's Health, Sports Illustrated, AOL, Yahoo, MSN, and Ticketmaster.

You can't want to -- you can't go through your life and not encounter RTB. We have a seven-year class period. The idea that any class member didn't run into RTB at some point, which they can't opt out of, and they can't exercise a control to stop, it is not in the class --

**THE COURT:** Okay. So -- so back to my question about striking the reference -- the personal information -- given what you've argued and given your theory.

**MR. LEVINE:** The answer is -- I think on the record that's now before the Court with our experts, you could remove the term "whose personal information was sold or shared." Because if you are a U.S. Google account holder, your information -- that -- the evidence will be that your

information was, in fact, sold and shared. So it collapses in on itself. You simply have to be a U.S. Google account holder with an account. I mean, we could make it an active account, to be clear. Google has those records.

**THE COURT:** All right.

There were Daubert motions brought. You didn't title them that way, but they were, in fact, Daubert motions. And you are subject to my local order with respect to them. So if you thought you could avoid my standing order by not calling them a "Daubert," you're wrong. A rose by any other color is still a rose -- or by any other name? -- by any other name. So they're Dauberts.

**MR. SOMVICHIAN:** We understood they were subject to your limitations, Your Honor.

**THE COURT:** Okay. Terrific.

Let me say -- and I'll give you just a little time -- there are -- and I actually don't think we need to deal with the damages expert, because it's not clear to me that -- if I need argument, I can always get it later.

Professors of law and cannot opine on my job. They should apply to be a judge if they want to opine on class certification, or you should hire them to help you write your briefs. And, in fact, I actually don't even want argument on that. They cannot opine on what I believe is -- on my job of deciding whether there's common evidence. I don't know how

many times I have to say this. Every conference I go to, I talk about Dauberts, because they're overused. But I don't understand why lawyers engage law professors to opine on what it is I'm supposed to decide.

So there are elements -- and there are numerous opinions that he has that -- I actually disagree with the defendants. I think they're totally fine. He has expertise. He is making his -- and I'm talking, obviously, about Richards. He is giving opinions with respect to issues of privacy on which he is qualified to do. But to do my job, he is not so qualified.

Any comments?

**MR. SOMVICHIAN:** Yes, Your Honor. I -- I agree with your comments. Obviously that was the basis of some aspects of our motion.

**THE COURT:** Well, only half.

**MR. SOMVICHIAN:** The opinion that I think is really front and center here is in Section VIII of Professor Richards' report. It's not long. It's two paragraphs. But this is the core of his opinion, where he says that Google account holders have a common, parentheses, false expectation of privacy. And, Your Honor, if you look at any of --

**THE COURT:** You don't -- you have the better of the argument.

Response?

**MR. MUDD:** Thank you, Your Honor.

I'd like to address your points on common evidence.

**THE COURT REPORTER:** Sorry. Can I ask who's speaking?

**MR. MUDD:** Jeff Mudd, Cotchett, Pitre & McCarthy.

**THE COURT REPORTER:** Thank you.

**MR. MUDD:** Your Honor, you mentioned it's your job to determine whether there's common evidence. And the plaintiffs largely agree.

I want to first say that Professor Richards plays an important role in this case by explaining overarching fundamental privacy rights, social norms, and historical context --

**THE COURT:** We're talking about number 8, paragraph 131. He tries to opine that there is evidence -- substantial evidence -- produced by Google that provides, quote, (as read):

> "Common objective facts from which a jury or trier of fact may conclude not only that a reasonable Google account holder has a reasonable expectation of privacy, but that Google is all too well aware of this fact."

That is the case. That is class certification. That is the ultimate decision of the jury. And that is not appropriate.

**MR. MUDD:** Thank you, Your Honor.

I would state that this should be considered in the context of the rest of his report. He's not merely opining

that there are common objective facts from which a jury could make this conclusion --

**THE COURT:** You know what? There are other opinions that I don't think it's appropriate to strike. That's not what we're talking about.

**MR. MUDD:** Paragraph 131, specifically?

**THE COURT:** Well, that's what Mr. Somvichian -- I always get that wrong --

**MR. SOMVICHIAN:** That was perfect.

**THE COURT:** -- referenced.

**MR. MUDD:** Certainly. The point about common objective facts from which a jury or trier of fact may reach certain conclusions -- the foundation for that is spread throughout Professor Richards report. So if --

**THE COURT:** And that's why I require that experts actually identify their opinions so that I know what their opinions are. And that opinion is referenced earlier.

I'm going to let you get out of the hole in which there is -- and I don't blame it on you -- it's also paragraph 6. It doesn't come in. And there are others. But there are numerous opinions here that I think are appropriate.

So I'm going to go back. I did a very quick read on this, but it seems to me the opinion in Sections 5, 6, and 7 are appropriate; 8 and 9 are not. But I'll go back and look. That's my tentative.

Okay. There is a more junior lawyer before we close up. Let's let the junior lawyer have a chance at the mic.

**MR. SOMVICHIAN:** Yes, Your Honor.

**THE COURT:** I heard there are lots of -- actually, I heard -- I read in the news that there are objections to this notion that we let younger lawyers argue. I still think it's appropriate. I'm not entitled, under the federal rules, to have any argument whatsoever. The fact that I want to use my, quote/unquote, "limited amount of free time" to allow people to argue in my courtroom I think is my choice.

And I don't think that federal judges should be criticized for wanting to build the profession and allow people to come to the mic and have some practice getting rid of all their butterflies, because that's the first part of it.

Okay. Mr. Trevor, you're at the mic.

**MR. TREVOR:** Your Honor, thanks very much. I appreciate that. And I think many of my more junior colleagues do, as well. My name is Reece Trevor from Cooley on behalf of Google.

I want to address, Your Honor, as Mr. Somvichian previewed, Google's evidentiary objections, which are at ECF 628, with a couple of sealed documents related to them at ECF 627.

I know it's been a long morning, so I'll keep it very brief. But one point of additional color I wanted to add to

these objections relates to the testimony of Suneeti Vakharia --

**THE COURT:** You need to slow down.

**MR. TREVOR:** The testimony of Suneeti Vakharia, which is at the core of many of the arguments plaintiffs raised in their reply, and we heard them today from Ms. Pritzker in her argument, as well.

Now, Ms. Vakharia offered a declaration in support of Google's opposition. And after she submitted that declaration, plaintiffs proceeded to depose her on both the declaration's contents and as a 30(b)(6) witness on a set of three very narrow issues.

The problem that Google has is that, in their reply papers and their expert reports and argument, plaintiffs have attributed to Ms. Vakharia opinions that she give in her personal capacity -- testimony she gave in her personal capacity -- that exceed the scope of that 30(b)(6) notice, particularly as it relates to consent and to the meaning and contents of a number of documents that Ms. Vakharia submitted in support -- or along with her declaration -- and that weren't the topic of the 30(b)(6) notice. So that 30(b)(6) notice was very heavily litigated about a year ago, before Judge DeMarchi. It was the result --

**THE COURT:** I take it -- I take it I have the 30(b)(6) notice.

**MR. TREVOR:** You do, Your Honor. It's in the record at ECF 622. And the portion that I'm referring to, specifically, is at page 5 of that document.

So plaintiffs limited the scope of their examination of Ms. Vakharia in the 30(b)(6) capacity -- I'm sorry -- it's at page 3 of the notice itself and 5 of the ECF header.

So plaintiffs limited the scope of Ms. Vakharia's examination on these documents in two ways. The first is that it wasn't two documents submitted with Ms. Vakharia's declaration. It was limited to documents that were submitted in plaintiffs' class certification opening brief and the supporting declaration of Ms. Caracuzzo.

The second way they limited it was that they clarified that plaintiffs would not ask the Google witness about the meaning or legal significance of any of the provisions of those documents. Plaintiffs were just going to ask about how those documents were maintained or created.

So the problem here, Your Honor, is that many, many places in the record, plaintiffs have attributed to Google some admission about the significance of the documents appended to Ms. Vakharia's declaration, or otherwise. And both of those -- any kind of admission like that goes well beyond what the 30(b)(6) notice contemplates.

So we have no problem with Your Honor considering Ms. Vakharia's testimony as an individual Google witness,

giving it the same weight you would give it based on the surrounding testimony. But to the extent plaintiffs try to characterize it as an admission by Google, they go too far. We'd ask Your Honor to disregard that.

**THE COURT:** Response?

**MS. PRITZKER:** I'm searching for the -- I'm searching for the notice. I apologize.

Two issues. So we had a deal with Judge DeMarchi that any declarant who came in at class certification would be able to be deposed on the topics of his or her declaration between the timing of the submission and our reply brief. So she was deposed on those issues, because that was evidence that was submitted in opposition to class certification, and we were allowed, by Judge DeMarchi's ruling, to depose her on those questions.

It's not so much that we were asking her for the legal significance of documents. She submits in her declaration, which these documents purport to say. And many of the questions, as I've discussed today, were directed at what these documents do not say. And so I don't know how that could have been an improper inquiry, given the nature of her declaration in this case.

She was also deposed, as opposing counsel mentions, as a 30(b)(6) witness, I think on the consent flow, but I have to go find the notice. So in terms of the ways in which consumers

can evidence consent -- what information they're given about what -- the terms of service; the privacy policies; the policies, procedures, and mechanisms through which individuals create a personal Google account -- and she was -- many of these topics were in the 30(b)(6) notice -- you know, how it -- you know -- to whom do the terms of service and privacy policies apply, have they been consistent --

**THE COURT:** So -- but the bottom line is that I have an objection. They believe it's outside the scope. Your argument is, in short, that Judge DeMarchi authorized it.

**MS. PRITZKER:** Actually, there's two. Judge DeMarchi did authorize us to depose her on the matters that were in her declaration.

The separate argument is we had been seeking this 30(b)(6) notice deposition for some time. It was not scheduled until -- I don't know -- ten days, or so, before our reply was due. And that was at the convenience of the witness. So in terms of the timing on the 30(b)(6) topics, they necessarily came in after the opposition briefing because of the schedule of the witness.

**THE COURT:** All right.

Any response?

**MR. TREVOR:** Just a couple quick points, Your Honor.

First, Ms. Pritzker is exactly right. Judge DeMarchi did authorize deposition of Ms. Vakharia on the topics in her declaration, but not in a 30(b)(6) capacity, only in a personal

capacity. And that was very clear from Judge DeMarchi's order. And it was clear at the deposition itself.

Opposing counsel began the deposition by explaining to Ms. Vakharia that there would be a 30(b)(6) examination and a personal capacity examination. We're asking the Court to consider that evidence, as well. It's at page 18 of the transcript, which plaintiffs don't include in their portion of the record.

**THE COURT:** Okay.

**MR. TREVOR:** On the second point, that Ms. Vakharia was designated to testify about consent issues more broadly, I would just ask the Court to take a close look at the notice. It is not as to any and all things related to consent. It's to the narrow topics of the TOSs, the privacy policy, the documents in the Caracuzzo declaration, and, as Ms. Pritzker said, the specific flows and screens that Google puts in front of users.

So the objection here is really narrowly drawn. It's just to that point of whether the documents that Ms. Vakharia was characterizing -- whether those are admissions or some other testimony attributable to Google in the 30(b)(6) capacity.

**THE COURT:** Okay.

I think I will take all of this under submission. I'll give you -- I don't know -- each side two minutes, if there's something that I didn't cover that you really wanted me to

consider.

**MS. PRITZKER:** I have a non -- a case-management related question I'd like to discuss with Your Honor.

**THE COURT:** Okay.

**MS. PRITZKER:** But if somebody else has a class certification or Daubert motion, I would allow them to go first.

I'm trying not to try the patience of the Court, but -- oh, okay.

**MR. LEVINE:** I'm going to make a final statement, Your Honor. Jonathan Levine for the plaintiffs.

I think, Your Honor, when you were talking on the injunctive relief, I think you hit the nail on the head: No transparency plus no choice. I think that's an equation and solves for equals no consent. So if there's no transparency plus no choice, that equals no consent.

That's it. Thank you.

**MS. PRITZKER:** The issue I wanted to raise --

I'm sorry, did you have something?

**MS. REDDY:** You can go ahead.

**MS. PRITZKER:** Okay.

**MS. REDDY:** I'll go next.

**THE COURT:** No, you had a case management issue.

Do you have anything?

**MS. REDDY:** Your Honor, I did want to raise one other

substantive issue regarding damages, with the Court's permission, really briefly.

So I had mentioned, previously, that there are two independent bases on which the Court should reject plaintiffs' unjust enrichment damages model. The second reason is a bit more nuanced. And I'm concerned that our argument won't come through in the papers. So I do just want to take the time to explain it to you in person while we're all here.

So plaintiffs' damages model -- just to take a step back, because I know it's been a long morning, and we've been in the weeds. Their theory of liability in this case is that Google improperly shares and sells personal information with third parties through bid requests.

This case is about one product -- the RTB system -- through which Google facilitates the sale of online advertisements. Your Honor, if I could direct you to the demonstrative that we sent to you earlier today. On page 2, there's a visual, which is similar to what is included in our -- page 2 of our class certification opposition. This lays out what the RTB system looks like.

Now, there is a fundamental problem with plaintiffs' unjust enrichment damages model, because it is illogical and only focuses on a tiny slice of the RTB system. There are multiple participants in the RTB system. There are third parties and then there are also internal Google participants.

Now, plaintiffs' claims in this case are that Google improperly shared and sold user data with third parties; however, third parties compete with internal bidders -- internal actors within Google -- who also compete bids for the same ad impressions. It's all part of the same auction.

Now, stepping back, their damages theory is to take Google's RTB revenue, deduct 51 percent, which they say is the value of personal or sensitive information, and say -- deduct costs -- and that is their damages award; however, Your Honor, that is fundamentally flawed, because it ignores what the second price -- second highest bidder -- who is not at issue in the case -- the internal Google bidders would have paid. And, again, those internal Google bidders are not at issue in this case, Your Honor, because this case is about the sharing and sale of user data with third parties.

So to take a very --

**THE COURT:** So are they -- are they ignored? Or does the report not address them at all?

**MS. REDDY:** The report --

**THE COURT:** Or does the report have an explanation?

**MS. REDDY:** Your Honor, I would just ask you to look at the last page of the demonstratives. They're ignored by their experts, as you can see in the opening reports.

In the reply reports -- and plaintiffs had the last word again -- their expert -- Dr. Zeithammer -- and that's -- these

are quotes from our expert and their expert -- their expert agrees that they should have looked at this issue, and they didn't.

**THE COURT:** All right.

Response?

**MR. DANITZ:** Thank you, Your Honor.

Professor Zeithammer always looked at the overall revenues. This is an apportionment issue, the second step in the unjust enrichment analysis. In his reply, Professor Zeithammer goes through all of the erroneous claims in connection with this -- in particular, in connection with this but for world, where only the external bidders would not have access to the personal information, but the internal bidders would.

Google's overall revenue, including revenue from internal bidders, according to Dr. Zeithammer, is the most relevant definition of revenue to this case. This auction revenues result from the strategic interplay, as he says, between diverse bidders.

It is a competition. If the person on the right raises a paddle, and the person on the left raises a paddle, it means the price -- the revenue -- is being set by the overall revenue -- the overall auction. That is driven by the personal information of the personal on the right, the person raising that paddle.

The personal information, according to Dr. Zeithammer's application of classic auction theory in economics, which is laid out at paragraphs 59 to 70 and paragraphs 77 to 84, demonstrates that, in fact, the overall price will drop, according to a numerical simulation, by 31 percent in that "but for" world.

Professor Zeithammer, at paragraphs 77 to 84, also identifies existing -- I'm not sure I can mention the word -- so types of experiments in the record that appear, which shows the effect of holding back that data and the effect on revenue.

**THE COURT:** And that's fine. I have to go back and read these reports. So I have the relevant paragraphs.

**MR. DANITZ:** And that actually measures exactly what Mr. Deal is talking about here. And it actually shows a greater decrease in the overall revenues -- the overall revenues -- due to the holding back only of the external -- of the private information from the external bidders -- which is Mr. Deal's "but for" world. So, in fact, 51 percent is conservative, Your Honor.

There is a -- in addition to the revenue information before Magistrate Judge DeMarchi, there is currently a motion to compel the data for this hold-back experiments, which we previously tried to get, but it was denied. That is currently teed up with Magistrate Judge DeMarchi.

**THE COURT:** All right.

**MS. REDDY:** Your Honor, just to simplify this, the fact is, their experts have not analyzed what would have happened in a "but for" world if these internal bidders continued to place ads for the same ad impressions that they are competing with the external bidders for.

So imagine you have an auction -- a home auction -- and the first -- buyer number one bids $1 million for a home and has additional information about the home. Buyer number two bids $800,000 for the home but doesn't have the additional information. It isn't at issue in the litigation.

Plaintiffs would have you believe that their damages are 51 percent of $1 million, not 51 percent of $200,000, the actual revenue attributed to the additional information. They haven't done any of that quantitive analysis. And they concede, as Mr. Danitz just conceded, that the interaction -- they should have looked at the overall revenue. They should have looked at the interaction between the internal bidders and the external bidders.

**THE COURT:** Okay.

**MS. REDDY:** And they did not.

**THE COURT:** I'll look at the issue.

All right. A housekeeping issue?

**MR. DANITZ:** Thank you, Your Honor.

**THE COURT:** Thank you.

**MS. REDDY:** Thank you, Your Honor.

**MS. PRITZKER:** Thank you, Your Honor. Elizabeth Pritzker.

This may be able to be resolved outside of Your Honor, but I wanted to alert you -- I mean, you now know that there are a half a dozen discovery motions pending in front of Judge DeMarchi on key discovery that our experts are hoping to rely upon for their merits reports, if it's ordered to be produced.

We run into a problem with the current case schedule, just given the passage of time. We submitted a revised case schedule to Your Honor about a month ago. And it currently has opening expert reports due on April 5th, which is only about five weeks from now.

**THE COURT:** My view is you just keep working. And when I get to this, we'll have a chat.

**MS. PRITZKER:** I think the bigger issue is that I think we would -- we know from, again, appearing in front of Your Honor, that if it's not in the expert report, it doesn't come in. And obviously we would like the opportunity, if discovery is ordered, to put that information in our expert -- in our merits expert reports.

And really this is -- I'd like to be able to propose to Your Honor that we move that schedule again, just a little bit, so that we can extend the time for merits expert reports to be due --

**THE COURT:** So it sounds like I have a specific date.

What we frequently do is have dates tee off when the order actually issues. I have a number of big things on the docket right now. I've got the Dublin Prison that I have to deal with.

**MS. PRITZKER:** I understand.

**THE COURT:** I've got Apple/Epic coming back. I've got another Apple case scheduled for trial soon. I've got a three-and-a-half month trial with five codefendant prison gang leaders for June. So just a few things on the plate.

**MS. PRITZKER:** Yeah.

**THE COURT:** So I'm going to try to get to this, because I don't -- I like to get things out when they're more fresh. But I cannot tell you when it is going to get out. Having this hearing means it's one step closer to going out. I would suggest that you all meet and confer, and give me a schedule that does not give a specific date but that gives a template from when you receive my order.

**MS. PRITZKER:** We would appreciate that, Your Honor. And, again, this wasn't an indication that you didn't have other things on your docket. And I was always willing to meet and confer with opposing counsel on an appropriate schedule.

**THE COURT:** That's the reason that I didn't just automatically issue it, is because I don't know if it's reasonable or not. I guess, I don't know when I'm going to get you your order.

**MS. PRITZKER:** No, no. And I understand that. And I wasn't intending to criticize.

**THE COURT:** And I know that you're not asking -- I know that you're not pushing me. It's just that -- you know -- one of the great things about being a federal judge is that we have to deal with lots of very interesting issues. But, frankly, I don't know what my day looks like half the time from day to day. Things explode. Things go away.

And so I'm trying to get to this. I just don't know exactly when it's going to happen. So it is better for you -- and there is more certainty -- if you can agree on a schedule that tees off when you get my order. Because you really don't want to have to finish off these --

**MS. PRITZKER:** Exactly.

**THE COURT:** -- kinds of things without knowing whether and if I certify. So -- and if I do certify, the extent of the certification. I would just recommend that that's what you all do.

**MR. SOMVICHIAN:** We understand the guidance, Your Honor. We'll confer based on that.

**THE COURT:** Okay.

Anything else?

**MS. PRITZKER:** Nothing from plaintiffs. Thank you very much. Appreciate your time.

**MR. SOMVICHIAN:** Not for us. Thank you for your time,

Your Honor.

**THE COURT:** All right. Thank you. We're adjourned.

**THE CLERK:** Court is adjourned.

(Proceedings adjourned at 11:52 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, March 6, 2024

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION* | **CASE NO. 4:21-CV-02155-YGR-VKD** |
| *This document applies to all actions.* | **DECLARATION OF BETHANY CARACUZZO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: TBD<br>Time:<br>Dept.:<br>Judge: Hon. Yvonne Gonzalez Rogers |

I, Bethany Caracuzzo, declare and state as follows:

1. I am an attorney duly admitted to practice before this Court and a partner of Pritzker Levine LLP, one of law firms representing plaintiffs in this matter. I submit this declaration in support of plaintiffs' motion for class certification. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

## I. <u>Google's Representations That It Does Not Sell Users' Personal Information</u>

2. From at least September 10, 2015 to the present, Google represented to its account holders that it does not sell users' personal information. This promise appears in several places, including:

### A. *Privacy & Terms – - Technologies - Privacy Principles*

3. Google publishes to the public a document titled *Privacy & Terms*. From September 10, 2015 through the present, Google represented on its public website, under the *Privacy & Terms – Technologies and Principles – Privacy Principles* heading, that "We don't sell user's personal information":

**Privacy principles**

4. **Give users meaningful choices to protect their privacy.**

People have different privacy concerns and needs. To best serve the full range of our users, Google strives to offer them <u>meaningful and fine-grained choices</u> over the use of their personal information. We believe personal information should not be held hostage and we are committed to building products that let users <u>export their personal information</u> to other services. We don't sell users' personal information.

4. A true and correct copy of one of Google's *Privacy & Terms - Technologies – Privacy Principles* documents, dated September 10, 2015, and which was produced by Google in this action at Bates No. GOOG-HEWT-00058417, is attached as **Exhibit 34**[1] hereto.

5. The above promise appears consistently in subsequent versions of the *Privacy & Terms* documents, produced by Google. GOOG-HEWT-00058419 (June 13, 2016); GOOG-HEWT-00058413 (August 22, 2016); GOOG-HEWT-0058415 (October 17, 2016); GOOG-HEWT-00058409 (November 2, 2016) and GOOG-HEWT-00058411 (November 10, 2017). In the interests of efficiency and judicial economy, plaintiffs do not attach every version. Should the Court wish for plaintiffs to provide the others, plaintiffs can and will do so.

6. The *Privacy & Terms – Technologies – Privacy Principles* documents, containing the above promise, were and are publicly posted on Google's public website, and Google continues to reference them, direct users to them, and hyperlink them in the Google Privacy Policies under "technologies and principles" through to the present. *See*, for example, Google's June 28, 2016 *Google Privacy Policy*, p. 10/17, a true and correct copy of which is attached as **Exhibit 35** hereto. The June 28, 2016 Privacy Policy is also Exhibit 6 to the Consolidated Class Action Amended Complaint ("CCAC") and is publicly available on Google's website at: https://policies.google.com/privacy/archive/20160628?hl=en-US.

7. To this day, when a user clicks on the hyperlink to "technologies" contained within the *Google Privacy Policy* (https://policies.google.com/privacy?hl=en-US) under "Other useful resources", they are brought to a page entitled "Privacy & Terms - Technologies" which then hyperlinks to "Our Privacy Principles" within the Google Safety Center (https://safety.google/principles/?hl=en_US). *See* excerpt in ¶ 12, below. Note: the July 1, 2023 most-current *Google Privacy Policy* does not number it's pages, so pinpoint cites cannot be included here.

---

[1] Exhibits 1 – 33 are attached to the Declaration of Elizabeth C. Pritzker filed herewith.

### B. *Safety Center – Our Privacy & Security Principles*

8. The *Safety Center* is publicly posted on Google's public website, and Google referenced it, directed users to it, and hyperlinked it under "safety center" in Google's Privacy Policies from at least September 20, 2018 to the present. *See, for example*, the June 28, 2016 Privacy Policy (Ex. 35), p. 10.

9. From at least September 20, 2018 to the present, in its *Safety Center*, under the heading *Our Privacy & Security Principles* Google represented and continues to represent that "It's important to clarify that our user's personal information is simply not for sale":

> 3.
>
> **Never sell our users' personal information to anyone.**
>
> We use data to make Google products like Search and Maps as useful as possible. We also use data to serve more relevant ads. While these ads help fund our services and make them free of charge for everyone, it's important to clarify that our users' personal information is simply not for sale.

10. A true and correct copy of Google's *Safety Center - Our Privacy & Security Principles* document, dated September 20, 2018, which was produced by Google at Bates No. GOOG-HEWT-00459543 is attached as **Exhibit 37** hereto.

11. Google has produced 54 of these *Privacy & Security Principles*, for 50 distinct dates during the time period September 20, 2018 to the present. They all contain the same language. In the interests of efficiency and judicial economy, plaintiffs do not attach every subsequent version. Should the Court wish for plaintiffs to provide the others, plaintiffs can and will do so.

12. The above promise appears consistently in each of the 54 versions, and remains in place to the present. To this day on Google's website, the "Our Privacy Principles" document

> 3. Never sell our users' personal information to anyone.
>
> We use data to make Google products like Search and Maps as useful as possible. We also use data to serve more relevant ads. While these ads help fund our services and make them free of charge for everyone, it's important to clarify that our users' personal information is simply not for sale.

hyperlinked within the Google Safety Center (https://safety.google/principles/?hl=en_US ), continues to promise:

**C. *How Our Business Works***

13. From at least February 22, 2020 to the present, on its *How Our Business Works* page, Google represents that, "We don't not sell your personal information to anyone…we never sell your personal information to anyone…Advertisers do not pay us for personal information…We never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation to personalize ads to you…" and that Google, though it shares reports "we do so without revealing any of your personal information.

> We don't sell your personal information to anyone
>
> We use your personal information to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But we never sell your personal information to anyone and you can use many of our products without signing in or saving any personal information at all.
>
> When we show ads, advertisers pay us either for the placement of an ad -- like a banner at the top of a web page -- or for how an ad actually performs -- like when someone

> clicks on it. Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.

14. A true and correct copy of Google's *How Our Business Works* page that existed on February 22, 2020 is attached as **Exhibit 38** hereto and is publicly available online at:

https://web.archive.org/web/20200222164213/https://about.google/intl/en_US/how-our-business-works/; see also a copy downloaded by plaintiffs on March 25, 2021, attached as Ex. 5 to the CACC. On July 6, 2023, Google produced 83 copies of the *How Our Business Works*, dated from February 14, 2020 to April 12, 2023. These contain the same promises, as does the current version, which is available on Google's website at: https://about.google/intl/en_US/how-our-business-works/.

> What's covered in these terms
>
> We know it's tempting to skip these Terms of Service, but it's important to establish what you can expect from us as you use Google services, and what we expect from you.
>
> These Terms of Service reflect the way Google's business works, the laws that apply to our company, and certain things we've always believed to be true. As a result, these Terms of Service help define Google's relationship with you as you interact with our services. For example, these terms include the following topic headings:

15. *How Our Business Works* has been incorporated and hyperlinked in Google's Terms of Service, from at least the March 31, 2020 Terms of Service to the present, under "the way Google's business works":

16. A true and correct copy of Google's March 31, 2020 Terms of Service is attached as **Exhibit 39** hereto, and publicly: https://policies.google.com/terms?hl=en-US. Google next issued a new Terms of Service on January 5, 2022, a true and correct copy of which is **Exhibit 41** hereto, and at: https://policies.google.com/terms?hl=en; this is the current version.

**D. *The Google Privacy Policy***

17. From March 31, 2020 continuing to the present, the Privacy Policy continues to represent to users whose information Google contends falls under the California Consumer Privacy Act ("CCPA"), that "Google does not sell your personal information.":

California requirements

The California Consumer Privacy Act (CCPA) requires specific disclosures for California residents.

This Privacy Policy is designed to help you understand how Google handles your information:

- We explain the categories of information Google collects and the sources of that information in Information Google collects.
- We explain how Google uses information in Why Google collects data.
- We explain when Google may share information in Sharing your information. Google does not sell your personal information.

Attached as **Exhibit 40** is a true and correct copy of the Privacy Policy dated March 31, 2020 which was produced by Google at GOOG-HEWT-00001203, is Ex. 16 to the CCAC, and at: https://policies.google.com/privacy/archive/20200331

18. The two most-recent versions of Google's Privacy Policy, effective December 15, 2022 and July 1, 2023, set forth similar information under a section now entitled "U.S. state law requirements":

We explain when Google may disclose information in Sharing your information. Google does not sell your personal information. Google also does not "share" your personal information as that term is defined in the California Consumer Privacy Act (CCPA).

19. Google issued at least 19 versions of its Privacy Policy during the proposed Class Period to the present. Many of these were attached to plaintiffs' CCAC and all are still available publicly online. The 19 Privacy Policies are available:

- June 28, 2016 Privacy Policy – referenced above and Ex. 35 hereto, and Ex. 6 to the CACC and at https://policies.google.com/privacy/archive/20160628?hl=en-US.
- August 29, 2016 Privacy Policy – Ex. 7 to the CCAC and at: https://policies.google.com/privacy/archive/20160829?hl=en-US
- March 1, 2017 Privacy Policy – Ex. 8 to the CCAC and at: https://policies.google.com/privacy/archive/20170301?hl=en-US

- April 17, 2017 Privacy Policy – Ex. 9 to the CCAC and at: https://policies.google.com/privacy/archive/20170417?hl=en-US
- October 10, 2017 Privacy Policy – Ex. 10 to the CCAC and at: https://policies.google.com/privacy/archive/20171002?hl=en-US
- December 18, 2017 Privacy Policy – Ex. 11 to the CCAC and at: https://policies.google.com/privacy/archive/20171218?hl=en-US
- May 25, 2018 Privacy Policy – Ex. 36 hereto and Ex. 12 to the CCAC and at: https://policies.google.com/privacy/archive/20180525?hl=en-US
- January 22, 2019 Privacy Policy – Ex. 13 to the CCAC and at: https://policies.google.com/privacy/archive/20190122?hl=en-US
- October 15, 2019 Privacy Policy – Ex. 14 to the CCAC and at: https://policies.google.com/privacy/archive/20191015?hl=en-US
- December 19, 2019 Privacy Policy – Ex. 15 to the CCAC and at: https://policies.google.com/privacy/archive/20191219?gl=US&hl=en
- March 31, 2020 Privacy Policy – referenced above and Ex. 40 hereto, and Ex. 16 to the CCAC and at: https://policies.google.com/privacy/archive/20200331?hl=en-US
- July 1, 2020 Privacy Policy -- and Ex. 17 to the CCAC, produced by Google at GOOG-HEWT-00001203, and at: https://policies.google.com/privacy/archive/20200701?hl=en-US
- August 28, 2020 Privacy Policy – Ex. 18 to the CACC and at: https://policies.google.com/privacy/archive/20200828?hl=en-US
- September 30, 2020 Privacy Policy – Ex. 19 to the CACC and at: https://policies.google.com/privacy/archive/20200930?hl=en-US
- February 4, 2021 Privacy Policy – Ex. 20 to the CACC and at: https://policies.google.com/privacy?hl=en-US
- February 10, 2022 Privacy Policy, was produced by Google at GOOG-HEWT-00421479 and at: https://policies.google.com/privacy/archive/20220210?hl=en-US
- October 4, 2022 Privacy Policy, at https://policies.google.com/privacy/archive/20221004?hl=en-US
- December 15, 2022 Privacy Policy, produced by Google on July 6, 2023 at GOOG-HEWT-00481688, and at https://policies.google.com/privacy?hl=en-US
- July 1, 2023 Privacy Policy, this is the current policy and at: https://policies.google.com/privacy/archive/20221004?hl=en-US

20. Each of these policies also references, directs users to, and hyperlinks the *Technologies – Privacy Principles* and to the *Safety Center*, as explained above. Should the Court wish for plaintiffs to provide the others, plaintiffs can and will do so.

### E. *The Consent Bump*

21. On or about June 28, 2016, Google issued what it calls a "*consent bump*" to its existing account holders, apprising account holders of "new features." In that "consent bump", which plaintiffs understand to be a one-time email blast, Google promises its account holders that it's "still the same" that "Google does not sell your personal information to anyone."

> **What's still the same?**
>
> - Google does not sell your personal information to anyone
> - You control the types of information we collect and use at *My Account* (myaccount.google.com)
>
> **Choose I AGREE to turn these features on or MORE OPTIONS for more choices.**
>
> I AGREE

22. These were produced by Google GOOG-HEWT-00456456 and GOOG-HEWT-00456464. A true and correct copy of GOOG-HEWT-00456456 is attached as **Exhibit 42** hereto.

## II. <u>Google's Representations That It Does Not Share Users' Personal Information</u>

23. From at least June 18, 2016 to the present, Google consistently represented to its account holders in its Privacy Policy that it does not share users' personal information, except: "with your consent", "with domain administrators" for account management, "for external processing" and for "legal reasons":

> **Information we share**
>
> We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:
>
> - **With your consent**
>
>   We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

> We may share non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.
>
> If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

Ex. 35 (June 18, 2016 Privacy Policy).

24. While the Privacy Policy changes over time, it has not changed materially with respect to the information excerpted herein, and the promise to not share users' personal information remained consistent. Further, the language under "With Your Consent" regarding changed from "we require opt-in consent for the sharing of any sensitive personal information" (see above) to "we'll ask for your explicit consent" starting in its May 25, 2018 version to the present, July 1, 2023 Privacy Policy.

**III. <u>Google's Representations That It Does Use Sensitive Categories for Ads Targeting</u>**

25. From at least June 18, 2016 to the present, Google represented to its account holders that it does not use sensitive categories for ads targeting. This promise appears in various Google documents, including the following:

**A. *The Google Privacy Policy***

26. Google's Privacy Policy, commencing at least with its June 28, 2016 policy to the present, promises to account holders that Google "…will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health":

> We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. One of the products we use to do this on our own services is Google Analytics. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health.

*See* Ex. 35 (June 28, 2016 Privacy Policy), p. 4.

27. The Privacy Policy, over time, also promises that "require[s] opt-in consent for the sharing of any sensitive personal information":

> **Information we share**
>
> We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:
>
> - **With your consent**
>
>   We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

*Id.*, p. 7.

28. When a user clicks on the hyperlink to "sensitive personal information" they are brought to the following definition:

> **Sensitive personal information**
>
> This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

29. These representations and definitions remained materially the same throughout the Privacy Policy versions identified in ¶ 19 above. For example, in Google's May 25, 2018 Privacy Policy, a true and correct copy of which is attached as **Exhibit 36** hereto, the format and some of the information changed, but the essential promises did not:

> - We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.
> - We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

*See* Ex. 36, p. 5 (May 25, 2018 Privacy Policy) (publicly at: https://policies.google.com/privacy/archive/20180525?hl=en-US).

> **With your consent**
>
> We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to request a ride from a ride-sharing service, we'll get your permission before sharing your address with that service. We'll ask for your explicit consent to share any sensitive personal information.

*Id.*, p. 11 (changing "opt-in consent" to "explicit consent").

> **sensitive categories**
>
> When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

*Id.*, p. 21.

> **Personal information**
>
> This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.
>
> **Sensitive personal information**
>
> This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

*Id.*, p. 26.

**B. *How Our Business Works***

30. In addition, Google's *How Our Business Works* page, which is incorporated into the Terms of Service (*see* ¶ 15 above) also represents that Google "never uses … sensitive information" to personalize ads:

> clicks on it. Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.

*See* Ex. 38 (Feb. 22, 2020, publicly at: https://web.archive.org/web/20200222164213/https://about.google/intl/en_US/how-our-business-works/) and currently at: https://about.google/intl/en_US/how-our-business-works/ )

## IV. Google's Terms of Service and Privacy Policy are Standardized Contracts

31. From June 28, 2016 to the present, every Google Privacy Policy commits to users that: "When this policy applies - ***Our Privacy Policy applies to all of the services offered by Google Inc.*** and its affiliates…". *See*, for example, Ex. 35 (June 28, 2016 Privacy Policy) and the present July 1, 2023 Privacy Policy: https://policies.google.com/privacy?hl=en-US.

32. There are four Terms of Service that applied during the Class Period: April 14, 2014, October 25, 2017, March 31, 2020 and the current version, dated January 5, 2022.

33. Google's April 14, 2014 Terms of Service requires that: "By using our Services, you are agreeing to these terms[]" and "By using our Services, you agree that Google can use such data in accordance with our privacy policies." "You must follow any policies made available to you within the Services" and, "By using our Services, you agree that Google can use such data in accordance with our privacy policy." It also sets forth:

> The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services.

Ex. 2 to the CCAC, p. 1, 2, and 6, respectively, and the privacy policy is hyperlinked earlier in that paragraph to "privacy policies". This is provided publicly at: https://policies.google.com/terms/archive/20140414?hl=en-US.

34. Google's October 25, 2017 Terms of Service contains language similar to the April 14, 2014 version set forth immediately above. *See* Ex.3 to the CCAC, pp. 1, 2, and 6, respectively, and publicly at: https://policies.google.com/terms/archive/20171025?hl=en-US.

35. The March 31, 2020 Terms of Service indicates "Understanding these terms is important because, by using our services, you're agreeing to these terms[]" and "These terms help define the relationship between you and Google. Broadly speaking, we give you permission to use our services if you agree to follow these terms, which reflect how Google's business works [hyperlinked] and how we earn money." "Besides these terms, we also publish a Privacy Policy [hyperlinked]. Although it's not a part of these terms, we encourage you to read it to better understand how you can update, manage, export, and delete your information." It also sets forth that "California law will govern all disputes arising out of or relating to these terms, service-specific additional terms [hyperlinked], or any related services, regardless of conflict of laws rules." Ex. 39, p. 1, and publicly at: https://policies.google.com/terms?hl=en-US

36. The March 31, 2020 Privacy Policy and all other Google Privacy Policies set forth that "**This Privacy Policy applies to all of the services offered by Google LLC** and its affiliates…" Ex. 39 (emphasis added).

37. The current Terms of Service, effective January 5, 2022, a true and correct copy of which is attached as **Exhibit 41** hereto, sets forth: "Understanding these terms is important because, by using our services, you're agreeing to these terms[]" and "These terms help define the relationship between you and Google. Broadly speaking, we give you permission to use our services if you agree to follow these terms, which reflect how Google's business works [hyperlinked] and how we earn money." "Besides these terms, we also publish a Privacy Policy [hyperlinked]. We encourage you to read it to better understand how you can update, manage, export, and delete your information[]" and "**You also agree that our Privacy Policy** [hyperlinked] **applies to your use of our services**." It also sets forth that "California law will

govern all disputes arising out of or relating to these terms, service-specific additional terms [hyperlinked], or any related services, regardless of conflict of laws rules." Ex. 41, pp. 1, 4, respectively (emphasis added), and publicly at: https://policies.google.com/terms?hl=en-US.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge. This declaration was executed in Emeryville, California on the 14th day of July, 2023.

By: _*/s/ Bethany Caracuzzo*__
Bethany Caracuzzo

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION* | **CASE NO. 4:21-CV-02155-YGR-VKD** |
| *This document applies to all actions.* | **DECLARATION OF ELIZABETH C. PRITZKER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Elizabeth C. Pritzker, hereby declare as follows:

1. I am a partner of Pritzker Levine LLP, and an attorney licensed in the State of California and duly admitted to practice before this Court. On August 3, 2021, I was appointed to serve as Interim Class Counsel on behalf of plaintiffs. *See* ECF 77. This declaration is made in support of Plaintiffs' Motion for Class Certification. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

LIMITED DISCOVERY RECORD

2. Plaintiffs have timely complied with the Court's scheduling order, requiring that plaintiffs' motion for class certification be filed on July 14, 2023, which date was extended from May 23, 2023 by stipulation of the parties. ECF 530, 534. While timely, plaintiffs' motion for certification is being brought on a limited discovery record.

3. When the parties last appeared before the Court on June 1, 2022, Google had at that time, one year into the litigation, produced roughly 51,175 documents—a production volume the Court then described as "nothing" in a complex, document-intensive, and data-driven case such as this. *See* June 1, 2022 Hr'g. Tr. at 12:13-15. ECF 226.

4. In the thirteen months since, Google has increased its production by only 6,418 additional documents – including 116 documents containing internal Google Real Time Bidding ("RTB") data related to the seven named plaintiffs, and 86 documents recently produced on July 6, 2023 to add to Google's production of its published U.S. Terms of Service, Privacy Policies, and related disclosures. This brings Google's production total, after two years of litigation, to just 57,462 documents today.

5. Plaintiffs have not been idle. On the contrary, efforts to obtain discovery to support plaintiffs' class certification motion have been earnest and they have been hard fought. The Court's docket presently contains 22 separate entries reflecting discovery briefing (and compliance or follow-on briefing) to Magistrate Judge DeMarchi by plaintiffs for the period February 1, 2022

through June 5, 2023, on topics ranging from the identity of sources of relevant information[1], to class membership and class damages[2], data about the named plaintiffs in Google's records[3], discovery deficiencies[4], privilege assertions[5], and other matters. And, as of the date of this motion, the parties are meeting and conferring in advance of additional discovery briefing to be filed by plaintiffs in the coming weeks.

6. Google has represented to counsel and this Court that it has preserved and is maintaining relevant and responsive class information. *See* ECF 68 at 7. But, generally speaking, Google has thus far refused to produce classwide data and information in this litigation, asserting that such data and information is not proportional to the needs of the case. *See, e.g*. ECF 291 (In which Google argues, "…the event-level data reflecting the total auction revenue for every user is vastly overbroad, and not relevant to quantifying the value of data shared with third parties. Even a tiny fraction of this data would be utterly disproportionate."). Google has refused to tell plaintiffs what class information is being preserved and for what period of time, and has refused to provide plaintiffs with some of the most basic information pertaining to the class, such as: the number of unique individual active U.S. Google accounts during the class period; the average daily number of bid requests and bid queries transmitted in the U.S. through Google RTB; information about Google account maintenance; and the locations of Google's two RTB servers in the U.S. (even though this latter information is published by Google).

---

[1] *See* ECF 157, 191 (Google search terms, custodians and noncustodial sources), 141, 336 (Google RTB data sources/architecture), and 464, 506 (hyperlinked documents, dashboards and source code change documentation). *See also* Dep. Trans. of George Levitte (Director of Project Management, Google New York) at 72:18-78:7 92:2-11, 157:6-158:24, 171:7-17, 204:17-24 (testifying as to existence of internal "dashboards" and external interfaces" or ("UI") as sources of information about Google's RTB business, including RTB revenue information), **Ex. 17** hereto.

[2] *See* ECF 171, 291 (number of Google Account holders/class membership, Google RTB revenues & costs, damages discovery).

[3] *See* ECF 171 (Google RTB revenues associated with plaintiffs), and 269, 365, 429, 430, 430, 503, 536-3 (Google RTB data fields pertaining to plaintiffs).

[4] *See* ECF 463 (hyperlinked and 2022 documents for Google custodians Bernston and Belov, and motion for further deposition of Mr. Belov in light of production deficiencies).

[5] *See* ECF 330, 339, 404.

7. Google also has represented to counsel and this Court that it has preserved and is maintaining relevant and responsive information pertaining to the seven named plaintiffs and their claims. *See, for example,* ECF 69 at 7. Again, however, Google has refused to produce all relevant data pertaining to these seven individuals, once again asserting that producing all such data is not proportional to the needs of the case. *See, e.g.,* Aug. 23, 2022 Hr'g. Tr. at 23, 83, 130; *see also* Google's Objections and Responses to Plaintiffs' Seventh Set of Requests for Production of Documents, RFP 117 (specifically objecting to plaintiffs' request for "documents pertaining…to each of the named plaintiffs, including all data fields associated with each named plaintiff in connection with Google's RTB platform", for the period Jan. 1, 2022 to April 20, 2023, asserting the request is "overly broad, seeks irrelevant information, is unduly burdensome, and is not proportional to the needs of the case," among other objections, and stating that "Google has not conducted and will not conduct searches for responsive documents, and as a result, will not produce documents in response to this Request.") A true and correct copy of Google's June 29, 2023 Objections to Request for Production No. 117 is attached as **Exhibit 27** hereto.

8. After multiple rounds of motion practice, including as least one compliance motion and a sanctions motion, Judge DeMarchi has to date issued seven orders that collectively require Google to produce from its Google RTB logs certain core Google RTB data fields, as maintained at Google in the ordinary course, for each of the named plaintiffs, but only for a total of twelve one-week periods of the class period (i.e., from June 28, 2016 to present).[6] In at least one such order, Judge DeMarchi ordered that Google ensure its time-sampled production be "representative" in time and in scope of the data Google regularly maintains in its Google RTB logs. *See* ECF 483 at 2. Google, however, has only produced named plaintiff data in response to the Court' orders for eight of the twelve weeks, claiming that the data does not exist for the other four weeks, which are earlier in the class period. Google has refused all efforts to date by plaintiffs to engage in meaningful discussions about (i) the lack of named plaintiff data for earlier in the class period, (ii) potential spoliation of relevant evidence pertaining to plaintiffs and the class, and (iii) Google's document

[6] *See* ECF 314, 382, 481, 483, 485, 487, 510.

retention efforts relating to this action.

9. Certain recent orders by Judge DeMarchi governing the named plaintiff Google RTB data fields that Google must produce issued on April 14 (ECF 81, 483, 485, 487) and May 17, 2023 (ECF 510), respectively. In meet and confer discussions with Google's counsel about the scope and timing of these productions on April 25, counsel for Google represented to plaintiffs that Google would begin rolling productions of the required data, but would not be able to complete those productions until May 26, 2023 – or possibly later. This meant that plaintiffs and their experts would not have the highly-relevant, court-ordered data associated with Google RTB's activities involving the named plaintiffs until after the previously-ordered May 23, 2023 class certification deadline.

10. Plaintiffs and Google stipulated to an extension of the class certification, from May 23, 2023 to July 14, 2023, to allow Google to make its court-ordered productions of named plaintiff data, and afford plaintiffs and their experts time to evaluate those productions for class certification. *See* ECF 530, 534.

11. While Google has produced additional named plaintiff data in response to Judge DeMarchi's recent discovery orders, the production remains deficient in material respects. Plaintiffs identified these deficiencies to Google, which again, has not responded.

12. Damages discovery has been similarly limited. Google has, to date, produced a single excel spreadsheet (containing one line) that shows gross RTB revenues during part, but not all, of the class period. Google has also, to date, produced a single excel spreadsheet (also containing one line) that purports to show some of Google's costs during part, but not all, of the class period. The costs spreadsheet does not appear to tie in to the gross revenue spreadsheet. No backup for either document has been provided and Google has refused to explain where the information used to create these documents came from.

13. Finally, with respect to the location of Google's activities in connection with plaintiffs' claim under the California Information Privacy Act, Cal. Pen. Code § 631, the Court directed Google to produce any proof that at least one RTB recipient or publisher received the communications at issue while they were not located in California. MTD Order (ECF 233) at 17:10-16. Google never produced any such proof in response to the Court's Order.

MATERIALS SUBMITTED WITH PLAINTIFFS' CLASS CERTIFICATION MOTION

14. Google's Representations, Terms Of Service, And Privacy Policies: The core common representations by Google to its account holders during the relevant class period that Google does not share or sell their personal information, and upon which plaintiffs rely for purposes of class certification, are excerpted and complied in the accompanying Declaration of Bethany Caracuzzo in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith.

15. Expert Reports: Plaintiffs' experts prepared their analyses and class certification expert reports relying on the limited, representative plaintiff data, and documents produced by Google, that were available to the experts at the time of the filing of this motion. True and correct copies of plaintiffs' expert reports in support of class certification are attached here to as follows:

**a.** **Exhibit 1** hereto is a true and correct copy of the Expert Class Certification Report of Professor Zubair Shafiq, Ph.D. Professor Shafiq's Curriculum Vitae is attached as Exhibit A thereto. The materials Professor Shafiq considered for his analysis and the preparation of his report, which include certain data and documents produced by Google to date, are attached as Exhibit B thereto.

b. **Exhibit 2** hereto is a true and correct copy of the Expert Class Certification Report of Professor Christopher Wilson, Ph.D. Professor Wilson's Curriculum Vitae is attached as Exhibit A thereto, and the materials he considered for the preparation of his analysis and report, which include certain data and documents produced by Google to date, and some third parties, are attached as Exhibit B to his report.

c. **Exhibit 3** hereto is a true and correct copy of the Expert Class Certification Report of Professor Robert Zeithammer, Ph.D. Professor Zeithammer's Curriculum Vitae is attached as Appendix 1 to his report, a list of his testimony over the past four years is attached as Appendix 2, and a list of materials he considered for his analysis and the preparation of his report, which include certain data and documents produced by Google to date, is attached as Appendix 3 to his report.

d. Attached as **Exhibit 4** hereto is a true and correct copy of the Expert Class Certification Report of Greg Regan, CPA/CFF, CFE of Hemming Morse, LLP. Mr.

Regan's qualifications and a list describing the testimony he has given over the past five years is attached as Appendix A to his report. A list of materials he considered for his analysis and the preparation of his report, which include certain data and documents produced by Google to date, is attached as Appendix B to his report.

e. Attached as **Exhibit 5** hereto is a true and correct copy of the Expert Class Certification Report of Professor Neil Richards. Professor Richards' qualifications, publications and his Curriculum Vitae are attached as Appendix A to his report. A list of materials he considered for his analysis and the preparation of his report, which include certain data and documents produced by Google to date, is attached as Exhibit B to his report.

THE PLAINTIFFS ARE TYPICAL OF THE CLASS AND WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS

16. The plaintiffs are typical of the proposed class, and their adequacy is more than demonstrated by their involvement in prosecuting the class claims thus far.

17. The plaintiffs are not adverse to each other or to other proposed class members. They are all similarly interested in obtaining valuable relief from Google.

18. Each plaintiff is motivated to act, has acted, and will continue to act on behalf of the unnamed members of the proposed class. As shown in discovery produced in the litigation, and in their depositions, the plaintiffs are all individuals residing in the United States who created a Google account to access certain Google products and who, from June 28, 2016 forward, used or use their web browsers or apps on their smartphones to request, obtain, and view on-line information and audio-visual media, including materials from publishers for which they are subscribers. *See* Complaint , ¶¶ 39-40, 45-46, 49-50, 53-58, 65-66, 70. ECF 92.

19. All of the plaintiffs are Google account holders subject to Google's U.S. Terms of Service and Google Privacy Policies. Their respective Google account creation dates, as reflected in documents and data produced by Google, are listed below:

| Plaintiff | Date of Google Account Creation | Evidence Produced by Google |
|---|---|---|
| Rethena Green | 2006-10-14 | GOOG-HEWT-00455593 |
| John Kevranian | 2010-09-24 | GOOG-HEWT-00455543 |
| Christopher Valencia | 2009-10-28 | GOOG-HEWT-00455560 |
| Terry Diggs | 2014-09-11 | GOOG-HEWT-00455623 |
| Salvatore Toronto | 2013-10-17 | GOOG-HEWT-00455615 |
| Tara Williams | 2013-05-15 | GOOG-HEWT-00455569 |
| Kimberley Woodruff | 2020-01-06 | GOOG-HEWT-00455552 |

As such, all plaintiffs were subject to Google's representations and promises not to share or sell their personal information, as well as Google's promises not to share personally identifies them with advertisers, and not to "use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health" during the relevant class period, identified in plaintiffs' moving papers as June 28, 2016 to the present. *See also* Caracuzzo Decl., ¶¶ 31-37, filed herewith.

20. Based on analyses of the limited, representative data produced by Google to date, plaintiffs' experts attest in their accompanying expert reports that all seven plaintiffs had their user data repeatedly shared and sold by Google through the RTB auction process in an automated manner that is common to all class members. *See* Expert Class Certification Report of Zubair Shafiq, PhD, ¶¶ 12, 13, 15, 35-46, and evidence cited therein. Frequently, this involved sensitive information being viewed by the plaintiffs, such as websites involving health matters, political views, and their precise geolocation, being shared with third party companies that participate in Google RTB *Id.*, ¶¶ 22, 35, 40, 42, 46, and evidence cited therein.

21. Each of the named plaintiffs has reviewed pleadings, responded to written discovery, produced documents and ESI, have worked with counsel, and have kept themselves apprised of the litigation, and all except one have testified at several-hours-long depositions. Excerpts of testimony from depositions of the named plaintiffs demonstrating their typicality and adequacy follow:

a. Attached as **Exhibit 6** is a true and correct copy of relevant excerpts of the deposition of named plaintiff <u>Terry Diggs</u>, showing typicality: 44:20-22, 78:4-23, 65:3-7, 74:16-22, 214:24-215:11; and adequacy: 27:9-14, 195:9-18, 85:21-86:15, 87:4-17, 98:1-99:21, 122:13-123:25, 126:1-16, 130:25-131:15,

132:2-17, 162:15-163:4, 179:4-11, 183:24-185:14, 211:15-212:8, 213:15-216:20;

b. Attached as **Exhibit 7** is a true and correct copy of relevant excerpts of the deposition of named plaintiff Rethena Green, showing typicality: 40:10-20, 42:2-47:4, 55:11-56:25, 76:14-77:25, 93:13-98:15, 107:4-113:18, 119:9-128:9, 130:1-133:25, 138:3-141:22: 159:3-162:16, 207:15-208:22; and adequacy: 16:14-21:20, 107:4-113:18; 119:9-128:12, 237:7-238:13.

c. Attached as **Exhibit 8** is a true and correct copy of relevant excerpts of the deposition of named plaintiff John Kevranian showing typicality: 20:4-21:22, 49:2-25, 55:13-56:24, 62:17-63:23, 65:11-19, 70:11-25, 82:2-25, 136:3-21, 207:2-21, 210:13-213:23; and adequacy: 13:4-19, 17:25–18:24, 35:3–36:9, 38:11–41:20, 43:19-25, 60:4–17, 65:11–67:12, 70:11-25, 104:11-105:17, 111:14-24, 128:3-13, 129:2-19, 172:16-173:16, 187:6–188:24, 202:16-203:17, 207:2-208:25, 210:13-213:23, 226:14–227:25.

d. Attached as **Exhibit 9** is a true and correct copy of relevant excerpts of the deposition of named plaintiff Salvatore Toronto showing typicality: 73:1-78:24, 83:9–86:19, 88:9–15, 88:16-89:19, 94:18-98:11, 117:16–25, 132:20-135:7, 137:9–138:23, 153:25-157:20, 167:9-168:14, 182:5-23, 208:3–210:12, 217:14-218:5, 230:7-19; and adequacy: 40:16-41:1, 52:5-21, 57:15-58:19, 62:1-6, 62:22-69:17, 94:18-98:11, 135:23-136:24, 149:11-151:25, 155:15-20; 156:6-25; 157:12-20; 175:6-15, 197:3-200:25, 230:7-19, 278:11-280:2.

e. Attached as **Exhibit 10** is a true and correct copy of relevant excerpts of the deposition of named plaintiff Christopher Valencia showing typicality: 28:5-19, 37:9-41:1, 68:15-70:24, 89:6-105:23, 107:1-117:22, 156:11-157:4, 183:11-185:20, 289:8-292:10, 295:10-196:6; and adequacy: 9:23-19:5 21:1-23:23, 26:23-28:4, 119:18-134:24, 143:8-145:2, 301:12-302:7.

f. Attached as **Exhibit 11** is a true and correct copy of relevant excerpts of the deposition of named plaintiff Kimberley Woodruff showing typicality: 71:3-8, 73:18-74:18; and adequacy at: 24:4-14, 25:9-11, 31:24-33:11, 34:211-35:14, 36:2-20, 38:12-23, 40:10-20, 54:25-55:16, 58:2-7, 125:15-22, 133:19-135:22, 172:15-173:1, 177:20-178:8, 178:16-24, 179:17-180:10, 181:12-14.

22. Prior to bringing this motion, plaintiffs have made plaintiff Tara Williams available for deposition on several dates, none of which were accepted by Google. Google only recently has requested deposition dates for Ms. Williams for time periods following the filing date of plaintiffs' class certification motion. As necessary to supplement the record, plaintiffs will provide transcript excerpts of Ms. Williams deposition on reply.

SPECIFIED DISCOVERY PRODUCED BY GOOGLE SUPPORTING CLASS CERTIFICATION

23. Although Google's production to date has been limited, plaintiffs' experts have considered certain documents and data produced by Google in this action as part of their engagements in this matter. Each expert identifies such discovery in the "Materials Considered" appendix to his respective expert report.

24. In addition to the materials considered by plaintiffs' experts, plaintiffs submit the following in support of their motion for class certification:

a. Attached as **Exhibit 12** is a true and correct copy of GOOG-HEWT-00349634, which is a document produced by Google that includes an analysis of Google's top spenders in Google RTB for a specified period in May 2018. This document was created from a tab entitled "Results" from a native Excel document produced by Google. This document was produced by Google with a Highly Confidential designation and is therefore lodged under seal.

b. Attached as **Exhibit 13** is a true and correct copy of GOOG-HEWT-00455800, a document prepared and produced by Google containing information about the aggregate number of U.S.-based account holders, on an annual basis, during the time period March 25, 2016 and October 12, 2022. This document was produced

by Google with a Highly Confidential – Attorneys' Eyes Only designation and is therefore lodged under seal.

c. Attached as **Exhibit 14** is Google's verified responses to Interrogatory No. 12, describing the data in GOOG-HEWT-00455800 (Ex. 13) as accounts associated with U.S.-based account holders who were active on select Google products (including Search, YouTube, and many more) at least once during the time period, excluding deleted accounts, for the period between March 25, 2016 and October 12, 2022. *See* p. 7.

d. Attached as **Exhibit 15** is a true and correct copy of GOOG-HEWT-00455648, a document prepared and produced by Google in this matter, a document that was produced by Google in discovery with a Highly Confidential – Attorneys' Eyes Only designation and is therefore lodged under seal. Google's verified response to Interrogatory No. 11 (Ex. 14), describes GOOG-HEWT-00455648 as data which, for the row "'US User Total' includes gross revenue from Authorized Buyers and Open Bidding Partners generated by advertisements displayed to US Users…."

e. Attached as **Exhibit 16** is a true and correct copy of GOOG-HEWT-00000767, produced by Google in this action, which discusses content labels, and which is a public document. Plaintiffs' expert, Professor Zubair Shafiq, PhD, discusses this document in his report. *See* Shafiq Rep. ¶ 42b.

f. Attached as **Exhibit 17** are true and correct copies of excerpts of the April 23, 2023 deposition of Google employee George Levitte, which transcript has been designated Highly Confidential – Attorneys' Eyes Only by Google and the excerpts are therefore lodged under seal.

g. Attached as **Exhibit 18** are true and correct copies of excerpts of the December 8, 2022 deposition of Google employee Glenn Berntson, which transcript was designated Confidential by Google and the excerpts are therefore lodged under seal.

h. Attached as **Exhibit 19** is a true and correct copy of GOOG-HEWT-00456419, which was marked as Exhibit 15 to the deposition of Google employee Haskell Garon, and which document was designated Highly Confidential – Attorneys' Eyes Only by Google and is therefore lodged under seal.

i. Attached as **Exhibit 20** is a true and correct copy of GOOG-HEWT-0098506, dated October 8, 2018 – a document that was produced by Google in discovery with a Confidential designation and is therefore lodged under seal.

j. Attached as **Exhibit 21** is a true and correct copy of GOOG-HEWT-00481219, last updated in August 2019 – a document that was produced by Google in discovery with a Highly Confidential – Attorneys' Eyes Only designation and is therefore lodged under seal.

k. Attached as **Exhibit 22** is a true and correct copy of GOOG-HEWT-0048125, entitled "Strat Paper" and last modified on May 13, 2020– a document that was produced by Google in discovery with a Highly Confidential – Attorneys' Eyes Only designation and is therefore lodged under seal.

l. Attached as **Exhibit 23** is a true and correct copy of GOOG-HEWT-00480493, last modified on August 26, 2020 – a document that was produced by Google in discovery with Confidential designation and is therefore lodged under seal.

m. Attached as **Exhibit 24** is a true and correct copy of GOOG-HEWT-00099180, dated September 24, 2020—a document that was produced by Google in discovery with a Confidential designation and is therefore lodged under seal.

n. Attached as **Exhibit 25** is a true and correct copy of GOOG-HEWT-00330759, bearing the description of "Comments" to an internal Google paper, dated June 28,201– a document that was produced by Google in discovery with Confidential designation and is therefore lodged under seal.

o. Attached as **Exhibit 26** is a true and correct copy of GOOG-HEWT-0035713, a document that was produced by Google in discovery with a Highly Confidential – Attorneys' Eyes Only designation and is therefore lodged under seal.

p. As noted in paragraph 7 above, attached as **Exhibit 27** hereto is a true and correct copy of Google's June 29, 2023 Objections to Request for Production No. 117.

PLAINTIFFS' CLASS COUNSEL WILL ADEQUATELY PRESENT THE CLASS THROUGHOUT THE LITIGATION AND AT TRIAL

25. On August 3, 2021, I was appointed Interim Class Counsel and Lesley E. Weaver of Bleichmar Fonti & Auld LLP, Jason Barnes of Simmons Hanley Conroy LLC, David A. Straite of DiCello Levitt LLC, Nanci Nishimura of Cotchett, Pitre & McCarthy, LLP, and Francis A. Bottini, Jr., of Bottini & Bottini, Inc were appointed to the Plaintiffs' Executive Committee. ECF 77. These firms and lawyers now seek to be collectively appointed as Class Counsel, with Yury A. Kolesnikov of the law firm of Bottini & Bottini, Inc., substituting for Francis A. Bottini, and with Elizabeth C. Pritzker of Pritzker Levine LLP, serving in the role as Lead Class Counsel.

26. All of these attorneys and their law firms have decades of experience litigating privacy class actions and complex litigation matters, including through trial.

27. As demonstrated in their submissions in connection with their application for appointment as interim lead counsel (ECF 75), and in their firm resumes described below and attached hereto, proposed Class Counsel are experienced class action litigators with substantial knowledge of the law and claims in this case. They have undertaken significant investigation and prosecution of the claims and committed substantial resources on behalf of the proposed class.

28. Since the commencement of this litigation, proposed Class Counsel and the Plaintiffs' Executive Committee have developed and zealously litigated this matter for the benefit of Google account holders nationwide, including:

a. Developing the theory of the case;

b. Hiring and coordinating with experts who have worked over the course of over a year to develop opinions including technical opinions and analysis regarding Google's actions with respect to the Google RTB auction process and how Google RTB works, damages on a class wide basis, and the impacts on privacy;

c. Coordinating the ongoing review of documents produced by Google and third parties;

d. Collecting plaintiffs' data including reviewing thousands of plaintiffs emails and collecting screenshots and other types of device data as requested by Google;

e. Issuing third-party subpoenas and conferring with counsel for those third parties for compliance;

f. Serving written discovery, writing letters, and conducting dozens of meet and confer Zoom meetings with Google counsel;

g. Researching, preparing and filing over 30 motions and the related sealing motions that Google's confidentiality designations require;

h. Preparing for and taking the depositions of Google employees;

i. Preparing for and defending the named plaintiff depositions.

29. Attached as **Exhibit 28** hereto is a true and correct copy of the firm resume of Pritzker Levine LLP.

30. Attached as **Exhibit 29** hereto is a true and correct copy of the firm resume of Bleichmar Fonti & Auld LLP.

31. Attached as **Exhibit 30** hereto is a true and correct copy of the firm resume of Cotchett Pitre & McCarthy LLP.

32. Attached as **Exhibit 31** hereto is a true and correct copy of the firm resume of Simmons Hanley Conroy LLC.

33. Attached as **Exhibit 32** hereto is a true and correct copy of the firm resume of DiCello Levitt LLC.

34. Attached as **Exhibit 33** hereto is a true and correct copy of the firm resume of Bottini & Bottini, Inc.

PLAINTIFFS PROPOSE A MANAGEABLE TRIAL PLAN UTLIZING COMMON CLASSWIDE EVIDENCE ADDRESSING COMMON CLAIMS AND DEFENSES

35. As previously noted, plaintiffs' class certification motion is being brought on a limited discovery record. As the case approaches trial, plaintiffs will wish to confer with the Court on a timeline for completing merits discovery, and the scope of such discovery, that will allow for

a full and fair presentation of the following six claims[7] for which plaintiffs seek class-wide treatment:

(i) breach of contract;

(ii) breach of confidence;

(iii) invasion of privacy;

(iv) intrusion upon seclusion;

(v) publication of private facts;

(vi) violations of the California Information Privacy Act (CIPA), Cal. Pen. Code §631.

All claims are triable to a jury.

36. California law applies to each of these six legal claims, because Google uniformly adopts California law in its contracts (Google's Terms of Service, Privacy Policies and related documents) with its U.S. account holders and proposed class members. This allows for a manageable class trial, as jurors will be instructed on a single state's law – California – and that same law will be applied to all claims of all proposed class members.

37. Jurors also will be shown a uniform set of representations, all of which are applicable to plaintiffs and all proposed class members, in the form of Google's Terms of Service, its Privacy Policies, and its related representations in its Google account holder agreements, in which Google promises that it does not share or sell class members' personal or sensitive information with anyone outside of Google. This means that there are a core set of common representations and contractual

---

[7] Plaintiffs' Complaint, filed September 2, 2021, asserted twelve individual and class claims. ECF 92. In a Case Management Order dated September 2, 2021, Judge Koh directed the parties to select eight claims from the twelve claims asserted to be litigated through trial, with plaintiffs selecting four claims and Google selecting the other four claims. *See* ECF 83 at 1. The parties completed the process and filed a joint statement identifying those claims (with plaintiffs reserving all rights, *see* ECF 91 at 2), which include the six claims for which plaintiffs now move for certification. The claims that remain in abeyance are count three (violations of the California Unfair Competition Law), count four (California Constitutional Invasion of Privacy), count nine (violations of the Electronic Communications Privacy Act, and count twelve (violations of the Video Privacy Protection Act). The Court previously dismissed without prejudice plaintiffs' claims for breach of the implied covenant of good faith and fair dealing (count two), granting plaintiffs leave to move to amend this claim, following discovery, as appropriate. *See* MTD Order (ECF 233) at 10:11.

promises for jurors to consider with respect to all claims, all plaintiffs and all proposed class members.

38. At trial, plaintiffs will present expert testimony and evidence that Google's RTB auctions are a fully automated process that operates in materially the same way at all times, and that involves Google sharing in bid requests with third parties the same common core set of information about class members and their computers. *See, e.g.,* Shafiq Rep. at ¶¶ 28-35-43, 46.[8] Given the entirely automated nature of Google's RTB auctions, the testimony and evidence to be presented to jurors will be common to all proposed class members.

39. The core question of law and fact that jurors will need to determine – whether the class member user data Google shares and sells in the automated Google RTB auctions is "personal information" under Google's contracts and California law – is common across the class. This question necessarily will be decided based on the same evidence and testimony, and with respect to the same law, for all proposed class members as it will for the individual plaintiffs. Such efficiencies favor conducting a single class trial over individual adjudications.[9]

40. Plaintiffs and plaintiffs' experts will provide representative trial testimony about their common experiences and the common impact of Google's sharing and selling their user data in Google's RTB auctions. Given Google RTB's fully-automated nature, such testimony will be representative of the experiences and impact of Google RTB on class members generally.

41. Plaintiffs also will provide expert trial testimony that will provide common class-wide proof of damages and a fair and common method for allocating damages among class members.

42. Based on the above, as well as plaintiffs' counsel's trial experience, plaintiffs estimate a class trial of this matter may be completed in a single proceeding comprised of twelve (12) trial days (exclusive of jury selection), to be divided evenly between plaintiffs and Google.

---

[8] Further discovery may reveal additional common user data not yet produced in the representative data set Google has produced to date for the named plaintiffs.

[9] This is so irrespective of whether certification is granted under Rule 23(b)(2), (b)(3) or (c)(4).

43. To streamline the trial, plaintiffs will seek to reach agreement with Google on certain stipulated facts in advance of trial. In accordance with this Court's Standing Order Re: Pretrial Instructions in Civil Cases, plaintiffs also will seek to reach agreement with Google on issues affecting the conduct of trial, including such matters as the authenticity of documents produced by either party to the litigation, joint proposed jury instructions, a joint proposed verdict form, and a joint preliminary statement of the case.

44. Plaintiffs' requested injunctive relief remedy (*see* ECF 92, Complaint, Prayer ¶ F, at 130) will be tried to the Court, either in conjunction with or at the conclusion of any jury trial, in accordance with the Court's preference on this issue. Consistent with this Court's Standing Order Re: Pretrial Instructions in Civil Cases, at least fourteen (14) days prior to the Pretrial Conference, plaintiffs will lodge proposed Findings of Fact and Conclusions of Law on material issues related to plaintiffs' requested injunctive relief. At that time, or at such other time as the Court may direct, plaintiffs also will propose for the Court's appointment, an independent third-party responsible for verifying that any injunctive relief awarded by the Court has been implemented by Google in a timely and reasonable manner.

45. Finally, prior to the Pretrial Conference, plaintiffs will propose to the Court a process for finally resolving any claims that have been held in abeyance or dismissed without prejudice (with leave to move to amend) for the reasons described in note 7, above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 14th day of July 2023 in Emeryville, California.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker