No. 26-2638

# In the United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

KIMBERLEY WOODRUFF; et al.,
*Plaintiffs-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:21-cv-02155-YGR (The Hon. Yvonne Gonzalez Rogers)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD VOLUME V OF VII

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94602
(415) 692-0772

MATTHEW W.H. WESSLER
ALISA C. PHILO
GUPTA WESSLER LLP
1400 16th Street NW, Suite 225
Washington, DC 20036
(202) 888-1741
*matthew@guptawessler.com*

October 28, 2026

*Counsel for Plaintiffs-Appellants*

*(Additional counsel listed on inside cover)*

FRANCIS A. BOTTINI, JR.
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
(858) 914-2001

THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

DAVID A. STRAITE
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 993-1000

LESLEY WEAVER
ANNE K. DAVIS
STRANCH, JENNINGS & GARVEY, PLLC
1111 Broadway, Suite 03-130
Oakland, CA 94607
(341) 217-0550

BRIAN DANITZ
NANCI NISHIMURA
COTCHETT PITRE & MCCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal. Bar. No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION* | **Case No. 4:21-cv-02155 YGR (VKD)** |
| *This document applies to all actions.* | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: TBD<br>Time: TBD<br>Courtroom: 1, 4th Floor |

**REDACTED VERSION**

TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .......... vii

STATEMENT OF ISSUES TO BE DECIDED .......... ix

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 4

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 9

A. All 23(a) Requirements are Satisfied .......... 9

1. Numerosity .......... 9

2. Commonality .......... 9

3. Typicality .......... 9

4. Adequacy .......... 10

B. Common Issues Predominate Under Rule 23(b) .......... 10

1. California Law Applies to All Claims .......... 10

2. Common Issues Predominate as to the Breach of Contract Claim .......... 11

a. Google's Form Contract is Common, Classwide Evidence .......... 11

b. Whether Google's Conduct Breached the Contract is Susceptible to Common, Classwide Proof .......... 13

3. Common Issues Predominate for Plaintiff's Other Claims .......... 16

a. Breach of Confidence Claim .......... 16

b. The CIPA Claim .......... 17

i. Lack of Consent is a Common Question .......... 17

ii. The CIPA Claim is Subject to Common Proof .......... 18

c. Invasion of Privacy and Intrusion Upon Seclusion Claims .......... 19

i. Whether a "Reasonable" Expectation of Privacy Exists is a Common, Class-wide Issue .......................... 20

ii. The "Highly Offensive" Element is Judged By a "Reasonable Person" Standard ..................................... 20

d, Publication of Private Facts Claim ........................................... 21

i. "Public Disclosure" is Subject to Common Evidence ...................................................................... 21

ii. The Information is Not of "Legitimate Public Concern" ...................................................................... 22

C. Common Issues Predominate Regarding the Relief Plaintiffs Seek ................. 22

1. Common Issues Predominate as to Disgorgement of Profits ................ 22

2. Common Issues Predominate Based on Market Pricing Damages........ 23

3. Common Issues Predominate as to Punitive Damages ......................... 23

4. Common Issues Predominate as to Statutory Damages......................... 23

D. Plaintiffs' Methods for Fairly Distributing Monetary Relief to Class Members ........................................................................................... 24

E. A Class Action is Superior to Individual Adjudications .................................. 24

F. Rule 23(b)(2) Certification is Warranted for Injunctive Relief .......................... 25

V. CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Alkayali v Hoed,* 2018 WL 3425980 (S.D. Cal. 2018)........ 22
*Amchem Products v. Windsor*, 521 U.S. 591 (1997)........ 24
*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ........ 8, 9
*Bakery v. Aubry,* 216 Cal. App. 3d 1259 (1989)........ 11
*Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327 (1990) ........ 16
*Berkla v. Corel Corp*., 302 F.3d 909 (9th Cir. 2002)........ 16
*Brown v. Google, LLC 2022* WL 17961497 *(N.D. Cal. Dec. 12, 2022)*........ 10, 12
*Dunkin v. Boskey*, 82 Cal. App. 4th 171 (2000)........ 22
*DZ Rsrv. v. Meta Platforms, Inc*., 2022 WL 912890, (N.D. Cal. Mar. 29, 2022)........ 25
*Ellis v. Costco Corp. III*, 285 F.R.D. 492 (N.D. Cal. 2012)........ 23
*Flores-Mendez v. Zoosk, Inc.,* 2021 WL 308543 (N.D. Cal. Jan. 30, 2021)........ 16
*Hernandez v. Lopez,* 180 Cal. App. 4th 932\ (2009 ........ 22
*Hill v. NCAA*, 7 Cal. 4th 1 (1994) ........ 20, 21
*In re. Facebook Biometric Inforomation Privacy Litig*., 326 F.R.D. 535 (N.D. Cal. 2018)........18
*In re Facebook, Inc., Consumer Privacy User Profile Litig*., 402 F. Supp. 3d 767 (N.D. Cal. 2019)........11, 12, 21
*In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589\ (9th Cir. 2020) ........ 12, 19, 20, 22
*In re Google Assistant Privacy Litigation*, 546 F. Supp. 3d 945 (N.D. Cal. 2021) ........ 22
*In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262\ (3d Cir. 2016) ........ 20
*In re Yahoo Mail Litig*., 308 F.R.D. 577 (May 26, 2015) ........ 19, 25
*Krzesniak v. Cendant Corp*., No. 05-05156, 2007 WL 1795703 (N.D. Cal. June 20, 2007........ 9
*Marchand v. Northrop Grumman*, 2017 WL 2633132 (N.D. Cal. Jun 19, 2017)........ 11
*Ojala v. Bohlin*, 178 Cal. App. 2d 292 (1960) ........ 17
*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022)........ 4, 8, 25
*Opperman v. Path, Inc.*, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ........ 20
*Patel v. Facebook*, Inc........ 23

*Raffin v. Medicredit, Inc.,* 2017 WL 131745 (C.D. Cal. Jan. 3, 2017 .......... 23

*Riley v. California*, 573 U.S. 373 (2014) .......... 16

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) .......... 25

*Roley v. Google LLC*, No. 18-CV-07537-BLF, 2020 WL 8675968 (N.D. Cal. July 20, 2020 .......... 13

*Ruiz Torres v. Mercer Canyons*, 835 F.3d 1125 (9th Cir. 2016) .......... 24

*San Jose Options, Inc.*, 2014 WL 4380045 .......... 16

*Sateriale v. RJ Reynolds Tobacco Co.*, No. 2:09-CV-08394-CAS, 2014 WL 7338877 (C.D. Cal. Dec. 19, 2014) .......... 12, 13

*Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44 (1997 .......... 11

*Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200 (1998) .......... 21

*Six (6) Mexican Workers*, 904 F.2d 1301 (9th Cir. 1990) .......... 24

*Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, (S.D. Cal. 2020) .......... 16

*Staton v. Boeing Co.*, 327 F. 3d 938 (9th Cir. 2003) .......... 10

*Stockwell v. City and Cty of San Francisco*, 749 F.3d 1107 (9th Cir. 2014) .......... 8

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .......... 18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......... 9

*Ward v. United Airlines, Inc.*, 2021 WL 534364 (N.D. Cal. Feb. 12, 2021) .......... 25

*Williams v. Apple, Inc.*, No. 19-cv-04700-LHK, 2021 WL 2186223 (N.D. Cal. May 28, 2021 .......... 12

*Zaklit v. Nationstart Mortg. LLC*, 2017 WL 3147901 (C.D. Cal. July 24, 2017) .......... 24

**STATUTES**

CAL. CIV. CODE § 1781.40(v)(1) .......... 14

CAL. CIV. CODE § 1798.140 .......... 3, 6, 15

CAL. PEN. CODE § 631 .......... vii, 18, 19

CAL. PENAL CODE § 637.2(a) .......... 23

FED. R. CIV. P. § 23 .......... *passim*

**OTHER AUTHORITIES**

Newberg on Class Actions § 3.24 (5th ed.) ........ 13, 24

Restatement (Second) of Contracts § 211(2) ........ 12

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on a date and time to be determined,[1] in Courtroom 1, 4th Floor, of this Court, located at 1301 Clay Street, Oakland, California 94612, plaintiffs Christopher Valencia, John Kevranian, Terry Diggs, Kimberley Woodruff, Rethena Green, Salvatore Toronto, and Tara Williams will and hereby do move the Court for an Order (i) certifying this action as a class action, (ii) appointing plaintiffs as representatives of the class, and (iii) appointing Elizabeth Pritzker of Pritzker Levine LLP, Lesley Weaver of Bleichmar Fonti & Auld LLP, Jay Barnes of Simmons Hanly Conroy LLC, David Straite of DiCello Levitt LLP, Nanci Nishimura of Cotchett Pitre & McCarthy, LLP, and Yury A. Kolesnikov of Bottini & Bottini, Inc. as class counsel, with Ms. Pritzker to serve as lead class counsel.

Plaintiffs seek to certify a class consisting of all individual Google account holders subject to a Google United States Terms of Service whose personal information was sold or shared by Google in its Real Time Bidding ("RTB") auctions after June 28, 2016 (the "Class"). Plaintiffs seek certification of the following claims, all arising under California law: (i) breach of contract, (ii) breach of confidence, (iii) invasion of privacy, (iv) intrusion upon seclusion, (v) publication of private facts, and (vi) for violations of the California Information Privacy Act ("CIPA"), CAL PEN. CODE § 631.[2]

This Motion is made pursuant to Rule 23 of the Federal Rules of Civil Procedure, on the grounds that:

---

[1] *See* ECF 530, 534.

[2] Plaintiffs' Consolidated Class Action Complaint ("CCAC") asserts 12 individual and class claims. ECF 92. After the CCAC was filed, Judge Koh directed the parties to select eight claims to be litigated through trial. *See* ECF 83 at 1. The parties filed a joint statement identifying the eight claims, with plaintiffs reserving all rights (*see* ECF 91 at 2), including the six claims for which plaintiffs now seek certification The claims that remain in abeyance are for violations of the California Unfair Competition Law; California Constitutional Invasion of Privacy; violations of the Electronic Communications Privacy Act; and violations of the Video Privacy Protection Act. The Court previously dismissed without prejudice plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, but granted leave to move to amend this claim, following discovery, as appropriate. *See* MTD Order (ECF 233) at 10-11.

(a) Joinder of all class members is impracticable because the Class consists of millions of similarly situated Google U.S. account holders whose personal information was improperly sold and shared by Google;

(b) Google's common contract and promises and the uniform conduct of its RTB auctions with respect to all class members present core questions of law and fact common to the Class;

(c) Plaintiffs' claims are typical of the claims of the Class;

(d) Plaintiffs and their attorneys have fairly and adequately protected the interests of the Class and will continue to do so;

(e) The questions of law and fact that are common to the Class overwhelmingly predominate over any individualized issues that might exist; and,

(f) A class action is superior to any other method of adjudicating plaintiffs' claims against Google.

Plaintiffs' Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Elizabeth C. Pritzker ("Pritzker Decl.") and Bethany Caracuzzo ("Caracuzzo Decl.") in support of class certification and all exhibits thereto, any reply memorandum plaintiffs may file, the orders, pleadings, and files in this action, and such other matters as may be presented at or before the hearing.

## STATEMENT OF ISSUES TO BE DECIDED

I. Should the Court certify the Class and class claims under Rule 23 of the Federal Rules of Civil Procedure?

II. Should the Court appoint plaintiffs Christopher Valencia, John Kevranian, Terry Diggs, Kimberley Woodruff, Rethena Green, Salvatore Toronto, and Tara Williams as representatives of the Class?

III. Should the Court appoint the Elizabeth Pritzker of Pritzker Levine LLP, Lesley Weaver of Bleichmar Fonti & Auld LLP, Jay Barnes of Simmons Hanly Conroy LLC, David Straite of DiCello Levitt LLP, Nanci Nishimura of Cotchett Pitre & McCarthy LLP, and Yury A. Kolesnikov of Bottini & Bottini Inc. as class counsel, with Ms. Pritzker to serve as lead class counsel?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Court has upheld the legal sufficiency of the claims in this case. The question for the Court to decide on this motion is whether, on the limited discovery to date, plaintiffs have satisfied Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). Because plaintiffs demonstrate that their class allegations satisfy each requirement under that Rule, the Court should certify the Class. Rule 23(a) is easily met here. The action is brought on behalf of Google account holders in the United States—tens of millions of them—to whom Google consistently, and unequivocally, makes a core promise in its Terms of Service ("ToS") and Privacy Policies:

**We don't sell users' personal information.**[3]

Google has restated this core promise —, and the related promise that it does not sell or share personal information with anyone outside of Google — in its ToS, Privacy Policies, and its Google account holder agreements since at least 2016:

> **What is still the same?**
>
> - Google does not sell your personal information to anyone.[4]
>
> ***
>
> We will share personal information with companies, organizations or individuals outside of Google ***when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information***.[5]
>
> ***
>
> **Never sell our users' personal information to anyone**... [i]t's important to clarify that **our users' personal information is simply not for sale**.[6]

---

[3] Google's Privacy & Terms – Technologies and Principles - Privacy Principles, published on Google's website and incorporated in its Privacy Policy since September 10, 2015. Caracuzzo Decl. ¶¶ 2-7, Ex. 34. The cited promises were made by Google throughout the class period. *Id.* ¶¶ 2, 6-7, 9, 12-15, 17, 20, 23-25, 29-30.

[4] Google's "Consent Bump" issued to U.S. account holders on June 28, 2016. *Id.* ¶¶ 21-22, Ex. 42.

[5] Google Privacy Policy, published on Google's website since June 28, 2016. *Id.* ¶¶ 19, 23-24, Exs. 35, 36, 40 (bold italics added).

[6] Google's Safety Center – Our Privacy & Security Principles, published on Google's website and incorporated into Google's Privacy Policy and ToS since September 10, 2018. *Id.* ¶¶ 8-12, Ex. 37.

***

> We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies: With your consent . . . With domain administrators . . . For external processing . . . For legal reasons . . . .[7]

***

> We don't show you personalized ads based on sensitive categories like race, religion, sexual orientation, or health. We don't share information that personally identifies you with advertisers unless you ask us to.[8]

***

> Google does not sell your personal information.[9]

***

> We don't sell your personal information to anyone.[10]

***

> [W]e never sell your personal information to anyone.[11]

***

> Advertisers do not pay us for personal information.[12]

***Google does not keep its promises***. Instead, billions of times every day, throughout the class period, Google sells and shares U.S. account holders' personal information to third-party advertisers, independent ad exchanges, social media websites (such as Facebook and Twitter), and other participants around the world in Google's "real time bidding" advertising auctions ("Google RTB").

Google RTB is a fully automated process that works as follows. First, there is Google source code that facilities data sharing through RTB and which is present on millions of websites and apps. When a Google account holder (the "user") visits any of these websites or apps, that source code commands the user's device and browser to report an impression (what the user is viewing), and information about the user and her computer—including unique identifiers associated with the user,

---

[7] Google Privacy Policy (6/28/16). Caracuzzo Decl. ¶¶ 19, 27, Ex. 35.
[8] Google Privacy Policy (5/25/18). *Id.* ¶¶ 19, 29, Ex. 36.
[9] Google Privacy Policy (3/31/20). *Id.* ¶ 17, Ex. 40.
[10] Google's "How Our Business Works" page, incorporated into Google's ToS, from March 31, 2020, to the present. *Id.* ¶¶ 13-16, Exs. 38, 39, 41.
[11] *Id.*
[12] *Id.*

the device's IP address, the URL of the website or app name being viewed, and the make/model of the user's browser or mobile device—to Google for processing through the Google RTB system. Through no action of the user, Google RTB then packages that impression into a "bid request," which is the standardized way that Google solicits bids from hundreds of potential buyers around the world seeking the opportunity to place an ad ("RTB participants"). Each bid request uniformly includes (1) information that Google associates with a user's Google account; (2) information that is reasonably capable of identifying the user to RTB participants, including a Google User ID and other information that uniquely identifies the user or their device; and (3) content and contextual information that places the user and their communication into specific ad targeting categories, including categories that Google publicly admits are "sensitive." As plaintiffs' experts show, the sharing of this information is a uniform process for all account holders. The RTB participants can then bid for the opportunity to have a targeted ad delivered to the user based on the information sent out in the bid request.

***Numerosity is easily satisfied, and plaintiffs are typical and adequate.*** Plaintiffs are typical of other class members and are adequate representatives. The data produced to date for the plaintiffs, and the expert reports of Prof. Zubair Shafiq Ph.D. ("Shafiq Rep.") and Prof. Christopher Wilson, Ph.D. ("Wilson Rep."), Pritzker Decl., Exs. 1-2, demonstrate typicality: plaintiffs' personal information was repeatedly shared with and sold to Google RTB participants despite Google's uniform promise that "Google will never sell any personal information to third parties." Plaintiffs' adequacy is demonstrated by their involvement in prosecuting the class claims thus far.

***There are common questions of fact and issues of law.*** Google uniformly adopts California law in its contracts with its U.S. account holders. And common evidence will show that every Google RTB bid request during the Class Period contains the same dozens of categories of user data for sale in the RTB auctions. Whether the core items of such data that Google ***concedes*** are transmitted with each bid request are "personal information" under Google's contract, defined as "information … that can be reasonably linked to [name or email address] by Google, such as information we [*i.e.*, Google] associate[s] with your Google Account," and under California law, *i.e.*, "information that identifies, relates, to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household" (CAL. CIV. CODE § 1798.140(o)(1)),

is a common question and is subject to common proof and law that is uniform for plaintiffs and all class members.

***The requirements of Rule 23(b) are satisfied.*** As for Rule 23(b)(3), Google earns billions in revenues each year by sharing the personal information at issue in this case in RTB auctions, as described in the expert reports of Prof. Robert Zeithammer, Ph.D. ("Zeithammer Rep.") and Greg J. Regan, CPA/CFF, CFE ("Regan Rep."), Pritzker Decl., Exs. 3, 4. Relying on Google's own internal documents, computation of class-wide damages stemming from Google's improper conduct can be done on a common basis by academically accepted, industry standard econometric studies and quantitative analysis. Class members who have suffered damages can be readily identified by common evidence in the form of Google's own data. Shafiq Rep. ¶¶ 90-91. And common questions of law and fact predominate over any individual issues. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663, 665–67 (9th Cir. 2022), *cert. denied sub nom*, *StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022) ("*Olean*"). Class treatment is appropriate because plaintiffs will use a common method to resolve the issues central to the claims in one stroke. *Id.* at 663. Given the uniform contract, law, and conduct, the predominance of common questions, and the size of the Class, a class action is far superior to any other method of adjudicating plaintiffs' claims against Google.

Rule 23(b)(2) also is satisfied. As discussed *infra*, Google "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2).

## II. BACKGROUND

The Court's description of the background of this dispute in its motion to dismiss order (ECF 233) is well supported by the evidence adduced to date. Plaintiffs are individuals residing in the United States who created a Google account to access Google's products and who, since June 28, 2016, have used their web browsers or apps to view information and media online. *See* CCAC, ECF 92, at ¶¶ 39-40, 45-46, 49-50, 53-58, 65-66, 70; Pritzker Decl. ¶¶ 16-22, Exs. 6-11. All plaintiffs and Class members are subject to Google's U.S. ToS. CCAC ¶¶ 71-72; Caracuzzo Decl. ¶¶ 31-37. Google's ToS contain two relevant provisions: First, that California law governs the contract.

Caracuzzo Decl. ¶¶ 35, 37, Exs. 39, 41. Second, since at least September 10, 2015, Google has represented that "We don't sell users' personal information", Never sell our users' personal information to anyone", "[O]ur users' personal information is simply not for sale" and "We don't sell your personal information to anyone." [13]

Like the ToS, Google's Privacy Policies have, throughout the class period, promised account holders that "we don't sell your personal information to anyone," "we don't share information that personally identifies you with advertisers," and "we don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health." *See* Caracuzzo Decl. ¶¶ 3-12, 17-20, 23-24, 26-30, Exs. 35, 36, 40.

In violation of these explicit promises, Google shares, offers for sale, and sells account holders' personal information ***billions of times a day*** to ***hundreds of entities*** around the world — ranging from advertisers, publishers, hedge funds, governments, and big data companies like Meta, Amazon, Yahoo, and LinkedIn — through Google's proprietary RTB auctions. *See* Pritzker Decl., Ex. 12; *see also* expert report of Prof. Neil Richards ("Richards Rep."), Pritzker Decl., Ex. 5 at ¶¶ 111-113. The scope and functioning of Google RTB are described more fully in the accompanying Wilson and Shafiq Reports. Generally speaking, Google owns and operates a platform to serve targeted display advertising on web-browsers and apps through which it surreptitiously observes, collects, and analyzes real-time data about account holders when they are using the internet. Wilson Rep. ¶¶ 18, 24. As an account holder uses her browser or app, that use is tracked, accompanied by cookies and other identifiers sent from the account holder's browser or app to Google. *Id.* ¶ 24. Google RTB then sends bid requests to RTB participants with the account holder's data — including her Google User ID and other personal identifiers, IP address, device identifiers, geolocation data, the specific content the user has requested and been shown when she is on a web-browser or, if on a handheld device, a smartphone app. *Id.*; Shafiq Rep. ¶¶ 21, 41-42.

RTB participants may respond to the bid request with monetary bids for the right to place a targeted ad based on the account holder's data, or they may simply "lurk" in the auction to acquire

---

[13] *See* Google's "Privacy & Terms, Technologies and Principles" (from 9/10/15 onward); "Safety Center – Our Privacy and Security Principles" (from 9/20/18 to present); and "How Our Business Works" (from 2/22/20 to present). Caracuzzo Decl. ¶¶ 2-16, Exs. 34, 37, 38.

information about the account holder for future use. Wilson Rep. ¶ 24. The winning bidder gets to place an ad on the specific account holder's browser or personal device, or assign that right to another, or resell and republish the account holder's personal information obtained in the bid to other entities or databases. *Id*. The entire RTB auction process takes less than a hundred milliseconds (it takes 300 milliseconds to blink an eye); hence, the name "real time" bidding. *Id*. ¶ 26; Shafiq Rep. ¶ 19. Google RTB is invisible and undisclosed to account holders. [14]

There is substantial common evidence that the account holder data that Google sells and offers for sale through Google RTB, in breach of its promises, is "personal information" under both Google's Privacy Policy and California law. Google's Privacy Policy tracks and is broader than California law. Under Google's definition, "personal information" includes "information that you provide to us which personally identifies you, such as your name, email address, or billing information, ***or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.***" Caracuzzo Decl. ¶¶ 19, 29, Ex. 36. The Privacy Policy describes information "Google "associate[s]with…Google Account[s]" to include:

> . . . unique identifiers, browser type and settings, device type and settings, operating system, mobile network information, including carrier name and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time and referrer URL of your request.

*Id.* at 2. The document hyperlinked at "unique identifiers" defines a unique identifier as "a string of characters that can be used to uniquely identify a browser, app or device" which includes cookies, advertising IDs, and other unique device identifiers." *Id*. at 27. Common evidence will show that Google associates these and other unique identifiers and sensitive information that Google routinely places in RTB bid requests and offers for sale and sells [15] to hundreds of participants outside of Google

---

[14] Richards Rep. ¶¶ 7, 91, 119, 128-131, 135. Because it is undisclosed, there is no mechanism for account holders to consent (or decline to consent) to Google sharing with or selling to third parties their personal information in RTB. *Id.* ¶ 137.

[15] California law, which applies here, defines a sale of personal information as "selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating…by electronic or other means, a consumer's personal information by the business to another business or third party for monetary or other valuable consideration." Cal. Civ. Code § 1798.140(t)(1).

in the Google RTB auctions. Shafiq Rep. ¶¶ 35-89, 96-98. Plaintiffs' expert's analysis of Google's data produced in this action reveals that, when a Google account holder is involved, Google can associate the information shared with RTB participants with a specific Google account holder [redacted]. *Id.* ¶¶ 35-36. In short, the evidence produced by Google shows that the information it shares is *always* and thus commonly associated with the user's Google account.

Common evidence also shows that Google maintains records of when each account holder created a Google account and that Google RTB affects all or virtually all Google U.S. account holders. Shafiq Rep. ¶¶ 90-91; Wilson Rep. ¶¶ 15, 80-100, 124. Notably, there is no setting or control available whereby Google users can completely stop their information from being shared through RTB. Richards Rep. ¶ 137; Wilson Rep. ¶¶ 101-123. [16] Thus, there is a common method and common evidence to establish Class membership.

Like all members of the proposed class, plaintiffs' personal information was offered for sale and sold in RTB auctions during the class period. Indeed, the limited data Google has produced to date shows that for just the eight-week sampled period allowed by the Court, plaintiffs' personal information was sent to hundreds of RTB participants around the world almost [redacted] times. Shafiq Rep. ¶¶ 35-36. More than [redacted] of these bid requests involve sensitive information being viewed by the plaintiffs, such as websites involving health matters, political views, and precise geolocation. *Id.* ¶¶ 35, 40. All of the [redacted] bid requests include at least [redacted] common data fields, including: the [redacted] *Id.* ¶¶ 41-42. The claims here focus on the common fields. Given the volume and uniformity of the sampled plaintiff bid data, and the Court's requirement that Google's production of sampled plaintiff data be representative of the entire class period and for the

---

[16] Google may wrongly contend that some settings can affect the personal information that is shared through RTB. However, regardless of the setting, there is always a core amount of personal information shared with RTB participants. Wilson Rep. ¶ 101. Moreover, even if effective, Google's own records show that the number of class members who changed these settings is truly de-minimis. *Id.* ¶ 103; Pritzker Decl., Ex. 13. Each RTB transaction is logged by Google; if any user successfully availed herself of these settings each-and-every time she went online over a seven-year period and for every device and browser and app used, she would not appear in Google's RTB-related logs, and therefore not be a member of the class. *See* Shafiq Rep. ¶¶ 92-95.

class as a whole (*see* ECF 382, 483), the Court can conclude for the purposes of this motion that all Google U.S. account holders since June 28, 2016 have similarly had significant amounts of the same categories of personal information shared through Google RTB.

Plaintiffs seek to certify the following class for whom Google breached its contractual promise not to share or sell its account holders' personal information to anyone outside of Google:

> All individual Google account holders subject to a Google United States Terms of Service whose personal information was sold or shared by Google in its Real Time Bidding auctions after June 28, 2016.

All legal claims in plaintiffs' complaint involve these common factual issues regarding Google's promises, conduct, and resulting harm, all of which can be answered using common evidence "in one stroke." *Olean*, 31 F.4th at 663. These "aggregating, enabling issues" predominate because they are "more prevalent or important" than any "individual issues." *Id.* at 664.

## III. LEGAL STANDARD

Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect class. A party seeking class certification need only satisfy the requirements of one subsection of Rule 23(b). *Olean*, 31 F.4th at 664-65. Certification under Rule 23(b)(3) is appropriate if "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

While the court's class certification analysis must be rigorous and may overlap with the merits, the mere fact that a party moves for class certification is not a "license to engage in free-ranging merits inquiries." *Stockwell v. City and Cty of San Francisco*, 749 F.3d 1107, 1111-12 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). Instead, "[m]erits questions may be considered to the extent—but only to the extent—that they are

relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* The overall goal of Rule 23 is "to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen*, 568 U.S. at 460 (cleaned up).

## IV. ARGUMENT

### A. All 23(a) Requirements are Satisfied

**1. Numerosity.** Numerosity requires a class so numerous that joinder of all members individually would be impracticable. Rule 23(a)(1). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." *See Krzesniak v. Cendant Corp.*, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007). While Google has not yet identified the number of unique Google U.S. account holders, Google has confirmed that there are about 1.4 billion U.S. accounts potentially at issue. *See* Pritzker Decl., Ex. 13. There are at a minimum tens of millions of potential class members here.

**2. Commonality.** Commonality requires "questions of law or fact common to the class." Rule 23(a)(2). A common question is one of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Id.* at 359 (quotations and brackets omitted). Here, common issues include whether: (1) Google promised not to share or sell Class members' personal or sensitive information to third parties; (2) Google offered for sale and/or sold Class members' personal or sensitive information to RTB participants in Google RTB auctions; and (3) Google's conduct contravenes societal norms and is highly offensive to a reasonable person. Here, Google's standardized contracts and uniform actions are evidence capable of answering these common questions. *See* Caracuzzo Decl. ¶¶ 31-37, Exs. 35, 39, 41; Wilson Rep. ¶¶ 32-42; Shafiq Rep. ¶¶ 35-42; Richards Rep. ¶¶ 75-118. Also, whether the [redacted] or more items of Class member data Google uniformly transmits in RTB bid requests are "personal information" under Google's contracts and California law is a common question. Commonality is met.

**3. Typicality.** "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim

arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Google, LLC,* 2022 WL 17961497, at *16 (N.D. Cal. Dec. 12, 2022*)*. It is a "permissive" standard and its focus "should be on the defendant's conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Simpson v. Fireman's Fund Ins. Co*., 231 F.R.D. 391, 396 (N.D. Cal. 2005). Here, each plaintiff and the Class is subject to a common U.S. Google ToS and Privacy Policy, and their claims and injuries all arise from a common wrong based on Google's broken promises and systematic sharing and sale of their personal information in Google RTB. *See* Caracuzzo Decl. ¶¶ 31-37; Pritzker Decl. ¶¶ 19-22, Exs. 6-11; Shafiq Rep. ¶¶ 35-42.

**4. Adequacy.** Plaintiffs and their counsel meet Rule 23(a)(4)'s requirement that they "will fairly and adequately protect the interests of the class." This inquiry considers whether plaintiffs and their counsel have any conflicts of interest with other class members, and whether plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co*., 327 F. 3d 938, 957 (9th Cir. 2003). Furthermore, analysis under Rule 23(g), which is part of the Rule 23(a)(4) adequacy analysis (*see Victorino v. FCA US LLC*, 322 F.R.D. 403, 406 (S.D. Cal. 2017)), and as supported by the Pritzker Declaration and exhibits, shows adequacy is met. Proposed Class Counsel (a) have done substantial work "identifying or investigating potential claims" (*see* Pritzker Decl. ¶ 28), (b) have, as their resumes demonstrate, experience and substantial success in complex litigation and class actions, including privacy rights litigation (*see id.* ¶¶ 26-34), (c) possess "knowledge of the applicable law" (*see ibid.*), and (d) have substantial resources that they are able to "commit to representing the class" (*see id.* ¶ 27). *See* Rule 23(g)(1)(A)(i)–(iv).

### B. Common Issues Predominate Under Rule 23(b)[17]

#### 1. California Law Applies to All Claims

Google's ToS uniformly provided that California law commonly applies to all claims.

---

[17] In accordance with Rule 23(c)(4), Ninth Circuit courts permits issue certification in the absence of a finding that common issues predominate over individual issues with respect to the action as a whole. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4) and proceed with class treatment of these particular issues."). Plaintiffs seek class certification under Rule 23(c)(4), as appropriate.

Caracuzzo Decl. ¶¶ 31-37, Exs. 39, 41 ("California law will govern all disputes arising out of or relating to these terms…or any related services.").

**2. Common Issues Predominate as to the Breach of Contract Claim**

There is a common contractual promise to class members—that Google will not share or sell their personal information to anyone outside of Google—and common, class-wide proof that Google breaches this promise when it shares and sells such information in Google RTB.

**a. Google's Form Contract is Common, Classwide Evidence**

Whether Google promised class members that it would not share or sell their personal or sensitive information is answerable with common proof—Google's Terms of Service, Privacy Policy, and incorporated notices—amounting to a common form contract.

To create a Google account, all class members must agree to Google's ToS. Caracuzzo Decl., ¶¶ 31-37, Exs. 39, 41. Since March 31, 2020, the ToS hyperlinks and incorporates Google's prominently-displayed "How Our Business Works" page, which expressly states that Google "never sells[s] your personal information to anyone." *Id*., Ex. 38; *see also* MTD Order (ECF 233) at 3, 8.[18] Google also states:

> Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you.

Caracuzzo Decl., Ex. 38.

Google's Privacy Policy also applies to all class members; The Privacy Policy makes express promises to class members regarding the protection of their personal information. *See* Introduction, *supra*; Caracuzzo Decl. ¶¶ 19, 23-30, Exs. 35, 36, 40. The Privacy Policy also states that Google "collects information to provide better services to all of our users. . . like which ads you'll find most

[18] "California law makes it quite easy to incorporate a document by reference." *See In re Facebook, Inc., Consumer Privacy User Profile Litig*., 402 F. Supp. 3d 767, 791 (N.D. Cal. 2019) ("*Facebook Consumer Priv*."). The "contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'" *Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 54 (1997) (quoting *Bakery v. Aubry,* 216 Cal. App. 3d 1259, 1264 (1989)); *accord Marchand v. Northrop Grumman*, 2017 WL 2633132, at *5 (N.D. Cal. Jun 19, 2017) (If a contract "directed" the parties to a document the document is part of the contract); *see also* Caracuzzo Decl. ¶¶ 13-15, 30.

useful," and describes the information Google collects to include:

> . . .[U]nique identifiers, browser type and setting, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers and devices with our services, including IP address, crash reports, system activity, and the date, time and referrer URL of your request.

*Id.*, Ex. 36, at 2. The Privacy Policy commonly defines Class member "[p]ersonal information" as

> information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably liked to such information by Google, such as information we associate with your Google Account.

*Id.* at 26.

Google's ToS, Privacy Policy, and incorporated notices provide a common commitment to class members that Google does not share or sell their personal information to anyone outside of Google. This is the precise type and form of commitment that courts look to in assessing whether there is common contract to which Google and class members are bound. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020) ("*Facebook Tracking*")(contract must "outline shared commitments to which users must abide").

Whether or not agreeing to these terms constitutes consent (or lack of consent) to Google's practice of disclosing users' personal information to RTB participants in the Google RTB auctions is subject to common proof. There is also classwide, objective proof of contract formation from the perspective of a reasonable user. *Sateriale v. RJ Reynolds Tobacco Co.*, 2014 WL 7338877, at *9 (C.D. Cal. Dec. 19, 2014). "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it." *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638 (N.D. Cal. May 28, 2021) (quoting Restatement (Second) of Contracts § 211(2)); *accord Brown v. Google LLC*, 2021 WL 6064009, at *8 (N.D. Cal. Dec. 22, 2021) (Google's "contract language must be assessed objectively, from the perspective of a reasonable [Google] user." (quoting *Facebook Consumer Priv.*, 402 F. Supp. 3d at 801).[19]

---

[19] In *Facebook Consumer Priv.*, 402 F. Supp. 3d at 789, the Court explained that the test for consent "is one of contract interpretation governed by California law," which "requires the Court to pretend that users actually read [the Defendant's] contractual language before clicking their acceptance, even though we all know virtually none of them did" and that requires the contract to "be assessed objectively, from the perspective of a reasonable" consumer.

Claims that arise from "form contracts" are "particularly appropriate for class treatment." Newberg on Class Actions § 3.24 (5th ed.). So too here. The common evidence for class members as a whole is Google's own contract language. Whether Google's ToS, Privacy Polices and incorporated notices constitute a unilateral contract, and whether class members accepted Google's commitment – its affirmative promise to not share or sell their personal information with or to third parties –"will be determined by reference to objective criteria and therefore these elements are susceptible to common proof" on a classwide basis. *Roley v. Google LLC*, 2020 WL 8675968, at *10 (N.D. Cal. July 20, 2020) (citing *Sateriale*, 2014 WL 7338877, at *9)).

**b. Whether Google's Conduct Breached the Contract is Susceptible to Common, Classwide Proof**

Whether Google breached its commitment not to sell or share class members' personal information is also susceptible to common proof. This common proof includes Google's internal documents and protocols, internal Google RTB data, the testimony of Google's witnesses, and expert testimony concerning the ubiquity of Google RTB and its common impact on the Class.

Google RTB is a highly-automated computer process, the details of which are discussed above and explained more fully in the accompanying Wilson and Shafiq Reports, both of whom are experts in the field of data security, computer science, and internet privacy. The RTB auction process is well-documented in Google's RTB records and commonly works as follows:

(1) A class member visits a website or opens an app where Google RTB related source code is present, creating an impression.

(2) The Google RTB source code sends the user's impression (what the class member is looking at) to Google RTB. The impression includes a common set of information about the class member and their device, including unique identifiers associated with the class member (such as the Google User ID, device IDs, hosted match data[20], and IP address [truncated]); browsing history (such as the website being visited, the URL, and the name of the app being used); location (such as country, postal code and hyperlocal [longitude and latitude], and the make and model of the class member's web browser or mobile device and its screen size and particulars.

(3) For Google account holders, Google associates the information collected with the

[20] Hosted match data reflects cookie-matching sold by Google in RTB auctions. Wilson Rep. ¶¶ 43-46; Shafiq Rep., ¶23.

user's Google account.

(4) Google RTB packages the identifiers and other information that it associates with each user's Google account into a "bid request," which is the standardized way that Google solicits bids from hundreds of RTB participants around the world seeking the opportunity to place an ad or simply lurking in the auctions to gather free data about Google account holders and their internet activities. The bid requests uniformly include (i) information that Google associates with a class member's Google account; (ii) information that uniquely identifies the class member to RTB participants, including a Google User ID and other information that uniquely identifies the class member and their device; and (iii) communications content and contextual information that places the class member and their communication into specific ad targeting categories, including categories that Google publicly admits are "sensitive."

(5) Google RTB sends the bid requests to RTB participants (including "Ad Tech" companies that further disseminate the bid request data to other third parties) that may choose to bid on this impression by submitting a common form of "bid response" to Google RTB.

(6) Google RTB selects the winning (highest) bidder, which can deliver a targeted advertisement to the specific class member, and collects revenue from the buyer.

Wilson Rep. ¶ 24; Shafiq Rep. ¶¶ 17-22.

The common question for the trier of fact is whether, contrary to Google's contractual commitment to class members, Google RTB transmits "personal information" to third parties under Google's contract and California law.. Plaintiffs will present common evidence to demonstrate the breach. As plaintiffs' experts explain, there is common evidence to show a jury that the account holder data Google actually and uniformly transmits to third parties in Google RTB auctions (1) is information that can be reasonably linked to each account holder and is, in fact, associated by Google with each user's Google account (qualifying as "personal information" under Google's contract); and (2) contains enough information and sufficient specificity to "identify, relate to, describe [or that] is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household" under California law. Cal. Civ. Code § 1781.40(v)(1). Although Google has not produced data on a class-wide basis, the data Google has produced so far for the plaintiffs (data that was required to be representative of the Class as a whole) was analyzed by plaintiffs' experts using established scientific methodologies and, together with Google's own records, provides common evidence for a jury to conclude that class member data uniformly

transmitted to third parties in the Google RTB auctions includes, at a minimum:

(a) "unique identifiers": a "persistent identifier that can be used to recognize a consumer, a family or a device that is linked to a consumer or family, over time and across services," including "a device identifier; an Internet Protocol address; cookies, beacons, pixel tags, mobile ad identifiers…; customer number; unique pseudonym, or user alias; telephone numbers, or other forms of persistent or probabilistic identifiers that can be used to identify a particular consumer or device that is linked to a consumer or family"[21];

(b) "browsing history. . . information regarding a consumer's interaction with an internet website application or advertisement," such as the domain name, app, web page, or URL the class member is currently viewing[22];

(c) "[g]eolocation data" including postal code/longitude and latitude coordinates[23]; and

(d) "[i]nferences drawn from any of the information identified [in the law] to create a profile about a consumer reflecting the consumer's preferences, characteristics, … predisposition, behavior, attitudes, intelligence, abilities, and aptitudes", such as hosted match data, user lists, age, gender, and sensitive categories or verticals [24]

Google RTB participants understand that these data fields in the bid requests can be and are reasonably associated with a particular consumer or household, which is why a consumer using her browser to search for a mattress for her son will see advertisements for mattresses pop up—across all her devices—for weeks. [25]

Google may argue that non-personalized-ads ("NPA"), do-not-track (DNT), or similar settings may be available on individual devices and that the existence of these capabilities make certification impossible. Not so. **First**, as a factual matter, Google's own records show that only about [redacted] percent of class members ever invoked these types of settings during the class period—even on a one-time basis. *See* Pritzker Decl., Ex. 13. That means approximately [redacted] percent of class members ***never*** invoked them. **Second**, to be clear, this is ***not*** a case about whether class members were or were

---

[21] CAL. CIV. CODE § 1798.140(a); Shafiq Rep. ¶ 42; Wilson Rep. ¶¶ 35-36.
[22] CAL. CIV. CODE § 1798.140(v)(1)(F); Shafiq Rep. ¶ 42; Wilson Rep. ¶¶ 35-36.
[23] CAL. CIV. CODE § 1798.140(v)(1)(G); Shafiq Rep. ¶ 42; Wilson Rep. ¶¶ 35-36.
[24] CAL. CIV. CODE § 1798.140(v)(1)(F); Shafiq Rep. ¶ 42; Wilson Rep. ¶¶ 35-36.
[25] *See* Kirsten Martin, PhD: *It's not their story to tell: why companies should respect our privacy* (TEDxChartlottesville, 2017) [video], http://tedxcharlottesville.com/archive/2017 (click on Kirsten Martin). Dr. Martin is the Director of Technology Ethics Center at the University of Notre Dame.

not shown personalized advertisements. Plaintiffs allege that Google shared or sold class members' personal information in the Google RTB auctions to third parties, despite Google's express promise that it would not do so. Here, there is common evidence to show a jury that class members' personal information was and is in fact shared or sold in the Google RTB auctions. Shafiq Rep. ¶¶ 35-36, 41-42; Wilson Rep. ¶¶ 32-37. Because common evidence will inform the Court's interpretation of Google's form contract, and because Google's alleged breach requires common proof, certification of plaintiffs' contract claim is warranted.

### 3. Common Issues Predominate for Plaintiffs' Other Claims

Each of plaintiffs' claims turns on Google's uniform promise that it doesn't share or sell class members' personal information, further supporting class treatment.

#### a. Breach of Confidence Claim

California's tort for breach of confidence has four elements: (1) the plaintiff conveyed confidential and novel information to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a use in violation of the understanding." *Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002) (citation omitted).

First, as shown above (at §§ II and IV.B), there is common proof that Google collects and shares with RTB participants class members' personal information. This includes the contents of class members' internet communications and information about their activities and interests. Shafiq Rep. ¶¶ 35, 42. Such information is obviously "confidential." MTD Order (ECF 233) at 15:2-6.[26]

Because the categories of user data transmitted to RTB participants in Google RTB auctions are standardized but reveal information that is specific to or reasonably associated with each account holder, plaintiffs will also be able to show a jury through common evidence that "the combination and totality of various different categories of [class members' personal information] makes such disclosure novel." MTD Order (ECF 233) at 15:6-10 (citing CCAC ¶ 419); *see San Jose Options,*

---

[26] *Cf. Riley v. California*, 573 U.S. 373, 395-96 (2014) ("Internet search and browsing history" and "location information"); *Flores-Mendez v. Zoosk, Inc.*, 2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021) ("sexual preference[]"); *Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020) (medical information).

*Inc*. v. *Yeh*, 2014 WL 4380045 at *5-6 (N.D. Cal. Sep. 4, 2014) (information was confidential and novel when "taken as a whole, viewing the forest instead of a single individual email"); *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327, 1343-46 (1990). Plaintiffs' theory is amply supported by evidence showing that common issues predominate with respect to the kinds of personal information that Google's systems routinely disclose to RTB participants, and the extent to which that personal information can be linked to or reasonably associated with individual class members, and thus inherently "novel." Shafiq Rep. ¶¶ 42-98; Wilson Rep. ¶¶ 32-79.

On the second and third elements, there is ample common evidence that Google knew class members were disclosing their information in confidence, and that there was a reasonable common understanding that Google would maintain that confidence. Richards Rep. ¶¶ 72-84, 130-131. Any contrary argument by Google "is belied by the express language of Google's policies," MTD Order (ECF 233) at 15:11-15, which are set forth both as contractual promises, *see above at IV.B.2.a*, and extracontractual representations that it would never sell or share users' personal information to any third party, including advertisers. *Cf. Ojala v. Bohlin*, 178 Cal. App. 2d 292, 300 (1960) (information was conveyed in confidence where defendant gave "assurance … that he would not use the [information] for his own benefit"). Google's extracontractual representations include its many unequivocal statements made on its website, in the national media, and in sworn Congressional testimony that Google will not only never share personal information that "personally identifies" users, but also that Google will never "sell," "share," or "reveal" users' personal information to any third party, full stop. *See, e.g.*, CCAC, Exs. 23 at 1, Ex. 24 at 1-4, Ex. 25 at 1; *see also* Google's ToS and Privacy Policies, Caracuzzo Decl., Exs. 35, 36, 49-41.

Google has also represented that it will not allow advertisers to target ads based on users' personal information related to health, sexuality, race, religious beliefs, and other sensitive categories (Caracuzzo Decl. ¶¶ 25-30), and that Google will otherwise keep users' personal information "protected and private." *Id*. Google made these statements uniformly to all class members. Finally, as discussed above at IV.B.2.b., whether the manner in which Google routinely conducts its RTB auctions resulted in class members' personal information being disclosed can be based on common proof. Plaintiffs' breach of confidence claim should be certified.

**b. The CIPA Claim**

**i. Lack of Consent is a Common Question**

Plaintiffs' claims under the California Information Privacy Act contain the common element (or defense) of lack of consent. *See* CAL. PEN. CODE § 631 (CIPA). "Consent 'can be explicit or implied, but any consent must be actual . . . . In order for consent to be actual, the disclosures must 'explicitly notify' users of the practice at issue." MTD Order (ECF 233) at 16; *accord Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012) (holding that claims of implied consent must be "actual" and "to be effective, ... must be ... to the particular conduct, or substantially the same conduct."). Here, plaintiffs will prove with common evidence—Google's uniform contract with class members, as discussed *above*—that Google uniformly and unequivocally promises that it "will not sell your personal information to anyone" and "do[es] not share personal information … outside of Google." Caracuzzo Decl., Exs. 34-42. ***Nowhere*** in its ToS or Privacy Policies does Google disclose that, contrary to this express promise, it *in fact* shares with and sells to hundreds of companies outside of Google class members' personal information in the Google RTB auctions, precisely as plaintiffs allege. *Id.*; Richards Rep. ¶¶ 90-118, 127-129, 137. Also commonly, there is no mechanism by which class members can overcome this promise—by either declaring that they do, or do not, consent to Google sharing their personal information with third parties in RTB. Richards Rep. ¶ 137.

There is thus common evidence to show a jury that Google uniformly fails to "explicitly notify" class members of "the practice at issue," and thus there is common class-wide evidence defeating the requirement of actual consent. MTD Order (ECF 233) at 16; *accord In re. Facebook Biometric Information Privacy Litig.*, 326 F.R.D. 535, 545 (N.D. Cal. 2018) (certifying class where Facebook's facial recognition technology harvest biometric identifiers as contemplated under BIPA, and if so, "did Facebook give users prior notice of these practices and obtain their consent."), *aff'd*, 932 F.3d 1264 (9th Cir. 2019).

**ii. The CIPA Claim is Subject to Common Proof**

To prevail on their CIPA claim, plaintiffs must show that Google (1) "aids, agrees with . . . or conspires with any other person or persons to unlawfully do, or permit or cause" those persons to (2) "willfully and without the consent of all parties to the communication, or in any unauthorized

manner" to (3) "read[], or attempt to read, or to learn the contents or meaning of any . . . communication;" (4) while the same is in transit or . . . is being sent from, or received at any place" (5) "within this state." CAL. PEN. CODE § 631. These CIPA elements are all subject to common proof.

**First**, proof that Google's RTB auctions pertain to "contents" of electronic communications is common to all class members. CIPA broadly defines "'content' as that which 'includes any information relating to the substance, purport, or meaning of the communication at issue.'" MTD Order (ECF 233) at 17:6-9. There is common proof that Google regularly allows RTB participants to "read" or "attempt to read' or "learn the contents or meaning of" class member communications as part of the Google RTB auction process. Shafiq Rep. ¶¶ 42; Richards Rep. ¶¶ 90-100.

**Second**, proof that Google's actions occurred while communications were "in transit" is also common to all class members. *See, e.g., In re Yahoo Mail Litig*., 308 F.R.D. 577, 591 (May 26, 2015) ("*Yahoo Mail*") ("Whether Yahoo intercepts emails while those emails are in transit is capable of classwide resolution"). Here, Google RTB's re-directions occur in "real-time," while the communications between class members and publishers are still occurring. Wilson Rep. ¶ 26; Shafiq Rep. ¶ 19.

Lastly, there is common proof that Google's actions occurred within the State of California, in particular: (i) Google's venue and choice of law agreement with class members in the ToS, and (ii) Google's activities were directed and accomplished by employees in California, using servers located or under the control of California employees.[27]

**c. Invasion of Privacy and Intrusion Upon Seclusion Claims**

For plaintiffs' invasion of privacy and intrusion upon seclusion claims, courts consider whether (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Tracking*, 956 F.3d at 601. Both elements can be established through common

[27] All Google RTB transactions in the United States run through two server locations, one in California and one in Virginia. *See* https://developers.google.com/authorized-buyers/rtb/peer-guide. Moreover, Google has waived any argument regarding location of the activity by failing to produce evidence showing otherwise. The Court directed Google to produce any proof that at least one Google RTB recipient or publisher received the communications at issue while they were not located in California. MTD Order (ECF 233) at 17:10-16. Google never produced any such proof. Pritzker Decl. ¶ 13.

proof.

**i. Whether a "Reasonable" Expectation of Privacy Exists is a Common, Class-wide Issue**

"A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." *Hill v. NCAA*, 7 Cal. 4th 1, 37 (1994). Accordingly, whether class members had "reasonable expectations" of privacy is subject to common proof of broadly based and widely accepted community norms, not on their subjective expectations. *See, e.g.*, *Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016) (certifying class for intrusion upon seclusion claim). In addition, insofar as a reasonable expectation of privacy rises or falls on consent, Google's express promises and its breaches of those promises are uniform for all class members and go directly to the issue of consent and reasonable expectations of privacy.

Here, in light of Google's uniform promises that it would not share and sell class members' personal information, class members uniformly had a reasonable expectation that Google would keep their information private in accordance with its promises. *See, e.g.*, *Facebook Tracking*, 956 F.3d at 602 ("Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway."); *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262, 294 (3d Cir. 2016) (holding that a reasonable expectation of privacy existed when Nickelodeon promised users that it would not collect information from website users, but then did). Proof of these issues is common to the class (*see* Richards Rep. ¶¶ 75-118, 130-131) and will be based on common evidence in the form of common representative information that Google has produced in discovery.

**i. The "Highly Offensive" Element is Judged By a "Reasonable Person" Standard**

The element of "highly offensive" is judged on an objective "reasonable person" standard and must be "'sufficiently serious and unwarranted' as to constitute an 'egregious breach of social norms,'" which does not depend upon any individual plaintiffs' feelings about the conduct. *Facebook Tracking*, 956 F.3d at 606. This element is "essentially a 'policy' determination" as to whether the alleged conduct is "highly offensive' under the circumstances." *Opperman*, 2016 WL 3844326, at * 11. The relevant factors include "the degree and setting of intrusion, and the intruder's motives and objective." *Id.* Critically, while "[t]hese determinations may require an examination of [Google's]

motives, [] they will not require individualized determinations of class members' subjective experiences." *Id.* Given this standard, the question of whether Google's conduct was "highly offensive" is subject to common proof class wide. *Id*; *see* Richards Rep. ¶¶ 75-118.

**d. Publication of Private Facts Claim**

For the publication of private facts claim, plaintiffs must show "(1) public disclosure of (2) a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 214 (1998) (citations omitted). Elements two and three mirror the elements of the other privacy claims and, for the same reasons discussed above, these elements are subject to common class-wide proof. In addition, on the issue of whether the information Google shares through RTB is "a private fact," the evidence demonstrates that the core allegations of plaintiffs' complaint are true for all class members. Shafiq Rep. ¶¶ 41-42. Thus, the evidence produced to date supports that the information shared through the RTB auctions is personal information under California law. "[P]arties generally maintain a reasonable expectation of privacy in their personal information." MTD Order (ECF 233) at 13:4-9.

**i. "Public Disclosure" is Subject to Common Evidence**

With respect to the first element, a plaintiff must show that the information is "widely published and not confined to a few persons or limited circumstances." *Hill*, 7 Cal. 4th at 27. This question will be answered with common evidence that Google shares class members' personal information through RTB with hundreds of RTB participants around the world based on information collected about those class members on millions of websites and apps. Shafiq Rep. ¶¶ 38-39; Pritzker Decl., Ex. 12. As this Court previously observed, the public disclosure element can be satisfied "[g]iven the large number of participants in the RTB bidding process." MTD Order (ECF 233) at 13:27-14:5; *see also Facebook Consumer Priv.*, 402 F. Supp. 3d at 796 ("[D]issemination of your private information to tens of thousands of individuals and companies is generally going to be equivalent to making that information 'public.'"). The scope and scale of Google's disclosures to third parties is further confirmed by plaintiffs' expert. Prof. Shafiq analyzed the representative data produced by Google showing the information Google shared with RTB participants about the plaintiffs. Shafiq Rep. ¶¶ 35-42. This analysis revealed that for just the seven plaintiffs and for just

an eight-week period, Google disclosed their personal information through Google RTB to at least [redacted] different companies located in [redacted] different countries almost [redacted] times. *Id.*

**ii. The Information is Not of "Legitimate Public Concern"**

The disclosure of class members' personal information and web-browsing histories through Google's RTB system are not of "legitimate public concern." This element also can be satisfied by common evidence and common legal arguments.

**C. Common Issues Predominate Regarding the Relief Plaintiffs Seek**

California law recognizes disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *Facebook Tracking*, 956 F.3d at 600; *In re Google Assistant Privacy Litigation*, 546 F. Supp. 3d 945, 967-8 (N.D. Cal. 2021) (plaintiffs in privacy case properly pled entitlement to non-restitutionary disgorgement for breach of contract).[28]

**1. Common Issues Predominate as to Disgorgement of Profits**

Disgorgement is a common issue subject to common proof. Plaintiffs' damages expert, Prof. Zeithammer, calculates classwide disgorgement based on Google's internal revenue analyses of Google RTB revenues attributable to the use of the class member personal information at issue here, and applies econometrics. Zeithammer Rep. ¶¶ 18-63. Google's internal revenue analyses, outside econometric studies, and Prof. Zeithammer's additional economic analyses provide convergent multi-method evidence that approximately 51.1% of Google's RTB revenues result from the improper sale of class members' personal information to RTB participants in Google RTB auctions. *Id.* ¶¶ 12-14, 81, 98. Plaintiffs' other damages expert, Greg Regan, applies Prof. Zeithammer's 51.1% allocation to Google's gross RTB revenues during the class period to determine what percentage of those revenues constitute profits subject to disgorgement under a class-wide unjust enrichment remedy. Regan Rep. ¶¶ 35-53. Mr. Regan, applying his accounting expertise to Google's internal revenue documents, calculates Google's unjust enrichment profits for each year of the class period on a class-

[28] *See also*, *Alkayali v Hoed,* 2018 WL 3425980, at* 3 (S.D. Cal. 2018) (*citing Hernandez v. Lopez,* 180 Cal. App. 4th 932, 939 (2009) (holding that "a plaintiff may seek compensation under an unjust enrichment theory. . .based on the pleaded contract of action for breach of contract"); *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 198 (2000) (same); 1 Witkin, Summary 11th Contracts § 1050 (2018) ("Restitution may also be awarded in contract actions. . ..").

wide basis (totaling at least [redacted]). *Id.* ¶ 53.

**2. Common Issues Predominate Based on Market Pricing Damages**

As an alternative classwide damages analysis, Prof. Zeithammer proposes a market price damages model using common evidence to determine the market value of class members' personal information shared with RTB participants. Zeithammer Rep. ¶¶ 15-17, 84-97. Based on his analysis, which includes a review and analysis of four vendors that pay consumers for their personal information, Prof. Zeithammer determines that the fair market value of class members' personal information is $38 per year (or $3.17 per month) for each class member. *Id.* ¶¶ 15-17, 93-97, 100. This is a common approach to market damages.

**3. Common Issues Predominate as to Punitive Damages**

Because "the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, . . . the focus of a punitive damages claim is not on the facts unique to each class member, but on the defendant's conduct toward the class as a whole." *Ellis v. Costco Corp. III*, 285 F.R.D. 492, 542-44 (N.D. Cal. 2012) (certifying Rule 23(b)(3) class including a claim for punitive damages). Here, plaintiffs claim that Google acted with the requisite intent on a class-wide basis and will rely on Google's internal documents and other common evidence to prove their entitlement to punitive damages at trial.

**4. Common Issues Predominate as to Statutory Damages**

CIPA provides for a statutory minimum judgment of $5,000 per violation or treble damages, whichever is greater. CAL. PENAL CODE § 637.2(a). Such statutory damages calculations are common and certifiable. Plaintiffs' proposed class is large—likely containing hundreds of millions of class members—and, accordingly, any statutory damages for the class would also likely be substantial. But that is not a basis to refuse certification. For example, in *Patel v. Facebook*, Inc., the Ninth Circuit affirmed certification of a Rule 23(b)(3) class even though the plaintiffs likewise sought statutory damages. 932 F. 3d 1264, 1276-77 (9th Cir. 2019) ("Where neither the statutory language nor legislative history indicates that the legislature intended to place a cap on statutory damages, denying class certification on that basis would subvert legislative intent."); *see also Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *9 (C.D. Cal. Jan. 3, 2017 (despite class action device, the California legislature

"evidently decided that [] damages of $5,000 per violation serve CIPA's purposes and are proportional to the harm caused by CIPA violations") (alteration in original). The same is true here. In any event, "concerns about excessive damages are better suited to a later stage of the litigation." *Zaklit v. Nationstart Mortg. LLC*, 2017 WL 3147901, at *9 (C.D. Cal. July 24, 2017).

**D. Plaintiffs' Methods for Fairly Distributing Monetary Relief to Class Members**

Plaintiffs' aggregate class-wide damages are calculable based on common proof and sound methodologies. At the class certification stage, that "may be all that plaintiffs need prove." Newberg on Class Actions § 12:2. This is because when "the only question is how to distribute damages, the interests affected are not the defendant's but rather those of silent class members." *Six (6) Mexican Workers*, 904 F.2d 1301, 1307 (9th Cir. 1990); *see also Ruiz Torres v. Mercer Canyons*, 835 F.3d 1125, 1140-41 (9th Cir. 2016) (while the partitioning of an aggregate damage award among class members may lead to individual calculations, that would not defeat class certification).

Although Ninth Circuit law is clear that Google has no stake in how an aggregate award might be distributed, plaintiffs nonetheless propose a plan to distribute damages, if awarded at trial, to class members. Whether constituted as disgorgement of unjust enrichment profits or an award of compensatory damages based on the market value of class members' personal information shared in RTB auctions, Mr. Regan, in his report, proposes a method to fairly and equitably allocate any aggregate damages award to all class members on a pro rata basis according to the number of months each class member has maintained an active Google account during the class period. This calculation is knowable because Google maintains records for all class members identifying when they first signed up for a Google account in the United States. Regan Rep. ¶¶ 54-57, 62-65; Shafiq Rep. ¶¶ 90-91.

**E. A Class Action is Superior to Individual Adjudications**

Under Rule 23(b)(3)'s superiority prong, a class action here will achieve "economies of time, effort, and expense" and promote "uniformity of decisions as to persons similarly situated." *Amchem Products v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted). All of these economies will be satisfied by class treatment and a single trial.[29] Liability will be established under one state forum's

[29] Plaintiffs' proposed trial plan is described in the Pritzker Decl. ¶¶ 35-41.

law, California, under Google's uniform contract with all class members The evidence to be presented to the jury will be the same for the individual plaintiffs as it is for the Class. Pritzker Decl. ¶¶ 35-41. As discussed, all of these claims involve common issues regarding Google's promises, conduct and resulting harm, all of which can be answered using common evidence "in one stroke." *Olean*, 31 F.4th at 663.

### F. Rule 23(b)(2) Certification Is Warranted for Injunctive Relief

Plaintiffs also seek certification under Rule 23(b)(2) for plaintiffs' claims for injunctive and declaratory relief. Rule 23(b)(2) requires courts to look at whether class members seek uniform relief from a practice applicable to all of them. *Ward v. United Airlines, Inc.*, 2021 WL 534364, at *7 (N.D. Cal. Feb. 12, 2021) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). Plaintiffs seek injunctive relief that would require Google to either stop sharing and selling class members' personal information in Google RTB auctions in violation of Google's contracts and California law, or provide accurate notice to class members that Google will or intends to share and sell their personal information to third parties in Google RTB auctions and afford all class members a meaningful and knowing opportunity to opt out and refuse Google permission to share or sell their personal information through Google RTB auctions. Plaintiffs also seek the appointment of an independent third-party to verify that the injunctive relief has been implemented. Pritzker Decl. ¶ 44.

"Unlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class." *Yahoo Mail*, 308 F.R.D. at 598-99 (certifying a Rule 23(b)(2) class seeking injunctive relief requiring Yahoo to stop scanning incoming and outgoing emails while in transit); *see DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) (certifying an injunctive relief class requiring Meta (f/k/a Facebook) to correct or cease certain practices). Here, Google has continued to uniformly breach its commitment to class members that it "doesn't sell your personal information to anyone," and to unjustly profit from its ongoing misconduct. These common practices can be addressed through injunctive relief.

## V. CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court certify the Class, appoint plaintiffs as representatives of the Class, and appoint class counsel.

DATED: July 14, 2023

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: /s/ *Elizabeth C. Pritzker*

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Jenny Paulson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*jpaulson@simmonsfirm.com*

**DICELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017

Tel.: (212) 784-6400
Fax: (212) 213-5949
Tel: (646) 993-1000
*dstraite@dicellolevitt.com*

James Ulwick (admitted pro hac vice)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*julwick@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (Cal. Bar No. 175783)
Yury A. Kolesnikov (Cal. Bar. No. 271173)
7817 Ivanhoe Ave., Ste. 102
La Jolla, CA 92037
Tel.: (858) 914-2001
*fbottini@bottinilaw.com*
*ykolesnikov@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

**FILER ATTESTATION**

I, Bethany Caracuzzo, attest that concurrence in the filing of this document has been obtained from the other signatories. Executed on July 14,2023 in Emeryville, California.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE APRIL 3, 2023 DISCOVERY DISPUTE**

**(REDACTED)**

Re: Dkt. No. 473

United States District Court
Northern District of California

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve their dispute concerning plaintiffs' demand that Google produce information about and exemplars of several internal "dashboards" related to RTB, and that Google produce information about an internal source code search tool and a summary of all source code changes Google has made to bid request and bid response fields in RTB during the class period. The Court deems this matter suitable for resolution without oral argument. Civil L.R. 7-1(b).

For the reasons explained below, the Court denies plaintiffs' request for relief, and orders further proceedings.

## I. BACKGROUND

Citing the deposition testimony of three Google witnesses, plaintiffs say that they recently learned that Google has internal "dashboards" that permit Google to locate, track, gather, and present information on different aspects of RTB auctions, including: [redacted] Dkt. No. 473 at 1, 2. In addition, plaintiffs say that they learned from depositions of

Google's witnesses Mr. Berntson and Mr. Belov that changes to RTB bid request and bid response fields are documented in Google's source code, that the source code can be searched using an internal tool, and that Google can generate a summary of all changes made to RTB bid request and bid response fields. *Id.* at 3.

Plaintiffs say that the dashboards contain "relevant and discoverable information that has not been adequately covered by Google's production to-date." *Id.* at 2. They also say that the source code-related evidence "bears directly on common practices and is probative of Google's knowledge of improper practices." *Id.* at 4. In a footnote, plaintiffs contend that these materials are responsive to their RFP 22(q)(ii)-(iv).[1] *Id.* at 2 n.4.

Google responds that plaintiffs have identified no document requests that would require production of the contents of its internal dashboards or its source code, and that these materials are beyond the scope of the non-custodial sources of ESI that Google was ordered to search. *Id.* at 4. Google also argues that the broad scope of production that plaintiffs now demand is inconsistent with this Court's orders denying plaintiffs' prior requests for discovery of the location and manner in which Google stores bid request information, the technical details of Google's RTB-related systems, and non-RTB products and services. *Id.* As to specific dashboards, Google argues that the information plaintiffs seek is duplicative of information Google has already produced from other sources. *Id.* at 5-6. Finally, Google objects that plaintiffs' demand for production of source code is overbroad and unduly burdensome. *Id.* at 7.

## II. DISCUSSION

Once again, the Court is confronted with a discovery dispute that it cannot fully resolve because the parties have not complied with the Court's discovery dispute resolution procedures. While plaintiffs suggest via a footnote that the dashboard and source code discovery they seek is responsive to RFP 22(q)(ii)-(iv), they do nothing to meaningfully link that request with their

[1] The parties did not attach this document request to their joint submission, as the Standing Order requires. However, this document request is reproduced in the Court's prior order at Dkt. No. 352. *See* Dkt. No. 352 at 3-4. Plaintiffs also include a "see also" cite to Dkt. No. 326 "re. RFPs 99, 100." Dkt. No. 473 at 2 n.4. The Court has reviewed the order at Dkt. No. 326; it does not address plaintiffs' RFPs 99 and 100.

United States District Court
Northern District of California

present demands. RFP 22(q)(ii)-(iv) asks for documents showing what information the winning bidder receives from Google and conveys to Google by means of an RTB auction, and how Google receives payment. *See* Dkt. No. 352 at 3-4. This RFP does not appear to encompass the much more comprehensive information plaintiffs demand here. As the Court has repeatedly reminded plaintiffs, the Court cannot decide discovery disputes based on conclusory assertions that the information is "relevant"; rather, the Court expects plaintiffs to identify the discovery request at issue and to explain why the discovery they seek is responsive to that request, relevant to a claim or defense, and proportional to the needs of the case. *See, e.g.*, Dkt. No. 231 at 4, 5, 6, 8, 11, 13-14; Dkt. No. 287 at 1-2; Dkt. No. 313 at 3; Dkt. No. 314 at 2-3; Dkt. No. 491 at 4, 5-6. Plaintiffs have not done that here, and the Court will not do this work for them.

In addition, the parties appear to have filed their joint discovery dispute submission without engaging in the substantive discussions the Court expects in advance of seeking relief. For example, plaintiffs contend that, irrespective of any particular discovery request, Google's internal dashboards are a relevant source of ESI and should have been included in the non-custodial data sources Google was required to disclose and search. Dkt. No. 473 at 2-3. Google responds that it disclosed its non-custodial data sources over a year ago and the Court resolved the parties' dispute about those sources. *Id.* at 4. The parties appear to agree that Google has refused to engage in substantive discussions with plaintiffs about what information is available from these dashboards. The problem with Google's approach to this issue is that it is not at all clear from the joint submission, or the briefing leading up to the Court's prior order regarding non-custodial ESI sources, that Google ever disclosed the existence of the dashboard information to plaintiffs as a *possible* source of relevant ESI. *See id.* at 4; Dkt. No. 188 at 4.

Finally, as the Court noted in its April 25, 2022 order, Google agreed to produce documents "sufficient to show" the information sought in RFP 22(q)(ii)-(iv). *See* Dkt. No. 184 at 6. In that same order, the Court stated: "If Google maintains a record of account holder information shared with third parties through the RTB process, it must produce documents sufficient to show what information is shared and how it tracks what information is shared." *Id.* Although plaintiffs say that the information from Google's dashboards "has not been adequately

covered by Google's production to-date," Dkt. No. 473 at 2, this conclusory statement is not further explained. Plaintiffs do not directly address Google's argument that it has already produced documents "sufficient to show" information responsive to RFP 22(q)(ii)-(iv); rather, they principally argue that the dashboard and source code materials are relevant and easy for Google to produce, so they should be ordered to produce them. Dkt. No. 473 at 1-2, 4. That argument is not persuasive unless plaintiffs can show Google has not already produced documents sufficient to show the information it was required to provide.

The Court orders the parties to confer further about the following matters:

1. With respect to the information plaintiffs believe is available via Google's internal dashboards, plaintiffs must identify for Google the specific discovery requests (or court orders) that support plaintiffs' demand for production. Plaintiffs must also explain why they believe the information Google has provided so far is not sufficient. Google should consider whether the internal dashboards contain information that plaintiffs contend is missing from Google's current production, and if it believes the information plaintiffs seek is not available from a dashboard or has already been produced from some other source, Google must explain why this is so, and not just refuse to discuss the matter.
2. With respect to the source code information, plaintiffs must identify for Google the specific discovery requests (or court orders) that support plaintiffs' demand for production of information showing changes to RTB-related source code. Plaintiff must also explain why they believe the information Google has already provided is not sufficient to show which fields were included in bid requests during the class period, including when certain fields were deprecated. Google should consider whether its source code contains information that plaintiffs contend is missing from Google's current production, and if it believes the information plaintiffs seek cannot be easily extracted from Google's source code repository or has already been produced from some other source, Google must explain why this is so, and not just refuse to discuss the matter.

3. With respect to the internal dashboards, if Google contends that some or all of the internal dashboards are among the non-custodial ESI sources Google identified in Dkt. No. 157-3, it must so advise plaintiffs and identify which dashboard materials were already searched for responsive ESI. If Google believes that the internal dashboards are not sources of potentially responsive ESI, it must explain why this is so.

4. The parties must complete their further discussion of the dashboard and source code discovery by **May 5, 2023**. If they still have disputes about these matters, they should file another discovery dispute submission by **May 10, 2023**, unless they agree to extend that deadline. The Court expects the parties to include in the joint submission the following information: Plaintiffs must identify the discovery requests at issue (or court order), and explain why the discovery they seek is responsive to that request, relevant to a claim or defense, and proportional to the needs of the case, assuming those matters are in dispute. Google must explain why the discovery is not responsive to a request (or court order), not relevant to a claim or defense, or not proportional to the needs of the case, again, assuming those matters are in dispute.

**IT IS SO ORDERED.**

Dated: April 28, 2023

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION.

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE MARCH 27, 2023 DISCOVERY DISPUTE RE BERNTSON AND BELOV**

Re: Dkt. No. 463

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve their dispute concerning plaintiffs' demand that Google collect, review, and produce responsive documents from two custodians, Glenn Berntson and Stan Belov, for the year 2022, and that Google make Mr. Belov available for a second full day of deposition testimony. Dkt. No. 463. The Court deems this matter suitable for resolution without oral argument. Civil L.R. 7-1(b).

For the reasons explained below, the Court denies plaintiffs' request for an order requiring Google to supplement its document production for Mr. Berntson and Mr. Belov and denies their request for a further deposition of Mr. Belov.

## I. BACKGROUND

Mr. Berntson and Mr. Belov are Google employees with engineering responsibilities that plaintiffs say make them "central to Google's RTB design and operation." Dkt. No. 463 at 1. Google collected and reviewed documents from these two custodians in early 2022, and completed production of their responsive documents by April 21, 2022 – the original deadline for the substantial completion of document production. *Id.* at 4. As a result, Google's production for Mr. Berntson contains no documents from 2022, and the production for Mr. Belov contains only one document from 2022. *Id.* at 1. Plaintiffs say that this makes Google's document production for

these custodians incomplete, given that the class period extends to the present. *Id.* at 2.

Plaintiffs have deposed both Mr. Berntson and Mr. Belov. Plaintiffs ask that Google be compelled to produce Mr. Belov for another full day of testimony because plaintiffs did not complete their examination of him. *Id.* at 3.

## II. DISCUSSION

### A. Duty to Supplement Document Production from Custodians

Given the timing of Google's document collection, review and production in this case, the Court understands that Google's document production for Mr. Berntson and Mr. Belov contains no or few documents from 2022. The question presented is whether Google has a duty to supplement its document production now to encompass any additional responsive documents in these custodians' possession.

Plaintiffs rely on Rule 26(e) which provides:

> **(1)** ***In General.*** A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

Fed. R. Civ. P. 26(e)(1). Plaintiffs argue that Google's document production is incomplete because Mr. Berntson and Mr. Belov are likely the custodians of additional documents that were created since Google completed its production a year ago. Dkt. No. 463 at 2. Indeed, plaintiffs argue they would be "within their rights" to demand a supplemental production for all custodians, not just these two. *Id.*

Google does not dispute that the duty to supplement under Rule 26(e) applies to its document production. However, it argues that the mere existence of relevant or responsive documents created after the date of a party's otherwise timely production does not render that

production "incomplete" within the meaning of the rule. *Id.* at 4. Google argues that plaintiffs must show that new information has made its existing document production materially incomplete or inaccurate, or that there is a specific need for supplementation. *Id.* at 5.

A party's duty to supplement its document production is triggered when the party learns that its production is incomplete or incorrect in some material respect. Plaintiffs essentially argue that for Mr. Berntson and Mr. Belov, Google's production has become incomplete because, given their roles with respect to RTB, they *must* have additional documents that are responsive to plaintiffs' document requests. The authority on which plaintiffs rely does not support such a broad rationale for requiring supplementation. In *Reinsdorf v. Skechers U.S.A., Inc.*, No. CV 10-7181 DDP (SSX), 2013 WL 12116416 (C.D. Cal. Sept. 9, 2013), the plaintiff served document requests asking for the production of recall notices and related documents. The defendant produced no responsive documents during the course of discovery because no such notices had been issued. However, the defendant's duty to supplement its production in response to the earlier document requests was triggered once it issued a recall notice, even though discovery had then closed. In other words, the change in circumstances made the defendant's earlier response (i.e., no recall notices had issued so none could be produced) materially incorrect and incomplete. *Reinsdorf*, 2013 WL 12116416, at *11. The court did not conclude that the defendants were required to supplement their production merely because additional responsive documents may exist due to the passage of time. Similarly, in *Switch Communications Group v. Ballard*, No. 2:11-CV-00285-KJD, 2012 WL 2342929 (D. Nev. June 19, 2012), the court required the defendant to produce documents generated since its earlier discovery responses but only "to the extent they materially affect the completeness or correctness of the previous responses," such as documents reflecting subsequent efforts to build a facility that utilized the plaintiff's alleged trade secrets. *Switch Commc'ns Grp*., 2012 WL 2342929, at *7.

Plaintiffs are correct that Google has an *affirmative* duty to supplement its discovery responses, including its document production, under Rule 26(e). Moreover, as many courts have held, that duty extends past the close of discovery or interim deadlines for document production. *See, e.g., Spears v. First Am. eAppraiseIT*, No. 5: 08-cv-00868 RMW (HRL), 2014 WL 11369808,



United States District Court
Northern District of California

United States District Court
Northern District of California

at *2 (N.D. Cal. June 17, 2014) (citing *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 73-80 (W.D.N.Y. 2011). However, Google's duty is triggered only if its prior production is materially incomplete or incorrect. The fact that responsive documents similar to those previously produced by a custodian have continued to accumulate in that custodian's files during the course of litigation does not automatically render the prior production materially incomplete or incorrect. "[N]othing in [Rule 26(e)(1)] imposes a never ending obligation to produce documents continuously as they are created." *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, No. C06-3359 JF (RS), 2008 WL 4786671, at *2 (N.D. Cal. Oct. 29, 2008) (rejecting the contention that relevance alone triggers the duty to supplement).

Here, plaintiffs do not identify anything that might trigger Google's duty to supplement, apart from likely relevance and the passage of time. Equally important, plaintiffs do not identify a single document request against which the Court might test an argument that Google's prior responsive production is now materially inaccurate or complete. And while Google's affirmative duty to supplement is independent of any showing plaintiffs may make, nothing in the parties' joint submission suggests that there has been some new development or change in Google's RTB design and operation since Google's prior production that supports plaintiffs' present demand for a supplemental production of specific documents from Mr. Berntson and Mr. Belov, let alone all responsive documents from these two custodians.

**B. Further Deposition of Mr. Belov**

According to the parties' joint submission, plaintiffs have already deposed Mr. Belov for a full day of nearly seven hours. Plaintiffs say that Mr. Belov is "the most central figure in the case concerning the design and operation of RTB over a seven-year period," and that he "has authored or is the custodian of hundreds if not thousands of documents critical to explaining how RTB works and how it has changed over the years." Dkt. No. 463 at 3. Plaintiffs explain that they did not have enough time to cover all of the matters they wished to cover with Mr. Belov. *Id.* Plaintiffs also suggest that they were not able to question Mr. Belov efficiently at his earlier deposition because he was difficult and defense counsel made excessive and improper objections. *Id.*

"Unless otherwise stipulated or ordered by the court, a deposition is limited to one day of 7 hours. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." Fed. R. Civ. P. 30(d)(1).[1] Absent a stipulation, "[t]he party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show good cause to justify such an order." Fed. R. Civ. P. 30, Advisory Committee Notes to 2000 amendment, subdivision (d).

Google argues that plaintiffs have not shown good cause for a further deposition of Mr. Belov. It says that plaintiffs chose to prioritize other matters during Mr. Belov's first deposition and should not be permitted to depose him a second time "simply because they want to revisit their strategic decisions on the subjects they chose to cover with Mr. Belov." Dkt. No. 463 at 6. For example, Google says that plaintiffs questioned Mr. Belov for more than an hour about matters of marginal relevance (his performance evaluations) or outside the scope of his knowledge (whether Google had produced certain hyperlinked documents in discovery). *Id.* at 5, 6. Google observes that the mere fact that complex litigation such as this involves the production of thousands of documents for an individual custodian is not, by itself, sufficient justification for further deposition. *Id.* at 6.

Plaintiffs do not respond to these observations. Nor do they provide support for their characterization of Mr. Belov as a "difficult" witness. While the fact that defense counsel objected more than 350 times during a single deposition is certainly concerning, it is impossible for the Court to fault Google for that without any information about the questions to which the objections were made. But the real problem with plaintiffs' request for a further deposition of Mr. Belov is the lack of any specific justification for additional time. Apart from noting Mr. Belov's role at Google and the volume of documents associated with him, plaintiffs say nothing about the

---

[1] Rule 26(b)(1) permits discovery of nonprivileged matters that are relevant to a party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P 26(b)(1). Rule 26(b)(2) requires the Court to limit discovery that is unreasonably cumulative or duplicative, or that the party seeking discovery has had ample opportunity to obtain, or that is outside the scope of permissible discovery described in Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2).

information they seek now but were not able to obtain during Mr. Belov's deposition, or why that information is "critical" to their case. By contrast, in *Rubalcava v. City of San Jose*, No. 20-cv-04191 BLF (VKD), 2022 WL 17551989 (N.D. Cal. Dec. 9, 2022), the plaintiff identified the specific topics he was unable to explore in sufficient detail, explained why those matters were relevant to the dispute, and identified deposition-specific reasons the seven hours allotted for the initial deposition were insufficient. *See Rubalcava*, 2022 WL 17551989, at *2 & n.2.

Here, plaintiffs have not made a sufficient showing of good cause for a further deposition of Mr. Belov.

## III. CONCLUSION

For the reasons explained above, the Court denies plaintiffs' present demand for a supplemental production of documents from Mr. Berntson and Mr. Belov and for a further deposition of Mr. Belov.

**IT IS SO ORDERED.**

Dated: April 21, 2023

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS**

Re: Dkt. No. 431

Plaintiffs move for an order finding defendant Google LLC ("Google") in contempt and imposing evidentiary and monetary sanctions against Google for failure to comply with the Court's prior discovery orders (Dkt. Nos. 314, 382). Dkt. No. 431. Google opposes the motion. Dkt. No. 448. The Court held a hearing on the motion on April 11, 2023. Dkt. No. 478. The motion is denied.

## I. BACKGROUND

Plaintiffs' motion focuses on two passages from the Court's prior orders dated August 26, 2022 and December 16, 2022:

> The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify an account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well. Otherwise, plaintiffs have not shown they are entitled to discovery of all information Google maintains about an account holder solely based on Google's internal linking of information with an account holder.

Dkt. No. 314 at 4-5.

> Plaintiffs say that Google's production must include documents sufficient to show both the explicit sharing of verticals associated

> with the named plaintiffs and any implicit sharing that facilitates ad targeting. The Court agrees. Google must produce documents sufficient to show for each named plaintiff the "verticals" data fields it shared with RTB participants during the class period. In addition, Google must produce documents sufficient to show for each named plaintiff the information, if any, that it provided to RTB participants that would permit those participants to infer information about the account holder based on verticals linked with the account holder.

Dkt. No. 382 at 5.

Plaintiffs claim that Google violated the Court's order in three respects. First, plaintiffs say that Google's production of named plaintiffs data responsive to these orders did not include three data fields—user_lists, content_labels, and app_category_fatcat_id —that are within the scope of the Court's prior orders. Dkt. No. 431 at 5. Second, plaintiffs say that Google improperly limited its responsive production to a selectively time-sampled period of six weeks, which was not representative of the class period. *Id.* at 4. Third, plaintiffs say that Google "intentionally stripped out" data fields that would identify the named plaintiffs whose data they produced, making it difficult for plaintiffs to know which data is associated with a particular named plaintiff and to match later productions with earlier productions. *Id.* at 5.

Google responds that plaintiffs' motion should be denied because it seeks the production of information that is outside the scope of the Court's prior orders. In addition, Google says that plaintiffs' motion disguises an effort by plaintiffs to evade the Court's expedited discovery dispute resolution procedures. Dkt. No. 448 at 1. Google argues that no sanctions are warranted in any event, as it has attempted to comply with the Court's orders in good faith, and even sought clarification of one of the orders. *Id.* at 2.

## II. LEGAL STANDARD

A court has authority to sanction litigants for discovery misconduct under both the Federal Rules of Civil Procedure and the court's inherent power to prevent abusive litigation practices. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *True Health Chiropractic Inc. v. McKesson Corp.*, 2015 WL 5341592, at *6 (N.D. Cal. Sept. 12, 2015). When a party violates a discovery order, Rule 37(b)(2)(A) authorizes a variety of sanctions, including "prohibiting the disobedient party from supporting or opposing designated claims or defenses," "striking pleadings," "dismissing the action," or "treating as contempt of court the failure to obey [an] order

. . . ." Fed. R. Civ. P. 37(b)(2)(A). "[O]n the menu of sanctions that a court may select from in applying Rule 37, preclusion of evidence is among the most severe." *True Health Chiropractic*, 2015 WL 5341592, at *6 (citing *Network Appliance, Inc. v. Bluearc Corp.*, No. C 03–5665 MHP, 2005 WL 1513099, at *3 (N.D. Cal. June 27, 2005) *aff'd*, 205 Fed. Appx. 835 (Fed. Cir. 2006)). Courts apply a five-factor test in the context of exclusionary sanctions to analyze "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; [and] (5) the availability of less drastic sanctions." *See, e.g., Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

To obtain a contempt order as a discovery sanction, the moving party must prove by clear and convincing evidence that a court order provided "unequivocal notice" that certain discovery must be produced. *Etienne v. Kaiser Found. Hosp.*, No. C11-02324 LB, 2012 U.S. Dist. LEXIS 91600, at *3 (N.D. Cal. July 2, 2012) (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992)); *see also F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (discussing clear and convincing evidence standard); *Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, No. 14-cv-02737-BLF, 2015 WL 6449399, at *2 (N.D. Cal. Oct. 26, 2015) ("[C]ontempt requires the existence of a specific and definite court order."). A finding of contempt is improper where the violation was "based on a good faith and reasonable interpretation of the [order]." *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 289 F.R.D. 548, 553 (N.D. Cal. 2013).

Sanctions are also available under Rule 16(f)(l), which provides that a "court may issue any just orders . . . if a party or its counsel . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(l)(C). Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial management." *Cato v. Fresno City*, 234 F.3d 1276, 1276 (9th Cir. 2000) (citation omitted). A court may order sanctions under Rule 16 for violation of an order where "[d]isregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).

Additionally, "discovery misconduct may be punished under the court's 'inherent powers' to manage its affairs." *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 396 (N.D. Cal. 2012) (quoting *Unigard Sec. Ins. Co.*, 982 F.2d at 368). Sanctions under a court's inherent authority are analyzed using the same test as those under Rule 37. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

## III. DISCUSSION

### A. Whether the Three Disputed Data Fields Are Within the Scope of the Court's Prior Orders

Plaintiffs' principal argument is that the user_lists, content_labels, and app_category_fatcat_id data fields are clearly within the scope of the Court's prior orders and Google should have produced them. Google points out that the Court's orders did not specifically identify these data fields for production, and the parties did not brief these particular data fields in the discovery dispute submissions that preceded the orders.[1]

In their briefing on the present motion, plaintiffs explain that the user_lists field includes signals that show when a named plaintiff sent a previous communication on a specific topic or action, and that assignment of a user to a user list is reflected in that user's profile, which is shared with RTB participants. Dkt. No. 431 at 5; Dkt. No. 457 at 7. Google responds that the user_lists field was removed from bid requests in 2018 and Google no longer has records from this data field to produce. Dkt. No. 448 at 10. Moreover, Google explains that it neither creates nor shares any user lists; rather, an *RTB participant* could create and populate these lists, which Google maintained internally. The lists could be used to "pre-filter" the bid requests that the participant wished to receive. *Id.* at 10; Dkt. No. 447-3 ¶ 5. Google explains that it did not and does not consider the user lists field a "vertical" or other user-specific information shared through RTB and reasonably did not believe this field was within the scope of the Court's prior orders. Dkt. No. 448 at 10-11.

[1] Plaintiffs did refer to several "user_lists" fields in Dkt. No. 367 at 2 (the *Calhoun* submission). In the same submission, Google took the position that such fields related to different ad products, not RTB. *Id.* at 4. The Court ultimately concluded that plaintiffs had not adequately supported their demands for these and other data fields. *See* Dkt. No. 382 at 3-4.

Similarly, plaintiffs explain that the content_labels field includes categories that describe the content of the publisher's web page being visited by a user and that this field is also used to target or filter bid requests. Dkt. No. 431 at 5. Plaintiffs argue that "any information in the possession of Google reflecting websites visited by specific account holders constitutes data that could allow RTB participants to infer information about those account holders." Dkt. No. 457 at 7-8. Google responds that content labels describe websites and are not user-specific information. Dkt. No. 448 at 11. Unlike user lists, content labels allow an RTB participant to "pre-filter" categories of websites (not users) for which the participant does *not* want to receive bid requests. *Id.* at 11; Dkt. No. 447-3 ¶¶ 6-7.[2] Google explains that it does not consider the content_labels field a "vertical" or other user-specific information shared through RTB and reasonably did not believe this field was within the scope of the Court's prior orders. Dkt. No. 448 at 11.

Finally, plaintiffs say that the app_category_fatcat_id field provides information about the "app equivalent of verticals for URLs including in RTB bid requests." Dkt. No. 431 at 5. At the hearing, plaintiffs explained further that this data field concerns bid requests for in-app advertising. Dkt. No. 478. Google explains that the app_category_fatcat_id field was removed from bid requests in February 2020, and Google no longer has records from this data field to produce. Dkt. No. 448 at 11. Moreover, it explains that this field contains information categorizing applications in the Google Play Store and the Apple App Store, but does not contain any information specific to a user. *Id.* at 11. Google argues that it does not consider the app_category_fatcat_id field a "vertical" or other user-specific information shared through RTB and reasonably did not believe this field was within the scope of the Court's prior orders. *Id.*

Having considered the parties' briefing and the arguments at the hearing, the Court agrees with Google that neither of the Court's prior orders clearly requires Google to produce these three data fields. While these data fields may contain information relevant to a claim or defense and may be responsive to a document request—an issue the Court does not address here—Google did not clearly disobey a Court order to produce them. Sanctions would be particularly inappropriate

[2] The parties disagree about whether the content labels are still used for ad targeting or pre-filtering.

here given that Google attempted to seek clarification of the Court's prior orders (an effort plaintiffs vigorously resisted), and the Court denied Google's request for clarification. Dkt. No. 316 (request for clarification); Dkt. No. 320 (Google's opposition to request); Dkt. No. 321 (order).

### B. Whether Google Improperly Limited Its Production to Sampled Data

Plaintiffs argue that the Court's December 16, 2022 order required Google to produce verticals information shared with RTB participants during the class period, which spans seven years beginning in March 2016. Plaintiffs claim that Google violated the Court's order when it produced only sampled data for six, week-long periods in 2021 and 2022, omitting data from earlier in the class period. Dkt. No. 431 at 4.

The parties have separately briefed, and the Court has separately addressed, the question of whether and how Google's production of named plaintiffs data may be sampled in preparation for briefing on class certification. *See* Dkt. Nos. 429, 483. To the extent plaintiffs construe the Court's December 16, 2022 order as requiring Google to produce *unsampled* data for the entire class period for "verticals" information, plaintiffs misunderstand the Court's prior order. Rather, that order made clear that the relevant time period included the class period, but directed the parties to confer further regarding how data that requires Google to provide advance notice before production should be sampled. Dkt. No. 282 at 5-6.

The Court has just now resolved the parties "sampling" dispute. Accordingly, Google's February 9, 2023 production did not violate any sampling/no sampling directive in the Court's December 16, 2022 order.

### C. Whether Google Improperly Omitted Identifying Information

Plaintiffs argue that Google deliberately omitted from its production the Google Account ID and Google User ID data fields, and the "joining keys" that link the two, so as to make it difficult for plaintiffs to match up Google's most recent production with its earlier productions of named plaintiffs data. Dkt. No. 431 at 5-6. Google responds that it produced the named plaintiffs data using a unique query ID field that allows plaintiffs to match prior productions with other productions that come from the [redacted]. Dkt. No. 448 at 12. Google also points out that

United States District Court
Northern District of California

nothing in the Court's prior orders requires Google to use plaintiffs' preferred method or data fields for correlating these document productions. *Id.*

The Court agrees with Google that its prior orders did not specify how Google should produce data so that earlier productions can easily be matched with later productions. However, to the extent Google's productions from multiple different data sources *cannot* be easily matched up based on the query ID, as plaintiffs contend in their reply, Google's reliance solely on the query ID needlessly burdens plaintiffs.

Accordingly, while Google's most recent data productions did not violate any directive in the Court's prior orders, Google must take care that all of its productions of named plaintiffs data can be easily correlated, and it must include the fields necessary to accomplish that result. During the hearing, Google acknowledged that it could include the Google Account ID, Google User ID, and "joining keys" without undue burden, and the Court expects that it will do so, including remedying its prior productions that omit this information.

## IV. CONCLUSION

For the reasons explained above, the Court denies plaintiffs' motion for an order of contempt and for evidentiary and monetary sanctions against Google.

**IT IS SO ORDERED.**

Dated: April 14, 2023

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE FEBRUARY 28, 2023 DISCOVERY DISPUTE RE BID RESPONSE FIELDS**

Re: Dkt. No. 429

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve their dispute concerning plaintiffs' demand that Google produce data relating to the named plaintiffs that is contained in 11 of the 69 data fields that Google maintains regarding responses RTB participants have made to bid requests. Dkt. No. 429. The Court deems this matter suitable for resolution without oral argument. Civil L.R. 7-1(b).

For the reasons explained below, the Court orders Google to produce eight of the disputed data fields.

## I. BACKGROUND

Plaintiffs ask Google to produce data from the following fields for each of the named plaintiffs:

1. ad.attribute
2. ad.category
3. ad.restricted_category
4. ad.native_ad.click_link_url
5. ad.advertiser_name
6. ad.sdk_rendered_ad.declared_ad.click_through_url

United States District Court
Northern District of California

7. ad.skadn.itunesitem
8. ad.skadn.sourceapp
9. ad.advertised_app_id
10. ad.slot.third_party_buyer_token
11. no_bid_reason

Dkt. No. 429. Plaintiffs identify no document requests or interrogatories that call for production of these data fields. Instead, they say that the information they seek is within the scope of the Court's August 26, 2022 order (Dkt. No. 314). That order concerns plaintiffs' demand for information responsive to their RFP Nos. 13, 41, and 42.[1] *See* Dkt. No. 314 at 1, 2 n.2; Dkt. No. 269-1. Plaintiffs rely on the portions of the Court's prior order that concern "links" between Google account holder information and the information Google discloses through RTB and "the use of cookie-matching." Dkt. No. 314 at 2. Specifically, plaintiffs rely on the following portions of the prior order:

> The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify an account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well. Otherwise, plaintiffs have not shown they are entitled to discovery of all information Google maintains about an account holder solely based on Google's internal linking of information with an account holder.
>
> ***
>
> Plaintiffs argue that "Google provides RTB participants, via cookie-matching, with a key to identify exactly who certain account holders are, and cookie-matching can enable participants to link a user's personal information obtained from the RTB auction process with its own data about that user." . . . Plaintiffs demand that Google produce "data revealing cookie-matching about the [named plaintiffs]." . . . [C]ookie-matching appears to be a vehicle whereby account holder-specific information may be shared with RTB participants. It is not clear from the parties' joint submission what

[1] For purposes of that dispute, plaintiffs limited their demand to responsive information concerning the named plaintiffs. *See* Dkt. No. 314 at 1.

> records Google has about instances of cookie-matching via RTB with respect to the named plaintiffs[.] . . . In any event, if there is such data, the Court is persuaded it is relevant to plaintiffs' claims and should be produced.

*Id.* at 4-5, 8 (citations omitted).

Google objects to producing the data in these 11 bid response fields because such production would exceed the scope of production in the Court's prior order, and because no discovery requests call for the production of information contained in *bid responses*, but only in *bid requests*. *Id.* at 4. In addition, Google argues that because plaintiffs' demand for bid responses encompasses both winning and non-winning bids, this demand exceeds the scope of relevant discovery. Finally, Google says that the Court's prior order requires it to produce documents sufficient to show the information Google shares with RTB participants, and Google has already completed that production. *Id.* at 5.

## II. DISCUSSION

As an initial matter, the Court is not persuaded by Google's over-arching argument that bid response data is categorically outside the scope of the Court's August 26, 2022 order. It is certainly possible that information contained in a bid response data field may reveal, for example, whether an RTB participant has information that allows it to identify an account holder based on information the participant receives from Google. While Google is correct that the August 26, 2022 order did not specifically require Google to produce bid responses, one of the document requests at issue in the dispute that order resolves does ask for "[a]ll bid responses associated with each [a]ccount [h]older." *See* Dkt. No. 269-1 at 7 (RFP No. 41).

For these reasons, the Court will address the parties' substantive arguments with respect to each of the disputed bid response fields, as well as the issue of whether Google should be required to produce responses for both winning and non-winning bids.

### A. ad.attribute field

The ad.attribute field contains information showing the ad targeting category an RTB participant selected for a proposed ad: "Remarketing" (where the user previously interacted with the bidder); "UserInterestTargeting" (where the user is on the bidder's list of users with a common





United States District Court
Northern District of California

interest); and "Tagging" (where the bidder's ad contains a tracking pixel that can be used for remarketing). Dkt. No. 429 at 2, 5. Plaintiffs argue that this selection "establishes" that the information Google shares with RTB participants is "personal information." *Id.* at 2. Google disputes this characterization and disputes plaintiffs' contention that any inference about *Google's* disclosure of personal information can be drawn from a data field populated, not by Google, but by an RTB participant. *Id.* at 5. Google states, without contradiction, that it has already produced data showing the user-specific information that *it* shares in bid-requests. *Id.*

While the Court agrees that an RTB participant's selection of one of these categories for the ad.attribute field does not necessarily establish that Google shares users' personal information or that an RTB participant has identified a particular user as a result of information shared by Google, the content of this data field may be relevant to the question of whether the information Google provides allows an RTB participant to identify a user based on information the participant already has about that user. At the very least there is a dispute between the parties on this point.

Google is correct that the Court's August 26, 2022 order only required Google to disclose data sufficient to show the information *Google disclosed* to RTB participants. The information plaintiffs now demand may show only how that information is *used by an RTB participant*, and it is therefore not within the scope of the Court's prior order. However, the Court agrees with plaintiffs that for purposes of discovery regarding the named plaintiffs, the ad.attribute field may contain relevant information. Google has not shown that production of this data field is disproportionate to the needs of the case.

**B. ad.category and ad.restricted.category fields**

These fields contain information showing the "ad sensitive category" or "ad restricted category" an RTB participant selected for a proposed ad. Dkt. No. 429 at 2-3, 5. Plaintiffs say that the contents of these fields are "evidence of whether the plaintiffs were targeted with sensitive ads because of personal information Google sold and shared through RTB." *Id.* at 2. Google argues that the Court has "previously rejected Plaintiffs' efforts to gain discovery about information Google considers sensitive." *Id.* at 5.

Google is correct that the Court denied plaintiffs' request for similar information, but that

United States District Court
Northern District of California

was primarily because plaintiffs failed to support their earlier request. Specifically, the Court's prior order stated:

> Plaintiffs argue that their claims regarding Google's use of "sensitive" information are "not limited to the sharing or sale of information." They say that "[i]f Google internally deems certain kinds of account holder information 'sensitive' that is used for advertising, it bears directly on [p]laintiffs' claims." Plaintiffs do not identify the claims to which they refer or explain how the documents they seek are relevant to their claims. They do not even say what documents they want. Claiming that relevance is "undisputed," plaintiffs cite a cobbled-together quote from Google's statements during a hearing on a prior dispute that, in the Court's view, distorts the statements' original meaning. Google argues that plaintiffs are not entitled to discovery about any and all use Google may make of "sensitive" information, and contends that the Court has already resolved this issue in deciding the parties' dispute about the scope of plaintiffs' Rule 30(b)(6) deposition notice.
>
> The Court cannot discern from the parties' joint submission what records plaintiffs seek with respect to the named plaintiffs or why plaintiffs believe the records are relevant to a claim or defense. Moreover, the word "sensitive" does not appear in any of the RFPs at issue. Because plaintiffs have not shown that the discovery they seek is relevant to a claim or defense and proportional to the needs of the case, the Court denies this aspect of plaintiffs' request for relief.

Dkt. No. 314 at 7-8 (citations omitted).

In the present joint submission, plaintiffs at least try to explain why they believe the information in these specific fields is relevant. While the Court disagrees that an RTB participant's selection of a "sensitive" or "restricted" category label to describe its ad necessarily shows that Google users were targeted with such ads *because* Google shared their personal information with RTB participants, the content of these data fields may be relevant to that disputed question. Google has not shown that production of these data fields is disproportionate to the needs of the case.

**C. ad.native_ad.click_link_url, ad.advertiser_name, ad.sdk_rendered_ad.declared_ad.click_through_url fields**

According to plaintiffs, these fields contain information that identifies the advertisers that respond to a bid request and the publishers of the page on which the ad is displayed. Dkt. No. 429 at 3. Plaintiffs say that this is contextual information that will inform their arguments about

whether advertisers received users' personal information from Google that allowed the advertisers to "target[] [users] with sensitive ads." *Id.* Google argues that it has already produced the landing page domains of ads actually displayed to users, as well as fields identifying the advertisers who placed winning bids, so the additional information plaintiffs seek is superfluous. *Id.* at 6. In addition, Google notes that the Court's August 26, 2022, did not require Google to produce this information.

Google is correct that the Court's prior order did not require Google to produce these data fields, nor did plaintiffs ever clearly demand this production; plaintiffs previously relied on a kitchen-sink approach, demanding all bid response information. Nevertheless, the Court is persuaded that the content of these data fields may be relevant to the question of whether advertisers received users' personal information from Google that allowed the advertisers to target particular users for placement of ads on "sensitive" websites. Google has not shown that production of these data fields is disproportionate to the needs of the case.

**D. ad.skadn.itunesitem, ad.skadn.sourceapp, ad.advertised_app_id fields**

According to plaintiffs, each of these data fields contains an Apple app store ID for an advertiser or publisher, or indicates whether an "ad query" come from a mobile app. Dkt. No. 429 at 3. Plaintiffs do not explain how this information is relevant to a claim or defense. None of these data fields is within the scope of the Court's August 26, 2022 order.

**E. ad.slot.third_party_buyer_token field**

Plaintiffs say that this data field "contains a token used to identify a third-party buyer if the bidder is acting as an intermediary," and that this shows "whether the named plaintiffs' information is shared beyond the RTB participants." *Id.* at 3. Google says that this data field [redacted] *Id.* at 6.

The parties appear to be talking past each other, have not meaningfully conferred about their dispute, and present the Court with very little information. If this data field is intended to record the existence of a third-party buyer beyond the RTB participant, it may contain information

relevant to plaintiffs' claims. The fact that field [redacted] may bear on the weight it can be given in the case, but the Court concludes that it is nevertheless discoverable and should be produced.

**F. no_bid_reason field**

When populated by an RTB participant, this field contains a number from 1 to 10 that corresponds to a reason the participant selected for *not* submitting a bid. *Id.* at 3. The number 8 corresponds to the reason "unmatched user," which plaintiffs say means no cookie-matching occurred. *Id.* Thus, plaintiffs argue that "for every bid response that was submitted that does not contain no_bid_reason=8, the bidder was able to identify a user with the information that Google disclosed in the Bid Request via cookie matching." *Id.* at 3-4. Google responds that this field is optional, so a bidder's decision not to fill in this field or to fill it with a different number does not show that the absence of a value "8" must mean cookie matching occurred. *Id.* at 6.

The Court agrees with Google that an optional field, populated by the RTB participant does not necessarily show that an RTB participant has identified a particular user as a result of information shared by Google any time the field does not contain the value "8." However, the content of this data field may be relevant to the question of whether the information Google provides allows an RTB participant to identify a user based on cookie matching. Google has not shown that production of this data field is disproportionate to the needs of the case.

**G. Winning v. Non-Winning Bids**

Plaintiffs argue that even if an RTB participant is not successful in the auction, its response to a bid request contains information that is relevant to plaintiffs' claims for the same reasons the data fields in the winning bid response are relevant. While an unsuccessful bid does not result in the display of an ad to a user and may not support plaintiffs' allegations that they suffered harm, even unsuccessful bid responses may nevertheless reveal whether Google discloses information that allows an RTB participant to identify a user based on information the RTB participant may already have about that user. For this reason, if a particular data field identified above is subject to production for the named plaintiffs, both winning and non-winning bid responses should be



United States District Court
Northern District of California

produced.

## III. CONCLUSION

For the reasons explained above, Google shall produce named plaintiffs data for the following eight bid response data fields:

ad.attribute

ad.category

ad.restricted.category

ad.native_ad.click_link_url

ad.advertiser_name

ad.sdk_rendered_ad.declared_ad.click_through_url

ad.slot.third_party_buyer_token

no_bid_reason

This production shall include both winning and non-winning bid responses, and is subject to sampling, as provided in the Court's order resolving the dispute at Dkt. No. 430.

If Google must give notice to third parties before producing the above-referenced data, it shall promptly give notice, and shall use its best efforts to produce this information no later than **April 28, 2023**.

**IT IS SO ORDERED.**

Dated: April 14, 2023

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION | Case No. 21-cv-02155-YGR (VKD)<br><br>**ORDER RE FURTHER PROCEEDINGS FOR RESOLUTION OF DISPUTES RE GOOGLE'S PRIVILEGE CLAIMS** |

The Court has considered the parties' joint status report regarding the remaining disputes concerning Google's privilege claims and their respective proposals for resolving those disputes. Dkt. No. 454. According to the report, plaintiffs continue to dispute over 5,000 of Google's 10,525 privilege log entries. Plaintiffs' principal contention is that it cannot determine from the information in Google's privilege logs whether the disputed claims of privilege or protection are proper.

The Court agrees with plaintiffs that Google's privilege entries generally do not provide sufficient information for the Court to assess the merits of Google's claim that a logged document is privileged or protected from disclosure. As the Court has previously observed, many of Google's privilege log entries do not disclose the information the Ninth Circuit has held sufficient to make a prima facie claim of privilege or protection. *See* Dkt. No. 360 at 3-4, 6-7 (discussing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)). Moreover, Google's privilege claims are not made in a categorical fashion that might permit the Court to consider and resolve disputes about groups of similar documents without requiring descriptive details for each individual document within the group. *Id.* at 4 (citing Fed. R. Civ. P. 26, Advisory Committee Note to 1980 amendment). The Court also continues to have concerns that Google has over-designated

United States District Court
Northern District of California

documents as privileged or protected.

Given the number of disputed entries, it is impossible for the Court to conduct an *in camera* review of, or to consider briefing about, each of the remaining disputed entries or even a significant portion of them. Plaintiffs suggest that Google re-review all challenged entries, after which the parties will select a "statistically significant sample" of disputed documents for *in camera* review. However, it is not clear from plaintiffs' proposal how resolution of the sampled disputes will resolve the remainder. Google suggests a re-review of a limited subset of its privilege entries, but offers no proposal for how to deal with the remaining disputed entries.

In these circumstances, the Court believes that the only practical course of action is to require Google to re-review all of the disputed entries and to provide more robust information to support its privilege claims. Accordingly, the Court orders as follows:

1. Google shall re-review those documents among the 5,177 challenged entries that it has not already re-reviewed. Google will complete the re-review by **April 21, 2023**. If it identifies entries for which it determines the claim of privilege or protection should be withdrawn or modified, Google shall promptly produce the corresponding documents in whole or with redactions, as appropriate. The Court expects this production to be made on a rolling basis, and to be completed no later than **April 28, 2023**.
2. For any claims of privilege or protection that remain among the 5,177 challenged entries after Google's re-review, Google must provide to plaintiffs at least the following information for each entry: (1) date, (2) author/sender/custodian name, (3) all known recipients, (4) the attorney(s) involved, (5) the nature of the document, (6) the subject matter of the document, (7) the privilege or protection claimed, and (8) an explanation of the basis for the claim of privilege or protection if not evident from the other information disclosed for that entry sufficient to enable the Court to evaluate the claim without reviewing the document *in camera*. If the sender or recipient of an email communication is a distribution list, Google must provide the current membership of the list, a description of the nature of the list (*e.g.*, company-wide, specific department, executive team, etc.), a statement indicating whether, at the time of the communication, the list included any

recipients who were not Google employees, and an explanation for why disclosure to the distribution list does not undermine or destroy the confidentiality of the privileged or protected communication in question. Google shall provide this updated privilege log information to plaintiffs no later than **May 5, 2023**.

3. After Google serves its updated privilege log, the parties shall confer about the remaining disputes and how to resolve them. By **May 19, 2023**, the parties shall jointly file a status report with the Court that (1) summarizes the *current* disputes remaining and (2) provides their agreed or respective proposal(s) for efficiently resolving *all* remaining disputes. The report must not exceed 1,000 words. The report must attach a copy of the entries on Google's privilege log that remain in dispute.

**IT IS SO ORDERED.**

Dated: March 27, 2023

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

[Additional Counsel on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION*<br><br>*This document applies to all actions.* | **CASE NO. 4:21-CV-02155-YGR-VKD**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CONTEMPT AND SANCTIONS FOR VIOLATIONS OF AUG. 26, 2022 AND DEC. 16, 2022 DISCOVERY ORDERS [DKT. NOS. 314, 382]**<br><br>Judge: Hon. Virginia K. DeMarchi<br>Date: April 4, 2023<br>Time: 10:00 a.m.<br>Courtroom: 2, Fifth Floor |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on April 4, 2023, at 10 a.m., in Courtroom 2, 5th Floor, of this Court, located at 280 South 1st Street, San Jose, California, before the Honorable Virginia K. DeMarchi, Magistrate Judge of the United States District Court for the Northern District of California, plaintiffs will and do hereby move the Court, pursuant to Federal Rules of Civil Procedure 16(f) and 37(b) and Civil Local Rule 37, and for the reasons set forth below and in the accompanying Declaration of Jonathan K. Levine ("Levine Decl."), for an order of contempt and imposition of evidentiary and monetary sanctions against Google for its willful failure to comply with discovery orders entered by Court on August 26, 2022 (the "Aug. 26 Order") (Dkt. 314) and December 16, 2022 (the "Dec. 16 Order") (Dkt. 382) with respect to the production of interest-based categories (called "verticals") pertaining to the named plaintiffs during the class period. A proposed order is submitted herewith.

The Court ordered Google to produce verticals data related to the named plaintiffs during the class period by January 31, 2023. Google made no production of verticals data on January 31, 2023. On February 9, 2023, Google finally and belatedly made a partial production of verticals data that appears to be for the named plaintiffs. This production is severely incomplete, has been stripped of key data, and facially fails to comply with the Aug. 26 and Dec. 16 Orders in multiple respects. On February 10, 2023, plaintiffs sent Google a letter asking Google to comply with the Court's Orders and make a full and complete production of verticals data for the named plaintiffs. Google waited 12 days to respond to this letter, but has not made any subsequent production of verticals data that would cure all of the problems with the late February 9, 2023 partial production.

This motion seeks an order of contempt, imposition of evidentiary sanctions, and monetary sanctions in the form of costs and attorneys' fees for Google's willful and knowing violation of this Court's discovery orders, on the grounds set forth in the accompanying memorandum of points and authorities, and upon any further grounds the Court may determine or that plaintiffs may assert on reply or at hearing in this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Google has twice been ordered by this Court to produce verticals information relating to the named plaintiffs. *See* Aug. 26 Order (Dkt. 314); Dec. 16 Order (Dkt. 382). On August 26, 2022, the Court ordered Google to produce certain categories of data relating to the named plaintiffs. *See* Aug. 26 Order at 4-5. Google failed to produce ***any*** verticals information relating to the named plaintiffs in response to the Aug. 26 Order, which the Court subsequently held to be a violation of that Order. *See* Dec. 16 Order at 4 ("Google has failed to comply with the Court's August 26 order in one important respect."). On December 16, 2022, the Court again ordered Google to produce verticals information relating to the named plaintiffs. *See* Dec. 16 Order at 4-5. This time, the Court was specific about what Google must produce and for what period the information must be produced, and set a firm deadline for Google to complete that production–January 31, 2023. *Id*. at 4-5, 7.

In violation of the Dec. 16 Order, Google made no production of verticals information relating to the named plaintiffs on January 31, 2023. Nor did it produce anything the following week. On February 9, 2023, after being threatened with a sanctions motion by plaintiffs, Google finally produced some verticals information that it claims relates to the named plaintiffs. If the February 9 production had been late, but complete, that would have been the end of the matter. But Google's belated production on February 9 is woefully incomplete, has had key data intentionally stripped out, and still is missing key verticals fields. In sum, the belated and partial February 9 production still facially fails to comply with the Court's two discovery orders.

Plaintiffs identified some of the problems with the February 9 production to Google in a letter sent the very next day, February 10, and asked Google to promptly cure the many deficiencies in that production and provide answers to questions raised by the production. Google waited 12 days to respond to that letter, and has not produced any additional verticals information required by the Court's two discovery orders since its deficient February 9 production.

Google's ongoing, repeated, and willful violations of the Court's Aug. 26 Order and Dec. 16 Order with respect to verticals information relating to the named plaintiffs is highly prejudicial to plaintiffs and constitutes contempt of this Court. For the reasons set forth herein and in the accompanying Levine Declaration, Google should be held in contempt and evidentiary and monetary sanctions should be imposed on Google for its discovery misconduct and continued refusal to comply with the Court's orders.

## II. BACKGROUND

As set forth in the Dec. 16 Order, "plaintiffs allege that Google collects personal and sensitive information about account holders, groups them into interest-based categories called 'verticals,' and then shares the verticals (or information about the verticals) with RTB participants." Dec. 16 Order at 4 (citing to plaintiffs' complaint). Plaintiffs have been seeking information about the verticals shared by Google through the RTB auctions since discovery first commenced back in May 2021, and Google has been fighting and resisting producing that information for the entire time since then. *See* Levine Decl., ¶¶ 2-3.

On July 29, 2022, after months of futile meet and confer discussions resulted in Google not producing ***any*** verticals information relating to the named plaintiffs, plaintiffs moved to compel Google to produce various categories of data, which included verticals information directly and indirectly relating to the named plaintiffs. *See* July 29, 2022 Joint Letter Brief at 1-3 (Dkt. 269); Levine Decl., ¶ 4.

On August 26, 2022, the Court granted plaintiffs' motion to compel and ordered Google to produce certain categories of data relating to the named plaintiffs, as follows:

> The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify and account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well.

Aug. 26 Order at 4-5 (emphasis in original).

After Google claimed to have completed its production of named plaintiff data in response to the Aug. 26 Order, plaintiffs informed Google that certain categories of named plaintiff data responsive to the Aug. 26 Order were missing from Google's production, including, specifically, all of the categories pertaining to verticals. *See* Levine Decl., ¶ 6. In subsequent meet and confer discussions, Google again refused to produce any verticals categories in violation of the Aug. 26 Order, which necessitated yet another motion to compel by plaintiffs that was filed on November 21, 2022. *See* Nov. 21, 2022 Joint Letter Brief at 1-4 (Dkt. 365); Levine Decl., ¶7.

On December 16, 2022, the Court issued its second discovery order on the named plaintiff data. *See* Dkt. 382. In the Dec. 16 Order, the Court first held that Google had failed to comply with the Aug. 26 Order when it refused to produce any of the verticals information relating to the named plaintiffs. *Id.* at 4 ("Google has failed to comply with the Court's August 26 order in one important respect."). The Court then granted plaintiffs' second motion to compel and ordered Google to produce as follows:

> Plaintiffs say that Google's production must include documents sufficient to show both the explicit sharing of verticals associated with the named plaintiffs and any implicit sharing that facilitates ad targeting. The Court agrees. Google must produce documents sufficient to show for each named plaintiff the "verticals" data fields it shared with RTB participants during the class period. In addition, Google must produce documents sufficient to show for each named plaintiff the information, if any, that it provided RTB participants that would permit those participants to infer information about the account holder based on verticals linked with the account holder.

Dec. 16 Order at 5.

To avoid any further delay by Google, the Court also specifically ordered Google to produce all verticals information relating to the named plaintiffs by no later than January 31, 2023. *See* Dec. 16 Order at 7. Google neither sought nor obtained relief from the January 31, 2023 deadline set by the Court.[1] *See* Levine Decl., ¶ 11.

---

[1] While Google did move for "clarification" of a portion of the Dec. 16 Order, it did not seek any extension of the January 31, 2023 production deadline (*see* Dkt. 408), and the Court never granted Google any such extension when it denied Google's clarification motion orally on January 31, 2023, and then in writing on February 1, 2023. *See* Dkt. 420.

Following the Court's Dec. 16 Order, and before the January 31 production deadline, plaintiffs' counsel attempted on multiple occasions to meet and confer with Google's counsel about the scope of Google's verticals production to ensure that the production would be complete and that there would be no further issues requiring judicial intervention. *See* Levine Decl., ¶ 12. Google and its counsel categorically refused to discuss Google's upcoming production of verticals information with plaintiffs. *Id.*

In violation of the Dec. 16 Order, Google did not produce ***any*** verticals information relating to the named plaintiffs on January 31, 2023. *See* Levine Decl., ¶ 13. Nor did it produce that information the following week. *Id.* On February 7, 2023, plaintiffs informed Google that in light of Google's continuing violation of the Dec. 16 Order and its continuing refusal to even say whether or when it would comply – despite plaintiffs' repeated efforts to obtain compliance – plaintiffs would be filing a sanctions motion to alert the Court to Google's ongoing violation of the Dec. 16 Order. *Id.* at ¶ 14. On February 8, 2023, Google informed plaintiffs that it would be producing verticals information relating to the named plaintiffs the following day. *Id.* at ¶ 15.

On February 9, 2023, Google finally and belatedly produced just some of the verticals information called for by the Aug. 26 and Dec. 16 Orders.[2] *See* Levine Decl., ¶ 16. The February 9 production, however, is grievously incomplete in at least three material respects, and facially fails to comply with the Court's Orders, as discussed below.

**First,** the Dec. 16 Order required Google to produce verticals information shared with RTB participants "***during the class period***." *See* Dec. 16 Order at 5 (emphasis added). The class period here is seven years, starting in March 2016. But in its February 9 production, Google only produced verticals information for a sample of just six weeks, all in 2021 and 2022, and which, notably, is the period ***after*** Google allegedly stopped sharing certain verticals fields in RTB bid requests. This sample represents a mere 1.6 percent of the class period, entirely ignores five of

[2] Notably, this partial production was made from two data logs that Google has previously told the Court do not include data that Google shared with RTB participants. Google's production of verticals fields from these two logs demonstrates the falsity of these prior representations.

seven years in the class period, and is plainly unrepresentative of what Google was sharing with RTB participants about the named plaintiffs for most of the class period since Google's practices apparently changed before the period Google sampled. *See* Levine Decl., ¶ 17.

**Second,** and equally critical, Google's February 9 production fails to include three fields of "verticals" information relating to the named plaintiffs, namely, user_lists, content_labels, and app categories. User_lists include signals that will show when a named plaintiff sent a previous communication on a specific topic or action. User lists are included as part of the "user profiles" that are shared through RTB bid requests and also are available to RTB participants for pretargeting and other deals. Content_labels are categories assigned by Google based on the content of the publisher's page being visited by the named plaintiff and Google still uses content labels for both pretargeting and bidding in RTB auctions. App categories are the app equivalent of verticals for URLs included in RTB bid requests. App categories are identified in a field called app_category_fatcat_ids. Plaintiffs identified these three fields of verticals data to Google prior to the February 9 production, and these three fields should have been included in the production because they are responsive to the Dec. 16 Order and were known to Google prior to that time. *See* Levine Decl., ¶ 18.

**Third**, while Google claims that the limited verticals data it has produced relates to the named plaintiffs, and that plaintiffs should be able to link the data produced to each named plaintiff, it is clear that before Google made its production on February 9, it intentionally stripped out the named plaintiff identifiers from the production and did not provide them to plaintiffs as part of the production. Thus, the verticals data Google produced on February 9 does not identify ***any*** named plaintiffs. This is improper. The Dec. 16 Order required Google to produce verticals data related to the named plaintiffs, and any fair reading of the Dec. 16 Order would require Google to include the named plaintiff identifiers as part of the production since that is how the data is maintained in the ordinary course of business at Google.[3] Google has no excuse for stripping that

[3] This would include the Google Account ID and the Google User ID, derivations of them, and any joining keys that linked the two, such as the Biscotti Joinability Key.

responsive information out of the February 9 production other than to make it harder for plaintiffs to relink the production with the data previously produced by Google. *See* Levine Decl., ¶ 19.

On February 10, 2023, plaintiffs sent Google a letter outlining the core deficiencies in Google's February 9 production and asked Google to cure those deficiencies by producing verticals data for a longer time period and with links to the named plaintiffs included. *See* Levine Decl., ¶ 20. Google waited 12 days to respond and, when it finally did respond, Google refused to provide any additional verticals data. *Id.*

## III. ARGUMENT

"Modern instruments of discovery" are designed to make litigation "a fair contest with the basic issues and facts disclosed to the fullest possible extent." *Fausto v. Credigy Servs. Corp.*, 251 F.R.D. 436, 439 (N.D. Cal. 2008) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)). When parties do not live up to their discovery obligations, the district court "may, within reason, use as many and as varied sanctions as are necessary to hold the scales of justice even." 8B *Federal Practice and Procedure* § 2284 (3d ed. 2022 update). Federal courts have the power to sanction litigants for discovery misconduct under both the Federal Rules of Civil Procedure and the court's inherent power to prevent abusive litigation practices. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951,958 (9th Cir. 2006).

When a party violates a discovery order, Rule 37(b)(2)(A) authorizes a variety of sanctions. For the most serious cases of disobedience, courts may dismiss claims or an action, render a default judgment, or hold the party in contempt of court for failing to obey a court order. Fed. R. Civ. P. 37(b)(2)(A)(v)–(vii). In other cases, they may strike pleadings, direct that certain matters or facts be deemed "established for purposes of the action," preclude a disobedient party from making certain arguments or introducing certain evidence. *Id.* R. 37(b)(2)(A)(i)–(iii).

Sanctions are also available under Rule 16(f)(l), which provides that a "court may issue any just orders ... if a party or its counsel . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(l)(C). Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial management." *Cato v. Fresno City*, 234 F.3d 1276, 1276 (9th Cir. 2000) (citation

omitted). A court may order sanctions under Rule 16 for violation of an order where "[d]isregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Johnson v. lvlammoth Recreations, Inc.*, 975 F.2d 604,610 (9th Cir. 1992).

Additionally, "discovery misconduct may be punished under the court's 'inherent powers' to manage its affairs." *Guifu Li v. A Perfect Day Franchise, Inc*, 281 F.R.D. 373, 396 (N.D. Cal. 2012) (quoting *Unigard Sec. Ins. Co. v. Lakewood Eng. Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992)). That inherent power embraces all the sanctions available under Rule 37. As the case law notes, sanctions under the inherent power are analyzed using the same test as those under Rule 37. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 n.4 (9th Cir. 1990) (making use of cases involving Rule 37 and the inherent power "interchangeably").

The Court may take general deterrence into account in imposing sanctions. That is because one of the objectives of discovery sanctions is "generally deterring flagrant disobedience and callous disregard of court discovery orders." *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370 (9th Cir. 1980) (citing *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam)).

Plaintiffs move the Court for an order of contempt against Google in light of its ongoing and willful failure to make a timely and complete production of verticals information for the named plaintiffs during the class period, as required by two Court orders. To hold a party in contempt, a court must find by clear and convincing evidence that the party violated a specific and definite order and that it had sufficient notice of its terms and the fact that it would be sanctioned if it did not comply. *See Harmon v. City of Santa Clara*, 323 F.R.D. 617, 626 (N.D. Cal. 2018) (citing *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)).

Granting contempt sanctions against Google is warranted here because Google has violated multiple specific and definite orders. The Court first ordered Google to produce certain named plaintiff data, which encompassed the verticals information that plaintiffs seek, in the Aug. 26

Order. *See* Dkt. 314 at 4 ("The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify an account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well.").

Google produced ***no*** verticals information relating to the named plaintiffs in response to the Aug. 26 Order and refused to make such a production without being compelled to do again by the Court. This was plainly a violation of the Aug. 26 Order since verticals information is specific to each named plaintiff and was shared with RTB participants during the class period. In the Dec. 16 Order, the Court specifically found that Google had failed to comply with Aug. 26 Order when it refused to produce any verticals information relating to the named plaintiffs. *See* Dec. 16 Order at 4. To avoid any further ambiguity, in the Dec. 16 Order, the Court specifically explained what verticals information Google was required to produce, for what period of time this production needed to be made, and when the production needed to occur. *See id.* at 4-5, 7.

Google once again willfully and knowingly failed to comply with the Court's Order, making a late and incomplete production that was intentionally stripped of key identifying information and therefore did not satisfy the Dec. 16 Order. Google then refused to remedy these deficiencies when they were identified by plaintiffs. Google's conduct is plainly willful and knowing and should be sanctioned. Google has now had two opportunities to produce verticals information for the named plaintiffs during the class period, and has failed both times. But, even if Google's actions were *not* willful, contempt sanctions would still be appropriate here in light of Google' violation of multiple Court orders. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) ("Civil contempt in . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order." (internal quotation omitted)).

Google also should be ordered to make a full and complete production of verticals

information relating to the named plaintiffs (1) for a truly representative sample of the entire class period, (2) that includes the three missing data fields identified above, and (3) that includes all named plaintiff identifiers present in any logs from which the verticals data is searched and produced. To avoid delay and alleviate further prejudice to plaintiffs, Google should be ordered to complete this production within seven (7) calendar days of the Court's order.

If Google will not or cannot comply because it failed to maintain verticals information pertaining to the named plaintiffs, as it was obligated to do and represented that it was doing, then evidentiary sanctions should be imposed on Google in the form of an order preventing Google from making any arguments based on verticals information in opposition to class certification or in favor of summary judgment in this matter. Courts impose evidentiary sanctions when monetary sanctions remain inadequate. *See In Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 3895118, at *3 (N.D. Cal. Aug. 29, 2011) (imposing evidentiary sanctions to remedy prejudice of "information withheld from Plaintiffs [that] could very well bear on whether or not Plaintiffs are able to establish commonality of issues across the putative class"). *See also Clear-View Tech., Inc., v. Rasnick*, 2015 WL 2251005 at *7-8 (evidentiary and monetary sanctions warranted given defendants' protracted and needless delays that frustrated discovery process); *Dong Ah Tire & Rubber Co., Ltd. v Glasforms, Inc.*, 2009 WL 1949124, *10 *adopted in part and modified in part* 2009 WL 2485556, *4 (N.D. Cal. Jul. 2, 2009) (evidentiary sanctions for failure to preserve evidence). Spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it. *See, e.g. Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party").

Finally, plaintiffs also seek monetary sanctions as appropriate, and will provide support for such a sanction if the Court concludes that Google has engaged in contempt and sanctionable discovery abuse. *See* Fed. R. Civ. P. 37(b)(2)(C).

## IV. CONCLUSION

For all of the foregoing reasons, Google should be held in contempt for its willful failure to comply with the Court's Aug. 26 and Dec. 16 Orders. Google should be ordered to make a full and complete production of verticals information relating to the named plaintiffs (1) for a truly representative sample of the entire class period, (2) that includes the three missing data fields identified above, and (3) that includes all named plaintiff identifiers present in any logs from which the verticals data is searched and produced. Google should be ordered to complete this production within seven (7) calendar days of the Court's order.

If Google will not or cannot comply because it failed to maintain verticals information pertaining to the named plaintiffs, as it was obligated to do and represented that it was doing, then evidentiary sanctions should be imposed on Google in the form of an order preventing Google from making any arguments based on verticals information in opposition to class certification or in favor of summary judgment in this matter. Monetary sanctions also should be imposed, in an amount to be determined, if the Court concludes that Google has engaged in contempt and sanctionable discovery abuse.

DATED: February 28, 2023

Respectfully submitted,

**PRITZKER LEVINE LLP**

By: */s/ Jonathan K. Levine*

Elizabeth C. Pritzker (Cal. Bar No.146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany Caracuzzo (Cal. Bar No. 190687)
Caroline Corbitt (Cal Bar No. 305492)
1900 Powell Street, Ste. 450
Oakland, CA 94602
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
*ccc@pritzkerlevine.com*

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Anne K. Davis (Cal. Bar No. 267909)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

**SIMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
485 Lexington Avenue
Suite 1001
Tel.: (212) 784-6400
Fax: (212) 213-5949
New York, NY 10017
Tel: (646) 993-1000
*dstraite@dicellolevitt.com*

**COTCHETT PITRE & MCCARTHY, LLP**
Nancy E. Nishimura (Cal. Bar No. 152621)
Brian Danitz (Cal Bar. No. 247403)
Karin B. Swope (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

**BOTTINI & BOTTINI INC.**

Frances A. Bottini, Jr. (Cal. Bar No. 175783)
Yuri A. Kolesnikov (Cal. Bar. No. 271173)
7817 Ivanhoe Ave., Ste. 102
LA Jolla, CA 92037
Tel.: (848) 914-2001
*fbottini@bottinilaw.com*
*ykolesnikov@bottinilaw.com*

*Plaintiffs' Executive Committee*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE OCTOBER 21, 2022 DISCOVERY DISPUTE RE GOOGLE'S PRIVILEGE ASSERTIONS**

Re: Dkt. No. 339

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve a dispute concerning the sufficiency of Google's privilege logs and the merits of its privilege assertions. Dkt. No. 339. The Court finds this dispute suitable for resolution without oral argument. Civil L.R. 7-1(b).

For the reasons explained below, the Court denies without prejudice the relief plaintiffs seek and orders further proceedings described in detail below.

## I. BACKGROUND

Google's privilege logs include nearly 10,500 entries. Dkt. No. 339, Exs. 1, 2. Plaintiffs challenge 5,470 of these entries as insufficient to support Google's assertions of attorney-client privilege or attorney work product protection. *Id.* at 1-4. They ask the Court to order Google to produce all of the challenged documents, or in the alternative, to supplement its logs with additional information regarding Google's assertions of privilege or work product protection. *Id.* at 1. Google opposes plaintiffs' challenges to the sufficiency of its privilege log entries on the merits and as inconsistent with provisions of the ESI Order entered in this case at Dkt. No. 125. *Id.* at 4-6.

## II. LEGAL STANDARD

Federal common law generally governs claims of privilege. "But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. In this action, subject matter jurisdiction is premised on federal question jurisdiction (28 U.S.C. § 1331) for Counts 9-12, supplemental jurisdiction (28 U.S.C. § 1367) for the remaining state law claims, and jurisdiction under the Class Action Fairness Act (28 U.S.C. § 1332(d)) as to the entire action. Dkt. No. 92 ¶¶ 34-36. Where an action asserts both federal and state law claims, and the evidence at issue relates to both, federal privilege law applies. *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014). No party contends that Google's disputed privilege entries concern documents relevant only to claims or defenses arising under state law. Accordingly, federal law governs Google's assertions of privilege.

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp*., 968 F.3d 1107, 1116 (9th Cir. 2020). The privilege extends to a client's confidential disclosures to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures. *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citations and quotations omitted). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (citations and quotations omitted). In the Ninth Circuit, whether information is protected by the attorney-client privilege is determined using an eight-part test:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Sanmina*, 968 F.3d at 1116. Where a communication has more than one purpose, it may be protected as privileged if the primary purpose of the communication is to give or receive legal advice, as opposed to business or some other non-legal advice. *In re Grand Jury*, 23 F.4th 1088, 1092-94 (9th Cir. 2021), *cert. granted sub nom. In re Jury,* No. 21-1397, 2022 WL 4651237 (U.S. Oct. 3, 2022) (describing and adopting the "primary purpose" test for dual-purpose

communications).

The attorney work product doctrine protects from discovery materials that are prepared by or for a party or its representative in anticipation of litigation. Fed. R. Civ. P. 26(b)(3). The doctrine provides qualified protection against discovery of the legal strategies and mental impressions of a party's counsel. *Hickman v. Taylor*, 329 U.S. 495, 508–10 (1947); *Upjohn Co. v. United States*, 449 U.S. 383, 390–91 (1981). It does not protect facts from disclosure unless disclosure of those facts would inherently reveal an attorney's strategies or mental impressions. *See, e.g.*, *O'Toole v. City of Antioch*, No. 11 CV 01502 PJH MEJ, 2015 WL 1848134, at *3 (N.D. Cal. Apr. 14, 2015); *Hamilton v. RadioShack Corp.*, No. C 11-00888 LB, 2012 WL 2327191, at *4–5 (N.D. Cal. June 18, 2012).

A party claiming that a document or information is privileged or protected from disclosure has the burden to establish that the privilege or protection applies. *See United States v. Martin*, 278 F.3d 988, 999–1000 (9th Cir. 2002). In particular, a party asserting privilege or work product protection must "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); *see also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1148 (9th Cir. 2005). The Ninth Circuit has held a party meets its burden by providing a privilege log that identifies "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) (citing *Dole v. Milonas*, 889 F.2d 885, 888 n.3 (9th Cir. 1989)). However, a party may substantiate a claim of privilege by other means. *Apple Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 237 (N.D. Cal. 2015) ("Briefs, declarations or other proof may establish the purpose of the communication or the specific role of the sender and each individual recipient."). The Advisory Committee Note to Rule 26 provides useful guidance about how a party should assert a claim of privilege or protection:

> The party must also provide sufficient information to enable other

> parties to evaluate the applicability of the claimed privilege or protection. Although the person from whom the discovery is sought decides whether to claim a privilege or protection, the court ultimately decides whether, if this claim is challenged, the privilege or protection applies. Providing information pertinent to the applicability of the privilege or protection should reduce the need for in camera examination of the documents.
>
> The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection. Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories. A party can seek relief through a protective order under subdivision (c) if compliance with the requirement for providing this information would be an unreasonable burden.

Fed. R. Civ. P. 26, Advisory Committee Note to 1980 amendment.

## III. DISCUSSION

Plaintiffs challenge Google's privilege assertions on several grounds. For the most part, the parties do not disagree about the law governing the scope of the attorney-client privilege or the attorney work product doctrine; they disagree about the sufficiency of Google's showing that the logged documents are, in fact, privileged or protected as Google claims. Accordingly, the Court first addresses the parties' arguments regarding the sufficiency of Google's privilege logs, and then discusses the further proceedings necessary to resolve this dispute.

### A. Sufficiency of Google's Privilege Log Entries

Plaintiffs argue that Google's privilege logs contain only generic descriptions that do not enable other parties or the Court to assess its privilege assertions. Dkt. No. 339 at 1. They say that if the Court does not order Google to produce all documents corresponding to disputed entries, it should order Google to provide the following additional information for all disputed entries: (1) the document title or subject line, (2) the positions of the authors and recipients, and (3) more detail about the issue, regulation, or policy that is the subject of the document. *Id.* at 2. Google responds that its privilege log entries are not generic assertions of privilege, but include descriptions of the subject matter of each privileged document, and that Rule 26(b)(5) does not

require disclosure of any of the additional information plaintiffs demand. *Id.* at 4-5. Google also argues that plaintiffs ask for information that is inconsistent with the ESI Order entered in this action. *Id.* at 4.

A privilege log is one vehicle by which a party may make a *prima facie* showing that a privilege or protection applies. *In re Grand Jury Investigation*, 974 F.2d at 1071; *Dole*, 889 F.2d at 890 (describing other means to assert privilege). Google is correct that the Ninth Circuit does not require disclosure of the title or subject line of a document, the organizational positions held by its senders or recipients, or a description of the subject matter of the document. *See In re Grand Jury Investigation*, 974 F.2d at 1071 (privilege log that included information on the subject matter of each document exceeded what was required). On the other hand, Google's privilege logs do not include, for every disputed entry, all of the information that the Ninth Circuit found sufficient for a *prima facie* showing of privilege in *In re Grand Jury Investigation* and *Dole*.

Consider, for example, the four entries plaintiffs cite in their discussion of this issue: Entries #41, #7390, #9028, and #9856. Entries #41 and #9028 include a date, the author/custodian's email address, and a description of the nature of the document and its general subject matter; they do not include the author/custodian's name, the attorney involved, or all persons or entities known to have received the document or been informed of its substance.[1] Entry #7390 is more complete. It includes a date, the author/custodian's name and email address, the recipients' names and email addresses, and a description of the nature of the document and its general subject matter; it does not include the attorney involved. At the other end of the spectrum, Entry #9856 includes only a date, a corporate (not individual) author/custodian, and a description of the nature of the document and its general subject matter; it does not include the name of the person who authored the document, all persons or entities known to have received the document or been informed of its substance, or the attorney involved.

Google explains that, as required by the ESI order, its log identifies the author and recipients of a privileged communication only where such information is "electronically

[1] The Court infers that an asterisk next to a name on the privilege log indicates that the person is an attorney.

United States District Court
Northern District of California

extractable from the relevant document," and that the description it provides of each document is otherwise sufficient. *See* Dkt. No. 339 at 4, 5 (citing ESI order, Dkt. No. 125 at 8). Google notes that the Court rejected plaintiffs' proposal with respect to redacted documents that "[u]pon reasonable request, the Producing Party agrees to provide additional information supporting the claim of privilege if it is not clear from the face of the redacted document." *See* Dkt. No. 116 at 4; Dkt. No. 95 at 3-4, Ex. 1 (sec. 11(d)). Plaintiffs respond that neither the ESI order nor any other order defines precisely what the contents of Google's privilege logs should be or relieves Google of its obligation to comply with Rule 26(b)(5)(A). Dkt. No. 339 at 2. Plaintiffs are correct. In addressing the parties' dispute about privilege assertions for ESI, the Court wrote:

> A party claiming privilege or work product protection must describe the materials being withheld "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). If the parties disagree about whether a withheld or redacted document is privileged or protected, they will have to discuss the matter before bringing the dispute to the Court's attention, and this discussion may well involve the exchange of additional information.
>
> To the extent plaintiffs' proposed text is intended as a statement of what may be necessary to resolve certain disputes about privilege claims, the Court finds it unnecessary to include such a statement in the ESI protocol.

Dkt. No. 116 at 4-5. The joint discovery dispute submission contains no indication that the parties have exchanged or discussed *any* additional information about *any* of the disputed entries, with the possible exception of the distribution list membership information Google says it will provide to plaintiffs.

Given the very large number of logged documents, the Court is sympathetic to Google's argument that it would be unduly burdensome to include for every entry the level of detail that might be appropriate when only small numbers of documents are withheld from production. *See* Rule 26, Advisory Committee Note to 1980 amendment ("Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected . . . ."). Nevertheless, for at least some of the disputed entries, it is difficult to conclude that Google has made an acceptable *prima facie* showing that the privilege applies, and it (apparently) has

provided no additional information to plaintiffs even about the four entries plaintiffs raise as examples (Entries #41, #7390, #9028, and #9856). On the other hand, plaintiffs' demand for information about the document title or subject line, the organizational positions of the authors and recipients, and detail about the issue, regulation, or policy that is the subject of the document are unlikely to make it easier for plaintiffs or the Court to assess whether a document actually seeks or contains legal advice. Rather, plaintiffs' demand for this information seems calculated to help them assess whether the contents of a withheld document might be important for the merits of the case. Likewise, plaintiffs' suggestion that the Court should find a waiver and order Google to produce all disputed documents is inconsistent with the Ninth Circuit's direction in *Burlington. See* 408 F.3d at 1148-1149 (discussing "holistic approach").

The very large number of otherwise responsive documents that Google has withheld as privileged, particularly when compared to the number of nonprivileged documents Google has produced, raises questions about whether Google's privilege assertions—i.e., its decisions to withhold documents in whole or in part from production—are more expansive than Ninth Circuit law permits. Those questions cannot be answered for all disputed entries simply by referring to Google's privilege logs, particularly for those entries that do not clearly indicate (by name or otherwise) the attorney or attorneys whose advice was sought or provided, or whose work product is reflected in the logged document. In any event, it is impossible for the Court to conduct a meaningful evaluation of the 5,470 entries in dispute.[2]

Because this dispute cannot be resolved on the basis of the parties' joint discovery dispute submission, the Court orders further proceedings, described in detail below.

**B. Further Proceedings**

The expedited dispute resolution procedure the Court requires parties to use for discovery disputes is not well-suited to resolving the parties' present dispute regarding Google's privilege assertions. Given the number of disputed entries and the likelihood that resolution may require the

[2] Because the Court adopts further proceedings, as set forth below, the Court denies plaintiffs' request for leave to file supplemental material in connection with the joint discovery dispute submission. Dkt. No. 341.

application of well-established legal principles to complex facts, the Court concludes that the matter should be briefed as a regularly noticed motion under Civil Local Rule 7-2, supported by declarations and other evidence as necessary. Unless the parties agree otherwise, plaintiffs will be the moving party. In addition, the Court will require Google to submit for *in camera* review the documents corresponding to representative disputed entries, as explained more fully below. *See, e.g.*, *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065 (N.D. Cal. 2002) (relying on briefing, declarations, and *in camera* review of challenged documents); *Klein v. Meta Platforms, Inc.*, No. 20-CV-08570-JD (VKD), 2022 WL 767096 (N.D. Cal. Mar. 11, 2022) (same). Before plaintiffs file their motion, the parties shall comply with the following directions:

In their joint submission, the parties refer to the following 18 disputed entries as examples: #4, #41, #268, #285, #660, #1095, #1231, #1262, #2813, #3265, #4712, #4835, #7390, #9028, #9865, #9886, #9955, and #10217. The Court will consider these to be representative examples.

For each of these 18 entries, Google must provide to plaintiffs at least the following information: (1) date, (2) author/sender/custodian name,[3] (3) all known recipients, (4) the attorney(s) involved, (5) the nature of the document, (6) the subject matter of the document, and (7) the privilege or protection claimed.[4] If the sender or recipient of an email communication is a distribution list, Google need only provide the current membership of the list (as it has already proposed to do), a description of the nature of the list (*e.g.*, company-wide, specific department, executive team, etc.), and a statement indicating whether, at the time of the communication, the list included any recipients who were not Google employees. Google shall provide this information to plaintiffs no later than **December 1, 2022**.

If, after receiving the additional information from Google, plaintiffs dispute Google's assertion of privilege or work product protection for any of the 18 disputed entries, they may file a regularly noticed motion addressing these entries. The motion need not be limited to the sufficiency of Google's supporting disclosures (i.e., whether Google has made a *prima facie*

---

[3] The disclosures should identify an individual or individuals, not "Google," if known.

[4] If any of this information is not available for a particular entry, Google must so inform plaintiffs.

United States District Court
Northern District of California

showing of privilege) but may challenge the privilege assertion on the merits.

If Google opposes plaintiffs' motion, it must submit for *in camera* review the documents corresponding to the disputed entries at the time it files its opposition.[5]

After the Court decides plaintiffs' motion it will consider whether any further proceedings are necessary to address any remaining disputes regarding Google's privilege assertions.

## IV. CONCLUSION

The Court denies without prejudice plaintiffs' request for relief and orders further proceedings as set forth in this order.

**IT IS SO ORDERED.**

Dated: November 17, 2022

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

[5] For now, the Court's *in camera* review will be limited to whichever of the 18 disputed entries remain in dispute at the time of Google's opposition.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE PLAINTIFFS' MOTION RE GOOGLE'S NON-COMPLIANCE WITH SEPTEMBER 6, 2022 ORDER AND MOTION FOR ORDER SHORTENING TIME**

Re: Dkt. Nos. 353, 354

United States District Court
Northern District of California

On November 7, 2022, plaintiffs filed a noticed motion asking the Court to compel Google to produce certain documents by November 18, 2022. Dkt. No. 353. On the same day, plaintiffs filed an administrative motion asking "that the Court shorten the time for ruling on" plaintiffs' motion to compel. Dkt. No. 354. Google opposes the administrative motion. Dkt. No. 356.

Both of plaintiffs' motions—the motion to compel and the administrative motion—rely on the same arguments: on September 6, 2022, the Court ordered Google to produce certain documents (Dkt. No. 326); nine weeks have passed and Google still has not produced all of the documents; and plaintiffs need these documents to prepare their class certification motion which is due to be filed January 24, 2023. Specifically, plaintiffs say that Google has not completed production of three categories of documents: (1) documents sufficient to show the revenue Google receives on an annual basis from RTB auctions in the United States; (2) documents sufficient to show any costs Google contends should be offset from revenues to calculate unjust enrichment; and (3) all reports, analyses, and studies showing the impact on Google's RTB revenues of disabling third-party cookies and other user identifiers. *See* Dkt. No. 353 at 3-4; Dkt. No. 354 at 1-2; *see also* Dkt. No. 326 at 4-6. Google opposes plaintiffs' administrative motion on several

grounds,[1] including that its filing violates the Court's standing order regarding the resolution of discovery disputes and Civil Local Rule 6-3. In addition, Google says it has been producing documents as ordered, has completed its production of annual revenue documents, and has produced other documents that the Court ordered produced. Dkt. No. 356 at 4-5. Google represents that it is "continuing to gather responsive documents and will make additional rolling productions later this month [i.e. November 2022]." *Id.* at 5.

The Court is mystified by plaintiffs' approach to this dispute. Plaintiffs want the Court to set a hard deadline for Google's production of documents the Court previously ordered produced, but instead of asking for that relief using the Court's expedited discovery dispute resolution procedures, they filed a regularly noticed motion (i.e., one that requires 35-days' notice for a hearing, and allows 14 days for opposition) and then a separate administrative motion asking the Court to hurry up and decide the noticed motion so that they can obtain an order requiring Google to make its production by November 18, 2022—11 days after plaintiffs filed their motion. While the Court is inclined to strike the noticed motion for failing to comply with the discovery dispute resolution procedures, such an order will simply lead to more paper about the same thing. As the parties have already briefed the merits of the dispute, the Court will just decide it now.

Google has had plenty of time to comply with the Court's September 6, 2022 order. It must produce all documents the Court previously ordered it to produce in the three categories described above[2] by **November 23, 2022.** Plaintiffs are admonished regarding their non-compliance with the Court's standing order.

//

//

//

---

[1] Google's opposition to plaintiffs' motion to compel is not yet due, although its opposition to plaintiffs' administrative motion argues that *both* motions should be denied. *See* Dkt. No. 356 at 1.

[2] Plaintiffs ask the Court to order Google's compliance with *all* aspects of the September 6, 2022 order, but as plaintiffs complain only about Google's non-compliance with the part of the order addressing these three specific categories of documents, the Court's order is limited to those categories.

**IT IS SO ORDERED.**

Dated: November 14, 2022

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE AUGUST 15, 2022 DISCOVERY DISPUTE RE DAMAGES-RELATED DISCOVERY**

Re: Dkt. Nos. 291, 298

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve their dispute concerning Google's production of six categories of damages-related documents. Dkt. No. 291. The Court held a hearing on this dispute on August 30, 2022. Dkt. No. 325.

As explained below, the Court orders Google to produce documents responsive to some categories but not others, and as to some requests, the Court directs the parties to confer further. Additionally, the Court grants Google's motion to strike (Dkt. No. 298), but without prejudice to plaintiffs' submission of *Calhoun* discovery material pursuant to the Court's direction below.

## I. BACKGROUND

Plaintiffs say that for purposes of this dispute they seek six categories of documents, which collectively are responsive to RFPs 34(b)-(c), 41(a), (d), and (e), 46-49, 51, and 54-56. Dkt. No. 291 at 2. The six categories are:

1. Annual revenue derived from RTB in the U.S. (RFPs 34(b)–(c), 46, 47);
2. Costs attributable to RTB in the U.S. (RFPs 34(c), 47, 51);
3. Reports, analyses, or studies showing the impact on revenues of disabling third-party cookies and other user identifiers, and back-up data used or referenced in such reports, analyses, or studies (RFPs 47, 48, 51);

4. Logs showing the revenue Google derived from the RTB ads it served on the Named Plaintiffs (this includes "backend" and "revenue" logs) (RFPs 41(a), (d), (e), 47, 55, 56);

5. The number of Google Account Holders in the U.S. during the Class Period (RFPs 55, 56); and

6. Documents related to Google's "Screenwise" program (RFPs 48, 49, 54).

*Id.* Plaintiffs complain that Google refuses to confer in good faith about these matters. *Id.* at 1. In addition to the joint discovery dispute submission, plaintiffs filed a separate declaration of counsel and several exhibits comprising discovery material obtained in the *Calhoun* action.[1] Dkt. No. 293.

Google objects that plaintiffs are attempting to re-litigate matters the Court resolved in earlier discovery orders at Dkt. Nos. 189 and 217, and that plaintiffs refuse to comply with the Court's directions regarding further steps the parties should take to resolve their disputes as to these same document requests. Dkt. No. 291 at 4-6. In addition, Google argues that most of the documents plaintiffs seek are not relevant to a claim or defense. *Id.* at 6-7. Google moves to strike plaintiffs' declaration of counsel and the attached *Calhoun*-related exhibits. Dkt. No. 298.

## II. DISCUSSION

The Court first addresses Google's argument that plaintiffs should not be permitted to re-litigate matters the Court has already decided in earlier discovery orders, and then considers the merits of the parties' disputes as to each of the six categories, as appropriate.

### A. Prior Discovery Orders

On March 15, 2022, the parties filed a discovery dispute letter that included discussion of many of the same requests for production at issue in the current submission. *See* Dkt. No. 171 at 3-4, 5-6. The Court issued an order on April 29, 2022 regarding this dispute. Dkt. No. 189. As to RFPs 46-49, 51, and 54-56, which are also at issue here, the Court ordered that "Google need not produce documents responsive to [these] RFPs at this time." *Id.* at 1. The Court explained its decision as follows:

> Plaintiffs may obtain discovery of information that will

---

[1] *Calhoun v. Google*, No. 20-cv-5146.



United States District Court
Northern District of California

> allow them to calculate or estimate the value of account holder information that Google allegedly shared with third parties without permission via the RTB process. However, RFPs 46-49, 51, and 54-56 are not limited to that objective, and plaintiffs provide an insufficient justification for the scope of these requests. With respect to RFPs 48, 49, and 54, plaintiffs do not explain how programs purportedly designed to pay Google users to share their web browsing history will reveal information relevant to the calculation of plaintiffs' damages in this case. With respect to RFPs 46, 47, 51, 55, and 56, it is not clear whether the documents plaintiffs seek concern valuations of some or all of the same information that Google allegedly shares with third parties via the RTB process.

*Id.* at 5. The Court ordered the parties to confer further as follows:

> The Court directs the parties to confer further regarding what information, if any, Google can provide that will permit plaintiffs to calculate or estimate their alleged damages. The parties should first endeavor to identify items of personal or sensitive information shared with third parties in the RTB process. Then, the parties should discuss whether Google assigns or estimates the value of some or all of those items of information for purposes of RTB. If Google does not assign or estimate value of those items of information for purposes of RTB, then the parties should discuss whether it does so for any other purpose and whether any of those other purposes are comparable to the purpose served by the RTB auction service. The parties should discuss any other matters that will facilitate resolution of this dispute. The parties must file a status report no later than May 13, 2022 advising the Court of the status of this dispute.

*Id.* After the parties jointly submitted an interim report, the Court asked for a further status report by May 27, 2022. Dkt. No. 202.

On May 27, 2022, the Court received separate status reports from plaintiffs and Google, as the parties apparently could not agree on the contents of a status report to be filed jointly. Dkt. Nos. 210, 212. Each side blamed the other for their collective inability to resolve their disputes or to engage in productive discussions.

On May 31, 2022, the Court held a hearing that included further discussion of RFPs 46-49, 51, and 54-56. In an effort to promote resolution of the parties' disputes as to these requests, the Court ordered them to confer further and provided specific guidance regarding how those discussions should proceed and the form in which the Court expected to receive the parties' positions if any disputes remained. *See* Dkt. No. 217. Google says that it attempted to comply with this guidance but that plaintiffs refused to do so, a point that plaintiffs do not dispute. *See*

Dkt. No. 291 at 4-5. Meanwhile, Google has not yet completed its production of responsive documents. *See id.* at 6.

Google is not correct to the extent it suggests the Court's prior orders finally resolved *all* matters concerning RFPs 46-49, 51, and 54-56; rather, the Court rejected plaintiffs' earlier efforts to obtain broad discovery that was not limited to "information that will allow them to calculate or estimate the value of account holder information that Google allegedly shared with third parties without permission via the RTB process." *See* Dkt. No. 189 at 5. The Court directed the parties to confer further about these matters. *See id.*; Dkt. No. 217. That said, the Court is not sympathetic to plaintiffs' complaints about delay and prejudice. *See* Dkt. No. 291 at 1. While Google has objected to most of plaintiffs' document requests and generally resisted discovery, plaintiffs have repeatedly undermined their cause by serving and insisting upon overbroad discovery requests and by failing to explain how the discovery they seek is relevant to a claim or defense and proportional to the needs of the case.

In these circumstances, the Court will consider the merits of the parties' current discovery dispute as it has been presented in the joint submission, taking into account the decisions the Court has already made about some aspects of these requests.

**B. Damages-Related Documents**

**1. Annual revenue derived from RTB in the U.S.**

Citing RFPs 34(b)-(c), 46, and 47, plaintiffs argue that Google should be required to produce documents sufficient to show the annual revenue Google receives from RTB in the United States.[2] Dkt. No. 291 at 2. Google argues that it should not be required to produce its RTB revenue because it is simply not plausible that the revenue Google receives for placement of an ad through an RTB auction is equivalent to the value of the personal information it allegedly shares

[2] Plaintiffs claim, incorrectly, that the Court has already concluded that this information is relevant. Dkt. No. 291 at 2 (citing hearing transcript at Dkt. No. 227 at 28:10-30:9; 45:1-15 and citing Dkt. No. 287 at 4-5 regarding RTB revenue specific to named plaintiffs whose information was shared through RTB). It should be apparent to experienced counsel that when a judge acknowledges a party's argument or theory of damages in a hearing, or encourages parties to reconsider their respective positions in a different context, this does not mean that the party has obtained a ruling in its favor.

United States District Court
Northern District of California

with third parties in such an auction. *Id.* at 6.

The Court agrees with Google that RTB revenue is not a plausible measure of plaintiffs' damages or Google's unjust enrichment, as revenue necessarily captures value associated with the ad itself and perhaps with other items of value besides plaintiffs' personal information. However, the Court understands that Google has not yet identified and produced another data source that more accurately captures the value likely to be associated with the sharing of account holder personal information through RTB, although Google represents that efforts are underway to identify and produce such information. In these circumstances, information about the revenue derived from RTB may inform the parties' respective damages analyses, even if revenue is not a reliable measure of damages.

Accordingly, the Court orders Google to produce documents sufficient to show the revenue it receives on an annual basis from RTB auctions in the United States for the relevant period.

**2. Costs attributable to RTB in the U.S.**

Citing RFPs 34(c), 47, and 51, plaintiffs argue that Google should be required to produce documents sufficient to show any costs Google contends should be "offset from revenues to calculate unjust enrichment, such as consideration that Google pays to others to receive data that is subsequently shared through RTB." Dkt. No. 291 at 2 (emphasis omitted). Google points out that plaintiffs previously served RFP 53, seeking the same information, and that the Court definitively resolved that dispute. *Id.* at 6.

Google is correct that plaintiffs' present demand is the same as the one they pressed in an earlier discovery dispute regarding RFP 53. *See* Dkt. No. 171 at 4. The Court resolved that dispute by ordering Google to amend its answer to RFP 53 to make clear that it does not have any documents responsive to RFP 53. Dkt. No. 189 at 5-6. Plaintiffs do not contend that they have evidence Google is withholding documents within the scope of this category.

Accordingly, if Google does not have any documents showing the costs it contends should be "offset from revenues to calculate unjust enrichment" that have not yet been produced, then the Court agrees that there is no relief to order. If Google does have such documents, it must produce them.

United States District Court
Northern District of California

**3. Impact on revenues of disabling third-party cookies, user identifiers**

Citing documents that have already been produced in this action, plaintiffs contend that "Google investigated the revenue impact when certain user identifying information was removed from bid requests." Dkt. No. 291 at 2. Plaintiffs argue that "[r]eports and underlying data concerning these experiments are needed by Plaintiffs' experts to calculate the portion of revenues attributable to personal information." *Id.* Plaintiffs claim these documents are responsive to RFPs 47, 48, and 51. *Id.* Google responds that it is "already searching for such documents." *Id.* at 6 (referencing sec. II.B.a. of Google's portion of the joint submission).

Despite this apparent agreement, the parties' arguments at the hearing reflect that plaintiffs seek a broader scope of production than Google plans to make. Plaintiffs seem to want Google to produce all documents, including the raw data, that reflect any assessment Google has made regarding how disabling a third-party cookie or user identifier in any context may impact Google's revenues. Google seems to want to limit its production to studies assessing the revenue impact of disabling a certain set of data signals in RTB and without the raw data. Dkt. No. 325 at 24:16-42:20.

The Court resolves this dispute as follows: Google must produce all reports, analyses, and studies showing the impact on Google's RTB revenues of disabling third-party cookies and other user identifiers.

Google need not produce the "underlying data" for these reports, analyses, and studies, as none of the document requests on which plaintiffs rely call for production of this information, and the Court is not persuaded that production of "underlying data" is proportional to the needs of the case.

Google also need not produce reports, analyses, and studies showing the impact on Google's revenues of disabling third-party cookies and other user identifiers with respect to other, non-RTB products or services. Plaintiffs' portion of the joint submission, which specifically references studies relating to "bid requests," does not discuss or support their demand for discovery about other Google products and services.

**4. Revenue derived from RTB ads served on named plaintiffs**

Citing RFPs 41(a), (d), (e), 47, 55, and 56, plaintiffs argue that Google should be required to produce transaction-specific logs showing, for each named plaintiff, the personal information provided to RTB participants, the winning bid, and the amount Google received from the winning bidder. Dkt. No. 291 at 3. At the hearing, plaintiffs claim to have identified twelve logs from materials produced in the *Calhoun* action that contain the information they seek. Dkt. No. 325 at 50:14-15. Google objects that to the extent plaintiffs demand production of all "back-end" logs, the Court has already denied their prior efforts to obtain such discovery. Dkt. No. 291 at 6. Google further objects that "event-level data reflecting the total auction revenue for every user is vastly overbroad, and not relevant to quantifying the value of data shared with third parties." *Id.* (emphasis omitted). Finally, Google objects that to the extent plaintiffs seek to limit their demand to transaction-level information associated with the named plaintiffs, no RFPs seek that information and, in any event, "individual ad revenue is not tied to the value of personal or sensitive information alleged shared with third parties via RTB." *Id.* at 6-7.

In connection with the parties' earlier dispute regarding named plaintiffs' data, the Court ordered as follows:

> The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify an account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well. Otherwise, plaintiffs have not shown they are entitled to discovery of all information Google maintains about an account holder solely based on Google's internal linking of information with an account holder.
>
> Regarding the sources of relevant information, plaintiffs claim that Google maintains records by account holder and by auction reflecting what information was disclosed to RTB participants, and they refer to information available in the *Calhoun* action. The parties should discuss the bases for plaintiffs' claim regarding the records available from Google, including, if appropriate, using the procedures set forth in Dkt. No. 313. Any remaining dispute regarding this topic may be submitted to the Court for decision.

Dkt. No. 314 at 4-5 (internal citation omitted). The Court will not revisit that order in the context

United States District Court
Northern District of California

of plaintiffs' present demand for production of named plaintiffs' "personal information provided to bidders." *See* Dkt. No. 291 at 3.

With respect to plaintiffs' demand for documents sufficient to show, for each named plaintiff, the U.S. revenues Google received for ads displayed to the named plaintiff as a result of an RTB auction, the Court agrees that Google should produce this information for the reasons explained above with respect to the first of the six categories in dispute. The question is whether Google should be required to produce *transaction-level* revenue information for each named plaintiff. If transaction-level U.S. revenue associated with RTB for each named plaintiff can be extracted from a log or logs without undue burden, the Court will require Google to produce it. If plaintiffs believe that discovery obtained in *Calhoun* supports their contention that the information can be extracted without undue burden, and if Google disagrees, the parties must confer further using the procedures set forth in Dkt. No. 313, and may submit any remaining dispute on this point to the Court for decision.

**5. Number of Google account holders in the U.S. during class period**

Citing RFPs 55 and 56, plaintiffs assert, without elaboration, that "the number of Google Account Holders, is a critical input for Plaintiffs' experts to calculate Class-wide damages by extrapolation as well as *pro rata* apportionment." Dkt. No. 291 at 3. Google objects that plaintiffs "have not propounded an RFP requesting this information and it is overbroad because it is not even limited to Google Account Holders who were subject to an RTB callout." *Id.* at 7.

The Court agrees with Google. RFP 55 asks for "[d]ocuments related to surveys performed or commissioned by Google regarding valuation of Account Holder information," and RFP 56 asks for "all Documents provided to Your auditors to support estimates of fair value relating to Account Holders' Information." Dkt. No. 291-1. Neither RFP asks Google to produce documents sufficient to show the number of Google account holders in the United States during the class period.[3] Moreover, even if those requests did encompass such information, plaintiffs do

[3] Plaintiffs attempted to argue during the hearing that other document requests not cited in their submission call for the number of account holders. Dkt. No. 325 at 57:4-15. This argument is improper. The Court's expedited discovery procedures require the parties to confer about their dispute in advance, attempt to resolve it, and describe their positions in writing *before* filing their

United States District Court
Northern District of California

not explain why they need the total number of all U.S. account holders, rather than the number of U.S. account holders whose personal information was shared with third parties participating in an RTB auction during the class period.

For these reasons, the Court denies plaintiffs' request for an order requiring Google to produce documents sufficient to show the total number of Google account holders in the U.S. during the class period.

**6. Documents related to Google's "Screenwise" program**

Citing RFPs 48, 49, and 54, plaintiffs argue that the Court should order Google to produce documents related to Google's Screenwise program. Plaintiffs say that "Screenwise is a program through which Google pays users for their online data, including browsing history attached to identifiers." Dkt. No. 291 at 3 (emphasis omitted). They argue that the amount Google pays users for this information is evidence of the "market rate" for the same information shared with third parties through RTB. *Id.* Plaintiffs say that, regardless of the outcome of this discovery dispute, their experts are prepared to use publicly available information they have already obtained about the Screenwise program to calculate damages. *Id.* It is not clear what additional information, if any, plaintiffs require from Google in order to calculate damages. However, during the hearing, plaintiffs limited their demand to the 94 documents relating to the Screenwise program that Google has already produced in the *Calhoun* action, noting that such a request would minimize Google's burden with respect to this category of documents. Dkt. No. 325 at 72:13-14, 88:1-2.

Google objects that plaintiffs' present demand for documents about the Screenwise program is "an unjustifiable, untimely motion for reconsideration" of the Court's prior order. Dkt. No. 291. at 7. Google further objects that the documents are not relevant. It describes the Screenwise program as "a consumer research project that collects browsing history related to a broad set of products," and that "whatever value Google places on such data for its own purposes is not probative of the value RTB bid request recipients would place on the different data they

---

joint submission with the Court. Plaintiffs did not identify any other document requests to Google in support of their demand for this information, even though Google expressly objected to production on the ground that plaintiffs had not served a document request asking for this information.

received." Dkt. No. 291 at 7.

As to Google's initial objection, Google is correct that the Court earlier found that "plaintiffs do not explain how programs purportedly designed to pay Google users to share their web browsing history will reveal information relevant to the calculation of plaintiffs' damages in this case." Dkt. No. 189 at 5. However, the Court directed the parties to confer further about RFPs 48, 49, and 54 and did not completely foreclose any future discussion about the Screenwise program. Therefore, the Court will consider whether documents related to the Screenwise program are relevant to plaintiffs' damages and, if so, whether plaintiffs should be allowed to rely on the Screenwise documents produced in *Calhoun*.

The parties agree that in exchange for allowing Google to track their browsing history, users participating in the Screenwise program are paid a fee. Google uses the information gleaned from the browsing history to develop its own products and services. According to plaintiffs, this development includes features having to do with advertising. Dkt. No. 325 at 86:4-12. Conversely, the parties appear to agree that Google does *not* disclose similarly comprehensive browsing history to third party participants in an RTB auction. Rather, Google says that the URL for the web page where an ad will be placed is disclosed to such participants—*i.e.* a browsing history consisting of the single web page that an account holder visits. The winning bidder pays Google.

The circumstances in which Google pays users a fee for participating in the Screenwise program differ significantly from the circumstances underlying plaintiffs' claims. The Court is skeptical of plaintiffs' thesis that the Screenwise program establishes a "market rate" for the value of information shared through RTB for several reasons: (i) the information shared is different, (ii) there are different "market" participants, (iii) the information is shared for different purposes, and (iv) payments are made for different purposes. However, there appears to be no dispute that some "browsing history" is shared with third parties in an RTB auction, and therefore, there is some overlap in the kinds of information that is potentially valued by the participants in Screenwise and in RTB. It is possible plaintiffs may be able to construct a reliable damages model using, at least in part, information from the Screenwise program. At the very least, the Court is not prepared to

conclude that discovery relating to the Screenwise program is wholly irrelevant.

As plaintiffs have limited their demand to 94 documents relating to Screenwise produced in the *Calhoun* action, the Court is inclined to allow plaintiffs to use those documents in this action without requiring Google to search for or produce any other Screenwise documents. However, because the Court did not expect Google to review the *Calhoun* material in advance of this order, if Google objects to the use of some of the *Calhoun* Screenwise documents in this action, the Court will require the parties to confer using the procedures set forth in Dkt. No. 313 before requiring Google to produce any objected-to Screenwise documents. The parties may submit any remaining dispute on this point to the Court for decision.

**C. Weaver Declaration and *Calhoun*-Related Exhibits**

Without seeking leave in advance, plaintiffs filed a separate declaration of counsel that included additional argument and attached or cited many documents from discovery obtained in the *Calhoun* action, contrary to the expedited procedures this Court has established for the resolution of discovery disputes. Dkt. No. 293. The Court has since established a procedure that must be used if plaintiffs believe materials that are subject to the protective order in *Calhoun* bear on a discovery dispute. *See* Dkt. No. 313.

Accordingly, the Court strikes plaintiffs' separate submission for failure to comply with the Court's discovery procedures, without prejudice to plaintiffs' submission of *Calhoun* discovery material pursuant to the Court's direction above and in compliance with Dkt. No. 313.

**IT IS SO ORDERED.**

Dated: September 6, 2022

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION

Case No. 21-cv-02155-YGR (VKD)

**ORDER RE JULY 29, 2022 DISCOVERY DISPUTE RE NAMED PLAINTIFFS' DATA**

Re: Dkt. No. 269, 274

United States District Court
Northern District of California

Plaintiffs and defendant Google LLC ("Google") ask the Court to resolve their dispute concerning four of plaintiffs' document requests to Google. Dkt. No. 269. The Court held a hearing on this dispute on August 23, 2022. Dkt. No. 308.

As explained below, the Court orders Google to produce documents, provides guidance about the scope of production, and directs the parties to engage in further discussion. As to some matters, the Court denies plaintiffs' requests. Additionally, the Court grants Google's motion to strike (Dkt. No. 274), but without prejudice to plaintiffs' submission of *Calhoun* discovery material pursuant to the Court's direction below.

## I. BACKGROUND

Plaintiffs ask Google to produce documents responsive to RFPs Nos. 12, 13, 41, and 42. Although each of these requests is directed to "Account Holders" generally, plaintiffs have limited their demand to responsive documents concerning the nine named plaintiffs. Dkt. No. 269 at 1. For each named plaintiff, plaintiffs ask for documents sufficient to show:

1. account sign-up information reflecting the date the account holder signed up for an account and which services the account holder signed up for, which in turn indicates whether an account holder saw a Google promise to not sell or disclose personal

information in proximity to a prompt asking the account holder to agree, *see id.* at 2;

2. how Google links information it discloses through RTB with the account holder's Google account and what information is linked, *see id.*;
3. unspecified device and account settings, *see id.* at 3;
4. web-browsing histories, *see id.*;
5. which ads were displayed to the account holder, *see id.*;
6. what information Google internally considers "sensitive" information for purposes of advertising, *see id.*;
7. the use of cookie-matching, which enables RTB participants to associate information about an account holder obtained through RTB with data about that account holder that the RTB participant maintains, thereby allowing the participant to identify a specific account holder, *see id.* at 4; and
8. "other important data related to, among other things, Google Account Identifiers, timestamps for recorded communications, identification of the winning ad, and identification of the winning bid amount," *see id.* at 2.

In addition to the joint discovery dispute submission, plaintiffs ask the Court to consider a separate declaration of counsel and 13 exhibits comprising discovery material obtained in the *Calhoun* action.[1] Dkt. No. 271.

Google objects that plaintiffs belatedly demand a much broader scope of discovery than what Google has committed to produce regarding the named plaintiffs, and that in any event, plaintiffs are not entitled to most of the documents they seek. *Id.* at 4, 5-6. Google also moves to strike plaintiffs' declaration of counsel and the attached *Calhoun*-related exhibits. Dkt. No. 274.

## II. DISCUSSION

Of the four RFPs plaintiffs cite as the basis for their discovery demands, only RFPs Nos. 13, 41, and 42 appear to be at issue.[2] Dkt. No. 269-1. Plaintiffs' portion of the joint submission is

---

[1] *Calhoun v. Google*, No. 20-cv-5146.

[2] RFP No. 12 asks for "documents sufficient to identify all Account Holders" within the scope of the putative class. Dkt. No. 269-1 at ECF 3. Because plaintiffs represent that they seek only

not tethered in any meaningful way to these document requests. The Court hopes this is because, during the conferences of counsel, plaintiffs have narrowed the categories of information for which they are seeking documents to those described in the joint submission, which the Court has summarized above. In any event, in resolving this dispute, the Court focuses on the categories described in the joint submission and not the much broader document requests.

It is not possible for the Court to completely resolve this dispute based on the parties' submissions, even after the benefit of a lengthy hearing. For some categories, plaintiffs rely on conclusory arguments or purported admissions without ever explaining why the discovery they seek is relevant to a claim or defense. *See, e.g.*, Dkt. No. 269 at 3 (discussing "Web Browsing Histories"). Moreover, for some categories, plaintiffs rely on a supplemental declaration of counsel which includes additional argument and attaches *Calhoun* discovery, to which Google objects and as to which the parties have not had any meaningful discussion. Below, the Court resolves what it can, and provides further direction regarding the remainder of the disputes.

**1. Account sign-up information, Google's promises, plaintiffs' consent**

Plaintiffs persuasively argue that what a user sees in the course of account sign-up, including a representation that "Google does not sell your personal information" in proximity to a button asking the user to "agree," is relevant to at least their breach of contract claim. To the extent a user is presented with other similar representations when prompted to sign up for particular Google services, a record of whether the user signed up for that service may support plaintiffs' contention that the user saw and relied on the representation. *Id.* at 2. For its part, Google represents that it will produce information about the named plaintiffs that relates to Google's consent defense, although it is not clear whether the parties have a meeting of the minds on what that data is. *Id.* at 5.

The Court expects Google to produce, for each named plaintiff, documents sufficient to show (i) the relevant representations each plaintiff saw (like the one at account sign-up), including indicia tending to show whether the user saw and potentially relied on the representation; (ii)

---

discovery concerning the named plaintiffs at this time, the Court understands that they are not presently asking Google to identify all other account holders who may be class members.

indications of express consent to the relevant use of information associated with each plaintiff; and (iii) any other information on which Google relies for its consent defense. If the parties cannot resolve their dispute based on this guidance, they must confer further (using the procedures set forth in Dkt. No. 313, as applicable) and submit their specific dispute to the Court for decision.

**2. Linking account information**

Plaintiffs argue that Google links information it shares with RTB participants with named plaintiffs' Google accounts, and that this renders all such linked information "personal information" of an account holder. The joint submission does not identify the information plaintiffs believe is linked or describe the nature of the linking they suspect occurs. Dkt. No. 269 at 2-3. Google responds that plaintiffs are merely seeking once again to obtain discovery of all information Google collects, regardless of whether that information is disclosed to a third party in an RTB auction, a demand that this Court has already rejected. *Id.* at 5.

Plaintiffs' premise is that if Google associates information with an account holder, the information is "personal" to the account holder because of that association. They seem to say that if such information is disclosed in an RTB auction, it is "personal information" of an account holder within the scope of discovery. The parties' arguments on this point are not well-developed. In particular, the Court is not persuaded that if an item of information *Google* associates with an account holder is shared with an RTB participant in a manner that (a) *eliminates* the association with a specific account holder and (b) does not allow the RTB participant to make the same association (*see* "cookie matching" discussion below), Google has necessarily shared "personal information" of an account holder with an RTB participant. If plaintiffs contend otherwise, they have not pointed the Court to any authority that supports their position.

The Court expects Google to produce documents sufficient to show, for each named plaintiff, what information specific to that plaintiff was shared with an RTB participant and the details of such sharing. If Google discloses information that allows an RTB participant to identify an account holder based on information the *participant* may have about that account holder, Google must produce records showing the disclosure of that information as well. Otherwise, plaintiffs have not shown they are entitled to discovery of all information Google maintains about

an account holder solely based on Google's internal linking of information with an account holder.

Regarding the sources of relevant information, plaintiffs claim that Google maintains records by account holder and by auction reflecting what information was disclosed to RTB participants, and they refer to information available in the *Calhoun* action. *See id.* at 3. The parties should discuss the bases for plaintiffs' claim regarding the records available from Google, including, if appropriate, using the procedures set forth in Dkt. No. 313. Any remaining dispute regarding this topic may be submitted to the Court for decision.

**3. Device and account settings**

Plaintiffs argue that Google should be required to produce device and account settings because the Court has already determined these settings are relevant. Dkt. No. 269 at 3. Google responds that plaintiffs are in the best position to produce this information themselves and that it would be unnecessarily duplicative for Google to have to produce the same information. *Id.* at 5. Neither side explains to the Court what device and account settings are at issue, although both refer to the Court's prior order at Dkt. No. 190. The word "setting" does not appear in any of the RFPs at issue.

On April 25, 2022, the Court issued an order resolving the parties' disputes concerning some of Google's document requests to plaintiffs. Dkt. No. 190. In the context of that dispute, Google demanded that the named plaintiffs produce the following information in response to Google's RFP No. 1: (1) controls or settings available on their devices, browsers, mobile applications, operating systems, and/or websites that are related to what and how user information is shared with Google; (2) cookie, location, and other privacy settings; (3) internet browsers installed on their devices; (4) the use of private-browsing methods; and (5) web-browsing history. *See id.* at 3 (summarizing Google's demand). For the reasons explained in the order, the Court directed plaintiffs to produce this information. *Id.* at 4. Plaintiffs now contend that Google has more complete information about the named plaintiffs' device and account settings than they do and they demand its production. Google does not dispute that it has the information or that it is burdensome to provide; they argue only that production would be duplicative.

As noted above, it not entirely clear what device and account settings plaintiffs demand

United States District Court
Northern District of California

from Google. However, the Court has already found that the information described above and in Dkt. No. 190 as items (1)-(5) is relevant to a claim or defense, and given plaintiffs' representations that their own production is incomplete, Google's production would not be entirely duplicative. If Google maintains this information for the named plaintiffs, it must produce it. If the parties cannot resolve their dispute based on this guidance, they must confer further (using the procedures set forth in Dkt. No. 313, as applicable) and submit their specific dispute to the Court for decision.

**4. Web-browsing history**

The parties disagree about whether Google discloses account holders' web-browsing history through RTB. Plaintiffs say that Google does disclose it; Google says that it shares only the URL of the specific ad opportunity that is the subject of an RTB auction. Dkt. No. 269 at 3, 6. The Court need not resolve this disagreement. For the same reasons Google argued that the named plaintiffs' web browsing histories are relevant, *see* Dkt. No. 142 at 2, which the Court accepted, *see* Dkt. No. 190 at 3-4, the Court concludes that Google must produce the named plaintiffs' web-browsing histories.

If Google contends it does not have this information or cannot produce it for some reason, the parties must confer further (using the procedures set forth in Dkt. No. 313, as applicable) and submit their specific dispute to the Court for decision.

**5. Ads shown**

It is not clear from the joint submission whether plaintiffs demand that Google produce documents sufficient to show *all* ads shown to the named plaintiffs or only all ads shown as the result of a successful bid placed through an RTB auction. RFP No. 13 asks for documents sufficient to show "all information Google has collected, created, associated and derived, and continues to collect, create, associate and derive, regarding [named plaintiffs'] . . . ad history . . . ." Dkt. No. 269-1 at ECF 5. RFP No. 41 asks for documents sufficient to show "[t]he resulting ad(s) that was displayed to each [named plaintiff]" after their personal information was shared in an RTB auction. *Id.* at ECF 53. Google objects that searching its logs for "every ad" shown to every named plaintiff would be "highly burdensome, time consuming, and not proportional," in part because Google would have to provide notice to its advertising customers. Dkt. No. 269 at 6; Dkt.

No. 308. In addition, Google argued during the hearing that *plaintiffs* have consistently taken the position that the particular ads shown to them are not relevant to any claim or defense. Dkt. No. 308. Plaintiffs countered that for purposes of establishing standing, adequacy, typicality, and damages, they must show that ads of a "sensitive" nature were shown to them through RTB. *Id.* Plaintiffs also suggested that Google maintains a log of all ads shown to the named plaintiffs, including those shown through the RTB process, and that it would not be unduly burdensome for Google to produce the complete data as to each named plaintiff. *Id.*

The Court is persuaded that to support their allegations of standing and to meet the criteria for class certification, plaintiffs may be required to demonstrate that the named plaintiffs were shown ads as a result of sharing of their personal information through RTB, and that they were harmed or that Google was unjustly enriched as a result. It is not clear from the parties' joint submission or the discussion at the hearing whether the data Google maintains can be produced without undue burden. If Google contends it is unduly burdensome to produce this information or that it cannot produce it for some other reason, the parties must confer further (using the procedures set forth in Dkt. No. 313, as applicable) and submit their specific dispute to the Court for decision.

**6. Information Google considers "sensitive"**

Plaintiffs argue that their claims regarding Google's use of "sensitive" information are "not limited to the sharing or sale of information." They say that "[i]f Google internally deems certain kinds of account holder information 'sensitive' that is used for advertising, it bears directly on [p]laintiffs' claims." Dkt. No. 269 at 3. Plaintiffs do not identify the claims to which they refer or explain how the documents they seek are relevant to their claims. They do not even say what documents they want. Claiming that relevance is "undisputed," plaintiffs cite a cobbled-together quote from Google's statements during a hearing on a prior dispute that, in the Court's view, distorts the statements' original meaning. *Id.* Google argues that plaintiffs are not entitled to discovery about any and all use Google may make of "sensitive" information, and contends that the Court has already resolved this issue in deciding the parties' dispute about the scope of plaintiffs' Rule 30(b)(6) deposition notice. *Id.* at 6.

The Court cannot discern from the parties' joint submission what records plaintiffs seek with respect to the named plaintiffs or why plaintiffs believe the records are relevant to a claim or defense. Moreover, the word "sensitive" does not appear in any of the RFPs at issue. Because plaintiffs have not shown that the discovery they seek is relevant to a claim or defense and proportional to the needs of the case, the Court denies this aspect of plaintiffs' request for relief.

**7. Cookie-matching**

Plaintiffs argue that "Google provides RTB participants, via cookie-matching, with a key to identify exactly who certain account holders are, and cookie-matching can enable participants to link a user's personal information obtained from the RTB auction process with its own data about that user." *Id.* at 4. Plaintiffs demand that Google produce "data revealing cookie-matching about the [named plaintiffs]." *Id.* Google does not contest plaintiffs' characterization of how cookie-matching operates in an RTB auction. Rather, Google says that plaintiffs did not specifically raise any issue about cookie-matching data until late June 2022 and only served specific requests about cookie-matching during the week of July 25, 2022. *Id.* at 6.

As noted above, cookie-matching appears to be a vehicle whereby account holder-specific information may be shared with RTB participants. It is not clear from the parties' joint submission what records Google has about instances of cookie-matching via RTB with respect to the named plaintiffs; perhaps plaintiffs' recent document requests identify the data they seek with more specificity. In any event, if there is such data, the Court is persuaded it is relevant to plaintiffs' claims and should be produced. If Google contends it does not have the information or cannot produce it for some reason, the parties must confer further (using the procedures set forth in Dkt. No. 313, as applicable) and submit their specific dispute to the Court for decision.

**8. Other data**

Plaintiffs complain generally that Google has produced records from a single log, but has not produced records from other relevant logs. Dkt. No. 269 at 1. With the exception of the categories of information discussed above in this order, plaintiffs do not identify what additional records they seek. However, they assert that the records Google has produced to date omit "important data related to, among other things, Google Account identifiers, timestamps for

United States District Court
Northern District of California

recorded communications, identification of the winning ad, and identification of the winning bid amount." *Id.* at 2. Some of this "other data" appears to be the subject of a separate dispute the Court has set for hearing on August 30, 2022. *See* Dkt. No. 291. Google does not respond specifically to plaintiffs' arguments that it maintains other sources of relevant information identifying the named plaintiffs and the information about them that has been shared with RTB participants.

Plaintiffs' principal argument here is that Google maintains records of relevant information but has declined to search all but a narrow set of data sources. The parties should discuss the bases for plaintiffs' claim that Google maintains other sources of relevant information, including, if appropriate, using the procedures set forth in Dkt. No. 313. Any remaining dispute regarding this issue may be submitted to the Court for decision.

**IT IS SO ORDERED.**

Dated: August 26, 2022

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

# EXHIBIT A

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
(rhodesmg@cooley.com)
JEFFREY M. GUTKIN (SBN 216083)
(jgutkin@cooley.com)
DANIELLE C. PIERRE (SBN 300567)
(dpierre@cooley.com)
KELSEY R. SPECTOR (SBN 321488)
(kspector@cooley.com)
COLIN S. SCOTT (SBN 318555)
(cscott@cooley.com)
3 Embarcadero Center, 20th floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BENJAMIN HEWITT and KIMBERLEY WOODRUFF, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 5:21-cv-02155-LHK

**DEFENDANT GOOGLE LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST AND SECOND SETS OF REQUEST FOR PRODUCTION OF DOCUMENTS**

protected by the attorney-client privilege or the work product doctrine, or any other privilege or immunity.

In addition, Google objects that the phrases "referenced," "comments," "discussions," and "analyses" are vague and ambiguous as none are self-evident or defined.

Subject to the foregoing objections, Google responds that because the editorial does not relate to the allegations concerning RTB challenged in Plaintiffs' Complaint, Google has not conducted and will not conduct searches for responsive documents, and, as a result, will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to identify all Account Holders for whom Google has shared, sold, or disseminated personal information to participants, persons or entities through Google Real Time Bidding, including:

a. All Account Holders for whom Google shared, sold, or disseminated their personal information through Real Time Bidding on a Video Tape Service Providers (VTSP), as defined in 18 U.S.C. § 2710;

b. All Account Holders for whom Google shared, sold, or disseminated personal information through Real Time Bidding while the Account Holder was using the Chrome web-browser; and,

c. All Account Holders for whom Google shared, sold, or disseminated personal information through Real Time Bidding while the Account Holder was using an Android operating system.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

In addition to the foregoing General Objections, which Google incorporates by reference, Google specifically objects to this Request as overly broad and unduly burdensome to the extent it is not limited in scope and encompasses other aspects of RTB that have no relation to Plaintiffs' central allegations regarding the alleged disclosure of Plaintiffs' and purported class members' personal information to third party participants utilizing RTB. Google also objects to the extent this Request is not limited to RTB. Accordingly, the Request is not proportional to the needs of

the case, and the burden of the proposed discovery outweighs any likely benefit. Google further objects to this Request because it is argumentative, and to the extent it calls for a legal conclusion with respect to the meaning of "Video Tape Service Providers." Google also objects to this Request to the extent it is not limited to the named Plaintiffs and, instead, seeks information and documents relating to individual putative class members when no class has been certified. Google further objects to this Request to the extent it seeks documents protected by the right of privacy under the California Constitution, Article I, Section 1. At this stage of the proceedings, the privacy rights of non-party putative class members and the undue burden imposed on Google outweigh Plaintiffs' purported need for the requested information. *See Nevarez v. Forty Niners Football Co., LLC*, No. 16CV07013-LHK-SVK, 2018 WL 306681, at *2 (N.D. Cal. Jan. 5, 2018) (holding that when a party seeks pre-certification discovery that may implicate the privacy concerns of putative class members, "a court 'must balance the party's need for the information against the individual's privacy right . . .'") (internal citation omitted). Moreover, Plaintiffs are not entitled to discovery to obtain the identity of putative class members prior to class certification unless it is relevant to issues of class certification. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 3746118, at *4 (S.D. Cal. July 15, 2013) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 354 (1978)) (("[T]he dispositive issue was not whether the sought after lists contained the names and addresses of class members, but whether that list bore any relevance to appropriate questions of law" related to class certification). Google further objects to this Request on the basis that it is compound.

In addition, Google objects that the phrase "disseminated" is vague and ambiguous as it is neither self-evident nor defined.

Subject to the foregoing objections, Google responds that it will conduct a reasonable search and produce responsive, non-privileged, and available documents sufficient to show what information, if any, that Google's systems directly associate with the identifiers Plaintiffs have provided or will provide to Google, and was shared with third parties utilizing RTB, to the extent Google can reasonably identify such data as belonging to Plaintiffs. Google will also produce documents sufficient to show what information is generally shared with third parties utilizing RTB.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to identify all information Google has collected, created, associated and derived, and continues to collect, create, associate and derive, regarding Plaintiffs and Account Holders, including: authenticated and unauthenticated personal identifiers and device, browser, and other identifiers (including IP address) associated with Plaintiffs and Account Holders; data associated with those identifiers, including browsing history, ad history, communications history, Google account sign-in history, Chrome Sync history; derived data; appended data; associated verticals and segments; embedded data; all data contained in user profiles, interest profiles, interest graphs; and, authenticated and unauthenticated data.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

In addition to the foregoing General Objections, which Google incorporates by reference, Google specifically objects to this Request as overly broad and unduly burdensome to the extent it is not limited in scope and encompasses other aspects of RTB that have no relation to Plaintiffs' central allegations regarding the alleged disclosure of Plaintiffs' and purported class members' personal information to third party participants utilizing RTB, including "Google account sign-in history" and "Chrome sync history." Google also objects to the extent this Request is not limited to RTB. Accordingly, the Request is not proportional to the needs of the case, and the burden of the proposed discovery outweighs any likely benefit. Google also objects to this Request to the extent it is not limited to the named Plaintiffs and, instead, seeks information and documents relating to individual putative class members when no class has been certified. Google further objects to this Request to the extent it seeks documents protected by the right of privacy under the California Constitution, Article I, Section 1. At this stage of the proceedings, the privacy rights of non-party putative class members and the undue burden imposed on Google outweigh Plaintiffs' purported need for the requested information. *See Nevarez v. Forty Niners Football Co., LLC*, No. 16CV07013-LHK-SVK, 2018 WL 306681, at *2 (N.D. Cal. Jan. 5, 2018) (holding that when a party seeks pre-certification discovery that may implicate the privacy concerns of putative class members, "a court 'must balance the party's need for the information against the individual's privacy right . . .'") (internal citation omitted). Moreover, Plaintiffs are not entitled to discovery to

obtain the identity of putative class members prior to class certification unless it is relevant to issues of class certification. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 3746118, at *4 (S.D. Cal. July 15, 2013) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 354 (1978)) ((“[T]he dispositive issue was not whether the sought after lists contained the names and addresses of class members, but whether that list bore any relevance to appropriate questions of law” related to class certification). Google also objects that this information is already in Plaintiffs' possession, custody or control. Google further objects to this Request to the extent it seeks documents protected by the attorney-client privilege or the work product doctrine, or any other privilege or immunity.

In addition, Google objects that the phrases “personal identifiers,” “other identifiers,” “derived data,” “appended data,” “embedded data,” “user profiles,” “verticals and segments,” “interest profiles,” “interest graphs,” and “authenticated or unauthenticated data” are vague and ambiguous as none are self-evident or defined.

Subject to the foregoing objections, Google will conduct a reasonable search and produce responsive, non-privileged, and available documents showing what information, if any, that Google's systems directly associate with the identifiers Plaintiffs have provided or will provide to Google, and was shared with third parties utilizing RTB, to the extent Google can reasonably identify such data as belonging to Plaintiffs.

**REQUEST FOR PRODUCTION NO. 14:**

Documents and communications related to Google's collection and storage of data and information of Account Holders that is or may be used, shared, sold, disseminated, or otherwise disclosed through Real Time Bidding, including privacy policies, retention policies, other guiding or informative documents, that describes the who, what, where, how, and when of the data and information collected and stored.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

In addition to the foregoing General Objections, which Google incorporates by reference, Google specifically objects to this Request as overly broad and unduly burdensome to the extent it is not limited in scope and encompasses other aspects of RTB that have no relation to Plaintiffs'

benefit. Google also objects to this Request to the extent it is duplicative of other requests. Google further objects to this Request on the basis that it is unintelligible.

In addition, Google objects that the phrases "technical processes, timing, directions, commands, and flow," "re-directed," "participants in an Internet communications on web-property through which an advertisement is served" are vague and ambiguous as none are self-evident or defined.

Subject to the foregoing objections, Google will conduct a reasonable search and produce responsive, non-privileged documents sufficient to show the technical processes, timing, directions, commands, or flow, if any, regarding the alleged disclosure of Google Account Holder data to third party participants utilizing RTB.

**REQUEST FOR PRODUCTION NO. 41:**

For all Account Holders for whom Google has shared sold, or disseminated their personal information to other persons or entities through Real Time Bidding, including for Account Holders for whom Google has shared, sold or disseminated their personal information through a VTSP property, those using the Chrome web-browser, and those using a Android operating system:

a. Documents sufficient to establish the amount of revenue associated with each Account Holder;

b. All Bid Requests associated with each Account Holder;

c. All bid responses associated with each Account Holder;

d. All winning bids and the identity of the winning bidder associated with each Account Holder;

e. The value paid for each Bid Request associated with each Account Holder;

f. The resulting ad(s) that was displayed to each Account Holder; and,

g. The contents of each Bid Request disclosure about each Account Holder that Google made to other companies.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

In addition to the foregoing General Objections, which Google incorporates by reference, Google specifically objects to this Request as overly broad and unduly burdensome to the extent it

is not limited in scope and encompasses other aspects of RTB that have no relation to Plaintiffs' central allegations regarding the alleged disclosure of Plaintiffs' and purported class members' personal information to third party participants utilizing RTB. Accordingly, the Request is not proportional to the needs of the case, and the burden of the proposed discovery outweighs any likely benefit. Google further objects to this Request because it is argumentative, and to the extent it calls for a legal conclusion with respect to the meaning of "Video Tape Service Providers." Google also objects to this Request to the extent it is not limited to the named Plaintiffs and, instead, seeks information and documents relating to individual putative class members when no class has been certified. Google further objects to this Request to the extent it seeks documents protected by the right of privacy under the California Constitution, Article I, Section 1. At this stage of the proceedings, the privacy rights of non-party putative class members and the undue burden imposed on Google outweigh Plaintiffs' purported need for the requested information. *See Nevarez v. Forty Niners Football Co., LLC*, No. 16CV07013-LHK-SVK, 2018 WL 306681, at *2 (N.D. Cal. Jan. 5, 2018) (holding that when a party seeks pre-certification discovery that may implicate the privacy concerns of putative class members, "a court 'must balance the party's need for the information against the individual's privacy right . . .'") (internal citation omitted). Moreover, Plaintiffs are not entitled to discovery to obtain the identity of putative class members prior to class certification unless it is relevant to issues of class certification. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 3746118, at *4 (S.D. Cal. July 15, 2013) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 354 (1978)) (("[T]he dispositive issue was not whether the sought after lists contained the names and addresses of class members, but whether that list bore any relevance to appropriate questions of law" related to class certification). Google further objects to this Request on the basis that it is compound. Google also objects to this Request to the extent it is duplicative of other requests—namely Request for Production No. 22. Google further objects to this Request to the extent it seeks documents protected by the attorney-client privilege or the work product doctrine, or any other privilege or immunity.

In addition, Google objects that the phrases "other persons or entities," "amount of revenue associated with each Account Holder," "value paid," and "Bid Request disclosure" are vague and ambiguous as none are self-evident or defined.

Subject to the foregoing objections, Google responds that, to the best of its current knowledge, no information it possesses by virtue of any person having a Google Account was shared with any third-party participant utilizing RTB. Moreover, this appears to be a request for comprehensive RTB transaction data that would be literally impossible to gather and produce. Google accordingly has not conducted and will not conduct searches for responsive documents, and, as a result, will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 42:**

All Information Google has collected, created associated and derived, and continues to collect, create, associate and derive, regarding Plaintiffs, including but not limited to: authenticated and unauthenticated personal identifiers and device, browser, and other identifiers (including IP address) associated with Plaintiffs and their devices; data associated with those identifiers, including browsing history, ad history, communications history, Google account sign-in history, Chrome Sync history; derived data; appended data; associated verticals and segments; embedded data; all data contained in user profiles, interest profiles, interest graphs; and, authenticated and unauthenticated data (this request will be supplemented with any currently known identifiers upon entry of a protective order governing the exchange of discovery).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

In addition to the foregoing General Objections, which Google incorporates by reference, Google specifically objects to this Request as overly broad and unduly burdensome to the extent it is not limited in scope and encompasses other aspects of RTB that have no relation to Plaintiffs' central allegations regarding the alleged disclosure of Plaintiffs' and purported class members' personal information to third party participants utilizing RTB, including but not limited to "Google account sign-in history" and "Chrome sync history." Google also objects to the extent this Request is not limited to RTB. Accordingly, the Request is not proportional to the needs of the case, and the burden of the proposed discovery outweighs any likely benefit. Google further objects to this

Request to the extent it is duplicative of other requests—namely Request for Production No. 13. Google also objects to the extent this information is already in Plaintiffs' possession, custody or control. Google further objects to this Request to the extent it seeks documents protected by the attorney-client privilege or the work product doctrine, or any other privilege or immunity.

In addition, Google objects that the phrases "personal identifiers," "other identifiers," "derived data," "appended data," "embedded data," "user profiles," "verticals and segments," "interest profiles," "interest graphs," and "authenticated or unauthenticated data" are vague and ambiguous as none are self-evident or defined.

Subject to the foregoing objections, Google will conduct a reasonable search and produce responsive, non-privileged, and available documents showing what information, if any, that Google's systems directly associate with the identifiers Plaintiffs have provided or will provide to Google, and was shared with third parties utilizing RTB, to the extent Google can reasonably identify such data as belonging to Plaintiffs.

Dated: June 22, 2021

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
JEFFREY M. GUTKIN (SBN 216083)
DANIELLE C. PIERRE (SBN 300567)
KELSEY R. SPECTOR (SBN 321488)
COLIN S. SCOTT (SBN 318555)

By: */s/ Jeffrey M. Gutkin*
Jeffrey M. Gutkin

Attorneys for Defendant
GOOGLE LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION** | CASE NO. 21-cv-2155-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 93 |

Plaintiffs Alexander Rowe, Christopher Valencia, Crystal Brown, Gary Garrett, John Kevranian, Robina Suwol, Terry Diggs, Tyler Elliot, Kimberly Woodruff, Rethena Green, Salvatore Toronto, Patrick Thompson, Christopher Johnson, Meghan Cornelius, Tara Williams, and P.W. (collectively, "plaintiffs") bring this consolidated putative class action on behalf of account holders whose personal information is allegedly sold and disseminated by defendant Google LLC through Google's Real-time Bidding process ("RTB") (Dkt. No. 92, Consolidated Class Action Complaint, "CCAC"). Plaintiffs assert eight causes of action [1]: (1) breach of contract (Count one); (2) breach of covenant of good faith and fair dealing (Count two); (3) violation of Article 1, § 1 of the California Constitution (invasion of privacy) (Count four); (4) intrusion upon seclusion (Count five); (5) publication of private information (Count six); (6) breach of confidence (Count seven); (7) violation of the California Invasion of Privacy Act, ("CIPA"), Cal. Penal Code

[1] Plaintiffs filed their CCAC on September 2, 2021, asserting twelve individual and class claims. (Dkt. No. 92.) In a Case Management Order dated September 2, 2021, Judge Koh directed the parties to select eight claims from the twelve claims asserted in the CCAC to be litigated through trial, with plaintiffs selecting four claims and Google selecting the other four claims. (*See* Dkt. No. 83 at 1.) The parties completed the process and filed a joint statement identifying the claims listed above.

§§ 630-638 (Count eight); and (8) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511—unauthorized interception, use and disclosure by an Electronic Communications Service (ECS) (Count ten).[2]

Currently pending is Google's motion to dismiss plaintiffs' CCAC. (Dkt. No. 93, Motion to Dismiss, "Mot."). Having carefully reviewed the pleadings and the briefing on the motion, and for the reasons stated below, the Court hereby **GRANTS IN PART AND DENIES IN PART** the motion.[3]

## I. BACKGROUND

The CCAC alleges as follows:

Google collects, observes, and analyzes data from everyone using any of its services and platforms. (CCAC ¶ 9.) This data is then disseminated and sold through Google's Real-Time Bidding system ("RTB"), which functions as an auction (*Id.* ¶¶ 3, 6.) Through RTB, Google solicits participants to bid on sending an ad to a specific individual ("the target"). (*Id.* ¶ 6.) Google provides highly specific information about the target in the bid request provided to RTB auction participants, including data that identifies the individual being targeted through unique identifiers, device identifiers, geolocation, IP address, cookie match, and other information. (*Id.*) Google also provides the specific content of account holders' internet communications and highly detailed personal profile information about peoples' interests, race, religion, sexual orientation, and health status. (*Id.* ¶¶ 12, 13.)

Once RTB participants receive the information about the target they compete for ad space to send the target an advertisement at a specific price. (*Id.* ¶ 7.) Google is paid by the winning bidder. (*Id.*) All RTB participants, even those who do not win and those who do not place a bid, are able to collect the target's data. (*Id.*) Google also allows RTB "surveillance participants" to receive users' data. (*Id.*) "Surveillance participants" are participants who have no interest in filling an ad space but who participate in RTB for the sole purpose of gaining access to users' personal

---

[2] Plaintiffs' complaint includes twenty-eight exhibits totaling 500 pages, all filed as a single attachment to the complaint. (Dkt. No. 92-1.) In the future, parties shall file exhibits individually so that it is easier to locate relevant exhibits.

[3] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

information. (*Id.*)

Because of RTB, Google is able to earn substantial revenue by selling users' data. (*Id.* ¶ 9.) In doing so, Google's practices violate California and federal law, as well as Google's explicit contractual and extracontractual promises to Google's account holders. (*See e.g.*, *id.* ¶¶ 11-12.) Google improperly sells and disseminates account holders' personal and private information to thousands of companies notwithstanding Google's express promises not to sell users' personal information. (*Id.* ¶¶ 1, 3.) RTB is also problematic because Google fails to disclose the practice to account holders and fails to obtain consent from account holders. (*Id.* ¶ 21.)

Plaintiffs are Google account holders who frequently use various web browsers, including Google Chrome, Safari, and Edge to request, obtain, and watch audio-visual materials and whose personal information was allegedly shared and sold through Google's RTB process. (*Id.* ¶¶ 9, 37-68.)

**A. Content of the Terms of Service**

To create a Google account, an individual must agree to Google's Terms of Service ("TOS"). (*Id.* ¶¶ 71-72.) Relevant here, the TOS contains two provisions. First, it states that California law governs the contract. (*Id.*, Ex. 4.) Second, since March 31, 2020, the TOS incorporates Google's "How Our Business Works" page which expressly states: "[w]e don't sell your personal information to anyone." Google also states:

Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to. We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you. We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.

(*Id.*, Ex.5).[4]

[4] Google also points to a section titled "permission to use your content," and the language that states that a user gives Google a license to use a users' content "to customize [Google's]



United States District Court
Northern District of California

**B. Content of the Privacy Policy**

Like the TOS, the privacy policy made promises to account holders throughout the class period regarding the protection of their personal information. Relevant here, the privacy policy includes the following promises:

- "[w]e do not share your personal information with companies, organizations, or individuals outside of Google except . . . [:] with your consent." (*Id.*, Ex. 15 at 11.)
- "[w]e don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to." (*Id.*, Ex. 15 at 5.)
- "[w]e don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health." (*Id.*)

The privacy policy also makes several disclosures, including the following:

- "[w]e collect information to provide better services to all our users . . . like which ads you'll find most useful." (*Id.*, Ex. 15 at 1.)
- [d]epending on your settings, we may show you personalized ads based on your interests." (*Id.*, Ex. 15 at 5.)
- "[t]he information we collect includes unique identifies, browser type and setting, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request." (*Id.*, Ex. 15 at 2.)
- "[w]e may share *non-personally identifiable information* publicly and with our partners—like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browse or device for advertising and measurement purposes using their own cookies or similar technologies." (*Id.*, Ex. 15 at 13.) (emphasis supplied).

services for you, such as providing recommendations and personalized search results, content, and ads (which you can change or turn off in Ads Settings." (*Id.*, Ex. 4.) However, Google ignores the express language, also under the "permission to use your content" section, that states "this license doesn't affect your privacy rights—it's only about your intellectual property rights." (*Id.*, Ex. 4 at 5.) Thus, Google's reliance on this language is inappropriate given the nature of plaintiffs' claims concern their privacy, not intellectual property rights.

- Personal information is defined as "information that you provide to us which personally identifies you, such as your name, email address or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account." (*Id.*, Ex. 15 at 28.)

- Non-personally identifiable information is defined as information that is recorded about users so that it no longer reflects or references an individually-identifiable user." (*Id.*, Ex. 15 at 27.)

## II. Legal Standard

### A. Standing

Federal courts are courts of limited jurisdiction. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in order words, standing." *Id.* (citation and quotation marks omitted). To establish standing, a "[p]laintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

### B. Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678-79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are



United States District Court
Northern District of California

merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

## III. ANALYSIS

Google moves to dismiss plaintiffs' CCAC on the grounds that plaintiffs fail to: (a) allege sufficient facts to establish Article III standing; and in the alternative, fail to state a claim for: (b) breach of contract; (c) breach of implied covenant of good faith and fair dealing; (d) invasion of privacy or claim for intrusion upon seclusion; (e) publication of private information; (f) breach of confidence; (g) disclosure under wiretap law; and (h) a CIPA violation. The Court addresses each in turn.

### A. Standing

Google moves to dismiss the CCAC for lack of standing. To establish standing, a "[p]laintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Here, traceability and redressability are not at issue.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The critical inquiry raised by Google is whether the injuries alleged are particularized. For an injury to be particularized, it "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339.

Google contends that plaintiffs have not alleged sufficient factual allegations about their online activities to show that they were subject to the challenged practices. Thus, according to Google, plaintiffs have not shown that they suffered a particularized injury.

The Court finds that plaintiffs have alleged enough facts to draw a reasonable inference that they have been injured by Google's conduct. Plaintiffs allege that Google "surreptitiously observes, collects, and analyzes real-time information about everyone engaging on [its] platforms" and services, including Google.com, Chrome, Gmail, YouTube, Android, Google Maps, Google Play, Google Docs, Google Calendars, Google Drive, Google Chat, Google Flights, Google Fit, Google Meet, Google Pay, Google Pixel, Chromebooks, and YouTube TV. (CCAC ¶¶ 9-10.) The



United States District Court
Northern District of California

complaint contains factual allegations describing the nature and extent of Google's data collection and disclosure practices, including through the use of RTB.

As to plaintiffs specifically, plaintiffs allege that they are Google account holders who frequently use various web browsers, including Google Chrome, Safari, and Edge to access websites from which Google sold and shared account holder information without authorization. (*Id.* ¶¶ 37-68.) Plaintiffs also allege that they frequently "use[] chrome to request, obtain, and watch audio-visual materials", including materials from publishers from which plaintiffs allege, on information and belief, that Google sold and shared plaintiffs' personal information through Google RTB. This data includes information about the websites plaintiffs visited, the content of those sites, photos, videos, and communications. At this stage, the Court must take these allegations as true, and view them in the light most favorable to plaintiffs, even if made on information and belief. *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1087 (N.D. Cal 2013). Thus, plaintiffs have sufficiently alleged a particularized injury with respect to Google's data practices. Accordingly, Google's motion on this ground is **DENIED**.

### B. Breach of Contract Claim (Count One)

Next, with respect to plaintiffs' breach of contract claim, Google argues that plaintiffs do not adequately plead breach.[5] Under California law, to state a claim for breach of contract, a plaintiff must plead the existence of: "(1) [a] contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damage to the plaintiff." *Convergent Mobile, Inc. v. JTH Tax, Inc.*, No. 19-cv-6484- YGR, 2020 WL 194088, at *1 (ND. Cal. Apr. 22, 2020) (citation omitted).

In pleading breach, the CCAC alleges that plaintiffs entered into two contracts with Google when they created their Google accounts: (1) the TOS and (2) Google's privacy policy. (CCAC ¶¶ 83-84.) Plaintiffs allege that both sets of contracts promises that Google would not sell

[5] Google also contends that dismissal is appropriate because plaintiffs fail to allege: (1) when they signed up for a Google Account, (2) the documents to which they agreed at that time or at any later date, (3) when any breach of their purported agreement with Google occurred. The Court finds these arguments specious for a Rule 12 motion based solely on the need to provide notice pleading under Rule 8, and Google's significant advantage and control of the information at issue.

or share plaintiffs' personal information, (*Id.* ¶¶ 78-82, 91-93), but that Google repeatedly violates these contractual obligations by selling plaintiffs' personal information through RTB (*see e.g.*, *id.* ¶ 260) (chart comparing Google's promises versus what Google actually does). Thus, plaintiffs have alleged the required elements of their breach of contract claims based on Google's sharing and selling of their personal data after agreeing not to do so.

Google's arguments to the contrary do not persuade. Google argues that "the language [p]laintiffs rely on for Google's purported contractual promise not to 'sell' users' personal information does not appear anywhere but [Google's How Our Business Works" page which, according to Google, is not part of the TOS. This argument fails for two reasons. First, plaintiffs do not only rely on the language of the "How Our Business Works" page, but also rely on language found in Google's privacy policy. (*See e.g., id.*, Ex. 15 at 5) ("we don't share information that personally identifies you with advertisers"). Second, the Court finds for purposes of this motion that the post March 31, 2020 TOS arguably incorporates Google's "How Our Business Works" page because the page is prominently displayed, is hyperlinked, and makes additional commitments to users, including the promise that Google "never sell[s] your personal information to anyone and you can use many of our products without signing in or saving any personal information at all.") (*Id.*, Ex. 5 at 1); *See Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 633 (N.D. Cal. 2021) (finding hyperlinked documents to be incorporated where they provided additional commitments).

Next, Google argues that no actual breach of the privacy policy is alleged because plaintiffs do not allege that Google shared any information, much less "personal information." Not so. As explained above, *see supra* III.A (standing), plaintiffs have alleged enough facts to draw a reasonable inference that their personal information had been shared by Google by way of the RTB process.

Moreover, plaintiffs allege that Google shares "a Google ID for each account holder"; "the account holder's IP address"; "the account holder's unique device identifier"; and information about account holders' "interests relating to race, religion, health, and sexual orientation." (*See e.g.*, CCAC ¶ 14.) This data falls within the definition of personal information under California

law, which expressly governs Google's TOS. (*See id.*, Ex. 4.) California law defines personal information as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household," including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140. Not surprisingly, Google's privacy policy is consistent with California law and defines personal information as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can reasonably be linked to such information by Google, such as information we associate with your Google account." (CCAC ¶ 87, Ex. 15). Because the Court finds that the information at issue in this case falls within the broad definition of personal information, as defined under both California law and in Google's privacy policy, Google's motion on this ground is denied.

Google also argues that plaintiffs fail to allege that they opted out of receiving personalized ads. However, Google's disclosures about personalized ads and the ability to opt out pertain only to Google's use of users' information for its own purposes of targeted advertising, not the selling and sharing of users' information to third parties. Thus, this argument does not persuade.

In sum, plaintiffs have plausibly alleged a claim for breach of contract based on Google's sharing and selling of plaintiffs' personal information as part of Google's RTB process. The motion to dismiss on this ground is **DENIED.**

### C. Breach of Implied Covenant Claim (Count Two)

Next, Google moves to dismiss the breach of implied covenant of good faith and fair dealing claim because plaintiffs base the claim on obligations and duties not contemplated by the contract and because the claim is largely duplicative of the breach of contract claim. The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (Cal. Ct. App. 2010) (emphasis and citation omitted). The covenant thus cannot be endowed with an

existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Durell*, 183 Cal. App. 4th at 1369 (citations omitted) (emphasis in original). "If there exists a contractual relationship between the parties, . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032, 14 Cal.Rptr.2d 335 (1992).

While the Court has found a sufficiently pleaded contract claim as stated above, the Court finds that the cause of action for breach of implied covenant of good faith and fair dealing is largely duplicative of plaintiffs' breach of contract claim. The Court notes that a claim for breach of the implied covenant of good faith and fair dealing is not duplicative of a breach of contract claim when a plaintiff alleges that the defendant acted in bad faith to frustrate the benefits of the alleged contract. *See Guz v. Bechtel Nat.Inc.*, 24 Cal. 4th 317, 353 n.18 (2000). However, plaintiffs only conclusorily allege bad faith here. (CCAC ¶ 369 ("Google's use of plaintiffs' and class members' personal information to target them and enable other companies to add to their own user profiles was in bad faith.")). In opposition to the motion, plaintiffs argue that they sufficiently pled bad faith acts that frustrate the purpose of the contract. (Dkt. No. 104-4, Opposition, "Opp.", at 10.) In arguing such, plaintiffs argue that they "[pled] that Google broke express promises—which were consistent with the terms of the contract—that it would not sell or share [a]ccount [h]olders' [personal information]. (*Id.*) However, such allegation depends on the duties of the contracts (i.e. "express promises") and is thus duplicative.

Further, to the extent plaintiffs' claims also rely on Google's extracontractual terms or alleged duties that are not part of the parties' contract, the claims fail because the covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Durell*, 183 Cal. App. 4th at 1369. Thus, plaintiffs' reliance on extracontractual promises and duties not found in the contracts does not save their claims.

Because the pleading fails to adequately allege that the disclosure and sale of plaintiffs'

personal information was prompted by bad faith, or that the claims go beyond the breach of contract claims, the motion to dismiss this cause of action is **GRANTED.** Plaintiffs' may later file a motion to seek leave to amend if discovery reveals additional evidence which can be pled to support this claim.

**D. Invasion of Privacy and Intrusion Upon Seclusion Claims (Counts Four/Five)**

Next, Google moves to dismiss plaintiffs' invasion of privacy and intrusion upon seclusion claims because plaintiffs have not alleged that Google shared their own information and because plaintiffs have not alleged a reasonable expectation of privacy. Having already found that plaintiffs sufficiently allege that their own personal information was shared and sold as part of the RTB process, the Court only addresses whether plaintiffs have alleged a reasonable expectation of privacy.

To state a claim for invasion of privacy under the California Constitution, a plaintiff must plead: (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is highly offensive. *Hernandez v. Hillsides, Inc.*, 47 Cal 4th 272, 287 (2009). A claim for intrusion upon seclusion under California common law involves similar elements. Plaintiffs must show that: (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) that the intrusion was "highly offensive" to a reasonable person. *Id.* at 286. Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exist a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *See In re Facebook, Inc., Internet Tracking Litig.*, ("*Facebook Tracking*")956 F. 3d 589, 605 (9th Cir. 2020). Whether the conduct was highly offensive can rarely be resolved at the pleading stage. *Id.* at 606.

Thus, the relevant question here is whether plaintiffs would reasonably expect that Google would use its access to account holders' personal information to share and sell it to third parties. Plaintiffs argue that the amount of data, its sensitivity, the nature of the misuse, and the representations that Google made to account holders that they would never sale their personal information makes it such that plaintiffs had a reasonable expectation of privacy.

Google relies on its TOS and Privacy Policy disclosures to argue that plaintiffs lack a

reasonable expectation of privacy in the information because Google provided sufficient notice of this conduct. Specifically, Google points to the following language as sufficient disclosure of the practice challenged in this lawsuit:

- Google uses "automated systems and algorithms to analyze your content" in order to "customize our services for you, such as providing recommendations and personalized search results, content, and ads (which you can change or turn off in Ad Settings." (CCAC, Ex. 4 at 7) (TOS)
- "We may show you personalized ads based on your interests." (*Id.*, Ex. 15 at 5) (Privacy Policy)
- "We may share non-personally identifiable information publicly and with our partners—like publishers, advertisers, developers, or rights holders." (*Id.* at 12) (Privacy Policy)
- "We use your personal information to make our products more helpful to you," such as by "show[ing] ads based on your interests." (*Id.*, Ex. 5 at 1-2) (Google's "How Our Business Works" page).

While plaintiffs might have been informed about Google's use of information for its own internal purposes such as directing targeted advertising to plaintiffs, the referenced disclosures do not disclose the challenged conduct here—the sale and disclosure of plaintiffs' personal information to third parties without plaintiffs' consent or knowledge. Plaintiffs allege that Google does not inform account holders that it would sale and disclose its personal information to third parties. Plaintiffs also adequately allege that Google's policies inform account holders that such information would never be sold to third parties without consent.

Plaintiffs have alleged sufficient facts to show that Google's disclosure and sale through the RTB process was not sufficiently disclosed to account holders, and therefore they could not consent to the conduct. The "critical fact [that] [Google] represented to the plaintiffs that their information would not be [sold] but then proceeded to [sale] it anyways" undermines Google's argument that plaintiffs lack a reasonable expectation of privacy. *Facebook Tracking,* 956 F.3d at 603 (finding plaintiffs adequately alleged a reasonable expectation of privacy where challenged conduct was not disclosed).

The nature and volume of the collected information is also important. Plaintiffs allege that Google sold and shared information relating to plaintiffs' web browsing histories, device

information, and consumer interest data. Specifically, plaintiffs allege that Google sells sensitive personal information such as plaintiff's IP address, geo-location data, and web-browsing information, search terms, and sensitive websites that plaintiffs visited relating to race, religion, sexual orientation, and health. Google argues that such information is routinely shared and thus cannot support a reasonable expectation of privacy. Not so. First, such information is personal information under California law and parties generally maintain a reasonable expectation in their personal information. *See* Cal. Civ. Code § 1798.140 (explaining that "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement").

Second, the Ninth Circuit's decision in *Facebook Tracking* forecloses Google's argument that plaintiffs do not maintain a reasonable expectation of privacy in their browsing activities. There, the Ninth Circuit held that plaintiffs adequately alleged a reasonable expectation of privacy where the Facebook allegedly collected and created "highly personalized profiles from [plaintiffs'] sensitive browsing histories and habits." *Facebook Tracking*, 956 F.3d at 603.Taking plaintiffs' allegations as true, as required at this stage of litigation, the Court finds that plaintiffs' allegations that Google shared and sold plaintiffs' personal and sensitive information without disclosing that it would precludes the Court from finding that plaintiffs have no reasonable expectation of privacy in this information. Accordingly, the motion to dismiss on this ground is **DENIED**.

**E. Publication of Private Information (Count Six)**

To state a claim for public disclosure of private facts, a plaintiff must show: (1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate concern." *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 214 (1998) (citation omitted). The disclosure must be "widely published and not confined to a few persons or limited circumstances." *Hill v. Nat'l Collegiate Athletics Ass'n*, 7 Cal. 4th 1, 27 (1994).

Google argues plaintiffs only allege disclosure to a limited group of RTB participants which would not qualify as "widely published." This argument does not persuade. Plaintiffs allege that Google operates "the world's largest ad exchange" by way of Google's RTB process, and that

through Google's RTB process, over 1 million publishers are known to participate in the RTB bidding process. (CCAC ¶¶ 113, 195.) Of those publishers, Google gave publicity to plaintiffs' and class members' private facts and the use of their sensitive information by selling it to hundreds of companies. (*Id.* ¶ 412.) Given the large number of participants in the RTB bidding process, the Court finds that plaintiffs have adequately alleged disclosure.

Google's remaining arguments relating to whether the information is private and whether such disclosure would be offensive to the reasonable person also fail. As explained above, plaintiffs have adequately alleged that the alleged information is private. (*See Supra* III. D.) Further, Google's alleged surreptitious disclosure and sale of such information to hundreds and thousands of bidders without prior knowledge or consent is sufficient, at this pleading stage, to state a claim. Thus, Google's motion on this ground is also **DENIED**.

**F. Breach of Confidence Claim (Count Seven)**

Google contends that plaintiffs' breach of confidence claim is duplicative of plaintiffs' breach of contract claim. To prevail on a claim for breach of confidence under California law, a plaintiff must demonstrate that: "(1) the plaintiff conveyed confidential and novel information to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a disclosure or use in violation of the understanding." *Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002) (citation omitted). To the extent that plaintiffs argue that Google's promises about confidentiality are based on extracontractual promises, plaintiffs' claims for breach of confidence is not barred by plaintiffs' breach of contract claims. However, to the extent plaintiffs' claims rely on Google's promises about confidentiality as found in the TOS and privacy policies, those claims are duplicative of the breach of contract claims and are therefore understood to be pled in the alternative of plaintiffs' breach of contract claims. (*See* Opp. at 16 (arguing that plaintiffs can allege these claims in the alternative)); *see also SocialApps, LLC v. Zynga, Inc.*, No.11-cv-4910 -YGR, 2012 WL 381216, at *3 (N.D. Cal. Feb 6, 2012).

Google also argues that plaintiffs' claims should be dismissed on the merits because

plaintiffs have failed to plead any factual allegations that plausibly show that any confidential or novel information was disclosed. Plaintiffs allege throughout their complaint that Google sold and disclosed confidential information such as the content of their internet communications. (CCAC ¶ 419.) The complaint adequately describes the nature of this information, including health data such as whether someone suffers from depression or eating disorders, or information about one's race, sexual orientation, and religious beliefs. (*See e.g.*, *id.* ¶¶ 143.) Plaintiffs allege that the combination and totality of various different categories of their personal information makes such disclosure novel. (*Id.* ¶ 419.) Truth cannot be determined at this stage, and viewing these allegations in plaintiffs' favor, as the Court must at this stage, the Court finds that plaintiffs have adequately alleged that Google disclosed confidential and novel information.

Google's remaining arguments that plaintiffs failed to allege that Google understood that plaintiffs disclosed their information in confidence or that Google and plaintiffs shared an understanding that confidence would be maintained is belied by the express language of Google's policies, including the language found in Google's "How Our Business Works" page, as previously discussed. (*See id*., Ex. 5 at 2.)

In sum, Google's motion on this ground is also **DENIED.**

### G. ECPA Wiretap Act Claim for Disclosure (Count Ten)

Next, Google moves to dismiss plaintiffs' ECPA claims.[6] The ECPA provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. §§ 2511(3)(a). Google moves to dismiss on two grounds: (1) the alleged conduct does not involve "contents" of communications, and (2) any alleged disclosure occurred with the parties' consent.

---

[6] Google moves to dismiss plaintiffs' violation of the ECPA Wiretap Act- Unauthorized Disclosure of Electronic Communications by an Electronic Communication Service. In its briefing Google refers to the claims as the as the "Wiretap Act" claims, whereas plaintiffs refer to the claims as their "ECPA claims." Consistent with the language used in the complaint and plaintiffs' briefing, the Court refers to the claims as the ECPA claims.

*1. Contents of Communications*

With respect to the content of their communications, plaintiffs allege that Google redirects the following content of electronic communications to other companies in the RTB process, including an: "array of [] content categories of the site or app"; "array of [content] categories that describe [the] current section of the site or app"; "URL of the page where the impression will be shown"; "referrer URL that caused navigation to the current page"; "details about the publisher object of the site or app"; "details about the content within the site or app"; "[] list of keywords about [the] site or app"; and content about the titles and series. (CCAC ¶ 449); *see In re Zynga Privacy Litigation*, 750 F.3d 1098, 1107 (9th Cir. 2014) (explaining that ECPA applies where a plaintiff's communication is disclosed but not where only record information relating to that communication is disclosed.) Because the ECPA broadly defines "content" as that which "includes any information relating to the substance, purport, or meaning" of the communication at issue, the Court finds that plaintiffs have adequately alleged that the disclosed information, which includes their communications and the substance of those communications, fall within the definition of content under the ECPA. Thus, the motion on this ground is **DENIED**.

*2. Consent*

Google next claims there was lawful consent from both the account holder and the websites. Google bears the burden of proof on consent. *Matera v. Google, Inc*, No. 15-CV-04062-LHK, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016). Consent "can be explicit or implied, but any consent must be actual." *In re Google, Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). In order for consent to be actual, the disclosures must "explicitly notify" users of the practice at issue. *Id.*

With respect to consent, Google repeats its argument that plaintiffs were provided sufficient notice of the challenged conduct and were told that they could opt out of personalized ads but chose not to do so. Again, these arguments fail. Plaintiffs' decision whether to opt out of personalized ads is not dispositive of Google's alleged sale and disclosure plaintiffs' information to third parties. (*See supra* III.D). Focusing on the alleged consent of the publisher is similarly non-dispositive at this juncture given that the policy upon which Google relies on does not

United States District Court
Northern District of California

concern the sale and disclosure to third parties.

Thus, the Court **DENIES** defendant's motion on this ground.

### H. CIPA Claim (Count Eight)

In moving to dismiss plaintiffs' CIPA claims, Google argues (1) the conduct alleged does not involve "contents" of communications and (2) the non-California plaintiffs do not allege that the alleged interceptions were sent or received within California.

Because the meaning of "contents" of a communication under CIPA is the same under the ECPA, *see Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110,127 (N.D. Cal. 2020), Google's first argument fails for the reasons stated above. (*See* supra III.G.1).

Next, regarding whether the communications occurred while they were in California or while the communications were "being sent from, or received at any place within [the] state." Cal. Penal Code § 631(a). The Court infers that it is plausible that at least one of the hundreds of RTB recipients and publishers received the communications at issue while they were located in California. To the extent there is uncontroverted proof to the contrary, Google shall produce it to the plaintiffs immediately and the parties shall meet and confer regarding the dismissal of the claim for the non-California plaintiffs.

Accordingly, the motion on this ground is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED AS TO COUNT 2 AND DENIED AS TO ALL OTHER COUNTS.**[7]

Google shall file its answer as to Counts 1, 4, 5, 6, 7, 8, and 10 within twenty-one (21) days from the date of this order.

The Court **SETS** a case management conference for **MONDAY, AUGUST 22, 2022 AT 2:00 PM**.

---

[7] Plaintiffs' Administrative Motion to File Under Seal Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should be Sealed (Dkt. No. 113) and Google's response and motion at Dkt. No. 119 is hereby **GRANTED** because the information contains Google's confidential business information. The Court seals the requested information for the limited purpose of the pending motion to dismiss only, given the procedural posture of the case. This Order does not mean that future requests to seal this information will be automatically given.

United States District Court
Northern District of California

This Order terminates Docket Number 93, 113 and 119.

**IT IS SO ORDERED.**

Dated: June 13, 2022

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE RTB CONSUMER PRIVACY LITIGATION | Case No. 21-cv-02155-LHK (VKD)<br><br>**ORDER RE DISCOVERY DISPUTE RE ESI PROTOCOL**<br><br>Re: Dkt. No. 95 |

The parties ask the Court to resolve disputes involving several provisions of their proposed protocol for discovery of electronically stored information ("ESI"). Dkt. No. 95. The Court held a hearing on these disputes on November 2, 2021. Dkt. No. 109. In this interim order, the Court decides some of the disputes presented and directs the parties to confer further regarding the remaining disputes.

The Court orders as follows[1]:

**1. Section 4(a): redactions for reasons other than privilege**

As a general matter, no party should redact material from an otherwise responsive document simply because such material is not relevant to a claim or defense. However, there may be good cause for redaction of irrelevant material based on other considerations, such as to avoid disclosure of the private personal information of an employee, and where the redaction can be implemented in a manner that does not eliminate necessary context. During the hearing, the parties suggested they may be able reach agreement on this point. The parties shall confer further

[1] This order refers to the disputed provisions of the parties' proposed ESI protocol. Dkt. No. 95, Ex. A.

United States District Court
Northern District of California

regarding this provision.

**2. Section 4(b): production of known responsive documents**

Plaintiffs propose to include the following text in the ESI protocol: "The Parties recognize that they are obligated to produce relevant and responsive non-privileged documents of which they are aware regardless of whether such documents contain any of the Agreed Upon or additional search terms." Google objects to including this proposed text in the ESI protocol on the ground that it is both unnecessary and potentially invites future disputes about when a large corporation, like Google, "is aware" of the existence of a responsive document.

Each party has a duty of "reasonable inquiry" in responding to document requests that is not displaced by the application of search terms to ESI. *See* Fed. R. Civ. P. 26(g)(1). If, as a result of that reasonable inquiry or otherwise, a party knows of a document that is relevant and responsive, and not otherwise objected to, the party must produce the document, even if the document does not contain an agreed or court-ordered search term. *See Waymo LLC v. Uber Techs., Inc.*, No. 3:16-cv-00939, 2017 WL 6501798, at *11 (N.D. Cal. Dec. 15, 2017) ("The Federal Rules obligate a party to produce known, relevant and reasonably accessible material that on its face is likely to be responsive to discovery requests."). The duty of "reasonable inquiry" and the obligation to produce "known" responsive documents applies to corporate parties as well as to individuals.

To the extent plaintiffs' proposed text is intended as a statement of the applicable law, the Court finds it unnecessary to include such a statement in the ESI protocol. Moreover, as the proposed text does nothing to define the circumstances in which Google will be deemed to be "aware" of the existence of a responsive document, it serves no useful function in the protocol. The parties may, if they choose, adopt a provision specifying criteria for determining when knowledge of a document may be attributed to Google for these purposes, but the Court will not require it. If a dispute arises concerning whether Google has failed to produce a responsive document of which it was aware, the Court will consider that dispute in light of the particular circumstances.

**3. Section 6(a): preservation date**

The parties need not preserve ESI created or received before March 26, 2016.

**4. Sections 7 and 8: ESI sources and search methodology**

The Court does not intend to micromanage the parties' collection, review, and production of ESI, or to permit the parties to do the same to each other. As a general matter, each party is expected to comply with its obligations under Rule 26 with respect to ESI without being specially ordered to do so.

The Court understands that discovery in these consolidated cases implicates a substantial quantity of ESI in Google's possession, and that collection, review, and production of such ESI cannot be accomplished without at least some resort to tools and techniques that will limit the scope and burden of the review Google must undertake. If Google chooses to use search terms, technology assisted review ("TAR"), or any other tools to identify potentially relevant and responsive documents, it must have some discussion with plaintiffs about what it plans to do and how it plans to do it. The required discussion should not take the form of "discovery on discovery." Rather, the parties are expected to engage in a candid but informal exchange of information bearing on the relevance and proportionality of discovery of ESI. This is not a novel requirement but a standard part of litigation in federal courts for at least the last decade. *See* Fed. R. Civ. P. 26(f)(3); Fed. R. Civ. P. 26 advisory committee's notes to 2006 amendment; *see also* N.D. Cal. ESI guidelines, first adopted Nov. 27, 2012; N.D. Cal. ESI checklist, first adopted Nov. 27, 2012. The Court's expectations for the parties' discussion of ESI are informed by the following observations by Magistrate Judge Laporte (ret.) and her co-author Jonathan Redgrave:

> Instead of engaging in costly and potentially wasteful formal discovery of [the details of a party's collection and review of ESI], parties will be better served by informally exchanging information regarding custodians, databases and other sources of information. Many courts encourage or require the parties to engage in such discussions during their Rule 26(f) conferences. Increased transparency will be facilitated where the parties agree that such disclosures will not constitute waiver of applicable attorney work product protections. However, the notion of transparency should not be morphed into an opportunity for unending questions and fishing expeditions as the same rules of relevance and proportionality should guide these exchanges themselves, which should be focused

> on advancing substantive discovery efforts (and the case) rather than looking for "gotcha" moments.

Hon. Elizabeth D. Laporte & Jonathan M. Redgrave, *A Practical Guide to Achieving Proportionality Under New Federal Rule of Civil Procedure 26*, 9 Fed. Cts. L. Rev. 19, 64 (2015) (footnote omitted).

The Court is not persuaded that the parties have engaged in the necessary discussion about discovery of ESI. Google now has plaintiffs' document requests, and it is therefore in a position to assess the potential sources (both custodial and non-custodial) of responsive ESI, the potential burdens of discovery from those sources, and the utility of search terms, TAR, or other tools to mitigate the burden of review and production. The parties must have this discussion, or a series of discussions if appropriate, without further delay. The parties must use this District's ESI Checklist as a *guide* for their discussion of ESI discovery. In addition, the parties must discuss a concrete plan for complying with Judge Koh's case management order, which requires substantial completion of document production by April 21, 2022. *See* Dkt. No. 83 at 2.

**5. Section 11(d): privilege claims**

Plaintiffs propose to include the following text in the ESI protocol: "Upon reasonable request, the Producing Party agrees to provide additional information supporting the claim of privilege if it is not clear from the face of the redacted document." Google objects to including this proposed text in the ESI protocol because it fears this provision will inspire plaintiffs to demand additional information for every item on Google's privilege log, beyond what Rule 26(b)(5) requires.

A party claiming privilege or work product protection must describe the materials being withheld "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). If the parties disagree about whether a withheld or redacted document is privileged or protected, they will have to discuss the matter before bringing the dispute to the Court's attention, and this discussion may well involve the exchange of additional information. *See* Section 4, Judge DeMarchi's Standing Order for Civil Cases (requiring the parties involved in a discovery dispute that cannot be resolved by agreement to hold a conference of lead counsel to discuss resolution of the dispute; if the dispute

United States District Court
Northern District of California

remains following the conference, the parties shall submit a joint discovery dispute letter to the Court).

To the extent plaintiffs' proposed text is intended as a statement of what may be necessary to resolve certain disputes about privilege claims, the Court finds it unnecessary to include such a statement in the ESI protocol.

**6. Appendix A**

The Court will not require any party to include a metadata field for "linked items" that contains information identifying, by bates number, the documents associated with hyperlinks within a produced document. Google represents that it is not technically feasible to provide this information on a production-wide basis, and plaintiffs do not contradict that representation. The parties should consider reasonable requests for production of hyperlinked documents on a case-by-case basis. Such requests should not be made as a matter of routine.

The Court will require the parties to include a metadata field for "file path" that contains information about the file structure in which a responsive document is located, but only if that information is available for automated collection.

The Court will require the parties to include a metadata field for "drive author" that contains information about the owner of a Google drive document. If metadata is available for automated collection indicating which users reviewed or edited a Google drive document, such metadata fields should also be included. However, the Court will not require any party to include metadata fields indicating all users who merely have access or editing rights to a Google drive document, or the metadata fields "drivelabels" and "drivefolders," as the Court is not persuaded that discovery of such information is proportional to the needs of the case.

The Court will not require any party to produce all Microsoft PowerPoint files and Google Slides files in native format, assuming that the agreed production components (*see* Appendix A, ¶ 1) will capture any notes pages that are part of such files. However, the parties should consider reasonable requests for production of these files in native format on a case-by-case basis when important information is not otherwise captured by the standard ESI production format.

**7. Further proceedings**

The Court orders further proceedings as follows:

1) The parties must complete their discussions about ESI discovery, as described above in section 4 of this order, by **November 22, 2021**.

2) The parties shall file a revised proposed ESI protocol by **December 6, 2021**. If disputes remain about the protocol, the parties shall address them in a further joint discovery dispute letter which also must be filed by **December 6, 2021.**

3) The parties must develop a concrete plan that will ensure substantial completion of document production by April 21, 2022. The plan may include dates for the further exchange of information (e.g., proposed ESI custodians and search terms, if applicable); interim dates of production of certain documents, dates for timely submission of disputes, if any, to the Court, and any other matters or deadlines that will facilitate compliance with the substantial production deadline. The parties shall advise the Court of their plan, or their respective proposals for such plan, by **December 17, 2021**.

Nothing in this order is intended to foreclose the parties' discussion of other matters that will facilitate the timely completion of fact discovery, including the use of a special master.

**IT IS SO ORDERED.**

Dated: November 4, 2021

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

**PRITZKER LEVINE LLP**
Elizabeth C. Pritzker (SBN 146267)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (SBN 191305)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*

**DiCELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*

**COTCHETT, PITRE & McCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577
*nnishimura@cpmlegal.com*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
*fbottini@bottinilaw.com*

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

BENJAMIN HEWITT, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 5:21-cv-02155-LHK-VKD

**CONSOLIDATED CLASS ACTION COMPLAINT**

TABLE OF CONTENTS

I. INTRODUCTION ... 1

II. JURISDICTION, VENUE, AND ASSIGNMENT ... 10

III. PARTIES ... 11

IV. FACTUAL ALLEGATIONS ... 19

A. Google Repeatedly and Uniformly Promises Google Account Holders That It Will Not Sell Their Personal Information to Others ... 19

1. The Terms of Service Provide That California Law Governs ... 19

2. Google's Terms of Service Specifically Provide That Google Will Not Sell or Share Personal Information ... 20

3. Google's Privacy Policy Similarly Promises That Google Does Not Sell or Share Personal Information ... 22

4. Google Makes Additional Statements Promising Not to Sell or Share Account Holders' Personal Information ... 26

a) Promises on the "Who are Google's Partners" Webpage ... 26

b) Promises on the "Personalized Advertising" Webpage ... 27

c) Promises on the "We Do Not Sell Your Personal Information to Anyone" Webpage ... 28

d) Promises on the "Your Privacy is Protected by Responsible Data Practices" Webpage ... 29

e) Google CEO Sundar Pichai's Promises ... 30

5. A Summary of Google's Promises ... 32

B. Google Repeatedly Violates its Promises to Account Holders by Selling Their Personal Information on Google RTB ... 32

1. The Google RTB Process ... 32

2. The Google RTB Shares Account Holders' Personal Information ... 37

a) OpenRTB Integration ... 38

b) Real-Time Bidding Protocol Buffer v.199 ... 39

c) Authorized Buyers Real-time Bidding Proto ... 43

d) Infrastructure Options for RTB Bidders (Part 4) ... 46

3. The Data Google Discloses and Sells is Designed to be Personally Identifiable to Google RTB Participants ... 49

C. Google Sells Account Holders' Private Information ... 56

1. Plaintiffs Have Identified Hundreds of Companies Who Are Winning Bidders in Google's Ad Exchange Auctions ... 58

2. Plaintiffs Have Obtained Specific Examples of Google's Sharing and Sale of User Personal Information ... 59

D. The Personal Information Shared and Sold Includes but Is Not Limited to Information Google Stores in an Account Holder's Google Account ... 63

1. IP Addresses ... 64

2. User-Agent Information ... 65

3. Device Identifiers ... 66

4. Geolocation ... 66

5. Cookies and Cookie-Related Identifiers ... 68

6. Browsing History and Information Regarding a Consumer's Interaction with an Internet Website, Application, or Advertisement ... 69

E. Google's Promises Versus Google's Actions ... 70

F. Google's Improper Sale of Personal Information Is a Serious Investion of Privacy and Is Highly Offensive ... 74

G. Google Faces Numerous Regulatory and Governmental Agency Investigations for RTB Privacy Concerns ... 76

H. Google Has Been Unjustly Enriched ... 79

I. Plaintiffs' Personal Information is Property Under California Law ... 87

J. Plaintiffs' and Account Holders' Privacy Expectations and Desire to Control the Dissemination of Their Own Data Are Reasonable and Market-Tested ... 90

K. Fraudulent Concealment and Tolling ... 93

V. CLASS ACTION ALLEGATIONS ... 94

VI. COUNTS ... 96

COUNT ONE: BREACH OF CONTRACT ... 96

COUNT TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ... 98

COUNT THREE: VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") ... 102

COUNT FOUR: CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY ... 103

COUNT FIVE: INTRUSION UPON SECLUSION ... 106

COUNT SIX: PUBLICATION OF PRIVATE INFORMATION .................................. 107

COUNT SEVEN: BREACH OF CONFIDENCE ........................................................ 108

COUNT EIGHT: VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ..................................................................................................................... 109

COUNT NINE: VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT – UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE ......................................................................................... 112

COUNT TEN: VIOLATION OF THE ECPA WIRETAP ACT – UNAUTHORIZED DISCLOSURE OF ELECTRONIC COMMUNICATIONS BY AN ECS ......... 117

COUNT ELEVEN: VIOLATION OF THE ECPA STORED COMMUNICATIONS ACT – UNAUTHORIZED DISCLOSURE OF ELECTRONIC COMMUNICATIONS BY AN ECS ......................................................................................... 120

COUNT TWELVE: VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT. 123

VII. PRAYER FOR RELIEF ......................................................................................... 129

VIII. JURY TRIAL DEMAND ........................................................................................ 130

## TABLE OF EXHIBITS

| EX. | DOCUMENT DESCRIPTION |
|---|---|
| 1 | Documents Constituting the Relevant Contract from June 28, 2016 to Present |
| 2 | Google Terms of Service dated Apr. 14, 2014 |
| 3 | Google Terms of Service dated Oct. 25, 2017 |
| 4 | Google Terms of Service dated Mar. 31, 2020 |
| 5 | *How our business works*, Google, https://about.google/intl/en_US/how-our-business-works/ (last visited Mar. 26, 2021) |
| 6 | Google Privacy Policy dated June 28, 2016 |
| 7 | Google Privacy Policy dated Aug. 29, 2016 |
| 8 | Google Privacy Policy dated Mar. 1, 2017 |
| 9 | Google Privacy Policy dated Apr. 17, 2017 |
| 10 | Google Privacy Policy dated Oct. 2, 2017 |
| 11 | Google Privacy Policy dated Dec. 18, 2017 |
| 12 | Google Privacy Policy dated May 25, 2018 |
| 13 | Google Privacy Policy dated Jan. 22, 2019 |
| 14 | Google Privacy Policy dated Oct. 15, 2019 |
| 15 | Google Privacy Policy dated Dec. 19, 2019 |
| 16 | Google Privacy Policy dated Mar. 31, 2020 |
| 17 | Google Privacy Policy dated July 1, 2020 |
| 18 | Google Privacy Policy dated Aug. 28, 2020 |
| 19 | Google Privacy Policy dated Sept. 30, 2020 |
| 20 | Google Privacy Policy dated Feb. 4, 2021 |
| 21 | *Who are Google's Partners?*, Google, https://policies.google.com/privacy/google-partners?hl=en-US (last visited Mar. 25, 2021) |
| 22 | *Personalized Advertising*, Google, https://support.google.com/adspolicy/answer/143465 (last visited Mar. 25, 2021) |

| EX. | DOCUMENT DESCRIPTION |
|---|---|
| | |
| 23 | *We do not sell your personal information to anyone*, Google, https://safety.google/intl/en_ca/privacy/ads-and-data/ (last visited Mar. 25, 2021) |
| 24 | *Your privacy is protected by responsible data practices*, Google, https://safety.google/intl/en_us/privacy/data/ (last visited Mar. 25, 2021) |
| 25 | Pichai, Sundar (May 7, 2019), *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, THE NEW YORK TIMES available at: https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html |
| 26 | Google AdWords API: VERTICALS https://developers.google.com/adwords/api/docs/appendix/verticals (last visited Mar. 24, 2021) |
| 27 | Google Example OpenRTB Protobuf for Web video Real-Time Bidding: Pregnancy and Maternity Vertical, https://developers.google.com/authorized-buyers/rtb/request-guide#openrtb-protobuf_6 (last visited Jan. 22, 2021) |
| 28 | Google Example OpenRTB Protobuf for "App native" Real-Time Bidding: OBGYN Vertical, https://developers.google.com/authorized-buyers/rtb/request-guide#openrtb-protobuf_6 (last visited Jan. 22, 2021) |

## I. INTRODUCTION

1. Through its consumer-facing products and services – and its business advertising and surveillance tools – Google amasses data about billions of people for the purpose of creating detailed dossiers about them in furtherance of targeted advertising. Recognizing that American consumers have significant privacy concerns, however, Google makes two "unequivocal" promises to users who sign up for Google's services: (1) "Google will never sell any personal information to third parties;" and (2) "you get to decide how your information is used."[1] Google also promises that it will not use certain sensitive information for advertising purposes.

We do not sell your personal information to anyone

2. Google breaks these promises countless times every day.

3. This Complaint identifies how Google actively sells and shares consumers' personal information with thousands of entities, ranging from advertisers to publishers to hedge funds to political campaigns and even the government, through the Google Real-Time Bidding ("RTB") system. The personal information that Google sells, shares, and uses includes the very sensitive information Google promises it would ***not*** use for advertising purposes. These practices are not disclosed to consumers.

4. This case is brought on behalf of all Google account holders whose personal information is sold and disseminated by Google to thousands of companies through Google's proprietary advertising auction process effectuated through RTB.

5. Regulators have described RTB as follows:

> RTB is the process by which the digital ads we see every day are curated. For each ad, an auction takes place milliseconds before it is

[1] Pichai, Sundar (May 7, 2019), *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, THE NEW YORK TIMES, *available at* https://www.nytimes.com/2019/05/07/pinion/google-sundar-pichai-privacy.html (attached as Exhibit 25).

> shown in an app or browser. The hundreds of participants in these auctions receive sensitive information about the potential recipient of the ad—device identifiers and cookies, location data, IP addresses, and unique demographic and biometric information such as age and gender. Hundreds of potential bidders receive this information, even though only one—the auction winner—will use it to deliver an advertisement.
>
> Few Americans realize that companies are siphoning off and storing that "bidstream" data to compile exhaustive dossiers about them. These dossiers include their web browsing, location, and other data, which are then sold by data brokers to hedge funds, political campaigns, and even to the government without court orders.[2]

6. Google runs the world's largest RTB auction (the "Google RTB"). In the Google RTB, Google solicits participants to bid on sending an ad to a specific individual (the "Target"). Google provides highly specific information about the Target in the Bid Request provided to auction participants, including data that identifies the individual person being targeted through unique identifiers, device identifiers, and IP addresses, among other information. The collected data provided about the Target to auction participants is called "Bidstream Data."

7. Auction participants receive the information and compete for ad space to send a message to the Target at a specific price. The winning bidder pays Google for the ad placement with currency. But all auction participants, even those who do not win and those who do not submit a bid, are able to collect Bidstream Data on the Target. Such "non-winning" auction participants include not just auction participants who engage in the RTB process with the intent of competing to fill the ad space, but also pure "Surveillance Participants" – participants that have no interest in filling the ad space but who participate in Google's RTB for the sole purpose of gaining access to the Target's Bidstream Data. Even though they do not bid, the Surveillance Participants' presence drives interest and encourages competitive bids, which increases the reach and profitability of Google RTB.

8. The Google RTB process takes place in fewer than 100 milliseconds, faster than the blink of an eye.

---

[2] Senator Ron Wyden (Oregon), *et al.* (July 31, 2020), Letter to Hon. Joseph J. Simmons, Chairman of the Federal Trade Commission (FTC) urging FTC investigation of RTB ("Wyden FTC Letter"), *available at* https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf.

9. Google's ability to provide a rich and highly personalized set of Bidstream Data for each Target is unprecedented and is the primary source of Google's massive revenues. Google is a consumer data powerhouse unmatched in human history. Google operates the world's largest search engine (Google.com), web-browser (Chrome), email service (Gmail), Internet video service (YouTube), mobile phone operating system (Android), and mapping service (Google Maps). Google also operates large consumer services in app sales (Google Play), document processing (Google Docs), scheduling (Google Calendars), storage (Google Drive), instant messaging (Google Chat), travel planning (Google Flights), fitness (Google Fit), videoconferencing (Google Meet), payment services (Google Pay), smartphone hardware (Google Pixel), laptop hardware (Chromebooks), and broadcast television (YouTube TV).

10. Through these services, Google surreptitiously observes, collects, and analyzes real-time information about everyone engaging on those platforms. This includes collecting and selling information about activity users would not expect to be sold. Google's purpose is to build massive repositories of the most current information available about the people using its services to sell it to Google's partners. But because transparency about those practices would lead to less user engagement on those platforms, which in turn would impede its ability to maximize targeted ad revenues, Google fails to make accurate, transparent disclosures about those practices to its account holders.

11. Instead, Google promises its account holders privacy and control. Any consumer can sign up for a Google Account by clicking a button assenting to the terms of service that Google has unilaterally drafted. In that contract, Google promises:

a. "You get to decide how your information is used." Ex. 25 at 1.

b. "We don't sell your personal information to anyone." Ex. 5 at 1.

c. "Advertisers do not pay us for personal information." Ex. 5 at 1.

d. "We don't share information that personally identifies you with advertisers." *E.g.* Ex. 20 at 6.

e. "We also never use … sensitive information like race, religion, or sexual orientation, to personalize ads to you." Ex. 5 at 1.

f. "We don't show you personalized ads based on sensitive categories, such as

race, religion, sexual orientation, or health." *E.g.* Ex. 20 at 6.

12. Google does not honor these terms. Without telling its account holders, Google automatically and invisibly sells Bidstream Data about them to thousands of different participants on Google RTB billions of times every day. The Bidstream Data that Google sells and discloses to thousands of Google RTB participants identifies individual account holders, their devices, and their locations; the specific content of their Internet communications; and even highly personal information about their race, religion, sexual orientation, and health.

13. The Google RTB system may be illustrated as follows:




14. Contrary to Google's promises, Bidstream Data is not anonymized. It includes:

a. A Google ID for each account holder;

b. The account holder's IP address;

c. A cookie-matching service that helps the recipient match the account holder's personal information with other personal information that the recipient has on the account holder;

d. The account holder's User-Agent information;

e. The Publisher ID of the website in question;

f. The content of the URL for the webpage where the ad will be placed;

g. The account holder's unique device identifier; and

h. "Vertical" interests associated with the bid that include interests relating to race, religion, health, and sexual orientation.

15. The "verticals" included in Bidstream Data sold and disclosed on Google RTB categorize Google's account holders into targetable interests. Google runs algorithms across the massive repositories of data it acquires about account holders and sorts them into more than 5,000 consumer categories (segments) and subcategories (verticals). According to Google's own description of the segments and verticals, these categories include:

a. In the Health segment, verticals include AIDS & HIV, Depression, STDs, and Drug & Alcohol Treatment. Ex. 24 at 14.

b. In the Religion segment, verticals include Buddhism, Christianity, Hinduism, Islam, and Judaism. *Id.* at 21.

c. In the Identity segment, verticals include African-Americans, Jewish Culture, and LGBT. *Id.*

d. In the Finance segment, verticals include Debt Collection and Short-Term Loans and Cash. *Id.* at 11-12.

e. Other verticals include Troubled Relationships, Divorce & Separation, and Bankruptcy. *Id.* at 21.

16. These "verticals" exemplify Google's use of the information it collects about account holders' activities and its ability to take that information and infer personal and sensitive characteristics. Google then packages account holders into narrowly drawn, targetable categories. That is, the Bidstream Data that Google provides to Google RTB participants is drawn from the extensive profile Google has built on the Target. This data set includes information based on Google's distillation of both public and highly private data points and inferences. Google's

Bidstream Data on Targets is so compelling that publishers are incentivized to choose Google RTB over other services to place their messages, and bidders in Google RTB will offer to pay premium dollars for the information. And all participants, including Surveillance Participants, can keep the Bidstream Data for each Target, which encourages Surveillance Participants to participate even if they do not wish to buy the ad space. But the consumers themselves do not even know that these categories exist, let alone that Google has placed them into one of these categories.

17. Data included in Bidstream Data constitutes "personal information" under California law. Google adopts California law in its contract with account holders. California law defines "personal information" to include any "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." CAL. CIV. CODE § 1798.140(o)(1). California law also provides a non-exhaustive list of "personal information," which includes unique personal identifiers, online identifiers, IP addresses, email addresses, account names, characteristics of protected classifications under California or federal law, purchase history or consideration, Internet or other electronic network activity (including browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement), geolocation data, employment-related information, education information, and "inferences drawn … to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes." *Id.* Thus, the information Google sells and discloses as part of a Target's Bidstream Data includes "personal information" under California law.

18. The exchange of Bidstream Data for auction participation constitutes a "sale" of "personal information." California law defines a sale of personal information as "selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating … by electronic or other means, a consumer's personal information by the business to another business or a third party for monetary or other valuable consideration." CAL. CIV. CODE § 1798.140(t)(1).

19. Google's dissemination and sale of the type of Bidstream Data available in Google

RTB violates Google's express contractual promises to its account holders.

20. It also violates laws prohibiting Google from selling account holders' personal and/or sensitive information, including (and especially) when it sells and discloses such information for the purpose of targeting them.

21. Google does not disclose to its account holders its creation and use of massive data sets to profile them specifically (and identifiably) in these auctions, and it cannot plausibly or credibly claim it has account holders' consent for this use of their data and information. None of the categories of information in Bidstream Data are identified in any of the many policies and terms of service Google presents to account holders. Indeed, the success of Google's RTB process is a function, in part, of the fact that account holders – the Targets for ad placements – are unaware that information drawn from their activities wholly unrelated to any bid are incorporated into what is presented to them in targeted ads milliseconds later.

22. "***We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you***," Google tells account holders. Ex. 5 at 2 (emphasis added).

23. But that is precisely what Google does. Google RTB bidders specifically seek to stimulate response in the Target based on the way Google slots the Target into verticals and segments concerning, among other things, the Target's race, religion, and sexual orientation.

24. The breadth of Google's privacy violations is staggering. Plaintiffs engaged an expert, Professor Christo Wilson, to help identify the scope of Google's dissemination of Bidstream Data on individual Targets. Professor Wilson identified 1.3 million separate publishers participating in Google's ad systems. Each of those publishers is a potential recipient of Google RTB Bidstream Data, including the personal information Google tells account holders it will not share.

25. Once a Target's Bidstream Data is disseminated by Google, the data is not recoverable.

26. Because Google account holders are not informed about this dissemination of their personal information – indeed, they are told the opposite – they cannot exercise reasonable

judgment to defend themselves against the insidious, pervasive, and highly personal ways in which Google has used and continues to use the data that Google has about them to make money for itself. Nor can account holders exercise reasonable judgment to defend themselves against winning bidders that are targeting them individually, or Surveillance Participants that use Google RTB to build their own data profiles on account holders.

27. On July 31, 2020, Senator Ron Wyden and nine other members of Congress wrote a letter to the Federal Trade Commission explaining the privacy dangers posed by the RTB systems. The letter explained:

> Unregulated data brokers have access to bidstream data and are using it in outrageous ways that violate Americans' privacy. For example, media reports recently revealed that Mobilewalla, a data broker and a buyer of bidstream data, used location and inferred race data to profile participants in recent Black Lives Matter protests. Moreover, Mobilewalla's CEO revealed, in a podcast recorded in 2017, that his company tracked Americans who visited places of worship and then built religious profiles based on that information.
>
> The identity of the companies that are selling bidstream data to Mobilewalla and countless other data brokers remains unknown. However, according to major publishers, companies are participating in RTB auctions solely to siphon off bidstream data, without ever intending to win the auction and deliver an ad. …
>
> Americans never agreed to be tracked and have their sensitive information sold to anyone with a checkbook. … This outrageous privacy violation must be stopped and the companies that are trafficking in Americans' illicitly obtained private data should be shut down.[3]

28. On April 1, 2021, a bipartisan group comprised of U.S. Senators Wyden, Cassidy, Gillibrand, Warner, Brown, and Warren, sent letters to Google and other tech companies engaged in buying and selling targeted ads through RTB, demanding answers to questions concerning the continuous selling of personal consumer information to all comers, including foreign governments:

> Few Americans realize that some auction participants are siphoning off and storing "bidstream" data to compile exhaustive dossiers about them. In turn, these dossiers are being openly sold to anyone with a credit card, including to hedge funds, political campaigns, and even to governments.

[3] Wyden FTC Letter.

> Over the past year, multiple reports have indicated that a number of federal agencies have purchased personal data derived from mobile apps and other online services, in ways that potentially merit closer scrutiny. But the United States is not the only government with the means and interest in acquiring Americans' personal data. This information would be a goldmine for foreign intelligence services that could exploit it to inform and supercharge hacking, blackmail, and influence campaigns. As Congress debates potential federal privacy legislation, we must understand the serious national security risks posed by the unrestricted sale of Americans' data to foreign companies and governments.[4]

29. RTB-related violations have also caught the eye of foreign regulators and civil liberties groups. Earlier this year, the Irish Council for Civil Liberties ("ICCL") filed a lawsuit in Hamburg, Germany that seeks to challenge the industry rules relating to RTB. The ICCL's lawsuit alleges that RTB "***causes the world's biggest data breach***" (emphasis added) and takes aim at Google, Facebook, Amazon, Twitter, Verizon, AT&T, and the entire online advertising and tracking industry.[5]

30. Plaintiffs bring this class action on behalf of themselves and all Google account holders in the United States whose personal information was sold or otherwise disclosed by Google without their authorization, and assert claims for breach of contract, violations of statutory and common law, and equitable claims against Google for compensatory damages, including statutory damages where available, unjust enrichment, punitive damages, injunctive relief, and all other remedies permitted by law.

## II. JURISDICTION, VENUE, AND ASSIGNMENT

31. This Court has personal jurisdiction over Defendant Google LLC ("Defendant" or "Google") because it is headquartered in this District. Google also concedes personal jurisdiction in its current and prior Google Terms of Service. *See* Exhibits 2 through 4.

32. Venue is proper in this District because Google is headquartered in this District and because its current and prior Terms of Service purport to bind Plaintiffs to bring disputes in this

---

[4] *See* April 1, 2021 letter to Sundar Pichai, available at https://www.wyden.senate.gov/imo/media/doc/040121%20Wyden%20led%20Bidstream%20Letter%20to%20Google.pdf.

[5] *See* Irish Council for Civil Liberties (June 15, 2021), ICCL Lawsuit Takes Aim at Google, Facebook, Amazon, Twitter and the Entire Online Advertising Industry, *available at* https://www.iccl.ie/news/press-announcement-rtb-lawsuit/.

District. *See id.*

33. Assignment of this case to the San Jose Division is proper pursuant to Civil Local Rule 3-2(c)(e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, California.

34. This Court has subject matter jurisdiction over the federal claims in this action. *Infra* Counts Nine, Ten, Eleven, and Twelve.

35. This Court has subject matter jurisdiction over this entire action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a state other than the state in which Google maintains its headquarters (California) and in which it is incorporated (Delaware).

36. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

## III. PARTIES

### A. Plaintiffs

37. Plaintiff Alexander Rowe is an adult domiciled in California. Plaintiff Rowe is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Rowe has used the Chrome web browser. In order to become a Google account holder, Plaintiff Rowe was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

38. On information and belief, like millions of other Americans, Google has sold and shared Rowe's personal information through Google RTB. Plaintiff Rowe frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Rowe sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without

his express written consent.

39. Plaintiff Christopher Valencia is an adult domiciled in California. Plaintiff Valencia is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Valencia has used the Chrome web browser. In order to become a Google account holder, Plaintiff Valencia was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

40. On information and belief, like millions of other Americans, Google has sold and shared Valencia's personal information through Google RTB. Plaintiff Valencia frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Valencia sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without his express written consent.

41. Plaintiff Crystal Brown is an adult domiciled in California. Plaintiff Brown is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Brown has used the Chrome and Safari web browsers. In order to become a Google account holder, Plaintiff Brown was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

42. On information and belief, like millions of other Americans, Google has sold and shared Brown's personal information through Google RTB. Plaintiff Brown frequently uses Chrome and Safari to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Brown sends, receives, views, or otherwise accesses on Chrome and Safari through Google's RTB auctions without her express written consent.

43. Plaintiff Gary Garrett is an adult domiciled in California. Plaintiff Garrett is a

Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Garrett has used the Chrome web browser. In order to become a Google account holder, Plaintiff Garrett was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

44. On information and belief, like millions of other Americans, Google has sold and shared Garrett's personal information through Google RTB. Plaintiff Garrett frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Garrett sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without his express written consent.

45. Plaintiff John Kevranian is an adult domiciled in California. Plaintiff Kevranian is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Kevranian has used the Chrome and Safari web browsers. In order to become a Google account holder, Plaintiff Kevranian was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

46. On information and belief, like millions of other Americans, Google has sold and shared Kevranian's personal information through Google RTB. Plaintiff Kevranian frequently uses Chrome and Safari to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Kevranian sends, receives, views, or otherwise accesses on Chrome and Safari through Google's RTB auctions without his express written consent.

47. Plaintiff Robina Suwol is an adult domiciled in California. Plaintiff Suwol is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Suwol has

used the Edge web browser. In order to become a Google account holder, Plaintiff Suwol was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

48. On information and belief, like millions of other Americans, Google has sold and shared Suwol's personal information through Google RTB. Plaintiff Suwol frequently uses Edge to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Suwol sends, receives, views, or otherwise accesses on Edge through Google's RTB auctions without her express written consent.

49. Plaintiff Terry Diggs is an adult domiciled in California. Plaintiff Diggs is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Diggs has used the Chrome web browser. In order to become a Google account holder, Plaintiff Diggs was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

50. On information and belief, like millions of other Americans, Google has sold and shared Diggs's personal information through Google RTB. Plaintiff Diggs frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Diggs sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without her express written consent.

51. Plaintiff Tyler Elliott is an adult domiciled in California. Plaintiff Elliott is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Elliott has used the Chrome web browser. In order to become a Google account holder, Plaintiff Elliott was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern

the relationship between him and Google.

52. On information and belief, like millions of other Americans, Google has sold and shared Elliot's personal information through Google RTB. Plaintiff Elliott frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Elliott sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without his express written consent.

53. Plaintiff Kimberley Woodruff is an adult domiciled in Missouri. Plaintiff Woodruff is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Woodruff has used the Chrome web browser. In order to become a Google account holder, Plaintiff Woodruff was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

54. On information and belief, like millions of other Americans, Google has sold and shared Woodruff's personal information through Google RTB. Plaintiff Woodruff frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Woodruff sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without her express written consent.

55. Plaintiff Rethena Green is an adult domiciled in Nevada. Plaintiff Green is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Green has used the Chrome web browser. In order to become a Google account holder, Plaintiff Green was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

56. On information and belief, like millions of other Americans, Google has sold and

shared Green's personal information through Google RTB. Plaintiff Green frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Green sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without her express written consent.

57. Plaintiff Salvatore Toronto is an adult domiciled in New Jersey. Plaintiff Toronto is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Toronto has used the Edge web browser. In order to become a Google account holder, Plaintiff Toronto was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

58. On information and belief, like millions of other Americans, Google has sold and shared Toronto's personal information through Google RTB. Plaintiff Toronto frequently uses Edge to request, obtain, and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Toronto sends, receives, views, or otherwise accesses on Edge through Google's RTB auctions without his express written consent.

59. Plaintiff Patrick Thompson is an adult domiciled in North Carolina. Plaintiff Thompson is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Thompson has used the Safari web browser. In order to become a Google account holder, Plaintiff Thompson was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

60. On information and belief, like millions of other Americans, Google has sold and shared Thompson's personal information through Google RTB. Plaintiff Thompson frequently uses Safari to request, obtain and watch audio-visual materials, including materials from publishers for

which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Thompson sends, receives, views, or otherwise accesses on Safari through Google's RTB auctions without his express written consent.

61. Plaintiff Christopher Johnson is an adult domiciled in Texas. Plaintiff Johnson is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Johnson has used the Chrome web browser. In order to become a Google account holder, Plaintiff Johnson was required to indicate he agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between him and Google.

62. On information and belief, like millions of other Americans, Google has sold and shared Johnson's personal information through Google RTB. Plaintiff Johnson frequently uses Chrome to request, obtain and watch audio-visual materials, including materials from publishers for which he is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Johnson sends, receives, views, or otherwise accesses on Chrome through Google's RTB auctions without his express written consent.

63. Plaintiff Meghan Cornelius is an adult domiciled in Texas. Plaintiff Cornelius is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Cornelius has used the Chrome and Safari web browsers. In order to become a Google account holder, Plaintiff Cornelius was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

64. On information and belief, like millions of other Americans, Google has sold and shared Cornelius's personal information through Google RTB. Plaintiff Cornelius frequently uses Chrome and Safari to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and

communications Plaintiff Cornelius sends, receives, views, or otherwise accesses on Chrome and Safari through Google's RTB auctions without her express written consent.

65. Plaintiff Tara Williams is an adult domiciled in Wisconsin. Plaintiff Williams is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff Williams has used the Safari web browser. In order to become a Google account holder, Plaintiff Williams was required to indicate she agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between her and Google.

66. On information and belief, like millions of other Americans, Google has sold and shared Williams's personal information through Google RTB. Plaintiff Williams frequently uses Safari to request, obtain and watch audio-visual materials, including materials from publishers for which she is a subscriber. On information and belief, like millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff Williams sends, receives, views, or otherwise accesses on Safari through Google's RTB auctions without her express written consent.

67. Plaintiff P.W. is a minor domiciled in Wisconsin. P.W. is under the age of 13. P.W.'s grandparent and legal guardian is Tara Williams, who is also a resident and citizen of the State of Wisconsin, and who is also a named Plaintiff in this case. Plaintiff P.W. is a Google account holder who has used the Internet, including websites from which Google sold and shared account holder information without authorization, as alleged herein. Plaintiff P.W. has used the Chrome and Safari web browsers. In order to become a Google account holder, Plaintiff P.W. was required to indicate they agreed to uniform conditions drafted and set forth exclusively by Google that govern the relationship between them and Google, despite the fact that they were unable to be bound by such an agreement because of their minor status.

68. On information and belief, like millions of other American children, Google has sold and shared P.W.'s personal information through Google RTB. Plaintiff P.W. frequently uses Chrome and Safari to request, obtain and watch audio-visual materials and play video games, including materials from publishers for which they are a subscriber. On information and belief, like

millions of Americans, Google has sold and shared information about the websites, content, photos, videos, and communications Plaintiff P.W. sends, receives, views, or otherwise accesses on Chrome and Safari through Google's RTB auctions without their express written consent.

**B. Defendant**

69. Defendant Google LLC is a Delaware Limited Liability Company headquartered at 1600 Amphitheatre Parkway, Mountain View, California, whose membership interests are entirely held by its parent holding company, Alphabet, Inc. ("Alphabet"), headquartered at the same address. Alphabet trades under the stock trading symbols GOOG and GOOGL. Alphabet generates revenues primarily by delivering targeted online advertising through the Google subsidiary. All operations relevant to this complaint are run by Google.

## IV. FACTUAL ALLEGATIONS

### A. Google Repeatedly and Uniformly Promises Google Account Holders That It Will Not Sell Their Personal Information to Others

70. A Google Account gives a user access to Google products.[6] The user, in turn becomes a Google account holder (the "Account Holder").

71. Google requires an Account Holder to indicate they agree to the Google Terms of Service (the "Terms of Service").

72. The Terms of Service are drafted exclusively by Google.

73. The Terms of Service at issue were materially identical throughout the Class Period. All versions of the Terms of Service contain the following assertions material to the claims asserted herein:

#### 1. The Terms of Service Provide That California Law Governs

74. At all times relevant to Plaintiffs' allegations, the Terms of Service designated California law as the governing law.

75. As a result, Google is bound by California's definition of "personal information."

76. California law broadly defines "personal information" as "information that identifies, relates to, describes, ***is reasonably capable of being associated with***, or could reasonably

[6] Google Account Help, Create A Google Account, https://support.google.com/accounts/answer/27441?hl=en&ref_topic=3382296 (last accessed Aug. 23, 2021).

be linked, directly or indirectly, with a particular consumer or household." CAL. CIV. CODE § 1798.140(o)(1) (emphasis added).

77. California law also provides a non-exhaustive list of information deemed to be personal information: "Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household:

> a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, internet protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.
>
> b. Any categories of personal information described in subdivision (e) of Section 1798.80.
>
> c. Characteristics of protected classifications under California or federal law.
>
> d. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.
>
> e. Biometric information.
>
> f. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.
>
> g. Geolocation data.
>
> h. Audio, electronic, visual, thermal, olfactory, or similar information.
>
> i. Professional or employment-related information.
>
> j. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232(g); 34 C.F.R. Part 99).
>
> k. Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes."

*Id.*

**2. Google's Terms of Service Specifically Provide That Google Will Not Sell or Share Personal Information**

78. Since March 31, 2020, the Terms of Service have stated: "You have no obligation

to provide any content to our services and you're free to choose the content that you want to provide." Ex. 4 at 5.

79. The second paragraph of the Terms of Service provides:

> These Terms of Service reflect the way Google's business works, the laws that apply to our company, and certain things we've always believed to be true. As a result, these Terms of Service help define Google's relationship with you as you interact with our services. For example, these terms include the following topic headings:
>
> - What you can expect from us, which describes how we provide and develop our services
> - What we expect from you, which establishes certain rules for using our services
> - Content in Google services, which describes the intellectual property rights to the content you find in our services — whether that content belongs to you, Google, or others
> - In case of problems or disagreements, which describes other legal rights you have, and what to expect in case someone violates these terms
>
> Understanding these terms is important because, by using our services, you're agreeing to these terms.

80. The reference and hyperlink to "the way Google's business works" takes the Account Holder to Google's "How our business works" page, thereby incorporating that linked document into the Terms of Service. On the very first page of that linked document, in large type, Google declares: "**We don't sell your personal information to anyone**." Google also states: "**[W]e never sell your personal information to anyone[.]**"[7]

> ## We don't sell your personal information to anyone
> We use your personal information to make our products more helpful to you. It's how we can autocomplete your searches, get you home faster with Maps, or show you more useful ads based on your interests. But we never sell your personal information to anyone and you can use many of our products without signing in or saving any personal information at all.

81. The "the way Google's business works" page further promises:[8]

[7] Ex. 5 at 1–2.

[8] *Id.* at 1–2.

a. "Advertisers do not pay us for personal information[.]"

b. "[W]e never share that information with advertisers, unless you ask us to."

c. "We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you."

d. "We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information."

e. "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies."

82. A reasonable Google Account Holder reading Google's Terms of Service would understand the foregoing terms to mean what they say — that Google "never sell[s]" Google Account Holders' "personal information" "to anyone."

**3. Google's Privacy Policy Similarly Promises That Google Does Not Sell or Share Personal Information**

83. Prior to around May 2018, Account Holders who created a Google Account were required to agree to both the Terms of Service *and* Google's Privacy Policy (the "Privacy Policy").

84. From around May 2018 to the present, Account Holders who created a Google Account were required to agree only to the Terms of Service. Nonetheless, during this period, the Google Account creation process still included a link (see below) to the Privacy Policy as a guide to how Google would "process your information."[9] As described further below, the Privacy Policy during this time contained repeated assurances and representations from Google regarding how Google would process Account Holders' information.

[9] *See, e.g.*, Tom Leeman, *How to Create a Google Account*, YouTube (Feb. 2, 2020) https://www.youtube.com/watch?v=ArZpwBl_z10 (at 4:40-4:45).




85. From March 31, 2020 to the present, the Terms of Service refer to the Privacy Policy, but state that the Privacy Policy is "not part of these terms." Ex. 4 at 1. During this time period, the Terms of Service expressly state that the "Terms of Service reflect the way Google's business works [hyperlink]." *Id.* The hyperlink takes an Account Holder to the "How our business works" webpage, thereby incorporating the terms set forth on that webpage into the Terms of Service. Thus, as of March 31, 2020, the contract between the parties consisted of the Terms of Service ***and*** Google's "How our business works" webpage (discussed above, *see supra* ¶ 80).

86. Like the Terms of Service, the Privacy Policy made promises to Account Holders throughout the Class Period regarding the protection of their personal information.

87. The Privacy Policy tracks the California statutory definition of "personal information," defining it as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, ***or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account***." *See* Ex. 15 at 28 (emphases added).

88. The Privacy Policy describes the information Google "associate[s] with … Google Accounts" — which, by Google's own definition, is "personal information" — to include the following:

> The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

*See*, *e.g.*, *id.* at 2.

89. The document at the "unique identifiers" hyperlink defines a unique identifier as "a string of characters that can be used to uniquely identify a browser, app, or device," which includes cookies, advertising IDs, and other unique device identifiers. *See*, *e.g.*, *id.* at 29.

90. Google associates these unique identifiers — cookies, IP addresses, User-Agent information, advertising IDs, other unique device identifiers, and browsing history information — with individual accounts that include names, email addresses, geolocation, and all other information Google maintains on individual Account Holders.

91. But Google expressly assures Account Holders that personal information will not be shared with third parties without Account Holders' consent. Specifically, the Privacy Policy makes the following promises, among others:

a. "We do not share your personal information with companies, organizations, or individuals outside of Google except…[:]" 1) "With your consent;" 2) "With domain administrators;" 3) "For external processing"; and 4) "For legal reasons." *E.g.*, Ex. 6 at 6; Ex. 15 at 11-12. Google has made this promise in the Google Privacy Policy since at least March 1, 2012.

b. "We don't share information that personally identifies you with advertisers[.]" *E.g.*, Ex. 12 at 5; Ex. 15 at 5. Google has made this promise in the Google Privacy Policy since at least May 25, 2018.

c. "We don't show you personalized ads based on sensitive categories [hyperlink], such as race, religion, sexual orientation, or health." *E.g.*, Ex. 12 at 5; Ex. 15 at 5. Google has made this promise in the Google Privacy Policy since at least May 25, 2018.

d. The Google Privacy Policy includes a definition of "sensitive categories" that promises: "We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we

> require the same from advertisers [hyperlink] that use our services."[10] *E.g.*, Ex. 12 at 21; Ex. 15 at 22. Google has made this promise in the Google Privacy Policy since at least May 25, 2018.

92. Also, since at least May 25, 2018, Google has acknowledged its responsibility to keep users' personal information secure, stating: "When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information[.]" *E.g.*, Ex. 12 at 1; Ex. 15 at 1; Ex. 20 at 1.

93. Where the Privacy Policy mentions sharing information with "partners," it emphasizes and promises that the information shared is ***not*** "personally identifiable":

> We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

*E.g.*, Ex. 15 at 12.

94. Paradoxically, this portion of the Privacy Policy appears to define "non-personally identifiable information" as "information that is recorded about users so that it no longer reflects or references an individually-identifiable user." *E.g.*, *id.* at 27. As described, this definition ***conflicts*** with California law (as discussed above), as well as the definition Google itself provides elsewhere in the Privacy Policy, both of which contemplate that the data Google associates with individual Account Holders ***is*** "personal information," regardless of whether it "no longer reflects or references an individually-identifiable user." *See*, *e.g.*, *id.* at 28.

95. A reasonable Google Account Holder reading the disclosure set forth above in ¶ 91 together with the other disclosures in the Privacy Policy would understand it to mean that the "non-personally identifiable information" that Google may share publicly and with its partners does ***not*** include any information that is recorded about users or that Google may associate with individual Account Holders. This reasonable expectation is consistent with applicable California law.

---

[10] The words "require the same from advertisers" provide a hyperlink to a separate policy titled "Personalized Advertising" detailed below. *See infra* ¶¶ 102-104.

96. Further, Google's statement that it "allow[s] specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies" is limited to the "specific partners" listed in the hyperlink. Those "specific partners" are Nielsen, comScore, Integral Ad Science, DoubleVerify, Oracle Data Cloud, Kantar, and RN SSI Group, and Google promises that their use is limited to "non-personally identifiable information." Ex. 21 at 1. In the section identifying these partners, Google repeats the promise, "We don't share information that personally identifies you with our advertising partners[.]" *Id.* at 2. Accordingly, a reasonable Google Account Holder reading the disclosure set forth above would understand it to mean that the "information" that Google allows its "specific partners" to "collect" is limited to "non-personally identifiable information" and, thus, does ***not*** include any information that is recorded about users or that Google may associate with individual Account Holders.

#### 4. Google Makes Additional Statements Promising Not to Sell or Share Account Holders' Personal Information

97. In addition to the contractual promises Google makes to Account Holders, Google has made similar promises elsewhere on its website and in the public sphere. These include but are not be limited to: (1) the "Who are Google's Partners" webpage, (2) the "Personalized Advertising" webpage, (3) the "We do not sell your personal information to anyone" webpage, (4) the "Your privacy is protected by responsible data practices" webpage, (5) Google CEO Sundar Pichai's statement and testimony before Congress when Google was facing inquiry into its privacy practices, and (6) an op-ed from Mr. Pichai that was published in *The New York Times*.

##### a. Promises on the "Who are Google's Partners" Webpage

98. As alleged above, the Privacy Policy states that it "allow[s] specific partners [hyperlink] to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies."

99. The hyperlink for "specific partners" takes an Account Holder to the "Who are Google's Partners" webpage where Google reiterates: "***We don't share information that personally identifies you with our advertising partners***, such as your name or email, unless you ask us to share it." Ex. 21 at 2 (emphasis added).

100. The same webpage identifies seven specific "partners" (Nielsen, comScore, Integral Ad Science, DoubleVerify, Oracle Data Cloud, Kantar, and RN SSI Group) that Google permits to "collect or receive ***non-personally identifiable*** information about your browser or device when you use Google sites or apps." *Id.* at 1 (emphasis added). Thus, Google promises its account holders that it does not share personal information with those partners.

101. The webpage fails to disclose, however, that Google sends Account Holder personal information to hundreds of other companies and advertising partners ***not*** identified on this page, and that Google works with nearly 1.3 million different publishers that Google sometimes refers to as partners and with which Google routinely shares Account Holder personal information.

**b. Promises on the "Personalized Advertising" Webpage**

102. Under the definition of "sensitive categories," the Privacy Policy provides a hyperlink to an Advertising Policies Help webpage titled "Personalized Advertising." *See*, *e.g.*, Ex. 15 at 22.

103. According to Google, this webpage is applicable to "all Google features using personalized advertising functionality." Ex. 22 at 1.

104. On this webpage, Google repeats its promises about sensitive categories, stating:

a. "Advertisers can't use sensitive interest categories to target ads to users or to promote advertisers' products or services." *Id.* at 2.

b. "Personal hardships: Because we don't want ads to exploit the difficulties or struggles of users, we don't allow categories related to personal hardships." *Id.*

c. "Identity and belief: Because we want ads to reflect a user's interests rather than more personal interpretations of their fundamental identity, we don't allow categories related to identity and belief, some of which could also be used to stigmatize an individual." *Id.*

d. "Sexual interests: Because we understand that sexual experiences and interests are inherently private, we don't allow categories related to sexual interests." *Id.*

105. On the same webpage, under the header "Prohibited Categories," Google promises that "[t]he following sensitive interest categories can't be used by advertisers to target ads to users or to promote advertisers' products or services" (*id.*):

a. Restricted drug terms – "Prescription medications and information about prescription medications, unless the medication and any listed ingredients are only intended for animal use and are not prone to human abuse or other misuse." *Id.* at 3.

b. "Personal hardships – We understand that users don't want to see ads that exploit their personal struggles, difficulties, and hardships, so we don't allow personalized advertising based on these hardships. Such personal hardships include health conditions, treatments, procedures, personal failings, struggles, or traumatic personal experiences. You also can't impose negativity on the user." *Id.*

c. "Health in personalized advertising [including] Physical or mental health conditions, including diseases, sexual health, and chronic health conditions, which are health conditions that require long-term care or management[;] products, services, or procedures to treat or manage chronic health conditions, which includes over-the-counter medications and medical devices[;] any health issues associated with intimate body parts or functions, which includes genital, bowel, or urinary health[;] invasive medical procedures, which includes cosmetic surgery[;] Disabilities, even when content is oriented toward the user's primary caretaker. Examples [include] Treatments for chronic health conditions like diabetes or arthritis, treatments for sexually transmitted diseases, counseling services for mental health issues like depression or anxiety, medical devices for sleep apnea like CPAP machines, over-the-counter medications for yeast infections, [and] information about how to support your autistic child." *Id.*

d. "Relationships in personalized advertising [including] Personal hardships with family, friends, or other interpersonal relationships. Examples [include] divorce services, books about coping with divorce, bereavement products or services, family counseling services[.]" *Id.* at 4.

e. "Sexual orientation in personalized advertising [including] lesbian, gay, bisexual, questioning, or heterosexual orientation[.] Examples [include] information about revealing your homosexuality, gay dating, gay travel, information about bisexuality." *Id.* at 4-5.

f. "Personal race or ethnicity." *Id.* at 5.

g. "Personal religious beliefs." *Id.*

### c. Promises on the "We Do Not Sell Your Personal Information to Anyone" Webpage

106. On a Google webpage titled "We do not sell your personal information to anyone," Google promises:

a. "We do not sell your personal information to anyone." Ex. 23 at 1.

b. "Without identifying you personally to advertisers or other third parties, we might use data that includes your searches and location, websites and apps that you've used, videos and ads that you've seen, and basic information that you've given us, such as your age range and gender." *Id.*

c. "We give advertisers data about their ads' performance, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected and private." *Id.*

d. "[R]emember, we never share any of this personal information with advertisers." *Id.* at 2.

**d. Promises on the "Your Privacy Is Protected by Responsible Data Practices" Webpage**

107. On its webpage "Your privacy is protected by responsible data practices,"[11] Google promises:

a. "Data plays an important role in making the products and services you use every day more helpful. We are committed to treating that data responsibly and protecting your privacy with strict protocols and innovative privacy technologies." Ex. 24 at 1.

b. "We never sell your personal information, and give you controls over who has access[.]" *Id.* at 2.

c. That it uses "advanced privacy technologies [to] help keep your personal information private." *Id.* at 3.

d. "We are continuously innovating new technologies that protect your private information without impacting your experiences on our products." *Id.*

e. "We use leading anonymization techniques to protect your data while making our services work better for you." *Id.* at 3-4.

f. "Privacy is core to how we build our products, with rigorous privacy standards guiding every stage of product development. Each product and feature adheres to these privacy standards, which are implemented through comprehensive privacy reviews." *Id.* at 4.

[11] https://safety.google/intl/en_us/privacy/data/

108. Screenshot examples from this webpage are provided below:







**e. Google CEO Sundar Pichai's Promises**

109. On December 11, 2018, Google CEO Sundar Pichai testified on behalf of Google before Congress and repeated the unequivocal promise, "We do not and would never sell consumer

data."[12]

110. On May 7, 2019, Mr. Pichai published an opinion piece in *The New York Times* in which he said the following:

> Many words have been written about privacy over the past year, including in these pages. I believe it's one of the most important topics of our time.
>
> People today are rightly concerned about how their information is used and shared, yet they all define privacy in their own ways. I've seen this firsthand as I talk to people in different parts of the world. To the families using the internet through a shared device, privacy might mean privacy from one another. To the small-business owner who wants to start accepting credit card payments, privacy means keeping customer data secure. To the teenager sharing selfies, privacy could mean the ability to delete that data in the future.
>
> Privacy is personal, which makes it even more vital for companies to give people clear, individual choices around how their data is used. Over the past 20 years, billions of people have trusted Google with questions they wouldn't have asked their closest friends: How do you know if you're in love? Why isn't my baby sleeping? What is this weird rash on my arm? We've worked hard to continually earn that trust by providing accurate answers and keeping your questions private. We've stayed focused on the products and features that make privacy a reality — for everyone.
>
> Our mission compels us to take the same approach to privacy. For us, that means privacy cannot be a luxury good offered only to people who can afford to buy premium products and services. Privacy must be equally available to everyone in the world.
>
> *  *  *
>
> ***To make privacy real, we give you clear, meaningful choices around your data. All while staying true to two unequivocal policies: that Google will never sell any personal information to third parties; and that you get to decide how your information is used.***[13]

111. On October 28, 2020, during his testimony before the Senate Committee on Commerce, Science and Transportation, Pichai stated: "Privacy is one of the most important areas we invest in as a company. Have thousands of engineers working on it. We believe in giving users control, choice, and transparency. And anytime we associate data with users, we are transparent."

---

[12] *See* Google CEO Sundar Pichai Testifies Before the House Judiciary Committee (Dec. 11, 2018), *available at* https://www.c-span.org/video/?455607-1/google-ceo-sundar-pichai-testifies-data-privacy-bias-concerns# (at 1:33:51).

[13] Ex. 25 at 1 (emphasis added).

**5. A Summary of Google's Promises**

112. In sum, Google repeatedly makes the following promises to individuals who sign up for a Google Account:

a. "We don't sell your personal information to anyone." Ex. 5 at 1.

b. "[W]e never sell your personal information to anyone[.]" *Id.*

c. "Advertisers do not pay us for personal information[.]" *Id.*

d. "[W]e never share that information with advertisers, unless you ask us to." *Id.* at 2.

e. "We share reports with our advertisers …, but we do so without revealing any of your personal information." *Id.*

f. "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies." *Id.*

g. "We also never use your … sensitive information like race, religion, or sexual orientation, to personalize ads to you." *Id.* at 1.

h. "We do not and would never sell consumer data." Pichai, *supra* note 12.

i. "We do not share your personal information with companies, organizations, or individuals outside of Google" except in limited circumstances. *See, e.g.*, Ex. 15 at 11-12.

**B. Google Repeatedly Violates Its Promises to Account Holders by Selling Their Personal Information on Google RTB**

**1. The Google RTB Process**

113. Google operates the world's largest ad exchange, the Google Ad Exchange, a digital marketplace that facilitates the buying and selling of advertising inventory. Through the RTB auction process on the Google Ad Exchange, Google shares and sells users' personal information with Google RTB participants to solicit bids for the right to display what is essentially a real-time, near-instantaneous advertisement to a specific user.

114. Thus, the Google RTB is an automated auction system where Google Account Holders' personal information is continually siphoned out and sold to hundreds of participants for advertising purposes.

115. Google RTB bidders bid on the "cost per mille" – the cost per one thousand impressions – which is used to measure how many impressions have been made by an ad.

116. The Google RTB process – from the offer of a targeted ad placement based on a specific user's personal information, to the solicitation of bids, to the sale to the highest bidder, to the placement of the winning bidder's ad on the specific user's personal device – takes less than a hundred milliseconds. For perspective, it takes 300 milliseconds to blink an eye. Hence the name "real time bidding."

117. Google RTB is invisible and undisclosed to Account Holders.

118. To understand the many ways in which Google is selling Account Holders' information, and how many companies Google is selling it to, it helps to first understand the ad ecosystem in which these auctions occur.

119. Account Holders' information passes through multiple layers of what is referred to as an "Ad Stack" as the data is re-directed by Google to various third parties.

120. The Ad Stack consists of between three to five layers depending on the ad:

a. The **publisher** is the website (or entity controlling the website) that has ad space to sell on its website;

b. The **supply side platform ("SSP")** is an entity that collects Account Holder data to sell and ad space inventory to populate with ads targeted to those Account Holders;

c. The **ad exchange** organizes auctions between each side of the Ad Stack;

d. The **demand-side platform ("DSP")** bids on behalf of advertisers to show ads to specific Account Holders; and

e. The **advertiser** purchases ads targeted to specific Account Holders.

121. In practice, for any single ad placement to a specific user, the Ad Stack may be compressed. For example, a DSP could place an ad for itself, rather than for another advertiser on whose behalf the DSP has been contracted to submit a bid. If a DSP wins an auction on behalf of itself, the DSP is also the advertiser for that particular ad.

122. Likewise, a publisher in one ad auction may be an advertiser in another. For example, *The New York Times* sells ads targeted to specific users on its own websites through this system – and may also pay for ads targeted to users on other websites.

123. Google compresses the Ad Stack in Google RTB because Google controls

significant players at the SSP, ad exchange, and DSP layers of the Ad Stack.

124. Conversely, according to the ICCL lawsuit filed in Hamburg, there may also be auctions of auctions in which *several* ad exchanges *each* send bid requests to a large number of companies to solicit bids for a single ad space.[14]

125. On the supply side, Google's AdMob is the most popular SSP for apps on iOS and Android, the two dominant mobile operating systems. AdMob creates software development kits ("SDKs") for publishers to incorporate into their apps. AdMob's SDKs serve as the mechanism for exchanging information between ad exchanges (the auction) and the developers. Within an app, AdMob code collects information and shares it with Google through the bidding process. Google purchased AdMob in 2009. Account Holders' phones share information with Google and ad exchanges.

126. According to the company MightySignal, an analytics firm that "provides detailed and accurate mobile data," Google AdMob is currently installed on:

a. 129,273 apps as of February 1, 2021 – or 82 percent of the Monetization SDK market on Apple devices, including 136 of the top 200 apps in Apple iOS products;[15] and

b. 1,013,605 apps as of February 1, 2021 – or 97 percent of the Monetization SDK market on Android devices, included 146 of the top 200 apps on Android.[16]

127. Google's Ad Manager is among the most prominent and used SSP for websites and functions just as AdMob does for smartphone and handheld device apps. Publishers install Google's code on their websites, which make requests to Google tied to identifying cookies.

128. After data leaves an Account Holder's device to be exchanged with the website with which the Account Holder is communicating, Google contemporaneously redirects the Account Holder's personal information and the content of the communication being exchanged with the website to Google RTB, which, in turn, contemporaneously redirects the personal information and

[14] ICCL complaint (English translation) at p.13, *available at* https://www.iccl.ie/wp-content/uploads/2021/06/ENGLISH-TRANSLATION-MACHINE-TRANSLATED-COMPRESSED-Schriftsatz-an-das-Landgericht-Hamburg.pdf.

[15] https://mightysignal.com/sdk/ios/1162/google-admob

[16] https://mightysignal.com/sdk/android/55931/google-admob

contents to hundreds of different participants on Google RTB. Google RTB participants then consider the personal information of the Account Holder on whose device the ad will be displayed, and calculate how much they are willing to bid for that specific Account Holder (*i.e.*, the Target). As explained above, the entire process takes less time than it does to blink an eye.

129. The Google RTB sells approximately 53 percent of all ad exchange transactions.

130. On the demand side, Google also has the world's largest DSP. For example, millions of advertisers contract through Google DoubleClick or Google Ads to target specific users with specific attributes.

131. In the Google RTB process, Google sends bid requests to DSPs from publishers to solicit bids from the DSPs based on the personal information of Account Holders. Thus, Google holds the auction and awards the winning bid.

132. All participants in Google RTB are part of the Bidstream, receiving Google's Bid Request, which is the vehicle through which Google sells and shares Account Holder personal information.

133. As illustrated below, the Bid Request moves from the publisher's website (https://website.com in the illustration), to the SSP, to the ad exchange (Google RTB), which fills out a "Bid Request," which is sent to DSPs, who bid on behalf of advertisers based on the personal information that is provided in the Bid Request.




Data flows in a typical real-time bidding system[17]

134. A concrete example helps illustrate the process. Consider a situation where *The New York Times* reserves advertising space on its own website to sell through Google RTB. An Account Holder views a specific page, in this example an article on post-partum depression, by entering the web address in the navigation bar of his or her web browser and hits ENTER. This triggers the web browser to send a GET request (or electronic communication) to *The New York Times*, which, in turn, responds by displaying *The New York Times* article on the Account Holder's device. Common

[17] Bennett Cyphers, *Google Says It Doesn't 'Sell' Your Data. Here's How the Company Shares, Monetizes, and Exploits It*, Electronic Frontier Foundation (Mar. 19, 2020), https://www.eff.org/deeplinks/2020/03/google-says-it-doesnt-sell-your-data-heres-how-company-shares-monetizes-and.

experience shows that the requested webpage will display in a matter of seconds. But what the Account Holder does not know is that the request to view *The New York Times* article on postpartum depression is also accompanied by a "cookie," which is sent from the Account Holder's web browser to the SSP (recall that an SSP is an entity that collects Account Holder information to sell ad space for targeted advertising). If the SSP is AdMob, which is owned by Google, AdMob matches the cookie to the Account Holder's personal information stored by Google. As one of the preeminent data companies in the world, Google's storage of individuals' personal information is vast and, consequently, its capability to connect cookies to personal information is unprecedented. From Google's vast data store, Google RTB creates a Bid Request – containing the Account Holder's personal information and the content of the specific article that is the subject of the Account Holder's communication. This Bid Request is then sent to DSP participants of the Google RTB (recall that DSPs bid on behalf of advertisers to display targeted ads on available ad space). All Google RTB participants, in turn, can view, collect, and use the information in the Bid Request to determine whether and in what amount they will pay to deliver an ad to the specific Account Holder in question. Bids are submitted and the highest bidder wins the right to place its ad (or its client's ad) on *The New York Times* postpartum depression article that the Account Holder is viewing. This is all done by algorithm and, as set forth above, the entire process takes milliseconds: between the time the Account Holder clicks to access the article and the seconds it takes for the article display, Google RTB has collected, disseminated, and sold the Account Holder's personal information to hundreds of Google RTB participants for the purpose of targeted advertising.

**2. The Google RTB Shares Account Holders' Personal Information**

135. Google publishes several documents in which it explains how Google RTB Bid Requests are structured. Among them are documents titled:

a. OpenRTB Integration;[18]

b. Real-Time Bidding Protocol Buffer v.199;[19]

---

[18] https://developers.google.com/authorized-buyers/rtb/openrtb-guide

[19] https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto

c. Authorized Buyers Real-time Bidding Proto;[20] and

d. Infrastructure Options for RTB Bidders (part 4).[21]

**a. OpenRTB Integration**

136. OpenRTB Integration provides a chart with "Bid request variables and definitions" involved in Google OpenRTB.

137. The following chart provides a subset of the Bid Request variables that OpenRTB Integration shares with developers:

| CATEGORIES | |
|---|---|
| site | Details about the publisher's website. |
| app | Details about the publisher's app. |
| device | Details about the user's device to which the impression will be delivered. |
| user | Details about the human user of the device; the advertising audience. |
| name | Site or app name. |
| domain | Domain of the site or app. For example, "foo.com". |
| **COMMUNICATIONS CONTENT** | |
| cat | Array of IAB content categories of the site or app. |
| sectioncat | Array of IAB content categories that describe current section of site or app. |
| pagecat | Array of IAB content categories that describe current site or app page or view. |
| page | URL of the page where the impression will be shown. |
| ref | Referrer URL that caused navigation to the current page. |
| publisher | Details about the Publisher object of the site or app. |
| content | Details about the Content within the site or app. |
| keywords | Comma-separated list of keywords about this site or app. |
| content id | ID uniquely identifying the content. |
| episode | Content episode number (typically applies to video content). |
| title | Content title. Video examples: "Search Committee" (television); "A New Hope (movie); or "Endgame" (made for web). Non-video example: "Why an Antarctic Glacier is Melting So Quickly" (Time magazine article). |
| series | Content series. Video examples: "The Office" (television); "Star Wars" (movie); or "Arby 'N' The Chief (made for web). Non-video example: ("Ecocentric") (Time magazine blog). |
| **DEVICE** | |
| dnt | Standard 'Do Not Track' flag as set in the header by the browser. |
| ua | Browser user-agent string. |
| ip | IPv4 address closest to device. |
| geo | Location of the device assumed to be the user's current location defined by a Geo object. |
| didsha1 | Hardwire device ID. |
| dpidsha1 | Platform device ID (e.g. Android ID). |
| ipv6 | IPv6 address closest to device. |
| carrier | Carrier or ISP, using exchange curated string names which should be published to bidders a priori. |
| make | Device make (e.g. Apple). |

[20] https://developers.google.com/authorized-buyers/rtb/realtime-bidding-guide

[21] https://cloud.google.com/solutions/infrastructure-options-for-rtb-bidders

| | |
|---|---|
| model | Device model (e.g. iPhone). |
| os | Device operating system (e.g. iOS). |
| osv | Device operating system version. |
| hwv | Hardware version of the device (e.g. '5S' for iPhone 5S). |
| devicetype | The general type of device. |
| ifa | ID sanctioned for advertiser use in the clear. |
| macsha1 | MAC address of the device. |
| **GEO-LOCATION** | |
| lat | Latitude from -90.0 to 90.0, where negative is south. |
| lon | Longitude from -180.0 to 180.0 where negative is west. |
| country | Country. |
| region | Region. |
| metro | Google metro code; similar to but not exactly Nielson DMAs. |
| city | City using United Nations Code for Trade & Transport. |
| zip | Zip/postal code. |
| type | Source of location data. |
| accuracy | Estimated location accuracy. |
| lastfix | Number of seconds since this geolocation fix was established. |
| **USER** | |
| Id | Exchange-specific id for the user. |
| Buyerid | Buyer-specific ID as mapped by the exchange for the buyer. |
| Gender | Gender as 'M' male, 'F' female, 'O' other. |
| Keywords | Comma-separated list of keywords, interests, or intent. |
| Customdata | Optional feature to pass bidder data set in the exchange's cookie. |
| Geo | Location of the user's home based defined by a Geo object. This is not necessarily their current location. |
| Data | Values for this field are now redacted. Segment.id references the exchange-detected vertical of the page. Segment.value corresponds to the weight of that detected vertical, a higher weight suggesting the page is more relevant for the detected vertical. |

**b. Real-Time Bidding Protocol Buffer v.199**

138. Real-Time Bidding Protocol Buffer v.199 provides further details. It explains of the protocol that it is "the message that Google uses to request bids" and confirms that the same categories of personal information are sent to bidders as those set forth in the OpenRTB Integration chart (see above).

139. Real-Time Bidding Protocol Buffer v.199 illustrates that the personal information about an Account Holder is the key item for sale based on the order in which the re-directed data is provided from Google to the bidders.

140. As shown in Real-Time Bidding Protocol Buffer v.199, data is shared in the following order:

| | | |
|---|---|---|
| **SPECIFIC REQUEST IDENTIFIER** | | |
| 1 | BidRequest | Unique request id generated by Google. This is 16 bytes long. |
| **"INFORMATION THAT WE KNOW ABOUT THE USER"** | | |

| | | |
|---|---|---|
| 2 | IP address | The first 3 bytes of IPv4 or first 6 bytes for IPv6. |
| 3 | Special Treatment | Reasons for special treatment of user data. For example, if the "current request should be treated as child-directed for purposes of the Children's Online Privacy Protection Act." |
| 4 | Google ID | "The Google ID for the user. … This field may be the same as the Google ID returned by the cookie matching service." |
| 5 | Google ID Version | "The version number of the google_user_id. We may sometimes change the mapping from cookie to google_user_id." |
| 6 | Google ID Age | "The time in seconds since the google_user_id was created." |
| 7 | Match Data | "Match data stored for this google_user_id through the cookie matching service. If a match exists, then this field holds the decoded data that was passed in the google_hm parameter." |
| 8 | User-Agent | "A string that identifies the browser and type of device that sent the request." |
| 9 | FLoC | "The value of a cohort ID – a string identifier that is common to a large cohort of users with similar browsing habits. … Experimental feature: may be subject to change." |
| 10 | User Agent Information | "This will be populated with information about the user agent, extracted from the User-Agent header." |
| 11 | Publisher location | The billing address country of the publisher. |
| 12 | End-user location | The user's approximate geographic location. |
| 13 | Zip code | Detected postal code of the user. |
| 14 | Hyperlocal | A hyperlocal targeting location when available. |
| 15 | User verticals | "List of detected user verticals. Currently unused. This field is not populated by default. We recommend that bidders instead store and look up list ids using either google_user_id or hosted-match-data as keys." |
| 16 | User-list | The user list id. |
| **"INFORMATION THAT WE KNOW ABOUT THE WEB PAGE OR MOBILE APP"** | | |
| 17 | Publisher ID | The publisher ID. |
| 18 | Seller network ID | The seller network ID. |
| 19 | Partner ID | ID for the partner that provides this inventory. |
| 20 | URL | The URL of the page with parameters removed. |
| 21 | Bool | Indicates that the request is using semi-transparent branding which means only a truncated version of the request URL provided. |
| 22 | String | An id for the domain of the page that is set when the inventory is anonymous. |
| 23 | String language | Detected user languages based on the language of the webpage. |
| 24 | Detected Verticals | One or more detected verticals for page as determined by Google. |
| 25 | Vertical Weight | Weight for each vertical. |
| 26 | Ordered Verticals | Orders list of detected content verticals. |
| 27 | Content Labels | List of detected content labels. |
| **AUCTION INFORMATION** | | |
| 28 | Unique ID | A unique ID for the overall query. |
| 29 | Auction type | The type of auction that will be run for this query. |
| **"INFORMATION ABOUT THE DEVICE"** | | |
| 30 | Type | Phone, tablet, desktop, connected TV, game console, or set-top box. |
| 31 | Platform | Examples: Android, iPhone, Palm. |
| 32 | Brand | Examples: Nokia, Samsung. |

| | | |
|---|---|---|
| 33 | Model | Examples: N70, Galaxy. |
| 34 | Operating System | Contains the OS version for the platform. |
| 35 | Mobile Carrier | Unique identifier for the mobile carrier. |
| 36 | Screen-width | As measured in pixels. |
| 37 | Screen-height | As measured in pixels. |
| 38 | Screen_pixel_ration_millis | Screen Density |
| 39 | Orientation | Portrait or Landscape |
| **INFORMATION FOR "AD QUERIES COMING FROM MOBILE DEVICES"** | | |
| 40 | Mobile | If true, then this request is coming from a smartphone or tablet. |
| 41 | Mobile App | The identifier of the mobile app or mobile webpage. "If the app was downloaded from the Apple iTunes app store, then this is the app-store id, e.g. 343200656. For Android devices, this is the fully qualified package name, e.g. com.rovio.angrybirds. For Windows devices, it's the App ID, e.g. f15abcde-f6gh-47i0-j3k8-37193817mn3o. For SDK-less requests (mostly from connected TVs), the app ID provided by the publisher directly in the request." |
| 42 | Interstitial | If true, then this is a mobile full screen ad request. |
| 43 | App Category | The IDs of categories to which the current mobile app belongs. |
| 44 | Mobile Optimized | This indicates whether the page is optimized for mobile browsers on high-end phones. |
| 45 | Advertising IDs | This field is used for advertising identifiers for:<br>1) iOS devices (This is called Identifier for Advertising or IDFA, as described at https://support.google.com/authorizedbuyers/answer/3221407);<br>2) Android devices;<br>3) Roku devices;<br>4) Microsoft Xbox devices;<br>5) Amazon devices (i.e. Amazon Fire) |
| 46 | App Name | App names for Android by Google Play and for iOS by App Annie. |
| 47 | App User Rating | Average User rating for the app. |
| 48 | Bidder SDK | Identification of and information about an SDK installed in the publisher's app that the bidder has access to, often because it's the bidder's SDK. |
| 49 | SKAdNetwork | Publisher's SKAdNetwork information to support app installation attribution for iOS 14 and later. |
| **VIDEO INFORMATION** | | |
| 50 | Placement | Where the ad is placed. |
| 51 | URL | The URL of the page that the publisher gives Google to describe the video content, with parameters removed. |
| 52 | Playback Method | How the video ad will be played. |
| 53 | Clickable | Describes whether the video ad is clickable. |
| 54 | Start-Delay | The time in milliseconds from the start of the video when the ad will be displayed. |
| 55 | Ad Duration | The minimum and maximum ad durations. |
| 56 | Skippable | Whether the publisher allows users to skip the ad. |
| 57 | Protocols | Supported video protocols. |
| 58 | File formats | Supported video file formats. |
| 59 | Companion Ads | Information about companion ad slots shown with the video. |
| 60 | Size | Height and width for the video ad. |
| 61 | Video title | The video title. |
| 62 | Video keywords | A list of keywords describing the video, extracted from the content management system of the video publisher. |

141. The above chart indicates that "User verticals" are among the types of information that have been sold to and shared with Google RTB participants. Verticals pertain to a marketing technique known as "vertical segmentation," and are used to facilitate targeted advertising by identifying users as falling within particular categories, segments, and subcategories. Segments include health, religion, ethnicity, nationality, and sexuality. These categories of information therefore reflect the information that Google knows about each Account Holder's personal characteristics.

142. Google's acknowledged use, disclosure, and sale of a "list of detected user verticals" therefore constitutes a substantial invasion of Account Holders' privacy.

143. Some of the categories used by Google are made available on its developer pages.[22] For example:

a. The People & Society segment includes the following verticals: LGBT, Men's Interests (mature), and Divorce & Separation.

b. The Ethnic & Identity Groups segment includes the following verticals: Africans & Diaspora, African-Americans, Arabs & Middle Easterners, Asians & Diaspora, East Asians & Diaspora, Southeast Asians & Diaspora, Eastern Europeans, Indigenous Peoples, Native Americans, Jewish Culture, Latinos and Latin-Americans, and Western Europeans.

c. The Religion & Belief segment includes the following verticals: Buddhism, Christianity, Hinduism, Islam, Judaism, Scientology, Skeptics & Non-Believers, and Spirituality.

d. The Health segment includes the following verticals:

| HEALTH VERTICALS CATEGORIES | | | |
|---|---|---|---|
| Acne & Blem. Treatments | Weight Loss | Aging & Geriatrics | Alzheimer's Disease |
| Cleansing and Detox. | Steroids & PEDs | AIDS & HIV | Allergies |
| Arthritis | Blood Sugar & Diabetes | Cancer | Ear Nose & Throat |
| Eating Disorders | Endocrine Conditions | Thyroid Conditions | GERD & Diges. Disorders |
| Genetic Disorders | Heart & Hypertension | Cholesterol Issues | Infectious Diseases |
| Parasites & Parasitic Dis. | Vaccines & Immunizations | Injury | Neurological Conditions |
| Learn. & Dev. Disabilities | ADD & ADHD | Obesity | Pain Management |
| Headaches & Migraines | Respiratory Conditions | Asthma | Skin Conditions |
| Sleep Disorders | Doctor's Offices | Hospitals & Treat. Centers | Surgery |
| Cosmetic Surgery | Physical Therapy | Men's Health | Mental Health |
| Anxiety & Stress | Counseling Services | Depression | Toxic Sub. & Poisoning |
| Reproductive Health | Birth Control | Infertility | Male Impotence |
| OBGYN | Sex Ed. & Counseling | Sexual Enhancement | STDs |
| Substance Abuse | Drug & Alcohol Testing | Drug & Alc. Treatment | Smoking & Sm. Cessation |

[22] https://developers.google.com/adwords/api/docs/appendix/verticals

144. Each of these verticals comprise personal information under California law and Google's policies.

**c. Authorized Buyers Real-time Bidding Proto**

145. Until sometime in February or March 2021, Google's developer tools included "sample bid requests and response," which illustrate how Account Holders' information in verticals are shared and sold through Bid Requests, on a developer page called Authorized Buyers Real-time Bidding Proto. The sample Bid Request for an app banner provides that the following data would be included among the Bidstream sent from Google to the authorized bidder:

```
user {
  id: "7T0uAq192ru9Ndd90Pnh73lsY2L"
  data {
    id: "DetectedVerticals"
    name: "DoubleClick"
    segment {
      id: "236"
      value: "0.2"
    }
    segment {
      id: "457"
      value: "0.2"
    }
```

This code tells the bidder that the Account Holder with the id 7T0uAq192ru9Ndd90Pnh73lsY2L is in the "weight loss" (236) and "special and restricted diets" (457) segments.[23]

146. Another example provided by Google showed an Account Holder with the ID iE0B3ASr55t81Mf8XnJ34W084h8 is in the "Pregnancy and Maternity" vertical:

[23] The complete list of verticals, including both the descriptor (e.g., Weight Loss) and corresponding segment ID (e.g., 236), is available at: https://developers.google.com/adwords/api/docs/appendix/verticals.

```
device {
  ua: "Mozilla/5.0 (Linux; Android 7.1.1; Moto E (4) Build/NCQS26.69-64-16;
wv) AppleWebKit/537.36 (KHTML, like Gecko) Version/4.0 Chrome/79.0.3945.116
Mobile Safari/537.36 [FB_IAB/FB4A;FBAV/252.0.0.22.355;]"
  ip: "192.168.1.0"
  geo {
    country: "USA"
    region: "US-NY"
    metro: "9067609"
    city: "New York"
    utcoffset: -480
  }
  carrier: "70091"
  make: "motorola"
  model: "moto e(4)"
  os: "android"
  osv: "7.1.1"
  devicetype: HIGHEND_PHONE
  w: 720
  h: 1280
  pxratio: 1.0
}
user {
  id: "iEOB3ASr55t81Mf8XnJ34W084h8"
  buyeruid: "9WYQiC4JG3hQfIM862Eym660G4UdsG4c"
  customdata: "WqJ725BD4feN7831884366n8gmA5Rk77Ud7K61GL85e4i9A6"
  data {
    id: "DetectedVerticals"
    name: "DoubleClick"
    segment {
      id: "184"
      value: "1"
    }
    segment {
      id: "401"
      value: "0.2"
```


Per Google documentation, Segment ID "184" corresponds with "Celebrities and Entertainment News"

Per Google documentation, Segment ID "401" corresponds with "Pregnancy and Maternity"

*See* Exhibit 27.

147. Another exemplar identifies the Account Holder with id 2R2e3G7G096GuMK118NkE67282 as being in the vertical "OBGYN":


```
device {
  ua: "Mozilla/5.0 (Linux; Android 9; Mi A2 Build/PKQ1.180904.001; wv)
AppleWebKit/537.36 (KHTML, like Gecko) Version/4.0 Chrome/78.0.3904.108
Mobile Safari/537.36 (Mobile; afma-sdk-a-v19831030.19831030.0)"
  ip: "192.168.1.0"
  geo {
    lat: 0.0
    lon: 0.0
    country: "USA"
    region: "US-NY"
    utcoffset: 420
  }
  make: "xiaomi"
  model: "mi a2"
  os: "android"
  osv: "9"
  devicetype: HIGHEND_PHONE
  ifa: "b\'c\\xbc\\xfbnB<\\xe9\\x1em\\xf9\\xdc\\xd1\\x04\\xa1\\xdf\\x88\'"
  w: 360
  h: 672
  pxratio: 3.0
}
user {
  id: "3R2e3G7G0966GuMK118NkE67282"
  data {
    id: "DetectedVerticals"
    name: "DoubleClick"
    segment {
      id: "558"
      value: "0.2"
    }
    segment {
      id: "695"
      value: "0.2"
    }
  }
```


Per Google documentation, Segment ID "558" corresponds with "OBGYN"

Per Google documentation, Segment ID "695" corresponds with "Time and Calendars"

*See* Exhibit 28.

148. Sometime in February or March 2021, Google removed these exemplars that show the line of code specifying "DetectedVerticals" for Account Holders. On March 14 or 15, 2021, Google also replaced what had previously been labeled as Real-Time Bidding Protocol Buffer v.198 with v.199 (the latter referenced above in this Complaint). As set forth above, Real-Time Bidding Protocol Buffer v.199 now claims that "User verticals" are unused. *See supra* at ¶ 140, Row 15. This is a distinction without a difference because Real-Time Bidding Protocol Buffer v.199 specifies that Google *does* include "Detected Verticals" for each page or app where the Google RTB auction sales system is in place. *See supra* at ¶ 140, Row 24.

149. Google's statement that "user verticals" are "unused" may simply reflect the fact that the inferred information contained in those verticals has been transferred to the new FLoC value, which Google describes in the Real-Time Bidding Protocol Buffer v.199 as "[t]he value of a cohort ID – a string identifier that is common to a large cohort of users with similar browsing habits." As the Electronic Frontier Foundation detailed in a recent article, "[i]t is highly likely that FLoC will group users" by gender, ethnicity, age, income, and mental health, and "may also directly reflect visits to websites related to substance abuse, financial hardship, or support for survivors of trauma."[24]

150. Moreover, the "Detected Verticals" still constitute "personal information" under California law because they are inferred data about web-browsing history that Google is selling and from which Google RTB participants can compile and augment their own detailed dossiers about Account Holders. *See* CAL. CIV. CODE § 1798.140(o)(1). Google still sells and shares these verticals and segments with approved bidders in Google RTB together with Account Holders' Google ID and other identifiers.

[24] Bennett Cyphers, *Google's FLoC Is a Terrible Idea*, Electronic Frontier Foundation (Mar. 3, 2021), https://www.eff.org/deeplinks/2021/03/googles-floc-terrible-idea.

**d. Infrastructure Options for RTB Bidders (Part 4)**

151. In the article "Infrastructure Options for RTB Bidders (Part 4)" ("Infrastructure Options"), Google notes that a Google RTB bidder may do the following:

> ## Bidding
>
> A bidder performs the following tasks:
>
> - **User matching**: Identify the (unique) user.
> - **Selecting segments**: Retrieve and select the (unique) user's segments and their price.
> - **Deciding whether to bid**: Some bids are too expensive, and some ad requests might not match any existing campaigns. A bidder should be able to refuse a bid. This refusal saves processing time and resources.
> - **Selecting relevant ads**:** **If the bidder decides to bid then the bidder must also select an ad. Selecting the right ad can improve the odds that a user might click and possibly generate a conversion.
> - **Optimizing bids**: A bidder should always try to find the minimum bid price that will still win the auction.
> - **Building a bid response**: Using OpenRTB or a custom application, build and return a bid response serialized in protobuf or JSON format. The response should include information such as the ad URL, the bid, and the win URL endpoint that can be called if the bid wins.

152. For "user matching," the article encourages Google RTB participants to collaborate on creating "match tables" that would enable them to sync cookies and identify users across multiple platforms. The article further directs the reader to a hyperlink to learn more about "[h]ow cookie matching works in real-time bidding." As explained below, cookie matching is a Google service that enables Google RTB participants to match cookie identifiers to participants' existing individual profiles.

153. For "selecting segments," Google explains that the Google RTB system can "extract user segments from the (unique) user profile store [hyperlinked], order the segments by price, and filter for the most appropriate segment."

154. The link to "(unique) user profile store," explains that "[t]his store contains (unique) users and their associated information that provide key insights to select a campaign or ad on request. Information can include the (unique) user's attributes your own segments, or segments imported from third-parties. In RTB, imported segments often include bid price

recommendations."[25]

155. The "(unique) user profile store" goes on to explain: "The store is updated frequently based on the (unique) user's interaction with ads, sites they visit, or actions they take. The more information, the better the targeting. You might also want to use third-party data management platforms (DMPs) to enrich your first-party data."

156. Thus, Google's internal documents indicate that, in addition to sharing Account Holders' personal information in the Google RTB Bidstream, Google is also grouping Account Holders into targeted advertising segments, ***which includes sensitive categories related to race, religion, and sexual orientation***, compiling in-depth personal profiles, and then using those profiles in furtherance of the Google RTB.

157. Independent research has confirmed that Google allows targeted advertising based on sensitive categories. In a 2015 study, researchers created an automated tool called AdFisher to "explore[] how user behaviors, Google's ads, and Ad Settings interact." The researchers started with a group of 500 fresh simulated browser instances. They then sent part of the group to the top 100 websites for substance abuse as listed on Alexa while the remainder acted as a control group and did nothing. Next, the researchers sent both browser groups to the Times of India, a content-providing webpage that uses Google for advertising. The ads displayed on the Times of India for both groups were collected and analyzed, to determine whether there was any difference in the outputs shown to the agents. For the substance abuse group, the top three ads shown to them were for an alcohol and drug rehabilitation center called the Watershed Rehab, with these top three ads making an appearance, respectively, 2,276 times, 362 times, and 771 times. The non-substance-abuse group was not shown the Watershed Rehab ads a single time.[26]

158. Account Holders have no idea that they have been associated with these categories,

[25] https://cloud.google.com/solutions/infrastructure-options-for-serving-advertising-workloads#unique_user_profile_store

[26] Amit Datta, Michael Carl Tschantz, and Anupam Datta, Automated Experiments on Ad Privacy Settings, Proceedings on Privacy Enhancing Technologies 2015; 2015 (1):92-112, available at https://www.andrew.cmu.edu/user/danupam/dtd-pets15.pdf. The study also showed that browser instances identified as women were 6 times less likely to be shown ads for high-paid executive positions than similarly-situated male browser instances.

and no way to prevent being targeted by their association with them. Indeed, the same article reported that despite the obvious, statistically significant return of drug rehabilitation ads for the substance abuse group when compared to the non-substance abuse group, the Ad Settings page for members of each group were not different.[27] "Thus," the researchers concluded, "information about visits to these websites" – the 100 websites for substance abuse – "is indeed being used to serve ads, but the Ad Settings page does not reflect this use in this case. Rather than providing transparency, in this instance, the ad settings were *opaque* as to the impact of this factor" (emphasis in original).

159. The above study is not an outlier. A 2019 study confirms that data collection and behavioral tracking information is aggregated to derive user interest profiles, which in turn are leveraged by advertising platforms, like Google RTB, to (1) expand their own data profiles on individual users, and (2) to sell more expensive ads that are more specifically targeted. Significantly, the 2019 study noted that Google has unprecedented visibility into users' browsing behavior because it is able to collect and aggregate user information from a vast array of sources, either owned by Google or accessible to Google by virtue of Google's embedded source code.[28] Google can therefore infer user interests to an alarmingly accurate degree.[29]

160. In 2012, researchers at Worchester Polytechnic Institute conducted a focused study of the Google ad network. The study found, among other things, that non-contextual ads were shown related to induced sensitive topics regarding sexual orientation, health, and financial matters. By way of background, contextual ads are those that derive from the content of the webpage that a user is viewing, *e.g.*, shoe ads being displayed on a website selling shoes. Conversely, non-contextual ads have no relation to the webpage content, *e.g.*, ads for mental health treatment on a

---

[27] Google makes the Ad Settings page available to Account Holders for the purported purpose of letting those Account Holders understand inferred interests that Google has assigned.

[28] Muhammad Ahmad Bashir, et al., Quantity vs Quality: Evaluating User Interest Profiles Using Ad Preference Managers, Network and Distributed Systems Security (NDSS) Symposium 2019 (February 24-27, 2019), *available at* https://www.ndss-symposium.org/wp-content/uploads/2019/02/ndss2019_04B-5_Bashir_paper.pdf.

[29] Only platforms that can observe users on a given site (i.e. by being directly embedded in the site, or by partnering with another third-party that is embedded[]) can draw such an inference. *Id.*

website selling shoes. Thus, the fact that the 2012 study found that the Google ad network was able to facilitate non-contextual ads related to induced sensitive categories ***confirms that sensitive information is being sold by the Google ad network to foster targeted advertising***.[30]

161. Account Holder information sold and shared by Google with advertising bidders constitutes personal information as defined by both Google and California law. The information shared by Google through its RTB process is personal information that is reasonably capable of being associated, or that could reasonably be linked, directly or indirectly, with a particular consumer or household. *See* CAL. CIV. CODE § 1798.140(o)(1). In fact, it is not only "capable" of being associated but *is being* associated with a particular consumer. That is, after all, the entire purpose of Google RTB.

162. The above studies and examples demonstrate that Google violates its express privacy promises not to share Account Holders' personal information each time it shares and sells their information, including information contained in verticals and segments, with participants in Google's RTB process. Moreover, each time Google shares information in segments concerning health, religion, ethnicity, race, or sexuality, Google violates its express promises to Account Holders that it will never share or sell their sensitive personal information.

### 3. The Data Google Discloses and Sells Is Designed to be Personally Identifiable to Google RTB Participants

163. Google is not selling or sharing anonymized, non-personally identifiable data to just a few "partners," as Google suggests in one paragraph in its Terms of Service. To the contrary, the data it sells and shares with participants on the Google RTB is tied to unique identifiers that track specific Account Holders across web and physical activity, including where they are, what they are doing, and what they purchase, and draw inferences from that data of the sort derived from and constituting the kinds of sensitive verticals described above. All of this data is tied to unique persistent identifiers.

164. Critically, the data Google sells allows its RTB participants not only to target Account Holders specifically, but also to build from scratch or cross-reference and add to the data

[30] Craig E. Wills and Can Tartar, Understanding What They Do with What They Know (Short Paper), *WPES'12*, October 15, 2012, *available at* https://web.cs.wpi.edu/~cew/papers/wpes12.pdf.

that they already have in ***their*** own detailed profiles for Account Holders.

165. For example, Facebook is a frequent bidder in Google RTB and, in addition to the personal information received from Google, Facebook has its own database of account holder names, email addresses, phone numbers, device IDs, likes, interests, and friends.[31] A large data company like Facebook is therefore able to connect the personal information made available by Google RTB to its own existing databases, matching certain of the information in the Account Holder's profile, such as the IP address, to information already in Facebook's possession.

166. The consequence is two-fold.

167. ***First***, Google provides Facebook with personal information that Facebook uses to specifically identify the account holder for the purpose of bidding on an ad in Google's Ad Exchange. Recent reports in *The Wall Street Journal* and *The New York Times* indicate that, in exchange for Google helping Facebook to recognize specific mobile and web users, Facebook agreed to place bids through Google RTB for 90 percent of the users it recognizes and to spend at least $500 million per year on the Google Ad Exchange.[32] Put differently, Google helped Facebook deanonymize its account holders in exchange for at least one half billion dollars.

168. Neither Google nor Facebook denied the existence of the deal or its terms in response to these reports. To the contrary, Google's response hinted that its deal with Facebook was not unique, stating that it is just "one of over 25 partners participating in Open Bidding" inside the Google Ad Exchange.[33] This significant admission supports the conclusion that Google is selling Account Holders' personal information – presumably to the highest bidder, or perhaps to itself when it sees fit.

---

[31] *See* www.facebook.com/privacy.

[32] Daisuke Wakabayashi and Tiffany Hsu, *Behind a Secret Deal Between Google and Facebook*, THE NEW YORK TIMES (Jan. 17, 2021), *available at* https://www.nytimes.com/2021/01/17/technology/google-facebook-ad-deal-antitrust.html; Ryan Tracy and Jeff Horwitz, *Inside the Google-Facebook Ad Deal at the Heart of a Price-Fixing Lawsuit*, THE WALL STREET JOURNAL (Dec. 29, 2020), *available at* https://www.wsj.com/articles/inside-the-google-facebook-ad-deal-at-the-heart-of-a-price-fixing-lawsuit-11609254758.

[33] Adam Cohen, *AG Paxton's Misleading Attack on Our Ad Tech Business* (Jan. 17, 2021), https://blog.google/outreach-initiatives/public-policy/ag-paxtons-misleading-attack-on-our-ad-tech-business/.

169. ***Second***, whether or not Facebook (or another DSP or advertiser) submits a winning bid, participating in the auction facilitates the acquisition and retention of Account Holders' personal information that Google RTB participants can and do use to create or continuously update and augment their own existing user data troves.

170. This is true even for Google RTB participants who are not as large as Facebook and who do not have their own consumer account holders. Google actively assists Google RTB participants in matching Account Holder information made available in a Bid Request to the information those participants already have about specific individuals through a "cookie matching service."

171. According to Google, "[c]ookie matching is a feature that enables" Google RTB participants "to match [their own cookie] – for example, an ID for a user that browsed your website – with a corresponding bidder-specific Google User ID, and construct user lists that can help you make more effective bidding choices."[34] Specifically:

> In the context of digital advertising, Google identifies users with cookies that belong to the `doubleclick.net` domain, and bidders participating in Real-Time Bidding may have their own domain where they identify some set of users they would like to show ads. Cookie Matching enables the bidder to match their cookies with Google's, such that they can determine whether an impression sent in a bid request is associated with one of users being targeted, they will receive either their own cookie data or a bidder-specific Google User ID that is an encrypted form of the `doubleclick.net` cookie in the bid request.
>
> The cookie matching service described in this guide facilitates the creation and maintenance of the association between a bidder's cookie and the Google User ID, and also allows one to populate user lists.

172. Google illustrates how cookie matching works:

[34] Cookie Matching, https://developers.google.com/authorized-buyers/rtb/cookie-guide.

**Cookie Matching workflow diagram**

This workflow is illustrated by the diagram below, where requests and responses are represented by an arrow, and the data items that accompany them are listed in parentheses.




173. Thus, Google RTB participants are able to match the alphanumeric id of the Google ID shared in the Bid Request with the auction participants' (including Surveillance Participants') own unique cookie identifier for the Account Holder. In other words, even though the Google ID is purportedly anonymous, Google provides participants a key, via cookie matching, to determine exactly who certain Account Holders are. If the Account Holder whose profile is up for bid also has an account id with the participant, cookie matching will not only let the participant know that fact, it will enable the participant to tie the personal information from Google RTB together with data it already has to enhance its profile of the Account Holder.

174. In an indication that Google realizes its cookie matching process violates California law, the Cookie Matching page states a "Key Point" that "the Google User ID will not be specified in the bid request" for "users detected to originate from California," but the bidder will "still receive … hosted match data" to inform bidding.[35]

[35] *Id.*

> **Key Point:** For users detected to originate from California, the Google User ID will not be specified in the bid request. You will still receive your hosted match data, which can be used to inform your bidding logic.

175. But this "Key Point" cannot absolve Google. It does not change the fact that Google is disclosing personal information about the Account Holder directly to the "buyer's service." By still providing the "buyer's service" with the "hosted match data," Google is connecting its own Google User ID to the buyer's user id, which is also personal information.

176. Cookie matching permits Google to share and sell Account Holders' personal information with participants ***even when Account Holders take steps to avoid Google's tracking***. By constructing "user lists," which include Account Holders, Google RTB auction participants can reidentify people even when different identifiers are used, purportedly to prevent that kind of targeting.

177. As Google explains to its developers: "Cookie Matching enables the bidder to match their cookies with Google's, such that they can determine whether an impression sent in a bid request is associated with one of users being targeted."[36] And Google explains to developers that the purpose of this is to allow third parties to associate information with Account Holders: "The cookie matching service described in this guide facilitates the creation and maintenance of the association between a bidder's cookie and the Google User ID, and ***also allows one to populate user lists***" (emphasis added).[37]

178. Notably, Google ***encourages*** Google RTB participants to "store" these user lists, inviting them to retain keys to defeat de-identification processes: "We recommend that bidders instead store and look up list ids using either google_user_id or hosted_match_data as keys."[38] That is, ***rather than protecting Account Holders' privacy, Google encourages its partners to invade it.***

179. The Google Cookie Matching service is ubiquitous. A 2019 analysis by the web

---

[36] *Id.*

[37] *Id.*

[38] Real-Time Bidding Protocol Buffer v.202, https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto

browser Brave showed that a single hour of web browsing resulted in 318 different Google cookie matches with at least 10 different companies participating in RTB auctions.[39]

180. Through Google Cookie Matching and through Google's ubiquitous presence on the Internet, participants in Google RTB are sold and provided with personal information through which they can and do build rich user dossiers based on the vast majority of every Internet Account Holder's browsing history.

181. A 2018 study co-authored by Professor Wilson found that 52 different companies "observe at least 91 percent of an average user's browsing history under reasonable assumptions about information sharing within RTB auctions" and 636 companies "observe at least 50 percent of an average user's impressions."[40]

182. Further, a recent investigation by *The New York Times* reveals how easy it is to tie what Google and others characterize as anonymous pieces of data together to identify a specific person. In an article titled "They Stormed the Capitol. Their Apps Tracked Them," writers Charlie Warzel and Stuart Thompson explain how they were able to identify specific individuals who participated in the attack on the United States Capitol on January 6, 2021 through a database of purportedly "anonymous" information that was provided to them by an industry insider.[41]

183. The article illustrates how an Account Holder's precise movements could be tracked across the country using purportedly anonymous data. For example, one person shown to have been near the Capitol during the attack was an individual from Kentucky. Starting with what the industry deemed anonymous data, *The New York Times* identified the person by name and tracked his specific path to and within Washington D.C.:

---

[39] Dr. Johnny Ryan, RTB Header Bidder Evidence – Explanatory Document, Brave, Inc. (Sept. 2, 2019), https://brave.com/wp-content/uploads/explanatory_note_google_RTB_and_push_pages.pdf

[40] Muhammad Ahmad Bashir and Christo Wilson, "Diffusion of User Tracking Data in the Online Advertising System," Proceedings on Privacy Enhancing Technologies 2018 (4):85-103, at 86, https://www.ccs.neu.edu/home/ahmad/publications/bashir-pets18.pdf.

[41] Warzel, C. and Thompson, S. (Feb. 5, 2021), *They Stormed the Capitol. Their Apps Tracked Them*. THE NEW YORK TIMES, *available at* https://www.nytimes.com/2021/02/05/opinion/capitol-attack-cellphone-data.html

The trip to Washington, D.C.




The day of the protest




184. *The New York Times* further reported that, by purchasing data from advertisers, it was "quickly able to match more than 2,000 supposedly anonymous devices in the data set [of people in or around the Capitol on the afternoon of January 6, 2021] with email addresses, birthdays, ethnicities, ages and more."




### C. Google Sells Account Holders' Private Information

185. Google's release, disclosure, dissemination, transfer, and electronic communication of Account Holders' personal information to participants in Google RTB is a sale of personal information for purposes of advertising.

186. The communication of Account Holders' personal information is made by Google in exchange for money and other valuable consideration.

187. The winning bidder pays for Account Holders' personal information.

188. Participants in Google RTB who do not win a bid to place an ad nevertheless receive Account Holders' personal information in exchange for other valuable consideration. This includes their continued participation in Google RTB, *i.e.*, the continued ability to receive, review, retain, and bid on Account Holders' personal information.

189. Moreover, even participants that do not submit a bid to advertise directly to an

Account Holder still receive access to that Account Holder's personal information via the Google RTB. This is a benefit and encourages them to participate in the auction.

190. All of the data transferred by Google is associated with multiple unique persistent identifiers. After the data leaves an Account Holder's device, it is sent to Google RTB, which entertains bids from SSPs all over the internet as well as bids from Google itself. Those bids are then presented to DSPs (who are acting on behalf of advertisers), also including Google itself. All of these third parties on the Ad Exchange thus have an opportunity to review and analyze the personal information about Account Holders that Google has collected and disseminated through the Bid Request.




191. This directly violates Google's promises to Account Holders that it will not sell their information to advertisers or share the information except in limited circumstances.

### 1. Plaintiffs Have Identified Hundreds of Companies Who Are Winning Bidders in Google's Ad Exchange Auctions

192. There is no transparency in the process that occurs in Google RTB. Indeed, one of the factors motivating recent antitrust investigations into Google is that Ad Stack markets are opaque, Google has a powerful role in multiple layers of the process, and Google has resisted disclosure of how the auctions operate. Plaintiffs' investigation is ongoing and many of these practices are only now coming to light and being analyzed by experts.

193. Regardless, and relevant here, Google does not tell Account Holders which companies are bidding on, and therefore accessing, their personal information, let alone which companies are winning the auctions.

194. To determine the prevalence of Google RTB in the United States, Plaintiffs retained Professor Wilson of the Khoury College of Computer Sciences at Northeastern University. Plaintiffs asked Professor Wilson to identify the raw number of publishers (those websites who are selling ad space on the Google Ad Exchange) that use the Google RTB in the United States.

195. Professor Wilson determined the precise number of publishers in the Google RTB by downloading the data Google publishes at https://storage.googleapis.com/adx-rtb-dictionaries/sellers.json. Professor Wilson determined that 1,298,541 publishers were identified by Google as participating in the Google RTB to sell their ad space. Of the approximately 1.3 million RTB publishers, Professor Wilson determined that only 172,849 (13.31 percent) were publicly disclosed by Google. Google marked the remainder as anonymous.

196. Professor Wilson also researched the scope of the RTB participants who won auctions in an experiment and concluded that there are *at least* 229 different advertisers to whom Google discloses Account Holders' personal information. Among the companies who did not win the auction but to whom Google disclosed Account Holders' personal information were Amazon, Facebook, Twitter, Taboola, Wayfair, Yahoo, and eBay. The list also included hundreds of companies that American consumers likely never heard of. Google sold and/or shared Account Holders' personal information to each of these companies.

197. Professor Wilson's effort to identify these participants through the creation and

deployment of massive web-crawling scripts is only necessary because Google is not required to publish such information to American consumers. However, other data protection regimes do require at least some transparency into who is buying Account Holders' personal information. Disclosures and reports from those other jurisdictions indicate that Professor Wilson's report may dramatically underestimate participation in Google RTB and the number of entities to which Google sells user personal information.

198. For example, European law requires Google to identify all companies with which it shares personal data in the European Economic Area. The published list includes 833 companies, including well-known companies like Amazon, Facebook, Twitter, Microsoft (LinkedIn), Netflix, Adobe, Oracle, Salesforce, and eBay, as well as hundreds of little-known companies such as Betgenius, Neustar, and Outbrain.[42]

199. A September 2020 study submitted to the Irish Data Protection Commission estimated that an estimated 13.5 million websites participated in the Google RTB and 2,182 companies directly received Google RTB data.[43]

### 2. Plaintiffs Have Obtained Specific Examples of Google's Sharing and Sale of User Personal Information

200. Plaintiffs' experts have identified certain auction participants who received personal information of the Plaintiff class through the RTB auction process.

201. Consistent with Google's description in its own developer pages, documents from auction participants demonstrate how Google discloses, shares, and sells data to RTB participants, including but not limited to the following categories of information, several of which are personal information on their own or in combination with other data because they either identify or are reasonably capable of identifying a specific person, household, or device:

a. User verticals

b. User list

[42] https://support.google.com/admanager/answer/9012903

[43] Dr. Johnny Ryan, Submission to the Irish Data Protection Commission, Irish Council for Civil Liberties (Sept. 21, 2020) https://www.iccl.ie/wp-content/uploads/2020/09/1.-Submission-to-Data-Protection-Commissioner.pdf at 16-17.

c. User Data Treatment

d. User-Agent

e. URL

f. Seller Network ID

g. Response Deadline

h. Publisher Type

i. Publisher ID

j. Publisher Country

k. Publisher Postal Code

l. Partner ID

m. Key Value

n. IP

o. ID

p. “Hyperlocal” geotargeting information in the form of precise latitude and longitude that can be traced to specific addresses;

q. Hosted Match Data

r. Google User ID

s. Google Query ID

t. Video Title

u. Video Format

v. Geo-criteria ID

w. Device details including screen width, height, pixel ratio, operating system, operating system version, model, device type, carrier ID, and brand;

x. Detected verticals

y. Detected language

z. Detected content label

aa. Auction type

202. In addition to this information which can be correlated to personally identify

Plaintiffs and other Class members as defined under California law, these bid requests also contain values in the fields for URL, Google User ID, IP, and hyperlocal geotargeting information with specific latitude and longitude.

203. Examples of the kind of URLs contained in the URL field include:

a. https://centurylink.net

b. https://definition.org/earning-millions-from-reruns/18

c. https://www.accuweather.com/en/weather-news/bootleg-fire-in-oregon-creating-pyrocumulus-clouds/985540

d. https://www.wenxuecity.com/news/2021/07/21/10743210.html

e. https://www.cbssports.com/college-football/news/sec-media-days-2021-lsu-florida-focus-on-defensive-improvements-to-help-them-emerge-as-divisional-threats

f. https://www.mindbodygreen.com/articles/4-planets-are-retrograde-summer-2021

g. https://stockcharts.com/freecharts/symbolsummary.html

h. https://games.metv.com

i. https://www.newyorker.com/jigsaw

j. https://www.unotv.com/nacional/covid-19-mexico-18-estados-concentran-90-de-casos-activos

k. https://www.dinamalar.com

l. https://www.yourdictionary.com/fairness

m. https://brickseek.com/lowes-inventory-checker

n. https://www.apartmentguide.com/r/apartments/North-Dakota/Bismarck

o. https://play.google.com/store/apps/details?id=teskin.jewels.plane

p. https://play.google.com/store/apps/details?id=free.vpn.unblock.proxy.turbovpn

q. https://www.inveposts.com/2020/07/08/true-love-is-real-these-hollywood-couples-will-prove-to-you-that-celebrity-marriages-actually-last-5/2

r. https://www.gm-trucks.com/forums/topic/231026-35x1250-20-on-stock-rims-pics-inside

s. https://itunes.apple.com/app/id1207472156

t. https://play.google.com/store/apps/details?id=loppipoppi.dominoes

u. https://play.google.com/store/apps/details?id=com.FidgetTrading3D.game

v. https://play.google.com/store/apps/details?id=com.loop.matchtile3d

w. https://truththeory.com/men-with-beards-carry-more-germs-than-dogs-according-to-this-study

x. https://www.photopea.com

y. https://chlloe.com/movies/fb/1640614915/images-that-show-the-way-the-world-used-to-be

z. https://democraticunderground.com

aa. https://www.crazygames.com/game/super-bike-the-champion

bb. https://witcher.fandom.com/wiki/Emhyr_var_Emreis

cc. https://www.ebay.com/itm/313506003835

dd. https://play.google.com/store/apps/details?id=com.Upperpik.HairChallenge

ee. https://blog.jennasuedesign.com/2014/03/kitchen-chronicles-ikea-pax-pantry-reveal

ff. https://www.kijiji.ca/b-for-rent/canada/rent/k0c30349001l0

gg. https://www.suggest.com/lifestyle/2490165/people-share-the-most-unprofessional-thing-their-doctor-ever-said-to-them

hh. https://brain-sharper.com/entertainment/cary-grant-yh/2

ii. https://itunes.apple.com/app/id1574151172

jj. https://diariosm.com.br/not%C3%ADcias/sa%C3%BAde/rio-grande-do-sul-antecipa-primeira-dose-a-todos-os-adultos-para-7-de-setembro-1.2349454

kk. https://www.dadpatrol.com/bat-dad/these-16-people-claim-to-have-it-all-figured-out-but-we-dont-buy-it/28

ll. https://www.jobbry.com/job/el-paso-county-jobs-08

mm. https://www.statsforspotify.com/track/top

nn. https://play.google.com/store/apps/details?id=puzzle.blockpuzzle.cube.relax

oo. https://itunes.apple.com/app/id1469003902

pp. https://pr.olx.com.br/regiao-de-curitiba-e-paranagua/autos-e-pecas/carros-vans-e-utilitarios/corolla-gli-1-8-2018-unico-dono-908630800

qq. https://play.google.com/store/apps/details?id=com.pixel.gun3d

rr. https://play.google.com/store/apps/details?id=jp.ne.ibis.ibispaintx.app

ss. https://www.ebay.com/itm/393443316950

tt. https://itunes.apple.com/app/id1197354394

uu. https://play.google.com/store/apps/details?id=com.digitalchemy.calculator.freedecimal

vv. https://www.freshedits.com/funny/the-internets-most-hilarious-set-of-failed-attempts/6.html

ww. https://play.google.com/store/apps/details?id=in.crossy.daily_crossword

204. The geo-location data contained in RTB bid requests is readily capable of being converted to residential street addresses via free, publicly available tools that can convert the hyper-local latitude and longitude coordinates to a specific address. For example, Plaintiffs' counsel were able to use publicly available tools to identify the location information obtained via discovery from an RTB participant:

a. 407 Avenue D, West Point, Iowa 52656

b. 4456-4400 Hillpine Road, Forest Park, Georgia 30297

c. 16598 NE 74th Street, Redmond, Washington 98052

d. 2247 Lawndale Avenue, Columbus, Ohio 43207

e. 4215 County Road 3, Minneapolis, Minnesota 55406

f. 2060 Otay Lakes Road, Chula Vista, California 91913

g. 1940 Highland Road, Dallas, Texas 75228

h. 1309 Water Street, Alverton, Pennsylvania 15612

i. 855 Azure Street, Sunnyvale, California 94087

j. 3601 North Giddings Road, Fort Collins, Colorado 80524

k. 914 N. 23rd Street, Bismarck, North Dakota, 58501

l. 42092 Lumino Lane, Hammond, Louisiana 70403

m. 334 South Grant Street, Seymour, Wisconsin 54165

n. 470 6th Avenue, Grand Forks Air Force Base, North Dakota 58205

**D. The Personal Information Shared and Sold Includes but Is Not Limited to Information Google Stores in an Account Holder's Google Account**

205. As set forth above, California law defines "personal information" to include any

"information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." CAL. CIV. CODE § 1798.140(o)(1).

206. California law also includes a specific, non-exhaustive list of "personal information" that includes personal identifiers, online identifiers, IP addresses, email addresses, account names, characteristics of protected classifications, purchase history or consideration, Internet or other electronic network activity, including browsing history, geolocation data, employment-related information, education information, and "inferences drawn" from these sources "to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes." CAL. CIV. CODE § 1798.140(o)(1).

207. While Google sells and shares information that it stores in an Account Holder's Google Account, this case is not limited to the sale and sharing of information that Google stores in a Google Account.

208. The datapoints described below that Google sells and shares in the RTB process are "personal information" regardless of whether Google stores the same in an Account Holder's Google Account.

**1. IP Addresses**

209. An IP address is a number that identifies a computer connected to the Internet.

210. IP addresses are used to identify and route communications on the Internet.

211. An IP address is not the same thing as a URL.

212. IP addresses of individual users are used by Internet service providers, websites, and tracking companies to facilitate and track Internet communications.

213. Google tracks IP addresses associated with specific users.

214. IP addresses are "personal information" as a matter of law.

215. Although not necessary to satisfy the definition of "personal information," Google is also capable of and does in fact associate specific Account Holders with specific IP addresses. For example, when an Account Holder signs into a Gmail account, Google associates the personal

information connected with that email account to the IP address in question.

216. Google keeps a record of every IP address that it has ever associated with an Account Holder in each Account Holder's Google Account.

217. Any Account Holder can receive a list of IP addresses Google has associated with them by going to Google Takeout at https://takeout.google.com and clicking to Export and Download their "Google Account" information about their "registration and account activity." These IP addresses are stored in "Google Subscriber Information" along with user names, email addresses, Google account IDs, phone numbers, and "raw user agents."

218. Google's own association of IP address in Account Holders' "subscriber information" illustrates how such information is "personal information."

219. Google sells and shares Account Holder IP addresses with RTB participants.

**2. User-Agent Information**

220. A user-agent is an identifier that identifies the application, operating system, and version of the application and operating system for a specific user making a communication.

221. A user-agent alone may or may not be personal information. However, when used in combination with other identifiers, it is capable of directly or indirectly identifying a specific individual or household. For example, even if a specific IP address is shared by multiple devices on a single network, Google is capable of and does, in fact, associate additional User-Agent information with each IP address that it associates with a Google Account Holder.

222. The Google Takeout Subscriber Information download contains a "raw user-agent" next to every IP address it has associated with a Google Account Holder.

223. User-Agent information is "personal information" under California law when disclosed in connection with an IP address because it is information that is reasonably capable of being associated with or could reasonably be linked, directly or indirectly, with a particular consumer or household."

224. Google's own association of IP address plus User-Agent information in Account Holders' "subscriber information" illustrates how such information is "personal information."

225. Google sells and shares Account Holder User-Agent data with RTB participants.

**3. Device Identifiers**

226. A device identifier is, as the name suggests, a number that identifies a device.

227. Device identifiers are commonly used to identify and track Internet communications of specific users, including Google Account Holders.

228. California law specifically lists "device identifiers" as "unique personal identifiers." CAL. CIV. CODE § 1798.140(x).

229. The current version of the Google Privacy Policy states that Google collects personal information in the form of "identifiers" that include "unique identifiers tied to the browser, application, or device you're using." Ex. 20 at 15. Previous versions of the Google Privacy Policy stated Google "may associate your device identifiers … with your Google Account." Ex. 9 at 2.

230. Any Account Holder can see basic information about specific devices Google associates with their account by visiting https://myaccount.google.com/security.

231. Device identifiers are "personal information" under California law because they are reasonably capable of being associated with and could reasonably be linked, directly or indirectly, with a particular consumer or household.

232. Google's own association of device identifiers with specific Account Holders illustrates how such information is "personal information."

233. Google sells and shares Account Holders' device identifiers with RTB participants.

**4. Geolocation**

234. California law specifically includes "geolocation data" in the definition of "personal information." *See* CAL. CIV. CODE § 1798.140(o)(1)(G).

235. Geolocation is commonly used to identify and track Internet communications of specific users, including Google Account Holders.

236. Google stores specific geolocation information associated with Account Holders in their Google Accounts.

237. In addition to direct association of geolocation to individual consumers and households, geolocation is reasonably capable of being linked, directly or indirectly, with a particular consumer or household.

238. Recent news illustrates the ease with which geolocation data can be linked to specific consumers or households with devastating impacts for personal privacy. On July 20, 2021, an online outfit called *The Pillar* outed a Catholic priest, who had allegedly used the Grindr app to meet men in various U.S. cities while working for the Catholic church. *The Pillar* publicly stated that it was able to out him through "commercially-available records of app signal data obtained by *The Pillar*."[44]

239. Specifically, *The Pillar* explained:

> [A]n analysis of app data signals correlated to [his] mobile device shows the priest also visited gay bars and private residences while using a location-based hookup app in numerous cities from 2018 to 2020, even while traveling on assignment for the U.S. bishops' conference.
>
> According to commercially available records of app signal data obtained by *The Pillar*, a mobile device correlated to [the priest] emitted app data signals from the location-based hookup app Grindr on a nearly-daily basis during parts of 2018, 2019, and 2020 – at both his USCCB office and his USCCB-owned residence, as well as during USCCB meetings and events in other cities. …
>
> On June 20, 2018, … the mobile device correlated to[the priest] emitted hookup app signals at the USCCB residence, and from a street in a residential Washington neighborhood. He traveled to Las Vegas shortly thereafter, data records show.
>
> On June 22, the mobile device correlated to [the priest] emitted signals from Entourage, which bills itself as Las Vegas' 'gay bathhouse.' …
>
> Commercially available app signal data does not identify the names of app users, but instead correlates a unique numerical identifier to each mobile device using particular apps. Signal data … can be analyzed to provide timestamped location data and usage information for each numbered device.
>
> The data obtained and analyzed by *The Pillar* conveys mobile app data signals during two 26-week periods, the first in 2018 and the second in 2019 and 2020. The data was obtained from a data vendor and authenticated by an independent data consulting firm contracted by The Pillar.
>
> *The Pillar* correlated a unique mobile device to [the priest] when it was used consistently from 2018 until at least 2020 from the USCCB staff residence and headquarters, from meetings at which he was in attendance, and was also used on numerous occasions at [his] family lake house, near the residences of [his] family members, and at a Wisconsin apartment in his hometown, at which he himself has been listed as a resident.[45]

---

[44] *See* https://www.pillarcatholic.com/p/pillar-investigates-usccb-gen-sec.

[45] *Id.*

240. This episode illustrates that the dissemination of geolocation data connected to network activity poses drastic privacy consequences for users – regardless of whether the specific content of their Internet communications are sold or shared.

241. In addition, geolocation data is "personal information" under California law because it is reasonably capable of being associated with and could reasonably be linked, directly or indirectly, with a particular consumer or household.

242. Google's ability to associate geolocation with specific Account Holders illustrates how such information is "personal information."

243. Further, the fact that Plaintiffs' counsel was able to convert the geolocation information included in the example of RTB data provided by an RTB participant to specific commercial and residential addresses through the use of publicly available tools further proves that, on its own, such data is "personal information" capable of being linked, directly or indirectly, with a particular consumer or household, even outside of Google's hands.

244. Google sells and shares geolocation with RTB participants.

**5. Cookies and Cookie-Related Identifiers**

245. A cookie is a small text file that a web-server can place on a person's web-browser and computing device when that person's web browser interacts with the website server.

246. Cookie-related identifiers include "beacons, pixel tags, mobile ad identifiers … and other forms of persistent or probabilistic identifiers that can be used to identify a particular consumer or device." CAL. CIV. CODE § 1798.140(x).

247. California law defines "personal information" to expressly include "Internet … activity including but not limited to browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement." CAL. CIV. CODE § 1798.140(o)(1)(F). It further defines "consumer" as a natural person, "however identified, including by any unique identifier" and, in turn, defines a "unique identifier" to expressly include "a persistent identifier that can be used to recognize a consumer, a family, or a device that is linked to a consumer or family, over time and across different services, including but not limited to … cookies, beacons, pixel tags, mobile ad identifiers, … or other forms of persistent or probabilistic

identifiers that can be used to identify a particular consumer or device." *Id.* § 1798.140(g), (x).

248. Cookies and cookie-related identifiers are "personal information" under California law regardless of whether they are precisely the same identifiers used by Google for Account Holders or are instead derived from Google's own identifiers.

249. Cookies and cookie-related identifiers are "personal information" under California law because they are reasonably capable of being associated with and could reasonably be linked, directly or indirectly, with a particular consumer or household.

250. The entire purpose of the RTB system is for Google to share and sell specific consumer data to RTB participants such that the participant can "identify the (unique) user" in deciding how much it will bid for that unique user. Google does this through the sale and sharing of many data points, and also through "cookie matching," whereby participants can "match their cookies with Google's" through a cookie-matching service that "facilitates the creation and maintenance of the association between a bidder's cookie and the Google User ID."

251. Google's own RTB documentation illustrates how cookies and cookie-related identifiers satisfy the California definition of "personal information" that Google incorporates into its contracts with all Account Holders.

252. Google sells and shares cookie and related identifiers with RTB participants.

**6. Browsing History and Information Regarding a Consumer's Interaction with an Internet Website, Application, or Advertisement**

253. California law expressly includes within the definition of "personal information" "Internet or other electronic network activity information, including but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet web site, application, or advertisements." CAL. CIV. CODE § 1798.140(o)(1)(F).

254. Browsing history alone is sufficient to identify a unique consumer.

255. Recently published research using the browsing history of approximately 52,000 Firefox browser users revealed that 99 percent of Internet users were capable of being uniquely

identified or re-identified by their browsing history alone.[46]

256. The researchers found that Google collected web-browsing information on 9,823 of the top 10,000 first party domains.[47]

257. As alleged herein, Google re-directs the contents of each individual's web-browsing history to hundreds of Google RTB participants on a substantial portion of those first-party domains from which Google is collecting web-browsing information.

258. Google's sharing, sale, and dissemination of browsing history and other information regarding consumer interactions with Websites, applications, and advertisements is another form of personal information.

259. The information that Google disseminates about users in the auction process is easily linked to individual users to personally identify them. Google is well aware that auction participants maintain their own data sets and are capable of automatically cross-referencing their own data to auction information so as to identify the individual user. Plaintiffs' experts will show how easy and instantaneous this process is.

**E. Google's Promises Versus Google's Actions**

260. The following chart compares Google's promises with its actions:

| What Google Promises | What Google Does |
|---|---|
| "[W]e never share [personal] information with advertisers, unless you ask us to." *How our business works*, Ex. 5 at 1. | Google shares Account Holders' personal information, including information that is tied to Account Holders' unique identifiers, with Google RTB participants for the purpose of targeted advertising. Google does so without Account Holders' consent. |
| "We don't share information that personally identifies you with advertisers[.]" *Google Privacy Policy*, *e.g.*, Ex. 15 at 5; Ex. 20 at 6. | |
| "We do not share your personal information with companies, organizations, or individuals outside of Google except…[1)] With your consent … [3)] With domain administrators… [3)] For external | |

[46] *See* Sarah Bird, Ilana Segall, & Martin Lopatka, "Replication: Why We Still Can't Browse in Peace: On the Uniqueness and Reidentifiability of Web Browsing Histories." *USENIX Symposium on Usable Privacy and Security (SOUPS) 2020* (Aug. 2020), *available at* https://www.usenix.org/system/files/soups2020-bird.pdf.

[47] *Id.*

| What Google Promises | What Google Does |
|---|---|
| processing … and [4])] For legal reasons[.]" *Google Privacy Policy*, *e.g.*, Ex. 15 at 11-12; Ex. 20 at 11-12. | |
| "[R]emember, we never share any of this personal information with advertisers." *We do not sell your personal information to anyone.*, Ex. 23 at 2. | |
| "We don't sell your personal information to anyone." *How our business works*, Ex. 5 at 1. | |
| "We don't share information that personally identifies you with our advertising partners, such as your name or email, unless you ask us to share it." *Who are Google's Partners?*, Ex. 21 at 2. | While Google may not directly provide Account Holders' names or email, Google does share their unique identifiers, provides cookie matching services to assist in identification of Account Holders, and encourages Google RTB participants to store user lists and hashed keys that enables them to reidentify Account Holders whose names and emails are known to participants. |
| "Without identifying you personally to advertisers or other third parties, we might use data that includes your searches and location, websites and apps that you've used, videos and ads you've seen, and basic information that you've given us, such as your age range and gender." *We do not sell your personal information to anyone.*, Ex. 23 at 1. | |
| "We give advertisers data about their ads' performance, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected and private." *We do not sell your personal information to anyone.*, Ex. 23 at 1. | Google not only fails to protect personal information, but rather directly provides it to Google RTB participants and enables participants to de-anonymize personal information with cookie matching services. |
| "Privacy is personal, which makes it even more vital for companies to give people clear, individual choices around how their data is used." *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, Ex. 25 at 1. | Google does not provide Account Holders with clear individual choices about how their data is used; rather, Google provides misinformation and broken promises about user privacy and fails to disclose that Account Holders' personal information is being sold on Google RTB. |
| "[P]rivacy cannot be a luxury good offered only to people who can afford to buy premium products and services. Privacy must be equally available to everyone in the world." *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, Ex. 25 at 1. | Google does not make "privacy equally available." Instead, it targets its own Account Holders, making privacy unavailable to them by subversively revealing their personal information thousands of times per second to millions of Google RTB participants. Only Google and Google RTB participants, not Account Holders, profit. |

| What Google Promises | What Google Does |
|---|---|
| "To make privacy real, we give you clear, meaningful choices around your data. All while staying true to two unequivocal policies: that Google will never sell any personal information to third parties; and that you get to decide how your information is used." *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, Ex. 25 at 1. | Google does not disclose what it is doing with Account Holders' data and gives Account Holders no choice about whether their personal information is sold at the Google RTB auctions. |
| "Advertisers do not pay us for personal information[.]" *How our business works*, Ex. 5 at 1. | Through Google RTB, advertisers in fact do pay Google for advertising, the value of which is directly tied to the disclosure of Account Holders' personal information. |
| "We never sell your personal information, and give you controls over who has access." *Your privacy is protected by responsible data practices*, Ex. 24 at 2. | Google sells Account Holders' personal information on Google RTB, a process that is invisible to Account Holders and in which their consent is not solicited prior to sale. |
| "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies." *How our business works*, Ex. 5 at 2. | Google reveals Account Holders' personal information in the Google RTB Bid Requests and provides cookie matching tools that enable participants to match Account Holders' personal information with individual profiles the participants already has. |
| "Privacy is core to how we build our products, with rigorous privacy standards guiding every stage of product development. Each product and feature adheres to these privacy standards, which are implemented through comprehensive privacy reviews." *Your privacy is protected by responsible data practices*, Ex. 24 at 4. | Google's core practice is building Account Holder profiles and monetizing those profiles through, among other things, the Google RTB, where Google sells Account Holders' personal information to facilitate targeted advertising, all the while making false promises of privacy to Account Holders. |
| "We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you." *How our business works*, Ex. 5 at 2. | Google targets Account Holders based on their sensitive information, like race, religion, sexual orientation, and health. Google does this by collecting Account Holders' browsing information to determine whether Account Holders fall within certain consumer categories, known as verticals and segments. These consumer categories include sensitive categories related to race, religion, sexual orientation, and health. This information is then shared with Google RTB participants to facilitate targeted advertising based on those sensitive categories. Google RTB participants are then able to bid on the ability to serve ads to Account Holders, including the ability to serve personalized ads based on specific sensitive information. |
| "We don't show you personalized ads based on <u>sensitive categories</u>, such as race, religion, sexual orientation, or health." *Google Privacy Policy*, *e.g.,* Ex. 15 at 5; Ex. 20 at 6. | |
| "We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we <u>require the same from advertisers</u> [hyperlink] that use our services." *Google Privacy Policy, e.g.*, Ex. 15 at 22; Ex. 20 at 30. | |

| What Google Promises | What Google Does |
|---|---|
| "Advertisers can't use sensitive interest categories to target ads to users or to promote advertisers' products or services." *Personalized Advertising*, Ex. 22 at 2. | |
| "Personal hardships: Because we don't want ads to exploit the difficulties or struggles of users, we don't allow categories related to personal hardships." *Personalized Advertising*, Ex. 22 at 2. | Google groups Account Holders into verticals and segments and facilitates targeted advertising based on these verticals and segments, which include those related to personal hardships, like health issues (*e.g.*, depression, eating disorders, infectious diseases, and learning and developmental disabilities), financial hardship (*e.g.*, bankruptcy, debt collection and repossession, short-term loans, and cash), and difficult interpersonal circumstances (*e.g.*, troubled relationships, divorce, and separation). |
| "Identity and belief: Because we want ads to reflect a user's interests rather than more personal interpretations of their fundamental identity, we don't allow categories related to identity and belief, some of which could also be used to stigmatize an individual." *Personalized Advertising*, Ex. 22 at 2. | Google allows advertisers to target messages to Account Holders based on verticals and segments related to identity and belief, including religion (*e.g.*, Judaism, Islam) and identity (*e.g.*, lesbian, gay, bisexual & transgender). |
| "Sexual interests: Because we understand that sexual experiences and interests are inherently private, we don't allow categories related to sexual interests." *Personalized Advertising*, Ex. 22 at 2. | Google allows advertisers to target messages to Account Holders based on verticals and segments related to sexual interests (*e.g.*, sexual enhancement). |
| "The following sensitive interest categories can't be used by advertisers to target ads to users or promote advertisers' products or services":<br>• "Restricted drug terms … [including] Prescription medications and information about prescription medications";<br>• "Personal hardships … [including] health conditions, treatments, procedures, personal failings, struggles, or traumatic personal experiences";<br>• "Personal health content, which includes: [] Physical or mental health conditions, including diseases, sexual health and chronic health conditions, which are health conditions that require | Google allows advertisers to target messages to Account Holders sorted by Google into verticals and segments related to verticals and segments related to the following categories and examples within each:<br><br><u>Prescription medications</u>: Drugs & Medications<br><br><u>Personal Hardships & Personal Health Content</u>: AIDS & HIV; Cancer; Eating Disorders; Genetic Disorders; Infectious Diseases; Neurological Conditions; Learning & Developmental Disabilities; Autism Spectrum Disorders; Obesity; Skin Conditions; Counseling Services; Depression; Fertility; Male Impotence; Sexual Enhancement; Sexually Transmitted Diseases; Drug & Alcohol Treatment; Steroids & Performance Enhancing Drugs; Anxiety & Stress; |

| What Google Promises | What Google Does |
|---|---|
| long-term care or management[; and] Products, services, or procedures to treat or manage chronic health conditions, which includes over-the-counter medications and medical devices";<br>• "Relationships [including] Personal hardships with family, friends, or other interpersonal relationships";<br>• "Sexual orientation";<br>• "Personal race or ethnicity" and<br>• "Personal religious beliefs"<br>*Personalized Advertising*, Ex. 22 at 2-5. | Counseling Services; Drugs & Medications; Troubled Relationships; Divorce & Separation; Bankruptcy; Debt Collection & Repossession; Short-Term Loans & Cash<br><br><u>Sexual Orientation</u>: Lesbian, Gay, Bisexual & Transgender<br><br><u>Race/Ethnicity</u>: African-Americans; Arabs & Middle Easterners; South Asians & Diaspora; Southeast Asians & Pacific Islanders; Eastern Europeans; Native Americans; Jewish Culture; Latinos & Latin-Americans<br><br><u>Religious Beliefs</u>: Buddhism; Christianity; Hinduism; Islam; Judaism |

### F. Google's Improper Sale of Personal Information Is a Serious Invasion of Privacy and Is Highly Offensive

261. Article I, § 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972.

262. The right to privacy in the California Constitution creates a right of action against private entities. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including computer-stored and -generated dossiers and cradle-to-grave profiles on every American.

263. In its public statements, Google pays lip service to the need to protect the privacy of Internet communications. For example, on June 6, 2016, a coalition of technology companies and privacy advocates came together to oppose Congressional efforts to expand government surveillance of online activities through the Senate's Intelligence Authorization Act for Fiscal Year 2017 and Senator Cornyn's proposed amendments to the ECPA.

264. The joint letter, signed by the ACLU, Amnesty International, and others, was also signed by Google. These organizations and companies argued (correctly) that obtaining sensitive

information about Americans' online activities without court oversight was an unacceptable privacy harm because it "would paint an incredibly intimate picture of an individual's life" if it included "browsing history, email metadata, location information, and the exact date and time a person signs in or out of a particular online account."[48]

265. The letter further posited that the proposed online surveillance could "reveal details about a person's political affiliation, medical conditions, religion, substance abuse history, sexual orientation," and even physical movements. The letter concluded that online surveillance raises "civil liberties and human rights concerns."

266. Google has publicly declared that non-consensual electronic surveillance is "dishonest" behavior. For example, Google's Update to its "Enabling Dishonest Behavior Policy" (effective August 11, 2020) restricted advertising for spyware and surveillance technology. The updated policy purports to "prohibit the promotion of products or services that are marketed or targeted with the express purpose of tracking or monitoring another person or their activities without their authorization." Through this amendment, Google explicitly takes the position that nonconsensual surveillance of "browsing history" is a "dishonest behavior."[49]

267. Google has also publicly declared privacy to be a human right. In 2004, in a letter from Google's founders to shareholders in advance of the company's initial public offering (included with the Company's S-1 Registration Statement filed with the SEC), Google declared its goal to "improve the lives of as many people as possible."[50] This letter appears today on Google's website on a page touting the company's commitment to be guided by "internationally recognized human rights standards," including specifically the human rights enumerated in three documents: The Universal Declaration of Human Rights (the "Universal Declaration"); the United Nations Guiding Principles on Business and Human Rights (the "UN Principles"); and the Global Network Initiative Principles (the "GNI Principles").

---

[48] June 6, 2016 Joint Letter. Available at http://www.ala.org/advocacy/sites/ala.org.advocacy/files/content/advleg/federallegislation/06-06-16%20Coalition%20Letter%20to%20Senators%20in%20Opposition%20to%20Expansion%20of%20NSL%20Statute%20on%20ECTRs.pdf

[49] https://support.google.com/adspolicy/answer/9726908?hl=en&ref_topic=29265

[50] https://about.google/intl/ALL_my/human-rights/

268. These three documents establish that privacy is a human right and that a violation of privacy rights is a violation of human rights. The Universal Declaration declares that no one should be subject to arbitrary interference with privacy, and even declares the right to the protection of laws against such interference. Similarly, the UN Principles identify privacy as a human right. Likewise, the GNI Principles have an entire section dedicated to privacy that begins: "Privacy is a human right and guarantor of human dignity. Privacy is important to maintaining personal security, protecting identity and promoting freedom of expression in the digital age."[51]

269. Finally, although not mentioned on Google's website, the United States in 1992 ratified the International Covenant on Civil and Political Rights, a human rights treaty that guarantees privacy rights in Article 17.

**G. Google Faces Numerous Regulatory and Governmental Agency Investigations for RTB Privacy Concerns**

270. The privacy violations due to Google's RTB, as described in the first-filed complaint in this action, have already triggered public outcry and legislative response. On April 1, 2021, in a press conference discussing a proposed Oklahoma state privacy bill, House member Colin Wake highlighted the *Hewitt* complaint and quoted allegations that Google sells "data relating to eating disorders, genetic disorders, Learning & Developmental Disabilities, [reproductive] health, OBGYNs, Cancer, Obesity, Depression, Infertility, Mental Health, Male Impotence and STDs."[52] Similarly, the ICCL's lawsuit in Hamburg noted that "[a] class action lawsuit was filed in the U.S. in May of this year against Google's Real Time Biding system," citing a news article that referenced the *Hewitt* action. Thus, the proprietary work of Plaintiffs and their experts has already augmented and assisted the inquiries of regulators, governmental entities, and civil liberties groups in the United States and abroad.

271. As noted above, international inquiries into Google's RTB are underway. In May 2019, the Irish Data Protection Commission opened an investigation into Google RTB after

[51] https://globalnetworkinitiative.org/gni-principles/

[52] https://www.dropbox.com/sh/kavi6rwiu0knp6s/AAAXIABrKUZsWE8xqpRTWz4Va?dl=0&preview=MediaAvailability.mp4.

receiving complaints from the ICCL and other groups about the disclosure of personal information in Google RTB. Complaints filed with the Irish Data Protection Commission detail the categories of sensitive personal information published in Google's RTB process, including political information, and health categories, such as "Substance abuse," "Diabetes," "Chronic Pain" "Sleep Disorders," "AIDS & HIV," "Incest & Abuse Support," "Brain Tumor," "Incontinence" and "Depression."[53] This investigation remains ongoing.

272. The U.K.'s Information Commissioner's Office ("ICO") has also opened an investigation into the privacy risks associated with RTB exchanges, including Google RTB. In a June 2019 report published by the ICO, the organization noted the following concerns:[54]

> 1. Processing of non-special category data is taking place unlawfully at the point of collection due to the perception that legitimate interests can be used for placing and/or reading a cookie or other technology . . . .
>
> 6. The profiles created about individuals are extremely detailed and are repeatedly shared among hundreds of organisations for any one bid request, all without the individuals' knowledge.
>
> 7. Thousands of organisations are processing billions of bid requests in the UK each week with (at best) inconsistent application of adequate technical and organisational measures to secure the data in transit and at rest, and with little or no consideration as to the requirements of data protection law about international transfers of personal data.
>
> 8. There are similar inconsistencies about the application of data minimisation and retention controls.
>
> 9. Individuals have no guarantees about the security of their personal data within the ecosystem.

273. The ICO recently announced it would be reopening this investigation after

---

[53] *See* TechCrunch, *Ireland's Data Watchdog Slammed for Letting AdTech Carry on "Biggest Breach of All Time,"* available at https://techcrunch.com/2020/09/21/irelands-data-watchdog-slammed-for-letting-adtech-carry-on-biggest-breach-of-all-time/ (last visited May 5, 2021).

[54] *Update Report into AdTech and Real Time Bidding*, Information Commissioner's Office, June 20, 2010, https://ico.org.uk/media/about-the-ico/documents/2615156/adtech-real-time-bidding-report-201906-dl191220.pdf.

temporarily suspending it to respond to the COVID-19 pandemic.[55] In doing so, the ICO stated: "The complex system of RTB can use people's sensitive personal data to serve adverts and requires people's explicit consent, which is not happening right now. . . . Sharing people's data with potentially hundreds of companies, without properly assessing and addressing the risk of these counterparties, also raises questions around the security and retention of this data."[56] The ICO noted that in response to its ongoing investigation, Google "will remove content categories, and improve its process for auditing counterparties."[57] Despite these vague promises, Google has not stopped disclosing users' personal information.

274. The Belgian Data Protection Commission likewise has opened an investigation into privacy risks on RTB exchanges. In October 2020, the Belgium privacy authority issued an internal report focusing on the online ad auctions and identifying as a core problem, how online-ad bidding systems "collect personal data when a user hasn't consented to share it."[58] The report "also took issue with the collection of 'sensitive category' data about users—such as race, sexuality, health status or political leaning—without their consent."[59] This investigation is ongoing.[60]

275. In addition, dozens of complaints have been filed by international civil liberties groups against Google and IAB over privacy abuses arising from real-time bidding. The list of countries where these complaints have been filed with governmental regulators includes: Bulgaria,

---

[55] Simon McDougall, *AdTech - The Reform of Real Time Bidding Has Started and Will Continue*, Jan. 17, 2020, https://ico.org.uk/about-the-ico/news-and-events/blog-adtech-the-reform-of-real-time-bidding-has-started/.

[56] ICO Statement, *AdTech Investigation Resumes*, available at https://ico.org.uk/about-the-ico/news-and-events/news-and-blogs/2021/01/adtech-investigation-resumes/ (last visited May 5, 2021).

[57] McDougall, *supra* n.54.

[58] Patience Haggin and Sam Schechner, *European Regulator Turns Up Heat on Ad Tactics Used by Google and Rivals*, WSJ (Oct. 16, 2020), https://www.wsj.com/articles/european-regulator-turns-up-heat-on-ad-tactics-used-by-google-and-rivals-11602872300.

[59] *Id.*

[60] Natasha Lomas, *Google and IAB AdTech Targeted with More RTB Privacy Complaints*, TechCrunch, Dec. 10, 2020, https://techcrunch.com/2020/12/10/google-and-iab-adtech-targeted-in-latest-batch-of-rtb-privacy-complaints/.

Croatia, Cyprus, the Czech Republic, Estonia, France, Germany, Greece, Hungary, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, and Spain.[61] These lawsuits are ongoing.

276. For example, earlier this year, the ICCL filed a lawsuit in Hamburg, Germany, seeking to challenge the industry rules relating to RTB. The lawsuit alleges that RTB "***causes the world's biggest data breach***" (emphasis added) and takes aim at Google, Facebook, Amazon, Twitter, Verizon, AT&T, and the entire online advertising and tracking industry.[62]

277. In the United States, in a July 2020 letter, Senator Wyden and other members of Congress urged the FTC to examine the privacy dangers of RTB exchanges. The letter explains that "hundreds of participants in these auctions receive sensitive information about the potential recipient of the ad — device identifiers and cookies, location data, IP addresses, and unique demographic and biometric information such as age and gender. Hundreds of potential bidders receive this information, even though only one — the auction winner — will use it to deliver an advertisement." The Congressional letter further cites to Mobilewalla as an example, explaining how Mobilewalla used Bidstream data, location, and inferred race data to profile participants in recent Black Lives Matter protests.[63]

278. This growing list of governmental entities and civil liberties groups, at home and abroad, that have opened investigations into the ad exchange process highlights the threat Account Holders face of their personal information being collected through Google RTB.

### H. Google Has Been Unjustly Enriched

279. Google's $1 trillion business was built entirely on monetizing the value of Internet users' personal information.

280. The value of Plaintiffs' personal information to Google is demonstrated in part by Google's advertisement revenue during the relevant time period. Google reported $146.9 billion in

---

[61] https://privacyinternational.org/examples/4349/cso-coalition-files-complaints-against-google-and-iab-member-companies-six-eu-states; https://brave.com/rtb-updates/.

[62] *See* Irish Council for Civil Liberties (June 15, 2021), ICCL Lawsuit Takes Aim at Google, Facebook, Amazon, Twitter and the Entire Online Advertising Industry, *available at* https://www.iccl.ie/news/press-announcement-rtb-lawsuit/.

[63] Wyden FTC Letter.

advertising revenue in 2020, $134.8 billion in 2019, $116.3 billion in 2018, $95.4 billion in 2017, and $79.4 billion in 2016.[64] This translates to 83% of Google's total revenues in 2019, 85% in 2018, 86% in 2017, and 88% in 2016.[65] While not all of that revenue is unjustly derived from the specific information collected by Google here, some portion of it is. Shown graphically below, Google's annual advertising revenue has increased over five hundred percent since 2008.[66]

## Advertising revenue of Google from 2001 to 2020

*(in billion U.S. dollars)*




[64] *2018 Annual Report*, Alphabet Inc. (Feb. 4, 2019), https://www.sec.gov/Archives/edgar/data/1652044/000165204419000004/goog10-kq42018.htm (hereinafter "2018 Annual Report").

[65] 2019 Annual Report, Alphabet Inc. (Feb. 3, 2020), https://www.sec.gov/Archives/edgar/data/1652044/000165204420000008/goog10-k2019.htm (hereinafter "2019 Annual Report"); 2018 Annual Report.

[66] J. Clement, *Advertising revenue of Google from 2001 to 2019*, statista (Feb. 5, 2020), https://www.statista.com/statistics/266249/advertising-revenue-of-google/.

281. The collection of Account Holders' personal information has facilitated the revenues of Google's Network Members' properties, which include ads placed through AdMob, AdSense, DoubleClick, and AdExchange. Google reported the following revenues from Google Network Members' properties: $21.5 billion in 2019, $20 billion in 2018, $17.6 billion in 2017, and $15.6 billion in 2016.[67] Google reports that "strength in both AdMob and AdManager" primarily led to the $2.4 billion increase in Google Network Members' properties revenues from 2017 to 2018.[68]

282. The fact of the advertising auctions themselves confirms that the personal information Google sells to RTB participants has economic value. A recent article published by Politico discussed one study that found that Google makes as much as 42 cents for each dollar spent on advertising on its platform.[69]

[67] 2019 Annual Report; 2018 Annual Report.

[68] 2019 Annual Report.

[69] Leah Nylen, *Google Dominates Online Ads – And DOJ May Be Ready to Pounce*, Politico (June 4, 2020), https://www.politico.com/news/2020/06/04/google-doj-ads-302576.

## Where does the money go?

Google could collect as much as 42 cents of every dollar spent on online display ads through the advertising technology it controls. A first-of-its kind study by the British advertising group ISBA and accounting firm PwC tracked £100 million — roughly $125 million — spent on display ads by 15 major brands like Disney and Pepsi, breaking down the role of tech providers like Google, Amazon and AT&T in the stages of buying and placing ads. The study focused on the United Kingdom's estimated $7 billion market for digital ads sold through exchanges but has implications for the roughly $60 billion U.S. market.




SOURCE: ISBA Programmatic Supply Chain Transparency Study, May 2020

283. A 2019 study co-authored by Robert J. Shapiro and Siddartha Aneja, titled *Who Owns America's Personal Information and What Is It Worth?*, calculated the value of Americans' personal information gathered and used by Google: $15.3 billion in 2016, $18.1 billion in 2017, and $21.5 billion in 2018.[70]

[70] Robert Shapiro and Siddhartha Aneja, *Who Owns Americans' Personal Information and What Is It Worth?*, Future Majority (April 2019), *available at* http://www.sonecon.com/docs/studies/Report_on_the_Value_of_Peoples_Personal_Data-Shapiro-Aneja-Future_Majority-March_2019.pdf. Shapiro is a Senior Policy Fellow at the Georgetown University McDonough School of Business and, among other past positions, served as the U.S. Under-Secretary of Commerce for Economic Affairs under President Clinton.

**Table 1. The Value of Americans' Personal Information Gathered and Used by Major Internet Platforms, Data Brokers, Credit Card and Healthcare Data Companies 2016-2018 ($ billions)**

| Platform | 2016 | 2017 | 2018 | Increase |
|---|---|---|---|---|
| **Major Internet Platforms** | | | | |
| **Google** | $15,303.6 | $18,132.4 | $21,453.5 | 40.2% |
| **Facebook** | $6,432.4 | $9,344.4 | $11,882.0 | 84.7% |
| **Amazon** | $582.4 | $920.4 | $2,397.2 | 311.6% |
| **Microsoft** | $1,736.8 | $1,944.8 | $2,339.4 | 34.7% |
| **Oath (Verizon)** | $1,830.4 | $1,872.0 | $1,917.8 | 4.8% |
| **Twitter** | $707.2 | $608.4 | $728.2 | 2.9% |
| **Other** | $10,951.2 | $14,180.4 | $17,045.7 | 55.7% |
| **Subtotal** | **$37,544.0** | **$47,002.8** | **$57,763.9** | **53.9%** |
| **Major Data Brokers** | | | | |
| **Axciom** | $804.0 | $824.6 | $1,053.0 | 31.0% |
| **CoreLogic** | $1,755.9 | $1,664.7 | $1,650.5 | - 6.0% |
| **Epsilon** | $2,062.4 | $2,174.3 | $2,080.2 | 0.08% |
| **Equifax** | $1,938.7 | $2,026.9 | $2,066.4 | 6.6% |
| **Experian** | $2,412.5 | $2,597.5 | $3,070.7 | 27.3% |
| **FICO** | $572.9 | $596.6 | $681.4 | 18.9% |
| **Harte-Hanks** | $348.6 | $330.9 | $249.8 | 28.3% |
| **RELX** | $1,910.3 | $1,973.6 | $2,061.9 | 7.9% |
| **Transunion** | $1,452.2 | $1,636.2 | $1,934.3 | 33.2% |
| **Subtotal** | **$13,257.6** | **$13,825.3** | **$14,848.2** | **12.0%** |
| **Credit Card Firms** | | | | |
| **MasterCard** | $1,010.1 | $1,185.4 | $1,418.1 | 40.4% |
| **American Express** | $238.2 | $279.6 | $334.5 | 40.4% |
| **Subtotal** | **$1,248.3** | **$1,465.0** | **$1,752.6** | **40.4%** |
| **Healthcare Data Firm** | | | | |
| **IQVIA** | $443.4 | $1,478.1 | $1,681.5 | 379.2% |
| **TOTAL** | **$52,493.3** | **$63,771.2** | **$76,046.2** | **44.9%** |

284. Shapiro and Aneja further predicted that Americans' personal information gathered and used by Google would be worth $30.1 billion in 2020, and $42.2 billion in 2022.

**Table 2. Projected Value of Americans' Personal Information Gathered and Used by Major Internet Platforms, Data Brokers, Credit Card and Healthcare Data Companies 2020 and 2022 ($ billions)**

| Platform | 2018 | 2020 | 2022 |
|---|---|---|---|
| **Major Internet Platforms** | | | |
| **Google** | $21,453.5 | $30,077.2 | $42,167.3 |
| **Facebook** | $11,882.0 | $21,948.6 | $40,543.7 |
| **Amazon** | $2,397.2 | $9,867.1 | $40,613.5 |
| **Microsoft** | $2,339.4 | $3,151.9 | $4,246.6 |
| **Oath (Verizon)** | $1,917.8 | $2,010.4 | $2,107.5 |
| **Twitter** | $728.2 | $749.7 | $771.7 |
| **Other** | $17,045.7 | $26,531.7 | $41,296.8 |
| **Subtotal** | **$57,763.9** | **$94,336.5** | **$171,747.1** |
| **Major Data Brokers** | | | |
| **Axciom** | $1,053.0 | $1,379.1 | $1,806.2 |
| **CoreLogic** | $1,650.5 | $1,551.4 | $1,458.3 |
| **Epsilon** | $2,080.2 | $2,098.2 | $2,116.3 |
| **Equifax** | $2,066.4 | $2,202.5 | $2,347.6 |
| **Experian** | $3,070.7 | $3,908.5 | $4,974.8 |
| **FICO** | $681.4 | $810.5 | $963.9 |
| **Harte-Hanks** | $249.8 | $179.0 | $128.3 |
| **RELX** | $2,061.9 | $2,225.5 | $2,402.2 |
| **Transunion** | $1,934.3 | $2,576.5 | $3,431.8 |
| **Subtotal** | **$14,848.2** | **$16,933.1** | **$19,629.3** |
| **Credit Card Firms** | | | |
| **MasterCard** | $1,418.1 | $1,991.0 | $2,795.3 |
| **American Express** | $334.5 | $469.6 | $659.3 |
| **Subtotal** | **$1,752.6** | **$2,460.6** | **$3,454.5** |
| **Healthcare Data Firm** | | | |
| **IQVIA** | $1,681.5 | $2,177.6 | $2,820.1 |
| **TOTAL** | **$76,046.2** | **$115,907.8** | **$197,651.1** |

285. The Organization for Economic Cooperation and Development ("OECD"), an intergovernmental economic organization, has issued numerous publications discussing how to value data such as that which is the subject matter of this complaint. For example, as early as 2013, the OECD published a paper titled "*Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*."[71] More recently, the OECD issued a study

[71] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en.

recognizing that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[72]

286. The Google RTB relies on the disclosure of sufficiently detailed personal information so that bidders can be confident their ads are purchased for the right Account Holders, so that the ads are likelier to be effective. Without personal information, Google RTB would not provide sufficient information for bidders to make an informed bid, and prices for the bids would be lower.

287. There is also a market incentive for companies to participate in an RTB system solely for the purpose of compiling consumer data for further sale, even if those companies have no intention of placing ads. This is because mere participation in an RTB enables participants to receive Account Holders' personal information even if they never prevail on, or even submit, a bid. Participants can thus harvest information through an RTB and can resell it to make money.

288. In her book *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshana Zuboff notes that Google's early success in monetizing account holder data prompted large corporations like Verizon, AT&T, and Comcast to transform their business models from fee for services provided to customers to monetizing their users' data — including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[73] In essence, Professor Zuboff explains that revenue from user data pervades every economic transaction in the modern economy. These revenues reveal that there is a market for this data. Data generated by users on Google's platform has economic value.

289. While the economic value of user data was discovered and leveraged by corporations who pioneered the methods of its extraction, analysis, and use, user data can also have economic value to users themselves. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Computer and Mobile

[72] *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en.

[73] Shoshana Zuboff, The Age of Surveillance Capitalism 166 (2019).

Panel pays certain users for their data.[74] Facebook has launched apps that pay users for their data directly.[75] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[76]

290. Indeed, Google once paid users to track their online behaviors:

> Google is building an opt-in user panel that will track and analyze people's online behaviors via an extension to its Chrome browser, called Screenwise. Users that install the plug-in will have the websites they visit and the ways in which they interact with them recorded, and they will then be paid with Amazon gift cards worth up to $25 a year in return.[77]

291. There are other markets for users' personal information. One study by content marketing agency Fractl has found that an individual's online identity, including hacked financial accounts, can be sold for $1,200 on the dark web.[78] These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other users' content, the implication is that there is a market for users to sell their own data.

292. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "*The Economics of Privacy*," published in the *Journal of Economic Literature*:

> Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as

---

[74] Kevin Mercadante, *Ten Apps for Selling Your Data for Cash*, Best Wallet Hacks (Mar. 16, 2021), https://wallethacks.com/apps-for-selling-your-data/.

[75] Saheli Roy Choudhury and Ryan Browne, *Facebook Pays Teens to Install an App that Could Collect All Kinds of Data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/Facebook-paying-users-to-install-app-to-collect-data-techcrunch.html.

[76] Jacob Kastrenakes, *A New TikTok Clone Hit the Top of the App Store by Paying Users to Watch Videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktok-clone-pay-watch-videos-kuaishou-bytedance-rival.

[77] Jack Marshall, *Google Pays Users for Browsing Data*, DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/.

[78] Maria LaMagna, *The Sad Truth About How Much Your Facebook Data Is Worth on the Dark Web*, MarketWatch (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-Google-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20.

> business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties.[79]

293. While the exact value of users' personal information in this action will be a matter for expert determination, it is clear that Google has been unjustly enriched by the practices described herein.

**I. Plaintiffs' Personal Information Is Property Under California Law**

294. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications.

295. Given that California courts have recognized the lost "property value" of personal information, Plaintiffs and other Account Holders have a property interest in their own data and personal information.

296. Accordingly, personal information, including websites visited by Plaintiffs and Account Holders, is property under California law.

297. Property includes intangible data, including the very specific data at issue here that Google is selling despite promising Plaintiffs and Account Holders it would not do so — personal information including Internet communications history and personally identifiable information.

298. Recent changes in California law have confirmed that individuals have a property interest in their information. In 2018, California enacted the California Consumer Privacy Act ("CCPA"). Among other things, the CCPA permits businesses to purchase consumer information from consumers themselves (CAL. CIV. CODE § 1798.125(b)(1)) and permits businesses to assess and appraise – *i.e.*, to place a monetary value on – consumer data (*id.* § 1798.125(a)(2)).

299. Just last year, Californians passed Proposition 24, the California Privacy Rights Act ("CPRA"). In the California General Election Voter Guide, proponents of Proposition 24 made their case for the law by specifically noting that companies use personal information such as a user's location: "Giant corporations make billions buying and selling our personal information –

---

[79] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 2, at 444 (June 2016), *available at* https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf.

apps, phones, and cars sell your location constantly."[80] Among other things, the passage of the CPRA foreclosed the ability of companies like Google to evade the CCPA by contending that they were "sharing" — instead of "selling" — users' personal information. Specifically, the CPRA clarifies that the provisions protecting users' data apply irrespective of whether the company defines its activities as "selling" or "sharing" data. CPRA § 9(a); *see id.* § 4(d)(2) (providing that "service providers" have the same data protection obligations as contractors and third parties).

300. Taking Plaintiffs' and Account Holders' personal information without authorization is larceny under California law regardless of whether and to what extent Google monetized the data, and Plaintiffs and Account Holders have a right to disgorgement and/or restitution damages for the value of the stolen data.

301. Plaintiffs and Account Holders have also suffered benefit of the bargain damages, in that Google shared and sold more data than the parties agreed would be permitted. Those benefit of the bargain damages also include, but are not limited to, (i) loss of the promised benefits of their Google experience; (ii) out-of-pocket costs; and (iii) loss of control over property which has marketable value.

302. In addition, when Plaintiffs and other Class members became Account Holders, they gained access to Google's various services in exchange for agreeing to Terms of Service that Google drafted. Those terms assured them that Google would not share or sell their personal information without authorization. Now that Google has sold the data without authorization, Plaintiffs and Account Holders are entitled to disgorgement of all such ill-gotten gains.

303. Data brokers and online marketers have developed sophisticated schemes for assessing the value of certain kinds of data, as discussed above. Experts in the field have identified specific values to assign to certain kinds of activity.

304. While Plaintiffs and Account Holders largely knew that Google generates revenue from business by selling advertising directed at them, it was a material term of the bargain that Plaintiffs' and Account Holders' personal information would not be shared by Google with third parties.

[80] California General Election Voter Guide, Proposition 24.

305. Google did not honor the terms of this bargain.

306. When Google shared and sold Plaintiffs' and Account Holders' personal information, it received direct benefits of payments from those authorized bidders that paid for advertisements based on the personal information.

307. As Google shared and sold Plaintiffs' and Account Holders' personal information beyond that to which Plaintiffs and Account Holders had agreed, Plaintiffs and Account Holders were denied the benefit of a Google experience where they were promised the right to determine the terms and scope of their content and personal information sharing and sale. Thus, through Google's sharing of Plaintiffs' and Account Holders' personal information with hundreds of different third parties, Plaintiffs and Account Holders lost benefits.

308. In order to preserve their privacy, Plaintiffs who now understand at least some of Google's violations—and there remains much to be revealed about Google's actual activities—are presented with the choice of: (i) reducing or ending their participation with Google; or (ii) knowingly accepting less privacy than they were promised. Each of these options deprives Plaintiffs and Account Holders of the remaining benefits of their original bargain. There is no option which recovers it. None of it recaptures the data taken in violation of Google's promises.

309. Further, Plaintiffs and Account Holders were denied the benefit of knowledge that their personal information was being shared by Google. Therefore, they were unable to mitigate harms they incurred because of Google's impermissible sharing and sale of their personal information to hundreds of third parties. That is, Google's lack of transparency prevented and still prevents Plaintiffs' and Account Holders' ability to mitigate.

310. Google knew that it was sharing and selling Plaintiffs' and Account Holders' personal information in violation of its express promises. Yet, Google failed to warn Plaintiffs and Account Holders so that they could take steps to attempt to avoid exposing their personal information.

311. Google also knew that it was not possible for Plaintiffs and Account Holders to use Google without Google sharing or selling their personal information.

312. Google avoided costs it should have incurred because of its own actions—

particularly the loss of user engagement which would have resulted from transparent disclosure of Google's actions—and transferred those costs to Plaintiffs and Account Holders. Warning users would have chilled Internet engagement as well as discouraged potential new users from joining.

313. Google was thus not only able to evade or defer these costs but to continue to accrue value for the Company and to further benefit from the delay due to the time value of money. Google has thus transferred all the costs imposed by the unauthorized disclosure of users' content and personal information onto Plaintiffs and Account Holders. Google increased the cost to Plaintiffs and Account Holders of mitigating such unauthorized disclosures by failing to notify them that their personal information had been disclosed so that they could take steps to minimize their exposure on the browser.

314. In addition, Plaintiffs and Account Holders have also suffered from the diminished loss of use of their own personal information, property which has both personal and economic value to them.

315. Plaintiffs' and Account Holders' personal information has value. First, there is transactional, or barter, value to user content and personal information. Indeed, Google has sold the data to other companies – all the while promising users that it would not do so.

316. Second, Plaintiffs' and Account Holders' property, which has economic value, was taken from them without their consent and in contradiction of Google's express promise not to share or sell it to others. There is a market for this data, and it has at minimum a value greater than zero.

317. Plaintiffs and Account Holders were harmed when Google took their property under false pretenses and exerted exclusive control over it, sharing it with and selling it to others without Plaintiffs' and Account Holders' knowledge or authorization.

### J. Plaintiffs and Account Holders' Privacy Expectations and Desire to Control the Dissemination of Their Own Data Are Reasonable and Market-Tested

318. Public polling on Internet tracking has consistently revealed that the overwhelming majority of Americans – 93% – believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of

what information is collected about [them]."[81]

319. Google has conducted its own research on the topic and understands that consumers are more likely to trust an Internet company when they believe the company has told them everything about its business practices and when the consumers believe they have control over how the Internet company uses their information.

320. In 2016, Google researcher Martin Ortlieb explained the following in a published research paper titled "*Sensitivity of personal data items in different online contexts*":[82]

a. "[I]nternet users are reluctant to share personal data items if it is not consciously perceived to be necessary to the primary function of the service;"

b. If the outcome of their Internet activity "can be achieved by sharing only the mandatory data required for that interaction, they do not want to share more."

c. For search providers, like Google, "users do not see a reason, or reasons, for sharing personal data items with a search provider as readily as with social networks and online retailers."

d. "In general, Internet users prefer to keep their online engagement separate – or at least separable – to their real world identity. In other words, they want to keep their personal identity and their virtual identities as disconnected as possible."

e. "Providing re-assurances on the security and secondary use of personal data can help allay these fears."

f. "[A]llowing users control over their digital identity will be key to engaging them at a deeper level."

g. "Data collected passively – which we have called internet behavior and account linkage in this word – are regarded as highly sensitive in all context scenarios."

h. "[I]f online service providers are collecting data passively they have to be aware that users of their service will consider such data sensitive as privacy concerns become more of a conscious consideration."

i. "The biggest factor reducing the level of data sensitivity in each context scenario is trust."

j. "Trust, when it comes to sharing personal data items, can be generated

---

[81] https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/

[82] Martin Ortlieb and Ryan Garner, *Sensitivity of Personal Data Items in Different Online Contexts*, De Gruyter Oldenbourg (June 3, 2016) *available at* https://www.degruyter.com/document/doi/10.1515/itit-2016-0016/html (last visited Feb. 1, 2021).

> through positive outcomes (relevant with clear benefits), transparency (no surprises through clear communication), and control (allowing the user to have a say in how and by whom their data is used)."

321. In another paper, Google researchers explained:[83]

> In order to increase users' comfort, . . . first-party companies should adopt more comprehensive communication strategies based on a greater transparency (i.e., what and how data is used or shared), provide more control over the data access to users (e.g., through intuitive settings and an opt-in approach) and clarify the extent of data anonymization before it is being shared.

322. In yet another paper, Google researchers explained:[84]

a. Previous research "has shown that people are more likely to share information if they feel that they have overview knowledge of personal data and are able to act on data controls."

b. "If trust is established through such means, users are ready to share more online and vice versa."

c. "The simple display of all personal data and eventual behavioral traces available can be an overwhelming and anxiety producing experience for users."

d. "Essentially, no one likes to be out of control, so as soon as this becomes apparent or is perceived, users will either execute control or go to places where they have these options."

e. "Recent research also shows that technologies that make individuals feel more in control over the release of personal information may have the unintended consequence of eliciting greater disclosure of sensitive information."

f. "The concept of trust is an extensively studied concept. . . . [T]rust is a social mechanism for reducing complexity. Transposing this to the world of products we could argue that the cumulative experience with a product or brand leads to confidence. In the realm of online services this could mean confidence in a company's practices such as never selling personal data to any third party."

323. Google's research into the value of trust highlights its knowledge of the importance of deceiving Account Holders by giving them the illusion of safety and control over their own data.

---

[83] Igor Bilogrevic and Martin Ortlieb, *"If You Put All The Pieces Together…" – Attitudes Towards Data Combination and Sharing Across Services and Companies*, CHI Conference on Human Factors in Computing Systems (May 2016), *available at* https://dl.acm.org/doi/pdf/10.1145/2858036.2858432 (last visited Feb. 1, 2021).

[84] Martin Ortlieb, et al., *Trust, Transparency & Control in Inferred User Interest Models*, CHI Extended Abstracts on Human Factors in Computing Systems (April 2014).

Google's privacy disclosures reflect this market research by providing Account Holders information to put them at ease. But, as alleged herein, the privacy disclosures are contradicted by Google's actual practices.

**K. Fraudulent Concealment and Tolling**

324. All applicable statutes of limitation have been tolled by Google's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

325. Plaintiffs and Account Holders were not informed anywhere in the Terms of Service that Google's advertising services would disclose their personal information; that Google has used their personal information to associate them into verticals and segments that it discloses in the RTB bidding process and/or makes available to participants in that process; that Google enables participants to re-identify Plaintiffs and Account Holders by saving and storing keys that reassociate Plaintiffs' and Account Holders' unique identifiers across platforms and devices; or that Google provides Google RTB participants with cookies that enable them to match information provided by Google during the RTB bidding process with information the participants already have on individuals, including their names and email addresses.

326. Google chooses not to disclose this information precisely because doing so might chill user engagement.

327. Google continues to conceal this information.

328. An average consumer could not reasonably be expected to know or understand how Google is using their data. The developer pages cited herein, while available on the web, are not easily understandable to the average person, and even they do not fully reveal the extent of Google's actions. Indeed, Plaintiffs' counsel had to retain experts to begin to understand Google's practices at issue in this complaint.

329. Despite reasonable diligence on their part, Plaintiffs remained ignorant of the factual bases for their claims for relief. Google's withholding of material facts concealed the claims alleged herein and tolled all applicable statutes of limitation.

## V. CLASS ACTION ALLEGATIONS

330. This is a class action pursuant to Rule 23(a), (b)(2), and (b)(3) (or, alternatively, 23(c)(4)) of the Federal Rules of Civil Procedure on behalf of a Class of all persons residing in the United States with a Google Account who used the Internet on or after Google began using RTB in a manner that disclosed Account Holders' personal information.

331. This action is also brought on behalf of the following two Subclasses:

a. Subclass A: All Google account holders who use the Google Chrome browser; and

b. Subclass B: All Google account holders who use Google Chrome, Android operating system, or apps that incorporate the Google software development kit (SDK).

332. Excluded from the Class and the Subclasses are the Court, Google and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

333. The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.

334. Common questions of law and fact exist as to all members of the Class and the Subclasses and predominate over any questions affecting solely individual members of the Class and the Subclasses. The questions of law and fact common to the Class include:

a. Whether Google promised not to share personal information with others;

b. Whether Google promised not to sell personal information to others;

c. Whether Google shared Account Holder personal information with others;

d. Whether Google sold Account Holder personal information to others;

e. Whether Google was authorized to disclose Account Holder personal information to others;

f. Whether Google was authorized to sell Account Holder personal information to others;

g. Whether Google breached its contract with Account Holders;

h. Whether Account Holders' Personal Information was improperly sold by

Google;

i. Whether Google was unjustly enriched by the unauthorized sales of Account Holders' personal information;

j. Whether Google's actions would be highly offensive to a reasonable person;

k. Whether Google's actions breached the duty of good faith and fair dealing;

l. Whether Google's actions constitute an intrusion upon seclusion;

m. Whether Google's actions constitute publication of private information;

n. Whether Google's actions violated the duty of confidence;

o. Whether Google's actions violated the California Unfair Competition Law;

p. Whether Google's actions violated Article I, Section 1 of the California Constitution;

q. Whether Google's actions violated the California Invasion of Privacy Act;

r. Whether Google's actions violated the Electronic Communications Privacy Act;

s. Whether Google's actions violated the Video Privacy Protection Act; and

t. Whether and the extent to which injunctive relief is appropriate.

335. Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Google's wrongful conduct in violation of federal and California law as complained of herein.

336. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action litigation. Plaintiffs have no interests that conflict with or are otherwise antagonistic to the interests of the other Class members.

337. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, as the damages individual Class and Subclass members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

338. There will be no difficulty in management of this action as a class action.

## VI. COUNTS

### COUNT ONE: BREACH OF CONTRACT

339. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

340. Google's relationship with its account holders is governed by the Google Terms of Service.

341. Since March 31, 2020, the Google Terms of Service incorporated by reference the document titled "How our business works."

342. Through these documents, Google tells account holders:[85]

a. "We don't sell your personal information to anyone."

b. "[W]e never sell your personal information to anyone[.]"

c. "Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers, unless you ask us to [hyperlink]." *Id.*

d. "We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you."

e. "We share reports with our advertisers . . . but we do so without revealing any of your personal information."

f. "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies [hyperlink]."

g. "When you use our products you trust us with your personal information. That's why we never sell your personal information."

343. Since at least May 25, 2018, the Google Privacy Policy has also told account holders:

a. "We don't share information that personally identifies you with advertisers[.]" *E.g.*, Ex. 12 at 5; Ex. 15 at 5.

b. "We don't show you personalized ads based on sensitive categories [hyperlink], such as race, religion, sexual orientation, or health." *E.g.*, Ex. 12 at 5; Ex. 15 at 5.

c. Google's Privacy Policy includes a definition of "sensitive categories" that promises: "We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers [hyperlink] that use our services." *E.g.*, Ex. 12 at

[85] Ex. 5 at 1-2.

21; Ex. 15 at 22.

344. Moreover, since at least March 1, 2012, the Privacy Policy has promised, "We do not share your personal information with companies, organizations, or individuals outside of Google[.]" *E.g.*, Ex. 15 at 11. The Privacy Policy identifies four exceptions to this promise, none of which applies to the allegations herein.[86]

345. Prior to May 2018, Account Holders who created a Google Account were required to agree to both the Terms of Service and the Privacy Policy.

346. From May 2018 to March 31, 2020, while Account Holders were required to agree to only the Terms of Service, the Google Account creation process included a link to the Privacy Policy as a guide to how Google would "process your information."

347. The Terms of Service expressly adopt California substantive law, including California's definition of personal information.

348. Plaintiffs and Class Members accepted Google's offer, have fulfilled their obligations under the contract, and are not in breach of contract.

349. Google has breached and continues to breach its contractual promise to maintain the privacy of Account Holders' personal information by selling and sharing Plaintiffs' and Class Members' personal information through Google RTB.

350. As a result of Google's breach of its contractual obligations, Google was able to obtain the personal property of Plaintiffs and Class Members, earn unjust profits, and cause privacy injury and other consequential damages.

351. Plaintiffs and Class Members did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of certain personal information they agreed to share. As alleged above, this personal information has ascertainable value to be proven at trial.

352. As a result of Google's breach of its contractual promises, Plaintiffs and Class

[86] The four exceptions in Google's Privacy Policy state that Google may share personal information with companies, organizations, and individuals outside Google: (1) with the Account Holder's consent; (2) with domain administrators; (3) for external processing; and (4) for legal reasons. *See, e.g.*, Ex. 15 at 11-12.

Members are entitled to recover benefit of the bargain damages, unjust enrichment, and nominal damages.

**COUNT TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

353. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

354. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

355. In dealings between Google, Plaintiffs and Class Members, Google is invested with discretionary power affecting the rights of its Account Holders.

356. The terms of Google's contract with Account Holders purport to respect and protect Account Holders' privacy and expressly promise not to sell or share their personal information. Google not only violated these contractual promises, it frustrated the purpose of those terms by specifically and repeatedly selling and sharing Account Holders' data through its RTB process.

357. Moreover, Google made statements concerning the purported privacy of Account Holder data outside of the specific confines of the contracts it drafted and required Account Holders to enter. By explicitly violating these extra-contractual terms and thereby acting in bad faith, Google violated the implied covenant of good faith and fair dealing.

358. On the "How our business works" webpage, Google promises, "[W]hen you use our products you trust us with your personal information. That's why we never sell your personal information and why we give you powerful privacy controls." Ex. 5 at 2.

359. On Google's "Who are Google's Partners" webpage,

a. Google states: "We don't share information that personally identifies you with our advertising partners, such as your name or email, unless you ask us to share it." Ex. 21 at 2.

b. Google identifies seven "partners" that it permits to "collect or receive non-personally identifiable information about your browser or device when you use Google sites and apps," without disclosing the hundreds of auction participants with whom it shares personal information, including highly-sensitive personal information. *Id.* at 1.

360. On Google's "Personalized Advertising" webpage, Google states:

a. "Advertisers can't use sensitive interest categories to target ads to users or to promote advertisers' products or services." Ex. 22 at 2.

b. "Personal hardships: Because we don't want ads to exploit the difficulties or struggles of users, we don't allow categories related to personal hardships." *Id.*

c. "Identity and belief: Because we want ads to reflect a user's interests rather than more personal interpretations of their fundamental identity, we don't allow categories related to identity and belief, some of which could also be used to stigmatize an individual." *Id.*

d. "Sexual interests: Because we understand that sexual experiences and interests are inherently private, we don't allow categories related to sexual interests." *Id.*

361. On the same webpage, under the header "Prohibited Categories," Google states: "The following sensitive interest categories can't be used by advertisers to target ads to users or to promote advertisers' products or services" (*Id.* at 2):

a. Restricted drug terms – "Prescription medications and information about prescription medications, unless the medication and any listed ingredients are only intended for animal use and are not prone to human abuse or other misuse." *Id.* at 3.

b. "Personal hardships – We understand that users don't want to see ads that exploit their personal struggles, difficulties, and hardships, so we don't allow personalized advertising based on these hardships. Such personal hardships include health conditions, treatments, procedures, personal failings, struggles, or traumatic personal experiences. You also can't impose negativity on the user." *Id.*

c. "Health in personalized advertising [including] Physical or mental health conditions, including diseases, sexual health, and chronic health conditions, which are health conditions that require long-term care or management[;] products, services, or procedures to treat or manage chronic health conditions, which includes over-the-counter medications and medical devices[;] any health issues associated with intimate body parts or functions, which includes genital, bowel, or urinary health[;] invasive medical procedures, which includes cosmetic surgery[;] Disabilities, even when content is oriented toward the user's primary caretaker. Examples [include] Treatments for chronic health conditions like diabetes or arthritis, treatments for sexually transmitted diseases, counseling services for mental health issues like depression or anxiety, medical devices for sleep apnea like CPAP machines, overt-the-counter medications for yeast infections, [and] information about how to support your autistic child." *Id.*

d. "Relationships in personalized advertising [including] Personal hardships with family, friends, or other interpersonal relationships[.] Examples [include] divorce services, books about coping with divorce, bereavement products or services, family counseling services[.]" *Id.* at 4.

e. "Sexual orientation in personalized advertising [including] lesbian, gay,

bisexual, questioning, or heterosexual orientation[.] Examples [include] information about revealing your homosexuality, gay dating, gay travel, information about bisexuality." *Id.* at 4-5.

f. "Personal race or ethnicity." *Id.* at 5.

g. "Personal religious beliefs." *Id.*

362. On Google's "Your privacy is protected by responsible data practices" webpage, Google states:

a. "Data plays an important role in making the products and services you use every day more helpful. We are committed to treating that data responsibly and protecting your privacy with strict protocols and innovative privacy technologies." Ex. 24 at 1.

b. That it uses "advanced privacy technologies [to] help keep your personal information private." *Id.* at 3.

c. "We are continuously innovating new technologies that protect your private information without impacting your experiences on our products." *Id.*

d. "We use leading anonymization techniques to protect your data while making our services work better for you." *Id.* at 3-4.

e. "Privacy is core to how we build our products, with rigorous privacy standards guiding every stage of product development. Each product and feature adheres to these privacy standards, which are implemented through comprehensive privacy reviews." *Id.* at 4.

363. On Google's "We do not sell your personal information to anyone" webpage, Google states:

a. "We do not sell your personal information to anyone." Ex. 23 at 1.

b. "Without identifying you personally to advertisers or other third parties, we might use data that includes your searches and location, websites and apps that you've used, videos and ads that you've seen, and basic information that you've given us, such as your age range and gender." *Id.*

c. "We give advertisers data about their ads' performance, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected and private." *Id.*

d. "[R]emember, we never share any of this personal information with advertisers." *Id.* at 2.

364. On Google's "Your privacy is protected by responsible data practices" webpage, Google states:

a. "Your privacy is protected by responsible data practices." Ex. 24 at 1.

b. "We never sell your personal information, and give you controls over who has access." *Id.* at 2.

c. "We are committed to protecting your data from third parties. That's why it's our strict policy to never sell your personal information to anyone." *Id.*

d. "We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to." *Id.* at 1-2.

365. Google's CEO Sundar Pichai publicly stated:

a. "We do not and would never sell consumer data." Pichai, *supra* note 10.

b. "To make privacy real, we give you clear, meaningful choices around your data. All while staying true to two unequivocal policies: that Google will never sell any personal information to third parties; and that you get to decide how your information is used." Ex. 25 at 1.

366. Google's sharing and selling of Plaintiffs' and Class Members' personal information with other companies:

a. Was objectively unreasonable given Google's numerous privacy promises both within and outside the confines of the terms it forced Account Holders to agree to in order to become Account Holders;

b. Evaded the spirit of the bargain made between Google, Plaintiffs and Class Members; and

c. Abused Google's power to specify terms in the contract.

367. Google's sharing, sale, and use of Plaintiffs' and Class Members' sensitive personal information for purposes of targeted advertising through Google RTB:

a. Evaded the spirit of the bargain made between Google, Plaintiffs and Class Members; and

b. Abused Google's power to specify terms in the contract.

368. Google's failure to inform Plaintiffs and Class Members of its conduct in Google RTB and failure to give Plaintiffs and Class Members privacy controls to prevent the sale and sharing of their personal information in Google RTB was objectively unreasonable and evaded the spirit of the bargain made between Google, Plaintiffs and Class Members

369. Google's use of Plaintiffs' and Class Members' personal information to target them

and enable other companies to add to their own user profiles was in bad faith, and promising Plaintiffs' and Class Members' personal information would not be disclosed induced them to share more information with Google.

370. As a result of Google's misconduct and breach of its duty of good faith and fair dealing, Google was able to obtain the personal property of Plaintiffs and Class Members, earn unjust profits, and cause privacy injury and other consequential damages.

371. As a result of Google's bad faith breach of its contractual and extra-contractual promises, Plaintiffs and Class Members are entitled to recover benefit of the bargain damages, unjust enrichment damages in the form of restitution measures by either unearned profits or a reasonable royalty value, and nominal damages.

**COUNT THREE: VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

372. Plaintiffs incorporate all preceding paragraphs as though set forth herein.

373. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

374. Google is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

375. Google violated the UCL by engaging in the following unlawful, unfair, and deceptive business acts and practices:

a. Violating its Terms of Service, knowingly and willfully or negligently and materially, in violation of Cal. Bus. & Prof. Code § 22576;

b. Violating the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 and 2701, *et seq.*;

c. Violating the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

d. Violating the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

e. Violating the California Computer Data Access and Fraud Act, Cal. Penal Code § 502;

f. Committing Statutory Larceny, Cal. Penal Code §§ 484 and 496;

g. Violating the common law right of privacy via intrusion upon seclusion and publication of private facts;

h. Violating the Art. 1, § 1 of the California Constitution Right to Privacy;

i. Violating express contract promises to consumers;

j. Violating the duty of good faith and fair dealing; and

k. Violating the duty to hold Account Holders' personal information in confidence.

376. Google's conduct violated the spirit and letter of these laws, which protect property, economic and privacy interests, and prohibit unauthorized disclosure and collection of private communications and personal information.

377. Google stated it would not sell or disseminate Plaintiffs' and Class Members' personal information without their consent to other companies, except in limited situations not applicable here.

378. Google's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and Class Members. Further, Google's conduct narrowly benefitted its own business interests at the expense of Plaintiffs' and Class Members' fundamental privacy interests protected by the California Constitution and the common law.

379. Plaintiffs' and Class Members' loss of their personal information constitutes an economic injury.

380. Plaintiffs and Class Members have suffered harm in the form of lost property value, specifically the diminution of the value of their private and personally identifiable data and content.

381. Google's actions caused damage to and loss of Plaintiffs' and Class Members' property right to control the dissemination and use of their personal information and communications.

382. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and all other equitable relief the Court determines is warranted.

**COUNT FOUR: CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY**

383. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

384. Article I, § 1 of the California Constitution provides, "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

385. The phrase "and privacy" was added by an initiative adopted by California voters on November 7, 1972 (the Privacy Initiative).

386. The Privacy Initiative created a private right of action against nongovernmental entities for invasions of privacy.

387. The California Supreme Court has explained that, one of the principal "mischiefs" to which the Privacy Initiative was directed was "the overbroad collection and retention of unnecessary personal information by government and business interests." *White v. Davis*, 13 Cal.3d 757, 775 (Cal. 1975). "The moving force behind the new constitutional provision … relat[ed] to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy." *Id.* at 774.

388. The ballot language for the Privacy Initiative explained:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. … The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.
>
> *Fundamental to our privacy is the ability to control circulation of personal information*. This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often, we do not know that these records even exist and we are certainly unable to determine who has access to them.

*White v. Davis*, 13 Cal.3d at 774-75 (emphasis in original) (quoting ballot language).

389. Google's conduct in selling and sharing Plaintiffs' and Class Members' personal information in violation of its express unequivocal promises to the contrary is exactly why California voters adopted the Privacy Initiative in 1972.

390. Google creates "cradle-to-grave profiles" and detailed dossiers of Plaintiffs and Class Members, and then sells and shares the personal information contained in those profiles and dossiers with hundreds of different companies to aid those other companies for the purpose of making money and assisting those other companies in supplementing or building their own separate profiles and dossiers about Plaintiffs and Class Members.

391. As described herein, Google has intruded upon the following legally protected privacy interests of Plaintiffs and Class Members:

a. The right to privacy contained on personal computing devices, including web-browsing history;

b. The right to restrain business interests from misusing information gathered for one purpose in order to serve other purposes;

c. The right to control circulation of their personal information;

d. Statutory rights codified in federal and California privacy statutes;

e. The California Computer Crime Law, Cal Pen. Code § 502, which applies to all plaintiffs in this case by virtue of Google's choice of California law to govern its relationship with Google users;

392. Through the Terms of Service, other policies and other public statements set forth above, Google promised not to share or sell Plaintiffs' and Class Members' personal information without authorization.

393. Plaintiffs and Class Members had a reasonable expectation of privacy in the circumstances in that:

a. Plaintiffs and Class Members could not reasonably expect Google would commit acts in violation of federal and state laws as set forth below.

b. Google affirmatively promised users it would not share or sell their personal information without authorization.

394. Google's actions constituted a serious invasion of privacy in that it:

a. Violated several federal criminal laws, including the Electronic

Communications Privacy Act.

b. Violated dozens of state criminal laws.

c. Invaded the privacy rights of hundreds of millions of Account Holders without their consent.

d. Disclosed sensitive personal information every time it shared information related to the verticals above relating to health, religion, ethnicity, race, or sexuality.

e. Enabled the targeting of Account Holders by third parties who did not have legal access to their personal information.

395. The surreptitious and unauthorized sharing and sale of the internet communications and associated personal information of millions of Account Holders constitutes an egregious breach of social norms.

396. Google lacked a legitimate business interest in sharing and selling Plaintiffs' and Class Members' personal information without their authorization.

397. In violating Plaintiffs' and Class Members' privacy in the manner described above, Google acted with oppression, fraud, or malice.

398. Plaintiffs and Class Members have been damaged by Google's invasion of their privacy and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

**COUNT FIVE: INTRUSION UPON SECLUSION**

399. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

400. A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

401. In carrying out its scheme to share and sell Plaintiffs' and Class Members' personal information without their consent, Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion in that it effectively placed itself in the middle of Plaintiffs' and Class Members' communications to which it was not an authorized party and used data that they had not authorized Google to sell or share, but which it sold and shared anyway.

402. By engaging in cookie-matching with hundreds of other companies, Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion. Cookie

matching enabled companies with limited information about Plaintiffs and other Class Members to accumulate substantially more information about each individual Plaintiff and Class Member from Google.

403. By selling and sharing Plaintiffs' and Class Members' sensitive personal information for purposes of targeted advertising, Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion in that it subjected Plaintiffs and Class Members to advertisements targeted to that sensitive information and publicized sensitive information to hundreds of other companies. Indeed, once sensitive information from Google account holders had been shared with other companies, there existed no way for account holders to further limit the continued spread of such information.

404. Google's actions were not authorized by the Plaintiffs and Class Members.

405. Google's intentional intrusion into Plaintiffs' and Class Members personal information, Internet communications, and computing devices was highly offensive to a reasonable person in that Google violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

406. Google's unauthorized sharing and sale of personal information from hundreds of millions of Americans, including highly sensitive information about individuals' race, ethnicity, religion, health, and financial status, is highly offensive behavior.

407. Google's secret monitoring of web browsing for purposes of selling and sharing it with hundreds of unknown companies without Account Holders' consent is highly offensive behavior.

408. In intruding on Plaintiffs' and Class Members' seclusion in the manner described herein, Google acted with oppression, fraud, or malice.

409. Plaintiffs and Class Members have been damaged by Google's intrusion upon their seclusion and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

## COUNT SIX: PUBLICATION OF PRIVATE INFORMATION

410. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

411. Plaintiffs' and Class Members' personal information, including their Internet communications and sensitive data, are private facts that Google promised not to share or sell to advertisers.

412. Google gave publicity to Plaintiffs' and Class Members' private facts and the content of their Internet communications by sharing and selling them to hundreds of different companies. Many of those companies have business models predicated on building massive databases of individual consumer profiles from which to sell targeted advertising and make further disseminations.

413. Plaintiffs and Class Members had no knowledge that Google was sharing and selling their personal information and did not authorize or consent to such publication.

414. Google's selling and sharing of patient personal information to hundreds of different advertising companies would be highly offensive to a reasonable person.

415. In disseminating Plaintiffs' and Class Members' personal information without their consent in the manner described above, Google acted with oppression, fraud, or malice.

416. Plaintiffs and Class Members have been damaged by the publication of their private information and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

**COUNT SEVEN: BREACH OF CONFIDENCE**

417. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

418. Plaintiffs and Class Members entrusted their personal information to Google.

419. The totality of Plaintiffs' and Class Members' personal information, including the content of their Internet communications, is confidential and novel.

420. Google knew that Plaintiffs' and Class Members' personal information was disclosed to Google in confidence. Indeed, Google's express promises to Plaintiffs and Class Members reflects its knowledge that their personal information was disclosed in confidence. Google told Account Holders:

a. "[W]hen you use our products, you trust us with your personal information. That's why we never sell your personal information." Ex. 5 at 1.

b. "When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information[.]" *E.g.*, Ex. 1 at 1; Ex. 15 at 1; Ex. 20 at 1.

421. As Google's CEO stated, "billions of people have trusted Google with questions they wouldn't have asked their closest friends." Ex. 25 at 1.

422. Google's CEO also stated, "To make privacy real, we give you clear, meaningful choices around your data. All while staying true to two unequivocal policies: that Google will never sell any personal information to third parties; and that you get to decide how your information is used." *Id.*

423. Google created and assumed a duty to protect Plaintiffs' and Class Members' confidential personal information by creating a legal relationship with them via its Terms of Service.

424. There was an understanding between Google on the one hand, and Plaintiffs and Class Members on the other, that Google would not betray their confidence by sharing their personal information without consent.

425. By disclosing and using Account Holders' personal information in violation of this understanding, Google breached the trust and confidence that Plaintiffs and Class Members placed in it.

426. In breaching Plaintiffs' and Class Members' confidence in the manner described above, Google acted with oppression, fraud, or malice.

427. Plaintiffs and Class Members have been damaged by Google's breach of trust and confidence and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

**COUNT EIGHT: VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**

428. Google is subject to the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630-638. Google is headquartered in California; designed, contrived, and effectuated its practice of disclosing account holder information during the RTB process in California; and has adopted California substantive law to govern its relationship with Plaintiffs and all Class Members.

429. The California Invasion of Privacy Act states the following purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

CAL. PENAL CODE § 630.

430. Cal. Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner ….willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ….

431. Google is a "person" within the meaning of § 631(a).

432. By employing its Google RTB to sell and share Account Holder information to hundreds of Google RTB participants in real-time while communications between the Account Holders and first-party websites were still in transit or being sent or received within California, Google aided, agreed with, and conspired with Google RTB participants to aid them in reading, attempting to read, learning, or using the contents or meaning of the communications being exchanged connected to the Plaintiffs' and Class Members' personal information.

433. Plaintiffs and Class Members did not consent to Google's aid to or agreement with Google RTB participants in reading, attempting to read, learning, or using the contents or meaning of Plaintiffs' and Class Members' communications with websites that Plaintiffs and Class Members were directly interacting with.

434. The following items constitute "machine[s], instrument[s], or contrivance[s]" under § 631(a):

a. The cookies Google used to track, share, and sell the Plaintiffs' and Class Members' communications to Google RTB participants;

b. The Plaintiffs' and Class Members' browsers;

c. The Plaintiffs' and Class Members' personal computing devices;

d. Google's web servers;

e. The web servers of non-Google websites from which Google tracked, intercepted, shared, and sold the Plaintiffs' and Class Members' communications; and

f. The web servers of the Google RTB participants to which Google sold and shared Plaintiffs' and Class Members' communications; and

g. The computer code Google deployed to effectuate its scheme, including but not limited to Bid Requests for each Target Google caused to be submitted to Google RTB participants.

435. Even if the above-listed items do not constitute "machine[s], instrument[s], or contrivance[s]," Google's deliberate and purposeful efforts to facilitate its conduct comprise "any other manner."

436. Google's aid to the Google RTB participants occurred in "real time," as acknowledged by Google in its naming of the Google *Real-Time* Bidding system. As such, Google's aid to Google RTB participants occurred while Plaintiffs' and Class Members' communications with first-party websites were in transit or in the process of being sent or received.

437. Google's RTB documentation acknowledges that the information Google aided RTB participants in reading, attempting to read, or to learn included the "contents" and "meaning" of the Plaintiffs' and Class Members' communications with first-party websites. The "contents" or "meaning" re-directed within Google RTB Bid Requests include:

| **COMMUNICATIONS CONTENT** | |
|---|---|
| cat | Array of IAB content categories of the site or app. |
| sectioncat | Array of IAB content categories that describe current section of site or app. |
| pagecat | Array of IAB content categories that describe current site or app page or view. |
| page | URL of the page where the impression will be shown. |
| ref | Referrer URL that caused navigation to the current page. |
| publisher | Details about the Publisher object of the site or app. |
| content | Details about the Content within the site or app. |
| keywords | Comma-separated list of keywords about this site or app. |
| content id | ID uniquely identifying the content. |
| episode | Content episode number (typically applies to video content). |
| title | Content title. Video examples: "Search Committee" (television); "A New Hope (movie); or "Endgame" (made for web). Non-video example: "Why an Antarctic Glacier is Melting So Quickly" (Time magazine article). |
| series | Content series. Video examples: "The Office" (television); "Star Wars" |

| | | |
|---|---|---|
| | | (movie); or "Arby 'N' The Chief (made for web). Non-video example: ("Ecocentric") (Time magazine blog). |
| **"INFORMATION THAT WE KNOW ABOUT THE WEB PAGE OR MOBILE APP"** | | |
| 17 | Publisher ID | The publisher ID. |
| 20 | URL | The URL of the page with parameters removed. |
| **VIDEO INFORMATION** | | |
| 51 | URL | The URL of the page that the publisher gives Google to describe the video content, with parameters removed. |
| 61 | Video title | The video title. |
| 62 | Video keywords | A list of keywords describing the video, extracted from the content management system of the video publisher. |

438. Plaintiffs and Class Members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personal information.

439. Because Plaintiffs and Class Members have been injured by Google's violations of Cal. Pen. Code § 631, each seeks damages of the greater of $5,000 or three times the amount of actual damages, if any, sustained, as well as injunctive relief.

## COUNT NINE: VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT – UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE

440. Plaintiffs incorporate all preceding paragraphs as though set forth herein.

441. The Electronic Communications Privacy Act ("ECPA") prohibits the unauthorized interception of the content of any communication through the use of any device, and any subsequent disclosure or use of the intercepted contents of any electronic communication. 18 U.S.C. §2511.

442. ECPA protects both the sending and receipt of communications.

443. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

444. Google violated the interception provisions of the Electronic Communications Privacy Act ("ECPA") by:

a. Intentionally disclosing, or endeavoring to disclose, to other companies the contents of Plaintiffs' and Class Members' electronic communications, knowing or having reason to know that the information was obtained through the interception of electronic communications, in violation of 18 U.S.C. § 2511(1)(c); and/or

b. Intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, knowing or having reason to know that the information was obtained through the interception of electronic communications, in violation of 18 U.S.C. § 2511(1) (d).

445. ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

446. Google intercepted Plaintiffs' and Class Members' electronic communications, including the following content:

a. The precise text of GET and POST requests that Plaintiffs and Class Members exchanged with non-Google websites to which they navigated;

b. The precise text of Plaintiffs' and Class Members' search queries at non-Google websites to which they navigated and on which they entered such queries; and

c. Information that is a general summary or informs Google (and the Google RTB participants) of the subject of communications between Plaintiffs and Class members and the first-party websites.

447. Electronic Communications. The transmission of data between Plaintiffs and Class Members and the non-Google websites with which they chose to exchange communications are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

448. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

449. Google's developer documentation details the following content of electronic communications that it redirects to other companies in the Google RTB process:

| **COMMUNICATIONS CONTENT** | |
|---|---|
| cat | Array of IAB content categories of the site or app. |
| sectioncat | Array of IAB content categories that describe current section of site or app. |
| pagecat | Array of IAB content categories that describe current site or app page or view. |
| page | URL of the page where the impression will be shown. |
| ref | Referrer URL that caused navigation to the current page. |
| publisher | Details about the Publisher object of the site or app. |
| content | Details about the Content within the site or app. |

| | | |
|---|---|---|
| keywords | | Comma-separated list of keywords about this site or app. |
| content id | | ID uniquely identifying the content. |
| episode | | Content episode number (typically applies to video content). |
| title | | Content tile. Video examples: "Search Committee" (television); "A New Hope (movie); or "Endgame" (made for web). Non-video example: "Why an Antarctic Glacier is Melting So Quickly" (Time magazine article). |
| series | | Content series. Video examples: "The Office" (television); "Star Wars" (movie); or "Arby 'N' The Chief (made for web). Non-video example: ("Ecocentric") (Time magazine blog). |
| **"INFORMATION THAT WE KNOW ABOUT THE WEB PAGE OR MOBILE APP"** | | |
| 17 | Publisher ID | The publisher ID. |
| 20 | URL | The URL of the page with parameters removed. |
| **VIDEO INFORMATION** | | |
| 51 | URL | The URL of the page that the publisher gives Google to describe the video content, with parameters removed. |
| 61 | Video title | The video title. |
| 62 | Video keywords | A list of keywords describing the video, extracted from the content management system of the video publisher. |

450. <u>Electronic, Mechanical, or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] ... electronic communication[.]" 18 U.S.C. § 2510(5).

451. The following constitute devices within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Google used to acquire Plaintiffs' and Class Members' communications, including cookies Google sets, acquires, and discloses or sells to other companies through cookie-sharing;

b. The Plaintiffs' and Class Members' browsers;

c. The Plaintiffs' and Class Members' computing devices;

d. Google's web servers;

e. The web servers of the first-party non-Google websites from which Google tracked and intercepted the Plaintiffs' and Class Members' communications; and

f. The computer code deployed by Google to effectuate its tracking and interception of Plaintiffs' and Class Members' communications for purposes of forwarding them to hundreds of Google RTB participants, without authorization, including but not limited to data contained in Bid Requests.

452. <u>Unauthorized Purpose.</u> Google intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the unauthorized purpose of disclosing and selling those contents to Google's RTB participants.

453. Plaintiffs and Class members did not authorize Google to acquire the content of their

communications for purposes of sharing and selling the personal information contained therein. Indeed, Google expressly and repeatedly promised that it would not share or sell user personal information, including browsing history.

454. Google's interception of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with the websites to which they directed their communications. As described above, the Google RTB process occurs in milliseconds while the communication is still being exchanged between Plaintiffs and Class Members and the website to which they directed their communications. That is why Google itself refers to the process as "Real-Time Bidding." The signal sent out to Google RTB is sent simultaneously with the signal sent to the websites to which Plaintiffs' and Class Members' communications were directed.

455. Google is not a party to Plaintiffs' and Class Members' electronic communications exchanged with the non-Google websites to which Plaintiffs and Class Members directed their communications.

456. Google acquired the content of Plaintiffs' and Class members' electronic communications with the non-Google websites to which their communications were directed through the surreptitious duplication, forwarding, and re-direction of those communications to Google. After intercepting the communications without authorization, Google then disclosed, sold, and shared the contents of the intercepted communications to hundreds of Google RTB participants and used the contents of the intercepted communications in furtherance of the Google RTB auction sales system.

457. <u>Exceptions Do Not Apply</u>. The ECPA prohibition on unauthorized interception contains exceptions. The burden is on the party seeking the benefit of an exception to prove its existence. Therefore, Plaintiffs need not affirmatively plead the absence of any exception. Nevertheless, Plaintiffs plead that Google's interceptions do not qualify for any exceptions.

458. ECPA provides an ordinary course of business exception for liability, under which the communications at issue are, by definition, not intercepted. 18 U.S.C. § 2510(5)(a)(ii). This exception is narrow and protects from liability only where an electronic service provider's interception facilitates the transmission of the communication at issue or is incidental to the

transmission of such communication. Google's interception of the contents of Plaintiffs' and Class Members' communications with any non-Google website to which they directed their browser does not facilitate and is not incidental to that communication. Rather, Google's interception facilitates a separate, unrelated communication – the contemporaneous communication of Plaintiffs' and Class Members' personal information to Google RTB participants.

459. ECPA provides an exception where one party to the communications provides consent to the disclosure of the communications at issue. 18 U.S.C. § 2511(2)(2). As detailed above, Plaintiffs and Class Members did not provide consent to the disclosure of the content of their communications with Google RTB participants. To the contrary, Google promised in its Terms of Service and numerous other communications that it would not sell or share Account Holders' personal information absent their consent. Plaintiffs and Class Members were not asked for, and did not provide, such consent. Nor did Google procure the "lawful consent" of the websites to which Plaintiffs and Class Members directed and exchanged communications.

460. Similarly, the agreements that Google enters with publishers using Google's RTB process to fill ad space echo the promises Google makes to Account Holders. Google promises the website publishers that fill advertising space through Google RTB that Google's use of information will be "in accordance with Google's privacy policy" – the same privacy policy detailed above that expressly promises not to sell or share Account Holder information. Publishers who sign up for Google RTB must do so through the Google Ad Manager. At the end of the initial sign-up process, the publisher is promised, "Google's use of your information will be in accordance with Google's privacy policy." The privacy policy referenced is the same Privacy Policy that pertains to Account Holders, promising, as set forth above, that Google will not share or sell Account Holder personal information.

461. Likewise, the Google API Terms of Service promise, "By using our APIs, Google may use submitted information in accordance with our privacy policy." Again, the privacy policy referenced is the same Privacy Policy that pertains to Account Holders, promising, as set forth above, that Google will not share or sell Account Holder personal information.

462. Moreover, ECPA also contains an exception to the exception for single party

consent. Under 18 U.S.C. § 2511(2)(d), an interception is unlawful and actionable even "where one of the parties to the communication has given prior consent to such interception" if the communication was "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

463. As alleged throughout, Google's redirection, sale, and sharing of Plaintiffs' and Class Members' personal information and the contents of their Internet communications had the requisite criminal or tortious purpose for Plaintiffs' and Class Members' claims for intrusion upon seclusion; publication of private facts; tortious violation of Art. I, sec. 1 of the California Constitution; breach of confidence; violation of the California UCL, Cal. Bus. & Prof. Code § 17200; the California Invasion of Privacy Act, Cal. Penal Code § 630; the California Computer Data Access and Fraud Act, Cal. Penal Code § 502; California Statutory Larceny, Cal. Penal Code §§ 484 and 496; the Electronic Communications Privacy Act, 18 U.S.C. §2511; and the Video Privacy Protection Act, 18 U.S.C. § 2710.

464. For the violations set forth above, Plaintiffs and Class Members seek appropriate preliminary and other equitable or declaratory relief; the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred. 18 U.S.C § 2520.

## COUNT TEN: VIOLATION OF THE ECPA WIRETAP ACT – UNAUTHORIZED DISCLOSURE OF ELECTRONIC COMMUNICATIONS BY AN ECS

***On behalf of Subclass A of All Google Account Holders Who Use the Google Chrome Browser***

465. Plaintiffs incorporate all preceding paragraphs as though set forth herein.

466. Plaintiffs are Account Holders who also use the Google Chrome web browser.

467. This count is brought on behalf of Subclass A of all Google Account Holders who use the Google Chrome web browser.

468. The ECPA Wiretap statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such

communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

469. Electronic Communication Service. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

470. The Google Chrome web browser is an electronic communication service. It provides to users thereof the ability to send or receive electronic communications. In the absence of a web browser or some other such system, Internet users could not send or receive communications over the Internet.

471. Intentional Divulgence. Google intentionally designed the Chrome web browser so that it would divulge the contents of Plaintiffs' and Subclass A members' communications with non-Google websites to hundreds of Google RTB participants.

472. While in Transmission. Google Chrome's divulgence of the contents of Plaintiffs' and Class members' communications was contemporaneous with their exchange with the websites to which they directed their communications. As described above, the Google RTB process occurs in milliseconds while the communication is still being exchanged between Plaintiffs and Class members and the websites to which they directed their communications. That is why Google itself refers to the process as "Real-Time Bidding." The signal sent out to Google RTB is sent simultaneously with the signal sent to the websites with which Plaintiffs' and Class members are exchanging communications and while those communications are still occurring.

473. Google Chrome is not a party to Plaintiffs' and Class members' electronic communications exchanged with the non-Google websites to which Plaintiffs and Class members directed their communications.

474. Google Chrome divulged the contents of Plaintiffs' and Class members' electronic communications with the non-Google websites to which their communications were directed through the surreptitious duplication, forwarding, and re-direction of those communications to Google. The divulgence of the contents of Plaintiffs' and Class members' communications was without authorization. Google Chrome divulged the contents of Plaintiffs' and Class members' communications to hundreds of Google RTB participants, entities other than the intended recipient

of such communication, while Plaintiffs' and Class members' communications were being transmitted on Google Chrome.

475. Exceptions Do Not Apply. In addition to the exception for communications directly to an ECS or an agent of an ECS, the Wiretap Act states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication":

a. "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"

b. "with the lawful consent of the originator or any addressee or intended recipient of such communication;"

c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or

d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency."

18 U.S.C. § 2511(3)(b).

476. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

477. Google's divulgence of the contents of Plaintiffs' and Class members' communications on the Chrome browser to hundreds of Google RTB participants was not authorized by 18 U.S.C. § 2511(2)(a) in that it was neither a necessary incident to the rendition of the Chrome service nor necessary to the protection of the rights or property of Google.

478. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

479. Google's divulgences of the contents of Plaintiffs' and Class members'

communications on the Chrome browser to hundreds of Google RTB participants was not done "with the lawful consent of the originator or any addressee or intended recipient of such communication[s]." As alleged above, Plaintiffs and Class members, including members of the Subclass A, did not authorize Google to divulge the contents of their communications to hundreds of Google RTB participants. Nor did Google procure the "lawful consent" of the websites to which Plaintiffs and Subclass A members directed and exchanged communications.

480. The other companies to which Google sold, shared, and divulged Plaintiffs' and Subclass A members' content of communications were not "person[s] employed or authorized, or whose facilities are used, to forward such communication[s] to [their] destination."

481. The contents of Plaintiffs' and the Subclass A members' communications did not appear to pertain to the commission of a crime, and Google Chrome did not divulge the contents of their communications to a law enforcement agency.

482. Plaintiffs and the Subclass A members seek appropriate preliminary and other equitable or declaratory relief; the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred. 18 U.S.C. § 2520.

**COUNT ELEVEN: VIOLATION OF THE ECPA STORED COMMUNICATIONS ACT – UNAUTHORIZED DISCLOSURE OF ELECTRONIC COMMUNICATIONS BY AN ECS**
***On Behalf of Subclass A of All Google Account Holders Who Use the Google Chrome Browser***

483. Plaintiffs incorporate all preceding paragraphs as though set forth herein.

484. This count is brought on behalf of Subclass A of all Google Account Holders who use the Google Chrome web browser.

485. The ECPA provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

486. Electronic Communication Service. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

487. The Google Chrome browser is an ECS.

488. Electronic Storage. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

489. Google stores Plaintiffs' and Subclass A members' personal information and the contents of their communications in the Chrome browser and files associated with it.

490. Specifically, Google stores the content of Plaintiffs' and Subclass A members' Internet communications within the Chrome browser in two ways:

a. For purposes of backup protection so that if the browser inadvertently shuts down, Plaintiffs' and Subclass Members' can be presented with the option to restore their previous communications;

b. For a temporary and intermediate amount of time incidental to the electronic transmission thereof when it places the contents into storage for purposes of maintaining a connection with the server for the website with which a Plaintiff and Class member is exchanging communications while data continues to be transmitted between the Plaintiffs or Class Members' communications device and the server for the website; and

c. For a temporary and intermediate amount of time incidental to the electronic transmission thereof when it places the contents of user communications into the browser's web-browsing history, which is only kept on the browser for 90 days.

491. When a Google Account Holder clicks a button or hits ENTER to exchange a communication with the website the Account Holder is interacting with while using the Chrome browser, the content of the communication is immediately placed into storage within the Chrome browser.

492. Google knowingly divulges the contents of Plaintiffs' and Subclass A members' communications to hundreds of different companies through the Google RTB process while such communications are in electronic storage.

493. Exceptions Do Not Apply. Section 2702(b) of the Stored Communications Act provides that an electronic communication service provider "may divulge the contents of a communication—"

a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient;"

b. "as otherwise authorized in section 2517, 2511(2)(a), or 2703 of this title;"

c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;"

d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service":

f. "to the National Center for Missing and Exploited Children, in connection with a reported submitted thereto under section 2258A;"

g. "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency;" or

i. "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies section 2523."

494. The hundreds of other companies to which Google divulges the content of Plaintiffs' and Subclass A members' communications while stored in Chrome are not "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of the Plaintiffs' and Subclass A members' communications.

495. Sections 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

496. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for

mechanical or service quality control checks.

497. Google's divulgence of the contents of user communications on the Chrome browser to hundreds of other companies through the Google RTB process was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither:

a. A necessary incident to the rendition of the Chrome service; nor

b. Necessary to the protection of the rights or property of Google.

498. Google's divulgence of the contents of user communications on the Chrome browser through the Google RTB process was not done "with the lawful consent of the originator or any addressee or intended recipient of such communication[s]."

499. As alleged above:

a. Plaintiffs and Google Account Holders, including members of Subclass A, did not authorize Google to divulge the contents of their communications to hundreds of other companies.

b. Google did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Subclass A members' were exchanging communications.

500. The hundreds of other companies to which Google divulges the content of Plaintiffs' and Subclass A members' communications while in Chrome storage through the RTB process are not "person[s] employed or whose facilities are used to forward such communication to its destination."

501. Google's divulgences in the RTB system were not to governmental entities.

502. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT TWELVE: VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**

***On Behalf of Subclass B of All Google Account Holders Who Use Google Chrome, Android Operating System, or Apps that Incorporate the Google Software Development Kit (SDK)***

503. Plaintiffs incorporate all preceding paragraphs as though set forth herein.

504. This count is brought on behalf of Subclass B of all Google Account Holders who use Google chrome, Android operating system, or apps that incorporate the Google SDK.

505. The Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") provides that "a video tape service provider" shall not "knowingly disclose[], to any person, personally identifiable information concerning any consumer of such provider" without informed written consent and not incident to the ordinary course of business. 18 U.S.C. § 2710(b)(1).

506. Video Tape Service Provider. Under the VPPA, a "video tape service provider" ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure." Under subparagraph (E) of subsection (b)(2), a VTSP is extended to include any person who obtains information "incident to the ordinary course of business of" the VTSP. As used in the VPPA, "'ordinary course of business' means only debt collection activities, order fulfillment, request processing, and transfer of ownership."

507. Google is a VTSP through its Chrome browser, Android operating system, and Google SDK that it provides to app developers:

a. Google Chrome, which establishes a supporting ecosystem to seamlessly deliver video content to consumers, is engaged in the delivery of audio visual materials similar to prerecorded video cassette tapes by providing software through which audio visual materials are requested or obtained by Plaintiffs and Subclass Members from various first-party websites accessed via the Chrome browser.

b. Google Android, which establishes a supporting ecosystem to seamlessly deliver video content to consumers, is engaged in the delivery of audio visual materials similar to prerecorded video cassette tapes by providing software through which audio visual materials are requested or obtained by Plaintiffs and Subclass Members at various first-party websites accessed via a mobile device running the Android operating system.

c. The Google SDK, which establishes a supporting ecosystem to seamlessly enable companies such as ESPN and Brid.tv, a provider of enterprise solutions for managing and monetizing customers' video that is also a Google Ad Manager certified external vendor, to deliver video content to consumers, is engaged in the delivery of audio visual materials similar to prerecorded video cassette tapes by providing software through which audio visual materials are requested or obtained by Plaintiffs and Subclass

Members at various first-party websites that make use of the Google SDK to provide such audio visual materials.

d. The Google Play store is engaged in the delivery of audio visual materials similar to prerecorded video cassette tapes by providing software and applications through which audio visual materials, including videos and video games, are requested or obtained by Plaintiffs at the Google Play Store.

e. Google Chrome, Android, and the Google SDK each also qualify as VTSPs through 18 U.S.C. § 2710(b)(2)(E) because they are Google services that aid VTSPs in order fulfillment and request processing.

508. Personally Identifiable Information. Under the VPPA, "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a" VTSP. 18 U.S.C. § 2710(a)(3).

509. The VPPA definition of "personally identifiable information" is purposefully broad and open-ended. The VPPA "prohibits … [the disclosure of] 'personally identifiable information' – information that links the customer or patron to particular materials or services." S. Rep. No. 100-599 at *7. "Unlike the other definitions [in the VPPA], paragraph (a)(3) uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information." S. Rep. No. 100-599 at *12. The Act was passed in 1988 following publication of "a profile of Judge Robert H. Bork based on the titles of 146 files *his family had rented* from a video store." S. Rep. 100-599 at 6 (emphasis added).

510. Google knowingly discloses personally identifiable information about Plaintiffs' and Subclass B members' requests, acquisitions, and viewing records of specific video materials and services.

511. The Google RTB developer documentation for Bid Requests states that it discloses the following information about Plaintiffs and Subclass B members to hundreds of different companies, including regarding the audio-visual materials they access through Google Chrome, Android, and Google SDK:

| COMMUNICATIONS CONTENT | |
|---|---|
| cat | Array of IAB content categories of the site or app. |
| sectioncat | Array of IAB content categories that describe current section of site or app. |
| pagecat | Array of IAB content categories that describe current site or app page or view. |
| page | URL of the page where the impression will be shown. |
| ref | Referrer URL that caused navigation to the current page. |

| | |
|---|---|
| publisher | Details about the Publisher object of the site or app. |
| content | Details about the Content within the site or app. |
| keywords | Comma-separated list of keywords about this site or app. |
| content id | ID uniquely identifying the content. |
| episode | Content episode number (typically applies to video content). |
| title | Content title. Video examples: "Search Committee" (television); "A New Hope (movie); or "Endgame" (made for web). Non-video example: "Why an Antarctic Glacier is Melting So Quickly" (Time magazine article). |
| series | Content series. Video examples: "The Office" (television); "Star Wars" (movie); or "Arby 'N' The Chief (made for web). Non-video example: ("Ecocentric") (Time magazine blog). |
| **DEVICE** | |
| dnt | Standard 'Do Not Track' flag as set in the header by the browser. |
| ua | Browser user-agent string. |
| ip | IPv4 address closest to device. |
| geo | Location of the device assumed to be the user's current location defined by a Geo object. |
| didsha1 | Hardwire device ID. |
| dpidsha1 | Platform device ID (e.g. Android ID). |
| ipv6 | IPv6 address closest to device. |
| carrier | Carrier or ISP, using exchange curated string names which should be published to bidders a priori. |
| make | Device make (e.g. Apple). |
| model | Device model (e.g. iPhone). |
| os | Device operating system (e.g. iOS). |
| osv | Device operating system version. |
| hwv | Hardware version of the device (e.g. '5S' for iPhone 5S). |
| devicetype | The general type of device. |
| ifa | ID sanctioned for advertiser use in the clear. |
| macsha1 | MAC address of the device. |
| **GEO-LOCATION** | |
| lat | Latitude from -90.0 to 90.0, where negative is south. |
| lon | Longitude from -180.0 to 180.0 where negative is west. |
| country | Country. |
| region | Region. |
| metro | Google metro code; similar to but not exactly Nielson DMAs. |
| city | City using United Nations Code for Trade & Transport. |
| zip | Zip/postal code. |
| type | Source of location data. |
| accuracy | Estimated location accuracy. |
| lastfix | Number of seconds since this geolocation fix was established. |
| **USER** | |
| Id | Exchange-specific id for the user. |
| Buyerid | Buyer-specific ID as mapped by the exchange for the buyer. |
| Gender | Gender as 'M' male, 'F' female, 'O' other. |
| Keywords | Comma-separated list of keywords, interests, or intent. |
| Customdata | Optional feature to pass bidder data set in the exchange's cookie. |
| Geo | Location of the user's home based defined by a Geo object. This is not necessarily their current location. |
| Data | Values for this field are now redacted. Segment.id references the exchange-detected vertical of the page. Segment.value corresponds to the weight of that detected vertical, a higher weight suggesting the page is more relevant for the detected vertical. |

| | | |
|---|---|---|
| **"INFORMATION THAT WE KNOW ABOUT THE USER"** | | |
| 2 | IP address | The first 3 bytes of IPv4 or first 6 bytes for IPv6. |
| 3 | Special Treatment | Reasons for special treatment of user data. For example, if the "current request should be treated as child-directed for purposes of the Children's Online Privacy Protection Act." |
| 4 | Google ID | "The Google ID for the user. … This field may be the same as the Google ID returned by the cookie matching service." |
| 5 | Google ID Version | "The version number of the google_user_id. We may sometimes change the mapping from cookie to google_user_id." |
| 6 | Google ID Age | "The time in seconds since the google_user_id was created." |
| 7 | Match Data | "Match data stored for this google_user_id through the cookie matching service. If a match exists, then this field holds the decoded data that was passed in the google_hm parameter." |
| 8 | User-Agent | "A string that identifies the browser and type of device that sent the request." |
| 9 | FLoC | "The value of a cohort ID – a string identifier that is common to a large cohort of users with similar browsing habits. … Experimental feature: may be subject to change." |
| 10 | User Agent Info. | "This will be populated with information about the user agent, extracted from the User-Agent header." |
| 11 | Publisher location | The billing address country of the publisher. |
| 12 | End-user location | The user's approximate geographic location. |
| 13 | Zip code | Detected postal code of the user. |
| 14 | Hyper-local | A hyperlocal targeting location when available. |
| 15 | User verticals | "List of detected user verticals. Currently unused. This field is not populated by default. We recommend that bidders instead store and look up list ids using either google_user_id or hosted-match-data as keys." |
| 16 | User-list | The user list id. |
| **INFORMATION FOR "AD QUERIES COMING FROM MOBILE DEVICES"** | | |
| 41 | Mobile App | The identifier of the mobile app or mobile webpage. "If the app was downloaded from the Apple iTunes app store, then this is the app-store id, e.g. 343200656. For Android devices, this is the fully qualified package name, e.g. com.rovio.angrybirds. For Windows devices, it's the App ID, e.g. f15abcde-f6gh-47i0-j3k8-37193817mn3o. For SDK-less requests (mostly from connected TVs), the app ID provided by the publisher directly in the request." |
| 45 | Advertising IDs | This field is used for advertising identifiers for:<br>1) iOS devices (This is called Identifier for Advertising or IDFA, as described at https://support.google.com/authorizedbuyers/answer/3221407)<br>2) Android devices;<br>3) Roku devices;<br>4) Microsoft Xbox devices;<br>5) Amazon devices (i.e. Amazon Fire) |
| 46 | App Name | App names for Android by Google Play and for iOS by App Annie. |
| **VIDEO INFORMATION** | | |
| 50 | Placement | Where the ad is placed. |
| 51 | URL | The URL of the page that the publisher gives Google to describe the video content, with parameters removed. |
| 52 | Playback Method | How the video ad will be played. |
| 53 | Clickable | Describes whether the video ad is clickable. |
| 54 | Start-Delay | The time in milliseconds from the start of the video when the ad will |

| | | |
|---|---|---|
| | | be displayed. |
| 55 | Ad Duration | The minimum and maximum ad durations. |
| 56 | Skippable | Whether the publisher allows users to skip the ad. |
| 57 | Protocols | Supported video protocols. |
| 58 | File formats | Supported video file formats. |
| 59 | Companion Ads | Information about companion ad slots shown with the video. |
| 60 | Size | Height and width for the video ad. |
| 61 | Video title | The video title. |
| 62 | Video keywords | A list of keywords describing the video, extracted from the content management system of the video publisher. |

512. Many of the companies to which Google knowingly discloses Plaintiffs' and Class members' video purchases and viewing habits already maintain their own databases of identifiers for Plaintiffs and Class members. For example, Google and Facebook have reached a deal worth at least $500 million annually associated with Facebook's use of Google RTB. Google knows that Google Chrome, Android, and Google SDK provide enough personally identifying information to Facebook to allow it to identify the individual Account Holder. Other companies to which Google discloses Plaintiffs' and Class members' video purchases and viewing habits are able to identify the individual Account Holder because Google provides a cookie-match system that it knows enables them to match the disclosed Google IDs to their own proprietary IDs for Plaintiffs and Class members.

513. In addition, the identifiers Google discloses to the Google RTB participants are readily capable of being used by those companies to identify specific users even in the absence of a pre-existing database possessed by the recipient of Google's disclosures. For example, *The New York Times* investigation detailed above used the same type of data disclosed on Google RTB to identify specific people who participated in the assault on the United States Capitol on January 6, 2021.

514. Exceptions Do Not Apply. Certain types of disclosures are permitted under the VPPA. Establishing the existence of such circumstances is an affirmative defense. Regardless, none exists here.

515. Google did not receive sufficient informed, written consent from Plaintiffs and Subclass B members to permit disclosure. 18 U.S.C. § 2710(b)(2)(B).

516. Disclosure was not made to law enforcement pursuant to a warrant, grand jury

subpoena, or court order. 18 U.S.C. § 2710(b)(2)(C); *see* 18 U.S.C. § 2710(b)(2)(F) (permitting disclosure pursuant to a court order, in a civil proceeding, upon a showing of compelling need for the information that cannot be accommodated by other means, where the consumer is given reasonable notice of the court proceeding and afforded the opportunity to appear and contest the claim of the person seeking disclosure).

517. Disclosure was not solely of the names and addresses of Plaintiffs and Subclass B members where they were provided a clear and conspicuous opportunity to prohibit the disclosure and the disclosure did not disclose the title, description, or subject matter of any audio visual material. 18 U.S.C. § 2710(b)(2)(D).[87]

518. Disclosure was not incident to the ordinary course of business for Google Chrome, Android, or Google SDK. 18 U.S.C. § 2710(b)(2)(E).

519. For Google's VPPA violations, the Subclass who uses Google Chrome, the Android mobile operating system, or apps that incorporate the Google SDK seeks actual damages but no less than liquidated damages in an amount of $2,500; punitive damages; reasonable attorneys' fees and other litigation costs reasonably incurred; and such other preliminary and equitable relief as the court determines to be appropriate. 18 U.S.C. § 2710(c).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award compensatory damages, including statutory damages where available, to Plaintiffs and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Award Plaintiffs and the Class the measure of unjust enrichment enjoyed by Defendant as a result of its violations identified herein, in an amount to be proven at trial, including

[87] While the subject matter may be disclosed for the exclusive use of marketing goods and services directly to the consumer, such disclosure remains conditioned on the consumer's clear and conspicuous opportunity to prohibit such disclosure. *Id.* That opportunity was not made available to Plaintiffs and Class Members here.

interest thereon;

D. Award Plaintiffs and the Class punitive damages pursuant to Cal. Civ. Code § 3294(a), as Google acted with oppression, fraud, or malice;

E. Award Plaintiffs declaratory relief in the form of an order finding the following, along with all other forms of declaratory relief the Court finds appropriate:

a. Google breached the contractual rights of its users;

b. Google's actions violated the duty of good faith and fair dealing;

c. Google's actions violated California's Unfair Competition Law;

d. Google's actions violated Art. 1, § 1 of the California Constitution, Right to Privacy;

e. Google's actions constitute an intrusion upon seclusion;

f. Google's actions constitute publication of private information;

g. Google's actions violated the duty of confidence;

h. Google's actions violated California's Invasion of Privacy Act;

i. Google's actions violated the Electronic Communications Privacy Act;

j. Google's actions violated the Video Privacy Protection Act;

k. Plaintiffs have suffered privacy harm; and

l. Plaintiffs have suffered economic harm.

F. Permanently enjoin Google, its officers, agents, servants, employees, and attorneys, from sharing or selling any existing Google Account Holder's personal information without express authorization for the sale of such information;

G. Award Plaintiffs and the Class their reasonable attorneys' fees, costs and expenses incurred in this action, including expert fees; and

H. Grant Plaintiffs such further relief as the Court deems appropriate.

## VIII. JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 27, 2021

**PRITZKER LEVINE LLP**

By: */s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Jonathan K. Levine (SBN 220289)
Caroline C. Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
*ecp@pritzkerlevine.com*
*jkl@pritzkerlevine.com*
*bc@pritzkerlevine.com*
ccc@pritzkerlevine.com

***Interim Class Counsel***

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley Weaver*
Lesley Weaver (SBN 191305)
Matthew S. Melamed (SBN 260272)
Anne K. Davis (SBN 267909)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*mmelamed@bfalaw.com*
*adavis@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**

By: */s/ Jay Barnes*
Jason 'Jay' Barnes (*pro hac vice*)
An Truong (*pro hac vice*)
Eric Johnson (*pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DiCELLO LEVITT GUTZLER LLC**

By: */s/ David A. Straite*
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*;

Amy Keller (admitted *pro hac vice*)
Adam Levitt (admitted *pro hac vice*)
James Ulwick (admitted *pro hac vice)*
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*alevitt@dicellolevitt.com*
*julwick@dicellolevitt.com*

**BOTTINI & BOTTINI, INC.**

By: */s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)
Yury A. Kolesnikov (SBN 271173)
Nicholaus Woltering (SBN 337193)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
abeste@bottinilaw.com
*ykolesnikov@bottinilaw.com*
*nwoltering@bottinilaw.com*

**COTCHETT, PITRE & McCARTHY LLP**

By: */s/ Nanci E. Nishimura*
Nanci E. Nishimura (SBN 152621)
Brian Danitz (SBN 247403)
Karin B. Swope (admitted *pro hac vice*)
Noorjahan Rahman (SBN 330572)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577
*nnishimura@cpmlegal.com*
*bdanitz@cpmlegal.com*
*kswope@cpmlegal.com*

***Counsel for Plaintiffs and the Proposed Class***

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Elizabeth C. Pritzker, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of August, 2021, at Emeryville, California.

*/s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker

**PRITZKER LEVINE LLP**
ELIZABETH C. PRITZKER (SBN146267)
(ecp@pritzkerlevine.com)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110

*Interim Class Counsel*

*Additional counsel listed on signature page*

**COOLEY LLP**
MICHAEL G. RHODES (SBN 116127)
(rhodesmg@cooley.com)
JEFFREY M. GUTKIN (SBN 216083)
(jgutkin@cooley.com)
KELSEY R. SPECTOR (SBN 321488)
(kspector@cooley.com)
COLIN S. SCOTT (SBN 318555)
(cscott@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Tel: (415) 693-2000
Fax: (415) 693-2222

*Counsel for Defendant, Google LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re Google RTB Consumer Privacy Litigation<br><br>This Document Relates To: *all actions* | Master File No.: 5:21-CV-02155-LHK-VKD<br><br>**JOINT SUBMISSION RE: PRIORITY CLAIMS PER CASE MANAGEMENT ORDER DATED SEPTEMBER 2, 2021 (DKT. NO. 83)**<br><br>Judge: Hon. Lucy H. Koh<br>Courtroom: Courtroom 8 – 4th Floor |

In its Case Management Order dated September 2, 2021, the Court directed that the parties select eight claims from the twelve claims asserted in Plaintiffs' Consolidated Amended Complaint, filed August 27, 2021, to be litigated through trial, "with Plaintiffs selecting 4 claims and Google selecting 4 claims." Dkt. No. 83 at 1. The parties have completed the court-ordered selection process and identify the selected claims below:

- Breach of Contract (Count 1);
- Breach of the Covenant of Good Faith and Fair Dealing (Count 2);
- California Constitution Invasion of Privacy (Count 4);
- Intrusion Upon Seclusion (Count 5);
- Publication of Private Information (Count 6);
- Breach of Confidence (Count 7);
- Violation of the California Information Privacy Act (Count 8);
- Violation of the Electronic Communications Privacy Act/Wiretap Act (ECPA) – Unauthorized Disclosure of Electronic Communications by an Electronic Communications Service (Count 10).

Plaintiffs reserve all rights with respect to the four remaining claims in the Consolidated Amended Complaint, including the right to litigate those claims through trial.

Dated: September 15, 2021

**PRITZKER LEVINE LLP**

By: */s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Jonathan K. Levine (SBN 220289)
Caroline C. Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Tel.: (415) 692-0772
Fax: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

*Interim Class Counsel*

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley Weaver*
Lesley Weaver (SBN 191305)
Matthew S. Melamed (SBN 260272)
Anne K. Davis (SBN 267909)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
mmelamed@bfalaw.com
adavis@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

**SIMMONS HANLY CONROY LLC**

By: */s/ Jay Barnes*
Jason ‘Jay’ Barnes (admitted pro hac vice)
An Truong (admitted pro hac vice)
Eric Johnson (admitted pro hac vice)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com
ejohnson@simmonsfirm.com

Respectfully Submitted,

**COOLEY LLP**

By: */s/ Jeffrey M. Gutkin*
MICHAEL G. RHODES (SBN 116127)
(rhodesmg@cooley.com)
JEFFREY M. GUTKIN (SBN 216083)
(jgutkin@cooley.com)
KELSEY R. SPECTOR (SBN 321488)
(kspector@cooley.com)
COLIN S. SCOTT (SBN 318555)
(cscott@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Tel: (415) 693-2000
Fax: (415) 693-2222

*Counsel for Defendant GOOGLE LLC*

**DiCELLO LEVITT GUTZLER LLC**

By: */s/ David A. Straite*
David A. Straite (admitted pro hac vice)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
dstraite@dicellolevitt.com

Amy Keller (admitted pro hac vice)
Adam Levitt (admitted pro hac vice)
James Ulwick (admitted pro hac vice)
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com
alevitt@dicellolevitt.com
julwick@dicellolevitt.com

**BOTTINI & BOTTINI, INC.**

By: */s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)
Yury A. Kolesnikov (SBN 271173)
Nicholaus Woltering (SBN 337193)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
abeste@bottinilaw.com
ykolesnikov@bottinilaw.com
nwoltering@bottinilaw.com

**COTCHETT, PITRE & McCARTHY LLP**

By: */s/ Nanci E. Nishimura*
Nanci E. Nishimura (SBN 152621)
Brian Danitz (SBN 247403)
Karin B. Swope (admitted pro hac vice)
Noorjahan Rahman (SBN 330572)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577
nnishimura@cpmlegal.com
bdanitz@cpmlegal.com
kswope@cpmlegal.com

*Counsel for Plaintiffs and the Proposed Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Bethany Caracuzzo, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of September, 2021, at Emeryville, California.

*/s/ Bethany Caracuzzo*
Bethany Caracuzzo

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BENJAMIN HEWITT, et al.<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 21-CV-02155-LHK<br>**CASE MANAGEMENT ORDER** |

On September 1, 2021, the parties filed a joint case management statement. ECF No. 82 ("JCMS"). The Court continues the September 8, 2021 case management conference to November 10, 2021 at 2:00 p.m. The parties shall file a joint case management statement by November 3, 2021.

In their JCMS, Plaintiffs state that the consolidated class action complaint includes 12 causes of action. JCMS at 4. The parties must select 8 claims to be litigated through trial, with Plaintiffs selecting 4 claims and Google selecting 4 claims. The parties shall file their identification of their 8 selected claims by September 15, 2021.

In their JCMS, Plaintiffs state that "Google should be limited in any motion to dismiss to addressing facts and legal issues that were not previously decided in the related cases of *Calhoun* and *Brown*." JCMS at 5. The Court disagrees. Google may move to dismiss the instant case on any grounds it wishes.

In their JCMS, the parties state that they have met and conferred regarding documents Google has previously produced to the Texas Attorney General in response to Civil Investigative

United States District Court
Northern District of California

Demands. JCMS at 9. Google shall produce the Texas Attorney General documents within 30 days.

The Court sets the following case schedule.

| | |
|---|---|
| Filing of Motions for Appointment of Interim Lead Plaintiffs' Counsel | Motions: July 16, 2021<br>Oppositions, if any: July 23, 2021<br>Hearing: August 5, 2021 at 1:30 p.m. |
| Filing of Consolidated Class Action Complaint | August 27, 2021 |
| Deadline for Parties to File Identification of 8 Selected Claims | September 15, 2021 |
| Filing of Response, likely a Motion to Dismiss | Motion to Dismiss: October 1, 2021<br>Opposition: October 29, 2021<br>Reply: November 19, 2021<br>Hearing: December 9, 2021 at 1:30 p.m. |
| Further Case Management Conference | November 10, 2021 at 2:00 p.m. |
| Last Day to Amend Pleadings/Add Parties | February 25, 2022 |
| Substantial Document Production Completion | April 21, 2022 |
| Class Certification Motion | Motion: June 23, 2022<br>Opposition: August 4, 2022<br>Reply: September 2, 2022<br>Hearing: September 15, 2022 at 1:30 p.m. |
| Fact Discovery Cut-Off | December 15, 2022 |
| Opening Expert Reports | January 12, 2023 |
| Rebuttal Expert Reports | February 9, 2023 |
| Close of Expert Discovery | March 2, 2023 |
| Dispositive/Daubert Motions<br>1 dispositive motion per side in the entire case<br>3 Daubert motions per side in the entire case | Motions: March 23, 2023<br>Oppositions: April 20, 2023<br>Replies: May 11, 2023<br>Hearing: May 25, 2023 at 1:30 p.m. |
| Pretrial Conference | July 27, 2023 at 1:30 p.m. |
| Jury Trial | August 21, 2023 at 9:00 a.m. |

**IT IS SO ORDERED.**

Dated: September 2, 2021

Lucy H. Koh

LUCY H. KOH
United States District Judge